# EXHIBIT 4

Exhibit 4
Page 86

S-4 1 d144950ds4.htm S-4

Table of Contents

As filed with the United States Securities and Exchange Commission on April 2, 2021

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM S-4
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

| Cayman Islands | 3674 | Not Applicable |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification Number) |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom, WA14 2DT**
**Tel: +44 (0) 1865 292017**
**(Address, including Zip Code, and Telephone Number, including Area Code, of Principal Executive Offices)**

*Copies to:*

| James J. Masetti | Carl Marcellino |
|---|---|
| Davina K. Kaile | Elizabeth Todd |
| Pillsbury Winthrop Shaw Pittman LLP | Ropes & Gray LLP |
| 2550 Hanover St | 1211 Avenue of the Americas |
| Palo Alto, California 94304 | New York, New York 10036 |
| (650) 233-4500 | (617) 951-7000 |

**Approximate date of commencement of proposed sale of the securities to the public: As soon as practicable after this Registration Statement becomes effective and all other conditions to the business combination described in the enclosed prospectus/proxy statement have been satisfied or waived.**

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box:  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act.  ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer)  ☐

Exhibit 4
Page 87

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer)  ☐

Exhibit 4
Page 88

**Table of Contents**

**CALCULATION OF REGISTRATION FEE**

| Title of each class of securities to be registered | Amount to be registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee(13) |
|---|---|---|---|---|
| Ordinary Shares(2) | 22,812,500 | $10.10(8) | $230,406,250.00 | $25,137.33 |
| Ordinary Shares(3)(7) | 42,232,715 | $4.77(9) | $201,576,000.00 | $21,991.94 |
| Ordinary Shares issuable upon the exercise of options(4)(7) | 7,207,044 | $4.94(10) | $35,602,797.36 | $3,884.27 |
| Warrants(5)(7) | 14,075,000 | — | —(12) | — |
| Ordinary Shares issuable upon the exercise of Warrants(6)(7) | 14,075,000 | $11.50(11) | $161,862,500.00 | $17,659.20 |
| Aggregate Fee | | | | $68,672.74(14) |

(1) All securities being registered will be issued by Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("HoldCo"). In connection with the Business Combination described in this registration statement and the enclosed prospectus/proxy statement (the "Business Combination"), among others, (a) the holders of ordinary shares with a nominal value of £0.00001 per share (the "Rockley ordinary shares") in the capital of Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 ("Rockley"), will exchange their Rockley ordinary shares for ordinary shares, par value $0.00001 per share, of HoldCo (the "HoldCo ordinary shares"), by means of a scheme of arrangement under Part 26 of the UK Companies Act 2006, as amended, and Rockley will become a direct wholly owned subsidiary of HoldCo, (b) the holders of options exercisable for Rockley ordinary shares (the "Rockley options") will be invited to rollover their Rockley options for options exercisable for HoldCo ordinary shares ("HoldCo options"), and (c) Rockley Mergersub Limited, a newly formed subsidiary of HoldCo ("Merger Sub"), will be merged (the "Merger") with and into SC Health Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("SC Health"), and all of the outstanding Class A ordinary shares, par value $0.0001 per share, of SC Health ("SC Health Class A ordinary shares") and Class B ordinary shares, par value $0.00008 per share, of SC Health (the SC Health Class B ordinary shares" and, together with the SC Health Class A ordinary shares, the "SC Health ordinary shares") will be exchanged for HoldCo ordinary shares, and all of the outstanding warrants to purchase SC Health Class A ordinary shares with a per share exercise price of $11.50 per share (the "SC Health warrants") will be converted into the right to receive warrants to purchase HoldCo ordinary shares with a per share exercise price of $11.50 per share ("HoldCo warrants").

(2) Consists of 22,812,500 HoldCo ordinary shares issuable in exchange for SC Health ordinary shares outstanding immediately prior to the closing of the Business Combination.

(3) Consists of 42,232,715 HoldCo ordinary shares issuable in exchange for Rockley ordinary shares outstanding immediately prior to the closing of the Business Combination, estimated on the basis of 33,664,977 Rockley ordinary shares outstanding, 7,581,910 Rockley ordinary shares issuable upon the conversion of Rockley's outstanding convertible loan notes prior to the closing of the Business Combination and 985,828 Rockley ordinary shares issuable upon the exercise of Rockley's outstanding warrants prior to the closing of the Business Combination, in each case, estimated on the basis of securities outstanding as of the date hereof and assuming the consummation of the Business Combination.

(4) Consists of 7,207,044 HoldCo ordinary shares issuable upon the exercise of HoldCo options to be issued in exchange for outstanding Rockley options in connection with the closing of the Business Combination.

(5) Consists of 14,075,000 HoldCo warrants issuable in exchange for SC Health warrants outstanding immediately prior to the closing of the Business Combination.

(6) Consists of 14,075,000 HoldCo ordinary shares issuable upon exercise of HoldCo warrants. Each HoldCo warrant will entitle the warrant holder to purchase one HoldCo ordinary share at a price of $11.50 per share (subject to adjustment).

(7) Pursuant to Rule 416(a) under the Securities Act of 1933, as amended (the "Securities Act"), there are also being registered an indeterminable number of additional securities as may be issued resulting from stock splits, stock dividends or similar transactions.

(8) Pursuant to Rules 457(c) and 457(f)(1) under the Securities Act, and solely for the purpose of calculating the registration fee, the proposed aggregate maximum offering price is the product of (i) $10.10, the average of the high and low prices of the SC Health Class A ordinary shares as reported on the New York Stock Exchange on March 30, 2021 multiplied by (ii) 22,812,500, the estimated number of SC Health ordinary shares that will be outstanding immediately prior to the closing of the Business Combination (including the SC Health ordinary shares included in the SC Health units).

(9) Pursuant to Rule 457(f)(2) under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is equal to the aggregate book value of Rockley ordinary shares as of December 31, 2020.

(10) Pursuant to Rule 457(h)(1) under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is equal to the weighted-average exercise price of the HoldCo ordinary shares issuable upon exercise of such options.

(11) Pursuant to Rule 457(g)(1) under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price of the HoldCo ordinary shares underlying the HoldCo warrants is calculated based on an exercise price of $11.50 per share.

(12) No separate registration fee required pursuant to Rule 457(g) under the Securities Act.

(13) Calculated by multiplying the proposed maximum aggregate offering price of securities to be registered by 0.0001091.

(14) Paid herewith.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Exhibit 4
Page 89

**Table of Contents**

**The information in this prospectus/proxy statement is not complete and may be changed. These securities may not be issued until the registration statement filed with the U.S. Securities and Exchange Commission is effective. This prospectus/proxy statement is not an offer to sell these securities and does not constitute the solicitation of an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY—SUBJECT TO COMPLETION, DATED APRIL 2, 2021**

**LETTER TO SHAREHOLDERS OF SC HEALTH CORPORATION**

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Republic of Singapore

Dear SC Health Corporation Shareholder:

You are cordially invited to attend an extraordinary general meeting of SC Health Corporation, a Cayman Islands exempted limited company ("SC Health"), which will be held on            , 2021 at         , local Singapore time, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900 (the "General Meeting").

On March 19, 2021, SC Health, Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company" or "Rockley"), Rockley Photonics Holdings Limited, a Cayman Islands exempted company ("HoldCo"), and Rockley Mergersub Limited, a Cayman Islands exempted company and a direct wholly owned subsidiary of HoldCo (*"Merger Sub"*), entered into a Business Combination Agreement and Plan of Merger (as it may be amended from time to time, the "Business Combination Agreement"), pursuant to which several transactions will occur (together, the "Business Combination"), and in connection therewith, HoldCo will become the ultimate parent company of the Company and Merger Sub will enter into a merger with SC Health, in which SC Health will be the surviving entity and Merger Sub, as the merging entity will cease to exist (the "Merger").

At the General Meeting, SC Health shareholders will be asked to consider and vote upon a proposal, as (i) an ordinary resolution (the "BCA Proposal" or "Proposal No. 1"), to approve the entry into the Business Combination Agreement, a copy of which is attached to the accompanying prospectus/proxy statement as <u>Annex A</u>, and the consummation of the transactions contemplated thereby, including the Business Combination, (ii) a special resolution to approve a plan of merger between SC Health and Merger Sub in the form tabled at the General Meeting, which will be in the form set forth in the Business Combination Agreement (the "Plan of Merger") and the consummation of the Merger and the remaining transactions contemplated thereby (the "Merger Proposal" or "Proposal No. 2"), (iii) an ordinary resolution (the "Incentive Plan Proposal" or "Proposal No. 3"), to approve, assuming the BCA Proposal and the Merger Proposal are approved and adopted, the Rockley Photonics Holding Limited 2021 Stock Incentive Plan (the "2021 Plan") a copy of which is attached to the accompanying prospectus/proxy statement as <u>Annex H</u>, including the authorization of the share reserve under the 2021 Plan, (iv) an ordinary resolution (the "ESPP Proposal" or "Proposal No. 4"), to approve, assuming the BCA and Merger Proposal are approved and adopted, the Rockley Photonics Holdings Limited 2021 Employee Share Purchase Plan (the "ESPP") a copy of which is attached to the accompanying prospectus/proxy statement as <u>Annex I</u>, including the authorization of the share reserve under the ESPP, and (v) an ordinary resolution (the "Adjournment Proposal" or "Proposal No. 5"), to adjourn the General Meeting to a later date or dates (A) in order to solicit additional proxies from SC Health shareholders in favor of the BCA or the Merger Proposal, (B) if as of the time for which the General Meeting is scheduled, there are insufficient SC Health ordinary shares represented (either in person or by proxy) to constitute a quorum necessary to conduct business at the General Meeting or (C) to allow reasonable time for the filing or mailing of any supplemental or amended disclosures that SC Health has determined, based on the advice of outside legal counsel, is reasonably likely to be required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to the General Meeting.

Exhibit 4
Page 90

Table of Contents

As further described in the accompanying prospectus/proxy statement, subject to the terms and conditions of the Business Combination Agreement, among other things:

- the Company will propose a scheme of arrangement under Part 26 of the UK Companies Act 2006, as amended (the "UK Companies Act"), as either a transfer scheme or a cancellation scheme pursuant to which the shareholders of the Company will transfer all their ordinary shares, nominal value of £0.00001 per share, of the Company (the "Company ordinary shares") to HoldCo or cancel all of their Company ordinary shares with new Company ordinary shares being issued to HoldCo, in either case in exchange for the same number of ordinary shares of HoldCo, with a par value of $0.00001 per share (the "HoldCo ordinary shares" and the "Equity Scheme");

- the holders of options (the "Company options") to purchase Company ordinary shares granted under the Rockley Photonics Limited 2013 Equity Incentive Plan as amended from time to time (the "2013 Plan") will be invited to rollover their Company options into replacement options for HoldCo ordinary shares;

- pursuant to a proposed scheme of arrangement under Part 26 of the UK Companies Act (i) if the Equity Scheme is structured as a cancellation scheme, the Company proposes to novate its obligations under the Scheme Convertible Notes (as defined in the Business Combination Agreement) to HoldCo and the Scheme Creditors (as defined in the Business Combination Agreement) will accept the performance by HoldCo of the Scheme Convertible Notes in place of performance by the Company and discharge the Company from further obligations under the Company Convertible Notes; the consideration for the novation shall be the issuance of an inter-company loan by the Company to HoldCo in an amount equal to the market value of the Scheme Convertible Notes; and (ii) if the Equity Scheme is structured as a transfer scheme, HoldCo proposes to acquire the Scheme Convertible Notes from each Scheme Creditor in consideration for HoldCo entering into a new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company (the "Creditor Scheme" and together with the Equity Scheme, the "Schemes");

- the holders of warrants (including conditional warrants) of the Company to purchase Company ordinary shares (the "Company warrants") (except for certain Company warrants which will be replicated at HoldCo in accordance with their terms) will be notified that their warrants will lapse unless exercised before the Equity Scheme becomes effective;

- as a result of the proposed Initial Exchange, the Company will become a direct wholly owned subsidiary of HoldCo and following completion of the Schemes (the "Initial Exchange") and prior to the closing of the Business Combination, HoldCo will complete a stock split of the HoldCo ordinary shares at the Exchange Ratio (as defined in the Business Combination Agreement) (the "Stock Split" and, together with the Initial Exchange, the "Exchange"); and

- following the consummation of the Exchange, upon the terms and subject to the conditions of the Business Combination Agreement and in accordance with the Companies Act (as amended) of the Cayman Islands (the "Cayman Islands Companies Act"), Merger Sub will merge with and into SC Health, with SC Health surviving such merger as a direct wholly owned subsidiary of HoldCo (the "Merger") and, in the context of such Merger, all SC Health ordinary shares (as defined below) (other than any SC Health Class A ordinary shares (as defined below) held in treasury by SC Health (the "Excluded Shares")) outstanding immediately prior to the Merger Effective Time (as defined in the Business Combination Agreement) shall be exchanged with HoldCo for the right to receive the Merger Consideration (as defined in the Business Combination Agreement) in the form of HoldCo ordinary shares pursuant to a share capital increase of HoldCo, as set forth in the Business Combination Agreement and the Plan of Merger in accordance with the Cayman Islands Act, and all SC Health warrants outstanding immediately prior to the Merger Effective Time shall be converted, at the Merger Effective Time, into a warrant at the HoldCo level on substantially the same terms as were in effect immediately prior to the Merger Effective Time, as set forth in the Business Combination Agreement.

In connection with the foregoing and concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into (i) subscription agreements (the "Investor Subscription

Exhibit 4
Page 91

Table of Contents

Agreements") with certain investors including, among others, SC Health Group Limited (an affiliate of the Sponsor (as defined below)) (the "Institutional PIPE Investors"), pursuant to which the Institutional PIPE Investors agreed to subscribe for and purchase, and HoldCo agreed to issue and sell to such Institutional PIPE Investors, an aggregate of 14,790,000 HoldCo ordinary shares at $10.00 per share for expected gross proceeds of $147,900,000 (as applicable, the "Investor PIPE Financing") on the date of the Merger prior to the effectiveness thereof and (ii) subscription agreements (the "Individual Subscription Agreements" and, together with the Investor Subscription Agreements, the "Subscription Agreements") with three individuals (the "Individual PIPE Investors" and, together with the Institutional PIPE Investors, the "PIPE Investors"), pursuant to which the Individual PIPE Investors agreed to subscribe for and purchase, and HoldCo agreed to issue and sell to such Individual PIPE Investors, an aggregate of 210,000 HoldCo ordinary shares at $10.00 per share for expected gross proceeds of $2,100,000 (the "Individual PIPE Financing" and together with the Investor PIPE Financing, the "PIPE Financing") on the Closing Date prior to the Merger Effective Time. The HoldCo ordinary shares to be issued pursuant to the Subscription Agreements have not been registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. HoldCo will grant the PIPE Investors certain registration rights in connection with the PIPE Financing. The PIPE Financing is contingent upon, among other things, the closing of the Business Combination, and all SC Health warrants outstanding immediately prior to the Merger Effective Time shall be converted, at the Merger Effective time into a warrant at the HoldCo level on substantially the same terms as were in effect immediately prior to the Merger Effective Time, as set forth in the Business Combination Agreement.

Additionally, in connection with their entry into the Business Combination Agreement, SC Health, the Company, Merger Sub, and HoldCo entered into a letter agreement (the "Investor Support Agreement") with SC Health Holdings Limited (the "Sponsor") pursuant to which the Sponsor has agreed to vote in favor of the BCA Proposal, the Merger Proposal and any other proposal relating to the transaction on the terms and subject to the conditions set forth in the Investor Support Agreement. In addition, the Sponsor agreed to waive its redemption rights with respect to all of the Founder Shares (as defined below) in connection with the closing of the Business Combination.

SC Health also entered into a support agreement with the Company, HoldCo, Merger Sub, and certain shareholders of the Company (the "Company Shareholders"), a copy of which is attached to the accompanying prospectus/proxy statement as Annex C (the "Company Holders Support Agreement"). Pursuant to the Company Holders Support Agreement, such Company Shareholders agreed to, among other things, vote in favor of the transactions contemplated by the Business Combination Agreement, vote against certain transactions that would be reasonably expected to impede or nullify the transactions contemplated by the Business Combination Agreement, be bound by certain transfer restrictions with respect to ordinary shares of the Company, and do all things reasonably necessary, proper or advisable to consummate the transaction contemplated by the Business Combination Agreement, in each case, subject to the terms and conditions of the Company Holders Support Agreement.

SC Health also entered into a support agreement with the Company, HoldCo, Merger Sub, and Dr. Andrew Rickman, OBE, a copy of which is attached to the accompanying prospectus/proxy statement as Annex D (the "AR Support Agreement"). Pursuant to the AR Support Agreement, Dr. Andrew Rickman, OBE agreed to, among other things, vote in favor of the transactions contemplated by the Business Combination Agreement, vote against certain transactions that would be reasonably expected to impede or nullify the transactions contemplated by the Business Combination Agreement, be bound by certain transfer restrictions with respect to ordinary shares of the Company, do all things reasonably necessary, proper or advisable to consummate the transaction contemplated by the Business Combination Agreement, and vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at a general meeting (or by written consent) of the shareholders of HoldCo, and take all other necessary and desirable actions reasonably requested by HoldCo in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement, in each case, subject to the terms and conditions of the AR Support Agreement.

In addition to the BCA Proposal and the Merger Proposal, SC Health shareholders are being asked to consider and vote on a proposal, as an ordinary resolution, to adjourn the General Meeting to a later date or dates

Exhibit 4
Page 92

Table of Contents

(A) in order to solicit additional proxies from SC Health shareholders in favor of the BCA Proposal or the Merger Proposal, (B) if as of the time for which the General Meeting is scheduled, there are insufficient SC Health ordinary shares represented (either in person or by proxy) to constitute a quorum necessary to conduct business at the General Meeting, or (C) to allow reasonable time for the filing or mailing of any supplemental or amended disclosures that SC Health has determined, based on the advice of outside legal counsel, is reasonably likely to be required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to the General Meeting (the "Adjournment Proposal"). The Adjournment Proposal will only be presented to SC Health shareholders in the event that there are insufficient votes for, or otherwise in connection with, the approval of the BCA Proposal or the Merger Proposal. Each of these proposals is more fully described in the accompanying prospectus/proxy statement, which each shareholder is encouraged to read carefully.

Immediately prior to the Merger Effective Time, (1) each of the then issued and outstanding 5,562,000 Class B ordinary shares, par value $0.0001 per share, of SC Health (the "SC Health Class B ordinary shares") will automatically be exchanged, on a one-for-one basis, for a SC Health Class A ordinary share (as defined below), (2) immediately following the conversion described in clause (1) at the Merger Effective Time, each of the then issued and outstanding SC Health Class A ordinary shares, par value $0.0001 per share, of SC Health (the "SC Health Class A ordinary shares" and together with the SC Health Class B ordinary shares, the "SC Health ordinary shares"), will automatically be exchanged, on a one-for-one basis, into an ordinary share, with a par value of $0.00001, of HoldCo (the "HoldCo ordinary shares"), (3) each of the then issued and outstanding 8,625,000 redeemable public warrants of SC Health (the "SC Health public warrants" or the "public warrants") will cease to represent a right to acquire the number of SC Health Class A ordinary shares set forth in such SC Health warrant but will instead convert automatically into one redeemable warrant to purchase one HoldCo ordinary share (the "HoldCo warrants") pursuant to the Warrant Agreement, dated July 11, 2019 (the "Warrant Agreement"), between SC Health, Sponsor and American Stock Transfer & Trust Company ("AST" or the "Transfer Agent"), as warrant agent, and (4) each of the then issued and outstanding units of SC Health that have not been previously separated into the underlying SC Health Class A ordinary shares and underlying SC Health warrants upon the request of the holder thereof (the "SC Health units"), will be cancelled and will entitle the holder thereof to one HoldCo ordinary share and one-half of one HoldCo warrant, and (5) each of the then issued and outstanding 5,450,000 private placement warrants of SC Health (the "SC Health private placement warrants" or the "private placement warrants") will convert automatically into one HoldCo warrant pursuant to the Warrant Agreement. No fractional HoldCo warrants will be issued upon separation of the SC Health units. As used herein, "public shares" shall mean the SC Health Class A ordinary shares (including those that underlie any unit consisting of one SC Health Class A ordinary Share and one-half of one SC Health warrant (the "SC Health units")) that were registered pursuant to the Registration Statement on Form S-1 (File No. 333-232240) in connection with SC Health's initial public offering and the HoldCo ordinary shares issued as a matter of law upon the exchange thereof described above and occurring at the Merger Effective Time.

The SC Health Class A ordinary shares, SC Health units and SC Health warrants are currently listed on the New York Stock Exchange (the "NYSE") under the symbols "SCPE," "SCPE.U" and "SCPE.WS." Upon the closing of the Business Combination, the SC Health securities will be delisted from the NYSE. HoldCo intends to apply to list the HoldCo ordinary shares and HoldCo warrants on the NYSE under the symbols "RKLY" and "RKLY.W," respectively, upon the closing of the Business Combination. We cannot assure you that the HoldCo ordinary shares or HoldCo warrants will be approved for listing on the NYSE.

**See "Risk Factors" beginning on page 48 of the accompanying prospectus/proxy statement for a discussion of information that should be considered in connection with an investment in HoldCo's securities.**

With respect to SC Health and the holders of the SC Health ordinary shares, the accompanying prospectus/proxy statement serves as a:

- proxy statement for the General Meeting of SC Health shareholders being held on                , 2021, where SC Health shareholders will vote on, among other things, proposals to adopt and approve each

Exhibit 4
Page 93

Table of Contents

of the Business Combination Agreement and the Plan of Merger, and the transactions contemplated thereby; and

•    prospectus for the HoldCo ordinary shares and HoldCo warrants that SC Health shareholders and public warrant holders will receive in the Business Combination.

Pursuant to the SC Health amended and restated memorandum and articles of association, SC Health is providing its public shareholders with the opportunity to redeem, upon the closing of the Business Combination, SC Health Class A ordinary shares then held by them for cash equal to the aggregate amount then on deposit in the trust account calculated as of two business days prior to the closing of the Business Combination, including interest earned on the funds held in the trust account and not previously released to SC Health to pay income taxes, if any, divided by the number of then-outstanding public shares. Redemptions referred to herein shall take effect as repurchases under the SC Health amended and restated memorandum and articles of association. The per-share amount SC Health will pay to investors who validly redeem their SC Health Class A ordinary shares will not be reduced by the aggregate deferred underwriting commission of $6.0 million that SC Health will pay to the underwriters of the SC Health initial public offering or transaction expenses incurred in connection with the Business Combination. For illustrative purposes, based on the fair value of marketable securities held in the trust account of approximately $174,545,229 as of March 30, 2021, the estimated per SC Health Class A ordinary share redemption price would have been approximately $10.12. The redemption rights include the requirement that a holder must identify itself in writing as a beneficial holder and provide its legal name, phone number and address to the Transfer Agent in order to validly redeem its shares.

**Public shareholders may elect to redeem their shares even if they vote for the BCA Proposal**. A public shareholder, together with any of his, her or its affiliates or any other person with whom he, she or it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 20% of the outstanding SC Health Class A ordinary shares (*i.e.*, in excess of 3,450,000 SC Health Class A ordinary shares). Each redemption of SC Health Class A ordinary shares by SC Health's public shareholders will reduce the amount in the trust account.

The conditions to closing in the Business Combination Agreement are for the sole benefit of the parties thereto and may be waived by such parties. In addition, in no event will SC Health redeem SC Health Class A ordinary shares in an amount that would cause its net tangible assets to be less than $5,000,001, as provided in the SC Health amended and restated memorandum and articles of association and as required as a closing condition to each party's obligation to consummate the Business Combination under the terms of the Business Combination Agreement. Holders of outstanding SC Health public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying prospectus/proxy statement assumes that none of SC Health's public shareholders exercise their redemption rights with respect to their SC Health Class A ordinary shares. For more information about the factors that affect the assumptions above, please see the section entitled "*The Business Combination — Ownership of HoldCo.*"

Sponsor and certain SC Health shareholders (collectively, the "SC Health Initial Shareholders"), as well as SC Health's officers and other current directors, have agreed to waive their redemption rights with respect to any SC Health ordinary shares they may hold in connection with the closing of the Business Combination. The founder shares that were issued to the SC Health Initial Shareholders (the "Founder Shares") will be excluded from the pro rata calculation used to determine the per share redemption price of each SC Health Class A ordinary share that is to be redeemed. Currently, the SC Health Initial Shareholders own 24.1% of the issued and outstanding SC Health ordinary shares, including all of the Founder Shares. The Sponsor has agreed to vote any SC Health ordinary shares owned by them in favor of the Business Combination and the transactions contemplated in connection therewith. The Founder Shares are subject to transfer restrictions. The SC Health amended and restated memorandum and articles of association includes a conversion adjustment which provides that the Founder Shares will automatically convert at the time of the Business Combination into a number of SC Health Class A ordinary shares on the first business day following the closing of the Business Combination, at a conversion rate that entitles the holders of such Founder Shares to continue to own, in the aggregate, 20% of the

Exhibit 4
Page 94

**Table of Contents**

issued and outstanding SC Health ordinary shares. However, the SC Health Initial Shareholders have agreed to waive such conversion adjustment pursuant to the Investor Support Agreement. As a result, each remaining Founder Share will be exchanged for one HoldCo ordinary share at Closing, such that the SC Health Initial Shareholders will represent approximately     % of the total number of HoldCo ordinary shares outstanding after giving effect to the closing.

SC Health is providing the accompanying prospectus/proxy statement and accompanying proxy card to its shareholders in connection with the solicitation of proxies to be voted at the General Meeting and at any adjournments or postponements of the General Meeting. Information about the General Meeting, the Business Combination, the Merger and other related business to be considered by the SC Health shareholders at the General Meeting is included in the accompanying registration statement/prospectus/proxy statement. **Whether or not you plan to attend the General Meeting, all SC Health shareholders are urged to carefully read the accompanying registration statement/prospectus/proxy statement, including the Annexes and the accompanying financial statements of SC Health and Rockley carefully and in their entirety. In particular, you are urged to read carefully the section entitled "Risk Factors" beginning on page 49 of the accompanying prospectus/proxy statement.**

**After careful consideration, the SC Health board of directors has approved the Business Combination Agreement, the Business Combination and the Plan of Merger, and recommends that SC Health shareholders vote "FOR" the BCA Proposal, "FOR" the Merger Proposal, and "FOR" all other proposals presented to SC Health shareholders in the accompanying registration statement/prospectus/proxy statement. When you consider the SC board of directors' recommendation of these proposals, you should keep in mind that certain SC Health directors and officers have interests in the Business Combination that may conflict with your interests as a shareholder. Please see the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" in the accompanying prospectus/proxy statement for additional information.**

Approval of the Merger Proposal requires the affirmative vote of holders of at least two-thirds of the SC Health ordinary shares that are entitled to vote and are voted at the General Meeting. Approval of the BCA Proposal and the Adjournment Proposal requires the affirmative vote of holders of a simple majority of the SC Health ordinary shares that are entitled to vote and are voted at the General Meeting.

**Your vote is very important. Whether or not you plan to attend the General Meeting, please vote as soon as possible by following the instructions in the accompanying prospectus/proxy statement to ensure that your shares are represented at the General Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the General Meeting. The transactions contemplated by the Business Combination Agreement, including the Merger, will be consummated only if both the BCA Proposal and the Merger Proposal are approved at the General Meeting. The closing of the Business Combination is conditioned upon the approval of the BCA Proposal and the Merger Proposal. The Adjournment Proposal is not conditioned on the approval of any other proposal set forth in the accompanying prospectus/proxy statement.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted **"FOR"** each of the proposals presented at the General Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the General Meeting in person, the effect will be, among other things, that your shares will not be counted for purposes of determining whether a quorum is present. If you are a shareholder of record and you attend the General Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND IN WRITING THAT SC HEALTH REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO THE TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE INITIALLY SCHEDULED VOTE AT THE GENERAL MEETING. THE

Exhibit 4
Page 95

**Table of Contents**

REDEMPTION RIGHTS INCLUDE THE REQUIREMENT THAT A HOLDER MUST IDENTIFY HIMSELF, HERSELF OR ITSELF IN WRITING AS A BENEFICIAL HOLDER AND PROVIDE HIS, HER OR ITS LEGAL NAME, PHONE NUMBER AND ADDRESS TO THE TRANSFER AGENT IN ORDER TO VALIDLY REDEEM HIS, HER OR ITS SHARES. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of SC Health's board of directors, I would like to thank you for your support of SC Health and look forward to the successful completion of the Business Combination.

Sincerely,

Angelo John Coloma
Chief Executive Officer and Director

, 2021

Exhibit 4
Page 96

Table of Contents

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THE ACCOMPANYING PROSPECTUS/PROXY STATEMENT, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THE ACCOMPANYING PROSPECTUS/PROXY STATEMENT. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.**

The accompanying prospectus/proxy statement is dated                    , 2021, and is expected to be first mailed or otherwise delivered to SC Health shareholders on or about              , 2021.

Exhibit 4
Page 97

**Table of Contents**

**NOTICE OF EXTRAORDINARY GENERAL MEETING**
**OF SC HEALTH CORPORATION**
**TO BE HELD              , 2021**

To the Shareholders of SC Health Corporation:

NOTICE IS HEREBY GIVEN that an extraordinary general meeting of SC Health Corporation, a Cayman Islands exempted company ("SC Health"), will be held on             , 2021 at           , local Singapore time, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900 (the "General Meeting"). You are cordially invited to attend the General Meeting to conduct the following items of business and/or consider, and if thought fit, approve the following resolutions:

1.  *BCA Proposal* — RESOLVED, as an ordinary resolution (the "BCA Proposal" or "Proposal No. 1") that the entry into the Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (as it may be amended from time to time, the "Business Combination Agreement," a copy of which is attached to the accompanying prospectus/proxy statement as Annex A), by and among SC Health, Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company" or "Rockley"), Rockley Photonics Holdings Limited, a Cayman Islands exempted company ("HoldCo"), and Rockley Mergersub Limited, a Cayman Islands exempted company and a direct wholly owned subsidiary of HoldCo ("Merger Sub"), pursuant to which several transactions will occur, and in connection therewith, HoldCo will become the ultimate parent company of each of Rockley and SC Health will merge with Merger Sub, with SC Health being the surviving entity in such merger (the "Business Combination"), and the consummation of the transactions contemplated thereby be confirmed, ratified and approved in all respects;

2.  *Merger Proposal* — RESOLVED, as a special resolution (the "Merger Proposal" or "Proposal No. 2") that the plan of merger in the form tabled to the General Meeting (a draft of which is attached as Exhibit D to the Business Combination Agreement, the "Plan of Merger") pursuant to which Merger Sub will merge with and into SC Health so that SC Health will be the surviving company (the "Surviving Company") and all the undertaking, property, rights and liabilities of Merger Sub vest in SC Health by virtue of such merger pursuant to the Companies Act (as amended) of the Cayman Islands (the "Cayman Islands Companies Act") (the "Merger"), and the consummation of the Merger and the remaining transactions contemplated thereby, be authorized, approved and confirmed in all respects; and SC Health be authorized to enter into the Plan of Merger;

3.  *Incentive Plan Proposal* — RESOLVED, as an ordinary resolution (the "Incentive Plan Proposal" or "Proposal No. 3") to consider and vote upon a proposal to approve, assuming the BCA Proposal and the Merger Proposal are approved and adopted, the Rockley Photonics Holding Limited 2021 Stock Incentive Plan (the "2021 Plan"), a copy of which is attached to the accompanying prospectus/proxy statement as Annex H, including the authorization of the share reserve under the 2021 Plan.

4.  *Employee Share Purchase Plan Proposal* — RESOLVED, as an ordinary resolution (the "ESPP Proposal" or "Proposal No. 4") to consider and vote upon a proposal to approve, assuming the BCA Proposal and Merger Proposal are approved and adopted, the Rockley Photonics Holdings Limited 2021 Employee Share Purchase Plan (the "ESPP"), a copy of which is attached to the accompanying prospectus/proxy statement as Annex I, including the authorization of the share reserve under the ESPP.

5.  *Adjournment Proposal* — RESOLVED, as an ordinary resolution (the "Adjournment Proposal" or "Proposal No.5"), to adjourn the General Meeting to a later date or dates (A) in order to solicit additional proxies from SC Health shareholders in favor of the BCA Proposal or the Merger Proposal, (B) if as of the time for which the General Meeting is scheduled, there are insufficient SC Health ordinary shares represented (either in person or by proxy) to constitute a quorum necessary to conduct business at the General Meeting or (C) to allow reasonable time for the filing or mailing of any supplemental or amended disclosures that SC Health has determined, based on the advice of outside legal counsel, is reasonably likely

Exhibit 4
Page 98

Table of Contents

to be required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to the General Meeting.

The record date for the General Meeting for SC Health shareholders that hold their shares in "street name" is          , 2021. For SC Health shareholders holding their shares in "street name," only shareholders at the close of business on that date may vote at the General Meeting or any adjournment thereof. For the avoidance of doubt, the record date does not apply to SC Health shareholders that hold their shares in registered form and are registered as shareholders in SC Health's register of members. SC Health shareholders that hold their shares in registered form are entitled to one vote on each proposal presented at the General Meeting for each SC Health ordinary share held on the date of the General Meeting.

As further described in the accompanying prospectus/proxy statement, subject to the terms and conditions of the Business Combination Agreement, among other things:

- the Company will propose a scheme of arrangement under Part 26 of the UK Companies Act 2006, as amended (the "UK Companies Act"), as either a cancellation scheme or a transfer scheme pursuant to which the shareholders of the Company will transfer all their ordinary shares, nominal value of £0.00001 per share, of the Company (the "Company ordinary shares") to HoldCo or cancel all of their Company ordinary shares with new Company ordinary shares being issued to HoldCo, in either case in exchange for the same number of ordinary shares of HoldCo, with a par value of $0.00001 per share (the "HoldCo ordinary shares") (the "Equity Scheme");

- the holders of options (the "Company options") to purchase Company ordinary shares granted under the Rockley Photonics Limited 2013 Equity Incentive Plan as amended from time to time will be invited to rollover their Company options into replacement options for HoldCo ordinary shares;

- pursuant to a proposed scheme of arrangement under Part 26 of the UK Companies Act (i) if the Equity Scheme is structured as a cancellation scheme, the Company proposes to novate its obligations under the Scheme Convertible Notes (as defined in the Business Combination Agreement) to HoldCo and the Scheme Creditors (as defined in the Business Combination Agreement) will accept the performance by HoldCo of the Scheme Convertible Notes in place of performance by the Company and discharge the Company from further obligations under the Company Convertible Notes; the consideration for the novation shall be the issuance of an inter-company loan by the Company to HoldCo in an amount equal to the market value of the Scheme Convertible Notes; and (ii) if the Equity Scheme is structured as a transfer scheme, HoldCo proposes to acquire the Scheme Convertible Notes from each Scheme Creditor in consideration for HoldCo entering into a new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company (the "Creditor Scheme" and together with the Equity Scheme, the "Schemes");

- the holders of warrants (including conditional warrants) of the Company to purchase Company ordinary shares (the "Company warrants") (except for certain Company warrants which will be replicated at HoldCo in accordance with their terms) will be notified that their warrants will lapse unless exercised before the Equity Scheme becomes effective;

- as a result of the proposed Initial Exchange, the Company will become a direct wholly owned subsidiary of HoldCo and following completion of the Schemes (the "Initial Exchange") and prior to the closing of the Business Combination, HoldCo will complete a stock split of the HoldCo ordinary shares at the Exchange Ratio (as defined in the Business Combination Agreement) (the "Stock Split" and, together with the Initial Exchange, the "Exchange"); and

- following the consummation of the Exchange, upon the terms and subject to the conditions of the Business Combination Agreement and in accordance with the Cayman Islands Companies Act, Merger Sub will merge with and into SC Health, with SC Health surviving such merger as a direct wholly

Exhibit 4
Page 99

**Table of Contents**

owned subsidiary of HoldCo (the "Merger") and, in the context of such Merger, all SC Health ordinary shares (as defined below) (other than any SC Health Class A ordinary shares (as defined below) held in treasury by SC Health (the "Excluded Shares")) outstanding immediately prior to the Merger Effective Time (as defined in the Business Combination Agreement) shall be exchanged with HoldCo for the right to receive the Merger Consideration (as defined in the Business Combination Agreement) in the form of HoldCo ordinary shares (as defined below) pursuant to a share capital increase of HoldCo, as set forth in the Business Combination Agreement and in accordance with the Cayman Island Companies Act.

In connection with the foregoing and concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into (i) subscription agreements (the "Investor Subscription Agreements") with certain investors including, among others, SC Health Group Limited (an affiliate of the Sponsor (as defined below)) (the "Institutional PIPE Investors"), pursuant to which the Institutional PIPE Investors agreed to subscribe for and purchase, and HoldCo agreed to issue and sell to such Institutional PIPE Investors, an aggregate of 14,790,000 HoldCo ordinary shares at $10.00 per share for expected gross proceeds of $147,900,000 (as applicable, the "Investor PIPE Financing") on the date of the Merger prior to the effectiveness thereof and (ii) subscription agreements (the "Individual Subscription Agreements" and, together with the Investor Subscription Agreements, the "Subscription Agreements") with three individuals (the "Individual PIPE Investors" and, together with the Institutional PIPE Investors, the "PIPE Investors"), pursuant to which the Individual PIPE Investors agreed to subscribe for and purchase, and HoldCo agreed to issue and sell to such Individual PIPE Investors, an aggregate of 210,000 HoldCo ordinary shares at $10.00 per share for expected gross proceeds of $2,100,000 (the "Individual PIPE Financing" and together with the Investor PIPE Financing, the "PIPE Financing") on the Closing Date prior to the Merger Effective Time. The HoldCo ordinary shares to be issued pursuant to the Subscription Agreements have not been registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. HoldCo will grant the PIPE Investors certain registration rights in connection with the PIPE Financing. The PIPE Financing is contingent upon, among other things, the closing of the Business Combination.

Immediately prior to the Merger Effective Time, (1) each of the then issued and outstanding 5,562,000 Class B ordinary shares, par value $0.0001 per share, of SC Health (the "SC Health Class B ordinary shares") will automatically be exchanged, into one SC Health Class A ordinary share (as defined below), (2) immediately following the conversion described in clause (1), each of the then issued and outstanding SC Health Class A ordinary shares, par value $0.0001 per share, of SC Health (the "SC Health Class A ordinary shares" and together with the SC Health Class B ordinary shares, the "SC Health ordinary shares"), will automatically be exchanged, on a one-for-one basis, with an ordinary share, with a par value of $0.00001 per share, of HoldCo (the "HoldCo ordinary shares"), (3) each of the then issued and outstanding 8,625,000 redeemable public warrants of SC Health (the "SC Health public warrants" or the "public warrants") will cease to represent a right to acquire the number of SC Health Class A ordinary shares set forth in such SC Health warrant but will instead convert automatically into one redeemable warrant to purchase one HoldCo ordinary share (the "HoldCo warrants") pursuant to the Warrant Agreement, dated July 11, 2019 (the "Warrant Agreement"), between SC Health, Sponsor and American Stock Transfer & Trust Company ("AST" or "Transfer Agent"), as warrant agent, and (4) each of the then issued and outstanding units of SC Health that have not been previously separated into the underlying SC Health Class A ordinary shares and underlying SC Health warrants upon the request of the holder thereof (collectively, the "SC Health units"), will be cancelled and will entitle the holder thereof to one HoldCo ordinary share and one-half of one HoldCo warrant, and (5) each of the then issued and outstanding 5,450,000 private placement warrants of SC Health (the "SC Health private placement warrants" or "private placement warrants") will convert automatically into one HoldCo warrant pursuant to the Warrant Agreement. No fractional HoldCo warrants will be issued upon separation of the SC Health units. As used herein, "public shares" shall mean the SC Health Class A ordinary shares (including those that underlie any unit consisting of one SC Health Class A ordinary share and one-half of one SC Health warrant (the "SC Health units")) that were registered pursuant to the Registration Statement on Form S-1 (File No. 333-232240) in connection with SC Health's initial public offering and the HoldCo ordinary shares issued as a matter of law upon the exchange thereof described above and occurring at the Merger Effective Time.

Exhibit 4
Page 100

Table of Contents

Pursuant to the SC Health amended and restated memorandum and articles of association, SC Health is providing its public shareholders with the opportunity to redeem, upon the closing of the Business Combination, SC Health Class A ordinary shares then held by them for cash equal to the aggregate amount then on deposit in the trust account calculated as of two business days prior to the closing of the Business Combination, including interest earned on the funds held in the trust account and not previously released to SC Health to pay income taxes, if any, divided by the number of then-outstanding public shares. Redemptions referred to herein shall take effect as repurchases under the SC Health amended and restated memorandum and articles of association. The per-share amount SC Health (or HoldCo, on its behalf) will pay to investors who validly redeem their SC Health Class A ordinary shares will not be reduced by the aggregate deferred underwriting commission of $6.0 million that SC Health will pay to the underwriters of the SC Health initial public offering or transaction expenses incurred in connection with the Business Combination. For illustrative purposes, based on the fair value of marketable securities held in the trust account of approximately $174,545,229 as of March 30, 2021, the estimated per SC Health Class A ordinary share redemption price would have been approximately $10.12. The redemption rights include the requirement that a holder must identify itself in writing as a beneficial holder and provide its legal name, phone number and address to the Transfer Agent in order to validly redeem its shares.

**Public shareholders may elect to redeem their shares even if they vote for the BCA Proposal**. A public shareholder, together with any of his, her or its affiliates or any other person with whom he, she or it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 20% of the outstanding SC Health Class A ordinary shares (*i.e.*, in excess of 3,450,000 SC Health Class A ordinary shares). Each redemption of SC Health Class A ordinary shares by SC Health's public shareholders will reduce the amount in the trust account.

The conditions to closing in the Business Combination Agreement are for the sole benefit of the parties thereto and may be waived by such parties. In addition, in no event will SC Health redeem SC Health Class A ordinary shares in an amount that would cause its net tangible assets to be less than $5,000,001, as provided in the SC Health amended and restated memorandum and articles of association and as required as a closing condition to each party's obligation to consummate the Business Combination under the terms of the Business Combination Agreement. Holders of outstanding SC Health public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying prospectus/proxy statement assumes that none of SC Health's public shareholders will exercise their redemption rights with respect to their SC Health Class A ordinary shares. For more information about the factors that affect the assumptions above, please see the section entitled "*Summary of the Prospectus/Proxy Statement—Ownership of HoldCo following the Business Combination.*"

Sponsor and certain SC Health shareholders (collectively, the "SC Health Initial Shareholders"), as well as SC Health's officers and other current directors, have agreed to waive their redemption rights with respect to any SC Health ordinary shares they may hold in connection with the closing of the Business Combination. The founder shares that were issued to the SC Health Initial Shareholders (the "Founder Shares") will be excluded from the pro rata calculation used to determine the per share redemption price of each SC Health Class A ordinary share that is to be redeemed. Currently, the SC Health Initial Shareholders own 24.1% of the issued and outstanding SC Health ordinary shares, including all of the Founder Shares. The Sponsor has agreed to vote any SC Health ordinary shares owned by them in favor of the Business Combination and the transactions contemplated in connection therewith. In addition, the Sponsor has agreed to waive its redemption rights with respect to all of the Founder Shares in connection with the closing of the Business Combination. The Founder Shares are subject to transfer restrictions. The SC Health amended and restated memorandum and articles of association includes a conversion adjustment which provides that the Founder Shares will automatically convert at the time of the Business Combination into a number of SC Health Class A ordinary shares on the first business day following the closing of the Business Combination, at a conversion rate that entitles the holders of such Founder Shares to continue to own, in the aggregate, 20% of the issued and outstanding SC Health ordinary shares. However, the SC Health Initial Shareholders have agreed to waive such conversion adjustment pursuant

Exhibit 4
Page 101

Table of Contents

to the Investor Support Agreement. As a result, each remaining Founder Share will be exchanged for one HoldCo ordinary share at the closing of the Business Combination, such that HoldCo ordinary shares held by the SC Health Initial Shareholders will represent approximately     % of the total number of HoldCo ordinary shares outstanding after giving effect to the closing.

The closing of the Business Combination is conditioned upon the approval of the BCA Proposal and the Merger Proposal. The Adjournment Proposal is not conditioned on the approval of any other proposal set forth in this prospectus/proxy statement.

The above matters are more fully described in the accompanying prospectus/proxy statement, which also includes, as <u>Annex A</u>, a copy of the Business Combination Agreement. **You are urged to carefully read the accompanying prospectus/proxy statement in its entirety, including the Annexes and accompanying financial statements of each of SC Health and Rockley. In particular, you are urged to read carefully the section entitled "Risk Factors" beginning on page 49 of the accompanying prospectus/proxy statement.**

Approval of the BCA Proposal requires the affirmative vote of holders of at least a majority of the SC Health ordinary shares that are entitled to vote and are voted at the General Meeting and approval of the Merger Proposal requires the affirmative vote of holders of at least two-thirds of the SC Health ordinary shares that are entitled to vote and are voted at the General Meeting. **The SC Health board of directors recommends that you vote "FOR" each of these proposals. When you consider the SC board of directors' recommendation of these proposals, you should keep in mind that certain SC Health directors and officers have interests in the Business Combination that may conflict with your interests as a shareholder. Please see the section entitled "Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination" in the accompanying prospectus/proxy statement for additional information.**

By Order of the Board of Directors

Angelo John Coloma
Chief Executive Officer and Director

    , 2021

Exhibit 4
Page 102

Table of Contents

## TABLE OF CONTENTS

| | |
|---|---|
| ABOUT THIS PROSPECTUS/PROXY STATEMENT | 1 |
| MARKET AND INDUSTRY DATA | 2 |
| REFERENCES TO ADDITIONAL INFORMATION | 3 |
| SELECTED DEFINITIONS | 4 |
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS | 9 |
| RISK FACTOR SUMMARY | 12 |
| QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION AND THE GENERAL MEETING | 15 |
| SUMMARY OF THE PROSPECTUS/PROXY STATEMENT | 27 |
| ORGANIZATIONAL STRUCTURE | 44 |
| COMPARATIVE SHARE INFORMATION | 45 |
| MARKET PRICE AND DIVIDEND INFORMATION | 47 |
| RISK FACTORS | 48 |
| GENERAL MEETING OF SC HEALTH | 96 |
| PROPOSAL NO. 1—BCA PROPOSAL | 102 |
| PROPOSAL NO. 2—MERGER PROPOSAL | 142 |
| PROPOSAL NO. 3—INCENTIVE PLAN PROPOSAL | 143 |
| PROPOSAL NO. 4—ESPP PROPOSAL | 150 |
| PROPOSAL NO. 5—ADJOURNMENT PROPOSAL | 154 |
| CERTAIN MATERIAL U.S. FEDERAL INCOME TAX TAX CONSIDERATIONS | 155 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 168 |
| INFORMATION ABOUT SC HEALTH | 177 |
| SC HEALTH'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 180 |
| INFORMATION ABOUT ROCKLEY | 185 |
| ROCKLEY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 207 |
| MANAGEMENT OF HOLDCO FOLLOWING THE BUSINESS COMBINATION | 226 |
| MANAGEMENT OF SC HEALTH | 233 |
| EXECUTIVE COMPENSATION OF ROCKLEY | 241 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 252 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 255 |
| DESCRIPTION OF HOLDCO SECURITIES | 260 |
| SECURITIES ACT RESTRICTIONS ON RESALE OF HOLDCO SECURITIES | 270 |
| SHAREHOLDER PROPOSALS AND NOMINATIONS | 272 |
| SHAREHOLDER COMMUNICATIONS | 273 |
| LEGAL MATTERS | 274 |
| EXPERTS | 275 |
| DELIVERY OF DOCUMENTS TO SHAREHOLDERS | 276 |
| ENFORCEABILITY OF CIVIL LIABILITY | 277 |
| WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE | 278 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

i

Exhibit 4
Page 103

Table of Contents

**ANNEXES**

| | |
|---|---|
| A—Business Combination Agreement and Plan of Merger | A-1 |
| B—Investor Support Agreement | B-1 |
| C—Company Holders Support Agreement | C-1 |
| D—AR Support Agreement | D-1 |
| E—Form of Investor Subscription Agreement | E-1 |
| F—Form of Individual Subscription Agreement | F-1 |
| G—Form of Registration Rights and Lock-Up Agreement | G-1 |
| H—Form of HoldCo 2021 Stock Incentive Plan | H-1 |
| I—Form of HoldCo Employee Stock Purchase Plan | I-1 |
| J—HoldCo Memorandum and Articles of Association | J-1 |
| K—Form of Proposed Organizational Documents | K-1 |

ii

Exhibit 4
Page 104

Table of Contents

**ABOUT THIS PROSPECTUS/PROXY STATEMENT**

This document, which forms part of a registration statement on Form S-4 filed with the U.S. Securities and Exchange Commission (the "SEC") by HoldCo, constitutes a prospectus of HoldCo under Section 5 of the Securities Act, with respect to (1) the HoldCo ordinary shares to be issued to the SC Health shareholders, (2) the HoldCo ordinary shares to be issued to Rockley shareholders, (3) HoldCo ordinary shares issuable upon the exercise of HoldCo options to be issued in exchange for outstanding Rockley options, (4) the warrants to acquire HoldCo ordinary shares to be issued by HoldCo to SC Health warrant holders and (5) the HoldCo ordinary shares underlying such warrants, in each case, if the Business Combination described herein is consummated. This document also constitutes a notice of meeting and a proxy statement under Section 14(a) of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") with respect to the special meeting of SC Health shareholders at which SC Health shareholders will be asked to consider and vote upon a proposal to approve the Business Combination by the approval and adoption of the Business Combination Agreement, among other matters.

This document does not constitute an offer to sell or the solicitation of an offer to buy securities or a solicitation of proxy in any jurisdiction or to any person to whom it would be unlawful to make such an offer or solicitation.

Neither the SEC nor any state securities regulatory agency has approved or disapproved the transactions described in this registration statement/prospectus/proxy statement, passed upon the merits or fairness of the Business Combination or related transactions or passed upon the adequacy or accuracy of the disclosure in this registration statement/prospectus/proxy statement. Any representation to the contrary constitutes a criminal offense.

The securities are not intended to be offered, sold or otherwise made available to, and should not be offered, sold or otherwise made available to, any persons in member states of the European Economic Area which apply Regulation (EU) 2017/1129 of the European Parliament and of the Council of 14 June 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market (this Regulation together with any implementing measures in any member state, the "Prospectus Regulation"), unless they are qualified investors for the purposes of the Prospectus Regulation in such member state or in any other circumstances falling within Article 1(4) of the Prospectus Regulation, and no person in member states of the European Economic Area that is not a relevant person or qualified investor may act or rely on this document or any of its contents.

This prospectus/proxy statement includes trademarks, tradenames and service marks, certain of which belong to us or SC Health and others that are the property of other organizations. Solely for convenience, trademarks, tradenames and service marks referred to in this prospectus/proxy statement appear without the ®, TM and SM symbols, but the absence of those symbols is not intended to indicate, in any way, that we or SC Health will not assert our or their rights or that the applicable owner will not assert its rights to these trademarks, tradenames and service marks to the fullest extent under applicable law. Neither we nor SC Health intend the use or display of other parties' trademarks, trade names or service marks to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of us by, these other parties.

No person is authorized to give any information or to make any representation with respect to the matters that this prospectus/proxy statement describes other than those contained in this prospectus/proxy statement, and, if given or made, the information or representation must not be relied upon as having been authorized by HoldCo, Merger Sub, SC Health or Rockley. Neither the delivery of this prospectus/proxy statement nor any distribution of securities made under this prospectus/proxy statement will, under any circumstances, create an implication that there has been no change in the affairs of HoldCo, Merger Sub, SC Health or Rockley since the date of this prospectus/proxy statement or that any information contained herein is correct as of any time subsequent to such date.

1

Exhibit 4
Page 105

**Table of Contents**

## MARKET AND INDUSTRY DATA

We are responsible for the disclosure contained in this registration statement/prospectus/proxy statement. However, this registration statement/prospectus/proxy statement includes market and industry data and forecasts the parties have derived from publicly available information, various industry publications, other published industry sources and internal data and estimates. Industry publications and other published industry sources generally indicate that the information contained therein was obtained from sources believed to be reliable. Internal data and estimates are based upon information obtained from trade and business organizations and other contacts in the markets in which Rockley operates and our management's understanding of industry conditions. Although we believe that such information is reliable, we have not had this information verified by any independent sources. Any estimates underlying such market-derived information and other factors could cause actual results to differ materially from those expressed in the independent parties' estimates and in our estimates. See "Risk Factors" for additional information regarding risks that could cause results to differ materially from those expressed in the estimates made by third-party sources and by HoldCo, Rockley, or SC Health, as applicable.

Certain information in this registration statement/prospectus/proxy statement is based on independent or third-party sources, including:

1.      Silicon Photonics for healthcare market analysis, Yole Développement SA, September 8, 2020 (the "Yole Report").

2.      Electronic Skin Patches 2020-2030 Report, IDtechEx (the "IDtechEx Report").

3.      TrendForce Market Research Projections, September 25, 2019 (the "TrendForce Report").

4.      LightCounting High Speed Ethernet Optics Report, September 30, 2020.

The content of the foregoing sources, except to the extent specifically set forth in this registration statement/prospectus/proxy statement, does not constitute a portion of this registration statement/prospectus/proxy statement and is not incorporated herein.

2

Exhibit 4
Page 106

Table of Contents

**REFERENCES TO ADDITIONAL INFORMATION**

This registration statement/prospectus/proxy statement incorporates important information that is not included in or delivered with this registration statement/prospectus/proxy statement. This information is available for you to review through the SEC's website at *www.sec.gov*.

**You may request copies of this registration statement/prospectus/proxy statement or other information concerning SC Health, without charge, by written request to SC Health Corporation, 108 Robinson Road #10-00 Singapore 068900, or Morrow Sodali LLC, SC Health's proxy solicitor, by calling (800) 662-5200 (toll-free in North America), or +1 (203) 658-9400 (outside of North America), or by email at SCPE.info@investor.morrowsodali.com.**

**In order for you to receive timely delivery of the documents in advance of the General Meeting of SC Health to be held on                , 2021, you must request the information no later than four business days prior to the date of the General Meeting, by            , 2021.**

3

Exhibit 4
Page 107

Table of Contents

**SELECTED DEFINITIONS**

Unless otherwise stated in this prospectus/proxy statement or the context otherwise requires, references to:

- "Adjournment Proposal" has the meaning set forth in the Notice of Extraordinary General Meeting of SC Health Corporation to be held              , 2021, which is in respect of a proposal, as an ordinary resolution, to adjourn the General Meeting to a later date or dates (A) in order to solicit additional proxies from SC Health shareholders in favor of the BCA Proposal or the Merger Proposal, (B) if as of the time for which the General Meeting is scheduled, there are insufficient SC Health ordinary shares represented (either in person or by proxy) to constitute a quorum necessary to conduct business at the General Meeting or (C) to allow reasonable time for the filing or mailing of any supplemental or amended disclosures that SC Health has determined, based on the advice of outside legal counsel, is reasonably likely to be required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to the General Meeting;

- "AR Support Agreement" are to the Support Agreement, dated March 19, 2021, by and among SC Health, the Company, HoldCo, Merger Sub and Dr. Andrew Rickman, OBE, as attached to this prospectus/proxy statement as Annex D, as amended from time to time;

- "BCA Proposal" and "Proposal No.1" are to the meanings set forth for "BCA Proposal" and "Proposal No.1" in the Notice of Extraordinary General Meeting of SC Health Corporation to be held              , 2021, which is in respect of a proposal, as an ordinary resolution, to approve the entry by SC Health into the Business Combination Agreement and the consummation of the transactions contemplated thereby, including the Business Combination;

- "Business Combination" are to the meaning set forth in Article 1.1 of SC Health's Governing Documents as in effect on the date of the Business Combination Agreement;

- "Business Combination Agreement" are to the Business Combination Agreement and Plan of Merger entered into on March 19, 2021, by and among SC Health, Rockley, HoldCo, and Merger Sub a direct wholly owned subsidiary of HoldCo, as amended from time to time;

- "Cayman Islands Companies Act" are to the Companies Act (as amended) of the Cayman Islands;

- "CFIUS" are to the Committee on Foreign Investment in the United States, or any member agency thereof acting in such capacity;

- "CFIUS Approval" shall occur only when one of the following conditions has been met: (a) in response to the filing of a Notice by the parties, SC Health and Rockley have received written notice from CFIUS stating that: (1) CFIUS has concluded that SC Health's Designation Right (as defined in the Business Combination Agreement) is not a Covered Transaction (as defined in 31 C.F.R. § 800.213) and not subject to review under the DPA; or (2) the review and/or investigation of SC Health's Designation Right under the DPA has been concluded and there are no unresolved national security concerns; or (b) CFIUS has sent a report to the President of the United States requesting the President's decision on SC Health's Designation Right and either (1) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on SC Health's Designation Right has expired without any such action being threatened, announced or taken or (2) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on SC Health's Designation Right;

- "Companies Act" are to the UK Companies Act 2006, as amended;

- "Company Capital Stock" are to Company ordinary shares and preferred stock of the Company (if any);

- "Company Convertible Note" are to each outstanding unsecured convertible loan note issued by the Company set forth on Section 1.01 of the Company Disclosure Letter (as defined in "*Proposal No. 1—BCA Proposal*");

4

Exhibit 4
Page 108

Table of Contents

- "Company Holders Support Agreement" are to the Support Agreement, dated March 19, 2021, by and among Rockley, SC Health, HoldCo, Merger Sub and certain shareholders of Rockley as attached to this prospectus/proxy statement as Annex C, as amended from time to time;

- "Company options" are options to purchase Company ordinary shares granted under the 2013 Plan;

- "Company ordinary shares" are to Rockley ordinary shares with a par value of £0.00001 per share;

- "Company Restricted Stock" are to a Company ordinary share that, as of immediately prior to the Exchange, is subject to a substantial risk of forfeiture, within the meaning of Section 83 of the Code and was issued pursuant to the 2013 Plan;

- "Company warrants" are to the warrants (including conditional warrants) issued by Rockley to purchase Company ordinary shares;

- "Condition Precedent Proposals" are to the BCA Proposal and the Merger Proposal;

- "COVID-19 Measures" are to any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar law, directive, guidelines or recommendations promulgated by any industry group or any governmental authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to the COVID-19 pandemic, including the CARES Act and Families First Act;

- "Creditor Scheme" means the proposed creditor scheme of arrangement under Part 26 of the Companies Act;

- "DPA" are to Section 721 of the Defense Production Act of 1950, as amended from time to time, including all implementing regulations thereof;

- "ESPP Proposal" has the meaning set forth in the Notice of Extraordinary General Meeting of SC Health Corporation to be held                    , 2021, which is in respect of a proposal, as an ordinary resolution, to consider and vote upon a proposal to approve, assuming the BCA Proposal and Merger Proposal are approved and adopted, the Rockley Photonics Holdings Limited 2021 Employee Share Purchase Plan, as attached to this prospectus/proxy statement as Annex I, including the authorization of the share reserve under the ESPP;

- "Exchange Act" are to the Securities Exchange Act of 1934, as amended from time to time;

- "Exchange Ratio" are to the ratio that results in the number of HoldCo ordinary shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo ordinary shares or Company ordinary shares) as of immediately prior to the Merger Effective Time (the "Stock Split ordinary shares") being increased or decreased on a pro rata basis per Stock Split ordinary share such that the HoldCo ordinary shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo ordinary shares or Company ordinary shares) after the Stock Split equals the number of HoldCo ordinary shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo ordinary shares or Company ordinary shares) that results from dividing the Exchange Value by $10.00;

- "Exchange Value" means one billion one hundred and forty-eight million one hundred and fourteen thousand one hundred and thirteen dollars ($1,148,114,113);

- "GAAP" are to accounting principles generally accepted in the United States of America;

- "HoldCo" are to Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability;

- "HoldCo Governing Documents" are to the Memorandum and Articles of Association of HoldCo attached to this prospectus/proxy statement as Annex J, as amended from time to time;

5

Exhibit 4
Page 109

Table of Contents

- "HoldCo ordinary shares" are to HoldCo ordinary shares, with a par value of $0.00001 per share;

- "HoldCo options" are to options to purchase HoldCo ordinary shares;

- "HoldCo Restricted Stock" are to restricted HoldCo ordinary shares;

- "HoldCo warrants" are to the redeemable warrants to purchase HoldCo ordinary shares;

- "HoldCo Warrant Agreement" are to the amended and restated Warrant Agreement to be entered into upon the closing of the Business Combination by American Stock Transfer & Trust Company and HoldCo;

- "HSR Act" are to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time;

- "initial public offering" are to SC Health's initial public offering that was consummated on July 16, 2019;

- "Incentive Plan Proposal" has the meaning set forth in the Notice of Extraordinary General Meeting of SC Health Corporation to be held          , 2021, which is in respect of a proposal, as an ordinary resolution, to consider and vote upon a proposal to approve, assuming the BCA Proposal and the Merger Proposal are approved and adopted, the Rockley Photonics Holding Limited 2021 Stock Incentive Plan, as attached to this prospectus/proxy statement as Annex H, including the authorization of the share reserve under such stock incentive plan;

- "Individual Subscription Agreements" are to the subscription agreements with three individuals to purchase an aggregate of $2,100,000 shares in HoldCo, each in the form attached to this prospectus/proxy statement as Annex F, as amended from time to time;

- "Investor Subscription Agreements" are to the subscription agreements with certain investors, including the Sponsor Related PIPE Investor, to purchase an aggregate of $147,900,000 of HoldCo ordinary shares, each in the form attached to this prospectus/proxy statement as Annex E, as amended from time to time;

- "Investor Support Agreement" are to the Support Agreement, dated March 19, 2021, by and among the Sponsor, HoldCo and Rockley attached to this prospectus/proxy statement as Annex B, as amended from time to time;

- "IPO registration statement" are to the Registration Statement on Form S-1 (File No. 333-232240) filed by SC Health in connection with its initial public offering, which became effective on July 11, 2019;

- "IRS" are to the U.S. Internal Revenue Service;

- "JOBS Act" are to the Jumpstart Our Business Startups Act of 2012;

- "Merger" are to the merger of Merger Sub with and into SC Health pursuant to the Plan of Merger and in accordance with Part XVI of the Cayman Islands Companies Act, with SC Health surviving the merger as a wholly owned subsidiary of HoldCo;

- "Merger Effective Time" are to the time the Merger shall become effective which shall be at the time specified in the Plan of Merger as submitted to the Registrar of Companies in the Cayman Islands, or at such later time as may be agreed by SC Health and the Company in writing and specified in the Plan of Merger;

- "Merger Proposal" has the meaning set forth in the Notice of Extraordinary General Meeting of SC Health Corporation to be held          , 2021, which is in respect of a proposal, as a special resolution to authorize the Plan of Merger and the consummation of the Merger and the remaining transactions contemplated thereby;

- "Merger Sub" are to Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability;

6

Exhibit 4
Page 110

Table of Contents

- "Notice" are to a notice to CFIUS filed pursuant to the DPA, including 31 C.F.R. Part 800, as appropriate with respect to the proposed transaction;

- "NYSE" are to the New York Stock Exchange;

- "Person" are to any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or instrumentality or other entity of any kind;

- "PIPE Financing" are to the issuance and sale of HoldCo ordinary shares pursuant to the Subscription Agreements;

- "PIPE Investors" are to investors and individuals participating in the PIPE Financing pursuant to the Subscription Agreements, including the Sponsor Related PIPE Investor;

- "Plan of Merger" are to the plan of merger in the form tabled to the General Meeting (a draft of which is attached as Exhibit D to the Business Combination Agreement.

- "private placement warrants" or the "SC Health private placement warrants" are to the warrants to purchase one (1) SC Health Class A Ordinary Share at an exercise price of $11.50 issued to the Sponsor;

- "pro forma" are to giving pro forma effect to the Business Combination and related transactions;

- "Proposed Organizational Documents" are to the Amended and Restated Memorandum and Articles of Association of HoldCo, which will be effective upon the closing of the Business Combination;

- "public shareholders" are to holders of public shares, whether acquired in SC Health's initial public offering or acquired in the secondary market;

- "public shares" are to the SC Health Class A ordinary shares (including those that underlie the units) that were offered and sold by SC Health in its initial public offering and registered pursuant to the IPO registration statement;

- "public warrants" or the "SC Health public warrants" are to the redeemable warrants (including those that underlie the units) that were offered and sold by SC Health in its initial public offering and registered pursuant to the IPO registration statement;

- "redemption" are to each redemption of public shares of SC Health Class A ordinary shares for cash pursuant to the SC Health Governing Documents;

- "Registration Rights and Lock-Up Agreement" are to the Registration Rights Agreement to be entered into at Closing, by and among HoldCo, the Sponsor, certain shareholders of Rockley, attached to this prospectus/proxy statement as Annex G, as amended from time to time;

- "Registration Statement" are to the registration statement of which this prospectus/proxy statement forms a part;

- "Rockley" or the "Company" are to Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015;

- "Sarbanes Oxley Act" are to the Sarbanes-Oxley Act of 2002;

- "SC Health" are to SC Health Corporation, including after its change of name to Rockley Photonics Cayman Limited in connection with the Merger;

- "SC Health Class A ordinary shares" are to SC Health's Class A ordinary shares, par value $0.0001 per share;

- "SC Health Class B ordinary shares" are to SC Health's Class B ordinary shares, par value $0.00008 per share;

7

Exhibit 4
Page 111

**Table of Contents**

- "SC Health Governing Documents" are to the Amended and Restated Memorandum and Articles of Association of SC Health, as amended from time to time;

- "SC Health ordinary shares" are to the SC Health Class A ordinary shares and the SC Health Class B ordinary shares, collectively;

- "SC Health units" and "units" are to the units of SC Health, each unit representing one SC Health Class A ordinary share and one-half of one redeemable warrant to acquire one SC Health Class A ordinary share, that were offered and sold by SC Health in its initial public offering and registered pursuant to the IPO registration statement (less the number of units that have been separated into the underlying public shares and underlying warrants upon the request of the holder thereof);

- "Scheme Convertible Notes" are to the Company Convertible Notes subject to the Creditor Scheme;

- "Scheme Creditors" are to such of the holders of Company Convertible Notes as Rockley and SC Health determine jointly shall be subject to the Creditor Scheme subject to their convertible loan notes not having been either repaid in full or already converted into Company ordinary shares;

- "SEC" are to the United States Securities and Exchange Commission;

- "Securities Act" are to the Securities Act of 1933, as amended from time to time;

- "Sponsor" are to SC Health Holdings Limited, a Cayman Islands exempted company;

- "Sponsor Related PIPE Investor" are to SC Health Group Limited, an affiliate of the Sponsor purchasing $50,000,000 of HoldCo ordinary shares in the PIPE Financing;

- "Subscription Agreements" are to the Investor Subscription Agreements and the Individual Subscription Agreements, collectively;

- "trust account" are to the trust account established at the consummation of SC Health's initial public offering at JP Morgan Chase Bank, N.A. and maintained by AST, acting as trustee;

- "Trust Agreement" are to the Investment Management Trust Agreement, dated as of July 11, 2019, between SC Health and American Stock Transfer & Trust Company, LLC, as trustee;

- "Warrant Agreement" is to the Warrant Agreement, dated as of July 11, 2019, between SC Health, Sponsor and American Stock Transfer & Trust Company;

- "warrants" or "SC Health warrants" are to the public warrants and the private placement warrants; and

- "we," "us" and "our" are to Rockley, prior to the Business Combination, and to HoldCo following the Business Combination.

8

Exhibit 4
Page 112

**Table of Contents**

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

All statements in this prospectus/proxy statement that are not historical in nature constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, without limitation, statements regarding the financial position, business strategy, and the plans and objectives of management, including as they relate to the potential Business Combination, Rockley, HoldCo, and SC Health, as well as projections, forecasts, and Rockley's product development plans and anticipated customer relationships, and are not guarantees of performance. When used in this registration statement/prospectus/proxy statement, words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "strive," "would," and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. When Rockley, HoldCo, or SC Health discusses its strategies or plans, including as they relate to the potential Business Combination, it is making projections, forecasts or forward-looking statements. Such statements are based on the beliefs of, as well as assumptions made by and information currently available to, the management of Rockley, HoldCo, or SC Health, as the case may be. As used in this subsection, references to "the Company" and "Rockley" are intended to refer to the business and operations of Rockley prior to the Business Combination and the business and operations of HoldCo as directly or indirectly affected by Rockley by virtue of HoldCo's ownership of Rockley following the Business Combination, unless the context clearly indicates otherwise.

Forward-looking statements in this prospectus/proxy statement may include, without limitation, statements regarding:

- SC Health's, HoldCo's, or Rockley's ability to complete the Business Combination by the anticipated timeframe or at all or, if SC Health, HoldCo, or Rockley do not consummate the Business Combination, any other initial business combination;

- the satisfaction or waiver (if applicable) of the conditions to the Merger, including, among other things:

  - certain customary closing conditions, including, among others, (i) approval of the Business Combination and related agreements and transactions by the respective shareholders of SC Health and Rockley; (ii) effectiveness of the registration statement of which this prospectus/proxy statement forms a part of; (iii) expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act; (iv) receipt of approval for listing on the NYSE of the HoldCo ordinary shares to be issued in connection with the Merger; (v) that SC Health have at least $5,000,001 of net tangible assets upon Closing; and (vi) the absence of any injunctions enjoining or prohibiting the closing of the Business Combination; and

- the occurrence of any other event, change, or other circumstances that could give rise to the termination of the Business Combination Agreement;

- SC Health's, HoldCo's, or Rockley's, as applicable, ability to obtain additional financing to complete the transaction and to execute on the Company's strategy and business plan after the Business Combination and ability to obtain or maintain the listing of HoldCo ordinary shares and HoldCo warrants on the NYSE following the Business Combination;

- the anticipated impact of the Business Combination on Rockley and HoldCo, including Rockley's ability to develop and commercially launch its products;

- SC Health's public securities' potential liquidity and trading;

- the lack of a market for SC Health's securities;

- SC Health officers and directors allocating their time to other businesses and potentially having conflicts of interest with SC Health's business or in approving the Business Combination;

- the funds in the trust account being available to SC Health or, following the Business Combination, HoldCo;

9

Exhibit 4
Page 113

Table of Contents

- the use of proceeds not held in the trust account or available to SC Health from interest income on the trust account balance;

- the number of SC Health shareholders voting for or against the BCA Proposal and the Merger Proposal;

- Rockley's projected financial information, anticipated growth rate, and market opportunity;

- Rockley's ability to develop or commercialize its products and services;

- Rockley's expectations as to when it may generate sufficient revenue from the sale of its products and services to cover expansion plans, operating expenses, working capital, and capital expenditures;

- the development status and anticipated timeline for commercial production of Rockley's products;

- Rockley's plans for products under development and future products and anticipated features and benefits thereof;

- the status and expectations regarding Rockley's customer and potential customer relationships;

- the success of Rockley's strategic relationships with third parties;

- the total addressable markets for Rockley's products and technology;

- the ability of Rockley to increase market share in its existing markets or any new markets it may enter;

- Rockley's ability to obtain any required regulatory approvals, including any required FDA approvals, in connection with the Company's anticipated products and technology;

- HoldCo's ability to maintain an effective system of internal control over financial reporting;

- Rockley's ability to maintain and protect its intellectual property;

- Rockley's success in retaining or recruiting, or changes required in, officers, key employees, or directors following the Business Combination;

- the ability of Rockley to manage its growth effectively;

- the ability of Rockley to achieve and maintain profitability in the future;

- the impact of the regulatory environment and complexities with compliance related to such environment; and

- the impact of the COVID-19 pandemic.

The forward-looking statements contained in this prospectus/proxy statement are based on current expectations and beliefs concerning future developments and their potential effects on Rockley, HoldCo, or SC Health. There can be no assurance that future developments affecting Rockley, HoldCo, or SC Health will be those that Rockley, HoldCo, or SC Health have anticipated. These forward-looking statements involve a number of risks, uncertainties (many of which are beyond Rockley's, HoldCo's or SC Health's control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the heading "*Risk Factors*" beginning on page 49 of this registration statement/prospectus/proxy statement. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. Rockley, HoldCo and SC Health undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

10

Exhibit 4
Page 114

Table of Contents

**BEFORE ANY SC HEALTH SHAREHOLDER GRANTS ITS PROXY OR INSTRUCTS HOW ITS VOTE SHOULD BE CAST OR VOTES ON THE PROPOSALS TO BE PUT TO THE GENERAL MEETING, SUCH SHAREHOLDER SHOULD BE AWARE THAT THE OCCURRENCE OF THE EVENTS DESCRIBED IN THE "*RISK FACTORS*" SECTION AND ELSEWHERE IN THIS PROSPECTUS/PROXY STATEMENT MAY ADVERSELY AFFECT SC HEALTH, ROCKLEY OR HOLDCO.**

11

Exhibit 4
Page 115

**Table of Contents**

**RISK FACTOR SUMMARY**

*Rockley's business and its ability to execute its strategy, the proposed Business Combination, and any investment in the securities of HoldCo after the Business Combination are subject to risks and uncertainties, many of which are beyond HoldCo's or Rockley's control and will be beyond the control of the combined company. You should carefully consider and evaluate all of the risks and uncertainties with respect to any investment in the securities of the combined company, including, but not limited to, the following and those discussed under "Risk Factors." References below to Rockley shall be deemed to also refer to HoldCo and the post-Business Combination company, as the context requires or as appropriate.*

**Risks Related to Rockley's Business and Industry; Customer-Related Risks**

- If Rockley does not fully develop or commercialize its products and services, or if such products and services experience significant delays, Rockley's business, financial condition, and results of operation will be materially and adversely affected.

- Rockley has a history of recurring losses and a significant accumulated deficit, which raises substantial doubt about its ability to continue as a "going concern." Rockley expects to incur significant research and development expenses and devote substantial resources to commercializing new products, which could increase its losses and negatively impact its ability to achieve or maintain profitability.

- If the end products into which Rockley's products are incorporated are not fully developed and commercialized or do not achieve widespread market acceptance, or if such products experience delays, cancellations, or reductions, or if Rockley's products are not selected for inclusion in its customers' end products, are not adopted in other industry verticals or use cases, or are not adopted by leading consumer and medical device companies, Rockley's business will be materially and adversely affected.

- The forecasts and projections contained in this prospectus/proxy statement are based upon assumptions, analyses, and internal estimates developed by Rockley's management. If these assumptions, analyses, or estimates prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from those forecasted or projected.

- Rockley expects its results of operations to fluctuate on a quarterly and annual basis, which could cause the stock price of the combined company to fluctuate or decline.

- If Rockley is unable to manage its growth or scale its operations, its business and operating results could be materially and adversely affected.

- Market opportunity estimates and growth forecasts are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate.

- Rockley's international operations expose it to operational, financial, and regulatory risks, which could harm Rockley's business.

- Rockley is susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt its supply chain and could delay deliveries of its products to customers, which in turn could adversely affect Rockley's business, results of operations, and financial condition.

- If Rockley is unable to sell its products to its target customers, including large corporations with substantial negotiating power, or is unable to enter into agreements with customers and suppliers on satisfactory terms, its prospects and results of operations will be adversely affected.

- Rockley currently depends on a few large customers for a substantial portion of its revenue. The loss of, or a significant reduction in, orders from Rockley's customers, or Rockley's failure to diversify its customer base, could significantly reduce its revenue and adversely impact Rockley's operating results.

- Because Rockley does not anticipate long-term purchase commitments with its customers, orders may be cancelled, reduced, or rescheduled with little or no notice, which in turn exposes Rockley to inventory risk, and may cause its business and results of operations to suffer.

12

Exhibit 4
Page 116

Table of Contents

•    Rockley's business depends substantially on the efforts of its executive officers, including its Chief Executive Officer and founder, Dr. Andrew Rickman.

**Regulatory, Intellectual Property, Infrastructure, Cybersecurity and Privacy Risks**

•    Rockley's failure to comply with applicable governmental export and import control laws and regulations, including those related to the use, distribution, and sale of its products, U.S. Food and Drug Administration clearance or approval requirements, or privacy, data protection, and information security requirements in the jurisdictions in which Rockley operates could materially harm its business and operating results.

•    Rockley may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Further, Rockley's intellectual property applications, including patent applications, may not be approved or granted.

•    A network or data security incident or disruption or performance issues with Rockley's network infrastructure could harm its brand, reputation, and business, as well as its operating results.

**Risks Related to Financial and Accounting Matters**

•    Rockley's failure to raise additional capital or generate the significant capital necessary to expand its operations could reduce its ability to compete and could harm its business.

•    In preparing Rockley's consolidated financial statements, Rockley makes good faith estimates and judgments that may change or turn out to be erroneous, which could adversely affect Rockley's operating results.

•    Projections contained in this prospectus/proxy statement have not been prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and have not been compiled or examined by any registered public accountants nor any other independent expert or outside party.

**Risks Related to SC Health and the Business Combination**

•    HoldCo's ordinary shares may not be approved, or may not remain eligible, for listing on the NYSE.

•    If the Business Combination's benefits do not meet the expectations of investors or securities analysts, the market price of SC Health's securities or, following the closing of the Business Combination, HoldCo's securities, may decline.

•    SC Health's founders, executive officers and directors have potential conflicts of interest in recommending that shareholders vote in favor of approval of the BCA Proposal and the transactions contemplated thereby.

•    The post-Business Combination company may be required to take write downs or write offs, or may be subject to restructuring, impairment or other charges that could have a significant negative effect on the post-Business Combination company's financial condition, results of operations and the market price of HoldCo's ordinary shares.

•    The unaudited pro forma financial information included herein may not be indicative of what the post-Business Combination company's actual financial position or results of operations would have been.

•    If analysts do not publish or cease publishing research or reports about the post-Business Combination company or if they change their recommendations regarding HoldCo's securities, the price and trading volume of HoldCo's securities could decline.

13

Exhibit 4
Page 117

Table of Contents

- The requirements of being a public company may strain HoldCo's and Rockley's resources, divert management's attention, and affect its ability to attract and retain qualified board members.

- The global COVID-19 pandemic could harm Rockley's business and results of operations.

14

Exhibit 4
Page 118

**Table of Contents**

**QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION AND THE GENERAL MEETING**

*The questions and answers below highlight only selected information from this document and only briefly address some commonly asked questions about the proposals to be presented at the General Meeting, including with respect to the proposed Business Combination. The following questions and answers do not include all the information that is important to SC Health's shareholders. SC Health urges its shareholders to read this prospectus/proxy statement, including the Annexes and the other documents referred to herein, carefully and in their entirety to fully understand the proposed Business Combination and the voting procedures for the General Meeting, which will be held at            , local Singapore time, on            , 2021, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900. If you hold your shares through a bank, broker or other nominee, you will need to take additional steps to participate in the General Meeting, as described in this proxy statement.*

**Q:    Why am I receiving this prospectus/proxy statement?**

A:    SC Health shareholders are being asked to consider and vote upon, among other proposals, a proposal to approve and adopt the Business Combination Agreement and approve the Business Combination and the Plan of Merger. The Business Combination Agreement and Plan of Merger provides for, among other things, the merger of Merger Sub with and into SC Health, with SC Health surviving the merger as a wholly owned subsidiary of HoldCo, in accordance with the terms and subject to the conditions of the Business Combination Agreement as more fully described elsewhere in this prospectus/proxy statement. See the section entitled "*Proposal No. 1—BCA Proposal*" for more detail.

A copy of the Business Combination Agreement is attached to this prospectus/proxy statement as Annex A and you are encouraged to read it in its entirety.

Immediately prior to the Merger Effective Time, (1) each of the then issued and outstanding SC Health Class B ordinary shares will automatically be exchanged for a SC Health Class A ordinary share according to the conversion ratio at which SC Health Class B ordinary shares are automatically convertible into SC Health Class A ordinary shares, pursuant to article 13 of the SC Health Governing Documents; (2) immediately following the conversion described in clause (1), at the Merger Effective Time each of the then issued and outstanding SC Health Class A ordinary shares will automatically be exchanged, on a one-for-one basis, for a HoldCo ordinary share; (3) each of the then issued and outstanding SC Health public warrants will convert automatically into a HoldCo warrant, pursuant to the Warrant Agreement; (4) each of the then issued and outstanding units of SC Health that have not been previously separated into the underlying SC Health Class A ordinary shares and underlying SC Health warrants upon the request of the holder thereof, will be cancelled and will entitle the holder thereof to one HoldCo ordinary share and one-half of one HoldCo warrant; and (5) each of the then issued and outstanding SC Health private placement warrants will convert automatically into a HoldCo warrant pursuant to the Warrant Agreement. No fractional HoldCo warrants will be issued upon separation of the SC Health units.

**THE VOTE OF SC HEALTH'S SHAREHOLDERS IS IMPORTANT. SC HEALTH'S SHAREHOLDERS ARE ENCOURAGED TO VOTE AS SOON AS POSSIBLE AFTER CAREFULLY REVIEWING THIS PROSPECTUS/PROXY STATEMENT, INCLUDING THE ANNEXES AND THE ACCOMPANYING FINANCIAL STATEMENTS OF SC HEALTH AND ROCKLEY, CAREFULLY AND IN ITS ENTIRETY.**

**Q:    What proposals are shareholders of SC Health being asked to vote upon?**

A:    At the General Meeting, SC Health is asking holders of SC Health ordinary shares to consider and vote upon:

    •    a proposal to approve and adopt by ordinary resolution the Business Combination Agreement

Exhibit 4
Page 119

Table of Contents

- a proposal to approve by special resolution the Plan of Merger; and

- a proposal to approve by ordinary resolution the 2021 Plan;

- a proposal to approve by ordinary resolution the ESPP;

- a proposal to approve by ordinary resolution the adjournment of the General Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for the approval of one or more proposals at the General Meeting.

If SC Health's shareholders do not approve each of the proposals, then unless certain conditions in the Business Combination Agreement are waived by the applicable parties to the Business Combination Agreement, the Business Combination Agreement could terminate and the Business Combination may not be consummated. See "*Proposal No. 1—BCA Proposal.*"

SC Health will hold the General Meeting to consider and vote upon these proposals. This prospectus/proxy statement contains important information about the Business Combination, the Plan of Merger and the other matters to be acted upon at the General Meeting. Shareholders of SC Health should read it carefully.

**After careful consideration, SC Health's board of directors has determined that the BCA Proposal, the Merger Proposal, and the Adjournment Proposal are in the best interests of SC Health and its shareholders and unanimously recommends that you vote or give instruction to vote "FOR" each of those proposals.**

The existence of financial and personal interests of one or more of SC Health's directors in the transactions contemplated by the Business Combination Agreement may result in a conflict of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of SC Health and its shareholders and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion of these considerations.

**Q:    Are the proposals conditioned on one another?**

A:    Yes, except the Adjournment Proposal. The BCA Proposal and Merger Proposal are cross-conditioned. The Incentive Plan Proposal and ESPP Proposal are conditioned on approval of the BCA Proposal and the Merger Proposal. The Adjournment Proposal is not conditioned upon the approval of any other proposal.

**Q:    Why is SC Health proposing the Business Combination?**

A:    SC Health was organized to effect a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination, with one or more businesses or entities.

Based on its due diligence investigations of Rockley and the industry in which it operates, including the financial and other information provided by Rockley in the course of SC Health's due diligence investigations, the SC Health board of directors believes that the Business Combination with Rockley is in the best interests of SC Health and its shareholders and presents an opportunity to increase shareholder value. However, there is no assurance of this. See "*Proposal No. 1—BCA Proposal—SC Health's Board of Directors' Reasons for the Approval of the Business Combination*" for additional information.

Although SC Health's board of directors believes that the Business Combination with Rockley presents a unique business combination opportunity and is in the best interests of SC Health and its shareholders, the

16

Exhibit 4
Page 120

Table of Contents

board of directors did consider certain potentially material negative factors in arriving at that conclusion. These factors are discussed in greater detail in the section entitled "*Proposal No. 1—BCA Proposal—SC Health's Board of Director's Reasons for the Approval of the Business Combination*," as well as in the sections entitled "*Risk Factors—Risks Related to Rockley's Business and Industry*."

**Q:    How will the Business Combination and the Merger affect my SC Health ordinary shares, warrants and units?**

A:    Immediately prior to the Merger Effective Time, (1) each of the then issued and outstanding 5,562,500 SC Health Class B ordinary shares will automatically be converted into and exchanged for a SC Health Class A ordinary share according to the ratio at which SC Health Class B ordinary shares are automatically convertible into SC Health Class A ordinary shares, pursuant to article 53 of SC Health's Articles of Association, (2) immediately following the conversion described in clause (1), at the Merger Effective Time each of the then issued and outstanding SC Health Class A ordinary shares will automatically be exchanged, on a one-for-one basis, for one HoldCo ordinary share, (3) each of the then issued and outstanding SC Health public warrants will convert automatically into a HoldCo warrant, pursuant to the Warrant Agreement (4) each of the then issued and outstanding units of SC Health that have not been previously separated into the underlying SC Health Class A ordinary shares and underlying SC Health warrants upon the request of the holder thereof, will be cancelled and will entitle the holder thereof to one HoldCo ordinary share and one-half of one HoldCo warrant, and (5) each of the then issued and outstanding SC Health private placement warrants will convert automatically into one HoldCo warrant pursuant to the Warrant Agreement. No fractional HoldCo warrants will be issued upon separation of the SC Health units.

**Q:    What will Rockley Shareholders receive in return for HoldCo's acquisition of all of the issued and outstanding shares of Rockley?**

A:    The Company will propose a scheme of arrangement under Part 26 of the Companies Act, as amended, (the "UK Companies Act") as either a cancellation scheme or a transfer scheme pursuant to which the Company Shareholders will transfer or cancel all their Company ordinary shares to HoldCo in exchange for the same number of HoldCo ordinary shares (the "Equity Scheme"). As a result of the proposed Initial Exchange, the Company will become a direct wholly owned subsidiary of HoldCo and following completion of the Equity Scheme and Creditor Scheme (the "Initial Exchange") and prior to the closing of the Business Combination, HoldCo will complete a stock split of the HoldCo ordinary shares at the Exchange Ratio (the "Stock Split" and, together with the Initial Exchange, the "Exchange"). For further details, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger—Consideration—Merger Consideration*."

**Q:    What equity stake will current SC Health shareholders and Rockley shareholders hold in HoldCo immediately after the closing of the Business Combination?**

A:    It is anticipated that, immediately following the Business Combination, (1) SC Health's public shareholders are expected to own approximately 11.3% of the outstanding HoldCo ordinary shares, (2) Rockley Shareholders (without taking into account any public shares held by Rockley Shareholders prior to the closing of the Business Combination or purchased in the PIPE Financing) are expected to own approximately 75.2 % of the outstanding HoldCo ordinary shares, (3) the Sponsor and related parties (including the Sponsor Related PIPE Investor) are expected to collectively own approximately 6.9 % of the outstanding HoldCo ordinary shares and (4) the PIPE Investors (other than the Sponsor Related PIPE Investor) are expected to own approximately 6.6 % of the outstanding HoldCo ordinary shares. These percentages assume: (i) that no public shareholders exercise their redemption rights in connection with the Business Combination; (ii) that HoldCo issues HoldCo ordinary shares as the Merger Consideration pursuant to the Business Combination Agreement, which in the aggregate equals 137,623,911 HoldCo ordinary shares; and (iii) that HoldCo issues 15,000,000 HoldCo ordinary shares to the PIPE Investors

17

Exhibit 4
Page 121

Table of Contents

pursuant to the PIPE Financing. If the actual facts are different from these assumptions, the percentage ownership retained by the Company's existing shareholders in the combined company will be different.

The following table illustrates varying ownership levels in HoldCo immediately after giving effect to the Business Combination and other events contemplated by the Business Combination Agreement.

| | Share Ownership of HoldCo | | | |
| | No Redemption | | Maximum Redemption(1) | |
| Shareholder | Shares | % | Shares | % |
|---|---|---|---|---|
| Former SC Health Class A shareholders | 17,250,000 | 11.3% | 988,576 | 0.7% |
| Sponsor and related parties(2) | 10,562,500 | 6.9% | 10,562,500 | 7.8% |
| Former Rockley shareholders and warrant holders | 114,811,411 | 75.2% | 114,811,411 | 84.2% |
| Third party investors in PIPE Investment(3) | 10,000,000 | 6.6% | 10,000,000 | 7.3% |
| **Total HoldCo ordinary shares outstanding at closing of the Business Combination(4)** | 152,623,911 | 100% | 136,362,487 | 100% |

(1)    This scenario assumes that 16,261,424 SC Health Class A ordinary shares are redeemed for an aggregate payment of $174.5 million, which is derived from the number of shares that could be redeemed in connection with the Business Combination at an assumed redemption price of approximately $10.73 per share of HoldCo ordinary shares based on the trust account balance as of December 31, 2020 in order for the amount of cash available in the trust account following the General Meeting to be at least equal to $5,000,001.

(2)    Amount includes 5,562,500 HoldCo ordinary shares the Sponsor will receive upon conversion of its Class B Ordinary Shares and 5,000,000 shares subscribed for by the Sponsor and the Sponsor Related PIPE Investor in the PIPE Financing.

(3)    Amount includes 2,100,000 HoldCo ordinary shares subscribed for by current shareholders of Rockley in the PIPE Financing, but excludes shares to be acquired by Sponsor Related PIPE Investor. See note (2) above.

(4)    The figures in this table are presented only as illustrative examples and are based on the assumptions described above, which may be different from the actual amount of redemptions in connection with the Business Combination. In the event that SC Health Class A ordinary shares are redeemed in connection with the Business Combination but the number of shares redeemed is less than 16,261,424, the ownership percentages set forth above will vary on a linear basis between the two scenarios.

For further details, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger—Consideration—Merger Consideration.*"

**Q:    How has the announcement of the Business Combination affected the trading price of the SC Health Class A ordinary shares?**

A:    On March 18, 2021, the trading date before the public announcement of the Business Combination, SC Health public units, SC Health Class A ordinary shares and SC Health warrants closed at $10.77, $10.11, and $1.19, respectively. On March 30, 2021, the most recent practicable date prior to the date of this registration statement/prospectus/proxy statement, SC Health public units, SC Health Class A ordinary shares and SC Health warrants closed at $10.09, $11.00, and $1.82, respectively.

**Q:    Will the Company obtain new financing in connection with the Business Combination?**

A:    Yes. The PIPE Investors have agreed to purchase in the aggregate approximately 15,000,000 HoldCo ordinary shares, for approximately $150.0 million of gross proceeds, in the PIPE Financing. The PIPE

18

Exhibit 4
Page 122

Table of Contents

Financing is contingent upon, among other things, the closing of the Business Combination. See "*Proposal No. 1—BCA Proposal—Related Agreements—Subscription Agreements.*"

**Q.    Do I have redemption rights?**

A:    If you are a holder of public shares, you have the right to request that we redeem all or a portion of your public shares for cash provided that you follow the procedures and deadlines described elsewhere in this prospectus/proxy statement. Public shareholders may elect to redeem all or a portion of the public shares held by them regardless of if or how they vote in respect of the BCA Proposal. If you wish to exercise your redemption rights, please see the answer to the next question: "How do I exercise my redemption rights?" If you are a holder of SC Health public warrants (other than the Sponsor and its affiliates), you have the right to require the Sponsor to repurchase or cause one of the Sponsor's affiliates to repurchase your SC Health public warrants, at $1.00 per SC Health public warrant (exclusive of commissions) provided that you follow the procedures and deadlines described elsewhere in this registration statement/prospectus/proxy statement. In the event the Business Combination is later abandoned, the Sponsor or its affiliate will not repurchase the SC Health public warrants, and the SC Health public warrants will be returned to the holders. There will be no redemption rights upon the completion of the Business Combination with respect to the SC Health public warrants.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 20% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 20% of the public shares, then any such shares in excess of that 20% limit would not be redeemed for cash.

The Sponsor (whose members include SC Health's directors and officers) has agreed to waive its redemption rights with respect to all of the Founder Shares in connection with the closing of the Business Combination. The Founder Shares will be excluded from the pro rata calculation used to determine the per-share redemption price.

**Q:    How do I exercise my redemption rights?**

A:    If you are a public shareholder and wish to exercise your right to redeem the public shares, you must:

(i)    (a) hold public shares, or (b) if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

(ii)    submit a written request to AST, SC Health's transfer agent, that SC Health redeem all or a portion of your public shares for cash; and

(iii)    deliver your certificates for public shares (if any) along with the redemption forms to AST, SC Health's transfer agent, physically or electronically through The Depository Trust Company ("DTC").

Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m. Eastern Time, on              , 2021 (which is 5:00 a.m. local Singapore time, on              , 2021) (two business days before the General Meeting) in order for their shares to be redeemed.

The address of AST, SC Health's transfer agent, is listed under the question "Who can help answer my questions?" below.

Holders of units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a

19

Exhibit 4
Page 123

**Table of Contents**

brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact AST directly and instruct them to do so.

Public shareholders will be entitled to request that their public shares be redeemed for a pro rata portion of the amount then on deposit in the trust account calculated as of two business days prior to the closing of the Business Combination including interest earned on the funds held in the trust account and not previously released to SC Health (net of taxes payable). For illustrative purposes, as of March 30, 2021, this would have amounted to approximately $10.00 per issued and outstanding public share. However, the proceeds deposited in the trust account could become subject to the claims of SC Health's creditors, if any, which could have priority over the SC Health claims of the public shareholders, regardless of whether such public shareholders vote or, if they do vote, irrespective of if they vote for or against the BCA Proposal. Therefore, the per share distribution from the trust account in such a situation may be less than originally expected due to such claims. Whether you vote, and if you do vote irrespective of how you vote, on any proposal, including the BCA Proposal, will have no impact on the amount you will receive upon exercise of your redemption rights. It is expected that the funds to be distributed to public shareholders electing to redeem their public shares will be distributed promptly after the closing of the Business Combination.

An SC Health shareholder may not withdraw a redemption request once submitted to AST unless SC Health's board of directors determines (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part). Furthermore, if a holder of a public share delivers its certificate (if any) along with the redemption forms in connection with an election of its redemption and subsequently decides prior to the applicable date not to elect to exercise such rights, it may simply request that SC Health permit the withdrawal of the redemption request and instruct AST to return the certificate (physically or electronically). The holder can make such request by contacting AST at the address or email address listed in this prospectus/proxy statement.

Any corrected or changed written exercise of redemption rights must be received by AST prior to the vote taken on the BCA Proposal at the General Meeting. No request for redemption will be honored unless the holder's certificates for public shares (if any) along with the redemption forms have been delivered (either physically or electronically) to AST at least two business days prior to the vote at the General Meeting.

If a holder of public shares properly makes a request for redemption and the certificates for public shares (if any) along with the redemption forms are delivered as described above, then, if the Business Combination is consummated, SC Health will redeem the public shares for a pro rata portion of funds deposited in the trust account, calculated as of two business days prior to the closing of the Business Combination. As a result of the election by an eligible holder of SC Health Class A ordinary shares, all or a portion of such SC Health Class A ordinary shares held by such holder shall be redeemed at a per-share price, payable in cash, equal to a pro rata share of the aggregate amount on deposit in the trust account (including any interest earned on the funds held in the trust account) (as determined in accordance with the SC Health Governing Documents).

If you are a holder of public shares and you exercise your redemption rights, such exercise will not result in the loss of any warrants that you may hold.

**Q:    If I am a holder of units, can I exercise redemption rights with respect to my units?**

A:    No. Holders of issued and outstanding units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If you hold your units in an account at a brokerage firm or bank, you must notify your broker or bank that you elect to separate the units into the underlying public shares and public warrants, or if you hold units registered in your own name, you must contact AST, SC Health's transfer agent, directly and instruct them to do so. You are requested to cause your public shares to be separated and delivered to AST along with the redemption

20

Exhibit 4
Page 124

**Table of Contents**

forms by 5:00 p.m. Eastern Time, on                , 2021 (which is 5:00 a.m. local Singapore time, on                , 2021) (two (2) business days before the General Meeting) in order to exercise your redemption rights with respect to your public shares.

**Q:    What are the U.S. federal income tax consequences of exercising my redemption rights?**

A:    The U.S. federal income tax consequences of exercising your redemption rights with respect to your SC Health Class A ordinary shares to receive cash from the trust account in exchange for SC Health Class A ordinary shares depend on your particular facts and circumstances. It is possible that you may be treated as selling such SC Health Class A ordinary shares and, as a result, recognize capital gain or capital loss. It is also possible that the redemption may be treated as a distribution for U.S. federal income tax purposes depending on the amount of SC Health Class A ordinary shares that you own or are deemed to own (including through the ownership of warrants). For a more complete discussion of the U.S. federal income tax considerations of an exercise of redemption rights, see "*Certain Material U.S. Federal Income Tax Considerations.*"

All holders considering exercising redemption rights are urged to consult their tax advisor on the tax consequences to them of an exercise of redemption rights, including the applicability and effect of U.S. federal, state, local and non-U.S. tax laws.

**Q:    What happens to the funds deposited in the trust account after closing of the Business Combination?**

A:    Following the closing of SC Health's initial public offering, an amount equal to $172.5 million ($10.00 per unit) of the net proceeds from SC Health's initial public offering and the sale of the private placement warrants was placed in the trust account. As of March 19, 2021, funds in the trust account totaled approximately $174,545,229 and were comprised entirely of U.S. government treasury obligations with a maturity of 180 days or less or of money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940, as amended (the "Investment Company Act"), which invest only in direct U.S. government treasury obligations. These funds will remain in the trust account, except for the withdrawal of interest to pay taxes, if any, until the earliest of (1) the completion of a business combination (including the closing of the Business Combination) and (2) the redemption of all of the public shares if SC Health is unable to complete a business combination by April 16, 2021 (or if such date is further extended at a duly called General Meeting, such later date), subject to applicable law.

Prior to the consummation of the Business Combination, the funds deposited in the trust account will be released to: (i) pay holders of SC Health public shares who properly exercise their redemption rights; (ii) to pay transaction fees and expenses associated with the Business Combination; and (iii) for working capital and general corporate purposes of HoldCo following the Business Combination. See "*Summary of the Prospectus/Proxy Statement—Sources and Uses of Funds for the Business Combination.*"

**Q:    What happens if a substantial number of the public shareholders vote in favor of the BCA Proposal and exercise their redemption rights?**

A:    SC Health's public shareholders are not required to vote in respect of the Business Combination in order to exercise their redemption rights. Accordingly, the Business Combination may be consummated even though the funds available from the trust account and the number of public shareholders are reduced as a result of redemptions by public shareholders.

The SC Health Governing Documents provide that SC Health is only required to redeem public shares so long as (after such redemption) SC Health's net tangible assets will be at least $5,000,001 either prior to or upon consummation of the Business Combination, after payment of the deferred underwriting commission (so that SC Health is not subject to the SEC's "penny stock" rules).

Exhibit 4
Page 125

Table of Contents

**Q:    What conditions must be satisfied to complete the Business Combination?**

A:    The Business Combination Agreement and Plan of Merger is subject to the satisfaction or waiver of certain customary closing conditions, including, among others: (i) approval of the Business Combination and related agreements and transactions by the respective shareholders of SC Health and Rockley (including approval of the Equity Scheme by the Rockley shareholders and the High Court of the United Kingdom); (ii) effectiveness of the registration statement of which this prospectus/proxy statement forms a part; (iii) expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act; (iv) receipt of approval for listing on the NYSE the HoldCo ordinary shares to be issued in connection with the Merger; (v) that SC Health have at least $5,000,001 of net tangible assets upon Closing; (vi) the amount of cash actually received by HoldCo from the PIPE Investors being at least equal to $150,000,000 (the "Minimum Cash Condition"); and (vii) the absence of any injunctions enjoining or prohibiting the closing of the Business Combination.

For more information about conditions to the closing of the Business Combination, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger*."

**Q:    When do you expect the Business Combination to be completed?**

A:    It is currently expected that the Business Combination will be consummated in the second quarter of 2021. This date depends, among other things, on the approval of the proposals to be put to SC Health shareholders at the General Meeting. However, such meeting could be adjourned if the Adjournment Proposal is adopted by SC Health's shareholders at the General Meeting and SC Health elects to adjourn the General Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for the approval of one or more proposals at the General Meeting. For a description of the conditions for the completion of the Business Combination, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger*."

**Q:    What happens if the Business Combination is not consummated?**

A:    If SC Health is not able to complete the Business Combination with Rockley by April 16, 2021 and is not able to complete another business combination by such date, in each case, as such date may be extended pursuant to the SC Health Governing Documents, SC Health will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible, but not more than 10 business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (less up to $100,000 of interest to pay dissolution expenses and which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of SC Health's remaining shareholders and its board of directors, dissolve and liquidate, subject in each case to its obligations under Cayman Islands law to provide for SC Health claims of creditors and the requirements of other applicable law.

**Q:    Do I have appraisal rights in connection with the proposed Business Combination?**

A:    Neither SC Health's shareholders nor SC Health's warrant holders have appraisal rights in connection with the Business Combination under Cayman Islands law.

**Q:    What do I need to do now?**

A:    SC Health urges you to read this prospectus/proxy statement, including the Annexes and the documents referred to herein, carefully and in their entirety and to consider how the Business Combination will affect

22

Exhibit 4
Page 126

**Table of Contents**

you as a shareholder or warrant holder. SC Health's shareholders should then vote as soon as possible in accordance with the instructions provided in this prospectus/proxy statement and on the enclosed proxy card.

**Q:    How do I vote?**

A:    If you are a holder of record of ordinary shares on the record date for the General Meeting, you may vote in person at the General Meeting or by submitting a proxy for the General Meeting. You may submit your proxy by completing, signing, dating and returning the enclosed proxy card in the accompanying pre-addressed postage-paid envelope. **If you hold your shares in "street name," which means your shares are held of record by a broker, bank or nominee, you should contact your broker, bank or nominee to ensure that votes related to the shares you beneficially own are properly counted. In this regard, you must provide the broker, bank or nominee with instructions on how to vote your shares or, if you wish to attend the General Meeting and vote in person, obtain a valid proxy from your broker, bank or nominee.**

**Q:    If my shares are held in "street name," will my broker, bank or nominee automatically vote my shares for me?**

A:    No. If your shares are held in a stock brokerage account or by a bank or other nominee, you are considered the "beneficial holder" of the shares held for you in what is known as "street name." If this is the case, this prospectus/proxy statement may have been forwarded to you by your brokerage firm, bank or other nominee, or its agent, and you may need to obtain a vote instruction form from the institution that holds your shares and follow the instructions included on that form regarding how to instruct your broker, bank or nominee as to how to vote your shares. Under the rules of various national and regional securities exchanges, your broker, bank, or nominee cannot vote your shares with respect to non-discretionary matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank, or nominee. We believe all the proposals presented to the shareholders will be considered non-discretionary and therefore your broker, bank, or nominee cannot vote your shares without your instruction. Your bank, broker, or other nominee can vote your shares only if you provide instructions on how to vote. As the beneficial holder, you have the right to direct your broker, bank or other nominee as to how to vote your shares and you should instruct your broker to vote your shares in accordance with directions you provide. If you do not provide voting instructions to your broker on a particular proposal on which your broker does not have discretionary authority to vote, your shares will not be voted on that proposal. This is called a "broker non-vote." Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting, and otherwise will have no effect on a particular proposal.

**Q:    When and where will the General Meeting be held?**

A:    The General Meeting will be held at            , local Singapore time, on            , 2021, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900, or such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals. Shareholders who hold their shares in street name will need to obtain a legal proxy from their broker, bank or other nominee. The General Meeting will begin promptly at            , local Singapore time.

**Q:    Who is entitled to vote at the General Meeting?**

A:    SC Health has fixed            , 2021 as the record date for the General Meeting. If you were a shareholder of SC Health at the close of business on the record date, you are entitled to vote on matters that come before the General Meeting. However, a shareholder may only vote his or her shares if he or she is present in person or is represented by proxy at the General Meeting.

23

Exhibit 4
Page 127

Table of Contents

**Q:**    **How many votes do I have?**

**A:**    SC Health shareholders are entitled to one vote at the General Meeting for each ordinary share held of record as of the record date. As of the close of business on the record date for the General Meeting, there were _____ ordinary shares issued and outstanding, of which _____% were issued and outstanding public shares held by SC Health shareholders, with the rest being held by SC Health's Initial Shareholders.

**Q:**    **What constitutes a quorum?**

**A:**    A quorum of SC Health shareholders is necessary to hold a valid meeting. A quorum will be present at the General Meeting if the holders of a majority of the issued and outstanding SC Health ordinary shares entitled to vote at the General Meeting are represented in person or by proxy. As of the record date for the General Meeting, _____ ordinary shares would be required to achieve a quorum.

**Q:**    **What vote is required to approve each proposal at the General Meeting?**

•    BCA Proposal: The approval of the BCA Proposal requires an ordinary resolution under the Cayman Islands Companies Act and the SC Health Governing Documents, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

•    Merger Proposal: The approval of the Merger Proposal requires a special resolution under the Cayman Islands Companies Act and the SC Health Governing Documents, being the affirmative vote of at least two-thirds of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

•    Incentive Plan Proposal: The ordinary resolution is being sought to approve the Incentive Plan Proposal, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

•    ESPP Proposal: The ordinary resolution is being sought to approve the ESPP Proposal, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

•    Adjournment Proposal: The approval of the Adjournment Proposal requires an ordinary resolution under SC Health Governing Documents, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

**Q:**    **What are the recommendations of SC Health's board of directors?**

**A:**    SC Health's board of directors believes that the BCA Proposal, the Merger Proposal and the other proposals to be presented at the General Meeting are in the best interest of SC Health's shareholders and unanimously recommends that its shareholders vote "FOR" the approval of the BCA Proposal, "FOR" the approval of the Merger Proposal, "FOR" the approval of the Incentive Plan Proposal, "FOR" the approval of the ESPP Proposal and "FOR" the approval of the Adjournment Proposal, in each case, if presented to the General Meeting.

**Q:**    **How does the Sponsor intend to vote its shares?**

**A:**    The Sponsor has agreed to vote all the Founder Shares and any other public shares it may hold in favor of all the proposals being presented at the General Meeting. As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding ordinary shares.

24

Exhibit 4
Page 128

Table of Contents

**Q:     What happens if I sell my SC Health ordinary shares before the General Meeting?**

A:     The record date for the General Meeting is earlier than the date of the General Meeting and earlier than the date that the Business Combination is expected to be completed. If you transfer your public shares after the applicable record date, but before the General Meeting, unless you grant a proxy to the transferee, you will retain your right to vote at such General Meeting but the transferee, and not you, will have the ability to redeem such shares (if time permits).

**Q:     May I change my vote after I have mailed my signed proxy card?**

A:     Yes. Shareholders may send a later-dated, signed proxy card to AST at AST's address set forth below so that it is received by AST prior to the vote at the General Meeting (which is scheduled to take place on          , 2021) or attend the General Meeting in person and vote. Shareholders also may revoke their proxy by sending a notice of revocation to AST, which must be received by AST prior to the vote at the General Meeting. However, if your shares are held in "street name" by your broker, bank or another nominee, you must contact your broker, bank or other nominee to change your vote.

**Q:     What happens if I fail to take any action with respect to the General Meeting?**

A:     If you fail to take any action with respect to the General Meeting and the Business Combination is approved by shareholders and the Business Combination is consummated, you will become a shareholder or warrant holder of HoldCo. If you fail to take any action with respect to the General Meeting and the Business Combination is not approved, you will remain a shareholder or warrant holder of SC Health. However, if you fail to vote with respect to the General Meeting, you will nonetheless be able to elect to redeem your public shares in connection with the Business Combination (if time permits).

**Q:     What should I do with my share certificates, warrant certificates or unit certificates?**

A:     SC Health shareholders who exercise their redemption rights must deliver (either physically or electronically) their share certificates (if any) along with the redemption forms to AST, SC Health's transfer agent, prior to the General Meeting.

Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m. Eastern Time, on          , 2021 (which is 5:00 a.m. local Singapore time, on          , 2021) (two business days before the General Meeting) in order for their shares to be redeemed.

SC Health warrant holders should not submit the certificates relating to their warrants. Public shareholders who do not elect to have their public shares redeemed for the pro rata share of the trust account should not submit the certificates relating to their public shares.

**Q:     What should I do if I receive more than one set of voting materials?**

A:     Shareholders may receive more than one set of voting materials, including multiple copies of this prospectus/proxy statement and multiple proxy cards or vote instruction forms. For example, if you hold your shares in more than one brokerage account, you will receive a separate vote instruction form for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date and return each proxy card and vote instruction form that you receive in order to cast a vote with respect to all of your ordinary shares.

**Q:     Who will solicit and pay the cost of soliciting proxies for the General Meeting?**

A:     SC Health will pay the cost of soliciting proxies for the General Meeting. SC Health has engaged Morrow Sodali LLC to assist in the solicitation of proxies for the General Meeting. SC Health has agreed to pay

25

Exhibit 4
Page 129

Table of Contents

Morrow Sodali LLC a fee of $            , plus disbursements. SC Health will also reimburse banks, brokers and other custodians, nominees and fiduciaries representing beneficial owners of SC Health's Class A ordinary shares for their expenses in forwarding soliciting materials to beneficial owners of SC Health Class A ordinary shares and in obtaining voting instructions from those owners. SC Health's directors and officers may also solicit proxies by telephone, by facsimile, by mail or email, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies.

**Q:     Where can I find the voting results of the General Meeting?**

A:     The preliminary voting results will be expected to be announced at the General Meeting. SC Health will publish final voting results of the General Meeting in a Current Report on Form 8-K within four business days after the General Meeting.

**Q:     Who can help answer my questions?**

A:     If you have questions about the Business Combination or if you need additional copies of the prospectus/proxy statement or additional proxies you may contact Morrow Sodali LLC, SC Health's proxy solicitor, by calling (800) 662-5200 (toll-free in North America), or +1 (203) 658-9400 (outside of North America), or by email at **SCPE.info@investor.morrowsodali.com**.

You also may obtain additional information about SC Health from documents filed with the SEC by following the instructions in the section entitled "*Where You Can Find More Information; Incorporation by Reference*." If you are a holder of public shares and you intend to seek redemption of your public shares, you will need to deliver the certificates for your public shares (if any) along with the redemption forms (either physically or electronically) to AST, SC Health's transfer agent, at the address below prior to the General Meeting. **Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m. Eastern Time, on            , 2021 (which is 5:00 a.m. local Singapore time, on            , 2021) (two business days before the General Meeting) in order for their shares to be redeemed.** If you have questions regarding the certification of your position or delivery of your share certificates (if any) along with the redemption forms, please contact:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219

Attention: Felix Orihuela
Email: FOrihuela@astfinancial.com

26

Exhibit 4
Page 130

Table of Contents

**SUMMARY OF THE PROSPECTUS/PROXY STATEMENT**

This summary highlights selected information from this prospectus/proxy statement and does not contain all of the information that is important to you. To better understand the proposals to be submitted for a vote at the General Meeting, including the Business Combination, you should read this entire document carefully, including the Business Combination Agreement, which is attached as Annex A to this prospectus/proxy statement. The Business Combination Agreement and Plan of Merger is the legal document that governs the Business Combination and the other transactions that will be undertaken in connection therewith. The Business Combination Agreement and Plan of Merger is also described in detail in this prospectus/proxy statement in the section entitled "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger*."

**The Parties to the Business Combination Agreement**

*SC Health*

SC Health is a blank check company incorporated on December 10, 2018, as a Cayman Islands exempted company and formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses.

On July 16, 2019, SC Health consummated its initial public offering of 15,000,000 units. Each unit consists of one Class A Share, and one-half of one redeemable warrant of SC Health. Each whole warrant entitles the holder thereof to purchase one Class A Share for $11.50 per share. The units were sold at a price of $10.00 per unit, generating gross proceeds to SC Health of $150,000,000.

Simultaneously with the closing of the initial public offering, SC Health completed the private sale of 5,000,000 warrants to its Sponsor at a purchase price of $1.00 per private placement warrant, generating gross proceeds to SC Health of $5,000,000.

On August 2, 2019, SC Health consummated the closing of the sale of 2,250,000 additional Units at the price of $10.00 per unit upon receiving the underwriters' election to fully exercise their over-allotment option, generating additional gross proceeds of $22,500,000 to SC Health. Simultaneously with the exercise of the over-allotment, SC Health completed the private sale of an additional 450,000 private placement warrants to the Sponsor, generating gross proceeds to SC Health of $450,000.

Following the closing of SC Health's initial public offering, a total of $172.5 million ($10.00 per unit) of the proceeds from its initial public offering was placed in the trust account. As of March 19, 2021, funds in the trust account totaled approximately $174,545,229.

The SC Health Class A ordinary shares, SC Health units and SC Health public warrants are currently listed on the NYSE under the symbols "SCPE," "SCPE.U" and "SCPE.WS," respectively.

SC Health's principal executive office is located at 108 Robinson Road #10-00 Singapore 068900. SC Health's corporate website address is https://www.schealthcorp.com SC Health's website and the information contained on, or that can be accessed through, the website is not deemed to be incorporated by reference in, and is not considered part of, this prospectus/proxy statement.

*Rockley*

Rockley is a company incorporated under the laws of England and Wales on September 9, 2013. Rockley's mission is to be the leading global provider of sensing products comprised of integrated optical modules with supporting electronics, software, application algorithms, and AI platforms for high-volume applications in

27

Exhibit 4
Page 131

Table of Contents

dynamic and high-growth market sectors. Rockley's focus is on consumer wearables and mobile and medical devices in the health and wellness sectors and the hyper-scale data center connectivity that allows them to seamlessly work together. Rockley's principal executive office is located at Clarendon Business Centre, 57 Woodstock Road, Oxford, OX2 6HJ. Its telephone number is +44 (0) 1865 292017.

### HoldCo

HoldCo is a Cayman Islands exempted company, was incorporated solely for the purposes of the Business Combination and as of the date hereof has as its sole shareholder, Dr. Andrew Rickman, OBE. HoldCo does not own any material assets or operate any business. HoldCo's principal executive office is located at Rockley Photonics Holdings Limited, 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT. Its telephone number is +44 (0) 1865 292017.

### Merger Sub

Merger Sub is a Cayman Islands exempted company and a direct wholly owned subsidiary of HoldCo. Merger Sub does not own any material assets or operate any business. Merger Sub's principal executive office is located at Rockley Photonics Holdings Limited, 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT. Its telephone number is +44 (0) 1865 292017.

### Proposals to be Put to the Shareholders of SC Health at the General Meeting

The following is a summary of the proposals to be put to the General Meeting of SC Health and certain transactions contemplated by the Business Combination Agreement. The BCA Proposal and the Merger Proposal are cross-conditioned. The Incentive Plan Proposal and the ESPP Proposal are conditioned upon the approval of the BCA Proposal and the Merger Proposal. The BCA Proposal and the Merger Proposal are not conditional on the Incentive Plan Proposal and the ESPP Proposal being approved. The Adjournment Proposal is not conditioned upon the approval of any other proposal set forth in this prospectus/proxy statement. The transactions contemplated by the Business Combination Agreement will be consummated only if the Condition Precedent Proposals are approved at the General Meeting.

### BCA Proposal

As discussed in this prospectus/proxy statement, SC Health is asking its shareholders to approve by ordinary resolution and adopt the Business Combination Agreement and Plan of Merger, dated as of March 19, 2021, by and among SC Health, Rockley, HoldCo and Merger Sub, a copy of which is attached to this prospectus/proxy statement as Annex A. The Business Combination Agreement and Plan of Merger provides for, among other things, the merger of Merger Sub with and into SC Health, with SC Health surviving the merger as a wholly owned subsidiary of HoldCo, in accordance with the terms and subject to the conditions of the Business Combination Agreement as more fully described elsewhere in this prospectus/proxy statement. After consideration of the factors identified and discussed in the section entitled "*Proposal No. 1—BCA Proposal—SC Health's Board of Directors' Reasons for the Approval of the Business Combination*," SC Health's board of directors concluded that the Business Combination met the requirements disclosed in the prospectus for SC Health's initial public offering, including that the business of SC Health and its subsidiaries had a fair market value equal to at least 80% of the net assets held in the trust account (excluding the amount of any deferred underwriting discount held in trust) at the time of SC Health's signing the Business Combination Agreement. For more information about the transactions contemplated by the Business Combination Agreement, see "*Proposal No. 1—BCA Proposal*."

28

Exhibit 4
Page 132

Table of Contents

*Merger Consideration*

At the Merger Effective Time, immediately following the SC Health Class B Conversion, by virtue of the Merger, and without any further action on the part of SC Health, Merger Sub, HoldCo or the Company or the holders of any of the following securities:

1. each SC Health Class A ordinary share (other than any SC Health Class A ordinary shares held in treasury by SC Health (if any) (each, an "Excluded Share" and, collectively, "Excluded Shares")) issued and outstanding immediately prior to the Merger Effective Time shall automatically be exchanged for one HoldCo Ordinary Share, in accordance with Section 233(5) of the Cayman Islands Companies Act following a share capital increase realized by HoldCo by virtue of the Merger, to be subscribed by the contributing holders of the SC Health Class A ordinary shares (the "Merger Consideration"), which HoldCo ordinary shares HoldCo shall cause to be issued and delivered in accordance with its obligations set forth in the Business Combination Agreement;

2. all SC Health Class A ordinary shares (other than the Excluded Shares) shall cease to be outstanding, shall be cancelled and shall cease to exist and (A) each certificate formerly representing SC Health Class A ordinary shares (other than Excluded Shares) and (B) each entry in the SC Health's register of members formerly representing SC Health Class A ordinary shares (other than Excluded Shares) issued and outstanding immediately prior to the Merger Effective Time shall thereafter, in case of both (A) and (B), only represent the right to receive Merger Consideration into which such SC Health Class A ordinary shares have been exchanged (and contributed-in-kind) pursuant to the Business Combination Agreement;

3. each Excluded Share shall, by virtue of the Merger and without any further action on the part of SC Health, Merger Sub, HoldCo or the Company or holder thereof, cease to be outstanding, shall be cancelled without payment of any consideration therefor and shall cease to exist; and

4. each ordinary share, par value $0.00001 per share, of the Merger Sub (the "Merger Sub ordinary shares") issued and outstanding immediately prior to the Merger Effective Time shall be converted into and exchanged for one (1) validly issued, fully paid and nonassessable ordinary share, par value $0.0001 per share, of the Surviving Company. For further details, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger.*"

*Closing Conditions*

The Business Combination Agreement and Plan of Merger is subject to the satisfaction or waiver of certain customary closing conditions, including, among others; (i) approval by SC Health's shareholders of the Business Combination and related agreements and transactions; (ii) the effectiveness of the registration statement of which this prospectus/proxy statement forms a part; (iii) the receipt of certain regulatory approvals (including, but not limited to, approval for listing on the NYSE of the HoldCo ordinary shares to be issued in connection with the Merger); (iv) that SC Health has at least $5,000,001 of net tangible assets upon Closing; (v) the satisfaction of the Minimum Cash Condition; and (vi) the absence of any injunctions enjoining or prohibiting the closing of the Business Combination. For further details, see "*Proposal No. 1—BCA Proposal—Closing Conditions.*"

If such conditions are not met, and such conditions are not or cannot be waived under the terms of the Business Combination Agreement, then the Business Combination Agreement could terminate and the proposed Business Combination may not be consummated. In addition, pursuant to the SC Health Governing Documents, in no event will SC Health redeem public shares in an amount that would cause its net tangible assets to be less than $5,000,001.

For further details, see "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger—Consideration.*"

29

Exhibit 4
Page 133

Table of Contents

### Merger Proposal

As discussed in this prospectus/proxy statement, SC Health is asking its shareholders to approve by special resolution the Plan of Merger between SC Health and Merger Sub in the form to be tabled at the General Meeting, which will be substantially in the form set forth in the Business Combination Agreement, pursuant to which Merger Sub will merge with and into SC Health so that SC Health will be the surviving company and all the undertakings, property, rights and liabilities of Merger Sub vest in SC Health by virtue of such merger pursuant to the Cayman Island Companies Act, and the consummation of the Merger and the remaining transactions contemplated thereby, be authorized, approved and confirmed in all respects and that SC Health be authorized to enter into the Plan of Merger.

The Plan of Merger is in the form required by the Cayman Island Companies Act and the Merger will become effective at the time when the Plan of Merger is registered by the Registrar of Companies in the Cayman Islands, or at such later time as may be agreed by SC Health and the Company in writing and specified in the Plan of Merger.

For further details, see "*Proposal No. 2—Merger Proposal*".

### Incentive Plan Proposal

As discussed in this prospectus/proxy statement, SC Health is asking its shareholders to approve by ordinary resolution the 2021 Plan and to authorize the issuance of HoldCo ordinary shares in connection with the grant of options, stock appreciation rights, restricted shares, restricted stock units and other stock-based awards. The purpose of the 2021 Plan is to align the interests of eligible employees and other service providers with those of HoldCo's shareholders. The total number of shares authorized for issuance under the Plan will be 7,631,196 shares, plus any shares outstanding under the 2013 Plan after the effective date of the 2021 Plan that (i) are subsequently forfeited or terminated for any reason before being exercised or settled, (ii) are not issued because such stock award or any portion thereof is settled in cash, (iii) are subject to vesting restrictions and are subsequently forfeited, (iv) are withheld or reacquired to satisfy the exercise, strike or purchase price, or (v) are withheld or reacquired to satisfy a tax withholding obligation, plus an annual increase over the 10-year period commencing on January 1, 2022 and ending on (and including January 1, 2031) equal to the lesser of 4% of the outstanding HoldCo shares on the last day of the immediately preceding fiscal year or such amount as determined by the Board (or Committee authorized to administer the 2021 Plan).

### ESPP Proposal

As discussed in this prospectus/proxy statement, SC Health is asking its shareholders to approve by ordinary resolution the ESPP and to authorize the issuance of HoldCo ordinary shares to eligible employees. The purpose of the ESPP is to provide a broad-based employee benefit to attract the services of new eligible employees, to retain the services of existing employees and to provide incentives for such individuals to exert maximum effort toward the Company's success by purchasing HoldCo ordinary shares on favorable terms and to pay for such purchases through payroll deductions. The number of shares available for purchase under the ESPP is 1,526,239, plus an annual increase over the 10-year period commencing on January 1, 2022 and ending on (and including January 1, 2031) equal to the least of 1% of the outstanding shares on the last day of the immediately preceding fiscal year, 1,526,239 shares, or such amount as determined by the Board (or Committee authorized to administer the ESPP).

### Adjournment Proposal

If, based on the tabulated vote, there are not sufficient votes at the time of the General Meeting to authorize SC Health to consummate the Business Combination (because any of the Condition Precedent Proposals (as defined below) have not been approved (including as a result of the failure of any other cross-conditioned

30

Exhibit 4
Page 134

Table of Contents

Condition Precedent Proposals to be approved)), SC Health's board of directors may submit a proposal to adjourn the General Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies. For additional information, see "*Adjournment Proposal*."

**Related Agreements**

This section describes certain additional agreements entered into or to be entered into pursuant to the Business Combination Agreement. For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements*."

***Investor Support Agreement***

In connection with the execution of the Business Combination Agreement, SC Health, the Sponsor, HoldCo, Merger Sub, and the Company entered into the Investor Support Agreement, dated as of March 19, 2021, a copy of which is attached to this prospectus/proxy statement as Annex B. Pursuant to the Investor Support Agreement, the Sponsor has agreed to, among other things: (i) be bound by certain transfer restrictions with respect to its shares and warrants in SC Health; (ii) vote in favor of the transactions contemplated by the Business Combination Agreement and the related transaction proposals contemplated therein; (iii) vote against certain transactions involving SC Health or against any proposal or agreement that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, result in a breach of any obligation or agreement of SC Health under the Business Combination Agreement or ancillary agreements, result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled or change the dividend policy or capitalization of SC Health; and (iv) waive any rights to adjustment or other anti-dilution protections with respect to the exchange of shares in SC Health for shares in HoldCo and certain rights relating to certain working capital loans, in each case, subject to the terms and conditions of the Investor Support Agreement. In addition, the Sponsor agreed to waive its redemption rights with respect to all of the Founder Shares in connection with the closing of the Business Combination.

The Investor Support Agreement will terminate in its entirety, and be of no further force or effect, upon the earliest to occur of: (a) the Merger Effective Time; (b) such date and time as the Business Combination Agreement shall be terminated in accordance with its terms; and (c) the written agreement of SC Health, the Sponsor, HoldCo, Merger Sub, and the Company. Upon such termination of the Investor Support Agreement, all obligations of the parties under the Investor Support Agreement will terminate, without any liability or other obligation on the part of any party thereto to any person in respect thereof or the transactions contemplated hereby, and no party thereto will have any claim against another (and no person will have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter thereof; provided, however, that the termination of the Investor Support Agreement will not relieve any party thereto from liability arising in respect of any breach of the Investor Support Agreement prior to such termination. For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—Investor Support Agreement.*"

***Company Holders Support Agreement***

Concurrently with the execution of the Business Combination Agreement, SC Health entered into the Company Holders Support Agreement with the Company, HoldCo, Merger Sub, and certain shareholders of the Company (the "Company Shareholders"), a copy of which is attached to this prospectus/proxy statement as Annex C. Pursuant to the Company Holders Support Agreement, certain shareholders who hold a material number of shares in the Company have agreed to, among other things and subject to certain tax conditions being met: (i) vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at the court meeting and general meeting of the Company shareholders contemplated in the Business Combination Agreement, and take all other necessary and desirable actions reasonably requested by the Company in connection with the transactions contemplated by the Business Combination Agreement or any

31

Exhibit 4
Page 135

Table of Contents

ancillary agreement; (ii) vote against certain transactions involving the Company that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, any ancillary agreements or the Company Holders Support Agreement, result in a breach of any obligation or agreement of the Company under the Business Combination Agreement or other related agreement, or result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled; (iii) be bound by certain transfer restrictions with respect to the ordinary shares of the Company held by the shareholder; and (iv) do all things reasonably necessary, proper or advisable to consummate the transactions contemplated by the Business Combination Agreement and not take any action that would reasonably be expected to prevent or delay the satisfaction of any of the conditions to those transactions, in each case, subject to the terms and conditions of the Company Holders Support Agreement.

The Company Holders Support Agreement will terminate in its entirety, and be of no further force or effect, upon the earliest to occur of (i) the Merger Effective Time, (ii) the termination of the Business Combination Agreement in accordance with its terms and (iii) as to each Company Shareholder party thereto, the mutual written agreement of SC Health, the Company, HoldCo, Merger Sub and each such Company Shareholder. Upon such termination of the Company Holders Support Agreement, all obligations of the parties under the Company Holders Support Agreement will terminate, without any liability or other obligation on the part of any party thereto to any person in respect thereof or the transactions contemplated hereby, and no party thereto will have any claim against another (and no person will have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter thereof; provided, however, that the termination of the Company Holders Support Agreement will not relieve any party thereto from liability arising in respect of any breach of the Company Holders Support Agreement prior to such termination. For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—Company Holders Support Agreement*."

Dr. Andrew Rickman OBE (chairman and chief executive officer of the Company and currently the sole shareholder of HoldCo), entered into the AR Support Agreement, a copy of which is attached to this prospectus/proxy statement as Annex D, which is on the same terms as the Company Holders Support Agreement except that it also includes Dr. Rickman agreeing to vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at a general meeting (or by written consent) of the shareholders of HoldCo, and take all other necessary and desirable actions reasonably requested by HoldCo in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement.

### Registration Rights and Lock-Up Agreement

The Business Combination Agreement and Plan of Merger contemplates that, at the closing of the Business Combination, HoldCo, the Sponsor, and certain former shareholders of Rockley, will enter into the Registration Rights and Lock-Up Agreement, pursuant to which HoldCo will agree to register for resale, pursuant to Rule 415 under the Securities Act, certain HoldCo ordinary shares and other equity securities of HoldCo that are held by the parties thereto from time to time. Additionally, the Registration Rights and Lock-Up Agreement generally provides for a 180-day Lock-Up Period (as defined in the Business Combination Agreement) for the Sponsor and other equity investors and their Permitted Transferees (as defined in the Business Combination Agreement), subject to certain other terms and conditions depending on the price of the HoldCo ordinary shares. For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—Registration Rights and Lock-Up Agreement.*"

### PIPE Subscription Agreements

In connection with the execution of the Business Combination Agreement, SC Health and HoldCo entered into Subscription Agreements with the PIPE Investors, pursuant to which the PIPE Investors agreed to purchase, in the aggregate, 15,000,000 HoldCo ordinary shares at $10.00 per share for an aggregate commitment amount of $150,000,000. The closings under the Subscription Agreements will occur substantially concurrently with the

32

Exhibit 4
Page 136

**Table of Contents**

closing of the Business Combination. Additionally, pursuant to the Subscription Agreements, the PIPE Investors agreed to waive any claims that they may have at the closing of the Business Combination or in the future as a result of, or arising out of, the Subscription Agreements against SC Health, including with respect to the trust account. For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—PIPE Subscription Agreements.*"

### *Ownership of HoldCo following the Business Combination*

As of the date of this prospectus/proxy statement, there are 22,829,750 SC Health ordinary shares issued and outstanding, which include the 5,562,500 Founder Shares held by the Sponsor (whose members include SC Health's directors and officers) and the 17,250,000 public shares. As of the date of this prospectus/proxy statement, there is outstanding an aggregate of 14,075,000 SC Health warrants, which includes the 5,450,000 SC Health private placement warrants held by the Sponsor and 8,625,000 SC Health public warrants. Each whole warrant entitles the holder thereof to purchase one SC Health Class A ordinary share which shall be exchanged for one HoldCo ordinary share. Therefore, as of the date of this prospectus/proxy statement (without giving effect to the Business Combination), the SC Health fully diluted share capital would be 36,887,500 SC Health ordinary shares.

It is anticipated that, following the Business Combination, (1) SC Health's public shareholders are expected to own approximately 11.3% of the outstanding HoldCo ordinary shares, (2) Rockley Shareholders (without taking into account any public shares held by the Rockley Shareholders prior to the closing of the Business Combination or purchased in the PIPE Financing) are expected to own approximately 75.2% of the outstanding HoldCo ordinary shares, (3) the Sponsor and related parties (including the Sponsor Related PIPE Investor) are expected to collectively own approximately 6.9% of the outstanding HoldCo ordinary shares and (4) the PIPE Investors (other than the Sponsor Related PIPE Investor) are expected to own approximately 6.6% of the outstanding HoldCo ordinary shares. These percentages assume (i) that no public shareholders exercise their redemption rights in connection with the Business Combination, (ii) (a) the vesting of all HoldCo ordinary shares received in respect of the HoldCo Restricted Shares and (b) that HoldCo issues HoldCo ordinary shares as the Merger Consideration pursuant to the Business Combination Agreement, which in the aggregate equals 137,623,911 HoldCo ordinary shares, and (iii) that HoldCo issues 15,000,000 HoldCo ordinary shares to the PIPE Investors pursuant to the PIPE Financing. The percentages do not take into account the issuance of any shares underlying HoldCo options prior to the Business Combination or the issuance of any shares underlying HoldCo options that will be held by equity holders of HoldCo following completion of the Business Combination. If the actual facts are different from these assumptions, the percentage ownership retained by the Company's existing shareholders in the combined company will be different.

The following table illustrates varying ownership levels in HoldCo immediately after giving effect to the Business Combination and other events contemplated by the Business Combination Agreement.

| | Share Ownership of HoldCo | | | |
| | No Redemption | | Maximum Redemption(1) | |
| Shareholder | Shares | % | Shares | % |
| --- | --- | --- | --- | --- |
| Former SC Health Class A shareholders | 17,250,000 | 11.3% | 988,576 | 0.7% |
| Sponsor and related parties(2) | 10,562,500 | 6.9% | 10,562,500 | 7.8% |
| Former Rockley shareholders and warrant holders | 114,811,411 | 75.2% | 114,811,411 | 84.2% |
| Third party investors in PIPE Financing(3) | 10,000,000 | 6.6% | 10,000,000 | 7.3% |
| **Total HoldCo ordinary shares outstanding at closing of the Business Combination(4)** | 152,623,911 | 100% | 136,362,487 | 100% |

(1)    This scenario assumes that 16,261,424 SC Health Class A ordinary shares are redeemed for an aggregate payment of $174.5 million, which is derived from the number of shares that could be redeemed in

33

Exhibit 4
Page 137

**Table of Contents**

connection with the Business Combination at an assumed redemption price of approximately $10.73 per share of HoldCo ordinary shares based on the trust account balance as of December 31, 2020 in order for the amount of cash available in the trust account following the General Meeting to be at least equal to $5,000,001.

(2)    Amount includes 5,562,500 HoldCo ordinary shares the Sponsor will receive upon conversion of its Class B Ordinary Shares and 5,000,000 shares subscribed for by the Sponsor and the Sponsor Related PIPE Investor in the PIPE Financing.

(3)    Amount includes 2,100,000 HoldCo ordinary shares subscribed for by current shareholders of Rockley in the PIPE Financing but excludes shares to be acquired by Sponsor Related PIPE Investor. See note (2) above.

(4)    The figures in this table are presented only as illustrative examples and are based on the assumptions described above, which may be different from the actual amount of redemptions in connection with the Business Combination. In the event that SC Health Class A ordinary shares are redeemed in connection with the Business Combination but the number of shares redeemed is less than 16,261,424, the ownership percentages set forth above will vary on a linear basis between the two scenarios.

**Date, Time and Place of General Meeting of SC Health's Shareholders**

The General Meeting of the shareholders of SC Health will be held at            , local Singapore time, on            , 2021, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900, to consider and vote upon the proposals to be put to the General Meeting, including if necessary, the Adjournment Proposal, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the General Meeting, each of the Condition Precedent Proposals have not been approved.

**Registering for the General Meeting**

Any shareholder wishing to attend the General Meeting should register for the General Meeting by            , 2021 at            , local Singapore time. To register for the General Meeting, please follow these instructions as applicable to the nature of your ownership of ordinary shares:

•    Beneficial shareholders (those holding shares through a stock brokerage account or by a bank or other holder of record) who wish to attend the General Meeting must obtain a legal proxy by contacting their account representative at the bank, broker, or other nominee that holds their shares and e-mail a copy (a legible photograph is sufficient) of their legal proxy to AST at FOrihuela@astfinancial.com.

**Voting Power; Record Date**

SC Health shareholders will be entitled to vote or direct votes to be cast at the General Meeting if they owned ordinary shares at the close of business on            , 2021, which is the record date for the General Meeting. Shareholders will have one vote for each ordinary share owned at the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly counted. SC Health warrants do not have voting rights. As of the close of business on the record date, there were            ordinary shares outstanding, of which            % were public shares, with the rest being held by SC Health's Initial Shareholders.

34

Exhibit 4
Page 138

Table of Contents

**Quorum and Vote of SC Health Shareholders**

A quorum of SC Health shareholders is necessary to hold a valid meeting. A quorum will be present at the SC Health General Meeting if the holders of a majority of the issued and outstanding SC Health ordinary shares entitled to vote at the General Meeting are represented in person or by proxy (which would include presence at the General Meeting). Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as a vote cast at the General Meeting.

As of the record date for the General Meeting,             SC Health ordinary shares would be required to achieve a quorum.

The Sponsor has agreed to vote all of its ordinary shares in favor of the proposals being presented at the General Meeting. As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding SC Health ordinary shares.

The proposals presented at the General Meeting require the following votes:

- **BCA Proposal**: The approval of the BCA Proposal requires an ordinary resolution, being the affirmative vote for the proposal by the holders of a simple majority of the SC Health ordinary shares who, being present and entitled to vote at the General Meeting to approve the BCA Proposal, vote at the General Meeting.

- **Merger Proposal**. The approval of the Merger Proposal requires a special resolution, being the affirmative vote for the proposal by holders of a majority of at least two-thirds of the SC Health ordinary shares, who being present and entitled to vote at the General Meeting to approve the Merger Proposal vote at the General Meeting.

- **Incentive Plan Proposal**. The approval of the Incentive Plan Proposal requires an ordinary resolution, being the affirmative vote for the proposal by holders of a simple majority of the SC Health ordinary shares, who being present and entitled to vote at the General Meeting to approve the Incentive Plan Proposal vote at the General Meeting.

- **ESPP Proposal**. The approval of the ESPP Proposal requires an ordinary resolution, being the affirmative vote for the proposal by holders of a simple majority of the SC Health ordinary shares, who being present and entitled to vote at the General Meeting to approve the ESPP Proposal vote at the General Meeting.

- **Adjournment Proposal**: The approval of the Adjournment Proposal requires an ordinary resolution, being the affirmative vote for the proposal by the holders of a simple majority of the SC Health ordinary shares who, being present and entitled to vote at the General Meeting to approve the Adjournment Proposal, vote at the General Meeting.

Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as a vote cast at the General Meeting.

**Redemption Rights**

Pursuant to the SC Health Governing Documents, a public shareholder may request that SC Health redeem all or a portion of its public shares for cash if the Business Combination is consummated. As a holder of public shares, you will be entitled to receive cash for any public shares to be redeemed only if you:

- hold public shares or if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

35

Exhibit 4
Page 139

**Table of Contents**

- submit a written request to American Stock Transfer & Trust Company ("AST"), SC Health's transfer agent, that HoldCo redeem all or a portion of your public shares for cash; and

- deliver the certificates for your public shares (if any) along with the redemption forms to AST physically or electronically through DTC.

Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m. Eastern Time, on              , 2021 (which is 5:00 a.m. local Singapore time, on              , 2021) (two business days before the General Meeting) in order for their shares to be redeemed.

Holders of units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact AST directly and instruct them to do so. Public shareholders may elect to redeem all or a portion of the public shares held by them regardless of if or how they vote in respect of the BCA Proposal. If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers the certificates for its shares (if any) along with the redemption forms to AST, HoldCo will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account, calculated as of two business days prior to the closing of the Business Combination. For illustrative purposes, as of March 30, 2021, this would have amounted to approximately $10.00 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 20% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 20% of the public shares, then any such shares in excess of that 20% limit would not be redeemed for cash.

Each holder of SC Health public warrants (other than the Sponsor and its affiliates) will have the right to require the Sponsor to repurchase or cause one of its affiliates to repurchase, at $1.00 per public warrant (exclusive of commissions), such holder's outstanding SC Health public warrants in connection with the completion of the Business Combination. In the event the Business Combination is later abandoned, the Sponsor or its affiliate will not repurchase the SC Health public warrants, and the SC Health public warrants will be returned to the holders. There will be no redemption rights upon the completion of the Business Combination with respect to the SC Health public warrants.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how SC Health's public shareholders vote. The Sponsor and each director and each officer of SC Health have agreed to, among other things, vote in favor of the Business Combination Agreement and the transactions contemplated thereby, in the case of the Sponsor, subject also to the terms and conditions contemplated by the Investor Support Agreement. As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding ordinary shares.

**Appraisal Rights**

Neither SC Health shareholders nor SC Health warrant holders have appraisal rights in connection with the Business Combination under Cayman Islands law.

36

Exhibit 4
Page 140

Table of Contents

**Proxy Solicitation**

Proxies may be solicited by mail, telephone or in person. SC Health has engaged Morrow Sodali to assist in the solicitation of proxies.

If a shareholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the General Meeting. A shareholder also may change its vote by submitting a later-dated proxy as described in the section entitled "*General Meeting of SC Health—Revoking Your Proxy*."

**Interests of HoldCo Health Directors and Officers in the Business Combination**

When you consider the recommendation of SC Health's board of directors in favor of approval of the BCA Proposal and Merger Proposal, you should keep in mind that the HoldCo and Rockley's directors and executive officers have interests in such proposal that are different from, or in addition to, those of SC Health shareholders and warrant holders generally. These interests include, among other things, are discussed "*Executive Compensation—Director Compensation*" and "*Executive Compensation—HoldCo Executive Compensation.*"

**Interests of SC Health's Directors and Officers in the Business Combination**

When you consider the recommendation of SC Health's board of directors in favor of approval of the BCA Proposal and Merger Proposal, you should keep in mind that the Sponsor and SC Health's directors and executive officers have interests in such proposal that are different from, or in addition to, those of SC Health shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

•    Prior to SC Health's initial public offering, the Sponsor purchased 3,450,000 SC Health Class B ordinary shares for an aggregate purchase price of $25,000, or approximately $ 0.006 per share. As a result of the significantly lower investment per share of SC Health's Sponsor as compared with the investment per share of SC Health's public shareholders, a transaction which results in an increase in the value of the investment of the Sponsor may result in a decrease in the value of the investment of SC Health public shareholders.

•    In addition, if SC Health does not consummate a business combination by April 16, 2021 (or if such date is extended at a duly called extraordinary general meeting, such later date), it would cease all operations except for the purpose of winding up, redeeming all of the outstanding public shares for cash and, subject to the approval of its remaining shareholders and its board of directors, liquidating and dissolving, subject in each case to its obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. In such event, the 5,562,500 SC Health Class B ordinary shares owned by the Sponsor would be worthless because following the redemption of the public shares, SC Health would likely have few, if any, net assets and because the Sponsor and SC Health's directors and officers have agreed to waive their respective rights to liquidating distributions from the trust account in respect of any SC Health Class A ordinary shares and SC Health Class B ordinary shares held by it or them, as applicable, if SC Health fails to complete a business combination within the required period. Additionally, in such event, the 5,000,000 private placement warrants purchased by the Sponsor simultaneously with the consummation of SC Health's initial public offering for an aggregate purchase price of $5,000,000 will also expire worthless.

•    SC Health's director and executive officer, David Sin, also has a direct or indirect economic interest in such private placement warrants and in the 5,562,500 SC Health Class B ordinary shares owned by the Sponsor. The 5,562,500 HoldCo ordinary shares into which the 5,562,500 SC Health Class B ordinary shares held by the Sponsor will automatically be exchanged for in connection with the Business Combination (after such SC Health Class B ordinary shares are automatically converted into SC Health Class A ordinary shares), if unrestricted and freely tradable, would have had an aggregate market value of $56.1 million based upon the closing price of $10.09 per public share on the NYSE on March 30,

37

Exhibit 4
Page 141

Table of Contents

2021, the most recent practicable date prior to the date of this prospectus/proxy statement. However, given that such HoldCo ordinary shares will be subject to certain restrictions, including those described elsewhere in this prospectus/proxy statement, SC Health believes such shares have less value. The 5,450,000 HoldCo warrants into which the 5,450,000 private placement warrants held by the Sponsor will automatically convert in connection with the Business Combination, if unrestricted and freely tradable, would have had an aggregate market value of $60.0 million based upon the closing price of $11.00 per public warrant on the NYSE on March 30, 2021, the most recent practicable date prior to the date of this prospectus/proxy statement;

- Angelo John Coloma and Lim Cheok Peng, current directors of SC Health, are expected to be directors of HoldCo after the closing of the Business Combination, subject to obtaining the CFIUS approval. As such, in the future, Mr. Coloma and Dr. Lim may receive fees for their services as directors of HoldCo, which may consist of cash or stock-based awards under the 2021 Plan, and any other remuneration that HoldCo's board of directors determines to pay to its non-employee directors. For additional information, see "*Executive Compensation—Director Compensation*;"

- HoldCo's existing directors and officers will be eligible for continued indemnification and continued coverage under HoldCo's directors' and officers' liability insurance policy after the Business Combination and pursuant to the Business Combination Agreement;

- The Sponsor Related PIPE Investor has subscribed for $50,000,000 of the PIPE Financing, for which it will receive 5,000,000 HoldCo ordinary shares. See "*Certain Relationships and Related Person Transactions—SC Health—Subscription Agreements;*"

- In order to protect the amounts held in SC Health's trust account, the Sponsor has agreed that it will indemnify and hold harmless SC Health if and to the extent any claims by a third party for services rendered or products sold to SC Health, or a prospective target business with which SC Health has entered into a written letter of intent, confidentiality or other similar agreement or business combination agreement, reduce the amount of funds in the trust account to below the lesser of (i) $10.00 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case, less taxes payable, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under the indemnity of the underwriters of SC Health's initial public offering against certain liabilities, including liabilities under the Securities Act;

- SC Health's officers and directors and their affiliates are entitled to reimbursement of out-of-pocket expenses incurred by them related to identifying, investigating, negotiating and completing an initial business combination. However, if SC Health fails to consummate a business combination by April 16, 2021 (or if such date is extended at a duly called extraordinary general meeting, such later date), they will not have any claim against the trust account for reimbursement. Accordingly, SC Health may not be able to reimburse these expenses if the Business Combination or another business combination is not completed by such date; and

- Pursuant to the Registration Rights and Lock-Up Agreement, the Sponsor will have customary registration rights, including demand and piggy-back rights, subject to cooperation and cut-back provisions with respect to the HoldCo ordinary shares and warrants held by such parties following the closing of the Business Combination.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how SC Health's public shareholders vote. The Sponsor and each director and each officer of SC Health have agreed to, among other things, vote in favor of the Business Combination Agreement and the transactions contemplated thereby, in the case of the Sponsor, subject also to the terms and conditions contemplated by the Investor Support Agreement.

Exhibit 4
Page 142

Table of Contents

As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding ordinary shares.

At any time at or prior to the Business Combination, during a period when they are not then aware of any material non-public information regarding SC Health or SC Health's securities, the Sponsor, Rockley, SC Health's or Rockley's respective directors, officers, advisors, or their respective affiliates may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against any of the Condition Precedent Proposals, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Condition Precedent Proposals. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record holder of SC Health's shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that the Sponsor, Rockley or their respective directors, officers, advisors or respective affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholder would be required to revoke their prior elections to redeem their shares. The purpose of such share purchases and other transactions would be to increase the likelihood of (1) satisfaction of the requirement that holders of a majority of the SC Health ordinary shares, represented in person or by proxy and entitled to vote at the General Meeting, vote in favor of the BCA Proposal, the Merger Proposal and the Adjournment Proposal, (2) the satisfaction of the Minimum Cash Condition, (3) otherwise limiting the number of public shares electing to redeem and (4) SC Health's net tangible assets being at least $5,000,001.

Entering into any such arrangements may have a depressive effect on the SC Health ordinary shares (e.g., by giving an investor or holder the ability to effectively purchase shares at a price lower than market, such investor or holder may therefore become more likely to sell the shares he or she owns, either at or prior to the Business Combination). If such transactions are effected, the consequence could be to cause the Business Combination to be consummated in circumstances where such consummation could not otherwise occur. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the General Meeting and would likely increase the chances that such proposals would be approved.

The existence of financial and personal interests of one or more of SC Health's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests of SC Health and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder.

The personal and financial interests of the Sponsor as well as SC Health's directors and officers may have influenced their motivation in identifying and selecting Rockley as a business combination target, completing an initial business combination with Rockley and influencing the operation of the business following the initial business combination. In considering the recommendations of SC Health's board of directors to vote for the proposals, its shareholders should consider these interests.

**Recommendation to Shareholders of SC Health**

SC Health's board of directors believes that the BCA Proposal, the Merger Proposal and the other proposals to be presented at the General Meeting are in the best interest of SC Health's shareholders and unanimously recommends that its shareholders vote "FOR" the approval of the BCA Proposal, "FOR" the approval of the Merger Proposal, and "FOR" the approval of each of the other proposals, in each case, if presented to the General Meeting.

The existence of financial and personal interests of one or more of SC Health's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests

39

Exhibit 4
Page 143

Table of Contents

of SC Health and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion of these considerations.

## Stock Exchange Listing

The SC Health Class A ordinary shares, SC Health units and SC Health public warrants are currently listed on the New York Stock Exchange (the "NYSE") under the symbols "SCPE," "SCPE.U" and "SCPE.WS." Upon the closing of the Business Combination, the SC Health securities will be delisted from the NYSE. HoldCo intends to apply to list the HoldCo ordinary shares and HoldCo warrants on the NYSE under the symbols "RKLY" and "RKLY.W," respectively, upon the closing of the Business Combination. We cannot assure you that the HoldCo ordinary shares or HoldCo warrants will be approved for listing on the NYSE.

## Sources and Uses of Funds for the Business Combination

The following table summarizes the sources and uses for funding the Business Combination.

| Sources | | Uses | |
|---|---|---|---|
| ($ in millions) | | | |
| Rockley shareholders rollover | $1,148.1 | Rockley shareholders rollover | $1,148.1 |
| Cash and investments held in trust account[1] | 172.5 | Cash to balance sheet | 288.9 |
| | | Promissory note[2] | 0.1 |
| PIPE Financing | 150.0 | Transaction expenses | 33.5 |
| **Total sources** | **1,470.6** | **Total uses** | **1,470.6** |

(1)  Assumes no redemptions.
(2)  In January 2019, SC Health issued an unsecured promissory note (the "Promissory Note") to the Sponsor, pursuant to which SC Health could borrow up to an aggregate principal amount of $300,000. The Promissory Note was non-interest bearing and payable on the earlier of December 31, 2019 or the completion of the initial public offering. In January 2019, SC Health transferred its outstanding advance from a related party in the amount of $32,313 into the Promissory Note. The outstanding balance of $254,595 under the Promissory Note was repaid as of December 31, 2019. Additionally, on December 30, 2020, the Sponsor deposited $100,000 into the operating bank account of SC Health for working capital. This amount is outstanding as of December 31, 2020.

## U.S. Federal Income Tax Considerations

For a discussion summarizing certain U.S. federal income tax considerations of an exercise of redemption rights in connection with the Business Combination, please see "*Certain Material U.S. Federal Income Tax Considerations*."

## Expected Accounting Treatment of the Business Combination

Notwithstanding the legal form of the Business Combination pursuant to the Business Combination Agreement, the Business Combination will be accounted for as a forward recapitalization in accordance with GAAP. Under this method of accounting, SC Health will be treated as the acquired company for financial reporting purposes, and Rockley will be treated as the accounting acquiror. In accordance with this accounting, the Business Combination will be treated as the equivalent of Rockley issuing stock for the net assets of SC

Exhibit 4
Page 144

**Table of Contents**

Health, accompanied by a recapitalization. The net assets of SC Health will be stated at historical costs, with no goodwill or other intangible assets recorded, and operations prior to the Business Combination will be those of Rockley. Rockley has been deemed to be the accounting acquiror for purposes of the Business Combination based on an evaluation of the following facts and circumstances:

- Rockley's existing shareholders will hold a majority ownership interest in HoldCo, irrespective of whether or not existing shareholders of SC Health exercise their right to redeem their ordinary shares of SC Health, and as such, will have the power to appoint a majority of the member of HoldCo's board of directors;

- Rockley's existing senior management team will comprise senior management of HoldCo;

- Rockley's is the larger of the companies based on historical operating activity and employee base; and

- Rockley's operations will comprise the ongoing operations of HoldCo.

### The Business Combination

We expect the Business Combination to be accounted for as a forward recapitalization in accordance with GAAP. Under the guidance in ASC 805, SC Health is expected to be treated as the "acquired" company for financial reporting purposes. Accordingly, the Business Combination is expected to be reflected as the equivalent of Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded.

### Regulatory Matters

Under the HSR Act and the rules that have been promulgated thereunder by the Federal Trade Commission ("FTC"), certain transactions may not be consummated unless information has been furnished to the Antitrust Division of the Department of Justice ("Antitrust Division") and the FTC and certain waiting period requirements have been satisfied. Certain anticipated shareholders of HoldCo under the Business Combination are subject to these requirements and may not obtain ordinary shares until the expiration of a 30-day waiting period following the filing of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. On          , 2021, the Sponsor and HoldCo filed the required forms under the HSR Act with respect to the Business Combination with the Antitrust Division and the FTC and requested early termination. On          , 2021, the 30-day waiting period expired.

At any time before or after closing of the Business Combination, notwithstanding termination of the waiting period under the HSR Act, the Antitrust Division or the FTC, or any state or foreign governmental authority could take such action under applicable antitrust laws as such authority deems necessary or desirable in the public interest, including seeking to enjoin the closing of the Business Combination, conditionally approving the Business Combination upon divestiture of assets, subjecting the completion of the Business Combination to regulatory conditions or seeking other remedies. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. SC Health cannot assure you that the Antitrust Division, the FTC, any state attorney general or any other government authority will not attempt to challenge the Business Combination on antitrust grounds, and, if such a challenge is made, SC Health cannot assure you as to its result.

Neither SC Health nor Rockley are aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than the expiration or early termination of the waiting period under the HSR Act with respect to the Sponsor's acquisition of HoldCo's ordinary shares. It is presently contemplated that if any such additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

Certain investments that involve the acquisition of, or investment in, a U.S. business may be subject to review and approval by CFIUS, depending on the structure, beneficial ownership, rights and control of interests

41

Exhibit 4
Page 145

**Table of Contents**

in the U.S. business. Pursuant to the Business Combination Agreement, SC Health's Designation Right (as defined in <u>Section 9.8</u> of the Business Combination Agreement) will not become operative until and unless CFIUS Approval has been obtained. CFIUS Approval shall occur only when one of the following conditions has been met: (a) in response to the filing of a Notice by the parties, SC Health and Rockley have received written notice from CFIUS stating that: (1) CFIUS has concluded that SC Health's Designation Right (as defined in <u>Section 9.8</u> of the Business Combination Agreement) is not a Covered Transaction (as defined in 31 C.F.R. § 800.213) and not subject to review under the DPA; or (2) the review and/or investigation of SC Health's Designation Right under the DPA has been concluded and there are no unresolved national security concerns; or (b) CFIUS has sent a report to the President of the United States requesting the President's decision on SC Health's Designation Right and either (1) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on SC Health's Designation Right has expired without any such action being threatened, announced or taken or (2) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on SC Health's Designation Right.

**Emerging Growth Company**

SC Health is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act, and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in SC Health's periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

Further, section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. SC Health has elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, SC Health, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of SC Health's financial statements with certain other public companies difficult or impossible because of the potential differences in accounting standards used.

SC Health will remain an emerging growth company until the earlier of: (1) the last day of the fiscal year (a) following the fifth anniversary of the closing of SC Health's initial public offering, (b) in which SC Health has total annual gross revenue of at least $1.07 billion or (c) in which SC Health is deemed to be a "large accelerated filer," which means the market value of SC Health's common equity that is held by non-affiliates exceeds $700 million as of the prior June 30th; and (2) the date on which SC Health has issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

Additionally, SC Health is a "smaller reporting company" as defined in Item 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. SC Health will remain a smaller reporting company until the last business day of June in any fiscal year in which (1) the market value of its common equity held by non-affiliates exceeds $700 million as of such date or (2) the market value of its common equity exceeds $250 million as of such date and its annual revenues exceeds $100 million during its fiscal year immediately preceding such date.

42

Exhibit 4
Page 146

**Table of Contents**

**Risk Factors**

In evaluating the proposals to be presented at the General Meeting, shareholders should carefully read this prospectus/proxy statement and especially consider the factors discussed in the section titled "*Risk Factors*."

43

Exhibit 4
Page 147

Table of Contents

ORGANIZATIONAL STRUCTURE

The following diagrams illustrate in abbreviated and simplified form the current structures of Rockley, SC Health and the PIPE Financing as well as the expected structure of HoldCo upon the closing of the Business Combination.

Current Structure



Anticipated Ending Structure



44

Exhibit 4
Page 148

Table of Contents

### COMPARATIVE SHARE INFORMATION

The following table sets forth summary historical comparative share information for SC Health and Rockley, respectively, and unaudited pro forma condensed combined per share information of HoldCo after giving effect to the Business Combination and other events contemplated by the Business Combination Agreement presented under two scenarios:

- **No Redemption Scenario** — this scenario assumes that no SC Health Class A ordinary shares are redeemed; and

- **Maximum Redemption Scenario** — this scenario assumes that 16,261,424 SC Health Class A ordinary shares are redeemed for an aggregate payment of $174.5 million, which is derived from the number of shares that could be redeemed in connection with the Business Combination at an assumed redemption price of approximately $10.73 per share of HoldCo ordinary shares based on the trust account balance as of December 31, 2020 in order for the amount of cash available in the trust account following the General Meeting to be at least equal to $5,000,001 million.

The pro forma book value information reflects the Business Combination as if it had occurred on December 31, 2020. The pro forma weighted average shares outstanding and net loss per share information reflects the Business Combination as if it had occurred on December 31, 2020.

This information is only a summary and should be read in conjunction with the historical financial statements of SC Health and Rockley and related notes included elsewhere in this prospectus/proxy statement. The unaudited pro forma combined per share information of SC Health and Rockley is derived from, and should be read in conjunction with, the unaudited pro forma condensed combined financial information and related notes included elsewhere in this prospectus/proxy statement in the section titled "*Unaudited Pro Forma Condensed Combined Financial Information*."

The unaudited pro forma combined income (loss) per share information below does not purport to represent the income (loss) per share which would have occurred had the companies been combined during the periods presented, nor earnings per share for any future date or period. The unaudited pro forma combined book value per share information below does not purport to represent what the value of SC Health and Rockley would have been had the companies been combined during the periods presented.

| | | | Pro forma combined | | Rockley equivalent pro forma per share data(2) | |
| | SC Health(1) | Rockley(1) | Assuming no redemptions | Assuming maximum redemptions | Assuming no redemptions | Assuming maximum redemptions |
|---|---|---|---|---|---|---|
| Weighted average number of shares outstanding — basic and diluted | 17,250,000 | 114,811,411 | 152,623,911 | 136,362,487 | 82,848,660 | 82,848,660 |
| Weighted average number of shares outstanding — SC Health Class B basic and diluted | 5,562,500 | N/A | N/A | N/A | N/A | N/A |
| Basic and diluted net income (loss) per share | $ 0.04 | $ (0.70) | $ (0.42) | $ (0.47) | $ (1.03) | $ (1.15) |
| SC Health Class B basic and diluted net loss per share | $ (0.31) | N/A | N/A | N/A | N/A | N/A |
| Stockholders' equity (deficit) per share — basic and diluted | $ 0.22 | $ (0.27) | $ 2.79 | $ 1.93 | $ 6.87 | $ 4.76 |

45

Exhibit 4
Page 149

**Table of Contents**

(1)    Basic and diluted net income (loss) per share for SC Health includes amounts related to SC Health Class A ordinary shares and for Rockley includes amounts related to Rockley ordinary shares. Potentially dilutive shares have been deemed to be anti-dilutive and, accordingly, have been excluded from the calculation of diluted loss per share. As of December 31, 2020, potentially dilutive shares that have been excluded from the determination of SC Health diluted loss per share include 14,075,000 outstanding warrants issued in connection with its initial public offering. Potentially dilutive shares that have been excluded from the determination of Rockley diluted loss per share, as of December 31, 2020, includes 4,420,105 and 985,828 options and warrants to purchase shares of Rockley ordinary shares that will remain outstanding and become exercisable to purchase ordinary shares of HoldCo upon consummation of the Business Combination.

(2)    The equivalent pro forma basic and diluted per share data for Rockley is calculated by multiplying the combined pro forma per share data by 2.461, which is the exchange ratio as determined in accordance with the Business Combination Agreement. Weighted average number of shares outstanding — basic and diluted is calculated by multiplying the exchange ratio of 2.461 by the shares of Rockley ordinary shares that will be exchanged in the Business Combination.

46

Exhibit 4
Page 150

Table of Contents

## MARKET PRICE AND DIVIDEND INFORMATION

The SC Health Class A ordinary shares, SC Health units and SC Health public warrants of SC Health are currently listed on the NYSE under the symbols "SCPE," "SCPE.U" and "SCPE.WS," respectively.

The most recent closing price of the units, ordinary shares and redeemable warrants as of March 18, 2021, the last trading day before announcement of the execution of the Business Combination Agreement, was $10.11, $10.76 and $1.19, respectively. As of            , 2021, the record date for the General Meeting, the closing price for each unit, ordinary shares and redeemable warrant was $          , $          and $          , respectively.

Holders of the units, public shares and public warrants should obtain current market quotations for their securities. The market price of SC Health's securities could vary at any time before the Business Combination.

### Holders

As of the date of this prospectus/proxy statement there was 1 holder of record of SC Health's Class A ordinary shares, 4 holders of record of SC Health Class B ordinary shares, 1 holder of record of SC Health public units and 2 holders of SC Health's warrants. See "*Beneficial Ownership of Securities*."

### Dividend Policy

SC Health has not paid any cash dividends on the SC Health Class A ordinary shares to date and does not intend to pay cash dividends prior to the completion of the Business Combination. The payment of cash dividends in the future will be dependent upon the revenues and earnings, if any, capital requirements and general financial condition of HoldCo subsequent to completion of the Business Combination. The payment of any cash dividends subsequent to the Business Combination will be within the discretion of HoldCo's board of directors. SC Health's board of directors is not currently contemplating and does not anticipate declaring share dividends nor is it currently expected that HoldCo's board of directors will declare any dividends in the foreseeable future. Further, the ability of HoldCo to declare dividends may be limited by the terms of financing or other agreements entered into by HoldCo or its subsidiaries from time to time.

### Price Range of Rockley's Securities

Historical market price information regarding Rockley is not provided because there is no public market for Rockley's securities. For information regarding Rockley's liquidity and capital resources, see "*Rockley's Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources.*"

47

Exhibit 4
Page 151

**Table of Contents**

**RISK FACTORS**

Shareholders should carefully consider the following risk factors, together with all of the other information included in this prospectus/proxy statement, including the financial statements and notes to the financial statements included herein, before they decide whether to vote or instruct their vote to be cast to approve the proposals described in this prospectus/proxy statement. Certain of the following risk factors apply to the business of Rockley and may also apply to the business and operations of HoldCo or the post-Business Combination company following Closing of the Business Combination. If any of the following risks occurs, or if Rockley, HoldCo, or the post-Business Combination company fail to manage these risks and uncertainties successfully, it may have a material adverse effect on the business, results of operations, or financial condition of Rockley, HoldCo, or the post-Business Combination company after the Business Combination. Further, if any of the following risks or events occur, it could have a material adverse effect on the trading price of the ordinary shares of HoldCo and the post-Business Combination company following the Business Combination. Further, the value of an investment in SC Health following the closing of the Business Combination of the Business Combination will be subject to the significant risks affecting Rockley and inherent to the industry in which Rockley operates. If any of the risks or events described below occur, shareholders may lose all or part of their investment. The risks and uncertainties described in this "Risk Factors" section or elsewhere in this prospectus/proxy statement may also be incorrect or may change and should be read together with the financial statements and notes to the financial statements included herein. Additional risks and uncertainties presently unknown to Rockley, SC Health, and HoldCo may also have a material and adverse impact on the post-Business Combination company.

As used in the risks described in this subsection, references to "the company," "Rockley," "we," "us," and "our," are intended to refer to the business and operations of Rockley prior to the Business Combination and the business and operations of HoldCo as directly or indirectly affected by Rockley by virtue of HoldCo's ownership of Rockley following the Business Combination, unless the context clearly indicates otherwise.

**Risks Related to Rockley's Business and Industry**

***Rockley has incurred net losses since inception and expects to continue to incur losses for the foreseeable future. If Rockley does not fully develop or commercialize its products and services, including its silicon photonics chipsets, or if such products and services experience significant delays, Rockley's business, financial condition, and results of operation will be materially and adversely affected and Rockley may never achieve or sustain profitability.***

Rockley has to date generated revenue primarily from non-recurring engineering ("NRE") and development services for customer-specific designs of silicon photonics chipsets for incorporation into its customers' end products. Rockley incurred a net loss of $80.3 million and $50.9 million for the years ended December 31, 2020 and 2019, respectively. As of December 31, 2020, Rockley had an accumulated deficit of $232.9 million. Rockley believes that it will continue to incur operating and net losses for the foreseeable future, including for a period of time after commercialization of its silicon photonics chipsets, which is not currently expected to begin until 2022; provided that any such commercialization may occur later than 2022 or not at all. Even if Rockley is able to successfully develop and sell its products, there can be no guarantee that it will do so within its anticipated timeframe or that its products will be commercially successful. Rockley's potential future profitability is dependent upon the successful development, commercial introduction, and acceptance of its products and services, including its silicon photonics chipsets for the consumer wearables market and its module applications with biomarker detection capabilities for advanced health metrics. Because Rockley will incur costs to develop and commercialize its products and services, including its chipsets and module applications, before it receives any significant revenue from any sales of such products or services, Rockley's losses in future periods may continue. Rockley may never achieve or sustain profitability.

Rockley expects to continue to incur operating losses for the foreseeable future as it:

- continues to invest in its technology and its silicon photonics chipsets and modules, as well as its cloud-based analytics subscription service;

48

Exhibit 4
Page 152

Table of Contents

- continues to develop innovative solutions and applications for its technology;

- commercializes its silicon photonics solutions;

- continues to invest in its sales and marketing activities and distribution channels;

- invests and improves its operational, financial, and management information systems;

- increases its headcount;

- expands its intellectual property portfolio; and

- enhances internal functions, systems, and infrastructure to support its anticipated transition to a public company.

***Rockley has a history of recurring losses and negative cash flows from operations, and a significant accumulated deficit, which raises substantial doubt about its ability to continue as a "going concern."***

Since inception, Rockley has financed its operations primarily through the issuance and sale of convertible loan notes, ordinary shares and revenue received from agreed-upon projects. As of December 31, 2020, Rockley's cash and cash equivalents balance was $19.2 million and it had an accumulated deficit of $232.9 million. Due to Rockley's history of recurring losses from operations, negative cash flows from operations, and a significant accumulated deficit, its management concluded that there is substantial doubt about Rockley's ability to continue as a going concern. There have been no adjustments to the accompanying financial statements of Rockley to reflect this uncertainty. Rockley's ability to continue as a going concern is dependent upon it becoming profitable in the future or obtaining the necessary capital to meet its obligations. Rockley's determination of substantial doubt about its ability to continue as a going concern could materially limit its ability to raise additional funds through the issuance of equity securities, debt financing or otherwise. There can be no assurance that any such issuance of equity securities, debt financing or other means of financing will be available in the future, or the terms of any such financing will be acceptable to Rockley. Further, there can be no assurance that Rockley will ever become profitable or continue as a going concern.

***If the end products into which Rockley's products are incorporated are not fully developed and commercialized or do not achieve widespread market acceptance, or if such products experience delays, cancellations, or reductions, Rockley's business, financial condition, and results of operations will be materially and adversely affected.***

Rockley's success in developing and commercializing its products depends in large part on its customers' success in developing, commercializing, and achieving widespread market acceptance of their end products that incorporate Rockley's products. Rockley's customers may be unable to fully develop and commercialize, or achieve widespread market acceptance of, their end products that incorporate Rockley's products. Further, these customers may not continue to incorporate Rockley's products into their end products either in the short or long term. If such customers' end products are not fully developed and commercialized, fail to achieve or maintain widespread market acceptance, experience delays, or if Rockley's customers otherwise choose not incorporate Rockley's products into their end products, Rockley's business, financial condition, and results of operations will be materially and adversely affected.

***If Rockley's products are not selected for inclusion in its customers' end products, including products for the consumer health and wellness market, or adopted in other industry verticals or use cases or are not adopted by leading consumer and medical device companies, life sciences companies, or their respective suppliers, Rockley's business will be materially and adversely affected.***

Rockley is currently developing products for use in its customers' end products, which are in varying stages of development. Many of these products, including products for consumer device, medical device, and life sciences companies, require extensive testing or qualification processes, which involve testing of Rockley's

49

Exhibit 4
Page 153

Table of Contents

products in the customers' end products and systems, as well as testing for reliability. These qualification processes may continue for several months or longer. However, qualification of any of Rockley's products by a customer does not assure any sales of such product by Rockley to that customer. Even after successful qualification and sales by Rockley of a product to a customer, a subsequent revision in Rockley's third-party contractors' manufacturing process or Rockley's selection of a new supplier may require a new qualification process with Rockley's customers, which may result in delays in the sale of such product and could also result in Rockley holding excess or obsolete inventory. After Rockley's products are qualified, it can take several months before the customer commences production of end products that incorporate Rockley's products. Rockley spends significant time and resources to have its products selected for incorporation into these end products, which is known as a "design win." If Rockley fails to win a significant number of design wins in its target markets, its business, results of operations, and financial condition will be materially and adversely affected.

Rockley is targeting the deployment of its products in the consumer health and wellness and medical device sectors and forecasts of Rockley's future results contained in this prospectus/proxy statement assume that Rockley will successfully commercialize its products and achieve significant market penetration in these sectors. As a result, if Rockley's products are not selected for inclusion by consumer device and medical device companies or life sciences companies, or their suppliers, Rockley's actual results may differ materially from the forecasts and projections included in this prospectus/proxy statement and Rockley's business would be materially and adversely affected.

***Rockley's limited operating history makes it difficult to evaluate its future prospects and the risks and challenges which may impact its business.***

Rockley was founded in 2013, completed development of its advanced sensing platform in 2019, launched its healthcare module offering in 2020, and has not yet fully developed and commercialized any of its products. This relatively limited operating history makes it difficult to evaluate Rockley's future prospects and the risks and challenges it may encounter. The risks and challenges which may impact Rockley's future prospects and business include, but are not limited to, its ability to:

- successfully commercialize its products and services, including its silicon photonics chipsets, module applications, and analytics subscription service;

- develop innovative applications for its silicon photonics and sensing technology;

- expand its sales and marketing activities and distribution channels;

- improve its operational, financial, and management information systems;

- attract, hire, integrate, and retain qualified talent to support the growth of its business. This includes increasing headcount to appropriately staff to projected growth;

- protect its intellectual property portfolio;

- enhance internal, systems, functions, and infrastructure to support its anticipated transition to a public company;

- comply with existing and new or modified laws and regulations applicable to its business;

- manage capital expenditures for its current and future products, as well as its supply chain and supplier relationships;

- anticipate and respond to macroeconomic changes and changes in the markets in which it operates;

- effectively manage its growth and business operations, including the impacts of the COVID-19 pandemic on its business; and

- hire, integrate, and retain qualified talent to support the growth of its business.

50

Exhibit 4
Page 154

Table of Contents

If Rockley fails to successfully manage the risks and difficulties that it faces, including those associated with the challenges listed above and those described elsewhere in this "*Risk Factors Related to Rockley*" section, its business, financial condition, and results of operations could be materially and adversely affected. Further, because Rockley has a limited operating history and has not yet commercialized its products, it is difficult to accurately assess its future prospects or financial performance. Rockley has encountered in the past, and will encounter in the future, risks and uncertainties frequently experienced by growing companies with limited operating histories in rapidly changing industries. If Rockley's assumptions regarding these risks and uncertainties, which it uses to plan and operate its business, are incorrect or change, or if it does not address these risks successfully, its results of operations could differ materially from its expectations and its business, financial condition, and results of operations could be materially and adversely affected.

***Rockley's forecasts and projections are based upon assumptions, analyses, and internal estimates developed by Rockley's management. If these assumptions, analyses, or estimates prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from those forecasted or projected.***

Rockley's forecasts and projections included in this prospectus/proxy statement are subject to uncertainty and are based on assumptions, analyses, and internal estimates developed by Rockley's management, all or some of which may not prove to be correct or accurate. If these assumptions, analyses, or estimates, including, but not limited to, those related to estimated revenue, production costs, operating expenses, and cash utilization, prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from those forecasted or projected. We have in the past experienced actual results which varied from our estimates. These assumptions, analyses, or estimates are subject to risks and uncertainties, some of which are outside of Rockley's control. These risks and uncertainties include, but are not limited to, risks discussed elsewhere in this "*Risk Factors Related to Rockley*" section and in this prospectus/proxy statement, as well as those discussed below:

- Revenue-related assumptions:

    - Customer contracts and design wins: Rockley's existing memoranda of understanding ("MOUs") and development contracts may not ultimately convert into production contracts. In addition, Rockley may be unable to secure design wins from additional customers in a timely manner;

    - Form of customer arrangement: It is possible that instead of entering into agreements with customers for the purchase of a significant amount of Rockley's products, Rockley may be required to enter into license arrangements with certain customers, any of which would have a significant impact on the revenue Rockley has currently forecasted to achieve;

    - Timing of launch and delivery: Rockley or Rockley's customers may encounter delays in the launch or delivery of Rockley's product or the customer's end product incorporating Rockley's product, including due to a customer's decision to delay the launch of a product, Rockley's ability to deliver its product in a timely manner to a customer, which in turn may result in the customer canceling a contract, technical challenges, or customer-related delays in its development program;

    - Pricing and volume fluctuation: Rockley may experience pricing and volume fluctuations due to price negotiations, lower than anticipated unit volumes, delays in volume ramp, decreases in average selling prices due to competition or market dynamics, or other factors; and

    - Timing and execution of customer agreements: Rockley may face difficulties in meeting customer milestones in a timely manner or achieving required technical specifications. In addition, Rockley may experience execution delays under its NRE programs, including with its largest customer, due to resource constraints or customer delay. Further, to the extent Rockley were to enter into licensing arrangements in lieu of a product sale with a customer, including its largest customer, it could have a significant negative impact on Rockley's anticipated revenue.

Exhibit 4
Page 155

**Table of Contents**

- Production cost-related assumptions:

  - Production volume and ramp: Rockley has in the past, and may in the future experience delays in contract execution, lower than expected manufacturing yields, manufacturing delays, and technical challenges, including if and when Rockley commences commercial production of its products, any of which could negatively impact forecasted production volume and ramp;

  - Production cost: Rockley may be unable to secure the volume pricing or yield cost levels underlying its assumptions and indirect materials and production overhead costs may exceed forecasted amounts; and

  - Inventory and obsolescence: Rockley's quality, warranty, return merchandise authorization, and inventory obsolescence may exceed forecasted amounts. Rockley may also experience product recalls which are not included in Rockley's assumptions. Further, Rockley may incur greater than expected costs in connection with its NRE programs.

- Operating expenses and cash utilization-related assumptions: Rockley's cash utilization may exceed currently anticipated rates due to a variety of factors, including lower than expected revenue, revenue delays, higher than anticipated production and manufacturing costs, operating expenses, and capital expenditures, lower than anticipated average selling prices, greater than anticipated cash needs for internal resources and organic growth, and potential strategic investments and acquisitions not currently anticipated.

The forecasts and projections in this prospectus/proxy statement also include forecasts and estimates relating to the expected size and growth of the markets in which Rockley operates or intends to enter, including the consumer wearables, mobile device, and medical device markets. Such markets may not develop or grow, or may develop and grow at a lower rate than expected, and even if these markets experience the forecasted growth described in this prospectus/proxy statement, Rockley may not grow its business at similar rates, or at all. Accordingly, the forecasts and estimates of market size and growth described in this prospectus/proxy statement should not be taken as a guarantee or other indication of Rockley's future growth or results of operations. In addition, these forecasts may be materially and adversely affected by a number of factors outside of Rockley's control, including, but limited to, factors associated with the ongoing COVID-19 pandemic.

***The strategic initiatives Rockley has undertaken or may undertake in the future may be more costly than currently anticipated and Rockley may not generate sufficient revenue to offset the costs of these initiatives, which in turn would negatively impact Rockley's ability to achieve and maintain profitability.***

Rockley continues to invest in initiatives designed to grow its business, including:

- partnering with customers and potential customers to develop and commercialize Rockley's products;

- investing in research and development;

- investing in its workforce, including its engineering talent;

- expanding its sales, marketing, and distribution efforts;

- investing in new applications and markets for its products;

- partnering with third-parties to develop manufacturing processes; and

- investing in legal, accounting, and other administrative and internal functions necessary to support its operations as a public company.

These initiatives may be more costly than anticipated and Rockley may not generate sufficient revenue to offset the costs of these initiatives. Certain of Rockley's market opportunities, such as healthcare monitoring devices incorporating sensing capabilities for disease detection and management, are at an early stage of development, and it may be years before these end markets generate demand for Rockley's products at scale, if at

52

Exhibit 4
Page 156

Table of Contents

all. Rockley's revenue may be adversely affected for a number of reasons, including the rate and degree of development or market acceptance of new technology that competes with its products, failure of Rockley's customers to develop and commercialize their end products that incorporate Rockley's products, Rockley's inability to effectively manage production of its products to scale, Rockley's inability to enter new markets or help its customers adopt Rockley's products for new applications, and Rockley's failure to attract new customers or expand orders from existing customers. Further, it is difficult to predict the size and growth rate of Rockley's target markets, customer demand for its products, commercialization timelines, developments in silicon photonics technology, the entry of competitive products, or the success of existing competitive products and services. As a result, Rockley does not expect to achieve profitability until 2023 at the earliest. If Rockley's revenue does not grow over the short or long term, its ability to achieve and maintain profitability will be adversely affected, and the value of its business may significantly decrease.

***Rockley expects its results of operations to fluctuate on a quarterly and annual basis, which could cause the stock price of the post-Business Combination company to fluctuate or decline.***

Rockley's revenue and operating results have fluctuated in the past and may vary significantly in the future. Historical comparisons of its operating results may not be relevant, or indicative of future results. In particular, because Rockley's revenue to date has been generated from NRE and development services for customer-specific designs of silicon photonics chipsets for testing in the customers' end products, revenue in any given quarter or period can fluctuate based on the timing and success of its customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Rockley's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of its control and may not fully reflect the underlying performance of Rockley's business. These fluctuations could adversely affect Rockley's ability to meet its expectations or those of securities analysts, ratings agencies, or investors. If Rockley does not meet these expectations for any reporting period, the value of its business and its securities, or those of the post-Business Combination company, could decline significantly. Factors that may cause these quarterly fluctuations include, but are not limited to, those listed below:

- the timing and magnitude of NRE services revenue in any quarter;

- the timing and magnitude of operating expenses incurred, including research and development expenses;

- Rockley's ability to meet product development roadmaps and timelines, which in turn may be impacted by resource constraints and must meet certain technical standards;

- the timing and degree of success of commercialization of Rockley's products;

- Rockley's ability to attract and retain contracted customers and successfully transition such customers to engaged customers and to attract new customers;

- changes in terms of customer agreements;

- the ability of Rockley's customers to commercialize and achieve widespread market adoption of products incorporating Rockley's products;

- the timing and magnitude of orders and shipments of Rockley's products in any quarter;

- the mix of product sales and licensing arrangements in lieu of product sales;

- the actual timing and magnitude of sales returns and warranty claims of Rockley's products in any quarter may differ from estimate;

- Rockley's ability to develop, introduce, commercialize, manufacture, and ship in a timely manner products that meet customer requirements;

- disruptions in Rockley's sales channels or termination of its relationships with key channel partners;

- customer demand and product life cycles;

53

Exhibit 4
Page 157

**Table of Contents**

- the receipt, reduction, or cancellation of, or changes in the forecasts or timing of, orders by customers;

- fluctuations in the levels of inventories held by distributors or end customers;

- the gain or loss of significant customers, including Rockley's largest customer;

- fluctuations in sales by customers who incorporate Rockley's products into their products;

- cyclicality, seasonality, and the competitive landscape in Rockley's target markets;

- fluctuations in manufacturing yields;

- changes in pricing, product cost, product volume, and product mix;

- sales of subscriptions to Rockley's cloud-based analytics subscription service, if and when commercially launched, and in the future, the rate of renewal of subscriptions by existing customers, the extent the use of subscription offerings and related services is expanded under such subscriptions, and timing and magnitude of any such subscriptions which are not renewed;

- the mix of customers licensing the service on a subscription basis as compared to a perpetual license;

- the size, timing, and terms of its subscription agreements with new customers;

- supply chain disruptions, delays, shortages, and capacity limitations as a result of the COVID-19 pandemic or other reasons;

- the impact and duration of the global COVID-19 pandemic;

- the timing and rate of broader market adoption of consumer and medical devices utilizing Rockley's products or technology across the consumer wearables, mobile device, and medical device sectors;

- changes in the competitive landscape in Rockley's target markets, including industry consolidation, regulatory developments, and new market entrants;

- Rockley's ability to effectively manage its third-party suppliers and manufacturing partners;

- changes in the source, cost, and availability of materials and components incorporated in Rockley's products;

- adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs;

- general economic, industry, and market conditions, including trade disputes; and

- Rockley's forecasts of market growth in this prospectus/proxy statement may not be accurate.

***Rockley expects to incur significant research and development expenses and devote substantial resources to commercializing new products, which could increase its losses and negatively impact its ability to achieve or maintain profitability.***

Rockley's future growth depends on developing and commercializing its products, achieving widespread market adoption of its products, adapting existing products to new applications and customer requirements, and introducing new products to address changing customer and market demands. Rockley plans to incur substantial research and development expenses as part of its efforts to design, develop, manufacture, and commercialize new products and enhance existing products. Rockley's research and development expenditures could increase its losses and adversely affect its results of operations in the future. Further, Rockley's research and development efforts may not be successful or result in additional revenue. This in turn would negatively impact Rockley's ability to achieve or maintain profitability.

Exhibit 4
Page 158

Table of Contents

***If Rockley is unable to manage its growth or expansion of operations, including in a cost-efficient manner, its business, operations, and financial condition, as well as its ability to scale its operations, could be materially and adversely affected.***

Rockley's ability to effectively manage its anticipated growth and expansion of operations and manage its transition to operating as a public company will also require it to enhance its operational, financial, and management controls and infrastructure, human resources policies, and reporting systems. These enhancements and improvements will require significant capital expenditures, investments in additional headcount and other operating expenditures, and allocation of valuable management and employee resources. Rockley's future financial performance and ability to execute on its business plan will depend, in part, on its ability to effectively manage any future growth and expansion. Rockley may be unable to effectively manage any future growth or expansion in an efficient or timely manner. Further, Rockley may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems, and procedures, which could have an adverse effect on its business, reputation, and financial results.

***Market opportunity estimates and growth forecasts included in this prospectus/proxy statement are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate.***

The forecasts and estimates in this prospectus/proxy statement relating to the expected size and growth of the markets for consumer wearables, mobile devices, and medical devices may prove to be inaccurate. Even if these markets experience the forecasted growth described in this prospectus/proxy statement, Rockley may not grow its business at similar rates, or at all. Rockley's future growth is subject to many factors, including market adoption of its products, which is subject to many risks and uncertainties. Accordingly, the forecasts and estimates of market size and growth described in this prospectus/proxy statement, including Rockley's estimates that the consumer wearables, mobile device, and medical devices markets will represent, in the aggregate, an approximately over $48 billion of total addressable market for healthcare monitoring devices incorporating additional sensing capabilities by 2025, should not be taken as indicative of Rockley's future growth. In addition, these forecasts may be materially and adversely affected as a result of the COVID-19 pandemic.

***If Rockley is unable to accurately forecast long-term end-customer adoption rates and demand for Rockley's products, it could materially and adversely affect its current and future financial results of operations.***

Rockley is pursuing opportunities in markets that are undergoing rapid changes, including technological and regulatory changes, and it is difficult to predict the timing and size of the opportunities. For example, consumer health and wellness applications and healthcare monitoring devices require complex technology. Because these products may incorporate technology from other companies, commercialization of these products could be delayed or impaired on account of certain technological components of Rockley or others not being ready to be deployed. Although Rockley currently has MOUs or development and supply agreements with various consumer and medical device companies, these companies may not be able to commercialize products incorporating Rockley's products immediately, or at all. Regulatory developments, many of which are outside of Rockley's control, could also cause delays or otherwise impair commercial adoption of these products. Rockley's future financial performance will depend on its ability to make timely investments in the correct market opportunities. Given the evolving nature of the markets in which Rockley operates in, it is difficult to predict customer demand or adoption rates for its products or the future growth of the markets in which it operates. As a result, the financial projections in this prospectus/proxy statement may not necessarily reflect various estimates and assumptions that may not prove accurate and these projections could differ materially from actual results due to the risks included in this "*Risk Factors Related to Rockley*" section, among others. If demand does not develop or if Rockley cannot accurately forecast customer demand, the size of its markets, inventory requirements, or its future financial results, its business, results of operations, and financial condition will be adversely affected.

Exhibit 4
Page 159

Table of Contents

***Rockley's target customer and product markets may not grow or develop as Rockley currently expects, and if Rockley fails to penetrate new markets and scale successfully within those markets, Rockley's revenue and financial condition would be harmed.***

Rockley's target markets include the consumer wearables, mobile device, and medical device markets. Any deterioration in Rockley's target customer or product markets or reduction in capital spending to support these markets could lead to a reduction in demand for Rockley's products, which would adversely affect its revenue and results of operations. Further, if Rockley's target customer markets do not grow or develop in ways that Rockley currently forecasts, demand for Rockley's products may not materialize as expected, which would also negatively impact its business, financial condition, and results of operations. Rockley may be unable to predict the timing or development of trends in its target markets with any accuracy. If Rockley fails to accurately predict market requirements or market demand for these solutions, Rockley's business may suffer.

Rockley's future revenue growth, if any, will depend in part on Rockley's ability to penetrate Rockley's current target markets, and to enter emerging markets, such as the market for consumer healthcare monitoring devices and predictive analytics. Meeting the technical requirements and securing design wins in any of these new markets will require a substantial investment of Rockley's time and resources. Rockley may not secure design wins from these or other new markets, or achieve meaningful revenue from sales in these markets. If any of these markets do not develop as Rockley currently anticipates or if Rockley is unable to penetrate and scale them successfully, it may adversely affect Rockley's ability to grow its business.

***Rockley's target markets are characterized by rapid technological change, which requires Rockley to continue to develop new products and technology innovations and could adversely affect market adoption of its products.***

Rapid technological changes in the markets for sensing technology, including the consumer wearables, mobile device, and medical device markets, could adversely affect adoption of Rockley's products, either generally or for particular applications. Rockley's future success will depend upon its ability to develop and introduce a variety of new capabilities and innovations to its products, as well as introduce new products, to address the changing needs of its target markets. Delays in delivering new products that meet customers' requirements could damage Rockley's relationships with its customers and lead them to seek alternative sources of supply. Further, the introduction of new products by Rockley's competitors, the delay or cancellation of any of Rockley's customers' end products into which Rockley's products are designed, the market acceptance of products based on new or alternative technologies, or the emergence of new industry standards could render Rockley's existing or future products uncompetitive, obsolete, and/or otherwise unmarketable.

In addition, Rockley's success to date has been based on the delivery of prototypes and services to research and development programs in which customers are investing substantial capital to develop new products. Delays in introducing products and innovations, the failure to choose correctly among technical alternatives, or the failure to offer innovative products at competitive prices may cause existing and potential customers to purchase Rockley's competitors' products or turn to alternative sensing technology. If Rockley is unable to successfully develop products that meet changing customer or market requirements on a timely basis or that remain competitive with technological alternatives, its products may fail to achieve commercial adoption, its revenue will decline, it may experience operating losses, and its business and prospects will be adversely affected.

***Rockley may be unable to make the substantial investments that are required to remain competitive.***

The silicon photonics industry requires substantial and continuous investment in research and development in order to bring to market new and enhanced solutions. Rockley expects its research and development expenditures to increase in the future as part of its strategy to increase demand for Rockley's solutions in Rockley's current target markets and to expand into additional markets. Rockley may not have sufficient resources to maintain the level of investment in research and development required to remain competitive. In addition, Rockley cannot assure you that the technologies, that are the focus of its research and development expenditures will become commercially successful or generate any revenue.

Exhibit 4
Page 160

Table of Contents

***If Rockley fails to compete effectively, it may lose or fail to gain market share, which could negatively impact Rockley's operating results and Rockley's business.***

The global optical components market in general, and the consumer sensor, healthcare, and data communications markets in particular, are highly competitive. Rockley expects competition to increase and intensify as additional companies enter Rockley's target markets. Increased competition could result in price pressure, reduced gross margins, and difficulty achieving market penetration, any of which could harm Rockley's business, financial condition, and results of operations. Rockley's competitors range from large, international companies offering a wide range of services and optical components, such as LEDs, lasers, detectors, or photonic integrated circuit ("PICs"), to smaller companies specializing in narrow market verticals. Some of Rockley's key competitors across various verticals include: ams AG ("AMS"), Analog Devices, Inc. ("ADI"), Broadcom Inc. ("Broadcom"), Brolis Semiconductors ("Brolis"), Cisco Systems, Inc. ("Cisco"), GlobalFoundries Inc. ("GlobalFoundries"), Intel Corporation ("Intel"), Lumentum Holdings Inc. ("Lumentum"), Maxim Integrated Products Inc. ("Maxim"), Osram Licht AG ("OSRAM"), Taiwan Semiconductor Manufacturing Company, Limited ("TSMC"), and Tower Semiconductor Ltd. ("Tower Jazz"). Rockley expects competition in its target markets to increase in the future as existing competitors improve or expand their product offerings and as new competitors enter these markets.

Rockley's ability to compete successfully depends, in part, on factors that are outside of its control, including industry and general economic trends. Rockley's ability to compete successfully will depend on a number of factors, including its ability to:

- define, design, and regularly introduce new products that anticipate the functionality and integration needs of Rockley's customers' next-generation products and applications;

- build strong and long-lasting relationships with Rockley's customers and other industry participants;

- cost-effectively develop and commercialize products which compete favorably with competitors' products;

- achieve design wins;

- accurately estimate the effectiveness and success of Rockley's customers' end products incorporating Rockley's products in their competitive end markets;

- expand its research and development capabilities to provide innovative solutions and maintain Rockley's product roadmap;

- strengthen its sales and marketing efforts, brand awareness and reputation;

- deliver products in volume on a timely basis at competitive prices;

- withstand or respond to significant price competition;

- build and expand international operations in a cost-effective manner;

- obtain, maintain, protect, and enforce Rockley's intellectual property rights;

- defend potential patent infringement claims arising from third parties;

- promote and support Rockley's customers' incorporation of Rockley's products into their products; and

- retain high-level talent, including Rockley's management team and engineers.

Rockley's competitors may also establish cooperative relationships among themselves or with third parties or may acquire companies that provide similar products to Rockley's. As a result, new competitors or alliances may emerge that could capture significant market share. Any of these factors, alone or in combination with others, could harm Rockley's business, financial condition, and results of operations and result in a loss of market share and an increase in pricing pressure.

57

Exhibit 4
Page 161

Table of Contents

***Rockley may pursue strategic investments or acquisitions in the future. If Rockley fails to successfully select, execute, or integrate its acquisitions, then its business, results of operations, and financial condition could be materially and adversely affected, and the stock price of the post-Business Combination company could decline.***

From time to time, Rockley may pursue investments or acquisitions to add new products and technologies, acquire talent, gain new sales channels, or enter into new markets or sales territories. In addition to possible shareholder approval, Rockley may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, which could result in increased delay and costs. Furthermore, acquisitions and the subsequent integration of new assets, businesses, key talent, customers, vendors, and suppliers require significant attention from Rockley's management and could result in a diversion of resources from Rockley's existing business, which in turn could have an adverse effect on Rockley's operations. Acquired assets or businesses may not generate the financial results Rockley expects. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets, and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

Failure to successfully identify, complete, manage, and integrate acquisitions could materially and adversely affect its business, financial condition, and results of operations and could cause the post-Business Combination company's stock price to decline.

***Rockley's international operations expose it to operational, financial, and regulatory risks, including possible unfavorable regulatory, political, tax, and labor conditions, which could harm Rockley's business.***

Rockley is committed to growing its international sales, and while it has committed resources to expanding its international operations and sales channels, these efforts may not be successful. International operations are subject to a number of other risks, including:

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue;

- political and economic instability, international terrorism, and anti-American or British sentiment, particularly in emerging markets;

- disadvantages of competing against companies from countries that are not subject to U.S. and U.K. laws and regulations, including the Foreign Corrupt Practices Act, Office of Foreign Assets Control regulations, and U.S. anti-money laundering regulations, as well as exposure of Rockley's foreign operations to liability under these regulatory regimes;

- preference for locally branded products, and laws and business practices favoring local competition;

- potential consequences of, and uncertainty related to, the "Brexit" process in the United Kingdom, which could lead to additional expense and complexity in doing business there;

- less effective protection of intellectual property;

- stringent regulation of the end products incorporating Rockley's products and stringent consumer protection and product compliance regulations, including but not limited to General Data Protection Regulation in the European Union, European competition law, the Restriction of Hazardous Substances Directive, the Waste Electrical and Electronic Equipment Directive, and the European Ecodesign Directive that are costly to comply with and may vary from country to country;

- difficulties and costs of staffing and managing foreign operations;

- foreign taxes, including withholding of payroll taxes; and

- the U.S. government's and U.K. government's restrictions on certain technology transfer to certain countries of concern.

58

Exhibit 4
Page 162

Table of Contents

For example, we have significant international operations that are denominating in foreign currencies, primarily the British Pound and Euro, subjecting us to foreign currency exchange risk that may adversely impact our financial results. The occurrence of any of these risks could negatively affect Rockley's international business and consequently its business, operating results, and financial condition.

***The average selling prices of Rockley's products could decrease rapidly over the life of the product, which may negatively affect Rockley's revenue and margins. In addition, the selling prices Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may be less than what Rockley currently projects, which may cause Rockley's actual operating results to differ materially from its projections.***

The prices that Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may experience declines for a variety of reasons, many of which are outside of Rockley's control. In order to sell products that have a falling average unit selling price and maintain margins at the same time, Rockley will need to continually reduce product and manufacturing costs. To manage manufacturing costs, Rockley must engineer the most cost-effective design for its products and collaborate with its manufacturing counterparties to reduce manufacturing costs. Rockley also needs to continually introduce new products with higher sales prices and gross margin in order to maintain its overall gross margin. If Rockley is unable to manage the cost of older products or successfully introduce new products with higher gross margin, its revenue and overall gross margin would likely decline. In addition, the selling prices Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may be less than what Rockley currently projects, which may cause Rockley's actual operating results to differ materially from its forecasts and projections.

***Rockley's gross margins may fluctuate due to a variety of factors, which could negatively impact Rockley's results of operations and Rockley's financial condition.***

Rockley's gross margins may fluctuate due to a number of factors, including customer and product mix, market acceptance of Rockley's new products, yield, wafer pricing, packaging and testing costs, competitive pricing dynamics, the impact of the COVID-19 pandemic, and geographic and market pricing strategies. To the extent Rockley may offer certain customers favorable prices, it would decrease Rockley's average selling prices and likely impact gross margins. Further, Rockley may in the future offer pricing incentives to Rockley's customers on earlier generations of products that inherently have a higher cost structure, which would negatively affect Rockley's gross margins. In addition, in the event Rockley's customers, including Rockley's larger customers, exert more pressure with respect to pricing and other terms, it could put downward pressure on Rockley's margins.

Because Rockley does not operate its own manufacturing, assembly, or testing facilities, it may not be able to reduce its costs as rapidly as companies that operate their own facilities, and Rockley's costs may even increase, which could further reduce Rockley's gross margins. Rockley relies primarily on obtaining yield improvements and volume-based cost reductions to drive cost reductions. To the extent that such cost reductions do not occur at a sufficient level and in a timely manner, Rockley's business, financial condition, and results of operations could be adversely affected and may vary from Rockley's projections and estimates.

In addition, Rockley may in the future maintain an inventory of Rockley's products at various stages of production and in finished goods inventory. Rockley will hold these inventories in anticipation of customer orders. If those customer orders do not materialize in a timely manner, Rockley may have excess or obsolete inventory which Rockley would have to reserve or write-down, and Rockley's gross margins would be adversely affected.

59

Exhibit 4
Page 163

Table of Contents

***Because some of the raw materials and key components in its products come from limited or single source suppliers, Rockley is susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt its supply chain and could delay deliveries of its products to customers, which could adversely affect Rockley's business, results of operations, and financial condition.***

Some of the components used in the manufacturing of Rockley's products are sourced from third-party suppliers. To date, Rockley has produced its products in relatively limited quantities for use in products. Rockley does not have extensive experience in managing its supply chain to manufacture and deliver its products at scale. Some of the key components used to manufacture Rockley's products come from limited or single source suppliers. Rockley is therefore subject to the risk of shortages and long lead times in the supply of these components and the risk that its suppliers discontinue or modify components used in its products. Rockley has a global supply chain and the COVID-19 pandemic and other health epidemics and outbreaks may adversely affect its ability to source components in a timely or cost effective manner from its third-party suppliers due to, among other things, work stoppages or interruptions. For example, Rockley relies on third-party foundries to manufacture its silicon photonic integrated circuits and for wafer scale integration. Any disruptions to those foundries could materially and adversely affect Rockley's ability to manufacture its products. In addition, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules. Rockley has in the past experienced and may in the future experience component shortages and price fluctuations of certain key components and materials, and the predictability of the availability and pricing of these components may be limited. In the event of a component shortage, supply interruption or material pricing change from suppliers of these components, Rockley may not be able to develop alternate sources in a timely manner or at all in the case of sole or limited sources. Developing alternate sources of supply for these components may be time-consuming, difficult, and costly and Rockley may not be able to source these components on terms that are acceptable to it, or at all, which may undermine Rockley's ability to meet its requirements or to fill customer orders in a timely manner. Any interruption or delay in the supply of any of these parts or components, or the inability to obtain these parts or components from alternate sources at acceptable prices and within a reasonable amount of time, would adversely affect Rockley's ability to meet its scheduled product deliveries to its customers. This could adversely affect Rockley's relationships with its customers and channel partners and could cause delays in shipment of its products and adversely affect its operating results. In addition, increased component costs could result in lower gross margins. Even where Rockley is able to pass increased component costs along to its customers, there may be a lapse of time before it is able to do so such that Rockley must absorb the increased cost. If Rockley is unable to buy these components in quantities sufficient to meet its requirements on a timely basis, it will not be able to deliver products to its customers. This in turn could materially and adversely affect Rockley's business, financial condition, and results of operations.

***If the foundries with which Rockley contracts do not achieve satisfactory yields or quality, Rockley's reputation and customer relationships could be harmed.***

Rockley depends on satisfactory wafer foundry manufacturing capacity, wafer prices, and production yields, as well as timely wafer delivery, to meet customer demand and enable it to maintain gross margins. The fabrication of Rockley's products is a complex and technically demanding process. Minor deviations in the manufacturing process can cause substantial decreases in yields and, in some cases, cause production to be suspended. Rockley's foundry vendors may experience manufacturing defects and reduced manufacturing yields from time to time. Further, any new foundry vendors Rockley employs may present additional and unexpected manufacturing challenges that could require significant management time and focus. Changes in manufacturing processes or the inadvertent use of defective or contaminated materials by the foundries that Rockley employs could result in lower than anticipated production yields or unacceptable performance of Rockley's products. Many of these problems are difficult to detect at an early stage of the manufacturing process and may be time-consuming and expensive to correct. Poor production yields from the foundries that Rockley employs, or defects, integration issues, or other performance problems in Rockley's products could significantly harm Rockley's customer relationships and financial results, and give rise to financial or other damages to Rockley's customers. Any product liability claim brought against Rockley, even if unsuccessful, would likely be time-consuming and costly to defend.

60

Exhibit 4
Page 164

Table of Contents

Manufacturing yields for new products initially tend to be lower as Rockley completes product development and commence volume manufacturing, and typically increase as Rockley brings the product to full production. While Rockley's business model includes this assumption of improving manufacturing yields its assumptions may be incorrect and, as a result, material variances between projected and actual manufacturing yields will have a direct effect on Rockley's gross margin and profitability. The difficulty of accurately forecasting manufacturing yields and maintaining cost competitiveness through improving manufacturing yields will continue to be magnified by the increasing process complexity of manufacturing silicon photonics products.

***Raw material price fluctuations can increase the cost of Rockley's products, impact Rockley's ability to meet customer commitments, and may adversely affect its results of operations.***

The cost of raw materials is a key element in the cost of Rockley's products. Rockley's inability to offset material price inflation through increased prices to customers, suppliers, productivity actions, or through commodity hedges could adversely affect Rockley's results of operations. Many major components, product equipment items, and raw materials are procured or subcontracted on a single or sole-source basis. Although Rockley maintains a qualification and performance surveillance process and Rockley believes that sources of supply for raw materials and components are generally adequate, it is difficult to predict what effects shortages or price increases may have in the future. Rockley's inability to fill its supply needs would jeopardize its ability to fulfill its contractual obligations, which could, in turn, result in reduced revenue, contract penalties or terminations, and damage to Rockley's customer relationships.

Furthermore, increases in the price of wafers, testing costs, and commodities, which may result in increased production costs, mainly assembly and packaging costs, may result in a decrease in Rockley's gross margins. Moreover, Rockley's suppliers may pass the increase in raw materials and commodity costs onto it which would further reduce the gross margin of Rockley's products. In addition, as Rockley is a fabless company, global market trends such as a shortage of capacity to fulfill Rockley's fabrication needs also may increase Rockley's raw material costs and thus decrease its gross margin.

***Rockley is subject to the cyclical nature of the semiconductor industry.***

The semiconductor industry is highly cyclical and is characterized by constant and rapid technological change, rapid product obsolescence, price erosion, evolving standards, short product life cycles, and wide fluctuations in product supply and demand. The industry experienced significant downturns during past global recessions. These downturns have been characterized by diminished product demand, production overcapacity, high inventory levels, and accelerated erosion of average selling prices. While these downturns have not directly impacted Rockley's business to date, any prolonged or significant downturn in the semiconductor industry could adversely affect Rockley's business and reduce demand for Rockley's products. Any future downturns in the semiconductor industry could also harm Rockley's business, financial condition, and results of operations. Furthermore, any significant upturn in the semiconductor industry could result in increased competition for access to third-party foundry and assembly capacity. Rockley is dependent on the availability of this capacity to manufacture and assemble Rockley's products and Rockley can provide no assurance that adequate capacity will be available to it in the future.

***If Rockley or its suppliers do not maintain sufficient inventory or if they do not adequately manage their respective inventory, Rockley could lose sales or incur higher inventory-related expenses, which could negatively affect Rockley's operating results.***

To ensure adequate inventory supply, Rockley and its suppliers must forecast inventory needs and expenses, place orders sufficiently in advance with their respective suppliers and manufacturing counterparties, and manufacture products based on its estimates of future demand for particular products. Changes in customer purchasing patterns may affect Rockley's ability to forecast its future operating results, including revenue, gross margins, cash flows, and profitability. Rockley's ability to accurately forecast demand for its products could be

61

Exhibit 4
Page 165

**Table of Contents**

affected by many factors, including the growth rate, if any, in Rockley's target markets or the market adoption of the end products into which Rockley's products are incorporated, the emergence of new markets, an increase or decrease in customer demand for Rockley's products or for products and services of its competitors, product introductions by competitors, the COVID-19 pandemic, other health epidemics and outbreaks, and any associated work stoppages or interruptions, unanticipated changes in general market conditions, and the weakening of economic conditions or consumer confidence in future economic conditions. If Rockley's products are commercialized in markets that are quickly growing, including the consumer wearables, mobile device, and medical device markets, Rockley may face challenges acquiring adequate supplies to manufacture its products and/or Rockley and its manufacturing counterparties may not be able to manufacture its products at a rate necessary to satisfy the levels of demand, which would negatively affect Rockley's revenue. This risk may be exacerbated by the fact that Rockley may not carry or be able to obtain for its manufacturers a significant amount of inventory to satisfy short-term demand increases. If it fails to accurately forecast customer demand, Rockley may experience excess inventory levels or a shortage of products available for sale.

Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would adversely affect Rockley's financial results, including its gross margin, and have a negative effect on its brand. Conversely, if Rockley underestimates customer demand for its products, Rockley, or its manufacturing counterparties, may not be able to deliver products to meet its requirements, and this could result in damage to Rockley's brand and customer relationships and adversely affect its revenue and operating results.

***If Rockley's products do not conform to, or are not compatible with, existing or emerging industry standards, demand for Rockley's products may decrease, which in turn would harm Rockley's business and operating results.***

Rockley's ability to compete in the future will depend on its ability to identify and ensure compliance with evolving industry standards in its target markets, as well as in the silicon photonics and sensing technology industry generally. The emergence of new industry standards could render Rockley's products incompatible with products developed by third-party suppliers or make it difficult for Rockley's products to meet the requirements of certain device manufacturers and their suppliers. If Rockley's customers or Rockley's third-party suppliers adopt new or competing industry standards with which Rockley's solutions are not compatible, or if industry groups fail to adopt standards with which Rockley's products are compatible, Rockley's products would become less desirable to its current or prospective customers. As a result, Rockley's sales would suffer and it could be required to make significant expenditures to develop new products. Although Rockley designs its products to be compliant with applicable industry standards, proprietary enhancements may not in the future result in conformance with existing industry standards under all circumstances. If Rockley's products do not conform to, or are not compatible with, existing or emerging standards, it would harm its business, financial condition, and results of operations.

***Rockley may be subject to warranty or product liability claims, which could result in unexpected expenses and loss of market share.***

Rockley may be subject to warranty or product liability claims. These claims may require Rockley to make significant expenditures to defend those claims, replace Rockley's solutions, refund payments, or pay damage awards. Rockley has not yet commercialized its products. Accordingly, the operation of Rockley's products and technology has not been validated over longer periods. If a customer's end product fails in use, the customer may incur significant monetary damages, including a product recall or associated replacement expenses as well as lost revenue. The customer may claim that a defect in Rockley's product caused the product failure and assert a claim against Rockley to recover monetary damages. The cost of defending these claims and satisfying any arbitration award or judgment with respect to these claims would result in unexpected expenses, which could be substantial, and could harm Rockley's business, financial condition, and results of operations. Although Rockley carries product liability insurance, this insurance is subject to significant deductibles and may not adequately cover Rockley's costs arising from defects in its products or otherwise.

Exhibit 4
Page 166

Table of Contents

***The complexity of Rockley's products and its anticipated future product and service offerings could result in unforeseen delays or expenses from undetected defects, errors, or reliability issues in hardware or software that could reduce the market adoption of its new products, damage its reputation with current or prospective customers, and adversely affect its operating costs.***

Rockley's current and future products and service offerings are or are expected to be highly technical and very complex and require high standards to manufacture or distribute and have in the past and will likely in the future experience defects, errors, or reliability issues at various stages of development. Rockley may be unable to timely release new products, product updates, manufacture existing products, correct problems that have arisen, or correct such problems to its customers' satisfaction. Additionally, undetected errors, defects, or security vulnerabilities, especially as new products or updates are introduced or as new versions are released, could result in inaccurate data to the end users of products incorporating Rockley's products. Any of the foregoing could negatively impact Rockley's ability to commercialize a product or service offering, result in litigation against Rockley, and damage Rockley's credibility. These risks may be heightened in the medical device industry, one of Rockley's target markets, where the end user may act in reliance upon inaccurate data as a result of errors or defects, or where there may be a privacy or data breach of an end user's personal health information. Some errors or defects in Rockley's products and service offerings may only be discovered after they have been tested, commercialized, and deployed by customers. In these cases, Rockley may incur significant additional development costs and product recall, repair, or replacement costs. These problems may also result in claims, including class actions, against Rockley by its customers or others. Rockley's reputation or brand may be damaged as a result of these problems and customers may be reluctant to buy its products, which could adversely affect its ability to retain existing customers and attract new customers and could adversely affect its financial results.

In addition to product liability claims, Rockley could face material legal claims for breach of contract, fraud, tort, or breach of warranty as a result of these problems. Defending a lawsuit, regardless of its merit, could be costly and may divert management's attention and adversely affect the market's perception of Rockley and its products. In addition, Rockley's business liability insurance coverage could prove inadequate with respect to a claim and future coverage may be unavailable on acceptable terms or at all. These product-related issues could result in claims against Rockley and its business could be adversely affected.

***Rockley currently expects to recognize subscription revenue from its future cloud-based analytics subscription offering ratably over the term of these subscriptions and, to a lesser extent, perpetual licenses ratably over an expected period of benefit and, as a result, downturns in sales may not be immediately reflected in its operating results.***

If Rockley is able to commercially launch its cloud-based analytics subscription service, which is currently expected to occur as early as 2023, it expects to recognize revenue ratably over the terms of its subscriptions with customers. As a result, a substantial portion of the revenue that it will report in each period will be derived from the recognition of deferred revenue relating to agreements entered into during previous periods. Consequently, a decline in new sales or renewals in any one period may not be immediately reflected in its revenue results for that period. This decline, however, will negatively affect its revenue in future periods. Accordingly, the effect of significant downturns in sales and market acceptance of its subscription service and potential changes in the rate of renewals may not be fully reflected in its results of operations until future periods. This will also make it difficult for Rockley to rapidly increase revenue growth through additional sales in any period, as revenue from new customers generally will be recognized over the term of the applicable agreement. Rockley may be unable to commercially launch its subscription service offering in a timely manner or at all and such subscription offering may not achieve widespread customer adoption.

Exhibit 4
Page 167

Table of Contents

***Any decline in customer renewals, terminations, or failure to convince customers to use Rockley's cloud-based analytics subscription service would harm its business, results of operations, and financial condition.***

The rate at which Rockley's customers purchase subscriptions to its cloud-based analytics service will depend on a number of factors, including the perceived value of the service. Rockley anticipates that its subscription offerings for enterprise customers will range from one to two years subject to renewal terms. Rockley's ability to grow revenue from its cloud-based analytics subscription offering, if and when commercially launched, will depend on a significant percentage of customer renewals when the then-existing subscription terms expire, as well as renewals on the same or more favorable terms. Customers will have no obligation to renew their subscriptions, and Rockley may not be able to accurately predict customer renewal rates. The growth of Rockley's business will depend in part on its customers adopting and expanding their use of Rockley's cloud-based analytics subscription offering and related services. If Rockley's customers do not maintain or renew their subscriptions or renew on less favorable terms, Rockley's future business prospects and growth opportunities may suffer.

***If Rockley's future platform offerings do not interoperate with its customers' network and security infrastructure or with third-party products, websites, or services, it would negatively impact its business and results of operations.***

Rockley's cloud-based analytics subscription offering, which is under development and is currently expected to be commercially launched as early as 2023, is expected to allow for the deployment of Rockley's technology through a cloud-based software-as-a-service model. As a result, it must interoperate with Rockley's customers' existing network and security infrastructure. The components of Rockley's customers' infrastructure have different specifications, rapidly evolve, utilize multiple protocol standards, include multiple versions and generations of products, and may be highly customized. Rockley must be able to interoperate and provide its software service to customers with highly complex and customized networks, which requires careful planning and execution between its customers, its customer support teams, and its channel partners. Further, whenever there are new or updated elements of the customers' infrastructure or new industry standards or protocols, Rockley may have to update or enhance its cloud platform to continue to provide service to customers. Rockley's competitors or other vendors may refuse to work with Rockley to allow their products to interoperate with Rockley's, which could make it difficult for Rockley's cloud-based analytics subscription service to function properly in customer networks that include these third-party products.

Rockley may not deliver or maintain interoperability quickly or cost-effectively, or at all. If Rockley fails to maintain compatibility of its cloud-based analytics subscription service with its customers' network and security infrastructures, its customers may not be able to fully utilize the service, and Rockley may, among other consequences, fail to achieve widespread customer adoption of this subscription service and experience reduced demand for its products and services, which would materially harm its business, operating results, and financial condition.

***Rockley licenses technology from third parties, and its inability to maintain those licenses could harm its business.***

Rockley incorporates technology that it licenses from third parties, including software, into its software subscriptions. Rockley cannot be certain that its licensors are not infringing the intellectual property rights of third parties or that its licensors have sufficient rights to the licensed intellectual property in all jurisdictions in which Rockley may sell its software subscriptions. In addition, some licenses may be non-exclusive, and therefore its competitors may have access to the same technology licensed to Rockley. Some of Rockley's license agreements may be terminated for convenience by the licensors. Rockley may also be subject to additional fees or be required to obtain new licenses if any of its licensors allege that Rockley has not properly paid for such licenses or that it has improperly used the technologies under such licenses, and such licenses may not be available on terms acceptable to Rockley or at all. If Rockley is unable to continue to license any of this

64

Exhibit 4
Page 168

**Table of Contents**

technology because of intellectual property infringement claims brought by third parties against its licensors or against it, or claims against Rockley by its licensors, or if Rockley is unable to continue its license agreements or enter into new licenses on commercially reasonable terms, its ability to develop and sell software subscriptions containing such technology would be severely limited, and its business could be harmed. Additionally, if Rockley is unable to license necessary technology from third parties, it may be forced to acquire or develop alternative technology, which it may be unable to do in a commercially feasible manner or at all, and Rockley may be required to use alternative technology of lower quality or performance standards. This would limit and delay its ability to offer new or competitive software subscriptions and increase its costs of production. As a result, Rockley's margins, market share, and operating results could be significantly harmed.

***Portions of Rockley's cloud-based analytics subscription offering utilize open source software, and any failure to comply with the terms of one or more of these open source licenses could negatively affect its business.***

Rockley's cloud-based analytics subscription offering contains software made available by third parties under so-called "open source" licenses. From time to time, there have been claims against companies that distribute or use open source software in their products and services, asserting that such open source software infringes the claimants' intellectual property rights. Rockley could be subject to suits by parties claiming that what Rockley believes to be licensed open source software infringes their intellectual property rights. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide warranties or other contractual protections regarding infringement claims or the quality of the code. In addition, certain open source licenses require that source code for software programs that are subject to the license be made available to the public and that any modifications or derivative works to such open source software continue to be licensed under the same terms. Further, certain open source licenses also include a provision that if Rockley enforces any patents against the software programs that are subject to the license, it will lose the license to such software. If Rockley were to fail to comply with the terms of such open source software licenses, such failures could result in costly litigation, lead to negative public relations, or require that it quickly find replacement software which may be difficult to accomplish in a timely manner.

Although Rockley monitors its use of open source software in an effort both to comply with the terms of the applicable open source licenses and to avoid subjecting its software to conditions it does not intend, the terms of many open source licenses have not been interpreted by U.S. or international courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on its ability to commercialize its product or operate its business. By the terms of certain open source licenses, Rockley could be required to release the source code of its software and to make its proprietary software available under open source licenses, if Rockley combines or distributes its software with open source software in a certain manner. In the event that portions of its software are determined to be subject to an open source license, Rockley could be required to publicly release the affected portions of its source code, re-engineer all, or a portion of, that software or otherwise be limited in the licensing of its software, each of which could reduce or eliminate the value of its product. Many of the risks associated with usage of open source software cannot be eliminated, and could negatively affect its business, results of operations, and financial condition.

**Customer-Related Risks**

***Rockley currently has, and intends to target, customers and suppliers that are large corporations with substantial negotiating power, exacting product, quality, and warranty standards, and potentially competitive internal solutions. If Rockley is unable to sell its products to these customers or is unable to enter into agreements with customers and suppliers on satisfactory terms, its prospects and results of operations will be adversely affected.***

Many of Rockley's customers and suppliers, and potential customers, are large corporations with substantial negotiating power relative to it and, in some instances, may have internal solutions that are competitive to

65

Exhibit 4
Page 169

Table of Contents

Rockley's products. Many of these large corporations that are customers or potential customers also have significant development resources, which may allow them to acquire or develop independently, or in partnership with others, competitive technologies. Meeting the technical requirements and securing design wins with any of these companies will require a substantial investment of Rockley's time and resources. Rockley cannot assure you that its products or technology will secure design wins from these or other companies or that it will generate meaningful revenue from the sales of its products to these key customers and potential customers. If Rockley's products are not selected by these large corporations or if these corporations develop or acquire competitive technology, it will have an adverse effect on Rockley's business.

***Rockley currently depends on a few large customers for a substantial portion of its revenue. The loss of, or a significant reduction in, orders from Rockley's customers, including its largest customer, could significantly reduce its revenue and adversely impact Rockley's operating results.***

Rockley believes that its operating results for the foreseeable future will continue to depend to a significant extent on revenue attributable to a few large customers, including Apple Inc., Rockley's largest customer. Rockley's two largest customers collectively accounted for 100% and 99.6% of Rockley's revenue in 2020 and 2019, respectively. Revenue attributable to Rockley's largest customer accounted for the majority of its revenue in 2020 and 2019, respectively. Rockley anticipates revenue attributable to this customer will fluctuate from period to period, although it expects to remain dependent on this customer for a significant portion of its revenue for the foreseeable future. Rockley has a master supply and development agreement with this customer, which provides a general framework for Rockley's transactions with it. This agreement continues until either party terminates for material breach. Under this agreement, Rockley has agreed to develop and deliver new products to this customer at its request, provided it also meets Rockley's business purposes, and has agreed to indemnify it for intellectual property infringement or any injury or damages caused by Rockley's products. This customer does not have any minimum or binding purchase obligations to Rockley under this agreement and could elect to discontinue or reduce making purchases from Rockley with little or no notice.

In addition, customers may seek to enter into licensing arrangements in lieu of product purchases, which could negatively impact Rockley's revenue, and, to a lesser extent, Rockley's gross margins. If Rockley's customers were to choose to work with other manufacturers or its relationships with its customers is disrupted for any reason, it could have a significant negative impact on Rockley's business. Any reduction in sales attributable to Rockley's larger customers would have a significant and disproportionate impact on Rockley's business, financial condition, and results of operations.

Rockley's customers, or the distributors through which it sells to these customers, may choose to use products in addition to Rockley's, use a different product altogether, or develop an in-house solution. Any of these events could significantly harm its business, financial condition, and results of operations. In addition, if Rockley's distributors' relationships with Rockley's end customers, including its larger end customers, are disrupted for inability to deliver sufficient products or for any other reason, it could have a significant negative impact on Rockley's business, financial condition, and results of operations.

***Rockley is dependent in part upon its relationships and alliances with industry participants to generate revenue, which involves risks and uncertainties.***

Rockley has, and in the future may, acquire interests in joint ventures, which may subject Rockley to risk because, among other things, Rockley cannot exercise sole decision-making power and its partners may have different economic interests than Rockley has. For example, Rockley currently holds a 24.9% share in a strategic joint venture with another industry participant and is currently in discussions regarding potential licensing of technology to the joint venture in return for future payments. Rockley is therefore dependent on the successful execution of a licensing agreement with this joint venture partner to generate additional revenue. Rockley may also acquire interests in other joint ventures with third parties. There are additional risks involved in joint venture transactions. For example, as a co-investor in a joint venture, Rockley may not be in a position to exercise sole

Exhibit 4
Page 170

Table of Contents

decision-making authority relating to the joint venture or other entity. As a result, the operations of any joint venture are subject to the risk that third parties may make business, financial, or management decisions with which Rockley does not agree, or the management of the joint venture may take risks or otherwise act in a manner that does not serve Rockley's interests. Further, there may be a potential risk of impasse in some business decisions because Rockley may not be in a position to exercise sole decision-making authority. In such situations, it is possible that Rockley may not be able to exit the relationship because it may not have the funds necessary to complete a buy-out of the other partner or it may be difficult to locate a third-party purchaser for its interest. Because Rockley may not have the ability to exercise control over such operations, it may not be able to realize some or all of the benefits that it believes will be created from its involvement. In addition, there is the potential that a joint venture partner may become bankrupt or have divergent, conflicting, or inconsistent economic or business interests from Rockley. This could result in, among other things, exposing Rockley to liabilities of the joint venture in excess of its proportionate share of these liabilities. If any of the foregoing were to occur, Rockley's business, financial condition, and results of operations could suffer.

***If Rockley is unable to expand or further diversify its customer base, its business, financial condition, and results of operations could suffer.***

Rockley currently expects the composition of its largest customers to vary over time, and that revenue attributable to its largest customers in any given period may decline over time. Rockley's relationships with existing customers may deter potential customers who compete with these customers from buying Rockley's products. If Rockley is unable to expand or further diversify its customer base, it could harm its business, financial condition, and results of operations.

***Because Rockley does not anticipate long-term purchase commitments with its customers, orders may be cancelled, reduced, or rescheduled with little or no notice, which in turn exposes Rockley to inventory risk, and may cause its business and results of operations to suffer.***

Rockley anticipates that its products will be sold directly to customers as well as through distributors and resellers, with, in certain cases, no long-term or minimum purchase commitments from them or their end customers. Rockley expects that sales of its products will be primarily made pursuant to standard purchase orders, which orders may be cancelled, reduced, changed, or rescheduled with little or no notice or penalty. Cancellations of orders could result in the loss of anticipated sales without allowing Rockley sufficient time to reduce its inventory and operating expenses. In addition, changes in forecasts or the timing of orders from its customers expose Rockley to the risks of inventory shortages or excess inventory. As a result, Rockley's revenue and operating results could fluctuate materially and could be materially and disproportionately impacted by purchasing decisions of Rockley's customers, including Rockley's larger customers. In the future, Rockley's customers or its distributors or their end customers may decide to purchase fewer units than expected, may alter their purchasing patterns at any time with limited or no notice, or may decide not to continue to purchase Rockley's products at all, any of which could cause Rockley's revenue to decline materially and materially harm Rockley's business, financial condition, and results of operations.

Cancellations of, reductions in, or rescheduling of customer orders could also result in the loss of anticipated sales without allowing Rockley sufficient time to reduce its inventory and operating expenses, as a substantial portion of Rockley's expenses are fixed at least in the short term. In addition, changes in forecasts or the timing of orders expose Rockley to the risks of inventory shortages or excess inventory. Any of the foregoing events could materially and adversely affect Rockley's business, financial condition, and results of operations.

***If Rockley is unable to establish and maintain confidence in its long-term business prospects among customers and analysts and within its industry or is subject to negative publicity, then Rockley's financial condition, operating results, business prospects, and access to capital may suffer materially.***

Rockley has not yet fully developed or commercialized its products or services and the successful commercialization of Rockley's products depends in part on Rockley's customers and potential customers

67

Exhibit 4
Page 171

**Table of Contents**

committing to use Rockley's products in their own products. Customers may be less likely to purchase Rockley's products if they are not convinced that Rockley's business will succeed or that its service and support and other operations will continue in the long term. Similarly, suppliers and other third parties will be less likely to invest time and resources in developing business relationships with Rockley if they are not convinced that Rockley's business will succeed. If Rockley is unable to establish and maintain confidence in its long-term business prospects among customers, suppliers, analysts, ratings agencies, and within its industry or is subject to negative publicity, then Rockley's financial condition, operating results, business prospects, and access to capital may suffer materially.

***Rockley's investments in educating its customers and potential customers about the advantages of Rockley's silicon photonics and sensing technology and its applications will require significant financial and talent resources and may not result in sales of Rockley's products.***

Educating Rockley's prospective customers, and to a lesser extent, its existing customers, about Rockley's silicon photonics and sensing technology and its applications in health monitoring devices, its advantages over competitive technologies, and the potential application of Rockley's products in different industries and use cases is an integral part of Rockley's strategy to expand into additional markets. Rockley's efforts to educate potential customers and the market generally will require significant financial and talent resources. These educational efforts may not be successful and Rockley may not offset the costs of such efforts with revenue from the new customers. If Rockley is unable to acquire new customers to offset these expenses, its financial condition will be adversely affected.

***Rockley's business depends substantially on the efforts of its executive officers, including its Chief Executive Officer and founder, Dr. Andrew Rickman, OBE, and highly skilled talent, and its operations may be severely disrupted if it lost their services.***

Rockley is highly dependent on its founder, Dr. Andrew Rickman, OBE as well its other executive officers, and the loss of his services would adversely affect Rockley's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Rockley's research and development activities, and retain existing customers or cultivate new ones. Competition for highly-skilled talent is often intense and Rockley may incur significant costs to attract highly-skilled talent. Rockley may not be successful in attracting, integrating, or retaining qualified talent to fulfill its current or future needs. Rockley has, from time to time, experienced, and it expects to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications.

In addition, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of Rockley's equity or equity awards declines, including those of the post-Business Combination company after the closing of the Business Combination of the Business Combination, it may adversely affect Rockley's ability to retain highly skilled employees. If Rockley fails to attract new talent or fails to retain and motivate its current talent, its business and future growth prospects could be adversely affected.

**Legal and Regulatory Risks Related to Rockley's Business**

***Rockley is subject to governmental export and import control laws and regulations. Rockley's failure to comply with these laws and regulations could have an adverse effect on its business, prospects, financial condition, and results of operations.***

Certain of Rockley's products and services are subject to export control and import laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations, and various economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Controls. U.S. export control laws and regulations and economic sanctions prohibit the shipment of certain products and

68

Exhibit 4
Page 172

Table of Contents

services to U.S. embargoed or sanctioned countries, governments and persons. In addition, complying with export control and sanctions regulations for a particular sale may be time-consuming and result in the delay or loss of sales opportunities. Exports of Rockley's products and technology must be made in compliance with these laws and regulations. If Rockley fails to comply with these laws and regulations, Rockley and certain of its employees could be subject to substantial civil or criminal penalties, including the possible loss of export or import privileges, fines, which may be imposed on Rockley and responsible employees or managers, and, in extreme cases, the incarceration of responsible employees or managers.

***Changes to trade policy, tariffs, and import/export regulations may have a material adverse effect on Rockley's business, financial condition, and results of operations.***

Changes in global political, regulatory, and economic conditions, or in laws and policies governing foreign trade, manufacturing, development, and investment in the territories or countries where Rockley may purchase its components, sell its products, or conduct its business, could adversely affect Rockley's business. The United States has in the past instituted or proposed changes in trade policies that included the negotiation or termination of trade agreements, the imposition of higher tariffs on imports into the United States, economic sanctions on individuals, corporations, or countries, and other government regulations affecting trade between the United States and other countries where Rockley conducts its business. A number of other nations have proposed or instituted similar measures directed at trade with the United States in response. As a result of these developments or any future similar developments, there may be greater restrictions and economic disincentives on international trade that could adversely affect Rockley's business. It may be time-consuming and expensive for Rockley to alter its business operations to adapt to or comply with any such changes, and any failure to do so could have a material adverse effect on its business, financial condition, and results of operations.

***Rockley may become involved in legal and regulatory proceedings and commercial or contractual disputes, which could have an adverse effect on its profitability and financial position.***

Rockley may be, from time to time, involved in litigation, regulatory proceedings, and commercial or contractual disputes that may be significant. These matters may include, without limitation, disputes with Rockley's suppliers and customers, intellectual property claims, shareholder litigation, government investigations, class action lawsuits, personal injury claims, environmental issues, customs and value-added tax disputes, and employment and tax issues. In addition, Rockley could face in the future a variety of labor and employment claims against it, which could include but is not limited to general discrimination, wage and hour, privacy, ERISA, or disability claims. In such matters, government agencies or private parties may seek to recover from Rockley indeterminate amounts in penalties or monetary damages (including, in some cases, treble or punitive damages) or seek to limit Rockley's operations in some way. These types of lawsuits could require significant management time and attention or could involve substantial legal liability, adverse regulatory outcomes, and/or substantial expenses to defend. Often these cases raise complex factual and legal issues and create risks and uncertainties. No assurances can be given that any proceedings and claims will not have a material adverse impact on Rockley's operating results and financial position or that its established reserves or its available insurance will mitigate this impact.

***Rockley is subject to, and must remain in compliance with, numerous laws and governmental regulations across various jurisdictions concerning the use, distribution, and sale of its products. Some of Rockley's customers also require that it comply with their own unique requirements relating to these matters.***

Rockley sells products that contain electronic components, and such components may contain materials that are subject to government regulation in locations where Rockley sells its products. For example, certain regulations limit the use of lead in electronic components. Since Rockley operates on a global basis, compliance with regulations is a complex process which requires continual monitoring of regulations and an ongoing compliance process to ensure that Rockley and its suppliers are in compliance with existing regulations in each market where it operates. If there is an unanticipated new regulation that significantly impacts Rockley's use and

69

Exhibit 4
Page 173

Table of Contents

sourcing of various components or requires more expensive components, that regulation could materially and adversely affect its business, results of operations, and financial condition. Rockley's products may also be used in healthcare monitoring and other medical devices, which are subject to additional regulation. If Rockley fails to adhere to these new regulations or fails to continually monitor the updates, it may be subject to litigation, loss of customers, or negative publicity and its business, results of operations, and financial condition will be adversely affected.

***Rockley may in the future become subject to additional regulations, including Food and Drug Administration (the "FDA") clearance or approval, for health monitoring products in which Rockley's products are incorporated. Achieving and maintaining compliance and approval under applicable regulations may be difficult to achieve.***

Rockley's products may be incorporated into end products in the health monitoring sector, including products which collect clinical data. Accordingly, it is possible that certain of Rockley's products, or the end products which incorporate Rockley's products will be subject to current and future regulation by the FDA, as well as by other federal, state, and local agencies. As Rockley's target market is consumer wellness rather than medical, Rockley currently anticipates that FDA clearance will be unnecessary for its products targeting the consumer wearables market; however, Rockley intends to monitor and comply with regulations to the extent they become applicable to Rockley.

Manufacturers of medical devices are required to comply with applicable laws and regulations governing development, testing, manufacturing, labeling, marketing, and distribution of medical devices. Devices are generally subject to varying levels of regulatory control, based on the risk level of the device. Governmental regulations specific to medical devices are wide-ranging and govern, among other things:

- product design, development, and manufacture;
- laboratory, pre-clinical and clinical testing, labeling, packaging, storage, and distribution;
- premarketing clearance or approval;
- record-keeping;
- product marketing, promotion and advertising, sales, and distribution; and
- post-marketing surveillance, including reporting of deaths or serious injuries and recalls and correction and removals.

Rockley or its customers may not be able to obtain the necessary clearances or approvals for their products or may be unduly delayed in doing so, which could harm Rockley's business. Furthermore, even if Rockley is granted regulatory clearances or approvals, they may include significant limitations on the permitted uses for the product, which may limit the market potential for the product. Delays in obtaining clearance or approval could increase Rockley's costs and harm Rockley's revenue and growth.

Additionally, Rockley's products may be subject to regulation by similar agencies in other states and foreign countries. While Rockley believes that it has complied with all applicable laws and regulations, continued compliance with such laws or regulations, including any new laws or regulations, might impose additional costs on Rockley which could adversely affect its financial performance and results of operations.

***Rockley is subject to various environmental laws and regulations that could impose substantial costs upon Rockley.***

Concerns over environmental pollution and climate change have produced significant legislative and regulatory efforts on a global basis, and Rockley believes this will continue both in scope and in the number of countries participating. In addition, as climate change issues become more prevalent, foreign, federal, state, and

70

Exhibit 4
Page 174

Table of Contents

local governments and Rockley's customers have been responding to these issues. The increased focus on environmental sustainability may result in new regulations and customer requirements, or changes in current regulations and customer requirements, which could materially and adversely impact Rockley's business, results of operations, and financial condition. If Rockley is unable to effectively manage real or perceived issues, including concerns about environmental impacts or similar matters, sentiments toward Rockley or its products could be negatively impacted, and its business, results of operations, or financial condition could suffer.

Rockley's operations are and will be subject to foreign, federal, state, and local environmental laws and regulations, and such laws and regulations could directly increase the cost of energy, which may have an effect on the way Rockley manufactures products or utilizes energy to produce its products. In addition, any new regulations or laws in the environmental area might increase the cost of raw materials or key components Rockley uses in its products. Environmental regulations require Rockley to reduce product energy usage, monitor and exclude an expanding list of restricted substances, and to participate in required recovery and recycling of its products. Environmental and health and safety laws and regulations can be complex, and Rockley has limited experience complying with them. Capital and operating expenses needed to comply with environmental laws and regulations can be significant, and violations may result in substantial fines and penalties, third-party damages, suspension of production, or a cessation of Rockley's operations.

The costs of complying with environmental laws and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on Rockley's financial condition or operating results. Rockley may face unexpected delays in obtaining the required permits and approvals in connection with its planned production facilities that could require significant time and financial resources and delay its ability to operate these facilities, which would adversely impact Rockley's business, prospects, financial condition, and operating results.

***Rockley is subject to U.S. and foreign anti-corruption and anti-money laundering laws and regulations. Rockley can face criminal liability and other serious consequences for violations, which can harm its business.***

Rockley is subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act, the U.K. Bribery Act of 2010, and possibly other anti-bribery and anti-money laundering laws in countries in which Rockley conducts activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and other collaborators from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. Rockley can be held liable for the corrupt or other illegal activities of its employees, agents, contractors, and other collaborators, even if Rockley does not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm, and other consequences.

***Failures, or perceived failures, to comply with privacy, data protection, and information security requirements in the variety of jurisdictions in which Rockley operates may adversely impact its business, and such legal requirements are evolving, uncertain, and may require improvements in, or changes to, Rockley's policies and operations.***

Rockley's current and potential future operations and sales are subject to laws and regulations addressing privacy and the collection, use, storage, disclosure, transfer, and protection of a variety of types of data. For example, the European Commission has adopted the General Data Protection Regulation and California recently enacted the California Consumer Privacy Act of 2018, both of which provide for potentially material penalties for non-compliance. These regimes may, among other things, impose data security requirements, disclosure requirements, and restrictions on data collection, uses, and sharing that may impact Rockley's operations and the

71

Exhibit 4
Page 175

Table of Contents

development of its business. Rockley has limited access to collect, store, process, or share certain information collected by its products, and Rockley's products may evolve to collect additional information. Therefore, the full impact of these privacy regimes on Rockley's business is rapidly evolving across jurisdictions and remains uncertain at this time.

Rockley may also be affected by cyber-attacks and other means of gaining unauthorized access to its products, systems, and data. For instance, cyber criminals or insiders may target Rockley or third parties with which it has business relationships to obtain data, or in a manner that disrupts Rockley's operations or compromises its products or the systems into which its products are integrated.

Rockley is assessing the continually evolving privacy and data security regimes and measures it believes are appropriate in response. Since these data security regimes are evolving, uncertain, and complex, especially for a global business like Rockley, Rockley may need to update or enhance its compliance measures and these updates or enhancements may require implementation costs. In addition, Rockley may not be able to monitor and react to all developments in a timely manner. The compliance measures Rockley does adopt may prove ineffective. Any failure, or perceived failure, by Rockley to comply with current and future regulatory or customer-driven privacy, data protection, and information security requirements, or to prevent or mitigate security breaches, cyber-attacks, or improper access to, use of, or disclosure of data, or any security issues or cyber-attacks affecting Rockley, could result in significant liability, costs (including the costs of mitigation and recovery), and a material loss of revenue resulting from the adverse impact on its reputation and brand, loss of proprietary information and data, disruption to its business and relationships, and diminished ability to retain or attract customers and business partners. Such events may result in governmental enforcement actions and prosecutions, private litigation, fines, and penalties or adverse publicity, and could cause customers and business partners to lose trust in Rockley, which could have an adverse effect on its reputation and business.

Further, in the event Rockley's products, or the end products into which Rockley's products are incorporated, involve the collection of personal medical or clinical data, Rockley would be subject to additional privacy regulations. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regulations apply U.S. national standards for some types of electronic health information transactions and the data elements used in those transactions to ensure the integrity, security, and confidentiality of health information and standards to protect the privacy of individually identifiable health information businesses receive, maintain or transmit. The Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act") expanded the scope of the privacy and security requirements under HIPAA and increased penalties for violations. In addition, the HITECH Act enacted federal breach notification rules requiring notification to affected individuals and the Department of Health and Human Services (and in some cases, relevant media outlets) whenever a breach of protected health information occurs. Rockley's failure to maintain confidentiality of sensitive protected health information or other personal information in accordance with the applicable regulatory requirements could damage its reputation and expose Rockley to claims, fines, and penalties. Rockley's business, operating results, and financial condition could also be negatively impacted by a violation of the HIPAA privacy or security rules or any other applicable privacy or data security law.

Many U.S. states and international jurisdictions in which Rockley operates also have laws and regulations that protect the privacy and security of confidential, protected health information, or other personal information and have similar or even more protection than U.S. federal regulations. Furthermore, state data breach notification laws continue to expand the type of protected health information and other personal information they encompass, and in many cases are more burdensome than the HIPAA/HITECH breach reporting requirements.

***Regulations related to conflict minerals may cause Rockley to incur additional expenses and could limit the supply and increase the costs of certain metals used in the manufacturing of its products.***

As a public company, Rockley will become subject to the requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, that will require it to determine, disclose,

72

Exhibit 4
Page 176

**Table of Contents**

and report whether its products contain conflict minerals. The implementation of these requirements could adversely affect the sourcing, availability, and pricing of the materials used in the manufacture of components used in Rockley's products. In addition, Rockley will incur additional costs to comply with the disclosure requirements, including costs related to conducting diligence procedures to determine the sources of conflict minerals that may be used in or necessary to the production of its products and, if applicable, potential changes to products, processes, or sources of supply as a consequence of such verification activities. It is also possible that its reputation may be adversely affected if Rockley determines that certain of its products contain minerals not determined to be conflict-free or if Rockley is unable to alter its products, processes, or sources of supply to avoid use of such materials.

**Risks Related to Rockley's Intellectual Property**

***Despite the actions Rockley is taking to defend and protect its intellectual property, Rockley may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Rockley's efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.***

The success of Rockley's products and its business depend in part on Rockley's ability to obtain patents and other intellectual property rights and maintain adequate legal protection for its products in the United States and other international jurisdictions. Rockley relies on a combination of patent, trademark, and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect its proprietary rights, all of which provide only limited protection.

As of March 1, 2021, Rockley had 154 issued and allowed patents and other patent applications pending in the United States and 51 patents in foreign jurisdictions. Seventy-four issued and allowed patents in the United States expire in the years beginning in 2021 through 2040. The 51 patents in foreign jurisdictions include 29 in the United Kingdom, 20 in China, and 2 in Japan, and they expire in the years beginning 2027 through 2039. Many of Rockley's issued patents and pending patent applications relate to sensors and sensor chips.

Rockley cannot assure you that any patents will be issued with respect to its currently pending patent applications or that any trademarks will be registered with respect to its currently pending applications in a manner that gives Rockley adequate defensive protection or competitive advantages, if at all, or that any patents issued to Rockley or any trademarks registered by it will not be challenged, invalidated, or circumvented. Rockley may file for patents and trademarks in the United States and in certain international jurisdictions, but such protections may not be available in all countries in which it operates or in which Rockley seeks to enforce its intellectual property rights, or may be difficult to enforce in practice. For example, the legal environment relating to intellectual property protection in certain emerging market countries where Rockley may operate in the future is relatively weaker, often making it difficult to create and enforce such rights. Rockley's currently-registered trademarks and any patents and trademarks that may be issued or registered, as applicable, in the future with respect to pending or future applications may not provide sufficiently broad protection or may not prove to be enforceable in actions against alleged infringers. Rockley cannot be certain that the steps it has taken will prevent unauthorized use of its technology or the reverse engineering of its technology. Moreover, others may independently develop technologies that are competitive to Rockley or infringe Rockley's intellectual property.

Protecting against the unauthorized use of Rockley's intellectual property, products, and other proprietary rights is expensive and difficult, particularly internationally. Unauthorized parties may attempt to copy or reverse engineer Rockley's sensing technology or certain aspects of Rockley's products or manufacturing processes that it considers proprietary. Litigation may be necessary in the future to enforce or defend Rockley's intellectual property rights, to prevent unauthorized parties from copying or reverse engineering its products, or technology to determine the validity and scope of the proprietary rights of others or to block the importation of infringing products into the United States.

Exhibit 4
Page 177

**Table of Contents**

Any such litigation, whether initiated by Rockley or a third party, could result in substantial costs and diversion of management resources, either of which could adversely affect Rockley's business, operating results, and financial condition. Even if it obtains favorable outcomes in litigation, Rockley may not be able to obtain adequate remedies, especially in the context of unauthorized parties copying or reverse engineering its products or technology.

Further, many of Rockley's current and potential competitors have the ability to dedicate substantially greater resources to defending intellectual property infringement claims and to enforcing their intellectual property rights than Rockley has. Attempts to enforce its rights against third parties could also provoke these third parties to assert their own intellectual property or other rights against Rockley or result in a holding that invalidates or narrows the scope of Rockley's rights, in whole or in part. Effective patent, trademark, service mark, copyright, and trade secret protection may not be available in every country in which Rockley's products are available and competitors based in other countries may sell infringing products in one or more markets. Failure to adequately protect Rockley's intellectual property rights could result in Rockley's competitors offering similar products, potentially resulting in the loss of some of Rockley's competitive advantage and a decrease in its revenue, which would adversely affect Rockley's business, operating results, financial condition, and prospects.

***Third-party claims that Rockley is infringing intellectual property, whether successful or not, could subject Rockley to costly and time-consuming litigation or expensive licenses, and its business could be adversely affected.***

Although Rockley has applied for patents related to its products and technology, a number of companies hold patents covering aspects of sensing and photonic chip technologies. In addition to these patents, participants in this industry typically also protect their technology, especially embedded software, through copyrights and trade secrets. As a result, there is frequent litigation based on allegations of infringement, misappropriation, or other violations of intellectual property rights. Rockley may in the future receive inquiries from other intellectual property holders and may become subject to claims that it infringes their intellectual property rights, particularly as Rockley expands its presence in the market, expands to new use cases, and faces increasing competition. In addition, parties may claim that the names and branding of Rockley's products infringe their trademark rights in certain countries or territories. If such a claim were to prevail, Rockley may have to change the names and branding of its products in the affected territories and it could incur other costs.

Rockley currently has a number of agreements in effect pursuant to which it has agreed to defend, indemnify, and hold harmless its customers, suppliers, and channel partners and other counterparties from damages and costs which may arise from the infringement by Rockley's products of third-party patents or other intellectual property rights. The scope of these indemnity obligations varies, and, in some instances, include indemnification for damages and expenses, including attorneys' fees. Rockley's insurance may not cover all intellectual property infringement claims. A claim that its products infringe a third party's intellectual property rights, even if untrue, could adversely affect Rockley's relationships with its customers, may deter future customers from purchasing its products, and could expose Rockley to costly litigation and settlement expenses. Even if Rockley is not a party to any litigation between a customer and a third party relating to infringement by its products, an adverse outcome in any such litigation could make it more difficult for Rockley to defend its products against intellectual property infringement claims in any subsequent litigation in which it is a named party. Any of these results could adversely affect Rockley's brand and operating results.

Rockley may in the future need to initiate infringement claims or litigation to try to protect its intellectual property rights. In addition to litigation where Rockley is a plaintiff, Rockley's defense of intellectual property rights claims brought against it or its customers, suppliers, and channel partners, with or without merit, could be time-consuming, expensive to litigate or settle, divert management resources and attention, and force Rockley to acquire intellectual property rights and licenses, which may involve substantial royalty or other payments and may not be available on acceptable terms or at all. Further, a party making such a claim, if successful, could

74

Exhibit 4
Page 178

**Table of Contents**

secure a judgment that requires Rockley to pay substantial damages or obtain an injunction and also Rockley may lose the opportunity to license its technology to others or to collect royalty payments. An adverse determination also could invalidate or narrow Rockley's intellectual property rights and adversely affect its ability to offer its products to its customers and may require that Rockley procure or develop substitute products that do not infringe, which could require significant effort and expense. Any of these events could adversely affect Rockley's business, reputation, operating results, financial condition, and prospects.

***Rockley's intellectual property applications, including patent applications, may not be approved or granted or may take longer than expected to result in approval or grant, which may have a material adverse effect on Rockley's ability to prevent others from commercially exploiting products similar to Rockley's.***

Rockley cannot be certain that it is the first inventor of the subject matter to which it has filed a particular patent application, or if it is the first party to file such a patent application. If another party has filed a patent application to the same subject matter as Rockley has, Rockley may not be entitled to the protection sought by the patent application. Rockley also cannot be certain whether the claims included in a patent application will ultimately be allowed in the applicable issued patent or the timing of any approval or grant of a patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, Rockley cannot be certain that the patent applications that it files will issue, or that its issued patents will afford protection against competitors with similar technology. In addition, Rockley's competitors may design around Rockley's registered or issued intellectual property, which may adversely affect Rockley's business, prospects, financial condition, and operating results.

***In addition to patented technology, Rockley relies on its unpatented proprietary technology, trade secrets, designs, experiences, workflows, data, processes, software, and know-how.***

Rockley relies on proprietary information (such as trade secrets, designs, experiences, workflows, data, know-how, and confidential information) to protect intellectual property that may not be patentable or subject to copyright, trademark, trade dress, or service mark protection, or that Rockley believes is best protected by means that do not require public disclosure. Rockley generally seeks to protect this proprietary information by entering into confidentiality agreements, or consulting, services, or employment agreements that contain non-disclosure and non-use provisions with its employees, consultants, contractors, and third parties. However, these agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement, or misappropriation of its proprietary information, may be limited as to their term, and may not provide an adequate remedy in the event of unauthorized disclosure or use of proprietary information. Rockley has limited control over the protection of trade secrets used by its current or future manufacturing counterparties and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, Rockley's proprietary information may otherwise become known or be independently developed by its competitors or other third parties. To the extent that its employees, consultants, contractors, advisors, and other third parties use intellectual property owned by others in their work for Rockley, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of Rockley's proprietary rights, and failure to obtain or maintain protection for its proprietary information could adversely affect its competitive business position. Furthermore, laws regarding trade secret rights in certain markets where Rockley operates may afford little or no protection to its trade secrets.

Rockley also relies on physical and electronic security measures to protect its proprietary information, but it cannot provide assurance that these security measures will not be breached or provide adequate protection for its property. There is a risk that third parties may obtain and improperly utilize Rockley's proprietary information to its competitive disadvantage. Rockley may not be able to detect or prevent the unauthorized use of such information or take appropriate and timely steps to enforce its intellectual property rights.

Exhibit 4
Page 179

Table of Contents

***Rockley may be subject to damages resulting from claims that it or its current or former employees have wrongfully used or disclosed alleged trade secrets of its current or former employees' former employers. Rockley may be subject to damages if its current or former employees wrongfully use or disclose Rockley's trade secrets.***

Rockley may be subject to claims that it or its current or former employees have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of a current or former employee's former employers. Litigation may be necessary to defend against these claims. If Rockley fails to defend against such claims, in addition to paying monetary damages, it may lose valuable intellectual property rights or talent. A loss of key talent or their work product could hamper or prevent Rockley's ability to commercialize its products, which could severely harm its business. Even if Rockley is successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

**Risks Related to Infrastructure, Cybersecurity and Privacy**

***A network or data security incident may allow unauthorized access to Rockley's network or data, harm its reputation, create additional liability, and adversely impact its financial results.***

Rockley and its third-party service providers may face security threats and attacks from a variety of sources. In addition to traditional computer "hackers," malicious code (such as viruses and worms), phishing attempts, employee theft or misuse, and denial of service attacks, sophisticated nation-state and nation-state supported actors engage in attacks (including advanced persistent threat intrusions) and increase the risks to Rockley's internal networks and customer facing environments and the information they store and process. These risks may increase due to COVID-19. A breach in Rockley's data or an attack against its service availability, or that of its third-party service providers, could impact Rockley's networks, creating system disruptions or slowdowns and exploiting security vulnerabilities of Rockley's products, and the information stored on Rockley's networks or those of its third-party service providers could be accessed, publicly disclosed, altered, lost, or stolen, which could subject Rockley to liability and cause it financial harm.

Unauthorized access by a third party to Rockley's internal network, any actual or perceived breach of network security in its systems or networks, or any other actual or perceived data security incident Rockley or its third-party service providers suffer, could result in damage to its reputation, negative publicity, loss of channel partners, end-customers and sales, loss of competitive advantages over its competitors, increased costs to remedy any problems and otherwise respond to any incident, regulatory investigations and enforcement actions, costly litigation, and other liability. In addition, Rockley may incur significant costs to investigate and remediate any security breaches and other security incidents. Rockley's data, corporate systems, third-party systems, and security measures may be breached due to the actions of outside parties, employee error, malfeasance, a combination of these, or otherwise, and, as a result, an unauthorized party may obtain access to its data. For example, in late 2020, Rockley was subject to phishing attacks, one involving a spoofed email whereby certain vendor account information was charged and payment was made to a fraudulent account and a second closely timed incident where a "forwarding" rule was applied to the spoofed email's recipient. While no personal data was accessed and the issue was addressed, the incident resulted in a net loss of approximately $66,345, which loss has been accounted for in Rockley's 2020 financial statements (which amount has been offset by a payout under our cybersecurity insurance policy in March 2021). While Rockley maintains cybersecurity insurance, such insurance may be insufficient to cover all liabilities incurred by these incidents, and any incidents may result in loss or increased costs of its cybersecurity insurance. Any of these negative outcomes could adversely impact the market perception of, and investor confidence in, Rockley.

***Any disruption or performance issues with Rockley's network infrastructure could harm its brand, reputation, and business.***

Rockley has experienced, and may in the future experience, disruptions, outages, and other performance problems due to a variety of factors, including infrastructure changes, human or software errors, capacity

76

Exhibit 4
Page 180

Table of Contents

constraints, and fraud. Any disruptions or other performance problems with Rockley's products or reliability or security of Rockley's systems could harm its reputation, brand, and Rockley's business and operating results. In addition, Rockley must continually improve its computer network and infrastructure to avoid service interruptions or slower system performance. Rockley will need to devote additional resources to improving its platform architecture and its infrastructure. Any failure or delays in Rockley's computer systems could cause service interruptions or slower system performance. These performance issues could harm Rockley's business operations and financial condition.

***Rockley relies on third parties to maintain and operate certain elements of its network infrastructure.***

Rockley relies on third parties to operate and maintain certain elements of its network infrastructure. Interruptions in Rockley's systems or the third-party systems on which it relies, whether due to system failures, computer viruses, physical or electronic break-ins, or other factors, could affect the security or availability of Rockley's network infrastructure and website. Rockley's existing data center facilities and third-party hosting providers have no obligations to renew their agreements with Rockley on commercially reasonable terms or at all, and certain of the agreements governing these relationships may be terminated by either party at any time, with no or limited notice. If any of these arrangements with third parties are terminated, Rockley could experience interruptions, as well as downtime, delays, and additional expenses in arranging alternative cloud infrastructure services. Rockley may incur significant liability from those customers and from third parties with respect to any breach of security affecting third parties' infrastructure.

**Risks Related to Financial and Accounting Matters**

***Rockley's failure to raise additional capital or generate the significant capital necessary to expand its operations could reduce its ability to compete and could harm its business.***

Rockley intends to continue to make investments to support its product development efforts and overall business growth and may require additional funds to respond to business challenges, including the need to develop new features to enhance its products or acquire complementary businesses and technologies. Accordingly, Rockley may in the long-term need to engage in equity or debt financings to secure additional funds. If Rockley raises additional equity or equity-linked financing, shareholders may experience dilution of their ownership interests. Current and future indebtedness may also contain terms that, among other things, restrict Rockley's ability to incur additional indebtedness. Rockley may also be required to take other actions that would otherwise be in the interests of the debt holders and would require it to maintain specified liquidity or other ratios, any of which could harm Rockley's business, operating results, and financial condition. Rockley may not be able to obtain additional financing on terms favorable to it, if at all. If Rockley is unable to obtain adequate financing or financing on satisfactory terms when required, Rockley's ability to continue to support its business growth and to respond to business challenges could be significantly impaired, and its business may be adversely affected.

***The nature of Rockley's business requires the application of complex revenue recognition rules. Significant changes in current principles will affect its consolidated financial statements and changes in financial accounting standards or practices may cause adverse, unexpected financial reporting fluctuations and harm its results of operations.***

The accounting rules and regulations with which Rockley must comply with are complex and subject to interpretation by the Financial Accounting Standards Board ("FASB"), the U.S. Securities and Exchange Commission (the "SEC"), and various bodies formed to promulgate and interpret appropriate accounting principles. In addition, many companies' accounting disclosures are being subjected to heightened scrutiny by regulators and the public. Further, the accounting rules and regulations are continually changing in ways that could impact Rockley's financial statements.

77

Exhibit 4
Page 181

Table of Contents

***In preparing Rockley's consolidated financial statements, Rockley makes good faith estimates and judgments that may change or turn out to be erroneous, which could adversely affect Rockley's operating results.***

In preparing Rockley's consolidated financial statements in conformity with GAAP, Rockley must make estimates and judgments in applying Rockley's most critical accounting policies. Those estimates and judgments have a significant impact on the results Rockley reports in its consolidated financial statements. The most difficult estimates and subjective judgments that Rockley makes relate to (i) revenue recognition including variable consideration, (ii) useful lives and recoverability of property and equipment and long-lived assets, (iii) incremental borrowing rates on the Company's finance and operating leases, (iv) valuation of our convertible loan notes, (v) valuation allowances for income taxes, (vi) stock-based compensation including the valuation of ordinary shares, (vii) valuation of warrants and (viii) contingencies. Rockley bases its estimates on historical experience, input from outside experts, and on various other assumptions that Rockley believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Rockley also has other key accounting policies that are not as subjective, and therefore, their application would not require Rockley to make estimates or judgments that are as difficult, but which nevertheless could significantly affect its financial reporting. Actual results may differ materially from these estimates. In general, if Rockley's estimates, judgments, or assumptions relating to its critical accounting policies are inaccurate or change or if actual circumstances differ from its estimates, judgments, or assumptions, including uncertainty in the current economic environment due to COVID-19, its operating results may be adversely affected and could fall below Rockley's publicly announced projections or the expectations of securities analysts and investors.

Additionally, Rockley regularly monitors its compliance with applicable financial reporting standards and review new pronouncements and drafts thereof that are relevant to it. As a result of new standards, changes to existing standards, and changes in their interpretation, Rockley might be required to change its accounting policies, alter its operational policies, and implement new or enhance existing systems so that they reflect new or amended financial reporting standards, or Rockley may be required to restate its published financial statements. Such changes to existing standards or changes in their interpretation may have an adverse effect on Rockley's reputation, business, financial position, and profit, or cause an adverse deviation from Rockley's revenue and operating profit target, which may negatively impact Rockley's financial results. For more information, refer to the section entitled "*Critical Accounting Estimates*" in "*Rockley's Management's Discussion and Analysis of Financial Condition and Results of Operations*" in this prospectus/proxy statement.

***Rockley's ability to use its net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2020, Rockley had $79.3 million of U.K. net operating loss carryforwards available to reduce future taxable income and will be carried forward indefinitely. To the extent Rockley is not able to offset future taxable income with its net operating losses, Rockley's cash flows may be adversely affected.

***Rockley's projections contained in this registration statement/prospectus/S statement are not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants ("AICPA"), and neither its registered public accountants nor any other independent expert or outside party compiles or examines the projections.***

Rockley's projections and their underlying assumptions contained in this prospectus/proxy statement were not prepared with a view toward compliance with AICPA guidelines and have not been reviewed by its registered public accountants or any other third parties. Accordingly, no such person expresses any opinion or any other form of assurance with respect to the projections. Projections are based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond Rockley's control, such as the impact of the COVID-19 pandemic, and are based upon specific assumptions with respect to future business decisions, some of which will change. The rapidly evolving market in which Rockley

Exhibit 4
Page 182

Table of Contents

operates may make it difficult to evaluate its current business and future prospects, including its ability to plan for and model future growth. Any failure to successfully implement Rockley's operating strategy or the occurrence of any of the events or circumstances set forth in this "*Risk Factors Related to Rockley*" section could result in Rockley's actual operating results being different from its projections, and the differences may be adverse and material.

**Risks Related to Being a Public Company**

*Rockley's management team has varying degrees of experience managing and operating a public company.*

Members of Rockley's management team have varying degrees of experience managing and operating a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Additionally, some members of Rockley's management team were recently hired, including its Senior Director of Sensing Application Algorithm Development, Controller, Senior Director of Sensing Product Module Development, and VP of Sensing Cloud, and AI Product. Rockley's management team may not successfully or efficiently manage their new roles and responsibilities. Rockley's transition to being a public company subjects it to significant regulatory oversight and reporting obligations under the U.S. securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from Rockley's senior management and could divert their attention away from the day-to-day management of Rockley's business. Rockley may not have adequate key talent with the appropriate level of knowledge, experience, and training in the accounting policies, practices, or internal controls over financial reporting required of public companies. The development and implementation of the standards and controls necessary for the post-Business Combination company to achieve the level of accounting standards required of a public company may require costs greater than expected. It is possible that the post-Business Combination company will be required to expand its employee base and hire additional employees to support its operations as a public company which will increase its operating costs in future periods. These factors could adversely affect the post-Business Combination company's business, financial condition, and operating results.

*If Rockley fails to maintain an effective system of internal controls, its ability to produce timely and accurate financial statements or comply with applicable regulations could be adversely affected.*

Following the closing of the Business Combination of the Business Combination, the post-Business Combination company will carry out Rockley's business and will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, and the rules and regulations of the New York Stock Exchange ("NYSE"). Rockley expects that the requirements of these rules and regulations will continue to increase its legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on its talent, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that Rockley maintain effective disclosure controls and procedures and internal control over financial reporting. Rockley is continuing to develop and refine its disclosure controls, internal control over financial reporting, and other procedures that are designed to ensure that information required to be disclosed by it in the reports that it will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to Rockley's principal executive and financial officers.

Rockley's current controls and any new controls that it develops may be inadequate because of changes in conditions in its business. Further, additional weaknesses in Rockley's internal controls may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in their implementation or improvement, could adversely affect Rockley's operating results or cause it to fail to meet its reporting obligations and may result in a restatement of Rockley's financial statements for prior periods. Any

Exhibit 4
Page 183

Table of Contents

failure to implement and maintain effective internal controls also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of Rockley's internal control over financial reporting that it is required to include in its periodic reports Rockley will file with the SEC under Section 404 of the Sarbanes-Oxley Act. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in Rockley's reported financial and other information.

In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, Rockley has expended and anticipates that it will continue to expend significant resources, including accounting-related costs, and provide significant management oversight. Any failure to maintain the adequacy of its internal controls, or consequent inability to produce accurate financial statements on a timely basis, could increase Rockley's operating costs and could materially and adversely affect its ability to operate its business. If Rockley's internal controls are perceived as inadequate or that it is unable to produce timely or accurate financial statements, investors may lose confidence in Rockley's operating results and the stock price of the post-Business Combination company could decline.

The post-Business Combination company's independent registered public accounting firm is not required to formally attest to the effectiveness of its internal control over financial reporting until after the post-Business Combination company is no longer an emerging growth company. At such time, the post-Business Combination company's independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which Rockley's controls are documented, designed, or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the post-Business Combination company's business and operating results.

In addition to Rockley's results determined in accordance with GAAP, Rockley believes certain non-GAAP measures may be useful in evaluating its operating performance. Rockley presents certain non-GAAP financial measures in this prospectus/proxy statement and intends to continue to present certain non-GAAP financial measures in future filings with the SEC and other public statements. Any failure to accurately report and present its non-GAAP financial measures could cause investors to lose confidence in its reported financial and other information, which would likely have a negative effect on the trading price of its ordinary shares.

***The requirements of being a public company may strain Rockley's resources, divert management's attention, and affect its ability to attract and retain qualified board members.***

Upon Closing of the Business Combination, Rockley, as part of the post-Business Combination company, will become subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Compliance with these rules and regulations will increase Rockley's legal and financial compliance costs, make some activities more difficult, time-consuming, or costly, and increase demand on its systems and resources. Among other things, the Exchange Act requires that public companies file annual, quarterly, and current reports with respect to their business and operating results. In addition, the Sarbanes-Oxley Act requires, among other things, that companies maintain effective disclosure controls and procedures and internal control over financial reporting. In order to meet the requirements of this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could harm Rockley's business and operating results. As a private company, Rockley has not been required to comply with these requirements and as such, had not invested in the resources required for such compliance. Although Rockley has already hired additional employees to comply with these requirements, it may need to hire even more employees in the future and will need to engage its auditors to review its quarterly and annual reports, which will increase its costs and expenses.

In addition, changing laws, regulations, and standards related to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs, and making some

80

Exhibit 4
Page 184

**Table of Contents**

activities more time-consuming. These laws, regulations, and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. Rockley intends to invest resources to comply with evolving laws, regulations, and standards, and this investment may result in increased general and administrative expense and a diversion of management's time and attention from revenue-generating activities to compliance activities. If Rockley's efforts to comply with new laws, regulations, and standards differ from the activities intended by regulatory or governing bodies, regulatory authorities may initiate legal proceedings against Rockley and its business may be harmed.

**General Risks**

***The global COVID-19 pandemic could harm Rockley's business and results of operations.***

On March 11, 2020, the World Health Organization characterized the outbreak of COVID-19 as a global pandemic and recommended containment and mitigation measures. Since then, extraordinary actions have been taken by international, federal, state, and local public health and governmental authorities and organizations to contain and combat the outbreak and spread of COVID-19 in regions throughout the world. These actions include travel bans, quarantines, "stay-at-home" orders, and similar mandates and guidelines for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations.

The COVID-19 pandemic has negatively impacted, and will likely continue to have a negative impact on, worldwide economic activity and financial markets and has impacted, will further impact, Rockley's workforce and operations, the operations of its customers, and those of their respective channel partners, vendors, and suppliers. In light of the uncertain and evolving situation and various international and government restrictions and guidelines, Rockley has taken measures intended to mitigate the spread of the virus and minimize the risk to its employees, channel partners, end-customers, and the communities in which it operates. Specifically, these measures include transitioning its employee population to work remotely from home, which is planned to continue through June 30, 2021 with the anticipated roll out of a phased return to office plan in through September 30, 2021 in accordance with government guidance and, in accordance with applicable government directives, reducing on-site operations at its facilities. Certain key laboratory employees and facilities were designated as Essential Critical Infrastructure and Rockley was able to continue internal testing and laboratory work to the extent necessary to service customer commitments. To facilitate on-site operations, revised operational and manufacturing plans were implemented that conform to COVID-19 precautionary health guidelines, including universal requirement of facial coverings, rearranging facilities to follow social distancing protocols, conducting active daily temperature checks, regular and thorough disinfecting of surfaces and tools, and regular testing of its employees for COVID-19. The remaining non-essential workforce was required to perform their duties from home.

Rockley intends to continue to monitor the situation and may adjust its current policies as more information and public health guidance become available. Any precautionary measures that Rockley has adopted or may adopt could negatively affect Rockley's sales and marketing efforts, delay and lengthen its sales cycles, and create operational or other challenges, any of which could harm its business and results of operations. In addition, COVID-19 may disrupt the operations of Rockley's customers and channel partners for an indefinite period of time, including as a result of travel restrictions and/or business shutdowns, all of which could negatively impact Rockley's business and results of operations, including cash flows.

The ongoing impact will depend on the duration of the pandemic, which is being mitigated by advances in the treatment of the disease, prevention efforts including vaccines, broad government measures to contain the spread of the virus, and related government stimulus measures. However, should Rockley experience sustained impact from the pandemic, additional actions such as cost reduction measures may need to be implemented. The impact of COVID-19 is fluid and uncertain, but it has caused and may continue to cause various negative effects,

81

Exhibit 4
Page 185

Table of Contents

including an inability to meet with actual or potential customers; customers deciding to delay or abandon their planned product development programs and product commercialization timelines; increased requests for delayed payment terms by customers and channel partners; changes in the demand of Rockley's products, which may cause it to reprioritize its engineering and research and development efforts; and delays or possible disruptions in its supply chain. Until the COVID-19 pandemic is contained and global economic activity stabilizes, it will continue to be more difficult for Rockley to forecast its operating results.

***The recurrence or continued effects of a global economic downturn as a result of the COVID-19 pandemic could have an adverse effect on Rockley's business and operating results.***

Rockley operates globally and as a result its business and revenue are impacted by global macroeconomic conditions. The multinational efforts to contain the spread of COVID-19 had a significant adverse effect on the global macroeconomic environment. In addition, the instability in the global credit markets, uncertainties regarding the effects of Brexit, uncertainties related to the timing of the lifting of governmental restrictions to mitigate the spread of COVID-19, uncertainties related to changes in public policies such as domestic and international regulations, taxes, or international trade agreements, international trade disputes, government shutdowns, geopolitical turmoil, and other disruptions to global and regional economies and markets could continue to add uncertainty to global economic conditions.

These adverse conditions could result in longer sales, development, and production cycles, slower adoption of new technologies, and increased price competition. As a result, any continued or further uncertainty, weakness, or deterioration in global macroeconomic and market conditions may cause Rockley's customers to modify spending priorities or delay purchasing decisions, and result in lengthened sales, development, and production cycles, any of which could harm its business and operating results.

**Risks Related to SC Health and the Business Combination**

***There can be no assurance that HoldCo's ordinary shares will be approved for listing on the NYSE or that HoldCo will be able to comply with the continued listing standards of the NYSE.***

In connection with the closing of the Business Combination, HoldCo intends to list its ordinary shares and warrants on the NYSE under the symbols "RKLY" and "RKLYW," respectively. If HoldCo is unable to list its shares on the NYSE or if, after the Business Combination, the NYSE delists HoldCo's shares from trading on its exchange for failure to meet the listing standards, the post-Business Combination company and its shareholders could face significant material adverse consequences including:

- a limited availability of market quotations for the HoldCo's securities;

- a determination that the post-Business Combination company's ordinary shares is a "penny stock" which will require brokers trading in the post-Business Combination company's ordinary shares to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for shares of the post-Business Combination company's ordinary shares;

- a limited amount of analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***Subsequent to the closing of the Business Combination, the post-Business Combination company may be required to take write-downs or write-offs, or the post-Business Combination company may be subject to restructuring, impairment or other charges that could have a significant negative effect on the post-Business Combination company's financial condition, results of operations and the market price of HoldCo's ordinary shares, which could cause you to lose some or all of your investment.***

Although SC Health has conducted due diligence on Rockley, SC Health cannot assure you that this diligence will surface all material issues that may be present with Rockley's business, that it would be possible to

82

Exhibit 4
Page 186

Table of Contents

uncover all material issues through a customary amount of due diligence, or that factors outside of Rockley's business and outside of SC Health's control will not later arise. As a result of these factors, the post-Business Combination company may be forced to later write-down or write-off assets, restructure its operations, or incur impairment or other charges that could result in the post-Business Combination company reporting losses. Even if SC Health's due diligence successfully identified certain risks, unexpected risks may arise, and previously known risks may materialize in a manner not consistent with its preliminary risk analysis. Even though these charges may be non-cash items and therefore not have an immediate impact on the post-Business Combination company's liquidity, the fact that the post-Business Combination company reports charges of this nature could contribute to negative market perceptions about the post-Business Combination company or its securities. In addition, charges of this nature may cause the post-Business Combination company to be unable to obtain future financing on favorable terms or at all, or to violate net worth or other covenants to which it may be subject as a result of assuming pre-existing debt held by Rockley or by virtue of obtaining post-Business Combination debt financing. Accordingly, any shareholders who choose to remain shareholders following the Business Combination could suffer a reduction in the value of their securities. Such shareholders are unlikely to have a remedy for such reduction in value unless they are able to successfully claim that the reduction was due to the breach by the post-Business Combination company's officers or directors of a duty of care or other fiduciary duty owed to them, or if they are able to successfully bring a private claim under securities laws that the proxy solicitation or tender offer materials, as applicable, relating to the business combination contained an actionable material misstatement or material omission.

***If the Business Combination's benefits do not meet the expectations of investors or securities analysts, the market price of SC Health's securities or, following the closing of the Business Combination, HoldCo's securities, may decline.***

If the perceived benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of SC Health's securities prior to the closing of the Business Combination may decline. The market values of SC Health's securities at the time of the Business Combination may vary significantly from their prices on the date the Business Combination Agreement was executed, the date of this prospectus/proxy statement, or the date on which SC Health's shareholders vote on the Business Combination.

In addition, following the Business Combination, fluctuations in the price of HoldCo's securities could contribute to the loss of all or part of your investment. Prior to the Business Combination, there has not been a public market for HoldCo's capital stock. Accordingly, the valuation ascribed to Rockley or the post-Business Combination company may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for HoldCo's securities develops and continues, the trading price of HoldCo's securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond the post-Business Combination company's control. Any of the factors listed below could have a material adverse effect on your investment in HoldCo's securities and HoldCo's securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of HoldCo's securities may not recover and may experience a further decline.

Factors affecting the trading price of HoldCo's securities may include:

- actual or anticipated fluctuations in the post-Business Combination company's quarterly financial results or the quarterly financial results of companies perceived to be similar to it;

- changes in the market's expectations about the post-Business Combination company's operating results;

- the post-Business Combination company's operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning the post-Business Combination company or the transportation industry in general;

83

Exhibit 4
Page 187

Table of Contents

- operating and share price performance of other companies that investors deem comparable to the post-Business Combination company;

- the post-Business Combination company's ability to market new and enhanced products and technologies on a timely basis;

- the post-Business Combination company's ability to compete;

- changes in laws and regulations affecting the post-Business Combination company's business;

- the post-Business Combination company's ability to meet compliance requirements;

- commencement of, or involvement in, litigation involving the post-Business Combination company;

- changes in the post-Business Combination company's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of the post-Business Combination company's ordinary shares available for public sale;

- any major change in the post-Business Combination company's board of directors or management;

- sales of substantial amounts of the post-Business Combination company's ordinary shares by the post-Business Combination company's directors, executive officers or significant shareholders, or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism, and public health crises, such as the COVID-19 pandemic.

Broad market and industry factors may materially harm the market price of HoldCo's securities irrespective of the post-Business Combination company's operating performance. The stock market in general, and the NYSE in particular, have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of HoldCo's securities, may not be predictable. A loss of investor confidence in the market for semiconductor stocks or the stocks of other companies which investors perceive to be similar to the post-Business Combination company could depress the post-Business Combination company's share price regardless of the post-Business Combination company's business, prospects, financial condition, or results of operations. A decline in the market price of HoldCo's securities also could adversely affect the post-Business Combination company's ability to issue additional securities and the post-Business Combination company's ability to obtain additional financing in the future.

***The unaudited pro forma financial information included herein may not be indicative of what the post-Business Combination company's actual financial position or results of operations would have been.***

The unaudited pro forma financial information included herein is presented for illustrative purposes only and is not necessarily indicative of what the post-Business Combination company's actual financial position or results of operations would have been had the Business Combination been completed on the dates indicated.

***SC Health's initial shareholders and management team have agreed to vote their founder shares in favor of the Business Combination, and its management team and initial shareholders have also agreed to vote any public shares purchased during or after the initial public offering in favor of its initial business combination, regardless of how SC Health's public shareholders vote.***

SC Health's initial shareholders own, on an as-converted basis, 24.4% of SC Health's outstanding Class A ordinary shares. The total number of SC Health Class B ordinary shares outstanding equals 20% of the sum of the total number of SC Health Class A ordinary shares and Class B ordinary shares outstanding plus the number of Class A ordinary shares to be sold pursuant to the Forward Purchase Agreement (which agreement will be

84

Exhibit 4
Page 188

**Table of Contents**

terminated prior to the closing of the Business Combination and the Sponsor Related PIPE Investor will instead purchase an equivalent number of HoldCo ordinary shares in the PIPE Financing). SC Health's initial shareholders and management team also may from time to time purchase Class A ordinary shares prior to the Business Combination. SC Health's amended and restated memorandum and articles of association provide that, if it seeks shareholder approval of an initial business combination (as contemplated in connection with the Business Combination), such initial business combination will be approved if it receives the affirmative vote of a majority of the shares voted at such meeting, including the founder shares. As a result, in addition to its initial shareholders' founder shares, SC Health would need 5,843,751, or approximately 33.9%, of the 17,250,000 public shares sold in the initial public offering to be voted in favor of an initial business combination in order to have the initial business combination approved (assuming all outstanding shares are voted and the over-allotment option is not exercised). Accordingly, the agreements to vote founder shares and public shares, as applicable, in favor of the Business Combination will increase the likelihood that SC Health will receive the requisite shareholder approval for such initial business combination.

Concurrently with the execution of the Business Combination Agreement, the Sponsor, SC Health, Rockley, HoldCo and Merger Sub entered into the Investor Support Agreement, pursuant to which the Sponsor has agreed to, among other things, vote in favor of the transactions contemplated by the Business Combination Agreement and the related transaction proposals contemplated therein, and vote against certain transactions involving SC Health or against any proposal or agreement that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, result in a breach of any obligation or agreement of SC Health under the Business Combination Agreement or ancillary agreements, result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled or change the dividend policy or capitalization of SC Health.

***Since the Sponsor will lose its entire investment in the founder shares and/or private placement warrants if SC Health's initial business combination is not completed (other than with respect to public shares they may acquire during or after the initial public offering), a conflict of interest may arise in determining whether a particular business combination target, including Rockley, is appropriate for SC Health's initial business combination. Further, SC Health's founders, executive officers and directors have potential conflicts of interest in recommending that shareholders vote in favor of approval of the BCA Proposal and approval of the other proposals described in this prospectus/proxy statement.***

As of December 31, 2020, the Sponsor held an aggregate of 5,562,500 founder shares, 4,312,500 of which were issued in exchange for a capital contribution of $25,000, or approximately $0.006 per share. Prior to the initial investment in SC Health of $25,000 by the Sponsor, SC Health had no assets, tangible or intangible. In 2019, the Sponsor transferred 25,000 founder shares to each of SC Health's independent director nominees at their original purchase price. The per share price of the founder shares was determined by dividing the amount contributed to the company by the number of founder shares issued. The founder shares held by the Sponsor will be worthless if SC Health does not complete an initial business combination. In addition, the Sponsor purchased an aggregate of 5,450,000 private placement warrants, each exercisable to purchase one Class A ordinary share at $11.50 per share, at a price of $1.00 per warrant ($5,450,000 in the aggregate), in a private placement that closed simultaneously with the closing of the initial public offering. If SC Health does not complete its initial business combination by April 16, 2021, the private placement warrants will expire worthless. The personal and financial interests of SC Health's executive officers and directors may influence their motivation in identifying and selecting a target business combination, and may have influenced their motivation in pursuing the Business Combination, completing an initial business combination, including the Business Combination, and influencing the operation of the business following the initial business combination, including the Business Combination. This risk may become more acute as the 18-month anniversary of the closing of the initial public offering nears, which is the deadline for SC Health's completion of an initial business combination.

Further, when considering SC Health's board of directors' recommendation that its shareholders vote in favor of the approval of the BCA Proposal, SC Health's shareholders should be aware that certain of SC Health's

Exhibit 4
Page 189

Table of Contents

founders, executive officers and directors have interests in the Business Combination that may be different from, or in addition to, the interests of SC Health's shareholders. These interests include:

•    the beneficial ownership of the Sponsor and certain of SC Health's board of directors and officers of an aggregate of            SC Health's ordinary shares and            SC Health warrants as of            , 2021, the record date of the General Meeting, which shares and warrants would become worthless if SC Health does not complete a business combination within the applicable time period, as SC Health's initial shareholders have waived any right to redemption with respect to these shares. Such shares and warrants have an aggregate market value of approximately $            million and $            million, respectively, based on the closing price of SC Health ordinary shares of $            on the NYSE on            , 2021, the record date for the General Meeting;

•    SC Health's board of directors will not receive reimbursement for any out-of-pocket expenses incurred by them on SC Health's behalf incident to identifying, investigating, and consummating a business combination to the extent such expenses exceed the amount not required to be retained in the trust account, unless a business combination is consummated;

•    the anticipated continuation of Angelo John Coloma, SC Health's President and Chief Executive Officer and a director of SC Health, and Lim Cheok Peng, a director of SC Health, as directors of HoldCo following the closing, subject to CFIUS clearance; and

•    the continued indemnification of current directors and officers of SC Health and the continuation of directors' and officers' liability insurance after the Business Combination.

***The post-Business Combination company will qualify as an "emerging growth company" within the meaning of the Securities Act, and if it takes advantage of certain exemptions from disclosure requirements available to emerging growth companies, which could make HoldCo's securities less attractive to investors and may make it more difficult to compare the post-Business Combination company's performance to the performance of other public companies.***

The post-Business Combination company will qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups, or JOBS Act. As such, the post-Business Combination company will be eligible for and intends to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as it continues to be an emerging growth company, including (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act, (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements and (iii) reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements. The post-Business Combination company will remain an emerging growth company until the earliest of (i) the last day of the fiscal year in which the market value of HoldCo ordinary shares that are held by non-affiliates exceeds $700 million as of June 30 of that fiscal year, (ii) the last day of the fiscal year in which it has total annual gross revenue of $1.07 billion or more during such fiscal year (as indexed for inflation), (iii) the date on which it has issued more than $1 billion in non-convertible debt in the prior three-year period or (iv) the last day of the fiscal year following the fifth anniversary of the date of the first sale of SC Health Ordinary shares in the IPO. In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as the post-Business Combination company is an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. HoldCo has elected not to opt out of such extended transition period and, therefore, the post-Business Combination company may not be subject to the same new or revised accounting standards as other public

Exhibit 4
Page 190

Table of Contents

companies that are not emerging growth companies. Investors may find HoldCo's ordinary shares less attractive because the post-Business Combination company will rely on these exemptions, which may result in a less active trading market for HoldCo's ordinary shares and their price may be more volatile.

***If SC Health does not conduct redemptions pursuant to the tender offer rules, and if you or a "group" of shareholders are deemed to hold in excess of 20% of the public shares, you will lose the ability to redeem all such shares in excess of 20% of the public shares.***

If SC Health seeks shareholder approval of its initial business combination (as is contemplated in connection with the Business Combination), and it does not conduct redemptions in connection with its initial business combination pursuant to the tender offer rules, SC Health's amended and restated memorandum and articles of association provides that a public shareholder, together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the public shares without SC Health's prior consent, which it refers to as the "Excess Shares." However, SC Health would not be restricting its shareholders' ability to vote all of their shares (including Excess Shares) for or against its initial business combination. Your inability to redeem the Excess Shares will reduce your influence over SC Health's ability to complete its initial business combination and you could suffer a material loss on your investment if you sell Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Excess Shares if SC Health completes its initial business combination. As a result, you will continue to hold the Excess Shares and, in order to dispose of such Excess Shares, would be required to sell your Excess Shares in open market transactions, potentially at a loss.

***SC Health may not be able to complete the Business Combination, by April 16, 2021, in which case it would cease all operations except for the purpose of winding up and it would redeem its public shares and liquidate, in which case its public shareholders may receive only their pro rata portion of the funds in the trust account that are available for distribution to public shareholders, and the warrants to purchase SC Health ordinary shares will expire worthless, subject to the warrant holders' right to receive $1.00 per public warrant.***

SC Health may not be able to complete the Business Combination by April 16, 2021. Although SC Health intends to seek shareholder approval to extend the deadline to complete a business combination to August 16, 2021, there is no assurance that the SC Health shareholders will approve the extension. SC Health's ability to complete the Business Combination may be negatively impacted by general market conditions, volatility in the capital and debt markets and the other risks described herein including as a result of terrorist attacks, natural disasters or a significant outbreak of infectious diseases. For example, the COVID-19 pandemic is ongoing and, while the extent of the impact of the outbreak on SC Health will depend on future developments, it could limit SC Health's ability to complete the Business Combination, including as a result of increased market volatility, decreased market liquidity, and third-party financing being unavailable on terms acceptable to us or at all. Additionally, the outbreak of COVID-19 and other events (such as terrorist attacks, natural disasters or a significant outbreak of other infectious diseases) may negatively impact Rockley's business.

If SC Health has not completed the Business Combination (or another business combination) within such time period, it will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (less up to $100,000 of interest to pay dissolution expenses and net of taxes payable), divided by the number of then outstanding public shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any) and (iii) as promptly as reasonably possible following such redemption, subject to the approval of its remaining shareholders and SC Health's board of directors, liquidate and dissolve, subject in the case of clauses (ii) and (iii), to its obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. In such case, its public shareholders may only receive $10.00 per share, and its warrants will expire worthless, subject to the warrant holders' right to

87

Exhibit 4
Page 191

**Table of Contents**

receive $1.00 per public warrant. In certain circumstances, the SC Health public shareholders may receive less than $10.00 per share on the redemption of their shares.

***SC Health's initial shareholders, Sponsor, directors, executive officers, advisors, and their affiliates may elect to purchase shares or public warrants from public shareholders, which may influence a vote on a proposed business combination and reduce the public "float" of the SC Health Class A ordinary shares.***

The Sponsor, directors, executive officers, advisors, or their affiliates may purchase shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of the Business Combination, although they are under no obligation to do so. However, SC Health's initial shareholders, directors, officers, advisors, and their affiliates do not have any current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares or public warrants in such transactions.

In the event that the Sponsor, directors, executive officers, advisors or their affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholders would be required to revoke their prior elections to redeem their shares. The purpose of any such purchases of shares could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining shareholder approval of the Business Combination or to satisfy a closing condition in an agreement with a target that requires it to have a minimum net worth or a certain amount of cash at the closing of SC Health's initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with SC Health's initial business combination. Any such purchases of SC Health's securities may result in the completion of SC Health's initial business combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of SC Health's Class A ordinary shares or public warrants and the number of beneficial holders of SC Health's securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of SC Health's securities on a national securities exchange.

***If a shareholder fails to receive notice of SC Health's offer to redeem SC Health's public shares in connection with the Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

SC Health will comply with the proxy rules or tender offer rules, as applicable, when conducting redemptions in connection with SC Health's initial business combination, including the Business Combination. Despite SC Health's compliance with these rules, if a shareholder fails to receive SC Health's proxy solicitation or tender offer materials, as applicable, such shareholder may not become aware of the opportunity to redeem its shares. In addition, the proxy solicitation or tender offer materials, as applicable, that SC Health will furnish to holders of SC Health's public shares in connection with SC Health's initial business combination will indicate the applicable delivery requirements, which will include the requirement that a beneficial holder must identify itself in order to validly redeem shares. In the event that a shareholder fails to comply with these procedures, its shares may not be redeemed.

Exhibit 4
Page 192

Table of Contents

***SC Health's ability to successfully effect the Business Combination and the post-Business Combination company's ability to successfully operate the business thereafter will be largely dependent upon the efforts of certain key personnel of HoldCo and Rockley, all of whom are expected to stay with the post-Business Combination company following the Business Combination. The loss of such key personnel could negatively impact the operations and financial results of the combined business.***

SC Health's ability to successfully effect the Business Combination and the post-Business Combination company's ability to successfully operate the business following the closing is dependent upon the efforts of certain key personnel of Rockley, including Dr. Andrew Rickman, OBE. Although key personnel are expected to remain with the post-Business Combination company following the Business Combination, there can be no assurance that they will do so. It is possible that Rockley will lose some key personnel, the loss of which could negatively impact the operations and profitability of the post-Business Combination company. Furthermore, following the closing, certain of the key personnel of Rockley may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause the post-Business Combination company to have to expend time and resources helping them become familiar with such requirements.

***SC Health's board of directors did not obtain a fairness opinion in determining whether or not to proceed with the Business Combination and, as a result, the terms may not be fair from a financial point of view to the public shareholders.***

In analyzing the Business Combination, SC Health's board of directors conducted significant due diligence on Rockley. For a complete discussion of the factors utilized by SC Health's board of directors in approving the business combination, see the section entitled, "*Proposal No. 1—BCA Proposal—SC Health's Board of Directors' Reasons for the Approval of the Business Combination.*" SC Health's board of directors believes because of the financial skills and background of its directors, it was qualified to conclude that the Business Combination was fair from a financial perspective to its shareholders and that Rockley's fair market value was at least 80% of its net assets (excluding any taxes payable on interest earned).

Notwithstanding the foregoing, SC Health's board of directors did not obtain a fairness opinion to assist it in its determination. Accordingly, SC Health's board of directors may be incorrect in its assessment of the Business Combination.

***SC Health does not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for it to complete its initial business combination with which a substantial majority of its shareholders do not agree.***

SC Health's amended and restated memorandum and articles of association do not provide a specified maximum redemption threshold, except that it will only redeem its public shares so long as (after such redemption) SC Health's net tangible assets will be at least $5,000,001 either prior to or upon consummation of its initial business combination and after payment of underwriters' fees and commissions (such that SC Health is not subject to the SEC's "penny stock" rules). As a result, SC Health may be able to complete its initial business combination even though a substantial majority of its public shareholders: (a) do not agree with the transaction and have redeemed their shares or (b) if SC Health seeks shareholder approval of its initial business combination (as is contemplated in connection with the Business Combination), and does not conduct redemptions in connection with its initial business combination pursuant to the tender offer rules, have entered into privately negotiated agreements to sell their shares to the Sponsor, officers, directors, advisors, or any of their affiliates. In the event the aggregate cash consideration SC Health would be required to pay for all SC Health Class A ordinary shares that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to it, SC Health will not complete the business combination or redeem any shares, all Class A ordinary shares submitted for redemption will be returned to the holders thereof, and SC Health instead may search for an alternate business combination.

89

Exhibit 4
Page 193

Table of Contents

***In order to effectuate an initial business combination, blank check companies have, in the recent past, amended various provisions of their charters and other governing instruments, including their warrant agreements. SC Health cannot assure you that it will not seek to amend its amended and restated memorandum and articles of association or governing instruments in a manner that will make it easier for it to complete its initial business combination that its shareholders may not support.***

In order to effectuate an initial business combination, blank check companies have, in the recent past, amended various provisions of their charters and other governing instruments, including their warrant agreements. SC Health cannot assure you that it will not seek to amend its amended and restated memorandum and articles of association or governing instruments in a manner that will make it easier for it to complete its initial business combination that its shareholders may not support. For example, blank check companies have amended the definition of business combination, increased redemption thresholds, changed industry focus and, with respect to their warrants, amended their warrant agreements to require the warrants to be exchanged for cash and/or other securities. Amending SC Health's amended and restated memorandum and articles of association will require a special resolution of its shareholders as a matter of Cayman Islands law, meaning the approval of holders of at least two-thirds of the SC Health ordinary shares who attend and vote at a general meeting of the company, and amending its warrant agreement will require a vote of holders of at least 50% of the public warrants. In addition, SC Health's amended and restated memorandum and articles of association require it to provide its public shareholders with the opportunity to redeem their public shares for cash if SC Health proposes an amendment to its amended and restated memorandum and articles of association (A) to modify the substance or timing of its obligation to redeem 100% of its public shares if SC Health do not complete an initial business combination by April 16, 2021 or (B) with respect to any other provisions relating to the rights of its Class A ordinary shares. To the extent any of such amendments would be deemed to fundamentally change the nature of any of the securities offered through this registration statement, SC Health would register, or seek an exemption from registration for, the affected securities. In addition, the warrant agreement provides that, in connection with a proposed amendment to the terms of SC Health's public warrants that would affect the substance or timing of the right of holders of the public warrants to receive $1.00 per public warrant in the various circumstances described in the warrant agreement, each holder of public warrants (other than the Sponsor and its affiliates) will have the right to require the Sponsor to repurchase or cause one of its affiliates to repurchase, at $1.00 per public warrant (exclusive of commissions), the outstanding public warrants.

***SC Health's public shareholders will not have any rights or interests in funds from the trust account, except under certain limited circumstances. Therefore, to liquidate their investment, therefore, SC Health's public shareholders may be forced to sell their securities, potentially at a loss.***

SC Health's public shareholders will be entitled to receive funds from the trust account only upon the earlier to occur of (i) our completion of an initial business combination, and then only in connection with those Class A ordinary shares that such shareholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of any public shares properly tendered in connection with a shareholder vote to amend SC Health's amended and restated memorandum and articles of association (A) to modify the substance or timing of its obligation to redeem 100% of its public shares if it does not complete its initial business combination by April 16, 2021 or (B) with respect to any other provisions relating to the rights of the SC Health Class A ordinary shares and (iii) the redemption of the public shares if it is unable to complete an initial business combination by April 16, 2021, subject to applicable law and as further described herein. In no other circumstances will a public shareholder have any right or interest of any kind in the trust account. Holders of warrants will not have any right to the proceeds held in the trust account with respect to the warrants. Accordingly, to liquidate their investment, SC Health's public shareholders and holders of warrants may be forced to sell their public shares or warrants, potentially at a loss.

90

Exhibit 4
Page 194

**Table of Contents**

***If third parties bring claims against SC Health, the proceeds held in the trust account could be reduced and the per share redemption amount received by shareholders may be less than $10.10 per share.***

SC Health's placing of funds in the trust account may not protect those funds from third-party claims against SC Health. Although SC Health has sought to have all vendors, service providers (other than its independent registered public accounting firm), prospective target businesses or other entities with which it does business execute agreements with SC Health waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of the SC Health's public shareholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against SC Health's assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, SC Health's management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to SC Health's than any alternative.

Examples of possible instances where SC Health may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where SC Health is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of the SC Health public shares, if SC Health is unable to complete its initial business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with its initial business combination, SC Health will be required to provide for payment of claims of creditors that were not waived that may be brought against SC Health within the 10 years following redemption. Accordingly, the per share redemption amount received by SC Health's public shareholders could be less than the $10.10 per share initially held in the trust account, due to claims of such creditors.

The Sponsor has agreed that it will be liable to SC Health if and to the extent any claims by a third party (other than SC Health's independent registered public accounting firm) for services rendered or products sold to us, or a prospective target business with which SC Health has discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (1) $10.10 per public share or (2) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay SC Health's franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under SC Health's indemnity of the underwriters of the IPO against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third-party claims. SC Health has not independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations and believes that the Sponsor's only assets are securities of SC Health and, therefore, the Sponsor may not be able to satisfy those obligations. SC Health has not asked the Sponsor to reserve for such obligations. As a result, if any such claims were successfully made against the trust account, the funds available for SC Health's initial business combination and redemptions could be reduced to less than $10.10 per public share. In such event, SC Health may not be able to complete its initial business combination, and its shareholders would receive such lesser amount per share in connection with any redemption of their Public Shares. None of SC Health's officers or directors will indemnify SC Health for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

91

Exhibit 4
Page 195

Table of Contents

***SC Health's directors may decide not to enforce the indemnification obligations of the Sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to its public shareholders.***

In the event that the proceeds in the trust account are reduced below the lesser of (i) $10.00 per share and (ii) the actual amount per share held in the trust account as of the date of the liquidation of the trust account if less than $10.00 per share due to reductions in the value of the trust assets, in each case less taxes payable, and the Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, SC Health's independent directors would determine whether to take legal action against the Sponsor to enforce its indemnification obligations. While SC Health currently expects that its independent directors would take legal action on its behalf against the Sponsor to enforce its indemnification obligations to SC Health, it is possible that the independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance. If SC Health's independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to its public shareholders may be reduced below $10.00 per share.

***If, after the distribution of the proceeds in the trust account to SC Health's public shareholders, SC Health were to file a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, a bankruptcy court may seek to recover such proceeds, and the members of the SC Health board of directors may be viewed as having breached their fiduciary duties to SC Health's creditors, thereby exposing the members of the SC Health Board of directors and SC Health to claims of punitive damages.***

If, after SC Health distributes the proceeds in the trust account to its public shareholders, it files a bankruptcy petition or an involuntary bankruptcy petition is filed against SC Health that is not dismissed, any distributions received by shareholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by SC Health's shareholders. In addition, the SC Health board of directors may be viewed as having breached its fiduciary duty to SC Health's creditors and/or having acted in bad faith, thereby exposing itself and SC Health to claims of punitive damages, by paying public shareholders from the trust account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the trust account to its public shareholders, SC Health files a bankruptcy petition or an involuntary bankruptcy petition is filed against SC Health that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of SC Health's shareholders and the per-share amount that would otherwise be received by its shareholders in connection with SC Health's liquidation may be reduced.***

If, before distributing the proceeds in the trust account to SC Health's public shareholders, SC Health files a bankruptcy petition or an involuntary bankruptcy petition is filed against SC Health that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in SC Health's bankruptcy estate and subject to the claims of third parties with priority over the claims of SC Health's shareholders. To the extent any bankruptcy claims deplete the trust account, the per-share amount that would otherwise be received by SC Health's shareholders in connection with SC Health's liquidation may be reduced.

***SC Health's shareholders may be held liable for claims by third parties against SC Health to the extent of distributions received by them upon redemption of their shares.***

If SC Health is forced to enter into an insolvent liquidation, any distributions received by shareholders could be viewed as an unlawful payment if it were proven that immediately following the date on which the distribution was made, SC Health were unable to pay its debts as they fall due in the ordinary course of business. As a result, a liquidator could seek to recover some or all amounts received by SC Health's shareholders. Furthermore, the SC Health directors may be viewed as having breached their fiduciary duties to SC Health or its creditors and/or may have acted in bad faith, thereby exposing themselves and SC Health to claims, by paying

92

Exhibit 4
Page 196

Table of Contents

public shareholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against SC Health for these reasons. SC Health and its directors and officers who knowingly and willfully authorized or permitted any distribution to be paid out of its share premium account while it was unable to pay its debts as they fall due in the ordinary course of business would be guilty of an offence and may be liable to a fine of $18,292.68 and to imprisonment for five years in the Cayman Islands.

***SC Health may amend the terms of the SC Health warrants in a manner that may be adverse to holders with the approval by the holders of at least 65% of the then outstanding public warrants.***

The SC Health warrants were issued in registered form under the Warrant Agreement between American Stock Transfer & Trust Company, as warrant agent, and us. The Warrant Agreement provides that the terms of the SC Health Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision but requires the approval by the holders of at least 65% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, SC Health may amend the terms of the SC Health warrants in a manner adverse to a holder if holders of at least 65% of the then outstanding public warrants approve of such amendment. Although SC Health's ability to amend the terms of the SC Health warrants with the consent of at least 65% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the SC Health warrants, convert the SC Health warrants into stock or cash, shorten the exercise period or decrease the number of warrant shares issuable upon exercise of a SC Health warrant.

***The post-Business Combination company may redeem your unexpired HoldCo warrants, which will have been converted from SC Health warrants in connection with the Business Combination, prior to their exercise at a time that is disadvantageous to you, thereby making such warrants worthless.***

The post-Business Combination company will have the ability to redeem outstanding HoldCo warrants, which will have been converted from SC Health warrants in connection with the Business Combination, at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of HoldCo's ordinary shares equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date the post-Business Combination company gives notice of redemption. If and when such become redeemable by the post-Business Combination company, the post-Business Combination company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding HoldCo warrants could force you (i) to exercise your HoldCo warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your HoldCo at the then-current market price when you might otherwise wish to hold your HoldCo warrants or (iii) to accept the nominal redemption price which, at the time the outstanding HoldCo warrants are called for redemption, is likely to be substantially less than the market value of your HoldCo warrants. None of the private warrants will be redeemable by the post-Business Combination company so long as they are held by their initial purchasers or their permitted transferees.

***SC Health may issue additional Class A ordinary shares or preference shares to complete its initial business combination or HoldCo may issue a substantial number of ordinary shares after completion of the Business Combination. SC Health may also issue Class A ordinary shares upon the conversion of the founder shares at a ratio greater than one-to-one at the time of the initial business combination as a result of the anti-dilution provisions contained therein. Any such issuances would dilute the interest of its shareholders and likely present other risks. SC Health has entered into the Investor Subscription Agreements and Individual Subscription Agreements in connection with the Business Combination.***

SC Health's amended and restated memorandum and articles of association authorizes the issuance of up to 180,000,000 Class A ordinary shares, par value $0.0001 per share, 25,000,000 Class B ordinary shares, par value $0.00008 per share, and 1,000,000 preference shares, par value $0.0001 per share. At December 31, 2020, there were 162,750,000 and 19,437,500 authorized but unissued Class A ordinary shares and Class B ordinary shares,

93

Exhibit 4
Page 197

Table of Contents

respectively, available for issuance, which amount does not take into account shares reserved for issuance upon exercise of outstanding warrants and the forward purchase warrants, shares issuable upon conversion of the Class B ordinary shares or shares issued upon the sale of the forward purchase shares. The Class B ordinary shares are automatically convertible into Class A ordinary shares at the time of its initial business combination. At December 31, 2020, there were no preference shares issued and outstanding.

It is currently anticipated that upon the closing of the Business Combination, HoldCo's memorandum and articles of association will authorize the issuance of up to 5,000,000,000 ordinary shares with a nominal or par value of US$0.00001 each.

Concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into (i) the Investor Subscription Agreements pursuant to which HoldCo agreed to issue and sell an aggregate of $150,000,000 shares in HoldCo, which will take effect immediately prior to the closing of the Business Combination, and (ii) the Individual Subscription Agreements pursuant to which HoldCo agreed to issue and sell an aggregate of $2,100,000 shares in HoldCo, which will take effect immediately prior to the closing of the Business Combination.

SC Health may otherwise issue a substantial number of additional Class A ordinary shares or preference shares to complete the Business Combination or HoldCo may issue a substantial number of ordinary shares under employee incentive plans or employee stock purchase plans or otherwise after the closing of the Business Combination. SC Health may also issue Class A ordinary shares to redeem the warrants or upon conversion of the Class B ordinary shares at a ratio greater than one-to-one at the time of its initial business combination as a result of the anti-dilution provisions as set forth herein. However, SC Health's amended and restated memorandum and articles of association provide, among other things, that prior to its initial business combination, SC Health may not issue additional shares that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination. These provisions of SC Health's amended and restated memorandum and articles of association, and of the anticipated memorandum and articles of association of HoldCo to be in effect upon the closing of the Business Combination, may be amended with a shareholder vote. The issuance of additional SC Health (prior to the Business Combination) or HoldCo (after the Business Combination) ordinary or preference shares, as applicable:

- may significantly dilute the equity interest of investors from the SC Health initial public offering, who will not have preemption rights in respect of such an issuance;

- may subordinate the rights of holders of shares of ordinary shares if one or more classes of preferred stock are created, and such preferred shares are issued, with rights senior to those afforded to SC Health or HoldCo ordinary shares, as applicable;

- could cause a change in control if a substantial number of shares of ordinary shares are issued, which may affect, among other things, its ability to use its net operating loss carry forwards, if any, and could result in the resignation or removal of its present officers and directors; and

- may adversely affect prevailing market prices for the SC Health units, SC Health ordinary shares and/or SC Health warrants (prior to the Business Combination) or the HoldCo ordinary shares and/or HoldCo warrants (after the Business Combination).

***Unlike most other similarly structured blank check companies, SC Health's initial shareholders will receive additional Class A ordinary shares if SC Health issues shares to consummate an initial business combination.***

The SC Health founder shares will automatically convert into Class A ordinary shares on the first business day following the consummation of the initial business combination at a ratio such that the number of Class A ordinary shares issuable upon conversion of all founder shares will equal, on an as-converted basis, 20% of the total number of Class A ordinary shares, plus the total number of Class A ordinary shares issued or deemed issued or issuable upon conversion or exercise of any equity-linked securities or rights issued or deemed issued, by SC Health in

94

Exhibit 4
Page 198

**Table of Contents**

connection with or in relation to the consummation of its initial business combination, excluding any Class A ordinary shares or equity-linked securities exercisable for or convertible into Class A ordinary shares issued, or to be issued, to any seller in the initial business combination and any warrants issued in a private placement to the Sponsor or an affiliate of the Sponsor upon conversion of working capital loans. This is different than most other similarly structured blank check companies in which the initial shareholders will only be issued an aggregate of 20% of the total number of shares to be outstanding prior to the initial business combination.

***After the closing of the Business Combination, we expect that several of the post-Business Combination company's directors and officers will live outside the United States and that certain assets of the post-Business Combination company will be located outside the United States; therefore, investors may not be able to enforce federal securities laws or their other legal rights.***

We expect that after the closing of the Business Combination, several of the post-Business Combination company's directors and officers will reside outside of the United States and that certain assets of the post-Business Combination company will be located outside of the United States. As a result, it may be difficult, or in some cases not possible, for investors in the United States to enforce their legal rights, to effect service of process upon the post-Business Combination company or any of its directors or officers or to enforce judgments of U.S. courts predicated upon civil liabilities and criminal penalties on its directors and officers under U.S. laws, including federal securities laws.

***Because neither SC Health nor HoldCo have any current plans to pay cash dividends on SC Health ordinary shares, or HoldCo ordinary shares, as applicable, for the foreseeable future, you may not receive any return on investment unless you sell your SC Health or HoldCo ordinary shares, as applicable, for a price greater than that which you paid for such shares.***

SC Health, prior to the Business Combination, and HoldCo, after the Business Combination, may retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. Any decision to declare and pay dividends as a public company in the future will be made at the discretion of the SC Health (prior to the Business Combination) or the HoldCo (after the Business Combination) board of directors, as applicable, and will depend on, among other things, its results of operations, financial condition, cash requirements, contractual restrictions, and other factors that the SC Health or HoldCo board of directors may deem relevant. In addition, the ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness SC Health, HoldCo, or their respective subsidiaries, as applicable, incur. As a result, you may not receive any return on an investment in SC Health or HoldCo ordinary shares unless you sell such ordinary shares for a price greater than that which you paid for such shares.

***If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about the post-Business Combination company, its business, or its market, or if they change their recommendations regarding HoldCo's securities adversely, the price and trading volume of HoldCo's securities could decline.***

The trading market for HoldCo's securities will be influenced by the research and reports that industry or securities analysts may publish about the post-Business Combination company, its business, market or competitors. Securities and industry analysts do not currently, and may never, publish research on the post-Business Combination company. If no securities or industry analysts commence coverage of the post-Business Combination company, the post-Business Combination company's share price and trading volume would likely be negatively impacted. If any of the analysts who may cover the post-Business Combination company change their recommendation regarding the post-Business Combination company's shares of ordinary shares adversely, or provide more favorable relative recommendations about the post-Business Combination company's competitors, the price of the post-Business Combination company's shares of ordinary shares would likely decline. If any analyst who may cover the post-Business Combination company were to cease coverage of the post-Business Combination company or fail to regularly publish reports on it, the post-Business Combination company could lose visibility in the financial markets, which in turn could cause its share price or trading volume to decline.

Exhibit 4
Page 199

Table of Contents

### GENERAL MEETING OF SC HEALTH

**General**

SC Health is furnishing this prospectus/proxy statement to its shareholders as part of the solicitation of proxies by its board of directors for use at the General Meeting of SC Health to be held on           , 2021, and at any adjournment thereof. This prospectus/proxy statement is first being furnished to SC Health's shareholders on or about           , 2021 in connection with the vote on the proposals described in this prospectus/proxy statement. This prospectus/proxy statement provides SC Health's shareholders with information they need to know to be able to vote or instruct their vote to be cast at the General Meeting.

**Date, Time and Place**

The General Meeting will be held on           , 2021, at           , local Singapore time, at SC Health's principal executive office, located at 108 Robinson Road #10-00, Singapore 068900.Shareholders who hold their shares in street name must obtain a legal proxy from their broker, bank or other nominee. The General Meeting will begin promptly at           , local Singapore time.

**Purpose of the SC Health General Meeting**

At the General Meeting, SC Health is asking holders of its ordinary shares to consider and vote upon:

- the BCA Proposal;

- the Merger Proposal;

- the Incentive Plan Proposal;

- the ESPP Proposal; and

- the Adjournment Proposal.

The BCA Proposal and the Merger Proposal are cross-conditioned. The Incentive Plan Proposal and the ESPP Proposal are conditioned upon the approval of the BCA Proposal and the Merger Proposal. The BCA Proposal and the Merger Proposal are not conditional on the Incentive Plan Proposal and the ESPP Proposal being approved. The Adjournment Proposal is not conditioned upon the approval of any other proposal set forth in this prospectus/proxy statement.

**Recommendation of SC Health Board of Directors**

SC Health's board of directors believes that the BCA Proposal, the Merger Proposal and the other proposals to be presented at the General Meeting are in the best interest of SC Health's shareholders and unanimously recommends that its shareholders vote "FOR" the approval of the BCA Proposal, "FOR" the approval of the Merger Proposal, "FOR" the approval of the Incentive Plan Proposal, "FOR" the approval of the ESPP Proposal and "FOR" the approval of the Adjournment Proposal, in each case, if presented to the General Meeting.

The existence of financial and personal interests of one or more of SC Health's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests of SC Health and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion of these considerations.

96

Exhibit 4
Page 200

Table of Contents

**Record Date; Who is Entitled to Vote**

SC Health shareholders will be entitled to vote or direct votes to be cast at the General Meeting if they owned ordinary shares at the close of business on         , 2021, which is the "record date" for the General Meeting. Shareholders will have one vote for each ordinary share owned at the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly counted. SC Health warrants do not have voting rights. As of the close of business on the record date, there were         ordinary shares issued and outstanding, of which         were issued and outstanding public shares.

The Sponsor and each director and each officer of SC Health have agreed to, among other things, vote in favor of the Business Combination Agreement and the transactions contemplated thereby, in the case of the Sponsor, subject also to the terms and conditions contemplated by the Investor Support Agreement, and waive their redemption rights in connection with the closing of the Business Combination with respect to any ordinary shares held by them. The ordinary shares held by the Sponsor will be excluded from the pro rata calculation used to determine the per-share redemption price. As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding ordinary shares.

**Quorum**

A quorum of SC Health shareholders is necessary to hold a valid meeting. A quorum will be present at the General Meeting if the holders of a majority of the issued and outstanding SC Health ordinary shares entitled to vote at the General Meeting are represented in person or by proxy. As of the record date for the General Meeting,         ordinary shares would be required to achieve a quorum.

**Abstentions and Broker Non-Votes**

Proxies that are marked "abstain" and proxies relating to "street name" shares that are returned to SC Health but marked by brokers as "not voted" will be treated as shares present for purposes of determining the presence of a quorum on all matters, but they will not be treated as shares voted on the matter. Under the rules of various national and regional securities exchanges, your broker, bank, or nominee cannot vote your shares with respect to non-discretionary matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank, or nominee. SC Health believes all the proposals presented to the shareholders will be considered non-discretionary and therefore your broker, bank, or nominee cannot vote your shares without your instruction.

**Vote Required for Approval**

The approval of the BCA Proposal requires an ordinary resolution under the Cayman Islands Companies Act and the SC Health Governing Documents, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

The approval of the Merger Proposal requires a special resolution under the Cayman Islands Companies Act and the SC Health Governing Documents, being the affirmative vote of a majority of at least two-thirds of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. The Merger Proposal and the BCA Proposal are cross-conditioned. Therefore, if the BCA Proposal is not approved, the Merger Proposal will have no effect, even if approved by holders of ordinary shares.

The approval of the Incentive Plan Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

97

Exhibit 4
Page 201

**Table of Contents**

The approval of the ESPP Proposal requires an ordinary resolution under Cayman Islands Companies Act and the SC Health Governing Documents, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

The approval of the Adjournment Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting.

The BCA Proposal and the Merger Proposal are cross-conditioned. The Incentive Plan Proposal and the ESPP Proposal are conditioned upon the approval of the BCA Proposal and the Merger Proposal. The BCA Proposal and the Merger Proposal are not conditional on the Incentive Plan Proposal and the ESPP Proposal being approved. The Adjournment Proposal is not conditioned upon the approval of any other proposal set forth in this prospectus/proxy statement.

**Voting Your Shares**

Each SC Health ordinary share that you own in your name entitles you to one vote. Your proxy card or vote instruction form shows the number of ordinary shares that you own. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted.

There are two ways to vote your ordinary shares at the General Meeting:

- *You Can Vote by Signing and Returning the Enclosed Proxy Card*. If you vote by proxy card, your "proxy," whose name is listed on the proxy card, will vote your shares as you instruct on the proxy card. If you sign and return the proxy card but do not give instructions on how to vote your shares, your shares will be voted as recommended by SC Health's board "FOR" the approval of the BCA Proposal, "FOR" the approval of the Merger Proposal, and "FOR" the approval of each of the other proposals, in each case, if presented to the General Meeting. Votes received after a matter has been voted upon at the General Meeting will not be counted.

- *You Can Attend the General Meeting and Vote in Person*.

  - Beneficial shareholders (those holding shares through a stock brokerage account or by a bank or other holder of record) who wish to attend the General Meeting must obtain a legal proxy by contacting their account representative at the bank, broker, or other nominee that holds their shares and e-mail a copy (a legible photograph is sufficient) of their legal proxy to AST at FOrihuela@astfinancial.com.

**Revoking Your Proxy**

If you are a SC Health shareholder and you give a proxy, you may revoke it at any time before it is exercised by doing any one of the following:

- you may send another proxy card with a later date;

- you may notify AST in writing before the General Meeting that you have revoked your proxy; or

- you may attend the General Meeting, revoke your proxy, and vote, as indicated above.

**Who Can Answer Your Questions About Voting Your Shares**

If you are a shareholder and have any questions about how to vote or direct a vote in respect of your ordinary shares, you may call Morrow Sodali LLC, SC Health's proxy solicitor, by calling (800) 662-5200 (toll-free in North America), or +1 (203) 658-9400 (outside of North America), or by email at SCPE.info@investor.morrowsodali.com.

Exhibit 4
Page 202

Table of Contents

**Redemption Rights**

Pursuant to the SC Health Governing Documents, a public shareholder may request of SC Health that HoldCo redeem all or a portion of its public shares for cash if the Business Combination is consummated. As a holder of public shares, you will be entitled to receive cash for any public shares to be redeemed only if you:

- (a) hold public shares, or (b) if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

- submit a written request to AST, SC Health's transfer agent, that HoldCo redeem all or a portion of your public shares for cash; and

- deliver the certificates for your public shares (if any) along with the redemption forms to AST, physically or electronically through DTC.

**Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m. Eastern Time, on           , 2021 (which is 5:00 a.m. local Singapore time, on           , 2021) (two business days before the General Meeting) in order for their shares to be redeemed.**

**Holders of units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact AST, SC Health's transfer agent, directly and instruct them to do so. Public shareholders may elect to redeem all or a portion of the public shares held by them, regardless of if or how they vote in respect of the BCA Proposal.**

If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers the certificates for its shares (if any) along with the redemption forms to AST, HoldCo will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account, calculated as of two business days prior to the closing of the Business Combination. For illustrative purposes, as of March 30, 2021, this would have amounted to approximately $10.00 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares.

If you hold the shares in "street name," you will have to coordinate with your broker to have your shares certificated or delivered electronically. HoldCo public shares that have not been tendered (either physically or electronically) in accordance with these procedures will not be redeemed for cash. There is a nominal cost associated with this tendering process and the act of certificating the shares or delivering them through DTC's DWAC (deposit withdrawal at custodian) system. The transfer agent will typically charge the tendering broker $80 and it would be up to the broker whether or not to pass this cost on to the redeeming shareholder. In the event the proposed Business Combination is not consummated this may result in an additional cost to shareholders for the return of their shares.

An SC Health shareholder may not withdraw a redemption request once submitted to AST unless SC Health's board of directors determines (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part). Furthermore, if a holder of a public share delivers its certificate (if any) along with the redemption forms in connection with an election of its redemption and subsequently decides prior to the applicable date not to elect to exercise such rights, it may simply request that SC Health permit the withdrawal of the redemption request and instruct AST to return the certificate (physically or electronically). The holder can make such request by contacting AST at the address or email address listed in this prospectus/proxy statement.

99

Exhibit 4
Page 203

Table of Contents

Any corrected or changed written exercise of redemption rights must be received by AST prior to the vote taken on the BCA Proposal at the General Meeting. No request for redemption will be honored unless the holder's public shares have been delivered (either physically or electronically) to AST at least two business days prior to the vote at the General Meeting.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 20% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 20% of the public shares, then any such shares in excess of that 20% limit would not be redeemed for cash.

The Sponsor and each director and each officer of SC Health have agreed to, among other things, vote in favor of the Business Combination Agreement and the transactions contemplated thereby, in the case of the Sponsor, subject also to the terms and conditions contemplated by the Investor Support Agreement, and waive their redemption rights in connection with the closing of the Business Combination with respect to any ordinary shares held by them. The ordinary shares held by the Sponsor will be excluded from the pro rata calculation used to determine the per-share redemption price. As of the date of this prospectus/proxy statement, the Sponsor (whose members include SC Health's directors and officers) owns 20% of the issued and outstanding ordinary shares.

Holders of the warrants will not have redemption rights with respect to the warrants.

The closing price of public shares on March 30, 2021, the most recent practicable date prior to the date of this prospectus/proxy statement, was $10.09. As of March 19, 2021, funds in the trust account totaled approximately $174,545,229 and were comprised entirely of U.S. government treasury obligations with a maturity of 185 days or less or of money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act, which invest only in direct U.S. government treasury obligations, or approximately $10.00 per issued and outstanding public share.

Prior to exercising redemption rights, public shareholders should verify the market price of the public shares as they may receive higher proceeds from the sale of their public shares in the public market than from exercising their redemption rights if the market price per share is higher than the redemption price. SC Health cannot assure its shareholders that they will be able to sell their public shares in the open market, even if the market price per share is higher than the redemption price, as there may not be sufficient liquidity in its securities when its shareholders wish to sell their shares.

**Appraisal Rights**

Neither SC Health's shareholders nor SC Health's warrant holders have appraisal rights in connection with the Business Combination under Cayman Islands law.

**SC Health Initial Shareholders**

As of the date of this prospectus/proxy statement, there are 22,812,500 ordinary shares issued and outstanding, which include the 5,562,500 Founder Shares held by the Sponsor (whose members include SC Health directors and officers) and the 17,250,000 public shares. As of the date of this prospectus/proxy statement, there is outstanding an aggregate of 14,075,000 warrants, which includes the 5,450,000 private placement warrants held by the Sponsor and 8,625,000 public warrants.

At any time at or prior to the Business Combination, subject to applicable securities laws (including with respect to material non-public information), the Sponsor, the existing shareholders of Rockley or SC Health or their

100

Exhibit 4
Page 204

**Table of Contents**

respective directors, officers, advisors or respective affiliates may: (i) purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against any of the Proposals, or elect to redeem, or indicate an intention to redeem, public shares; (ii) execute agreements to purchase such shares from such investors in the future; or (iii) enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Proposals or not redeem their public shares. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record holder of SC Health's shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that the Sponsor, the existing shareholders of Rockley or SC Health or their respective directors, officers, advisors, or respective affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholders would be required to revoke their prior elections to redeem their shares. The purpose of such share purchases and other transactions would be to increase the likelihood of (1) satisfaction of the requirement that holders of a majority of the ordinary shares, represented in person or by proxy and entitled to vote at the General Meeting, vote in favor of the BCA Proposal, the Merger Proposal and the Adjournment Proposal, (2) satisfaction of the Minimum Cash Condition, (3) otherwise limiting the number of public shares electing to redeem, and (4) SC Health's net tangible assets being at least $5,000,001. Entering into any such arrangements may have a depressive effect on the ordinary shares (e.g., by giving an investor or holder the ability to effectively purchase shares at a price lower than market, such investor or holder may therefore become more likely to sell the shares he or she owns, either at or prior to the Business Combination).

If such transactions are effected, the consequence could be to cause the Business Combination to be consummated in circumstances where such consummation could not otherwise occur. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the General Meeting and would likely increase the chances that such proposals would be approved.

101

Exhibit 4
Page 205

**Table of Contents**

## PROPOSAL NO. 1—BCA PROPOSAL

SC Health is asking its shareholders to approve by ordinary resolution the Business Combination Agreement. SC Health shareholders should carefully read this prospectus/proxy statement in its entirety for more detailed information concerning the Business Combination Agreement, a copy of which is attached as Annex A to this prospectus/proxy statement. Please see the subsection entitled "*The Business Combination Agreement and Plan of Merger*" below for additional information and a summary of certain terms of the Business Combination Agreement. You are urged to carefully read the Business Combination Agreement in its entirety before voting on this proposal.

**SC Health may consummate the Merger only if it is approved by the affirmative vote of the holders of a majority at least two-thirds of SC Health of ordinary shares that are entitled to vote and are voted at the General Meeting.**

### The Business Combination Agreement and Plan of Merger

*This subsection of this prospectus/proxy statement describes the material provisions of the Business Combination Agreement but does not purport to describe all of the terms of the Business Combination Agreement. The following summary is qualified in its entirety by reference to the complete text of the Business Combination Agreement, a copy of which is attached as Annex A to this prospectus/proxy statement. You are urged to read the Business Combination Agreement in its entirety because it is the primary legal document that governs the Merger.*

*The Business Combination Agreement and Plan of Merger contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in part by the underlying disclosure letters (the "Disclosure Letters"), which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to shareholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the Disclosure Letters contain information that is material to an investment decision. Additionally, the representations and warranties of the parties to the Business Combination Agreement may or may not have been accurate as of any specific date and do not purport to be accurate as of the date of this prospectus/proxy statement. Accordingly, no person should rely on the representations and warranties in the Business Combination Agreement or the summaries thereof in this prospectus/proxy statement as characterizations of the actual state of facts about SC Health, the Company or any other matter.*

### *Structure of the Merger*

On March 19, 2021, SC Health entered into the Business Combination Agreement with the Company, HoldCo, and Merger Sub, pursuant to which, following the consummation of the Exchange, Merger Sub will merge with and into SC Health, with SC Health surviving such merger as a direct wholly owned subsidiary of HoldCo and, in the context of such Merger, all SC Health ordinary shares (other than Excluded Shares) outstanding immediately prior to the Merger Effective Time shall be exchanged with HoldCo for the right to receive the Merger Consideration in the form of HoldCo ordinary shares pursuant to a share capital increase of HoldCo, as set forth in the Business Combination Agreement and in accordance with the Cayman Islands Companies Act.

Prior to the Merger Effective Time, among other things, the Company will propose a scheme of arrangement under Part 26 of the Companies Act as either a cancellation scheme or a transfer scheme pursuant to

102

Exhibit 4
Page 206

Table of Contents

which the Company Shareholders will transfer all their Company ordinary shares to HoldCo or cancel all their Company ordinary shares with new Company ordinary shares being issued to HoldCo, in either case in exchange for the same number of HoldCo ordinary shares (the "Equity Scheme").

### *Consideration*

*Merger Consideration*

At the Merger Effective Time, immediately following the SC Health Class B Conversion, by virtue of the Merger, and without any further action on the part of SC Health, Merger Sub, HoldCo or the Company or the holders of any of the following securities:

1. each SC Health Class A ordinary share (other than any SC Health Class A ordinary shares held in treasury by SC Health (if any) (each, an "Excluded Share" and, collectively, "Excluded Shares")) issued and outstanding immediately prior to the Merger Effective Time shall automatically be exchanged for one HoldCo ordinary share, in accordance with Section 233(5) of the Cayman Islands Companies Act following a share capital increase realized by HoldCo by virtue of the Merger, to be subscribed by the contributing holders of the SC Health Class A ordinary shares (the "Merger Consideration"), which HoldCo ordinary shares HoldCo shall cause to be issued and delivered in accordance with its obligations set forth in the Business Combination Agreement;

2. all SC Health Class A ordinary shares (other than the Excluded Shares) shall cease to be outstanding, shall be cancelled and shall cease to exist and (A) each certificate formerly representing SC Health Class A ordinary shares (other than Excluded Shares) and (B) each entry in the SC Health's register of members formerly representing SC Health Class A ordinary shares (other than Excluded Shares) issued and outstanding immediately prior to the Merger Effective Time shall thereafter, in case of both (A) and (B), only represent the right to receive Merger Consideration into which such SC Health Class A ordinary shares have been exchanged (and contributed-in-kind) pursuant to the Business Combination Agreement;

3. each Excluded Share shall, by virtue of the Merger and without any further action on the part of SC Health, Merger Sub, HoldCo or the Company or holder thereof, cease to be outstanding, shall be cancelled without payment of any consideration therefor and shall cease to exist; and

4. each ordinary share, par value $0.00001 per share, of the Merger Sub (the "Merger Sub ordinary shares") issued and outstanding immediately prior to the Merger Effective Time shall be converted into and exchanged for one (1) validly issued, fully paid and nonassessable ordinary share, par value $0.0001 per share, of SC Health.

*Treatment of the Company Options and Restricted Stock*

As a result of and upon the closing of the Business Combination (the "Closing"), among other things, each Company option, whether vested or unvested, that is issued and outstanding immediately prior to the Initial Exchange shall, upon the Equity Scheme becoming effective and contingent on agreement with the holder thereof executing a rollover agreement, be substituted by a HoldCo option in accordance with the requirements of Section 424(a) and Section 409A of the Internal Revenue Code, as applicable, such that the intrinsic value of the exchanged Company option is preserved, and shall otherwise be subject to the same terms and conditions (including any vesting requirements) set forth under the applicable award agreement in effect immediately prior to the Equity Scheme becoming effective; each Company Restricted Stock that is issued and outstanding immediately prior to the Equity Scheme becoming effective shall, at the Equity Scheme becoming effective, automatically and without any action on the part of the holder thereof, be exchanged against the aggregate number of HoldCo Restricted Shares in the manner as provided in the Business Combination Agreement; and the Company will take all necessary actions to effect the treatment of Company options and Company Restricted Stock pursuant to the Business Combination Agreement in accordance with the 2013 Plan and the applicable

103

Exhibit 4
Page 207

Table of Contents

award agreements and to ensure that no HoldCo option may be exercised prior to the effective date of an applicable Form S-8 (or other applicable form, including Form S-1 or Form S-3) of HoldCo. For additional information on the Business Combination Agreement, see "*Proposal No. 1—The Business Combination Agreement and Plan of Merger.*"

### Closing

In accordance with the terms and subject to the conditions of the Business Combination Agreement, the Closing will take place at 10:00 a.m., Eastern time, on the date that is two business days after the first date on which all conditions set forth in the Business Combination Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such time and place as SC Health and the Company may mutually agree in writing. The date on which the Closing actually occurs is referred to as the "Closing Date."

### Representations and Warranties

The Business Combination Agreement and Plan of Merger contains representations and warranties of SC Health, the Company, HoldCo and Merger Sub, certain of which are qualified by materiality and material adverse effect (or Company Material Adverse Effect as defined below) and may be further modified and limited by the disclosure letters. See "—*Company Material Adverse Effect*" below.

#### Representations and Warranties of the Company

The Company has made representations and warranties relating to, among other things, company organization, subsidiaries, due authorization, no conflict, governmental authorities and consents, capitalization of the Company, capitalization of subsidiaries, financial statements, undisclosed liabilities, litigation and proceedings, legal compliance, contracts and no defaults, the Company's benefit plans, labor relations and employees, taxes, brokers' fees, insurance, licenses and permits, equipment and other tangible property, real property, intellectual property, privacy and cybersecurity, environmental matters, absence of changes, anti-corruption and anti-money laundering compliance, sanctions and international trade compliance, information supplied, customers and suppliers, government contracts, sufficiency of assets and no additional representation or warranties.

The representations and warranties of the Company identified as fundamental under the terms of the Business Combination Agreement are those made pursuant to: the first and second sentences of Section 4.1 of the Business Combination Agreement (*Company Organization*), the first and second sentences of Section 4.2 of the Business Combination Agreement (*subsidiaries*), Section 4.3 of the Business Combination Agreement (*Due Authorization*), Section 4.6 of the Business Combination Agreement (*Capitalization of the Company*) (other than the first sentence of Section 4.6(a) of the Business Combination Agreement), Section 4.7 of the Business Combination Agreement (*Capitalization of subsidiaries*) and Section 4.16 of the Business Combination Agreement (*Broker's Fees*) (collectively, the "Company's Fundamental Representations").

#### Representations and Warranties of SC Health

SC Health has made representations and warranties relating to, among other things, organization, due authorization, no conflict, subsidiaries, litigation and proceedings, SEC filings, internal controls, listing, financial statements, governmental authorities and consents, trust account, Investment Company Act and JOBS Act, absence of changes, no undisclosed liabilities, capitalization, brokers' fees, indebtedness, taxes, business activities, the NYSE stock market quotation, registration statement and proxy statement and proxy/registration statement, no outside reliance, no additional representations or warranties and affiliate arrangements.

104

Exhibit 4
Page 208

**Table of Contents**

*Representations and Warranties of HoldCo and Merger Sub*

Each of HoldCo and Merger Sub have made representations and warranties relating to, among other things, corporate organization, organizational documents, capitalization, authority relative to the Business Combination Agreement, no conflict, required filings and consents, compliance, board approval and vote required, no prior operations of HoldCo or Merger Sub and post-closing operations, no indebtedness, brokers' fees and information supplied. The representations and warranties of HoldCo and Merger Sub identified as fundamental under the terms of the Business Combination Agreement are those made pursuant to: Section 6.1 (*Corporate Organization*), Section 6.3 (*Capitalization*), Section 6.4 (*Authority Relative to this Agreement*), Section 6.8 (*Post-Closing Operations; No Prior Obligations of HoldCo or Merger Sub*) and Section 6.10 (*Brokers' Fees*) (collectively, the "HoldCo and Merger Sub Fundamental Representations").

*Survival of Representations and Warranties*

Except in the case of claims against a person in respect of such person's actual fraud, the representations and warranties of the respective parties to the Business Combination Agreement generally will not survive the Closing.

*Company Material Adverse Effect*

Under the Business Combination Agreement, certain representations and warranties of the Company are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. Under the Business Combination Agreement, certain representations and warranties of the Company are qualified in whole or in part by a material adverse effect on the ability of the Company to enter into and perform its obligations under the Business Combination Agreement standard for purposes of determining whether a breach of such representations and warranties has occurred.

"Company Material Adverse Effect" means any event, state of facts, condition, change, development, circumstance, occurrence or effect (collectively, "Events") that (i) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, results of operations or financial condition of the Company and its subsidiaries, taken as a whole or (ii) does or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impede the ability of the Company to consummate the Merger; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "Company Material Adverse Effect": (a) any change in applicable laws or GAAP or any interpretation thereof following the date of the Business Combination Agreement, (b) any change in interest rates or economic, political, business or financial market conditions generally, (c) the taking of any action required by the Business Combination Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic, disease outbreak or other public health emergency (including COVID-19 or the effect of any abatement thereof, and any action permitted under the Business Combination Agreement in response thereto, or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the date of the Business Combination Agreement) or change in climate, (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, (f) any failure of the Company to meet any projections or forecasts (provided that clause (f) shall not prevent a determination that any Event not otherwise excluded from this definition of Company Material Adverse Effect underlying such failure to meet projections or forecasts has resulted in a Company Material Adverse Effect), (g) any Events generally applicable to the industries or markets in which the Company and its subsidiaries operate (including increases in the cost of products, supplies, materials or other goods purchased from third party suppliers), (h) the announcement of the Business Combination Agreement and consummation of the transactions contemplated hereby, (x) excluding the termination of a Contract by a customer, the termination of a Contract by a top supplier listed in the Company Disclosure Letter and/or termination of a Contract by a key employee (y) but including any termination of, reduction in or similar adverse

105

Exhibit 4
Page 209

**Table of Contents**

impact on relationships, contractual or otherwise, with any landlords, suppliers (other than any such top suppliers), distributors, partners or employees (other than any key employees) of the Company and its subsidiaries (it being understood that this clause (h) shall be disregarded for purposes of the representation and warranty set forth in Section 4.4 of the Business Combination Agreement (*No Conflict*) and the condition to Closing with respect thereto), (i) any matter set forth on Section 1.3 of the Company Disclosure Letter, (j) any Events to the extent actually known by those individuals set forth on Section 1.3 of the SC Health Disclosure Letter on or prior to the date of the Business Combination Agreement, or (k) any action taken by, or at the request of, SC Health; provided, further, that any Event referred to in clauses (a), (b), (d), (e) or (g) above may be taken into account in determining if a Company Material Adverse Effect has occurred to the extent it has a disproportionate and adverse effect on the business, assets, results of operations or condition (financial or otherwise) of the Company and its subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its subsidiaries conduct their respective operations, but only to the extent of the incremental disproportionate effect on the Company and its subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its subsidiaries conduct their respective operations.

***Covenants and Agreements***

The Company, HoldCo and Merger Sub has made covenants relating to, among other things, conduct of business, inspection, preparation and delivery of additional Company financial statements, affiliate agreements, acquisition proposals, shareholder litigation, employment agreement amendments and indemnification and insurance.

SC Health has made covenants relating to, among other things, trust account proceeds, no solicitation by SC Health, SC Health's conduct of business, inspection, SC Health public filings, shareholder litigation and affiliate agreements.

*Conduct of Business by the Company*

The Company has agreed that from the date of the Business Combination Agreement through the earlier of the Closing or the termination of the Business Combination Agreement (the "Interim Period"), it will, and will cause its subsidiaries to, except as otherwise explicitly contemplated by the Business Combination Agreement or the Ancillary Agreements (as defined below), as consented to by SC Health in writing (which consent will not be unreasonably conditioned, withheld, delayed or denied) or as required by applicable law, use reasonable best efforts to operate the business of the Company in the ordinary course consistent with past practices.

During the Interim Period, the Company has also agreed not to, and to cause its subsidiaries not to, except as otherwise contemplated by the Business Combination Agreement, including the Company disclosure letter thereto (the "Company Disclosure Letter"), the ancillary agreements, or as consented to by SC Health in writing (which consent will not be unreasonably conditioned, withheld, delayed or denied) or as required by applicable law:

- change or amend the governing documents of the Company;

- make or declare any dividend or distribution to shareholders of the Company or make any other distributions in respect of any of the Company Capital Stock or equity interests;

- split, combine, reclassify, recapitalize or otherwise amend any terms of any shares or series of the Company Capital Stock or equity interests in a manner that would increase the Merger Consideration payable to the shareholders of the Company;

- purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, membership interests or other equity interests of the Company, except for (i) the acquisition by the Company of any shares of capital stock, membership interests or

106

Exhibit 4
Page 210

Table of Contents

other equity interests of the Company or of any Company options and Company Restricted Stock in connection with the repurchase, forfeiture or cancellation of such interests, Company options and Company Restricted Stock, (ii) the acquisition by the Company of Company ordinary shares in connection with the surrender of Company ordinary shares by holders of Company options in order to pay the exercise price of the Company options, and (iii) the withholding of Company ordinary shares to satisfy tax obligations with respect to the Company options and Company Restricted Stock;

•    enter into, modify in any material respect or terminate (other than expiration in accordance with its terms) any contract of a type required to be listed in Section 4.12(a) of the Company Disclosure Letter or any real property lease, in each case, other than in the ordinary course of business or as required by law;

•    sell, assign, transfer, license, sublicense, convey, lease, covenant not to assert, pledge or otherwise encumber or subject to any lien, abandon, cancel, let lapse or otherwise dispose of any material tangible assets or properties of the Company or its subsidiaries, except for (i) the sale of inventory in the ordinary course of business consistent with past practice, (ii) dispositions of obsolete or worthless equipment, (iii) transactions among the Company and its subsidiaries or among its subsidiaries and (iv) transactions in the ordinary course of business consistent with past practice;

•    acquire any ownership interest in any real property;

•    except as required by law, an existing Company benefit plan, or contracts listed in the Company Disclosure Letter, (i) grant any severance, retention, change in control or termination or similar pay, except in the ordinary course of business consistent with past practice, (ii) terminate, adopt, enter into or materially amend or grant any new awards under any Company benefit plan or any plan, policy, practice, program, agreement or other arrangement that would be deemed a Company benefit plan as of the date of the Business Combination Agreement, except in the ordinary course of business consistent with past practice, (iii) increase the cash compensation or bonus opportunity of any employee, officer, director or other individual service provider, except such increases to any such individuals who are not directors or officers of the Company or its subsidiaries in the ordinary course of business consistent with past practice, (iv) take any action to amend or waive any performance or vesting criteria or to accelerate the time of payment or vesting of any compensation or benefit payable by the Company or any of the Company's subsidiaries, (v) hire or engage any new employee or independent contractor if such new employee or independent contractor will receive annual base compensation in excess of $250,000, other than in the ordinary course of business consistent with past practice or (vi) terminate the employment or engagement, other than for cause, death, or disability, of any employee or independent contractor with an annual base compensation in excess of $250,000;

•    acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all or a material portion of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof;

•    incur or assume any indebtedness for borrowed money under its term facility with Argentum Securities Ireland plc and/or its facility with Silicon Valley Bank and/or any other third party debt facilities, in each case, other than in the ordinary course of business, which is not in excess of $100,000;

•    (i) make or change any material election in respect of taxes in a manner inconsistent with past practice, (ii) amend, modify or otherwise change any filed tax return in a manner that is material to the Company and its subsidiaries, (iii) adopt or request permission of any taxing authority to change any accounting method in respect of material taxes, (iv) enter into any closing agreement in respect of material taxes executed on or prior to the Closing Date or enter into any tax sharing or similar agreement (other than customary commercial contracts entered into in the ordinary course of business not primarily related to taxes), (v) settle any claim or assessment in respect of material taxes, (vi) surrender or allow to expire any right to claim a refund of material taxes, (vii), file any tax return of the Company or its subsidiaries in a manner that is materially inconsistent with the past practices of

107

Exhibit 4
Page 211

Table of Contents

the Company, or (viii) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material taxes or in respect to any material tax attribute that would give rise to any claim or assessment of taxes;

- authorize for issuance, issue, sell, transfer, encumber, dispose or deliver any additional shares of Company Capital Stock or securities exercisable for or convertible into Company Capital Stock or grant any additional equity or equity-based compensation (including Company Restricted Stock) other than (i) in the ordinary course of business not to exceed the amount of Company ordinary shares available for grant under the 2013 Plan on the date of the Business Combination Agreement, or (ii) upon the exercise or settlement of Company options under the 2013 Plan and applicable award agreement outstanding on the date of the Business Combination Agreement in accordance with their terms as in effect as of the date of the Business Combination Agreement, and (iii) as required to comply with any Company benefit plan as in effect on the date of the Business Combination Agreement;

- adopt a plan of, or otherwise enter into or effect a, complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of the Company or its subsidiaries (other than the Merger);

- waive, release, settle, compromise or otherwise resolve any inquiry, investigation, claim, action, litigation or other legal proceedings, except in the ordinary course of business or where such waivers, releases, settlements or compromises are covered by insurance or involve only the payment of monetary damages in an amount less than $250,000 in the aggregate;

- (A) sell, assign, transfer, license, sublicense, covenant not to assert, pledge, encumber, subject to a lien (other than a permitted lien), or grant to, or agree to grant to, any Person rights in or to any Company IP (as defined in the Business Combination Agreement) that is material to the Company and its subsidiaries (other than non-exclusive licenses of Company IP granted to customers or distributors in the ordinary course of business consistent with past practice), or dispose of, cancel, abandon or permit to lapse any rights to any intellectual property that is material to the Company and its subsidiaries except for the expiration of any Company Registered Intellectual Property (as defined in the Business Combination Agreement) in accordance with the applicable statutory term (or in the case of immaterial domain names, applicable registration period) or (B) subject any material Company IP to any Copyleft Licenses (as defined in the Business Combination Agreement);

- disclose or agree to disclose to any Person (other than SC Health or any of its representatives) any trade secret or any other material confidential or proprietary information, know-how or process of the Company or any of its subsidiaries other than in the ordinary course of business and pursuant to obligations to maintain the confidentiality thereof;

- make or commit to make capital expenditures other than in an amount not in excess of the amount set forth on Section 7.1(a)(xvii) of the Company Disclosure Letter, in the aggregate; enter into or extend any collective bargaining agreement or similar labor agreement other than as required by applicable law, or recognize or certify any labor union, labor organization, or group of employees of the Company or its subsidiaries as the bargaining representative for any employees of the Company or its subsidiaries;

- (i) limit the right of the Company or any of the Company's subsidiaries to engage in any line of business or in any geographic area, to develop, market or sell products or services, or to compete with any Person or (ii) grant any exclusive or similar rights to any Person, in each case, except where such limitation or grant does not, and would not be reasonably likely to, individually or in the aggregate, materially and adversely affect, or materially disrupt, the ordinary course operation of the businesses of the Company and its subsidiaries, taken as a whole;

- terminate without replacement or amend in a manner materially adverse to the Company and its subsidiaries, taken as a whole, any material insurance policy insuring the business of the Company or any of the Company's subsidiaries;

108

Exhibit 4
Page 212

**Table of Contents**

- cease conducting, or enter into any new line of business outside of the business currently conducted by the Company and its subsidiaries as of the date of the Business Combination Agreement;

- make any material change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable law; or

- enter into any agreement to take any of the above actions prohibited under the Business Combination Agreement.

*Conduct of Business of HoldCo and Merger Sub*

During the Interim Period, except as set forth in the Company's Disclosure Letter or as consented to by SC Health in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied) HoldCo and Merger Sub shall not, except as otherwise contemplated by the Business Combination Agreement or the ancillary agreements or as explicitly contemplated in connection with the Transactions (as defined below) or required by law or in connection with COVID-19 Measures:

- engage in any business or activity other than the consummation of the Exchange;

- amend or otherwise change the HoldCo Governing Documents or organizational documents of Merger Sub except as otherwise required to implement the transactions contemplated hereby;

- declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock;

- reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of the HoldCo ordinary shares;

- issue, sell, pledge, dispose of, grant or encumber, or authorize, solicit, propose, or negotiate with respect to the issuance, sale, pledge, disposition, grant or encumbrance of, any shares of any class of capital stock or other securities of HoldCo or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of HoldCo or of Merger Sub;

- liquidate, dissolve, reorganize or otherwise wind up the business and operations of HoldCo or of Merger Sub;

- amend any agreement directly related to the Exchange;

- permit any Company Shareholder who acquires HoldCo ordinary shares pursuant to the Exchange to transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or otherwise dispose of any HoldCo ordinary shares, or recognize any such transfer, sale, lease, license, mortgage, pledge, surrender, encumbrances, divestment, cancellation, abandonment or other disposition of HoldCo ordinary shares;

- transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any Company Shares acquired pursuant to the Exchange and any such attempted action shall be null and void and HoldCo will not inscribe any such transfer (of any kind as contemplated in this provision) in the shareholder register;

- acquire or hold any equity securities or rights thereto in any person other than the Company pursuant to the Exchange except for new HoldCo ordinary shares held by the Company upon the Exchange which shall be distributed in kind by the Company to HoldCo to be held in treasury by HoldCo following completion of the Exchange; or

- enter into any formal or informal agreement or otherwise make a binding commitment to do any of the foregoing.

109

Exhibit 4
Page 213

Table of Contents

*Conduct of Business of SC Health*

During the Interim Period, SC Health shall, except as contemplated by the Business Combination Agreement (including as contemplated by the PIPE Financing), or as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), operate its business in the ordinary course and consistent with past practice. Further, except as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), SC Health shall not, except as otherwise contemplated by the Business Combination Agreement (including as contemplated by the PIPE Financing) or the ancillary agreements or as required by law:

- seek any approval from SC Health shareholders, to change, modify or amend the Trust Agreement or the SC Health Governing Documents, except as contemplated by the Transaction Proposals (as defined below) or otherwise to obtain the approval of the shareholders of SC Health by special resolution to extend the deadline in the SC Health Governing Documents for SC Health to complete an initial business combination to April 16, 2021 (and any further extension);

- make or declare any dividend or distribution to SC Health shareholders or make any other distributions in respect of any of SC Health's capital stock, share capital or equity interests, (y) split, combine, reclassify or, save pursuant to FPA Termination (as defined below), otherwise amend any terms of any shares or series of SC Health's capital stock or equity interests, or (z) purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, share capital or membership interests, warrants or other equity interests of SC Health, other than a redemption of SC Health Class A ordinary shares made as part of SC Health Share redemptions;

- make or change any material election in respect of taxes, (A) amend, modify or otherwise change any filed material tax return, (B) adopt or request permission of any taxing authority to change any accounting method in respect of material taxes, (C) enter into any closing agreement in respect of material taxes or enter into any tax sharing or similar agreement, (D) settle any claim or assessment in respect of material taxes, (E) surrender or allow to expire any right to claim a refund of material taxes, (F) file any tax return in a manner that is inconsistent with the past practices of SC Health or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material taxes or in respect to any material tax attribute that would give rise to any claim or assessment of taxes;

- other than as expressly required by the SC Health Investor Support Agreement or to give effect to the FPA Termination, enter into, renew or amend in any material respect, any transaction or Contract with an Affiliate of SC Health (including, for the avoidance of doubt, (x) the Sponsor and (y) any Person in which the Sponsor has a direct or indirect legal, contractual or beneficial ownership interest of 5% or greater);

- incur or assume any Indebtedness or guarantee any Indebtedness of another Person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of the Company's subsidiaries or guaranty any debt securities of another Person, other than any indebtedness for borrowed money or guarantee incurred in the ordinary course of business consistent with past practice and in an aggregate amount not to exceed $100,000;

- incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness or otherwise knowingly and purposefully incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any other material liabilities, debts or obligations, other than fees and expenses for professional services incurred in support of the transactions contemplated by the Business Combination Agreement or ancillary agreements or in support of the ordinary course operations of SC Health (which the parties agree shall include any Indebtedness in respect of any Working Capital Loan incurred in the ordinary course of business);

- issue any SC Health securities or securities exercisable for or convertible into SC Health securities, (B) grant any options, warrants or other equity-based awards with respect to SC Health Securities not

110

Exhibit 4
Page 214

**Table of Contents**

outstanding on the date of the Business Combination Agreement, or (C) save pursuant to the FPA Termination, amend, modify or waive any of the material terms or rights set forth in any SC Health warrant or the Warrant Agreement, including any amendment, modification or reduction of the warrant price set forth therein; or

- enter into any agreement to do any action prohibited above.

During the Interim Period, SC Health shall, comply with, and continue performing under, as applicable, SC Health's Governing Documents, the Trust Agreement and all other agreements or Contracts to which SC Health s may be a party.

*Additional Covenants of SC Health*

Pursuant to the Business Combination Agreement, SC Health has agreed, among other things, in addition to the covenants described above under "*—Conduct of Business of SC Health,*" to:

- With respect to the trust account, as of the Merger Effective Time, the obligations of SC Health to dissolve or liquidate within a specified time period as contained in SC Health Governing Documents will be terminated and SC Health shall have no obligation whatsoever to dissolve and liquidate the assets of SC Health by reason of the closing of the Business Combination or otherwise, and no SC Health shareholders shall be entitled to receive any amount from the trust account. At least 48 hours prior to the Merger Effective Time, SC Health shall provide notice to the Trustee in accordance with the Trust Agreement and shall deliver any other documents, opinions or notices required to be delivered to the Trustee pursuant to the Trust Agreement and shall cause the Trustee prior to the Merger Effective Time to transfer all funds held in the trust account to SC Health (to be held as available cash on the balance sheet of SC Health, and to be used for working capital and other general corporate purposes of the business following the Closing) and thereafter shall cause the trust account and the Trust Agreement to terminate.

- From the date of the Business Combination Agreement until the Closing Date or, if earlier, the termination pursuant to the Business Combination Agreement, SC Health shall not, and shall cause its subsidiaries not to, and SC Health shall instruct its and their representatives, not to, (i) make any proposal or offer that constitutes a BCA Proposal, (ii) initiate any discussions or negotiations with any Person with respect to a BCA Proposal or (iii) enter into any acquisition agreement, business combination, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other agreement relating to a BCA Proposal, in each case, other than to or with the Company and its respective representatives. From and after the date of the Business Combination Agreement, SC Health shall, and shall instruct its officers and directors to, and SC Health shall instruct and cause its representatives, its subsidiaries and their respective representatives to, immediately cease and terminate all discussions and negotiations with any Persons that may be ongoing with respect to a Business.

- Subject to confidentiality obligations that may be applicable to information furnished to SC Health by third parties that may be in SC Health's possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent possible, the parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable law, SC Health shall provide to the Company and, if applicable, its accountants, counsel or other representatives, (x) such information concerning the affairs of SC Health and such other information, materials and resources relating to any Legal Proceeding initiated, pending or threatened during the Interim Period, or to the compliance and risk management operations and activities of SC Health during the Interim Period, in each case, as the Company or such representative may reasonably request, (y) prompt written notice of any material status updates in connection with any such Legal Proceedings or otherwise relating to any compliance and risk management matters or decisions of the Company or

111

Exhibit 4
Page 215

**Table of Contents**

its subsidiaries, and (z) copies of any communications sent or received by the Company or its subsidiaries in connection with such Legal Proceedings, matters and decisions (and, if any such communications occurred orally, the Company shall, and shall cause its subsidiaries to, memorialize such communications in writing to SC Health). All information obtained by the Company, HoldCo, Merger Sub or their respective representatives) shall be subject to the Confidentiality Agreement.

- Through the Merger Effective Time, SC Health will keep current and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable laws.

- In the event that any litigation related to the Business Combination Agreement, any ancillary agreement or the transactions contemplated hereby or thereby is brought, or, to the knowledge of SC Health, threatened in writing, against SC Health or SC Health board of directors by any of SC Health shareholders prior to the Closing, SC Health shall promptly notify the Company of any such litigation and keep the Company reasonably informed with respect to the status thereof. SC Health shall provide the Company the opportunity to participate in (subject to a customary joint defense agreement), but not control, the defense of any such litigation, shall give due consideration to the Company's advice with respect to such litigation and shall not settle or agree to settle any such litigation without the prior written consent of the Company, such consent not to be unreasonably withheld, conditioned or delayed.

- Prior to the closing pursuant to that certain Forward Purchase Agreement entered into as of July 11, 2019, between SC Health and SC Health Group Limited (the "Forward Purchase Agreement"), SC Health will procure the termination of the Forward Purchase Agreement (including, for the avoidance of doubt, termination of the rights and obligations of SC Health Group Limited under the Warrant Agreement, with respect to the Forward Purchase Warrants as defined therein, without liability or further obligation of SC Health or SC Health Group Limited (the "FPA Termination")).

*Covenants of the Company, HoldCo and Merger Sub*

Pursuant to the Business Combination Agreement, the Company, HoldCo and Merger Sub have agreed, among other things, in addition to the covenants described above under *"—Conduct of Business of the Company"* or *"—Conduct of Business of HoldCo and Merger Sub,"* as the case may be, to:

- Subject to confidentiality obligations that may be applicable to information furnished to the Company or any of the Company's subsidiaries by third parties that may be in the Company's or any of its subsidiaries' possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent possible, the parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable law, (a) the Company shall, and shall cause its subsidiaries to, afford to SC Health and its accountants, counsel and other representatives reasonable access during the Interim Period, during normal business hours and with reasonable advance notice, in such manner as to not materially interfere with the ordinary course of business of the Company and its subsidiaries, to all of their respective properties, books, Contracts, commitments, tax returns, records and appropriate officers and employees of the Company and its subsidiaries, and shall furnish such representatives with all financial and operating data and other information concerning the affairs of the Company and its subsidiaries as such representatives may reasonably request; provided, that such access shall not include any unreasonably invasive or intrusive investigations or other testing, sampling or analysis of any properties, facilities or equipment of the Company or its subsidiaries without the prior written consent of the Company, and (b) the Company shall, and shall cause its subsidiaries to, provide to SC Health and, if applicable, its accountants, counsel or other representatives, (x) such information and such other materials and resources relating to any Legal Proceeding initiated, pending or threatened during the Interim Period, or to the compliance

112

Exhibit 4
Page 216

**Table of Contents**

and risk management operations and activities of the Company and its subsidiaries during the Interim Period, in each case, as SC Health or such representative may reasonably request, (y) prompt written notice of any material status updates in connection with any such Legal Proceedings or otherwise relating to any compliance and risk management matters or decisions of the Company or its subsidiaries, and (z) copies of any communications sent or received by the Company or its subsidiaries in connection with such Legal Proceedings, matters and decisions (and, if any such communications occurred orally, the Company shall, and shall cause its subsidiaries to, memorialize such communications in writing to SC Health). All information obtained by SC Health or their respective representatives pursuant to the Business Combination Agreement shall be subject to the Confidentiality Agreement.

• As soon as reasonably practicable following the date of the Business Combination Agreement and in any event by no later than April 9, 2021, the Company shall deliver to SC Health audited consolidated balance sheets and statements of operations, comprehensive loss, shareholders' equity, and cash flows of the Company and its subsidiaries as of and for the years ended December 31, 2020 and December 31, 2019, together with the auditor's reports thereon, which comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act (collectively, the "PCAOB Financial Statements"); provided, that upon delivery of such PCAOB Financial Statements, such financial statements shall be deemed "Audited GAAP Financial Statements" for the purposes of the Business Combination Agreement and the representations and warranties set forth in the Business Combination Agreement shall be deemed to apply to such Audited GAAP Financial Statements with the same force and effect as if made as of the date of the Business Combination Agreement.

• If the Merger Effective Time has not occurred prior to May 14, 2021, as soon as reasonably practicable following May 14, 2021, the Company shall deliver to SC Health the unaudited consolidated balance sheets and statements of operations, comprehensive loss, shareholders' equity, and cash flows of the Company and its subsidiaries as of and for the three-month period ending March 31, 2021 (the "Q1 Financial Statements"), which comply with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act; provided, that upon delivery of such Q1 Financial Statements, the representations and warranties set forth in Section 4.8 of the Business Combination Agreement (other than those set forth in clause (a) thereof) shall be deemed to apply to the Q1 Financial Statements, with the same force and effect as if made as of the date of the Business Combination Agreement.

• The Company shall use its reasonable best efforts (i) to assist, upon advance written notice, during normal business hours and in a manner such as to not unreasonably interfere with the normal operation of the Company, SC Health in causing to be prepared in a timely manner any other financial information or statements (including customary pro forma financial statements) that are required to be included in the Registration Statement and this prospectus/proxy statement and any other filings to be made by SC Health with the SEC in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement and (ii) to obtain the consents of its auditors with respect thereto as may be required by applicable law or requested by the SEC.

• All Affiliate Agreements set forth in the Company's Disclosure Letter shall be terminated or settled at or prior to the Closing without further liability to HoldCo, the Company or any of the Company's subsidiaries, in each case, except as otherwise set forth in the Company Disclosure Letter.

• From the date of the Business Combination Agreement until the Closing Date or, if earlier, the termination of the Business Combination Agreement, the Company and its subsidiaries shall not, and the Company shall instruct and use its reasonable best efforts to cause its representatives, not to, directly or indirectly: (i) initiate, solicit or engage in any negotiations with any Person with respect to, or provide any non-public information or data concerning the Company or any of the Company's subsidiaries to any Person relating to, an Acquisition Proposal (as defined in the Business Combination

113

Exhibit 4
Page 217

**Table of Contents**

Agreement) or afford to any Person access to the business, properties, assets or talent of the Company or any of the Company's subsidiaries in connection with an Acquisition Proposal, (ii) execute or enter into any acquisition agreement, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other arrangement or agreement relating to an Acquisition Proposal, (iii) grant any waiver, amendment or release under any confidentiality agreement or the anti-takeover laws of any state, (iv) otherwise knowingly encourage or facilitate any such inquiries, proposals, discussions, or negotiations or any effort or attempt by any Person to make an Acquisition Proposal or (v) agree or otherwise commit to enter into or engage in any of the foregoing. The Company also agrees that immediately following the execution of the Business Combination Agreement it shall, and shall cause each of its subsidiaries and shall use its reasonable best efforts to cause its and their representatives to, cease any solicitations, discussions or negotiations with any Person (other than the parties and their respective representatives) conducted heretofore in connection with an Acquisition Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal. The Company shall promptly (and in any event within two business days) notify, in writing, SC Health of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal, which notice shall include a summary of the material terms of such inquiry, proposal, offer or request for information. The Company shall promptly (and in any event within twenty-four (24) hours) keep SC Health reasonably informed of any material developments with respect to any such inquiry, proposal, offer, request for information or Acquisition Proposal (including any material changes thereto).

- In the event that any litigation related to the Business Combination Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby is brought, or, to the knowledge of the Company or any of its subsidiaries, threatened in writing, against the Company or any of its subsidiaries or any of their boards by any of their shareholders prior to the Closing, the Company shall promptly notify SC Health of any such litigation and keep SC Health reasonably informed with respect to the status thereof. The Company and any of its subsidiaries shall provide SC Health the opportunity to participate in (subject to a customary joint defense agreement), but not control, the defense of any such litigation, shall give due consideration to SC Health's advice with respect to such litigation and shall not settle or agree to settle any such litigation without the prior written consent of SC Health, such consent not to be unreasonably withheld, conditioned or delayed.

- The Company shall use its reasonable efforts to agree the employment agreement amendments with the relevant employees by Closing and to arrange for all agreed employment agreement amendments to be entered into by the relevant employer entities and employees on Closing.

- From and after the Merger Effective Time, HoldCo agrees that it shall indemnify and hold harmless each present and former director and officer of the (x) Company and each of its subsidiaries (in each case, solely to the extent acting in their capacity as such and to the extent such activities are related to the business of the Company being acquired under the Business Combination Agreement) (the "Company Indemnified Parties to the Business Combination Agreement") and (y) SC Health and each of its subsidiaries (the "SC Health Indemnified Parties to the Business Combination Agreement" together with the Company Indemnified Parties to the Business Combination Agreement, the "D&O Indemnified Parties to the Business Combination Agreement") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any Legal Proceeding, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Merger Effective Time, whether asserted or claimed prior to, at or after the Merger Effective Time, to the fullest extent that the Company, SC Health or their respective subsidiaries, as the case may be, would have been permitted under applicable law and its respective certificate of incorporation, certificate of formation, bylaws, limited liability company agreement or other organizational documents in effect on the date of the Business Combination Agreement to indemnify such D&O Indemnified Parties to the Business

114

Exhibit 4
Page 218

**Table of Contents**

Combination Agreement (including the advancing of expenses as incurred to the fullest extent permitted under applicable law). Without limiting the foregoing, HoldCo shall, and shall cause its subsidiaries to (i) maintain for a period of not less than six (6) years from the Merger Effective Time provisions in the HoldCo Governing Documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of HoldCo's and its subsidiaries' former and current officers, directors, employees, and agents that are no less favorable to those Persons than the provisions of the governing documents of the Company, and its subsidiaries' or SC Health, as applicable, in each case, as of the date of the Business Combination Agreement, and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by law. HoldCo shall assume, and be liable for, each of the covenants in the Business Combination Agreement.

- For a period of six (6) years from the Merger Effective Time, HoldCo shall maintain in effect directors' and officers' liability insurance covering those Persons who are currently covered by SC Health's, the Company's, HoldCo's, Merger Sub's or their respective subsidiaries' directors' and officers' liability insurance policies (true, correct and complete copies of which have been heretofore made available to the Company or its agents or representatives) on terms not less favorable than the terms of such current insurance coverage; provided, however, that (i) HoldCo may cause coverage to be extended under the current directors' and officers' liability insurance by obtaining a six (6) year "tail" policy containing terms not materially less favorable than the terms of such current insurance coverage with respect to claims existing or occurring at or prior to the Merger Effective Time and (ii) if any claim is asserted or made within such six (6) year period, any insurance required to be maintained under the Business Combination Agreement shall be continued in respect of such claim until the final disposition thereof.

- Notwithstanding anything contained in the Business Combination Agreement to the contrary, the covenants shall survive the closing of the Business Combination indefinitely and shall be binding, jointly and severally, on HoldCo and all successors and assigns of HoldCo. In the event that HoldCo or any of its successors or assigns consolidates with or merges into any other Person and shall not be the continuing or Surviving Company or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, HoldCo shall ensure that proper provision shall be made so that the successors and assigns of HoldCo shall succeed to the obligations set forth in the Business Combination Agreement.

On or prior to the Closing Date, HoldCo shall enter into customary indemnification agreements reasonably satisfactory to each of the Company and SC Health with the post-Closing directors and officers of HoldCo, which indemnification agreements shall continue to be effective following the Closing.

*Joint Covenants of SC Health, the Company, HoldCo and Merger Sub*

In addition, each of SC Health, the Company, HoldCo and Merger Sub have agreed, among other things, to take certain actions set forth below.

- To the extent required under any laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or creation or strengthening of a dominant position through merger or acquisition, including the HSR Act and the laws of any jurisdiction or Governmental Authority (as defined below) outside of the United States ("Antitrust laws"), the parties shall promptly (and, to the extent required, shall cause its affiliates to) substantially comply with and take reasonably necessary and appropriate actions with respect to Antitrust laws, including in no event later than ten (10) business days after the date of the Business Combination Agreement complying with the notification and reporting requirements of the HSR Act. The parties shall substantially comply with any Antitrust Information or Document Requests (as defined in the Business Combination Agreement).

- The parties shall (and, to the extent required, shall cause its affiliates to) request early termination of any waiting period under the HSR Act and exercise its reasonable best efforts to (i) obtain termination

115

Exhibit 4
Page 219

Table of Contents

or expiration of the waiting period under the HSR Act and (ii) prevent the entry, in any legal proceeding brought by an antitrust authority or any other person, of any Governmental Order (as defined below) which would prohibit, make unlawful or delay the consummation of the transactions contemplated hereby.

•     The parties shall cooperate in good faith with Governmental Authorities and use reasonable best efforts to complete lawfully the transactions as soon as practicable (but in any event prior to the Agreement End Date) (as defined below) and use reasonable best efforts to avoid, prevent, eliminate or remove the actual or threatened commencement of any proceeding in any forum by or on behalf of any Governmental Authority or the issuance of any Governmental Order that would delay, enjoin, prevent, restrain or otherwise prohibit the closing of the Business Combination, including, with the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned, delayed or denied), (i) proffering and consenting and/or agreeing to a Governmental Order or other agreement providing for (A) the sale, licensing or other disposition, or the holding separate, of particular assets, categories of assets or lines of business of the Company or SC Health or (B) the termination, amendment or assignment of existing relationships and contractual rights and obligations of the Company or SC Health and (ii) promptly effecting the disposition, licensing or holding separate of assets or lines of business or the termination, amendment or assignment of existing relationships and contractual rights, in each case, at such time as may be necessary to permit the lawful consummation of the transactions contemplated hereby on or prior to the Agreement End Date.

•     With the exception of any notices or filings made with CFIUS pursuant to the DPA (as discussed below), each of the above filings, and any other requests, filings, inquiries, Actions or other proceedings by or from Governmental Authorities, each of the parties will (i) diligently and expeditiously defend and use reasonable best efforts to obtain any necessary clearance, approval, consent, or Governmental Authorization under laws prescribed or enforceable by any Governmental Authority for the transactions contemplated by the Business Combination Agreement and to resolve any objections as may be asserted by any Governmental Authority with respect to the transactions contemplated by the Business Combination Agreement; and (ii) cooperate fully with each other in the defense of such matters. To the extent not prohibited by law, the Company shall promptly furnish to SC Health, and SC Health shall promptly furnish to the Company, copies of any notices or written communications received by such party or any of its Affiliates from any third party or any Governmental Authority with respect to the transactions, and each party shall permit counsel to the other parties an opportunity to review in advance, and each party shall consider in good faith the views of such counsel in connection with, any proposed written communications by such party and/or its Affiliates to any Governmental Authority concerning the transactions; provided, that none of the parties shall extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Authority without the written consent of the other parties. To the extent not prohibited by law, the Company agrees to provide SC Health and its counsel, and SC Health agrees to provide the Company and its counsel, the opportunity, on reasonable advance notice, to participate in any substantive meetings or discussions, either in person or by telephone, between such party and/or any of its Affiliates, agents or advisors, on the one hand, and any Governmental Authority, on the other hand, concerning or in connection with the transactions contemplated hereby.

•     As promptly as practicable after the execution of the Business Combination Agreement and receipt of the PCAOB Financial Statements, (x) HoldCo, SC Health and the Company shall jointly prepare and file with the SEC, mutually acceptable materials which shall include the proxy statement to be filed with the SEC as part of the Registration Statement and sent to SC Health shareholders relating to an SC Health General Meeting (such proxy statement, together with any amendments or supplements thereto, the "Proxy Statement"), and (y) SC Health, HoldCo and the Company shall prepare and file with the SEC the Registration Statement, in which the Proxy Statement will be included as a prospectus, in connection with the registration under the Securities Act of the HoldCo ordinary shares and HoldCo Warrants to be issued in the Merger and Exchange or otherwise in

116

Exhibit 4
Page 220

**Table of Contents**

connection with the transactions contemplated hereby and the units comprising such (collectively, the "Registration Statement Securities"). Each of the parties shall use its reasonable best efforts to cause the Registration statement and this prospectus/proxy statement to comply with the rules and regulations promulgated by the SEC, to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and to keep the Registration Statement effective as long as is necessary to consummate the transactions. SC Health also agrees to use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions, and the Company shall furnish all information concerning the Company, its subsidiaries and any of their respective members or shareholders as may be reasonably requested in connection with any such action. Each of the parties agrees to furnish to the other parties all information concerning itself, its subsidiaries, officers, directors, managers, shareholders, and other equity holders and information regarding such other matters as may be reasonably necessary or advisable or as may be reasonably requested in connection with the Registration Statement and this prospectus/proxy statement, a Current Report on Form 8-K pursuant to the Exchange Act in connection with the transactions contemplated by the Business Combination Agreement, or any other statement, filing, notice or application made by or on behalf of SC Health, the Company or their respective subsidiaries to any regulatory authority (including the NYSE) in connection with the Merger and the other transactions (the "Offer Documents"). SC Health will cause this prospectus/proxy statement to be mailed to SC Health shareholders, in each case, as promptly as reasonably practicable after the Registration Statement is declared effective under the Securities Act.

• To the extent not prohibited by law, SC Health will advise the Company, reasonably promptly after SC Health receives notice thereof, of the time when the Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order or the suspension of the qualification of SC Health ordinary shares for offering or sale in any jurisdiction, of the initiation or written threat of any proceeding for any such purpose, or of any request by the SEC for the amendment or supplement of the Registration Statement or this prospectus/proxy statement or for additional information. To the extent not prohibited by law, the Company and their counsel shall be given a reasonable opportunity to review and comment on this registration statement/prospectus/proxy statement and any Offer Document each time before any such document is filed with the SEC, and SC Health shall give reasonable and good faith consideration to any comments made by the Company and its counsel. To the extent not prohibited by law, SC Health shall provide the Company and their counsel with (i) any comments or other communications, whether written or oral, that SC Health or its counsel may receive from time to time from the SEC or its staff with respect to the Registration Statement or this prospectus/proxy statement or Offer Documents as promptly as reasonably practicable after receipt of those comments or other communications and (ii) a reasonable opportunity to participate in the response of SC Health to those comments and to provide comments on that response (to which reasonable and good faith consideration shall be given), including by participating with the Company or its counsel in any discussions or meetings with the SEC.

• Each of SC Health and the Company shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in (A) the Registration Statement will, at the time the Registration Statement is filed with the SEC, at each time at which it is amended and at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, not misleading or (B) the Proxy Statement will, at the date it is first mailed to SC Health shareholders and at the time of the SC Health General Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

• At any time prior to the Merger Effective Time, any information relating to SC Health, the Company or HoldCo or any of their respective affiliates, directors or officers, should be discovered by SC Health, the Company or HoldCo which should be set forth in an amendment or supplement to either the

117

Exhibit 4
Page 221

Table of Contents

Registration Statement or this prospectus/proxy statement, so that the Registrant Statement or this document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by law, disseminated to SC Health shareholder.

• The Registration Statement, to the extent permitted by applicable rules and regulations of the SEC, also will register the resale of the HoldCo ordinary shares that constitute the Merger Consideration or was issued in connection with the Exchange or Transactions, other than certain equity securities issuable under the Incentive Equity Plan that are based on HoldCo ordinary shares and constitute a portion of the Merger Consideration, which shall instead be registered pursuant to an effective registration statement on Form S-8 (or other applicable form, including Form S-1 or Form S-3).

• SC Health shall (a) as promptly as practicable after the Registration Statement is declared effective under the Securities Act, (i) cause the Proxy Statement to be disseminated to SC Health shareholders in compliance with applicable law, (ii), duly (1) give notice of and (2) convene and hold a General Meeting of SC Health shareholders (the "SC Health General Meeting") in accordance with SC Health's Governing Documents and Section 710 of the NYSE Listing Rules for a date no later than thirty (30) business days following the date the Registration Statement is declared effective, and (iii) solicit proxies from the holders of SC Health ordinary shares to vote in favor of each of the Transaction Proposals, and (b) provide SC Health shareholders with the opportunity to elect to effect a SC Health Share redemption. Subject to any Permitted Withdrawal (as defined below), SC Health shall, through its Board of Directors, recommend to SC Health shareholders the (A) the adoption and approval of the Business Combination Agreement and the transactions contemplated in accordance with applicable law and exchange rules and regulations, (B) adoption and approval of the Business Combination Agreement in accordance with Section 233(6) of the Cayman Islands Companies Act (C) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Registration Statement or correspondence related thereto, (E) adoption and approval of any other proposals as reasonably agreed by SC Health and the Company to be necessary or appropriate in connection with the transactions, and (F) adjournment of an SC Health General Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in (A) through (D), together, the "Transaction Proposals"), and include such recommendation in the Proxy Statement. SC Health board of directors shall not withdraw, amend, qualify or modify its recommendation to SC Health shareholders that they vote in favor of the Transaction Proposals (together with any withdrawal, amendment, qualification or modification of its recommendation to SC Health shareholders described in the Business Combination Agreement, a "Modification in Recommendation"); provided that, in the event that the SC Health board of directors determines a Company Material Adverse Effect has occurred, the SC Health board of directors may make a withdrawal of such recommendation or an amendment, qualification or modification of such recommendation to the extent required, upon the advice of counsel, in order to comply with its fiduciary duties (a "Permitted Withdrawal"). SC Health shall, subject to any Permitted Withdrawal, promptly notify (and in any event, no later than three (3) business days prior to making any such Permitted Withdrawal or amendment, qualification or modification) the Company in writing of any determination to make any Permitted Withdrawal of its recommendation or amendment, qualification or modification of its recommendation in a manner adverse to the Company. To the fullest extent permitted by applicable law, (x) SC Health's obligations to establish a record date for, duly call, give notice of, convene and hold an SC Health General Meeting shall not be affected by any Modification in Recommendation, save for any Permitted Withdrawal, (y) SC Health agrees to establish a record date for, duly call, give notice of, convene and hold an SC Health General Meeting and submit for approval the Transaction Proposals and (z) SC Health agrees that if SC Health shareholder approval (as defined below) shall not have been obtained at any such SC Health General Meeting, then SC Health shall promptly continue to take all such necessary actions, and

118

Exhibit 4
Page 222

Table of Contents

hold additional SC Health General Meetings in order to obtain SC Health shareholder approval. SC Health may only adjourn an SC Health General Meeting (i) to solicit additional proxies for the purpose of obtaining SC Health shareholder approval, (ii) for the absence of a quorum and (iii) to allow reasonable additional time for the filing or mailing of any supplemental or amended disclosure that SC Health has determined in good faith after consultation with outside legal counsel is required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to an SC Health General Meeting; provided, that, without the consent of the Company, SC Health General Meeting (x) may not be adjourned to a date that is more than fifteen (15) days after the date for which such SC Health Shareholders' Meeting was originally scheduled (excluding any adjournments required by applicable law) and (y) shall not be held later than three (3) business days prior to the Agreement End Date. SC Health agrees that it shall provide the holders of SC Health Class A ordinary shares the opportunity to elect redemption of such SC Health Class A ordinary shares in connection with an SC Health General Meeting, as required by SC Health's Governing Documents.

- Upon the terms set forth in the Business Combination Agreement, the Company and HoldCo shall use its reasonable best efforts to solicit and obtain approvals to the Resolutions (as defined in the Business Combination Agreement) and the HoldCo shareholder approval (as defined in the Business Combination Agreement) including, for the avoidance of doubt, HoldCo circulating the HoldCo shareholder approval to its member for approval prior to the Initial Exchange.

- HoldCo, SC Health (subject to its right of Permitted Withdrawal only), Merger Sub and the Company shall each, and each shall cause its subsidiaries to (a) use reasonable best efforts to obtain all material consents and approvals of third parties that any of SC Health, or the Company or their respective Affiliates are required to obtain in order to consummate the Merger, and (b) take such other action as may be reasonably necessary or as another party hereto may reasonably request to satisfy the conditions of or otherwise to comply with the Business Combination Agreement and to consummate the transactions as soon as practicable (including any applicable actions or filings required under or in connection with the NSIB (as defined in the Business Combination Agreement)).

- All transfer, documentary, sales, use, real property, stamp, registration and other similar taxes, fees and costs (including any associated penalties and interest) incurred in connection with the Business Combination Agreement that are payable by SC Health, HoldCo, Merger Sub, the Company or its subsidiaries ("Transfer taxes") shall constitute Transaction Expenses. The Company and its subsidiaries shall, at their own expense, file all necessary tax returns with respect to all such taxes, and, if required by applicable law, SC Health will cooperate and join in the execution of any such tax returns.

- Prior to the Merger Effective Time, each of the HoldCo, Company and SC Health shall take all such steps as may be required (to the extent permitted under applicable law) to cause any dispositions of shares of the HoldCo ordinary shares, Company Capital Stock or acquisitions of SC Health ordinary shares (including, in each case, securities deliverable upon exercise, vesting or settlement of any derivative securities) resulting from the transactions by each individual who may become subject to the reporting requirements of Section 16(a) of the Exchange Act in connection with the transactions to be exempt under Rule 16b-3 promulgated under the Exchange Act.

- Prior to Closing, each of HoldCo, the Company and SC Health shall, and each of them shall cause its respective subsidiaries (as applicable) and its and their officers, directors, managers, employees, consultants, counsel, accounts, agents and other representatives to, reasonably cooperate in a timely manner in connection with any financing arrangement the parties mutually agree to seek in connection with the transactions contemplated by the Business Combination Agreement (it being understood and agreed that the consummation of any such financing by HoldCo, the Company or SC Health shall be subject to the parties' mutual agreement), including (if mutually agreed by the parties) (a) by providing such information and assistance as the other parties may reasonably request, (b) granting such access to

119

Exhibit 4
Page 223

**Table of Contents**

the other parties and its representatives as may be reasonably necessary for their due diligence, and (c) participating in a reasonable number of meetings, presentations, road shows, drafting sessions, due diligence sessions with respect to such financing efforts (including direct contact between senior management and other representatives of HoldCo, the Company and its subsidiaries at reasonable times and locations). All such cooperation, assistance and access shall be granted during normal business hours and shall be granted under conditions that shall not unreasonably interfere with the business and operations of HoldCo, the Company, SC Health, or their respective auditors.

• From the date of the announcement of the Business Combination Agreement or the transactions (pursuant to any applicable public communication), until the Closing Date, SC Health shall use its reasonable best efforts to, and shall instruct its financial advisors to, keep the Company and its financial advisors reasonably informed with respect to the PIPE Financing during such period, including by (i) providing regular updates and (ii) consulting and cooperating with, and considering in good faith any feedback from, the Company or its financial advisors with respect to such matters.

• Subject to the terms and conditions set forth in the Business Combination Agreement, and to applicable laws, prior to Closing, the Parties to the Business Combination Agreement shall cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action (including executing and delivering and documents, certificates, instruments and other papers that are necessary for the consummation of the transactions), and do, or cause to be done, and assist and cooperate with the other Parties to the Business Combination Agreement in doing, all things necessary to consummate and make effective, in the most expeditious manner practicable the Transactions. The Company shall, and shall cause its subsidiaries to, use its and their commercially reasonable efforts to send the requisite notice to or to solicit and obtain the consents of as applicable, the contractual counterparties to the Contracts listed in the Company Disclosure Letter prior to the Closing; provided, however, that no party to the Business Combination Agreement nor any of their Affiliates shall be required to pay or commit to pay any amount to (or incur any obligation in favor of) any Person from whom any such consent may be required (unless such payment is explicitly required in accordance with the terms of the relevant Contract requiring such consent); provided, further, that the Parties to the Business Combination Agreement acknowledge and agree that the failure to obtain any such consents is not, and shall not be, a condition to Closing.

• Prior to the effectiveness of the Registration Statement, HoldCo shall approve and adopt, subject to receipt of shareholder approval, (w) an incentive equity plan and an employee stock purchase plan (with such changes that may be agreed in writing by SC Health and the Company (such agreement not to be unreasonably withheld, conditioned or delayed by either SC Health or the Company, as applicable)) (the "Incentive Equity Plans"), (x) a form of stock option agreement, which such form shall be distributed to SC Health not later than ten (10) business days prior to HoldCo approval and adoption for SC Health's (or SC Health's designee's) review and comment, and (y) a form of restricted stock unit agreement, which such form shall be distributed to SC Health not later than ten (10) business days prior to HoldCo approval and adoption for SC Health's (or SC Health's designee's) review and comment, and (z) a form of restricted stock agreement, which such form shall be distributed to SC Health not later than ten (10) business days prior to HoldCo approval and adoption for SC Health's (or SC Health's designee's) review and comment, in each case, effective as of the Closing Date. Within two (2) business days following the expiration of the sixty (60) day period following the date HoldCo has filed current Form 10 information with the SEC reflecting its status as an entity that is not a shell company, HoldCo shall file an effective registration statement on Form S-8 (or other applicable form, including Form S-3) with respect to the HoldCo ordinary shares issuable under the Incentive Equity Plans, and HoldCo shall use reasonable best efforts to maintain the effectiveness of such registration statement(s) (and maintain the current status of the prospectus or prospectuses contained therein) for so long as awards granted pursuant to the Incentive Equity Plans remain outstanding.

120

Exhibit 4
Page 224

**Table of Contents**

• Each of the parties to the Business Combination Agreement acknowledges and agrees that all of the provisions of this and the prior paragraph are included for the sole benefit of SC Health, HoldCo and the Company, and that nothing in the Business Combination Agreement, whether express or implied, (i) shall be construed to establish, amend, or modify any employee benefit plan, program, agreement or arrangement, (ii) shall limit the right of SC Health, HoldCo, the Company or their respective Affiliates to amend, terminate or otherwise modify any Company benefit plan or other employee benefit plan, agreement or other arrangement following the Closing Date, or (iii) shall confer upon any Person who is not a party to the Business Combination Agreement (including any equity holder, any current or former director, manager, officer, employee or independent contractor of the Company, or any participant in any Company benefit plan or other employee benefit plan, agreement or other arrangement (or any dependent or beneficiary thereof)), any right to continued or resumed employment or recall, any right to compensation or benefits, or any third-party beneficiary or other right of any kind or nature whatsoever.

• Subject to the terms of HoldCo's Governing Documents and the applicable rules and regulations of the NYSE, SC Health, the Company and HoldCo shall take all such action within its power as may be necessary or appropriate such that immediately following the Merger Effective Time:

(a) unless and until the CFIUS Approval has been obtained, the board of directors of HoldCo shall consist of up to seven (7) director nominees, with such initial director nominees, to be designated by the Company pursuant to written notice to SC Health as soon as reasonably practicable following the date of the Business Combination Agreement (one of whom shall be the current Chairman of the Company's board of directors), subject to SC Health's reasonable acceptance of such initial director nominees:

(b) following the date that the CFIUS Approval is obtained (if at all), the board of directors of HoldCo shall consist of up to nine (9) directors, which shall initially include:

• so long as the Sponsor and its Affiliates continue to own HoldCo ordinary shares, two (2) Class II director nominees to be designated by the Sponsor pursuant to written notice to be delivered to the Company or HoldCo (as applicable) as soon as reasonably practicable following receipt of the CFIUS Approval (which notice must, in any event, be delivered prior to the date that is the later of (x) June 30, 2022 and (y) the date of the 2022 Annual Meeting of HoldCo shareholders), and SC Health shall consult with the Company or HoldCo (as applicable) with regards to the identity of such director nominees;

• two (2) director nominees to be designated by the Company (one of whom shall be the current Chairman of the Company's board of directors), and the Company shall consult with SC Health with regards to the identity of the non-Chairman director nominee; and

• five (5) director nominees to be designated by the Company, subject to SC Health's reasonable acceptance of the initial director nominees.

(c) the board of directors of HoldCo shall have a majority of "independent" directors for the purposes of NYSE rules, each of whom shall serve in such capacity in accordance with the terms of the HoldCo's Governing Documents following the Merger Effective Time; and

(d) the initial officers of HoldCo shall be as set forth in the Company Disclosure Letter (as may be updated by the Company prior to Closing following written notice to SC Health), who shall serve in such capacity in accordance with the terms of HoldCo's Governing Documents following the Merger Effective Time.

• The Company and SC Health shall (i) jointly file a draft of the Notice with CFIUS (the "CFIUS filing") contemplated under 31 C.F.R. § 800.501 with respect to SC Health's director nominee rights pursuant to Section 9.8(a)(i) of the Business Combination Agreement (the "Designation Right") as soon as reasonably practicable following the execution of the Business Combination Agreement, and (ii) as

121

Exhibit 4
Page 225

**Table of Contents**

soon as reasonably practicable after receiving CFIUS notification that the draft Notice meets all requirements of 31 C.F.R. § 800.502 and is, accordingly, complete, jointly file with CFIUS a voluntary notice as contemplated under 31 C.F.R. § 800.501(a). Any filings fees or similar costs associated with the CFIUS Filing shall be borne by SC Health.

- The Company and SC Health shall (i) cooperate and coordinate with the other in the making of the CFIUS filing except as prohibited by applicable law or order or as directed by CFIUS, including any U.S. Government agency that is a member of CFIUS including, (x) providing copies of all such documents and materials to each other (or their outside counsel) prior to filing, and (y) considering all reasonable additions, deletions or changes suggested in connection therewith and in connection with resolving any investigation, request or other inquiry from CFIUS under the applicable laws or orders with respect to any such filing, (ii) supply the other party (or its outside counsel) with any information and reasonable assistance that may be required or reasonably requested by CFIUS in connection with the making of the filing, (iii) supply any certifications, additional information, documents or other materials that may be required or reasonably requested by CFIUS in connection with the notice filing or the Designation Right as soon as practicable and in all cases within the amount of time allowed by CFIUS, and (iv) use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to obtain the CFIUS Approval as soon as practicable. Notwithstanding the foregoing or anything else to the contrary in the Business Combination Agreement, in no event shall SC Health or any of its Affiliates be obligated in connection with the CFIUS Approval, to (A) propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture or accept any operational restriction, or take or commit to make payments or enter into any commercial arrangement, or commit, or commit to take, any action which action limits the freedom of action of SC Health or any of its Affiliates with respect to its or its Affiliates' or the Company's or the Company's subsidiaries' businesses, product lines or assets, (B) defend through litigation, any Action asserted by any Person in any court before any Governmental Authority with respect to any notifications, filings, registrations and other materials required or necessary under the DPA or appeal any adverse decision or order by any such governmental body with respect to CFIUS, or (C) take any actions that would reasonably be expected to have a material and adverse impact on the Company, the Company's subsidiaries, SC Health or any of its Affiliates.

- Prior to receipt of CFIUS Approval, SC Health shall not request or obtain from the Company or its subsidiaries, and the Company and its subsidiaries shall not provide to the Sponsor or its Affiliates, either directly or indirectly (through any other person or otherwise), (i) control rights (as defined in 31 C.F.R. § 800.208); (ii) access to material nonpublic technical information (as defined in 31 C.F.R. § 800.232); (iii) the right to appoint any member or observer to the board or equivalent governing body of the Company or any of its subsidiaries; or (iv) the right to have involvement with substantive decision making, as those terms are defined in 31 C.F.R. § 800.229 and 31 C.F.R. § 800.245, respectively, regarding (x) the use, development, acquisition, safekeeping, or release of any sensitive personal data of U.S. citizens (as defined in 31 C.F.R. § 800.241) maintained or collected by the Company or any of its subsidiaries; (y) the use, development, acquisition, or release of critical technologies (as defined in 31 C.F.R. § 800.215); or (z) the management, operation, manufacture, maintenance, or supply of covered investment critical infrastructure identified in column 1 of Appendix A to 31 C.F.R. Part 800.

- The Company, HoldCo and SC Health shall use their respective reasonable best efforts to cause the HoldCo ordinary shares and HoldCo warrants issuable in the Merger or the Exchange and the HoldCo ordinary shares that will become issuable upon the exercise of the HoldCo Warrants to be approved for listing on NYSE, subject to official notice of issuance, as promptly as practicable after the date of the Business Combination Agreement, and in any event prior to the Closing Date.

- The Company, HoldCo and SC Health shall use their respective reasonable best efforts to cause SC Health Units, SC Health Class A ordinary shares and SC Health warrants to be delisted from NYSE (or

122

Exhibit 4
Page 226

**Table of Contents**

be succeeded by the respective HoldCo securities) and to terminate its registration with the SEC pursuant to Sections 12(b), 12(g) and 15(d) of the Exchange Act (or be succeeded by HoldCo) as of the Closing Date or as soon as practicable thereafter.

•  Unless otherwise approved in writing by HoldCo and SC Health (which approval shall not be unreasonably withheld, conditioned or delayed), SC Health and HoldCo shall not permit any amendment or modification to be made to, any waiver (in whole or in part) of, or provide consent to modify (including consent to terminate), any provision or remedy under, or any replacements of, any of the Subscription Agreements. Subject to the immediately preceding sentence, SC Health and HoldCo shall use reasonable best efforts to take, or to cause to be taken, all actions required, necessary or that it otherwise deems to be proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms described therein, including each using its reasonable best efforts to enforce its rights under the Subscription Agreements to cause the PIPE Investors to pay to (or as directed by) HoldCo, the applicable purchase price under each PIPE Investor's applicable Subscription Agreement in accordance with its terms.

•  From the date of the Business Combination Agreement until Closing, each party to the Business Combination Agreement shall be bound by and comply with the provisions set forth in the Confidentiality Agreement; provided, that effective as of and subject to the closing of the Business Combination, the Confidentiality Agreement shall terminate and be of no further force and effect (other than the terms that expressly survive the termination of the Confidentiality Agreement as set forth therein) without any further action of any of the parties thereto. Each party to the Business Combination Agreement acknowledges and agrees that each is aware, and each of their respective Affiliates and representatives is aware (or upon receipt of any material nonpublic information of the other party to the Business Combination Agreement, will be advised), of the restrictions imposed by the United States federal securities laws and other applicable foreign and domestic laws on Persons possessing material nonpublic information about a public company. Each party to the Business Combination Agreement hereby agrees, that until Closing, except in connection with or support of the transactions contemplated by the Business Combination Agreement, while any of them are in possession of such material nonpublic information, none of such Persons shall, directly or indirectly (through its Affiliates or otherwise), acquire, offer or propose to acquire, agree to acquire, sell or transfer or offer or propose to sell or transfer any securities of SC Health, communicate such information to any other Person or cause or encourage any Person to do any of the foregoing in violation of such US federal securities laws and other applicable foreign and domestic laws.

### Closing Conditions

The closing of the Business Combination is conditioned upon the satisfaction or waiver by the applicable parties to the Business Combination Agreement of the conditions set forth below. Therefore, unless these conditions are waived by the applicable parties to the Business Combination Agreement, the Merger may not be consummated. There can be no assurance that the parties to the Business Combination Agreement would waive any such provisions of the Business Combination Agreement.

### Minimum Cash Condition

The Business Combination Agreement and Plan of Merger provides that the obligations of the Company to consummate the Merger are conditioned on, among other things, that substantially concurrently with the Closing, the amount of cash actually received by HoldCo from the PIPE Investors is at least equal to $150,000,000. The Minimum Cash Condition is for the sole benefit of the Company.

Exhibit 4
Page 227

**Table of Contents**

*Conditions to the Obligations of Each party to the Business Combination Agreement*

The obligations of each party to the Business Combination Agreement to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by all of such parties:

- the approval of the proposals by SC Health's shareholders entitled to attend and vote thereupon will have been obtained, including the Merger Proposal by at least two-thirds of SC Health's shareholders (the "SC Health shareholder approval");

- the Resolutions (other than the Creditor Scheme Court Meeting Resolution (as defined in the Business Combination Agreement)) being duly passed by the requisite majorities at the Equity Scheme Court Meeting and the general meeting of the shareholders of the Company and the Equity Scheme and (if applicable) the Capital Reduction (as defined in the Business Combination Agreement) being sanctioned or confirmed (as applicable) by the Court (as each such capitalized term is defined in the Business Combination Agreement);

- the Equity Scheme Document (as defined in the Business Combination Agreement) approved by the Court shall have been filed with the Registrar of Companies (England and Wales);

- the Registration Statement will have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement will have been issued and no proceedings for that purpose will have been initiated or threatened by the SEC and not withdrawn;

- the waiting period or periods under the HSR Act applicable to the transactions contemplated by the Business Combination Agreement (i) the SC Health Investor Support Agreement and Company Holders Support Agreement, (ii) the Employment Agreement Amendments (as such term is defined in the Business Combination Agreement), (iii) the Registration Rights and Lock-Up Agreement; (iv) the Andrew Rickman Employment Agreement Amendment and (v) the Non-Disclosure Agreement, dated as of December 8, 2020 (collectively, the "Ancillary Agreements") will have expired or been terminated;

- there will not be in force any order, judgment, injunction, decree, writ, stipulation, determination or award (in each case, entered by or with any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court or tribunal (a "Governmental Authority")) (a "Governmental Order"), statute, rule or regulation enjoining or prohibiting the closing of the Business Combination (including any restriction or prohibition under or in connection with the NSIB); provided, that the Governmental Authority issuing such Governmental Order has jurisdiction over the parties to the Business Combination Agreement with respect to the transactions contemplated the Business Combination Agreement;

- SC Health will have at least $5,000,001 of net tangible assets; and

- the HoldCo ordinary shares to be issued in connection with the Merger will have been approved for listing on the NYSE, subject to official notice of issuance.

*Conditions to the Obligations of SC Health*

The obligations of SC Health to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by SC Health:

- (i) The representations and warranties regarding the capitalization of each of the Company, HoldCo and Merger Sub contained in the first sentence of Section 4.6(a), Section 6.3(a), and Section 6.3(b), respectively, of the Business Combination Agreement shall be true and correct in all but de minimis respects as of the Closing Date, except with respect to such representations and warranties which speak

124

Exhibit 4
Page 228

Table of Contents

as to an earlier date, which representations and warranties shall be true and correct in all but de minimis respects at and as of such date, except for changes after the date of the Business Combination Agreement which are contemplated or expressly permitted by the Business Combination Agreement and Plan of Merger or the Ancillary Agreements; (ii) the Company Fundamental Representations and the HoldCo and Merger Sub Fundamental Representations shall be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of the Business Combination Agreement which are contemplated or expressly permitted by the Business Combination Agreement or the Ancillary Agreements; and (iii) each of the representations and warranties of the Company, HoldCo, and MergerSub contained in the Business Combination Agreement (other than the representations and warranties regarding capitalization of each of the Company, HoldCo, and Merger Sub contained in the first sentence of Section 4.6(a), Section 6.3(a), Section 6.3(b), respectively, of the Business Combination Agreement, and the Company's Fundamental Representations and the HoldCo and Merger Sub Fundamental Representations) (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect and Company Material Adverse Effect or any similar qualification or exception) shall be true and correct as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, inaccuracies or omissions that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect; and

- each of the covenants of the Company and HoldCo to be performed as of or prior to the Closing will have been performed in all material respects (subject to a 20-day cure period).

*Conditions to the Obligations of the Company, HoldCo, and Merger Sub*

The obligation of each of the Company, HoldCo, and Merger Sub to consummate, or cause to be consummated, the Merger is subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Company:

- each of the representations and warranties of SC Health regarding its capitalization, as provided for in the Business Combination Agreement, will be true and correct in all but de minimis respects as of the Closing Date, except with respect to such representations and warranties that are made as of an earlier date, which representations and warranties will be true and correct in all but de minimis respects at and as of such date, except for changes after the date of the Business Combination Agreement which are contemplated or expressly permitted by the Business Combination Agreement;

- each of the other representations and warranties of SC Health contained in the Business Combination Agreement and Plan of Merger (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect or any similar qualification or exception) will be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties that are made as of an earlier date, which representations and warranties will be true and correct in all material respects at and as of such date, except for changes after the date of Business Combination Agreement which are contemplated or expressly permitted by Business Combination Agreement or the Ancillary Agreements;

- each of the covenants of SC Health to be performed as of or prior to the Closing will have been performed in all material respects; and

- the occurrence of the Minimum Cash Condition.

125

Exhibit 4
Page 229

**Table of Contents**

*Termination; Effectiveness*

The Business Combination Agreement and Plan of Merger may be terminated and the Merger abandoned at any time prior to the Closing:

- by written consent of SC Health and the Company;

- by the Company or SC Health if any Governmental Authority shall have enacted, issued, promulgated, enforced or entered Governmental Order has become final and nonappealable which has the effect of making closing of the Business Combination illegal or otherwise preventing or prohibiting or restricting closing of the Business Combination; provided, that the Governmental Authority issuing such Governmental Order has jurisdiction over the parties to the Business Combination Agreement with respect to the transactions contemplated thereby;

- by the Company if the SC Health shareholder approval will not have been obtained by reason of the failure to obtain the required vote at a meeting of SC Health's shareholders duly convened therefor or at any adjournment thereof;

- by SC Health if the resolutions in connection with the equity scheme have not been approved by the requisite majorities;

- by either the Company or SC Health if the Court shall decline or refuse to sanction the equity scheme, unless both the Company and SC Health agree in writing that the decision of the Court shall be appealed;

- prior to the Closing by written notice to the Company from SC Health if, pursuant to the SC Health Governing Documents, SC Health is required to cease all operations as a result of not completing a business combination;

- prior to the Closing, by written notice to the Company from SC Health in the event of certain uncured breaches on the part of the Company or if the Closing has not occurred on or before December 31, 2021 (the "Agreement End Date"), unless SC Health is in material breach of the Business Combination Agreement and can be cured; or

- prior to the Closing, by written notice to SC Health from the Company in the event of certain uncured breaches on the part of SC Health or if the Closing has not occurred on or before the Agreement End Date, unless the Company is in material breach of the Business Combination Agreement and can be cured.

In the event of the termination of the Business Combination Agreement, the Business Combination Agreement will become void and have no effect, without any liability on the part of any party thereto or its respective affiliates, officers, directors or shareholders, other than liability of the Company, SC Health, HoldCo or Merger Sub, as the case may be, for any willful and material breach of the Business Combination Agreement occurring prior to such termination, other than with respect to certain exceptions contemplated by the Business Combination Agreement (including the terms of the Confidentiality Agreement) that will survive any termination of the Business Combination Agreement.

*Waiver; Amendments*

No provision of the Business Combination Agreement may be waived unless such waiver is in writing and signed by the party or parties against whom such waiver is effective. Any party to the Business Combination Agreement may, at any time prior to the Closing, by action taken by its board of directors, board of managers, managing member or other officers or persons thereunto duly authorized, (a) extend the time for the performance of the obligations or acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties (of another party hereto) that are contained in the Business Combination Agreement or (c) waive compliance by the other parties hereto with any of the agreements or conditions contained in the Business Combination Agreement, but such extension or waiver will be valid only if in writing signed by the waiving party.

126

Exhibit 4
Page 230

Table of Contents

The Business Combination Agreement and Plan of Merger may be amended or modified in whole or in part, only by a duly authorized agreement in writing that is executed in the same manner as the Business Combination Agreement and which makes reference to the Business Combination Agreement.

**Fees and Expenses**

If the Closing does not occur, each party to the Business Combination Agreement will be responsible for and pay its own expenses incurred in connection with the Business Combination Agreement and the transactions contemplated thereby, including all fees of its legal counsel, financial advisers and accountants. If the Closing occurs, SC Health will, upon the closing of the Business Combination and release of proceeds from the trust account, pay or cause to be paid all accrued and unpaid transaction expenses of the Company and pay or cause to be paid all accrued transaction expenses of SC Health. SC Health and the Company will exchange written statements listing all accrued and unpaid transaction expenses not less than two business days prior to the Closing Date.

**Related Agreements**

*This section describes certain additional agreements entered into or to be entered into pursuant to the Business Combination Agreement, but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the agreements. The full text of the Related Agreements, or forms thereof, are filed as annexes to this prospectus/proxy statement or as exhibits to the Registration Statement of which this prospectus/proxy statement forms a part, and the following descriptions are qualified in their entirety by the full text of such annexes and exhibits. Shareholders and other interested parties are urged to read such Related Agreements in their entirety prior to voting on the proposals presented at the General Meeting.*

*Investor Support Agreement*

In connection with the execution of the Business Combination Agreement, SC Health, the Sponsor, HoldCo, Merger Sub and the Company entered into the Investor Support Agreement, dated as of March 19, 2021, a copy of which is attached to this prospectus/proxy statement as Annex B. Pursuant to the Investor Support Agreement, the Sponsor has agreed to, among other things, (i) be bound by certain transfer restrictions with respect to its shares and warrants in SC Health; (ii) vote in favor of the transactions contemplated by the Business Combination Agreement and the related transaction proposals contemplated therein; (iii) vote against certain transactions involving SC Health or against any proposal or agreement that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, result in a breach of any obligation or agreement of SC Health under the Business Combination Agreement or ancillary agreements, result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled or change the dividend policy or capitalization of SC Health; and (iv) waive any rights to adjustment or other anti-dilution protections with respect to the exchange of shares in SC Health for shares in HoldCo and certain rights relating to certain working capital loans,, in each case, subject to the terms and conditions of the Investor Support Agreement. In addition, the Sponsor agreed to waive its redemption rights with respect to all of the Founder Shares in connection with the closing of the Business Combination.

The Investor Support Agreement will terminate in its entirety, and be of no further force or effect, upon the earliest to occur of: (a) the effective time of the Merger; (b) such date and time as the Business Combination Agreement shall be terminated in accordance with its terms; and (c) the written agreement of SC Health, the Sponsor, HoldCo, Merger Sub, and the Company. Upon such termination of the Investor Support Agreement, all obligations of the parties under the Investor Support Agreement will terminate, without any liability or other obligation on the part of any party thereto to any person in respect thereof or the transactions contemplated hereby, and no party thereto will have any claim against another (and no person will have any rights against such

127

Exhibit 4
Page 231

Table of Contents

party), whether under contract, tort or otherwise, with respect to the subject matter thereof; provided, however, that the termination of the Investor Support Agreement will not relieve any party thereto from liability arising in respect of any breach of the Investor Support Agreement prior to such termination.

***Company Holders Support Agreement***

Concurrently with the execution of the Business Combination Agreement, SC Health entered into the Company Holders Support Agreement with the Company, HoldCo, Merger Sub, and certain shareholders of the Company (the "Company Shareholders"), a copy of which is attached to this prospectus/proxy statement as Annex C. Pursuant to the Company Holders Support Agreement, certain shareholders who hold a material number of shares in the Company have agreed to, among other things and subject to certain tax conditions being met: (i) vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at the court meeting and general meeting of the Company shareholders contemplated in the Business Combination Agreement, and take all other necessary and desirable actions reasonably requested by the Company in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement; (ii) vote against certain transactions involving the Company that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, any ancillary agreements or the Company Holders Support Agreement, result in a breach of any obligation or agreement of the Company under the Business Combination Agreement or other related agreement, or result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled; (iii) be bound by certain transfer restrictions with respect to the ordinary shares of the Company held by the shareholder; and (iv) do all things reasonably necessary, proper or advisable to consummate the transactions contemplated by the Business Combination Agreement and not take any action that would reasonably be expected to prevent or delay the satisfaction of any of the conditions to those transactions, in each case, subject to the terms and conditions of the Company Holders Support Agreement.

The Company Holders Support Agreement will terminate in its entirety, and be of no further force or effect, upon the earliest to occur of (i) the Merger Effective Time, (ii) the termination of the Business Combination Agreement in accordance with its terms and (iii) as to each Company Shareholder party thereto, the mutual written agreement of SC Health, the Company, HoldCo, Merger Sub and each such Company Shareholder. Upon such termination of the Company Holders Support Agreement, all obligations of the parties under the Company Holders Support Agreement will terminate, without any liability or other obligation on the part of any party thereto to any person in respect thereof or the transactions contemplated hereby, and no party thereto will have any claim against another (and no person will have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter thereof; provided, however, that the termination of the Company Holders Support Agreement will not relieve any party thereto from liability arising in respect of any breach of the Company Holders Support Agreement prior to such termination.

Dr. Andrew Rickman, OBE (chairman and chief executive officer of the Company and currently the sole shareholder of HoldCo), entered into the AR Support Agreement, a copy of which is attached to this prospectus/proxy statement as Annex D, which is on the same terms as the Company Holders Support Agreement except that it also includes Dr. Rickman agreeing to vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at a general meeting (or by written consent) of the shareholders of HoldCo, and take all other necessary and desirable actions reasonably requested by HoldCo in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement.

***Registration Rights and Lock-Up Agreement***

The Business Combination Agreement and Plan of Merger contemplates that, at the Closing, HoldCo, the Sponsor, and the PIPE Investors of the Company, will enter into the Registration Rights and Lock-Up Agreement, pursuant to which HoldCo will agree to register for resale, pursuant to Rule 415 under the Securities

128

Exhibit 4
Page 232

Table of Contents

Act, certain HoldCo ordinary shares and other equity securities of HoldCo that are held by the parties thereto from time to time.

The Registration Rights and Lock-Up Agreement provides that, solely with respect to subscriptions by the shareholders and other equity holders, HoldCo is required to file with the SEC, within 30 days after the Closing (the "Filing Deadline"), a registration statement registering the resale of the HoldCo ordinary shares to be issued to any such investor and to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof but no later than the earlier of (i) the 90th calendar day (or 120th calendar day if the SEC notifies HoldCo that it will "review" such registration statement) following the earlier of (A) the filing of the registration statement and (B) Filing Deadline and (ii) the 10th business day after the date HoldCo is notified (in writing) by the SEC that such registration statement will not be "reviewed" or will not be subject to further review. However, HoldCo, may delay such filing or effectiveness of such registration statement under certain circumstances, including if the Company were required to update the financial statements included in such registration statement in order to comply with Regulation S-X age of financial statement requirements.

Additionally, the Registration Rights and Lock-Up Agreement, generally, provides for a 180-day Lock-Up Period (as defined in the Business Combination Agreement) for the Sponsor and other equity investors and their Permitted Transferees (as defined in the Business Combination Agreement), subject to certain other terms and conditions depending on the price of the HoldCo ordinary shares.

### PIPE Subscription Agreements

In connection with the execution of the Business Combination Agreement, SC Health and HoldCo entered into (i) the Investor Subscription Agreements with certain investors, including, among others, the Sponsor Related PIPE Investor, pursuant to which such investors agreed to purchase, in the aggregate, 14,790,000 HoldCo ordinary shares at $10.00 per share for an aggregate commitment amount of $147,900,000 and (ii) the Individual Subscription Agreements with three individuals, pursuant to which such individuals agreed to purchase, in the aggregate, 210,000 HoldCo ordinary shares at $10.00 per share for an aggregate commitment amount of $2,100,000. The closings under the Subscription Agreements will occur substantially concurrently with the Closing.

The Subscription Agreements provide that, solely with respect to subscriptions by the investors, HoldCo is required to file with the SEC, within 30 days after the Closing (the "Filing Deadline"), a registration statement registering the resale of the HoldCo ordinary shares to be issued to any such third-party investor and to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof but no later than the earlier of (i) the 90th calendar day (or 120th calendar day if the SEC reviews the and has written comments to such registration statement) following the earlier of (A) the filing of the registration statement and (B) Filing Deadline and (ii) the 10th business day after the date HoldCo is notified (in writing) by the SEC that such registration statement will not be "reviewed" or will not be subject to further review. However, HoldCo may delay such filing or effectiveness of such registration statement under certain circumstances, including if the Company were required to update the financial statements included in such registration statement in order to comply with Regulation S-X age of financial statement requirements.

Additionally, pursuant to the Subscription Agreements, the PIPE Investors agreed to waive any claims that they may have at the Closing or in the future as a result of, or arising out of, the Subscription Agreements against SC Health, including with respect to the trust account. The Subscription Agreements will terminate, and be of no further force and effect, upon the earlier to occur of (i) such date and time as the Business Combination Agreement is terminated in accordance with its terms and (ii) upon the mutual written agreement of HoldCo, SC Health and the applicable PIPE Investor.

Previously, SC Health had entered into a forward purchase agreement with the Sponsor Related PIPE Investor which provided for the purchase by the Sponsor Related PIPE Investor of an aggregate of 5,000,000 SC

Exhibit 4
Page 233

Table of Contents

Health Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants to purchase one SC Health Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per SC Health Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of its initial business combination. As part of the Business Combination, SC Health agreed with the Sponsor Related PIPE Investor that the forward purchase agreement should be terminated and instead of purchasing $50,000,000 of SC Health Class A ordinary shares pursuant to the forward purchase agreement, the Sponsor Related PIPE Investor would instead enter into the Investor Subscription Agreement referenced above and, pursuant to that agreement, has agreed to purchase an aggregate of $50,000,000 shares in HoldCo.

**Background of the Business Combination**

On July 16, 2019, SC Health completed its initial public offering of 15,000,000 units, with each unit consisting of one Class A ordinary share and one-half of one redeemable warrant to purchase one Class A ordinary share at a price of $11.50 per share upon the completion of its initial business combination. On August 2, 2019, SC Health consummated the closing of an additional 2,250,000 Units sold pursuant to the underwriters' over-allotment option.

Simultaneously with the closing of the initial public offering, SC Health consummated the private placement of an aggregate of 5,000,000 warrants at a purchase price of $1.00 per warrant, generating gross proceeds to SC Health of $5,000,000. Simultaneously with the exercise of the over-allotment on August 12, 2019, SC Health completed the private sale of an additional 450,000 private placement warrants to the Sponsor, generating gross proceeds to SC Health of $450,000. Approximately $172.5 million of the net proceeds of the sale of the units in the initial public offering, over-allotment and the sale of the warrants in the private placement, is held in a trust account for the benefit of the purchasers in SC Health's initial public offering.

Following SC Health's initial public offering, SC Health began considering potential target businesses with the objective of consummating a business combination. SC Health sought out potential target businesses based on internal research and through a network of relationships of SC Health's management, board of directors and with professional service providers (lawyers, accountants, consultants, finders and investment bankers). SC Health educated these parties on its structure as a special purpose acquisition company and its criteria for an acquisition. SC Health also responded to inquiries from investment bankers or other similar professionals who represented companies engaged in a sale or financing process. On a regular basis, SC Health's directors were updated with respect to the status of the business combination search. Input received from SC Health's directors was material to SC Health's management's evaluation of a potential business combination.

In evaluating potential business combination targets, SC Health used certain criteria, which included revenue growth outlook, strong free cash flow generation, experience and vision of the management team, the competitive position of the target and its industry's dynamics. SC Health narrowed its focus based on the interest expressed by potential targets and the suitability of each potential target as a potential acquisition candidate.

Based on initial screening efforts and criteria evaluation, SC Health compiled a pipeline of potential targets and updated and supplemented such pipeline from time to time. This pipeline and related developments were discussed periodically with SC Health's board. From July 2019 to January 2021, SC Health and its representatives:

- Identified and preliminarily evaluated 37 potential acquisition targets;

- Conducted initial business and financial due diligence or had meaningful discussions with representatives of 16 potential acquisition targets;

- Sent non-binding letters of intent or indications of interest to four potential acquisition targets; and

- Executed a non-binding letter of intent and commenced further diligence with respect to three potential acquisition targets.

130

Exhibit 4
Page 234

Table of Contents

In particular, SC Health executed a term sheet with the major shareholder of a China-based healthcare services platform in January 2020 after several months of initial due diligence and commercial negotiation. Third party advisors were appointed on both sides, and substantial due diligence work was conducted. However, the onset of COVID-19 initially in China in December 2019 and through the first half of 2020 resulted in a material downturn in the business operations of the target company. In addition, the COVID-19 pandemic created material uncertainty in respect of the target company's projections in 2020 and 2021 and more generally, SC Health was of the view that a material change in transaction terms would be necessary in light of the aforementioned factors.

Moreover, the onset of COVID-19 made it materially more difficult for SC Health to initiate discussions with and to evaluate potential acquisition targets in the Asia Pacific region both due to travel bans, which made it impossible to conduct face-to-face negotiations, or to conduct site visits, as well as due to the substantial level of operational and financial volatility introduced to potential targets. Discussions ended between the parties without an agreement to move forward on the transaction.

In September 2020, SC Health executed a term sheet with an Asian healthcare services platform (which we refer to as "Party A") after several months of initial discussions and third-party advisors were engaged to evaluate such a merger. Despite significant progress on due diligence, transaction documentation, and the launch of a PIPE marketing process, SC Health and Party A determined that the proposed transaction structure would not be in the best interests of the stakeholders of both SC Health and Party A. Negotiations with Party A were therefore ceased in early December 2020.

In October and November 2020, SC Health received introductory investment materials from Cowen and Company, LLC ("Cowen") regarding Rockley Photonics Ltd. ("Rockley"), which was identified as "an anonymous next generation technology developer" with applications in consumer health and medical devices, among others. However, due to SC Health's current discussions with Party A, discussions with Rockley did not immediately progress further.

Following its decision to terminate the proposed transaction with Party A, SC Health began to explore a potential business combination with Rockley (the "Proposed Transaction"). SC Health and Rockley held various discussions during December 2020 regarding Rockley's technology capabilities, commercial outlook, financial plan, and transaction structure.

On December 8, 2020, SC Health and Rockley executed a confidentiality agreement.

On December 10, 2020, representatives of SC Health attended a management presentation of Rockley via conference call.

On December 11, 2020, SC Health filed a preliminary proxy statement with the Securities and Exchange Commission to call an extraordinary general meeting of SC Health shareholders to be held on January 12, 2021 (the "SC Health Special Shareholder Meeting") to consider and vote on a proposal to extend the date by which SC Health was required either to consummate a business combination transaction or to cease all operations except for the purpose of winding up and dissolving SC Health from January 16, 2021 to April 16, 2021 (the "Extension Proposal").

On December 15, 2020, representatives of SC Health, Cowen and Pillsbury Winthrop Shaw Pittman LLP, legal advisor to Rockley ("Pillsbury"), met to discuss coordination and logistics ahead of an organizational meeting scheduled for the following week.

On December 17, 2020, representatives of SC Health attended a follow-up management presentation of Rockley via conference call to discuss the target company's financial model and commercial outlook. On the same day, representatives of SC Health and Cowen held a conference call to discuss the Proposed Transaction and next steps.

131

Exhibit 4
Page 235

Table of Contents

On December 22, 2020, SC Health sent first draft of a non-binding letter of intent which included the term sheet (the "Letter of Intent") to Rockley.

On December 22, 2020, SC Health filed its definitive proxy statement with the Securities and Exchange Agreement to call the SC Health Special Shareholder Meeting to consider the Extension Proposal.

On December 23, 2020, SC Health received a revised draft of the Letter of Intent from Rockley. Representatives of SC Health and Cowen held a conference call to discuss the contents of the revised Letter of Intent.

On December 29, 2020, representatives of SC Health held a conference call with representatives of Ropes & Gray, legal advisor to SC Health ("Ropes") to discuss the Proposed Transaction and the contents of the Letter of Intent.

On December 30, 2020, SC Health sent a revised draft of the Letter of Intent to Rockley. Representatives of SC Health and Cowen held a conference call to discuss the contents of the revised Letter of Intent.

On December 31, 2020, SC Health received a revised draft of the Letter of Intent from Rockley.

On January 1, 2021, SC Health sent a revised draft of the Letter of Intent to Rockley.

On January 5, 2021, SC Health and Rockley executed a non-binding Letter of Intent.

On January 7, 2021, representatives of SC Health's management held a briefing with its board of directors to discuss the Proposed Transaction, including key areas of diligence and the overall transaction process.

On January 8, 2021, representatives of SC Health and Cowen held a conference call to initiate the full due diligence process and coordinate transaction workstreams.

On January 5, 2021, SC Health first contacted BofA Securities ("BofA") to discuss a potential advisory role in connection with an acquisition of Rockley and a placement agent role on the PIPE transaction.

On January 12, 2021, SC Health held a conference call with senior representatives of BofA to discuss further details relating to a potential merger with Rockley and a PIPE transaction. Following the call from January 12, 2021, BofA executed a confidentiality agreement on January 14, 2021 and received access to financial and commercial due diligence.

On January 18, 2021, representatives of SC Health, Rockley, BofA, Cowen, Ropes, Pillsbury, Walkers Global, Cayman legal counsel to SC Health, Ernst & Young, and Connor Group held a conference call to discuss and coordinate key transaction workstreams.

On January 19, 2021, the Rockley board of directors met with representatives of Pillsbury, and discussed, among other business, the current status of the Proposed Transaction.

On January 20, 2021, representatives of SC Health and BofA attended an updated management presentation on Rockley via conference call.

On January 21, 2021, representatives of SC Health and BofA held a conference call to discuss preparations for the PIPE marketing process.

On January 22, 2021, representatives of SC Health and BofA attended a financial model review led by Rockley's management via conference call.

132

Exhibit 4
Page 236

Table of Contents

On January 25, 2021, a Transaction Committee of the Rockley board of directors met telephonically with representatives of Pillsbury to review the current status of the Proposed Transaction. Between January 25, 2021 and March 15, 2021, the Transaction Committee of the Rockley board of directors met telephonically with advisors once a week, except for weeks when the Rockley board of directors met, to receive updates on the status of the Proposed Transaction.

On January 26, 2021, representatives of SC Health, Rockley, BofA, and Cowen held a conference call to discuss preparation and coordination of the PIPE marketing process, including targeted investors.

On January 29, 2021, Rockley announced $65 million was secured from Morningside Ventures.

During the months of January and February 2021, as part of SC Health's ongoing due diligence efforts, SC Health conducted a virtual lab tour of Rockley's facilities and several third-party interviews of Rockley's customers, suppliers, and existing investors, and non-affiliated silicon photonics industry experts. SC Health also engaged a third-party silicon photonics industry expert with over 20 years of experience at photonics companies to conduct in depth technical diligence of Rockley's patents, IP portfolio, and in-house engineering capabilities.

During the months of January, February, and March 2021, Rockley, Pillsbury, and Ernst & Young held frequent conference calls to discuss the transaction structure and related tax considerations.

On February 3, 2021, representatives of SC Health and Ropes held a conference call to discuss open issues in determining the transaction deal structure given regulatory and tax considerations.

On February 5, 2021, representatives of SC Health, BofA, and Cowen held a conference call to provide updates on key workstreams and review transaction progress.

On February 9, 2021, representatives of SC Health, BofA, Ropes, Pillsbury and Rockley held legal due diligence calls during which members of management of Rockley and representatives of Ropes and Pillsbury actively participated. Also, on February 9, 2020, SC Health, BofA, Cowen, Ropes, Pillsbury and SC Health's third-party silicon photonics industry advisor attended a three—hour virtual lab tour and product demonstrations which included Q&A on the technology.

During the weeks of February 9, 2021 and February 15, 2021, representatives of SC Health, Rockley, BofA, Cowen, Ropes, and Pillsbury held several conference calls to review and finalize the PIPE investor presentation.

On February 12, 2021, Rockley engaged Travers Thorp Alberga to serve as Cayman Islands counsel.

On February 19, 2021, representatives of BofA provided SC Health with an update regarding the results of its due diligence findings and target company assessment.

Meetings with potential PIPE investors involving SC Health and Rockley commenced on February 22, 2021 and proceeded through to March 12, 2021.

On February 22, 2021, the Rockley board of directors had a virtual meeting with representatives of Pillsbury, during which members of Rockley's management presented the PIPE presentation intended for prospective PIPE Investors and also reviewed Rockley's financial forecasts in detail.

On February 24, 2021, SC Health held a briefing with its board of directors to present its diligence findings and provide an update regarding the proposed transaction timing and PIPE marketing process. Representatives from BofA were also present during the board meeting to discuss their commercial and financial due diligence findings.

133

Exhibit 4
Page 237

**Table of Contents**

On March 1, 2021, representatives of SC Health, BofA, Cowen, Ropes, and Pillsbury held a conference call to discuss the remaining open issues in the transaction structure.

On March 6, 2021, representatives of Pillsbury sent an initial draft of the Business Combination Agreement to representatives of Ropes & Gray. On the same day, representatives of SC Health, Rockley, BofA, Cowen, Ropes, Pillsbury, and the Blueshirt Group, LLC, an investor relations firm, held a conference call to discuss the progress of PIPE marketing and preliminary investor feedback.

On March 8, 2021, representatives of SC Health and Ropes held a conference call to review the issues list of the draft Business Combination Agreement.

On March 8, 2021, representatives of Ropes sent representatives of Pillsbury an initial list of outstanding issues related to the Business Combination Agreement, which was discussed on a call between their respective teams later in the day.

On March 8, 2021, representatives of SC Health, Rockley, BofA, Cowen, Ropes, Pillsbury, and Ernst & Young held a conference call to reassess the transaction timeline and discuss the documentation progress.

On March 11, 2021, representatives of SC Health, Rockley, BofA, Cowen, Ropes, Pillsbury, and Ernst & Young held a conference call to discuss the progress of the PIPE marketing and transaction documentation processes.

On March 12, 2021, representatives of Ropes sent representatives of Pillsbury a list of outstanding issues related to the Business Combination Agreement.

On March 13, 2021, SC Health, Rockley, Ropes and Pillsbury met to discuss the Business Combination Agreement and ancillary agreements. Between March 13, 2021 and March 15, 2021, Ropes and Pillsbury exchanged drafts of the Business Combination Agreement and ancillary agreements.

On March 15, 2021, the Rockley board of directors, with representatives of Pillsbury, Ernst & Young and Cowen present, met remotely to discuss the Business Combination, including a detailed discussion of the PIPE marketing process, the deal structure and the forms of transaction documents. The Rockley board of directors reviewed the proposed terms of the transaction documents that had been negotiated with SC Health and its representatives. At the end of the meeting, the transaction documents were unanimously approved by the Rockley board of directors, subject to final negotiations and modifications, and the Rockley board of directors determined to recommend the approval of the transaction documents to its shareholders.

On March 17, 2021, representatives of SC Health, Rockley, Ropes and Pillsbury finalized the form of Subscription Agreement to be provided to the PIPE Investors in connection with the PIPE Investment, and on March 17, 2021, the final form of Subscription Agreement was made available for review by potential PIPE Investors.

On March 18, 2021, the SC health board, with representatives of Ropes and Walkers present, met by video conference to discuss the Business Combination, including a detailed discussion of the transaction structure, the key aspects of each of the transaction documents and the required shareholder voting threshold for the Business Combination. A representative of Walkers also discussed with the SC Health board the fiduciary duties of independent directors under Cayman Islands law. Following discussion and careful consideration, the SC health board unanimously (i) determined that the Merger and the other transactions contemplated by the Business Combination Agreement (the "Transactions") are fair to, and in the best interests of, SC Health's shareholders, (ii) adopted a resolution approving the Business Combination Agreement and declaring its advisability and approving the Merger and the other Transactions, and (iii) recommended the approval and adoption of the Business Combination Agreement, the Merger and the other Transactions by SC Health's shareholders.

134

Exhibit 4
Page 238

Table of Contents

From March 6, 2021 to March 18, 2021, the parties continued to negotiate and finalize definitive transaction documents and on the morning of March 19, 2021, prior to the opening of trading of the SC Health Class A ordinary shares on the NYSE, SC Health and Rockley issued a joint press release announcing, among other things, the execution of the Business Combination Agreement. Also, on March 19, 2021, SC Health filed with the SEC a Form 8-K that summarized the Business Combination Agreement and included the Business Combination Agreement as an exhibit thereto.

**SC Health's Board of Directors' Reasons for Approval of the Business Combination**

SC Health's board of directors considered a wide variety of factors in connection with its evaluation of the Business Combination. SC Health's board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision. Different individual members of SC Health's board of directors may have given different weight to different factors in their evaluation of the Business Combination.

In considering the business combination, the SC Health board gave considerable weight to the following factors:

- **Highly Attractive Large Consumer Health Market Opportunity.** The SC Health board considered the large market opportunity of a growing universe of consumer health and wellness monitoring devices generating a total addressable market in 2025 of US$30 billion, based on Rockley's management estimates. This market includes smartphones, smart watches, fitness bands, biometric patches, smart earbuds, and at-home consumer electronics such as smart speakers. The SC Health board believes that demand for wearable and mobile devices that have advanced biometric sensing capabilities will continue to grow due to the confluence of increased focus on preventative health and wellness as well as a growing prevalence of chronic conditions and need for long-term care. Further, there is a lack of existing health monitoring solutions that are accessible outside of a traditional clinical setting, as most of these devices are limited to one or a few functions, high cost, and bulky. The SC Health board believes Rockley's sensing technology will enable high quality health monitoring devices to be available to consumers and radically transform the way everyday users monitor their wellbeing.

- **Unique and Innovative Technology Platform.** The SC Health board believes Rockley's silicon photonics and optical measurement science deliver peerless sensor performance, accuracy, density, and spectral range that is unmatched by existing LED-based technology solutions. Rockley seeks to protect its technology platform via a portfolio of 154 issued and allowed patents in the United States and 51 patents in foreign jurisdictions covering all key relevant technology domains and the confidential and systematic documentation of critical know-how and trade secrets. Furthermore, Rockley seeks to maintain end-to-end control of the manufacturing ecosystem through implementing proprietary designs and processes and embedding over 20 engineers in one of their foundry partners to perform key wafer integration process steps in a secured facility.

- **Strong Relationships with Leading Blue-Chip Customers.** The SC Health board considered the terms of Rockley's existing customer contracts and development agreements as well as SC Health's positive diligence calls with key customers, including a key customer which has committed to US$70 million of non-recurring engineering to date. Rockley also has identified a large robust pipeline of potential consumer electronics and medical device OEMs that are at varying stages of discussion with the commercial team.

- **Scalable, Asset Light Business Model.** Rockley is a fabless chip designer, with a seeded global manufacturing ecosystem running proprietary processes that are wholly owned by Rockley, which Rockley believes is protected by IP and unavailable to other customers. Rockley has three primary fab partners for its silicon photonic integrated circuits, III-V semiconductor active optics component, and electronic integrated circuits with back-up secondary sources. These partners are all qualified by consumer OEMs and Rockley has confirmed they are ready for high volume production. The SC

135

Exhibit 4
Page 239

**Table of Contents**

Health board believes Rockley's asset-light business model is scalable and will begin to generate free cash flow following commercial launch.

- **Multiple Avenues for Consistent Growth.** The projected revenue growth through FY 2024 is primarily supported by the launch of wearable and mobile devices for four large consumer technology companies. The SC Health board believes there are several avenues for growth beyond consumer health that are not captured in the financial projections, including medical devices, which requires additional development efforts over the next several years including clinical trials and FDA applications and could generate more consistent and higher margin long-term revenues. Rockley has also implemented a Sensing Cloud and AI Product team to evaluate commercial uses of the valuable spectral data captured from its devices that could be used for health data analytics and clinical insights. Other sensing and data communications fields where Rockley's technology is applicable include robotics, automotive Lidar, in-package optics, and optical computing. Furthermore, Rockley has established a joint venture with Hengtong Optic-Electric Co., Ltd. to manufacture high performance, low-cost optical transceiver modules for datacenters.

- **World Class Management Team with an Extensive Track Record.** The SC Health board believes Rockley management's experience in developing new and disruptive technologies and managing public companies make them highly qualified to lead the combined company. The combined company's chief executive officer and chairman, Dr. Andrew Rickman, is globally recognized as the pioneer of commercial silicon photonics. The combined company chief financial officer, Mr. Mahesh Karanth, has successfully led several early-stage technology and semiconductor companies over the last sixteen years. The combined company's chief operating officer, Mr. Amit Nagra, PhD., has 15 years of experience in silicon photonics operations and supply chain management. Beyond the executive management team, Rockley is supported by a deep bench of engineers and developers, with over half of the employees holding PhDs in their fields of knowledge. The SC Health Board believes that all of Rockley's employees intend to remain fully invested in the combined company with 100% equity rollover and key executives will sign new employment agreements.

- **Terms of the Business Combination Agreement.** The SC Health Board considered the terms and conditions of the Business Combination Agreement and the transactions contemplated thereby, including the Merger.

- **Independent Director Role.** The SC Health board is comprised of a majority of independent directors who are not affiliated with SC Health's Sponsor and its affiliates. In connection with the Merger, SC Health's independent directors, Dr. Lim, Mr. Lavin and Mr. Marimuthu, took an active role in evaluating and guiding SC Health management on the proposed terms of the Merger, including the Business Combination Agreement, the governance of SC Health post-Merger and the charter proposals. SC Health's independent directors evaluated and unanimously approved, as members of the SC Health board, the Business Combination Agreement, and the transactions contemplated therein, including the Merger.

- **Other Alternatives.** After a thorough review of other business combination opportunities reasonably available to SC Health, the SC Health board believes that the proposed Merger represents the best potential business combination for SC Health and the most attractive opportunity for SC Health management to accelerate its business plan.

The SC Health board also considered a variety of uncertainties and risks and other potentially negative factors concerning the business combination, including, but not limited to, the following:

- **Macroeconomic Risks.** Macroeconomic uncertainty and the effects it could have on the combined company's revenues;

- **Benefits Not Achieved.** The risk that the potential benefits of the Merger may not be fully achieved or may not be achieved within the expected timeframe;

136

Exhibit 4
Page 240

Table of Contents

- **Liquidation of SC Health.** The risks and costs to SC Health if the Merger is not completed, including the risk of diverting management focus and resources from other businesses combination opportunities, which will likely result in SC Health being unable to effect a business combination by April 16, 2021 and force SC Health to liquidate;

- **Shareholder Vote.** The risk that SC Health's shareholders may fail to provide the respective votes necessary to effect the Merger, including approvals of the BCA Proposal, the Merger Proposal, the Incentive Plan Proposal, the ESP Proposal, and the Adjournment Proposal;

- **Closing Conditions.** The fact that completion of the Merger is conditioned on the satisfaction of certain closing conditions that are not within SC Health's control;

- **Litigation.** The possibility of litigation challenging the Merger or that an adverse judgment granting injunctive relief could indefinitely or permanently enjoin consummation of the Merger;

- **Fees and Expenses.** The fees and expenses associated with completing the Merger; and

- **Other Risks.** Various other risks associated with the business of Rockley, as described in the section entitled "*Risk Factors*" appearing elsewhere in this prospectus/proxy statement.

**Projected Financial Information**

In connection with its consideration of the potential Business Combination, the SC Health board of directors was provided with prospective financial information prepared by Rockley's management team (the "Projections").

**Certain Rockley Projected Financial Information**

Rockley provided SC Health with its internally prepared forecasts for each of the years in the four-year period ending 2024. Rockley does not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of their future performance, revenue, financial condition or other results. However, in connection with the proposed Business Combination, management of Rockley prepared the financial projections set forth below to present key elements of the forecasts provided to SC Health. The Rockley forecasts were prepared solely for internal use and not with a view toward public disclosure or toward complying with GAAP, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. In the view of Rockley's management, the financial projections were prepared on a reasonable basis reflecting management's currently available estimates and judgments.

The inclusion of financial projections in this prospectus/proxy statement should not be regarded as an indication that Rockley, its board of directors, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the BCA Proposal. You are cautioned not to rely on the projections in making a decision regarding the transaction, as the projections may be materially different than actual results. We will not refer back to the financial projections in our future periodic reports filed under the Exchange Act.

The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Rockley's business, all of which are difficult to predict and many of which are beyond Rockley's and SC Health's control. The financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Rockley's control. The various risks and uncertainties include those set forth in the "*Risk Factors*," "*Rockley Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Cautionary Statement Regarding Forward-Looking*

Exhibit 4
Page 241

**Table of Contents**

*Statements*" sections of this prospectus/proxy statement, respectively. As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the financial projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

None of Rockley's independent registered accounting firm, SC Health's independent registered accounting firm or any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections included below, nor have they expressed any opinion or any other form of assurance on such information or their achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Information provided by Rockley does not constitute any representation, estimate or projection of any other party. The projected financial information included in this document has been prepared by, and is the responsibility of, Rockley's management. Ernst & Young LLP has not audited, reviewed, examined, compiled nor applied agreed-upon procedures with respect to the accompanying projected financial information and, accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report included in this document relates to Rockley's historical financial statements included herein. It does not extend to the projected financial information and should not be read to do so. Furthermore, the projected financial information does not take into account any circumstances or events occurring after the date they were prepared. Nonetheless, a summary of the projected financial information is provided in this prospectus/proxy statement because the projected financial information was made available to SC Health. No person has made or makes any representation or warranty to any SC Health shareholder regarding the information included in the projected financial information. The projected financial information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this prospectus/proxy statement are cautioned not to place undue reliance on this information. The projected financial information should not be viewed as public guidance.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT/PROSPECTUS A SUMMARY OF THE FINANCIAL PROJECTIONS FOR ROCKLEY, SC HEALTH UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

The key elements of the projections provided by management of Rockley to SC Health are summarized in the tables below (dollars in thousands).

|  | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Fiscal 2024 |
|---|---|---|---|---|
| Revenue | $ 40,500 | $ 78,600 | $ 426,500 | $ 1,125,100 |
| Gross Profit | $ 7,400 | $ 20,700 | $ 234,100 | $ 595,500 |
| Gross Margin | 18.3% | 26.3% | 54.9% | 52.9% |
| EBITDA (1) | ($ 96,400) | ($ 95,600) | $ 48,900 | $ 260,100 |
| Capital Expenditures | ($ 10,400) | ($ 18,500) | ($ 38,500) | ($ 50,000) |
| Free Cash Flow (2) | ($106,100) | ($118,700) | ($ 11,600) | $ 149,700 |

(1)  Rockley defines EBITDA, a non-GAAP financial measure, as earnings before interest, taxes, depreciation and amortization.
(2)  Rockley defines Free Cash Flow, a non-GAAP financial measure, as cash flow from operations minus capital expenditures.

Exhibit 4
Page 242

Table of Contents

Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information in compliance with GAAP, and may not be comparable to similarly titled measures used by other companies.

**Satisfaction of 80% Test**

NYSE rules require that SC Health must consummate an initial business combination with one or more operating businesses or assets with a fair market value equal to at least 80% of the net assets held in the trust account (excluding the amount of any deferred underwriting discount held in trust) at the time of SC Health's signing a definitive agreement in connection with its initial business combination. Based on the fully-diluted pre-money equity valuation of $1.1 billion for Rockley compared to the approximately $174,545,229 in investments and cash as of March 19, 2021 in the trust account, the fact that the purchase price for SC Health was the result of an arm's length negotiation and all of the factors described in this section and the section of this prospectus/proxy statement entitled "*Proposal No. 1—BCA Proposal—The Business Combination Agreement and Plan of Merger,*" **SC Health board of directors determined that this requirement was met.**

**Stock Exchange Listing**

The SC Health Class A ordinary shares, SC Health units and SC Health public warrants are currently listed on the New York Stock Exchange (the "NYSE") under the symbols "SCPE," "SCPE.U," and "SCPE.WS." Upon the closing of the Business Combination, the SC Health securities will be delisted from the NYSE. HoldCo intends to apply to list the HoldCo ordinary shares and HoldCo warrants on the NYSE under the symbols "RKLY" and "RKLY.W," respectively, upon the closing of the Business Combination. We cannot assure you that the HoldCo ordinary shares or HoldCo warrants will be approved for listing on the NYSE.

**Expected Accounting Treatment of the Business Combination**

We expect the Business Combination to be accounted for as a forward recapitalization in accordance with GAAP. Under the guidance in ASC 805, SC Health is expected to be treated as the "acquired" company for financial reporting purposes. Accordingly, the Business Combination is expected to be reflected as the equivalent of HoldCo issuing stock for the net assets of SC Health, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded.

**Sources and Uses of Funds for the Business Combination**

The following table summarizes the sources and uses for funding the Business Combination.

| Sources | | Uses | |
|---|---|---|---|
| ($ in millions) | | | |
| Rockley shareholders rollover | $1,148.1 | Rockley shareholders rollover | $1,148.1 |
| Cash and investments held in trust account[1] | 172.5 | Cash to balance sheet | 288.9 |
| | | Promissory note[2] | 0.1 |
| PIPE Financing | 150.0 | Transaction expenses | 33.5 |
| **Total sources** | **1,470.6** | **Total uses** | **1,470.6** |

(1)    Assumes no redemptions.
(2)    In January 2019, SC Health issued an unsecured promissory note (the "Promissory Note") to the Sponsor, pursuant to which SC Health could borrow up to an aggregate principal amount of $300,000. The Promissory Note was non-interest bearing and payable on the earlier of December 31, 2019 or the completion of the initial public offering. In January 2019, SC Health transferred its outstanding advance from a related party in the amount of $32,313 into the Promissory Note. The outstanding balance of

Exhibit 4
Page 243

Table of Contents

$254,595 under the Promissory Note was repaid as of December 31, 2019. Additionally, on December 30, 2020, the Sponsor deposited $100,000 into the operating bank account of SC Health for working capital. This amount is outstanding as of December 31, 2020.

*Regulatory Matters*

Under the HSR Act and the rules that have been promulgated thereunder by the FTC, certain transactions may not be consummated unless information has been furnished to the Antitrust Division and the FTC and certain waiting period requirements have been satisfied. Certain anticipated shareholders of HoldCo under the Business Combination are subject to these requirements and may not obtain ordinary shares until the expiration of a 30-day waiting period following the filing of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. On          , 2021, the Sponsor and HoldCo filed the required forms under the HSR Act with respect to the Business Combination with the Antitrust Division and the FTC and requested early termination. On          , 2021, the 30-day waiting period expired.

At any time before or after closing of the Business Combination, notwithstanding termination of the waiting period under the HSR Act, the Antitrust Division or the FTC, or any state or foreign governmental authority could take such action under applicable antitrust laws as such authority deems necessary or desirable in the public interest, including seeking to enjoin the closing of the Business Combination, conditionally approving the Business Combination upon divestiture of assets, subjecting the completion of the Business Combination to regulatory conditions or seeking other remedies. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. SC Health cannot assure you that the Antitrust Division, the FTC, any state attorney general or any other government authority will not attempt to challenge the Business Combination on antitrust grounds, and, if such a challenge is made, SC Health cannot assure you as to its result.

Neither SC Health nor Rockley are aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than the expiration or early termination of the waiting period under the HSR Act with respect to the Sponsor's acquisition of HoldCo's shares. It is presently contemplated that if any such additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

**Vote Required for Approval**

The approval of the BCA Proposal requires an ordinary resolution under the Cayman Islands Companies, being the affirmative vote of a simple majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting.

The BCA Proposal is conditioned on the approval of each of the Condition Precedent Proposals. Therefore, if each of the Condition Precedent Approvals is not approved, the BCA Proposal will have no effect, even if approved by holders of SC Health ordinary shares.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution (the "BCA Proposal" or "Proposal No. 1") that the entry into the Business Combination Agreement, dated as of March 19, 2021 (as it may be amended from time to time, the "Business Combination Agreement," a copy of which is attached to the accompanying prospectus/proxy statement as Annex A), by and among SC Health Corporation ("SC Health"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales (the "Company" or "Rockley"), Rockley Photonics Holdings Limited, a Cayman Islands exempted company ("HoldCo"), and Rockley Mergersub Limited, a Cayman Islands

140

Exhibit 4
Page 244

Table of Contents

exempted company and a direct wholly owned subsidiary of HoldCo (*"Merger Sub"*), pursuant to which several transactions will occur, and in connection therewith, HoldCo will become the ultimate parent company of Rockley and SC Health will merge with Merger Sub, with SC Health being the surviving entity in such merger (the "Business Combination") be approved and the consummation of the transactions contemplated thereby be confirmed, ratified and approved in all respects.

**Recommendation of SC Health's Board of Directors**

**THE SC HEALTH BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SC HEALTH SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE BCA PROPOSAL.**

The existence of financial and personal interests of one or more of SC Health's board of directors may result in a conflict of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of SC Health and its shareholders and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

141

Exhibit 4
Page 245

Table of Contents

**PROPOSAL NO. 2—MERGER PROPOSAL**

**Vote Required for Approval**

The approval of the Merger Proposal requires a special resolution under the Cayman Islands Companies Act, being the affirmative vote of a majority of at least two-thirds of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as a special resolution (the "Merger Proposal" or "Proposal No. 2") that the plan of merger in the form tabled to the General Meeting (a draft of which is attached to the accompanying prospectus/proxy statement as the Business Combination Agreement in Annex A, the "Plan of Merger*"*) pursuant to which Merger Sub will merge with and into SC Health so that SC Health will be the surviving company and all the undertaking, property, rights and liabilities of Merger Sub vest in SC Health by virtue of such merger pursuant to the Companies Act (as amended) of the Cayman Islands, be approved and the consummation of the Merger and the remaining transactions contemplated thereby, be authorized, approved and confirmed in all respects; and SC Health be authorized to enter into the Plan of Merger"

**Recommendation of SC Health's Board of Directors**

THE SC HEALTH BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SC HEALTH SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE MERGER PROPOSAL.

The existence of financial and personal interests of one or more of SC Health's board of directors may result in a conflict of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of SC Health and its shareholders and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

142

Exhibit 4
Page 246

**Table of Contents**

PROPOSAL NO. 3—INCENTIVE PLAN PROPOSAL

**The Background of the 2021 Plan**

On March 31, 2021, HoldCo's board of directors approved and adopted, subject to shareholder approval, the Rockley Photonics Holdings Limited 2021 Stock Incentive Plan (the "2021 Plan"), effective as of and contingent on the closing of the Business Combination (the "Effective Date"). If the 2021 Plan is approved by shareholder, HoldCo will be authorized to grant equity and cash incentive awards to eligible service providers under the 2021 plan. A copy of the 2021 Plan is attached to this prospectus/proxy statement as Annex H. SC Health shareholders are being asked to approve the 2021 Plan as presented.

**Purpose of the 2021 Plan**

The purpose of the 2021 Plan is to enhance HoldCo's ability to attract, retain, incentivize, reward and motivate persons who make (or are expected to make) important contributions to HoldCo by providing these individuals with equity ownership and other incentive opportunities. HoldCo believes that the equity-based awards to be issued under the 2021 Plan will motivate recipients to offer their maximum effort to HoldCo and help focus them on the creation of long-term value consistent with the interests of HoldCo's shareholders. HoldCo believes that grants of incentive awards are necessary to enable HoldCo to attract and retain top talent.

**Reasons for the Approval of the Incentive Plan Proposal**

Shareholder approval of the 2021 Plan is necessary in order for HoldCo to (1) meet the shareholder approval requirements of the NYSE and (2) grant thereunder incentive stock options ("ISOs"), as defined under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

**Consequences if the Incentive Plan Proposal is Not Approved**

If the Incentive Plan Proposal is not approved by shareholders, the 2021 Plan will not become effective and HoldCo will not be able to grant equity awards under the 2021 Plan. Additionally, HoldCo believes its ability to recruit, retain and incentivize top talent will be adversely affected if the Incentive Plan Proposal is not approved.

**Summary of the Material Terms of the 2021 Plan**

The material terms of the 2021 Plan, as adopted by HoldCo's board of directors, are summarized below. A copy of the 2021 Plan is attached to this prospectus/proxy statement as Annex H. This summary is not a complete description of all provisions of the 2021 Plan and is qualified in its entirety by reference to the complete text of the 2021 Plan, which we urge you to read in its entirety. SC Health's shareholders are being asked to approve the 2021 Plan as presented. If the terms of the 2021 Plan are materially amended in a manner that would require shareholder approval under NYSE or the requirements for issuing ISOs under the Code, shareholders will be asked to approve such material amendment.

*Stock Awards.*    The 2021 Plan provides for the grant of ISOs, nonstatutory stock options ("NSOs"), restricted share awards, stock unit awards, stock appreciation rights, other stock-based awards, and cash-based awards, and performance-based stock awards, (collectively, "stock awards"). ISOs may be granted only to HoldCo's employees, including officers, and the employees of HoldCo's parent or subsidiaries. All other stock awards may be granted to HoldCo's employees, officers, HoldCo's non-employee directors, and consultants and the employees and consultants of HoldCo's parent, subsidiaries, and affiliates.

*Share Reserve.*    The aggregate number HoldCo ordinary shares that may be issued pursuant to stock awards after the closing of the Business Combination under the 2021 Plan will not exceed the sum of (x) 7,631,196 shares, plus (y) the sum of the number of shares subject to outstanding awards under the Rockley

143

Exhibit 4
Page 247

**Table of Contents**

Photonic Limited 2013 Equity Incentive Plan, as amended (the "2013 Plan"), following the Effective Date that (i) are subsequently forfeited or terminated for any reason before being exercised or settled, (ii) are not issued because such stock award or any portion thereof is settled in cash, (iii) are subject to vesting restrictions and are subsequently forfeited, (iv) are withheld or reacquired to satisfy the exercise, strike or purchase price, or (v) are withheld or reacquired to satisfy a tax withholding obligation, plus (z) the number of shares reserved under the 2013 Plan not issued or subject to outstanding grants under the 2013 Plan on the Effective Date. In addition, the share reserve will be subject to an annual increase on the first day of each fiscal year, for a period of not more than 10 years, beginning on January 1, 2022 and ending on (and including) January 1, 2031, in an amount equal to the lesser of (i) four percent (4%) of the outstanding shares on the last day of the immediately preceding fiscal year or (ii) such lesser amount (including zero) that the Compensation Committee (as defined below) determines for purposes of the annual increase for that fiscal year.

If restricted shares or shares issued upon the exercise of options are forfeited, then such shares shall again become available for awards under the 2021 Plan. If stock units, options, or stock appreciation rights are forfeited or terminate for any reason before being exercised or settled, or an award is settled in cash without the delivery of shares to the holder, then the corresponding shares will again become available for awards under the 2021 Plan. Any shares withheld to satisfy the exercise price or tax withholding obligation pursuant to any award of options or stock appreciation rights shall again become available for awards under the 2021 Plan. If stock units or stock appreciation rights are settled, then only the number of shares (if any) actually issued in settlement of such stock units or stock appreciation rights shall reduce the number of shares available under the 2021 Plan, and the balance (including any shares withheld to cover taxes) shall again become available for awards under the 2021 Plan.

Shares issued under the 2021 Plan shall be authorized but unissued shares, treasury shares, or previously issued shares by HoldCo. As of the date hereof, no awards have been granted and no HoldCo ordinary shares have been issued under the 2021 Plan.

*Incentive Stock Option Limit.*    The maximum number of HoldCo ordinary shares that may be issued upon the exercise of ISOs under the 2021 Plan is equal to 38,155,980 shares plus, to the extent allowable under Section 422 of the Code, any shares that become available for issuance under the 2021 Plan on account of (i) an award being forfeited before all underlying shares have been issued or settled, or (ii) a portion of shares underlying an award being withheld to satisfy the exercise price or tax withholding of such award.

*Grants to Outside Directors.*    The sum of (i) the grant date fair value for financial reporting purposes of any awards granted during any calendar year under the 2021 Plan to an outside director as compensation for services as an outside director and (ii) any cash fees paid by HoldCo to such outside director during such calendar year for service on HoldCo's board of directors, may not exceed $750,000 (other than in the calendar year in which the outside director commences service). In addition, initial awards granted under the 2021 Plan to outside directors who are members of the board on the Effective Date or who first join the board in the calendar year of the Effective Date will not be taken into account for purposes of this limitation.

*Administration.*    The 2021 Plan will be administered by the compensation committee appointed by HoldCo's board of directors (the "Compensation Committee"), or by HoldCo's board of directors acting as the Compensation Committee. Subject to the limitations set forth in the 2021 Plan, the Compensation Committee will have the authority to determine, among other things, to whom awards will be granted, the number of shares subject to awards, the term during which an option or stock appreciation right may be exercised and the rate at which the awards may vest or be earned, including any performance criteria to which they may be subject. The Compensation Committee also will have the authority to determine the consideration and methodology of payment for awards. To the extent permitted by applicable law, the board of directors or Compensation Committee may also authorize one or more officers of HoldCo to designate employees, other than officers under Section 16 of the Exchange Act, to receive awards and/or to determine the number of such awards to be received by such persons subject to a maximum total number of awards.

144

Exhibit 4
Page 248

**Table of Contents**

*Repricing; Cancellation and Re-Grant of Stock Awards.*    The Compensation Committee will have the authority to modify outstanding awards under the 2021 Plan. Subject to the terms of the 2021 Plan, the Compensation Committee will have the authority to cancel any outstanding stock award in exchange for new stock awards, including awards having the same or a different exercise price cash, or other consideration, without shareholder approval but with the consent of any adversely affected participant.

*Stock Options.*    A stock option is the right to purchase a certain number of shares of stock, at a certain exercise price, in the future. Under the 2021 Plan, ISOs and NSOs are granted pursuant to stock option agreements adopted by the Compensation Committee. The Compensation Committee determines the exercise price for a stock option, within the terms and conditions of the 2021 Plan, provided that the exercise price of a stock option generally cannot be less than one hundred percent (100%) of the fair market value of HoldCo's ordinary shares on the date of grant (one hundred and ten percent (110%) in the case of ISOs issued to certain individuals who own more than ten percent (10%) of the total combined voting power of all classes of outstanding stock of the Company or all classes of outstanding stock of the Company or certain affiliates). Options granted under the 2021 Plan vest at the rate specified by the Compensation Committee.

Stock options granted under the 2021 Plan generally must be exercised by the optionee before the earlier of the expiration of such option or the expiration of a specified period following the optionee's termination of employment. Each stock option agreement will set forth the extent to which the option recipient will have the right to exercise the option following the termination of the recipient's service with us, and the right to exercise the option of any executors or administrators of the award recipient's estate or any person who has acquired such options directly from the award recipient by bequest or inheritance.

Payment of the exercise price may be made in cash or, if provided for in the stock option agreement evidencing the award, (1) by surrendering, or attesting to the ownership of, shares which have already been owned by the optionee, (2) future services or services rendered to HoldCo or HoldCo's affiliates prior to the award, (3) by delivery of an irrevocable direction to a securities broker to sell shares and to deliver all or part of the sale proceeds to HoldCo in payment of the aggregate exercise price, (4) by delivery of an irrevocable direction to a securities broker or lender to pledge shares and to deliver all or part of the loan proceeds to HoldCo in payment of the aggregate exercise price, (5) by a "net exercise" arrangement, (6) by delivering a full-recourse promissory note, or (7) by any other form that is consistent with applicable laws, regulations, and rules.

*Tax Limitations on Incentive Stock Options.*    The aggregate fair market value, determined at the time of grant, of HoldCo ordinary shares with respect to ISOs that are exercisable for the first time by an option holder during any calendar year under all of HoldCo's stock plans may not exceed $100,000. Options or portions thereof that exceed such limit will generally be treated as NSOs. No ISO may be granted to any person who, at the time of the grant, owns or is deemed to own stock possessing more than ten percent (10%) of HoldCo's total combined voting power or that of any of HoldCo's affiliates unless (1) the option exercise price is at least one hundred ten percent (110%) of the fair market value of the stock subject to the option on the date of grant, and (2) the term of the ISO does not exceed five years from the date of grant.

*Restricted Share Awards.*    The terms of any awards of restricted shares under the 2021 Plan will be set forth in a restricted share agreement to be entered into between HoldCo and the recipient. The Compensation Committee will determine the terms and conditions of such restricted share agreements, which need not be identical. A restricted share award may be subject to vesting requirements or transfer restrictions or both. Restricted shares may be issued for such consideration as the Compensation Committee may determine, including cash, cash equivalents, full recourse promissory notes, past services and future services. Award recipients who are granted restricted shares generally have all of the rights of a shareholder with respect to those shares, provided that dividends and other distributions will not be paid in respect of unvested shares unless otherwise determined by the Compensation Committee and, in such case, only once such unvested shares vest.

*Stock Unit Awards.*    Stock unit awards give recipients the right to acquire a specified number of shares of stock (or cash amount) at a future date upon the satisfaction of certain conditions, including any vesting arrangement, established by the Compensation Committee and as set forth in a stock unit award agreement. A

Exhibit 4
Page 249

Table of Contents

stock unit award may be settled by cash, delivery of stock, a combination of cash and stock as deemed appropriate by the Compensation Committee. Recipients of stock unit awards generally will have no voting or dividend rights prior to the time the vesting conditions are satisfied and the award is settled. At the Compensation Committee's discretion and as set forth in the stock unit award agreement, stock units may provide for the right to dividend equivalents. Dividend equivalents may not be distributed prior to settlement of the stock unit to which the dividend equivalents pertain and the value of any dividend equivalents payable or distributable with respect to any unvested stock units that do not vest will be forfeited.

*Stock Appreciation Rights.*    Stock appreciation rights generally provide for payments to the recipient based upon increases in the price of HoldCo ordinary shares over the exercise price of the stock appreciation right. The Compensation Committee determines the exercise price for a stock appreciation right, which generally cannot be less than one hundred percent (100%) of the fair market value of HoldCo ordinary shares on the date of grant. A stock appreciation right granted under the 2021 Plan vests at the rate specified in the stock appreciation right agreement as determined by the Compensation Committee. The Compensation Committee determines the term of stock appreciation rights granted under the 2021 Plan, up to a maximum of ten years. Upon the exercise of a stock appreciation right, HoldCo will pay the participant an amount in stock, cash, or a combination of stock and cash as determined by the Compensation Committee, equal to the product of (1) the excess of the per share fair market value of HoldCo ordinary shares on the date of exercise over the exercise price, multiplied by (2) the number of HoldCo ordinary shares with respect to which the stock appreciation right is exercised.

*Other Stock Awards.*    The Compensation Committee may grant other awards based in whole or in part by reference to HoldCo ordinary shares. The Compensation Committee will set the number of shares under the stock award and all other terms and conditions of such awards.

*Cash-Based Awards.*    A cash-based award is denominated in cash. The Compensation Committee may grant cash-based awards in such number and upon such terms as it shall determine. Payment, if any, will be made in accordance with the terms of the award, and may be made in cash or in HoldCo ordinary shares, as determined by the Compensation Committee.

*Performance-Based Awards.*    The number of shares or other benefits granted, issued, retainable and/or vested under a stock or stock unit award may be made subject to the attainment of performance goals. The Compensation Committee may utilize any performance criteria selected by it in its sole discretion to establish performance goals.

*Changes to Capital Structure.*    In the event of a recapitalization, stock split, or similar capital transaction, the Compensation Committee will make appropriate and equitable adjustments to the number of shares reserved for issuance under the 2021 Plan, the number of shares that can be issued as incentive stock options, the number of shares subject to outstanding awards and the exercise price under each outstanding option or stock appreciation right.

*Transactions.*    If HoldCo is involved in a merger or other reorganization, outstanding awards will be subject to the agreement or merger or reorganization. Subject to compliance with applicable tax laws, such agreement may provide, without limitation, for (1) the continuation of the outstanding awards by HoldCo, if HoldCo is a surviving corporation, (2) the assumption or substitution of the outstanding awards by the surviving corporation or its parent or subsidiary, (3) the immediate vesting, exercisability, and settlement of the outstanding awards followed by their cancellation, (4) cancellation of the award, to the extent not vested or not exercised prior to the effective time of the merger or reorganization, in exchange for such cash or equity consideration (including no consideration) as the Compensation Committee, in its sole discretion, may consider appropriate, or (5) the settlement of the intrinsic value of the outstanding awards (whether or not vested or exercisable) in cash, cash equivalents, or equity (including cash or equity subject to deferred vesting and delivery consistent with the vesting restrictions applicable to such award or the underlying shares) followed by cancellation of such awards.

146

Exhibit 4
Page 250

Table of Contents

*Change of Control.*    The Compensation Committee may provide, in an individual award agreement or in any other written agreement between a participant and HoldCo, that the stock award will be subject to acceleration of vesting and exercisability in the event of a change of control.

*Transferability.*    Unless the Compensation Committee provides otherwise, no award granted under the 2021 Plan may be transferred in any manner (prior to the vesting and lapse of any and all restrictions applicable to shares issued under such award), except by will, the laws of descent and distribution, provided that all ISOs may only be transferred or assigned only to the extent consistent with Section 422 of the Code.

*Amendment and Termination.*    HoldCo's board of directors will have the authority to amend, suspend, or terminate the 2021 Plan, provided that such action does not materially impair the existing rights of any participant without such participant's written consent. No ISOs may be granted after the tenth anniversary of the date HoldCo's board of directors adopted the 2021 Plan.

*Recoupment.*    To the extent permitted by applicable law, the Compensation Committee will have the authority to require that, in the event that HoldCo is required to prepare restated financial results owing to an executive officer's intentional misconduct or grossly negligent conduct, such executive officer will reimburse or forfeit to HoldCo the amount of any bonus or incentive compensation (whether cash-based or equity-based) such executive officer received during a fixed period, as determined by the Compensation Committee, preceding the year the restatement is determined to be required. That executive officer shall forfeit or reimburse to HoldCo any bonus or incentive compensation to the extent that such bonus or incentive compensation exceeds what the officer would have received in that period based on an applicable restated performance measure or target. HoldCo will recoup incentive-based compensation from executive officers to the extent required under the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules, regulations and listing standards that may be issued under that act.

**Certain Federal Income Tax Aspects of Awards Under the 2021 Plan**

This is a brief summary of the federal income tax aspects of awards that may be made under the 2021 Plan based on existing U.S. federal income tax laws. This summary provides only the basic tax rules. It does not describe a number of special tax rules, including the alternative minimum tax and various elections that may be applicable under certain circumstances. It also does not reflect provisions of the income tax laws of any municipality, state or foreign country in which a holder may reside, nor does it reflect the tax consequences of a holder's death or purport to describe any applicable employment taxes. The tax consequences of awards under the 2021 Plan depend upon the type of award.

*Incentive Stock Options.*    The recipient of an ISO generally will not be taxed upon the grant or exercise of the ISO. Federal income taxes are generally imposed only when the HoldCo ordinary shares from an exercised ISO are disposed of, by sale or otherwise. The amount by which the fair market value of HoldCo ordinary shares on the date of exercise exceeds the exercise price is, however, included in determining the option recipient's liability for the alternative minimum tax. If the ISO recipient does not sell or dispose of the HoldCo ordinary shares until more than one year after the receipt of the shares and two years after the ISO was granted, then, upon sale or disposition of the shares, the difference between the exercise price and the amount realized upon the sale or disposition of such shares will be treated as a long-term capital gain (or loss). If a recipient fails to hold the shares for the minimum required time, the recipient will recognize ordinary income in the year of disposition generally in an amount equal to any excess of the market value of HoldCo ordinary shares on the date of exercise (or, if less, the amount realized on the sale or disposition of the shares) over the exercise price paid for the shares. Any further gain (or loss) realized by the recipient generally will be taxed as short-term or long-term gain (or loss) depending on the holding period. HoldCo will generally be entitled to a tax deduction at the same time and in the same amount as ordinary income is recognized by the option recipient.

*Nonstatutory Stock Options.*    The recipient of stock options not qualifying as ISOs generally will not be taxed upon the grant of the option. Federal income taxes are generally due from an NSO recipient when the

147

Exhibit 4
Page 251

Table of Contents

NSOs are exercised. The excess of the fair market value of HoldCo ordinary shares purchased on such date over the exercise price of the NSO is taxed as ordinary income. Thereafter, the tax basis for the acquired shares is equal to the amount paid for the shares plus the amount of ordinary income recognized by the recipient on exercise. We will generally be entitled to a tax deduction at the same time and in the same amount as ordinary income is recognized by the NSO recipient by reason of the exercise of the NSO.

*Other Awards.*    Recipients who receive restricted stock unit awards will generally recognize ordinary income when they receive shares upon settlement of the awards in an amount equal to the fair market value of the shares at that time. Recipients who receive awards of restricted shares subject to a vesting requirement will generally recognize ordinary income at the time vesting occurs in an amount equal to the fair market value of the shares at that time minus the amount, if any, paid for the shares. However, a recipient who receives restricted shares which are not vested may, within 30 days of the date the shares are transferred, elect in accordance with Section 83(b) of the Code to recognize ordinary compensation income at the time of transfer of the shares rather than upon the vesting dates. Recipients who receive stock appreciation rights will generally recognize ordinary income upon exercise in an amount equal to the excess of the fair market value of the underlying HoldCo ordinary shares on the exercise date over the exercise price. HoldCo will generally be entitled to a tax deduction at the same time and in the same amount as ordinary income is recognized by the recipient.

*Application of Section 409A of the Code.*    Section 409A of the Code imposes an additional 20% tax and interest on an individual receiving non-qualified deferred compensation under a plan that fails to satisfy certain requirements. While the awards to be granted pursuant to the 2021 Plan are expected to be designed in a manner intended to comply with the requirements of Section 409A of the Code if they are not exempt from coverage under such section, if they do not, a participant could be subject to additional taxes and interest.

### 2021 Plan Benefits

Grants of awards under the 2021 Plan are subject to the discretion of the Compensation Committee. Therefore, it is not possible to determine the future benefits that will be received by these participants under the 2021 Plan.

### Interests of SC Health's Directors and Officers in the Incentive Plan Proposal

When you consider the recommendation of SC Health's board of directors in favor of approval of the 2021 Plan, you should keep in mind that certain of SC Health's board of directors and officers have interests in the 2021 Plan that are different from, or in addition to, your interests as a shareholder or warrant holder, including, among other things, the existence of financial and personal interests. See the section entitled "*The Business Combination—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

### Registration with the SEC

If the 2021 Plan is approved by SC Health's shareholders and becomes effective, HoldCo intends to file a registration statement on Form S-8 registering the shares reserved for issuance under the 2021 Plan as soon as reasonably practicable after HoldCo becomes eligible to use such form.

### Vote Required for Approval

The ordinary resolution is being sought to approve the Incentive Plan, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting.

148

Exhibit 4
Page 252

Table of Contents

The Incentive Plan Proposal is conditioned on the approval of each of the BCA Proposal and the Merger Proposal. Therefore, if each of such Proposals are not approved, the Incentive Plan will have no effect, even if approved by holders of ordinary shares.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution (the "Incentive Plan Proposal" or "Proposal No. 3") to consider and vote upon a proposal to approve, assuming the BCA Proposal and Merger Proposal are approved, the Rockley Photonics Holdings Limited 2021 Stock Incentive Plan (the "2021 Plan"), a copy of which is attached to the accompanying prospectus/proxy statement as Annex H, including the authorization of the share reserve under the 2021 Plan.

**Recommendation of SC Health's Board of Directors**

**THE SC HEALTH BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SC HEALTH SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE INCENTIVE PLAN PROPOSAL.**

The existence of financial and personal interests of one or more of SC Health's board of directors may result in a conflict of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of SC Health and its shareholders and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

149

Exhibit 4
Page 253

**Table of Contents**

**PROPOSAL NO. 4—ESPP PROPOSAL**

**The Background of the ESPP**

On March 31, 2021, HoldCo's board of directors approved and adopted, subject to shareholder approval, the Rockley Photonics Holdings Limited 2021 Employee Stock Purchase Plan (the "ESPP"), effective as of and contingent on the closing of the Business Combination. If the ESPP is approved by shareholders, HoldCo will be authorized to provide eligible employees with an opportunity to request payroll deductions to purchase a number of HoldCo ordinary shares at a discount and in an amount determined in accordance with the ESPP's terms. A copy of the ESPP is attached to this prospectus/proxy statement as Annex I.

**Purpose of the ESPP**

The purpose of the ESPP is to provide a broad-based employee benefit to attract the services of new employees, to retain the services of existing employees, and to provide incentives for such individuals to exert maximum efforts toward our success by purchasing HoldCo ordinary shares from HoldCo on favorable terms and to pay for such purchases through payroll deductions. HoldCo believes by providing eligible employees with an opportunity to increase their proprietary interest in the success of HoldCo, the ESPP will motivate recipients to offer their maximum effort to HoldCo and help focus them on the creation of long-term value consistent with the interests of the HoldCo shareholders.

**Reasons for the Approval of the ESPP Proposal**

Shareholder approval of the ESPP is necessary in order for HoldCo to satisfy the shareholder approval requirements under Section 423 of the Code.

**Consequences if the ESPP Proposal is Not Approved**

If the ESPP Proposal is not approved by shareholders, the ESPP will not become effective and employees of HoldCo will not be able to purchase HoldCo ordinary shares under the ESPP. Additionally, HoldCo believes its ability to recruit, retain and incentivize top talent will be adversely affected if the ESPP Proposal is not approved.

**Summary of the Material Terms of the ESPP**

The material terms of the ESPP, as currently contemplated by HoldCo's board of directors, are summarized below. A copy of the ESPP is attached to this prospectus/proxy statement as Annex I. This summary is qualified in its entirety by reference to the complete text of the ESPP. HoldCo's shareholders are being asked to approve the ESPP as presented. If the terms of the ESPP are materially amended in a manner that would require shareholder approval Section 423 of the Code, shareholders will be asked to approve such material amendment.

*General.*    The ESPP is intended to qualify as an "employee stock purchase plan" under Code Section 423, except as explained below under heading "*—Summary of Material Terms of the ESPP—International Participation*." During regularly scheduled "offerings" under the ESPP, participants will be able to request payroll deductions and then expend the accumulated deduction to purchase a number of HoldCo ordinary shares at a discount and in an amount determined in accordance with the ESPP's terms.

*Shares Available for Issuance.*    The ESPP will have 1,526,239 authorized but unissued or reacquired HoldCo ordinary shares reserved for issuance under the ESPP after the closing of the Business Combination, plus an additional number of shares to be reserved annually on the first day of each fiscal year for a period of not more than ten years, beginning on January 1, 2022, in an amount equal to the least of (i) one percent (1%) of the outstanding HoldCo ordinary shares on such date (ii) 7,631,196 shares, or (iii) a lesser amount (including zero) that the Compensation Committee (as defined below) determines for purposes of the annual increase for that fiscal year

150

Exhibit 4
Page 254

**Table of Contents**

*Administration.*    The ESPP will be administered by the Compensation Committee, or by HoldCo's board of directors acting as the Compensation Committee. The Compensation Committee has the authority to construe, interpret and apply the terms of the ESPP, to determine eligibility, to establish such limitations and procedures as it determines are consistent with the ESPP and to adjudicate any disputed claims under the ESPP.

*Eligibility.*    Each employee of HoldCo and any of its participating subsidiaries who is employed by HoldCo (or its participating subsidiaries) on the day preceding the start of any offering period, will be eligible to participate in the ESPP. The ESPP requires that any such employee customarily work more than twenty (20) hours per week and more than five (5) months per calendar year with HoldCo (or its participating subsidiaries) in order to be eligible to participate in the ESPP. The ESPP will permit an eligible employee to purchase HoldCo ordinary shares through payroll deductions, which may not be less than one percent (1%) nor more than fifteen percent (15%) of the employee's compensation, or such lower limit as may be determined by the Compensation Committee from time to time. However, no employee is eligible to participate in the ESPP if, immediately after electing to participate, the employee would own stock (including stock such employee may purchase under this plan or other outstanding options) representing five percent (5%) or more of the total combined voting power or value of all classes of HoldCo's stock. No employee will be able to purchase more than five thousand (5,000) shares, or such number of shares as may be determined by the Compensation Committee with respect to a single offering period, or purchase period, if applicable. In addition, no employee is permitted to accrue, under the ESPP and all similar purchase plans of HoldCo or its subsidiaries, a right to purchase stock of the HoldCo having a value in excess of $25,000 of the fair market value of such stock (determined at the time the right is granted) for each calendar year. Employees will be able to withdraw their accumulated payroll deductions prior to the end of the offering period in accordance with the terms of the offering. Participation in the ESPP will end automatically on termination of employment.

*Offering Periods and Purchase Price.*    The ESPP will be implemented through a series of offerings of purchase rights to eligible employees. Under the ESPP, the Compensation Committee may specify offerings with a duration of not more than 27 months and may specify shorter purchase periods within each offering. During each purchase period, payroll deductions will accumulate, without interest. On the last day of the purchase period, accumulated payroll deductions will be used to purchase HoldCo ordinary shares for employees participating in the offering.

The purchase price will be specified pursuant to the offering, but cannot, under the terms of the ESPP, be less than eighty-five percent (85%) of the fair market value per HoldCo ordinary share on either the offering date or on the purchase date, whichever is less. The fair market value of HoldCo ordinary shares for this purpose will generally be the closing price on the NYSE (or such other exchange as the HoldCo ordinary shares may be traded at the relevant time) for the date in question, or if such date is not a trading day, for the last trading day before the date in question.

*Reset Feature.*    The Compensation Committee may specify that, if the fair market value of a HoldCo ordinary shares on any purchase date within a particular offering period is less than or equal to the fair market value on the start date of that offering period, then the offering period will automatically terminate and the employee in that offering period will automatically be transferred and enrolled in a new offering period which will begin on the next day following such purchase date.

*Changes to Capital Structure.*    In the event that there is a specified type of change in HoldCo's capital structure, such as a stock split, appropriate adjustments will be made to (1) the number of shares reserved under the ESPP, (2) the individual and aggregate participant share limitations described in the plan and (3) the price of shares that any participant has elected to purchase.

*International Participation.*    To provide HoldCo with greater flexibility in structuring HoldCo's equity compensation programs for HoldCo's non-U.S. employees, the ESPP also permits HoldCo to grant employees of HoldCo's non-U.S. subsidiary entities rights to purchase HoldCo ordinary shares pursuant to other offering rules

151

Exhibit 4
Page 255

**Table of Contents**

or sub-plans adopted by the Compensation Committee in order to achieve tax, securities law or other compliance objectives. While the ESPP is intended to be a qualified "employee stock purchase plan" within the meaning of Code Section 423, any such international sub-plans or offerings are not required to satisfy those U.S. tax code requirements and therefore may have terms that differ from the ESPP terms applicable in the U.S. However, the international sub-plans or offerings are subject to the ESPP terms limiting the overall shares available for issuance, the maximum payroll deduction rate, maximum purchase price discount and maximum offering period length.

*Corporate Reorganization.* Immediately before a corporate reorganization, the offering period and purchase period then in progress shall terminate and either HoldCo ordinary shares will be purchased with the accumulated payroll deductions or the accumulated payroll deductions will be refunded without occurrence of any HoldCo ordinary shares purchase, unless the surviving corporation (or its parent corporation) assumes the ESPP under the plan of merger or consolidation.

*Amendment and Termination.* HoldCo's board of directors and the Compensation Committee will each have the right to amend, suspend or terminate the ESPP at any time. Any increase in the aggregate number of shares of stock to be issued under the ESPP is subject to shareholder approval. Any other amendment is subject to shareholder approval only to the extent required under applicable law or regulation, including Section 423 of the Code.

**Certain Federal Income Tax Consequences of Participating in the ESPP**

The following brief summary of the effect of U.S. federal income taxation upon the participant and the Company with respect to the shares purchased under the ESPP does not purport to be complete and does not discuss the tax consequences of a participant's death or the income tax laws of any state, local or non-U.S. jurisdiction in which the participant may reside which laws will vary depending upon the particular jurisdiction or jurisdictions involved. In particular, participants who are stationed outside of the United States may be subject to foreign taxes as a result of participation in the ESPP. The ESPP, and the right of U.S. participants to make purchases thereunder, is intended to qualify under the provisions of Sections 421 and 423 of the Code. Under these provisions, no income will be taxable to a participant until the shares purchased under the ESPP are sold or otherwise disposed of. Upon sale or other disposition of the shares, the participant generally will be subject to tax in an amount that depends upon whether the sale occurs before or after expiration of the holding periods described in the following sentence. If the shares are sold or otherwise disposed of more than two years from the first day of the applicable offering and one year from the applicable date of purchase, the participant will recognize ordinary income measured as the lesser of (1) the excess of the fair market value of the shares at the time of such sale or disposition over the purchase price, or (2) the excess of the fair market value of a share on the offering date that the right was granted over the purchase price for the right as determined on the offering date. Any additional gain will be treated as long term capital gain. If the shares are sold or otherwise disposed of before the expiration of either of these holding periods, the participant will recognize ordinary income generally measured as the excess of the fair market value of the shares on the date the shares are purchased over the purchase price. Any additional gain or loss on such sale or disposition will be long-term or short-term capital gain or loss, depending on how long the shares have been held from the date of purchase. The Company generally is not entitled to a deduction for amounts taxed as ordinary income or capital gain to a participant except to the extent of ordinary income recognized by participants upon a sale or disposition of shares prior to the expiration of the holding periods described above.

The tax consequences to a participant may vary depending upon the participant's individual situation. In addition, various state and local laws may provide for tax consequences that vary significantly from those described above.

152

Exhibit 4
Page 256

Table of Contents

**ESPP Benefits**

Purchase rights are subject to an eligible employee's discretion, including an employee's decision not to participate in the ESPP, and awards under the ESPP are not determinable. Directors who are not employees are not eligible to participate in, and will not receive any benefit under, the ESPP.

**Interests of Directors and Officers in the ESPP Proposal**

When you consider the recommendation of SC Health's board of directors in favor of approval of the ESPP, you should keep in mind that certain of HoldCo's directors and officers have interests in the ESPP that are different from, or in addition to, your interests as a shareholder or warrant holder, including, among other things, the existence of financial and personal interests. See the section entitled "*The Business Combination—Interests of HoldCo's Directors and Officers in the Business Combination*" for a further discussion.

**Registration with the SEC**

If the ESPP is approved by SC Health's shareholders and becomes effective, HoldCo intends to file a registration statement on Form S-8 registering the shares reserved for issuance under the ESPP as soon as reasonably practicable after HoldCo becomes eligible to use such form.

**Vote Required for Approval**

An ordinary resolution is being sought to approve the ESPP, being the affirmative vote of a simple majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting.

The ESPP Proposal is conditioned on the approval of each of the BCA Proposal and the Merger Proposal. Therefore, if each of such Proposals is not approved, the ESPP will have no effect, even if approved by holders of ordinary shares.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution (the "ESPP Proposal" or "Proposal No. 4") to consider and vote upon a proposal to approve, assuming the BCA Proposal and Merger Proposal are approved, the Rockley Photonics Holdings Limited 2021 Employee Share Purchase Plan (the "ESPP"), a copy of which is attached to the accompanying prospectus/proxy statement as Annex I, including the authorization of the initial share reserve under the ESPP.

**Recommendation of SC Health's Board of Directors**

**THE SC HEALTH BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SC HEALTH SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE ESPP PROPOSAL.**

The existence of financial and personal interests of one or more of SC Health's board of directors may result in a conflict of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of SC Health and its shareholders and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, SC Health's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

153

Exhibit 4
Page 257

**Table of Contents**

## PROPOSAL NO. 5—ADJOURNMENT PROPOSAL

The Adjournment Proposal allows SC Health's board of directors to submit a proposal to approve, by ordinary resolution, the adjournment of the General Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that, based on the tabulated votes, there are not sufficient votes at the time of the General Meeting to approve the Condition Precedent Proposals. See "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*."

### Consequences if the Adjournment Proposal is Not Approved

If the Adjournment Proposal is presented to the General Meeting and is not approved by the shareholders, SC Health's board of directors may not be able to adjourn the General Meeting to a later date in the event that, based on the tabulated votes, there are not sufficient votes at the time of the General Meeting to approve the Condition Precedent Proposals. In such events, the Business Combination would not be completed.

The Adjournment Proposal is not conditioned upon any other proposal.

### Vote Required for Approval

The approval of the Adjournment Proposal requires an ordinary resolution under the SC Health Governing Documents, being the affirmative vote of a majority of the SC Health ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the General Meeting. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the General Meeting.

The Adjournment Proposal is not conditioned upon any other proposal.

### Resolution

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution, to adjourn the General Meeting to a later date or dates (A) in order to solicit additional proxies from SC Health shareholders in favor of the BCA Proposal or the Merger Proposal, (B) if as of the time for which the General Meeting is scheduled, there are insufficient SC Health Ordinary Shares represented (either in person or by proxy) to constitute a quorum necessary to conduct business at the General Meeting or (C) to allow reasonable time for the filing or mailing of any supplemental or amended disclosures that SC Health has determined, based on the advice of outside legal counsel, is reasonably likely to be required under applicable law and for such supplemental or amended disclosure to be disseminated and reviewed by SC Health shareholders prior to the General Meeting.

### Recommendation of the SC Health Board of Directors

**SC HEALTH'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE ADJOURNMENT PROPOSAL.**

The existence of financial and personal interests of SC Health's directors may result in a conflict of interest on the part of one or more of the directors between what he, she or they may believe is in the best interests of SC Health and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining to recommend that shareholders vote for the proposals. See the section entitled "*Proposal No. 1—BCA Proposal—Interests of SC Health's Directors and Officers in the Business Combination*" for a further discussion.

154

Exhibit 4
Page 258

Table of Contents

**CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS**

The following discussion is a summary of certain material U.S. federal income tax considerations applicable to you if you are a U.S. Holder (as defined below) solely of SC Health Class A ordinary shares and/or SC Health public warrants (other than the Sponsor or any of its affiliates), as a consequence of (i) electing to have your SC Health Class A ordinary shares redeemed for cash if the Business Combination is completed, (ii) the Business Combination, and/or (iii) the ownership and disposition of HoldCo ordinary shares and HoldCo warrants after the Business Combinations. This discussion addresses only those U.S. Holders that hold SC Health Class A ordinary shares and/or SC Health public warrants as a capital asset (generally, property held for investment).

This discussion is limited to U.S. federal income tax considerations and does not address estate or any gift tax considerations or considerations arising under the tax laws of any state, local or non-U.S. jurisdiction. This discussion does not describe all of the U.S. federal income tax consequences that may be relevant to particular investors in light of their particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income and the different consequences that may apply to investors subject to special rules under U.S. federal income tax law, such as:

- financial institutions,
- insurance companies,
- specified non-U.S. corporations including "controlled foreign corporations," and "passive foreign investment companies" (each as defined in the Code) or corporations that accumulate earnings to avoid U.S. federal income tax,
- mutual funds,
- pension plans,
- S corporations,
- broker-dealers,
- traders in securities, including taxpayers subject to mark-to-market treatment,
- regulated investment companies,
- real estate investment trusts,
- trusts and estates,
- tax-exempt organizations (including private foundations), partnerships (including entities or arrangements treated as partnerships for U.S. federal income tax purposes), governments or agencies or instrumentalities thereof (including foreign governments)
- investors that hold SC Health Class A ordinary shares or SC Health public warrants or who will hold HoldCo ordinary shares or HoldCo warrants as part of a "straddle," "hedge," "conversion," "synthetic security," "constructive ownership transaction," "constructive sale" or other integrated transaction for U.S. federal income tax purposes,
- investors subject to the alternative minimum tax provisions of the Code,
- U.S. Holders that have a functional currency other than the U.S. dollar,
- U.S. expatriates or former long-term residents of the United States,
- investors subject to the U.S. "inversion" rules,
- U.S. Holders owning or considered as owning (directly, indirectly, or through attribution) 5 percent (measured by vote or value) or more of the SC Health Class A ordinary shares, or, following the Business Combination, HoldCo ordinary shares, or the Sponsor or its affiliates,

155

Exhibit 4
Page 259

Table of Contents

- persons who purchase HoldCo ordinary shares as part of the PIPE Financing,

- persons who received any SC Health or HoldCo interests pursuant to an exercise of employee options, in connection with employee incentive plans or otherwise as compensation, and

- persons who are not U.S. Holders, all of whom may be subject to tax rules that differ materially from those summarized below.

This summary does not discuss any state, local, or non-U.S. tax considerations, any non-income tax (such as gift or estate tax) considerations, the alternative minimum tax or the Medicare tax on net investment income. In addition, this summary does not address any tax consequences to investors that directly or indirectly hold equity interests in Rockley prior to the Business Combination, including holders of SC Health Class A ordinary shares or SC Health public warrants that also hold, directly or indirectly, equity interests in Rockley. With respect to the consequences of holding HoldCo ordinary shares or HoldCo warrants, this discussion is limited to U.S. Holders who acquire such HoldCo ordinary shares in connection with the Business Combination or as a result of the exercise of a HoldCo warrant, and U.S. Holders who acquire such HoldCo warrants in connection with the Business Combination.

If a partnership (or any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds SC Health Class A ordinary shares or SC Health public warrants or HoldCo ordinary shares or HoldCo warrants, the tax treatment of such partnership and a person treated as a partner in such partnership will generally depend on the status of the partner, the activities of the partnership and the partner and certain determinations made at the partner level. If you are a partner of a partnership holding SC Health Class A ordinary shares or SC Health public warrants or HoldCo ordinary shares or HoldCo warrants, you are urged to consult your tax advisor regarding the tax consequences to you of a redemption, the Business Combination and/or the ownership and disposition of HoldCo ordinary shares and HoldCo warrants by the partnership.

This summary is based upon the Code, the regulations promulgated by the U.S. Treasury Department, current administrative interpretations and practices of the IRS, and judicial decisions, all as currently in effect and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax considerations described below.

For purposes of this discussion, because any SC Health unit consisting of one SC Health Class A ordinary share and one-half of an SC Health public warrant is separable at the option of the holder, SC Health treats any SC Health Class A ordinary shares and one-half of an SC Health public warrant held by a U.S. Holder in the form of a single unit as separate instruments and is assuming that the SC Health unit itself will not be treated as an integrated instrument. Accordingly, the separation of an SC Health unit in connection with the closing of the Business Combination generally should not be a taxable event for U.S. federal income tax purposes. This position is not free from doubt, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a contrary position. U.S. Holders of SC Health Class A ordinary shares and SC Health public warrants are urged to consult their tax advisors concerning the U.S. federal, state, local and any non-U.S. tax consequences of the transactions contemplated by the Business Combination (including any Redemption (as defined below)) with respect to any SC Health Class A ordinary shares and SC Health public warrants held through an SC Health unit (including alternative characterizations of an SC Health unit).

SC Health has not sought, and does not intend to, seek any rulings from the IRS as to any U.S. federal income tax considerations described herein. There can be no assurance that the IRS will not take positions inconsistent with the considerations discussed below or that any such positions would not be sustained by a court.

**THIS DISCUSSION IS ONLY A SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS ASSOCIATED WITH THE EXERCISE OF REDEMPTION RIGHTS WITH RESPECT TO THE SC HEALTH CLASS A ORDINARY SHARES AND WITH THE BUSINESS**

156

Exhibit 4
Page 260

Table of Contents

**COMBINATION. EACH U.S. HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PARTICULAR TAX CONSEQUENCES TO SUCH HOLDER OF THE EXERCISE OF SUCH REDEMPTION RIGHTS AND OF THE BUSINESS COMBINATION, INCLUDING THE APPLICABILITY AND EFFECTS OF U.S. FEDERAL NON-INCOME, STATE AND LOCAL AND NON-U.S. TAX LAWS.**

As used herein, a "U.S. Holder" is a beneficial owner of SC Health Class A ordinary shares or SC Health public warrants, or of HoldCo ordinary shares or HoldCo warrants, as the case may be, that is:

- an individual who is a citizen or resident (for U.S. federal income tax purposes) of the United States;

- a corporation (or other entity that is treated as a corporation for U.S. federal income tax purposes) that is created or organized (or treated as created or organized) in or under the laws of the United States or any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income tax regardless of its source; or

- a trust if (1) a U.S. court can exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of the trust or (2) a valid election is in place to treat the trust as a United States person.

*Tax Consequences for U.S. Holders Exercising Redemption Rights*

The following discussion assumes that any redemption of SC Health Class A ordinary shares pursuant to the redemption provisions described in the section entitled "*General Meeting of SC Health—Redemption Rights*" (a "Redemption") is treated as a transaction that is separate from the other transactions contemplated by the Business Combination. Such treatment is not free from doubt, particularly if you elect to redeem some, but not all, of the SC Health Class A ordinary shares held by you immediately prior to the Business Combination. See "*—Tax Consequences of the Merger to U.S. Holders*" below for more information. You are urged to consult your tax advisor regarding the tax consequences to you of electing to redeem some, but not all, of the SC Health Class A ordinary shares held by you.

*Redemption of SC Health Class A Ordinary Shares*

If you are a U.S. Holder and elect to redeem some or all of your SC Health Class A ordinary shares in a Redemption, subject to the discussion of the PFIC rules below, the treatment of the transaction for U.S. federal income tax purposes will generally depend on whether the Redemption qualifies as a "sale" of the SC Health Class A ordinary shares under Section 302 of the Code taxable as described below under the heading "*—Taxable Sale or Exchange of SC Health Class A Ordinary Shares,*" or rather as a "distribution" taxable as described below under the heading "*—Taxation of Distributions.*" Generally, whether the Redemption by a U.S. Holder qualifies for such sale or distribution treatment will depend largely on the total number of shares of SC Health's stock held or treated as held by the U.S. Holder (including any stock constructively owned by the U.S. Holder as a result of owning SC Health public warrants) immediately after the Redemption, relative to the shares of SC Health stock held or treated as held by the U.S. Holder immediately before such Redemption. A Redemption of SC Health Class A ordinary shares generally will be treated as a sale of SC Health Class A ordinary shares (rather than as a distribution) if the Redemption (i) is "substantially disproportionate" with respect to the U.S. Holder, (ii) results in a "complete termination" of the U.S. Holder's interest in SC Health or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. Holder, in each case for U.S. federal income tax purposes.

In determining whether any of the foregoing tests is satisfied, a U.S. Holder generally takes into account not only the shares of SC Health's stock actually owned by the U.S. Holder, but also any shares of SC Health's stock that are constructively owned by the U.S. Holder. A U.S. Holder may constructively own, in addition to SC Health stock owned directly, SC Health stock owned by certain related individuals and entities in which the U.S.

157

Exhibit 4
Page 261

**Table of Contents**

Holder has an interest or that have an interest in such U.S. Holder, as well as any stock the U.S. Holder has a right to acquire by exercise of an option, which would generally include SC Health Class A ordinary shares which could be acquired pursuant to the exercise of any SC Health public warrants held by the U.S. Holder (and, after the completion of the Business Combination, HoldCo ordinary shares which could be acquired by exercise of the HoldCo warrants).

In order to meet the "substantially disproportionate" test, the percentage of the outstanding voting stock of SC Health actually and constructively owned by the U.S. Holder immediately following the Redemption of SC Health Class A ordinary shares must, among other requirements, be less than 80% of such voting stock actually and constructively owned by the U.S. Holder immediately before the Redemption. Prior to the Business Combination, the SC Health Class A ordinary shares may not be treated as voting stock for this purpose and, consequently, this "substantially disproportionate" test may not be applicable. There will be a "complete termination" of a U.S. Holder's interest if either (i) all of the shares of SC Health's stock actually and constructively owned by the U.S. Holder are redeemed or (ii) all of the shares of SC Health's stock actually owned by the U.S. Holder are redeemed, and the U.S. Holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of SC Health stock owned by certain family members, and the U.S. Holder does not constructively own any other SC Health stock (such as through a legal entity or by continuing to hold SC Health public warrants) and certain other requirements are met. A Redemption of the SC Health Class A ordinary shares will not be essentially equivalent to a dividend if a U.S. Holder's Redemption results in a "meaningful reduction" of the U.S. Holder's proportionate interest in SC Health. Whether the Redemption will result in a "meaningful reduction" in a U.S. Holder's proportionate interest in SC Health will depend on the particular facts and circumstances. The IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction."

If none of the foregoing tests is satisfied, the Redemption generally will be treated as a "distribution" and the tax effects will be as described below under "—*Taxation of Distributions.*"

U.S. Holders of the SC Health Class A ordinary shares considering exercising their Redemption rights are urged to consult their tax advisors to determine whether the Redemption of their SC Health Class A ordinary shares would be treated as a sale or as a distribution under the Code as described above.

*Taxable Sale or Exchange of SC Health Class A Ordinary Shares*

Subject to the discussion of the PFIC rules below, if a Redemption of an SC Health Class A ordinary share by any U.S. Holder qualifies as a sale of an SC Health Class A ordinary share (rather than a distribution with respect to such SC Health Class A ordinary share), a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between (i) the cash received in the Redemption of such SC Health Class A ordinary share and (ii) the U.S. Holder's adjusted tax basis in such SC Health Class A ordinary share. Any such gain or loss generally will be capital gain or loss. Such gain or loss generally will be long-term capital gain or loss if the U.S. Holder's holding period for such SC Health Class A ordinary share exceeds one year. A U.S. Holder's adjusted tax basis in an SC Health Class A ordinary share generally will equal the U.S. Holder's acquisition cost of such share (which, if such share was acquired as part of an SC Health unit, is the portion of the purchase price of the SC Health unit allocated to such share or, if such share was received upon exercise of an SC Health public warrant, the initial basis of the SC Health Class A ordinary share upon the exercise of the SC Health public warrant (generally determined as described below in "—*Tax Consequences of Ownership and Disposition of HoldCo Ordinary Shares and HoldCo Warrants—Exercise or Lapse of a Warrant*"). Long-term capital gain realized by a non-corporate U.S. Holder generally will be taxable at a reduced rate. The deduction of capital losses is subject to limitations.

158

Exhibit 4
Page 262

Table of Contents

*Taxation of Distributions*

Subject to the PFIC rules discussed below, if a Redemption of an SC Health Class A ordinary share by any U.S. Holder is taxable as a distribution for U.S. federal income tax purposes, such distribution generally will be taxable as a dividend for U.S. federal income tax purposes to the extent paid from SC Health's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of SC Health's current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. Holder's adjusted tax basis in its SC Health Class A ordinary shares and generally will not be taxable. Any remaining excess will be treated as gain realized on the sale or other disposition of the SC Health Class A ordinary share and will be treated as described above under "*—Taxable Sale or Exchange of SC Health Class A Ordinary Shares*." Amounts treated as dividends that SC Health pays to a U.S. Holder that is taxable as a corporation generally will be taxed at regular rates and will not qualify for the dividends received deduction generally allowed to U.S. corporations in respect of dividends received from other U.S. corporations. With respect to non-corporate U.S. Holders, under tax laws currently in effect and subject to certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), dividends generally will be taxed at the lower applicable long-term capital gains rate only if SC Health Class A ordinary shares are readily tradable on an established securities market in the United States, SC Health is not treated as a PFIC at the time the dividend was paid or in the preceding year and provided certain holding period requirements are met. Because SC Health believes it is likely that SC Health will have been a PFIC for the most recent taxable year at the time of the Redemption (as discussed below under "*—Tax Consequences of the Merger to U.S. Holders—PFIC Considerations*") dividends SC Health pays to a non-corporate U.S. Holder generally will not constitute "qualified dividends" that would be taxable at a reduced rate.

**IF YOU ARE A HOLDER OF SC HEALTH CLASS A ORDINARY SHARES CONTEMPLATING EXERCISE OF YOUR REDEMPTION RIGHTS, SC HEALTH URGES YOU TO CONSULT YOUR TAX ADVISOR CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES THEREOF.**

***Tax Consequences of the Merger to U.S. Holders***

This section is subject in its entirety to the discussion in the section below entitled "*—Tax Consequences of Ownership and Disposition of HoldCo Ordinary Shares and HoldCo Warrants—Passive Foreign Investment Company Rules*." This section is addressed to U.S. Holders of SC Health Class A ordinary shares that elect to participate in the Business Combination. The parties to the Business Combination intend that (i) the Exchange and the Merger collectively qualify as a transaction described in Section 351 of the Code and (ii) that the Merger constitutes a transaction treated as a "reorganization" within the meaning of Section 368(a) of the Code. To qualify as a reorganization, a transaction must satisfy certain requirements, including, among others, that the acquiring corporation (or, in the case of certain reorganizations structured similarly to the Business Combination, its corporate parent) continue, either directly or indirectly through certain controlled corporations, either a significant line of the acquired corporation's historic business or use a significant portion of the acquired corporation's historic business assets in a business, in each case, within the meaning of Treasury Regulations Section 1.368-1(d). HoldCo (the parent of Merger Sub, the acquiring corporation) intends to continue a significant line of SC Health's historic business, or use a significant portion of SC Health's historic business assets in a business, within the meaning of the regulations. However, there are significant factual and legal uncertainties as to whether the Merger will satisfy this requirement and, in turn, qualify as a reorganization. Neither SC Health nor HoldCo intends to request a ruling from the IRS regarding the U.S. federal income tax treatment of the Business Combination, and the IRS or a court could take a different position. U.S. Holders of SC Health Class A ordinary shares and SC Health public warrants are urged to consult their tax advisors regarding the proper U.S. federal income tax treatment of the Business Combination, including with respect to its qualification as a "reorganization" within the meaning of Section 368(a) of the Code.

159

Exhibit 4
Page 263

Table of Contents

*Consequences of the SC Health Merger Being Treated as a Reorganization or Code Section 351 Transaction*

Subject to the discussion in the following paragraph and the discussions under the headings "—*Additional Requirements for Tax Deferral*" and "—*PFIC Considerations*" below, if, as intended by the parties, the Merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, (i) no gain or loss would be recognized by a U.S. Holder of SC Health Class A ordinary shares who exchanges such shares solely for HoldCo ordinary shares pursuant to the Merger, and, in such case, the U.S. Holder would have an adjusted tax basis of the HoldCo ordinary shares received in the SC Health Merger equal to the adjusted tax basis of the SC Health Class A ordinary shares surrendered in exchange therefor (determined in U.S. dollars), (ii) the holding period of the HoldCo ordinary shares received in the SC Health Merger by such a U.S. Holder would include the period during which such shares were held on the date of the Merger and (iii) any U.S. Holder that exchanges SC Health public warrants for HoldCo warrants in connection with the Merger also would not recognize gain or loss on such exchange, and, in such case, the U.S. Holder's tax basis in the HoldCo warrant received would be equal to the holder's tax basis in the SC Health public warrant exchanged therefor (determined in U.S. dollars), and the holding period of such HoldCo warrant would include the holding period of the SC Health public warrant exchanged therefor.

If the Merger does not so qualify as a "reorganization" within the meaning of Section 368(a) of the Code, but the Exchange and the Merger collectively qualify as a transaction described in Section 351 of the Code, then the tax treatment would be same with respect to clauses (i) and (ii) of the previous paragraph, but a U.S. Holder that exchanges SC Health public warrants for HoldCo warrants in connection with the Merger would recognize gain or loss on such exchange, and, in such case, a U.S. Holder's tax basis in the HoldCo warrant received in the Merger would be equal to the fair market value of such warrant at the time of the Merger, and a U.S. Holder's holding period in its HoldCo warrant would begin on the day after the Merger.

Notwithstanding the foregoing, if a U.S. Holder elects to participate in a Redemption with respect to some, but not all, of its SC Health Class A ordinary shares, such Redemption may be treated as integrated with the Merger rather than as a separate transaction. In such case, cash received by such U.S. Holder in a Redemption may be treated as taxable boot received in a reorganization (which, depending on the circumstances applicable to such U.S. Holder, may be treated as capital gain, taxable as described above under the heading "—*Taxable Sale or Exchange of SC Health Class A Ordinary Shares*," or dividend income to the extent of SC Health's accumulated earnings and profits, taxable as described above under the heading "—*Taxation of Distributions*") or in a Section 351 transaction (in which case gain may be recognized by such U.S. Holder in a manner similar to that described above under the heading "—*Taxable Sale or Exchange of SC Health Class A Ordinary Shares*," but not in excess of the amount of cash received). Under these characterizations, such U.S. Holder may be required to recognize more gain or income than if the Redemption of SC Health Class A ordinary shares were treated as a separate transaction from the Merger, and would not be entitled to recognize any loss with respect to its redeemed SC Health Class A ordinary shares.

In addition, if a U.S. Holder elects to participate in a Redemption with respect to all its SC Health Class A ordinary shares and also receives HoldCo warrants in exchange for SC Health public warrants in connection with the Merger, such Redemption also may be treated as integrated with the Merger rather than as a separate transaction. In such case, even if the Merger were treated as a "reorganization" within the meaning of Section 368(a) of the Code, and no gain or loss generally recognized upon the deemed exchange of SC Health public warrants for HoldCo warrants as described above, cash received by such U.S. Holder in a Redemption may be treated as taxable boot received in a reorganization (which, depending on the circumstances applicable to such U.S. Holder, may be treated as capital gain, taxable as described above under the heading "—*Taxable Sale or Exchange of SC Health Class A Ordinary Shares*," or dividend income to the extent of SC Health's accumulated earnings and profits, taxable as described above under the heading "—*Taxation of Distributions*"). Under this characterization, such U.S. Holder generally is expected to recognize capital gain (but not loss) on such exchange in an amount equal to the difference between the amount of cash received and such U.S. Holder's adjusted basis in the SC Health Class A ordinary shares exchanged therefor. This treatment

160

Exhibit 4
Page 264

**Table of Contents**

assumes that the terms of the transactions contemplated by the Business Combination (including any Redemption) specify that cash received in the Redemption will be received in exchange for SC Health Class A ordinary shares and that the HoldCo warrants received in the exchange will be received solely in exchange for SC Health public warrants, and that such terms will be considered economically reasonable for applicable tax purposes. If the IRS were to assert, and a court were to sustain a contrary position, such U.S. Holder may be required to recognize more gain or income than if the Redemption of SC Health Class A ordinary shares was treated as a separate transaction from the Merger.

*PFIC Considerations*

As discussed more fully below under "*—Tax Consequences of Ownership and Disposition of HoldCo Ordinary Shares and HoldCo Warrants—Passive Foreign Investment Company Rules*," if SC Health is a "passive foreign investment company" within the meaning of the Code ("PFIC") for any taxable year, U.S. Holders of SC Health Class A ordinary shares or SC Health warrants may be subject to adverse U.S. federal income tax consequences with respect to dispositions of, and distributions with respect to SC Health's stock, and may be subject to additional reporting requirements. Based upon the composition of SC Health's income and assets, SC Health believes that it is likely SC Health was a PFIC for the 2019 and 2020 taxable years and likely will be a PFIC for SC Health's current taxable year.

If SC Health is a PFIC, any income or gain recognized by a U.S. Holder electing to have its SC Health Class A ordinary shares Redeemed would generally be subject to a special tax and interest charge if the U.S. Holder did not make either a qualified electing fund ("QEF") election or a mark-to-market election for SC Health's first taxable year as a PFIC in which the U.S. Holder held (or was deemed to hold) such shares, or a QEF election along with an applicable purging election (collectively, the "PFIC Elections"). These rules are described more fully below under "*—Tax Consequences of Ownership and Disposition of HoldCo Ordinary Shares and HoldCo Warrants—Passive Foreign Investment Company Rules*."

In addition, Section 1291(f) of the Code requires, to the extent provided in Treasury Regulations, a U.S. person who disposes of stock of a PFIC to recognize gain (but not loss) notwithstanding any other provision of the Code. No final Treasury Regulations are currently in effect under Section 1291(f) of the Code. However, proposed Treasury Regulations under Section 1291(f) of the Code were proposed in 1992 with a retroactive effective date were they to be finalized in current form. If finalized in their current form, the proposed Treasury Regulations may require a U.S. Holder of SC Health Class A ordinary shares to recognize gain (which generally would be subject to the special tax and interest charge) if (i) SC Health were classified as a PFIC at any time during the U.S. Holder's holding period of such shares; (ii) the U.S. Holder did not timely make any of the PFIC Elections for all taxable years during the U.S. Holder's holding period while SC Health was classified as a PFIC; and (iii) HoldCo were not a PFIC in the taxable year that includes the day after the Merger. Although uncertainty exists as to whether, immediately following the Business Combination, HoldCo will be treated as a PFIC for U.S. federal income tax purposes, HoldCo believes that it will likely not be a PFIC for its current taxable year, but no assurance can be provided to that effect.

The application of the PFIC rules to SC Health public warrants is unclear. A proposed Treasury Regulation generally treats an "option" (which would include an SC Health public warrant) to acquire the stock of a PFIC as stock of the PFIC, while a final Treasury Regulation provides that the holder of an option is not entitled to make the PFIC Elections. If the proposed Treasury Regulation described in the previous sentence were to apply to a U.S. Holder of SC Health public warrants, and, if finalized in their current form, proposed Treasury Regulations under Section 1291(f) may require a U.S. Holder of SC Health public warrants to recognize gain (which would generally be subject to the special tax and interest charge) on a deemed exchange of SC Health public warrants for HoldCo warrants even if the exchange would have otherwise qualified for non-recognition treatment.

It is difficult to predict if the proposed Treasury Regulations under the PFIC rules will be adopted, whether such proposed Treasury Regulations will be adopted in their current form, and whether any such Treasury Regulations, as finally adopted, would be retroactive to the date of the Business Combination.

161

Exhibit 4
Page 265

Table of Contents

The rules dealing with PFICs discussed above are very complex and are affected by various factors in addition to those described above. Accordingly, you are strongly urged to consult your tax advisor concerning the application of the PFIC rules to your exchange of SC Health Class A ordinary shares and/or SC Health public warrants under your particular circumstances, including as a result of PFIC Elections such U.S. Holders may have made (or may wish to make for the taxable year including the Business Combination).

***Tax Consequences of Ownership and Disposition of HoldCo Ordinary Shares and HoldCo Warrants***

*Taxation of Dividends and Other Distributions on HoldCo Ordinary Shares*

Subject to the PFIC rules discussed below, the gross amount of distributions made by HoldCo to a U.S. Holder with respect to the HoldCo ordinary shares (including the amount of any taxes withheld therefrom) will generally be includable in the gross income of such U.S. Holder as dividend income on the date of receipt, but only to the extent that the distribution is paid out of HoldCo's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). With respect to corporate U.S. Holders, the dividends will generally not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from other U.S. corporations.

With respect to non-corporate U.S. Holders, including individual U.S. Holders, dividends will be taxed at the lower capital gains rate applicable to qualified dividend income, provided that (1) the HoldCo ordinary shares are readily tradable on an established securities market in the United States, or HoldCo is eligible for the benefits of an approved qualifying income tax treaty with the United States that includes an exchange of information program, (2) HoldCo is not a PFIC (as discussed below under "—*Passive Foreign Investment Company Rules*") for either the taxable year in which the dividend is paid or the preceding taxable year, and (3) certain holding period requirements are met. You are urged to consult your tax advisors regarding the availability of the lower rate for dividends paid with respect to HoldCo ordinary shares.

To the extent that the amount of the distribution exceeds HoldCo's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), it will be treated first as a non-taxable return of your tax basis in your HoldCo ordinary shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain. It is unclear whether HoldCo will calculate its earnings and profits under U.S. federal income tax principles. Therefore, a U.S. Holder should expect that a distribution will be treated as a dividend even if that distribution would otherwise be treated as a non-taxable return of capital or as capital gain under the rules described above.

*Taxation of Dispositions of HoldCo Ordinary Shares and HoldCo Warrants*

Subject to the PFIC rules discussed below, you will recognize taxable gain or loss on any sale, exchange or other taxable disposition of a HoldCo ordinary share and HoldCo warrants equal to the difference between the amount realized (in U.S. dollars) for the HoldCo ordinary share or HoldCo warrant and your tax basis (in U.S. dollars) therein. The gain or loss will be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held HoldCo ordinary shares for more than one year, you may be eligible for reduced tax rates on any such capital gains. The deductibility of capital losses is subject to limitations.

*Exercise, Lapse or Redemption of a HoldCo Warrant*

A U.S. Holder generally will not recognize taxable gain or loss on the acquisition of a HoldCo ordinary share upon exercise of a HoldCo warrant for cash. The U.S. Holder's tax basis in the HoldCo ordinary share received upon exercise of the HoldCo warrant generally will be an amount equal to the sum of the U.S. Holder's initial investment in the HoldCo warrant (i.e., its tax basis, calculated in U.S. dollars) and the exercise price. The U.S. Holder's holding period for HoldCo ordinary shares received upon exercise of the of

162

Exhibit 4
Page 266

**Table of Contents**

a HoldCo warrant will begin on the date following the date of exercise (or possibly the date of exercise) of the HoldCo warrant and will not include the period during which the U.S. Holder held the HoldCo warrant (or any SC Health public warrant exchanged therefor). If a HoldCo warrant is allowed to lapse unexercised, a U.S. Holder generally will recognize a capital loss equal to such U.S. Holder's tax basis in the warrant (calculated in U.S. dollars). Such loss will be long-term if the warrant has been held for more than one year.

The tax consequences of a cashless exercise of an SC Health public warrant are not clear under current law. A cashless exercise may be tax free, either because the exercise is not a realization event or because the exercise is treated as a recapitalization for United States federal income tax purposes. In either situation, a U.S. Holder's tax basis in the HoldCo ordinary shares received generally would equal the U.S. Holder's tax basis in the SC Health public warrants. If the cashless exercise were not a realization event, the U.S. Holder's holding period for HoldCo ordinary shares would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the HoldCo warrant and will not include the period during which the U.S. Holder held the HoldCo warrant (or any SC Health public warrant exchanged therefor). If the cashless exercise were treated as a recapitalization, the holding period of the HoldCo ordinary shares would include the holding period of the SC Health public warrants.

It is also possible that a cashless exercise may be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a portion of the SC Health public warrants to be exercised on a cashless basis could, for U.S. federal income tax purposes, be deemed to have been surrendered in consideration for the exercise price of the remaining SC Health public warrants, which would be deemed to be exercised. For this purpose, a U.S. Holder may be deemed to have surrendered a number of SC Health public warrants having an aggregate value equal to the exercise price for the total number of SC Health public warrants to be deemed exercised. Subject to the PFIC rules discussed below, the U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the fair market value of the SC Health public warrants deemed surrendered and the U.S. Holder's tax basis in such SC Health public warrants. In this case, a U.S. Holder's tax basis in the HoldCo ordinary shares received would equal such U.S. Holder's basis in the HoldCo warrants deemed exercised and the exercise price of such warrants. It is unclear whether a U.S. Holder's holding period for the HoldCo ordinary shares would commence on the date of such exercise or the day following such date.

Due to the absence of authority on the United States federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

Subject to the PFIC rules described below, a redemption of SC Health public warrants for SC Health Class A ordinary shares pursuant to the terms of such SC Health public warrants should be treated as a "recapitalization" within the meaning of Section 368(a)(1)(E) of the Code, although such treatment is not free from doubt. Accordingly, you should not recognize any gain or loss on the redemption of warrants for HoldCo ordinary shares. Your aggregate tax basis in the HoldCo ordinary shares received in the redemption should equal your aggregate tax basis in your warrants redeemed and your holding period for the HoldCo ordinary shares received in redemption of your warrants should include your holding period for your surrendered warrants.

Subject to the PFIC rules described below, if SC Health redeems SC Health public warrants for cash pursuant to the redemption provisions of such warrants or if SC Health purchases warrants in an open market transaction, such redemption or purchase generally will be treated as a taxable disposition to the U.S. Holder, taxed as described above under "*—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of HoldCo Ordinary Shares and HoldCo Warrants.*"

163

Exhibit 4
Page 267

**Table of Contents**

*Possible Constructive Distributions*

Under Section 305 of the Code, if certain adjustments are made (or not made) to the number of shares to be issued upon the exercise of a HoldCo warrant or to the HoldCo warrant's exercise price, a U.S. Holder may be deemed to have received a constructive distribution with respect to the warrant, which could result in adverse consequences for the U.S. Holder, including the inclusion of dividend income (with the consequences generally as described above under the heading "*—Taxation of Dividends and Other Distributions on HoldCo Ordinary Shares*"). The rules governing constructive distributions as a result of certain adjustments with respect to a HoldCo warrant are complex, and U.S. Holders are urged to consult their tax advisors on the tax consequences any such constructive distribution with respect to a HoldCo warrant.

*Passive Foreign Investment Company Rules*

The treatment of U.S. Holders of HoldCo ordinary shares and HoldCo warrants could be materially different from that described above if HoldCo is treated as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.

A foreign (i.e., non-U.S.) corporation will be classified as a PFIC for U.S. federal income tax purposes if either (i) at least 75% of its gross income in a taxable year, including its pro rata share of the gross income of any corporation in which it is considered to own at least 25% of the shares by value, is passive income or (ii) at least 50% of its assets in a taxable year (ordinarily determined based on fair market value and averaged quarterly over the year), including its pro rata share of the assets of any corporation in which it is considered to own at least 25% of the shares by value, are held for the production of, or produce, passive income. Passive income generally includes dividends, interest, rents and royalties (other than rents or royalties derived from the active conduct of a trade or business) and gains from the disposition of passive assets.

Although uncertainty exists as to whether, immediately following the Business Combination, HoldCo will be treated as a PFIC for U.S. federal income tax purposes, HoldCo believes that it will likely not be a PFIC for its current taxable year, but no assurance can be provided to that effect.

Although HoldCo's PFIC status is determined annually, an initial determination that HoldCo is a PFIC will generally apply for subsequent years to a U.S. Holder who held HoldCo ordinary shares or HoldCo warrants while HoldCo was a PFIC, whether or not HoldCo meets the test for PFIC status in those subsequent years.

If SC Health is determined to be a PFIC with respect to a U.S. Holder who exchanges SC Health Class A ordinary shares or SC Health public warrants for HoldCo ordinary shares or HoldCo warrants, as applicable, in the Merger, such U.S. Holder did not make any of the PFIC Elections with respect to such SC Health Class A ordinary shares or SC Health public warrants, and such U.S. Holder was not subject to tax on the receipt of such HoldCo ordinary shares or HoldCo warrants under Section 1291(f) of the Code or otherwise, then, under the proposed regulations, HoldCo would also be treated as a PFIC as to such U.S. Holder with respect to such HoldCo ordinary shares and HoldCo warrants, even if HoldCo did not meet the test for PFIC status in its own right. In addition, if these rules were to apply, such U.S. Holder would be treated for purposes of the PFIC rules as if such U.S, Holder held such HoldCo ordinary shares (treated as shares of a PFIC as to such U.S. Holder) for a period that includes its holding period for the SC Health Class A ordinary shares and SC Health public warrants exchanged therefor, respectively.

If HoldCo is determined to be a PFIC for any taxable year (or portion thereof) that is included in the holding period of a U.S. Holder of HoldCo ordinary shares or HoldCo warrants and, in the case of HoldCo ordinary shares, the U.S. Holder did not make either an applicable PFIC Election (or elections) for the first taxable year of HoldCo (or, as applicable, SC Health) in which it was treated as a PFIC, and in which the U.S. Holder held (or was deemed to hold) such shares, such U.S. Holder generally will be subject to special and

164

Exhibit 4
Page 268

**Table of Contents**

adverse rules with respect to (i) any gain recognized by the U.S. Holder on the sale or other disposition of its HoldCo ordinary shares or HoldCo warrants and (ii) any "excess distribution" made to the U.S. Holder (generally, any distributions to such U.S. Holder during a taxable year of the U.S. Holder that are greater than 125% of the average annual distributions received by such U.S. Holder in respect of the HoldCo ordinary shares during the three preceding taxable years of such U.S. Holder or, if shorter, such U.S. Holder's holding period for the HoldCo ordinary shares).

Under these rules:

- the U.S. Holder's gain or excess distribution will be allocated ratably over the U.S. Holder's holding period for the HoldCo ordinary shares or HoldCo warrants;

- the amount allocated to the U.S. Holder's taxable year in which the U.S. Holder recognized the gain or received the excess distribution, or to the period in the U.S. Holder's holding period before the first day of HoldCo's first taxable year in which HoldCo is a PFIC, will be taxed as ordinary income;

- the amount allocated to other taxable years (or portions thereof) of the U.S. Holder and included in its holding period will be taxed at the highest tax rate in effect for that year and applicable to the U.S. Holder; and

- an additional tax equal to the interest charge generally applicable to underpayments of tax will be imposed on the U.S. Holder with respect to the tax attributable to each such other taxable year of the U.S. Holder.

*PFIC Elections*

In general, if HoldCo is determined to be a PFIC, a U.S. Holder may avoid some of the adverse PFIC tax consequences described above in respect of HoldCo ordinary shares (but not HoldCo warrants) by making and maintaining a timely and valid qualified electing fund ("QEF") election (if eligible to do so) to include in income its pro rata share of HoldCo's net capital gains (as long-term capital gain) and other earnings and profits (as ordinary income), on a current basis, in each case whether or not distributed, in the first taxable year of the U.S. Holder in which or with which HoldCo's taxable year ends and each subsequent taxable year. A U.S. Holder generally may make a separate election to defer the payment of taxes on undistributed income inclusions under the QEF rules, but, if deferred, any such taxes will be subject to an interest charge.

A U.S. Holder may not make a QEF election with respect to its HoldCo warrants. As a result, if a U.S. Holder sells or otherwise disposes of such HoldCo warrants (other than upon exercise of HoldCo warrants for cash) and HoldCo were a PFIC at any time during the U.S. Holder's holding period of such HoldCo warrants (including by reason of the exchange of SC Health public warrants for HoldCo warrants in a non-taxable exchange described above), any gain recognized generally will be treated as an excess distribution, taxed as described above. If a U.S. Holder that exercises such HoldCo warrants properly makes and maintains a QEF election with respect to the newly acquired HoldCo ordinary shares (or has previously made a QEF election with respect to HoldCo ordinary shares, or SC Health Class A ordinary shares, as applicable), the QEF election will apply to the newly acquired HoldCo ordinary shares. Notwithstanding such QEF election, the adverse tax consequences relating to PFIC shares, adjusted to take into account the current income inclusions resulting from the QEF election, will continue to apply with respect to such newly acquired HoldCo ordinary shares (which generally will be deemed to have a holding period for purposes of the PFIC rules that includes the period the U.S. Holder held the HoldCo warrants), unless the U.S. Holder makes a purging election under the PFIC rules. Under one type of purging election, the U.S. Holder will be deemed to have sold such shares at their fair market value and any gain recognized on such deemed sale will be treated as an excess distribution, as described above. As a result of such purging election, the U.S. Holder will generally have a new basis and holding period in the SC Health Class A ordinary shares acquired upon the exercise of the warrants for purposes of the PFIC rules. U.S. Holders should consult their tax advisors as to the application of the rules governing purging elections to their particular circumstances.

165

Exhibit 4
Page 269

Table of Contents

The QEF election is made on a shareholder-by-shareholder basis and, once made, can be revoked only with the consent of the IRS. A U.S. Holder generally makes a QEF election by attaching a completed IRS Form 8621 (Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund), including the information provided in a PFIC Annual Information Statement, to a timely filed U.S. federal income tax return for the tax year to which the election relates. Retroactive QEF elections generally may be made only by filing a protective statement with such return and if certain other conditions are met or with the consent of the IRS. U.S. Holders are urged to consult their tax advisors regarding the availability and tax consequences of a retroactive QEF election under their particular circumstances.

In order to comply with the requirements of a QEF election, a U.S. Holder must receive a PFIC Annual Information Statement from us. Upon written request, HoldCo intends to provide the information necessary for U.S. Holders to make or maintain a QEF election, including information necessary to determine the appropriate income inclusion amounts for purposes of the QEF election. However, there is also no assurance that HoldCo will have timely knowledge of its status as a PFIC in the future or of the required information to be provided.

Alternatively, if HoldCo is a PFIC and HoldCo ordinary shares constitute "marketable stock," a U.S. Holder may avoid the adverse PFIC tax consequences discussed above if such U.S. Holder makes a mark-to-market election with respect to such shares for the first taxable year in which it holds (or is deemed to hold) HoldCo ordinary shares and each subsequent taxable year. Such U.S. Holder generally will include for each of its taxable years as ordinary income the excess, if any, of the fair market value of its HoldCo ordinary shares at the end of such year over its adjusted basis in its HoldCo ordinary shares. The U.S. Holder also will recognize an ordinary loss in respect of the excess, if any, of its adjusted basis of its HoldCo ordinary shares over the fair market value of its HoldCo ordinary shares at the end of its taxable year (but only to the extent of the net amount of previously included income as a result of the mark-to-market election). The U.S. Holder's basis in its HoldCo ordinary shares will be adjusted to reflect any such income or loss amounts, and any further gain recognized on a sale or other taxable disposition of its HoldCo ordinary shares will be treated as ordinary income. Currently, a mark-to-market election may not be made with respect to HoldCo warrants.

The mark-to-market election is available only for "marketable stock," generally, stock that is regularly traded on a national securities exchange that is registered with the Securities and Exchange Commission, including the NYSE (on which HoldCo ordinary shares are intended to be listed), or on a non-U.S. exchange or market that the IRS determines has rules sufficient to ensure that the market price represents a legitimate and sound fair market value. If made, a mark-to-market election would be effective for the taxable year for which the election was made and for all subsequent taxable years unless the HoldCo ordinary shares cease to qualify as "marketable stock" for purposes of the PFIC rules or the IRS consents to the revocation of the election. U.S. Holders are urged to consult their tax advisors regarding the availability and tax consequences of a mark-to-market election with respect to HoldCo ordinary shares under their particular circumstances.

*Related PFIC Rules*

If HoldCo is a PFIC and, at any time, has a non-U.S. subsidiary that is classified as a PFIC, a U.S. Holder generally would be deemed to own a proportionate amount of the shares of such lower-tier PFIC, and generally could incur liability for the deferred tax and interest charge described above if HoldCo receives a distribution from, or disposes of all or part of its interest in, the lower-tier PFIC, or the U.S. Holder otherwise was deemed to have disposed of an interest in the lower-tier PFIC.

A U.S. Holder that owns (or is deemed to own) shares in a PFIC during any taxable year of the U.S. Holder, may have to file an IRS Form 8621 (whether or not a QEF or mark-to-market election is made) and to provide such other information as may be required by the U.S. Treasury Department. Failure to do so, if required, will extend the statute of limitations applicable to such U.S. Holder until such required information is furnished to the IRS.

Exhibit 4
Page 270

Table of Contents

The rules dealing with PFICs and with the QEF and mark-to-market elections are very complex and are affected by various factors in addition to those described above. Accordingly, U.S. Holders of HoldCo ordinary shares and HoldCo warrants are urged to consult their own tax advisors concerning the application of the PFIC rules to HoldCo securities under their particular circumstances.

*Additional Reporting Requirements*

Certain U.S. Holders may be required to file an IRS Form 926 (Return by a U.S. Transferor of Property to a Foreign Corporation) to report a transfer of property to HoldCo. Substantial penalties may be imposed on a U.S. Holder that fails to comply with this reporting requirement and the period of limitations on assessment and collection of U.S. federal income taxes will be extended in the event of a failure to comply. In addition, certain U.S. Holders holding specified non-U.S. financial assets with an aggregate value in excess of the applicable dollar thresholds are required to report information to the IRS relating to HoldCo ordinary shares, subject to certain exceptions (including an exception for HoldCo ordinary shares held in accounts maintained by U.S. financial institutions), by attaching a complete IRS Form 8938, (Statement of Specified Foreign Financial Assets) with their tax return for each year in which they hold HoldCo ordinary shares. Substantial penalties apply to any failure to file IRS Form 8938 and the period of limitations on assessment and collection of U.S. federal income taxes will be extended in the event of a failure to comply. U.S. Holders are urged to consult their tax advisors regarding the effect, if any, of these rules on the ownership and disposition of HoldCo ordinary shares.

Treasury Regulations meant to require the reporting of certain tax shelter transactions could be interpreted to cover transactions generally not regarded as tax shelters, including certain non-U.S. currency transactions. Under the applicable Treasury Regulations, certain transactions are required to be reported to the IRS including, in certain circumstances, a sale, exchange, retirement or other taxable disposition of non-U.S. currency, to the extent that such sale, exchange, retirement or other taxable disposition results in a tax loss in excess of a threshold amount. You should consult your tax advisor to determine the tax return obligations, if any, with respect to HoldCo ordinary shares and HoldCo warrants including any requirement to file IRS Form 8886 (Reportable Transaction Disclosure Statement).

**Information Reporting and Backup Withholding**

Payments of dividends and sales proceeds that are made within the United States or through certain U.S.-related financial intermediaries are subject to information reporting, and may be subject to backup withholding, unless (i) the U.S. Holder is a corporation or other exempt recipient or (ii) in the case of backup withholding, the U.S. Holder provides a correct taxpayer identification number and certifies that it is not subject to backup withholding.

The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against the holder's U.S. federal income tax liability and may entitle it to a refund, provided that the required information is timely furnished to the IRS.

**The U.S. federal income tax discussion set forth above is included for general information only and may not be applicable to you depending upon your particular situation. You are urged to consult your own tax advisor with respect to the tax consequences to you of the disposition of the SC Health Class A ordinary shares and SC Health public warrants in connection with the Business Combination, and of the acquisition, ownership and disposition of HoldCo ordinary shares and HoldCo warrants including the tax consequences under state, local, estate, non-U.S. and other tax laws and tax treaties and the possible effects of changes in U.S. or other tax laws.**

167

Exhibit 4
Page 271

Table of Contents

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

**Introduction**

We are providing the following unaudited pro forma condensed combined financial information to aid you in your analysis of the financial aspects of the Business Combination. The unaudited pro forma condensed combined financial information should be read in conjunction with the accompanying notes.

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 combines the historical audited balance sheet of SC Health as of December 31, 2020 with the historical audited consolidated balance sheet of Rockley as of December 31, 2020, giving effect to the Business Combination as if it had been consummated on that date.

The unaudited pro forma condensed combined statement of operations for the fiscal year ended December 31, 2020 combines the historical audited statement of operations of SC Health for the fiscal year ended December 31, 2020 with the historical audited consolidated statement of operations of Rockley for the fiscal year ended December 31, 2020, giving effect to the Business Combination as if it had been consummated on January 1, 2020.

The unaudited pro forma condensed combined financial information was derived from and should be read in conjunction with the following historical financial statements and the accompanying notes, which are included elsewhere in this prospectus/proxy statement:

• The historical audited financial statements of SC Health as of and for the fiscal year ended December 31, 2020; and

• The historical audited consolidated financial statements of Rockley as of and for the fiscal year ended December 31, 2020.

The foregoing historical financial statements have been prepared in accordance with GAAP.

The unaudited pro forma condensed combined financial information should also be read together with "*SC Health's Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Rockley's Management's Discussion and Analysis of Financial Condition and Results of Operations*," and other financial information included elsewhere in this prospectus/proxy statement.

**Description of the Business Combination**

Pursuant to the Business Combination Agreement, Rockley shareholders, which includes shares issued to convert Rockley's convertible loan notes and warrants to equity, will transfer their shares in Rockley to HoldCo, a newly formed entity. HoldCo will further undertake a stock split based upon an exchange ratio to align the valuation of Rockley's shares with the valuation of the SC Health's shares. Rockley MergerSub Limited ("MergerSub"), another newly formed entity and a wholly owned subsidiary of HoldCo, will merge with SC Health, with SC Health surviving the merger. All SC Health's ordinary shares outstanding immediately after the merger with Merger Sub will be exchanged with HoldCo for the right to receive HoldCo ordinary shares and HoldCo becomes a public company.

The aggregate merger consideration for Rockley to receive will be 114,811,411 HoldCo ordinary shares at a deemed value of $10 per share for an aggregate merger consideration of $1,148.1 million.

**Accounting for the Business Combination**

The Business Combination will be accounted for as a forward recapitalization in accordance with GAAP. Under this method of accounting, SC Health has been treated as the "acquired" company for financial reporting

168

Exhibit 4
Page 272

Table of Contents

purposes. This determination was primarily based on current shareholders of Rockley having a relative majority of the voting power of the combined entity, and as such, having the power to appoint a majority of the member of HoldCo's board of directors, the operations of Rockley prior to the acquisition comprising the only ongoing operations of the combined entity and senior management of Rockley comprising the majority of the senior management of the combined entity. Accordingly, for accounting purposes, the financial statements of the combined entity will represent a continuation of the financial statements of Rockley with the acquisition being treated as the equivalent of Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization. The net assets of SC Health will be stated at historical cost, with no goodwill or other intangible assets recorded.

**Other Events in Connection with the Business Combination**

- The board of directors of HoldCo intends to approve and implement a director compensation program for HoldCo's non-employee directors (the "Director Compensation Program"). Under the Director Compensation Program, and following the filing of a registration statement on Form S-8 with respect to the 2021 Plan, HoldCo expects to grant (i) an "Initial RSU Award" to each non-employee director in connection with the closing of the Business Combination and (ii) an "Annual RSU Award" following the conclusion of each regular annual meeting of HoldCo's shareholders commencing with the 2022 annual meeting, to each non-employee director who continues serving as a member of HoldCo's board of directors. The grant and vesting of these RSU awards are contingent upon, among other things, the closing of the Business Combination, the approval of the 2021 Plan by SC Health shareholders at the extraordinary general meeting and the continued service of the respective directors through the closing of the Business Combination or the regular annual meeting of shareholders (as applicable). In addition, each eligible non-employee director will receive an annual cash retainer in connection with their service on HoldCo's board of directors and respective committees. For additional information, including size of any cash retainers, and the size and vesting terms of the Initial RSU Award and Annual RSU Award, see "*Executive Compensation—Director Compensation.*"

- Following the filing of a registration statement on Form S-8 with respect to the 2021 Plan, the board of directors of HoldCo is also expected to approve grants of stock options and RSU awards to select members of the management team. The grant and vesting of stock options and RSU awards are contingent upon, among other things, the closing of the Business Combination, the approval of the 2021 Plan by SC Health shareholders at the extraordinary general meeting and the continued service of the respective participants through the Closing Date. For additional information, including the size and vesting terms application to these awards, see "*Executive Compensation—HoldCo Executive Compensation.*"

- In addition, HoldCo expects to enter into new employment agreements with its executive officers, including its named executive officers. The terms of these new employment agreements, including compensation, have been prepared as to form but remain subject to change. Accordingly, the effect of the new employment arrangements with HoldCo's executive officers has been included in the unaudited pro forma condensed combined financial information. For additional information, see "*Executive Compensation—HoldCo Executive Compensation—Executive Employment Arrangements—Post-Closing Agreements.*"

The adjustments in the unaudited pro forma condensed combined financial information have been identified and presented to provide relevant information necessary for an accurate understanding of the combined entity upon closing of the Business Combination.

The unaudited pro forma condensed combined financial information is for illustrative purposes only. The financial results may have been different had the companies always been combined. You should not rely on the unaudited pro forma condensed combined financial information as being indicative of the historical results that would have been achieved had the companies always been combined or the future results that the combined

169

Exhibit 4
Page 273

**Table of Contents**

entity will experience. SC Health and Rockley have not had any historical relationship prior to the transactions. Accordingly, no pro forma adjustments were required to eliminate activities between the companies.

Due to the redemption rights held by SC Health's public shareholders, the unaudited pro forma condensed combined financial information has been prepared assuming two alternative levels of redemption of SC Health's publicly-traded shares:

- *Assuming No Additional Redemptions*. This presentation assumes:

  - No Class A shareholders of SC Health exercise their redemption rights with respect to their redeemable Class A public shares upon closing of the Business Combination.

- *Assuming Maximum Redemptions*. This presentation assumes:

  - The redemption of 16,261,424 publicly-traded shares of SC Health, which represents the maximum number of shares outstanding that could be redeemed in connection with the Business Combination.

Assuming no additional redemptions of any Class A public shares of SC Health in connection with the Business Combination, Rockley Shareholders will hold 114,811,411 HoldCo ordinary shares immediately after the closing of the Business Combination, which approximates a 75.2% ownership level. Assuming maximum redemptions of Class A public shares of SC Health in connection with the Business Combination, Rockley Shareholders will hold 114,811,411 HoldCo ordinary shares immediately after the closing of the Business Combination, which approximates an 84.2% ownership level.

| Shareholder | No Additional Redemptions | | Maximum Redemptions | |
| --- | --- | --- | --- | --- |
| | No. of Shares | % Ownership | No. of Shares | % Ownership |
| Rockley Shareholders | 114,811,411 | 75.2% | 114,811,411 | 84.2% |
| SC Health public Shareholder | 17,250,000 | 11.3% | 988,576 | 0.7% |
| SC Health Sponsor | 10,562,500 | 6.9% | 10,562,500 | 7.8% |
| PIPE Investors | 10,000,000 | 6.6% | 10,000,000 | 7.3% |
| **Total(1)** | 152,623,911 | 100.0% | 136,362,487 | 100.0% |

---

(1)    Outstanding HoldCo ordinary shares held by the Sponsor excludes the 75,000 HoldCo ordinary shares underlying the director RSU Awards that will be granted in connection with the Business Combination. The director RSU Awards will vest at the closing of the Business Combination but will not settle into HoldCo ordinary shares until a date, selected by HoldCo, that occurs between January 1 and December 31 of the year following the closing of the Business Combination.

The two alternative levels of additional redemptions assumed in the unaudited pro forma condensed combined balance sheet and statement of operations are based on the assumption that there are no adjustments for the outstanding public or private placement warrants issued by SC Health as such securities are not exercisable until 30 days after the closing of the Business Combination.

If the actual facts are different than these assumptions, then the amounts and shares outstanding in the unaudited pro forma condensed combined financial information will be different.

Exhibit 4
Page 274

Table of Contents

**Unaudited Pro Forma Condensed Combined Balance Sheet**
**As of December 31, 2020**

*(in thousands, except share and per share amounts)*

| | SC Health | Rockley | CLN received after December 31, 2020 | | Assuming No Redemption – Transaction Accounting Adjustments | | Pro Forma Combined | Assuming Maximum Redemption – Transaction Accounting Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Current assets | | | | | | | | | | |
| Cash and cash equivalents | $ 125 | $ 19,228 | $ 76,723 | E | $ 288,894 | A | $ 384,970 | $ 126,280 | P | $ 222,356 |
| Accounts receivable | | 4,925 | | | | | 4,925 | | | 4,925 |
| Other receivable | | 18,024 | | | | | 18,024 | | | 18,024 |
| Prepaid expenses | 122 | 1,605 | | | | | 1,727 | | | 1,727 |
| Other current assets | | 609 | | | | | 609 | | | 609 |
| **Total current assets** | **247** | **44,391** | **76,723** | | **288,894** | | **410,255** | **126,280** | | **247,641** |
| Property, equipment and finance lease right-of-use assets, net | | 6,182 | | | | | 6,182 | | | 6,182 |
| Equity method investment | | 5,202 | | | | | 5,202 | | | 5,202 |
| Intangible assets | | 3,048 | | | | | 3,048 | | | 3,048 |
| Cash and marketable securities held in trust account | 174,542 | | | | (174,542) | C | | (174,542) | C | |
| Other non-current assets | | 1,607 | | | (187) | F | 1,420 | (187) | F | 1,420 |
| **Total assets** | **$174,789** | **$ 60,430** | **$ 76,723** | | **$ 114,165** | | **$ 426,107** | **$ (48,449)** | | **$ 263,493** |
| **Liabilities** | | | | | | | | | | |
| Current liabilities | | | | | | | | | | |
| Accounts payable and accrued expenses | $ 1,037 | $ 14,808 | $ | | $ | | $ 15,845 | $ | | $ 15,845 |
| Other current liabilities | 100 | 998 | | | (100) | K | 998 | (100) | K | 998 |
| **Total current liabilities** | **1,137** | **15,806** | | | **(100)** | | **16,843** | **(100)** | | **16,843** |
| Long-term debt, net of current portion | | 74,804 | 76,723 | E | (148,667) | L | 2,860 | (148,667) | L | 2,860 |
| Deferred underwriting fee payable | 6,038 | | | | (6,038) | G | | (6,038) | G | |
| Other long-term liabilities | | 1,127 | | | | | 1,127 | | | 1,127 |
| **Total liabilities** | **7,175** | **91,737** | **76,723** | | **(154,805)** | | **20,830** | **(154,805)** | | **20,830** |
| Class A ordinary shares subject to redemption | 162,614 | | | | (162,614) | M | | (162,614) | M | |
| **Shareholders' Equity** | | | | | | | | | | |
| Ordinary shares | | | | | 2 | N | 2 | 1 | Q | 1 |
| Class A ordinary shares | | | | | | N | | | Q | |
| Class B ordinary shares | | | | | | N | | | Q | |
| Additional paid-in capital | 5,136 | 201,576 | | | 431,446 | N | 638,158 | 268,833 | Q | 475,545 |
| Accumulated deficit | (136) | (232,883) | | | 136 | O | (232,883) | 136 | O | (232,883) |
| **Total shareholders' equity** | **5,000** | **(31,307)** | | | **431,584** | | **405,277** | **268,970** | | **242,663** |
| **Total liabilities & shareholders' equity** | **$174,789** | **$ 60,430** | **$ 76,723** | | **$ 114,165** | | **$ 426,107** | **$ (48,449)** | | **$ 263,493** |

171

Exhibit 4
Page 275

Table of Contents

**Unaudited Pro Forma Condensed Combined Statement of Operations**
**For the Fiscal year Ended December 31, 2020**
*(in thousands, except share and per share amounts)*

| | SC Health | Rockley | Assuming No Redemption Transaction Accounting Adjustments | | Pro Forma Combined | Assuming Maximum Redemption Transaction Accounting Adjustments | | Pro Forma Combined | |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | $ 22,343 | $ | | $ 22,343 | $ | | $ 22,343 | |
| Cost of revenue | | 24,240 | | | 24,240 | | | 24,240 | |
| **Gross profit** | | **(1,897)** | | | **(1,897)** | | | **(1,897)** | |
| Selling, general, and administrative expenses | 1,736 | 20,260 | 198 | *a* | | 198 | *a* | | |
| | | | 389 | *b* | | 389 | *b* | | |
| | | | 754 | *c* | 23,337 | 754 | *c* | 23,337 | |
| Research and development expenses | | 35,900 | 542 | *b* | 36,442 | 542 | *b* | 36,442 | |
| **Operating loss** | **(1,736)** | **(58,057)** | **(1,883)** | | **(61,676)** | **(1,883)** | | **(61,676)** | |
| Interest income (expense), net | 644 | (189) | (644) | *d* | (189) | (644) | *d* | (189) | |
| Equity method investment loss | | (1,274) | | | (1,274) | | | (1,274) | |
| Change in fair value of debt instruments | | (20,163) | 20,163 | *g* | | 20,163 | *g* | | |
| Realized and unrealized gain/loss on foreign currency | | (25) | | | (25) | | | (25) | |
| **Income (loss) before income taxes** | **(1,092)** | **(79,708)** | **17,636** | | **(63,164)** | **17,636** | | **(63,164)** | |
| Income tax expense | | 569 | | | 569 | | | 569 | |
| **Net income (loss)** | **$(1,092)** | **$(80,277)** | **$ 17,636** | | **$ (63,733)** | **$ 17,636** | | **$ (63,733)** | |
| **Net loss per share** | | | | | | | | | |
| Basic and diluted | | | | | $ (0.42) | *e* | | $ (0.47) | *E* |
| **Weighted average shares outstanding** | | | | | | | | | |
| Basic and diluted | | | | | 152,623,911 | *f* | | 136,362,487 | *F* |

172

Exhibit 4
Page 276

Table of Contents

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

The pro forma adjustments have been prepared as if the Business Combination had been consummated on December 31, 2020 in the case of the unaudited pro forma condensed combined balance sheet and on January 1, 2020, the beginning of the earliest period presented in the unaudited pro forma condensed combined statement of operations.

The unaudited pro forma condensed combined financial information has been prepared assuming the following methods of accounting in accordance with GAAP.

The Business Combination will be accounted for as a forward recapitalization in accordance with GAAP. Accordingly, for accounting purposes, the financial statements of the combined entity will represent a continuation of the financial statements of Rockley with the acquisition being treated as the equivalent of Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization. The net assets of SC Health will be stated at historical cost, with no goodwill or other intangible assets recorded.

The pro forma adjustments represent management's estimates based on information available as of the date of this prospectus/proxy statement and are subject to change as additional information becomes available and additional analyses are performed. Management considers this basis of presentation to be reasonable under the circumstances.

One-time direct and incremental transaction costs anticipated to be incurred prior to, or concurrent with, the closing of the Business Combination are reflected in the unaudited pro forma condensed combined balance sheet as a direct reduction to the combined entity's additional paid-in capital ("APIC") and are assumed to be cash settled.

The pro forma combined provision for income taxes does not necessarily reflect the amounts that would have resulted had the post-combination company filed consolidated income tax returns during the periods presented.

**2. Adjustments and Assumptions to the Unaudited Pro Forma Condensed Combined Balance Sheet as of December 31, 2020**

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 reflects the following adjustments:

**A** – Represents the aggregate impact of the following pro forma adjustments to cash to give effect to the Business Combination, the PIPE Financing, transaction costs and the cash settlement of certain obligations in accordance with the Business Combination Agreement:

| | | |
|---|---:|---|
| Cash inflow from PIPE Financing | $100,000 | **B** |
| Cash inflow from SC Health's trust account | 174,542 | **C** |
| Cash inflow from SC Heath Sponsor | 50,000 | **D** |
| Payment from SC Health's deferred IPO fees and SC Health's accrued transaction-related liabilities | (6,038) | **G** |
| Payments of estimated financing fees | (21,000) | **H** |
| Payments of estimated transaction fees incurred by Rockley | (5,550) | **I** |
| Payment of estimated transaction fees incurred by SC Health | (2,960) | **J** |
| Settlement of SC Health promissory note | (100) | **K** |
| Net Pro Forma adjustment to cash | $288,894 | **A** |

173

Exhibit 4
Page 277

Table of Contents

**B** – Represents gross proceeds attributable to the issuance of 10.0 million HoldCo Ordinary Shares for $10 per share, or $100.0 million in aggregate gross proceeds, upon the closing of the PIPE Financing that will occur immediately prior to closing of the Business Combination.

**C** – Represents cash equivalents that will be released from SC Health's trust account and relieve of restrictions regarding use upon consummation of a Business Combination and, accordingly, will be available for general use by the combined company.

**D** – Represents gross proceeds attributable to the issuance of 5.0 million shares of HoldCo for $10 per share, or $50 million in gross proceeds from SC Health Sponsor that will occur immediately prior to closing of the Business Combination.

**E** – Represents cash proceeds totaling $76.7 million from issuance of convertible loan notes received after December 31, 2020 that will be converted into Rockley's Ordinary shares, then subsequently converted to HoldCo's ordinary shares for which HoldCo will undertake a stock split immediately prior to closing of the Business Combination.

**F** – Represents deferred legal, accounting and other costs incurred as liabilities on Rockley's balance sheet that are directly related to the Transactions. For purposes of the forward recapitalization, these transaction costs will be treated as a reduction of the cash proceeds resulting from the Business Combination and accordingly, the deferred asset will be de-recognized as a reduction to additional paid-in capital upon closing of the Business Combination. Refer to balance sheet adjustments **A** for the corresponding adjustments to cash, accounts payable and accrued expenses reported for the combined company and balance sheet adjustment **N** for the corresponding adjustment to additional paid-in capital reported for the combined company.

**G** – Represents cash that will be used to pay 1) underwriting fees incurred by SC Health in connection with the Initial Public Offering, for which payment was deferred until consummation of a business combination, and 2) transaction-related expenses accrued and reported as liabilities on Rockley's balance sheet as of December 31, 2020. Detail of amounts accrued on SC Health and Rockley's balance sheets are as follows:

| | | |
|---|---|---|
| SC Health's deferred IPO underwriting commissions | $6,038 | G |
| Rockley's deferred transaction fees | 187 | |
| Total deferred costs and accrued expenses to be paid with SC Health and PIPE Financing fees | $6,225 | |

**H** – Represents financing fees for which payment will made upon consummation of a Business Combination.

**I** – Represents cash that will be used to pay the estimated direct and incremental transaction costs, legal and other fees, that will be due from Rockley on the Business Combination close date, but have not yet been accrued and reported as a liability on Rockley's balance sheet. For purpose of a forward recapitalization transaction, these direct and incremental transaction costs will be treated as a reduction of the cash proceeds resulting from the Transactions and, accordingly, will be reported as a reduction to additional paid-in capital. Refer to balance sheet adjustments **N** for the corresponding pro forma adjustment to additional paid-in capital reported for the combined company.

**J** – Represents cash that will be used to pay the estimated direct and incremental transaction costs, legal and other fees, that will be due from SC Health on the Business Combination close date, but have not yet been accrued and reported as a liability on SC Health's balance sheet. For purpose of a forward recapitalization transaction, these direct and incremental transaction costs will be treated as a reduction of the cash proceeds resulting from the Transactions and, accordingly, will be reported as a reduction to additional paid-in capital. Refer to balance sheet adjustments **N** for the corresponding pro forma adjustment to additional paid-in capital reported for the combined company.

174

Exhibit 4
Page 278

Table of Contents

**K** – Represents SC Health promissory notes payable to related party for which payment will made upon the closing of the Business Combination.

**L** – Represents a series of sequential steps of converting Rockley's convertible loan notes and related accrued interest to Rockley's ordinary shares at a conversion price of $24.61 per share, then subsequently convert to HoldCo's ordinary shares for which HoldCo will undertake a stock split prior to the Business Combination. Interest will continue to accrue on the convertible notes through the date that the Business Combination is consummated, increasing the aggregate notes payable obligation for which HoldCo Ordinary Shares will be exchanged. Refer to balance sheet adjustment **N** for the pro forma impact of this exchange on additional paid-in capital reported for the combined company.

**M** – Represents the reclassification of SC Health redeemable Class A ordinary shares to permanent equity upon consummation of Business Combination, assuming no redemptions. Balance sheet adjustment **N** presents the corresponding pro forma impact that the reclassification of SC Health redeemable Class A ordinary shares to permanent equity would have on the pro forma amounts reported for both the par value of HoldCo ordinary shares and additional paid-in capital of the combined company.

**N** – Represents the net impact of the following pro forma adjustments related to (1) the Business Combination, inclusive of the issuance of HoldCo ordinary shares for Rockley's issued and outstanding ordinary shares, stock split effected, immediately prior to the Business Combination, SC Health's issued and outstanding Class A ordinary shares prior to the Business Combination, (3) the PIPE Financing, (4) transaction costs, and (5) certain other transactions triggered by the Business Combination on the capital accounts of the combined company:

| | Scenario 1—Assuming No Redemptions | | | | |
| | HoldCo Par Value | SC Health Par Value | | Rockley Par Value | |
| | Ordinary Shares | Class A Ordinary Shares | Class B Ordinary Shares | Ordinary Shares | Additional Paid-in Capital |
|---|---|---|---|---|---|
| Reclassification of redeemable SC Health shares to Class A Ordinary Shares | 1 | — | — | — | $162,613 |
| Conversion of SC Health Class B to Class A Ordinary Shares(1) | — | — | — | — | — |
| PIPE Financing | — | — | — | — | 100,000 |
| SC Health Sponsor | — | — | — | — | 50,000 |
| Shares issued to Rockley's ordinary shareholders as consideration for the Business Combination | 1 | — | — | — | 148,666 |
| Adjustment for share issuance and conversion transaction | 2 | — | — | — | 461,279 |
| Estimated SC Health transaction costs | — | — | — | — | (2,960) |
| Estimated Rockley's transaction costs | — | — | — | — | (5,537) |
| Estimated PIPE financing transaction costs | — | — | — | — | (21,000) |
| Elimination of SC Health's historical retained Earnings | — | — | — | — | (136) |
| Total adjustments to par value and additional paid-in capital | 2 | — | — | — | $431,446 |

(1)   SC Health's issued and outstanding Class B ordinary shares will convert to SC Health Class A ordinary shares and will ultimately convert to the single class of HoldCo ordinary shares that will be outstanding subsequent to the Business Combination on a one-for-one basis immediately prior to closing of the Business Combination.

175

Exhibit 4
Page 279

Table of Contents

**O** – Represents the aggregate impact of the pro forma adjustments to the combined company's accumulated deficit to eliminate of SC Health accumulated deficit to additional paid-in capital.

**P** –Represents the net impact of the following pro forma adjustments to the amount of cash that would be available to the combined company if the holders of SC Health's publicly-traded Class A ordinary shares exercise their right for maximum redemption of the outstanding Class A Ordinary Shares in exchange for cash held in SC Health's trust account.

**Q** – Represents the maximum redemption of 16.3 million shares of SC Health's publicly-traded Class A ordinary shares for cash. The redemption amount has been allocated to ordinary shares and additional paid-in capital using HoldCo ordinary shares with a par value of $0.00001 per share.

**3. Adjustments and Assumptions to the Unaudited Pro Forma Condensed Combined Statement of Operations for the Fiscal year Ended December 31, 2020**

The unaudited pro forma condensed combined statement of operations for the fiscal year ended December 31, 2020 reflects the following adjustments:

**a** – Recognition of executive officers and employees' compensation under the new employment agreements for the period after Business Combination. The adjustment does not include $3.8 million in bonuses to our executive officers and employees that will be paid contingent upon, and no later than shortly following, the closing of the Business Combination because these bonuses will not have a continuing impact on ongoing operations.

**b** – Recognition of executive officers and employees' stock compensation for the period after Business Combination.

**c** – Recognition of Director Compensation Program RSU and Cash Considerations for the period prior to the 2021 Business Combination.

**d** – Represents the elimination of interest income earned on cash equivalents held in SC Health's trust account during the period. Cash equivalents will be released from SC Health's trust account and available for general use by the combined company upon closing of the Business Combination.

**e** – Basic and diluted net loss per share as a result of the pro forma adjustments.

**f** – Basic and diluted weighted average ordinary shares outstanding as a result of the pro forma adjustments.

**g** – Represents the elimination of adjustments to the fair value of convertible loan notes which will be converted into Rockley's Ordinary shares prior to closing of the Business Combination.

| | Years Ended December 31, 2020 | | | |
|---|---|---|---|---|
| | Assuming No Redemptions | | Assuming Maximum Redemptions | |
| **Numerator** | | | | |
| Pro Forma net loss | $ (63,733) | | $ (63,733) | |
| **Denominator** | | | | |
| Current Rockley Shareholders | 114,811,411 | | 114,811,411 | |
| SC Health Shareholders | 17,250,000 | | 988,576 | |
| Sponsor Shareholders | 10,562,500 | | 10,562,500 | |
| PIPE Investors | 10,000,000 | | 10,000,000 | |
| Total | 152,623,911 | *f* | 136,362,487 | *f* |
| **Net loss per Share** | | | | |
| Basic and diluted | $ (0.42) | *e* | $ (0.47) | *e* |

176

Exhibit 4
Page 280

Table of Contents

### INFORMATION ABOUT SC HEALTH

**Overview; Incorporation and History**

SC Health is a blank check company incorporated on December 10, 2018, as a Cayman Islands exempted company and formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses (a "business combination"). SC Health has neither engaged in any operations nor generated any revenue to date. Based on SC Health's business activities, SC Health is a "shell company," as defined under the Exchange Act, because we have no operations and nominal assets consisting almost entirely of cash.

On July 16, 2019, SC Health consummated its initial public offering of 15,000,000 units. Each unit consists of one SC Health Class A ordinary share, and one-half of one redeemable SC Health warrant. Each whole SC Health warrant entitles the holder thereof to purchase one SC Health Class A ordinary share for $11.50 per share. The units were sold at a price of $10.00 per unit, generating gross proceeds to SC Health of $150,000,000.

Simultaneously with the closing of the initial public offering, SC Health completed the private sale of 5,000,000 SC Health warrants (the "SC Heath private placement warrants") to the Sponsor at a purchase price of $1.00 per private placement warrant, generating gross proceeds to SC Health of $5,000,000.

On August 2, 2019, SC Health consummated the closing of the sale of 2,250,000 additional SC Health units at the price of $10.00 per unit upon receiving the underwriters' election to fully exercise their over-allotment option, generating additional gross proceeds of $22,500,000 to SC Health. As used herein, "initial public offering" includes the consummation of the sale of the shares in connection with the underwriters' exercise of their over-allotment option.

Simultaneously with the exercise of the over-allotment, SC Health completed the private sale of an additional 450,000 SC Health private placement warrants to the Sponsor, generating gross proceeds to SC Health of $450,000.

Prior to the consummation of the initial public offering, on December 28, 2018, the Sponsor purchased the Founder Shares, for an aggregate purchase price of $25,000. On February 8, 2019, SC Health completed a sub-division of SC Health Class B ordinary shares, pursuant to which the Founder Shares were sub-divided into 4,312,500 shares with a par value of $0.00008 per share. On July 9, 2019, SC Health issued 1,250,000 Founder Shares to the Sponsor in connection with the Forward Purchase Agreement for par value, or $100, resulting in a total of 5,562,500 Founder Shares issued and outstanding, of which an aggregate of up to 562,500 shares were subject to forfeiture to the extent that the underwriters did not exercise their over-allotment option. As a result of the underwriters' election to fully exercise their over-allotment option, such Founder Shares are no longer subject to forfeiture.

Prior to the initial public offering, SC Health entered into the Forward Purchase Agreement pursuant to which SC Health Group agreed to subscribe for an aggregate of 5,000,000 SC Health Class A ordinary shares (the "forward purchase shares") plus 1,250,000 redeemable SC Health warrants (the "forward purchase warrants" and, together with the forward purchase shares, the "forward purchase securities") for a purchase price of $10.00 per SC Health Class A ordinary share and accompanying fraction of a forward purchase warrant, or $50,000,000 in the aggregate, in a private placement that closed concurrently with the closing of SC Health's initial business combination. The forward purchase warrants have the same terms as the SC Health warrants.

The obligations under the Forward Purchase Agreement do not depend on whether any SC Health Class A ordinary shares are converted by SC Health's public shareholders.

On January 12, 2021, SC Health Corporation held an Extraordinary General Meeting where the shareholders approved a special resolution to amend SC Health's amended and restated memorandum and articles of

177

Exhibit 4
Page 281

Table of Contents

association (the "Articles") to extend the date, from January 16, 2021 to April 16, 2021, by which SC Health must either (a) consummate a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities or (b) (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem all of the SC Health Class A ordinary shares included as part of the SC Health units sold in SC Health's initial public offering that was consummated on July 16, 2019; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of SC Health's remaining members and SC Health's board of directors, liquidate and dissolve, subject in the case of (ii) and (iii), to its obligations under Cayman Islands law to provide for claims of creditors and in all cases subject to the other requirements of applicable law. SC Health will hold an Extraordinary General Meeting on April 14, 2021 for its shareholders to approve a special resolution to amend the Articles to further extend the deadline for such obligations from April 16, 2021 to August 16, 2021.

A total of $172,500,000 from the proceeds SC Health received from the initial public offering and the sale of the SC Health private placement warrants was placed in a segregated trust account located in the United States at Deutsche Bank Trust Company Americas, with American Stock Transfer & Trust Company acting as trustee. The amounts held in the trust account are invested in permitted United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), having a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act that invest only in direct U.S. government treasury obligations. Except with respect to interest earned on the funds in the trust account that may be released to us to pay SC Health's taxes, the funds held in the trust account will not be released until the earliest of: (i) the completion of SC Health's initial business combination; (ii) the redemption of any public SC Health Class A ordinary shares properly submitted in connection with a shareholder vote to amend our amended and restated memorandum and articles of association (A) to modify the substance or timing of SC Health's obligation to redeem 100% of SC Health's public shares if SC Health does not complete our initial business combination by April 16, 2021 or (B) with respect to any other provisions relating to the rights of the SC Health Class A ordinary shares; and (iii) the redemption of SC Health's public shares if we are unable to complete SC Health's initial business combination within 18 months from the closing of SC Health's initial public offering, subject to applicable law.

As of March 19, 2021, there was approximately $174,545,229 in investments and cash held in the trust account and approximately $10.12 of cash held outside the trust account.

**Competition**

In identifying, evaluating and selecting a target business for SC Health's initial business combination, we may encounter intense competition from other entities having a business objective similar to SC Health's, including other blank check companies, private equity groups and leveraged buyout funds, public companies and operating businesses seeking strategic acquisitions. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Moreover, many of these competitors possess greater financial, technical, human and other resources than us. SC Health's ability to acquire larger target businesses will be limited by SC Health's available financial resources. This inherent limitation gives others an advantage in pursuing the acquisition of a target business. Furthermore, SC Health's obligation to pay cash in connection with our public shareholders who exercise their redemption rights may reduce the resources available to SC Health for SC Health's initial business combination and the outstanding SC Health warrants, and the future dilution they potentially represent, may not be viewed favorably by certain target businesses. Either of these factors may place SC Health at a competitive disadvantage in successfully negotiating an initial business combination.

**Our Employees**

SC Health currently has three executive officers. These individuals are not obligated to devote any specific number of hours to SC Health matters but they intend to devote as much of their time as they deem necessary to

178

Exhibit 4
Page 282

Table of Contents

our affairs until we have completed our initial business combination. The amount of time they will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the stage of the business combination process SC Health is in.

**Material Properties**

SC Health currently maintains its executive offices at 108 Robinson Road #10-00, Singapore 068900. The cost for SC Health's use of this space is included in the $10,000 per month fee that SC Health pays to an affiliate of SC Health's Sponsor for office space, administrative and support services. SC Health considers its current office space adequate for our current operations.

**Legal Proceedings**

SC Health is not currently subject to any material legal proceedings, nor, to SC Health's knowledge, is any material legal proceeding threatened against SC Health or any of SC Health's officers or directors in their capacity as such.

Exhibit 4
Page 283

**Table of Contents**

**SC HEALTH'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of the financial condition and results of SC Health should be read in conjunction with SC Health's consolidated financial statements and related notes included elsewhere in this prospectus/proxy statement.*

*This discussion and analysis contains forward-looking statements which, although based on assumptions that SC Health considers reasonable, are subject to risks and uncertainties that could cause actual events or conditions to differ materially from those expressed or implied herein. Factors that could cause or contribute to such differences include, but are not limited to, those discussed below and elsewhere in this prospectus / offer to exchange, see particularly "Risk Factors" beginning on page 49 and "Cautionary Statement Regarding Forward-Looking Statements" on page 9 of this prospectus/proxy statement.*

*The financial information and related discussion and analysis contained in this section are presented in U.S. dollars, and many of the amounts and percentages have been rounded for convenience of presentation.*

*As used in this section, references to "we", "us", and "our" are to SC Health.*

*Overview*

SC Health was incorporated in the Cayman Islands on December 10, 2018. SC Health was formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, recapitalization or similar business combination with one or more businesses (a "business combination").

Although SC Health is not limited to a particular industry or geographic region for purposes of consummating a business combination, SC Health is focusing its search on companies with operations or prospects in the healthcare sector in the Asia Pacific region. SC Health is an early stage and emerging growth company and, as such, SC Health is subject to all of the risks associated with early stage and emerging growth companies.

As of the date of this prospectus/proxy statement, SC Health had not commenced any operations. All activity through the date of this prospectus/proxy statement, relates to SC Health's formation, the initial public offering, which is described below, and, after the initial public offering, identifying a target company for a business combination. SC Health will not generate any operating revenues until after the completion of its initial business combination, at the earliest. SC Health generates non-operating income in the form of interest income from the proceeds derived from the initial public offering, and the sale of the SC Health private placement warrants.

On March 19, 2021, SC Health entered into the Business Combination Agreement, which, among other things, contemplates the consummation of the Business Combination.

*Results of Operations*

We have neither engaged in any operations nor generated any revenues to date. Our only activities from inception to the date of this prospectus/proxy statement were organizational activities, those necessary to prepare for the initial public offering, described below, and, after the initial public offering, identifying a target company for a business combination. We do not expect to generate any operating revenues until after the completion of our business combination. We generate non-operating income in the form of interest income on marketable securities held in the trust account. We incur expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses in connection with completing a business combination.

Exhibit 4
Page 284

Table of Contents

For the year ended December 31, 2020, we had net loss of $1,091,958, which consisted of operating expenses of $1,736,059, offset by interest earned on investments held in the trust account of $644,101.

For the year ended December 31, 2019, we had net income of $958,107, which consisted of interest earned on marketable securities held in the Trust Account of $1,397,911, offset by operating expenses of $439,804.

### Liquidity and Capital Resources

Until the consummation of the initial public offering, SC Health's only source of liquidity was an initial purchase of SC Health Class B ordinary shares by the Sponsor and loans from the Sponsor.

On July 16, 2019, we consummated the initial public offering of 15,000,000 SC Health units at a price of $10.00 per SC Health unit, generating gross proceeds of $150,000,000. Simultaneously with the closing of the initial public offering, we consummated the sale of an aggregate of 5,000,000 private placement warrants to the Sponsor at a price of $1.00 per warrant, generating gross proceeds of $5,000,000.

On August 2, 2019, in connection with the underwriters' full exercise of their over-allotment option, we consummated the sale of an additional 2,250,000 SC Health units and the sale of an additional 450,000 private placement warrants, generating total gross proceeds of $22,950,000.

Following the initial public offering, the exercise of the over-allotment option and the sale of the SC Health private placement warrants, a total of $172,500,000 was placed in the trust account. We incurred $10,224,407 in transaction costs, including $3,450,000 of underwriting fees, $6,037,500 of deferred underwriting fees and $736,907 of other costs in connection with the Initial Public Offering and the sale of the SC Health private placement warrants.

For the year ended December 31, 2020, net cash used in operating activities was $747,535. Net loss of $1,091,958 was impacted by interest earned on investments of $644,101. Changes in operating assets and liabilities provided $988,524 of cash from operating activities.

For the year ended December 31, 2019, net cash used in operating activities was $515,847. Net income of $958,107 was impacted by interest earned on marketable securities of $1,397,911. Changes in operating assets and liabilities used $76,043 of cash from operating activities.

At December 31, 2020, we had investments held in the trust account of $174,542,012. We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less taxes payable (if applicable) and deferred underwriting commissions) to complete a business combination. To the extent that our shares or debt is used, in whole or in part, as consideration to complete a business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the post-business combination entity, make other acquisitions and pursue our growth strategies.

At December 31, 2020, we had cash of $124,878 held outside of the trust account. We intend to use the funds held outside the trust account primarily to identify and evaluate target businesses, perform business due diligence on prospective target businesses, travel to and from the offices, properties or similar locations of prospective target businesses or their representatives or owners, review corporate documents and material agreements of prospective target businesses, and structure, negotiate and complete a business combination.

As of March 19, 2021, there was approximately $174,545,229 in investments and cash held in the trust account and approximately $10.12 of cash held outside the trust account. In order to fund working capital deficiencies or finance transaction costs in connection with a business combination, the Sponsor or an affiliate of the Sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete a business combination, we would repay such loaned amounts. In the event that a

181

Exhibit 4
Page 285

Table of Contents

business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $2,000,000 of such loans may be convertible into warrants identical to the SC Health private placement warrants, at a price of $1.00 per warrant at the option of the lender.

We do not believe we will need to raise additional funds in order to meet the expenditures required for operating our business. However, if our estimate of the costs of identifying a target business, undertaking in-depth due diligence and negotiating and consummating a business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our business combination. Moreover, we may need to obtain additional financing either to complete our business combination or because we become obligated to redeem a significant number of our public shares upon consummation of a business combination, in which case we may issue additional securities or incur debt in connection with such business combination. Subject to compliance with applicable securities laws, we would only complete such financing simultaneously with the completion of a business combination. If we are unable to complete our business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. In addition, following our business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

In the event that we are unable to close a business combination by April 16, 2021, the escrow agent under an escrow created by the Sponsor or an affiliate will be authorized and instructed to transfer $1.00 per whole SC Health public warrant, to holders of public warrants other than the Sponsor and its affiliates, at the same time as we redeem our public SC Health Class A ordinary shares, and all public warrants will expire worthless.

In connection with the Initial Public Offering, the Sponsor deposited cash funds into an escrow account with J.P. Morgan Chase Bank, N.A. in an amount equal to $8,625,000. The funds held in the escrow account may be used to pay $1.00 per SC Health public warrant (other than public warrants held by the Sponsor and its affiliates) as described above. The funds in the escrow account will not be held in trust or comprise any portion of any pro-rata distribution of our trust account. The escrow of the cash funds are governed by an escrow agreement.

Following a repurchase or payment to holders of SC Health public warrants, any amounts remaining in the escrow account will be returned to the Sponsor or its affiliate.

### Going Concern

In connection with SC Health's assessment of going concern considerations in accordance with FASB's Accounting Standards Update ("ASU") 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern," management has determined that if SC Health is unable to raise additional funds to alleviate liquidity needs as well as complete a business combination during the Combination Period, then SC Health will cease all operations except for the purpose of liquidating. The liquidity condition and date for mandatory liquidation and subsequent dissolution raise substantial doubt about SC Health's ability to continue as a going concern. No adjustments have been made to the carrying amounts of assets or liabilities should SC Health be required to liquidate after the Combination Period.

### Off-Balance Sheet Financing Arrangements

We have no obligations, assets or liabilities, which would be considered off-balance sheet arrangements as of December 31, 2020. We do not participate in transactions that create relationships with unconsolidated entities or financial partnerships, often referred to as variable interest entities, which would have been established for the purpose of facilitating off-balance sheet arrangements. We have not entered into any off-balance sheet financing arrangements, established any special purpose entities, guaranteed any debt or commitments of other entities, or purchased any non-financial assets.

182

Exhibit 4
Page 286

Table of Contents

***Contractual Obligations***

We do not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities, other than as described below.

We entered into an agreement to pay an affiliate of the Sponsor a monthly fee of $10,000 for office space, secretarial and administrative support to SC Health. We began incurring these fees on July 16, 2019 and will continue to incur these fees on a monthly basis until the earlier of the completion of the business combination and SC Health's liquidation.

We have an agreement to pay the underwriters a deferred fee of $6,037,500, which will become payable to them from the amounts held in the Trust Account solely in the event that SC Health completes a Business Combination, subject to the terms of the underwriting agreement.

Additionally, SC Health Group Limited, an affiliate of the Sponsor, entered into the Forward Purchase agreement with us which provides for the purchase by SC Health Group Limited of an aggregate of 5,000,000 SC Health Class A ordinary shares, plus an aggregate of 1,250,000 redeemable SC Health warrants, each to purchase one SC Health Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per SC Health Class A ordinary share and accompanying fraction of a SC Health warrant in a private placement to close concurrently with the closing of a Business Combination. The obligations under the forward purchase agreement do not depend on whether any Class A ordinary shares are redeemed by our public shareholders.

***Critical Accounting Policies***

The preparation of condensed interim financial statements and related disclosures in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and income and expenses during the periods reported. Actual results could materially differ from those estimates. We have identified the following critical accounting policies:

*Ordinary Shares Subject to Possible Redemption*

We account for our ordinary shares subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." SC Health ordinary shares subject to mandatory redemption is classified as a liability instrument and is measured at fair value. Conditionally redeemable SC Health ordinary shares (including SC Health ordinary shares that features redemption rights that is either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within our control) is classified as temporary equity. At all other times, SC Health ordinary shares are classified as shareholders' equity. Our SC Health ordinary shares feature certain redemption rights that are considered to be outside of our control and subject to occurrence of uncertain future events. Accordingly, SC Health ordinary shares subject to possible redemption is presented as temporary equity, outside of the shareholders' equity section of our condensed balance sheets.

*Net Income (Loss) per Ordinary Share*

We apply the two-class method in calculating earnings per share. Net income per SC Health ordinary share, basic and diluted for redeemable SC Health Class A ordinary shares is calculated by dividing the interest income earned on the trust account by the weighted average number of redeemable SC Health Class A ordinary shares outstanding for the period. Net loss per common share, basic and diluted for non-redeemable SC Health Class B ordinary shares is calculated by dividing the net income (loss), less income attributable to redeemable SC Health Class A ordinary shares, by the weighted average number of non-redeemable SC Health Class B ordinary shares outstanding for the periods presented.

183

Exhibit 4
Page 287

Table of Contents

*Recent Accounting Standards*

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on our unaudited condensed interim financial statements.

184

Exhibit 4
Page 288

**Table of Contents**

## INFORMATION ABOUT ROCKLEY

*The following discussion contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this section, the terms "may," "might," "will," "objective," "intend," "should," "could," "can," "would," "expect," "believe," "estimate," "predict," "potential," "plan," "anticipate," "seek," "future," "strategy," "likely," or the negative of these terms, and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these or any other forward-looking statements. These risks and uncertainties include, but are not limited to, those risks set forth under "Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which are based on current expectations and reflect management's opinions only as of the date hereof. These forward-looking statements speak only as of the date of hereof. Rockley expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or any changes in events, conditions or circumstances on which any such statement is based.*

*All references in this section to "we," "us," "our," or "Rockley" refer to Rockley Photonics, Ltd. and its predecessor and subsidiaries prior to the closing of the Business Combination.*

*Rockley®, RayDriver™, RPFabric™, RPStack™, Topanga™, LightDriver™, SpectraCloud™, and SpectraSense™ are among the trademarks, registered trademarks, or service marks owned by Rockley.*

### Company Overview

We have developed a unique sensing platform that we believe can reshape the wellness and healthcare industries through multiple applications in non-invasive, multi-modal biomarker monitoring. We believe products based on our technology platform could have the potential to unlock and accelerate advancements in areas such as early disease detection, nutrition management, and preventative healthcare delivery through continuous health and wellness monitoring.

Our unique sensing platform has been built upon our silicon photonics technology, which enables compelling sensor performance, power, resolution, and density. This technology has the potential to allow monitoring devices, currently the size of clinical machines, to be condensed to the size of a wearable device. We believe this in turn has the potential to unlock additional uses in consumer electronics and medical devices. Our technology is built on over 120 patents, over seven years of product development, and $290 million in total funding as of the date of this prospectus/proxy statement, through the issuance of convertible loan notes and ordinary shares. We have established a manufacturing ecosystem based upon our wholly owned, proprietary processes in several areas for rapid scalability, which we believe provides us with a significant competitive advantage. The resulting combination of technologies and manufacturing know-how is the "full-stack Rockley Platform" which is made up of photonic integrated circuits ("PICs") in silicon with integrated III-V devices (devices incorporating certain conductor elements that offer superior electronic properties, such as lasers), application-specific electronic integrated circuits ("ASICs"), photonic and electronic co-packaging, together with biosensing algorithms and artificial intelligence ("AI") cloud analytics, firmware/software, system architecture, and hardware design.

As testament to the relevance of our product development, we have captured the attention of several consumer electronics companies and, as of the date of this prospectus/proxy statement, we are engaged in discussions or have non-binding MOUs or development and supply agreements with entities which collectively account for over 55% market share of wearable devices and over 50% market share of smartphone devices, based on a combination of data sourced from the Yole Report, the IDtechEx Report and the TrendForce Report, as well as our internal volume forecasts for smartphone, smart watch, and smart earbuds through 2025 (based on customer data). We plan to leverage this attention to develop new capabilities in consumer wearables in the near term, and to expand over time into medical devices and other industry applications. There are no binding purchase commitments under our MOUs and supply agreements.

185

Exhibit 4
Page 289

Table of Contents

Our company was founded in 2013 by Dr. Andrew Rickman, OBE. Dr. Rickman, who has over 30 years of experience in silicon photonics and is a pioneer in the field, led the development of our unique and versatile platform to address a range of emerging and growing markets. In 1988, Dr. Rickman founded Bookham Technology Ltd, the first silicon photonics company and one of the world's largest photonics and fiber optics telecom component producers, and he served as its chief executive officer and chairman until 2004. The acquisition by Bookham of Avanex, Inc., led to the creation of Oclaro, Inc. (NASDAQ: OCLR), which in turn was acquired by Lumentum, Inc., in 2018 (NASDAQ: LITE). From 2007 to 2013, Dr Rickman was chairman of Kotura Inc., a leader in the field of silicon photonics for fiber optic communications, where he oversaw its development and eventual sale to Mellanox Technologies, Ltd. From Rockley's inception in 2013 through December 31, 2020, Dr. Rickman has assembled an industry leading team in silicon photonics with over 82 PhDs and over 150 engineers to work at Rockley. We believe our extensive industry knowledge and deep talent base is a key differentiator to enable us to build a successful business based on our platform.

Our vision is to address many pressing healthcare concerns using our technology and we believe that there exists a large market opportunity for our platform. We estimate that the total addressable market ("TAM") for the consumer wearables, mobile device, and medical device markets is projected to be over $48 billion by 2025, based on data sourced from the Yole Report, the IDtechEx Report, the TrendForce Report, and our internal volume forecasts for smartphone, smart watch, and smart earbuds through 2025 (based on customer data), as the universe of healthcare and consumer wearable devices incorporating additional sensing capabilities emerges.[11] Our target biomarkers for consumer healthcare include lactate, alcohol, glucose (indicator), carbon monoxide, blood pressure, blood oxygen, and core body temperature, among others. Due to the high performance of our lasers up to 1,000,000 times higher resolution, 1,000 times higher accuracy and 100 times broader range in wavelengths compared with existing LED offerings in wearable solutions (based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing solutions), we believe our platform will also be able to address existing applications in consumer wearable devices with significantly higher resolution, accuracy, and range. Further, we believe there are multiple additional markets and concrete opportunities for our technology platform in areas such as data center connectivity (optical transceivers), machine vision (robotic and automotive LiDAR), and compute connectivity (co-packaged optics, or CPO).

---

[11]    Specifically, we believe our TAM for the wearables, mobile, and medical device markets will be approximately $48 billion by 2025, taking into account our anticipated timeline for commercial availability of our products and the market for the end products into which our products are designed to be incorporated. Our products are being designed for utilization in: (a) medical devices, including blood pressure, body temperature, blood glucose, and alcohol monitoring devices, pulse oximetry, and near infra-red ("NIR") spectrometers, with an aggregate forecasted TAM of $15.1 billion by 2025, according to the Yole Report, and mobile cardiac telemetry/general patient monitoring patch devices, with an aggregate forecasted TAM of $2.7 billion by 2025, according to the IDtechEx Report; and (b) consumer wearables and mobile devices, including smartwatches, smart earbuds, fitness bands, and mobile phones, which, based on our internal estimates, are expected to have a TAM of $2.7 billion, $3.0 billion, $1.5 billion, and $23.5 billion, respectively, or an aggregate TAM of $30.7 billion, by 2025. We estimated our TAM in the consumer wearables and mobile device sectors by multiplying third-party forecasted total volumes in 2025 for the devices for which our products are being designed, by our currently anticipated and estimated average selling prices for these products. The volume estimate for smartwatches was based on the benchmarked figure forecasted by annual volume for smartwatches for 2022 according to the TrendForce Report. The volume estimate for smart earbuds was based a 20% volume CAGR between 2020-2025, with 2020 annual shipments estimated at 230 million units, according to the TrendForce Report. According to the Yole Report, fitness bands were forecasted to reach 89 million units by 2025. The volume estimates for smartphones were based on multiple third-party forecasted volumes for mobile phones, multiplied by the average selling price.

186

Exhibit 4
Page 290

Table of Contents

**Product Applications and Development Status**

We believe our innovative and differentiated silicon photonics platform positions us to make photonics-based solutions increasingly pervasive while unlocking previously unaddressed applications. Consequently, we believe the potential applications for our technology will be wide-ranging. Leveraging the flexibility and power of our innovative silicon photonics platform, we believe we are positioned to become a leading supplier of integrated optical components for dynamic, high-growth market sectors, including consumer sensors, healthcare, and data communications. To date, we have been engaged in developing customer-specific designs of our silicon photonics chipsets for incorporation into our customers' end products and currently we do not have any of our own end products in commercial production. We expect that our immediate focus over the next two years will be on developing and commercializing our products for incorporation in consumer wearables and mobile applications, followed by medical devices in the healthcare space, and subsequently on developing our AI analytics cloud platform. In respect of consumer wearables and mobile applications, we plan to start delivering final samples to customers in the first half of 2022 with production ramp of these products commencing in in the second half of 2022. For medical devices in the healthcare space, we plan to commence data collection trials in 2022 with production of units commencing in the first half of 2023, initially at a low run rate. During 2022, our aim is to build a collaboration model for our AI analytics cloud platform before progressing to a commercial launch of a subscription platform planned for the first half of 2023.

*Healthcare: Consumer Wearables*

We are developing an integrated optics module for health-related biomarker sensing and monitoring applications. We believe the high-density optical integration capabilities of our platform can personalize healthcare monitoring of multiple biophysical and biochemical biomarkers and can significantly improve how individuals track and monitor their health and wellbeing. We believe the ability to bring laboratory precision diagnostics to the wrist and other small and convenient form factors can significantly enhance consumer awareness of their health and wellbeing. Further, we plan to develop an AI analytics cloud platform which will offer further insight by leveraging data we collect through our sensing platform and provide meaningful and actionable insight to end users. Although our target market is consumer wellness rather than medical, we intend to monitor and comply with regulations to the extent they become applicable to us, including any requirements for clearance by the FDA. Our plans for the Rockley Platform include a Basic Module and an Advanced Module, which will have a wide array of current and potential applications, as shown in the figure below.



187

Exhibit 4
Page 291

Table of Contents

### Healthcare: Medical Devices

We plan to incorporate our technology into existing devices such as medical patches, wearable bands, and other monitoring devices to provide additional biomarkers not currently available to consumers. We believe this will enhance point-of-care and remote monitoring solutions that have the potential to ultimately transform and disrupt the delivery of patient monitoring and healthcare. In the medical device space, we currently anticipate that we will need to seek FDA clearance for devices that are currently under development based on our technology platform. As these products are still under development and while there can be no assurance that we will be successful in these product development efforts or that even if developed, that such products will achieve widespread market acceptance, we believe these efforts present significant market opportunities in addition to our consumer wearables applications.

### Datacom: Transceiver Chipsets and Co-Packaged Optics

Data centers, which are the nerve centers of the digital economy, require interconnected communications for which we believe our optical transceiver products offer several advantages. Business, entertainment, vital medical research, and other aspects of daily life are in many ways connected to hyperscale data centers, which in turn rely on cost-effective, power-efficient optical communication links. Whether incorporated in pluggable optical transceiver modules or in co-packaged optics, we believe hyperscale data centers will benefit from the unique advantages that our silicon photonics platform has to offer. Furthermore, we believe our go-to-market approach of partnering with a joint venture in China has economic benefits over participating directly as a chipset provider in this margin-sensitive market. By licensing our technology to the joint venture, we offer the joint venture the opportunity to create an economically compelling solution without being required to source elements from multiple suppliers and therefore not incurring higher margin costs, while Rockley benefits from license revenue and our equity stake in the joint venture.

### Other Applications

We believe that our silicon photonic platform is ideally suited for delivering sensing solutions needed for machine perception and interrogation at depth, which is increasingly required in industrial automation, robotic vision, including surgical applications, safety, and autonomous applications. Finely tuned light, delivered through a photonic integrated circuit ("PIC") via a free space aperture or fiber optic interconnect with accompanying detection receiver capabilities, enables substantially better capabilities than previously available technology, such as frequency modulated continuous wave ("FMCW") LiDAR for automotive safety solutions, as well as future autonomous vehicle offerings. Our team has extensive experience in the design of PICs for use in the LiDAR domain and we have prototyped the key components of the system and demonstrated their superior performance. Although we believe the inflection point for LiDAR and the automotive market may be approaching, we plan to leverage our core technology readiness and economies of scale from our consumer business to position ourselves for this potential market opportunity.

### Market Opportunity

#### Health and Wellness

There is growing demand for miniaturized, non-invasive sensing technology devices with real-time diagnostics and analytics that are affordable and accessible outside the clinical environment. We believe this demand is driven by two major market and secular trends:

- *Consumer health and wellbeing awareness*. While there is an existing market for athletes in training, and highly active and health-conscious users, there has been an increasing consumer focus globally on preventative health with users desiring greater control and visibility over their own health and wellbeing. In parallel, amid the proliferation of wearable technologies with emerging health monitoring capabilities, there is greater demand for more sophisticated and comprehensive sensing technology that can cover a broad range of conditions and biomarkers. More recently, COVID-19 has had a profound impact on the way consumers perceive their need for "at-home" monitoring solutions.

188

Exhibit 4
Page 292

Table of Contents

- *Chronic conditions and disease care*. With increased life expectancies, a growing number of chronic conditions and diseases has placed a strain on healthcare systems. Further, non-invasive monitoring solutions for chronic conditions have historically been costly and available only in a medical facility. With our potential for individual noninvasive wearable monitoring solutions, we believe we have a great opportunity to impact patients' compliance with healthcare guidance, that will lead to better quality of life and drastic overall healthcare cost reductions. Non-invasive monitoring could also allow detection and prevention of potential chronic conditions and disease at a much earlier stage, resulting in reduced overall healthcare cost.

We believe existing technologies are not capable of taking full advantage of the above trends, which require solutions that can be miniaturized and operate with low enough power to be integrated into consumer wearables, medical patches, and other compact form factors, that can cover a broad range of conditions and biomarkers, and that can scale cost effectively to high volumes. We believe that our unique silicon photonics-based platform is now poised to serve at the confluence of the above two market and secular trends.

We consider our immediate addressable market to be comprised of consumer wearables and mobile smartphone devices. Based on data sourced from the Yole Report, the IDtechEx Report, and TrendForce Report, as well as our internal forecasts, we estimate that, by 2025, consumer wearables, which includes, smart watches, fitness bands, and smart earbuds, will reach a total of 700 million units per year; smart phones may reach a total of 1.5 billion units per year; and medical devices, which includes blood pressure monitors, pulse oximeters, body temperature monitors, blood glucose monitors, alcohol monitors, and NIR spectrometers, will reach a TAM of $18 billion.[12]

Beyond these opportunities, we believe there may be significant potential for us in the field of genomics. As the field of genomics grows, as shown in the development of personalized medicines and treatment, the value and effectiveness are enhanced when genomic information is combined and processed along with continuous biomarker monitoring for the users. We believe this emerging field could play to the strengths of our platform and potentially represents a high value growth opportunity for the future.

### Datacom

Datacenter operators continue to build and upgrade their datacenter infrastructure to meet the continuing growth in public, private, and hybrid cloud capacity. As these datacenters rely heavily on fiber optics to interconnect compute, storage, accelerators and other resources, this trend is reflected with substantial growth in demand in the high-speed Ethernet optics. LightCounting forecasts that the market for Ethernet optics will grow from approximately $3.0 billion in 2018 to approximately $6.0 billion in 2025. The market segment that we are primarily targeting comprises 400Gb/s and 800Gb/s modules and their addressable market are expected to grow to approximately $3.0 billion in 2025, according to LightCounting's forecasts. We believe our silicon photonics platform is well positioned to address this market with highly integrated PICs to implement the optical functionality required for such transceiver modules. We believe that our platform will provide a substantial cost advantage over conventional discrete-optics-based solutions, as well as over competing integrated photonics solutions due to our platform's volume-scale manufacturing readiness and wafer-level integration and testing capabilities. In addition to the PICs, our silicon photonics-based spectrometer chipset for transceiver modules includes the analog/mixed-signal ICs that implement the interface to the electrical domain.

---

[12] We believe the TAM for medical devices into which our products may be incorporated will be approximately $18 billion by 2025 based on: (a) an aggregate forecasted addressable market of $15.1 billion for healthcare monitoring devices and NIR spectrometers by 2025, according to the Yole Report; and (b) mobile cardiac telemetry/general patient monitoring patch devices with an aggregate forecasted addressable market of $2.7 billion by 2025, according to the IDtechEx Report.

189

Exhibit 4
Page 293

Table of Contents

**Competitive Advantages**

We believe our silicon photonics solutions and technology offer the following key benefits:

- *Superior sensing performance.* Our silicon photonics-based spectrometer chip provides up to one million times higher resolution, approximately one thousand times higher accuracy, and approximately one hundred times broader spectral range than existing LED-based solutions based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing LED-based solutions. We believe our unique silicon photonics technology and the entire product ecosystem we are developing will make our end-to-end offerings in the health and wellness domain difficult to replicate. Current optical-based sensing solutions rely on LED-based sensing (PPG signals for SpO2, heart rate, heart rate variability, breath rate, and blood pressure). However, there are many biomarkers present in the body (such as in blood or interstitial fluid) that are not detectable in visible LED range. We believe the wide wavelength span in infra-red and capability of our silicon photonics solutions to integrate many wavelengths within that range in a compact chip at high volume and low cost opens the door to addressing those biomarkers.



- *Flexible platform architecture.* We have designed our platform from the ground up and, leveraging our team's extensive experience, have developed a highly flexible platform architecture. As a result, we believe our innovative platform architecture will allow us to easily configure core building blocks to produce a wide range of functional components and modules for high-volume applications across a broad range of market sectors.

- *Deep understanding of market opportunity and customer priorities.* We are developing many applications and systems with our silicon photonics solutions that are driven by industry leaders in the consumer sensors, healthcare, and data communications markets. Through our established relationships with industry leaders, we have consistently demonstrated our ability to address their technological challenges. As a result, we have signed memoranda of understanding and have contracted with several industry leaders in wearable consumer technology to establish product specifications and desirable features. We believe we are well-positioned to develop high-volume optical sensing modules and algorithms for their emerging architectures. We have ongoing, collaborative discussions with consumer wearables, healthcare, and communication companies and original equipment manufacturers ("OEM") and module and component vendors to address their next generation product offering to end users.

- *Fabless, scalable business model with manufacturing process expertise and ownership.* We plan to operate in a fabless business model by using third-party foundries to manufacture and to test our products. We believe that outsourcing our product manufacturing and test processes and procedures

190

Exhibit 4
Page 294

**Table of Contents**

simplifies our operations, significantly reduces capital commitments and provides greater flexibility to respond to new market opportunities and scale with our customer demand. We also believe this approach will allows us to invest and focus our resources on proprietary process development and sales and marketing effort.

- *Highly differentiated process.* Our manufacturing processes in several key areas (PICs, III-V actives, Integration) are unique and well suited to meeting our customers' economic and performance needs for their applications. In particular, we believe our silicon PIC process on multi-micron thick Silicon-On-Insulator ("SOI") is a key differentiator. Our manufacturing processes utilize standard semiconductor manufacturing equipment but are optimized for photonics performance through incorporating innovative features to facilitate easier integration and packaging.

- *Strong intellectual property portfolio.* We believe our extensive intellectual property provides us with a significant competitive advantage. Our know-how is based on over 30 years of leadership in the development and commercialization of silicon photonics and we have established strong and deep technical foundations and expertise for high-volume product delivery that would be difficult for a competitor to replicate.

- *Established and committed foundry partner network.* We have built a high-volume foundry network comprised of strategic partners who share our growth vision, and our engineering team continues to work to push new boundaries in photonic component manufacturing processes.

We believe the combination of all our capabilities makes the Rockley Platform unique. Our high-performance optical sensing module with broad biomarker detection capabilities, combined with the power of our algorithms and AI platform, enable us to target unmet needs and challenges in the health and wellness markets. We have ongoing formal and informal collaborative discussions with the industry and technology leaders in consumer sensor, healthcare, and data communications companies, as well as with OEMs, and module and component vendors concerning the design of architectures and products to address existing and next generation applications. Based on these interactions, we believe we are one of a limited number of suppliers to these OEMs for the type of products we plan to sell, and in some cases, we may be the sole supplier for certain applications.

**Our Strategy**

Our strategy is to become the leading global provider of sensing products comprised of integrated optical modules with supporting electronics, software, application algorithms, and AI platforms for high-volume applications in dynamic and high-growth market sectors. Key elements of our strategy include:

- **Extend our silicon photonics leadership**. We intend, through continuous platform engineering and advanced research and development, to continue driving innovation in the silicon photonics market and to improve the performance of our current solutions across a variety of key metrics, including size, power, and signal quality. Such innovation will be a key to opening new market opportunities.

- **Identify and promote new and emerging applications for our technologies**. We are actively engaged with our science and technology partners to explore new potential markets and applications for our technology. We intend to continue to collaborate with our partners to understand the challenges in their end-product roadmaps and to demonstrate how our technologies can help them to devise and enable innovative solutions.

- **Develop our product portfolio**. Beginning with our first target products in the consumer domain and on the wrist applications, we intend to develop and broaden our product portfolio by continuing to invest in research and development so we can expand our platform capabilities as well as enhance our existing product roadmap. We are actively conducting research and development on other form factors and domains such as mobile and patch for spot checks. We believe our differentiated technology will play an important role in usage of patches for post hospital patient monitoring needs and for other niche markets such as diet and weight management, and diabetes prevention.

191

Exhibit 4
Page 295

Table of Contents

- ***Forming strategic partnerships in products and applications:*** Working with our partners, we have developed many potential product application opportunities with our unique technology that can be researched and unlocked in the future. Our partners operate in various domains such as hardware development, algorithm development, AI, and clinical research.

- ***Continue to attract and acquire new customers***. We intend to expand our customer base by focusing on direct dialogue with large strategic accounts as well as partnering with large distributors and resellers. We believe this multi-track strategy will allow us to provide differentiated solutions to a broad array of customers.

- ***Sustain margin through expansion of our products into higher-end markets***. We intend to use our technological expertise to deliver higher value and high product margins. In addition, we intend to continue to reduce our costs through operational improvements and supply-chain management initiatives.

**Our Technology Platform and Product Offerings**

Our solutions leverage our deep understanding of silicon photonics, application science, and our innovative platform architecture to address high-volume applications in the consumer sensors, healthcare, and data communications markets. We believe our leadership position in developing silicon photonics-based sensing solutions is a result of the following core strengths:

- A unique and proprietary silicon photonics platform technology to address a broad set of requirements in the healthcare and wellness industries.

- Our custom multi-micron-waveguide photonics-optimized process with integrated III-V semiconductor actives brings multiple competitive advantages in terms of performance and manufacturability, offering lower waveguide losses, higher waveguide power handling, polarization independence, ubiquitous integration of III-V actives in their native known-good-die form, ultra-broad-band performance, and lower sensitivity to manufacturing variations while enabling compact circuitry with high integration densities.

The figure below illustrates the key benefits of Rockley's silicon photonics platform in comparison with mainstream platforms. The horizontal axis represents waveguide thickness—conventional platforms are based on thin waveguides with a thickness in the range of 220—300nm (on the left side of the scale), whereas Rockley's platform adopts multi-micron thick waveguides (on the right side of the scale). The diagram shows how several key performance metrics improve with waveguide thickness, highlighting the platform's superior photonic performance and suitability for high-yield volume manufacturing.



192

Exhibit 4
Page 296

**Table of Contents**

Additional key points concerning the photonics technology include the following:

- Optical loss per unit distance is much lower than for others, enabling lower power solutions and/or larger-scale PICs.

- The platform provides broadband performance and is suitable for the visible, short-wave and mid-infrared bands. This is a key enabler for sensing applications that other platforms cannot serve.

- A larger waveguide is much less sensitive to manufacturing variations that can affect its shape and hence its refractive index, thus achieving much better center wavelength registration than small waveguides enabling accurate wavelength filters.

- Strong optical confinement enables tight packing of waveguides and sharp waveguide bends, hence dense layout capability and compact PICs.

- Our waveguides exhibit low dispersion (low signal distortion) and low polarization dependent loss (simplifying receiver architectures in particular).

- The platform incorporates features that enable low-loss, passively-aligned fiber coupling (integrated mode size converters and v-grooves).

- The platform is well suited to power-efficient integration of III-V waveguide devices such as lasers and modulators that also have a multi-micron mode size. Processed, known good, III-V devices can be flip-chip bonded into recesses etched in the silicon waveguide layer to achieve edge coupling. This has the advantages of compact coupling without tapers or spot-size converters, active device processing in existing III-V foundries, back-end integration of known good and reliable III-V devices, and more favorable thermals.

- The large waveguides also offer a much higher optical power handling capability than small waveguides.

- Broadband optical performance enables sensing a large optical spectrum to cover a wide range of measurands.

- Accurate wavelength targeting enables using many finely-spaced wavelengths for accurate detection.

- Low optical loss enables a high signal-to-noise ratio ("SNR") and hence high-fidelity signal detection and helps reduce overall power consumption.

- Low-loss coupling from III-V to Si waveguide drives down power consumption for long battery life.

- Compact PIC layouts result in small chip sizes to fit within consumer device form factors and reduce product cost.

- Known-good-die integration of active elements improved yields, which leads to cost-effective solutions.

193

Exhibit 4
Page 297

**Table of Contents**

The figure below illustrates our full stack platform model.



- *Photonic integrated circuits in silicon with integrated III-V:* The design and large-scale manufacturing of silicon photonic PICs and integration of active "III-V" elements onto these PICs are the foundational competencies of Rockley. These PICs are manufactured using our proprietary and highly differentiated process flow deployed at our foundry partners.

- *Application-specific integrated circuits ("ASICs"):* The design of electronic ICs to complement our PICs and facilitate their integration into a specific end product is the second key component of our platform offering. The ICs are designed in volume CMOS or BiCMOS technology nodes using standard design flows and are manufactured at volume-scale foundries.

- *Photonic & electronic co-packaging:* The next layer of the stack conjoins photonic and electronic ICs into opto-electronic engines through advanced co-packaging technologies, including 2.5D and 3D integration. Such dense integration is key and enables us to achieve the energy efficiency and physical size requirements for our core use cases. We partner with specialized packaging houses to provide the capacity required for serving consumer markets.

- *System architecture & hardware design:* We have built deep expertise in architecting photonic systems for sensing solutions in healthcare and wellness, machine vision, and data communications. This enables us to go beyond making chips, and allows us to deliver higher value-add photonic subsystems, modules and chipsets that fit seamlessly into our end product partners' designs.

- *Firmware/software:* Any system requires some degree of firmware and software to operate and inter-operate, and our photonic systems are no exception. We have in-house expertise to develop the necessary firmware and software to complement our hardware offerings and facilitate system integration, testing, and monitoring by our customers.

- *Sensing algorithms, AI & cloud analytics:* At the highest level of the stack, we develop algorithms, AI models, and cloud-based infrastructure to gain deeper insights into health and wellness trends from the mass sensor data collected by our wearable modules.

We believe the key benefits that our solutions can provide to our customers are as follows:

- **Low Power and Small Footprint**. In each of the end markets that we expect to serve, the power budget of the overall system is a key consideration. Power consumption greatly impacts system operation cost, footprint, and cooling requirements, and is increasingly becoming a point of focus for our customers and other market participants we are targeting as future customers. We believe that our silicon photonics solutions enable our customers to implement system architectures that reduce overall system power

194

Exhibit 4
Page 298

**Table of Contents**

consumption. In addition, in many of our applications, we are able to design and deliver semiconductors that have a smaller footprint and therefore reduce the overall system size.

- **Faster Time to Market**. Our customers and other market participants that we are targeting as customers compete in markets that require high-speed, reliable optical components that can be integrated into their systems as soon as new market opportunities develop. To meet our customers' time-to-market requirements, we work closely with them early in their design cycles and are actively involved in their development processes.

| Business Unit | Product | Application |
|---|---|---|
| Health Sensing | Basic Module | • PPG sensing: Heart rate, heart rate variability, breath rate, blood oxygenation, blood pressure<br>• IR sensing: Temperature, hydration |
| Health Sensing | Advanced Module | • PPG sensing: Heart rate, heart rate variability, breath rate, blood oxygenation, blood pressure<br>• IR sensing: Temperature, hydration, alcohol, lactate, glucose |
| Datacomms | 400G-DR4 Chipset, 800G-2DR4 Chipset | • Intra datacenter optical communications |

- We will target applications in the consumer health and wellness industry and expect strong customer engagement in the consumer electronics and wearables market. The Rockley Platform represents a breakthrough which will confer on consumer electronic devices, primarily including personal wearables, smartphones and homecare devices, the capacity for new powerful healthcare and wellness monitoring. Our first health monitoring product offering is expected to launch in 2022 consists of a basic module targeting fitness tracker bands and an advanced module targeting smartwatches.

- The Rockley basic and advanced modules leverages existing LED based optical sensing and augments with Rockley's proprietary infrared optical sensing to expand biomarkers sensing at the wrist. The advanced module will have the hardware and software capabilities to collect information available relevant to glucose tracking. This feature will then be enabled for our customers after we gather and analyze an appropriate amount of user data and determine the level of information we need to make available.

- The continuing growth in datacenter deployments and upgrades is driving demand for high-speed optical intra-datacenter network links with reaches up to 2km. Our 400G-DR4 chipset provides 400Gb/s of capacity (four lanes of 100Gb/s each) and is targeted at the market for 400GBASE-DR4 Ethernet optics (pluggable transceiver modules) in QSFP-DD and OSFP form factors. This is forecast to be the largest segment within the datacenter optics market for the coming years. This chipset enables transceiver module vendors to implement a solution with lower cost and lower power than conventional discrete-optics-based approaches. The four-part chipset comprises a transmit PIC, a receive PIC, a transmit IC, and a receive IC, which have been co-optimized for highest performance.

- The 800G-2DR4 chipset addresses the emerging market for 800Gb/s transceiver modules. This market is expected to take off when switch ASICs with 100Gb/s serdes start being deployed. This chipset essentially doubles the number of channels of the 400G-DR4 chipset from four to eight and enables a doubling of bandwidth density at the transceiver module level that will increase power efficiency, and reduce cost per capacity.

195

Exhibit 4
Page 299

**Table of Contents**

**Rockley's Silicon Photonics Toolbox Elements**

Rockley's proprietary silicon photonics platform covers a unique end-to-end solution, from generation of the light into, manipulation (modulation, multiplexing), radiation out of the module, and collection and processing of the returned light. The following provides an overview of the key components of our platform:

- **Lasers**: Our lasers offer fine wavelength control and good power efficiency. The waveguide platform allows efficient wafer-scale integration of laser-devices through a flip-chip process.

- **Modulators and detectors**: We have developed optical modulators and detectors that are ultra-compact, power efficient and high speed, capable of handling high data rates and a broad range of wavelengths.

- **Combiners and splitters**: Our platform is capable of wavelength division multiplexing ("WDM") and demultiplexing, enabling in excess of 100 wavelengths on a single optical path.

- **Fiber optic coupling**: Our photonic IC contains on-chip embedded interfaces to the optical fibers. These interfaces allow the fiber to be passively attached directly to the photonic IC without external light coupling elements.

- **Free-space optics**: Our platform allows for efficient light coupling from free space into and out of the photonics circuits, with either edge or perpendicular coupling. This feature enables a broad range of sensing applications.

- **Photonic integrated circuits**: Our development platform enables integration of light sources, active devices, passive devices and optical coupling elements into a single compact silicon chip.

- **Wafer-scale processing**: Our silicon photonics platform enables high throughput wafer-scale processing of monolithic and multi-die structures for chip-on-wafer integration.

- **Interface electronics**: We have in-house design expertise for custom analog circuitry to translate high-speed data streams into signals that actuate the photonics ICs (drivers) and receive signals from them (amplifiers). This is complimented with our digital design capability for device control, signal processing and interfaces to our customers systems.

- **Packaged assembly**: The assembly of electrical ASICs, photonics ICs and fiber optics (if needed) into a single, highly integrated product requires a test and manufacturing flow which enable high volume scale.

Further application-based expertise is focused on:

- **Tissue optics design**: Our sensing module product includes probe and hardware design to optimize sensing through skin.

- **Biomarker application**: Our sensing algorithms are developed through various levels of validation from proof of concept in the lab to clinically validated in human to provide state of the art sensing capabilities.

- **Applied data science**: Our AI and cloud analytics transforms spectral data from our sensing product to extract additional insights and algorithm improvements.

**Future Product Capabilities**

We plan to incorporate our technology into existing devices such as patches, wearable bands, and other monitoring devices to provide additional biomarkers not currently available. We continuously research, evaluate, and prioritize the addition of new biomarkers into our product offerings to add more valuable information and insight. Our broad range of addressable biomarkers are at various stage of validation and demonstrations, from

196

Exhibit 4
Page 300

**Table of Contents**

proven science to miniaturization. The chart below illustrates a few examples of biomarkers for which we have validated their addressability using its IR wavelengths.



These biomarkers along a few others we are investigating are key in early detection, prevention, and monitoring of major chronic illnesses, as illustrated in the table below:



As these products are still under development, there can be no assurance that we will be successful in these product development efforts or that even if developed, that such products will achieve widespread market acceptance.

**Customers**

We believe existing commercial relationships with leading consumer device customers validates our unique technology and the business opportunity at hand. Our near-term commercial focus is on a robust pipeline in

197

Exhibit 4
Page 301

**Table of Contents**

consumer devices, medical devices, and life sciences companies. We have a sales funnel of over 100 potential customer targets of which we started discussions with 45, entered into due diligence with 17 of the 45, proceeded to contract negotiations with eight, and engaged (through non-binding memorandums of understanding) or entered into contracts with five of the eight. The customers with whom we are engaged or contracted with represent more than 50% of wearable and more 55% of smartphone global volumes. Although our near-term focus through 2024 is on our consumer health and wellness strategy, we believe other markets also represent upside potential.

To date, we have generated revenue primarily from NRE and development services for customer-specific designs of silicon photonics chipsets for incorporation into their customers' end products. Our two largest customers collectively accounted for 100% and 99.6% of our revenue in 2020 and 2019, respectively. We anticipate revenue attributable to these customers will fluctuate from period to period, although we expect to remain dependent on these customers for a significant portion of our revenue for the foreseeable future. See "Risk Factors – Customer-Related Risks." Our current projections anticipate that we will achieve increased revenue beginning in 2023, assuming commercial adoption of our products by consumer device manufacturers in the wearable space, with revenue projected to exceed over $1.1 billion in 2024, assuming sensor volume ramp with the contracted customers. Our 2024 unit-volume forecast represents less than 5% penetration in the wearables and mobile phone space. See "Risk Factors – Risks Related to Rockley's Business and Industry – Rockley's forecasts and projections are based upon assumptions, analyses and internal estimates developed by Rockley's management. If these assumptions, analyses or estimates prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from those forecasted or projected" and other risk factors discussed in "Risk Factors" relating to the forecasts, projections, and estimates included in this prospectus/proxy statement.

We work closely with our end customers throughout their design cycles and will develop long-term relationships as our differentiated technology becomes embedded into their products. For example, we currently hold a development and supply agreement with one customer since 2017 and have successfully designed and delivered critical sample chips to them. As a result, we believe we are well-positioned to be designed into their current product roadmaps and develop their next generation solutions for their future products. Because many of our target customers or their OEMs are located in North America and Asia Pacific, we anticipate that a majority of our future revenue will come from sales in these regions. Although a large percentage of our sales are made to customers in North America, we believe that a significant number of the systems and devices designed by these customers will incorporate our semiconductor products which are then sold to end-users globally. In addition to our current customers, we have entered into non-binding memorandums of understanding with Zepp Health Corp., LifeSignals Group, Inc., and Withings France SA with respect to the future supply of our Rockley basic and advanced modules, if and when such products become commercially available. The terms of these agreements are non-binding in nature and non-committal as to volumes and price. However, we believe these memorandums of understandings indicate a significant interest in Rockley's products and the potential for the future supply our products to significant product manufacturers. We expect that once the Rockley modules are commercially available, Rockley will enter into standard supply agreements with each of these parties.

**Sales and Marketing**

Our customers' design cycle from initial engagement to volume shipment typically ranges from three to five years, with product life cycles of two years or more. For many of our products, which are technically complex, we must engage early with our customers' technical staff. To ensure an adequate level of early engagement, our sales, marketing, and development engineers must work closely with our customers and channel partners to understand, identify, and propose solutions to meet their systems' challenges. We work closely with our customers to anticipate end customer market needs. In some cases, we work with ecosystem partners to better understand market trends and new requirements that are being placed on our end customers.

Exhibit 4
Page 302

Table of Contents

**Manufacturing**

**Our Proprietary Production and Manufacturing Ecosystem**

We have built, and plan to continue to develop, a global manufacturing ecosystem designed with the ability to scale in a rapid and efficient manner. Several key areas within this manufacturing ecosystem run on our proprietary process and manufacturing technologies and are protected by our intellectual property portfolio. We possess end-to-end control over design, manufacturing and packaging process, algorithms, and software. Our disciplined and systematic documentation and protection of critical know-how, trade secrets, and proprietary information further underpins our manufacturing ecosystem. To the best of our knowledge, there are no other turnkey options with the components and technologies needed to put together our sensing product. In addition to the intellectual property arrangements, we also have commercial exclusivity agreements with some of the key manufacturing ecosystem partners to prevent replication of this capability.

In addition to providing what we believe to be unmatched capabilities at the product level, our platform and the associated technology have been designed from bottom up to take into account the relative ease and cost of manufacturing and scaling. Elements like waveguide dimensions for ease of wafer fabrication and high yields, robust and position tolerant coupling strategies for III-V integration, wafer scale back-end activities for III-V manufacturing, and all known good die integration at the module are integral to the product and the process technology. These elements are covered by the intellectual property which we have licensed to our manufacturing ecosystem.

**Manufacturing Model Overview**

We plan to operate a fabless business model and use third-party foundries and assembly and test contractors to manufacture, assemble and test our products. In several key areas, our third-party partners operate a proprietary process wholly owned by us and protected by our intellectual property portfolio. This outsourced manufacturing approach allows us to focus our resources on the design, sale, and marketing of our products. In addition, we believe that outsourcing many of our manufacturing and assembly activities provides us with the flexibility needed to respond to new market opportunities and scale for customer demand, simplifies our operations, and significantly reduces our capital commitments.

We believe our fabless model will allow us to scale in a capex efficient manner. We have contracted with global tier-1 foundries, including Newport Wafer Fab ("NWF") for silicon PICs and wafer-scale III-V device integration and testing. This foundry is qualified for health, consumer and auto applications and has the capacity to manufacture over 400,000 wafers per year. The terms of this agreement provide that Rockley will be a priority customer of NWF with regard to supply of PICs, wafers, and testing facilities. In return, Rockley agrees to give NWF a right of first refusal to supply of such products and services, subject to NWF completing a build out of their capabilities, provided that Rockley is entitled to seek alternative supply where NWF does not satisfy Rockley that NWF is able to meet Rockley's requirements for price, lead times, or quality of supply. Our agreement with NWF does not include any binding commitments or minimum requirements with respect to order or supply volumes. Our high-volume III-V semiconductor foundry is consumer and telecom qualified, supports very high volumes, and runs fully automated processes at one of the largest wafer scale in III-V manufacturing globally. Finally, our global IC foundry supplier handles the manufacturing of the electronic integrated circuits for our sensing modules. The foundry is used by most major consumer OEMs and is qualified for the ultra-high volume process node that we have chosen.

- **Raw Materials and Wafer Supply:** The starting raw materials (SOI wafers) for our silicon photonics have been customized by world leading silicon providers for the Rockley proprietary specification. For the active III-V components, we have arrangements in place with the world's leading epitaxial wafer supplier. We also have volume ready suppliers for commercial off-the shelf-components ("COTS") that go into the visible sensing and the overall module.

199

Exhibit 4
Page 303

Table of Contents

- **Wafer Fabrication:** Our SOI wafers are converted into fully processed silicon photonics PIC wafers at NWF which is the leading site for semiconductor manufacturing in the United Kingdom and qualified at Tier-1 global companies. The process used by NWF is wholly owned by Rockley and licensed for use by NWF only in Rockley products. The process design kit ("PDK") for this process is developed and maintained by us and constitutes our intellectual property.

    For the III-V active components, epitaxial materials are processed into finished wafers at a world leading dedicated III-V foundry making detectors, lasers and LEDs using state-of-the-art wafer-scale levels of automation. We have adapted the base process technology from this foundry to incorporate the previously discussed elements that allow for ease of integration into our platform and ease of manufacturing. These elements are exclusively for use in Rockley products.

    Finally, for ASIC manufacturing, we use a standard process node and PDK provided to us by TSMC. While the manufacturing process is widely used in high volume (good for product economics), the design know-how belongs to Rockley. The custom ASIC matches our silicon photonics platform optimally for low noise, low power and high level of integration.

- **Chipset and module integration:** The chipset integration of the III-V active components into the silicon PICs is done at wafer scale and using passive alignment techniques that are uniquely enabled in our platform. Furthermore, we have ensured that the III-V components are in arrays of devices (reduces amount of alignment and integration activities) and on pretested known good die ("KGD") which ensures very high compounded yields. The process IP is developed and owned by Rockley and the integration will be performed at NWF where the PIC wafers are fabricated.

The integration of the overall module is in-line with assemblies used for wearables and mobile devices and there are many global suppliers with this capability. We have engaged with leading suppliers that serve Tier-1 consumers in this space and expect to finalize these arrangements for assembly within 2021.

We have development and supply agreements in place with the key suppliers. These agreements cover the development program, economic framework, IP licenses, exclusivity terms and other matters. Although we have commenced long-term supply agreement discussions in parallel with the detailed manufacturing ramp discussions, we do not currently have any long-term supply agreements in place and transact business with our third-party suppliers on a purchase-order basis with no minimum supply obligations on their part. We have designed our manufacturing partner network to be resilient by having multiple sources of supply for several key processes/components and we have plans for the appropriate inventory and stocking strategies to mitigate risks to our ramp plans.

**Commitment to Quality**

We are committed to excellence by creating class-leading silicon photonics-based products and services. We intend to meet or exceed our global customer expectations by:

- Creating long-lasting, trusting, and mutually beneficial relationships with customers and partners;

- Establishing a full understanding of our customers' requirements and ensuring our products and services meet their expectations;

- Building a team of highly trained, empowered, and accountable employees;

- Innovating in the creation of technology driving our products and services; and

- Improving the effectiveness and efficiency of our quality management system through review of results, learning, and enhancement on a continual basis

We are actively seeking ISO 9001:2015 certification in second half of 2021. We subject our third-party manufacturing contractors to rigorous qualification requirements to meet the high quality and reliability

Exhibit 4
Page 304

**Table of Contents**

standards required of our products. We carefully qualify each of our partners and their processes. Our engineers work closely with our foundries (we even have teams embedded at partners sites in some critical areas) and other contractors to perfect the in-house processes, increase yield, lower manufacturing costs, and improve product quality.

**Research and Development**

We believe that our future success depends on our ability to develop new products for both existing and new markets, development enhancements to our products once developed or if and when commercially launched, to stay ahead of our competition by being leaders in extending the boundaries of our technologies. As a result, a significant amount of our operating expenses has been allocated towards next-generation platform development. Our research and development efforts are focused primarily on extending the functionality and addressable markets of our integrated photonics platform, as well as continually increasing its performance, efficiency, and volume manufacturing competitiveness. We have assembled a core team of experienced engineers and systems designers with an extremely broad range of skill sets across different disciplines who conduct research and development activities in the United States and various European locations, and we are supported by partnerships with leading research institutions and consumer electronics and medical devices companies. As of March 2021, we have 205 employees globally with over 75% of our workforce focused on research, product development, and engineering.

**Competition**

The global optical components market in general, and the consumer sensor, healthcare, and data communications markets in particular, are highly competitive. We expect competition to increase and intensify as additional companies enter our target markets. Our competitors range from large, international companies offering a wide range of services and optical components, such as LEDs, lasers, detectors, or PICs, to smaller companies specializing in narrow market verticals. Some of our key competitors across various verticals include: AMS, ADI, Broadcom, Brolis, Cisco, GlobalFoundries, Intel, Lumentum, Maxim, OSRAM, TSMC, and Tower Jazz. We expect competition in our target markets to increase in the future as existing competitors improve or expand their product offerings and as new competitors enter these markets. However, we believe we are currently the only provider with the capability to integrate the technologies and features and performance required by customers in our target markets. We believe our unique silicon photonic-based platform and the entire product ecosystem which we have developed around it will make our end-to-end offerings in the health and wellness domain difficult to replicate and provides us with a significant competitive advantage. We believe this will be particularly true as we incorporate our AI and cloud-based offerings currently under development.

The following summarizes how we believe we are positioned with respect to key competitive factors across our target markets:

• **Product performance and features**

  • Power consumption meeting wearable product requirements: We believe our proprietary low-loss photonics platform in combination with electronics designed in a state-of-the-art technology node and configurability of frequency and accuracy of application data collection enables us to meet the power requirements of our target markets.

  • Novel features and extended functionality: Compared with existing conventional solutions, we believe our platform supports more wavelengths in both the visible and infrared ("IR") wavelength ranges. This in turn unlocks multiple biomarkers that can only be targeted in our optimized IR platform. The number of wavelengths, wavelength registration (accuracy), wavelength resolution, tunability, and stability are all key aspects in delivering such broad functionality.

  • Application specific algorithms and AI: We plan to monetize the sensor data generated by our unique hardware capabilities by means of a cloud-based data collection and processing platform based on

Exhibit 4
Page 305

Table of Contents

proprietary algorithms and AI models. We believe this will enable extraction of lower order health information. Moreover, processing the sensor data through our AI platform can extract more in-depth health information such as indications of illness or trending direction of all health-related information.

- Size: Our compact form factor technology enables us to meet the product requirements smart bands and smartwatch end products.

- **End to end manufacturing ecosystem**

  - Covers all the elements needed to bring full solution together.

  - Optimized to meet the application performance needs.

  - Cost effective and designed to scale rapidly.

  - Unique and not easy to replicate.

- **Reputation and reliability**: Deep customer relationships starting at development phase and strong support in adoption and deployment of devices using our technology.


**Intellectual Property**

We rely on a combination of intellectual property rights, including patents, trade secrets, copyrights and trademarks, and contractual protections, to protect our core technology and intellectual property. As of March 1, 2021, we had 74 issued and allowed patents and 80 other patent applications pending in the United States. The 74 issued and allowed patents in the United States expire in the years beginning in 2021 through 2040. Many of our issued patents and pending patent applications relate to sensors and sensor chips, and we have extensive geographic coverage over numerous relevant technology domains.

In addition to our own intellectual property, we also use third-party licensors for certain technologies embedded in our silicon photonics solutions. These are typically non-exclusive contracts provided under paid-up licenses. These licenses are generally perpetual or automatically renewed for as long as we continue to pay any maintenance fees that may be due. To date, maintenance fees have not constituted a significant portion of our annual capital expenditures. We have entered into a number of licensing arrangements pursuant to which we license third-party technologies. We do not believe our business is dependent to any significant degree on any individual third-party license.

We generally control access to and use of our confidential information and trade secrets through the use of internal and external controls, including contractual protections with employees, contractors, and customers. We rely in part on the laws of the United States and international laws to protect our work. All employees and consultants are required to execute confidentiality agreements in connection with their employment and consulting relationships with us. We also require them to agree to disclose and assign to us all inventions conceived or made in connection with the employment or consulting relationship. However, we cannot guarantee that we have entered into such agreements with every such party, and we may not have adequate remedies in case of a breach of any such agreements. Our trade secrets could be disclosed to our competitors or others may independently develop substantially equivalent technologies or otherwise gain access to our trade secrets. Trade secrets can be difficult to protect and some courts inside and outside of the United States are less willing or unwilling to protect trade secrets.


**Government Regulation**

*Healthcare-Related Regulation*

Our solutions may be incorporated into multi-application, health-related sensing, and monitoring applications, including healthcare consumer wearables. Accordingly, the end products into which our solutions

202

Exhibit 4
Page 306

**Table of Contents**

are incorporated may be subject to FDA and similar or related regulations, and demand for these end products or future regulated products could be adversely affected if such end products do not comply with applicable requirements. Although our target market is consumer wellness rather than medical, we intend to monitor and comply with regulations to the extent they become applicable to us, including any requirements for FDA clearance. Certain healthcare-related products may be regulated by the FDA and corresponding state regulatory agencies in the United States and separate governmental authorities outside of the United States. In the United States, the medical device industry is regulated by governmental authorities, principally the FDA and corresponding state regulatory agencies. Before a new regulated product or a significant modification to an existing medical device may be marketed or sold in the United States, it must comply with FDA Quality Management System regulations, and must obtain regulatory clearance or approval from the FDA, unless an exemption from pre-market review applies. In addition, certain future software functionality, whether standalone or embedded in existing or future devices, may be regulated as a medical device and require pre-market review and clearance or approval by the FDA. The process of obtaining regulatory clearances or approvals to market a medical device can be costly and time consuming, and our end customers may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any medical device products under development could prevent us from generating revenue from our solutions incorporated into these products.

Medical devices are also subject to numerous ongoing compliance requirements under the regulations of the FDA and corresponding state regulatory agencies, which can be costly and time consuming. For example, under FDA regulations medical device manufacturers are required to, among other things: (i) establish a quality management system to help ensure that their products consistently meet applicable requirements and specifications; (ii) establish and maintain procedures for receiving, reviewing, and evaluating complaints; (iii) establish and maintain a corrective and preventive action procedure; (iv) report certain device-related adverse events and product problems to the FDA; and (v) report to the FDA the removal or correction of a distributed product. If our solutions are incorporated into any medical device products of our end customers and these customers experience any product problems requiring reporting to the FDA or otherwise fail to comply with applicable FDA regulations or the regulations of corresponding state regulatory agencies, it could harm our ability to sell our solutions. In addition, if our end customers in the healthcare market are subject to enforcement actions such as fines, civil penalties, injunctions, recalls of products, delays in the introduction of products into the market, and refusal of the FDA or other regulators to grant future clearances or approvals, it could harm our reputation, business, operating results, and financial condition. In addition, in the United States, the FDA has taken the position that device manufacturers are prohibited from promoting their products other than for the uses and indications set forth in the approved product labeling, and any failure to comply could subject our end customers to significant civil or criminal exposure, administrative obligations and costs, and/or other potential penalties from, and/or agreements with, the federal government.

Government regulations outside the United States have, and may continue to, become increasingly stringent and common. In the European Union, for example, the European Union Medical Device Regulation was published in 2017 and, when it entered into full force in 2020, included significant additional pre-market and post-market requirements. Penalties for regulatory non-compliance could be severe, including fines and revocation or suspension of a company's business license, mandatory price reductions, and criminal sanctions. Future laws and regulations may have a material adverse effect on our end customers in the healthcare market, which in turn may negatively impact our ability to sell our solutions and otherwise harm our business and financial results.

*Export Regulation*

Our business activities are also subject to various restrictions under U.S. export and similar laws and regulations, as well as various economic and trade sanctions administered by the U.S. Treasury Department's Office of Foreign Assets Control. Further, various countries regulate the import of certain technology and have enacted or could enact laws that could limit our ability to provide customers with our products in those countries.

Exhibit 4
Page 307

Table of Contents

We are also subject to various domestic and international anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act, as well as other similar anti-bribery and anti-kickback laws and regulations. These laws and regulations generally prohibit companies, their employees, and their intermediaries from authorizing, offering, providing, and/or accepting improper payments or other benefits for improper purposes. Although we take precautions to prevent violations of these laws, our exposure for violating these laws increases as our international presence expands and as we increase sales and operations in foreign jurisdictions.

New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to technology in the wearables industry generally could result in significant additional compliance costs and responsibilities for our business.

*Privacy*

We are or may become subject to a variety of laws and regulations in the United States and abroad regarding privacy, data protection, and data security. These laws and regulations are continuously evolving and developing. The scope and interpretation of the laws that are or may be applicable to us are often uncertain and may be conflicting, particularly with respect to foreign laws.

In particular, there are numerous U.S. federal, state, and local laws and regulations and foreign laws and regulations regarding privacy and the collection, sharing, use, processing, disclosure, and protection of personal data. Such laws and regulations often have changes in scope, may be subject to differing interpretations, and may be inconsistent among different jurisdictions. For example, the General Data Protection Regulation (the "GDPR"), which became effective in May 2018, includes operational requirements for companies that receive or process personal data of residents of the European Union that are broader and more stringent than those previously in place in the European Union. The GDPR includes significant penalties for non-compliance, including fines of up to €20 million or 4% of total worldwide revenue. Additionally, in June 2018, California enacted the California Consumer Privacy Act (the "CCPA"), which became effective in January 2020. The CCPA requires covered companies to provide California consumers with new disclosures and expands the rights afforded consumers regarding their data. Fines for noncompliance may be up to $7,500 per violation. We cannot currently estimate the potential impact of the CCPA on our business or operations.

Additionally, we rely on various legal mechanisms for transferring certain personal data outside of the European Economic Area, or EEA, including the EU-U.S. Privacy Shield Framework, or Privacy Shield, and EU Standard Contractual Clauses, or SCCs. If we fail or are perceived to fail to meet the Privacy Shield principles or our obligations under the SCCs, or if any of these legal mechanisms for transferring data from the EEA are invalidated by European courts or otherwise become defunct, European Union data protection authorities or the U.S. Federal Trade Commission, or FTC, could bring enforcement actions seeking to prohibit or suspend our data transfers or alleging unfair or deceptive practices. In such cases, we could be required to make potentially expensive changes to our information technology infrastructure and business operations, and we could face legal liability, fines, negative publicity, and resulting loss of business.

Certain health-related laws and regulations such as the Health Insurance Portability and Accountability Act of 1996, or HIPAA, and the Health Information Technology for Economic and Clinical Health Act, or HITECH, may also have an impact on our business. If we are unable to comply with the applicable privacy and security requirements under HIPAA, HITECH, or PCI DSS, or we fail to comply with BAAs that we enter into with covered entities, we could be subject to claims, legal liabilities, penalties, fines, and negative publicity, which could harm our operating results.

Governments are continuing to focus on privacy and data security, and it is possible that new privacy or data security laws will be passed, or existing laws will be amended in a way that is material to our business. Any significant change to applicable laws, regulations, or industry practices regarding our users' data could require us to modify our services and features, possibly in a material manner, and may limit our ability to develop new

Exhibit 4
Page 308

**Table of Contents**

products, services, and features. Although we have made efforts to design our policies, procedures, and systems to comply with the current requirements of applicable state, federal, and foreign laws, changes to applicable laws and regulations in this area could subject us to additional regulation and oversight, any of which could significantly increase our operating costs.

We strive to comply with all applicable laws, policies, legal obligations, and industry codes of conduct relating to privacy, data security, and data protection. The costs of compliance with, and other burdens imposed by, the GDPR, CCPA, HIPAA, and similar laws may limit the use and adoption of our products and services, and/or require us to incur substantial compliance costs, which could have an adverse impact on our business. In addition, given that the scope, interpretation, and application of these laws and regulations are often uncertain and may be conflicting, it is possible that these obligations may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. Any failure or perceived failure by us, our end customers, or third-party service-providers to comply with our privacy or security policies or privacy-related legal obligations, the failure or perceived failure by our end customers to comply with their privacy policies or privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of personal data, may result in governmental enforcement actions, litigation, damages, penalties, and negative publicity, and could also have an adverse effect on our brand and operating results.

*Cybersecurity*

We have designed and implemented and continue to maintain a security program consisting of policies, procedures, and technology intended to maintain the privacy, security and integrity of our information, systems, and networks. Among other things, the program includes controls designed to limit and monitor access to authorized systems, networks, and data, prevent inappropriate access or modification, and monitor for threats or vulnerability.

**Employees and Human Capital Resources**

Our workforce represents a highly regarded team of silicon photonics and measurement science experts under the same organization. A significant number of our employees have advanced degrees, including a large percentage holding PhDs. As of January 30, 2021, we had 202 full-time employees, a large percentage of those employees are in technical roles, including engineering.

- The quality of our employees is well recognized in the industry and has a strong and positive impact on our ability to develop and capitalize on our strategic operating model and business plan.

- Our leadership team is recognized for world-leading expertise in silicon photonics design and process, microelectronics design, packaging and test, software and Algorithms including Cloud and AI, and applications in data communications and medical sensing.

- We have strong relationship with our employees and have never experienced a work stoppage.

Despite the significant challenges facing the world economy in light of the COVID-19 pandemic, we have remained focused on our business plan and priorities. We intend to continue to focus on:

- Protecting the wellbeing of our employees and keeping them healthy and engaged.

- Making our physical workplaces safe and compliant.

- Building out efficient global human resource information systems and processes.

- Recruiting and staff retention for critical skills and competencies.

- Investing in the development of current and future leadership.

205

Exhibit 4
Page 309

Table of Contents

- Creating sustainable operations, while building resilience, efficiency and flexibility into everything, from strategy to work design.

**Facilities**

Our headquarters are currently located in Pasadena, California under a lease for approximately 16,000 square feet, which lease for the majority of the premises leased expires in June 2023. The premises in Pasadena are predominantly used for engineering and finance and general administration services We also lease a property in San Jose, California to approximately 4,600 square feet under a lease expiring in 2024, which is predominantly used for finance and general administration services. To support headcount growth over the past year, we continue to explore options and timing for improving and expanding our facilities. In the United States, we recently finalized a new office lease in Irvine, California to accommodate our sensor application facility under a lease for approximately 8,000 square feet, which lease expires in July 2026. In the United Kingdom, we have expanded our lab facilities in Wales to approximately 1,733 square feet under a lease due to expire in 2024. We believe our current facilities are sufficient to support our operations and growth plans and that additional space, if needed, will be available on commercially reasonably terms.

206

Exhibit 4
Page 310

**Table of Contents**

**ROCKLEY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis provides information which Rockley's management believes is relevant to an assessment and understanding of Rockley's consolidated results of operations and financial condition. The discussion should be read together with our consolidated financial statements and related notes that are included elsewhere in this registration statement /prospectus/proxy statement. The discussion and analysis should also be read together with our pro forma financial information as of December 31, 2020 and for the year ended December 31, 2020. See "Unaudited Pro Forma Condensed Combined Financial Information." This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or in other parts of this prospectus/proxy statement. Unless the context otherwise requires, references in this "Rockley Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we," "us," "our," and "the Company" are intended to mean the business and operations of Rockley and its consolidated subsidiaries.*

**Overview**

We have developed a unique sensing platform that we believe can reshape the wellness and healthcare industries through multiple applications in non-invasive, multi-modal biomarker monitoring. We believe products based on our technology platform could have the potential to unlock and accelerate advancements in areas such as early disease detection, nutrition management, and preventative healthcare delivery through continuous health and wellness monitoring.

Our unique sensing platform has been built upon our silicon photonics technology, which enables compelling sensor performance, power, resolution, and density. This technology has the potential to allow monitoring devices, currently the size of clinical machines, to be condensed to the size of a wearable device. We believe this in turn has the potential to unlock additional uses in consumer electronics and medical devices. The resulting combination of technologies and manufacturing know-how is the "full-stack Rockley Platform" which is made up of PICs in silicon with integrated III-V devices (devices incorporating certain conductor elements that offer superior electronic properties, such as lasers), ASICs, photonic and electronic co-packaging, together with biosensing algorithms and AI cloud analytics, firmware/software, system architecture, and hardware design.

As testament to the relevance of our product development, we have captured the attention of several consumer electronics companies and, as of the date of this prospectus/proxy statement, we are engaged or in contract with entities which collectively account for over 55% market share of wearable devices and over 50% market share of smartphone devices, based on a combination of data sourced from the Yole Report, the IDtechEx Report and the TrendForce Report, as well as our internal volume forecasts for smartphone, smart watch, and smart earbuds through 2025 (based on customer data). We plan to leverage this attention to develop new capabilities in consumer wearables in the near term, and to expand over time into medical devices and other industry applications.

Our vision is to address many pressing healthcare concerns using our technology and we believe that there exists a large market opportunity for our platform. We estimate that the TAM for the consumer wearables, mobile device, and medical device markets is projected to be over $48 billion by 2025, based on data sourced from the Yole Report, the IDtexEx Report, the TrendForce Report, and our internal volume forecasts for smartphone, smart watch, and smart earbuds through 2025 (based on customer data), as the universe of healthcare and consumer wearable devices incorporating additional sensing capabilities emerges.[1] Our target biomarkers for consumer healthcare include lactate, alcohol, glucose (indicator), carbon monoxide, blood pressure, blood oxygen, and core body temperature, among others. Due to the high performance of our lasers up to 1,000,000 times higher resolution, 1,000 times higher accuracy and 100 times broader range in wavelengths compared with existing LED offerings in wearable solutions (based on product analysis undertaken by Rockley

207

Exhibit 4
Page 311

**Table of Contents**

comparing the Rockley silicon photonics-based spectrometer chip to existing solutions), we believe our platform will also be able to address existing applications in consumer wearable devices with significantly higher resolution, accuracy, and range. Further, we believe there are multiple additional markets and concrete opportunities for our technology platform in areas such as data center connectivity (optical transceivers), machine vision (robotic and automotive LiDAR), and compute connectivity (co-packaged optics, or CPO).

To date, we have generated revenue primarily from NRE and development services for customer-specific designs of silicon photonics chipsets for incorporation into their customers' end products and we have financed our operations primarily through the issuance of convertible loan notes, as well as private placements of ordinary shares. From the date of our formation through December 31, 2020 we have raised aggregate gross proceeds of approximately $290.0 million from the issuance of convertible loan notes and ordinary shares. We incurred a net loss of $80.3 million in 2020 and utilized $48.4 million in cash to fund our operations during the year ended December 31, 2020.

We expect both our capital and operating expenditures will increase significantly in connection with our ongoing activities, as we:

- continue to invest in our technology and our silicon photonics solutions;
- continue to develop innovative solutions and applications for our technology;
- commercialize our silicon photonics solutions;
- continue to invest in our sales and marketing activities and distribution channels;
- invest and improve our operational, financial, and management information systems;
- increase our headcount;
- maintain and expand our intellectual property portfolio; and
- enhance internal functions to support our operations as a public company.

**Impact of COVID-19**

On March 11, 2020, the World Health Organization characterized the outbreak of COVID-19 as a global pandemic and recommended containment and mitigation measures. Since then, extraordinary actions have been taken by international, federal, state, and local public health and governmental authorities to contain and combat the outbreak and spread of COVID-19 in regions throughout the world. These actions include travel bans, quarantines, "stay-at-home" orders, and similar mandates for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations.

Consistent with the actions taken by governmental authorities, we have taken steps to protect our workforce and support community efforts. As part of these efforts and in accordance with applicable government directives, we reduced on-site operations at our facilities, in addition to following all regulatory and safety guidelines and protocols from the Centers for Disease Control and Prevention, the Occupational Safety and Health Administration, and federal, state and local government bodies. We also adhered to all regulatory and safety guidelines and protocols designated by governmental bodies in each country in which we have operations. Certain key laboratory employees and facilities were designated as "Essential Critical Infrastructure" by Cybersecurity and Infrastructure Security Agency and the State of California Public Health Department, which allowed us to continue internal testing and laboratory work to the extent necessary to service customer commitments. To facilitate on-site operations, we implemented revised operational plans that conformed to COVID-19 precautionary health guidelines, including universal requirement of facial coverings, rearranging facilities to follow social distancing protocols, conducting active daily temperature checks, regular and thorough disinfecting of surfaces and tools, and regular testing of our employees for COVID-19. The remaining non-essential workforce was required to perform their duties from home.

Exhibit 4
Page 312

Table of Contents

The COVID-19 pandemic and continuing precautionary measures taken have adversely impacted our operational efficiency and caused delays in operational activities. The ongoing impact of COVID-19 and related precautionary measures will depend on the duration of the pandemic, which is being mitigated by advances in the treatment of the disease, prevention efforts including vaccines, broad government measures to contain the spread of the virus, and related government stimulus measures. However, should we experience sustained impact from the COVID-19 pandemic, additional actions such as cost reduction measures may need to be implemented. For more information on risks associated with the COVID-19 pandemic and regulatory actions, see "*Risk Factors*."

**Comparability of Financial Information**

Rockley's results of operations and statements of assets and liabilities may not be comparable between periods as a result of the Business Combination described below.

**Business Combination and Public Company Costs**

On March 19, 2021, SC Health, HoldCo, Merger Sub, and Rockley entered into a Business Combination Agreement pursuant to which HoldCo plans to acquire all of the issued and outstanding equity interests of Rockley and SC Health. Pursuant to the Business Combination Agreement, and assuming a favorable vote of SC Health shareholders, HoldCo will acquire all of the shares of Rockley. Subsequently, Merger Sub, a newly formed subsidiary of HoldCo, will merge with and into SC Health, with SC Health surviving the merger. In the merger transaction, Merger Sub will cease to exist and SC Health will become a wholly owned subsidiary of HoldCo. HoldCo will be a publicly traded company listed in the New York Stock Exchange trading as "RKLY" after the closing of the Business Combination Agreement and SC Health will be delisted from the New York Stock Exchange.

Consideration for the Business Combination will consist of ordinary shares of HoldCo issued in exchange for all outstanding ordinary shares of Rockley and SC Health, determined on a fully diluted basis, as if all of Rockley issued and outstanding convertible loan notes, inclusive of interest accrued thereon, converted into ordinary shares of HoldCo at a conversion price of $10.00 per share, and options exercisable for HoldCo ordinary shares issued in exchange for all outstanding options exercisable for Rockley ordinary shares.

The following expenses will occur immediately prior to or upon closing of the Business Combination:

- Total non-recurring transaction costs are estimated at approximately $33.5 million, of which Rockley expects approximately $2.0 million to be expensed; and

- The payment of deferred legal fees, underwriting commission, and other costs in connection with the initial public offering.

Pursuant to the Business Combination Agreement, the aggregate consideration, consisting of ordinary shares of HoldCo issuable to Rockley securityholders following a stock split at HoldCo, will be the number of HoldCo ordinary shares that results from dividing $1,148,114,113 by 10.

Concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into Investor Subscription Agreements with certain investors, including, among others, the Sponsor Related PIPE Investor. Pursuant to the Investor Subscription Agreements, each investor agreed to subscribe for and purchase, and HoldCo agreed to issue and sell an aggregate of 14,790,000 HoldCo ordinary shares, at $10.00 per share, for an aggregate commitment amount of $147,900,000, which will take effect immediately prior to the closing of the Business Combination.

Also, concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into Individual Subscription Agreements with three individuals pursuant to which HoldCo agreed to issue and sell an aggregate of 210,000 HoldCo ordinary shares, at $10.00 per share, for an aggregate commitment amount of $2,100,000, which will take effect immediately prior to the closing of the Business Combination. These three individuals are existing shareholders of Rockley.

209

Exhibit 4
Page 313

**Table of Contents**

**PIPE Financing; Accounting for the Business Combination**

Notwithstanding the legal form of the Business Combination pursuant to the Business Combination Agreement, the Business Combination will be accounted for as a forward recapitalization in accordance with GAAP. Under this method of accounting, SC Health will be treated as the acquired company for financial reporting purposes, and Rockley will be treated as the accounting acquiror. In accordance with this accounting, the Business Combination will be treated as the equivalent of Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization. The net assets of SC Health will be stated at historical costs, with no goodwill or other intangible assets recorded, and operations prior to the Business Combination will be those of Rockley. Rockley has been deemed the accounting acquiror for purposes of the Business Combination based on an evaluation of the following facts and circumstances:

- Rockley's existing shareholders will hold a majority ownership interest in HoldCo, irrespective of whether or not existing shareholders of SC Health exercise their right to redeem their ordinary shares of SC Health;

- Rockley's existing senior management team will comprise senior management of HoldCo;

- Rockley's is the larger of the companies based on historical operating activity and employee base; and

- Rockley's operations will comprise the ongoing operations of HoldCo.

As a consequence of the Business Combination, HoldCo will be an SEC-registered and NYSE-listed company, which will require it to hire additional talent and implement procedures and processes to address public company regulatory requirements and customary practices. We expect to incur additional annual expenses as a public company for, among other things, directors' and officers' liability insurance, director fees, and additional internal and external accounting and legal and administrative resources, including increased audit and legal fees.

**Key Factors Affecting Operating Results**

We believe that our performance and future success depend on several factors that present significant opportunities for us but also pose risks and challenges, including, without limitation, the following:

*Resource Constraints*

Our products are currently under development and we do not have any products in commercial production. Our ability to achieve our product roadmaps and development timelines, including our ability to commence commercial production of our products, may be impacted by resource constraints, including the need for additional capital. We have a history of losses and our determination of substantial doubt as a going concern could materially limit our ability to raise additional funds through the issuance of equity securities or otherwise. Further, our products must also meet certain technical standards and customer requirements, which in turn require additional funds and other resources. Additional financing and resources may not be available to us when needed or on commercially reasonable terms.

*Ability to Achieve Design Wins or Long-Term Production Contracts*

We may engage in discussions with customers and co-develop products but we may not be able to convert the relationship into a design win or a long-term production contract due to resource constraints, delays, or technical challenges. We work closely with our customers and potential customers to understand their product roadmaps and strategies. Our customers also continuously develop new products in existing and new application areas. We believe achieving design wins and the ability to secure long-term production contracts will be critical to our future success. The selection process is typically lengthy and may require us to incur significant design and development expenditures in pursuit of a design win with no assurance that our products will be selected. The failure to secure a design win or long-term production contract could adversely affect our business.

210

Exhibit 4
Page 314

**Table of Contents**

*Customer Orders and Forecasts*

We currently anticipate that sales of our future products will be made pursuant to standard purchase orders, which may be cancelled, reduced, or rescheduled with little or no notice and without penalty. Cancellations of orders could result in the loss of anticipated sales without allowing us sufficient time to reduce our inventory and operating expenses. In addition, changes in forecasts or the timing of orders from customers, including if and when we commence commercial production of our products, could expose us to the risks of inventory shortages or excess inventory.

*Pricing and Customer Demand*

We expect our operating results, including if and when we commence commercial production of our products, will be impacted by the pricing of our products, our average selling prices, and fluctuations in customer purchasing volumes. If and when we begin commercial production of our products, we may not be able to fulfill customer demand in a timely manner or at all. We monitor and work to reduce our product manufacturing costs and improve the potential value our products can provide to our customers' end products. The cost of raw materials and components critical for the manufacture of our anticipated products is largely out of our control and may fluctuate significantly. Since we rely on third-party wafer foundries and assembly and test contractors to manufacture, assemble, and test our products, we maintain a close relationship with our suppliers to improve quality, increase yields, and lower manufacturing costs.

*New Markets and Applications*

As we evaluate potential markets and applications for the products we are developing, we analyze forecasts by industry analysts, the adoption curve of technology, and potential competing forces that could hinder such adoption. If we fail to anticipate or respond to technological shifts or market demands, or to timely develop products or technologies in response to the same, it could result in our inability to achieve revenue growth and could harm our business and operations.

*Cyclical Nature of the Semiconductor Industry*

The semiconductor industry is highly cyclical and is characterized by constant and rapid technological change, rapid product obsolescence, price erosion, evolving standards, short product life cycles, and wide fluctuations in product supply and demand. Downturns in the semiconductor industry have been characterized by diminished product demand, production overcapacity, high inventory levels, and accelerated erosion of average selling prices. Any prolonged or significant downturn in the semiconductor industry generally could adversely affect our business and reduce demand for our products and otherwise harm our financial condition and results of operations.

See the *"Risk Factors"* section of this prospectus/proxy statement for additional discussion of the risks and challenges facing our business.

**Basis of Presentation**

Currently, we conduct business through one operating and reportable segment. All long-lived assets are maintained in, and all losses are attributable to the one segment. See Note 1 in our accompanying audited consolidated financial statements for more information about our operating segment.

**Components of Results of Operations**

The following discusses certain line items in Rockley's consolidated statements of operations.

Exhibit 4
Page 315

**Table of Contents**

*Revenue*

To date, we have primarily generated revenue from development services, which entail developing customer-specific designs of silicon photonics chipsets. Our contracts with customers include specific achievement of agreed-upon projects and a substantive acceptance criteria for each agreed-upon project. In the event an agreed-upon project is successful and the customer provides acceptance, we allocate the contract consideration related to the performance obligations that are satisfied during the period and recognizes the revenue at that point in time.

Following the completion of our product development phase and introduction of our spectra-sense chipsets to the wearable devices market, we expect the majority of our revenue to be derived from sales of high-volume consumer wearable products. In addition, we plan to offer advanced module applications with biomarker detection capabilities for advanced health metrics that can detect, classify, and potentially prevent disease. We also expect to offer a cloud analytics platform to provide a full range of subscription services, including the deployment of our technology through a subscription and cloud-based software as a service.

*Cost of Revenue*

To date, our cost of revenue has included cost related to our development services, which include cost of materials, cost associated with packaging and assembly, testing and shipping, cost of talent, including stock-based compensation, and equipment associated with manufacturing support, logistics, and quality assurance, overhead, and occupancy costs. Once we commence commercial production of our silicon photonics chipsets, cost of revenues will include direct parts, material, and labor costs, manufacturing overhead, including amortized tooling costs, shipping and logistics costs, and reserves for estimated warranty expenses.

*Gross Profit and Gross Margin*

Gross profit is calculated based on the difference between our revenue and cost of revenue. Gross margin is the percentage obtained by dividing gross profit by our revenue. As we approach commercial production of spectra-sense chipsets, advanced module applications, and Rockley Photonics Cloud Analytics technology, we expect our gross profit and gross margin to vary.

*Selling, General, and Administrative Expense*

Selling, general, and administrative expenses consist of human capital related expenses for employees involved in general corporate functions, including executive management and administration, accounting, finance, tax, legal, information technology, marketing, and human resources; depreciation expense and rent relating to facilities; travel costs; professional fees; and other general corporate costs. Human capital expenses primarily include salaries, benefits, bonuses, and stock-based compensation. As we continue to grow as a company, we expect that our selling, general and administrative costs will increase on an absolute dollar basis. We also expect our selling, general and administrative expense to increase in absolute dollars for the foreseeable future as we increase our headcount to support the growth of our business, and as a result of operating as a public company, including compliance with the rules and regulations of the SEC, legal, audit, additional general and director and officer insurance expenses, investor relations activities, and other administrative and professional services.

*Research and Development Expense*

Research and development expense consists primarily of talent costs for engineers and third parties engaged in the design and development of products, software, and technologies, including salary, bonus, and stock-based compensation expense, project material costs, services, and depreciation of our research and development facilities and equipment. We expense research and development costs as they are incurred. Research and

212

Exhibit 4
Page 316

Table of Contents

development expense also includes the research and development tax credits that we are able to claim in accordance with the relevant U.K. tax legislation. These tax credits are payable to us in cash and are carried on the consolidated balance sheets at the amount claimed and expected to be received from the U.K. government within the next 12 months. We expect research and development expense to increase in absolute dollars as we continue to invest in the development of our products and technology.

**Interest Income (Expense)**

Interest income consists primarily of interest received or earned on our cash, cash equivalents, and investment balances held in interest-bearing deposit accounts. Interest expense consists of interest paid on our convertible loan notes and capital lease obligations.

**Equity Method Investment**

Equity method investments consist of entities over which we have significant influence but not control or joint control. Under the equity method of accounting, all of our investments are initially recognized at cost and adjusted thereafter to recognize our share of the post-acquisition profits or losses of the investee in our consolidated statements of operations.

**Change in Fair Value of Debt Instruments**

Gains or losses from the change in fair value of debt instruments are recorded from the remeasurement of the fair value of our convertible loan notes using a discounted cash flow methodology based upon certain valuation assumptions.

**Gain (Loss) on Foreign Currency**

We have significant international operations that are denominated in foreign currencies, primarily the British Pound and Euro, subjecting us to foreign currency exchange risk that may adversely impact our financial results. We calculate the year-over-year impact of foreign currency movement on our business using foreign currency exchange rates that are applied to transactional currency amounts.

**Provision for Income Tax**

We are subject to income taxes in the United Kingdom, the United States, Finland, Ireland, and Switzerland. Our income tax provision consists of an estimate of federal, state, and foreign income taxes based on enacted federal, state, and foreign tax rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws. Due to cumulative losses, we maintain a valuation allowance against our U.S. federal and foreign deferred tax assets.

Exhibit 4
Page 317

Table of Contents

**Results of Operations**

The following table sets forth our historical operating results for the periods indicated (in thousands):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| **Consolidated Statements of Operations and Loss Data:** | | |
| Revenue | $ 22,343 | $ 20,492 |
| Cost of revenue | 24,240 | 30,705 |
| Gross profit | (1,897) | (10,213) |
| Operating expenses: | | |
| Selling, general and administrative expenses | 20,260 | 13,306 |
| Research and development expenses | 35,900 | 22,303 |
| Operating loss | (58,057) | (45,822) |
| Other income (expense): | | |
| Interest income (expense), net | (189) | (747) |
| Equity method investment loss | (1,274) | (1,281) |
| Change in fair value of debt instruments | (20,163) | (2,969) |
| Gain (loss) on foreign currency | (25) | 280 |
| Loss before provision for income tax | (79,708) | (50,539) |
| Provision for income tax | 569 | 311 |
| Net loss and comprehensive loss | $(80,277) | $(50,850) |

**Discussion and Analysis of Results of Operations**

*Revenue (in thousands, except for percentages)*

|  | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
|  | **2020** | **2019** | **$** | **%** |
| Revenue | $22,343 | $20,492 | $1,851 | 9% |

Revenue increased by $1.9 million, or 9%, to $22.3 million for the year ended December 31, 2020 from $20.5 million for the year ended December 31, 2019. This is primarily due to an increase of development activities provided to customers under long-term contracts, as well as related fulfillment costs incurred for material and subcontractor costs to satisfy performance obligations. The increase in revenue was partially offset by a decrease in development activities with smaller scale customers, primarily due to the completion of project milestones with those customers in fiscal 2019.

*Cost of Revenue and Gross Profit (in thousands, except for percentages)*

|  | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
|  | **2020** | **2019** | **$** | **%** |
| Cost of revenue | $24,240 | $ 30,705 | $(6,465) | (21)% |
| Gross Profit | $ (1,897) | $(10,213) | $ 8,316 | 81% |
| Gross Margin | (8)% | (50)% | NM | NM |

NM – Not meaningful

Cost of revenue decreased by $6.5 million, or 21%, to $24.2 million for the year ended December 31, 2020 from $30.7 million for the year ended December 31, 2019. This decrease in cost of revenue was primarily driven

214

Exhibit 4
Page 318

Table of Contents

by a decrease of $8.3 million from engineering, fab partner, and compensation costs. The decrease was partially offset by $1.7 million in fulfillment costs to satisfy performance obligations with customers. Gross profit increased by $8.3 million, or 81% to ($1.9) million for the year ended December 31, 2020 from ($10.2) million for the year ended December 31, 2019. The increase in gross profit was primarily driven by increased revenue from development services and a substantial decrease in engineering level of effort, fab partner, and human capital costs related to cost of revenue. Revenue is recognized at the achievement of milestones and is not necessarily aligned with the timing of costs incurred.

In general, our margins and cost of revenue varies from project to project, with each project requiring differing levels of time and costs. The projects we undertake are determined by our customer commitments and our long-term strategy goals.

### *Selling, General and Administrative Expenses (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Selling, general and administrative expenses | $20,260 | $13,306 | $6,954 | 52% |

Selling, general and administrative expenses increased by $7.0 million, or 52%, to $20.3 million for the year ended December 31, 2020 from $13.3 million for the year ended December 31, 2019. The $7.0 million increase was primarily due to general corporate growth, of which $4.8 million was from additional professional fees related to accounting and audit matters, and $1.1 million and $0.3 million were due to increased human capital and stock-based compensation costs, respectively.

### *Research and Development Expenses (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Research and development expenses | $35,900 | $22,303 | $13,597 | 61% |

Research and development expenses increased by $13.6 million, or 61%, to $35.9 million for the year ended December 31, 2020 from $22.3 million for the year ended December 31, 2019. The increase was primarily attributable to growth of $16.5 million from engineering, fab partner, and engineering research and development headcount due to the allocation of resources into products that are considered part of research and development activities. This also led to an increase in stock-based compensation expenses of $1.5 million. The increase was mainly offset by $3.7 million in research and development tax credits and grants we received in 2020 supporting our research and development activities.

### *Interest Income (Expense) (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Interest income | $ 30 | $ 281 | $(251) | (89)% |
| Interest expense | $(219) | $(1,028) | $ 809 | (79)% |

Interest income decreased by $0.3 million, or 89%, in the year ended December 31, 2020 primarily due to a decrease in interest rates and our investment deposit balances. Interest expense decreased by $0.8 million, or 79%, to $0.2 million for the year ended December 31, 2020 from $1.0 million for year ended December 31, 2019, primarily due to new convertible loan notes issued in fiscal 2020. Interest expense relating to convertible loan notes is recorded as part of the change in fair value of the notes.

215

Exhibit 4
Page 319

Table of Contents

### *Equity Method Investment Loss*

The change in equity method investment was immaterial for the years ended December 31, 2020 and 2019.

### *Change in Fair Value of Debt Instruments (in thousands, except for percentages)*

| | As of December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | $ | % |
| Change in fair value of debt instruments | $20,163 | $2,969 | $17,194 | 579% |

Change in fair value of debt instruments captures losses from a change in fair value estimates using discounted cash flow and binominal lattice methodologies that are based upon a set of valuation assumptions. The key assumptions used in valuation include default rates from historical performance, risk-free rates, expected volatility rates, and discount rates that reflect estimates of the rates of return that investors would require when investing in other convertible debt with similar characteristics. The change in fair value of debt instruments is a result of the difference in value between the initial issuance and subsequent fair value measurements.

### *Gain (Loss) on Foreign Currency (in thousands)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | $ | % |
| Gain (loss) on foreign currency | $25 | $(280) | $305 | NM |

NM – Not Meaningful

During the year ended December 31, 2020, we recorded an overall loss from the impact of foreign currency, primarily due to timing of transactions in the fiscal year, as well as fluctuations in average foreign currency translation rates versus the closing rates year-over-year.

### *Provision for Income Tax (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | $ | % |
| Provision for income tax | $569 | $311 | $258 | 83% |

Provision for income tax expense was immaterial for the years ended December 31, 2020 and 2019. We have accumulated net operating losses as we have not yet started commercial operations. We maintain a substantially full valuation allowance against our net deferred tax assets. The income tax expenses shown above are primarily related to minimum filing fees in the states where we have operations as well as corporate income taxes for the foreign jurisdictions.

### Non-GAAP Financial Measures

In addition to our results determined in accordance with GAAP, we believe the following non-GAAP measures are useful in evaluating our operational performance. We use the following non-GAAP financial information to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that non-GAAP financial information, when taken collectively and in context, may be helpful to investors in assessing our operating performance and trends and in comparing our financial measures with those of comparable companies which may present similar non-GAAP financial measures.

Exhibit 4
Page 320

Table of Contents

*Limitations of Non-GAAP Measures*

These non-GAAP financial measures are not prepared in accordance with GAAP, are supplemental in nature, and are not intended, and should not be construed, as the sole measure of our performance, and should not be considered in isolation from or as a substitute for comparable financial measures prepared in accordance with GAAP. There are a number of limitations related to EBITDA and Adjusted EBITDA, including the following:

- EBITDA and Adjusted EBITDA exclude certain recurring, non-cash charges, such as depreciation of property and equipment and/or amortization of intangible assets. While these are non-cash charges, we may need to replace the assets being depreciated and amortized in the future and Adjusted EBITDA and Adjusted EBITDA Margin do not reflect cash requirements for these replacements or new capital expenditure requirements.

- EBITDA and Adjusted EBITDA do not reflect interest expense, net, which may constitute a significant recurring expense in the future.

- Adjusted EBITDA excludes stock-based compensation, which may constitute a significant recurring expense in the future, as equity awards are expected to continue to be an important component of our compensation strategy.

- Future expenses may be similar to the non-recurring special items that are excluded from Adjusted EBITDA.

Because of these limitations, you should consider EBITDA and Adjusted EBITDA alongside other financial performance measures, including net loss and our other GAAP results.

*EBITDA and Adjusted EBITDA*

We define "EBITDA" as net loss before interest expense, net, income tax expense, and depreciation and amortization. We define "Adjusted EBITDA" as EBITDA adjusted for stock-based compensation, non-capitalized transaction costs, and other non-recurring special items determined by management that are not considered representative of our underlying operating performance. Adjusted EBITDA is intended as a supplemental measure of our performance that is neither required by, nor presented in accordance with, GAAP. Our presentation of these measures should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items. Our computation of EBITDA and Adjusted EBITDA may not be comparable to other similarly titled measures computed by other companies, because all companies may not calculate EBITDA or Adjusted EBITDA in the same fashion.

Because of these limitations, EBITDA and Adjusted EBITDA should not be considered in isolation or as a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and using EBITDA and Adjusted EBITDA on a supplemental basis. You should review the reconciliation of our net loss to EBITDA and Adjusted EBITDA below and not rely on any single financial measure to evaluate our business.

217

Exhibit 4
Page 321

Table of Contents

*Reconciliation*

The following table reconciles our net loss (the most directly comparable GAAP measure to EBITDA and Adjusted EBITDA) to EBITDA and Adjusted EBITDA for 2020 and 2019 (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | **2020** | **2019** |
| **Net Loss** | $(80,277) | $(50,850) |
| Interest expense, net | 189 | 747 |
| Income tax expense | 569 | 311 |
| Depreciation and amortization | 2,787 | 1,948 |
| **EBITDA** | (76,732) | (47,844) |
| Non-capitalized transaction costs* | 3,611 | — |
| Stock-based compensation | 8,043 | 6,229 |
| Equity-method investment loss | 1,274 | 1,281 |
| Change in fair value of debt instruments | 20,163 | 2,969 |
| **Adjusted EBITDA** | $(43,641) | $(37,365) |

---

\*     Non-capitalized transaction costs include non-recurring expense related to the issuance of convertible loan notes in 2020 and the Business Combination.

**Liquidity and Capital Resources**

Due to Rockley's history of recurring losses from operations, negative cash flows from operations, and a significant accumulated deficit, management concluded that there is substantial doubt about Rockley's ability to continue as a going concern. In addition, our independent registered public accounting firm has included an explanatory paragraph in their opinion for the year ended December 31, 2020 as to the substantial doubt about our ability to continue as a going concern. Since inception, Rockley has financed its operations primarily through the issuance and sale of convertible loan notes, ordinary shares and agreed-upon projects. As of December 31, 2020 and 2019, the cash and cash equivalents balance was $19.2 million and $20.9 million.

As of the date of this prospectus/proxy statement, we have yet to generate any material revenue from our business operations. Based on current cash on hand, management's plan to continue as a going concern includes raising additional financing, specifically through the Business Combination and PIPE Financing to satisfy our minimum cash requirements for at least the next 12 months. The funds raised through the Business Combination and PIPE Financing will be used to support our core business operations and overall growth of our business and to execute our current growth strategies. Until the Business Combination is completed and PIPE Financing is consummated, we plan to control the timing and extent of certain discretionary operating and planned capital expenditures. Accordingly, absent the funds to be raised upon completion of the Business Combination and PIPE Financing, management has concluded that substantial doubt exists about our ability to continue as going concern.

If the closing of the Business Combination and the PIPE Financing were to occur, we currently expect to receive approximately $290 million of additional cash, which will be used to fund our future capital and liquidity needs in order to support our core business operations and overall growth of our business and to execute our current growth strategies.

As of the date of this prospectus/proxy statement, Management believes that the cash that may be generated by the closing of the of the Business Combination and the PIPE Financing will be sufficient to fund both our liquidity needs for the execution of our business strategy over the next 24 to 36 month period, including (1) investing in research and developments activities, including completion and commercialization of our

218

Exhibit 4
Page 322

Table of Contents

wearables, smart phone and point-of-care technologies, (2) investing in backend processing, intellectual property protection, quality control and process, (3) expanding sales and marketing activities, and (4) pursuing strategic partnerships. However, actual results could vary materially and negatively as a result of a number of factors, including:

- Timing and the costs involved in bringing our products to market;

- Anticipated customer contracts and design wins may not materialize;

- Delay in launching our products due to technical challenges from our customers or our product development team;

- Pricing and the volume of sales of our products may be different from our forecast;

- Execution delays due to resources constraints;

- Assisting our fab partners with expansion of production capacity;

- The cost of maintaining, expanding and protecting our intellectual property portfolio, including litigation costs and liabilities;

- The cost of additional general and administrative talent, including accounting and finance, legal and human resources, as a result of becoming a public company; and

- Rockley's additional investment requirement needed for Hengtong Rockley Technology Co., Ltd to be self-sufficient; and

- Other risks discussed in the section entitled "Risk Factors."

By fiscal year 2024, we anticipate that we will be able to generate sufficient revenue from the sale of our products and services to cover expansion plans, operating expenses, working capital, and capital expenditures. If adequate funds are not available, we will be required to explore various options to fund future cash needs through sale of additional equity, debt financing, and others. There can be no assurance that any such issuance of equity securities, debt financing or other means of financing will be available in the future, or the terms of any such financing will be acceptable to us. If we raise funds by issuing equity securities, there will be dilution to the existing shareholders. Any equity securities issued may also provide for rights, preferences, or privileges senior to those holders of ordinary shares. If we raise funds by issuing debt securities, these debt securities would have rights, preferences, and privileges senior to the holders of ordinary shares. The term of debt securities or borrowing could impose significant restriction on our operations. The credit market and financial service industry have in the past, and may in the future, experience periods of upheaval that could impact the availability and cost of equity and debt financing.

If adequate funds are not available, we will need to curb our expansion plans or limit our research and development activities, which would have a material adverse impact on our business prospects and results of operations.

### *Historical Cash flows*

The following table is a summary of our cash flow activities (in thousands):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| **Consolidated Statements of Cash Flow Data:** |  |  |
| Net cash (used in) provided by: |  |  |
| Operating activities | $(48,354) | $(36,556) |
| Investing activities | (6,656) | (2,831) |
| Financing activities | 53,334 | 48,933 |
| Net (decrease) increase in cash and cash equivalents | $ (1,676) | $ 9,546 |

219

Exhibit 4
Page 323

Table of Contents

*Cash Flows from Operating Activities*

During the year ended December 31, 2020, net cash used in operating activities was $48.4 million, primarily consisting of net losses of $80.3 million, adjusted by non-cash depreciation and amortization of $2.8 million, stock-based compensation of $8.0 million, equity-method investment loss of $1.3 million, increase in fair value of debt instruments of $20.2 million, and gain on disposal of assets of $0.1 million. Changes in assets and liabilities for the year ended December 31, 2020 included the following: decreases in accounts receivable, trade payables, prepaid expenses, other current assets, offset by increases in other receivables, and accrued expenses.

During the year ended December 31, 2019, net cash used in operating activities was $36.6 million, primarily consisting of net losses of $50.9 million, adjusted by non-cash depreciation and amortization of $1.9 million, stock-based compensation of $6.2 million, equity-method investment loss of $1.3 million, non-cash interest on convertible loan notes of $0.3 million, and change in fair value of debt instruments of $3.0 million. Changes in assets and liabilities for the year ended December 31, 2019 included the following: increases in accounts receivable, other receivables, prepaid expenses, other current assets, and trade payables offset by a decrease in long term debt, net of current portion.

*Cash Flows from Investing Activities*

Net cash used in investing activities was $6.7 million for the year ended December 31, 2020, primarily consisting of $1.4 million purchases of property and equipment to be used in the ordinary course of business, $0.3 million acquisition of TruTouch assets, and $5.0 million additional investments made in equity method investment. Net cash used in investing activities was $2.9 million for the year ended December 31, 2019, primarily consisting of purchases of property and equipment to be used in the ordinary course of business.

*Cash Flows from Financing Activities*

Net cash provided by financing activities was $53.3 million for the year ended December 31, 2020, primarily consisting of proceeds received for convertible loan notes and issuance of ordinary shares and warrants. Net cash provided by financing activities was $49.0 million for the year ended December 31, 2019, primarily consisting of proceeds received for convertible loan notes and issuance of ordinary shares and warrants.

Purchase obligations include commitments to third-party suppliers for various research and development activities. As of December 31, 2020, we had $3.0 million in contractual obligations for which we have not yet received services.

We are a party to operating leases, primarily for office space. These leases have remaining lease terms of 1 years to 4 years. Some leases include extension options for up to 5 years.

**Off-Balance Sheet Arrangements**

Since the date of our incorporation, we have not engaged in any off-balance sheet arrangements, as defined in the rules and regulations of the SEC.

**Critical Accounting Policies and Estimates**

Our financial statements have been prepared in accordance with GAAP as set forth in the Financial Accounting Standards Board's Accounting Standards Codification ("ASC"), and we consider the various staff accounting bulletins and other applicable guidance issued by the SEC. The preparation of our consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well

220

Exhibit 4
Page 324

Table of Contents

as the reported expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources.

Our actual results may differ from these estimates under different assumptions or conditions. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

While our significant accounting policies are described in Note 1 in our consolidated financial statements, we believe that the following accounting policies are most critical to understanding our financial condition and historical and future results of operations:

- Revenue recognition;
- Equity valuations;
- Fair value of financial instruments and fair value measurements; and
- Income taxes

### Revenue Recognition

For the years ended December 31, 2020 and 2019, we generated revenue principally from development services, which entails developing customer-specific designs of photonics chipsets. Our contracts with customers include specific achievement milestones and a substantive acceptance criteria for each milestone. In the event a milestone is achieved and the customer provides acceptance, the Company allocates the contract consideration related to the performance obligations that are satisfied during the period and recognizes the revenue at that point in time.

### Equity Valuations

As there is not a market for the Company's equity, valuations of the Company's equity instruments require the application of significant estimates, assumptions, and judgment. These valuations impact various amounts reported in the Company's financial statements, inclusive of the recognition of equity-based compensation and fair value of convertible loan notes. The following discussion provides additional detail regarding the significant estimates, assumptions, and judgment that impact the determination of the fair values of equity-based compensation awards, warrants, and the ordinary shares that comprises the Company's capital structure. The following discussion also explains why these estimates, assumptions, and judgments could be subject to uncertainties and future variability.

#### Equity-Based Compensation, Warrants

The Company estimates the grant date fair value of stock options, warrants, and restricted stock awards granted to employees, non-employees and directors and uses the estimated fair values to measure and recognize the costs for services received in exchange for the grants.

The Company uses the Black-Scholes option-pricing model in order to estimate the fair values of both time-based stock option awards and warrants. Estimating the fair value of stock options and warrants using the Black-Scholes option-pricing model requires the application of significant assumptions, such as the fair value of our underlying ordinary shares, the estimated term of the option, the risk-free interest rates, the expected volatility of the price of our ordinary shares and the expected dividend yield. Each of these assumptions is subjective, require significant judgment, and is based upon management's best estimates. If any of these assumptions were to change significantly in the future, equity-based compensation for future awards may differ significantly, as compared with awards previously granted.

221

Exhibit 4
Page 325

Table of Contents

The assumptions and estimates applied by the Company to derive the inputs for inclusion in the Black-Scholes pricing model are as follows:

- Fair value of ordinary shares—see "*Ordinary shares Valuations*" discussion below;

- Expected Term—This is the period that the options or warrants that have been granted are expected to remain unexercised. The Company employs the average period the stock options and warrants are expected to remain outstanding;

- Volatility—This is a measure of the amount by which a financial variable, such as a share price, has fluctuated (historical volatility) or is expected to fluctuate (expected volatility) during a period. As the Company does not yet have sufficient history of its own volatility, management has identified several guideline comparable companies and estimates volatility based on the volatility of those companies;

- Risk-Free Interest Rate—This is the U.S. Treasury rate, having a term that most closely resembles the expected life of the stock option or warrant; and

- Dividend Yield—The Company has not and does not expect to pay dividends on its ordinary shares in the foreseeable future.

*Convertible Loan Notes*

The Company estimates the fair value of convertible loan notes held by its investors at issuance of the note and also at each reporting period-end by using the estimated fair values of the ordinary shares and recognizing changes in the fair value of the note in the Company's statement of operations. Rockley determines the conversion option component by using the binomial lattice approach which requires the application of significant assumptions, such as the fair value of our underlying ordinary shares, the risk-free interest rates, the expected volatility of the price of our ordinary shares and the implied discount yield. Each of these assumptions is subjective, require significant judgment, and is based upon management's best estimates, and may impact the change in fair value of the convertible loan note that is recognized in the Company's statement of operations.

*Ordinary Shares Valuations*

The Company uses valuations of its ordinary shares for various purposes, including, but not limited to, the determination of the exercise price of stock options and warrants and inclusion in the Black-Scholes option pricing model. The Company also uses valuations of its ordinary shares for determining the fair value of its convertible loan note. As a privately held company, the lack of an active public market for our ordinary shares requires our management and board of directors to exercise reasonable judgment and consider a number of factors in order to make the best estimate of fair value of our equity. We engaged the assistance of a third-party valuation specialist to determine the fair value of the ordinary shares by first estimating the fair value of our total enterprise value and total equity value using a combination of the income approach and guideline transaction method. Estimating our total enterprise value and total equity value requires the application of significant judgment and assumptions. Factors considered in connection with estimating these values:

- Rockley's historical financial results and future financial projections;

- The lack of marketability of Rockley's ordinary shares;

- The likelihood of achieving a liquidity event, such as an initial public offering or business combination, given prevailing market conditions;

- Industry outlook; and

- General economic outlook, including economic growth, inflation and unemployment, interest rate environment and global economic trends.

The fair value ultimately assigned to our ordinary shares may take into account any number or combination of the various factors described above, based upon their applicability at the time of measurement. Determination

222

Exhibit 4
Page 326

Table of Contents

of the fair value of our ordinary shares may also involve the application of multiple valuation methodologies and approaches, with varying weighting applied to each methodology as of the grant date. Application of these approaches involves the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows; discount rates; market multiples; the selection of comparable companies; and the probability of possible future events. Changes in any or all of these estimates and assumptions or the relationships between those assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our ordinary shares. During 2020, the estimated fair value of our ordinary shares fluctuated between $10.433 and $20.280 per share, the later fair value primarily reflecting our progress towards a business combination. The necessary steps undertaken to prepare for the Business Combination included meeting with SC Health and investment bankers, discussing timing expectations, and negotiating the preliminary Letter of Intent between SC Health and the Company. A Letter of Intent related to the Business Combination was signed by both parties in January 2021 reflecting an increased likelihood of a near-term exit transaction and/or liquidity event. The valuation of the Company's equity as of December 31, 2020 took into consideration the indicated equity value implied in the signed Letter of Intent. While the December 31, 2020 valuation incorporated equity values based upon the traditional income approach consisting of the discounted cash flow method, the valuation also incorporated the equity value implied by the planned Business Combination transaction. Accordingly, the valuation applied the probability-weighted expected return method (PWERM) to weigh the indicated equity value determined under the traditional income approach and the equity value implied by our planned Business Combination. Based upon management's determination that there was a high probability that the Business Combination would occur, a higher weighting was assigned to the implied value of the negotiated Business Combination transaction.

Equity-based grants and issuance of convertible loan notes occur throughout the year. However, the valuation of the ordinary shares is performed at specific points in the fiscal year such as the end of the fiscal quarter or fiscal year. Therefore, to determine the fair value of the ordinary shares at points in time in between valuation dates, management interpolated the change in the fair value of our ordinary shares to derive a fair value between valuation dates.

Upon consummation of the Business Combination, we will exchange approximately 0.407 of our ordinary shares for each SC Health common share equivalent, determined based upon the number shares of our ordinary shares that would be outstanding if each outstanding share of our warrants and all of our convertible loan notes were to convert to our ordinary shares immediately prior to the merger. Accordingly, the indicated fair value of our equity based upon the terms of the Business Combination is $1.2 billion. Following the Business Combination with SC Health, it will not be necessary for our management and its board of directors to estimate the fair value of our ordinary shares, as the ordinary shares of the combined company will be traded in the public market.

### *Fair Value of Financial Instruments and Fair Value Measurements*

We determine fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. For debt instruments for which we have elected fair value accounting, fair value is based on the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants. Where available, fair value is based on or derived from observable market prices or other observable inputs. Where observable prices or inputs are not available, valuation techniques are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. For debt instruments for which we have not elected fair value accounting, fair value is based on the present value of expected future cash flows and assumptions about the then-current market interest rates as of the reporting period and our creditworthiness. The carrying value of these debt instruments approximates fair value as the stated interest rate approximates market rates currently available to us.

223

Exhibit 4
Page 327

**Table of Contents**

*Income Taxes*

We record income tax expense for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, we recognize deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial reporting and tax basis of asset and liabilities, as well as for operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using tax rates that are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. We record valuation allowances to reduce its deferred tax assets to the net amount that it believes is more likely than not to be realized. Its assessment considers the realization of deferred tax assets on a jurisdictional basis. We recognize the income tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by taxing authorities, based on the technical merits of the position. The income tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

**Recent Accounting Pronouncements**

Please refer to Note 1 in our consolidated financial statements included elsewhere in this prospectus/proxy statement for more information about recent accounting pronouncements, the timing of their adoption, and our assessment, to the extent we have made one, of their potential impact on our financial condition and our results of operations.

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to a variety of market and other risks, including the effects of changes in interest rates, inflation, and foreign currency exchange rates, as well as risks to the availability of funding sources, hazard events, and specific asset risks.

*Interest Rate Risk*

The market risk inherent in our financial instruments and our financial position represents the potential loss arising from adverse changes in interest rates. As of December 31, 2020, we had cash and cash equivalents of $19.2 million, consisting of interest-bearing money market accounts for which the fair market value would be affected by changes in the general level of U.S. interest rates. However, due to the short-term maturities and the low-risk profile of our investments, an immediate 10% change in interest rates would not have a material effect on the fair market value of our cash and cash equivalents. We are also exposed to interest rate risk relating to our convertible debt instruments. We carry these instruments at face value in our consolidated balance sheets. Since these instruments bear interest at fixed rates, we have no financial statement risk associated with changes in interest rates. However, the fair value of these instruments fluctuates when interest rates change. For additional details related to our debt, see Note 7, Long Term Debt to the consolidated financial statements included in this report.

*Foreign Currency Risk*

The functional currency of our operations is the United States dollar. We conduct operations in the United Kingdom, as well as various parts of Europe, and as such we are exposed to foreign currency risk. Currently, we do not use foreign currency forward contracts to manage exchange rate risk, as the amount subject to foreign currency risk has no material impact to our overall operations and results.

---

1    Specifically, we believe our TAM for the wearables, mobile, and medical device markets will be approximately $48 billion by 2025, taking into account our anticipated timeline for commercial availability of our products and the market for the end products into which our products are designed to be incorporated. Our products are being designed for utilization in: (a) medical devices, including blood

Exhibit 4
Page 328

Table of Contents

pressure, body temperature, blood glucose, and alcohol monitoring devices, pulse oximetry, and near infra-red ("NIR") spectrometers, with an aggregate forecasted TAM of $15.1 billion by 2025, according to the Yole Report, and mobile cardiac telemetry/general patient monitoring patch devices, with an aggregate forecasted TAM of $2.7 billion by 2025, according to the IDtechEx Report; and (b) consumer wearables and mobile devices, including smartwatches, smart earbuds, fitness bands, and mobile phones, which, based on our internal estimates, are expected to have a TAM of $2.7 billion, $3.0 billion, $1.5 billion, and $23.5 billion, respectively, or an aggregate TAM of $30.7 billion, by 2025. We estimated our TAM in the consumer wearables and mobile device sectors by multiplying third-party forecasted total volumes in 2025 for the devices for which our products are being designed, by our currently anticipated and estimated average selling prices for these products. The volume estimate for smartwatches was based on the benchmarked figure forecasted by annual volume for smartwatches for 2022 according to the TrendForce Report. The volume estimate for smart earbuds was based a 20% volume CAGR between 2020-2025, with 2020 annual shipments estimated at 230 million units, according to the TrendForce Report. According to the Yole Report, fitness bands were forecasted to reach 89 million units by 2025. The volume estimates for smartphones were based on multiple third-party forecasted volumes for mobile phones, multiplied by the average selling price.

225

Exhibit 4
Page 329

Table of Contents

## MANAGEMENT OF HOLDCO FOLLOWING THE BUSINESS COMBINATION

The following sets forth certain information, as of the date of this prospectus/proxy statement, concerning the persons who are expected to serve as directors and executive officers of HoldCo following the closing of the Business Combination.

| Name | Age | Position |
|---|---|---|
| **Executive Officers** | | |
| Andrew Rickman, OBE | 61 | Chairman and Chief Executive Officer |
| Mahesh Karanth | 59 | Chief Financial Officer |
| Amit Nagra, PhD | 48 | Chief Operating Officer |
| **Non-Employee Director Nominees** | | |
| William Huyett | 65 | Lead Independent Director |
| Brian Blaser | 56 | Director |
| Caroline Brown, PhD[1] | 58 | Director |
| Karim Karti | 52 | Director |
| Michele Klein | 71 | Director |

[1]    Member of the audit committee, effective upon the closing of the Business Combination.
[2]    Member of the compensation committee, effective upon the closing of the Business Combination.
[3]    Member of the nominating and corporate governance committee, effective upon the closing of the Business Combination.

**Executive Officers**

*Andrew Rickman, OBE.* Upon the closing of the Business Combination, Dr. Andrew Rickman, OBE will serve as the chairman of the HoldCo board of directors and chief executive officer. Dr. Rickman founded Rockley in 2013 and currently serves as its chief executive officer. Dr. Rickman previously founded Bookham, Inc. ("Bookham"), now part of Lumentum (NASDAQ:LITE) (after its 2018 acquisition of Oclaro Inc. (NASDAQ:OCLR) which was formed in 2009 after Bookham's merger with Avanex Inc.), one of the world's largest photonics and fiber optics telecom component producers in 1998 and served as its chief executive officer and chairman until 2004. From 2007 to 2013, he was chairman of Kotura Inc., a leader in the field of silicon photonics for fiber optic communications, high performance computing, and sensing applications, through to its development and sale to Mellanox Technologies, Ltd (NASDAQ: MLNX) in 2013. In 2000, Dr. Rickman was named U.K.'s Technology and Communications Entrepreneur of the Year by Ernst and Young. In 2011, Dr. Rickman was awarded an Honorary Professorship at SIMIT, Chinese Academy of Sciences. From 2003 to 2013, he was a trustee of the Oxford Trust and from 2001 to 2004 was a council member of the U.K. Government's Engineering and Physical Sciences Research Council. Dr. Rickman holds a mechanical engineering degree from Imperial College, London, a PhD in silicon photonics from Surrey University, an MBA from Cranfield University, and honorary doctorates from Surrey, Edinburgh Napier, and Kingston Universities. He is a chartered engineer and a Fellow of the Royal Academy of Engineering and the Institute of Physics. He was awarded an OBE in the Queen's Millennium Honors list for services to the telecommunications industry and is a winner of the prestigious Royal Academy of Engineering Silver medal for his outstanding contribution to British Engineering. We believe Dr. Rickman's extensive experience and his demonstrated leadership skills make him well-qualified to serve on the HoldCo board of directors.

*Mahesh Karanth.* Upon the closing of the Business Combination, Mahesh Karanth will serve as HoldCo's chief financial officer. Since December 2017, Mr. Karanth has served as the chief financial officer of Rockley. From 2013 to 2017, Mr. Karanth worked as an interim consulting chief financial officer at the Brenner Group LLC, and Mr. Karanth was most recently the chief financial officer for Enlighted, Inc., an enterprise developing advanced lighting control systems. From 2007 to 2010, he was the chief financial officer for InvenSense, Inc., a pioneer in MEMS sensor technology, where he led the company's expansion of finance, administration, and

Exhibit 4
Page 330

Table of Contents

operations leading up to its initial public offering in 2010. Prior to InvenSense, Mr. Karanth was the chief financial officer for Telsima Inc., which was successfully sold to Harris Stratex Networks. From 1995 to 2002, Mr. Karanth held several senior roles at Compaq including M&A, treasury, and corporate development. After Compaq's acquisition by Hewlett-Packard Company, he led corporate development for the customer services group and several major services acquisitions of publicly listed companies in India and the United Kingdom. Mr. Karanth holds a bachelor's and master's degree in commerce and finance from Bangalore University, certifications as a Chartered Accountant from The Institute of Chartered Accountants of India (ICAI), and Chartered Secretary from The Institute of Company Secretaries of India (ICSI), and is a Certified Public Accountant (inactive) in the State of Texas.

*Amit Nagra, PhD.* Upon the closing of the Business Combination, Amit Nagra will serve as HoldCo's chief operating officer. Since 2015, Dr. Nagra has served as the chief operating officer of Rockley. Dr. Nagra has experience developing technology and processes in early-stage businesses and scaling up products and organizations to meet customer demand. From 2007 to 2017, Dr. Nagra served as an executive vice president of operations at Source Photonics Inc., where he was responsible for the global operations and internal manufacturing from wafers to final finished goods. From 2001 to 2005, Dr. Nagra was an early employee and key technical contributor at Phasebridge Inc., a start-up involved in high-speed optical communications that was acquired by Emcore Corporation (NASDAQ: EMKR), and was previously a member of technical staff at Vitesse Semiconductor Corporation, working on the design of 40Gbps circuits for optical communications. Dr. Nagra holds a PhD and MS in electrical engineering from the University of California at Santa Barbara and an MBA from the Anderson School of Business at University of California at Los Angeles.

**Non-Employee Directors**

Rockley and SC Health anticipate that upon the closing of the Business Combination, the initial size of the HoldCo's board of directors will be seven directors.

*William Huyett.* Upon the closing of the Business Combination, William Huyett will serve as the lead independent director of the HoldCo board of directors. Mr. Huyett retired in December 2020 as the Chief Financial Officer of Cyclerion Therapeutics, a NASDAQ listed biopharmaceutical company in Cambridge, MA, which was spun out of Ironwood Pharmaceuticals in 2019, where he had been the Chief Operating Officer. Cyclerion is developing small-molecule therapies for CNS diseases. He remains an advisor to the company. Mr. Huyett is a senior partner emeritus at McKinsey and Company, Inc. ("McKinsey"). During his 30 year career at McKinsey, he was a leader in the firm's pharmaceutical and medical products and its strategy and corporate finance practices, and served on McKinsey's Shareholder's Council (its board of directors) from 2005 to 2014, serving as chair of its Finance Committee from 2007 to 2010. Mr. Huyett was, until the company's merger in August 2020, non-executive board chair of the London Stock Exchange listed, Tbilisi based Georgia Healthcare Group. He serves on the boards of the Rockefeller University, the Marine Biological Laboratory Woods Hole, the University of Virginia Engineering School Foundation, and the National Parks Conservation Association. Mr. Huyett earned his B.S. in electronics in engineering and his MBA from the University of Virginia, where he now serves as a lecturer on corporate finance, corporate strategy and governance. We believe Mr. Huyett's top executive experience, and his strong governance background, make him well-qualified to serve on the HoldCo board of directors.

*Brian Blaser.* Upon the closing of the Business Combination, Brian Blaser will serve as a member of the HoldCo board of directors. Mr. Blaser joins the board of directors after a 15-year tenure at Abbott Laboratories (NYSE: ABT), a multinational medical devices and healthcare company. Since March 2021, Mr. Blaser has served as an Executive Advisor to Water Street Healthcare Partners, an investment and strategic advisory firm specializing in the healthcare sector. From 2012 to 2019 Mr. Blaser was executive vice president of the Diagnostics Products division at Abbott, and he served in several roles covering global and strategic operations. Prior to joining Abbott in 2004, Mr. Blaser held positions in operations, finance, and engineering at Johnson & Johnson, Eastman Kodak Company, and General Motors Company. Mr. Blaser holds a B.S. in mechanical

Exhibit 4
Page 331

Table of Contents

engineering technology from the University of Dayton and an MBA from the Rochester Institute of Technology Saunders College of Business. We believe Mr. Blaser's strategic and operational experience in the in-vitro diagnostics industry make him well-qualified to serve on the HoldCo board of directors.

*Caroline Brown, PhD.* Upon the closing of the Business Combination, Dr. Caroline Brown will serve as an independent member of the HoldCo board of directors and chair the Audit Committee of the HoldCo board of directors. Since 2019, Dr. Brown has served as a non-executive director for the IP Group plc (LON: IPO), an intellectual property commercialization company, and Rockley, where she currently chairs the audit committees for both companies. Dr. Brown is also a non-executive director of Georgia Capital plc (LON: CGEO) and Luceco plc (LON: LUCE). Dr. Brown has served on public company boards for 20 years and is experienced in managing early-stage companies and divisions of FTSE 100 groups in the energy and technology sectors. Dr. Brown spent her early career in corporate finance with Merrill Lynch (New York), UBS, and HSBC, advising global corporations and governments. Dr. Brown holds a first-class degree and PhD in Natural Sciences from the University of Cambridge, an MBA from the City Business School, University of London and is a Fellow of the Chartered Institute of Management Accountants. We believe Dr. Brown's strong corporate governance experience and leadership on public company boards makes her well-qualified to serve on the HoldCo board of directors.

*Karim Karti*. Upon the closing of the Business Combination, Karim Karti will serve as a member of the HoldCo board of directors. Mr. Karti has served as a senior advisor to Rockley's management team since February 2021. Since November 2020, Mr Karti has served as chairman of the Med Tech Acquisition Corporation board of directors (NASDAQ: MTAC). Prior to MTAC, Mr. Karti served as the chief operating officer of iRhythm Technologies, Inc. (NASDAQ: IRTC) from 2018 to 2020. Prior to iRhythm, Mr. Karti served as the president and chief executive officer of the Imaging division at GE Healthcare, the healthcare business unit of General Electric Company (NYSE: GE) ("GE") from 2016 to 2018, and as the chief marketing officer for GE Healthcare from 2013 to 2015. In 2011, Mr. Karti was appointed as president and chief executive officer of GE Healthcare's Eastern and Africa Growth Markets where he was responsible for regional operations in the Middle East, Africa, Turkey, Central Asia, and Russia and the Commonwealth of Independent States. Mr. Karti holds an engineering degree from Ecole Centrale de Lyon in France and graduated from the Entrepreneur program of the Business School of Lyon. We believe Mr. Karti's strong knowledge of the healthcare industry and his prior leadership positions make him well-qualified to serve on the HoldCo board of directors.

*Michele Klein*. Upon the closing of the Business Combination, Michele Klein will serve as a member of the HoldCo board of directors. Since 2011, Ms. Klein has served as the chief executive officer and a director of Jasper Ridge Inc., a company which she co-founded to provide science-based tools to improve vision. Ms. Klein currently serves as a board member of Intevac (NASDAQ: IVAC), Photon Control (TSX: PHO), and Gridtential Energy Inc. From 2005 to 2010, she was a senior director of Applied Ventures, LLC, the venture capital arm of Applied Materials Inc. (NASDAQ: AMAT) ("Applied"), where she recommended and managed investments in energy storage and solar energy, representing Applied on the boards of seven technology companies. Earlier she founded and led two semiconductor equipment companies. Ms. Klein was chief executive of Boxer Cross Inc. from 1997 to 2003 when it was acquired by Applied, and ran the In-line Electrical Metrology team from 2003 to 2005. She led High Yield Technology from 1986 to 1996 when it was acquired by Pacific Scientific (NYSE: DHR). Ms. Klein previously held marketing management positions at Knoll International and Hewlett-Packard Company. Ms. Klein holds a B.S. from the University of Illinois and an MBA from the Stanford Graduate School of Business. We believe Ms. Klein's founder and leadership experience in the semiconductor industry, coupled with her corporate governance background, makes her well-qualified to serve on the HoldCo board of directors.

**Corporate Governance**

***Composition of the HoldCo Board of Directors***

The business and affairs of HoldCo will be managed under the direction of its board of directors. Following the closing of the Business Combination, its board of directors will initially consist of seven directors, with

228

Exhibit 4
Page 332

Table of Contents

Dr. Rickman serving as chairman and William Huyett serving as the lead independent director. Subject to the terms of HoldCo's Governing Documents the number of directors will be fixed by HoldCo's board of directors.

When considering whether directors and director nominees have the experience, qualifications, attributes, and skills, taken as a whole, to enable HoldCo's board of directors to satisfy its oversight responsibilities effectively in light of its business and structure, the board of directors expects to focus primarily on each person's background and experience as reflected in the information discussed in each of the directors' individual biographies set forth above in order to provide an appropriate mix of experience and skills relevant to the size and nature of its business.

In accordance with the terms of the Proposed Organizational Documents, which will be effective upon the closing of the Business Combination, the HoldCo board of directors will be divided into three classes, Class I, Class II, and Class III, with members of each class serving staggered three-year terms. The HoldCo board of directors will be divided into the following classes:

- Class I, which is currently expected to consist of                ,             and            , whose terms will expire at HoldCo's first annual meeting of shareholders to be held after the completion of the Business Combination;

- Class II, which is currently expected to consist of              ,             and            , whose terms will expire at HoldCo's second annual meeting of shareholders to be held after the completion of the Business Combination; and

- Class III, which is currently expected to consist of              ,             and            , whose terms will expire at HoldCo's third annual meeting of shareholders to be held after the completion of the Business Combination.

At each annual meeting of shareholders to be held after the initial classification, the successors to directors whose terms then expire will be elected to serve from the time of election and qualification until the third annual meeting following their election and until their successors are duly elected and qualified. This classification of the HoldCo board of directors may have the effect of delaying or preventing changes in control or management of HoldCo. HoldCo's directors may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of at least a majority of all HoldCo ordinary shares entitled to vote and who vote at a general meeting of HoldCo.

### Director Independence

Upon the closing of the Business Combination, the HoldCo board of directors is expected to determine that each of the directors on the HoldCo board of directors other than Dr. Andrew Rickman, OBE, will qualify as independent directors, as defined under the rules of the NYSE Listed Company Manual (the "NYSE listing rules"), and the HoldCo board of directors will consist of a majority of "independent directors," as defined under the rules of the SEC and NYSE listing rules relating to director independence requirements. In addition, HoldCo will be subject to the rules of the SEC and NYSE listing rules relating to the membership, qualifications, and operations of the audit committee, nominating and corporate governance committee, and compensation committee, as discussed below.

### Committees of the Board of Directors

HoldCo's board of directors will direct the management of its business and affairs, as provided by the laws of the Cayman Islands, and will conduct its business through meetings of the board of directors and standing committees. Effective upon the closing of the Business Combination, HoldCo's board of directors will establish a standing audit committee, compensation committee, and nominating and corporate governance committee, each of which will operate under a written charter adopted by HoldCo's board of directors that will comply with the applicable requirements of current NYSE listing rules.

229

Exhibit 4
Page 333

Table of Contents

In addition, from time to time, special committees may be established under the direction of the board of directors when the board deems it necessary or advisable to address specific issues. Following the closing of the Business Combination, copies of the charters for each committee will be available on the investor relations portion of HoldCo's website.

**Audit Committee**

HoldCo will establish an audit committee of the board of director to be in place prior to or upon the closing of the Business Combination. The audit committee will consist of Dr. Brown,      , and             , with Dr. Brown serving as chair. The HoldCo board of directors will affirmatively determine that each director to be appointed to the audit committee will qualify as independent under NYSE listing rules applicable to board members generally and under the NYSE listing rules and Exchange Act Rule 10A-3 with respect to audit committee members. All members of HoldCo's audit committee will meet the requirements for financial literacy under the applicable NYSE listing rules. In addition, the HoldCo board of directors has determined that Dr. Brown qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. The audit committee's responsibilities will include, among other things:

- appointing, compensating, retaining, evaluating, terminating, and overseeing HoldCo's independent registered public accounting firm;

- discussing with HoldCo's independent registered public accounting firm their independence from management;

- reviewing with HoldCo's independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by HoldCo's independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and HoldCo's independent registered public accounting firm the interim and annual financial statements that HoldCo will file with the SEC;

- reviewing and monitoring HoldCo's accounting principles, accounting policies, financial and accounting controls, and compliance with legal and regulatory requirements; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls, or auditing matters.

*Nominating and Corporate Governance Committee Information*

HoldCo will establish a nominating and corporate governance committee of the board of directors to be in place prior to or upon the closing of the Business Combination.             will serve as chair of the nominating and corporate governance committee,             and             will serve as members of HoldCo's nominating and corporate governance committee. In accordance with NYSE listing rules and SEC rules, HoldCo's nominating and corporate governance committee will consist of all independent members. HoldCo will adopt a nominating and corporate governance committee charter, which will detail the principal functions of the compensation committee, including, without limitation:

- Identifying, screening, and reviewing individuals qualified to serve as directors and recommending to the board of directors candidates for nomination for election at the annual meeting of shareholders or to fill vacancies on the board of directors;

- Developing, recommending to the board of directors, and overseeing implementation of HoldCo's corporate governance guidelines;

- Coordinating and overseeing the annual self-evaluation of the board of directors, its committees, individual directors, and management in the governance of the company; and

230

Exhibit 4
Page 334

**Table of Contents**

- Reviewing on a regular basis our overall corporate governance and recommending improvements as and when necessary.

*Guidelines for Selecting Director Nominees*

HoldCo's nominating and corporate governance committee will recommend to the board of directors candidates for nomination for election at the annual meeting of the shareholders. In identifying and evaluating potential candidates, HoldCo's nominating and corporate governance committee will consider several factors, including, without limitation, high personal and professional integrity, strong ethics and values, the ability to make mature business judgments, experience in corporate management such as serving as an officer or former officer of a publicly held company, experience as a board member of another publicly held company, professional and academic experience relevant to our business, leadership skills, experience in finance and accounting, or executive compensation practices, whether candidate has the time required for preparation, participation and attendance at board of directors meetings and committee meetings, if applicable, independence, and the ability to represent the best interests of HoldCo's shareholders.

***Compensation Committee***

HoldCo will establish a compensation committee of the board of directors to be in place prior to or upon the closing of the Business Combination.          will serve as chair of the compensation committee,          and          will serve as members of HoldCo's compensation committee following the Business Combination. In accordance with NYSE listing rules and SEC rules, HoldCo's compensation committee will consist of all independent members.

HoldCo will adopt a compensation committee charter, which will detail the principal functions of the compensation committee, including, without limitation:

- Reviewing and approving on an annual basis the corporate goals and objectives relevant to HoldCo's chief executive officer's compensation, evaluating HoldCo's chief executive officer's performance in light of such goals and objectives, and determining and approving the remuneration (if any) of post-Business Combination company's chief executive officer based on such evaluation;

- Reviewing and approving on an annual basis the compensation of all of HoldCo's other officers;

- Reviewing on an annual basis HoldCo's executive compensation policies and plans;

- Implementing and administering HoldCo's incentive compensation equity-based remuneration plans;

- Assisting management in complying with HoldCo's proxy statement and annual report disclosure requirements;

- Approving all special perquisites, special cash payments, and other special compensation and benefit arrangements for HoldCo's officers and employees;

- If required, producing a report on executive compensation to be included in HoldCo's annual proxy statement; and

- Reviewing, evaluating, and recommending changes, if appropriate, to the remuneration for directors.

The charter will also provide that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel, or other adviser and will be directly responsible for the appointment, compensation, and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel, or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by the NYSE and the SEC.

231

Exhibit 4
Page 335

**Table of Contents**

***Code of Business Conduct and Ethics for Employees, Executive Officers, and Directors***

HoldCo will adopt a Code of Business Conduct and Ethics applicable to all of its employees, executive officers, and directors, as well as a Code of Ethics applicable to its senior financial officers (collectively, the "Codes of Conduct") to be in place prior to or upon the closing of the Business Combination. The Codes of Conduct will be available on HoldCo's website. Information contained on or accessible through HoldCo's website is not a part of and is not incorporated by reference into this prospectus/proxy statement, and the inclusion of HoldCo's website address in this prospectus/proxy statement is an inactive textual reference only. The nominating and corporate governance committee of HoldCo's board of directors will be responsible for overseeing the Codes of Conduct and must approve any waivers of the Codes of Conduct for employees, executive officers, and directors. HoldCo expects that any amendments to the Codes of Conduct, or any waivers of its requirements, will be disclosed on HoldCo's website.

***Compensation Committee Interlocks and Insider Participation***

None of HoldCo's expected executive officers currently serve, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of HoldCo's board of directors.

The Proposed Organizational Documents, which will be effective upon the closing of the Business Combination, limits HoldCo's directors' liability to the fullest extent permitted under the Cayman Island Companies Act. Cayman law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except for liability:

- for any transaction from which the director derives an improper personal benefit;

- for any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- for any unlawful payment of dividends or redemption of shares; or

- for any breach of a director's duty of loyalty to the corporation or its shareholders.

The Cayman Islands Companies Act and the Proposed Organizational Documents provide that HoldCo will, in certain situations, indemnify HoldCo's directors and officers and may indemnify other employees and other agents, to the fullest extent permitted by law. Any indemnified person is also entitled, subject to certain limitations, to advancement, direct payment, or reimbursement of reasonable expenses (including attorneys' fees and disbursements) in advance of the final disposition of the proceeding.

In addition, HoldCo will enter into separate indemnification agreements with HoldCo's directors and officers. These agreements, among other things, require HoldCo to indemnify its directors and officers for certain expenses, including attorneys' fees, judgments, fines, and settlement amounts incurred by a director or officer in any action or proceeding arising out of their services as one of HoldCo's directors or officers or any other company or enterprise to which the person provides services at HoldCo's request.

HoldCo plans to maintain a directors' and officers' insurance policy pursuant to which HoldCo's directors and officers are insured against liability for actions taken in their capacities as directors and officers. We believe these provisions in the Proposed Organizational Documents and these indemnification agreements are necessary to attract and retain qualified persons as directors and officers.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers, or control persons, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

Exhibit 4
Page 336

**Table of Contents**

## MANAGEMENT OF SC HEALTH

SC Health's current executive officers and directors are as follows:

| Name | Age | Position |
|------|-----|----------|
| David Sin | 42 | Chairman |
| AJ Coloma | 40 | Chief Executive Officer and Director |
| Eric Teo | 42 | Chief Financial Officer |
| Lim Cheok Peng | 74 | Director |
| Frank Lavin | 63 | Director |
| Suresh Marimuthu | 54 | Director |

*David Sin*, 42, has served as SC Health's Chairman since inception. In December 2008, Mr. Sin founded the SINCap group of companies, a multi-asset investment group focused on real estate and private investments across Asia, and he has served as the Chief Executive Officer since inception. Mr. Sin is also the Co-Founder, Deputy Chairman and Group President of FHC, a leading integrated healthcare platform in the Asia Pacific region, where he has served as Deputy Chairman since September 2016 and Group President since March 2018. Mr. Sin previously served as Executive Chairman of FHC from 2013 to 2016. Mr. Sin has been instrumental in growing FHC from a Singapore-only business to a pan-regional platform across eight markets in the Asia Pacific region. Before that, he served as an Associate Director of American International Group, Inc. and a Financial Analyst at Goldman Sachs, where he gained experience in investment banking and special situations investing. Mr. Sin is a World Economic Forum Young Global Leader (2018) and a member of the Harvard Business School Global Leaders Circle. Mr. Sin holds a BA in Accounting in Finance from The University of Manchester and an MBA from the Harvard Business School. SC Health believes that Mr. Sin is well-qualified to serve as a member of SC Health's board of directors due to his experience investing across Asia and his leadership in the healthcare industry.

*AJ Coloma*, 40, has served as SC Health's Chief Executive Officer since inception and as a director since the initial public offering. Since January 2019, Mr. Coloma has served as Managing Director-Investments at SINCap, where he focuses on private equity investing in the Asia Pacific region. From May 2018 to July 2020, Mr. Coloma acted as Group Head of M&A at FHC, where he was responsible for leading group M&A activities in the healthcare space across the Asia Pacific region. Previously, from October 2016 to January 2019, Mr. Coloma served as Director-Investments at SINCap. Before SINCap, from January 2015 to October 2016, Mr. Coloma served as Director, Investment Banking at Credit Suisse, a multinational investment lender and financial services company. Mr. Coloma previously served as Vice President, Investment Banking at Credit Suisse from January 2012 to December 2014, and as Associate, Investment Banking from July 2008 to December 2011. In his over 10 years of experience in the Asia Pacific region, Mr. Coloma has executed over 50 transactions in excess of $25 billion in total value. Mr. Coloma holds a BS and an MBA from the New York University-Leonard N. Stern School of Business.

*Eric Teo*, 42, has served as SC Health's Chief Financial Officer since February 2021. Mr. Teo is the Chief Operations Officer and Chief Financial Officer for SIN Capital Group Pte Ltd ("SIN Capital"). Prior to SIN Capital, he spent close to three years with Fullerton Healthcare Corporation and held various positions during that period. These include country Chief Financial Officer, Group Finance Director and the latest as Executive Vice President, Group Operations and Strategic Projects. Before Fullerton Healthcare, Mr. Teo was a financial controller with an investment management company, Arisaig Partners. Earlier in his career, Mr. Teo was a senior manager with Ernst & Young, Financial Services practice. Eric holds a Bachelor of Accountancy Degree from Nanyang Technological University and is a Chartered Accountant in Singapore.

*Lim Cheok Peng*, 74, has served as a director since the initial public offering. Dr. Lim possesses more than 40 years of experience in the healthcare sector, both as a medical practitioner and in managing hospital businesses. He has practiced internal medicine and cardiology at Mr. Elizabeth Hospital in Singapore since

233

Exhibit 4
Page 337

Table of Contents

January 1985 and has been a physician at Gleneagles Hospital and Parkway East Hospital since January 1985 and June 1985, respectively. Dr. Lim currently serves as Vice Chairman of Cotec Healthcare, a Vietnamese hospital developer and subsidiary of the Vietnamese real estate firm Cotec Group. From 2011 to 2013, Dr. Lim served as the Managing Director of IHH Healthcare Berhad, a Malaysian-Singaporean private healthcare group focused on upmarket health services, and Asia's largest private healthcare group. From 2000 to 2010, he served as Managing Director and Chief Executive Officer of Parkway Holdings Limited. Previously, from 1990 to 2000, he served as Executive Director of Parkway Group Healthcare Pte. Ltd. Both Parkway entities are subsidiaries of IHH Healthcare Berhad. Dr. Lim was instrumental in Parkway's and IHH Healthcare's expansion of their healthcare businesses in the Asia Pacific region, as well as in the Middle East and Turkey. Dr. Lim has led a host of significant transactions, including the acquisition of Mount Elizabeth Hospital and East Shore Hospital (now Parkway East), as well as the Shenton Medical Group in Singapore in 1995, the acquisition of a control stake in Pantai Holdings Berhad in Malaysia in 2005, the acquisition of a control stake in The World Link Group in China in 2006 and the acquisition of a control stake in Acibadem Holdings in Turkey in 2011. He was also instrumental to several key projects during his tenure at Parkway / IHH, including the redevelopment of Gleneagles Hospital in Singapore from 1989 to 1994, the construction and commissioning of Gleneagles Kolkata in India in 2003 and the launch of Mount Elizabeth Novena in Singapore in 2009.

Dr. Lim was a Member of the Singapore Medical Council from 2006 to 2013 and was presented with the Singapore Medical Association Merit Award in 2013 for his significant contributions to the medical profession and his social service to the community in Singapore. He is now a member of the Singapore Medical Council's Disciplinary Tribunal. He is a Member of the Royal College of Physicians of the United Kingdom. He has also received a Diploma of Fellowship from the Royal College of Physicians and Surgeons of Glasgow and the Royal College of Physicians and Surgeons of Edinburgh. Dr. Lim sits on the boards of over a dozen companies in Singapore, Malaysia, Hong Kong and Taiwan. He holds a Bachelor of Medicine and Surgery and a Master of Medicine in Internal Medicine from the University of Singapore. SC Health believes that Dr. Lim is well-qualified to serve as a member of SC Health's board of directors due to his experience in building and operating hospitals and integrating businesses, as well as his deep industry knowledge across the healthcare spectrum.

*Frank Lavin*, 63, has served as a director since the initial public offering. In 2010, Mr. Lavin founded Export Now, a U.S. firm that operates e-commerce stores in China for international brands, where he serves as Chief Executive Officer. Mr. Lavin previously served as Under Secretary for International Trade at the U.S. Department of Commerce from 2005 to 2007. Before that, Mr. Lavin served as U.S. Ambassador to Singapore from 2001 to 2005. In addition to those roles in government, he served in senior finance and management positions in Hong Kong and Singapore with Edelman, Bank of America and Citibank. Previously, Mr. Lavin served in the George H.W. Bush and Reagan Administrations, working in the Department of Commerce, Department of State, National Security Council and the White House. He served as Director of the White House Office of Political Affairs from 1987 to 1989.

Mr. Lavin currently serves as Chairman of the International Council of the National University of Singapore School of Medicine and on the Board of Directors of Advanced MedTech Holdings, a medical technologies company. He is a Fellow of the Singapore Institute of Directors. Mr. Lavin holds a BS from the School of Foreign Service at Georgetown University, an MS in Chinese Language and History from Georgetown, an MA in International Economics from the School of Advanced International Studies at Johns Hopkins University and an MBA in Finance from the Wharton School of the University of Pennsylvania. SC Health believes that Mr. Lavin is well-qualified to serve as a member of SC Health's board of directors due to his considerable experience in the public and private sector and his knowledge and experience relating to the Asia Pacific region.

*Suresh Marimuthu*, 54, has served as a director since the initial public offering. Since June 2016, Mr. Marimuthu has served as Chief Financial Officer and Adviser to the SJ Family office, which is involved in investment properties and technology business. Previously, from May 2008 to May 2016, Mr. Marimuthu served as M&A Transaction Services Partner for Singapore and Southeast Asia (SEA) at Deloitte & Touche, LLP, a professional services firm. Before Deloitte, he held various positions at PricewaterhouseCoopers ("**PwC**") from

234

Exhibit 4
Page 338

Table of Contents

June 1990 to April 2008. Mr. Marimuthu holds a Bachelor of Commerce from Murdoch University Australia and holds a CPA-Certified Practicing Accountants Australia, a CA-Malaysian Institute of Chartered Accountants and a CA-Institute of Singapore Chartered Accountants. SC Health believes that Mr. Marimuthu is well-qualified to serve as a member of SC Health's board of directors due to his extensive experience regarding corporate finance and accounting matters and his experience in leadership roles at Deloitte and PwC.

**Director Independence**

NYSE listing standards require that a majority of SC Health's board of directors be independent. SC Health's board of directors has determined that Dr. Lim Cheok Peng, Frank Lavin and Suresh Marimuthu are "independent directors" as defined in the NYSE listing standards and applicable SEC rules. SC Health's independent directors will have regularly scheduled meetings at which only independent directors are present.

*Audit Committee*

Dr. Lim Cheok Peng, Frank Lavin and Suresh Marimuthu are members of SC Health's audit committee, with Mr. Marimuthu serving as the chairman of the audit committee. Each member of the audit committee is financially literate and SC Health's board of directors has determined that Suresh Marimuthu qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

The audit committee is responsible for:

- meeting with SC Health's independent registered public accounting firm regarding, among other issues, audits, and adequacy of SC Health's accounting and control systems;

- monitoring the independence of the independent registered public accounting firm;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law; inquiring and discussing with management SC Health's compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by SC Health's independent registered public accounting firm, including the fees and terms of the services to be performed;

- appointing or replacing the independent registered public accounting firm;

- determining the compensation and oversight of the work of the independent registered public accounting firm (including resolution of disagreements between management and the independent registered public accounting firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding SC Health's financial statements or accounting policies;

- monitoring compliance on a quarterly basis with the terms of the Initial Public Offering and, if any non-compliance is identified, immediately taking all action necessary to rectify such non-compliance or otherwise causing compliance with the terms of the Initial Public Offering; and

- reviewing and approving all payments made to SC Health's existing shareholders, executive officers or directors and their respective affiliates. Any payments made to members of SC Health's audit committee will be reviewed and approved by SC Health's board of directors, with the interested director or directors abstaining from such review and approval.

The audit committee's charter provides that the audit committee has the authority to engage independent counsel and other advisers as it determines necessary to carry out its duties. The written charter is available on SC Health's website.

235

Exhibit 4
Page 339

Table of Contents

***Compensation Committee***

The members of SC Health's compensation committee are Dr. Lim Cheok Peng, Frank Lavin and Suresh Marimuthu, with Dr. Lim serving as chairman of the compensation committee. SC Health has adopted a compensation committee charter, which details the principal functions of the compensation committee, including:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to SC Health's chief executive officer's compensation, evaluating SC Health's chief executive officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of SC Health's chief executive officer based on such evaluation;

- reviewing SC Health's executive compensation policies and plans;

- implementing and administering SC Health's incentive compensation equity-based remuneration plans;

- assisting management in complying with SC Health's proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for SC Health's executive officers and employees;

- producing a report on executive compensation to be included in SC Health's annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

The charter also provides that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel or other adviser and is directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by the NYSE and the SEC. The written charter is available on SC Health's website.

***Nominating and Corporate Governance Committee***

The members of SC Health's nominating and corporate governance committee are Dr. Lim Cheok Peng, Frank Lavin and Suresh Marimuthu, each of whom is an independent director under the NYSE's listing standards. Mr. Lavin serves as chair of the nominating and corporate governance committee.

The primary purposes of SC Health's nominating and corporate governance committee are to assist the board in:

- identifying, screening and reviewing individuals qualified to serve as directors and recommending to the board of directors candidates for nomination for election at the annual meeting of shareholders or to fill vacancies on the board of directors;

- developing, recommending to the board of directors and overseeing implementation of SC Health's corporate governance guidelines;

- coordinating and overseeing the annual self-evaluation of the board of directors, its committees, individual directors and management in the governance of the company; and

- reviewing on a regular basis SC Health's overall corporate governance and recommending improvements as and when necessary.

The nominating and corporate governance committee is governed by a charter that complies with the rules of the NYSE, which is available on SC Health's website.

Exhibit 4
Page 340

Table of Contents

*Director Nominations*

SC Health's nominating and corporate governance committee will recommend to the board of directors candidates for nomination for election at the first annual meeting of the shareholders. Prior to SC Health's initial business combination, the SC Health board of directors will also consider director candidates recommended for nomination by holders of the Founder Shares during such times as they are seeking proposed nominees to stand for election at an annual meeting of shareholders (or, if applicable, a special meeting of shareholders). Prior to SC Health's initial business combination, holders of SC Health's public shares will not have the right to recommend director candidates for nomination to SC Health's board.

SC Health has not formally established any specific minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, the board of directors considers educational background, diversity of professional experience, knowledge of SC Health's business, integrity, professional reputation, independence, wisdom and the ability to represent the best interests of SC Health's shareholders.

*Compensation Committee Interlocks and Insider Participation*

None of SC Health's executive officers currently serves, and in the past year has not served, as a member of the compensation committee of any entity that has one or more executive officers serving on SC Health's board of directors.

*Code of Business Conduct and Ethics*

SC Health has adopted a Code of Business Conduct and Ethics that applies to all of SC Health's employees, officers and directors, including those officers responsible for financial reporting. A copy of SC Health's Code of Business Conduct and Ethics may be accessed free of charge by visiting SC Health's website at www.schealthcorp.com. In addition, a copy of the Code of Business Conduct and Ethics will be provided without charge upon request from us. SC Health intends to disclose any amendments to or waivers of certain provisions of SC Health's Code of Business Conduct and Ethics in a Current Report on Form 8-K.

*Legal Proceedings*

SC Health is not currently subject to any material legal proceedings, nor, to SC Health's knowledge, is any material legal proceeding threatened against it or any of SC Health's officers or directors in their capacity as such.

*Periodic Reporting and Audited Financial Statements*

SC Health has registered its securities under the Exchange Act and has reporting obligations, including the requirement to file annual and quarterly reports with the Securities and Exchange Commission. In accordance with the requirements of the Exchange Act, SC Health's annual reports contain financial statements audited and reported on by SC Health's independent registered public accounting firm. SC Health has filed with the SEC its Annual Report on Form 10-K covering the fiscal years ended December 31, 2019 and December 31, 2020.

Executive Compensation

None of SC Health's executive officers or directors has received any cash compensation for services rendered to it. Commencing on the date that its securities were first listed on the NYSE through the earlier of consummation of its initial business combination, SC Health is paying an affiliate of its Sponsor $10,000 per month, or up to $180,000 in the aggregate, for office space, secretarial and administrative services provided to it. In addition, SC Health's Sponsor, executive officers and directors, or any of their respective affiliates will be

237

Exhibit 4
Page 341

Table of Contents

reimbursed for any out-of-pocket expenses incurred in connection with activities on its behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. SC Health's audit committee will review on a quarterly basis all payments that were made to its Sponsor, executive officers or directors, or its or their affiliates. Any such payments prior to an initial business combination will be made using funds held outside the trust account. Other than quarterly audit committee review of such reimbursements, SC Health does not expect to have any additional controls in place governing its reimbursement payments to its directors and executive officers for their out-of-pocket expenses incurred in connection with SC Health's activities on its behalf in connection with identifying and consummating an initial business combination. Other than these payments and reimbursements, no compensation of any kind, including finder's and consulting fees, will be paid by SC Health to its Sponsor, executive officers and directors, or any of their respective affiliates. After the completion of its initial business combination, directors or members of SC Health's management team who remain with SC Health may be paid consulting or management fees from the combined company. All of these fees will be fully disclosed to shareholders, to the extent then known, in the proxy solicitation materials or tender offer materials furnished to SC Health shareholders in connection with a proposed business combination. SC Health has not established any limit on the amount of such fees that may be paid by the combined company to its directors or members of management. It is unlikely the amount of such compensation will be known at the time of the proposed business combination, because the directors of the post-combination business will be responsible for determining executive officer and director compensation. Any compensation to be paid to SC Health's executive officers will be determined, or recommended to the board of directors for determination, either by a compensation committee constituted solely by independent directors or by a majority of the independent directors on the SC Health board of directors.

SC Health does not intend to take any action to ensure that members of its management team maintain their positions with it after the consummation of its initial business combination, although it is possible that some or all of its executive officers and directors may negotiate employment or consulting arrangements to remain with SC Health after its initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with SC Health may influence its management's motivation in identifying or selecting a target business but SC Health does not believe that the ability of its management to remain with it after the consummation of its initial business combination will be a determining factor in its decision to proceed with any potential business combination. SC Health is not party to any agreements with its executive officers and directors that provide for benefits upon termination of employment.

**Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters**

The following table sets forth information regarding the beneficial ownership of SC Health ordinary shares as of March 30, 2021 held by:

- each person known by it to be the beneficial owner of more than 5% of any class of its outstanding ordinary shares;

- each of its executive officers and directors; and

- all its executive officers and directors as a group.

238

Exhibit 4
Page 342

Table of Contents

- The following table is based on 22,812,500 ordinary shares of outstanding at March 30, 2021, of which 17,250,000 were SC Health Class A ordinary shares and 5,562,500 were SC Health Class B ordinary shares. Unless otherwise indicated, it is believed that all persons named in the table below have sole voting and investment power with respect to all ordinary shares beneficially owned by them.

| Name of Beneficial Owner(1) | Class A Ordinary Shares | | Class B Ordinary Shares(2) | | Approximate Percentage of Outstanding Ordinary Shares |
| --- | --- | --- | --- | --- | --- |
| | Number of Shares Beneficially Owned | Approximate Percentage of Class | Number of Shares Beneficially Owned | Approximate Percentage of Class | |
| SC Health Holdings Limited (SC Health's Sponsor)(3) | — | — | 5,487,500 | 98.7% | 24.1% |
| David Sin(3) | — | — | 5,487,500 | 98.7% | 24.1% |
| AJ Coloma | — | — | — | — | — |
| Hwei Lynn Lau | — | — | — | — | — |
| Eric Teo | — | — | — | — | — |
| Lim Cheok Peng | — | — | 25,000 | * | * |
| Frank Lavin | — | — | 25,000 | * | * |
| Suresh Marimuthu | — | — | 25,000 | * | * |
| Glazer Capital, LLC(4) | 2,200,048 | 12.8% | — | — | 9.6% |
| Hudson Bay Capital Management LP(5) | 1,283,210 | 7.4% | — | — | 5.6% |
| Perceptive Advisors LLC(6) | 1,000,000 | 5.8% | — | — | 4.4% |
| Polar Asset Management Partners Inc.(7) | 891,391 | 5.2% | — | — | 3.9% |
| HGC Investment Management Inc.(8) | 871,049 | 5.0% | — | — | 3.8% |
| All executive officers and directors as a group (6 individuals) | — | — | 5,562,500 | 100% | 24.4% |

* Less than one percent.
(1) Unless otherwise noted, the business address of each of its shareholders is 108 Robinson Road #10-00, Singapore 068900.
(2) Interests shown consist solely of Founder Shares, classified as SC Health Class B ordinary shares. Such shares will automatically convert into SC Health Class A ordinary shares at the time of the initial business combination.
(3) SC Health Holdings Limited is wholly-owned by SC Health Group Limited. Each of SC Health Group Limited and David Sin may be deemed to beneficially own the shares held by SC Health's Sponsor by virtue of their direct and indirect ownership, respectively, of the shares of SC Health Holdings Limited. Each of SC Health Group Limited and David Sin disclaims beneficial ownership over any securities owned by SC Health's Sponsor other than to the extent of any of their respective pecuniary interest therein, directly or indirectly.
(4) Based on a Schedule 13G/A filed with the SEC on February 16, 2021, by Glazer Capital, LLC and Paul J. Glazer. Glazer Capital, LLC and Paul J. Glazer exercise shared voting and dispositive power over 2,200,048 shares and their principal business address is 250 West 55th Street, Suite 30A, New York, New York 10019.
(5) Based on a Schedule 13G filed with the SEC on February 10, 2021, by Hudson Bay Capital Management LP and Sander Gerber. Hudson Bay Capital Management LP and Sander Gerber exercise shared voting and dispositive power over 1,283,210 shares and their principal business address is 777 Third Avenue, 30th Floor, New York, NY 10017.
(6) Based on a Schedule 13G filed with the SEC on February 16, 2021, by Perceptive Advisors LLC, Joseph Edelman and Perceptive Life Sciences Master Fund, Ltd. Perceptive Advisors LLC, Joseph Edelman and Perceptive Life Sciences Master Fund, Ltd. exercise shared voting and dispositive power over 1,000,000 shares and their principal business address is 51 Astor Place, 10th Floor, New York, NY 10003.
(7) Based on a Schedule 13G/A, filed with the SEC on February 10, 2021, by Polar Asset Management Partners Inc. Polar Asset Management Partners Inc. exercises sole voting and dispositive power over 891,391 shares.

239

Exhibit 4
Page 343

Table of Contents

The principal business address of Polar Asset Management Partners Inc. is 401 Bay Street, Suite 1900, PO Box 19, Toronto, Ontario M5H 2Y4, Canada.

(8)    Based on a Schedule 13G, filed with the SEC on February 14, 2020, by HGC Investment Management Inc. HGC Investment Management Inc. exercises sole voting and dispositive power over 871,049 shares. The principal business office of HGC Investment Management Inc. is 366 Adelaide, Suite 601, Toronto, Ontario M5V 1R9, Canada.

240

Exhibit 4
Page 344

Table of Contents

**EXECUTIVE COMPENSATION OF ROCKLEY**

*Throughout this section, unless otherwise noted, "we," "us," "our," and similar terms refer to Rockley (which includes its subsidiaries) prior to the closing of the Business Combination, and to HoldCo (which includes its subsidiaries) after the closing of the Business Combination.*

This section discusses the material components of the executive compensation program for Rockley's executive officers who are named in the "2020 Summary Compensation Table" below. For 2020, the "named executive officers" and their positions with Rockley were as follows:

- Andrew Rickman, OBE, Chief Executive Officer;

- Mahesh Karanth, Chief Financial Officer; and

- Amit Nagra, PhD, Chief Operating Officer.

Following the closing of the Business Combination, Dr. Rickman will serve as chief executive officer, Mr. Karanth will serve as chief financial officer, and Dr. Nagra will serve as chief operating officer, in each case, of HoldCo.

This discussion may contain forward-looking statements that are based on our current plans, considerations, expectations, and determinations regarding future compensation programs. Actual compensation programs that HoldCo adopts following the closing of the Business Combination may differ materially from the currently planned programs summarized in this discussion.

**2020 Summary Compensation Table**

The following table sets forth information concerning the compensation of the named executive officers of Rockley for the year ended December 31, 2020.

| Name and Principal Position | Salary ($) | Option Awards ($)(1) | Nonequity Incentive Plan Compensation ($)(2) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|
| Andrew Rickman, OBE *Chief Executive Officer* | 366,200 | — | 165,275 | 10,679 | 542,154 |
| Mahesh Karanth *Chief Financial Officer* | 300,012 | 586,814 | 138,006 | 3,072 | 1,027,904 |
| Amit Nagra, PhD *Chief Operating Officer* | 337,851 | — | 186,494(3) | 3,081 | 527,426 |

(1) The amount in this column represents the aggregate grant date fair value of awards granted to each named executive officer, computed in accordance with the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topic 718. See Note 11 to Rockley's audited consolidated financial statements included elsewhere in this prospectus/proxy statement for a discussion of the assumptions Rockley made in determining the grant date fair value of Rockley's equity awards.

(2) The amount in this column represents annual bonuses earned by each named executive officer in 2020 and to be paid in cash in 2021, based on the attainment of individual and company performance metrics as determined by the board of directors of Rockley in its discretion.

(3) In addition to the annual target bonus, this number includes a one-time cash bonus payment of $125,000, paid pursuant to Dr. Nagra's employment agreement amendment dated November 15, 2019.

241

Exhibit 4
Page 345

Table of Contents

(4)    Amounts in this column include the amounts set forth in the table below:

| Named Executive Officer | Employer Retirement Contributions ($) | AD&D Premium ($) |
| --- | --- | --- |
| Andrew Rickman, OBE | 10,679 | — |
| Mahesh Karanth | 3,000 | 72 |
| Amit Nagra, PhD | 3,000 | 81 |

**Narrative to the Summary Compensation Table**

*2020 Salaries*

In 2020, each of the named executive officers of Rockley received an annual base salary to compensate them for services rendered to Rockley. The base salary payable to each named executive officer was intended to provide a fixed component of compensation reflecting such executive's skill set, experience, role, and responsibilities.

*2020 Bonus*

In 2020, Dr. Rickman, Mr. Karanth, and Dr. Nagra were eligible to earn annual cash bonuses targeted at 50%, 50%, and 60% of their respective base salaries. Each named executive officer was eligible to earn his bonus based on the attainment of company and individual performance metrics, as determined by the board of directors of Rockley, in its discretion. The actual annual cash bonuses awarded to each named executive officer for 2020 performance are set forth above in the 2020 Summary Compensation Table in the column titled "Nonequity Incentive Plan Compensation."

*Equity Compensation*

The 2013 Plan was adopted by Rockley's board of directors, and approved by its shareholders, on November 12, 2013. The 2013 Plan has been amended since that date, with the most recent amendment adopted by Rockley's board of directors on November 18, 2020 and approved by its shareholders on December 4, 2020. Rockley's board of directors or the remuneration committee thereof administers the 2013 Plan and any awards granted thereunder.

Options granted pursuant to the 2013 Plan to eligible service providers, including executive officers, have an exercise price that Rockley's board of directors determined is not less than the fair market value of the underlying stock on the date of grant. Options generally vest and become exercisable over a four-year period, often with a 25% cliff vest at the first anniversary of the vesting commencement date, subject to the option holder's continued service with Rockley. Options generally expire ten years from the date of grant. The materials terms of the 2013 Plan are described in greater detail under "—*Equity Benefit Plans*."

In addition, shareholders are being asked to approve the 2021 Plan in connection with the approval of the Business Combination. Upon the 2021 Plan becoming effective, no new awards will be granted under the 2013 Plan. The materials terms of the 2021 Plan are described in greater detail under "*Incentive Plan Proposal*."

*Other Elements of Compensation*

*Retirement Plans*

In 2020, Dr. Rickman participated in the Rockley U.K. pension ("U.K. Pension") and Mr. Karanth and Dr. Nagra participated in the ADP TotalSource Retirement Savings Plan, a multiple employer defined contribution plan in which Rockley participates ("401(k) Plan"). The U.K. Pension and the 401(k) Plan are

242

Exhibit 4
Page 346

Table of Contents

designed to take advantage of certain provisions of Her Majesty's Revenue and Customs ("HRMC") and the Internal Revenue Code, respectively, which allow eligible employees to defer a portion of their compensation, within prescribed limits, on a pre-tax basis to the U.K. Pension or the 401(k) Plan, as applicable. In 2020, contributions made by participants in the U.K. Pension and the 401(k) Plan were matched up to a specified percentage of the employee contributions on behalf of the named executive officers. These matching contributions are fully vested as of the date on which the contribution is made. Rockley anticipates that, following the closing of the Business Combination, its named executive officers will continue to participate in these retirement plans on the same terms as other full-time employees.

### Employee Benefits and Perquisites

*Health & Welfare Benefit Plans.* In 2020, the named executive officers of Rockley participated in health and welfare plans maintained by Rockley, including:

- medical, dental, and vision benefits;
- medical and dependent care flexible spending accounts;
- short-term and long-term disability insurance;
- life insurance; and
- paid time off and paid holidays.

### No Tax Gross-Ups

In 2020, Rockley did not make gross-up payments to cover the named executive officers' personal income taxes that may pertain to any of the compensation or perquisites paid or provided by Rockley.

## Outstanding Equity Awards at 2020 Fiscal Year-End

| | | Option Awards | | | |
|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Options Exercise Price ($) | Options Expiration Date |
| Andrew Rickman, OBE | — | — | — | — | — |
| Mahesh Karanth | 12/22/17(1) | 303,750 | 101,250 | 5.363 | 12/21/27 |
| | 10/05/20(2) | 4,218 | 97,032 | 7.722 | 06/28/30 |
| Amit Nagra, PhD | 05/20/15(3) | 712,230 | — | 1.331 | 05/19/25 |

(1)    Option vests monthly over a 48-month period, with 25% vesting on December 20, 2018 and the remaining portion vesting in 36 equal monthly installments thereafter. All unvested options shall vest in the event of a Change in Control or Sale of Assets, each as defined in the 2013 Plan.
(2)    Option vests monthly over a 48-month period following the grant date. All unvested options shall vest in the event of a Change in Control or Sale of Assets, each as defined in the 2013 Plan.
(3)    Options vest monthly over a 48-month period, with 25% vesting on first anniversary of the grant date and the remaining portion vesting in 36 equal monthly installments thereafter. All unvested options shall vest in the event of a Change in Control or Sale of Assets, each as defined in the 2013 Plan.

## Executive Compensation Arrangements—Existing

### Andrew Rickman, OBE Employment Agreement

On September 9, 2013, Dr. Andrew Rickman, OBE entered into an employment agreement with Rockley to serve as its chief executive officer. That employment agreement was subsequently amended on April 1, 2020. On

243

Exhibit 4
Page 347

Table of Contents

August 1, 2020, Dr. Rickman entered into a consultancy agreement with Rockley Ventures Limited, an affiliate of Rockley and HoldCo. The consultancy agreement, together with Dr. Rickman's employment agreement as amended on April 1, 2020 (collectively, the "CEO Agreements"), will continue until terminated in accordance with their terms.

Dr. Rickman is entitled to a base salary and consulting fee of $371,681. In addition, under the CEO Agreements, Dr. Rickman is eligible to receive an annual cash performance bonus of up to 50% of his base salary and consulting fee, to be paid based on the achievement of company and individual performance goals. The CEO Agreements also provide that Dr. Rickman may participate in any benefit programs maintained for the benefit of Rockley's employees within the United Kingdom.

Under the CEO Agreements, Rockley must provide Dr. Rickman at least six months' notice, or pay in lieu of notice, prior to any termination of his employment unless, in the reasonable view of Rockley, Dr. Rickman is guilty of serious misconduct, willful neglect of duty, dishonesty, gross incompetence, or gross negligence and is terminated on that basis. Dr. Rickman must provide Rockley with at least one month's notice prior to his resignation. Except in the event of a summary dismissal in the circumstances described above, if Dr. Rickman's employment is terminated by Rockley, then he will be eligible to receive (a) 50% of his annual target performance bonus payable in installments over six months and (b) continuation of all employee benefits, including any private medical coverage, insurance, and pension benefits, for a period of six months following termination. These severance benefits are in addition to any pay in lieu of notice.

Dr. Rickman's employment agreement contains customary confidentiality/non-disclosure, non-solicitation, and intellectual property/invention assignment provisions which continue for a period of one month following Dr. Rickman's termination for any reason.

### *Mahesh Karanth Employment Agreement*

On December 20, 2017, Mr. Mahesh Karanth entered into an employment agreement with Rockley to serve as its chief financial officer. That employment agreement was subsequently amended with the latest amendment dated August 1, 2020. Mr. Karanth's employment agreement, as amended, is "at-will" and is terminable by either party for any reason and with or without notice.

Mr. Karanth is entitled to a base salary of $300,012 per year. In addition, under his employment agreement, as amended, Mr. Karanth is eligible to earn an annual cash performance bonus of up to 50% of his base salary, to be paid based on the achievement of individual and company performance goals. The employment agreement also provides that Mr. Karanth may participate in the benefit programs maintained for the benefit of Rockley employees within the United States subject to applicable eligibility requirements.

If Mr. Karanth's employment involuntarily terminates other than for cause or Mr. Karanth resigns for good reason (as each is defined in his employment agreement), he will be eligible to receive six months of base salary and 50% of his annual target bonus, paid in equal installments over six months, subject to his timely execution and non-revocation of a general release of claims.

In the event of a "Change in Control" or "Sale Event" as defined under the 2013 Plan, Mr. Karanth's outstanding options under the 2013 Plan will vest in full.

In addition, pursuant to Mr. Karanth's employment agreement from Rockley dated June 22, 2020, Mr. Karanth is entitled to a cash bonus in the event Rockley undergoes a listing or change in control, as each is defined in such letter. It is expected that the Business Combination will constitute a listing under the liquidity event letter and that Mr. Karanth will thereby receive a $775,000 cash bonus, to be paid contingent upon and shortly following the closing of the Business Combination.

Exhibit 4
Page 348

**Table of Contents**

In connection with entering into his employment agreement, Mr. Karanth also executed an invention, non-disclosure and non-solicitation agreement.

### Amit Nagra, PhD Employment Agreement

On April 25, 2015, Dr. Amit Nagra entered into an employment agreement with Rockley to serve as its chief operating officer. That employment agreement was subsequently amended with the latest amendments dated November 15, 2019 and August 1, 2020. Dr. Nagra's employment agreement, as amended, is "at-will" and is terminable by either party for any reason and with or without notice.

Dr. Nagra is entitled to receive a base salary of $337,851 per year. In addition, under his employment agreement as amended, Dr. Nagra is eligible to earn an annual cash performance bonus of up to 60% of his base salary, to be paid based on the achievement of individual and company performance goals. The employment agreement also provides that Dr. Nagra may participate in the benefit programs maintained for the benefit of Rockley employees within the United States, subject to applicable eligibility requirements.

If Dr. Nagra's employment is terminated without cause (as defined in the employment agreement), he is entitled to receive, as severance, six months of base salary and 50% of his annual target bonus, payable in installments over six months, subject to his timely execution and non-revocation of a general release of claims. In addition, unless Dr. Nagra's employment is terminated for cause (as defined in his employment agreement) or due to death or disability, Dr. Nagra's equity award will remain exercisable through the original term of the option.

In connection with entering into his employment agreement, Dr. Nagra also executed an invention, non-disclosure and non-solicitation agreement.

## HoldCo Executive Compensation

Following the closing of the Business Combination, HoldCo intends to develop an executive compensation program that aligns compensation with HoldCo's business objectives and the creation of shareholder value, while enabling HoldCo to attract, retain, incentivize, and reward individuals who contribute to the long-term success of HoldCo. Decisions on the executive compensation program will be made by the Compensation Committee. On September 30, 2020, Rockley engaged a leading external compensation consulting firm to serve as the executive compensation consultant to the Company. This external consulting firm has provided competitive compensation analysis, including recommendations for the Company's senior management and directors. All proposals were presentation and approved by the Rockley Compensation Committee.

HoldCo expects to enter into employment agreements with our named executive officers in connection with the closing of the Business Combination. These employment agreements will supersede and restate each named executive officer's prior employment and compensation arrangements with the modifications described below. In addition, each named executive officer will be asked to waive any entitlement to accelerated vesting under the terms of their respective option award agreements with respect to the Business Combination. These terms, as described below, have not been finalized and remain subject to change.

### Andrew Rickman, OBE

HoldCo expects to enter into an employment agreement with Dr. Rickman, pursuant to which Dr. Rickman will serve as the chief executive officer of HoldCo and will report directly to the board of directors of HoldCo. Dr. Rickman's service pursuant to the employment agreement will continue until terminated in accordance with its terms.

Under the employment agreement, Dr. Rickman will receive an initial annual base salary of $500,000, which will be subject to increase at the discretion of the board of directors of HoldCo or the Compensation

Exhibit 4
Page 349

Table of Contents

Committee thereof and will be eligible to receive an annual performance bonus targeted at 100% of Dr. Rickman's then current annual base salary. The actual amount of any such bonus will be determined by reference to the attainment of applicable HoldCo and/or individual performance objectives, as determined by the board of directors of HoldCo or the Compensation Committee. Pursuant to the employment agreement, Dr. Rickman will also be eligible to participate in customary health, welfare, and fringe benefit plans provided by HoldCo to its employees.

In addition, subject to approval by the board of directors of HoldCo or the Compensation Committee thereof, Dr. Rickman will be eligible to receive equity awards with a fair value of $5 million, weighted equally between (i) stock options to purchase HoldCo ordinary shares at a price equal to such stock's fair market value at grant and (ii) restricted stock units ("RSUs"). Both Dr. Rickman's stock option and his RSUs would be subject to ratable monthly vesting over four (4) years beginning on the closing of the Business Combination.

In addition, Dr. Rickman's severance terms under his existing employment agreement will continue except that: (i) Dr. Rickman's pre-termination notice period will be extended to twelve (12) months and (ii) if Dr. Rickman's employment is terminated by HoldCo without "cause," or by Dr. Rickman for "good reason" (each, as defined in his employment agreement), in each case, on or within twelve (12) months following a change in control (as defined under the 2021 Plan), then, subject to his execution and non-revocation of a general release of claims in our favor and continued compliance with customary confidentiality and non-solicitation requirements, the vesting shall accelerate with respect to 100% the stock options and RSUs describe in the preceding paragraph.

The employment agreement will contain non-competition and non-solicitation and confidentiality provisions which, generally, restrict Dr. Rickman's ability to (i) engage, become involved, or have business dealings with any of HoldCo's or HoldCo's affiliates customers or suppliers, or (ii) employ, engage or facilitate the employment of HoldCo or HoldCo's affiliates key employees, for a period of twelve (12) months following his termination.

### Mahesh Karanth

HoldCo expects to enter into an employment agreement with Mr. Karanth, pursuant to which Mr. Karanth will serve as the chief financial officer of HoldCo and will report directly to HoldCo's chief executive officer. Mr. Karanth's service pursuant to the employment agreement will continue until terminated in accordance with its terms. Under the employment agreement, Mr. Karanth will receive an initial annual base salary of $450,000, which will be subject to increase at the discretion of the board of directors of HoldCo or the Compensation Committee thereof and will be eligible to receive an annual performance bonus targeted at 60% of Mr. Karanth's then-current annual base salary. The actual amount of any such bonus will be determined by reference to the attainment of applicable company and/or individual performance objectives, as determined by the board of directors of HoldCo or the Compensation Committee thereof.

Pursuant to the employment agreement, Mr. Karanth will also be eligible to participate in customary health, welfare, and fringe benefit plans, provided by HoldCo to its employees.

In addition, subject to approval by the board of directors of HoldCo or the Compensation Committee thereof, Mr. Karanth will be eligible to receive equity awards with a fair value of $2 million, weighted equally between (i) stock options to purchase HoldCo ordinary shares at a price equal to such stock's fair market value at grant and (ii) RSUs. Both Mr. Karanth's stock option and his RSUs would be subject to ratable monthly vesting over four (4) years beginning on the closing of the Business Combination.

If Mr. Karanth's employment is terminated by HoldCo without "cause," or by Mr. Karanth for "good reason" (each, as defined in his employment agreement), subject to his execution and non-revocation of a general release of claims in our favor and continued compliance with customary confidentiality and non-solicitation

246

Exhibit 4
Page 350

**Table of Contents**

requirements, then, in addition to any accrued amounts, Mr. Karanth will be entitled to receive the following severance payments and benefits: (i) an amount equal to the sum of (a) six (6) months of his annual base salary then in effect and (b) 50% of his target annual bonus amount, payable in equal installments over six months; (ii) continued healthcare coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") for up to six (6) months after the termination date; and (iii) if such a termination occurs on or within twelve (12) months following a change in control (as defined under the 2021 Plan), 100% vesting acceleration of the stock options and RSUs describe in the preceding paragraph.

The employment agreement will contain customary confidentiality and non-solicitation provisions, and also will include a "best pay" provision under Section 280G of the Code, pursuant to which any "parachute payments" that become payable to Mr. Karanth will either be paid in full or reduced so that such payments are not subject to the excise tax under Section 4999 of the Code, whichever results in the better after-tax treatment to Mr. Karanth.

### *Amit Nagra, PhD*

HoldCo expects to enter into an employment agreement with Dr. Nagra, pursuant to which Dr. Nagra will serve as the chief operating officer of HoldCo and will report directly to HoldCo's chief executive officer. Dr. Nagra's service pursuant to the employment agreement will continue until terminated in accordance with its terms. Under the employment agreement, Dr. Nagra will receive an initial annual base salary of $450,000, which will be subject to increase at the discretion of the board of directors or the Compensation Committee thereof and will be eligible to receive an annual performance bonus targeted at 60% of Dr. Nagra then-current annual base salary. The actual amount of any such bonus will be determined by reference to the attainment of applicable company and/or individual performance objectives, as determined by the board of directors of HoldCo or the Compensation Committee thereof.

Pursuant to the employment agreement, Dr. Nagra will also be eligible to participate in customary health, welfare, and fringe benefit plans, provided by HoldCo to its employees.

In addition, subject to approval by the board of directors of HoldCo or the Compensation Committee thereof, Dr. Nagra will be eligible receive equity awards with a fair value of $1.5 million, weighted equally between (i) stock options to purchase HoldCo ordinary shares at a price equal to such stock's fair market value at grant and (ii) RSUs. Both Dr. Nagra's stock option and his RSUs would be subject to ratable monthly vesting over four (4) years beginning on the closing of the Business Combination.

If Dr. Nagra's employment is terminated by HoldCo without "cause," or by Dr. Nagra for "good reason" (each, as defined in his employment agreement), subject to his execution and non-revocation of a general release of claims in our favor, then, in addition to any accrued amounts, Dr. Nagra will be entitled to receive the following severance payments and benefits: (i) an amount equal to the sum of (a) six months of his annual base salary then in effect and (b) 50% of his target annual bonus amount, payable in equal installments over six months; (ii) payments of premiums for continued healthcare coverage under COBRA for up to six months after the termination date; and (iii) if such a termination occurs on or within twelve (12) months following a change in control (as defined under the 2021 Plan), 100% vesting acceleration of the stock options and RSUs describe in the preceding paragraph.

The employment agreement will contain customary confidentiality provisions, and also will include a "best pay" provision under Section 280G of the Code, pursuant to which any "parachute payments" that become payable to Dr. Nagra will either be paid in full or reduced so that such payments are not subject to the excise tax under Section 4999 of the Code, whichever results in the better after-tax treatment to Dr. Nagra.

Exhibit 4
Page 351

Table of Contents

**Equity Benefit Plans**

*2013 Equity Incentive Plan*

The following is a description of the material terms of the 2013 Plan. This summary is qualified in its entirety by reference to the complete text of the 2013 Plan, a copy of which is included as an exhibit to this prospectus/proxy statement.

*General.* The 2013 Plan was adopted by Rockley's board of directors, and approved by its shareholders, on November 12, 2013. The 2013 Plan has been amended since the date, with the most recent amendment adopted by Rockley's board of directors on November 18, 2020 and approved by its shareholders on December 4, 2020. As of December 31, 2020, Rockley had reserved 11,458,989 ordinary shares for issuance under the 2013 Plan. In addition, as of December 31, 2020, there were 7,207,044 options outstanding under the 2013 Plan, 11,458,989 ordinary shares remained available for future issuance under the 2013 Plan (of which 2,746,089 shares were available for grant), and the weighted-average exercise price of the options outstanding under the 2013 Plan was $4.94 per share.

Following the closing of the Business Combination, and upon the effective date of the 2021 Plan, no additional awards and Rockley ordinary shares will remain available for future issuance under the 2013 Plan. However, the 2013 Plan, as assumed by HoldCo, will continue to govern the terms and conditions of the outstanding awards previously granted thereunder. Following the 2021 Plan's effective date, shares originally reserved for issuance under the 2013 Plan will become available for issuance under the 2021 plan as described under *"Proposal No. 3—Incentive Plan Proposal*." In addition, as a result of and upon the closing of the Business Combination, equity award holders under the 2013 Plan will be treated as described under "*Proposal No.1—BCA Proposal—Consideration—Treatment of the Company Options and Restricted Stock.*"

*Administration.* The 2013 Plan is administered by Rockley's board of directors or the Compensation Committee thereof. Following the closing of the Business Combination, the 2013 Plan will be administered by the board of directors of HoldCo, or the Compensation Committee thereof, with respect to outstanding awards. The term "Compensation Committee" will be used in this section to refer to the 2013 Plan administrator both before and after the Business Combination.

*Stock Awards.* The 2013 Plan provides for the grant of incentive stock options ("ISOs"), nonstatutory stock options ("NSOs"), enterprise management incentive ("EMI") options, restricted share awards, RSUs awards, stock appreciation rights, cash-based awards, and performance-based stock awards, (collectively, "stock awards"). ISOs may be granted only to Rockley's employees, including officers, and the employees of Rockley's affiliates. All other stock awards may be granted to Rockley's employees, officers, Rockley's non-employee directors, and consultants and the employees and consultants of Rockley's parent, subsidiaries, and affiliates.

*Stock Options.* A stock option is the right to purchase a certain number of shares of stock, at a certain exercise price, in the future. Under the 2013 Plan, ISOs, EMIs, and NSOs are granted pursuant to stock option agreements adopted by the Compensation Committee. The Compensation Committee determines the vesting schedule and exercise price for each stock option, within the terms and conditions of the 2013 Plan, provided that the exercise price of a stock option generally cannot be less than one hundred percent (100%) of the fair market value of Rockley ordinary shares on the date of grant. No ISO may be granted to any person who, at the time of the grant, owns or is deemed to own stock possessing more than ten percent (10%) of Rockley's total combined voting power or that of any of Rockley's affiliates unless (1) the option exercise price is at least one hundred ten percent (110%) of the fair market value of the stock subject to the option on the date of grant, and (2) the term of the ISO does not exceed five years from the date of grant.

Stock options granted under the 2013 Plan generally must be exercised by the optionee before the earlier of the expiration of such option or the expiration of a specified period following the optionee's termination of employment. Each stock option agreement under the 2013 Plan sets forth the extent to which the option recipient

248

Exhibit 4
Page 352

**Table of Contents**

will have the right to exercise the option following the termination of the recipient's service with us, and the right to exercise the option of any executors or administrators of the award recipient's estate or any person who has acquired such options directly from the award recipient by bequest or inheritance.

Payment of the exercise price may be made in cash, check, or, if provided for in the stock option agreement evidencing the award, (1) by surrendering, or attesting to the ownership of, shares which have already been owned by the optionee, (2) future services or services rendered to Rockley or Rockley's affiliates prior to the award, (3) by delivery of an irrevocable direction to a securities broker to sell shares and to deliver all or part of the sale proceeds to Rockley in payment of the aggregate exercise price, (4) by delivery of an irrevocable direction to a securities broker or lender to pledge shares and to deliver all or part of the loan proceeds to Rockley in payment of the aggregate exercise price, (5) by a "net exercise" arrangement, (6) by delivering a full-recourse promissory note, or (7) by any other form that is consistent with applicable laws, regulations, and rules.

*Repricing; Cancellation and Re-Grant of Stock Awards.* The Compensation Committee has the authority to modify outstanding awards under the 2013 Plan. Subject to the terms of the 2013 Plan, the Compensation Committee has the authority to cancel any outstanding stock award in exchange for new stock awards, cash, or other consideration, without shareholder approval but with the consent of any adversely affected participant.

*Changes to Capital Structure.* In the event of a recapitalization, stock split, or similar capital transaction, the Compensation Committee will make appropriate and equitable adjustments to the number of shares subject to outstanding awards and the exercise price under each outstanding option.

*Change of Control.* In the event of a change of control as defined in the 2013 Plan, the Compensation Committee may provide that (i) unexercised awards shall terminate in connection with the change of control, (ii) awards shall be assumed or substituted by the surviving corporation, (iii) vesting with respect to outstanding awards shall accelerate in whole or in part in connection with the change of control, (iv) award holders shall receive a share of the transaction consideration or liquidation proceeds (as applicable) in exchange for their awards or (v) any combination of the foregoing. In addition, the Compensation Committee may provide that certain awards will be subject to acceleration of vesting and exercisability in the event of a change of control.

Certain awards under the 2013 Plan are subject to vesting acceleration upon a change of control. While the proposed Business Combination may constitute a change of control under the 2013 Plan, all such award holders will be asked to waive any entitlement to accelerated vesting upon a change in control with respect to the Business Combination.

*Transferability.* Unless the Compensation Committee provides otherwise, no award granted under the 2013 Plan may be transferred in any manner (prior to the vesting and lapse of any and all restrictions applicable to shares issued under such award), except by will, the laws of descent, and distribution.

Exhibit 4
Page 353

**Table of Contents**

**DIRECTOR COMPENSATION**

**2020 Director Compensation**

The table below summarizes the compensation of each person serving as a non-employee director of Rockley in 2020.

| Name | Fees Earned or Paid in Cash ($) | Option Awards ($) (1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Caroline Brown(2) | 50,000 | 40,063 | | 90,063 |
| Markku Hirvonen(3) | 47,500 | 40,063 | 103,509(4) | 191,072 |
| Robert Rickman | 40,000 | 40,063 | | 80,063 |
| Sunit Rikhi | 40,000 | 40,063 | 20,247(5) | 100,310 |
| John Burgess | 12,500(6) | — | 33,764(7) | 12,500 |
| Andy Parker | — | — | | — |
| Jianqiang Ma | — | — | | — |

(1)    The amount in this column represents the aggregate grant date fair value of options granted to each of Rockley's directors, computed in accordance with the FASB ASC Topic 718. See Note 11 to Rockley's audited consolidated financial statements included elsewhere in this prospectus/proxy statement for a discussion of the assumptions Rockley made in determining the grant date fair value of Rockley's equity awards.
(2)    Dr. Brown served as the Audit Committee Chair in 2020 and therefore received $10,000 in additional compensation.
(3)    Mr. Hirvonen served as the Compensation Committee Chair from April 1, 2020 through December 31, 2020 and therefor received $7,500 in additional compensation.
(4)    Paid in connection with Mr. Hirvonen's consultancy services to Rockley.
(5)    Paid in connection with Mr. Rikhi's consultancy services to Rockley.
(6)    Mr. Burgess resigned as a director and the Compensation Committee Chair on March 31, 2020 and therefore received only a prorated portion of any associated director fees.
(7)    Paid in connection with Mr. Burgess' consultancy services to Rockley.

**Non-Employee Director Compensation Policy**

Rockley's policy is to reimburse directors for reasonable and necessary out-of-pocket expenses incurred in connection with attending board of directors and committee meetings or performing other services in their capacities as directors.

It is expected that upon the closing of the Business Combination, HoldCo's board of directors will approve the Director Compensation Program that is expected to consist of annual retainer fees and long-term equity awards for its non-employee directors.

Under the Director Compensation Program and in connection with the closing of the Business Combination, HoldCo expects to grant RSUs to each non-employee director (each an "Initial RSU Award") under the 2021 Plan covering HoldCo ordinary shares with an aggregate grant date value of $220,000, to vest as to 1/3 of the total number of shares subject to the award on the earlier of the first anniversary of the date of grant or the next annual meeting of HoldCo's shareholders, and in each of the next two calendar years following the year of the initial vesting date, 1/3 of the total number of shares shall vest on the earlier of the one-year anniversary of the prior annual meeting of shareholders or the current year annual meeting of shareholders. Each Initial RSU Award shall become 100% vested if a change in control as defined in the 2021 Plan occurs during such director's service.

Exhibit 4
Page 354

**Table of Contents**

In addition, under the Director Compensation Program, following the conclusion of each regular annual meeting of HoldCo's shareholders, commencing with the 2022 annual meeting, each non-employee director who will continue serving as a member of HoldCo's board of directors thereafter shall receive a grant of RSUs (each an "Annual RSU Award") under the 2021 Plan covering HoldCo ordinary shares with an aggregate grant date target value of $162,000. In addition, if a non-employee director is elected to the HoldCo board of directors other than at an annual meeting of shareholders and after the effective date of the Director Compensation Program, the non-employee director shall receive an Annual RSU Award upon election to HoldCo's board of directors that is prorated based upon the number of calendar days remaining before (1) the next annual meeting of shareholders, if scheduled, or (2) the date of the first anniversary of the last annual meeting of shareholders, if the next annual meeting is not yet scheduled.

Each Annual RSU Award shall become fully vested, subject to the applicable non-employee director's continued service as a director, on the earliest of the one-year anniversary of the date of grant, the next annual meeting of shareholders following the date of grant or the consummation of a change in control as defined in the 2021 plan.

The Director Compensation Program also will consist of the following cash components:

- Annual Retainer for all non-employee directors: $45,000

- Lead Director Retainer: $23,000

- Annual Committee Chair Retainer:

  - Audit: $20,000

  - Nominating and Corporate Governance $10,000

  - Compensation: $15,000

- Annual Committee Member (Non-Chair) Retainer:

  - Audit: $10,000

  - Nominating and Corporate Governance: $5,000

  - Compensation: $7,500

The annual cash retainer will be paid in quarterly installments in arrears following the end of each quarter in which the service occurred, pro-rated for any partial months of service.

### *Non-Employee Director Share Ownership Policy*

In connection with the closing of the Business Combination, HoldCo is expected to adopt a share ownership policy (the "Share Ownership Policy") for its non-employee directors to further align the personal interests of such directors with the interests of HoldCo.

Under the Share Ownership Policy, each non-employee director is expected to acquire, and continue to hold during the term or his or her service on HoldCo's board of directors, ownership of HoldCo common shares having a value equal to four times the annual cash retainer paid by HoldCo to its non-employee directors. For this purpose, shares are considered owned by a non-employee director which are directly owned by such director or subject to vested RSUs. Non-employee directors are required to hold 100% of the shares acquired through any of HoldCo's equity incentive plans (net of the number applied to pay applicable taxes) until the Share Ownership Policy is satisfied.

Exhibit 4
Page 355

Table of Contents

**BENEFICIAL OWNERSHIP OF SECURITIES**

The following table sets forth information regarding (i) the beneficial ownership of SC Health ordinary shares as of March 30, 2021 and (ii) the expected beneficial ownership of HoldCo ordinary shares immediately following closing of the Business Combination (assuming a "no redemption" scenario and assuming a "maximum redemption" scenario as described below) by:

- each person who is known to be the beneficial owner of more than 5% of SC Health ordinary shares and is expected to be the beneficial owner of more than 5% of shares of HoldCo's ordinary shares (i.e. HoldCo shares) post-Business Combination;

- each of SC Health's current executive officers and directors;

- each person who will become an executive officer or director of HoldCo post-Business Combination; and

- all executive officers and directors of SC Health as a group pre-Business Combination, and all executive officers and directors of HoldCo as a group post-Business Combination.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days. The beneficial ownership of SC Health ordinary shares pre-Business Combination is based on 22,812,500 SC Health ordinary shares issued and outstanding as of March 30, 2021.

The expected beneficial ownership of HoldCo ordinary shares post-Business Combination assumes two scenarios:

- a "no redemption" scenario where no SC Health Class A ordinary shares are redeemed in connection with the Business Combination; and

- a "maximum redemption" scenario where 16,261, 464 SC Health Class A ordinary shares are redeemed in connection with the Business Combination.

Based on the foregoing assumptions, and including the            HoldCo ordinary shares to be issued in connection with the PIPE Financing, we estimate that there would be            HoldCo ordinary shares issued and outstanding immediately following the closing of the Business Combination in the "no redemption" scenario, and            HoldCo ordinary shares issued and outstanding immediately following the closing of the Business Combination in the "maximum redemption" scenario. If the actual facts are different from the foregoing assumptions, ownership figures in the combined company and the columns under Post-Business Combination in the table that follows will be different.

The following table does not reflect record of beneficial ownership of any HoldCo ordinary shares issuable upon exercise of public warrants or private placement warrants, as such securities are not exercisable or convertible within 60 days of March 30, 2021.

252

Exhibit 4
Page 356

Table of Contents

Unless otherwise indicated, SC Health believes that all persons named in the table below have sole voting and investment power with respect to the voting securities beneficially owned by them.

| Name and Address of Beneficial Owner(1) | Number of SC Health Ordinary Shares(2) | % of SC Health Class A Ordinary Shares | % of SC Health Class B Ordinary Shares | % of SC Health Ordinary Shares | Assuming No Redemption Number of Shares of HoldCo Common Stock | % | Assuming Maximum Redemption Number of Shares of HoldCo Common Stock | % |
|---|---|---|---|---|---|---|---|---|
| **5% Holders** | | | | | | | | |
| SC Health Holdings Limited (the Sponsor)(3) | 5,487,500 | — | 98.7% | 24.1% | | % | | % |
| David Sin(3) | 5,487,500 | — | 98.7% | 24.1% | | | | |
| Lim Cheok Peng | 25,000 | | * | * | | | | |
| Frank Lavin | 25,000 | — | * | * | | % | | % |
| Suresh Marimuthu | 25,000 | — | * | * | | % | | % |
| Glazer Capital LLC(4) | 2,200,048 | 12.8% | — | 9.6% | | % | | % |
| Hudson Bay Capital(5) Management LP | 1,283,210 | 7.4% | — | 5.6% | | % | | % |
| Perceptive Advisors LLC(6) | 891,391 | 5.2% | — | 3.9% | | % | | % |
| Polar Asset Management Partners Inc.(7) | 1,000,000 | 5.8% | — | 4.4% | | % | | % |
| HGC Investment Management Inc.(8) | 871,049 | 5.0% | — | 3.8% | | | | |
| **Directors and Executive Officers Pre-Business Combination**: | | | | | | | | |
| David Sin(3) | 5,487,500 | — | 98.7% | 24.1% | | * | | * |
| AJ Coloma | — | — | — | — | | * | | * |
| Hwei Lynn Lau | — | — | — | — | — | — | — | — |
| Eric Teo | — | — | — | — | — | — | — | — |
| Lim Cheok Peng | 25,000 | | * | * | — | — | — | — |
| Frank Lavin | 25,000 | — | * | * | — | — | — | — |
| Suresh Marimuthu | 25,000 | — | * | * | — | — | — | — |
| **All SC Health directors and executive officers as a group (six individuals):** | 5,562,500 | — | 100% | 24.4% | | * | | * |
| **Directors and Executive Officers Post-Business Combination**: | | | | | | | | |
| Andrew Rickman | — | — | — | — | | * | | * |
| Mahesh Karanth | — | — | — | — | | * | | * |
| Amit Nagra | — | — | — | — | | * | | * |
| William Huyettt | — | — | — | — | | * | | * |
| Brian Blaser | — | — | — | — | | * | | * |
| Caroline Brown | — | — | — | — | | * | | * |
| Karim Karti | — | — | — | — | | * | | * |
| Michele Klein | — | — | — | — | | * | | * |
| **All HoldCo directors and executive officers as a group (eight individuals)** | — | — | — | — | | * | | * |

---

\*     Less than one percent

253

Exhibit 4
Page 357

**Table of Contents**

(1)   Unless otherwise noted, the business address of each of those listed in the table above pre-Business Combination is 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT.

(2)   Prior to the closing of the Business Combination, holders of record of SC Health Class A ordinary shares and SC Health Class B ordinary shares are entitled to one vote for each share held on all matters to be voted on by SC Health shareholders and vote together as a single class, except as required by law; provided, that holders of SC Health Class B ordinary shares have the right to elect all of SC Health's directors prior to the closing of the Business Combination, and holders of SC Health's Class A ordinary shares are not entitled to vote on the election of directors during such time.

(3)   SC Health Holdings Limited is wholly-owned by SC Health Group Limited. Each of SC Health Group Limited and David Sin may be deemed to beneficially own the shares held by the Sponsor by virtue of their direct and indirect ownership, respectively, of the shares of SC Health Holdings Limited. Each of SC Health Group Limited and David Sin disclaims beneficial ownership over any securities owned by the Sponsor other than to the extent of any of their respective pecuniary interest therein, directly or indirectly.

(4)   Based on a Schedule 13G/A filed with the SEC on February 16, 2021, by Glazer Capital, LLC and Paul J. Glazer. Glazer Capital, LLC and Paul J. Glazer exercise shared voting and dispositive power over 2,200,048 shares and their principal business address is 250 West 55th Street, Suite 30A, New York, New York 10019.

(5)   Based on a Schedule 13G with the SEC on February 10, 2021, by Hudson Bay Capital Management LP and Sander Gerber. Hudson Bay Capital Management LP and Sander Gerber exercise shared voting and dispositive power over 1,283,210 shares and their principal business address is 777 Third Avenue, 30th Floor, New York, NY 10017.

(6)   Based on a Schedule 13G with the SEC on February 16, 2021, by Perceptive Advisors LLC, Joseph Edelman and Perceptive Life Sciences Master Fund, Ltd. Perceptive Advisors LLC, Joseph Edelman and Perceptive Life Sciences Master Fund, Ltd. exercise shared voting and dispositive power over 1,000,000 shares and their principal business address is 51 Astor Place, 10th Floor, New York, NY 10003.

(7)   Based on a Schedule 13G/A, filed with the SEC on February 10, 2021, by Polar Asset Management Partners Inc. Polar Asset Management Partners Inc. exercises sole voting and dispositive power over 891,391 shares. The principal business address of Polar Asset Management Partners Inc. is 401 Bay Street, Suite 1900, PO Box 19, Toronto, Ontario M5H 2Y4, Canada.

(8)   Based on a Schedule 13G, filed with the SEC on February 14, 2020, by HGC Investment Management Inc. HGC Investment Management Inc. exercises sole voting and dispositive power over 871,049 shares. The principal business office of HGC Investment Management Inc. is 366 Adelaide, Suite 601, Toronto, Ontario M5V 1R9, Canada.

Exhibit 4
Page 358

Table of Contents

CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**SC Health Corporation**

*Founder Shares*

On December 28, 2018, the Sponsor paid $25,000, or approximately $0.006 per share, to cover certain of SC Health's offering costs relating to the initial public offering in exchange for 3,450,000 Founder Shares. On February 8, 2019, SC Health effected a share capital sub-division (in respect of the founder shares) so that there were 4,312,500 Founder Shares outstanding. The Sponsor surrendered 562,500 Founder Shares to SC Health for no consideration in connection with the underwriters' election to not exercise the overallotment option relating to the initial public offering at the end of the 45-day option period.

In connection with the Business Combination, each of the 5,562,500 Founder Shares will convert into one HoldCo ordinary share.

*Private Placement Warrants*

The Sponsor purchased an aggregate of 5,000,000 private placement warrants, each exercisable to purchase one SC Health Class A ordinary share at $11.50 per share, at a price of $1.00 per SC Health warrant, or $5,000,000 in the aggregate, in connection with the initial public offering. The private placement warrants are identical to the warrants sold in the initial public offering except that the private placement warrants, so long as they are held by the Sponsor or its permitted transferees, (i) are not be redeemable by SC Health, (ii) may not (including the SC Health Class A ordinary shares issuable upon exercise of these warrants), subject to certain limited exceptions, be transferred, assigned or sold by the holders until 30 days after the completion of SC Health's initial business combination, (iii) may be exercised by the holders on a cashless basis and (iv) are entitled to registration rights. On August 2, 2019, SC Health consummated the closing of the sale of 2,250,000 additional SC Health units at the price of $10.00 per unit upon receiving the underwriters' election to fully exercise their over-allotment option, generating additional gross proceeds of $22,500,000 to SC Health. Simultaneously with the exercise of the over-allotment, SC Health completed the private sale of an additional 450,000 SC Health private placement warrants to the Sponsor, generating gross proceeds to SC Health of $450,000.

In connection with the Business Combination, each of the 5,450,000 SC Health private placement warrants will convert automatically into one HoldCo warrant to purchase one HoldCo ordinary share pursuant to the Warrant Agreement.

*Subscription Agreements*

Concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into Investor Subscription Agreements with certain investors, including, among others, the Sponsor Related PIPE Investor. Pursuant to the Investor Subscription Agreements, each investor agreed to subscribe for and purchase, and HoldCo agreed to issue and sell an aggregate of 14,790,000 HoldCo ordinary shares, at $10.00 per share, for an aggregate commitment amount of $147,900,000, which will take effect immediately prior to the closing of the Business Combination.

Previously, SC Health had entered into a forward purchase agreement with the Sponsor Related PIPE Investor which provided for the purchase by the Sponsor Related PIPE Investor of an aggregate of 5,000,000 SC Health Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants to purchase one SC Health Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per SC Health Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of its initial business combination. As part of the Business Combination, SC Health agreed with the Sponsor Related PIPE Investor that the forward purchase agreement should be terminated and

255

Exhibit 4
Page 359

**Table of Contents**

instead of purchasing $50,000,000 of SC Health Class A ordinary shares pursuant to the forward purchase agreement, the Sponsor Related PIPE Investor would instead enter into the Investor Subscription Agreement referenced above and, pursuant to that agreement, has agreed to purchase an aggregate of $50,000,000 shares in HoldCo.

Also concurrently with the execution of the Business Combination Agreement, SC Health and HoldCo entered into Individual Subscription Agreements with three individuals pursuant to which HoldCo agreed to issue and sell an aggregate of 210,000 HoldCo ordinary shares, at $10.00 per share, for an aggregate commitment amount of $2,100,000, which will take effect immediately prior to the closing of the Business Combination. These three individuals are existing shareholders of Rockley.

The issuance and sale of HoldCo ordinary shares pursuant to the Subscription Agreements will be consummated substantially concurrently with the closing of the Business Combination. For additional information, see "*Proposal No. 1—BCA Proposal—Approval of the Business Combination—Related Agreements—Subscription Agreements.*"

### *Related Party Note and Advances*

SC Health's officers and directors are entitled to reimbursement for any out-of-pocket expenses related to identifying, investigating, negotiating and completing an initial business combination. SC Health's audit committee reviews on a quarterly basis all payments that were made to the Sponsor, SC Health's officers, directors or its or their affiliates.

In addition, in order to finance transaction costs in connection with an intended initial Business Combination, the Sponsor or an affiliate of the Sponsor or certain of SC Health's officers and directors may, but are not obligated to, loan SC Health funds as may be required on a non-interest basis. If SC Health completes the Business Combination, it would repay such loaned amounts. In the event that the Business Combination does not close, SC Health may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from SC Health's trust account would be used for such repayment. Up to $2,000,000 of such loans may be convertible into private placement warrants at a price of $1.00 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants. Except as set forth above, the terms of such loans, if any, have not been determined and no written agreements exist with respect to such loans.

### *Registration Rights and Lock-Up Agreement*

The Business Combination Agreement and Plan of Merger contemplates that, at the closing of the Business Combination, HoldCo, the Sponsor, and the PIPE Investors will enter into the Registration Rights and Lock-Up Agreement, pursuant to which HoldCo will agree to register for resale, pursuant to Rule 415 under the Securities Act, certain HoldCo ordinary shares and other equity securities of HoldCo that are held by the parties thereto from time to time.

The Registration Rights and Lock-Up Agreement provides that, solely with respect to subscriptions by the shareholders and other equity holders, HoldCo is required to file with the SEC, within 30 days after the closing of the Business Combination (the "Filing Deadline"), a registration statement registering the resale of the HoldCo ordinary shares to be issued to any such investor and to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof but no later than the earlier of: (i) the 90th calendar day (or 120th calendar day if the SEC notifies HoldCo that it will "review" such registration statement) following the earlier of (A) the filing of the registration statement and (B) Filing Deadline; and (ii) the 10th business day after the date HoldCo is notified (in writing) by the SEC that such registration statement will not be "reviewed" or will not be subject to further review. However, HoldCo may delay such filing or effectiveness of such registration statement under certain circumstances, including if the Company were required to update the financial statements included in such registration statement in order to comply with Regulation S-X age of financial statement requirements.

256

Exhibit 4
Page 360

Table of Contents

Additionally, the Registration Rights and Lock-Up Agreement, generally provides for a 180-day Lock-Up Period for the Sponsor and other equity investors and their Permitted Transferees, subject to certain other terms and conditions depending on the price of the HoldCo ordinary shares.

For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—Registration Rights and Lock-Up Agreement.*"

### Company Holders Support Agreement

Concurrently with the execution of the Business Combination Agreement, SC Health, Rockley, HoldCo, Merger Sub and certain of the shareholders of Rockley entered into the Company Holders Support Agreement, pursuant to which certain shareholders who hold a material number of shares in Rockley have agreed to, among other things and subject to certain tax conditions being met: (i) vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at the court meeting and general meeting of Rockley shareholders contemplated in the Business Combination Agreement, and take all other necessary and desirable actions reasonably requested by Rockley in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement; (ii) vote against certain transactions involving Rockley that would reasonably be expected to, among other things, impede or nullify the transactions contemplated by the Business Combination Agreement, any ancillary agreements or Company Holders Support Agreement, result in a breach of any obligation or agreement of Rockley under the Business Combination Agreement or other related agreement, or result in any of the conditions to obligations of the Business Combination Agreement not being fulfilled; (iii) be bound by certain transfer restrictions with respect to the ordinary shares of Rockley held by the shareholder; and (iv) do all things reasonably necessary, proper or advisable to consummate the transactions contemplated by the Business Combination Agreement and not take any action that would reasonably be expected to prevent or delay the satisfaction of any of the conditions to those transactions.

Dr. Andrew Rickman, OBE (chairman and chief executive officer of Rockley and currently the sole shareholder of HoldCo), entered into the AR Support Agreement which is on the same terms as the Company Holders Support Agreement except that it also includes Dr. Rickman agreeing to vote in favor of the transactions contemplated by the Business Combination Agreement, any resolutions proposed at a general meeting (or by written consent) of the shareholders of HoldCo, and take all other necessary and desirable actions reasonably requested by HoldCo in connection with the transactions contemplated by the Business Combination Agreement or any ancillary agreement.

For additional information, see "*Proposal No. 1—BCA Proposal—Related Agreements—Company Holders Support Agreement.*"

**Rockley**

### Hengtong JV

In 2017, Rockley formed HRT, a joint venture with Hengtong Optic-Electric Co., Ltd. ("Hengtong") pursuant to the Sino-Foreign Equity Joint Venture Contract (the "JV Agreement"). Under the JV Agreement, HRT must procure chipsets from Rockley for use in finished products and HRT owns the copyright in the final designs. HRT has a license to the underlying intellectual property in the reference designs, including a license to modify and improve. Rockley has certain non-compete obligations under the JV Agreement. During the years ended December 31, 2020 and 2019, Rockley made sales to HRT of $5.3 million and $6.7 million, respectively. As of December 31, 2020 and 2019, the balance owed by the joint venture amounted to $3.3 million and $2.9 million, respectively, and is included in accounts receivable in the accompanying balance sheets.

On March 15, 2019, Hengtong participated in Rockley's Round E financing, and entered into a further Subscription Agreement whereby Hengtong agreed to purchase, and Rockley agreed to sell, 2,098,195 ordinary shares at a purchase price of $14.298, for an aggregate of $30,000,000.

Exhibit 4
Page 361

**Table of Contents**

*Consultancy Agreements*

Rockley engages two affiliate entities of Rockley's directors for consulting and administrative services, Rockley Ventures Limited and Rockley Management (HK) Limited. For the years ended December 31, 2020 and 2019, Rockley incurred $0.8 million and $1.9 million in fees for these services, respectively. As of December 31, 2020 and 2019, the amounts included in accounts payable and accrued expenses in the accompanying balance sheets were not considered material.

*Intra Group Loan*

On February 24, 2021, Rockley entered into an Intra Group Loan Agreement with Rockley Photonics Oy as borrower, for an amount of €928,794 (the "Finland Loan"). The Finland Loan shall be drawn down in full on or before February 28, 2023 and be repayable immediately by the borrower to Rockley following the final claim submission to a grant funded project with Business Finland (the Finnish funding agency for innovation) scheduled for June 30, 2023.

**Indemnification Agreements**

HoldCo intends to enter into separate indemnification agreements with its directors and executive officers, in addition to the indemnification provided for in HoldCo's Governing Documents. These agreements, among other things, require HoldCo to indemnify HoldCo's directors and executive officers for certain expenses, including attorneys' fees, judgments, fines and settlement amounts incurred by a director or executive officer in any action or proceeding arising out of their services as one of HoldCo's directors or executive officers or as a director or executive officer of any other company or enterprise to which the person provides services at HoldCo's request. For more information regarding these indemnification arrangements, see "*Management of Rockley Following the Business Combination—Limitation on Liability and Indemnification of Directors and Officers*." HoldCo believes that these charter provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers.

The limitation of liability and indemnification provisions in HoldCo's Proposed Organizational Documents may discourage shareholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might benefit HoldCo and its shareholders. A shareholder's investment may decline in value to the extent HoldCo pays the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

**Related Person Transactions Policy Following the Business Combination**

Upon closing of the Business Combination, it is anticipated that HoldCo's board of directors will adopt a written Related Person Transactions Policy that sets forth HoldCo's policies and procedures regarding the identification, review, consideration and oversight of "related person transactions." For purposes of HoldCo's policy only, a "related person transaction" is a transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which HoldCo or any of its subsidiaries are participants involving an amount that exceeds $120,000, in which any "related person" has a material interest.

Transactions involving compensation for services provided to HoldCo as an employee, consultant or director will not be considered related person transactions under this policy. A related person is any executive officer, director, nominee to become a director or a holder of more than 5% of any class of HoldCo's voting securities (including HoldCo's ordinary shares), including any of their immediate family members and affiliates, including entities owned or controlled by such persons.

Under the policy, the related person in question or, in the case of transactions with a holder of more than 5% of any class of HoldCo's voting securities, an officer with knowledge of a proposed transaction, must present

258

Exhibit 4
Page 362

Table of Contents

information regarding the proposed related person transaction to HoldCo's audit committee (or, where review by HoldCo's audit committee would be inappropriate, to another independent body of HoldCo's board of directors) for review. To identify related person transactions in advance, HoldCo will rely on information supplied by HoldCo's executive officers, directors and certain significant shareholders. In considering related person transactions, HoldCo's audit committee will take into account the relevant available facts and circumstances, which may include, but are not limited to:

- the risks, costs, and benefits to HoldCo;

- the impact on a director's independence in the event the related person is a director, immediate family member of a director or an entity with which a director is affiliated;

- the terms of the transaction;

- the availability of other sources for comparable services or products; and

- the terms available to or from, as the case may be, unrelated third parties.

HoldCo's audit committee will approve only those transactions that it determines are fair to HoldCo's shareholders and in HoldCo's best interests. All of the transactions described above were entered into prior to the adoption of such policy.

**Certain Engagements in Connection with the Business Combination and Related Transactions**

Cowen was engaged by Rockley to act as its exclusive financial advisor in connection with a business combination with a SPAC, and will receive compensation in connection therewith. SC Health also engaged Cowen to act as a co-placement agent on its $150 million PIPE. Cowen will receive fees and expense reimbursements in connection therewith. Cowen provided the SC Health board of directors with a description of Cowen's relationship with Rockley.

In addition, Cowen (together with its affiliates) is a full service financial institution engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investing, hedging, market making, brokerage and other financial and non-financial activities and services. In addition, Cowen and its affiliates, may provide investment banking and other commercial dealings to SC Health, Rockley and their respective affiliates in the future, for which they would expect to receive customary compensation.

In addition, in the ordinary course of its business activities, Cowen and its affiliates, officers, directors and employees may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of SC Health or Rockley, or their respective affiliates. Cowen and its affiliates, may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

259

Exhibit 4
Page 363

**Table of Contents**

## DESCRIPTION OF HOLDCO SECURITIES

The following summary of certain provisions of HoldCo securities does not purport to be complete and is subject to the Proposed Organizational Documents, the HoldCo Warrant Agreement and the provisions of applicable law. Copies of the Proposed Organizational Documents are attached to this prospectus/proxy statement as Annex K, and a copy of the HoldCo Warrant Agreement is attached as an exhibit to the registration statement of which this prospectus/proxy statement is a part.

**Share Capital**

*Authorized Capitalization*

*General*

The total amount of HoldCo's authorized share capital consists of 5,000,000,000 HoldCo ordinary shares with a par value of $0.00001 per share. HoldCo expects to have                HoldCo ordinary shares and warrants to purchase                0 HoldCo ordinary shares outstanding immediately after the closing of the Business Combination, excluding contingent shares and assuming no public shareholders exercise their redemption rights in connection with the Business Combination.

*Ordinary Shares*

HoldCo ordinary shares are not entitled to preemptive or other similar subscription rights to purchase any of HoldCo's securities. HoldCo ordinary shares are neither convertible nor redeemable. Unless HoldCo's board of directors determines otherwise, HoldCo will issue all of HoldCo's share capital in uncertificated form.

*Voting Rights*

Each holder of HoldCo ordinary shares is entitled to one vote per share on each matter submitted to a vote of shareholders, as provided by the Proposed Organizational Documents. The Proposed Organizational Documents provide that the holders of one-third of the share capital issued and outstanding and entitled to vote thereat, present in person, or by remote communication, if applicable, or represented by proxy, will constitute a quorum at all meetings of the shareholders for the transaction of business. When a quorum is present, the affirmative vote of a majority of the votes cast is required to take action, unless otherwise specified by law, the Proposed Organizational Documents. There are no cumulative voting rights.

*Dividend Rights*

Each holder of shares of HoldCo's share capital is entitled to the payment of dividends and other distributions as may be declared by the board of directors of HoldCo from time to time out of HoldCo's assets or funds legally available for dividends or other distributions. These rights are subject to the preferential rights of the holders of HoldCo's preferred shares, if any, and any contractual limitations on HoldCo's ability to declare and pay dividends.

*Other Rights*

Each holder of HoldCo ordinary shares is subject to, and may be adversely affected by, the rights of the holders of any series of HoldCo preferred shares, if any, that HoldCo may designate and issue in the future.

*Liquidation Rights*

If HoldCo is involved in voluntary or involuntary liquidation, dissolution or winding up of HoldCo's affairs, or a similar event, each holder of HoldCo ordinary shares will participate pro rata in all assets remaining after payment of liabilities, subject to prior distribution rights of HoldCo preferred shares, if any, then outstanding.

260

Exhibit 4
Page 364

Table of Contents

### Special Meetings of Shareholders

The Proposed Organizational Documents provide that a meeting of shareholders may be called by the board of directors of HoldCo. At least seven calendar days' notice shall be given for any meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business.

### Action by Written Consent

The Proposed Organizational Documents provide that any action required or permitted to be taken by the shareholders may be effected at an annual or extraordinary general meeting of the shareholders, or taken by unanimous written consent in lieu of a meeting.

### Removal of Directors

The board of directors of HoldCo or any individual director may be removed from office at any time by the affirmative vote of the holders of at least a majority of the HoldCo ordinary shares entitled to vote and who vote at a general meeting.

### Limitations on Liability and Indemnification of Officers and Directors

The Proposed Organizational Documents provide that HoldCo will indemnify HoldCo's directors. In addition, HoldCo expects to enter into agreements to indemnify HoldCo's directors, executive officers and other employees as determined by the Board.

### Transfer Agent

The transfer agent for HoldCo ordinary shares will be          .

### Warrants

#### Public Warrants

Upon the closing of the Business Combination, each whole HoldCo warrant will entitle the registered holder to purchase one HoldCo ordinary share at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing 30 days after the closing of the Business Combination, provided that there is an effective registration statement under the Securities Act covering the HoldCo ordinary shares issuable upon exercise of the HoldCo warrants and a current prospectus relating to them available (or HoldCo permits holders to exercise their HoldCo warrants on a cashless basis under the circumstances specified in the HoldCo Warrant Agreement) and such shares are registered, qualified or exempt from registration under the securities, or blue sky, laws of the state of residence of the holder. Pursuant to the HoldCo Warrant Agreement, a HoldCo warrant holder may exercise its HoldCo warrants only for a whole number of HoldCo ordinary shares. This means only a whole HoldCo warrant may be exercised at a given time by a HoldCo warrant holder. The HoldCo warrants will expire five years after the closing of the Business Combination, at 5:00 p.m. Eastern Time, or earlier upon redemption or liquidation.

HoldCo will not be obligated to deliver any HoldCo ordinary shares pursuant to the exercise of a HoldCo warrant and will have no obligation to settle such HoldCo warrant exercise unless a registration statement under the Securities Act with respect to the HoldCo ordinary shares underlying the HoldCo warrants is then effective and a prospectus relating thereto is current, subject to HoldCo satisfying its obligations described below with respect to registration. No HoldCo warrant will be exercisable and HoldCo will not be obligated to issue a HoldCo ordinary share upon exercise of a HoldCo warrant unless the HoldCo ordinary shares issuable upon such HoldCo warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the HoldCo warrants. In the event that the conditions in the two

261

Exhibit 4
Page 365

Table of Contents

immediately preceding sentences are not satisfied with respect to a HoldCo warrant, the holder of such HoldCo warrant will not be entitled to exercise such HoldCo warrant and such HoldCo warrant may have no value and expire worthless. In no event will HoldCo be required to net cash settle any HoldCo warrant.

HoldCo will be obligated to use its best efforts to file as soon as practicable, but in no event later than 30 business days after the closing of the Business Combination, with the SEC a registration statement for the registration, under the Securities Act, of the HoldCo ordinary shares issuable upon exercise of the warrants. HoldCo will be obligated to use its best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the HoldCo Warrant Agreement. If a registration statement covering the HoldCo ordinary shares issuable upon exercise of the warrants is not effective by the 60th business day after the closing of the Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when HoldCo will have failed to maintain an effective registration statement, exercise such warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. Notwithstanding the above, if the HoldCo ordinary shares are at the time of any exercise of a warrant not listed on a national securities exchange such that they satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, HoldCo may, at its option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event HoldCo so elects, it will not be required to file or maintain in effect a registration statement, and in the event HoldCo does not so elect, it will use its best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

Once the HoldCo warrants become exercisable, HoldCo may call the warrants for redemption:

- in whole and not in part;
- at a price of $0.01 per HoldCo warrant;
- upon not less than 30 days' prior written notice of redemption (the "30-day redemption period") to each warrantholder; and
- if, and only if, the reported closing price of the HoldCo ordinary shares equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending three business days before HoldCo sends the notice of redemption to the warrantholders.

If and when the HoldCo warrants become redeemable by HoldCo, HoldCo may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If the foregoing conditions are satisfied and HoldCo issues a notice of redemption of the warrants, each HoldCo warrant holder will be entitled to exercise his, her or its warrant prior to the scheduled redemption date. However, the price of HoldCo ordinary shares may fall below the $18.00 redemption trigger price (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) as well as the $11.50 warrant exercise price after the redemption notice is issued.

If HoldCo calls the HoldCo warrants for redemption as described above, HoldCo's board of directors will have the option to require any holder that wishes to exercise his, her or its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," HoldCo's management will consider, among other factors, HoldCo's cash position, the number of warrants that are outstanding and the dilutive effect on its shareholders of issuing the maximum number of HoldCo ordinary shares issuable upon the exercise of HoldCo's warrants. If HoldCo's management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of HoldCo ordinary shares equal to the quotient obtained by dividing (a) the product of the number of HoldCo ordinary

262

Exhibit 4
Page 366

**Table of Contents**

shares underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (b) the fair market value. The "fair market value" will mean the average reported closing price of the HoldCo ordinary shares for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If HoldCo's management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of HoldCo ordinary shares to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. HoldCo believes this feature is an attractive option to it if it does not need the cash from the exercise of the warrants after the closing of the Business Combination. If HoldCo calls its warrants for redemption and HoldCo's management does not take advantage of this option, the holders of the private placement warrants and their permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrant holders would have been required to use had all warrant holders been required to exercise their warrants on a cashless basis, as described in more detail below. A holder of a warrant may notify HoldCo in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 4.9% or 9.8% (or such other amount as specified by the holder) of the HoldCo ordinary shares outstanding immediately after giving effect to such exercise.

If the number of outstanding HoldCo ordinary shares is increased by a stock dividend payable in HoldCo ordinary shares, or by a split-up or other similar event, then, on the effective date of stock dividend, split-up or similar event, the number of HoldCo ordinary shares issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding HoldCo ordinary shares. A rights offering to holders of HoldCo ordinary shares entitling holders to purchase HoldCo ordinary shares at a price less than the fair market value will be deemed a stock dividend of a number of HoldCo ordinary shares equal to the product of (a) the number of HoldCo ordinary shares actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for HoldCo ordinary shares) and (b) the quotient of (i) the price per HoldCo ordinary share paid in such rights offering and (ii) the fair market value. For these purposes (a) if the rights offering is for securities convertible into or exercisable for HoldCo ordinary shares, in determining the price payable for HoldCo ordinary shares, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (b) fair market value means the volume weighted average price of HoldCo ordinary shares as reported during the 10 trading day period ending on the trading day prior to the first date on which the HoldCo ordinary shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if HoldCo, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of HoldCo ordinary shares on account of such HoldCo ordinary shares (or other securities into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of HoldCo ordinary shares in connection with the closing of the Business Combination, or (d) to satisfy the redemption rights of the holders of HoldCo ordinary shares in connection with a shareholder vote to amend the Proposed Organizational Documents, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each HoldCo ordinary share in respect of such event.

If the number of outstanding HoldCo ordinary shares is decreased by a consolidation, combination, reverse stock split or reclassification of HoldCo ordinary shares or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of HoldCo ordinary shares issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding HoldCo ordinary shares.

263

Exhibit 4
Page 367

**Table of Contents**

Whenever the number of HoldCo ordinary shares purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (a) the numerator of which will be the number of HoldCo ordinary shares purchasable upon the exercise of the warrants immediately prior to such adjustment, and (b) the denominator of which will be the number of HoldCo ordinary shares so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding HoldCo ordinary shares (other than those described above or that solely affects the par value of such HoldCo ordinary shares), or in the case of any merger or consolidation of HoldCo with or into another corporation (other than a consolidation or merger in which HoldCo is the continuing corporation and that does not result in any reclassification or reorganization of the issued and outstanding HoldCo ordinary shares), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of HoldCo as an entirety or substantially as an entirety in connection with which HoldCo is dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the HoldCo ordinary shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of HoldCo ordinary shares or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. If less than 70% of the consideration receivable by the holders of HoldCo ordinary shares in such a transaction is payable in the form of HoldCo ordinary shares in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within 30 days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the HoldCo Warrant Agreement based on the Black-Scholes Warrant Value (as defined in the HoldCo Warrant Agreement) of the warrant. The purpose of such exercise price reduction is to provide additional value to holders of the warrants when an extraordinary transaction occurs during the exercise period of the warrants pursuant to which the holders of the warrants otherwise do not receive the full potential value of the warrants.

The HoldCo Warrant Agreement provides that the terms of the warrants may be amended without the consent of any holder for the purpose of (a) curing any ambiguity or to correct any defective provision, (b) adjusting the provisions relating to cash dividends on HoldCo ordinary shares as contemplated by and in accordance with the HoldCo Warrant Agreement or (c) adding or changing any other provisions with respect to matters or questions arising under the HoldCo Warrant Agreement as the parties to the HoldCo Warrant Agreement may deem necessary or desirable and that the parties deem to not adversely affect the interests of the registered holders of the warrants. All other modifications or amendments will require the approval by the holders of at least 50% of the then-outstanding public warrants and, solely with respect to any amendment to the terms of the private placement warrants, 50% of the then outstanding private placement warrants. You should review a copy of the HoldCo Warrant Agreement, which will be filed as an exhibit to the registration statement of which this prospectus/proxy statement is a part, for a complete description of the terms and conditions applicable to the warrants.

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to HoldCo, for the number of warrants being exercised. The warrant holders do not have the rights or privileges of holders of HoldCo ordinary shares and any voting rights until they exercise their warrants and receive HoldCo ordinary shares. After the issuance of HoldCo ordinary shares upon exercise of the warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by shareholders.

264

Exhibit 4
Page 368

Table of Contents

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, HoldCo will, upon exercise, round down to the nearest whole number of HoldCo ordinary shares to be issued to the warrantholder.

*Private Placement Warrants*

In connection with the initial public offering, the Sponsor purchased an aggregate of 5,000,000 SC Health private placement warrants, each exercisable to purchase one SC Health Class A ordinary share at $11.50 per share, at a price of $1.00 per warrant, or $5,000,000 in the aggregate. On August 2, 2019, SC Health consummated the closing of the sale of 2,250,000 additional units at the price of $10.00 per SC Health unit upon receiving the underwriters' election to fully exercise their over-allotment option, generating additional gross proceeds of $22,500,000 to SC Health. Simultaneously with the exercise of the over-allotment, SC Health completed the private sale of an additional 450,000 SC Health private placement warrants to the Sponsor, generating gross proceeds to SC Health of $450,000.

The SC Health private placement warrants (including the HoldCo ordinary shares issuable upon exercise of such warrants) will not be transferable, assignable or salable until 30 days after the closing of the Business Combination (except, among other limited exceptions to HoldCo's officers and directors and other persons or entities affiliated with the Sponsor) and they will not be redeemable by HoldCo so long as they are held by the Sponsor, members of the Sponsor or their permitted transferees. The Sponsor or its permitted transferees, have the option to exercise the private placement warrants on a cashless basis. Except as described below, the private placement warrants have terms and provisions that are identical to those of the public warrants, including as to exercise price, exercisability and exercise period. If the private placement warrants are held by holders other than the Sponsor or its permitted transferees, the private placement warrants will be redeemable by HoldCo and exercisable by the holders on the same basis as the public warrants.

If holders of the private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering his, her or its warrants for that number of HoldCo ordinary shares equal to the quotient obtained by dividing (a) the product of the number of HoldCo ordinary shares underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (b) the fair market value. The "fair market value" will mean the average reported closing price of the HoldCo ordinary shares for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent.

265

Exhibit 4
Page 369

Table of Contents

**COMPARISON OF THE RIGHTS OF HOLDERS OF SC HEALTH CLASS A ORDINARY SHARES AND HOLDCO ORDINARY SHARES**

The following is a summary comparison of the material differences between the rights of the SC Health shareholders, and the rights that former SC Health shareholders will have as shareholders of HoldCo under the BCA and the HoldCo Articles effective following the closing of the Business Combination. The discussion in this section does not include a description of rights or obligations under the U.S. federal securities laws or Nasdaq rules. Such rights or obligations generally apply equally to SC Health shares and HoldCo shares.

Both SC Health and HoldCo are companies incorporated under the laws of the Cayman Islands, and so both operate under and subject to the same statutory framework. More details about the rights of HoldCo shareholders can be found in the section titled "*Description of HoldCo Securities*". This summary is not intended to be a complete discussion of the respective rights of SC Health shareholders and HoldCo shareholders and may not contain all of the information that is important to you, but is focused upon the differences that may be considered material to you. This summary is qualified in its entirety by reference to the Cayman Island Companies Act and the governing documents of SC Health and HoldCo, which we urge you to read carefully and in their entirety.

SC Health and HoldCo urge you to carefully read this entire prospectus/proxy statement, the relevant provisions of the Cayman Island Companies Act and the other documents to which we refer in this prospectus/proxy statement for a more complete understanding of the differences between the rights of a HoldCo shareholder and the rights of a SC Health shareholder.

SC Health has filed its governing documents with the SEC and will send copies of these documents to you, without charge, upon your request. See the section titled "*References to Additional Information*". The form of HoldCo Articles, which will be adopted at the Closing, is included as Annex J to this registration statement/prospectus.

| | SC Health | HoldCo |
|---|---|---|
| Authorized and Outstanding Capital | The total authorized share capital of SC Health is US$20,100 divided into 180,000,000 Class A ordinary shares with a nominal or par value of US$0.0001, 25,000,000 Class B ordinary shares with a nominal or par value of US$0.00008, and 1,000,000 preference shares with a nominal or par value of US$0.0001. | Following the closing of the Business Combination, the total authorized share capital of HoldCo will be US$50,000 divided into 5,000,000,000 shares of a nominal or par value of US$0.00001 each. |
| | As of March 30, 2021, there were 17,250,000 SC Health Class A ordinary shares outstanding, were 5,562,500 SC Health Class B ordinary shares outstanding and no SC Health preference shares outstanding. | |
| Issue of shares | SC Health shares for the time being unissued shall be under the control of the directors who may:<br><br>(a) issue, allot and dispose of the same to such persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and<br><br>(b) grant options with respect to such shares and issue warrants or similar instruments with | Subject to any direction that may be given by the HoldCo shareholders in a general meeting, the HoldCo directors may, in their absolute discretion and without approval of the existing shareholders, issue shares, grant rights over existing shares or issue other securities in one or more series as they deem necessary and appropriate and determine designations, powers, preferences, privileges and other rights, including dividend rights, conversion rights, terms of redemption and liquidation |

266

Exhibit 4
Page 370

Table of Contents

| SC Health | HoldCo |
|---|---|
| respect thereto; and, for such purposes, the directors may reserve an appropriate number of shares for the time being unissued; provided however that the directors shall not allot, issue, grant options over or otherwise dispose of shares (including fractions of a share) to the extent that it may affect the ability of SC Health to convert the SC Health Class B ordinary shares or to apply their anti-dilution rights. | preferences, any or all of which may be greater than the powers and rights associated with the shares held by existing shareholders, at such times and on such other terms as they think proper. |

| | SC Health | HoldCo |
|---|---|---|
| Redemption or repurchase | Shareholders who hold SC Health Class A ordinary shares issued as part of the units issued in the SC Health IPO ("Public Shares") are entitled to request the redemption of such shares in the circumstances described below. Any shareholder holding Public Shares who is not a founder, officer or director may, contemporaneously with any vote on a Business Combination, elect to have their Public Shares redeemed for cash (the "IPO Redemption"), provided that no such shareholder acting together with any affiliate of his or any other person with whom he is acting in concert or as a partnership, syndicate, or other group for the purposes of acquiring, holding, or disposing of Shares may exercise this redemption right with respect to more than 20% of the Public Shares, and provided further that any holder that holds Public Shares beneficially through a nominee must identify itself to SC Health in connection with any redemption election in order to validly redeem such Public Shares. In connection with any vote held to approve a proposed Business Combination, holders of Public Shares seeking to exercise their redemption rights will be required to either tender their certificates (if any) to SC Health's transfer agent or to deliver their shares to the transfer agent electronically using The Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option, in each case up to two business days prior to the initially scheduled vote on the proposal to approve a Business Combination. If so demanded, SC Health shall pay any such redeeming shareholder, regardless of whether he is voting for or against such proposed Business Combination, | Subject to the provisions of the Cayman Islands Companies Act, HoldCo may purchase its own shares (including any redeemable shares) in such manner and on such other terms as the directors may agree with the relevant shareholder. |

267

Exhibit 4
Page 371

**Table of Contents**

| SC Health | HoldCo |
|---|---|
| a per-Share redemption price payable in cash, equal to the aggregate amount then on deposit in the trust account established by SC Health upon the consummation of the SC Health IPO and into which a certain amount of the net proceeds of the SC Health IPO, together with certain of the proceeds of a private placement of warrants simultaneously with the closing date of the SC Health IPO, were deposited (the "Trust Fund") calculated as of two business days prior to the consummation of a Business Combination, representing (x) the proceeds held in the Trust Fund from the SC Health IPO and the sale of the private placement warrants and (y) any interest income earned on the funds held in the Trust Fund (which interest shall be net of taxes payable), divided by the number of Public Shares then in issue (such redemption price being referred to herein as the "Redemption Price"). | |

| | SC Health | HoldCo |
|---|---|---|
| Voting Rights | SC Health's Governing Documents provide that the shareholders shall be entitled to one vote for each such share on each matter properly submitted to the shareholders on which the holders are entitled to vote (except for the appointment of directors upon which only the SC Health Class B ordinary shares are entitled to vote). | The Proposed Organizational Documents provide that each HoldCo share shall entitle its holder to one vote at all meetings of the shareholders of HoldCo, except meetings at which only holders of another specified class of shares are entitled to vote pursuant to the provisions of the Proposed Organizational Documents. |
| Requisition of Meetings | SC Health's Governing Documents provide that general meetings of the shareholders may be convened on the requisition in writing of any shareholder(s) entitled to attend and vote at general meetings of the Company holding at least thirty percent of the paid up voting share capital of the Company deposited at the registered office of the company in the Cayman Islands specifying the objects of the meeting by notice given no later than 21 days from the date of deposit of the requisition signed by the requisitionists.<br><br>If the directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting. | A HoldCo shareholder requisition is a requisition of shareholders holding at the date of deposit of the requisition not less than one-third of the share capital of HoldCo as at that date carries the right of voting at general meetings of HoldCo. If the directors do not within 21 calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further 21 calendar days, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the second said 21 calendar days. |
| Notice of Meetings | At least 5 days' notice in writing counting from the date service is deemed to take place as provided in the SC Health Governing | At least 7 days' notice shall be given for any general meeting. Every notice shall be exclusive of the day on which it is given or |

268

Exhibit 4
Page 372

**Table of Contents**

| SC Health | HoldCo |
|---|---|
| Documents shall be given to such Persons as are entitled to receive such notices from the Company, but with the consent of all the shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those shareholders may think fit. | deemed to be given and of the day for which it is given, provided that a general meeting of HoldCo shall be deemed to have been duly convened if it is so agreed: (a) in the case of an annual general meeting by all the shareholders (or their proxies) entitled to attend and vote; and (b) in the case of an extraordinary general meeting by a majority in number of the shareholders (or their proxies) having a right to attend and vote at the meeting, being a majority together holding not less than ninety five percent in par value of the shares giving that right. |
| **Quorum at Shareholder Meetings** One or more shareholders holding at least a majority of the paid up voting share capital of SC Health present in person or by proxy and entitled to vote at that meeting shall form a quorum, except that, in the case of a separate meeting of a class of shares, a quorum shall be one or more persons at least holding or representing by proxy one-third in nominal or par value amount of the issued shares of the relevant class. | One or more shareholders holding not less than an aggregate of one-third of all voting share capital of HoldCo in issue present in person or by proxy and entitled to vote shall be a quorum for all purposes. |

269

Exhibit 4
Page 373

Table of Contents

**SECURITIES ACT RESTRICTIONS ON RESALE OF HOLDCO SECURITIES**

Upon completion of this offering, HoldCo will have 5,000,000,000 HoldCo ordinary shares authorized and, based on the assumptions set forth elsewhere in this prospectus/proxy statement, up to            HoldCo ordinary shares issued and outstanding, assuming no shares of SC Health ordinary shares are redeemed in connection with the Business Combination. All HoldCo ordinary shares issued in connection with the Business Combination will be freely transferable by persons other than by HoldCo's 'affiliates' without restriction or further registration under the Securities Act. Sales of substantial amounts of the HoldCo ordinary shares in the public market could adversely affect prevailing market prices of the HoldCo ordinary shares.

**Lock-up Agreements and Registration Rights**

The Business Combination Agreement and Plan of Merger contemplates that, at the closing of the Business Combination, HoldCo, the Sponsor, and the PIPE Investors will enter into the Registration Rights and Lock-Up Agreement, pursuant to which HoldCo will agree to register for resale, pursuant to Rule 415 under the Securities Act, certain HoldCo ordinary shares and other equity securities of HoldCo that are held by the parties thereto from time to time. The Registration Rights and Lock-Up Agreement provides that HoldCo will file with the SEC, within 30 days after the closing of the Business Combination, a registration statement registering the resale of the HoldCo ordinary shares to be issued to any such investor and to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof, subject to the terms of the Registration Rights and Lock-Up Agreement. Additionally, the Registration Rights and Lock-Up Agreement, generally provides for a 180-day Lock-Up Period for the Sponsor and other equity investors and their Permitted Transferees, subject to certain other terms and conditions depending on the price of the HoldCo ordinary shares. For more information about the Registration Rights and Lock-Up Agreement, see "*Proposal No. 1—BCA Proposal—Related Agreements—Registration Rights and Lock-Up Agreement.*" and "*Certain Relationships and Related party to the Business Combination Agreement Transactions—Registration Rights and Lock-Up Agreement.*"

**Rule 144**

A person who has beneficially owned restricted HoldCo ordinary shares or restricted HoldCo warrants for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of HoldCo's affiliates at the time of, or at any time during the three months preceding, a sale and (ii) HoldCo is subject to the Exchange Act periodic reporting requirements for at least three months before the sale. Persons who have beneficially owned restricted HoldCo ordinary shares or restricted HoldCo warrants for at least six months but who are HoldCo affiliates at the time of, or any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period a number of securities that does not exceed the greater of either of the following:

- 1% of the then outstanding equity shares of the same class which, immediately after the Business Combination, will equal            HoldCo ordinary shares and            HoldCo warrants; or

- the average weekly trading volume of HoldCo ordinary shares of the same class or HoldCo warrants, as applicable, during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

Sales by affiliates of HoldCo under Rule 144 are also subject to certain requirements relating to manner of sale, notice and the availability of current public information about HoldCo.

**Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

270

Exhibit 4
Page 374

Table of Contents

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, the Sponsor will be able to sell their Founder Shares and private placement warrants, as applicable, pursuant to Rule 144 without registration one year after SC Health has completed SC Health's initial business combination, subject to the applicable requirements of Rule 144.

HoldCo and SC Health anticipate that following the closing of the Business Combination, HoldCo will no longer be a shell company, and so, once the conditions set forth in the exceptions listed above are satisfied, Rule 144 will become available for the resale of the above noted restricted securities.

271

Exhibit 4
Page 375

Table of Contents

## SHAREHOLDER PROPOSALS AND NOMINATIONS

**Shareholder Proposals**

HoldCo's Governing Documents do not establish a procedure for shareholders who wish to present a proposal before an annual meeting of shareholders. HoldCo's Governing Documents provide that the only business that may be conducted at an annual meeting of shareholders is business that is properly brought before such meeting by or at the direction of HoldCo's board of directors.

HoldCo's Governing Documents do provide a means for shareholders holding at the date of deposit of the requisition not less than one-third of the share capital of HoldCo as at that date carries the right of voting at general meetings of HoldCo. The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at HoldCo's principal place of business (with a copy forwarded to the registered office), and may consist of several documents in like form each signed by one or more requisitionists. If the directors do not within 21 calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further 21 calendar days, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the second said 21 calendar days.

**Shareholder Director Nominees**

HoldCo's Governing Documents do not provide for shareholders to nominate directors for election at an annual meeting or at a special meeting.

272

Exhibit 4
Page 376

**Table of Contents**

## SHAREHOLDER COMMUNICATIONS

Shareholders and interested parties may communicate with SC Health's board of directors, any committee chair or the non-management directors as a group by writing to the board or committee chair in care of SC Health Corporation, c/o 108 Robinson Road #10-00, Singapore 068900. Following the business combination, such communications should be sent to HoldCo, 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT. Each communication will be forwarded, depending on the subject matter, to the board of directors, the appropriate committee chair or all non-management directors.

Exhibit 4
Page 377

Table of Contents

**LEGAL MATTERS**

Travers Thorp Alberga and Pillsbury Winthrop Shaw Pittman LLP have passed upon the validity of the securities of HoldCo offered by this prospectus/proxy statement and certain other legal matters related to this prospectus/proxy statement, and Ropes & Gray LLP as tax counsel to SC Health Corporation, has passed upon certain U.S. federal income tax consequences of the business combination. Walkers (Singapore) Limited Liability Partnership, as Cayman Islands counsel to SC Health, has passed upon matters of Cayman Islands law related to this prospectus/proxy statement

274

Exhibit 4
Page 378

**Table of Contents**

**EXPERTS**

The financial statements of SC Health Corporation as of December 31, 2020 and 2019 and for each of the years then ended included in this prospectus/proxy statement have been audited by WithumSmith+Brown, PC, an independent registered public accounting firm, as set forth in their report thereon (which contains an explanatory paragraph relating to SC Health Corporation's ability to continue as a going concern as described in Note 1 to the financial statements), appearing elsewhere in this registration statement/prospectus/proxy statement, and are included in reliance on such report given on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of Rockley Photonics Limited at December 31, 2020 and 2019, and for each of the two years in the period ended December 31, 2020, included in the prospectus of Rockley Photonics Holdings Limited and the proxy statement of SC Health Corporation, which is referred to and made part of this Registration Statement, have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon (which contains an explanatory paragraph describing conditions that raise substantial doubt about the Company's ability to continue as a going concern as described in Note 1 to the consolidated financial statements) appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in auditing and accounting.

Exhibit 4
Page 379

Table of Contents

**DELIVERY OF DOCUMENTS TO SHAREHOLDERS**

Pursuant to the rules of the SEC, SC Health and services that it employs to deliver communications to its shareholders are permitted to deliver to two or more shareholders sharing the same address a single copy of each of SC Health's annual report to shareholders and SC Health's proxy statement. Upon written or oral request, SC Health will deliver a separate copy of the annual report to shareholders and/or proxy statement to any shareholder at a shared address to which a single copy of each document was delivered and who wishes to receive separate copies of such documents. Shareholders receiving multiple copies of such documents may likewise request that SC Health deliver single copies of such documents in the future. Shareholders receiving multiple copies of such documents may request that SC Health deliver single copies of such documents in the future. Shareholders may notify SC Health of their requests by calling or writing SC Health at its principal executive offices at c/o 108 Robinson Road #10-00 Singapore 068900.

276

Exhibit 4
Page 380

Table of Contents

**ENFORCEABILITY OF CIVIL LIABILITY**

SC Health and HoldCo are incorporated under the laws of the Cayman Islands as exempted companies with limited liability. Both are incorporated in the Cayman Islands because of certain benefits associated with being a Cayman Islands exempted company, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of foreign exchange control or currency restrictions, and the availability of professional and support services. However, the Cayman Islands has a less developed body of securities laws than the United States and provides less protection for investors.

Substantially all of HoldCo's assets are currently located outside the United States. In addition, several of HoldCo's directors and officers are nationals or residents of jurisdictions other than the United States and all or a substantial portion of these individuals' assets may be located outside the United States. As a result, it may be difficult for investors to effect service of process within the United States upon HoldCo or these persons, or to enforce judgments obtained in U.S. courts against HoldCo or them, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States. It may also be difficult for you to enforce judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against HoldCo and its officers and directors.

HoldCo has appointed Andrew Rickman as its agent to receive service of process with respect to any action brought against us in the U.S. District Court for the Southern District of New York in connection with this offering under the federal securities laws of the United States or the securities laws of any State in the United States or any action brought against HoldCo in the Supreme Court of the State of New York in the County of New York in connection with this offering under the securities laws of the State of New York.

Travers Thorp Alberga, HoldCo's counsel as to the laws of the Cayman Islands has advised it that there is uncertainty as to whether the courts of the Cayman Islands would (i) recognize or enforce judgments of U.S. courts obtained against HoldCo or its directors or officers that are predicated upon the civil liability provisions of the federal securities laws of the United States or the securities laws of any state in the United States, or (ii) entertain original actions brought in the Cayman Islands against HoldCo or its directors or officers that are predicated upon the federal securities laws of the United States or the securities laws of any state in the United States.

Travers Thorp Alberga has informed HoldCo that although there is no statutory enforcement in the Cayman Islands of judgments obtained in the federal or state courts of the United States (and the Cayman Islands are not a party to any treaties for the reciprocal enforcement or recognition of such judgments), a judgment in personam obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment (i) is given by a competent foreign court with jurisdiction to give the judgment, (ii) imposes a specific positive obligation on the judgment debtor (such as an obligation to pay a liquidated sum or perform a specified obligation), (iii) is final and conclusive, (iv) is not in respect of taxes, a fine, or a penalty; (v) has not been obtained by fraud; and (vi) was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or the public policy of the Cayman Islands. However, the Cayman Islands courts are unlikely to enforce a judgment obtained from the U.S. courts under civil liability provisions of the U.S. federal securities law if such judgment is determined by the courts of the Cayman Islands to give rise to obligations to make payments that are penal or punitive in nature. Because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands. A Cayman Islands Court may stay enforcement proceedings if concurrent proceedings are being brought elsewhere.

277

Exhibit 4
Page 381

**Table of Contents**

**WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE**

SC Health files reports, proxy statements and other information with the SEC as required by the Exchange Act. Upon the closing of the Business Combination, HoldCo will file annual, quarterly and current reports, proxy statements and other information with the SEC as required by the Exchange Act. You may access information on SC Health, and will be able to access information about HoldCo following the closing of the Business Combination, at the SEC web site containing reports, proxy statements and other information at: *http://www.sec.gov.*

Information and statements contained in this prospectus/proxy statement or any annex to this prospectus/proxy statement are qualified in all respects by reference to the copy of the relevant contract or other annex filed as an exhibit to the registration statement of which this prospectus/proxy statement forms a part, which includes exhibits incorporated by reference from other filings made with the SEC.

All information contained in this prospectus/proxy statement relating to SC Health has been supplied by SC Health, and all information relating to Rockley has been provided by Rockley and all information relating to HoldCo and Merger Sub has been supplied by HoldCo, respectively. Information provided by one another does not constitute any representation, estimate or projection of the other.

If you would like additional copies of this prospectus/proxy statement, or if you have questions about the business combination, you should contact via phone or in writing Morrow Sodali LLC, SC Health's proxy solicitor, by calling (800) 662-5200 (toll-free in North America), or +1 (203) 658-9400 (outside of North America), or by email at **SCPE.info@investor.morrowsodali.com**.

If you are a shareholder of SC Health and would like to request documents, please do so by      , 2021 to receive them before the special meeting of shareholders. If you request any documents from SC Health, SC Health will mail them to you by first class mail, or another equally prompt means.

None of SC Health, Rockley or HoldCo has authorized anyone to give any information or make any representation about the Business Combination or their companies that is different from, or in addition to, that contained in this prospectus/proxy statement or in any of the materials that have been incorporated in this prospectus/proxy statement. Therefore, neither SC Health, Rockley nor HoldCo take any responsibility for any other information that others may provide you. If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this prospectus/proxy statement or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this prospectus/proxy statement does not extend to you. The information contained in this prospectus/proxy statement speaks only as of the date of this prospectus/proxy statement unless the information specifically indicates that another date applies.

Exhibit 4
Page 382

Table of Contents

**ROCKLEY PHOTONICS LIMITED
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Years Ended December 31, 2020 and 2019

|  | **Page** |
|---|---|
| **Index to Audited Consolidated Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Financial Statements: | |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations and Comprehensive Loss | F-4 |
| Consolidated Statements of Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

Exhibit 4
Page 383

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Rockley Photonics Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Rockley Photonics Limited (the Company) as of December 31, 2020 and 2019, the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows for the years then ended, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020 and 2019, and the results of its operations and its cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

**The Company's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has incurred losses from operations since inception and has stated that substantial doubt exists about the Company's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2020.

San Jose, California
April 2, 2021

F-2

Exhibit 4
Page 384

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Consolidated Balance Sheets**
*(in thousands, except share and per share amounts)*

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 19,228 | $ 20,904 |
| Accounts receivable | 4,925 | 6,383 |
| Other receivables | 18,024 | 15,949 |
| Prepaid expenses | 1,605 | 1,763 |
| Other current assets | 609 | 1,757 |
| Total current assets | 44,391 | 46,756 |
| Property, equipment, and finance lease right-of-use assets, net | 6,182 | 7,280 |
| Equity method investment | 5,202 | 1,486 |
| Intangible asset | 3,048 | — |
| Other non-current assets | 1,607 | 2,212 |
| Total assets | $ 60,430 | $ 57,734 |
| **Liabilities and Stockholders' equity** | | |
| Current liabilities | | |
| Trade payables | $ 4,413 | $ 7,373 |
| Accrued expenses | 10,395 | 6,852 |
| Long term debt, current portion | — | 1,952 |
| Other current liabilities | 998 | 3,569 |
| Total current liabilities | 15,806 | 19,746 |
| Long-term debt | 74,804 | — |
| Other long-term liabilities | 1,127 | 1,729 |
| Total liabilities | 91,737 | 21,475 |
| Commitments and contingencies (Note 14) | | |
| Stockholders' (deficit) equity | | |
| Ordinary shares, $0.00001 par value; 55,982,833 and 38,312,233 authorized as of December 31, 2020 and 2019, respectively; 33,637,762 and 33,337,115 issued and outstanding as of December 31, 2020 and 2019, respectively | — | — |
| Additional paid-in-capital | 201,576 | 188,865 |
| Accumulated deficit | (232,883) | (152,606) |
| Total stockholders' equity (deficit) | (31,307) | 36,259 |
| Total liabilities and stockholders' equity | $ 60,430 | $ 57,734 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-3

Exhibit 4
Page 385

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Consolidated Statements of Operations and Comprehensive Loss**
*(in thousands, except share and per share amounts)*

| | Years Ended December 31, | |
| | 2020 | 2019 |
| --- | ---: | ---: |
| Revenue | $ 22,343 | $ 20,492 |
| Cost of revenue | 24,240 | 30,705 |
| Gross profit | (1,897) | (10,213) |
| Operating expenses: | | |
| Selling, general and administrative expenses | 20,260 | 13,306 |
| Research and development expenses | 35,900 | 22,303 |
| Total operating expenses | 56,160 | 35,609 |
| **Loss from operations** | (58,057) | (45,822) |
| Other income (expense): | | |
| Interest expense, net | (189) | (747) |
| Equity method investment loss | (1,274) | (1,281) |
| Change in fair value of debt instruments | (20,163) | (2,969) |
| Gain (loss) on foreign currency | (25) | 280 |
| Total other expense | (21,651) | (4,717) |
| **Loss before income taxes** | (79,708) | (50,539) |
| Provision for income tax | 569 | 311 |
| **Net loss and comprehensive loss** | $ (80,277) | $ (50,850) |
| **Net loss per share:** | | |
| Basic and diluted | $ (2.39) | $ (1.62) |
| **Weighted-average shares outstanding:** | | |
| Basic and diluted | 33,604,752 | 31,406,127 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-4

Exhibit 4
Page 386

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Consolidated Statements of Stockholders' Equity**
*(in thousands, except share amounts)*

| | Number of Ordinary Shares | Ordinary Shares | Additional paid-in capital | Accumulated Deficit | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| **Balance, December 31, 2018** | 29,215,692 | $ — | $125,662 | $ (101,756) | $ 23,906 |
| Net loss | — | — | — | (50,850) | (50,850) |
| Exercise of stock options | 24,750 | — | 33 | — | 33 |
| Exercise of warrants | 2,757 | — | 19 | — | 19 |
| Issuance of warrants | — | — | 2,878 | — | 2,878 |
| Stock-based compensation | — | — | 6,229 | — | 6,229 |
| Non-cash warrants issued as dividends | — | — | (1,838) | — | (1,838) |
| Extinguishment of 2019 Convertible Loan Note | — | — | 18,244 | — | 18,244 |
| Ordinary share issuance, net of issuance costs | 4,093,916 | — | 37,638 | — | 37,638 |
| **Balance, December 31, 2019** | 33,337,115 | $ — | $188,865 | $ (152,606) | $ 36,259 |
| Net loss | — | — | — | (80,277) | (80,277) |
| Exercise of stock options | 7,813 | — | 42 | — | 42 |
| Exercise of warrants | 5,523 | — | 7 | — | 7 |
| Issuance of warrants | — | — | 360 | — | 360 |
| Stock-based compensation | — | — | 8,043 | — | 8,043 |
| Ordinary share issuance for acquisition of in-process research and development | 139,879 | — | 2,298 | — | 2,298 |
| Ordinary share issuance, net of issuance costs | 147,432 | — | 1,961 | — | 1,961 |
| **Balance, December 31, 2020** | 33,637,762 | $ — | $201,576 | $ (232,883) | $ (31,307) |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-5

Exhibit 4
Page 387

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Consolidated Statements of Cash Flows**
*(in thousands)*

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| **OPERATING ACTIVITIES** | | |
| Net loss | $(80,277) | $(50,850) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization of property, equipment and finance lease right-of-use assets | 2,787 | 1,948 |
| Gain on disposal of property and equipment | (107) | (24) |
| Amortization of debt discount and issuance costs | — | 268 |
| Stock-based compensation | 8,043 | 6,229 |
| Equity-method investment loss | 1,274 | 1,281 |
| Change in fair value of debt instrument | 20,163 | 2,958 |
| Non-cash interest on convertible loan notes | — | 286 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 1,458 | (618) |
| Other receivables | (2,074) | (3,246) |
| Prepaid expenses and other current assets | 1,307 | (1,030) |
| Other non-current assets | 604 | (672) |
| Trade payables | (3,126) | 2,464 |
| Accrued expenses | 3,537 | 2,214 |
| Other current and long-term liabilities | (1,943) | 2,236 |
| Net cash used in operating activities | (48,354) | (36,556) |
| **INVESTING ACTIVITIES** | | |
| Purchase of property and equipment | (1,416) | (2,973) |
| Purchase of asset acquisition | (250) | — |
| Proceeds from disposal of property and equipment | — | 142 |
| Investment in equity method investee | (4,990) | — |
| Net cash used in investing activities | (6,656) | (2,831) |
| **FINANCING ACTIVITIES** | | |
| Proceeds from convertible loan notes | 51,781 | 15,000 |
| Principal payments on long-term debt | (1,952) | (3,534) |
| Proceeds from Paycheck Protection Program | 2,860 | — |
| Proceeds from issuance of ordinary shares, net of issuance costs | 1,961 | 38,639 |
| Proceeds from exercise of options | 42 | 33 |
| Proceeds from issuance of warrants | 360 | — |
| Proceeds from exercise of warrants | 7 | — |
| Debt issuance costs incurred | (494) | — |
| Principal payments on finance lease | (1,231) | (1,205) |
| Net cash provided by financing activities | 53,334 | 48,933 |
| Net (decrease) increase in cash and cash equivalents | (1,676) | 9,546 |
| Cash and cash equivalents beginning of year | 20,904 | 11,358 |
| Cash and cash equivalents at end of year | $ 19,228 | $ 20,904 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-6

Exhibit 4
Page 388

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

1.    **Description of Business and Significant Accounting Policies**

*Description of Business*

Rockley Photonics Limited and its subsidiaries (together, "we", "us," "our," or, "the Company") was founded in 2013 in the United Kingdom. We specialize in the research and development of integrated silicon photonics chipsets and have developed a versatile, application specific, third-generation silicon photonics platform specifically designed for the optical integration challenges facing numerous mega-trend markets. We have partnered with multiple tier-1 customers across the markets to deliver complex optical systems required for transformational sensor, communications, and medical product realization.

*Going Concern*

The Company has incurred net losses since inception, has an accumulated deficit of $232.9 million as of December 31, 2020 and negative cash flow from operations of $48.4 million for the year ended December 31, 2020 and expects to incur losses from operations for the foreseeable future. As of December 31, 2020, the Company had cash and cash equivalents of approximately $19.2 million. The Company's ability to meet its obligations in the ordinary course of business is dependent on its ability to obtain additional financing. As a result, there is substantial doubt about our ability to continue as a going concern. The consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might result from the outcome of this uncertainty.

Our future liquidity needs, and ability to address those needs, will largely be determined by its ability to obtain additional financing on terms acceptable to us. We will continue to seek additional capital through the sale of debt or equity, or other arrangements, however, there can be no assurance that we will be able to raise additional capital when needed or under acceptable terms, if at all. The sale of additional equity may dilute existing shareholders and newly issued shares may contain senior rights and preferences compared to currently outstanding ordinary shares. Issued debt securities may contain covenants and limit our ability to pay dividends or make other distributions to shareholders. If we are unable to obtain additional financing, operations may be scaled back or discontinued.

*Global Pandemic*

On March 11, 2020, the World Health Organization characterized the outbreak of COVID-19 as a global pandemic and recommended containment and mitigation measures. Since then, extraordinary actions have been taken by international, federal, state, and local public health and governmental authorities to contain and combat the outbreak and spread of COVID-19 in regions throughout the world. These actions include travel bans, quarantines, "stay-at-home" orders, and similar mandates for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations.

Consistent with the actions taken by governmental authorities, we have taken appropriately cautious steps to protect our workforce and support community efforts. As part of these efforts and in accordance with applicable government directives, we reduced on-site operations at our facilities. Certain key laboratory employees and facilities were designated as Essential Critical Infrastructure and we were able to continue internal testing and laboratory work to the extent necessary to service customer commitments. To facilitate on-site operations, revised operational and manufacturing plans were implemented that conform to COVID-19 precautionary health guidelines, including universal requirement of facial coverings, rearranging facilities to follow social distancing protocols, conducting active daily temperature checks, regular and

Exhibit 4
Page 389

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

thorough disinfecting of surfaces and tools, and regular testing of its employees for COVID-19. The remaining non-essential workforce was required to perform their duties from home.

The COVID-19 pandemic and continuing precautionary measures taken have adversely impacted our operational efficiency and caused delays in operational activities. The ongoing impact will depend on the duration of the pandemic, which is being mitigated by advances in the treatment of the disease, prevention efforts including vaccines, broad government measures to contain the spread of the virus, and related government stimulus measures. However, should we experience sustained impact from the pandemic, additional actions such as cost reduction measures may need to be implemented.

*Basis of Presentation*

The consolidated financial statements and accompanying notes were prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP").

*Principles of Consolidation*

The consolidated financial statements include Rockley Photonics Limited and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

On an ongoing basis, we evaluate our estimates and assumptions, including those related to (i) revenue recognition including variable consideration, (ii) useful lives and recoverability of property and equipment and long-lived assets, (iii) incremental borrowing rates on the Company's finance and operating leases, (iv) valuation of our convertible loan notes, (v) valuation allowances for income taxes, (vi) stock-based compensation including the valuation of ordinary shares, (vii) valuation of warrants and (viii) contingencies. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results could materially differ from these estimates, including impacts from the COVID-19 pandemic, the anticipated effects of which have been incorporated, as applicable, into management's estimates as of and for the year ended December 31, 2020.

*Cash and Cash Equivalents*

Cash and cash equivalents include short-term, highly liquid investments with an original maturity of three months or less.

*Property and Equipment, Net*

Property and equipment are recorded at cost and presented net of accumulated depreciation and amortization. Significant additions or improvements extending the useful life of an asset are capitalized, while repairs and maintenance costs are expensed as incurred. Leasehold improvements are amortized on a straight-line basis over the shorter of the term of the lease or the useful life of the assets. Depreciation and

Exhibit 4
Page 390

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

amortization are computed using the straight-line method over the estimated useful lives of the related assets.

| | |
|---|---|
| Computer equipment | 3 years |
| Lab equipment | 3 years |
| Furnitures and fixtures | 4 years |
| Leasehold improvements | Shorter of the lease term and the useful life |

*Impairment of Long-Lived Assets*

We evaluate our long-lived assets, such as property and equipment, and right-of-use assets for impairment whenever events or changes in circumstances indicate that the carrying value of assets or asset group may not be recoverable. Recoverability of these assets or asset groups is measured by comparing their carrying value to the future net undiscounted cash flows the assets are expected to generate over their remaining economic life. If such assets or asset groups are considered impaired, the impairment to be recognized is measured by the amount by which the carrying value of the assets exceeds their fair value.

The Company tests other intangible assets not subject to amortization for impairment annually and more frequently if events or changes in circumstances between annual tests indicate that it is more likely than not that the asset is impaired.

For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash inflows which are largely independent of the cash inflows from other assets or groups of assets. To date, no such impairment losses have been recorded.

*Revenue Recognition*

We generate our revenue principally from development services, which entails developing the customer-specific designs of photonics chips. Revenue is recognized when control of promised goods and services are transferred to customers in an amount that reflects the expected consideration in exchange for those products and services. This principle is achieved by applying the following five-step approach:

- *Identification of the contract with a customer*—A contract with a customer exists when we enter into an enforceable contract with a customer that defines each party's rights and obligations regarding the goods or services to be transferred and identifies the payment terms related to these goods or services, the contract has commercial substance, and we determine that collection of substantially all consideration for goods or services that are transferred is probable based on the customer's intent and ability to pay the promised consideration. We consider the terms and conditions of the contracts and customary business practices in identifying contracts under Topic 606 Revenue from Contracts with Customers. Our contracts with a customer generally consist of a development services contract against which statements of work ("SOW") are issued. Each SOW contains one or more agreed-upon projects. We consider the arrangement to be the development services contract combined with the SOW. While the typical duration of a development services contract is multiple years, we generally expect the duration of agreed-upon projects to be six months or less. Generally, our customers have the right to cancel their contracts at any time.

- *Identification of the performance obligations in the contract*—Performance obligations promised in a contract are identified based on the goods or services that will be transferred to the customer that are both capable of being distinct and are distinct in the context of the contract. To the extent a contract includes multiple promised goods or services, we apply judgment to determine whether promised goods or services are capable of being distinct and distinct in the context of the contract. If these

F-9

Exhibit 4
Page 391

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

criteria are not met, the promised goods or services are accounted for as a combined performance obligation. The individual components of the development services are generally capable of being distinct but not distinct in the context of the contract unless all the goods and services within a certain agreed-upon project of the contract are completed. Generally, the deliverables associated with each agreed-upon project, when combined, are considered a distinct performance obligation.

- *Determination of the transaction price*—The transaction price is determined based on the consideration to which we are entitled in exchange for transferring goods or services to the customer. Our contracts generally do not contain a significant amount of variable consideration as the price of our services are generally fixed at the inception of the agreed-upon project. The Company excludes sales taxes and other taxes from the measurement of transaction price. None of the contracts contain a significant financing component.

- *Allocation of the transaction price to the performance obligations in the contract*—Contracts that contain multiple performance obligations require an allocation of the transaction price to each performance obligation based on a relative standalone selling price ("SSP"). The Company prices each agreed-upon project with an SOW at SSP based on the expected cost plus a margin approach.

- *Recognition of revenue when or as performance obligations are satisfied*—We satisfy performance obligations at a point in time for the development services since the customers do not simultaneously receive and consume the benefits, we do not create or enhance an asset that the customer controls, and we do not have an enforceable right to payment for the performance completed to date. The contracts also contain substantive acceptance terms for each agreed-upon project. Revenue is recognized at the time the related performance obligation is satisfied through the transfer of control of a promised good or service to a customer, which is upon achievement of the agreed-upon project and acceptance by the customer.

*Contract balances*—The timing of revenue recognition may differ from the timing of invoicing to customers. Accounts receivable is recorded when the right to consideration is unconditional. We generally have the right to invoice the customer upon acceptance of the agreed-upon project. The payment terms on invoiced amounts are typically 30-45 days, and such amounts are nonrefundable. In situations where revenue recognition occurs before invoicing, an unbilled receivable is recorded, which represents a contract asset. Deferred revenue is recognized if we have an unconditional right to bill or have collected consideration in advance of the right to recognize revenue. There have been no contract balances recorded to date.

*Costs to obtain and fulfill a contract*—Incremental costs incurred to obtain a contract with a customer are required to be capitalized and amortized over the period in which the goods and services to which the asset relates are transferred to the customer. We have not incurred any incremental costs in connection with obtaining the revenue contracts. We recognize an asset from the costs to fulfill a contract only if, the costs relate directly to a contract or an anticipated contract, the costs generate or enhance resources of the Company that will be used in satisfying a performance obligation in the future, and the costs are expected to be recovered. These costs have been insignificant to date.

*Foreign Currency Transactions*

The Company's reporting currency is the U.S. dollar and the functional currency of the Company's foreign subsidiaries is the U.S. dollar. Assets and liabilities that are not denominated in the functional currency are remeasured into the functional currency with any related gain or loss recorded in earnings.

Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in realized and unrealized losses/(gains) on foreign currency in the accompanying consolidated statements of operations and comprehensive loss.

F-10

Exhibit 4
Page 392

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Segment Information*

Operating segments are defined as components of an entity for which discrete financial information is available that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the CODM. The CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company determined that it has one operating and reportable segment.

*Net Loss Per Share*

Basic earnings per share is calculated using our weighted-average outstanding ordinary shares. Diluted earnings per share is calculated using our weighted-average outstanding ordinary shares including the dilutive effect of outstanding equity instruments as determined under the treasury stock method. For periods in which we report net losses, diluted net loss per ordinary share attributable to ordinary stockholders is the same as basic net loss per ordinary share attributable to ordinary stockholders, because all potentially dilutive ordinary shares are anti-dilutive.

*Concentration of Risk*

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash and cash equivalents and accounts receivable. We maintain cash balances at financial institutions that management believes are high-credit, quality financial institutions, where deposits, at times, exceed the Federal Deposit Insurance Corporation limits.

*Accounts Receivable*

Accounts receivable is recorded at the invoiced amount and do not bear interest. We assess the need for an allowance for doubtful accounts based upon an analysis of past credit history and the current financial condition of its customers, as well as the consideration of expected trends based upon characteristics of the accounts and general economic conditions. Account balances are written off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The allowance for doubtful accounts is insignificant as of December 31, 2020 and 2019.

*Equity Method Investments*

Equity method investments are all entities over which we have significant influence but not control or joint control. Under the equity method of accounting, the investments are initially recognized at cost and adjusted thereafter to recognize the Company's share of the post-acquisition profits or losses of the investee in the consolidated statement of operations and comprehensive loss. Earnings and losses of equity method investments are based on the most recently available financial statements of the investee. Basis differences between the cost of an equity method investment and the underlying equity in the long-lived assets are amortized over the estimated economic useful life of the underlying long-lived asset. We periodically review our equity method investments for impairment and record a reduction in the carrying value, if and when necessary. To date, no such impairment losses have been recorded.

*Stock-Based Compensation*

We measure compensation expense for all stock-based awards based on the estimated fair value of the awards on the date of grant. Compensation expense is generally recognized as expense on a straight-line

F-11

Exhibit 4
Page 393

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

basis over the service period based on the vesting requirements. We recognize forfeitures as they occur. We estimate the fair value of stock options granted to employees using the Black-Scholes option pricing model, which requires the input of subjective assumptions, including (i) the fair value of ordinary shares, (ii) the expected stock price volatility, (iii) the expected term of the award, (iv) the risk-free interest rate and (v) expected dividends.

We measure nonemployee awards at their fair value on the adoption date of ASU No. 2018-07. Following the adoption of ASU No. 2018-07 on January 1, 2018, the accounting for nonemployee awards is consistent with the accounting for employee stock-based compensation as described above.

We granted options and restricted stock units which vest on the satisfaction of both a specific performance condition and a service-based condition.

*Warrants*

We determine the accounting classification of warrants, as either liability or equity classified, by first assessing whether the warrants meet liability classification in accordance with ASC 480-10, Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity, then in accordance with ASC 815-40, Accounting for Derivative Financial Instruments Indexed to and Potentially Settled in, a Company's Own Stock. Under ASC 480, warrants are considered liability classified if the warrants are mandatorily redeemable, obligate the Company to settle the warrants or the underlying shares by paying cash or other assets, and warrants that must or may require settlement by issuing variable number of shares. If warrants do not meet the liability classification under ASC 480-10, the Company assesses the requirements under ASC 815-40, which states that contracts that require or may require the issuer to settle the contract for cash are liabilities recorded at fair value, irrespective of the likelihood of the transaction occurring that triggers the net cash settlement feature. If the warrants do not require liability classification under ASC 815-40, in order to conclude equity classification, the company also assesses whether the warrants are indexed to the Company's ordinary share and whether the warrants are classified as equity under ASC 815-40 or other U.S. GAAP. After all such assessments, the Company concludes whether the warrants are classified as liability or equity. Liability classified warrants require fair value accounting at issuance and subsequent to initial issuance with all changes in fair value after the issuance date recorded in the statements of operations and comprehensive loss. Equity classified warrants only require fair value accounting at issuance with no changes recognized subsequent to the issuance date.

We issue warrants to purchase ordinary shares for goods and services received and these warrants are measured at their fair values upon issuance. Where vendors are issued warrants, the fair value of the services are determined by the fair value of the warrants issued. This fair value is measured at the grant date and excludes the impact of non-market vesting conditions (for example profitability and sales growth targets and performance conditions). Warrants issued for goods and services are ultimately recognized as an expense in selling, general and administrative expenses on the consolidated statements of operations and comprehensive loss with a corresponding credit in additional paid-in capital.

We may also issue warrants to purchase ordinary shares in conjunction with equity financing rounds. Such warrant issuances are recognized as equity issuance costs, with a corresponding credit in additional paid-in capital, resulting in a net zero change in additional paid-in capital.

We issued the liability classified warrants during the year ended December 31, 2020 that are embedded with the 8.0% Convertible Notes. Refer to Note 7, Long Term Debt for details.

F-12

Exhibit 4
Page 394

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Leases*

Our lease portfolio is comprised of two major classes: real estate leases, which are the majority of our leased assets, are accounted for as operating leases and a manufacturing equipment lease accounted for as a finance lease on the consolidated balance sheet.

We classify leases as either operating or financing. We determine if an arrangement is a lease at inception by evaluating whether the arrangement conveys the right to use an identified asset and whether we obtain substantially all the economic benefits from and have the ability to direct the use of the asset. Operating lease assets are included under other non-current assets and operating lease liabilities under other current and long-term liabilities, respectively in the consolidated balance sheets. We recognize lease expense for operating leases on a straight-line basis over the term of the lease. Finance lease asset is included under property, equipment, and finance lease right-of-use assets, net and finance lease liabilities, current portion under other current liabilities in the consolidated balance sheets. Finance ROU assets are amortized on a straight-line basis over their estimated useful lives.

ROU assets represent the right to use an underlying asset for the lease term and lease liabilities represent the obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As the Company's leases do not provide an implicit rate, an incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments is used. The operating lease ROU asset includes any lease payments made and excludes lease incentives. Lease terms may include options to extend or terminate the lease when it is reasonably certain that the option will be exercised. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company has lease agreements with lease and non-lease components, which are generally combined.

We elected, as an accounting policy for leases of real estate, to account for lease and non-lease components in a contract as a single lease component. In addition, the recognition requirements are not applied to leases with a term of twelve months or less. Rather, the lease payments for short-term leases are recognized on the consolidated statements of operations and comprehensive loss on a straight-line basis over the lease term.

Variable payments, such as common area charges, maintenance, insurance and taxes, are primarily based on the amount of space occupied. These payments in the Company's leases are not dependent on an index or a rate and are excluded from the measurement of the lease liabilities and recognized in the consolidated statements of operations and comprehensive loss in the period in which the obligation for those payments is incurred. The Company remeasures lease payments when the contingency underlying such variable payments is resolved such that some or all of the remaining payments become fixed.

*Cost of Revenue*

Our cost of revenue consists of costs related to the Company's development services which includes cost of materials, cost associated with packaging and assembly, testing and shipping, cost of personnel, including stock-based compensation, and equipment associated with manufacturing support, logistics and quality assurance, overhead and occupancy costs.

*Research and Development Expenses*

Research and development expense consists primarily of personnel costs for engineers and third parties engaged in the design and development of products, software and technologies, including salary, bonus and share-based compensation expense, project material costs, services and depreciation. The Company expenses research and development costs as they are incurred.

F-13

Exhibit 4
Page 395

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses consist of human capital related expenses for employees involved in general corporate functions, including executive management and administration, accounting, finance, tax, legal, information technology, marketing, and human resources; depreciation expense and rent relating to facilities; travel costs; professional fees; and other general corporate costs. Human capital expenses primarily include salaries, benefits, bonuses and stock-based compensation. As we continue to grow as a company, we expect that our selling, general and administrative costs will increase on an absolute dollar basis.

*Fair Value of Financial Instruments and Fair Value Measurements*

The Company determines fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following levels:

Level 1 Inputs: Unadjusted quoted prices for identical assets or instruments in active markets.

Level 2 Inputs: Quoted prices for similar instruments in active markets and quoted prices for identical or similar instruments in markets that are not active and model derived valuations whose inputs are observable or whose significant value drivers are observable.

Level 3 Inputs: Significant inputs into the valuation model are unobservable.

As permitted under the FASB, *ASC 825, Financial Instruments ("ASC 825"), we have elected the fair value option to account for the 2019 Convertible Notes, the 3.0% – 2020 Convertible Notes, the 8.00% – 2020 Convertible Notes and the 2020 Term Facility Loan. In accordance with ASC 825, the Company records these debt instruments at fair value with changes in fair value recorded under change in fair value of debt instruments in the consolidated statements of operations and comprehensive loss. As a result of applying the fair value option, direct costs and fees related to the debt instruments were recognized in earnings as incurred and were not deferred.*

Fair value is based on the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants. Where available, fair value is based on or derived from observable market prices or other observable inputs. Where observable prices or inputs are not available, valuation techniques are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

For debt instruments for which we have not elected fair value accounting (i.e. paycheck protection program), fair value is based on the present value of expected future cash flows and assumptions about the then-current market interest rates as of the reporting period and the creditworthiness of the Company. The carrying value of these debt instruments approximates fair value as the stated interest rate approximates market rates currently available to us.

For all debt instruments, including any for which we have elected fair value accounting, the Company classifies interest that has been accrued during each period as Interest expense on the consolidated statements of operations and comprehensive loss.

The recorded amounts of cash, accounts receivable, trade payable, and accrued expenses and other liabilities approximate the fair values principally because of their short-term nature.

F-14

Exhibit 4
Page 396

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Income Taxes*

Deferred income taxes are provided on a liability method, whereby deferred income tax assets are recognized for deductible temporary differences, operating losses, and tax loss carryforwards, and deferred income tax liabilities are recognized for taxable temporary differences. Deferred income tax balances reflect the effects of temporary differences between the carrying amounts of assets and liabilities and their tax bases and are stated at enacted tax rates expected to be in effect when taxes are actually paid or recovered. Deferred income tax assets are reduced by a valuation allowance when, considering all sources of taxable income, in the opinion of management, it is more likely than not that some portion or all of the deferred income tax assets will not be realized. Deferred income tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company recognizes the income tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by taxing authorities, based on the technical merits of the position. The income tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

*Recently Adopted Accounting Pronouncements*

In January 2016, the FASB issued ASU 2016-01, *Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities*, to address certain aspects of recognition, measurement, presentation, and disclosure of financial assets and financial liabilities. The Company adopted this guidance on January 1, 2019 and it did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income (Topic 815)*, which allows a reclassification from accumulated other comprehensive income (loss) to retained earnings (accumulated deficit) for stranded income tax effects resulting from the 2017 Tax Cuts and Jobs Act. The amendments in ASU 2018-02 also require certain disclosures about stranded income tax effects. The Company adopted this guidance on January 1, 2019 and it did not have a material impact on the consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement ("Topic 820"): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement*, which modifies the disclosure requirements on fair value measurements in Topic 820, based on the concepts in the Concepts Statement, including the consideration of costs and benefits. An entity is permitted to early adopt either the entire standard or only the provisions that eliminate or modify requirements. The Company adopted this guidance on January 1, 2020. The adoption of the guidance did not have a material impact on the consolidated financial statements. The Company has updated its fair value footnote (see Note 5, Fair Value Measurements for details) with additional and modified disclosures as required by the standard upon adoption.

*Accounting Pronouncements Issued but Not Yet Adopted*

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes,* which simplifies the accounting for income taxes by eliminating certain exceptions to the guidance in Topic 740 related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The new guidance also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates. ASU 2019-12 is effective for fiscal years beginning after

Exhibit 4
Page 397

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

December 15, 2020, with early adoption permitted. Upon adoption, the Company must apply certain aspects of this standard retrospectively for all periods presented while other aspects are applied on a modified retrospective basis through a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. The Company is currently evaluating the impact this guidance will have on the consolidated financial statements.

On June 16, 2016, the FASB issued ASU No. 2016-13, Financial Instruments-Credit Losses, requiring the measurement and recognition of expected credit losses for financial assets held at amortized cost, which include our accounts receivable and contract assets. The standard also requires that the Company recognizes credit impairment losses related to our available-for-sale debt securities through an allowance for credit losses instead of a reduction in the cost basis. The effective date of the new standard for all non-public entities is for fiscal years beginning after December 15, 2020 and interim periods within fiscal years beginning after December 2021. Early adoption is permitted. The new standard must be adopted using a modified retrospective transition with a cumulative effect adjustment recorded to opening retained earnings as of the initial adoption date. The Company is currently evaluating the impact this guidance will have on the consolidated financial statements.

**2.    Fiscal 2020 Asset Acquisition**

On November 25, 2020, we acquired certain technologies from TruTouch Technologies, Inc. ("Trutouch"). The consideration for the purchased technology was $3.1 million and consisted of $0.8 million in cash and $2.3 million in equity. The cash payments consisted of $0.3 million paid prior to the close of the transaction, and an additional $0.5 million to be paid in April 2021. The equity component of the consideration was 139,879 shares of ordinary stock in Rockley Photonics Limited, with a fair value of $16.43 per share or $2.3 million in total.

We accounted for the transaction as an asset acquisition as substantially all of the estimated fair value of the gross assets acquired was concentrated in a single identified asset, in-process research & development ("IPR&D"), thus satisfying the requirements of the screen test in ASU 2017-1. We allocated the total purchase price consideration of $3.1 million to IPR&D asset as the asset was purchased solely for the research and development activities and will be incorporated in efforts and milestones to be undertaken by the Company to design and develop a new application in order to expand its presence in the healthcare and well-being markets (which the Company has determined to be the alternative future use of the asset). The IPR&D asset is reported as an indefinite-lived intangible asset and subject to impairment whenever events or changes in circumstances indicate that the carrying amount of the asset might not be recoverable. Upon completion of our new product development cycle that incorporates Trutouch technology, the IPR&D asset will be amortized over the useful life of the developed technology that underpins our product. In the event the Company abandons the project, the entire IPR&D asset will be written off in full.

**3.    Revenue Recognition**

We satisfy performance obligations at a point in time for the development services since the customers do not simultaneously receive and consume the benefits, we do not create or enhance an asset that the customer controls, and we do not have an enforceable right to payment for the performance completed to date. The contracts also contain substantive acceptance terms for each milestone due to its complexity. Revenue is recognized at the time the related performance obligation is satisfied with the transfer of a promised good or service to a customer, e.g., upon achievement of the milestone and acceptance by the customer.

F-16

Exhibit 4
Page 398

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Disaggregation of Revenue and Revenue Recognition*

The following table depicts the disaggregation of revenue by geography, consistent with how we evaluate its financial performance (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| United States | $ 17,037 | $ 13,783 |
| Rest of World | 5,306 | 6,709 |
| Total revenue | $ 22,343 | $ 20,492 |

*Significant Customers*

The following is our significant customers as of and for the years ended December 31, 2020 and 2019:

|  | Revenue December 31, | | Accounts receivable December 31, | |
| --- | --- | --- | --- | --- |
|  | 2020 | 2019 | 2020 | 2019 |
| Customer A | 76% | 67% | 33% | 55% |
| Customer B | 24% | 33% | 67% | 45% |

**4.    Investments**

As of December 31, 2020 and 2019, we held an investment in Hengtong Rockley Technology Co., Ltd ("HRT") and have appointed two of their five board members. HRT manufactures and sells optical fiber transceivers based on silicon photonics chipsets. HRT has share capital consisting solely of ordinary shares. We hold 24.9% of HRT's ordinary shares, which is the same as the proportion of its voting rights. We consider HRT to be a variable interest entity upon which it does exercise significant influence, but the Company concluded it does not control the investment. Accordingly, the investment in HRT is accounted for under the equity method. We have made the election to use a three-month lag to record our share of HRT's results. See Note 12, Related Party Transactions for details of the Company's transactions with HRT.

For the years ended December 31, 2020 and 2019, the accompanying consolidated balance sheets and statements of operations and comprehensive loss reflected the following (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| As of January 1, | $ 1,486 | $ 2,767 |
| Investment in HRT | 4,990 | — |
| Share of loss of HRT | (1,274) | (1,281) |
| As of December 31, | $ 5,202 | $ 1,486 |

**5.    Fair Value Measurements**

Our financial assets as of December 31, 2020 and 2019 are considered Level 1 in the fair value hierarchy and measured at fair value as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| **Assets** | | |
| Money market funds | $ 11,516 | 12,343 |

F-17

Exhibit 4
Page 399

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

All of our financial liabilities as of December 31, 2020, and 2019, are considered Level 3 in the fair value hierarchy, where inputs to the valuation techniques used to measure fair value were considered unobservable.

The fair value of our liabilities are as follows (in thousands):

| | December 31, | |
| | 2020 | 2019 |
| --- | --- | --- |
| **Liabilities** | | |
| 3.0% – 2020 Convertible Notes | $32,106 | — |
| 8.00% – 2020 Convertible Notes | 14,789 | — |
| 2020 Term Facility Loan | 25,049 | — |
| 2017 Term Loan | — | 1,952 |
| Total financial liabilities | $71,944 | $1,952 |

The fair value of the 2017 Term Loan approximates the carrying value, as of December 31, 2019, due to the rate of interest of the Term Loan being variable.

The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires management to make judgments and consider factors specific to the asset or liability.

At December 31, 2020 and December 31, 2019, the carrying value of certain financial instruments, such as cash equivalents, accounts receivable, other receivable, prepaid expenses and other current assets, trade payable and other current accrued liabilities, approximate fair value due to their relatively short maturities and low market interest rates, if applicable.

Changes in the fair value of debt that is accounted for at fair value are presented as gains or losses in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments.

*3.0% – 2020 Convertible Notes*

On March 9, 2020, we issued $21.3 million of 3.0% Convertible Notes and elected the fair value option of accounting for this debt instrument (see Note 7, Long Term Debt for details). At December 31, 2020, the contractual outstanding principal of the 3.0% Convertible Notes Due 2025 was $21.3 million and the fair value was $32.1 million. As of December 31, 2020, we measured fair value using a binominal lattice model (which is discussed in further detail below) with the following significant inputs:

| | |
| --- | --- |
| Fair Value per share of ordinary shares | $ 20.28 |
| Risk-free interest rate | 0.08% - 0.10% |
| Expected volatility | 55% |
| Expected term, in years | 0.14 - 4.19 |
| Discount yield | 48.4% |
| Conversion price discount | 25% - 40% |

For the year ended December 31, 2020, we recorded a $10.8 million loss from change in fair value of debt in connection with the initial issuance and subsequent fair value remeasurement of the 3.0% Convertible Notes, as follows (in thousands):

| | |
| --- | --- |
| Fair value at March 9, 2020 | $ 21,281 |
| Plus: Loss from change in fair value | 10,825 |
| Fair value at December 31, 2020 | $ 32,106 |

F-18

Exhibit 4
Page 400

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

A binomial lattice model was used to determine the fair value of the 3.0% Convertible Notes Due 2025 based on assumptions as to when these would be converted or redeemed at each decision point. Within the lattice model, the following assumptions are made: (i) upon IPO/Sale/Merger/SPAC or maturity, the convertible notes may be converted to ordinary shares or redeemed at principal and accrued interest; and (ii) upon qualified financing event, the convertible notes will automatically convert to ordinary shares. The lattice model uses the stock price, conversion price, maturity date, risk-free rate, estimated stock volatility and estimated credit spread. We remeasure the fair value of the debt instrument and record the change as a gain or loss from change in fair value of debt in the statements of operations and comprehensive loss for each reporting period.

*8.00% – 2020 Convertible Notes*

On February 19, 2020, we issued $8.0 million of 8.0% Convertible Notes and elected the fair value option of accounting for this debt instrument (see Note 7, Long Term Debt for details). At December 31, 2020, the contractual outstanding principal of the 8.0% Convertible Notes Due 2027 was $8.0 million and the fair value was $14.8 million (including embedded warrants). As of December 31, 2020, we measured fair value using a binominal lattice model (which is discussed in further detail below) with the following significant inputs:

| | |
|---|---:|
| Fair Value per share of ordinary shares | $ 20.28 |
| Risk-free interest rate | 0.08% - 0.52% |
| Expected volatility | 55% |
| Expected term, in years | 0.14 - 6.14 |
| Discount yield | 35% |
| Conversion price discount | 25% - 40% |

For the year ended December 31, 2020, we recorded a $4.4 million loss from change in fair value of debt in connection with the initial issuance and subsequent fair value remeasurement of the 8.0% Convertible Notes, as follows (in thousands):

| | |
|---|---:|
| Fair value at February 19, 2020 | $ 10,415 |
| Plus: Loss from change in fair value | 4,374 |
| Fair value at December 31, 2020 | $ 14,789 |

A binomial lattice model was used to determine the fair value of the 8.0% Convertible Notes Due 2025 based on assumptions as to when these would be converted or redeemed at each decision point. Within the lattice model, the following assumptions are made: (i) upon IPO/Sale/Merger/SPAC or maturity, the convertible notes may be converted to ordinary shares or put at 125% of principal and accrued interest; and (ii) upon financing event, the convertible notes may be converted to ordinary shares. We remeasure the fair value of the debt instrument and record the change as a gain or loss from change in fair value of debt in the statements of operations and comprehensive loss for each reporting period.

We issued liability classified warrants in conjunction with the issuance of the 8.0% Convertible Notes. We evaluated the terms of these warrants and noted that under ASC 480, our potential obligation to settle the warrants only when the exercise of contingencies is met. Due to this provision, ASC 480 requires that these warrants be classified as liabilities and combined within the 8.0% Convertible Notes. The fair value of these warrants is embedded within the fair value of the 8.0% Convertible Notes presented in the table above.

Exhibit 4
Page 401

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*2020 Term Facility Loan*

On September 29, 2020, we issued $35.0 million of convertible notes and elected the fair value option of accounting for this debt instrument (see Note 7, Long Term Debt for details). At December 31, 2020, the contractual outstanding principal of the 2020 Term Facility Loan was $22.5 million and the fair value was $25.1 million. As of December 31, 2020, we measured fair value using a binominal lattice model and discounted cash flow approach for various exit event scenario, with the following significant inputs:

| | | |
|---|---|---|
| Fair Value per share of ordinary shares | $ | 20.28 |
| Risk-free interest rate | | 0.21% |
| Expected volatility | | 55% |
| Expected term, in years | | 0.14 - 4.13 |
| Discount yield | | 35% |

For the year ended December 31, 2020, we recorded a $1.7 million loss from change in fair value of debt in connection with the initial issuance and subsequent fair value remeasurement of 2020 Term Facility Loan, as follows (in thousands):

| | |
|---|---|
| Fair value at September 29, 2020 | $ 23,320 |
| Plus: Loss from change in fair value | 1,729 |
| Fair value at December 31, 2020 | $ 25,049 |

A binomial lattice model was used to determine the fair value of the 2020 Term Facility Loan based on assumptions as to when these would be converted upon IPO/Sale/Merger/SPAC. Upon such event, the convertible notes will be paid off as following: (i) if par value exit, repayment of base multiple times principal plus unpaid interest; (ii) if greater value exit, repayment of base multiple plus add-on multiple ratio times principal plus accrued interest.

We used the probability weighted discounted cash flow approach to determine if the 2020 Term Facility Loan would be converted upon qualified financing or maturity. Upon the qualified financing, the convertible notes will not be converted and will remain outstanding until maturity and put at 280% principal plus unpaid interest. Upon maturity, the convertible notes will be repaid at a full principal balance. We remeasure the fair value of the debt instrument and record the change as a gain or loss from change in fair value of debt in the statements of operations and comprehensive loss for each reporting period.

*2019 Convertible Notes*

During 2019, we issued convertible loan notes in an aggregate principal amount of $15.0 million (see Note 7, "Long Term Debt" for details). We elected to account for the 2019 Convertible Notes at fair value. Management believes that the fair value option better reflects the underlying economics of the 2019 Convertible Notes, which contains embedded derivatives. The notes were converted to ordinary shares due to a qualified financing event in June 2019. During 2019, the 2019 Convertible Notes were converted into 1,336,344 ordinary shares.

F-20

Exhibit 4
Page 402

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

**6.    Balance Sheet Components**

*Cash and cash equivalents*

Our cash and cash equivalents balances as of December 31, 2020 and 2019 were concentrated by location as follows:

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| United Kingdom | 96% | 95% |
| United States | 3% | 4% |
| Other | 1% | 1% |

We have not experienced any losses on cash and cash equivalents to date.

*Other receivables*

Other receivables consist of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| R&D tax credit receivable | $ 17,412 | $ 14,731 |
| Grants receivable | — | 239 |
| VAT receivable | 607 | 886 |
| Other receivable | 5 | 93 |
| Total other receivables | $ 18,024 | $ 15,949 |

The research and development tax credit receivable consists of research and development expenses that have been claimed as research and development tax credits in accordance with the relevant U.K. tax legislation. These refundable tax credits are payable to the Company in cash and are carried on the consolidated balance sheet at the amount claimed and expected to be received from the U.K. government within the next 12 months. The amount of the R&D tax credit has been recorded as a reduction to cost of revenue and operating expenses (based on the nature of the underlying expenditure) on the accompanying consolidated statements of operations and comprehensive loss.

*Property, equipment and finance lease right-of-use assets, net*

Property and equipment, net consisted of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Computer equipment | $ 1,218 | $ 1,020 |
| Lab equipment | 7,607 | 5,614 |
| Motor vehicles | 31 | 31 |
| Furnitures and fixtures | 265 | 265 |
| Leasehold improvements | 704 | 704 |
| Assets under construction | 27 | 587 |
| Total property and equipment | $ 9,852 | $ 8,221 |
| Less: accumulated depreciation | (5,802) | (3,561) |
| Total property and equipment, net | $ 4,050 | $ 4,660 |

F-21

Exhibit 4
Page 403

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

Depreciation expense was $2.4 million and $1.5 million for the years ended December 31, 2020, and 2019, respectively.

Finance lease right-of-use assets, net consisted of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Finance lease right-of-use assets | $2,966 | $3,105 |
| Less: accumulated amortization | (834) | (485) |
| Total finance lease right-of-use assets, net | $2,132 | $2,620 |

Amortization expense was $0.4 million and $0.4 million for the years ended December 31, 2020, and 2019, respectively.

*Intangible asset*

Intangible asset consisted of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| In-process Research and Development | $3,048 | $— |
| Total intangible asset | $3,048 | $— |

*Accrued expenses*

Accrued expenses consist of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Accrued bonus | $ 3,349 | $2,501 |
| Accrued payroll and benefits | 1,524 | 602 |
| Accrued taxes | 332 | 75 |
| Accrued fabrication costs | 2,321 | 1,884 |
| Share appreciation rights | 706 | 435 |
| Other accrued expenses | 2,163 | 1,355 |
| Total accrued expenses | $10,395 | $6,852 |

F-22

Exhibit 4
Page 404

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

7.    **Long Term Debt**

The following table summarizes information relating to our long-term debt, (in thousands):

|  | December 31, 2020 | | |
|  | Principal | Fair Value Adjustment | Net |
|---|---|---|---|
| 3.0% – 2020 Convertible Notes | $21,281 | $ 10,825 | $32,106 |
| 8.00% – 2020 Convertible Notes | 8,000 | 6,789 | 14,789 |
| 2020 Term Facility Loan | 22,500 | 2,549 | 25,049 |
| Paycheck Protection Program | 2,860 | — | 2,860 |
| Total long-term debt | $54,641 | $ 20,163 | $74,804 |
| Less: current portion of long-term debt | — | — | — |
| Long-term debt, net of current portion | $54,641 | $ 20,163 | $74,804 |

Future minimum payments under the debt agreements as of December 31, 2020 are as follows (in thousands):

| Year Ending December 31: | Convertible Notes |
|---|---|
| 2021 | $        — |
| 2022 | — |
| 2023 | — |
| 2024 | — |
| 2025 | 66,281 |
| Thereafter | 10,000 |
| Total future minimum payments | $  76,281 |
| Less: current portion of debt principal | — |
| Non-current portion of debt principal | $  76,281 |

*January 2017 Term Loan and May 2017 Term Loan*

On January 27, 2017, we secured a term loan of $5.0 million from Silicon Valley Bank ("January 2017 Term Loan"). The January 2017 Term Loan matured on March 31, 2020, with an interest only period through March 31, 2017 preceding the 36-month term. Interest is accrued on the outstanding balance of the loan at a variable rate based on Wall Street Prime Rate plus 5.50% and had an interest floor of 9.00%. There were no financial covenants included in the January 2017 Term Loan.

On May 26, 2017, we secured a new term loan for $10.0 million of which $5.0 million was provided by Silicon Valley Bank and €4.5 million was provided by Kreos Capital ("May 2017 Term Loan"). The May 2017 Term Loan had a thirty-six month term and matured on June 1, 2020. Interest is accrued on the outstanding balance of the loan at a variable rate based on Wall Street Prime Rate plus 5.50% and has an interest floor of 9.00%. The interest rate was 11.0% as of December 31, 2019. There are no financial covenants included in the May 2017 Term Loan.

The $5.0 million received from Silicon Valley Bank under the May 2017 Term Loan was used to repay the January 2017 Term Loan and we received a waiver of the prepayment fee. The repayment of the January 2017 Term Loan was treated as a modification of debt. Therefore, additional fees paid to the creditor was

F-23

Exhibit 4
Page 405

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

reflected as additional debt discount and amortized over the remaining term using the interest method and has been fully amortized as of December 31, 2020 and was immaterial as of December 31, 2019.

Under the January 2017 Term Loan, Silicon Valley Bank and under the May 2017 Term Loan, Kreos Capital each received 52,050 warrants to purchase ordinary shares of the Company at an exercise price of $8.646 per warrant ("Bank Warrants"). The Silicon Valley Bank and Kreos Capital warrants expire on January 27, 2027 and May 26, 2027, respectively. See Note 11 for further discussion regarding warrants.

*2019 Convertible Notes*

During 2019, we issued convertible loan notes in an aggregate principal amount of $15.0 million ("2019 Convertible Notes"). The 2019 Convertible Notes mature on the second anniversary date of the instrument and bore interest at a rate of 8.0% per annum. The 2019 Convertible Notes were issued in two tranches—$6.7 million on March 5, 2019 and $8.3 million on March 27, 2019. The 2019 Convertible Notes were convertible as follows:

(a)    if in an equity financing raised total proceeds for the Company of not less than $10.0 million then the outstanding principal amount of all notes and any unpaid accrued interest shall automatically convert into the most senior class of share at a conversion price of $11.4384, equal to a 20% discount to the Series E issuance price of $14.298 per share; or

(b)    At an exit event, convert the outstanding principal amount of all notes and any unpaid accrued interest thereon into the most senior class of share of the Company, at a conversion price equal to the Series E issuance price of $14.298 per share.

(c)    At the maturity date, convert into the most senior class of share at a conversion price equal to the Series E issuance price of $14.298.

We elected to account for the 2019 Convertible Notes at fair value as of the issuance date. Management believes that the fair value option better reflects the underlying economics of the 2019 Convertible Notes, which contains embedded derivatives. Under the fair value election, changes in fair value are reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments.

On June 12, 2019, we received equity financing of $24.0 million, resulting in the automatic conversion of the 2019 Convertible Notes. Upon settlement, we recorded interest expense in the amount of $0.3 million for the amount that would have been accrued from the issuance date to the settlement date at annual rate of 8%, on the $15.0 million of principal under the terms of the 2019 Convertible Notes. To extinguish the 2019 Convertible Notes, 1,336,344 ordinary shares were issued. A loss of $3.0 million was generated on the extinguishment of the liability during the conversion based on the difference between the fair value of the shares at $13.65 and the conversion price of $11.44 and was recorded in statements of operations and comprehensive loss under change in fair value of debt instruments.

*3.0% – 2020 Convertible Notes*

On March 9, 2020, we issued convertible loan notes in an aggregate principal amount of $21.3 million (the "3.0% Convertible Notes"). The 3.0% Convertible Notes mature on the fifth anniversary date of the instrument and bear interest at a rate of 3.0% per annum. The 3.0% Convertible Notes contain no financial covenants. We accrued but unpaid interest of $0.3 million for the year ended December 31, 2020. The 3.0% Convertible Notes were issued in two tranches – $20.0 million on March 9, 2020 and $1.3 million on October 20, 2020. The 3.0% Convertible Notes were convertible as follows:

(a)    If in an equity financing raised total proceeds for the Company of not less than $10.0 million then the outstanding principal amount of all notes and any unpaid accrued interest shall automatically convert into the most senior class of equity share at a conversion price of $14.298 per share; or

F-24

Exhibit 4
Page 406

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

(b)     if an equity financing is not raised for the Company, then the outstanding principal amount of all notes and any unpaid accrued interest may convert into the most senior class of share at a conversion price of $14.298 per share.

(c)     At an exit event, redeem the outstanding notes for an amount equal to the outstanding principal plus accrued interests or convert the outstanding principal amount of all notes and any unpaid accrued interest thereon into the most senior class of share of the Company, at a conversion price equal to the issuance price of $14.298 per share.

(d)     At the maturity date, convert into the most senior class of shares at a conversion price equal to the issuance price of $14.298 per share.

We elected to account for the 3.0% Convertible Notes at fair value as of the issuance date. Management believes that the fair value option better reflects the underlying economics of the 3.0% Convertible Notes. Under the fair value election, changes in fair value are reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments. For the year ended December 31, 2020, we recorded a loss of $10.8 million which is shown as Fair Value Adjustment in the table at the beginning of this Note 7. See Note 5, Fair Value Measurements for information about the assumptions we used to measure the fair value of the 3.0% Convertible Notes.

*8.00% – 2020 Convertible Notes*

On February 19, 2020, we issued convertible loan notes to our board member in an aggregate principal amount of $8.0 million (the "8.0% Convertible Notes"). The 8.0% Convertible Notes mature on the seventh anniversary date of the instrument and bear interest at a rate of 8.0% per annum. The 8.0% Convertible Notes contain no financial covenants. We accrued but unpaid interest of $0.6 million for the year ended December 31, 2020. The 8.0% Convertible Notes were convertible as follows:

(a)     In the event of an equity financing, the outstanding principal amount of all notes and any unpaid accrued interest shall automatically convert into the most senior class of share at a conversion price being the lower of 14.298 per share or a discounted subscription price of the equity shares; or

(b)     At an exit event, convert the outstanding principal amount of all notes and any unpaid accrued interest thereon into the most senior class of share of the Company, at a conversion price, equal to a 25% discount to the Series E issuance price of $14.298 per share.

(c)     At the maturity date, convert into the most senior class of equity share at a conversion price of $14.298.

We elected to account for the 8.0% Convertible Notes at fair value as of the issuance date. Management believes that the fair value option better reflects the underlying economics of the 8.0% Convertible Notes. Under the fair value election, changes in fair value are reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments. For the year ended December 31, 2020, we recorded a loss of $6.8 million which is shown as Fair Value Adjustment in the table at the beginning of this Note 7. See Note 5, Fair Value Measurements for information about the assumptions we used to measure the fair value of 8.0% Convertible Notes.

In conjunction with the 8.0% Convertible Notes, we also issued the holder warrants ("Investor Warrants") which are convertible into ordinary shares of the Company. The warrants have an exercise price of $0.00001 per share and will only become exercisable if we fail to achieve certain revenue and contribution margin targets in 2021 and 2022. The number of shares that the warrants will convert into varies according to the proportion of the revenue and contribution targets ultimately achieved. The value of the warrants is embedded within the 8.0% Convertible Notes.

F-25

Exhibit 4
Page 407

**Table of Contents**

## ROCKLEY PHOTONICS LIMITED
### Notes to Consolidated Financial Statements

*2020 Term Facility Loan*

On September 29, 2020, we secured a term facility loan of $35.0 million from Argentum ("2020 Term Facility Loan"). The 2020 Term Facility Loan matures on March 29, 2025 and bears interest at a rate of 2.0% per annum. The 2020 Term Facility Loan has no financial covenants. We may extend the maturity date through the filing of an extension request up to an additional one year. The 2020 Term Facility Loan may be voluntarily prepaid in full (no partial repayments), plus the applicable repayment premium payable. The Company paid interest of $0.1 million for the year ended December 31, 2020.

The Company shall repay the aggregate amount of the loans utilized in full on the maturity date, subject to no Qualified Exit occurring at the time plus the applicable repayment premium payable. The Qualified Exit means: 1) qualified listing—a flotation or a public offering, the value of which is equal to or exceeds the free float value of $350.0 million; 2) non-qualified trade. As of December 31, 2020, the total amount borrowed was $22.5 million.

Upon any occurrence of a non-qualified trade sale or qualified listing, amounts due to Argentum will be discharged in full by way of conversion into our most senior class of shares.

We elected to account for the 2020 Term Facility Loan at fair value as of the issuance date. Management believes that the fair value option better reflects the underlying economics of the 2020 Term Facility Loan. Under the fair value election, changes in fair value are reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments. For the year ended December 31, 2020, we recorded a loss of $2.5 million which is shown as Fair Value Adjustment in the table at the beginning of this Note 7. See Note 5, Fair Value Measurements for information about the assumptions we used to measure the fair value of 2020 Term Facility Loan.

*Paycheck Protection Program*

On April 21, 2020, we received loan proceeds of approximately $2.9 million ("PPP Loan") under the Paycheck Protection Program ("PPP"). The PPP, established as part of the Coronavirus Aid, Relief and Economic Security Act, provides for loans to qualifying businesses for amounts up to 2.5 times the average monthly payroll expenses of the qualifying business. The PPP Loan and accrued interest are forgivable after twenty-four weeks as long as the borrower uses the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities, and maintains its payroll levels. The amount of loan forgiveness will be reduced if the borrower terminates employees or reduces salaries during the eight-week period.

The PPP Loan is evidenced by a promissory note, dated as of April 21, 2020 (the "Note"), between the Company, as Borrower, and Silicon Valley Bank, as Lender (the "Lender"). The interest rate on the Note is 1.0% per annum, with interest accruing on the unpaid principal balance computed on the basis of the actual number of days elapsed in a year of 360 days. No payments of principal or interest are due during the six-month period beginning on the date of the Note (the "Deferral Period"). On December 8, 2020, we filed an application seeking forgiveness of the PPP Loan. On March 2, 2021, we received notification from the Lender that our loan forgiveness application has been submitted to Small Business Administration ("SBA").

Beginning one month following expiration of the Deferral Period and continuing monthly until 24 months from the date of the Note (the "Maturity Date"), we are obligated to make monthly payments of principal and interest to the Lender with respect to any unforgiven portion of the Note, in such equal amounts required to fully amortize the principal amount outstanding on the Note as of the last day of the Deferral Period by the Maturity Date. We are permitted to prepay the Note at any time without payment of any premium. As of December 31, 2020, we had $2.9 million of borrowings outstanding under the PPP Loan, recorded under long term debt in the consolidated statements of operations and comprehensive loss.

Exhibit 4
Page 408

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

**8.   Income Taxes**

For the years ended December 31, 2020 and 2019, loss before income taxes were as follows (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| U.K. Operations | $ (82,705) | $ (53,291) |
| Foreign operations | 2,997 | 2,752 |
| Loss before income taxes | $ (79,708) | $ (50,539) |

The components of provision for income tax for the years ended December 31, 2020 and 2019 are as follows (in thousands):

| | Current | Deferred | Total |
|---|---|---|---|
| Year ended December 31, 2020 | | | |
| U.K. operations | $ — | $ — | $— |
| Foreign jurisdictions | 569 | — | 569 |
| | $ 569 | $ — | $569 |

| | Current | Deferred | Total |
|---|---|---|---|
| Year ended December 31, 2019 | | | |
| U.K. operations | $ — | $ — | $— |
| Foreign jurisdictions | 311 | — | 311 |
| | $ 311 | $ — | $311 |

The effective tax rate of the Company's provision for income taxes differs from the 19% statutory rate of the Company's U.K. headquarters entity (in thousands, except percentages):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| U.K. Statutory Rate | $(15,145) | 19.0% | $(9,602) | 19.0% |
| Foreign income tax | 308 | (0.4)% | 96 | (0.2)% |
| Research & Development credit | (628) | 0.8% | (1,086) | 2.1% |
| Stock-based compensation | 1,293 | (1.6)% | 758 | (1.5)% |
| Permanent differences | 3,325 | (4.2)% | (681) | 1.3% |
| Change in valuation allowance | 7,480 | (9.4)% | 2,636 | (5.2)% |
| Losses not benefited | 3,999 | (5.0)% | 8,169 | (16.1)% |
| Others, net | (63) | 0.1% | 21 | — % |
| Total | $ 569 | (0.7)% | $ 311 | (0.6)% |

*Deferred Tax Assets and Liabilities*

Deferred income taxes reflect the net effects of (a) temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes, and (b) operating losses and tax credit carryforwards.

F-27

Exhibit 4
Page 409

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

We record income tax expense for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, the Company recognizes deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial reporting and tax basis of assets and liabilities, as well as for operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using tax rates that are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. The Company records valuation allowances to reduce its deferred tax assets to the net amount that it believes is more likely than not to be realized. Its assessment considers the realization of deferred tax assets on a jurisdictional basis.

The significant components of the Company's deferred taxes are as follows (in thousands):

|  | December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 15,066 | $ 7,494 |
| Research and development credits | — | 1,217 |
| Stock-based compensation | 1,476 | 1,057 |
| Lease liabilities | 482 | 916 |
| Accrued liabilities | 788 | 633 |
| Other | 2 | — |
| Total gross deferred tax assets | 17,814 | 11,317 |
| Less valuation allowance | (16,377) | (9,520) |
| | | |
| Net deferred tax assets | $ 1,437 | $ 1,797 |
| Deferred tax liabilities: | | |
| Right-of-use Assets | $ (821) | $(1,064) |
| Property and equipment, principally due to differences in depreciation | (592) | (733) |
| Other | (24) | — |
| Total gross deferred tax liabilities | (1,437) | (1,797) |
| Net deferred tax assets | $ — | $ — |

ASC 740 requires that the tax benefit of net operating losses ("NOLs"), temporary differences and credit carryforwards be recorded as an asset to the extent that management assesses that realization is "more likely than not." Realization of our future tax benefits is dependent on our ability to generate sufficient taxable income within the carryforward period.

The changes in valuation allowance related to operating activity was an increase in the amount of $6.9 million and $2.8 million during the years ended December 31, 2020 and 2019, respectively.

NOLs and tax credit gross carryforwards as of December 31, 2020 are as follows (in thousands):

|  | Amount | Expiration Years |
|---|---|---|
| NOLs, U.K. (gross) | $ 79,293 | See notes below |
| Tax credits, Federal | $ — | See notes below |
| Tax credits, State | $ — | See notes below |

F-28

Exhibit 4
Page 410

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

**Net Operating Losses**

As of December 31, 2020, the Company has U.K. NOL of approximately $79.3 million that can be carried forward indefinitely.

The U.S. R&D tax credit for the year ended December 31, 2020 has been fully utilized.

**Uncertain Tax Positions**

The Company recognizes tax benefits from uncertain tax positions only if it believes that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. As the Company expands, it will face increased complexity in determining the appropriate tax jurisdictions for revenue and expense items. The Company's policy is to adjust these reserves when facts and circumstances change. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the income tax expense in the period in which such determination is made and could have a material impact on its financial condition and operating results. The income tax expense includes the effects of any accruals that the Company believes are appropriate, as well as the related net interest and penalties. As of December 31, 2020 and 2019, the Company had total uncertain tax positions of $2.2 million and $0.4 million. No interest or penalties have been recorded related to the uncertain tax positions. None of the unrecognized tax benefits, if recognized, would affect the effective tax rate. A reconciliation of the beginning and ending balances of unrecognized tax benefits is as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Balance at beginning of the year | $      405 | $      271 |
| Increases based on tax positions related to current year | 733 | 134 |
| Increases based on tax positions related to prior years | 1,199 | — |
| Decreases based on tax positions related to prior years | (101) | — |
| Balance at end of year | $   2,236 | $      405 |

It is not expected that there will be a significant change in uncertain tax position in the next 12 months. We are subject to income tax in the U.K., U.S. federal and various states and three other foreign jurisdictions. Our U.S. income tax filings are currently under audit for the tax year ended December 31, 2018. The statute of limitations for U.K. and foreign tax jurisdictions other than the U.S. are no longer subject to audit for tax years before December 31, 2018. We are no longer subject to U.S. federal income tax audit for the tax years before the year ended December 31, 2017 and are no longer subject to state income tax audit for tax years before December 31, 2016.

9.    **Ordinary Shares**

Ordinary shares have no liquidation preferences and entitle holders to one vote per share. Ordinary shareholders are entitled to receive non-cumulative dividends, when and if declared by our Board of Directors.

Exhibit 4
Page 411

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

**10.   Earnings Per Share**

A reconciliation of net loss available to ordinary shareholders and the number of shares in the calculation of basic and diluted net loss per share follows (in thousands, except for share and per share data):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Basic and diluted: | | |
| Net loss | $    (80,277) | $    (50,850) |
| Weighted average ordinary shares outstanding | 33,604,752 | 31,406,127 |
| Basic and diluted net loss per share | $      (2.39) | $      (1.62) |

Basic net loss per share is calculated by dividing net loss for the period by the weighted average number of the ordinary shares outstanding plus 132,099 outstanding warrants outstanding with a $0.01 exercise price during the period.

As of December 31, 2020 and 2019, we excluded the potential effect of the following in the calculation of the diluted loss per share, as the effect would be anti-dilutive due to losses incurred.

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Outstanding warrants, less 132,099 outstanding warrants with a $0.01 exercise price | 881,004 | 848,240 |
| Outstanding options | 7,207,044 | 5,904,413 |
| Outstanding performance awards | 249,605 | 249,605 |
| | 8,337,653 | 7,002,258 |

**11.   Stock-Based Compensation**

The Company has established a number of share-based incentive plans for current employees, directors and others, which include Share Appreciation Rights, 2013 Share Option Plan and Warrants.

*Share Appreciation Rights*

On November 12, 2013, the Company issued to certain employees Share Appreciation Rights ("SARs") that require us to pay the intrinsic value of the SARs to the employee at the date of exercise. These SARs vest over a period of four years, provided the employee remains in the employment of the Company and recorded as liabilities at fair value as of the respective period end. As of December 31, 2020 and 2019, there were 30,000 SARs outstanding at an exercise price per share of $0.00001.

As of December 31, 2020 and 2019, the Company had recorded liabilities of $0.7 million and $0.4 million related to these SARs based on their fair value of $20.28 and $12.98 per share as of December 31, 2020 and 2019, respectively. The Company recognized expense for the SARs in the consolidated statements of operations and comprehensive loss under selling, general and administrative of $0.3 million and $0.02 million during the years ended December 31, 2020 and 2019.

F-30

Exhibit 4
Page 412

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*2013 Share Option Plan*

In 2013, we adopted the 2013 Equity Incentive Plan (the "Plan"), which provides for grants of stock options to attract and retain employees, directors, officers, and consultants.

As of December 31, 2020, there were 11,458,989 shares authorized for issuance under the Plan, of which 2,746,089 shares were available for grant. Share options can be granted with an exercise price less than, equal to or greater than the shares' fair market value at the date of grant. All options vest over the earlier of 4 years of service from grant or start of service, with typically 25% becoming exercisable on the first anniversary of the grant or start of service and the balance becoming exercisable in equal monthly portions over the following 36 months.

The following table summarizes stock option activity related to the plans during the years ended December 31, 2020 and 2019:

| | Number of Options Outstanding | Average Exercise Price Per Share | Remaining Contractual Life *(Years)* | Intrinsic Value *(In thousands)* |
|---|---|---|---|---|
| **Balances as of December 31, 2018** | 5,565,292 | $ 2.88 | 6.68 | $ 59,146 |
| Options granted | 1,135,148 | 9.29 | | |
| Options exercised | (24,750) | 1.33 | | |
| Options forfeited | (120,001) | 6.65 | | |
| Options expired | (651,276) | 2.78 | | |
| **Balances as of December 31, 2019** | 5,904,413 | $ 4.05 | 6.94 | $ 54,100 |
| Options granted | 2,328,385 | 8.67 | | |
| Options exercised | (7,813) | 5.36 | | |
| Options forfeited | (826,488) | 8.62 | | |
| Options expired | (191,453) | 6.92 | | |
| **Balances as of December 31, 2020** | 7,207,044 | $ 4.94 | 6.75 | $ 110,552 |
| **Options exercisable—December 31, 2020** | 4,693,313 | $ 3.16 | 5.51 | $ 80,334 |

The aggregated intrinsic value represents the difference between the exercise price and the fair value of ordinary shares. The total aggregate intrinsic value of options exercised during the years ended December 31, 2020 and 2019 was $0.1 million and $0.3 million, respectively. The weighted-average grant-date fair value of options granted during the years ended December 31, 2020 and 2019 was $8.32 and $7.92 per share, respectively.

Stock-based compensation expense for all equity arrangements for the years ended December 31, 2020 and 2019 was as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Cost of revenue | $ 2,271 | $ 2,230 |
| Research and development | 4,313 | 2,835 |
| Sales and marketing | 639 | 475 |
| General and administrative | 820 | 689 |
| Total stock-based compensation expense | $ 8,043 | $ 6,229 |

F-31

Exhibit 4
Page 413

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

As of December 31, 2020 and 2019, there was approximately $19.5 million and $13.8 million of total unrecognized stock based compensation expense, related to unvested options granted to employees under the Company's stock option plan that is expected to be recognized over a weighted average period of 1.4 years and 1.3 years, respectively.

*Performance Awards*

During the year ended December 31, 2019, 249,605 performance-based awards at a weighted average grant date fair value of $7.84 were granted to certain individuals with conditions that include specific sales and fundraising targets. As of December 31, 2020, it was determined that all of these awards met their performance conditions, and the Company recognized a total expense of $0.8 million in relation to these awards. As of December 31, 2020 and 2019, there were approximately $1.2 million and $2.0 million of unrecognized stock-based compensation expense related to these performance-based awards. During the year ended December 31, 2020, no additional performance-based awards were granted.

*Fair Value of Options*

The fair values of options granted during the period were determined using a Black-Scholes model. The following principal assumptions were used in the valuation:

*Fair Value of Ordinary Shares*—The fair value of the ordinary shares underlying the stock option awards was determined by the Board of Directors ("the Board"). Given the absence of a public trading market, the Board considered numerous objective and subjective factors to determine the fair value of the Company's ordinary shares at each meeting at which awards were approved. These factors included, but were not limited to (i) contemporaneous third party valuations of ordinary shares; (ii) the lack of marketability of ordinary shares; (iii) stage and development of the Company's business; (iv) general economic conditions; and (vi) the likelihood of achieving a liquidity event, such as an IPO or sale of the Company, given prevailing market conditions. To evaluate the fair value of the underlying shares for grants between two independent valuations and after the last independent valuation, a linear interpolation framework was used to evaluate the fair value of the underlying shares.

*Volatility*—The expected stock price volatilities are estimated based on the historical and implied volatilities of comparable publicly traded companies as the Company does not have sufficient history of trading its ordinary shares.

*Risk-free Interest Rate*—The risk-free interest rates are based on US Treasury yields in effect at the grant date for notes with comparable terms as the awards.

*Expected Term*—As the Company does not have sufficient historical information to develop reasonable expectations about future exercise patterns and post-vesting employment termination behavior, the Company determines the expected term based on the average period the stock options are expected to remain outstanding. For stock options, expected term is calculated as the midpoint of the stock options vesting term and contractual expiration period.

F-32

Exhibit 4
Page 414

**Table of Contents**

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Dividend Yield*—The expected dividend rate is zero as the Company has not declared or paid any cash dividends and does not anticipate to do so in the foreseeable future.

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Expected term (in years) | 4.86 – 6.25 | 5.61 – 6.25 |
| Expected volatility (%) | 50.29 – 52.45 | 50.40 – 51.37 |
| Risk-free interest rate (%) | 0.30 – 1.75 | 1.42 – 1.88 |
| Fair value of ordinary shares | $10.58 – 19.96 | $13.21 – 13.52 |
| Dividend yield | — | — |

*Warrants*

We issued warrant certificates to certain counterparties to subscribe in its ordinary shares.

During the years ended December 31, 2020 and 2019, 51,859 and 164,485 warrants were issued to intermediaries for introducing new investors related to equity financings. The Company recognized these warrants as equity issuance costs, with a corresponding credit in additional paid-in capital. Accordingly, there were no net change in additional paid in capital.

The 2019 Convertible Loan Notes were converted into ordinary shares during 2019 at a lower price than was paid by certain shareholders who had invested prior to the issuance of the 2019 Convertible Loan Notes. In order to compensate these investors, the Company issued 135,133 warrants to these investors. The fair value of the warrants issued was $1.8 million and was accounted for as a non-cash dividend by the Company. No additional warrants were issued during the year ended December 31, 2020.

During the year ended December 31, 2019, the Company issued 5,246 warrants for goods and services, which were recognized as an expense in selling, general and administrative expense on the consolidated statements of operations and comprehensive loss with a corresponding credit in additional paid-in capital.

The below warrants are equity classified and exercisable as of December 31, 2020 and 2019. Investor Warrants in connection with the 8.0% Convertible Notes were excluded from the below table as they were classified as liabilities. A summary of the Company's outstanding warrants as of December 31, 2020 and 2019 are presented below:

| | Number of Warrants Outstanding | Weighted-Average Exercise Per Shares | Weighted-Average Contractual Life (Years) |
| --- | --- | --- | --- |
| Balances as of December 31, 2018 | 678,232 | $ 7.05 | 7.60 |
| Warrants issued | 304,864 | 7.44 | |
| Warrants exercised | (2,757) | 0.00 | |
| Warrants cancelled | — | — | |
| Balances as of December 31, 2019 | 980,339 | $ 7.19 | 7.29 |
| Warrants issued | 51,859 | 10.30 | |
| Warrants exercised | (5,523) | 1.26 | |
| Warrants cancelled | (13,572) | 11.44 | |
| Balances as of December 31, 2020 | 1,013,103 | $ 7.33 | 6.45 |

F-33

Exhibit 4
Page 415

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

**12.    Related Party Transactions**

The Company formed HRT, a joint venture with Hengtong Optic-Electric Co., Ltd. in 2017, which was recognized by the Company as an equity method investment. During the years ended December 31, 2020 and 2019, we made sales to HRT of $5.3 million and $6.7 million, respectively. As of December 31, 2020 and 2019, the balance owed by the joint venture amounted to $3.3 million and $2.9 million, respectively, and is included in accounts receivable in the accompanying balance sheets.

The Company engages two affiliate entities of the Company's directors for consulting and administrative services. For the years ended December 31, 2020 and 2019, the Company incurred $0.8 million and $1.9 million in fees for these services, respectively. As of December 31, 2020 and 2019, the amounts included in accounts payable and accrued expenses in the accompanying balance sheets were not considered material.

**13.    Leases**

We have operating leases for office space and finance leases for manufacturing equipment. These leases have remaining lease terms of 1 years to 4 years. Some leases include extension options for up to 5 years. These options are included in the lease term when it is reasonably certain that the option will be exercised.

The weighted average remaining lease term was 3 years for operating leases as of December 31, 2020. The weighted average discount rate was 6% for operating leases as of December 31, 2020.

The components of lease cost for the year ended December 31, 2020, were as follows (in thousands):

|  | Years Ended December 31, | |
|  | 2020 | 2019 |
| --- | --- | --- |
| **Operating Lease Cost:** | | |
| Fixed lease cost | $    851 | 777 |
| Variable lease cost | 154 | 253 |
| Total operating cost | $    1,005 | $    1,030 |
| Total lease cost | $    1,391 | $    1,533 |

F-34

Exhibit 4
Page 416

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

Other information related to leases was as follows (in thousands):

| | Years Ended December 31, | |
| | 2020 | 2019 |
| --- | --- | --- |
| **Supplemental Cash Flow Information:** | | |
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows for operating leases | $ 916 | $ 756 |
| Operating cash flows for finance leases | $ 15 | $ 115 |
| Financing cash flows for finance leases | $ 1,192 | $ 1,215 |
| Right-of-use assets obtained in exchange of lease obligations: | | |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ — | $ 1,158 |

There are no finance lease liabilities as of December 31, 2020. Maturities of operating lease liabilities as of December 31, 2020, were as follows (in thousands):

| | Operating Leases |
| --- | --- |
| **Year Ending December 31:** | |
| 2021 | $ 682 |
| 2022 | 613 |
| 2023 | 456 |
| 2024 | 121 |
| Total lease obligation | $ 1,872 |
| Less: Imputed interest | (149) |
| Total lease liabilities | $ 1,723 |
| Less: Current lease liabilities | (596) |
| Total non-current lease liabilities | $ 1,127 |

**14.  Commitments and Contingencies**

*Legal Contingencies*

From time to time, we are a party to various lawsuits, claims and other legal proceedings that arise in the ordinary course of business. We apply accounting for contingencies to determine when and how much to accrue for and disclose related to legal and other contingencies. Accordingly, we disclose contingencies deemed to be reasonably possible and accrue loss contingencies when, in consultation with legal advisors, it is concluded that a loss is probable and reasonably estimable. Although the ultimate aggregate amount of monetary liability or financial impact with respect to these matters is subject to many uncertainties and is therefore not predictable with assurance, management believes that as of December 31, 2020 there are no litigations pending that could have, individually and in the aggregate, a material adverse effect on our financial position, results of operations or cash flows.

F-35

Exhibit 4
Page 417

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

*Financial Commitments*

In the ordinary course of business, we make commitments to third-party suppliers for various research and development activities. As of December 31, 2020 and 2019, we had $3.0 million and $3.3 million, respectively, in contractual obligations for which we have not yet received the services.

**15.  Defined Contribution Plan**

We have defined contribution plans, under which we contribute based on a percentage of the employees' elected contributions. We will have no legal or constructive obligation to pay further amounts. The contributions made by us for the years ended December 31, 2020 and 2019 was $0.5 million and $0.4 million, respectively.

**16.  Supplemental Cash Flow Information**

Non-cash operating, investing, and financing activities, and supplemental cash flow information are as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **Supplemental disclosure** | | |
| Cash payments for: | | |
| Interest paid | $ 47 | $ 506 |
| Income tax paid | $ 313 | $ 352 |
| Schedule for noncash operating activities | | |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ — | $ 1,158 |
| | $ — | $ 1,158 |
| Schedule for noncash investing activities | | |
| Unpaid property and equipment received | $ 166 | $ 397 |
| Unpaid balance related to the Trutouch Asset Acquisition | 500 | — |
| | $ 666 | $ 397 |
| Schedule for noncash financing activities | | |
| Conversion of note payable to ordinary shares | $ — | $ 18,244 |
| Issuance of ordinary shares related to the Trutouch Asset Acquisition | 2,298 | — |
| Non-cash equity issuance costs | — | 995 |
| Non-cash dividend | — | 1,838 |
| | $ 2,298 | $ 21,077 |

**17.  Subsequent Events**

Subsequent events have been evaluated through April 2, 2021, which is the date that the financial statements were issued.

During the year ended December 31, 2020, 250,000 restricted stock units ("RSUs") were offered to our three executives. Each RSU has a performance-based grant criteria that the Company completes a SPAC

F-36

Exhibit 4
Page 418

Table of Contents

**ROCKLEY PHOTONICS LIMITED**
**Notes to Consolidated Financial Statements**

transaction. As of December 31, 2020, it was determined that none of these awards meet the performance condition and no expense was recognized in relation to these awards.

In 2021, the Company issued convertible notes bearing interest at a rate of 5.0% per annum. The terms of the notes are similar to the 2020 Convertible Notes. We received $25.0 million on January 5, 2021, $10.0 million on January 13, 2021, and $30.0 million on January 18, 2021. We also received $11.4 million in connection with the 2020 Term Facility Loan on February 19, 2021.

On March 19, 2021, the Company entered into a definitive agreement to combine with SC Health Corporation, a publicly traded special purpose acquisition company. The transaction will result in Rockley becoming a publicly traded company on the NYSE under the symbol "RKLY" and values the Company at a pro forma enterprise value of $1.2 billion.

F-37

Exhibit 4
Page 419

Table of Contents

**SC HEALTH CORPORATION**
**INDEX TO FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-39 |
| Financial Statements: | |
| Balance Sheets | F-40 |
| Statements of Operations | F-41 |
| Statements of Changes in Shareholders' Equity | F-42 |
| Statements of Cash Flows | F-43 |
| Notes to Financial Statements | F-44 to F-57 |

F-38

Exhibit 4
Page 420

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of
SC Health Corporation

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of SC Health Corporation (the "Company") as of December 31, 2020 and 2019, the related statements of operations, changes in shareholders' equity and cash flows for each of the two years in the period ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, if the Company is unable to raise additional funds to alleviate liquidity needs as well as complete a Business Combination by the close of business on April 16, 2021, then the Company will cease all operations except for the purpose of liquidating. This date for mandatory liquidation and subsequent dissolution raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ WithumSmith+Brown, PC

We have served as the Company's auditor since 2018.

New York, New York
March 29, 2021

F-39

Exhibit 4
Page 421

Table of Contents

**SC HEALTH CORPORATION**
**BALANCE SHEETS**
**DECEMBER 31, 2020**

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **ASSETS** | | |
| Current Assets | | |
| Cash | $ 124,878 | $ 772,413 |
| Prepaid expenses | 122,067 | 123,658 |
| Total Current Assets | 246,945 | 896,071 |
| Marketable securities held in Trust Account | 174,542,012 | 173,897,911 |
| **TOTAL ASSETS** | **$ 174,788,957** | **$ 174,793,982** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Account payable and accrued expenses | $ 1,037,048 | $ 50,115 |
| Accrued offering costs | 167 | 167 |
| Promissory note – related party | 100,000 | — |
| Total Current Liabilities | 1,137,215 | 50,282 |
| Deferred underwriting fee payable | 6,037,500 | 6,037,500 |
| **Total Liabilities** | **7,174,715** | **6,087,782** |
| **Commitments and Contingencies (Note 5)** | | |
| Class A ordinary shares subject to possible redemption, 16,261,424 and 16,370,619 shares at $10.00 per share as of December 30, 2020 and 2019, respectively | 162,614,240 | 163,706,190 |
| **Shareholders' Equity** | | |
| Preference shares, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | — | — |
| Class A ordinary shares, $0.0001 par value; 180,000,000 shares authorized; 988,576 and 879,381 shares issued and outstanding (excluding 16,261,424 and 16,370,619 shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 99 | 88 |
| Class B ordinary shares, $0.00008 par value; 25,000,000 shares authorized; 5,562,500 shares issued and outstanding as of December 31, 2020 and 2019 | 445 | 445 |
| Additional paid-in capital | 5,135,809 | 4,043,870 |
| (Accumulated deficit) Retained earnings | (136,351) | 955,607 |
| **Total Shareholders' Equity** | **5,000,002** | **5,000,010** |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **$ 174,788,957** | **$ 174,793,982** |

*The accompanying notes are an integral part of these financial statements.*

F-40

Exhibit 4
Page 422

Table of Contents

**SC HEALTH CORPORATION**
**STATEMENTS OF OPERATIONS**

|  | Year Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Operating costs | $ 1,736,059 | $ 439,804 |
| **Loss from operations** | **(1,736,059)** | **(439,804)** |
| Other income: |  |  |
| Interest earned on investments held in Trust Account | 644,101 | 1,397,911 |
| **Net (loss) income** | **$ (1,091,958)** | **$ 958,107** |
| Weighted average shares outstanding of Class A redeemable ordinary shares | 17,250,000 | 17,010,355 |
| **Basic and diluted net income per share, Class A** | **$ 0.04** | **$ 0.08** |
| Weighted average shares outstanding of Class B non-redeemable ordinary shares | 5,562,500 | 4,911,815 |
| **Basic and diluted net loss per share, Class B** | **$ (0.31)** | **$ (0.09)** |

*The accompanying notes are an integral part of these financial statements.*

F-41

Exhibit 4
Page 423

Table of Contents

**SC HEALTH CORPORATION**
**STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**

| | Class A Ordinary Shares | | Class B Ordinary Shares | | Additional Paid-in Capital | (Accumulated Deficit) Retained Earnings | Total Shareholders' Equity |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | |
| **Balance – January 1, 2019** | — | $  — | 4,312,500 | $  345 | $    24,655 | $    (2,500) | $    22,500 |
| Issuance of Class B ordinary shares to Sponsor | — | — | 1,250,000 | 100 | (100) | — | — |
| Sale of 17,250,000 Units, net of underwriting discounts and offering costs | 17,250,000 | 1,725 | — | — | 162,273,868 | — | 162,275,593 |
| Sale of 5,450,000 Private Placement Warrants | — | — | — | — | 5,450,000 | — | 5,450,000 |
| Class A ordinary shares subject to possible redemption | (16,370,619) | (1,637) | — | — | (163,704,553) | — | (163,706,190) |
| Net income | — | — | — | — | — | 958,107 | 958,107 |
| **Balance – December 31, 2019** | **879,381** | **88** | **5,562,500** | **445** | **4,043,870** | **955,607** | **5,000,010** |
| Change in value of Class A ordinary shares subject to possible redemption | 109,195 | 11 | — | — | 1,091,939 | — | 1,091,950 |
| Net loss | — | — | — | — | — | (1,091,958) | (1,091,958) |
| **Balance – December 31, 2020** | **988,576** | **$  99** | **5,562,500** | **$  445** | **$  5,135,809** | **$  (136,351** | **$  5,000,002** |

*The accompanying notes are an integral part of these financial statements.*

F-42

Exhibit 4
Page 424

Table of Contents

**SC HEALTH CORPORATION**
**STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | |
| | 2020 | 2019 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net (loss) income | $ (1,091,958) | $      958,107 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | |
| Interest earned on marketable securities held in Trust Account | (644,101) | (1,397,911) |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses | 1,591 | (123,658) |
| Accounts payable and accrued expenses | 986,933 | 47,615 |
| **Net cash used in operating activities** | **(747,535)** | **(515,847)** |
| **Cash Flows from Investing Activities:** | | |
| Investment of cash in Trust Account | — | (172,500,000) |
| **Net cash used in investing activities** | **—** | **(172,500,000)** |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from sale of Units, net of underwriting discounts paid | — | 169,050,000 |
| Proceeds from sale of Private Placement Warrants | — | 5,450,000 |
| Proceeds from promissory note – related party | 100,000 | — |
| Repayment of promissory note – related party | — | (254,595) |
| Payments of offering costs | — | (489,458) |
| **Net cash provided by financing activities** | **100,000** | **173,755,947** |
| **Net Change in Cash** | **(647,535)** | **740,100** |
| Cash – Beginning | 772,413 | 32,313 |
| **Cash – Ending** | **$      124,878** | **$      772,413** |
| **Non-Cash Investing and Financing Activities:** | | |
| Payment of offering costs through promissory note | $      — | $      222,282 |
| Conversion of advances to promissory note | $      — | $      32,313 |
| Initial classification of Class A ordinary shares subject to possible redemption | $      — | $ 162,747,730 |
| Change in value of Class A ordinary shares subject to possible redemption | $ (1,091,950) | $      958,460 |
| Deferred underwriting fee payable | $      — | $      6,037,500 |

*The accompanying notes are an integral part of these financial statements.*

F-43

Exhibit 4
Page 425

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**

**NOTE 1 — DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS**

SC Health Corporation (the "Company") was incorporated in the Cayman Islands on December 10, 2018. The Company was formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, recapitalization or similar business combination with one or more businesses (the "Business Combination").

Although the Company is not limited to a particular industry or geographic region for purposes of consummating a Business Combination, the Company is focusing its search on companies with operations or prospects in the healthcare sector in the Asia Pacific region. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

As of December 31, 2020, the Company had not commenced any operations. All activity through December 31, 2020 relates to the Company's formation, the initial public offering ("Initial Public Offering"), which is described below, and, after the Initial Public Offering, identifying a target company for a Business Combination. The Company will not generate any operating revenues until after the completion of its initial Business Combination, at the earliest. The Company generates non-operating income in the form of interest income from the proceeds derived from the Initial Public Offering.

The registration statement for the Company's Initial Public Offering was declared effective on July 11, 2019. On July 16, 2019, the Company consummated the Initial Public Offering of 15,000,000 units (the "Units" and, with respect to the shares of Class A ordinary shares included in the Units sold, the "Public Shares"), which is described in Note 3.

Simultaneously with the closing of the Initial Public Offering, the Company consummated the sale of 5,000,000 warrants (the "Private Placement Warrants") at a price of $1.00 per Private Placement Warrant in a private placement to SC Health Holdings Limited, a Cayman Islands exempted company (the "Sponsor"), generating gross proceeds of $5,000,000, which is described in Note 4.

Following the closing of the Initial Public Offering on July 16, 2019, an amount of $150,000,000 ($10.00 per Unit) from the net proceeds of the sale of the Units in the Initial Public Offering and the sale of the Private Placement Warrants was placed in a trust account (the "Trust Account") and invested in U.S. government securities, within the meaning set forth in Section 2(a)(16) of the Investment Company Act, with a maturity of 180 days or less or in any open-ended investment company that holds itself out as a money market fund selected by the Company meeting the conditions of Rule 2a-7 of the Investment Company Act of 1940, as amended (the "Investment Company Act"), as determined by the Company, until the earlier of: (i) the completion of a Business Combination and (ii) the distribution of the Trust Account, as described below.

On August 2, 2019, in connection with the underwriters' election to fully exercise their over-allotment option, the Company consummated the sale of an additional 2,250,000 Units at $10.00 per Unit and the sale of an additional 450,000 Private Placement Warrants at $1.00 per Private Placement Warrant, generating total gross proceeds of $22,950,000. Following the closing, an additional $22,500,000 of net proceeds was placed in the Trust Account, resulting in $172,500,000 held in the Trust Account.

Transaction costs amounted to $10,224,407, consisting of $3,450,000 of underwriting fees, $6,037,500 of deferred underwriting fees and $736,907 of other offering costs. As of December 31, 2020, cash of $124,878 was held outside of the Trust Account and is available for working capital purposes.

Substantially all of the net proceeds of the Initial Public Offering and the sale of the Private Placement Warrants are intended to be applied toward consummating a Business Combination, and the Company's

F-44

Exhibit 4
Page 426

Table of Contents

management has broad discretion to identify targets for such a potential Business Combination and over the specific application of the funds held in the Trust Account if and when such funds are properly released from the Trust Account. The Company's initial Business Combination must be with one or more target businesses that together have a fair market value of at least 80% of the net assets held in the Trust Account (net of amounts disbursed to management for working capital purposes and excluding deferred underwriting discount) at the time of the agreement to enter into a Business Combination. The Company will only complete a Business Combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. There is no assurance that the Company will be able to complete a Business Combination successfully.

The Company will provide its holders of the outstanding Public Shares (the "public shareholders") with the opportunity to redeem all or a portion of their Public Shares upon the completion of a Business Combination either (i) in connection with a shareholder meeting called to approve the Business Combination or (ii) by means of a tender offer. The decision as to whether the Company will seek shareholder approval of a Business Combination or conduct a tender offer will be made by the Company, solely in its discretion. The public shareholders will be entitled to redeem their Public Shares for a pro rata portion of the amount then in the Trust Account ($10.00 per Public Share, plus any pro rata interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations). The per-share amount to be distributed to public shareholders who redeem their Public Shares will not be reduced by the deferred underwriting commissions the Company will pay to the underwriters (as discussed in Note 5). There will be no redemption rights upon the completion of a Business Combination with respect to the Company's warrants.

The Company will proceed with a Business Combination only if the Company has net tangible assets of at least $5,000,001 upon such consummation of a Business Combination and, if the Company seeks shareholder approval, a majority of the shares voted are voted in favor of the Business Combination. If a shareholder vote is not required by law and the Company does not decide to hold a shareholder vote for business or other legal reasons, the Company will, pursuant to its amended and restated memorandum and articles of association ("Memorandum and Articles of Association"), conduct the redemptions pursuant to the tender offer rules of the U.S. Securities and Exchange Commission ("SEC") and file tender offer documents with the SEC prior to completing a Business Combination. If, however, shareholder approval of the transactions is required by law, or the Company decides to obtain shareholder approval for business or legal reasons, the Company will offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. Additionally, each public shareholder may elect to redeem their Public Shares irrespective of whether they vote for or against the proposed transaction. If the Company seeks shareholder approval in connection with a Business Combination, the Sponsor, executive officers and directors (the "initial shareholders") have agreed to vote their Founder Shares (as defined in Note 4) and any Public Shares purchased during or after the Initial Public Offering in favor of approving a Business Combination.

Notwithstanding the foregoing, if the Company seeks shareholder approval of a Business Combination and it does not conduct redemptions pursuant to the tender offer rules, the Memorandum and Articles of Association provides that a public shareholder, together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), will be restricted from redeeming its shares with respect to more than an aggregate of 20% or more of the Public Shares, without the prior consent of the Company.

The initial shareholders have agreed (a) to waive their redemption rights with respect to their Founder Shares and Public Shares held by them in connection with the completion of a Business Combination and (b) not to propose an amendment to the Memorandum and Articles of Association to modify the substance or timing of the Company's obligation to redeem 100% of its Public Shares if the Company does not complete a Business Combination, unless the Company provides the public shareholders with the opportunity to redeem their Public Shares in conjunction with any such amendment.

Exhibit 4
Page 427

**Table of Contents**

The Company initially had until January 16, 2021, or such later date as a result of a shareholder vote to amend the Memorandum and Articles of Association, to complete a Business Combination (the "Combination Period"). If the Company is unable to complete a Business Combination within the Combination Period, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining shareholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to the Company's warrants, which will expire worthless if the Company fails to complete a Business Combination within the Combination Period.

On January 12, 2021, the Company held an extraordinary general meeting pursuant to which the Company's shareholders approved extending the Combination Period from January 16, 2021 to April 16, 2021 (the "Extension Date"). In connection with the approval of the extension, no shareholders elected to redeem their shares for cash (see Note 8).

The initial shareholders have agreed to waive their liquidation rights with respect to the Founder Shares if the Company fails to complete a Business Combination within the Combination Period. However, if the initial shareholders acquire Public Shares in or after the Initial Public Offering, such Public Shares will be entitled to liquidating distributions from the Trust Account if the Company fails to complete a Business Combination within the Combination Period. The underwriters have agreed to waive their rights to their deferred underwriting commission (see Note 5) held in the Trust Account in the event the Company does not complete a Business Combination within the Combination Period and, in such event, such amounts will be included with the other funds held in the Trust Account that will be available to fund the redemption of the Public Shares. In the event of such distribution, it is possible that the per share value of the assets remaining available for distribution will be less than the Initial Public Offering price per Unit ($10.00).

In order to protect the amounts held in the Trust Account, the Sponsor has agreed to be liable to the Company if and to the extent any claims by a vendor for services rendered or products sold to the Company, or a prospective target business with which the Company has discussed entering into a transaction agreement, reduce the amounts in the Trust Account to below the lesser of (i) $10.00 per share and (ii) the actual amount per Public Share held in the Trust Account if less than $10.00 per Public Share due to reductions in the value of the trust assets. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account nor to any claims under the Company's indemnity of the underwriters of the Initial Public Offering against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third-party claims. The Company will seek to reduce the possibility that the Sponsor will have to indemnify the Trust Account due to claims of creditors by endeavoring to have all vendors, service providers (except for the Company's independent auditors), prospective target businesses or other entities with which the Company does business, execute agreements with the Company waiving any right, title, interest or claim of any kind in or to monies held in the Trust Account.

**Going Concern**

In connection with the Company's assessment of going concern considerations in accordance with FASB's Accounting Standards Update ("ASU") 2014-15, "Disclosures of Uncertainties about an Entity's Ability to

F-46

Exhibit 4
Page 428

Table of Contents

Continue as a Going Concern," management has determined that if the Company is unable to raise additional funds to alleviate liquidity needs as well as complete a Business Combination during the Combination Period, then the Company will cease all operations except for the purpose of liquidating. The liquidity condition and date for mandatory liquidation and subsequent dissolution raise substantial doubt about the Company's ability to continue as a going concern. No adjustments have been made to the carrying amounts of assets or liabilities should the Company be required to liquidate after the Combination Period. The Company intends to complete a Business Combination before the mandatory liquidation date.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("GAAP") and pursuant to the rules and regulations of the SEC.

### Emerging Growth Company

The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statement with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

The Company will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of its Initial Public Offering, (b) in which the Company has total annual gross revenue of at least $1.07 billion, or (c) in which the Company is deemed to be a "large accelerated filer," which means the market value of its ordinary shares that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which the Company has issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

### Use of Estimates

The preparation of the financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of expenses during the reporting periods.

F-47

Exhibit 4
Page 429

**Table of Contents**

Making estimates requires management to exercise significant judgment. It is at least reasonably possible that the estimate of the effect of a condition, situation or set of circumstances that existed at the date of the financial statements, which management considered in formulating its estimate, could change in the near term due to one or more future events. Accordingly, the actual results could differ significantly from those estimates.

### Investments Held in Trust Account

At December 31, 2020 and 2019, the assets held in the Trust Account were invested in money market funds.

### Class A Ordinary Shares Subject to Possible Redemption

The Company accounts for its Class A ordinary shares subject to possible redemption in accordance with the guidance in ASC Topic 480 "Distinguishing Liabilities from Equity." Class A ordinary shares subject to mandatory redemption is classified as a liability instrument and is measured at fair value. Conditionally redeemable ordinary shares (including ordinary shares that features redemption rights that is either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within the Company's control) are classified as temporary equity. At all other times, ordinary shares are classified as shareholders' equity. The Company's Class A ordinary shares feature certain redemption rights that are considered to be outside of the Company's control and subject to occurrence of uncertain future events. Accordingly, at December 31, 2020 and 2019, Class A ordinary shares subject to possible redemption is presented as temporary equity, outside of the shareholders' equity section of the Company's balance sheets.

### Offering Costs

Offering costs consist of legal, accounting, underwriting fees and other costs incurred through the Initial Public Offering that are directly related to the Initial Public Offering. Offering costs amounting to $10,224,407 were charged to shareholders' equity upon the completion of the Initial Public Offering.

### Income Taxes

The Company accounts for income taxes under ASC Topic 740, "Income Taxes," which prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The Company's management determined that the Cayman Islands is the Company's major tax jurisdiction. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. As of December 31, 2020 and 2019, there were no unrecognized tax benefits and no amounts accrued for interest and penalties. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position.

The Company is considered to be an exempted Cayman Islands company with no connection to any other taxable jurisdiction and is presently not subject to income taxes or income tax filing requirements in the Cayman Islands or the United States. As such, the Company's tax provision was zero for the period presented.

### Net Income (Loss) per Ordinary Share

Net income (loss) per share is computed by dividing net income (loss) by the weighted average number of ordinary shares outstanding for the period. The calculation of diluted income (loss) per share does not consider the effect of the warrants issued in connection with the (i) Initial Public Offering, (ii) the exercise of the over-allotment option and (iii) Private Placement Warrants since the exercise of the warrants are contingent upon the occurrence of future events and the inclusion of such warrants would be anti-dilutive. The warrants are exercisable to purchase 14,075,000 shares of Class A ordinary shares in the aggregate.

F-48

Exhibit 4
Page 430

Table of Contents

The Company's statements of operations includes a presentation of income (loss) per share for ordinary shares subject to possible redemption in a manner similar to the two-class method of income (loss) per share. Net income per share, basic and diluted, for Class A redeemable ordinary shares is calculated by dividing the interest income earned on the Trust Account, by the weighted average number of Class A redeemable ordinary shares outstanding since original issuance. Net loss per share, basic and diluted, for Class B non-redeemable ordinary shares is calculated by dividing the net loss, adjusted for income attributable to Class A redeemable ordinary shares, by the weighted average number of Class B non-redeemable ordinary shares outstanding for the period. Class B non-redeemable ordinary shares includes the Founder Shares as these shares do not have any redemption features and do not participate in the income earned on the Trust Account.

The following table reflects the calculation of basic and diluted net income (loss) per ordinary share (in dollars, except per share amounts):

| | Year Ended December 31, | |
| | 2020 | 2019 |
|---|---|---|
| Redeemable Class A Ordinary Shares | | |
| Numerator: Earnings allocable to Redeemable Class A Ordinary Shares | | |
| Interest Income | $ 644,101 | $ 1,397,911 |
| Net Earnings | $ 644,101 | $ 1,397,911 |
| Denominator: Weighted Average Redeemable Class A Ordinary Shares | | |
| Redeemable Ordinary Shares, Basic and Diluted | 17,250,000 | 17,010,355 |
| Earnings/Basic and Diluted Redeemable Class A Ordinary Shares | $ 0.04 | $ 0.08 |
| Non-Redeemable Class B Ordinary Shares | | |
| Numerator: Net (Loss) Income minus Redeemable Net Earnings | | |
| Net (Loss) Income | $ (1,091,958) | $ 958,107 |
| Redeemable Net Earnings | (644,101) | (1,397,911) |
| Non-Redeemable Net Loss | $ (1,736,059) | $ (439,804) |
| Denominator: Weighted Average Non-Redeemable Class B Ordinary Shares | | |
| Non-Redeemable Class B Ordinary Shares, Basic and Diluted | 5,562,500 | 4,911,815 |
| Loss/Basic and Diluted Non-Redeemable Class B Ordinary Shares | $ (0.31) | $ (0.09) |

As of December 31, 2020 and 2019, basic and diluted shares are the same as there are no securities that are dilutive to the shareholders.

***Concentration of Credit Risk***

Financial instruments that potentially subject the Company to concentrations of credit risk consist of a cash account in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on this account and management believes the Company is not exposed to significant risks on such account.

***Fair Value of Financial Instruments***

The fair value of the Company's assets and liabilities, which qualify as financial instruments under ASC Topic 820, "Fair Value Measurement," approximates the carrying amounts represented in the accompanying balance sheets, primarily due to their short-term nature.

***Recent Accounting Standards***

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's financial statements.

F-49

Exhibit 4
Page 431

Table of Contents

**NOTE 3 — PUBLIC OFFERING**

Pursuant to the Initial Public Offering, the Company sold 17,250,000 Units at a purchase price of $10.00 per Unit, inclusive of 2,250,000 Units sold to the underwriters on August 2, 2019 upon the underwriters' election to fully exercise their over-allotment option. Each Unit consists of one Class A ordinary share and one-half of one redeemable warrant ("Public Warrant"). Each whole Public Warrant entitles the holder to purchase one Class A ordinary share at a price of $11.50 per share, subject to adjustment (see Note 6).

**NOTE 4 — RELATED PARTY TRANSACTIONS**

*Founder Shares*

In December 2018, the Sponsor purchased 3,450,000 shares (the "Founder Shares") of the Company's Class B ordinary shares for an aggregate price of $25,000. On February 8, 2019, the Company completed a sub-division of its Class B ordinary shares, pursuant to which the Founder Shares were sub-divided into 4,312,500 shares with a par value of $0.00008 per share. All share and per-share amounts have been retroactively restated to reflect the sub-division. On July 9, 2019, the Company issued 1,250,000 Founder Shares to the Sponsor in connection with the forward purchase agreement (see Note 5) for par value, or $100, resulting in a total of 5,562,500 Founder Shares issued and outstanding of which an aggregate of up to 562,500 shares were subject to forfeiture to the extent that the underwriters' over-allotment option was not exercised in full or in part, so that the initial shareholders would own, on an as-converted basis, 20% of the Company's issued and outstanding shares after the Initial Public Offering (assuming no purchase by the initial shareholders of any Public Shares in the Initial Public Offering). As a result of the underwriters' election to fully exercise their over-allotment option, 562,500 Founder Shares are no longer subject to forfeiture.

The Founder Shares will automatically convert into Class A ordinary shares upon consummation of a Business Combination on a one-for-one basis, subject to adjustments as described in Note 6.

The initial shareholders have agreed, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier of (i) one year after the completion of the Company's Business Combination or (ii) the date on which the Company completes a liquidation, merger, share exchange or other similar transaction after the Company's Business Combination that results in all of the Company's shareholders having the right to exchange their Class A ordinary shares for cash, securities or other property. Notwithstanding the foregoing, if the closing price of the Company's Class A ordinary shares equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Company's Business Combination, the Founder Shares will be released from the lock-up.

*Private Placement*

Simultaneously with the closing of the Initial Public Offering, the Sponsor purchased an aggregate of 5,000,000 Private Placement Warrants at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $5,000,000. On August 2, 2019, in connection with the underwriters' exercise of the over-allotment option in full, the Company sold an additional 450,000 Private Placement Warrants at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $450,000. Each Private Placement Warrant is exercisable to purchase one Class A ordinary share at a price of $11.50 per share. A portion of the proceeds from the Private Placement Warrants were added to the proceeds from the Initial Public Offering held in the Trust Account. If the Company does not complete a Business Combination within the Combination Period, the proceeds of the sale of the Private Placement Warrants will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law), and the Private Placement Warrants and all underlying securities will expire worthless.

F-50

Exhibit 4
Page 432

Table of Contents

*Administrative Support Agreement*

The Company entered into an agreement whereby, commencing on July 16, 2019 and continuing through the earlier of the Company's consummation of a Business Combination and its liquidation, the Company will pay an affiliate of the Sponsor a total of $10,000 per month for office space, secretarial and administrative support. For the year ended December 31, 2020 and 2019, the Company incurred $120,000 and $60,000, respectively, in fees for these services. As of December 31, 2020 and 2019, $10,000 and $20,000 of such fees, respectively, are included in accounts payable and accrued expenses in the accompanying balance sheets.

*Advance from Related Party*

The Sponsor advanced the Company an aggregate of $32,313 to cover expenses related to the Initial Public Offering. The advances were non-interest bearing and due on demand. In January 2019, the advances were converted into a promissory note issued to the Sponsor (see below).

*Promissory Note – Related Party*

In January 2019, the Company issued an unsecured promissory note (the "Promissory Note") to the Sponsor, pursuant to which the Company could borrow up to an aggregate principal amount of $300,000. The Promissory Note was non-interest bearing and payable on the earlier of December 31, 2019 or the completion of the Initial Public Offering. In January 2019, the Company transferred its outstanding advance from a related party in the amount of $32,313 into the Promissory Note. The outstanding balance of $254,595 under the Promissory Note was repaid as of December 31, 2019. Additionally, on December 30, 2020, the Sponsor deposited $100,000 into the operating bank account of the Company for working capital. This amount is outstanding as of December 31, 2020.

*Related Party Loans*

In order to finance transaction costs in connection with a Business Combination, the Sponsor or an affiliate of the Sponsor may, but is not obligated to, loan the Company funds as may be required ("Working Capital Loans"). If the Company completes a Business Combination, the Company would repay the Working Capital Loans out of the proceeds of the Trust Account released to the Company. Otherwise, the Working Capital Loans would be repaid only out of funds held outside the Trust Account. In the event that a Business Combination does not close, the Company may use a portion of proceeds held outside the Trust Account to repay the Working Capital Loans but no proceeds held in the Trust Account would be used to repay the Working Capital Loans. Except for the foregoing, the terms of such Working Capital Loans, if any, have not been determined and no written agreements exist with respect to such loans. The Working Capital Loans would either be repaid upon consummation of a Business Combination or, at the lender's discretion, up to $2,000,000 of such Working Capital Loans may be convertible into warrants of the post Business Combination entity at a price of $1.00 per warrant. The warrants would be identical to the Private Placement Warrants. As of December 31, 2020 and 2019, no amounts were borrowed under the Working Capital Loans.

**NOTE 5 — COMMITMENTS AND CONTINGENCIES**

*Risks and Uncertainties*

Management is continuing to evaluate the impact of the COVID-19 pandemic and has concluded that while it is reasonably possible that the virus could have a negative effect on the Company's financial position, results of its operations and/or search for a target company, the specific impact is not readily determinable as of the date of these financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

F-51

Exhibit 4
Page 433

Table of Contents

*Registration Rights*

Pursuant to a registration rights agreement entered into on July 11, 2019, the holders of the Private Placement Warrants, the warrants that may be issued upon conversion of the Working Capital Loans, and the Founder Shares are entitled to registration rights with respect to such warrants and the ordinary shares underlying such warrants and Founder Shares. The holders of these securities are entitled to make up to three demands, excluding short form demands, that the Company register such securities for sale under the Securities Act. In addition, the holders will have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a Business Combination. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Underwriting Agreement*

The Company granted the underwriters a 45-day option from the date of Initial Public Offering to purchase up to 2,250,000 additional Units to cover over-allotments, if any, at the Initial Public Offering price less the underwriting discounts and commissions. In connection with the underwriters' exercise of the over-allotment option in full on August 2, 2019, the underwriters purchased all 2,250,000 additional Units.

The underwriters are entitled to a deferred fee of $6,037,500, which will become payable to them from the amounts held in the Trust Account solely in the event that the Company completes a Business Combination, subject to the terms of the underwriting agreement.

*Forward Purchase Agreement*

On July 9, 2019, SC Health Group Limited, an affiliate of the Sponsor, entered into a forward purchase agreement with the Company which provides for the purchase by SC Health Group Limited of an aggregate of 5,000,000 Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants, each to purchase one Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of a Business Combination. On July 9, 2019, the Company issued 1,250,000 Founder Shares to the Sponsor in connection with the forward purchase agreement for par value, or $100, of which such shares will be transferred to SC Health Group Limited. The obligations under the forward purchase agreement do not depend on whether any Class A ordinary shares are redeemed by the Company's public shareholders.

## NOTE 6 — SHAREHOLDERS' EQUITY

*Preference Shares* — The Company is authorized to issue to 1,000,000 preference shares with a par value of $0.0001 per share, with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors. At December 31, 2020 and 2019, there were no preference shares issued or outstanding.

*Class A Ordinary Shares* — The Company is authorized to issue 180,000,000 Class A ordinary shares with a par value of $0.0001 per share. Holders of the Company's Class A ordinary shares are entitled to one vote for each share. At December 31, 2020 and 2019, there were 988,576 and 879,381 Class A ordinary shares issued and outstanding, excluding 16,261,424 and 16,370,619 Class A ordinary shares subject to possible redemption, respectively.

*Class B Ordinary Shares* — The Company is authorized to issue to 25,000,000 Class B ordinary shares with a par value of $0.00008 per share. Holders of Class B ordinary shares are entitled to one vote for each share. At December 31, 2020 and 2019, there were 5,562,500 ordinary shares issued and outstanding.

Holders of Class B ordinary shares will have the right to elect the Company's directors prior to or in connection with the completion of a Business Combination. Holders of Class A ordinary shares and Class B ordinary shares will vote together as a single class on all other matters submitted to a vote of shareholders, except as required by law.

F-52

Exhibit 4
Page 434

**Table of Contents**

The Class B ordinary shares will automatically convert into Class A ordinary shares at the time of a Business Combination on a one-for-one basis, subject to adjustment as follows. The Class B ordinary shares will automatically convert into Class A ordinary shares on the first business day following the consummation of a Business Combination at a ratio such that the total number of Class A ordinary shares issuable upon conversion of all Founder Shares will equal, in the aggregate, on an as-converted basis, 20% of the total number of Class A ordinary shares outstanding upon completion of this offering, plus the total number of Class A ordinary shares issued or deemed issued or issuable upon conversion or exercise of any equity-linked securities or rights issued or deemed issued, by the Company in connection with or in relation to the consummation of a Business Combination, excluding any Class A ordinary shares or equity-linked securities exercisable for or convertible into Class A ordinary shares issued, or to be issued, to any seller in a Business Combination and any warrants issued in a private placement to the Sponsor or an affiliate of the Sponsor upon conversion of Working Capital Loans.

*Warrants* — Public Warrants may only be exercised for a whole number of shares. No fractional warrants were issued upon separation of the Units, which occurred on September 3, 2019, and only whole warrants will trade. The Public Warrants will become exercisable on the later of (a) 30 days after the completion of a Business Combination or (b) 12 months from the closing of the Initial Public Offering. The Public Warrants will expire five years after the completion of a Business Combination or earlier upon redemption or liquidation.

The Company will not be obligated to deliver any Class A ordinary shares pursuant to the exercise of a Public Warrant and will have no obligation to settle such Public Warrant exercise unless a registration statement under the Securities Act with respect to the Class A ordinary shares underlying the Public Warrants is then effective and a prospectus relating thereto is current, subject to the Company satisfying its obligations described below with respect to registration. No warrant will be exercisable and the Company will not be obligated to issue a Class A ordinary share upon exercise of a Public Warrant unless the Class A ordinary share issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants.

The Company has agreed that as soon as practicable, but in no event later than thirty (30) business days after the closing of a Business Combination, it will use its best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the Class A ordinary shares issuable upon exercise of the Public Warrants. The Company will use its best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. If a registration statement covering the Class A ordinary shares issuable upon exercise of the warrants is not effective by the sixtieth (60th) day after the closing of a Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when the Company will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption.

*Redemption of Warrants for Cash.* Once the warrants become exercisable, the Company may redeem the Public Warrants:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption; and

- if, and only if, the reported last sales price of the Company's Class A ordinary shares equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If and when the warrants become redeemable by the Company, the Company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

Exhibit 4
Page 435

Table of Contents

*Redemption of Warrants for Class A Ordinary Shares.* Commencing ninety days after the warrants become exercisable, the Company may redeem the outstanding Public Warrants:

•   in whole and not in part;

•   at a price equal to a number of Class A ordinary shares to be determined, based on the redemption date and the fair market value of the Company's Class A ordinary shares;

•   upon a minimum of 30 days' prior written notice of redemption;

•   if, and only if, the last reported sale price of the Company's Class A ordinary shares equals or exceeds $10.00 per share (as adjusted for share splits, share dividends, reorganizations, recapitalizations and the like) on the trading day prior to the date on which the Company sends the notice of redemption to the warrant holders;

•   if, and only if, the Private Placement Warrants are also concurrently exchanged at the same price (equal to a number of Class A ordinary shares) as the outstanding Public Warrants; and

•   if, and only if, there is an effective registration statement covering the Class A ordinary shares issuable upon exercise of the warrants and a current prospectus relating thereto available throughout the 30-day period after written notice of redemption is given

If the Company calls the Public Warrants for redemption, management will have the option to require any holder that wishes to exercise the Public Warrants to do so on a "cashless basis," as described in the warrant agreement. The exercise price and number of ordinary shares issuable upon exercise of the warrants may be adjusted in certain circumstances including in the event of a share dividend, or recapitalization, reorganization, merger or consolidation. However, the warrants will not be adjusted for issuance of ordinary shares at a price below its exercise price. Additionally, in no event will the Company be required to net cash settle the warrants. If the Company is unable to complete a Business Combination within the Combination Period and the Company liquidates the funds held in the Trust Account, holders of warrants will not receive any of such funds with respect to their warrants, nor will they receive any distribution from the Company's assets held outside of the Trust Account with the respect to such warrants. Accordingly, the warrants may expire worthless.

In addition, if (x) the Company issues additional Class A ordinary shares or equity-linked securities for capital raising purposes in connection with the closing of a Business Combination at an issue price or effective issue price of less than $9.20 per ordinary share (with such issue price or effective issue price to be determined in good faith by the Company) and, (i) in the case of any such issuance to the Sponsor or its affiliates, without taking into account any Founder Shares held by the Sponsor or such affiliates, as applicable, prior to such issuance, and (ii) to the extent that such issuance is made to SIN Capital Group Pte. Ltd., an affiliate of the Company and the Sponsor or its affiliates, without taking into account the transfer of Founder Shares or Private Placement Warrants (including if such transfer is effectuated as a surrender to the Company and subsequent reissuance by the Company) by the Sponsor in connection with such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of a Business Combination on the date of the consummation of a Business Combination (net of redemptions), and (z) the volume weighted average trading price of our Class A ordinary shares during the 20 trading day period starting on the trading day prior to the day on which the Company consummates a Business Combination (such price, the "Market Value") is below $9.20 per share, the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the higher of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price will be adjusted (to the nearest cent) to be equal to 180% of the higher of the Market Value and the Newly Issued Price.

The Private Placement Warrants are identical to the Public Warrants underlying the Units sold in the Initial Public Offering, except that the Private Placement Warrants and the Class A ordinary shares issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or salable until 30 days after the completion of a Business Combination, subject to certain limited exceptions. Additionally, the Private Placement

F-54

Exhibit 4
Page 436

Table of Contents

Warrants will be exercisable on a cashless basis and be non-redeemable (for cash) so long as they are held by the initial purchasers or their permitted transferees. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

## NOTE 7 — FAIR VALUE MEASUREMENTS

The fair value of the Company's financial assets and liabilities reflects management's estimate of amounts that the Company would have received in connection with the sale of the assets or paid in connection with the transfer of the liabilities in an orderly transaction between market participants at the measurement date. In connection with measuring the fair value of its assets and liabilities, the Company seeks to maximize the use of observable inputs (market data obtained from independent sources) and to minimize the use of unobservable inputs (internal assumptions about how market participants would price assets and liabilities). The following fair value hierarchy is used to classify assets and liabilities based on the observable inputs and unobservable inputs used in order to value the assets and liabilities:

Level 1:     Quoted prices in active markets for identical assets or liabilities. An active market for an asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2:     Observable inputs other than Level 1 inputs. Examples of Level 2 inputs include quoted prices in active markets for similar assets or liabilities and quoted prices for identical assets or liabilities in markets that are not active.

Level 3:     Unobservable inputs based on our assessment of the assumptions that market participants would use in pricing the asset or liability.

The Company classifies its U.S. Treasury and equivalent securities as held-to-maturity in accordance with ASC Topic 320 "Investments—Debt and Equity Securities." Held-to-maturity securities are those securities which the Company has the ability and intent to hold until maturity. Held-to-maturity treasury securities are recorded at amortized cost on the accompanying balance sheets and adjusted for the amortization or accretion of premiums or discounts.

At December 31, 2020, assets held in the Trust Account were comprised of $174,542,012 in money market funds, which are invested in U.S. Treasury Securities. At December 31, 2019, assets held in the Trust Account were comprised of $173,897,911 in money market funds, which are invested in U.S. Treasury Securities, During the year ended December 31, 2020 and 2019, the Company did not withdraw any interest income from the Trust Account.

The following table presents information about the Company's assets that are measured at fair value on a recurring basis at December 31, 2020 and 2019 and indicates the fair value hierarchy of the valuation inputs the Company utilized to determine such fair value. The gross holding gains and fair value of held-to-maturity securities at December 31, 2020 and 2019 are as follows:

| Description | Level | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Assets: | | | |
| Marketable securities held in Trust Account – U.S. Treasury Securities Money Market Fund | 1 | $ 174,542,012 | $ 173,897,911 |

## NOTE 8 — SUBSEQUENT EVENTS

The Company evaluated subsequent events and transactions that occurred after the balance sheet date up to the date that the financial statements were issued. Based upon this review, other than as describe below, the

F-55

Exhibit 4
Page 437

Table of Contents

Company did not identify any subsequent events that would have required adjustment or disclosure in the financial statements.

On January 5, 2021, the Company announced that it had entered into a non-binding letter of intent (the "Letter of Intent") with a next generation technology developer (the "Target") relating to a proposed business combination transaction. The Target has developed a technology targeting consumer healthcare applications, and the Company believes the Target is a compelling investment opportunity given its cutting-edge technology and commercial opportunity. Completion of the proposed transaction is subject to the completion of due diligence, the negotiation and execution of a definitive agreement and satisfaction of the conditions therein, including approval of the transaction by the Company's shareholders.

On January 12, 2021, the Company held an extraordinary general meeting pursuant to which the Company's shareholders approved extending the Combination Period to the Extension Date.

On March 19, 2021, the Company entered into a Business Combination Agreement and Plan of Merger (the "Business Combination Agreement"), by and among Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Rockley"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("HoldCo"), and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo ("Merger Sub"). The Business Combination Agreement and the transactions contemplated thereby (the "Rockley Business Combination") were approved by our board of directors and the boards of directors of each of HoldCo, Merger Sub and Rockley.

The Business Combination Agreement provides for, among other things, the following transactions on the closing date: (i) the Company carries out a scheme of arrangement in the UK courts pursuant to which all of the Company's shares (including those issued prior to the scheme as a result of the conversion of convertible loan notes and the exercise of warrants) will be cancelled or transferred by the Company's shareholders in exchange for shares in HoldCo; (ii) the holders of options over shares in the Company will be invited to roll their options into new options over shares in HoldCo; (iii) to the extent convertible loan notes issued by the Company do not convert into shares in the Company prior to the effectiveness of the scheme described in clause (i) above, such notes will, depending on which form the scheme of arrangement takes, either be (a) novated to HoldCo (resulting in HoldCo becoming responsible to issue HoldCo ordinary shares on exercise) and the consideration for the novation shall be an inter-company loan between the Company and HoldCo, or (b) acquired by HoldCo in exchange for the issue of new convertible loan notes by HoldCo to each convertible loan note holder; (iv) the holders of warrants over shares in the Company (other than warrants that by their terms will be replicated at HoldCo in exchange for market value consideration) will be notified that if they do not exercise their warrants for shares in the Company prior to the effectiveness of the scheme described in clause (i) above, then those warrants will lapse; (v) HoldCo will complete a 'stock-split' to prepare its share capital for Merger Sub's merger into SC Health; (vi) certain investors will subscribe for and purchase an aggregate of $150,000,000 of shares in HoldCo; (vii) Merger Sub will merge with and into SC Health, with SC Health surviving the merger and becoming a direct wholly-owned subsidiary of HoldCo; and (viii) the shares and warrants in SC Health will be exchanged for shares and warrants in HoldCo.

In accordance with the terms and subject to the conditions of the Business Combination Agreement, (i) the existing holders of securities in the Company will exchange their securities for new securities in HoldCo; and (ii) HoldCo will split its stock such that the number of shares in (together with any other securities in or convertible for securities in) HoldCo after the stock split will be equal to $1,148,114,113 divided by $10.00. Certain PIPE investors will subscribe for shares in HoldCo and the warrants in SC Health (each $10.00 shares) will then be exchanged for shares in HoldCo.

Concurrently with the execution of the Business Combination Agreement, the Company and HoldCo entered into subscription agreements (the "Investor Subscription Agreements") with certain investors and

F-56

Exhibit 4
Page 438

**Table of Contents**

individuals, including, among others, SC Health Group Limited (an affiliate of the Sponsor), Medtronic, Senvest Management LLC and UBS O'Connor. Pursuant to the Investor Subscription Agreements, each investor agreed to subscribe for and purchase, and HoldCo agreed to issue and sell an aggregate of $150,000,000 shares in HoldCo, which will take effect immediately prior to the closing of the Rockley Business Combination.

Previously the Company had entered into a forward purchase agreement with SC Health Group Limited which provided for the purchase by SC Health Group Limited of an aggregate of 5,000,000 Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants to purchase one Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of our initial business combination. As part of the Rockley Business Combination, the Company agreed with SC Health Group Limited that the Forward Purchase Agreement should be terminated and instead of purchasing $50,000,000 of Class A ordinary shares pursuant to the forward purchase agreement, SC Health Group Limited would instead enter into the Investor Subscription Agreement referenced above and, pursuant to that agreement, has agreed to purchase an aggregate of $50,000,000 shares in HoldCo.

Exhibit 4
Page 439

**Table of Contents**

ANNEX A

**Execution Version**

---

**BUSINESS COMBINATION AGREEMENT**

**AND PLAN OF MERGER**

**by and among**

**SC HEALTH CORPORATION,**

**ROCKLEY PHOTONICS HOLDINGS LIMITED,**

**ROCKLEY MERGERSUB LIMITED,**

**and**

**ROCKLEY PHOTONICS LIMITED**

**dated as of March 19, 2021**

---

Exhibit 4
Page 440

Table of Contents

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| **ARTICLE I CERTAIN DEFINITIONS** | | A-3 |
| Section 1.1 | Definitions | A-3 |
| Section 1.2 | Construction | A-19 |
| Section 1.3 | Knowledge | A-19 |
| **ARTICLE II EXCHANGE; AGREEMENT AND PLAN OF MERGER** | | A-19 |
| Section 2.1 | Initial Exchange | A-19 |
| Section 2.2 | The Merger | A-21 |
| Section 2.3 | Effects of the Merger | A-22 |
| Section 2.4 | Closing; Merger Effective Time | A-22 |
| Section 2.5 | Closing Deliverables | A-22 |
| Section 2.6 | Governing Documents | A-23 |
| Section 2.7 | Directors and Officers | A-23 |
| Section 2.8 | Intended Tax Treatment | A-24 |
| **ARTICLE III EXCHANGE CONSIDERATION AND EFFECTS OF THE MERGER ON THE COMPANY CAPITAL STOCK, CONVERTIBLE NOTES AND EQUITY AWARDS** | | A-24 |
| Section 3.1 | Initial Exchange Consideration | A-24 |
| Section 3.2 | Conversion of Securities | A-25 |
| Section 3.3 | Exchange Procedures | A-26 |
| Section 3.4 | Treatment of Company Options and Company Restricted Stock, Company Convertible Notes and Company Warrants | A-28 |
| Section 3.5 | Withholding | A-29 |
| Section 3.6 | No Dissent Rights | A-29 |
| Section 3.7 | Register of Members | A-29 |
| Section 3.8 | SPAC Warrants | A-29 |
| **ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** | | A-29 |
| Section 4.1 | Company Organization | A-30 |
| Section 4.2 | Subsidiaries | A-30 |
| Section 4.3 | Due Authorization | A-30 |
| Section 4.4 | No Conflict | A-31 |
| Section 4.5 | Governmental Authorities; Consents | A-31 |
| Section 4.6 | Capitalization of the Company | A-31 |
| Section 4.7 | Capitalization of Subsidiaries | A-33 |
| Section 4.8 | Financial Statements | A-33 |
| Section 4.9 | Undisclosed Liabilities | A-34 |
| Section 4.10 | Litigation and Proceedings | A-34 |
| Section 4.11 | Legal Compliance | A-34 |
| Section 4.12 | Contracts; No Defaults | A-35 |
| Section 4.13 | Company Benefit Plans | A-36 |
| Section 4.14 | Labor Relations; Employees | A-38 |
| Section 4.15 | Taxes | A-39 |
| Section 4.16 | Brokers' Fees | A-42 |
| Section 4.17 | Insurance | A-42 |
| Section 4.21 | Intellectual Property | A-43 |
| Section 4.22 | Privacy and Cybersecurity | A-45 |
| Section 4.23 | Environmental Matters | A-45 |

A-i

Exhibit 4
Page 441

Table of Contents

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 4.24 | Absence of Changes | A-46 |
| Section 4.25 | Anti-Corruption and Anti-Money Laundering Compliance | A-46 |
| Section 4.26 | Sanctions and International Trade Compliance | A-46 |
| Section 4.27 | Information Supplied | A-47 |
| Section 4.28 | Customers and Suppliers | A-47 |
| Section 4.29 | Government Contracts | A-47 |
| Section 4.30 | Sufficiency of Assets | A-47 |
| Section 4.31 | No Additional Representation or Warranties | A-48 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SPAC | | A-48 |
| Section 5.1 | SPAC Organization | A-48 |
| Section 5.2 | Due Authorization | A-48 |
| Section 5.3 | No Conflict | A-49 |
| Section 5.4 | Subsidiaries | A-49 |
| Section 5.5 | Litigation and Proceedings | A-49 |
| Section 5.6 | SEC Filings | A-49 |
| Section 5.7 | Internal Controls; Listing; Financial Statements | A-50 |
| Section 5.8 | Governmental Authorities; Consents | A-50 |
| Section 5.9 | Trust Account | A-51 |
| Section 5.10 | Investment Company Act; JOBS Act | A-51 |
| Section 5.11 | Absence of Changes | A-51 |
| Section 5.12 | No Undisclosed Liabilities | A-51 |
| Section 5.13 | Capitalization of SPAC | A-52 |
| Section 5.14 | Brokers' Fees | A-53 |
| Section 5.15 | Indebtedness | A-53 |
| Section 5.16 | Taxes | A-53 |
| Section 5.17 | Business Activities | A-54 |
| Section 5.18 | NYSE Stock Market Quotation | A-54 |
| Section 5.19 | Registration Statement, Proxy Statement and Proxy Statement/Registration Statement | A-54 |
| Section 5.20 | No Outside Reliance | A-55 |
| Section 5.21 | No Additional Representation or Warranties | A-55 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES OF HOLDCO AND MERGER SUB | | A-55 |
| Section 6.1 | Corporate Organization | A-55 |
| Section 6.2 | Certificate of Incorporation and By-laws | A-56 |
| Section 6.3 | Capitalization | A-56 |
| Section 6.4 | Authority Relative to this Agreement | A-56 |
| Section 6.5 | No Conflict; Required Filings and Consents | A-57 |
| Section 6.6 | Compliance | A-57 |
| Section 6.7 | Board Approval; Vote Required | A-57 |
| Section 6.8 | No Prior Operations of HoldCo or Merger Sub; Post-Closing Operations | A-58 |
| Section 6.9 | No Indebtedness | A-58 |
| Section 6.10 | Brokers' Fees | A-58 |
| Section 6.11 | Information Supplied | A-58 |
| ARTICLE VII COVENANTS OF THE COMPANY, HOLDCO AND MERGER SUB | | A-58 |
| Section 7.1 | Conduct of Business | A-58 |
| Section 7.2 | Inspection | A-62 |

A-ii

Exhibit 4
Page 442

Table of Contents

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 7.3 | Preparation and Delivery of Additional Company Financial Statements | A-62 |
| Section 7.4 | Affiliate Agreements | A-63 |
| Section 7.5 | Acquisition Proposals | A-63 |
| Section 7.6 | Shareholder Litigation | A-63 |
| Section 7.7 | Employment Agreement Amendments | A-64 |
| Section 7.8 | Indemnification and Insurance | A-64 |
| ARTICLE VIII COVENANTS OF SPAC | | A-65 |
| Section 8.1 | Trust Account | A-65 |
| Section 8.2 | No Solicitation by SPAC | A-65 |
| Section 8.3 | SPAC Conduct of Business | A-65 |
| Section 8.4 | Inspection | A-66 |
| Section 8.5 | SPAC Public Filings | A-67 |
| Section 8.6 | Shareholder Litigation | A-67 |
| ARTICLE IX JOINT COVENANTS | | A-67 |
| Section 9.1 | Filings | A-67 |
| Section 9.2 | Preparation of Proxy Statement/Registration Statement; Shareholders' Meeting and Approvals | A-68 |
| Section 9.3 | Support of Transaction | A-71 |
| Section 9.4 | Tax Matters | A-71 |
| Section 9.5 | Section 16 Matters | A-71 |
| Section 9.6 | Cooperation; Consultation | A-71 |
| Section 9.7 | Commercially Reasonable Efforts; Further Assurances | A-72 |
| Section 9.8 | Employee Matters | A-72 |
| Section 9.9 | Post-Closing Directors and Officers of HoldCo | A-72 |
| Section 9.10 | NYSE Listing and De-Listing | A-74 |
| Section 9.11 | PIPE Subscriptions | A-74 |
| Section 9.12 | Confidentiality | A-74 |
| ARTICLE X CONDITIONS TO OBLIGATIONS | | A-75 |
| Section 10.1 | Conditions to Obligations of SPAC, HoldCo, Merger Sub, and the Company | A-75 |
| Section 10.2 | Conditions to Obligations of SPAC | A-75 |
| Section 10.3 | Conditions to the Obligations of the Company | A-77 |
| ARTICLE XI TERMINATION/EFFECTIVENESS | | A-77 |
| Section 11.1 | Termination | A-77 |
| Section 11.2 | Effect of Termination | A-78 |
| ARTICLE XII MISCELLANEOUS | | A-78 |
| Section 12.1 | Trust Account Waiver | A-78 |
| Section 12.2 | Waiver | A-79 |
| Section 12.3 | Notices | A-79 |
| Section 12.4 | Assignment | A-80 |
| Section 12.5 | Rights of Third Parties | A-80 |
| Section 12.6 | Expenses | A-80 |
| Section 12.7 | Governing Law | A-81 |
| Section 12.8 | Headings; Counterparts | A-81 |
| Section 12.9 | Company and SPAC Disclosure Letters | A-81 |

A-iii

Exhibit 4
Page 443

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 12.10 | Entire Agreement | A-81 |
| Section 12.11 | Amendments | A-81 |
| Section 12.12 | Publicity | A-81 |
| Section 12.13 | Severability | A-82 |
| Section 12.14 | Jurisdiction; Waiver of Jury Trial | A-82 |
| Section 12.15 | Enforcement | A-82 |
| Section 12.16 | Non-Recourse | A-83 |
| Section 12.17 | Non-Survival of Representations, Warranties and Covenants | A-83 |
| Section 12.18 | Conflicts and Privilege | A-83 |

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit A | Memorandum of Association of HoldCo |
| Exhibit B | Articles of Association of HoldCo |
| Exhibit C | Form of Registration Rights and Lock-Up Agreement |
| Exhibit D | Form of Plan of Merger and Director Declaration |
| Exhibit E | Form of Incentive Equity Plan |
| Exhibit F | Form of Employee Stock Purchase Plan |

A-iv

Exhibit 4
Page 444

**Table of Contents**

## BUSINESS COMBINATION AGREEMENT AND PLAN OF MERGER

This Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (this "<u>Agreement</u>"), is made and entered into by and among SC Health Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("<u>SPAC</u>"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "<u>Company</u>"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("<u>HoldCo</u>"), and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo ("<u>Merger Sub</u>").

### RECITALS

**WHEREAS**, SPAC is a blank check company incorporated as a Cayman Islands exempted company and incorporated for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses;

**WHEREAS**, each of HoldCo and Merger Sub is an entity newly formed for the purposes of the transactions proposed herein;

**WHEREAS**, upon the terms and subject to the conditions of this Agreement, SPAC, HoldCo, Merger Sub and the Company will complete a business combination transaction pursuant to which, among other things:

(a) the Company will propose a scheme of arrangement under Part 26 of the Companies Act, as either a cancellation scheme or a transfer scheme pursuant to which the Company Shareholders will transfer or cancel all their Company Ordinary Shares to HoldCo in exchange for the same number of HoldCo Ordinary Shares (the "<u>Equity Scheme</u>");

(b) the holders of Company Options will be invited to rollover their Company Options into replacement options over HoldCo Ordinary Shares;

(c) pursuant to a proposed scheme of arrangement under Part 26 of the Companies Act (i) if the Equity Scheme is structured as a cancellation scheme, the Company proposes to novate its obligations under the Scheme Convertible Notes to HoldCo and the Scheme Creditors will accept the performance by HoldCo of the Scheme Convertible Notes in place of performance by the Company and discharge the Company from further obligations under the Company Convertible Notes; the consideration for the novation shall be the issuance of an inter-company loan by the Company to HoldCo in an amount equal to the market value of the Scheme Convertible Notes; and (ii) if the Equity Scheme is structured as a transfer scheme, HoldCo proposes to acquire the Scheme Convertible Notes from each Scheme Creditor in consideration for HoldCo entering into a new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company (the "<u>Creditor Scheme</u>" and together with the Equity Scheme, the "<u>Schemes</u>");

(d) the holders of Company Warrants (except for certain Company Warrants which will be replicated at the HoldCo level in accordance with their terms) will be notified that their warrants will lapse unless exercised before the Equity Scheme becoming effective;

(e) as a result of the proposed Initial Exchange, the Company will become a direct wholly-owned subsidiary of HoldCo and following completion of the Schemes (the "<u>Initial Exchange</u>") and prior to Closing HoldCo will complete a stock split of the HoldCo Ordinary Shares at the Exchange Ratio (the "<u>Stock Split</u>"; the Stock Split together with the Initial Exchange, collectively, the "<u>Exchange</u>"); and

A-1

Exhibit 4
Page 445

**Table of Contents**

(f) following the consummation of the Exchange, Merger Sub will merge with and into SPAC, with SPAC surviving such merger as a direct wholly-owned subsidiary of HoldCo (the "Merger") and, in the context of such Merger, all SPAC Ordinary Shares (other than Excluded Shares) outstanding immediately prior to the Merger Effective Time shall be exchanged with HoldCo for the right to receive the Merger Consideration in the form of HoldCo Ordinary Shares pursuant to a share capital increase of HoldCo, as set forth in this Agreement and in accordance with the Cayman Statute;

WHEREAS, prior to the Closing, HoldCo shall adopt by the HoldCo Shareholder Approval and subsequently file the memorandum of association and the articles of association with the Cayman Registrar (in the forms attached as Exhibits A and B hereto, with such changes as may be agreed in writing by SPAC and the Company);

WHEREAS, each of the parties intends that, for United States federal income tax purposes, (i) the Transactions, taken together, qualify as a transaction described in Section 351 of the United States Internal Revenue Code of 1986, as amended (the "Code"), (ii) this Agreement constitutes a "plan of reorganization" within the meaning of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a) and (iii) the Merger constitutes a transaction treated as a "reorganization" within the meaning of Section 368(a)(2)(E) of the Code (collectively, the "Intended U.S. Tax Treatment"). Additionally, the Exchange may (subject to the facts and meeting the appropriate criteria) also constitute a transaction treated as a "reorganization" within the meaning of Section 368(a)(1)(B) of the Code;

WHEREAS, each of the parties intends that, for UK tax purposes, the Initial Exchange qualifies as a reorganisation of share capital within the meaning of Section 127 of the Taxation of Chargeable Gains Act 1982 and as a qualifying acquisition of share capital under Section 77 of the Finance Act 1986 (the "Intended UK Tax Treatment" and together with Intended U.S. Tax Treatment, the "Intended Tax Treatment");

WHEREAS, SPAC Board has unanimously (a) determined that the Merger and the other Transactions are fair to, and in the best interests of, SPAC Shareholders, (b) adopted a resolution approving this Agreement and declaring its advisability and approving the Merger and the other Transactions, and (c) subject to the terms herein, will recommend the approval and adoption of this Agreement, the Merger and the other Transactions by SPAC Shareholders;

WHEREAS, the Company Board has (i) unanimously determined that the Transactions contemplated hereby are fair and are in the best interests of the Company and the Company Shareholders, (ii) has approved this Agreement, the Schemes, the Merger and the other Transactions and (iii) will recommend that the Company Shareholders vote in favor of the Resolutions at the Court Meetings and the General Meeting;

WHEREAS, the HoldCo Board has unanimously determined that the transactions contemplated hereby are fair and are in the best interests of HoldCo and has approved this Agreement, the Schemes, the Merger and the other Transactions;

WHEREAS, the Merger Sub Board has unanimously (a) determined that this Agreement, the Merger and the other Transactions are fair to, and in the best interests of, Merger Sub and HoldCo (as the sole shareholder of Merger Sub), (b) adopted a resolution approving this Agreement and approving the Merger and the other Transactions contemplated hereby, and (c) recommended the approval and adoption of this Agreement and the Merger by HoldCo (as the sole stockholder of Merger Sub);

WHEREAS, as a condition and inducement to SPAC's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, certain of the Company Shareholders have each executed and delivered to SPAC the Company Holders Support Agreement pursuant to which such shareholders have agreed, among other things, to vote (whether pursuant to a duly convened meeting of the Company Shareholders or pursuant to an action by written consent of the Company Shareholders) in favor of the adoption and approval of this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby, including the Exchange;

A-2

Exhibit 4
Page 446

**Table of Contents**

WHEREAS, in connection with the Exchange and the Merger, the Parties desire for HoldCo to register with the SEC to become a publicly traded company;

WHEREAS, in furtherance of the Merger and in accordance with the terms hereof, SPAC shall provide an opportunity to SPAC Shareholders to have their outstanding SPAC Ordinary Shares redeemed on the terms and subject to the conditions set forth in this Agreement and SPAC's Governing Documents (as defined below) in connection with obtaining SPAC Shareholder Approval (as defined below);

WHEREAS, as a condition and inducement to the Company's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, the Sponsor has executed and delivered to the Company the SPAC Investor Support Agreement pursuant to which the Sponsor has agreed to, among other things, vote to adopt and approve this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby;

WHEREAS, on or prior to the date hereof, SPAC and HoldCo entered into Subscription Agreements with PIPE Investors (as defined below) pursuant to which, and on the terms and subject to the conditions of which, such PIPE Investors agreed to purchase HoldCo Ordinary Shares from HoldCo for an aggregate purchase price equal to the Minimum PIPE Investment Amount, such purchases to be consummated after the Exchange and immediately prior to the Merger Effective Time;

WHEREAS, at the Closing, SPAC, the Sponsor and certain former Company Shareholders shall enter into a Registration Rights and Lock-Up Agreement (the "Registration Rights and Lock-Up Agreement") in the form attached hereto as Exhibit C (with such changes as may be agreed in writing by SPAC and the Company) which shall be effective as of the Closing; and

WHEREAS, the Company shall procure that HoldCo or one of its subsidiaries and Andrew Rickman enter into an employment agreement amendment which shall incorporate the applicable key terms attached hereto as Exhibit A of the Company Disclosure Letter (the "Andrew Rickman Employment Agreement Amendment").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and intending to be legally bound hereby, SPAC, HoldCo, Merger Sub and the Company agree as follows:

**ARTICLE I**

**CERTAIN DEFINITIONS**

**Section 1.1 Definitions**. As used herein, the following terms shall have the following meanings:

"Acquisition Proposal" means, with respect to the Company and its Subsidiaries other than the transactions contemplated hereby and other than the acquisition or disposition of inventory, equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to, in a single transaction or series of related transactions: (a) any acquisition or purchase, direct or indirect, of: (i) a portion of the business of the Company and its Subsidiaries, that comprises 15% or more of their combined net revenues or net income (ii) 15% or more of the consolidated assets of the Company and its Subsidiaries, as applicable, taken as a whole (based on the fair market value thereof, as determined in good faith by the Company Board) or (iii) 15% or more of any class of equity or voting securities of (x) the Company or (y) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 15% or more of any class of equity or voting securities of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting,

A-3

Exhibit 4
Page 447

Table of Contents

individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving the sale or disposition of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries.

"Action" means any claim, action, suit, audit, examination, assessment, arbitration, mediation or inquiry, or any proceeding, investigation or enforcement action, by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, whether through one or more intermediaries or otherwise. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Affiliate Agreements" has the meaning specified in Section 4.12(a)(vi).

"Agreement" has the meaning specified in the Preamble hereto.

"Agreement End Date" has the meaning specified in Section 11.1(g).

"Ancillary Agreements" has the meaning specified in Section 12.10.

"Andrew Rickman Employment Agreement Amendment" has the meaning set forth in the Recitals.

"Anti-Bribery Laws" means the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977, as amended, and all other applicable anti-corruption and bribery Laws (including the UK Bribery Act 2010, and any rules or regulations promulgated thereunder or other Laws of other countries implementing the OECD Convention on Combating Bribery of Foreign Officials).

"Anti-Money Laundering Laws" means all applicable laws or regulations of the United Kingdom, the United States of America, the European Union and its Member States and any jurisdiction applicable to the Company or its Subsidiaries that relate to money laundering, counter-terrorist financing or record keeping and reporting requirements relating to money laundering or counter-terrorist financing.

"Antitrust Authorities" means the Antitrust Division of the United States Department of Justice, the United States Federal Trade Commission or the antitrust or competition Law authorities of any other jurisdiction (whether United States, foreign or multinational).

"Audited GAAP Financial Statements" has the meaning specified in Section 4.8(b).

"Audited IFRS Financial Statements" has the meaning specified in Section 4.8(a).

"Antitrust Information or Document Request" means any request or demand for the production, delivery or disclosure of documents or other evidence, or any request or demand for the production of witnesses for interviews or depositions or other oral or written testimony, by any Antitrust Authorities relating to the transactions contemplated hereby or by any third party challenging the transactions contemplated hereby, including any so called "second request" for additional information or documentary material or any civil investigative demand made or issued by any Antitrust Authority or any subpoena, interrogatory or deposition.

"Business Combination" has the meaning set forth in Article 1.1 of SPAC's Governing Documents as in effect on the date hereof.

Exhibit 4
Page 448

**Table of Contents**

"Business Combination Proposal" means any offer, inquiry, proposal or indication of interest (whether written or oral, binding or non-binding, and other than an offer, inquiry, proposal or indication of interest with respect to the transactions contemplated hereby), relating to a Business Combination.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, London, United Kingdom, Singapore, or Governmental Authorities in the Cayman Islands are authorized or required by Law to close.

"Capital Reduction" means the reduction of the Company's share capital under section 648 of the Companies Act provided for by the Equity Scheme, if applicable.

"Cayman Registrar" means the Registrar of Companies of the Cayman Islands under the Cayman Statute.

"Cayman Statute" means the Companies Act (Revised) of the Cayman Islands.

"CFIUS" means the Committee on Foreign Investment in the United States, or any member agency thereof acting in such capacity.

"CFIUS Approval" shall occur only when one of the following conditions has been met: (a) in response to the filing of a Notice by the parties, SPAC and the Company have received written notice from CFIUS stating that: (1) CFIUS has concluded that SPAC's Designation Right (as defined in Section 9.8 of this Agreement) is not a Covered Transaction (as defined in 31 C.F.R. § 800.213) and not subject to review under the DPA; or (2) the review and/or investigation of SPAC's Designation Right under the DPA has been concluded and there are no unresolved national security concerns; or (b) CFIUS has sent a report to the President of the United States requesting the President's decision on SPAC's Designation Right and either (1) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on SPAC's Designation Right has expired without any such action being threatened, announced or taken or (2) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on SPAC's Designation Right.

"Class B Conversion Ratio" means the ratio at which SPAC Class B Ordinary Shares are automatically convertible into SPAC Class A Ordinary Shares pursuant to article 53 of SPAC Articles of Association.

"Closing" has the meaning specified in Section 2.4(a).

"Closing Date" has the meaning specified in Section 2.4(a).

"Code" has the meaning specified in the Recitals hereto.

"Companies Act" means the UK Companies Act 2006, as amended.

"Company" has the meaning specified in the Preamble hereto.

"Company Award" shall mean a Company Option or Company Restricted Stock.

"Company Board" means the board of directors of the Company.

"Company Benefit Plan" has the meaning specified in Section 4.13(a).

"Company Convertible Note" means each outstanding unsecured convertible loan note issued by the Company set forth on Section 1.01 of the Company Disclosure Letter (collectively, the "Company Convertible Notes").

"Company Cure Period" has the meaning specified in Section 11.1(g).

A-5

Exhibit 4
Page 449

Table of Contents

"Company Disclosure Letter" has the meaning specified in the introduction to Article IV.

"Company Holders Support Agreement" means a shareholders Support Agreement, dated as of the date hereof, by and among each of the Company shareholders that are parties thereto, SPAC and the Company, as amended or modified from time to time.

"Company Incentive Plan" means the Rockley Photonics Limited 2013 Equity Incentive Plan as amended from time to time.

"Company Indemnified Parties" has the meaning specified in Section 7.8(a).

"Company IP" or "Company Intellectual Property" mean any and all Intellectual Property owned (or purported to be owned), in whole or in part, by the Company or any of its Subsidiaries and includes the Company Software and Company Registered Intellectual Property.

"Company IT Contracts" means all agreements or arrangements (whether written or unwritten and including those currently being negotiated) under which any third party provides or will provide any element of, or services relating to, the Company IT Systems, including leasing, hire purchase, licensing, maintenance, website hosting, outsourcing, security, back-up, disaster recovery, insurance, cloud computing and other types of services agreements.

"Company IT Systems" means any and all IT Systems that are owned, leased, or licensed by the Company or its Subsidiaries and used (or held for use) in or necessary for the operation of their businesses.

"Company Material Adverse Effect" means any event, state of facts, condition, change, development, circumstance, occurrence or effect (collectively, "Events") that (i) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, results of operations or financial condition of the Company and its Subsidiaries, taken as a whole or (ii) does or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impede the ability of the Company to consummate the Merger; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "Company Material Adverse Effect": (a) any change in applicable Laws or GAAP or any interpretation thereof following the date of this Agreement, (b) any change in interest rates or economic, political, business or financial market conditions generally, (c) the taking of any action required by this Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic, disease outbreak or other public health emergency (including COVID-19 or the effect of any abatement thereof, and any Permitted Action in response thereto, or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the date of this Agreement) or change in climate, (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, (f) any failure of the Company to meet any projections or forecasts (provided that clause (f) shall not prevent a determination that any Event not otherwise excluded from this definition of Company Material Adverse Effect underlying such failure to meet projections or forecasts has resulted in a Company Material Adverse Effect), (g) any Events generally applicable to the industries or markets in which the Company and its Subsidiaries operate (including increases in the cost of products, supplies, materials or other goods purchased from third party suppliers), (h) the announcement of this Agreement and consummation of the transactions contemplated hereby, (x) excluding the termination of a Contract by a customer, the termination of a Contract by a Top Supplier and/or termination of a Contract by a key employee (y) but including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any landlords, suppliers (other than any Top Suppliers), distributors, partners or employees (other than any key employees) of the Company and its Subsidiaries (it being understood that this clause (h) shall be disregarded for purposes of the representation and warranty set forth in Section 4.4 and the condition to Closing with respect thereto), (i) any matter set forth on Section 1.3 of the Company Disclosure Letter, (j) any Events to the extent actually known by

A-6

Exhibit 4
Page 450

Table of Contents

those individuals set forth on Section 1.3 of SPAC Disclosure Letter on or prior to the date hereof, or (k) any action taken by, or at the request of, SPAC; provided, further, that any Event referred to in clauses (a), (b), (d), (e) or (g) above may be taken into account in determining if a Company Material Adverse Effect has occurred to the extent it has a disproportionate and adverse effect on the business, assets, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations, but only to the extent of the incremental disproportionate effect on the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations.

"Company Option" means an option to purchase Company Ordinary Shares granted under the Company Incentive Plan.

"Company Ordinary Share" means an ordinary share in the capital of the Company with a nominal value of £0.00001 per share.

"Company Organizational Documents" means the articles of association and bylaws of Company or equivalent organizational documents, as amended, modified or supplemented from time to time.

"Company Registered Intellectual Property" has the meaning specified in Section 4.21(a).

"Company Restricted Stock" means a Company Ordinary Share that, as of immediately prior to the Exchange, is subject to a substantial risk of forfeiture, within the meaning of Section 83 of the Code and was issued pursuant to the Company Incentive Plan.

"Company Restricted Stock Unit Award" means an award of restricted stock units covering Company Ordinary Shares granted under the Company Incentive Plan.

"Company Software" means any and all Software owned (or purported to be owned), in whole or in part, by the Company or any of its Subsidiaries.

"Company Shareholders" means holders of Company Ordinary Shares.

"Company Warrants" means the warrants (including conditional warrants) of the Company to purchase Company Ordinary Shares.

"Confidentiality Agreement" has the meaning specified in Section 12.10.

"Constituent Companies" has the meaning specified in Section 2.1.

"Contracts" means any legally binding contracts, agreements, subcontracts, leases, and purchase orders.

"CTA 2010" means the United Kingdom Corporation Tax Act 2010.

"Copyleft License" means any license that requires, as a condition of use, modification and/or distribution of Software subject to such license, that such Software subject to such license, or other Software incorporated into, derived from, linked in or to, or used or distributed with such Software subject to such license (i) in the case of Software, be made available or distributed in a form other than binary (e.g., source code form), (ii) be licensed for the purpose of preparing derivative works, (iii) be licensed under terms that allow products or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than by operation of Law) or (iv) be redistributable at no license fee. Copyleft Licenses include the GNU General Public License, the GNU Lesser General Public License, the Affero General Public License, the Mozilla Public License, the Common Development and Distribution License, the Eclipse Public License, and all Creative Commons "sharealike" licenses.

A-7

Exhibit 4
Page 451

Table of Contents

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or other similar measure, in each case in connection with or in response to COVID-19 and in each case implemented or otherwise required by Law applicable to the Company and/or its Subsidiaries, including the CARES Act and Families First Act.

"Court" means the High Court of Justice in England and Wales.

"Court Meetings" means the Creditor Scheme Court Meeting and the Equity Scheme Court Meeting.

"Creditor Scheme" has the meaning specified in the Recitals hereto.

"Creditor Scheme Court Hearing" means the hearing by the Court to sanction the Creditor Scheme.

"Creditor Scheme Court Meeting" means the meeting of the relevant holders of Company Convertible Notes convened at the direction of the Court pursuant to Part 26 of the Companies Act for the purpose of considering and approving the Creditor Scheme (with or without amendment), and any adjournment thereof.

"Creditor Scheme Court Meeting Resolution" means the resolution to be proposed at the Creditor Scheme Court Meeting for the purposes of approving and implementing the Creditor Scheme.

"Creditor Scheme Circular" means a document (including any amendments or supplements thereto) to be distributed to Scheme Creditors containing (i) the Creditor Scheme, (ii) the notice or notices of the Creditor Scheme Court Meeting, (iii) an explanatory statement as required by the Companies Act with respect to the Creditor Scheme, (iv) such other information as may be required or necessary pursuant to the Companies Act, and (v) such other information as the Company and SPAC shall agree.

"D&O Indemnified Parties" has the meaning specified in Section 7.8(a).

"Disclosure Letter" means, as applicable, the Company Disclosure Letter or SPAC Disclosure Letter.

"Dollars" or "$" means lawful money of the United States.

"DPA" means Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

"Employment Agreement Amendments" has the meaning set forth in the Recitals.

"Environmental Laws" means any and all applicable Laws relating to Hazardous Materials, pollution, or the protection or management of the environment or natural resources, or protection of human health (with respect to exposure to Hazardous Materials).

"Equity Scheme" has the meaning specified in the Recitals hereto.

"Equity Scheme Court Meeting" means the meeting of Company Shareholders convened at the direction of the Court pursuant to Part 26 of the Companies Act for the purpose of considering and approving the Equity Scheme (with or without amendment), and any adjournment thereof.

"Equity Scheme Court Meeting Resolution" means the resolution to be proposed at the Equity Scheme Court Meeting for the purposes of approving and implementing the Equity Scheme.

A-8

Exhibit 4
Page 452

**Table of Contents**

"Equity Scheme Circular" means a document (including any amendments or supplements thereto) to be distributed to Company Shareholders and, for information only, to holders of Company Awards and Company Warrants containing (i) the Equity Scheme, (ii) the notice or notices of the Equity Scheme Court Meeting and General Meeting, (iii) an explanatory statement as required by the Companies Act with respect to the Equity Scheme, (iv) such other information as may be required or necessary pursuant to the Companies Act, and (v) such other information as the Company and SPAC shall agree.

"ERISA" has the meaning specified in Section 4.13(a).

"ERISA Affiliate" means any Affiliate or business, whether or not incorporated, that together with the Company would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Exchange" has the meaning specified in the Recitals hereto.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Agent" has the meaning specified in Section 3.3(a).

"Exchange Ratio" The Exchange Ratio shall be the ratio that results in the number of HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) as of immediately prior to the Merger Effective Time (the "Stock Split Ordinary Shares") being increased or decreased on a pro rata basis per Stock Split Ordinary Share such that the HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) after the Stock Split equals the number of HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) that results from dividing the Exchange Value by $10.00.

"Exchange Value" means one billion one hundred and forty eight million one hundred and fourteen thousand one hundred and thirteen dollars ($1,148,114,113).

"Excluded Shares" has the meaning specified in Section 3.2(c)

"Export Approvals" has the meaning specified in Section 4.26(a).

"Forward Purchase Agreement" means the Forward Purchase Agreement entered into as of July 11, 2019, between SPAC and SC Health Group Limited, which was filed as Exhibit 10.12 to to SPAC's Form 10-K, filed March 23, 2020.

"FPA Termination" has the meaning specified in Section 8.7.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"General Meeting" means the general meeting of Company Shareholders (and any adjournment or postponement thereof) to be convened for the purposes of considering and approving the Special Resolution required to approve among other things (and if applicable) the Capital Reduction, and certain other matters ancillary to the Schemes and their implementation to be held as soon as the preceding Court Meeting(s) shall have been concluded (it being understood that if a Court Meeting is adjourned or postponed, the General Meeting shall be correspondingly adjourned or postponed).

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a US

Exhibit 4
Page 453

**Table of Contents**

corporation are its certificate of incorporation and by-laws, the "Governing Documents" of a US limited partnership are its limited partnership agreement and certificate of limited partnership, the "Governing Documents" of a US limited liability company are its operating agreement and certificate of formation and the "Governing Documents" of an exempted company are its memorandum and articles of association and in each case analogous documents in the jurisdiction of incorporation of the relevant Person.

"Governmental Authority" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court or tribunal, including any data protection regulators or supervisory authorities.

"Governmental Authorization" has the meaning specified in Section 4.5.

"Governmental Order" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Hazardous Material" means any (i) pollutant, contaminant, chemical, (ii) industrial, solid, liquid or gaseous toxic or hazardous substance, material or waste, (iii) petroleum or any fraction or product thereof, (iv) asbestos or asbestos-containing material, (v) polychlorinated biphenyl, (vi) chlorofluorocarbons, and (vii) other substance, material or waste, in each case, which are regulated under any Environmental Law or as to which liability may be imposed pursuant to Environmental Law.

"HoldCo" has the meaning specified in the Preamble hereto.

"HoldCo Board" means the board of directors of HoldCo.

"HoldCo Board Approval" means, resolutions of the HoldCo Board approving the entry into this Agreement and the matters set out herein dated as of the date hereof.

"HoldCo Convertible Notes" means the convertible notes to be issues to the Scheme Creditors pursuant to the Creditors Scheme.

"HoldCo Ordinary Shares" means ordinary shares in the capital of HoldCo with a nominal value of $0.00001 per share.

"HoldCo Organizational Documents" means the memorandum of association and articles of association of HoldCo as amended, restated, modified or supplemented from time to time.

"HoldCo Requisite Approvals" means the HoldCo Board Approval and the HoldCo Shareholder Approval, as applicable.

"HoldCo Shareholder Approval" means a written resolution of HoldCo's sole shareholder approving the amendment and restatement of the HoldCo Organizational Documents in the forms set out in Exhibit A and Exhibit B and the matters set out in this Agreement in the form agreed with SPAC (acting reasonably).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Incentive Equity Plans" has the meaning specified in Section 9.8(a).

"IFRS" means the International Financial Reporting Standards as adopted by the European Union.

"IHTA 1984" means the United Kingdom Inheritance Tax Act 1984.

Exhibit 4
Page 454

**Table of Contents**

"Indebtedness" means with respect to any Person, without duplication, any obligations, contingent or otherwise (together with accrued and unpaid interest thereon and any prepayment premium or other penalties and any fees, costs, and expenses thereunder due upon repayment thereof), in respect of (a) the principal of and premium (if any) in respect of all indebtedness for borrowed money, including accrued interest and any per diem interest accruals or cost associated with prepaying any such indebtedness solely to the extent such indebtedness is prepaid, (b) the principal and interest components of capitalized lease obligations under GAAP, (c) amounts drawn (including any accrued and unpaid interest) on letters of credit, bank guarantees, bankers' acceptances and other similar instruments (solely to the extent such amounts have actually been drawn), (d) the principal of and premium (if any) in respect of obligations evidenced by bonds, debentures, notes, debt securities, loans, credit agreements and similar instruments, (e) payment obligations of a third party secured by (or for which the holder of such payment obligations has an existing right, contingent or otherwise, to be secured by) any Lien, other than a Permitted Lien, on assets or properties of such Person, whether or not the obligations secured thereby have been assumed, (f) the termination value of interest rate protection agreements and currency obligation swaps, hedges or similar arrangements (without duplication of other indebtedness supported or guaranteed thereby), (g) the principal component of all obligations to pay the deferred and unpaid purchase price of property and equipment which have been delivered, including "earn outs" and "seller notes" and (h) breakage costs, prepayment or early termination premiums, penalties, or other fees or expenses payable as a result of the consummation of the transactions contemplated hereby in respect of any of the items in the foregoing clauses (a) through (g), and (j) all Indebtedness of another Person referred to in clauses (a) through (h) above guaranteed directly or indirectly, jointly or severally.

"Initial Exchange" has the meaning specified in the Recitals hereto.

"Intellectual Property" means all intellectual property, including any and all rights in or to the following: (i) patents, patent applications, invention disclosures, including all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, provisionals, and extensions thereof (collectively, "Patents"); (ii) registered and unregistered trademarks, logos, service marks, certification marks, trade dress and trade names, taglines, social media identifiers and accounts, brand names, slogans, corporate names, business names, pending applications therefor, and all other indicia of source or origin, together with all goodwill symbolized by or associated with any of the foregoing and the right to sue for passing off (collectively, "Marks"); (iii) registered and unregistered copyrights, neighboring and related rights, mask work rights, design rights and all moral rights or similar attribution rights and applications for registration of copyright, including such corresponding rights in Software, and other works of authorship; (iv) know-how, trade secrets, confidential information, inventions, processes, procedures, database rights, customer lists, supplier lists, business plans, formulae, discoveries, methods, techniques, ideas, designs, models, concepts, creations, confidential business information and other proprietary information (collectively, "Trade Secrets"); (v) internet domain names and IP addresses; (vi) rights of publicity and privacy; (vii) all other intellectual property rights and other rights recognized under applicable Law that are equivalent or similar to any of the foregoing which subsist now or in the future; and (viii) applications, rights to apply for and be granted, registrations, issuances, renewals, extensions, rights to claim priority from, or equivalents or foreign equivalents or counterparts of any of the foregoing in any jurisdiction.

"Intended Tax Treatment" has the meaning specified in the Recitals hereto.

"Intended UK Tax Treatment" has the meaning specified in the Recitals hereto.

"Intended U.S. Tax Treatment" has the meaning specified in the Recitals hereto.

"Interim Period" has the meaning specified in Section 7.1.

"International Trade Laws" means all Laws relating to the import, export, re-export, deemed export, deemed re-export, or transfer of information, data, goods, and technology, including but not limited to the Export

A-11

Exhibit 4
Page 455

**Table of Contents**

Administration Regulations administered by the United States Department of Commerce, the International Traffic in Arms Regulations administered by the United States Department of State, customs and import Laws administered by United States Customs and Border Protection, any other export or import controls administered by an agency of the United States government, the anti-boycott regulations administered by the United States Department of Commerce and the United States Department of the Treasury, and other Laws adopted by Governmental Authorities of the United Kingdom and of other territories (including the European Union, as enforced by its Member States) relating to the same subject matter as the United States Laws described above.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IRS" means the United States Internal Revenue Service.

"IT Systems" mean any and all information technology systems, hardware, servers, workstations, routers, hubs, switches, data communications lines and all other information technology equipment and assets and any Software in or used in connection with any of the foregoing, including any of the foregoing that are used (or held for use) pursuant to outsourced or cloud computing arrangements.

"JOBS Act" has the meaning specified in Section 5.7(a).

"Law" means any statute, law, ordinance, rule, regulation or Governmental Order, in each case, of any Governmental Authority.

"Leased Real Property" means all real property leased, licensed, subleased or otherwise used or occupied by the Company or any of its Subsidiaries.

"Legal Proceedings" has the meaning specified in Section 4.10.

"Letter of Transmittal" has the meaning specified in Section 3.3(b).

"Licenses" means any approvals, authorizations, consents, licenses, registrations, permits or certificates of a Governmental Authority.

"Lien" means all liens, mortgages, deeds of trust, pledges, hypothecations, encumbrances, security interests, adverse claim, options, restrictions, claims or other liens of any kind whether consensual, statutory or otherwise.

"Merger" has the meaning specified in the Recitals hereto.

"Merger Consideration" has the meaning specified in Section 3.2(c)(i).

"Merger Effective Time" has the meaning specified in Section 2.4(b)

"Merger Sub" has the meaning specified in the Preamble hereto.

"Merger Sub Board" means the board of directors of Merger Sub.

"Merger Sub Share Capital" means the ordinary shares of par value $0.00001 per share in the capital of Merger Sub.

"Minimum PIPE Investment Amount" has the meaning specified in Section 5.13(d).

"Modification in Recommendation" has the meaning specified in Section 9.2(b).

"Multiemployer Plan" has the meaning specified in Section 4.13(c).

A-12

Exhibit 4
Page 456

**Table of Contents**

"NSIB" means the UK National Security and Investment Bill.

"Notice" means a notice to CFIUS filed pursuant to the DPA, including 31 C.F.R. Part 800, as appropriate, with respect to the Proposed Transaction.

"NYSE" has the meaning specified in Section 5.7(c).

"Offer Documents" has the meaning specified in Section 9.2(a)(i).

"Open Source License" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative or any Creative Commons License. "Open Source Licenses" shall include Copyleft Licenses.

"Open Source Materials" means any Software subject to an Open Source License.

"Payment Spreadsheet" means a spreadsheet that shall be delivered by the Company to SPAC pursuant to Section 3.1(a) at least two (2) Business Days prior to the Closing, which shall set forth, in accordance with the Exchange Ratio, the allocation of HoldCo Ordinary Shares post Stock Split among each of the Company Shareholders.

"PCAOB Financial Statements" has the meaning specified in Section 7.3.

"Permitted Action" means any such commercially reasonable action or inaction, whether or not in the ordinary course of business, that the Company reasonably believes is necessary or prudent for the Company or any of its Subsidiaries to take or abstain from taking, in order to carry on and preserve or protect their respective businesses, assets or properties or to protect the health or safety of natural Persons employed by the Company or any of its Subsidiaries, in each case, solely in connection with COVID-19 or any other pandemic, disease outbreak or other public health emergency, or the effect of any abatement thereof.

"Permitted Liens" means (i) mechanic's, materialmen's and similar Liens arising in the ordinary course of business with respect to any amounts (A) not yet due and payable or which are being contested in good faith through appropriate proceedings and (B) for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens for Taxes (A) not yet due and payable or (B) which are being contested in good faith through appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (iii) defects or imperfections of title, easements, encroachments, covenants, rights-of-way, conditions, matters that would be apparent from a physical inspection or current, accurate survey of such real property, restrictions and other similar charges or encumbrances that do not, in the aggregate, materially impair the value or materially interfere with the present use of the Leased Real Property, (iv) with respect to any Leased Real Property (A) the interests and rights of the respective lessors with respect thereto, including any statutory landlord liens and any Lien on the lessor's interest therein, and (B) any Liens encumbering the underlying fee title of the real property of which the Leased Real Property is a part, (v) zoning, building, entitlement and other land use and environmental regulations promulgated by any Governmental Authority that do not, in the aggregate, materially interfere with the current use of, or materially impair the value of, the Leased Real Property and which are not violated in any material respect, (vi) non-exclusive licenses of Company Intellectual Property granted to customers or distributors entered into in the ordinary course of business, (vii) ordinary course purchase money Liens and Liens securing rental payments under operating or capital lease arrangements for amounts not yet due or payable, (viii) other Liens arising in the ordinary course of business consistent with past practice and not incurred in connection with the borrowing of money or in connection with workers' compensation, unemployment insurance or other types of social security, (ix) reversionary rights in favor of landlords under any Real Property Leases with respect to any of the buildings or other improvements owned by the Company or any of its Subsidiaries, and (x) real property Liens that do not, individually or in the aggregate, result in a Company Material Adverse Effect.

A-13

Exhibit 4
Page 457

**Table of Contents**

"Permitted Withdrawal" has the meaning specified in Section 9.2(b).

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or instrumentality or other entity of any kind.

"Pillsbury" has the meaning specified in Section 12.18(b).

"PIPE Investment" means the purchase of HoldCo Ordinary Shares pursuant to the Subscription Agreements.

"PIPE Investment Amount" means the aggregate gross purchase price received by HoldCo after the Exchange and immediately prior to the Merger Effective Time for the shares in the PIPE Investment.

"PIPE Investors" means those certain investors participating in the PIPE Investment pursuant to the Subscription Agreements, including SC Health Group Limited purchasing $50,000,000 of HoldCo Ordinary Shares.

"Plan of Merger" has the meaning specified in Section 2.2.

"Prospectus" has the meaning specified in Section 12.1.

"Proxy Statement" has the meaning specified in Section 9.2(a)(i).

"Proxy Statement/Registration Statement" has the meaning specified in Section 9.2(a)(i).

"Q1 Financial Statements" has the meaning specified in Section 7.3.

"Real Property Leases" has the meaning specified in Section 4.20(a)(ii).

"Registration Rights and Lock-Up Agreement" has the meaning specified in the Recitals hereto.

"Registration Statement" means the Registration Statement on Form S-4, or other appropriate form, including any pre-effective or post-effective amendments or supplements thereto, to be filed with the SEC by SPAC under the Securities Act with respect to the Registration Statement Securities.

"Registration Statement Securities" has the meaning specified in Section 9.2(a)(i).

"Resolutions" means the Equity Scheme Court Meeting Resolution, the Creditor Scheme Court Meeting Resolution and the Special Resolution, and any other resolutions to be proposed at the General Meeting.

"Rockley Group" has the meaning specified in Section 12.18(b).

"Rollover Spreadsheet" means a spreadsheet that shall be delivered by the Company to SPAC for SPAC's reasonable review and comment pursuant to Section 3.1(c), which shall set forth (a) the number of HoldCo Ordinary Shares for which each Company Option is exercisable after the replacement of such Company Option with a HoldCo Option in accordance with Section 3.4(a) (b) the holder thereof and (c) the applicable exercise prices of each Company Option and each HoldCo Option, (ii) the number of HoldCo Restricted Shares to be received by each holder upon replacement of the Company Restricted Stock in accordance with Section 3.4(b), and (iii) in respect of any Company Warrants that have been replaced by equivalent warrants issued by HoldCo pursuant to Section 3.4(a), the number of HoldCo Ordinary Shares upon exercise and the applicable exercise price.

"Ropes" has the meaning specified in Section 4.6(a).

A-14

Exhibit 4
Page 458

**Table of Contents**

"Sanctioned Country" means, a country or territory which is itself the subject or target of any country-wide or territory-wide Sanctions Laws (at the time of this Agreement, the Crimea region, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means (i) any Person identified in any sanctions-related list of designated Persons maintained by (a) the United States Department of the Treasury's Office of Foreign Assets Control, the United States Department of Commerce, Bureau of Industry and Security, or the United States Department of State; (b) Her Majesty's Treasury of the United Kingdom; (c) any committee of the United Nations Security Council; or (d) the European Union; (ii) any Person located, organized, or resident in, or a Governmental Authority or government instrumentality of, any Sanctioned Country; and (iii) any Person directly or indirectly 50% or more owned by, or acting for the benefit or on behalf of, a Person described in clause (i) or (ii), either individually or in the aggregate.

"Sanctions Laws" means those trade, economic and financial sanctions Laws administered, enacted or enforced by (i) the United States (including the Department of the Treasury's Office of Foreign Assets Control), (ii) the European Union and enforced by its Member States, (iii) the United Nations, or (iv) Her Majesty's Treasury of the United Kingdom.

"Sarbanes-Oxley Act" means the Sarbanes-Oxley Act of 2002.

"Schemes" has the meaning specified in the Recitals hereto.

"Scheme Convertible Notes" means the Company Convertible Notes subject to the Creditor Scheme.

"Scheme Creditors" means such of the holders of Company Convertible Notes as the Company and SPAC determine jointly shall be subject to the Creditor Scheme subject to their convertible notes not having been either repaid in full or already converted into Company Ordinary Shares.

"**Scheme Consideration**" means the HoldCo Ordinary Shares to be issued to the Company Shareholders as consideration pursuant to the Equity Scheme.

"Scheme Documents" means the Equity Scheme Circular and the Creditor Scheme Circular.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Software" means any and all (a) computer programs, including any and all algorithms, models and methodologies, whether in source code, object code, human readable form or other form, including compilers, middleware, tools, firmware, operating systems, specifications, platforms, algorithms, interfaces, APIs, architecture, modules, test specifications, scripts, executables, libraries, and other components thereof, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (c) all versions, updates, releases, patches, corrections, enhancements and modifications thereto and all documentation including developer notes, instructions, comments, annotations, user manuals and other training documentation relating to any of the foregoing.

"SPAC" has the meaning specified in the Preamble hereto.

"SPAC Articles of Association" means the Amended and Restated Articles of Association of SPAC adopted by special resolution on July 15, 2019.

"SPAC Board" means the board of directors of SPAC.

Exhibit 4
Page 459

**Table of Contents**

"SPAC Class A Ordinary Shares" means Class A ordinary shares, par value $0.0001 per share, of SPAC.

"SPAC Class B Ordinary Share" means Class B ordinary shares, par value $0.00008 per share, of SPAC.

"SPAC Cure Period" has the meaning specified in Section 11.1(h).

"SPAC Disclosure Letter" has the meaning specified in the introduction to Article V.

"SPAC Extension" means the approval of SPAC shareholders by special resolution to extend the deadline in the articles of association of SPAC for SPAC to complete an initial business combination to 16 August 2021 (and any further extension).

"SPAC Forward Purchase Warrant" means the Forward Purchase Warrants (as such term is defined in the Warrant Agreement).

"SPAC Forward Purchase Shares" means the Forward Purchase Shares (as such term is defined in the Forward Purchase Agreement).

"SPAC Financial Statements" has the meaning specified in Section 5.7(d).

"SPAC Group" has the meaning specified in Section 12.18(a).

"SPAC Indemnified Parties" has the meaning specified in Section 7.8(a).

"SPAC Memorandum of Association" means the Amended and Restated Memorandum of Association of SPAC adopted by special resolution on July 15, 2019.

"SPAC Ordinary Shares" means SPAC Class A Ordinary Shares and SPAC Class B Ordinary Shares.

"SPAC Ordinary Warrant" means a warrant to purchase one (1) SPAC Class A Ordinary Share at an exercise price of eleven Dollars fifty cents ($11.50) that was included in the units sold as part of SPAC's initial public offering.

"SPAC Organizational Documents" means SPAC Memorandum of Association, SPAC Articles of Association, and the Trust Agreement, in each case as amended, modified, restated or supplemented from time to time.

"SPAC Private Placement Warrant" means a warrant to purchase one (1) SPAC Class A Ordinary Share at an exercise price of eleven Dollars fifty cents ($11.50) issued to the Sponsor.

"SPAC SEC Filings" has the meaning specified in Section 5.6.

"SPAC Securities" has the meaning specified in Section 5.13(a).

"SPAC Share Redemption" means the election of an eligible (as determined in accordance with SPAC's Governing Documents) holder of SPAC Class A Ordinary Shares to redeem all or a portion of SPAC Class A Ordinary Shares held by such holder at a per-share price, payable in cash, equal to a pro rata share of the aggregate amount on deposit in the Trust Account (including any interest earned on the funds held in the Trust Account) (as determined in accordance with SPAC's Governing Documents) in connection with the Transaction Proposals.

"SPAC Share Redemption Amount" means the aggregate amount payable with respect to all SPAC Share Redemptions.

A-16

Exhibit 4
Page 460

Table of Contents

"SPAC Shareholder Approval" means the approval of those Transaction Proposals identified in Section 9.2(b), in each case, by an affirmative vote of the holders of at least two-thirds of SPAC Ordinary Shares who, being entitled to, attend and vote thereupon (as determined in accordance with SPAC's Governing Documents) at a shareholders' meeting duly called by SPAC Board and held for such purpose.

"SPAC Shareholders" means the shareholders of SPAC as of immediately prior to the Merger Effective Time.

"SPAC Shareholders' Meeting" has the meaning specified in Section 9.2(b).

"SPAC Investor Support Agreement" means that certain Support Agreement, dated as of the date hereof, by and among the Sponsor, HoldCo and the Company, as amended or modified from time to time.

"SPAC Warrants" means SPAC Ordinary Warrants and SPAC Private Placement Warrants.

"Special Resolution" means the resolution of the Company, among other things, necessary to implement the Equity Scheme.

"Sponsor" means SC Health Holdings Limited, a Cayman Islands exempted company limited by shares.

"Stock Split" has the meaning specified in the Recitals hereto.

"Subscription Agreements" means the subscription agreements pursuant to which the PIPE Investment will be consummated.

"Subsidiary" means, with respect to a Person, a corporation or other entity of which more than 50% of the voting power of the equity securities or equity interests is owned, directly or indirectly, by such Person.

"Surviving Company" has the meaning specified in Section 2.2(b).

"Tax Return" means any return, declaration, report, statement, information statement or other document filed or required to be filed with any Governmental Authority with respect to Taxes, including any claims for refunds of Taxes, any information returns and any schedules, attachments, amendments or supplements of any of the foregoing.

"Taxes" means any and all federal, state, local, foreign or other taxes imposed by any Governmental Authority, including all income, gross receipts, license, payroll, net worth, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, escheat, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, employment, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, governmental charges, duties, levies and other similar charges imposed by a Governmental Authority in the nature of a tax, alternative or add-on minimum, or estimated taxes, and including any interest, penalty, or addition thereto.

"Terminating Company Breach" has the meaning specified in Section 11.1(g).

"Terminating SPAC Breach" has the meaning specified in Section 11.1(h).

"Title IV Plan" has the meaning specified in Section 4.13(c).

"Top Customers" has the meaning specified in Section 4.28(a).

"Top Suppliers" has the meaning specified in Section 4.28(a).

A-17

Exhibit 4
Page 461

**Table of Contents**

"Transactions" means the transactions contemplated by the Transaction Documents, including the Initial Exchange, Exchange, the transactions related to the Exchange, the PIPE Investment and the Merger.

"Transaction Documents" means this Agreement, including all schedules and exhibits hereto, the Company Disclosure Letter, the Ancillary Agreements, and all other agreements, certificates and instruments executed and delivered by SPAC, HoldCo, Merger Sub or the Company in connection with the transactions and specifically contemplated by this Agreement.

"Transaction Expenses" means the following out-of-pocket fees and expenses paid or payable by the Company or any of its Subsidiaries (whether or not billed or accrued for) as a result of or in connection with the negotiation, documentation and consummation of the transactions contemplated hereby: (i) all fees, costs, expenses, brokerage fees, commissions, finders' fees and disbursements of financial advisors, investment banks, data room administrators, attorneys, accountants and other advisors and service providers, (ii) change-in-control payments, transaction bonuses, retention payments, severance or similar compensatory payments payable by the Company or any of its Subsidiaries to any current or former employee (including any amounts due under any consulting agreement with any such former employee), independent contractor, officer, or director of the Company or any of its Subsidiaries as a result of the transactions contemplated hereby (and not tied to any subsequent event or condition, such as a termination of employment), including the employer portion of payroll Taxes arising therefrom, (iii) Transfer Taxes, (iv) any and all filing fees payable by the Company or any of its Subsidiaries to the Antitrust Authorities in connection with the transactions contemplated hereby, and (v) amounts owing or that may become owed, payable or otherwise due, directly or indirectly, by the Company or any of its Subsidiaries to any Affiliate of the Company or any of its Subsidiaries in connection with the consummation of the transactions contemplated hereby, including fees, costs and expenses related to the termination of any Affiliate Agreement.

"Transaction Proposals" has the meaning specified in Section 9.2(b).

"Transfer Taxes" has the meaning specified in Section 9.4.

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"Treasury Share" has the meaning specified in Section 3.2(a).

"Trust Account" has the meaning specified in Section 12.1.

"Trust Agreement" has the meaning specified in Section 5.9.

"Trustee" has the meaning specified in Section 5.9.

"Unpaid Transaction Expenses" has the meaning specified in Section 2.5(c).

"VAT" means: (a) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and (b) any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"Warrant Agreement" means the Warrant Agreement, dated as of July 11, 2019, between SPAC, Sponsor and American Stock Transfer & Trust Company.

"Working Capital Loans" means any loan made to SPAC by any of the Sponsor, an Affiliate of the Sponsor, or any of SPAC's officers or directors, and evidenced by a promissory note, for the purpose of financing costs incurred in connection with a Business Combination.

"Written Consent" has the meaning specified in Section 9.2(c).

A-18

Exhibit 4
Page 462

**Table of Contents**

**Section 1.2 Construction.**

(a) Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation" and (vi) the word "or" shall be disjunctive but not exclusive.

(b) Unless the context of this Agreement otherwise requires, references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

(d) All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(e) The term "actual fraud" means, with respect to a party to this Agreement, an actual and intentional fraud with respect to the making of the representations and warranties pursuant to Article IV, Article V, or Article VI (as applicable), provided, that such actual and intentional fraud of such Person shall only be deemed to exist if any of the individuals included on Section 1.3 of the Company Disclosure Letter (in the case of the Company, HoldCo and Merger Sub) or Section 1.3 of SPAC Disclosure Letter (in the case of SPAC) had actual knowledge (as opposed to imputed or constructive knowledge) that the representations and warranties made by such Person pursuant to, in the case of the Company, Article IV as qualified by the Company Disclosure Letter, or, in the case of SPAC, Article V as qualified by SPAC Disclosure Letter, or, in case of the Merger Sub or HoldCo, Article VI were actually breached when made, with the express intention that the other party to this Agreement rely thereon to its detriment.

**Section 1.3 Knowledge**. As used herein, (i) the phrase "to the knowledge" of the Company shall mean the knowledge of the individuals identified on Section 1.3 of the Company Disclosure Letter and (ii) the phrase "to the knowledge" of SPAC shall mean the knowledge of the individuals identified on Section 1.3 of SPAC Disclosure Letter, in each case, as such individuals would have acquired in the exercise of a reasonable inquiry of direct reports.

**ARTICLE II**

**EXCHANGE; AGREEMENT AND PLAN OF MERGER**

**Section 2.1 Initial Exchange.**

(a) The Initial Exchange shall take place through the Equity Scheme and the Creditor Scheme, an overview of which is set out in **Schedule A** attached hereto**.** Save where the SPAC and the Company agree otherwise by April 2, 2021 that the alternatives set out in Schedule A shall be adopted, the Equity Scheme will be implemented by way of a transfer scheme of arrangement under Part 26 of the Companies Act.

(b) The Company shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) be responsible for the preparation of the Scheme Documents and all other documentation necessary to effect the Schemes and to convene the Court Meetings and the General Meeting, with all such documentation (including the Scheme Documents) to be agreed by the Company with SPAC (acting reasonably);

(ii) for the purpose of implementing the Schemes, shall provide SPAC with the opportunity to attend any meetings with the barrister instructed by the Company in connection with the Schemes to discuss matters pertaining to the Schemes, and any issues arising in connection with them;

A-19

Exhibit 4
Page 463

**Table of Contents**

(iii) as promptly as reasonably practicable after the date of this Agreement make all necessary applications to the Court in connection with the implementation of the Schemes, including issuing appropriate proceedings requesting the Court to give directions as to what are the appropriate meetings to be held and to order that the Court Meetings be convened as promptly as is reasonably practicable following the date of this Agreement, and to use its reasonable best efforts to ensure that the hearing of such proceedings occurs as promptly as is reasonably practicable in order to facilitate the despatch of the Scheme Documents and seek such directions of the Court as it considers necessary or desirable in connection with such Court Meetings and thereafter comply with such directions;

(iv) procure the publication of the requisite advertisements and despatch of the Scheme Documents (and the related forms of proxy for the use at the Court Meetings and the General Meeting (the form of which shall be agreed between the Company and SPAC, each acting reasonably) as promptly as reasonably practicable after securing approval of the Court to despatch such documents, and thereafter shall publish and/or post such other documents and information (the form of which shall be agreed between the Company and SPAC, each acting reasonably) as the Court may approve or direct from time to time;

(v) prior to the Court Meetings, keep SPAC reasonably informed on a reasonably current basis of the number of proxy votes received in respect of resolutions to be proposed at the Court Meetings and/or the General Meeting, and in any event provide such number promptly upon the request of SPAC and use reasonable best efforts to solicit proxies as may be necessary to pass the Resolutions at the Court Meetings and/or the General Meeting;

(vi) hold the Court Meetings and the General Meeting on the relevant dates set out in the Scheme Documents, or such later date as may be agreed in writing by the Company and SPAC (such agreement not to be unreasonably withheld, conditioned or delayed), and in such a manner as shall be approved, if necessary by the Court, and propose the Resolutions in the form agreed to in writing by SPAC, such agreement not to be unreasonably withheld, conditioned or delayed;

(vii) shall procure that a special resolution be proposed to the Company Shareholders at the General Meeting proposing that the Company Articles of Association be amended so that any Company Shares allotted following the General Meeting will either be subject to the terms of the Equity Scheme or acquired by HoldCo for the same Scheme Consideration as shall be payable to Company Shareholders under the Equity Scheme (depending upon the timing of such allotment);

(viii) following the Court Meetings and the General Meeting, assuming the Resolutions are duly passed (including by the requisite majorities required under the Companies Act in the case of the Court Meetings) and all other conditions of the Schemes are satisfied or with the prior consent of SPAC, waived (where permissible under the Scheme Documents) take all necessary steps on the part of the Company to prepare and issue, serve and lodge all such court documents as are required to seek the sanction of the Court to the Schemes as soon as possible thereafter; provided, that, if the Creditor Scheme Court Meeting Resolution is not duly passed and/or any other conditions of the Creditor Scheme are not satisfied or waived, the Company shall take all necessary steps on the part of the Company to prepare and issue, serve and lodge all such court documents as are required to seek the sanction of the Court to the Equity Scheme as soon as possible thereafter;

(ix) if the Company becomes aware of any information that, pursuant to the Act, should be disclosed in an amendment or supplement to the Scheme Documents then on becoming so aware shall promptly inform SPAC and the Company and SPAC shall cooperate with each other in submitting or filing such amendment or supplement with the Court and, if required, in mailing such amendment to the Company Shareholders or Company Convertible Notes participating in the Creditor Scheme, as applicable;

(c) HoldCo shall, unless this Agreement has been validly terminated pursuant to Section 11.1 provide a written undertaking to the Court to be bound by the terms of the Equity Scheme and the Creditor Scheme insofar as it relates to HoldCo;

A-20

Exhibit 4
Page 464

**Table of Contents**

(d) Both the Company and HoldCo shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) keep SPAC reasonably informed as to the performance of the obligations and responsibilities required of them pursuant to the Schemes;

(ii) agree with SPAC the content and form or all pleadings, affidavits, petitions and other filings prepared by them for submission to the Court in connection with the Schemes prior to their filing; and

(iii) give such undertakings as are required by the Court in connection with the Schemes as are reasonably necessary to implement the Schemes.

(e) SPAC shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) assume responsibility for the information relating to it contained in the Equity Scheme Circular and the Creditor Scheme Circular or filed with the Court or in any announcement, in each case unless provided for inclusion by or on behalf of the Company; and

(ii) review and provide comments (if any) in a reasonably timely manner on all documentation submitted to it by the Company.

(f) At the closing of the Initial Exchange and implementation of the Schemes, it is proposed that:

(i) the Company Ordinary Shares held by Company Shareholders will provided the Equity Scheme has become effective:

(A) if a cancellation scheme is used: be cancelled and following such cancellation the issued share capital of the Company will be restored to its former amount by the application of the credit arising on the balance sheet of the Company in paying up in full, at par, shares of an equivalent nominal value, which will be issued by the Company to HoldCo; or

(B) if a transfer scheme is used: be transferred to HoldCo,

in both cases, in consideration HoldCo shall allot and issue to each of the Company Shareholders one (1) HoldCo Ordinary Share for each Company Ordinary Share that they have cancelled or transferred; and

(ii) the Scheme Convertible Notes held by the Scheme Creditors will provided the Creditor Scheme has become effective:

(A) if a cancellation scheme has been used for the Company Ordinary Shares: the Company proposes to novate its obligations under the Convertible Loan Notes to HoldCo and the Scheme Creditors will accept the performance by HoldCo of the Convertible Loan Notes in place of performance by the Company and discharge HoldCo from further obligations under the Convertible Loan Notes; or

(B) if a transfer scheme is used: HoldCo proposes to acquire the Scheme Convertible Loan Notes from each Scheme Creditor in consideration of HoldCo entering into new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Loan Notes will be amended to a form of inter-company loan between HoldCo and the Company.

(g) Immediately prior to the Merger Effective Time, SPAC and HoldCo shall consummate (i) the Stock Split and (ii) the transactions contemplated by the PIPE Investment, including the issuance of HoldCo Ordinary Shares contemplated thereby.

**Section 2.2 The Merger.**

(a) Upon the terms and subject to the conditions set forth in this Agreement, and immediately following the consummation of the PIPE Investment, Merger Sub shall be merged with and into SPAC (Merger Sub and SPAC sometimes being referred to herein as the "Constituent Companies"), with SPAC being the surviving company in

A-21

Exhibit 4
Page 465

**Table of Contents**

the Merger. The Merger shall be consummated in accordance with this Agreement and a plan of merger with respect to the Merger in accordance with the relevant provisions of the Cayman Statute in a form substantially the same as that attached at Exhibit D (with any changes to be reasonably agreed by or on behalf of the Company and SPAC) (the "Plan of Merger"), executed by the Constituent Companies and filed (together with the required supporting declarations of a director of each Constituent Company) with the Cayman Registrar in accordance with the relevant provisions of the Cayman Statute. The consummation of the Exchange shall be a condition precedent to the consummation of the Merger.

(b) Upon consummation of the Merger, the separate corporate existence of Merger Sub shall cease and SPAC, as the surviving company of the Merger (hereinafter referred to for the periods at and after the Merger Effective Time as the "Surviving Company"), shall continue its corporate existence under the Cayman Statute, as a wholly owned subsidiary of HoldCo.

**Section 2.3 Effects of the Merger**. At and after the Merger Effective Time, the Surviving Company shall thereupon and thereafter possess all of the rights, privileges, powers and franchises, of a public as well as a private nature, of the Constituent Companies, and shall become subject to all the restrictions, disabilities and duties of each of the Constituent Companies; and all rights, privileges, powers and franchises of each Constituent Company, and all property, real, personal and mixed, and all debts due to each such Constituent Company, on whatever account, shall become vested in the Surviving Company; and all property, rights, privileges, powers and franchises, and all and every other interest shall become thereafter the property of the Surviving Company as they are of the Constituent Companies; all of the foregoing in accordance with the applicable provisions of the Cayman Statute.

**Section 2.4 Closing; Merger Effective Time.**

(a) In accordance with the terms and subject to the conditions of this Agreement, the closing of the Merger (the "Closing") shall take place at the offices of Pillsbury Winthrop Shaw Pittman, LLP, 31 West 52nd Street, New York, New York 10019, at 10:00 a.m. (New York time) on the date which is two (2) Business Days after the first date on which all conditions set forth in Article X shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such other time and place as SPAC and the Company may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date".

(b) Subject to the satisfaction or waiver of all of the conditions set forth in Article X of this Agreement, and provided this Agreement has not theretofore been terminated pursuant to its terms, SPAC, Merger Sub, and the Company shall cause the Plan of Merger to be executed and duly submitted for filing with the Cayman Registrar in accordance with the applicable provisions of the Cayman Statute, together with the required declaration from a director of each Constituent Company in substantially the form attached at Exhibit D (with such changes requested to reflect the facts as apply at that time). The Merger shall become effective at the time when the Plan of Merger is registered by the Cayman Registrar, or at such later time as may be agreed by SPAC and the Company in writing and specified in the Plan of Merger (the "Merger Effective Time").

(c) For the avoidance of doubt, the Closing and the Merger Effective Time shall occur after the Equity Scheme becoming effective.

**Section 2.5 Closing Deliverables.**

(a) At the Closing, the Company, HoldCo and Merger Sub will deliver or cause to be delivered:

(i) to SPAC, a certificate signed by an officer of the Company, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 10.2(a), Section 10.2(b) and Section 10.2(c) have been fulfilled;

(ii) to SPAC, the Registration Rights and Lock-Up Agreement, duly executed by the Company Shareholders that are parties thereto and HoldCo;

Exhibit 4
Page 466

**Table of Contents**

(iii) to SPAC, a certificate on behalf of the Company dated no more than thirty (30) days prior to the Closing Date, prepared in a manner consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(g), (h) and 1.1445-2(c)(3), certifying that no interest in the Company is, or has been during the relevant period specified in Section 897(c)(1)(A)(ii) of the Code, a "U.S. real property interest" within the meaning of Section 897(c) of the Code, and a form of notice to the Internal Revenue Service prepared in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2); and

(iv) to SPAC, the Andrew Rickman Employment Agreement Amendment, duly executed by each of HoldCo (or one of its Subsidiaries) and Andrew Rickman;

(b) At the Closing, SPAC will deliver or cause to be delivered:

(i) to the Company, a certificate signed by an officer of SPAC, dated the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 10.3(a), Section 10.3(b) and Section 10.3(c) have been fulfilled; and

(ii) to the Company, the Registration Rights and Lock-Up Agreement, duly executed by duly authorized representatives of SPAC and the Sponsor.

(c) On the Closing Date, concurrently with the Merger Effective Time, the Surviving Company shall pay or cause to be paid by wire transfer of immediately available funds, (i) all accrued transaction expenses of SPAC (which shall include any outstanding amounts under any Working Capital Loans) as set forth on a written statement to be delivered to the Company not less than two (2) Business Days prior to the Closing Date and (ii) all accrued and unpaid Transaction Expenses ("Unpaid Transaction Expenses") as set forth on a written statement to be delivered to SPAC by or on behalf of the Company not less than two (2) Business Days prior to the Closing Date, which shall include the respective amounts and wire transfer instructions for the payment thereof, together with corresponding invoices for the foregoing; provided, that any Unpaid Transaction Expenses due to current or former employees, independent contractors, officers, or directors of the Company or any of its Subsidiaries shall be paid to the Company for further payment to such employee, independent contractor, officer or director through the Company's payroll.

(d) **Frustration of Closing Conditions.** None of the Company, HoldCo or SPAC may rely on the failure of any condition set forth in this Section 2.5 to be satisfied if such failure was caused by such Party's failure to comply with its obligation under this Agreement.

**Section 2.6 Governing Documents.**

(a) The memorandum of association and the articles of association of the Merger Sub in effect immediately prior to the Merger Effective Time, shall be the memorandum of association and the articles of association of the Surviving Company until thereafter amended as provided therein and under the Cayman Statute, except that the name of the Surviving Company shall be Rockley Photonics Cayman Limited.

(b) The memorandum of association and the articles of association of HoldCo as of immediately prior to the Closing Date (which shall be in the form attached as Exhibits A and B hereto (with such changes as may be agreed in writing by SPAC and the Company)), shall be the memorandum of association and the articles of association of HoldCo from and after the Effective Time, until thereafter amended as provided therein and under the Cayman Statute.

**Section 2.7 Directors and Officers.**

(a) The parties shall cause the initial directors of the Company and the initial officers of the Company on the Merger Effective Time to be comprised of the individuals set forth on Exhibit B of the Company Disclosure Letter, each to hold office in accordance with the Company Organizational Documents.

(b) At the Merger Effective Time, subject to CFIUS Approval, if applicable, the parties shall cause (including by obtaining the HoldCo Requisite Approvals) the initial directors of HoldCo and the initial officers of

A-23

Exhibit 4
Page 467

**Table of Contents**

HoldCo as of immediately following the Merger Effective Time to be comprised of the individuals set forth on Exhibit C of the Company Disclosure Letter, each to hold office in accordance with the HoldCo Organizational Documents.

(c) The parties shall cause the initial directors of the Surviving Company and the officers of Surviving Company as of immediately following the Merger Effective Time to be comprised of the individuals set forth on Exhibit D of the Company Disclosure Letter, each to hold office in accordance with the memorandum and articles of association of the Surviving Company.

**Section 2.8 Tax Matters**

(a) The parties intend that, for United States federal income tax purposes, the Transactions qualify for the Intended U.S. Tax Treatment and this Agreement is hereby adopted as, a plan of reorganization for purposes of Sections 354, 361 and the 368 of the Code and within the meaning of Treasury Regulations Section 1.368-2(g). For U.S. federal income tax purposes, each of SPAC, HoldCo, the Company and Merger Sub, (i) is classified as an association taxable as a corporation as of the date hereof, and (ii) shall, unless the Company and the Sponsor agree otherwise, maintain such classification until at least two business days after the Closing Date. The Transactions shall be reported by the parties for all applicable Tax purposes in accordance with the foregoing, unless otherwise required by a Governmental Authority as a result of a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of applicable state, local or non-U.S. Tax Law) or a change in applicable Law after the date hereof.

(b) The parties intend that, for UK tax purposes, the Transactions qualify for the Intended UK Tax treatment. Clearance applications have been submitted to HM Revenue & Customs seeking confirmation that the Board of HM Revenue & Customs are satisfied that Section 137 of the Taxation of Chargeable Gains Act 1992 shall not apply to the Transactions. Clearance has also been sought to confirm that the Equity Scheme (if executed as a transfer scheme) shall qualify for reconstruction relief from stamp duty under Section 77 of the Finance Act 1986.

(c) None of the parties knows of any fact or circumstance (without conducting independent inquiry or diligence of the other relevant party), or has knowingly taken or will knowingly take any action (excluding any action contemplated by this Agreement), if such fact, circumstance or action would be reasonably expected to cause the Transactions to fail to qualify for the Intended Tax Treatment. Each of the parties agrees to use reasonable best efforts to promptly notify all other parties of any challenge to the Intended Tax Treatment by any Governmental Authority. The parties shall reasonably cooperate in good faith with each other and their respective counsel to document and support the Tax treatment of the Transactions consistent with the Intended Tax Treatment, including providing reasonable and customary factual support letters. Further, each of the parties shall (and shall cause their respective Affiliates to) cooperate fully, as and to the extent reasonably requested by another party, in connection with the filing of relevant Tax Returns, and any audit or tax proceeding. Such cooperation may include the retention and (upon the other party's request) the provision (with the right to make copies) of records and information reasonably relevant to any tax proceeding or audit, making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

**ARTICLE III**

**EXCHANGE CONSIDERATION AND EFFECTS OF THE MERGER ON THE COMPANY CAPITAL STOCK, CONVERTIBLE NOTES AND EQUITY AWARDS**

**Section 3.1 Initial Exchange Consideration**.

(a) The new HoldCo Ordinary Shares following the Equity Scheme will be held in the same proportions as the Company Ordinary Shares were held in the Company prior to the Equity Scheme .

A-24

Exhibit 4
Page 468