Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

subject to forfeiture to the extent that the underwriters' over-allotment option was not exercised in full or in part, so that the initial shareholders would own, on an as-converted basis, 20% of the Company's issued and outstanding shares after the Initial Public Offering (assuming no purchase by the initial shareholders of any Public Shares in the Initial Public Offering). As a result of the underwriters' election to fully exercise their over-allotment option, 562,500 Founder Shares are no longer subject to forfeiture.

The Founder Shares will automatically convert into Class A ordinary shares upon consummation of a Business Combination on a one-for-one basis, subject to adjustments as described in Note 6.

The initial shareholders have agreed, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier of (i) one year after the completion of the Company's Business Combination or (ii) the date on which the Company completes a liquidation, merger, share exchange or other similar transaction after the Company's Business Combination that results in all of the Company's shareholders having the right to exchange their Class A ordinary shares for cash, securities or other property. Notwithstanding the foregoing, if the closing price of the Company's Class A ordinary shares equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Company's Business Combination, the Founder Shares will be released from the lock-up.

**Private Placement**

Simultaneously with the closing of the Initial Public Offering, the Sponsor purchased an aggregate of 5,000,000 Private Placement Warrants at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $5,000,000. On August 2, 2019, in connection with the underwriters' exercise of the over-allotment option in full, the Company sold an additional 450,000 Private Placement Warrants at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $450,000. Each Private Placement Warrant is exercisable to purchase one Class A ordinary share at a price of $11.50 per share. A portion of the proceeds from the Private Placement Warrants were added to the proceeds from the Initial Public Offering held in the Trust Account. If the Company does not complete a Business Combination within the Combination Period, the proceeds of the sale of the Private Placement Warrants will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law), and the Private Placement Warrants and all underlying securities will expire worthless. At the date of the IPO, the fair value of the Private Placement Warrants was $0.62. The difference between the purchase price of $1 and the fair value at the IPO date of $0.62 was recorded within equity as a contribution in excess of the fair value of the Private Placement Warrants.

**Administrative Support Agreement**

The Company entered into an agreement whereby, commencing on July 16, 2019 and continuing through the earlier of the Company's consummation of a Business Combination and its liquidation, the Company will pay an affiliate of the Sponsor a total of $10,000 per month for office space, secretarial and administrative support. For the three months ended March 31, 2021, the Company incurred $30,000 in fees for these services, respectively. As of March 31, 2021 and December 31, 2020, $10,000 and $10,000 of such fees, respectively, are included in accounts payable and accrued expenses in the accompanying condensed interim balance sheets.

**Advance from Related Party**

The Sponsor advanced the Company an aggregate of $32,313 to cover expenses related to the Initial Public Offering. The advances were non-interest bearing and due on demand. In January 2019, the advances were converted into a promissory note issued to the Sponsor (see below).

F-105

Exhibit 6
Page 1282

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

**Promissory Note – Related Party**

In January 2019, the Company issued an unsecured promissory note (the "Promissory Note") to the Sponsor, pursuant to which the Company could borrow up to an aggregate principal amount of $300,000. The Promissory Note was non-interest bearing and payable on the earlier of December 31, 2019 or the completion of the Initial Public Offering. In January 2019, the Company transferred its outstanding advance from a related party in the amount of $32,313 into the Promissory Note. The outstanding balance of $254,595 under the Promissory Note was repaid as of December 31, 2019. Additionally, on December 30, 2020, the Sponsor deposited $100,000 into the operating bank account of the Company for working capital. An additional $50,000 and $35,000 was deposited into the operating bank statement form the Sponsor on March 22, 2021 and March 31, 2021, respectively. As of March 31, 2021, $185,000 in promissory notes from the Sponsor is outstanding.

**Related Party Loans**

In order to finance transaction costs in connection with a Business Combination, the Sponsor or an affiliate of the Sponsor may, but is not obligated to, loan the Company funds as may be required ("Working Capital Loans"). If the Company completes a Business Combination, the Company would repay the Working Capital Loans out of the proceeds of the Trust Account released to the Company. Otherwise, the Working Capital Loans would be repaid only out of funds held outside the Trust Account. In the event that a Business Combination does not close, the Company may use a portion of proceeds held outside the Trust Account to repay the Working Capital Loans but no proceeds held in the Trust Account would be used to repay the Working Capital Loans. Except for the foregoing, the terms of such Working Capital Loans, if any, have not been determined and no written agreements exist with respect to such loans. The Working Capital Loans would either be repaid upon consummation of a Business Combination or, at the lender's discretion, up to $2,000,000 of such Working Capital Loans may be convertible into warrants of the post Business Combination entity at a price of $1.00 per warrant. The warrants would be identical to the Private Placement Warrants. As of March 31, 2021, no amounts were borrowed under the Working Capital Loans.

**Note 5 — Commitments and Contingencies**

**Risks and Uncertainties**

Management is continuing to evaluate the impact of the COVID-19 pandemic and has concluded that while it is reasonably possible that the virus could have a negative effect on the Company's financial position, results of its operations and/or search for a target company, the specific impact is not readily determinable as of the date of these financial statements. The condensed interim financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Registration Rights**

Pursuant to a registration rights agreement entered into on July 11, 2019, the holders of the Private Placement Warrants, the warrants that may be issued upon conversion of the Working Capital Loans, and the Founder Shares are entitled to registration rights with respect to such warrants and the ordinary shares underlying such warrants and Founder Shares. The holders of these securities are entitled to make up to three demands, excluding short form demands, that the Company register such securities for sale under the Securities Act. In addition, the holders will have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a Business Combination. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

F-106

Exhibit 6
Page 1283

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

**Underwriting Agreement**

The Company granted the underwriters a 45-day option from the date of Initial Public Offering to purchase up to 2,250,000 additional Units to cover over-allotments, if any, at the Initial Public Offering price less the underwriting discounts and commissions. In connection with the underwriters' exercise of the over-allotment option in full on August 2, 2019, the underwriters purchased all 2,250,000 additional Units.

The underwriters are entitled to a deferred fee of $6,037,500, which will become payable to them from the amounts held in the Trust Account solely in the event that the Company completes a Business Combination, subject to the terms of the underwriting agreement.

**Forward Purchase Agreement**

On July 9, 2019, SC Health Group Limited, an affiliate of the Sponsor, entered into a forward purchase agreement with the Company which provides for the purchase by SC Health Group Limited of an aggregate of 5,000,000 Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants, each to purchase one Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of a Business Combination. On July 9, 2019, the Company issued 1,250,000 Founder Shares to the Sponsor in connection with the forward purchase agreement for par value, or $100, of which such shares would be transferred to SC Health Group Limited. The obligations under the forward purchase agreement do not depend on whether any Class A ordinary shares are redeemed by the Company's public shareholders. As part of the Rockley Business Combination, the Company agreed with SC Health Group Limited that the Forward Purchase Agreement should be terminated and instead of purchasing $50,000,000 of Class A ordinary shares pursuant to the forward purchase agreement, SC Health Group Limited would instead enter into the Investor Subscription Agreement referenced below and, pursuant to that agreement, has agreed to purchase an aggregate of $50,000,000 shares in Rockley Photonics Holdings Limited. In connection with the termination of the Forward Purchase Agreement, the company recognized a gain of $2,950,567, which is included in the change in FPA liability on the accompanying unaudited condensed interim statement of operations.

**Business Combination Agreement**

On January 5, 2021, the Company announced that it had entered into a non-binding letter of intent (the "Letter of Intent") with a next generation technology developer (the "Target") relating to a proposed business combination transaction. The Target has developed a technology targeting consumer healthcare applications, and the Company believes the Target is a compelling investment opportunity given its cutting-edge technology and commercial opportunity. Completion of the proposed transaction is subject to the completion of due diligence, the negotiation and execution of a definitive agreement and satisfaction of the conditions therein, including approval of the transaction by the Company's shareholders.

On March 19, 2021, the Company entered into a Business Combination Agreement and Plan of Merger (the "Business Combination Agreement"), by and among Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Rockley"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("HoldCo"), and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo ("Merger Sub"). The Business Combination Agreement and the transactions contemplated thereby (the "Rockley Business Combination") were approved by our board of directors and the boards of directors of each of HoldCo, Merger Sub and Rockley.

F-107

Exhibit 6
Page 1284

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

The Business Combination Agreement provides for, among other things, the following transactions on the closing date: (i) the Company carries out a scheme of arrangement in the UK courts pursuant to which all of the Company's shares (including those issued prior to the scheme as a result of the conversion of convertible loan notes and the exercise of warrants) will be cancelled or transferred by the Company's shareholders in exchange for shares in HoldCo; (ii) the holders of options over shares in the Company will be invited to roll their options into new options over shares in HoldCo; (iii) to the extent convertible loan notes issued by the Company do not convert into shares in the Company prior to the effectiveness of the scheme described in clause (i) above, such notes will, depending on which form the scheme of arrangement takes, either be (a) novated to HoldCo (resulting in HoldCo becoming responsible to issue HoldCo ordinary shares on exercise) and the consideration for the novation shall be an inter-company loan between the Company and HoldCo, or (b) acquired by HoldCo in exchange for the issue of new convertible loan notes by HoldCo to each convertible loan note holder; (iv) the holders of warrants over shares in the Company (other than warrants that by their terms will be replicated at HoldCo in exchange for market value consideration) will be notified that if they do not exercise their warrants for shares in the Company prior to the effectiveness of the scheme described in clause (i) above, then those warrants will lapse; (v) HoldCo will complete a 'stock-split' to prepare its share capital for Merger Sub's merger into SC Health; (vi) certain investors will subscribe for and purchase an aggregate of $150,000,000 of shares in HoldCo; (vii) Merger Sub will merge with and into SC Health, with SC Health surviving the merger and becoming a direct wholly-owned subsidiary of HoldCo; and (viii) the shares and warrants in SC Health will be exchanged for shares and warrants in HoldCo.

In accordance with the terms and subject to the conditions of the Business Combination Agreement, (i) the existing holders of securities in the Company will exchange their securities for new securities in HoldCo; and (ii) HoldCo will split its stock such that the number of shares in (together with any other securities in or convertible for securities in) HoldCo after the stock split will be equal to $1,148,114,113 divided by $10.00. Certain PIPE investors will subscribe for shares in HoldCo and the warrants in SC Health (each $10.00 shares) will then be exchanged for shares in HoldCo.

Concurrently with the execution of the Business Combination Agreement, the Company and HoldCo entered into subscription agreements (the "Investor Subscription Agreements") with certain investors and individuals, including, among others, SC Health Group Limited (an affiliate of the Sponsor), Medtronic, Senvest Management LLC and UBS O'Connor. Pursuant to the Investor Subscription Agreements, each investor agreed to subscribe for and purchase, and HoldCo agreed to issue and sell an aggregate of $150,000,000 shares in HoldCo, which will take effect immediately prior to the closing of the Rockley Business Combination.

Previously the Company had entered into a forward purchase agreement with SC Health Group Limited which provided for the purchase by SC Health Group Limited of an aggregate of 5,000,000 Class A ordinary shares, plus an aggregate of 1,250,000 redeemable warrants to purchase one Class A ordinary share at $11.50 per share, for an aggregate purchase price of $50,000,000, or $10.00 per Class A ordinary share and accompanying fraction of a warrant in a private placement to close concurrently with the closing of our initial business combination. As part of the Rockley Business Combination, the Company agreed with SC Health Group Limited that the Forward Purchase Agreement should be terminated and instead of purchasing $50,000,000 of Class A ordinary shares pursuant to the forward purchase agreement, SC Health Group Limited would instead enter into the Investor Subscription Agreement referenced above and, pursuant to that agreement, has agreed to purchase an aggregate of $50,000,000 shares in HoldCo.

Exhibit 6
Page 1285

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

**Note 6 — Shareholders' Equity**

*Preference Shares* — The Company is authorized to issue to 1,000,000 preference shares with a par value of $0.0001 per share, with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors. At March 31, 2021 and December 31, 2020, there were no preference shares issued or outstanding.

*Class A Ordinary Shares* — The Company is authorized to issue 180,000,000 Class A ordinary shares with a par value of $0.0001 per share. Holders of the Company's Class A ordinary shares are entitled to one vote for each share. At March 31, 2021 and December 31, 2020, there were 4,344,617 and 3,189,208 Class A ordinary shares issued and outstanding, excluding 12,905,383 and 14,060,792 Class A ordinary shares subject to possible redemption, respectively.

*Class B Ordinary Shares* — The Company is authorized to issue to 25,000,000 Class B ordinary shares with a par value of  $0.00008 per share. Holders of Class B ordinary shares are entitled to one vote for each share. At March 31, 2021 and December 31, 2020, there were 5,562,500 ordinary shares issued and outstanding.

Holders of Class B ordinary shares will have the right to elect the Company's directors prior to or in connection with the completion of a Business Combination. Holders of Class A ordinary shares and Class B ordinary shares will vote together as a single class on all other matters submitted to a vote of shareholders, except as required by law.

The Class B ordinary shares will automatically convert into Class A ordinary shares at the time of a Business Combination on a one-for-one basis, subject to adjustment as follows. The Class B ordinary shares will automatically convert into Class A ordinary shares on the first business day following the consummation of a Business Combination at a ratio such that the total number of Class A ordinary shares issuable upon conversion of all Founder Shares will equal, in the aggregate, on an as-converted basis, 20% of the total number of Class A ordinary shares outstanding upon completion of this offering, plus the total number of Class A ordinary shares issued or deemed issued or issuable upon conversion or exercise of any equity-linked securities or rights issued or deemed issued, by the Company in connection with or in relation to the consummation of a Business Combination, excluding any Class A ordinary shares or equity-linked securities exercisable for or convertible into Class A ordinary shares issued, or to be issued, to any seller in a Business Combination and any warrants issued in a private placement to the Sponsor or an affiliate of the Sponsor upon conversion of Working Capital Loans.

**NOTE 7 — WARRANTS**

*Warrants* — Public Warrants may only be exercised for a whole number of shares. No fractional warrants were issued upon separation of the Units, which occurred on September 3, 2019, and only whole warrants will trade. The Public Warrants will become exercisable on the later of (a) 30 days after the completion of a Business Combination or (b) 12 months from the closing of the Initial Public Offering. The Public Warrants will expire five years after the completion of a Business Combination or earlier upon redemption or liquidation.

The Company will not be obligated to deliver any Class A ordinary shares pursuant to the exercise of a Public Warrant and will have no obligation to settle such Public Warrant exercise unless a registration statement under the Securities Act with respect to the Class A ordinary shares underlying the Public Warrants is then effective and a prospectus relating thereto is current, subject to the Company satisfying its obligations described

F-109

Exhibit 6
Page 1286

**Table of Contents**

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

below with respect to registration. No warrant will be exercisable and the Company will not be obligated to issue a Class A ordinary share upon exercise of a Public Warrant unless the Class A ordinary share issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants.

The Company has agreed that as soon as practicable, but in no event later than thirty (30) business days after the closing of a Business Combination, it will use its best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the Class A ordinary shares issuable upon exercise of the Public Warrants. The Company will use its best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. If a registration statement covering the Class A ordinary shares issuable upon exercise of the warrants is not effective by the sixtieth (60th) day after the closing of a Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when the Company will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption.

*Redemption of Warrants for Cash.* Once the warrants become exercisable, the Company may redeem the Public Warrants:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption; and

- if, and only if, the reported last sales price of the Company's Class A ordinary shares equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If and when the warrants become redeemable by the Company, the Company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

*Redemption of Warrants for Class A Ordinary Shares.* Commencing ninety days after the warrants become exercisable, the Company may redeem the outstanding Public Warrants:

- in whole and not in part;

- at a price equal to a number of Class A ordinary shares to be determined, based on the redemption date and the fair market value of the Company's Class A ordinary shares;

- upon a minimum of 30 days' prior written notice of redemption;

- if, and only if, the last reported sale price of the Company's Class A ordinary shares equals or exceeds $10.00 per share (as adjusted for share splits, share dividends, reorganizations, recapitalizations and the like) on the trading day prior to the date on which the Company sends the notice of redemption to the warrant holders;

- if, and only if, the Private Placement Warrants are also concurrently exchanged at the same price (equal to a number of Class A ordinary shares) as the outstanding Public Warrants; and

F-110

Exhibit 6
Page 1287

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

- if, and only if, there is an effective registration statement covering the Class A ordinary shares issuable upon exercise of the warrants and a current prospectus relating thereto available throughout the 30-day period after written notice of redemption is given

If the Company calls the Public Warrants for redemption, management will have the option to require any holder that wishes to exercise the Public Warrants to do so on a "cashless basis," as described in the warrant agreement. The exercise price and number of ordinary shares issuable upon exercise of the warrants may be adjusted in certain circumstances including in the event of a share dividend, or recapitalization, reorganization, merger or consolidation. However, the warrants will not be adjusted for issuance of ordinary shares at a price below its exercise price. Additionally, in no event will the Company be required to net cash settle the warrants. If the Company is unable to complete a Business Combination within the Combination Period and the Company liquidates the funds held in the Trust Account, holders of warrants will not receive any of such funds with respect to their warrants, nor will they receive any distribution from the Company's assets held outside of the Trust Account with the respect to such warrants. Accordingly, the warrants may expire worthless.

In addition, if (x) the Company issues additional Class A ordinary shares or equity-linked securities for capital raising purposes in connection with the closing of a Business Combination at an issue price or effective issue price of less than $9.20 per ordinary share (with such issue price or effective issue price to be determined in good faith by the Company) and, (i) in the case of any such issuance to the Sponsor or its affiliates, without taking into account any Founder Shares held by the Sponsor or such affiliates, as applicable, prior to such issuance, and (ii) to the extent that such issuance is made to SIN Capital Group Pte. Ltd., an affiliate of the Company and the Sponsor or its affiliates, without taking into account the transfer of Founder Shares or Private Placement Warrants (including if such transfer is effectuated as a surrender to the Company and subsequent reissuance by the Company) by the Sponsor in connection with such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of a Business Combination on the date of the consummation of a Business Combination (net of redemptions), and (z) the volume weighted average trading price of our Class A ordinary shares during the 20 trading day period starting on the trading day prior to the day on which the Company consummates a Business Combination (such price, the "Market Value") is below $9.20 per share, the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the higher of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price will be adjusted (to the nearest cent) to be equal to 180% of the higher of the Market Value and the Newly Issued Price.

The Private Placement Warrants are identical to the Public Warrants underlying the Units sold in the Initial Public Offering, except that the Private Placement Warrants and the Class A ordinary shares issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or salable until 30 days after the completion of a Business Combination, subject to certain limited exceptions. Additionally, the Private Placement Warrants will be exercisable on a cashless basis and be non-redeemable (for cash) so long as they are held by the initial purchasers or their permitted transferees. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

**Note 8 — Fair Value Measurements**

The fair value of the Company's financial assets and liabilities reflects management's estimate of amounts that the Company would have received in connection with the sale of the assets or paid in connection with the transfer of the liabilities in an orderly transaction between market participants at the measurement date. In

Exhibit 6
Page 1288

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

connection with measuring the fair value of its assets and liabilities, the Company seeks to maximize the use of observable inputs (market data obtained from independent sources) and to minimize the use of unobservable inputs (internal assumptions about how market participants would price assets and liabilities). The following fair value hierarchy is used to classify assets and liabilities based on the observable inputs and unobservable inputs used in order to value the assets and liabilities:

Level 1:    Quoted prices in active markets for identical assets or liabilities. An active market for an asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2:    Observable inputs other than Level 1 inputs. Examples of Level 2 inputs include quoted prices in active markets for similar assets or liabilities and quoted prices for identical assets or liabilities in markets that are not active.

Level 3:    Unobservable inputs based on our assessment of the assumptions that market participants would use in pricing the asset or liability.

The Company classifies its U.S. Treasury and equivalent securities within the Trust Account as held-to-maturity in accordance with ASC Topic 320 "Investments—Debt and Equity Securities." Held-to-maturity securities are those securities which the Company has the ability and intent to hold until maturity. Held-to-maturity treasury securities are recorded at amortized cost on the accompanying balance sheets and adjusted for the amortization or accretion of premiums or discounts.

At March 31, 2021, assets held in the Trust Account were comprised of $174,547,492 in money market funds, which are invested in U.S. Treasury Securities. At December 31, 2020, assets held in the Trust Account were comprised of $174,542,012 in money market funds, which are invested in U.S. Treasury Securities, For the money market funds that the Trust Accounts are invested in, the fair market value of the money market funds is equivalent to the amortized cost value. During the three months ended March 31, 2021, and the year ended December 31, 2020, the Company did not withdraw any interest income from the Trust Account.

At March 31, 2021 and December 31, 2020, there were 8,625,000 Public Warrants and 5,450,000 Private Placement Warrants outstanding. Additionally, there were 0 and 5,000,000 Class A ordinary shares with an accompanying fractional warrant outstanding in relation to the Forward Purchase Agreement as of March 31, 2021, and December 31, 2020 outstanding, respectively.

The following table presents information about the Company's assets and liabilities that are measured at fair value on a recurring basis at March 31, 2021 and December 31, 2020 and indicates the fair value hierarchy of the valuation inputs the Company utilized to determine such fair value. The gross holding gains and fair value of held-to-maturity securities at March 31, 2021 and December 31, 2020 are as follows:

| | Level | March 31, 2021 | December 31, 2020 |
|---|---|---|---|
| **Description** | | | |
| Assets: | | | |
| Marketable securities held in Trust Account – U.S. Treasury Securities Money Market Fund | 1 | $ 174,547,492 | $ 174,788,957 |
| Liabilities: | | | |
| Private Placement Warrants | 3 | $ 17,000,092 | $ 7,412,000 |
| Public Warrants | 1 | 16,301,250 | 11,643,750 |
| Forward Purchase Agreement Liability | 3 | — | 2,950,567 |

F-112

Exhibit 6
Page 1289

Table of Contents

**SC HEALTH CORPORATION**
**NOTES TO CONDENSED INTERIM FINANCIAL STATEMENTS**
**MARCH 31, 2021**
*(Unaudited)*

The Warrants and FPA were accounted for as liabilities in accordance with ASC 815-40 and are presented within warrant liabilities on the balance sheet. The warrant liabilities are measured at fair value at inception and on a recurring basis, with changes in fair value presented within change in fair value of warrant liabilities in the consolidated statement of operations.

The Company established the initial fair value for the private and public warrants and the FPA on July 16, 2019, the date of the Company's Initial Public Offering, using various valuation methodologies. The Private Placement Warrants were initially measured using a Black-Scholes, the public warrants were initially measured using a Monte Carlo simulation, and the FPA was initially measured using a forward valuation model. The initial measurement of the liabilities was classified as Level 3 due to the use of unobservable inputs.

The Warrants are subsequently measured at fair value on a recurring basis. The subsequent measurement of the private warrants is performed using Black-Scholes Model. The public warrants are subsequently measured at the trading stock price at the end of the reporting period. The FPA is no longer measured due to the termination described in Note 5.

The key inputs into the Black-Scholes Model for the Private Placement Warrants were as follows at March 31, 2021 and December 31, 2020:

| Input | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Risk-free interest rate | 0.98% | 0.40% |
| Time to Maturity (Years) | 5.25 | 5.29 |
| Implied volatility | 38.00% | 19.00% |
| Exercise price | $ 11.50 | $ 11.50 |
| Implied Stock Price | $ 10.08 | $ 10.25 |

The following table presents the changes in the fair value of warrant liabilities:

| | Forward Purchase Agreement | Private Placement Warrants |
|---|---|---|
| **Fair value as of December 31, 2020** | $ 2,950,567 | $ 7,412,000 |
| Change in valuation inputs or other assumptions | (2,950,567) | 9,588,092 |
| **Fair value as of March 31, 2021** | $ — | $ 17,000,092 |

**Note 9 — Subsequent Events**

The Company evaluated subsequent events and transactions that occurred after the balance sheet date up to the date that the unaudited condensed interim financial statements were issued. Based upon this review, the Company did not identify any subsequent events that would have required adjustment or disclosure in the unaudited condensed interim financial statements.

F-113

Exhibit 6
Page 1290

Table of Contents

ANNEX A

Execution Version

**BUSINESS COMBINATION AGREEMENT**

**AND PLAN OF MERGER**

**by and among**

**SC HEALTH CORPORATION,**

**ROCKLEY PHOTONICS HOLDINGS LIMITED,**

**ROCKLEY MERGERSUB LIMITED,**

**and**

**ROCKLEY PHOTONICS LIMITED**

**dated as of March 19, 2021**

Exhibit 6
Page 1291

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| ARTICLE I CERTAIN DEFINITIONS | | A-3 |
| Section 1.1 | Definitions | A-3 |
| Section 1.2 | Construction | A-19 |
| Section 1.3 | Knowledge | A-19 |
| ARTICLE II EXCHANGE; AGREEMENT AND PLAN OF MERGER | | A-19 |
| Section 2.1 | Initial Exchange | A-19 |
| Section 2.2 | The Merger | A-21 |
| Section 2.3 | Effects of the Merger | A-22 |
| Section 2.4 | Closing; Merger Effective Time | A-22 |
| Section 2.5 | Closing Deliverables | A-22 |
| Section 2.6 | Governing Documents | A-23 |
| Section 2.7 | Directors and Officers | A-23 |
| Section 2.8 | Intended Tax Treatment | A-24 |
| ARTICLE III EXCHANGE CONSIDERATION AND EFFECTS OF THE MERGER ON THE COMPANY CAPITAL STOCK, CONVERTIBLE NOTES AND EQUITY AWARDS | | A-24 |
| Section 3.1 | Initial Exchange Consideration | A-24 |
| Section 3.2 | Conversion of Securities | A-25 |
| Section 3.3 | Exchange Procedures | A-26 |
| Section 3.4 | Treatment of Company Options and Company Restricted Stock, Company Convertible Notes and Company Warrants | A-28 |
| Section 3.5 | Withholding | A-29 |
| Section 3.6 | No Dissent Rights | A-29 |
| Section 3.7 | Register of Members | A-29 |
| Section 3.8 | SPAC Warrants | A-29 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | A-29 |
| Section 4.1 | Company Organization | A-30 |
| Section 4.2 | Subsidiaries | A-30 |
| Section 4.3 | Due Authorization | A-30 |
| Section 4.4 | No Conflict | A-31 |
| Section 4.5 | Governmental Authorities; Consents | A-31 |
| Section 4.6 | Capitalization of the Company | A-31 |
| Section 4.7 | Capitalization of Subsidiaries | A-33 |
| Section 4.8 | Financial Statements | A-33 |
| Section 4.9 | Undisclosed Liabilities | A-34 |
| Section 4.10 | Litigation and Proceedings | A-34 |
| Section 4.11 | Legal Compliance | A-34 |
| Section 4.12 | Contracts; No Defaults | A-35 |
| Section 4.13 | Company Benefit Plans | A-36 |
| Section 4.14 | Labor Relations; Employees | A-38 |
| Section 4.15 | Taxes | A-39 |
| Section 4.16 | Brokers' Fees | A-42 |
| Section 4.17 | Insurance | A-42 |
| Section 4.21 | Intellectual Property | A-43 |
| Section 4.22 | Privacy and Cybersecurity | A-45 |
| Section 4.23 | Environmental Matters | A-45 |

A-i

Exhibit 6
Page 1292

**Table of Contents**

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 4.24 | Absence of Changes | A-46 |
| Section 4.25 | Anti-Corruption and Anti-Money Laundering Compliance | A-46 |
| Section 4.26 | Sanctions and International Trade Compliance | A-46 |
| Section 4.27 | Information Supplied | A-47 |
| Section 4.28 | Customers and Suppliers | A-47 |
| Section 4.29 | Government Contracts | A-47 |
| Section 4.30 | Sufficiency of Assets | A-47 |
| Section 4.31 | No Additional Representation or Warranties | A-48 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SPAC | | A-48 |
| Section 5.1 | SPAC Organization | A-48 |
| Section 5.2 | Due Authorization | A-48 |
| Section 5.3 | No Conflict | A-49 |
| Section 5.4 | Subsidiaries | A-49 |
| Section 5.5 | Litigation and Proceedings | A-49 |
| Section 5.6 | SEC Filings | A-49 |
| Section 5.7 | Internal Controls; Listing; Financial Statements | A-50 |
| Section 5.8 | Governmental Authorities; Consents | A-50 |
| Section 5.9 | Trust Account | A-51 |
| Section 5.10 | Investment Company Act; JOBS Act | A-51 |
| Section 5.11 | Absence of Changes | A-51 |
| Section 5.12 | No Undisclosed Liabilities | A-51 |
| Section 5.13 | Capitalization of SPAC | A-52 |
| Section 5.14 | Brokers' Fees | A-53 |
| Section 5.15 | Indebtedness | A-53 |
| Section 5.16 | Taxes | A-53 |
| Section 5.17 | Business Activities | A-54 |
| Section 5.18 | NYSE Stock Market Quotation | A-54 |
| Section 5.19 | Registration Statement, Proxy Statement and Proxy Statement/Registration Statement | A-54 |
| Section 5.20 | No Outside Reliance | A-55 |
| Section 5.21 | No Additional Representation or Warranties | A-55 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES OF HOLDCO AND MERGER SUB | | A-55 |
| Section 6.1 | Corporate Organization | A-55 |
| Section 6.2 | Certificate of Incorporation and By-laws | A-56 |
| Section 6.3 | Capitalization | A-56 |
| Section 6.4 | Authority Relative to this Agreement | A-56 |
| Section 6.5 | No Conflict; Required Filings and Consents | A-57 |
| Section 6.6 | Compliance | A-57 |
| Section 6.7 | Board Approval; Vote Required | A-57 |
| Section 6.8 | No Prior Operations of HoldCo or Merger Sub; Post-Closing Operations | A-58 |
| Section 6.9 | No Indebtedness | A-58 |
| Section 6.10 | Brokers' Fees | A-58 |
| Section 6.11 | Information Supplied | A-58 |
| ARTICLE VII COVENANTS OF THE COMPANY, HOLDCO AND MERGER SUB | | A-58 |
| Section 7.1 | Conduct of Business | A-58 |
| Section 7.2 | Inspection | A-62 |

A-ii

Exhibit 6
Page 1293

**TABLE OF CONTENTS**
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| Section 7.3 | Preparation and Delivery of Additional Company Financial Statements | | A-62 |
| Section 7.4 | Affiliate Agreements | | A-63 |
| Section 7.5 | Acquisition Proposals | | A-63 |
| Section 7.6 | Shareholder Litigation | | A-63 |
| Section 7.7 | Employment Agreement Amendments | | A-64 |
| Section 7.8 | Indemnification and Insurance | | A-64 |
| **ARTICLE VIII COVENANTS OF SPAC** | | | A-65 |
| Section 8.1 | Trust Account | | A-65 |
| Section 8.2 | No Solicitation by SPAC | | A-65 |
| Section 8.3 | SPAC Conduct of Business | | A-65 |
| Section 8.4 | Inspection | | A-66 |
| Section 8.5 | SPAC Public Filings | | A-67 |
| Section 8.6 | Shareholder Litigation | | A-67 |
| **ARTICLE IX JOINT COVENANTS** | | | A-67 |
| Section 9.1 | Filings | | A-67 |
| Section 9.2 | Preparation of Proxy Statement/Registration Statement; Shareholders' Meeting and Approvals | | A-68 |
| Section 9.3 | Support of Transaction | | A-71 |
| Section 9.4 | Tax Matters | | A-71 |
| Section 9.5 | Section 16 Matters | | A-71 |
| Section 9.6 | Cooperation; Consultation | | A-71 |
| Section 9.7 | Commercially Reasonable Efforts; Further Assurances | | A-72 |
| Section 9.8 | Employee Matters | | A-72 |
| Section 9.9 | Post-Closing Directors and Officers of HoldCo | | A-72 |
| Section 9.10 | NYSE Listing and De-Listing | | A-74 |
| Section 9.11 | PIPE Subscriptions | | A-74 |
| Section 9.12 | Confidentiality | | A-74 |
| **ARTICLE X CONDITIONS TO OBLIGATIONS** | | | A-75 |
| Section 10.1 | Conditions to Obligations of SPAC, HoldCo, Merger Sub, and the Company | | A-75 |
| Section 10.2 | Conditions to Obligations of SPAC | | A-75 |
| Section 10.3 | Conditions to the Obligations of the Company | | A-77 |
| **ARTICLE XI TERMINATION/EFFECTIVENESS** | | | A-77 |
| Section 11.1 | Termination | | A-77 |
| Section 11.2 | Effect of Termination | | A-78 |
| **ARTICLE XII MISCELLANEOUS** | | | A-78 |
| Section 12.1 | Trust Account Waiver | | A-78 |
| Section 12.2 | Waiver | | A-79 |
| Section 12.3 | Notices | | A-79 |
| Section 12.4 | Assignment | | A-80 |
| Section 12.5 | Rights of Third Parties | | A-80 |
| Section 12.6 | Expenses | | A-80 |
| Section 12.7 | Governing Law | | A-81 |
| Section 12.8 | Headings; Counterparts | | A-81 |
| Section 12.9 | Company and SPAC Disclosure Letters | | A-81 |

A-iii

Exhibit 6
Page 1294

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 12.10 | Entire Agreement | A-81 |
| Section 12.11 | Amendments | A-81 |
| Section 12.12 | Publicity | A-81 |
| Section 12.13 | Severability | A-82 |
| Section 12.14 | Jurisdiction; Waiver of Jury Trial | A-82 |
| Section 12.15 | Enforcement | A-82 |
| Section 12.16 | Non-Recourse | A-83 |
| Section 12.17 | Non-Survival of Representations, Warranties and Covenants | A-83 |
| Section 12.18 | Conflicts and Privilege | A-83 |

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit A | Memorandum of Association of HoldCo |
| Exhibit B | Articles of Association of HoldCo |
| Exhibit C | Form of Registration Rights and Lock-Up Agreement |
| Exhibit D | Form of Plan of Merger and Director Declaration |
| Exhibit E | Form of Incentive Equity Plan |
| Exhibit F | Form of Employee Stock Purchase Plan |

A-iv

Exhibit 6
Page 1295

**Table of Contents**

<u>**BUSINESS COMBINATION AGREEMENT AND PLAN OF MERGER**</u>

This Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (this "<u>Agreement</u>"), is made and entered into by and among SC Health Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("<u>SPAC</u>"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "<u>Company</u>"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("<u>HoldCo</u>"), and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo ("<u>Merger Sub</u>").

**RECITALS**

**WHEREAS**, SPAC is a blank check company incorporated as a Cayman Islands exempted company and incorporated for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses;

**WHEREAS**, each of HoldCo and Merger Sub is an entity newly formed for the purposes of the transactions proposed herein;

**WHEREAS**, upon the terms and subject to the conditions of this Agreement, SPAC, HoldCo, Merger Sub and the Company will complete a business combination transaction pursuant to which, among other things:

(a) the Company will propose a scheme of arrangement under Part 26 of the Companies Act, as either a cancellation scheme or a transfer scheme pursuant to which the Company Shareholders will transfer or cancel all their Company Ordinary Shares to HoldCo in exchange for the same number of HoldCo Ordinary Shares (the "<u>Equity Scheme</u>");

(b) the holders of Company Options will be invited to rollover their Company Options into replacement options over HoldCo Ordinary Shares;

(c) pursuant to a proposed scheme of arrangement under Part 26 of the Companies Act (i) if the Equity Scheme is structured as a cancellation scheme, the Company proposes to novate its obligations under the Scheme Convertible Notes to HoldCo and the Scheme Creditors will accept the performance by HoldCo of the Scheme Convertible Notes in place of performance by the Company and discharge the Company from further obligations under the Company Convertible Notes; the consideration for the novation shall be the issuance of an inter-company loan by the Company to HoldCo in an amount equal to the market value of the Scheme Convertible Notes; and (ii) if the Equity Scheme is structured as a transfer scheme, HoldCo proposes to acquire the Scheme Convertible Notes from each Scheme Creditor in consideration for HoldCo entering into a new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company (the "<u>Creditor Scheme</u>" and together with the Equity Scheme, the "<u>Schemes</u>");

(d) the holders of Company Warrants (except for certain Company Warrants which will be replicated at the HoldCo level in accordance with their terms) will be notified that their warrants will lapse unless exercised before the Equity Scheme becoming effective;

(e) as a result of the proposed Initial Exchange, the Company will become a direct wholly-owned subsidiary of HoldCo and following completion of the Schemes (the "<u>Initial Exchange</u>") and prior to Closing HoldCo will complete a stock split of the HoldCo Ordinary Shares at the Exchange Ratio (the "<u>Stock Split</u>"; the Stock Split together with the Initial Exchange, collectively, the "<u>Exchange</u>"); and

A-1

Exhibit 6
Page 1296

Table of Contents

(f) following the consummation of the Exchange, Merger Sub will merge with and into SPAC, with SPAC surviving such merger as a direct wholly-owned subsidiary of HoldCo (the "Merger") and, in the context of such Merger, all SPAC Ordinary Shares (other than Excluded Shares) outstanding immediately prior to the Merger Effective Time shall be exchanged with HoldCo for the right to receive the Merger Consideration in the form of HoldCo Ordinary Shares pursuant to a share capital increase of HoldCo, as set forth in this Agreement and in accordance with the Cayman Statute;

WHEREAS, prior to the Closing, HoldCo shall adopt by the HoldCo Shareholder Approval and subsequently file the memorandum of association and the articles of association with the Cayman Registrar (in the forms attached as Exhibits A and B hereto, with such changes as may be agreed in writing by SPAC and the Company);

WHEREAS, each of the parties intends that, for United States federal income tax purposes, (i) the Transactions, taken together, qualify as a transaction described in Section 351 of the United States Internal Revenue Code of 1986, as amended (the "Code"), (ii) this Agreement constitutes a "plan of reorganization" within the meaning of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a) and (iii) the Merger constitutes a transaction treated as a "reorganization" within the meaning of Section 368(a)(2)(E) of the Code (collectively, the "Intended U.S. Tax Treatment"). Additionally, the Exchange may (subject to the facts and meeting the appropriate criteria) also constitute a transaction treated as a "reorganization" within the meaning of Section 368(a)(1)(B) of the Code;

WHEREAS, each of the parties intends that, for UK tax purposes, the Initial Exchange qualifies as a reorganisation of share capital within the meaning of Section 127 of the Taxation of Chargeable Gains Act 1982 and as a qualifying acquisition of share capital under Section 77 of the Finance Act 1986 (the "Intended UK Tax Treatment" and together with Intended U.S. Tax Treatment, the "Intended Tax Treatment");

WHEREAS, SPAC Board has unanimously (a) determined that the Merger and the other Transactions are fair to, and in the best interests of, SPAC Shareholders, (b) adopted a resolution approving this Agreement and declaring its advisability and approving the Merger and the other Transactions, and (c) subject to the terms herein, will recommend the approval and adoption of this Agreement, the Merger and the other Transactions by SPAC Shareholders;

WHEREAS, the Company Board has (i) unanimously determined that the Transactions contemplated hereby are fair and are in the best interests of the Company and the Company Shareholders, (ii) has approved this Agreement, the Schemes, the Merger and the other Transactions and (iii) will recommend that the Company Shareholders vote in favor of the Resolutions at the Court Meetings and the General Meeting;

WHEREAS, the HoldCo Board has unanimously determined that the transactions contemplated hereby are fair and are in the best interests of HoldCo and has approved this Agreement, the Schemes, the Merger and the other Transactions;

WHEREAS, the Merger Sub Board has unanimously (a) determined that this Agreement, the Merger and the other Transactions are fair to, and in the best interests of, Merger Sub and HoldCo (as the sole shareholder of Merger Sub), (b) adopted a resolution approving this Agreement and approving the Merger and the other Transactions contemplated hereby, and (c) recommended the approval and adoption of this Agreement and the Merger by HoldCo (as the sole stockholder of Merger Sub);

WHEREAS, as a condition and inducement to SPAC's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, certain of the Company Shareholders have each executed and delivered to SPAC the Company Holders Support Agreement pursuant to which such shareholders have agreed, among other things, to vote (whether pursuant to a duly convened meeting of the Company Shareholders or pursuant to an action by written consent of the Company Shareholders) in favor of the adoption and approval of this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby, including the Exchange;

A-2

Exhibit 6
Page 1297

Table of Contents

WHEREAS, in connection with the Exchange and the Merger, the Parties desire for HoldCo to register with the SEC to become a publicly traded company;

WHEREAS, in furtherance of the Merger and in accordance with the terms hereof, SPAC shall provide an opportunity to SPAC Shareholders to have their outstanding SPAC Ordinary Shares redeemed on the terms and subject to the conditions set forth in this Agreement and SPAC's Governing Documents (as defined below) in connection with obtaining SPAC Shareholder Approval (as defined below);

WHEREAS, as a condition and inducement to the Company's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, the Sponsor has executed and delivered to the Company the SPAC Investor Support Agreement pursuant to which the Sponsor has agreed to, among other things, vote to adopt and approve this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby;

WHEREAS, on or prior to the date hereof, SPAC and HoldCo entered into Subscription Agreements with PIPE Investors (as defined below) pursuant to which, and on the terms and subject to the conditions of which, such PIPE Investors agreed to purchase HoldCo Ordinary Shares from HoldCo for an aggregate purchase price equal to the Minimum PIPE Investment Amount, such purchases to be consummated after the Exchange and immediately prior to the Merger Effective Time;

WHEREAS, at the Closing, SPAC, the Sponsor and certain former Company Shareholders shall enter into a Registration Rights and Lock-Up Agreement (the "Registration Rights and Lock-Up Agreement") in the form attached hereto as Exhibit C (with such changes as may be agreed in writing by SPAC and the Company) which shall be effective as of the Closing; and

WHEREAS, the Company shall procure that HoldCo or one of its subsidiaries and Andrew Rickman enter into an employment agreement amendment which shall incorporate the applicable key terms attached hereto as Exhibit A of the Company Disclosure Letter (the "Andrew Rickman Employment Agreement Amendment").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and intending to be legally bound hereby, SPAC, HoldCo, Merger Sub and the Company agree as follows:

ARTICLE I

CERTAIN DEFINITIONS

Section 1.1 Definitions. As used herein, the following terms shall have the following meanings:

"Acquisition Proposal" means, with respect to the Company and its Subsidiaries other than the transactions contemplated hereby and other than the acquisition or disposition of inventory, equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to, in a single transaction or series of related transactions: (a) any acquisition or purchase, direct or indirect, of: (i) a portion of the business of the Company and its Subsidiaries, that comprises 15% or more of their combined net revenues or net income (ii) 15% or more of the consolidated assets of the Company and its Subsidiaries, as applicable, taken as a whole (based on the fair market value thereof, as determined in good faith by the Company Board) or (iii) 15% or more of any class of equity or voting securities of (x) the Company or (y) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 15% or more of any class of equity or voting securities of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting,

A-3

Exhibit 6
Page 1298

**Table of Contents**

individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving the sale or disposition of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries.

"Action" means any claim, action, suit, audit, examination, assessment, arbitration, mediation or inquiry, or any proceeding, investigation or enforcement action, by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, whether through one or more intermediaries or otherwise. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Affiliate Agreements" has the meaning specified in Section 4.12(a)(vi).

"Agreement" has the meaning specified in the Preamble hereto.

"Agreement End Date" has the meaning specified in Section 11.1(g).

"Ancillary Agreements" has the meaning specified in Section 12.10.

"Andrew Rickman Employment Agreement Amendment" has the meaning set forth in the Recitals.

"Anti-Bribery Laws" means the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977, as amended, and all other applicable anti-corruption and bribery Laws (including the UK Bribery Act 2010, and any rules or regulations promulgated thereunder or other Laws of other countries implementing the OECD Convention on Combating Bribery of Foreign Officials).

"Anti-Money Laundering Laws" means all applicable laws or regulations of the United Kingdom, the United States of America, the European Union and its Member States and any jurisdiction applicable to the Company or its Subsidiaries that relate to money laundering, counter-terrorist financing or record keeping and reporting requirements relating to money laundering or counter-terrorist financing.

"Antitrust Authorities" means the Antitrust Division of the United States Department of Justice, the United States Federal Trade Commission or the antitrust or competition Law authorities of any other jurisdiction (whether United States, foreign or multinational).

"Audited GAAP Financial Statements" has the meaning specified in Section 4.8(b).

"Audited IFRS Financial Statements" has the meaning specified in Section 4.8(a).

"Antitrust Information or Document Request" means any request or demand for the production, delivery or disclosure of documents or other evidence, or any request or demand for the production of witnesses for interviews or depositions or other oral or written testimony, by any Antitrust Authorities relating to the transactions contemplated hereby or by any third party challenging the transactions contemplated hereby, including any so called "second request" for additional information or documentary material or any civil investigative demand made or issued by any Antitrust Authority or any subpoena, interrogatory or deposition.

"Business Combination" has the meaning set forth in Article 1.1 of SPAC's Governing Documents as in effect on the date hereof.

Exhibit 6
Page 1299

**Table of Contents**

"Business Combination Proposal" means any offer, inquiry, proposal or indication of interest (whether written or oral, binding or non-binding, and other than an offer, inquiry, proposal or indication of interest with respect to the transactions contemplated hereby), relating to a Business Combination.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, London, United Kingdom, Singapore, or Governmental Authorities in the Cayman Islands are authorized or required by Law to close.

"Capital Reduction" means the reduction of the Company's share capital under section 648 of the Companies Act provided for by the Equity Scheme, if applicable.

"Cayman Registrar" means the Registrar of Companies of the Cayman Islands under the Cayman Statute.

"Cayman Statute" means the Companies Act (Revised) of the Cayman Islands.

"CFIUS" means the Committee on Foreign Investment in the United States, or any member agency thereof acting in such capacity.

"CFIUS Approval" shall occur only when one of the following conditions has been met: (a) in response to the filing of a Notice by the parties, SPAC and the Company have received written notice from CFIUS stating that: (1) CFIUS has concluded that SPAC's Designation Right (as defined in Section 9.8 of this Agreement) is not a Covered Transaction (as defined in 31 C.F.R. § 800.213) and not subject to review under the DPA; or (2) the review and/or investigation of SPAC's Designation Right under the DPA has been concluded and there are no unresolved national security concerns; or (b) CFIUS has sent a report to the President of the United States requesting the President's decision on SPAC's Designation Right and either (1) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on SPAC's Designation Right has expired without any such action being threatened, announced or taken or (2) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on SPAC's Designation Right.

"Class B Conversion Ratio" means the ratio at which SPAC Class B Ordinary Shares are automatically convertible into SPAC Class A Ordinary Shares pursuant to article 53 of SPAC Articles of Association.

"Closing" has the meaning specified in Section 2.4(a).

"Closing Date" has the meaning specified in Section 2.4(a).

"Code" has the meaning specified in the Recitals hereto.

"Companies Act" means the UK Companies Act 2006, as amended.

"Company" has the meaning specified in the Preamble hereto.

"Company Award" shall mean a Company Option or Company Restricted Stock.

"Company Board" means the board of directors of the Company.

"Company Benefit Plan" has the meaning specified in Section 4.13(a).

"Company Convertible Note" means each outstanding unsecured convertible loan note issued by the Company set forth on Section 1.01 of the Company Disclosure Letter (collectively, the "Company Convertible Notes").

"Company Cure Period" has the meaning specified in Section 11.1(g).

A-5

Exhibit 6
Page 1300

**Table of Contents**

"Company Disclosure Letter" has the meaning specified in the introduction to Article IV.

"Company Holders Support Agreement" means a shareholders Support Agreement, dated as of the date hereof, by and among each of the Company shareholders that are parties thereto, SPAC and the Company, as amended or modified from time to time.

"Company Incentive Plan" means the Rockley Photonics Limited 2013 Equity Incentive Plan as amended from time to time.

"Company Indemnified Parties" has the meaning specified in Section 7.8(a).

"Company IP" or "Company Intellectual Property" mean any and all Intellectual Property owned (or purported to be owned), in whole or in part, by the Company or any of its Subsidiaries and includes the Company Software and Company Registered Intellectual Property.

"Company IT Contracts" means all agreements or arrangements (whether written or unwritten and including those currently being negotiated) under which any third party provides or will provide any element of, or services relating to, the Company IT Systems, including leasing, hire purchase, licensing, maintenance, website hosting, outsourcing, security, back-up, disaster recovery, insurance, cloud computing and other types of services agreements.

"Company IT Systems" means any and all IT Systems that are owned, leased, or licensed by the Company or its Subsidiaries and used (or held for use) in or necessary for the operation of their businesses.

"Company Material Adverse Effect" means any event, state of facts, condition, change, development, circumstance, occurrence or effect (collectively, "Events") that (i) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, results of operations or financial condition of the Company and its Subsidiaries, taken as a whole or (ii) does or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impede the ability of the Company to consummate the Merger; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "Company Material Adverse Effect": (a) any change in applicable Laws or GAAP or any interpretation thereof following the date of this Agreement, (b) any change in interest rates or economic, political, business or financial market conditions generally, (c) the taking of any action required by this Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic, disease outbreak or other public health emergency (including COVID-19 or the effect of any abatement thereof, and any Permitted Action in response thereto, or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the date of this Agreement) or change in climate, (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, (f) any failure of the Company to meet any projections or forecasts (provided that clause (f) shall not prevent a determination that any Event not otherwise excluded from this definition of Company Material Adverse Effect underlying such failure to meet projections or forecasts has resulted in a Company Material Adverse Effect), (g) any Events generally applicable to the industries or markets in which the Company and its Subsidiaries operate (including increases in the cost of products, supplies, materials or other goods purchased from third party suppliers), (h) the announcement of this Agreement and consummation of the transactions contemplated hereby, (x) excluding the termination of a Contract by a customer, the termination of a Contract by a Top Supplier and/or termination of a Contract by a key employee (y) but including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any landlords, suppliers (other than any Top Suppliers), distributors, partners or employees (other than any key employees) of the Company and its Subsidiaries (it being understood that this clause (h) shall be disregarded for purposes of the representation and warranty set forth in Section 4.4 and the condition to Closing with respect thereto), (i) any matter set forth on Section 1.3 of the Company Disclosure Letter, (j) any Events to the extent actually known by

A-6

Exhibit 6
Page 1301

Table of Contents

those individuals set forth on Section 1.3 of SPAC Disclosure Letter on or prior to the date hereof, or (k) any action taken by, or at the request of, SPAC; provided, further, that any Event referred to in clauses (a), (b), (d), (e) or (g) above may be taken into account in determining if a Company Material Adverse Effect has occurred to the extent it has a disproportionate and adverse effect on the business, assets, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations, but only to the extent of the incremental disproportionate effect on the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations.

"Company Option" means an option to purchase Company Ordinary Shares granted under the Company Incentive Plan.

"Company Ordinary Share" means an ordinary share in the capital of the Company with a nominal value of £0.00001 per share.

"Company Organizational Documents" means the articles of association and bylaws of Company or equivalent organizational documents, as amended, modified or supplemented from time to time.

"Company Registered Intellectual Property" has the meaning specified in Section 4.21(a).

"Company Restricted Stock" means a Company Ordinary Share that, as of immediately prior to the Exchange, is subject to a substantial risk of forfeiture, within the meaning of Section 83 of the Code and was issued pursuant to the Company Incentive Plan.

"Company Restricted Stock Unit Award" means an award of restricted stock units covering Company Ordinary Shares granted under the Company Incentive Plan.

"Company Software" means any and all Software owned (or purported to be owned), in whole or in part, by the Company or any of its Subsidiaries.

"Company Shareholders" means holders of Company Ordinary Shares.

"Company Warrants" means the warrants (including conditional warrants) of the Company to purchase Company Ordinary Shares.

"Confidentiality Agreement" has the meaning specified in Section 12.10.

"Constituent Companies" has the meaning specified in Section 2.1.

"Contracts" means any legally binding contracts, agreements, subcontracts, leases, and purchase orders.

"CTA 2010" means the United Kingdom Corporation Tax Act 2010.

"Copyleft License" means any license that requires, as a condition of use, modification and/or distribution of Software subject to such license, that such Software subject to such license, or other Software incorporated into, derived from, linked in or to, or used or distributed with such Software subject to such license (i) in the case of Software, be made available or distributed in a form other than binary (*e.g.*, source code form), (ii) be licensed for the purpose of preparing derivative works, (iii) be licensed under terms that allow products or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than by operation of Law) or (iv) be redistributable at no license fee. Copyleft Licenses include the GNU General Public License, the GNU Lesser General Public License, the Affero General Public License, the Mozilla Public License, the Common Development and Distribution License, the Eclipse Public License, and all Creative Commons "sharealike" licenses.

Exhibit 6
Page 1302

Table of Contents

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or other similar measure, in each case in connection with or in response to COVID-19 and in each case implemented or otherwise required by Law applicable to the Company and/or its Subsidiaries, including the CARES Act and Families First Act.

"Court" means the High Court of Justice in England and Wales.

"Court Meetings" means the Creditor Scheme Court Meeting and the Equity Scheme Court Meeting.

"Creditor Scheme" has the meaning specified in the Recitals hereto.

"Creditor Scheme Court Hearing" means the hearing by the Court to sanction the Creditor Scheme.

"Creditor Scheme Court Meeting" means the meeting of the relevant holders of Company Convertible Notes convened at the direction of the Court pursuant to Part 26 of the Companies Act for the purpose of considering and approving the Creditor Scheme (with or without amendment), and any adjournment thereof.

"Creditor Scheme Court Meeting Resolution" means the resolution to be proposed at the Creditor Scheme Court Meeting for the purposes of approving and implementing the Creditor Scheme.

"Creditor Scheme Circular" means a document (including any amendments or supplements thereto) to be distributed to Scheme Creditors containing (i) the Creditor Scheme, (ii) the notice or notices of the Creditor Scheme Court Meeting, (iii) an explanatory statement as required by the Companies Act with respect to the Creditor Scheme, (iv) such other information as may be required or necessary pursuant to the Companies Act, and (v) such other information as the Company and SPAC shall agree.

"D&O Indemnified Parties" has the meaning specified in Section 7.8(a).

"Disclosure Letter" means, as applicable, the Company Disclosure Letter or SPAC Disclosure Letter.

"Dollars" or "$" means lawful money of the United States.

"DPA" means Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

"Employment Agreement Amendments" has the meaning set forth in the Recitals.

"Environmental Laws" means any and all applicable Laws relating to Hazardous Materials, pollution, or the protection or management of the environment or natural resources, or protection of human health (with respect to exposure to Hazardous Materials).

"Equity Scheme" has the meaning specified in the Recitals hereto.

"Equity Scheme Court Meeting" means the meeting of Company Shareholders convened at the direction of the Court pursuant to Part 26 of the Companies Act for the purpose of considering and approving the Equity Scheme (with or without amendment), and any adjournment thereof.

"Equity Scheme Court Meeting Resolution" means the resolution to be proposed at the Equity Scheme Court Meeting for the purposes of approving and implementing the Equity Scheme.

A-8

Exhibit 6
Page 1303

Table of Contents

"Equity Scheme Circular" means a document (including any amendments or supplements thereto) to be distributed to Company Shareholders and, for information only, to holders of Company Awards and Company Warrants containing (i) the Equity Scheme, (ii) the notice or notices of the Equity Scheme Court Meeting and General Meeting, (iii) an explanatory statement as required by the Companies Act with respect to the Equity Scheme, (iv) such other information as may be required or necessary pursuant to the Companies Act, and (v) such other information as the Company and SPAC shall agree.

"ERISA" has the meaning specified in Section 4.13(a).

"ERISA Affiliate" means any Affiliate or business, whether or not incorporated, that together with the Company would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Exchange" has the meaning specified in the Recitals hereto.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Agent" has the meaning specified in Section 3.3(a).

"Exchange Ratio" The Exchange Ratio shall be the ratio that results in the number of HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) as of immediately prior to the Merger Effective Time (the "Stock Split Ordinary Shares") being increased or decreased on a pro rata basis per Stock Split Ordinary Share such that the HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) after the Stock Split equals the number of HoldCo Ordinary Shares (including for this purpose any restricted shares, options, warrants, notes or other interests exercisable for HoldCo Ordinary Shares or Company Ordinary Shares) that results from dividing the Exchange Value by $10.00.

"Exchange Value" means one billion one hundred and forty eight million one hundred and fourteen thousand one hundred and thirteen dollars ($1,148,114,113).

"Excluded Shares" has the meaning specified in Section 3.2(c)

"Export Approvals" has the meaning specified in Section 4.26(a).

"Forward Purchase Agreement" means the Forward Purchase Agreement entered into as of July 11, 2019, between SPAC and SC Health Group Limited, which was filed as Exhibit 10.12 to to SPAC's Form 10-K, filed March 23, 2020.

"FPA Termination" has the meaning specified in Section 8.7.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"General Meeting" means the general meeting of Company Shareholders (and any adjournment or postponement thereof) to be convened for the purposes of considering and approving the Special Resolution required to approve among other things (and if applicable) the Capital Reduction, and certain other matters ancillary to the Schemes and their implementation to be held as soon as the preceding Court Meeting(s) shall have been concluded (it being understood that if a Court Meeting is adjourned or postponed, the General Meeting shall be correspondingly adjourned or postponed).

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a US

A-9

Exhibit 6
Page 1304

**Table of Contents**

corporation are its certificate of incorporation and by-laws, the "Governing Documents" of a US limited partnership are its limited partnership agreement and certificate of limited partnership, the "Governing Documents" of a US limited liability company are its operating agreement and certificate of formation and the "Governing Documents" of an exempted company are its memorandum and articles of association and in each case analogous documents in the jurisdiction of incorporation of the relevant Person.

"Governmental Authority" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court or tribunal, including any data protection regulators or supervisory authorities.

"Governmental Authorization" has the meaning specified in Section 4.5.

"Governmental Order" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Hazardous Material" means any (i) pollutant, contaminant, chemical, (ii) industrial, solid, liquid or gaseous toxic or hazardous substance, material or waste, (iii) petroleum or any fraction or product thereof, (iv) asbestos or asbestos-containing material, (v) polychlorinated biphenyl, (vi) chlorofluorocarbons, and (vii) other substance, material or waste, in each case, which are regulated under any Environmental Law or as to which liability may be imposed pursuant to Environmental Law.

"HoldCo" has the meaning specified in the Preamble hereto.

"HoldCo Board" means the board of directors of HoldCo.

"HoldCo Board Approval" means, resolutions of the HoldCo Board approving the entry into this Agreement and the matters set out herein dated as of the date hereof.

"HoldCo Convertible Notes" means the convertible notes to be issues to the Scheme Creditors pursuant to the Creditors Scheme.

"HoldCo Ordinary Shares" means ordinary shares in the capital of HoldCo with a nominal value of $0.00001 per share.

"HoldCo Organizational Documents" means the memorandum of association and articles of association of HoldCo as amended, restated, modified or supplemented from time to time.

"HoldCo Requisite Approvals" means the HoldCo Board Approval and the HoldCo Shareholder Approval, as applicable.

"HoldCo Shareholder Approval" means a written resolution of HoldCo's sole shareholder approving the amendment and restatement of the HoldCo Organizational Documents in the forms set out in Exhibit A and Exhibit B and the matters set out in this Agreement in the form agreed with SPAC (acting reasonably).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Incentive Equity Plans" has the meaning specified in Section 9.8(a).

"IFRS" means the International Financial Reporting Standards as adopted by the European Union.

"IHTA 1984" means the United Kingdom Inheritance Tax Act 1984.

A-10

Exhibit 6
Page 1305

**Table of Contents**

"<u>Indebtedness</u>" means with respect to any Person, without duplication, any obligations, contingent or otherwise (together with accrued and unpaid interest thereon and any prepayment premium or other penalties and any fees, costs, and expenses thereunder due upon repayment thereof), in respect of (a) the principal of and premium (if any) in respect of all indebtedness for borrowed money, including accrued interest and any per diem interest accruals or cost associated with prepaying any such indebtedness solely to the extent such indebtedness is prepaid, (b) the principal and interest components of capitalized lease obligations under GAAP, (c) amounts drawn (including any accrued and unpaid interest) on letters of credit, bank guarantees, bankers' acceptances and other similar instruments (solely to the extent such amounts have actually been drawn), (d) the principal of and premium (if any) in respect of obligations evidenced by bonds, debentures, notes, debt securities, loans, credit agreements and similar instruments, (e) payment obligations of a third party secured by (or for which the holder of such payment obligations has an existing right, contingent or otherwise, to be secured by) any Lien, other than a Permitted Lien, on assets or properties of such Person, whether or not the obligations secured thereby have been assumed, (f) the termination value of interest rate protection agreements and currency obligation swaps, hedges or similar arrangements (without duplication of other indebtedness supported or guaranteed thereby), (g) the principal component of all obligations to pay the deferred and unpaid purchase price of property and equipment which have been delivered, including "earn outs" and "seller notes" and (h) breakage costs, prepayment or early termination premiums, penalties, or other fees or expenses payable as a result of the consummation of the transactions contemplated hereby in respect of any of the items in the foregoing clauses (a) through (g), and (j) all Indebtedness of another Person referred to in clauses (a) through (h) above guaranteed directly or indirectly, jointly or severally.

"<u>Initial Exchange</u>" has the meaning specified in the Recitals hereto.

"<u>Intellectual Property</u>" means all intellectual property, including any and all rights in or to the following: (i) patents, patent applications, invention disclosures, including all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, provisionals, and extensions thereof (collectively, "<u>Patents</u>"); (ii) registered and unregistered trademarks, logos, service marks, certification marks, trade dress and trade names, taglines, social media identifiers and accounts, brand names, slogans, corporate names, business names, pending applications therefor, and all other indicia of source or origin, together with all goodwill symbolized by or associated with any of the foregoing and the right to sue for passing off (collectively, "<u>Marks</u>"); (iii) registered and unregistered copyrights, neighboring and related rights, mask work rights, design rights and all moral rights or similar attribution rights and applications for registration of copyright, including such corresponding rights in Software, and other works of authorship; (iv) know-how, trade secrets, confidential information, inventions, processes, procedures, database rights, customer lists, supplier lists, business plans, formulae, discoveries, methods, techniques, ideas, designs, models, concepts, creations, confidential business information and other proprietary information (collectively, "<u>Trade Secrets</u>"); (v) internet domain names and IP addresses; (vi) rights of publicity and privacy; (vii) all other intellectual property rights and other rights recognized under applicable Law that are equivalent or similar to any of the foregoing which subsist now or in the future; and (viii) applications, rights to apply for and be granted, registrations, issuances, renewals, extensions, rights to claim priority from, or equivalents or foreign equivalents or counterparts of any of the foregoing in any jurisdiction.

"<u>Intended Tax Treatment</u>" has the meaning specified in the Recitals hereto.

"<u>Intended UK Tax Treatment</u>" has the meaning specified in the Recitals hereto.

"<u>Intended U.S. Tax Treatment</u>" has the meaning specified in the Recitals hereto.

"<u>Interim Period</u>" has the meaning specified in <u>Section 7.1</u>.

"<u>International Trade Laws</u>" means all Laws relating to the import, export, re-export, deemed export, deemed re-export, or transfer of information, data, goods, and technology, including but not limited to the Export

A-11

Exhibit 6
Page 1306

Table of Contents

Administration Regulations administered by the United States Department of Commerce, the International Traffic in Arms Regulations administered by the United States Department of State, customs and import Laws administered by United States Customs and Border Protection, any other export or import controls administered by an agency of the United States government, the anti-boycott regulations administered by the United States Department of Commerce and the United States Department of the Treasury, and other Laws adopted by Governmental Authorities of the United Kingdom and of other territories (including the European Union, as enforced by its Member States) relating to the same subject matter as the United States Laws described above.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IRS" means the United States Internal Revenue Service.

"IT Systems" mean any and all information technology systems, hardware, servers, workstations, routers, hubs, switches, data communications lines and all other information technology equipment and assets and any Software in or used in connection with any of the foregoing, including any of the foregoing that are used (or held for use) pursuant to outsourced or cloud computing arrangements.

"JOBS Act" has the meaning specified in Section 5.7(a).

"Law" means any statute, law, ordinance, rule, regulation or Governmental Order, in each case, of any Governmental Authority.

"Leased Real Property" means all real property leased, licensed, subleased or otherwise used or occupied by the Company or any of its Subsidiaries.

"Legal Proceedings" has the meaning specified in Section 4.10.

"Letter of Transmittal" has the meaning specified in Section 3.3(b).

"Licenses" means any approvals, authorizations, consents, licenses, registrations, permits or certificates of a Governmental Authority.

"Lien" means all liens, mortgages, deeds of trust, pledges, hypothecations, encumbrances, security interests, adverse claim, options, restrictions, claims or other liens of any kind whether consensual, statutory or otherwise.

"Merger" has the meaning specified in the Recitals hereto.

"Merger Consideration" has the meaning specified in Section 3.2(c)(i).

"Merger Effective Time" has the meaning specified in Section 2.4(b)

"Merger Sub" has the meaning specified in the Preamble hereto.

"Merger Sub Board" means the board of directors of Merger Sub.

"Merger Sub Share Capital" means the ordinary shares of par value $0.00001 per share in the capital of Merger Sub.

"Minimum PIPE Investment Amount" has the meaning specified in Section 5.13(d).

"Modification in Recommendation" has the meaning specified in Section 9.2(b).

"Multiemployer Plan" has the meaning specified in Section 4.13(c).

A-12

Exhibit 6
Page 1307

**Table of Contents**

"NSIB" means the UK National Security and Investment Bill.

"Notice" means a notice to CFIUS filed pursuant to the DPA, including 31 C.F.R. Part 800, as appropriate, with respect to the Proposed Transaction.

"NYSE" has the meaning specified in Section 5.7(c).

"Offer Documents" has the meaning specified in Section 9.2(a)(i).

"Open Source License" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative or any Creative Commons License. "Open Source Licenses" shall include Copyleft Licenses.

"Open Source Materials" means any Software subject to an Open Source License.

"Payment Spreadsheet" means a spreadsheet that shall be delivered by the Company to SPAC pursuant to Section 3.1(a) at least two (2) Business Days prior to the Closing, which shall set forth, in accordance with the Exchange Ratio, the allocation of HoldCo Ordinary Shares post Stock Split among each of the Company Shareholders.

"PCAOB Financial Statements" has the meaning specified in Section 7.3.

"Permitted Action" means any such commercially reasonable action or inaction, whether or not in the ordinary course of business, that the Company reasonably believes is necessary or prudent for the Company or any of its Subsidiaries to take or abstain from taking, in order to carry on and preserve or protect their respective businesses, assets or properties or to protect the health or safety of natural Persons employed by the Company or any of its Subsidiaries, in each case, solely in connection with COVID-19 or any other pandemic, disease outbreak or other public health emergency, or the effect of any abatement thereof.

"Permitted Liens" means (i) mechanic's, materialmen's and similar Liens arising in the ordinary course of business with respect to any amounts (A) not yet due and payable or which are being contested in good faith through appropriate proceedings and (B) for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens for Taxes (A) not yet due and payable or (B) which are being contested in good faith through appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (iii) defects or imperfections of title, easements, encroachments, covenants, rights-of-way, conditions, matters that would be apparent from a physical inspection or current, accurate survey of such real property, restrictions and other similar charges or encumbrances that do not, in the aggregate, materially impair the value or materially interfere with the present use of the Leased Real Property, (iv) with respect to any Leased Real Property (A) the interests and rights of the respective lessors with respect thereto, including any statutory landlord liens and any Lien on the lessor's interest therein, and (B) any Liens encumbering the underlying fee title of the real property of which the Leased Real Property is a part, (v) zoning, building, entitlement and other land use and environmental regulations promulgated by any Governmental Authority that do not, in the aggregate, materially interfere with the current use of, or materially impair the value of, the Leased Real Property and which are not violated in any material respect, (vi) non-exclusive licenses of Company Intellectual Property granted to customers or distributors entered into in the ordinary course of business, (vii) ordinary course purchase money Liens and Liens securing rental payments under operating or capital lease arrangements for amounts not yet due or payable, (viii) other Liens arising in the ordinary course of business consistent with past practice and not incurred in connection with the borrowing of money or in connection with workers' compensation, unemployment insurance or other types of social security, (ix) reversionary rights in favor of landlords under any Real Property Leases with respect to any of the buildings or other improvements owned by the Company or any of its Subsidiaries, and (x) real property Liens that do not, individually or in the aggregate, result in a Company Material Adverse Effect.

A-13

Exhibit 6
Page 1308

**Table of Contents**

"Permitted Withdrawal" has the meaning specified in Section 9.2(b).

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or instrumentality or other entity of any kind.

"Pillsbury" has the meaning specified in Section 12.18(b).

"PIPE Investment" means the purchase of HoldCo Ordinary Shares pursuant to the Subscription Agreements.

"PIPE Investment Amount" means the aggregate gross purchase price received by HoldCo after the Exchange and immediately prior to the Merger Effective Time for the shares in the PIPE Investment.

"PIPE Investors" means those certain investors participating in the PIPE Investment pursuant to the Subscription Agreements, including SC Health Group Limited purchasing $50,000,000 of HoldCo Ordinary Shares.

"Plan of Merger" has the meaning specified in Section 2.2.

"Prospectus" has the meaning specified in Section 12.1.

"Proxy Statement" has the meaning specified in Section 9.2(a)(i).

"Proxy Statement/Registration Statement" has the meaning specified in Section 9.2(a)(i).

"Q1 Financial Statements" has the meaning specified in Section 7.3.

"Real Property Leases" has the meaning specified in Section 4.20(a)(ii).

"Registration Rights and Lock-Up Agreement" has the meaning specified in the Recitals hereto.

"Registration Statement" means the Registration Statement on Form S-4, or other appropriate form, including any pre-effective or post-effective amendments or supplements thereto, to be filed with the SEC by SPAC under the Securities Act with respect to the Registration Statement Securities.

"Registration Statement Securities" has the meaning specified in Section 9.2(a)(i).

"Resolutions" means the Equity Scheme Court Meeting Resolution, the Creditor Scheme Court Meeting Resolution and the Special Resolution, and any other resolutions to be proposed at the General Meeting.

"Rockley Group" has the meaning specified in Section 12.18(b).

"Rollover Spreadsheet" means a spreadsheet that shall be delivered by the Company to SPAC for SPAC's reasonable review and comment pursuant to Section 3.1(c), which shall set forth (a) the number of HoldCo Ordinary Shares for which each Company Option is exercisable after the replacement of such Company Option with a HoldCo Option in accordance with Section 3.4(a) (b) the holder thereof and (c) the applicable exercise prices of each Company Option and each HoldCo Option, (ii) the number of HoldCo Restricted Shares to be received by each holder upon replacement of the Company Restricted Stock in accordance with Section 3.4(b), and (iii) in respect of any Company Warrants that have been replaced by equivalent warrants issued by HoldCo pursuant to Section 3.4(a), the number of HoldCo Ordinary Shares upon exercise and the applicable exercise price.

"Ropes" has the meaning specified in Section 4.6(a).

A-14

Exhibit 6
Page 1309

**Table of Contents**

"<u>Sanctioned Country</u>" means, a country or territory which is itself the subject or target of any country-wide or territory-wide Sanctions Laws (at the time of this Agreement, the Crimea region, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means (i) any Person identified in any sanctions-related list of designated Persons maintained by (a) the United States Department of the Treasury's Office of Foreign Assets Control, the United States Department of Commerce, Bureau of Industry and Security, or the United States Department of State; (b) Her Majesty's Treasury of the United Kingdom; (c) any committee of the United Nations Security Council; or (d) the European Union; (ii) any Person located, organized, or resident in, or a Governmental Authority or government instrumentality of, any Sanctioned Country; and (iii) any Person directly or indirectly 50% or more owned by, or acting for the benefit or on behalf of, a Person described in clause (i) or (ii), either individually or in the aggregate.

"<u>Sanctions Laws</u>" means those trade, economic and financial sanctions Laws administered, enacted or enforced by (i) the United States (including the Department of the Treasury's Office of Foreign Assets Control), (ii) the European Union and enforced by its Member States, (iii) the United Nations, or (iv) Her Majesty's Treasury of the United Kingdom.

"<u>Sarbanes-Oxley Act</u>" means the Sarbanes-Oxley Act of 2002.

"<u>Schemes</u>" has the meaning specified in the Recitals hereto.

"<u>Scheme Convertible Notes</u>" means the Company Convertible Notes subject to the Creditor Scheme.

"<u>Scheme Creditors</u>" means such of the holders of Company Convertible Notes as the Company and SPAC determine jointly shall be subject to the Creditor Scheme subject to their convertible notes not having been either repaid in full or already converted into Company Ordinary Shares.

"<u>Scheme Consideration</u>" means the HoldCo Ordinary Shares to be issued to the Company Shareholders as consideration pursuant to the Equity Scheme.

"<u>Scheme Documents</u>" means the Equity Scheme Circular and the Creditor Scheme Circular.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Software</u>" means any and all (a) computer programs, including any and all algorithms, models and methodologies, whether in source code, object code, human readable form or other form, including compilers, middleware, tools, firmware, operating systems, specifications, platforms, algorithms, interfaces, APIs, architecture, modules, test specifications, scripts, executables, libraries, and other components thereof, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (c) all versions, updates, releases, patches, corrections, enhancements and modifications thereto and all documentation including developer notes, instructions, comments, annotations, user manuals and other training documentation relating to any of the foregoing.

"<u>SPAC</u>" has the meaning specified in the Preamble hereto.

"<u>SPAC Articles of Association</u>" means the Amended and Restated Articles of Association of SPAC adopted by special resolution on July 15, 2019.

"<u>SPAC Board</u>" means the board of directors of SPAC.

Exhibit 6
Page 1310

Table of Contents

"SPAC Class A Ordinary Shares" means Class A ordinary shares, par value $0.0001 per share, of SPAC.

"SPAC Class B Ordinary Share" means Class B ordinary shares, par value $0.00008 per share, of SPAC.

"SPAC Cure Period" has the meaning specified in Section 11.1(h).

"SPAC Disclosure Letter" has the meaning specified in the introduction to Article V.

"SPAC Extension" means the approval of SPAC shareholders by special resolution to extend the deadline in the articles of association of SPAC for SPAC to complete an initial business combination to 16 August 2021 (and any further extension).

"SPAC Forward Purchase Warrant" means the Forward Purchase Warrants (as such term is defined in the Warrant Agreement).

"SPAC Forward Purchase Shares" means the Forward Purchase Shares (as such term is defined in the Forward Purchase Agreement).

"SPAC Financial Statements" has the meaning specified in Section 5.7(d).

"SPAC Group" has the meaning specified in Section 12.18(a).

"SPAC Indemnified Parties" has the meaning specified in Section 7.8(a).

"SPAC Memorandum of Association" means the Amended and Restated Memorandum of Association of SPAC adopted by special resolution on July 15, 2019.

"SPAC Ordinary Shares" means SPAC Class A Ordinary Shares and SPAC Class B Ordinary Shares.

"SPAC Ordinary Warrant" means a warrant to purchase one (1) SPAC Class A Ordinary Share at an exercise price of eleven Dollars fifty cents ($11.50) that was included in the units sold as part of SPAC's initial public offering.

"SPAC Organizational Documents" means SPAC Memorandum of Association, SPAC Articles of Association, and the Trust Agreement, in each case as amended, modified, restated or supplemented from time to time.

"SPAC Private Placement Warrant" means a warrant to purchase one (1) SPAC Class A Ordinary Share at an exercise price of eleven Dollars fifty cents ($11.50) issued to the Sponsor.

"SPAC SEC Filings" has the meaning specified in Section 5.6.

"SPAC Securities" has the meaning specified in Section 5.13(a).

"SPAC Share Redemption" means the election of an eligible (as determined in accordance with SPAC's Governing Documents) holder of SPAC Class A Ordinary Shares to redeem all or a portion of SPAC Class A Ordinary Shares held by such holder at a per-share price, payable in cash, equal to a pro rata share of the aggregate amount on deposit in the Trust Account (including any interest earned on the funds held in the Trust Account) (as determined in accordance with SPAC's Governing Documents) in connection with the Transaction Proposals.

"SPAC Share Redemption Amount" means the aggregate amount payable with respect to all SPAC Share Redemptions.

A-16

Exhibit 6
Page 1311

Table of Contents

"SPAC Shareholder Approval" means the approval of those Transaction Proposals identified in Section 9.2(b), in each case, by an affirmative vote of the holders of at least two-thirds of SPAC Ordinary Shares who, being entitled to, attend and vote thereupon (as determined in accordance with SPAC's Governing Documents) at a shareholders' meeting duly called by SPAC Board and held for such purpose.

"SPAC Shareholders" means the shareholders of SPAC as of immediately prior to the Merger Effective Time.

"SPAC Shareholders' Meeting" has the meaning specified in Section 9.2(b).

"SPAC Investor Support Agreement" means that certain Support Agreement, dated as of the date hereof, by and among the Sponsor, HoldCo and the Company, as amended or modified from time to time.

"SPAC Warrants" means SPAC Ordinary Warrants and SPAC Private Placement Warrants.

"Special Resolution" means the resolution of the Company, among other things, necessary to implement the Equity Scheme.

"Sponsor" means SC Health Holdings Limited, a Cayman Islands exempted company limited by shares.

"Stock Split" has the meaning specified in the Recitals hereto.

"Subscription Agreements" means the subscription agreements pursuant to which the PIPE Investment will be consummated.

"Subsidiary" means, with respect to a Person, a corporation or other entity of which more than 50% of the voting power of the equity securities or equity interests is owned, directly or indirectly, by such Person.

"Surviving Company" has the meaning specified in Section 2.2(b).

"Tax Return" means any return, declaration, report, statement, information statement or other document filed or required to be filed with any Governmental Authority with respect to Taxes, including any claims for refunds of Taxes, any information returns and any schedules, attachments, amendments or supplements of any of the foregoing.

"Taxes" means any and all federal, state, local, foreign or other taxes imposed by any Governmental Authority, including all income, gross receipts, license, payroll, net worth, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, escheat, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, employment, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, governmental charges, duties, levies and other similar charges imposed by a Governmental Authority in the nature of a tax, alternative or add-on minimum, or estimated taxes, and including any interest, penalty, or addition thereto.

"Terminating Company Breach" has the meaning specified in Section 11.1(g).

"Terminating SPAC Breach" has the meaning specified in Section 11.1(h).

"Title IV Plan" has the meaning specified in Section 4.13(c).

"Top Customers" has the meaning specified in Section 4.28(a).

"Top Suppliers" has the meaning specified in Section 4.28(a).

A-17

Exhibit 6
Page 1312

**Table of Contents**

"Transactions" means the transactions contemplated by the Transaction Documents, including the Initial Exchange, Exchange, the transactions related to the Exchange, the PIPE Investment and the Merger.

"Transaction Documents" means this Agreement, including all schedules and exhibits hereto, the Company Disclosure Letter, the Ancillary Agreements, and all other agreements, certificates and instruments executed and delivered by SPAC, HoldCo, Merger Sub or the Company in connection with the transactions and specifically contemplated by this Agreement.

"Transaction Expenses" means the following out-of-pocket fees and expenses paid or payable by the Company or any of its Subsidiaries (whether or not billed or accrued for) as a result of or in connection with the negotiation, documentation and consummation of the transactions contemplated hereby: (i) all fees, costs, expenses, brokerage fees, commissions, finders' fees and disbursements of financial advisors, investment banks, data room administrators, attorneys, accountants and other advisors and service providers, (ii) change-in-control payments, transaction bonuses, retention payments, severance or similar compensatory payments payable by the Company or any of its Subsidiaries to any current or former employee (including any amounts due under any consulting agreement with any such former employee), independent contractor, officer, or director of the Company or any of its Subsidiaries as a result of the transactions contemplated hereby (and not tied to any subsequent event or condition, such as a termination of employment), including the employer portion of payroll Taxes arising therefrom, (iii) Transfer Taxes, (iv) any and all filing fees payable by the Company or any of its Subsidiaries to the Antitrust Authorities in connection with the transactions contemplated hereby, and (v) amounts owing or that may become owed, payable or otherwise due, directly or indirectly, by the Company or any of its Subsidiaries to any Affiliate of the Company or any of its Subsidiaries in connection with the consummation of the transactions contemplated hereby, including fees, costs and expenses related to the termination of any Affiliate Agreement.

"Transaction Proposals" has the meaning specified in Section 9.2(b).

"Transfer Taxes" has the meaning specified in Section 9.4.

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"Treasury Share" has the meaning specified in Section 3.2(a).

"Trust Account" has the meaning specified in Section 12.1.

"Trust Agreement" has the meaning specified in Section 5.9.

"Trustee" has the meaning specified in Section 5.9.

"Unpaid Transaction Expenses" has the meaning specified in Section 2.5(c).

"VAT" means: (a) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and (b) any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"Warrant Agreement" means the Warrant Agreement, dated as of July 11, 2019, between SPAC, Sponsor and American Stock Transfer & Trust Company.

"Working Capital Loans" means any loan made to SPAC by any of the Sponsor, an Affiliate of the Sponsor, or any of SPAC's officers or directors, and evidenced by a promissory note, for the purpose of financing costs incurred in connection with a Business Combination.

"Written Consent" has the meaning specified in Section 9.2(c).

Exhibit 6
Page 1313

Table of Contents

**Section 1.2 Construction.**

(a) Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation" and (vi) the word "or" shall be disjunctive but not exclusive.

(b) Unless the context of this Agreement otherwise requires, references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

(d) All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(e) The term "actual fraud" means, with respect to a party to this Agreement, an actual and intentional fraud with respect to the making of the representations and warranties pursuant to Article IV, Article V, or Article VI (as applicable), provided, that such actual and intentional fraud of such Person shall only be deemed to exist if any of the individuals included on Section 1.3 of the Company Disclosure Letter (in the case of the Company, HoldCo and Merger Sub) or Section 1.3 of SPAC Disclosure Letter (in the case of SPAC) had actual knowledge (as opposed to imputed or constructive knowledge) that the representations and warranties made by such Person pursuant to, in the case of the Company, Article IV as qualified by the Company Disclosure Letter, or, in the case of SPAC, Article V as qualified by SPAC Disclosure Letter, or, in case of the Merger Sub or HoldCo, Article VI were actually breached when made, with the express intention that the other party to this Agreement rely thereon to its detriment.

**Section 1.3 Knowledge**. As used herein, (i) the phrase "to the knowledge" of the Company shall mean the knowledge of the individuals identified on Section 1.3 of the Company Disclosure Letter and (ii) the phrase "to the knowledge" of SPAC shall mean the knowledge of the individuals identified on Section 1.3 of SPAC Disclosure Letter, in each case, as such individuals would have acquired in the exercise of a reasonable inquiry of direct reports.

## ARTICLE II

### EXCHANGE; AGREEMENT AND PLAN OF MERGER

**Section 2.1 Initial Exchange.**

(a) The Initial Exchange shall take place through the Equity Scheme and the Creditor Scheme, an overview of which is set out in **Schedule A** attached hereto**.** Save where the SPAC and the Company agree otherwise by April 2, 2021 that the alternatives set out in Schedule A shall be adopted, the Equity Scheme will be implemented by way of a transfer scheme of arrangement under Part 26 of the Companies Act.

(b) The Company shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) be responsible for the preparation of the Scheme Documents and all other documentation necessary to effect the Schemes and to convene the Court Meetings and the General Meeting, with all such documentation (including the Scheme Documents) to be agreed by the Company with SPAC (acting reasonably);

(ii) for the purpose of implementing the Schemes, shall provide SPAC with the opportunity to attend any meetings with the barrister instructed by the Company in connection with the Schemes to discuss matters pertaining to the Schemes, and any issues arising in connection with them;

A-19

Exhibit 6
Page 1314

Table of Contents

(iii) as promptly as reasonably practicable after the date of this Agreement make all necessary applications to the Court in connection with the implementation of the Schemes, including issuing appropriate proceedings requesting the Court to give directions as to what are the appropriate meetings to be held and to order that the Court Meetings be convened as promptly as is reasonably practicable following the date of this Agreement, and to use its reasonable best efforts to ensure that the hearing of such proceedings occurs as promptly as is reasonably practicable in order to facilitate the despatch of the Scheme Documents and seek such directions of the Court as it considers necessary or desirable in connection with such Court Meetings and thereafter comply with such directions;

(iv) procure the publication of the requisite advertisements and despatch of the Scheme Documents (and the related forms of proxy for the use at the Court Meetings and the General Meeting (the form of which shall be agreed between the Company and SPAC, each acting reasonably) as promptly as reasonably practicable after securing approval of the Court to despatch such documents, and thereafter shall publish and/or post such other documents and information (the form of which shall be agreed between the Company and SPAC, each acting reasonably) as the Court may approve or direct from time to time;

(v) prior to the Court Meetings, keep SPAC reasonably informed on a reasonably current basis of the number of proxy votes received in respect of resolutions to be proposed at the Court Meetings and/or the General Meeting, and in any event provide such number promptly upon the request of SPAC and use reasonable best efforts to solicit proxies as may be necessary to pass the Resolutions at the Court Meetings and/or the General Meeting;

(vi) hold the Court Meetings and the General Meeting on the relevant dates set out in the Scheme Documents, or such later date as may be agreed in writing by the Company and SPAC (such agreement not to be unreasonably withheld, conditioned or delayed), and in such a manner as shall be approved, if necessary by the Court, and propose the Resolutions in the form agreed to in writing by SPAC, such agreement not to be unreasonably withheld, conditioned or delayed;

(vii) shall procure that a special resolution be proposed to the Company Shareholders at the General Meeting proposing that the Company Articles of Association be amended so that any Company Shares allotted following the General Meeting will either be subject to the terms of the Equity Scheme or acquired by HoldCo for the same Scheme Consideration as shall be payable to Company Shareholders under the Equity Scheme (depending upon the timing of such allotment);

(viii) following the Court Meetings and the General Meeting, assuming the Resolutions are duly passed (including by the requisite majorities required under the Companies Act in the case of the Court Meetings) and all other conditions of the Schemes are satisfied or with the prior consent of SPAC, waived (where permissible under the Scheme Documents) take all necessary steps on the part of the Company to prepare and issue, serve and lodge all such court documents as are required to seek the sanction of the Court to the Schemes as soon as possible thereafter; provided, that, if the Creditor Scheme Court Meeting Resolution is not duly passed and/or any other conditions of the Creditor Scheme are not satisfied or waived, the Company shall take all necessary steps on the part of the Company to prepare and issue, serve and lodge all such court documents as are required to seek the sanction of the Court to the Equity Scheme as soon as possible thereafter;

(ix) if the Company becomes aware of any information that, pursuant to the Act, should be disclosed in an amendment or supplement to the Scheme Documents then on becoming so aware shall promptly inform SPAC and the Company and SPAC shall cooperate with each other in submitting or filing such amendment or supplement with the Court and, if required, in mailing such amendment to the Company Shareholders or Company Convertible Notes participating in the Creditor Scheme, as applicable;

(c) HoldCo shall, unless this Agreement has been validly terminated pursuant to Section 11.1 provide a written undertaking to the Court to be bound by the terms of the Equity Scheme and the Creditor Scheme insofar as it relates to HoldCo;

A-20

Exhibit 6
Page 1315

Table of Contents

(d) Both the Company and HoldCo shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) keep SPAC reasonably informed as to the performance of the obligations and responsibilities required of them pursuant to the Schemes;

(ii) agree with SPAC the content and form or all pleadings, affidavits, petitions and other filings prepared by them for submission to the Court in connection with the Schemes prior to their filing; and

(iii) give such undertakings as are required by the Court in connection with the Schemes as are reasonably necessary to implement the Schemes.

(e) SPAC shall, unless this Agreement has been validly terminated pursuant to Section 11.1:

(i) assume responsibility for the information relating to it contained in the Equity Scheme Circular and the Creditor Scheme Circular or filed with the Court or in any announcement, in each case unless provided for inclusion by or on behalf of the Company; and

(ii) review and provide comments (if any) in a reasonably timely manner on all documentation submitted to it by the Company.

(f) At the closing of the Initial Exchange and implementation of the Schemes, it is proposed that:

(i) the Company Ordinary Shares held by Company Shareholders will provided the Equity Scheme has become effective:

(A) if a cancellation scheme is used: be cancelled and following such cancellation the issued share capital of the Company will be restored to its former amount by the application of the credit arising on the balance sheet of the Company in paying up in full, at par, shares of an equivalent nominal value, which will be issued by the Company to HoldCo; or

(B) if a transfer scheme is used: be transferred to HoldCo,

in both cases, in consideration HoldCo shall allot and issue to each of the Company Shareholders one (1) HoldCo Ordinary Share for each Company Ordinary Share that they have cancelled or transferred; and

(ii) the Scheme Convertible Notes held by the Scheme Creditors will provided the Creditor Scheme has become effective:

(A) if a cancellation scheme has been used for the Company Ordinary Shares: the Company proposes to novate its obligations under the Convertible Loan Notes to HoldCo and the Scheme Creditors will accept the performance by HoldCo of the Convertible Loan Notes in place of performance by the Company and discharge HoldCo from further obligations under the Convertible Loan Notes; or

(B) if a transfer scheme is used: HoldCo proposes to acquire the Scheme Convertible Loan Notes from each Scheme Creditor in consideration of HoldCo entering into new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Loan Notes will be amended to a form of inter-company loan between HoldCo and the Company.

(g) Immediately prior to the Merger Effective Time, SPAC and HoldCo shall consummate (i) the Stock Split and (ii) the transactions contemplated by the PIPE Investment, including the issuance of HoldCo Ordinary Shares contemplated thereby.

**Section 2.2 The Merger.**

(a) Upon the terms and subject to the conditions set forth in this Agreement, and immediately following the consummation of the PIPE Investment, Merger Sub shall be merged with and into SPAC (Merger Sub and SPAC sometimes being referred to herein as the "Constituent Companies"), with SPAC being the surviving company in

A-21

Exhibit 6
Page 1316

Table of Contents

the Merger. The Merger shall be consummated in accordance with this Agreement and a plan of merger with respect to the Merger in accordance with the relevant provisions of the Cayman Statute in a form substantially the same as that attached at Exhibit D (with any changes to be reasonably agreed by or on behalf of the Company and SPAC) (the "Plan of Merger"), executed by the Constituent Companies and filed (together with the required supporting declarations of a director of each Constituent Company) with the Cayman Registrar in accordance with the relevant provisions of the Cayman Statute. The consummation of the Exchange shall be a condition precedent to the consummation of the Merger.

(b) Upon consummation of the Merger, the separate corporate existence of Merger Sub shall cease and SPAC, as the surviving company of the Merger (hereinafter referred to for the periods at and after the Merger Effective Time as the "Surviving Company"), shall continue its corporate existence under the Cayman Statute, as a wholly owned subsidiary of HoldCo.

**Section 2.3 Effects of the Merger**. At and after the Merger Effective Time, the Surviving Company shall thereupon and thereafter possess all of the rights, privileges, powers and franchises, of a public as well as a private nature, of the Constituent Companies, and shall become subject to all the restrictions, disabilities and duties of each of the Constituent Companies; and all rights, privileges, powers and franchises of each Constituent Company, and all property, real, personal and mixed, and all debts due to each such Constituent Company, on whatever account, shall become vested in the Surviving Company; and all property, rights, privileges, powers and franchises, and all and every other interest shall become thereafter the property of the Surviving Company as they are of the Constituent Companies; all of the foregoing in accordance with the applicable provisions of the Cayman Statute.

**Section 2.4 Closing; Merger Effective Time.**

(a) In accordance with the terms and subject to the conditions of this Agreement, the closing of the Merger (the "Closing") shall take place at the offices of Pillsbury Winthrop Shaw Pittman, LLP, 31 West 52nd Street, New York, New York 10019, at 10:00 a.m. (New York time) on the date which is two (2) Business Days after the first date on which all conditions set forth in Article X shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such other time and place as SPAC and the Company may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date".

(b) Subject to the satisfaction or waiver of all of the conditions set forth in Article X of this Agreement, and provided this Agreement has not theretofore been terminated pursuant to its terms, SPAC, Merger Sub, and the Company shall cause the Plan of Merger to be executed and duly submitted for filing with the Cayman Registrar in accordance with the applicable provisions of the Cayman Statute, together with the required declaration from a director of each Constituent Company in substantially the form attached at Exhibit D (with such changes requested to reflect the facts as apply at that time). The Merger shall become effective at the time when the Plan of Merger is registered by the Cayman Registrar, or at such later time as may be agreed by SPAC and the Company in writing and specified in the Plan of Merger (the "Merger Effective Time").

(c) For the avoidance of doubt, the Closing and the Merger Effective Time shall occur after the Equity Scheme becoming effective.

**Section 2.5 Closing Deliverables.**

(a) At the Closing, the Company, HoldCo and Merger Sub will deliver or cause to be delivered:

(i) to SPAC, a certificate signed by an officer of the Company, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 10.2(a), Section 10.2(b) and Section 10.2(c) have been fulfilled;

(ii) to SPAC, the Registration Rights and Lock-Up Agreement, duly executed by the Company Shareholders that are parties thereto and HoldCo;

A-22

Exhibit 6
Page 1317

**Table of Contents**

(iii) to SPAC, a certificate on behalf of the Company dated no more than thirty (30) days prior to the Closing Date, prepared in a manner consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(g), (h) and 1.1445-2(c)(3), certifying that no interest in the Company is, or has been during the relevant period specified in Section 897(c)(1)(A)(ii) of the Code, a "U.S. real property interest" within the meaning of Section 897(c) of the Code, and a form of notice to the Internal Revenue Service prepared in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2); and

(iv) to SPAC, the Andrew Rickman Employment Agreement Amendment, duly executed by each of HoldCo (or one of its Subsidiaries) and Andrew Rickman;

(b) At the Closing, SPAC will deliver or cause to be delivered:

(i) to the Company, a certificate signed by an officer of SPAC, dated the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 10.3(a), Section 10.3(b) and Section 10.3(c) have been fulfilled; and

(ii) to the Company, the Registration Rights and Lock-Up Agreement, duly executed by duly authorized representatives of SPAC and the Sponsor.

(c) On the Closing Date, concurrently with the Merger Effective Time, the Surviving Company shall pay or cause to be paid by wire transfer of immediately available funds, (i) all accrued transaction expenses of SPAC (which shall include any outstanding amounts under any Working Capital Loans) as set forth on a written statement to be delivered to the Company not less than two (2) Business Days prior to the Closing Date and (ii) all accrued and unpaid Transaction Expenses ("Unpaid Transaction Expenses") as set forth on a written statement to be delivered to SPAC by or on behalf of the Company not less than two (2) Business Days prior to the Closing Date, which shall include the respective amounts and wire transfer instructions for the payment thereof, together with corresponding invoices for the foregoing; provided, that any Unpaid Transaction Expenses due to current or former employees, independent contractors, officers, or directors of the Company or any of its Subsidiaries shall be paid to the Company for further payment to such employee, independent contractor, officer or director through the Company's payroll.

(d) **Frustration of Closing Conditions.** None of the Company, HoldCo or SPAC may rely on the failure of any condition set forth in this Section 2.5 to be satisfied if such failure was caused by such Party's failure to comply with its obligation under this Agreement.

**Section 2.6 Governing Documents.**

(a) The memorandum of association and the articles of association of the Merger Sub in effect immediately prior to the Merger Effective Time, shall be the memorandum of association and the articles of association of the Surviving Company until thereafter amended as provided therein and under the Cayman Statute, except that the name of the Surviving Company shall be Rockley Photonics Cayman Limited.

(b) The memorandum of association and the articles of association of HoldCo as of immediately prior to the Closing Date (which shall be in the form attached as Exhibits A and B hereto (with such changes as may be agreed in writing by SPAC and the Company)), shall be the memorandum of association and the articles of association of HoldCo from and after the Effective Time, until thereafter amended as provided therein and under the Cayman Statute.

**Section 2.7 Directors and Officers.**

(a) The parties shall cause the initial directors of the Company and the initial officers of the Company on the Merger Effective Time to be comprised of the individuals set forth on Exhibit B of the Company Disclosure Letter, each to hold office in accordance with the Company Organizational Documents.

(b) At the Merger Effective Time, subject to CFIUS Approval, if applicable, the parties shall cause (including by obtaining the HoldCo Requisite Approvals) the initial directors of HoldCo and the initial officers of

A-23

Exhibit 6
Page 1318

Table of Contents

HoldCo as of immediately following the Merger Effective Time to be comprised of the individuals set forth on Exhibit C of the Company Disclosure Letter, each to hold office in accordance with the HoldCo Organizational Documents.

(c) The parties shall cause the initial directors of the Surviving Company and the officers of Surviving Company as of immediately following the Merger Effective Time to be comprised of the individuals set forth on Exhibit D of the Company Disclosure Letter, each to hold office in accordance with the memorandum and articles of association of the Surviving Company.

**Section 2.8 Tax Matters**

(a) The parties intend that, for United States federal income tax purposes, the Transactions qualify for the Intended U.S. Tax Treatment and this Agreement is hereby adopted as, a plan of reorganization for purposes of Sections 354, 361 and the 368 of the Code and within the meaning of Treasury Regulations Section 1.368-2(g). For U.S. federal income tax purposes, each of SPAC, HoldCo, the Company and Merger Sub, (i) is classified as an association taxable as a corporation as of the date hereof, and (ii) shall, unless the Company and the Sponsor agree otherwise, maintain such classification until at least two business days after the Closing Date. The Transactions shall be reported by the parties for all applicable Tax purposes in accordance with the foregoing, unless otherwise required by a Governmental Authority as a result of a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of applicable state, local or non-U.S. Tax Law) or a change in applicable Law after the date hereof.

(b) The parties intend that, for UK tax purposes, the Transactions qualify for the Intended UK Tax treatment. Clearance applications have been submitted to HM Revenue & Customs seeking confirmation that the Board of HM Revenue & Customs are satisfied that Section 137 of the Taxation of Chargeable Gains Act 1992 shall not apply to the Transactions. Clearance has also been sought to confirm that the Equity Scheme (if executed as a transfer scheme) shall qualify for reconstruction relief from stamp duty under Section 77 of the Finance Act 1986.

(c) None of the parties knows of any fact or circumstance (without conducting independent inquiry or diligence of the other relevant party), or has knowingly taken or will knowingly take any action (excluding any action contemplated by this Agreement), if such fact, circumstance or action would be reasonably expected to cause the Transactions to fail to qualify for the Intended Tax Treatment. Each of the parties agrees to use reasonable best efforts to promptly notify all other parties of any challenge to the Intended Tax Treatment by any Governmental Authority. The parties shall reasonably cooperate in good faith with each other and their respective counsel to document and support the Tax treatment of the Transactions consistent with the Intended Tax Treatment, including providing reasonable and customary factual support letters. Further, each of the parties shall (and shall cause their respective Affiliates to) cooperate fully, as and to the extent reasonably requested by another party, in connection with the filing of relevant Tax Returns, and any audit or tax proceeding. Such cooperation may include the retention and (upon the other party's request) the provision (with the right to make copies) of records and information reasonably relevant to any tax proceeding or audit, making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

<div align="center">

**ARTICLE III**

**EXCHANGE CONSIDERATION AND EFFECTS OF THE MERGER ON THE COMPANY CAPITAL STOCK, CONVERTIBLE NOTES AND EQUITY AWARDS**

</div>

**Section 3.1 Initial Exchange Consideration**.

(a) The new HoldCo Ordinary Shares following the Equity Scheme will be held in the same proportions as the Company Ordinary Shares were held in the Company prior to the Equity Scheme .

<div align="center">A-24</div>

Exhibit 6
Page 1319

Table of Contents

(b) For the avoidance of doubt, the allocation of HoldCo Ordinary Shares in the Stock Split shall be based on the Exchange Ratio as set forth in the Payment Spreadsheet.

(c) At least five (5) Business Days prior to the Closing Date, the Company shall cause the Chief Financial Officer of the Company, solely in his or her capacity as such, to deliver to SPAC a certificate certified by such Chief Financial Officer (solely in his or her capacity as such) setting forth: (i) the Company's good faith estimate of the Transaction Expenses, including reasonable supporting materials for the amount of each item included in Transaction Expenses and (ii) the Payment Spreadsheet and the Rollover Spreadsheet.

**Section 3.2 Conversion of Securities**.

(a) Immediately prior to the Merger Effective Time, each SPAC Class B Ordinary Share issued and outstanding immediately prior to the Merger Effective Time shall automatically be converted into and exchanged for a number of validly issued, fully paid and nonassessable SPAC Class A Ordinary Shares equal to the Class B Conversion Ratio (the "SPAC Class B Conversion") and SPAC shall cause its register of members to be updated, with effect immediately prior to the Merger Effective Time, to reflect the SPAC Class B Conversion;

(b) For the avoidance of doubt, HoldCo Ordinary Shares are being issued in consideration for the acquisition of SPAC in connection with the Transactions.

(c) At the Merger Effective Time, immediately following SPAC Class B Conversion, by virtue of the Merger, and without any further action on the part of SPAC, Merger Sub, HoldCo or the Company or the holders of any of the following securities:

(i) each SPAC Class A Ordinary Share (other than any SPAC Class A Ordinary Shares held in treasury by SPAC (if any) (each, an "Excluded Share" and, collectively, "Excluded Shares")) issued and outstanding immediately prior to the Merger Effective Time shall automatically be exchanged for one HoldCo Ordinary Share, in accordance with Section 233(5) of the Cayman Statute following a share capital increase realized by HoldCo by virtue of the Merger, to be subscribed by the contributing holders of SPAC Class A Ordinary Shares (the "Merger Consideration"), which HoldCo Ordinary Shares HoldCo shall cause to be issued and delivered in accordance with its obligations set forth in Section 3.3;

(ii) all SPAC Class A Ordinary Shares (other than the Excluded Shares) shall cease to be outstanding, shall be cancelled and shall cease to exist and (A) each certificate formerly representing SPAC Class A Ordinary Shares (other than Excluded Shares) and (B) each entry in SPAC's register of members formerly representing SPAC Class A Ordinary Shares (other than Excluded Shares) issued and outstanding immediately prior to the Merger Effective Time shall thereafter, in case of both (A) and (B), only represent the right to receive Merger Consideration into which such SPAC Class A Ordinary Shares have been exchanged (and contributed-in-kind) pursuant to this Section 3.2 and any distribution or dividend pursuant to Section 3.3(c);

(iii) each Excluded Share shall, by virtue of the Merger and without any further action on the part of SPAC, Merger Sub, HoldCo or the Company or holder thereof, cease to be outstanding, shall be cancelled without payment of any consideration therefor and shall cease to exist; and

(iv) each ordinary share, par value $0.00001 per share, of Merger Sub (the "Merger Sub Ordinary Shares") issued and outstanding immediately prior to the Merger Effective Time shall be converted into and exchanged for one (1) validly issued, fully paid and nonassessable ordinary share, par value $0.0001 per share, of the Surviving Company.

(d) On the Closing Date (and after the Merger Effective Time and the consummation of the transactions contemplated by Section 3.2(c)), SPAC shall cause its register of members to be updated, to reflect the transactions contemplated by Section 3.2(c)(ii) to Section 3.2(c)(iv).

A-25

Exhibit 6
Page 1320

Table of Contents

**Section 3.3 Exchange Procedures.**

(a) On the Closing Date (and after the Merger Effective Time and the consummation of the transactions contemplated by Section 3.2(c)), HoldCo shall deposit with a bank or trust company that shall be designated by SPAC and is reasonably satisfactory to the Company (the "Exchange Agent"), for the benefit of the holders of SPAC Ordinary Shares, for exchange in accordance with this Article III, the number of HoldCo Ordinary Shares (in uncertificated registered form) sufficient to deliver the Merger Consideration consisting of the HoldCo Ordinary Shares to be issued to the holders of SPAC Class A Ordinary Shares (other than Excluded Shares) in the Merger pursuant to this Agreement and HoldCo shall cause its register of members to be updated, to reflect the deposit of such HoldCo Ordinary Shares with the Exchange Agent. In addition, HoldCo shall deposit, or cause to be deposited, with the Exchange Agent, as necessary from time to time after the Merger Effective Time, any dividends or other distributions payable pursuant to Section 3.3(c) (all such HoldCo Ordinary Shares, together with the amount of any dividends or distributions contemplated pursuant to Section 3.3(c), being hereinafter referred to, collectively, as the "Exchange Fund"). HoldCo shall cause the Exchange Agent pursuant to irrevocable instructions, to deliver the Merger Consideration out of the Exchange Fund in accordance with this Agreement. Except as contemplated by this Section 3.3 hereof, the Exchange Fund shall not be used for any other purpose. The Exchange Agent shall invest the cash portion of the Exchange Fund as directed by HoldCo; provided that such investments shall be in obligations, funds or accounts typical for (including having liquidity typical for) transactions of this nature. To the extent that there are losses or any diminution of value with respect to such investments, or the Exchange Fund diminishes for any other reason below the level required to make prompt cash payment of any dividends or other distributions payable pursuant to Section 3.3(c), HoldCo shall promptly replace or restore the cash in the Exchange Fund lost through such investments or other events so as to ensure that the Exchange Fund is at all times maintained at a level sufficient to make such cash payments. Any interest and other income resulting from such investment shall become a part of the Exchange Fund, and any amounts in excess of the amounts payable under this Section 3.3(a) shall be promptly returned to HoldCo.

(b) As promptly as practicable after the Merger Effective Time, HoldCo shall use its reasonable best efforts to cause the Exchange Agent to deliver to each holder of record of SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from SPAC Class B Conversion) entitled to receive the Merger Consideration pursuant to Section 3.2 a letter of transmittal, which shall be in a form reasonably acceptable to SPAC and the Company (the "Letter of Transmittal") and shall specify (i) that delivery shall be effected, and risk of loss and title to the certificates evidencing such SPAC Ordinary Shares (collectively, the "Certificates") shall pass, only upon proper delivery of the Certificates to the Exchange Agent; and (ii) instructions for use in effecting the surrender of the Certificates pursuant to the Letter of Transmittal. Within five (5) Business Days after the surrender to the Exchange Agent of all Certificates held by such holder for cancellation, together with a Letter of Transmittal, duly completed and validly executed in accordance with the instructions thereto and such other documents as may be required pursuant to such instructions, the holder of such Certificates shall be entitled to receive in exchange therefor, and HoldCo shall cause the Exchange Agent to deliver (i) the Merger Consideration and (ii) an amount in immediately available funds (or, if no wire transfer instructions are provided, a check) equal to any unpaid non-stock dividends and any other dividends or other distributions that such holder has the right to receive pursuant to Section 3.3(c) in accordance with the provisions of this Section 3.3, and the Certificates so surrendered shall forthwith be cancelled. No interest will be paid or accrued on any amount payable upon due surrender of the Certificates. Until surrendered as contemplated by this Section 3.3, each Certificate entitled to receive a portion of the Merger Consideration in accordance with Section 3.2 shall be deemed at all times after the Merger Effective Time, as the case may be, to represent only the right to receive upon such surrender the Merger Consideration that such holder is entitled to receive in accordance with the provisions of Section 3.2. HoldCo shall cause its register of members to be updated to reflect any transfers of HoldCo Ordinary Shares made by the Exchange Agent to holders of record of SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from the SPAC Class B Conversion) in connection with the delivery of Merger Consideration out of the Exchange Fund in accordance with this Section 3.3.

(c) No dividends or other distributions declared or made after the Merger Effective Time with respect to the HoldCo Ordinary Shares with a record date after the Merger Effective Time shall be paid to the holder of any

A-26

Exhibit 6
Page 1321

Table of Contents

unsurrendered Certificate with respect to SPAC Class A Ordinary Shares (including SPAC Class A Ordinary Shares resulting from SPAC Class B Conversion) represented thereby until the holder of such Certificate shall surrender such Certificate in accordance with this Section 3.3. Subject to the effect of escheat, tax or other applicable Laws, following surrender of any such Certificate, HoldCo shall pay or cause to be paid to the holder of the certificates representing SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from SPAC Class B Conversion) issued in exchange therefor, without interest, (i) promptly, but in any event within five (5) Business Days of such surrender, the amount of dividends or other distributions with a record date after the Merger Effective Time and theretofore paid with respect to such Person's HoldCo Ordinary Shares, and (ii) at the appropriate payment date, the amount of dividends or other distributions, with a record date after the Merger Effective Time but prior to surrender and a payment date occurring after surrender, payable with respect to such Person's HoldCo Ordinary Shares.

(d) The Merger Consideration payable upon conversion of SPAC Class A Ordinary Shares (including SPAC Class A Ordinary Shares resulting from SPAC Class B Conversion) in accordance with the terms hereof, when paid in accordance with this Section 3.3 shall be deemed to have been paid and issued in full satisfaction of all rights pertaining to such SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from the conversion of SPAC Class B Ordinary Shares).

(e) The Merger Consideration shall be adjusted to reflect appropriately the effect of any stock split, reverse share split, stock dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change with respect to SPAC Ordinary Shares occurring on or after the date hereof and prior to the Merger Effective Time.

(f) Any portion of the Exchange Fund that remains undistributed to the holders of SPAC Ordinary Shares with respect to the Merger Consideration for one (1) year after the Merger Effective Time shall be delivered to HoldCo, and any holders of SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from SPAC Class B Conversion) who have not theretofore complied with this Section 3.3 shall thereafter look only to HoldCo for the Merger Consideration. Any portion of the Exchange Fund with respect to the Merger Consideration remaining unclaimed by holders of SPAC Ordinary Shares (including SPAC Class A Ordinary Shares resulting from the conversion of SPAC Class B Conversion), as may be applicable, as of a date which is immediately prior to such time as such amounts would otherwise escheat to or become property of any government entity shall, to the extent permitted by applicable Law, become the property of HoldCo free and clear of any claims or interest of any person previously entitled thereto.

(g) None of the Exchange Agent, SPAC, HoldCo, the Surviving Company or any of their respective affiliates shall be liable to any holder of SPAC Ordinary Shares for any such SPAC Ordinary Shares (or dividends or distributions with respect thereto) or cash delivered to a public official pursuant to any abandoned property, escheat or similar Law in accordance with this Section 3.3.

(h) Notwithstanding any other provision of this Agreement, no fractional shares of HoldCo Ordinary Shares will be issued. In connection with the Stock Split such holders otherwise enititled to a fractional share shall have their shareholdings of HoldCo Ordinary Shares rounded down to the nearest whole share.

(i) If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed, the Exchange Agent will deliver in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration, as the case may be, that such holder is otherwise entitled to receive pursuant to, and in accordance with, the provisions of Section 3.2.

A-27

Exhibit 6
Page 1322

**Table of Contents**

**Section 3.4 Treatment of Company Options and Company Restricted Stock, Company Convertible Notes and Company Warrants.**

Pursuant to the terms of the applicable Company Incentive Plan or other terms and conditions governing each security and as specified on the Rollover Spreadsheet:

(a) Each Company Option, whether vested or unvested, that is issued immediately prior to the Initial Exchange shall, at the Equity Scheme becoming effective, contingent on agreement with the holder thereof executing a rollover agreement, a form of which shall be provided to SPAC not later than five (5) Business Days prior to the distribution of such agreement to holders of Company Options for SPAC's (or SPAC designee's) review and comment (save where such form has previously been agreed with SPAC) be substituted by an option over shares in HoldCo (a "HoldCo Option ") in such a manner by which such HoldCo Option shall represent an option award exercisable for the aggregate number of HoldCo Ordinary Shares as set forth opposite the name of each holder thereof on the Rollover Spreadsheet. Each HoldCo Option shall otherwise be subject to the same terms and conditions (including any vesting requirements) set forth under the applicable award agreement in effect immediately prior to the Equity Scheme becoming effective; provided, however, that in the case of any Company Option to which Section 409A of the Code applies, the exercise price and the number of HoldCo Ordinary Shares purchasable under each HoldCo Option shall be determined in a manner intended to comply with the requirements of Section 409A of the Code; and provided, further, that in the case of any Company Option to which Section 422 of the Code applies, the exercise price and the number of HoldCo Ordinary Shares purchasable under such HoldCo Option shall be determined in accordance with the foregoing in a manner that satisfies the requirements of Section 424(a) of the Code.

(b) Each Company Restricted Stock that is issued immediately prior to the Equity Scheme becoming effective shall, at the Equity Scheme becoming effective, automatically and without any action on the part of the holder thereof, be exchanged against the aggregate number of HoldCo Restricted Shares in the manner as provided in Section 3.1(a) of this Agreement as set forth opposite the name of each holder thereof on the Payment Spreadsheet.

(c) For those Company Convertible Notes that have not been repaid or converted, the Company shall seek to carry out the Creditor Scheme as set out above. The HoldCo Convertible Notes in issue following the Creditor Scheme shall, subject to meeting applicable conversion conditions and performance criteria (if applicable) shall be permitted to convert into or shall automatically convert into HoldCo Ordinary Shares immediately prior to the NYSE Listing of the HoldCo Ordinary Shares as set out in Section 9.10.

(d) The exercise period under each Company Warrant that is in issue immediately prior to the Equity Scheme becoming effective, shall automatically lapse except for Company Warrants with SVB Financial Group, Kreos Capital (Expert Fund) LP and potentially, BVC Limited, which subject to the consent of the relevant warrant holder, will be cancelled and replaced with equivalent warrants in HoldCo. The Company shall notify the holders of the Company Warrants at least 20 days in advance of the Equity Scheme becoming effective in order to give them the opportunity to participate in the Equity Scheme. If the relevant Company Warrants are exercised prior to the Equity Scheme becoming effective, the Company Ordinary Shares issued upon exercise shall participate in the Equity Scheme. Any Company Ordinary Shares issued after the Equity Scheme has become effective, shall be subject to drag rights, such that they shall be acquired by HoldCo for similar consideration to that consideration received under the Equity Scheme.

(e) The Company shall take all necessary actions to effect the treatment of Company Options and Company Restricted Stock pursuant to Sections 3.4(a) and 3.4(b) in accordance with the Company Incentive Plan and the applicable award agreements and to ensure that no HoldCo Option may be exercised prior to the effective date of an applicable Form S-8 (or other applicable form, including Form S-1 or Form S-3) of HoldCo. The Company Board shall amend the Company Incentive Plan and take all other necessary actions, effective as of immediately prior to the Closing, in order to (i) cancel the remaining unallocated share reserve under the Company Incentive

A-28

Exhibit 6
Page 1323

Table of Contents

Plan, and (ii) provide that no new Company Options, Company Restricted Stock Unit Awards and Company Restricted Stock will be granted under the Company Incentive Plan.

**Section 3.5 Withholding**. Notwithstanding any other provision to this Agreement, SPAC, HoldCo, Merger Sub, the Company and its Subsidiaries and the Exchange Agent, as applicable, shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement such Taxes that are required to be deducted and withheld from such amounts under the Code or any other applicable Law (as reasonably determined by HoldCo, SPAC, Merger Sub, the Company or its Subsidiaries, or the Exchange Agent, respectively); provided, that the party proposing to deduct and withhold any tax shall use commercially reasonable efforts to provide the other party with commercially reasonable prior written notice of any amounts that it intends to withhold in connection with any payment contemplated by this Agreement (other than any compensatory payments to be made pursuant to this Agreement) and will reasonably cooperate to reduce or eliminate any applicable withholding. To the extent that any amounts are so deducted and withheld, such deducted and withheld amounts shall be (i) timely remitted to the appropriate Governmental Authority and (ii) treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made. In the case of any such payment payable to employees of the Company or its Subsidiaries in connection with the Transactions treated as compensation, the parties shall cooperate to pay such amounts through the Company's or the relevant Subsidiary's payroll to facilitate applicable withholding.

**Section 3.6 No Dissent Rights**. In accordance with Section 239(1) of the Cayman Statute and provided that the HoldCo Ordinary Shares shall have been approved for listing on NYSE (or on another recognized stock exchange), and become so listed, on or prior to the Merger Effective Date, holders of SPAC Ordinary Shares shall not be entitled to dissenter rights in respect of such shares under Section 238 of the Cayman Statute. If the Merger becomes effective in accordance with this Agreement and the Plan of Merger, all holders of SPAC Ordinary Shares (other than Excluded Shares), including any such holders who do not vote in favor of approving the Plan of Merger, shall be entitled to receive the Merger Consideration in respect of their SPAC Ordinary Shares in accordance with this Agreement and the Plan of Merger.

**Section 3.7 Register of Members**. At the Merger Effective Time, following the recordation of the transactions contemplated hereby in the share records of HoldCo, the register of members of SPAC shall be closed and there shall be no further registration of transfers of SPAC Ordinary Shares thereafter on the records of SPAC. From and after the Merger Effective Time, the holders of Certificates representing SPAC Ordinary Shares outstanding immediately prior to the Merger Effective Time shall cease to have any rights with respect to such SPAC Ordinary Shares, except as otherwise provided in this Agreement or by applicable Law. On or after the Merger Effective Time, any Certificates presented to the Exchange Agent or HoldCo for any reason shall be converted into the Merger Consideration in accordance with the provisions of Section 3.2.

**Section 3.8 SPAC Warrants**. At the Merger Effective Time, each SPAC Warrant that is outstanding immediately prior to the Merger Effective Time shall, pursuant to the Warrant Agreement, cease to represent a right to acquire the number of SPAC Class A Ordinary Shares set forth in such SPAC Warrant and shall be converted in accordance with the terms of such Warrant Agreement, at the Merger Effective Time, into a right to acquire one (1) HoldCo Ordinary Share (a "HoldCo Warrant" and collectively, the "HoldCo Warrants") on substantially the same terms as were in effect immediately prior to the Merger Effective Time under the terms of the Warrant Agreement. The parties hereof shall take all lawful action to effect the aforesaid provisions of this Section 3.8, including causing the Warrant Agreement to be amended or amended and restated to the extent necessary to give effect to this Section 3.8, including adding HoldCo as a party thereto.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure letter delivered to SPAC by the Company on the date of this Agreement (the "Company Disclosure Letter") (each section of which, subject to Section 12.9, qualifies the correspondingly

A-29

Exhibit 6
Page 1324

Table of Contents

numbered and lettered representations in this Article IV, the Company represents and warrants to SPAC as follows:

**Section 4.1 Company Organization**. The Company has been duly incorporated and is validly existing under the Laws of England and Wales and has the requisite company or corporate power, as applicable, and authority to own, lease or operate all of its properties and assets and to conduct its business as it is now being conducted. The Governing Documents of the Company, as amended to the date of this Agreement and as previously made available by or on behalf of the Company to SPAC, are true, correct and complete. The Company is duly licensed or qualified and in good standing as a foreign or extra-provincial corporation (or other entity, if applicable) in each jurisdiction in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified or in good standing would not be material to the business of the Company and its Subsidiaries, taken as a whole.

**Section 4.2 Subsidiaries**. A complete list of each Subsidiary of the Company and its jurisdiction of incorporation, formation or organization, as applicable, is set forth on Section 4.2 of the Company Disclosure Letter. The Subsidiaries of the Company have been duly formed or organized and are validly existing under the Laws of their jurisdiction of incorporation or organization and have the requisite power and authority to own, lease or operate all of their respective properties and assets and to conduct their respective businesses as they are now being conducted. True, correct and complete copies of the Governing Documents of the Company's Subsidiaries, in each case, as amended to the date of this Agreement, have been previously made available to SPAC by or on behalf of the Company. Each Subsidiary of the Company is duly licensed or qualified and in good standing as a foreign or extra-provincial corporation (or other entity, if applicable) in each jurisdiction in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

**Section 4.3 Due Authorization.**

(a) Other than the approvals required at the Court Meeting and the General Meeting, the Company has all requisite company or corporate power, as applicable, and authority to execute and deliver this Agreement and the other documents to which it is a party contemplated hereby and (subject to the approvals described in Section 4.5) to consummate the transactions contemplated hereby and thereby and to perform all of its obligations hereunder and thereunder. The execution and delivery of this Agreement and the other documents to which the Company is a party contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by the Company Board, and no other company or corporate proceeding on the part of the Company is necessary to authorize this Agreement and the other documents to which the Company is a party contemplated hereby. This Agreement has been, and on or prior to the Closing, the other documents to which the Company is a party contemplated hereby will be, duly and validly executed and delivered by the Company and this Agreement constitutes, and on or prior to the Closing, the other documents to which the Company is a party contemplated hereby will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(b) On or prior to the date of this Agreement, the Company Board has duly adopted resolutions (i) determining that this Agreement and the other documents to which the Company is a party contemplated hereby and the transactions contemplated hereby and thereby are advisable and fair to, and in the best interests of, the Company and Company Shareholders, as applicable, and (ii) authorizing and approving the execution, delivery and performance by the Company of this Agreement and the other documents to which the Company is a party contemplated hereby and the transactions contemplated hereby and thereby. No other corporate action is required on the part of the Company or any of the Company Shareholders to enter into this Agreement or the

A-30

Exhibit 6
Page 1325

**Table of Contents**

documents to which the Company is a party contemplated hereby or to approve the Exchange or Merger other than the approvals required at the Court Meeting and the General Meeting.

**Section 4.4 No Conflict**. Subject to the receipt of the consents, approvals, authorizations and other requirements set forth in <u>Section 4.5</u> and except as set forth on <u>Section 4.4</u> of the Company Disclosure Letter, the execution and delivery by the Company of this Agreement and the documents to which the Company is a party contemplated hereby and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate or conflict with any provision of, or result in the breach of, or default under the Governing Documents of the Company or its Subsidiaries, (b) violate or conflict with any provision of, or result in the breach of, or default under any Law, permit, or Governmental Order applicable to the Company or any of the Company's Subsidiaries, or any of their respective properties or assets (other than applicable requirements of the HSR Act), (c) violate, conflict with any provision of, or result in the breach of, result in the loss of any right or benefit, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, modification, or acceleration) under any Contract of the type described in <u>Section 4.12(a)</u> to which the Company or any of the Company's Subsidiaries is a party or by which the Company or any of the Company's Subsidiaries may be bound, or terminate or result in the termination of any such foregoing Contract or (d) result in the creation of any Lien (other than Permitted Liens) upon any of the properties, equity interests or assets of the Company or any of the Company's Subsidiaries, except, in the case of clauses (b) through (d), to the extent that the occurrence of the foregoing would not (i) have, or would not reasonably be expected to have a Company Material Adverse Effect.

**Section 4.5 Governmental Authorities; Consents**. Assuming the truth and completeness of the representations and warranties of SPAC contained in this Agreement, no consent, waiver, approval or authorization of, or designation, declaration or filing with, or notification to, any Governmental Authority (each, a "<u>Governmental Authorization</u>") is required on the part of the Company or its Subsidiaries with respect to the Company's execution or delivery of this Agreement or the consummation by the Company of the transactions contemplated hereby, except for (i) applicable requirements of the HSR Act; and (ii) any consents, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Company to perform or comply with on a timely basis any material obligation of the Company under this Agreement or to consummate the transactions contemplated hereby and (ii) the filing of the Plan of Merger in accordance with Cayman Statute.

**Section 4.6 Capitalization of the Company.**

(a) As of the date of this Agreement, the Company has 33,664,977 Company Ordinary Shares issued and outstanding, and there are no other authorized equity interests of the Company that are issued and outstanding. All of the issued and outstanding Company Ordinary Shares (i) have been duly authorized and validly issued and are fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including applicable securities Laws, and all requirements set forth in (1) the Governing Documents of the Company and (2) any other applicable Contracts governing the issuance of such securities; (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of the Company or any Contract to which the Company is a party or otherwise bound; and (iv) are free and clear of any Liens, other than as set out in the Governing Documents.

(b) <u>Section 4.6(b)</u> of the Company Disclosure Letter sets forth, as of the date of this Agreement, the outstanding Company Warrants. All outstanding Company Warrants (i) have been duly authorized and validly issued and constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity; (ii) have been offered, sold and issued in compliance with applicable Law, including

A-31

Exhibit 6
Page 1326

**Table of Contents**

applicable securities Laws, and all requirements set forth in (1) the Governing Documents of the Company and (2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of the Company or any Contract to which the Company is a party or otherwise bound; (iv) are free and clear of any Liens; and (v) are, as of the date of this Agreement, within their exercise period and have not lapsed.

(c) As of the date of this Agreement, Company Options to purchase 6,877,613 Company Ordinary Shares are outstanding and Company has no Company Restricted Stock or Company Restricted Stock Unit Awards outstanding. There are 3,071,583 Company Ordinary Shares reserved for issuance under the Company Incentive Plan as of the date of this Agreement. The Company has provided to SPAC, prior to the date of this Agreement, a true and complete list of each current or former employee, consultant or director of the Company or any of its Subsidiaries who, as of the date of this Agreement, holds a Company Award, including the type of Company Award, the number of Company Ordinary Shares comprised thereof or subject thereto, vesting schedule, expiration date and, if applicable, the exercise price thereof. All Company Options, shares of Company Restricted Stock and Company Restricted Stock Unit Awards are evidenced by award agreements in substantially the forms previously made available to SPAC, and no Company Option, share of Company Restricted Stock or Company Restricted Stock Unit Award is subject to terms that are materially different from those set forth in such forms. Each Company Option, each share of Company Restricted Stock, and each Company Restricted Stock Unit Award was validly granted or issued and properly approved by the Company Board (or appropriate committee thereof) in accordance with the terms of the Company Incentive Plan. Each Company Option granted to a U.S. Person has been granted with an exercise price that is no less than the fair market value of the underlying Company Ordinary Share on the date of grant, as determined in accordance with Section 409A of the Code or section 422 of the Code, if applicable. Each Company Option granted to a U.S. Person is intended to either qualify as an "incentive stock option" under Section 422 of the Code or to be exempt under Section 409A of the Code.

(d) Section 4.6(b) of the Company Disclosure Letter sets forth, as of the date of this Agreement, the outstanding Company Convertible Notes. All outstanding Company Convertible Notes (i) have been duly authorized and validly issued and constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity; (ii) have been offered, sold and issued in compliance with applicable Law, including applicable securities Laws, and all requirements set forth in (1) the Governing Documents of the Company and (2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of the Company or any Contract to which the Company is a party or otherwise bound.

(e) Except as otherwise set forth in this Section 4.6 of the Company Disclosure Letter, the Company has not granted any outstanding subscriptions, options, stock appreciation rights, warrants, rights or other securities (including debt securities) convertible into or exchangeable or exercisable for shares of Company Capital Stock, any other commitments, calls, conversion rights, rights of exchange or privilege (whether pre-emptive, contractual or by matter of Law), plans or other agreements of any character providing for the issuance of additional shares, the sale of treasury shares or other equity interests, or for the repurchase or redemption of shares or other equity interests of the Company or the value of which is determined by reference to shares or other equity interests of the Company, and there are no voting trusts, proxies or agreements of any kind which may obligate the Company to issue, purchase, register for sale, redeem or otherwise acquire any shares of Company Capital Stock.

Exhibit 6
Page 1327

**Table of Contents**

**Section 4.7 Capitalization of Subsidiaries.**

(a) The outstanding shares of capital stock or equity interests of each of the Company's Subsidiaries (i) have been duly authorized and validly issued, are, to the extent applicable, fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including applicable securities Laws, and all requirements set forth in (1) the Governing Documents of each such Subsidiary, and (2) any other applicable Contracts governing the issuance of such securities; (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of each such Subsidiary or any Contract to which each such Subsidiary is a party or otherwise bound; and (iv) are free and clear of any Liens.

(b) Except as set forth on Section 4.7(b) of the Company Disclosure Letter, the Company owns of record and beneficially all the issued and outstanding shares of capital stock or equity interests of such Subsidiaries free and clear of any Liens other than Permitted Liens.

(c) Except as set forth on Section 4.7(c) of the Company Disclosure Letter, there are no outstanding subscriptions, options, warrants, rights or other securities (including debt securities) exercisable or exchangeable for any capital stock of such Subsidiaries, any other commitments, calls, conversion rights, rights of exchange or privilege (whether pre-emptive, contractual or by matter of Law), plans or other agreements of any character providing for the issuance of additional shares, the sale of treasury shares or other equity interests, or for the repurchase or redemption of shares or other equity interests of such Subsidiaries or the value of which is determined by reference to shares or other equity interests of the Subsidiaries, and there are no voting trusts, proxies or agreements of any kind which may obligate any Subsidiary of the Company to issue, purchase, register for sale, redeem or otherwise acquire any of its capital stock.

**Section 4.8 Financial Statements.**

(a) Attached as Section 4.8(a) of the Company Disclosure Letter are true and complete copies of (i) the audited consolidated balance sheets and statements of operations, comprehensive loss, stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the year ended December 31, 2019, together with the auditor's reports thereon (the "Audited IFRS Financial Statements"); and (ii) the unaudited consolidated balance sheet and statements of operations, comprehensive loss, shareholders' equity, and cash flows of the Company and its Subsidiaries as of and for the year ended December 31, 2020 (the "Unaudited 2020 Financial Statements"). The Audited IFRS Financial Statements and the Unaudited 2020 Financial Statements (i) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the date thereof, and the consolidated results of their operations, their consolidated changes in shareholders' equity and their consolidated cash flows for the period then ended, (ii) were prepared in conformity with IFRS or GAAP, as applicable, applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto), and (iii) and were prepared from, and are in accordance in all material respects with, the books and records of the Company and its consolidated Subsidiaries, subject, in the case of the Unaudited 2020 Financial Statements, to normal and recurring year-end adjustments and the absence of notes.

(b) Except as set forth on Section 4.8(b) of the Company Disclosure Letter when delivered pursuant to Section 7.3, the PCAOB Financial Statements (the "Audited GAAP Financial Statements") and the Q1 Financial Statements (collectively, the "Financial Statements") in each case, (i) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the respective dates thereof, and the consolidated results of their operations, their consolidated changes in shareholders' equity (with respect to the Audited GAAP Financial Statements only) and their consolidated cash flows for the respective periods then ended (subject, in the case of the Q1 Financial Statements, to normal year-end adjustments and the absence of footnotes), (ii) were prepared in conformity with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of the Q1 Financial Statements, the absence of footnotes or the inclusion of limited footnotes), (iii) were prepared from, and are in accordance in

A-33

Exhibit 6
Page 1328

**Table of Contents**

all material respects with, the books and records of the Company and its consolidated Subsidiaries and (iv) when delivered by the Company for inclusion in the Registration Statement for filing with the SEC following the date of this Agreement in accordance with Section 7.3, will comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act applicable to a registrant, in effect as of the respective dates thereof.

(c) Except as set forth on Section 4.8(c) of the Company Disclosure Letter, neither the Company (including, to the knowledge of the Company, any employee thereof) nor any independent auditor of the Company has identified or been made aware of (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by the Company, (ii) any fraud, whether or not material, that involves the Company's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by the Company or (iii) any claim or allegation regarding any of the foregoing.

**Section 4.9 Undisclosed Liabilities**. Except as set forth on Section 4.9 of the Company Disclosure Letter, as of the date of this Agreement, there is no other liability, debt (including Indebtedness) or obligation of, or claim or judgement against, the Company or any of the Company's Subsidiaries (whether direct or indirect, absolute or contingent, accrued or unaccrued, known or unknown, liquidated or unliquidated, or due or to become due), except for liabilities, debts, obligations, claims or judgments (a) reflected or reserved for on the Financial Statements or disclosed in the notes thereto, (b) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of business, consistent with past practice, of the Company and its Subsidiaries, (c) that will be discharged or paid off to or at the Closing, (d) obligations for future performance under any contract to which the Company or any Company Subsidiary is a party or (e) any other liabilities and obligations which are not, individually or in the aggregate, material to the Company and the Company Subsidiaries, taken as a whole.

**Section 4.10 Litigation and Proceedings**. Except as set forth on Section 4.10 of the Company Disclosure Letter or that in each case would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole, as of the date hereof (a) there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened by any Governmental Authority), or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order.

**Section 4.11 Legal Compliance.**

(a) As of the date hereof, each of the Company and its Subsidiaries is in compliance with all applicable Laws in all material respects.

(b) For the past three (3) years, none of the Company or any of its Subsidiaries has received any written notice of, or been charged with, the violation of any Laws, except where such violation has not been material to the business of the Company and its Subsidiaries, taken as a whole.

(c) The Company and its Subsidiaries maintain a program of policies, procedures and internal controls reasonably designed and implemented to provide reasonable assurance that violation of applicable Law by any of the Company's or its Subsidiaries' directors, officers, employees or its or their respective agents, representatives or other Persons, acting on behalf of the Company or any of the Company's Subsidiaries, will be prevented, detected and deterred.

A-34

Exhibit 6
Page 1329

**Table of Contents**

**Section 4.12 Contracts; No Defaults.**

(a) Section 4.12(a) of the Company Disclosure Letter contains a listing of all Contracts described in clauses (i) through (xv) below to which, as of the date of this Agreement, the Company or any of the Company's Subsidiaries is a party or by which they are bound, other than a Company Benefit Plan. True, correct and complete copies of the Contracts listed on Section 4.12(a) of the Company Disclosure Letter have previously been delivered to or made available to SPAC or its agents or representatives, together with all amendments thereto.

(i) Any Contract with any of the Top Customers or Top Suppliers;

(ii) Each note, debenture, other evidence of Indebtedness, guarantee, loan, credit or financing agreement or instrument or other Contract for money borrowed by the Company or any of the Company's Subsidiaries, in each case, in excess of $500,000;

(iii) Each Contract for the acquisition of any Person or any business unit thereof or the disposition of any material assets of the Company or any of its Subsidiaries in the last two (2) years, in each case, involving payments in excess of $500,000 other than Contracts (A) in which the applicable acquisition or disposition has been consummated and there are no material obligations ongoing, (B) entered into in the ordinary course of business consistent with past practice or (C) between the Company and its Subsidiaries;

(iv) Each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Contract that provides for the ownership of, leasing of, title to, use of, or any leasehold or other interest in any real or personal property that involves aggregate payments in excess of $500,000 in any calendar year;

(v) Each Contract involving the formation of a (A) joint venture (B) partnership, excluding any Subsidiary of the Company);

(vi) Contracts (other than employment agreements, employee confidentiality and invention assignment agreements, equity or incentive equity documents and Governing Documents) between the Company and its Subsidiaries, on the one hand, and Affiliates of the Company or any of the Company's Subsidiaries (other than the Company or any of the Company's Subsidiaries), the officers and managers (or equivalents) of the Company or any of the Company's Subsidiaries, the members or Company Shareholders or any of the Company's Subsidiaries, any employee of the Company or any of the Company's Subsidiaries or a member of the immediate family of the foregoing Persons, on the other hand (collectively, "Affiliate Agreements");

(vii) Contracts with each current executive, officer, director or current employee of the Company or its Subsidiaries with a title of Vice President or higher;

(viii) Contracts with any employee or consultant of the Company or any of the Company's Subsidiaries that provide for change in control, retention or similar payments or benefits contingent upon, accelerated by or triggered by the consummation of the transactions contemplated hereby;

(ix) Contracts containing covenants of the Company or any of the Company's Subsidiaries (A) prohibiting or limiting the right of the Company or any of the Company's Subsidiaries to engage in or compete with any Person in any line of business in any material respect or (B) prohibiting or restricting the Company's and the Company's Subsidiaries' ability to conduct their business with any Person in any geographic area in any material respect other than customary non-solicitation and no-hire provisions entered into in the ordinary course of business;

(x) Any collective bargaining (or similar) agreement or Contract between the Company or any of the Company's Subsidiaries, on one hand, and any labor union or other body representing employees of the Company or any of the Company's Subsidiaries, on the other hand;

(xi) Each Contract (including license agreements, coexistence agreements, and agreements with covenants not to sue) pursuant to which the Company or any of the Company's Subsidiaries (i) grants to a third Person a license, immunity, or other right in or to any material Company Intellectual Property or (ii) is

A-35

Exhibit 6
Page 1330

Table of Contents

granted by a third Person a license, immunity, or other right in or to any Intellectual Property that is material to the business of the Company and its Subsidiaries, provided, however, that none of the following are required to be set forth on Section 4.12(a) in the Company Disclosure Letter (but shall be deemed to constitute Material Contracts for purposes of Section 4.12(b) if they otherwise qualify): (A) non-exclusive licenses or grants of rights in Intellectual Property in independent contractor agreements or consulting agreements on terms substantially similar to the Company's or any of the Company's Subsidiaries' standard forms made available to SPAC); (B) Contracts granting nonexclusive rights to use Company products or services (or Marks in connection with the promotion or sale of Company products or services); (C) Contracts granting nonexclusive rights to Intellectual Property incidental to or implied by the sale or purchase of goods or services, in each case of (A)-(C), entered into in the ordinary course of business consistent with past practice; (D) Open Source Licenses; or (E) Contracts granting to the Company or any of its Subsidiaries nonexclusive rights to use uncustomized Software that is generally commercially available to the public on standard or nondiscriminatory terms with license, maintenance, support, and other fees less than $100,000 per year);

(xii) Each Contract requiring capital expenditures by the Company or any of the Company's Subsidiaries after the date of this Agreement in an amount in excess of $500,000 in any calendar year;

(xiii) Any Contract that (A) grants to any third Person any "most favored nation rights" or (B) grants to any third Person price guarantees for a period greater than one year from the date of this Agreement and requires aggregate future payments to the Company and its Subsidiaries in excess of $500,000 in any calendar year;

(xiv) Contracts granting to any Person (other than the Company or its Subsidiaries) a right of first refusal, first offer or similar preferential right to purchase or acquire equity interests in the Company or any of the Company's Subsidiaries; and

(xv) Any outstanding written commitment to enter into any Contract of the type described in subsections (i) through (xiv) of this Section 4.12(a).

(b) Except for any Contract that will terminate upon the expiration of the stated term thereof prior to the anticipated Closing Date, all of the Contracts listed pursuant to Section 4.12(a) in the Company Disclosure Letter are (i) in full force and effect and (ii) represent the legal, valid and binding obligations of the Company or the Subsidiary of the Company party thereto and, to the knowledge of the Company, represent the legal, valid and binding obligations of the counterparties thereto. Except, in each case, where the occurrence of such breach or default or failure to perform would not be material to the Company and its Subsidiaries, taken as a whole, (x) the Company and its Subsidiaries have performed in all respects all respective obligations required to be performed by them to date under such Contracts listed pursuant to Section 4.12(a) and neither the Company, the Company's Subsidiaries, nor, to the knowledge of the Company, any other party thereto is in breach of or default under any such Contract, (y) during the last twelve (12) months, neither the Company nor any of its Subsidiaries has received any written claim or written notice of termination or breach of or default under any such Contract, and (z) to the knowledge of the Company, no event has occurred which individually or together with other events, would reasonably be expected to result in a breach of or a default under any such Contract by the Company or its Subsidiaries or, to the knowledge of the Company, any other party thereto (in each case, with or without notice or lapse of time or both).

**Section 4.13 Company Benefit Plans**.

(a) Section 4.13(a) of the Company Disclosure Letter sets forth an accurate and complete list, as of the date hereof, of each material Company Benefit Plan. For purposes of this Agreement, a "Company Benefit Plan" means an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") or any other plan, policy, practice, program, agreement or other arrangement (including any employment, bonus, incentive or deferred compensation, employee loan, note or pledge agreement, equity or equity-based compensation, severance, termination, retention, retirement, supplemental

A-36

Exhibit 6
Page 1331

**Table of Contents**

retirement, profit sharing, change in control, vacation, sick, insurance, medical, welfare, fringe or similar plan, policy, program, agreement or other arrangement) providing compensation or other benefits or remuneration to any current or former director, officer, individual consultant, worker or employee, which are maintained, sponsored or contributed to by the Company or any of the Company's Subsidiaries, or to which the Company or any of the Company's Subsidiaries is a party or has or may have any liability, and in each case whether or not (i) subject to the Laws of the United States, (ii) in writing or (iii) funded, but excluding in each case any statutory plan, program or arrangement that is required under applicable Law and maintained by any Governmental Authority. With respect to each material Company Benefit Plan, the Company has made available to SPAC, to the extent applicable, true, complete and correct copies of (A) such Company Benefit Plan (or, if not written a written summary of its material terms) and all plan documents, trust agreements, insurance Contracts or other funding vehicles and all amendments thereto, (B) the most recent summary plan descriptions, including any summary of material modifications (C) the three (3) most recent annual reports (Form 5500 series) filed with the IRS with respect to such Company Benefit Plan, (D) the most recent actuarial report or other financial statement relating to such Company Benefit Plan, (E) the most recent determination or opinion letter, if any, issued by the IRS with respect to any Company Benefit Plan and any pending request for such a determination letter and (F) all material correspondence to or from the IRS, the United States Department of Labor ("DOL"), the Pension Benefit Guaranty Corporation or any other Governmental Authority received in the last three (3) years with respect to any Company Benefit Plan.

(b) Except as set forth on Section 4.13(b) of the Company Disclosure Letter, (i) each Company Benefit Plan has been operated and administered in compliance with its terms and all applicable Laws, including ERISA and the Code, except where the failure to comply would not be material to the Company and its Subsidiaries, taken as a whole; (ii) in all material respects, all contributions required to be made with respect to any Company Benefit Plan have been made and all obligations in respect of each Company Benefit Plan have been accrued and reflected in the Company's financial statements to the extent required by GAAP; and (iii) each Company Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS as to its qualification or may rely upon an opinion letter for a prototype plan and, to the knowledge of the Company, no fact or event has occurred that would reasonably be expected to adversely affect the qualified status of any such Company Benefit Plan.

(c) No Company Benefit Plan is a multiemployer pension plan (as defined in Section 3(37) of ERISA) (a "Multiemployer Plan") or other pension plan that is subject to Title IV of ERISA or subject to Section 412 of the Code or Section 302 of ERISA (each, a "Title IV Plan"), and neither the Company nor any of its ERISA Affiliates has sponsored or contributed to, been required to contribute to, or had any actual or contingent liability under, a Multiemployer Plan or Title IV Plan at any time within the previous six (6) years. Neither the Company nor any of its ERISA Affiliates has incurred any withdrawal liability under Section 4201 of ERISA that has not been fully satisfied. No Company Benefit Plan is (i) a "multiple employer plan" (within the meaning of the Code or ERISA), (ii) a "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA) or a (iii) a "funded welfare plan" within the meaning of Section 419 of the Code.

(d) There are no pending, or to the knowledge of the Company, threatened claims (other than routine claims for benefits) by, on behalf of or against any Company Benefit Plan or any trust related thereto, which could reasonably be expected to result in any material liability to the Company and its Subsidiaries, taken as a whole, and no audit or other proceeding by a Governmental Authority is pending, or to the knowledge of the Company, threatened with respect to any Company Benefit Plan.

(e) Neither the Company, any Company Benefit Plan nor, to the knowledge of the Company, any trustee, administrator or other third-party fiduciary and/or party-in-interest thereof, has engaged in any breach of fiduciary responsibility or any "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) to which Section 406 of ERISA or Section 4975 of the Code applies and which could subject the Company or any ERISA Affiliate to the tax or penalty on prohibited transactions imposed by Section 4975 of the Code, which, assuming the taxable period of such transaction expired as of the date hereof,

A-37

Exhibit 6
Page 1332

**Table of Contents**

could reasonably be expected to result in any material liability to the Company and its Subsidiaries, taken as a whole.

(f) With respect to each Company Benefit Plan, no material actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending or, to the knowledge of the Company, threatened, and to the knowledge of the Company, no facts or circumstances exist that would reasonably be expected to give rise to any such actions, suits or claims.

(g) No Company Benefit Plan provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of the Company or any Subsidiary for periods extending beyond their retirement or other termination of service, other than coverage mandated by applicable Law, and none of the Company or any of its Subsidiaries has any obligation to provide such benefits.

(h) Except as set forth on Section 4.13(h) of the Company Disclosure Letter, the consummation of the transactions contemplated hereby will not, either alone or in combination with another event (such as termination following the consummation of the transactions contemplated hereby), (i) entitle any current or former employee, officer or other service provider of the Company or any Subsidiary of the Company to any severance pay or increase in severance pay or any other compensation payable by the Company or any Subsidiary of the Company, (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such employee, officer or other individual service provider by the Company or a Subsidiary of the Company, (iii) directly or indirectly cause the Company to transfer or set aside any assets to fund any material benefits under any Company Benefit Plan, (iv) otherwise give rise to any material liability under any Company Benefit Plan, or (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Company Benefit Plan on or following the Merger Effective Time. The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, result in any "excess parachute payment" under Section 280G of the Code. No Company Benefit Plan provides for a Tax gross-up, make whole or similar payment with respect to the Taxes imposed under Sections 409A or 4999 of the Code or any other Tax.

**Section 4.14 Labor Relations; Employees.**

(a) Except as set forth on Section 4.14(a) of the Company Disclosure Letter, (i) neither the Company nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, or any similar agreement or arrangement, (ii) no such agreement or such other arrangement is being negotiated by the Company or any of the Company's Subsidiaries, (iii) no labor union or any other employee representative body has requested or, to the knowledge of the Company, has sought to represent any of the employees of the Company or its Subsidiaries, and (iv) there are no representation or certification proceedings or petitions seeking a representation proceeding pending or, to the knowledge of the Company, threatened in writing to be brought or filed with the National Labor Relations Board or any other applicable labor relations authority. In the past three (3) years, there has been no actual or, to the knowledge of the Company, threatened strike, slowdown, work stoppage, labor organization activity, lockout or other material labor dispute or similar activity against or affecting the Company or any Subsidiary of the Company.

(b) Each of the Company and its Subsidiaries are, and have been for the past three (3) years, in material compliance with all applicable Laws respecting labor and employment including, but not limited to, all Laws respecting terms and conditions of employment, health and safety, wages and hours, holiday pay and the calculation of holiday pay, working time, employee classification (with respect to both exempt vs. non-exempt status and employee vs. independent contractor and worker status), child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity and equal pay, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.

(c) In the past three (3) years, the Company and its Subsidiaries have not received written (i) notice of any unfair labor practice charge or material complaint pending or threatened before the National Labor Relations

A-38

Exhibit 6
Page 1333

Table of Contents

Board or any other Governmental Authority against them, (ii) notice of any complaints, grievances or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures against them, (iii) notice of any material charge or complaint with respect to or relating to them pending before the Equal Employment Opportunity Commission or any other Governmental Authority responsible for the prevention of unlawful employment practices, (iv) notice of the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health Laws to conduct an investigation with respect to or relating to them or notice that such investigation is in progress, or (v) notice of any material complaint, lawsuit or other proceeding pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment or classes of the foregoing alleging breach of any express or implied Contract of employment, any applicable Law governing employment or the termination thereof or other discriminatory, wrongful or tortious conduct in connection with the employment relationship.

(d) To the knowledge of the Company, no present or former employee, worker or independent contractor of the Company or any of the Company's Subsidiaries' is in material violation of (i) any restrictive covenant, nondisclosure obligation or fiduciary duty to the Company or any of the Company's Subsidiaries or (ii) any restrictive covenant or nondisclosure obligation to a former employer or engager of any such individual relating to (A) the right of any such individual to work for or provide services to the Company or any of the Company's Subsidiaries' or (B) the knowledge or use of Trade Secrets.

(e) In the past three (3) years, the Company and its Subsidiaries have not engaged in layoffs, furloughs or employment terminations sufficient to trigger application of the Workers' Adjustment and Retraining Notification Act or any similar state or local law relating to group terminations. The Company and its Subsidiaries have not engaged in layoffs or furloughs or effected any broad-based salary or other compensation or benefits reductions, in each case, whether temporary or permanent, since January 1, 2020 through the date hereof.

(f) In the past three (3) years, (i) no allegations of sexual harassment or sexual misconduct have been made in writing, or, to the knowledge of the Company, threatened to be made against or involving any current or former officer, director or other employee at the level of Vice President or above by any current or former officer, employee or individual service provider of the Company or any of its Subsidiaries, and (ii) neither the Company nor any of its Subsidiaries has entered into any settlement agreements resolving, in whole or in part, allegations of sexual harassment or sexual misconduct by any current or former officer, director or other key employee.

**Section 4.15 Taxes.**

(a) All material Tax Returns required to be filed by the Company or any of its Subsidiaries have been timely filed (taking into account any applicable extensions), all such Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects and all material Taxes due and payable (whether or not shown on any Tax Return) by the Company and its Subsidiaries have been paid, other than Taxes being contested in good faith and for which adequate reserves have been established in accordance with the applicable accounting standards.

(b) The Company and each of its Subsidiaries have withheld from amounts owing to any employee, creditor or other Person all material Taxes required by Law to be withheld, paid over to the proper Governmental Authority in a timely manner all such withheld amounts required to have been so paid over and otherwise complied in all material respects with all applicable withholding and related reporting requirements with respect to such Taxes.

(c) There are no material Liens for Taxes (other than Liens described in clause (ii) of the definition of Permitted Liens) upon the property or assets of the Company or any of its Subsidiaries.

Exhibit 6
Page 1334

Table of Contents

(d) No claim, assessment, deficiency or proposed adjustment for any material amount of Tax has been asserted or assessed by any Governmental Authority against the Company or any of its Subsidiaries that (i) remained unresolved or unpaid as of the date of the PCAOB Financial Statements or (ii) was asserted after the date of the PCAOB Financial Statements.

(e) There are no audits, examinations or other Legal Proceedings with respect to any Taxes of the Company or any of its Subsidiaries in excess of $125,000 (determined individually or in the aggregate) presently in progress, and there are no waivers, extensions or requests for any waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of the Company or any of its Subsidiaries.

(f) Neither the Company nor any of its Subsidiaries has made a request for an advance tax ruling, request for technical advice, a request for a change of any method of accounting or any similar request that is in progress or pending with any Governmental Authority with respect to any material Taxes.

(g) Neither the Company nor any of its Subsidiaries is a party to any Tax indemnification or Tax sharing or similar agreement (other than any such agreement solely between the Company and its existing Subsidiaries and customary commercial Contracts entered into in the ordinary course of business not primarily related to Taxes).

(h) Neither the Company nor any of its Subsidiaries has been a party to any transaction treated by the parties as a distribution of stock qualifying for tax-free treatment under Section 355 of the Code (or a similar provision of non-US Tax Law) in the three (3) years prior to the date of this Agreement.

(i) Neither the Company nor any of its Subsidiaries (i) is liable for Taxes of any other Person (other than the Company and its Subsidiaries) under Treasury Regulations Section 1.1502-6 or any similar provision of state, local or non-U.S. Tax Law or as a transferee or successor or by Contract (other than customary commercial Contracts entered into in the ordinary course of business not primarily related to Taxes) or (ii) has ever been a member of an affiliated, consolidated, combined or unitary group filing for income Tax purposes, other than a group the common parent of which was or is the Company or any of its Subsidiaries.

(j) No transaction, act, omission or event has occurred in consequence of which the Company is or may be held liable for any Tax or deprived of any Relief or allowances otherwise available to it in consequence of any Tax or may otherwise be held liable for or to indemnify any person in respect of Tax where some other company or person is or may become primarily liable for the Tax in question.

(k) No written claim has been made by any Governmental Authority within the last three (3) years where the Company's U.S. Subsidiary does not file Tax Returns that it is or may be subject to material taxation in that jurisdiction.

(l) Neither the Company nor any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b).

(m) Neither the Company nor any of its Subsidiaries will be required to include any material amount in taxable income, exclude any material item of deduction or loss from taxable income, or make any adjustment under Section 481 of the Code (or any similar provision of state, local or non-U.S. Law) for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) installment sale, intercompany transaction described in the Treasury Regulations under Section 1502 of the Code (or any similar provision of state, local or non-U.S. Law) or open transaction disposition, in each case, made by the Company or its Subsidiaries prior to the Closing, (ii) prepaid amount received or deferred revenue realized or received by the Company or its Subsidiaries prior to the Closing, (iii) change in method of accounting of the Company or its Subsidiaries for a taxable period (or portion thereof) ending on or prior to the Closing Date made or required to be made prior to the Closing, (iv) "closing agreement" described in Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law) executed by the Company or its Subsidiaries prior to the Closing or (v) election under Section 965 of the Code.

A-40

Exhibit 6
Page 1335

Table of Contents

(n) The Company has not entered into nor been a party to nor otherwise been involved in any scheme, arrangement, transaction or series of transactions designed wholly or mainly, or containing steps or stages having no commercial purpose and designed wholly or mainly, for the purposes of avoiding, deferring or reducing a liability to Tax or amounts to be accounted for to a Governmental Authority, or the main benefit or purpose or one of the main benefits or purposes of which was the avoidance or reduction of Tax or the relief from Tax or the repayment of Tax or the obtaining of a tax advantage

(o) The Company has not taken any action or agreed to take any action, nor to the knowledge of the Company or any of its Subsidiaries are there any facts or circumstances, that could reasonably be expected to prevent the Transactions from qualifying for the Intended Tax Treatment.

(p) The Company and each of its Subsidiaries is resident for tax purposes solely in the jurisdiction in which it is incorporated. Neither the Company nor any of its Subsidiaries has an office, permanent establishment, branch or other activities outside the jurisdiction of its incorporation.

(q) Neither the Company nor any of its Subsidiaries is, nor has been, party to any transaction or arrangement for which the pricing stands to be adjusted under applicable transfer pricing or thin capitalization legislation. All transactions entered into by the Company and it subsidiaries have been on arm's length terms.

(r) No associated person of the Company or any of its Subsidiaries has facilitated tax evasion in any manner which could give rise to criminal liability of that Group Company under Part 3 of the Criminal Finances Act 2017 ("Part 3") and each of the Company and its Subsidiaries to which Part 3 may apply is covered by a written risk assessment in connection with the Part 3 offences which is in the possession of a the relevant company, has otherwise put in place prevention procedures for the purposes of establishing the defence under Part 3, and has monitored and kept updated such risk assessment and procedures.

(s) The Company and each of its Subsidiaries which is required to be registered is properly registered for the purposes of VAT in each jurisdiction in which it is liable to be so registered and has complied in all material respects with all Tax legislation concerning VAT, and has made, obtained and kept up to date accurate records, invoices and other documents appropriate or requisite for the purposes of such Tax legislation.

(t) Neither the Company nor any of its Subsidiary is, nor has ever been, a close company (within the meaning of section 439 of CTA 2010).

(u) No distribution within section 1064 of CTA 2010 has been made by the Company or any Subsidiary during the seven years ending at Closing.

(v) Any loans or advances made, or agreed to be made, by the Company or any Subsidiary within sections 455, 459 and 460 of CTA 2010 have been disclosed in the Company Disclosure Letter. Neither the Company nor any Subsidiary has released or written off, or agreed to release or write off, the whole or any part of any such loans or advances.

(w) Neither the Company nor any Subsidiary has: (a) made any transfer of value within sections 94 and 202 of IHTA 1984; or (b) received any value such that liability might arise under section 199 of IHTA 1984; or (c) been a party to associated operations in relation to a transfer of value as defined by section 268 of IHTA 1984.

(x) There is no unsatisfied liability to inheritance tax attached to, or attributable to, the Company Ordinary Shares or any asset of the Company or any Subsidiary. None of them are subject to any Inland Revenue charge as mentioned in sections 237 and 238 of IHTA 1984.

(y) No asset owned by the Company or any Subsidiary, nor the Company Ordinary Shares, are liable to be subject to any sale, mortgage or charge by virtue of section 212(1) of IHTA 1984.

A-41

Exhibit 6
Page 1336

Table of Contents

(z) The Company was not a "passive foreign investment company" within the meaning of Section 1297 of the Code for its taxable period ending December 31, 2020. Neither the Company nor any of its Subsidiaries is treated as an "expatriated entity" as defined in Section 7874(a)(2)(A) of the Code, a "surrogate foreign corporation" as defined in Section 7874(a)(2)(B) of the Code or a domestic corporation as a result of the application of Section 7874(b) of the Code.

**Section 4.16 Brokers' Fees**. Except as set forth on Section 4.16 of the Company Disclosure Letter, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated hereby based upon arrangements made by the Company, any of the Company's Subsidiaries' or any of their Affiliates for which SPAC, the Company or any of the Company's Subsidiaries has any obligation.

**Section 4.17 Insurance**. Section 4.17 of the Company Disclosure Letter contains a list of, as of the date hereof, all material policies or binders of property, fire and casualty, product liability, workers' compensation, and other forms of insurance held by, or for the benefit of, the Company or any of the Company's Subsidiaries as of the date of this Agreement. True, correct and complete copies of such insurance policies as in effect as of the date hereof have previously been made available to SPAC. All such policies are in full force and effect, all premiums due have been paid, and no written notice of cancellation or termination has been received by the Company or any of the Company's Subsidiaries with respect to any such policy. Except as disclosed on Section 4.17 of the Company Disclosure Letter, no insurer has denied or disputed coverage of any material claim under an insurance policy during the last twelve (12) months.

**Section 4.18 Licenses and Permits**. The Company and its Subsidiaries have obtained, and maintain, all of the material Licenses reasonably required to permit the Company and its Subsidiaries to acquire, originate, own, operate, use and maintain their assets in the manner in which they are now operated and maintained and to conduct the business of the Company and its Subsidiaries as currently conducted. Each material License held by the Company or any of the Company's Subsidiaries is in full force and effect. Neither the Company nor any of its Subsidiaries (a) is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) in any material respect of any term, condition or provision of any material License to which it is a party, (b) is or has been in the past three (3) years the subject of any pending or threatened Action by a Governmental Authority seeking the revocation, suspension, termination, modification, or impairment of any material License; or (c) has received any written notice in the past three (3) years that any Governmental Authority that has issued any material License intends to cancel, terminate, or not renew any such material License, except to the extent such material License may be amended, replaced, or reissued as a result of and as necessary to reflect the transactions contemplated hereby, or as otherwise disclosed in Section 4.4 of the Company Disclosure Letter, provided such amendment, replacement, or reissuance does not materially adversely affect the continuous conduct of the business of the Company and its Subsidiaries as currently conducted from and after Closing. Section 4.18 of the Company Disclosure Letter sets forth a true, correct and complete list of material Licenses held by the Company or its Subsidiaries.

**Section 4.19 Equipment and Other Tangible Property**. The Company or one of its Subsidiaries owns and has good title to, and has the legal and beneficial ownership of or a valid leasehold interest in or right to use by license or otherwise, all material machinery, equipment and other tangible property reflected on the books of the Company and its Subsidiaries as owned by the Company or one of its Subsidiaries, free and clear of all Liens other than Permitted Liens. All material personal property and leased personal property assets of the Company and its Subsidiaries are structurally sound and in good operating condition and repair (ordinary wear and tear expected) and are suitable for their present use.

**Section 4.20 Real Property.**

(a) Section 4.20(a) of the Company Disclosure Letter sets forth a true, correct and complete list as of the date of this Agreement of all Leased Real Property, including the address thereof, and all Real Property Leases

A-42

Exhibit 6
Page 1337

Table of Contents

(as hereinafter defined) pertaining to such Leased Real Property. With respect to each parcel of Leased Real Property:

(i) The Company or one of its Subsidiaries holds a good and valid leasehold estate in such Leased Real Property, free and clear of all Liens, except for Permitted Liens.

(ii) The Company and its Subsidiaries have delivered to SPAC true, correct and complete copies of all leases, lease guaranties, subleases, agreements for the leasing, use or occupancy of, or otherwise granting a right in and to the Leased Real Property by or to the Company and its Subsidiaries, including all amendments, terminations and modifications thereof (collectively, the "Real Property Leases"), and none of such Real Property Leases have been modified in any material respect, except to the extent that such modifications have been disclosed by the copies delivered to SPAC.

(iii) The Company and its Subsidiaries', as applicable, possession and quiet enjoyment of the Leased Real Property under such Real Property Leases has not been materially disturbed and, to the knowledge of the Company, there are no material disputes with respect to such Real Property Leases.

(iv) Neither the Company nor any of its Subsidiaries have received or served written notice of a material breach in relation to the Real Property Leases and, to the Company's knowledge, there is any such material breach.

(v) No party, other than the Company or its Subsidiaries, has any right to use or occupy the Leased Real Property or any portion thereof.

(vi) Neither the Company nor any of its Subsidiaries are expecting any material end of term liabilities (including reinstatement or dilapidations liabilities) in relation to the Leased Real Property.

(vii) Neither the Company nor any of its Subsidiaries have received written notice of any current condemnation proceeding or proposed similar Action or agreement for taking in lieu of condemnation with respect to any portion of the Leased Real Property, and to the Company's knowledge no such proceeding or similar Action has been threatened.

(b) None of the Company or any of its Subsidiaries owns real property.

**Section 4.21 Intellectual Property.**

(a) <u>Section 4.21(a)</u> of the Company Disclosure Letter sets forth a true, complete and accurate list of (i) each item of Company Intellectual Property that is registered or applied for with a Governmental Authority and is owned by the Company or any of the Company's Subsidiaries as of the date of this Agreement ("<u>Company Registered Intellectual Property</u>") and (ii) all material unregistered trademarks used by the Company or any of the Company's Subsidiaries as the name of Company products or otherwise material to their business as a whole; and (iii) material Company Software. The Company or one of the Company's Subsidiaries is the sole and exclusive owner of all right, title, and interest in and to all Company Intellectual Property, and all Company Intellectual Property (excluding any pending applications included in the Company Registered Intellectual Property) is valid, subsisting, and enforceable and nothing has been done, or not been done, or is due to be done within thirty (30) days of the date of this Agreement as a result of which any Company Intellectual Property has ceased or might cease to be valid, subsisting or enforceable. All Company Registered Intellectual Property has been maintained effective by the filing of all necessary timely filings, maintenance and renewals and timely payment of requisite fees.

(b) The Company or one of its Subsidiaries solely and exclusively owns all right, title, and interest in and to all Company IP free and clear of all Liens (other than Permitted Liens) and has a valid license or otherwise lawful right to use all other Intellectual Property and Company IT Systems used in or necessary for the continued conduct of the business of the Company and its Subsidiaries in substantially the same manner as such business has been operated during the twenty-four (24) months prior to the date hereof and as currently contemplated to be conducted, and none of the foregoing (including any material Company IT Contracts) will be materially

A-43

Exhibit 6
Page 1338

**Table of Contents**

adversely impacted by (nor will require the payment or grant of additional amounts or consideration as a result of) the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby, provided that the foregoing shall not be deemed a representation or warranty regarding non-infringement, validity or enforceability of Intellectual Property.

(c) As of the date of this Agreement, there is not, and within the six (6) years preceding the date of this Agreement there has not been, any Action or other Legal Proceedings, oppositions, challenges or disputes pending against the Company or any of the Company's Subsidiaries, or to the knowledge of the Company, that is threatened (including unsolicited offers to license Patents) against the Company or any of its Subsidiaries either (A) alleging the Company's or its Subsidiaries' infringement, misappropriation or other violation of any Intellectual Property of any third Person; or (B) challenging the ownership, use, patentability, validity, or enforceability of any Company IP. None of the Company, its Subsidiaries, their products and services, nor the conduct of their businesses does or did infringe, misappropriate, or otherwise violate any Intellectual Property of any Person.

(d) Except as set forth on <u>Section 4.21(d)</u> of the Company Disclosure Letter, (i) to the knowledge of the Company as of the date of this Agreement, no Person is infringing upon, misappropriating or otherwise violating any Intellectual Property owned and/or used by the Company or any of the Company's Subsidiaries in any respect, and (ii) the Company and its Subsidiaries have not sent to any Person within the six (6) years preceding the date of this Agreement any written notice, charge, complaint, claim or other written assertion against any such third Person claiming infringement or violation by or misappropriation of any such Intellectual Property and no action is current.

(e) The Company and its Subsidiaries have implemented commercially reasonable measures to maintain and protect all Company IP and to protect the confidentiality of any Trade Secrets included in the Company Intellectual Property and other Trade Secrets used by the Company and/or its Subsidiaries that are material to the business of the Company and its Subsidiaries. To the knowledge of the Company, there has not been any unauthorized disclosure of or unauthorized access to any Trade Secrets owned and/or used by the Company or any of the Company's Subsidiaries to or by any Person.

(f) All current or past employees and contractors of the Company who contribute or have contributed to the creation or development of any material Intellectual Property in the course of their employment or provision of services for the Company or any of its Subsidiaries have executed valid written agreements pursuant to which such Persons have assigned to the Company or its applicable Subsidiaries all of such Person's rights, title, and interest in and to such Intellectual Property that did not vest automatically in the Company or its relevant Subsidiaries by operation of Law (and, in the case of contractors, to the extent such Intellectual Property was intended by the Company to be proprietary to the Company or its relevant Subsidiary). There are no outstanding or potential claims against the Company or any of the Subsidiaries under any contract or under section 40 of the Patents Act 1977 (or any similar or equivalent Laws) for employee compensation in respect of any Intellectual Property.

(g) Neither the Company nor any of its Subsidiaries is a member of or party to any patent pool, industry standards body, trade association, or other organization pursuant to which the Company or any of its Subsidiaries is obligated to grant any licence, rights, or immunity in or to any Company IP to any Person.

(h) Neither the Company nor its Subsidiaries use or distribute Open Source Materials in the Company's and/or its Subsidiaries' products and/or services.

(i) To the Company's knowledge, the Company IT Systems and Company IT Contracts are adequate for the purposes of the business of the Company and the Subsidiaries as they are operated on the date of this Agreement.

(j) The Company IT Systems operate and perform as required for the conduct of the businesses of the Company and its Subsidiaries as presently conducted. To the knowledge of the Company, the Company IT

A-44

Exhibit 6
Page 1339

Table of Contents

Systems and Company Software do not contain and have not within the last twelve (12) months contained any "time bombs," "Trojan horses," "back doors," "trap doors," worms, viruses, spyware, keylogger software, or other faults or malicious code or damaging devices, or other vulnerabilities that, in each case, if activated would be material to the business of the Company and/or its Subsidiaries.

**Section 4.22 Privacy and Cybersecurity.**

(a) The Company and its Subsidiaries maintain and are in compliance with, and during the past three (3) years have maintained and been in compliance with, (i) all applicable Laws relating to privacy, data security, and data protection, (ii) the Company's and its Subsidiaries' internal and external privacy policies, and (iii) the Company's and its Subsidiaries' contractual obligations concerning privacy, data protection, cybersecurity, data security and the security of the Company's and each of its Subsidiaries' information technology systems, in each case of (i)-(iii) above, other than any non-compliance that would not reasonably be expected to have a material effect on the Company and its Subsidiaries as a whole. There are no Legal Proceedings by any Person (including any Governmental Authority) pending to which the Company or any of the Company's Subsidiaries is a named party or, threatened in writing against the Company or its Subsidiaries alleging a violation of any applicable Law relating to privacy, data security, and/or data protection, or of any third Person's privacy or personal information rights and there have been no such Legal Proceedings during the past three (3) years.

(b) Except as set forth on Section 4.22(b) of the Company Disclosure Letter, during the past three (3) years preceding the date of this Agreement (i) there have been no unauthorized intrusions nor material breaches of the security of the information technology systems of the Company and/or its Subsidiaries, and (ii) there have been no disruptions in any information technology systems of the Company or its Subsidiaries that have been material to the Company and its Subsidiaries as a whole. Each of the Company and its Subsidiaries have implemented (A) commercially reasonable measures designed to protect personal information in their possession, custody, or control against unauthorized access, use, modification, disclosure or other misuse, including through administrative, technical and physical safeguards; (B) commercially reasonable security controls and disaster recovery plans and procedures for the Company IT Systems to ensure the confidentiality, integrity and availability of the Company IT Systems and the data processed by such Company IT Systems, including backup, anti-virus, security and disaster recovery technology, policies and procedures consistent with applicable legal and regulatory standards and customary industry practices; and (C) commercially reasonable security designed to prevent unauthorized access to, or control of, the Company's and its Subsidiaries' products.

(c) Neither the Company nor any Subsidiary of the Company has experienced any material incident impacting the confidentiality, integrity, or availability of any personal information, or any information technology systems, networks, or Software owned and/or used by the Company or any of its Subsidiaries and none of the Company or its Subsidiaries has suffered any other material personal data breach (as defined in the General Data Protection Regulation (EU) 2016/679). Neither the Company nor any Subsidiary of the Company has received any written notice or complaint from any Person, or provided any written notice to any Person, with respect to any material violation of their privacy, data security, and data protection practices or obligations, nor has any such notice or complaint been threatened in writing against the Company or any of the Company's Subsidiaries.

**Section 4.23 Environmental Matters.**

(a) The Company and its Subsidiaries are and, except for matters which have been fully resolved, have been for the past three (3) years in material compliance with all Environmental Laws.

(b) There has been no material release of any Hazardous Materials by the Company or its Subsidiaries (i) at, in, on or under any Leased Real Property or (ii) to the knowledge of the Company, at, in, on or under any formerly owned or Leased Real Property during the time that the Company owned or leased such property or at any other location where Hazardous Materials generated by the Company or any of the Company's Subsidiaries have been transported to, sent, placed or disposed of.

A-45

Exhibit 6
Page 1340

**Table of Contents**

(c) Neither the Company nor its Subsidiaries are subject to any current Governmental Order relating to any material non-compliance with Environmental Laws by the Company or its Subsidiaries or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials.

(d) No material Legal Proceeding is pending or, to the knowledge of the Company, threatened with respect to the Company's and its Subsidiaries' compliance with or liability under Environmental Laws, and, to the knowledge of the Company, there are no facts or circumstances which could reasonably be expected to form the basis of such a Legal Proceeding.

(e) The Company has made available to SPAC all material environmental reports, assessments, audits and inspections and any material communications or notices from or to any Governmental Authority concerning any material non-compliance of the Company or any of the Company's Subsidiaries with, or liability of the Company or any of the Company's Subsidiaries under, Environmental Law.

**Section 4.24 Absence of Changes**. From the date of the most recent balance sheet included in the Audited IFRS Financial Statements to the date of this Agreement there has not been any Company Material Adverse Effect.

**Section 4.25 Anti-Corruption and Anti-Money Laundering Compliance.**

(a) For the past three (3) years, neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any director, officer, employee or agent acting on behalf of the Company or any of the Company's Subsidiaries, has (i) violated any Anti-Bribery Laws or Anti-Money Laundering Laws, or (ii) offered or given anything of value to any official or employee of a Governmental Authority, any political party or official thereof, any candidate for political office, or any other Person, in any such case while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any official or employee of a Governmental Authority or candidate for political office, in each case in violation of the Anti-Bribery Laws.

(b) Each of the Company and its Subsidiaries has instituted and maintains policies and procedures reasonably designed to ensure compliance in all material respects with the Anti-Bribery Laws and Anti-Money Laundering Laws.

(c) To the knowledge of the Company, as of the date hereof, there are no current or pending internal investigations, third party investigations (including by any Governmental Authority), or internal or external audits that address any material allegations or information concerning possible material violations of the Anti-Bribery Laws or Anti-Money Laundering Laws related to the Company or any of the Company's Subsidiaries.

**Section 4.26 Sanctions and International Trade Compliance**.

(a) The Company and its Subsidiaries (i) are, and have been for the past three (3) years, in compliance with all International Trade Laws and Sanctions Laws, and (ii) have obtained all required licenses, consents, notices, waivers, approvals, orders, registrations, declarations, or other authorizations from, and have made any material filings with, any applicable Governmental Authority for the import, export, re-export, deemed export, deemed re-export, or transfer required under the International Trade Laws and Sanctions Laws (the "Export Approvals"). There are no pending or, to the knowledge of the Company, threatened, claims, complaints, charges, investigations, voluntary disclosures or Legal Proceedings against the Company or any of the Company's Subsidiaries related to any violation of International Trade Laws or Sanctions Laws or any Export Approvals.

(b) Neither the Company nor any of its Subsidiaries nor any of their respective directors or officers, or to the knowledge of the Company, employees or any of the Company's or its Subsidiaries' respective agents, representatives or other Persons acting on behalf of the Company or any of the Company's Subsidiaries, (i) is, or has been during the past three (3) years, a Sanctioned Person or (ii) has transacted business directly or knowingly indirectly with any Sanctioned Person or in any Sanctioned Country, in violation of Sanctions Laws.

Exhibit 6
Page 1341

**Table of Contents**

**Section 4.27 Information Supplied**. None of the information supplied or to be supplied by the Company or any of the Company's Subsidiaries specifically in writing for inclusion in the Registration Statement will, as of the date on which the Proxy Statement/Registration Statement is declared effective (and in the case of any amendment thereto, at the time of such amendment), at the time the Proxy Statement/Registration Statement is first mailed to SPAC Shareholders, at the time of SPAC Shareholders' Meeting or at the Merger Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

**Section 4.28 Customers and Suppliers.**

(a) Section 4.28(a) of the Company Disclosure Letter sets forth, as of the date of this Agreement, the top ten (10) customers and the top five (5) suppliers or manufacturers, in each case, based on the aggregate Dollar value of the Company's and its Subsidiaries' transaction volume with such counterparty during the trailing twelve months for the period ending December 31, 2020 (each group of Persons, respectively, the "Top Customers" and "Top Suppliers").

(b) Except as set forth on Section 4.28(b) of the Company Disclosure Letter, none of the Top Customers or Top Suppliers has, as of the date of this Agreement, notified the Company or any of the Company's Subsidiaries in writing, or to the Company's knowledge, verbally: (i) that it will, or, to the knowledge of the Company, has threatened to, terminate, cancel, materially limit or materially alter and adversely modify any of its existing business with the Company or any of the Company's Subsidiaries (other than due to the expiration of an existing contractual arrangement); or (ii) that it is in a material dispute with the Company or its Subsidiaries or their respective businesses.

(c) No Top Supplier or Top Customer of the Company or any of its Subsidiaries shall either (i) have a right to terminate or modify (in a manner that would be materially adverse to the Company and its Subsidiaries taken as a whole) any Contract with the Company or any of the Company's Subsidiaries as a result of any of the transactions contemplated by this Agreement; or (ii) be required to consent to or be notified of any of the transactions contemplated by this Agreement.

(d) No party to any joint venture or partnership arrangement entered into by the Company or any of its Subsidiaries shall (i) have a right to terminate or modify (in a manner that would be materially adverse to the Company and its Subsidiaries taken as a whole) any Contract with the Company or any of the Company's Subsidiaries as a result of any of the transactions contemplated by this Agreement; or (ii)  be required to consent to or be notified of any of the transactions contemplated by this Agreement.

**Section 4.29 Government Contracts**. The Company is not party to: (i) any Contract, including an individual task order, delivery order, purchase order, basic ordering agreement, letter Contract or blanket purchase agreement between the Company or any of its Subsidiaries, on one hand, and any Governmental Authority, on the other hand, or (ii) any subcontract or other Contract by which the Company or one of its Subsidiaries has agreed to provide goods or services through a prime contractor directly to a Governmental Authority that is expressly identified in such subcontract or other Contract as the ultimate consumer of such goods or services. None of the Company or any of its Subsidiaries have provided any offer, bid, quotation or proposal to sell products made or services provided by the Company or any of its Subsidiaries that, if accepted or awarded, would lead to any Contract or subcontract of the type described by the foregoing sentence.

**Section 4.30 Sufficiency of Assets**. Except as would not be expected to be material to the Company and its Subsidiaries, taken as a whole, the tangible and intangible assets owned, licensed or leased by the Company and its Subsidiaries constitute all of the assets reasonably necessary for the continued conduct of the business of the Company and its Subsidiaries after the Closing in the ordinary course.

Exhibit 6
Page 1342

**Table of Contents**

**Section 4.31 No Additional Representation or Warranties**. Except as provided in and this Article IV, neither the Company nor any of its Affiliates, nor any of their respective directors, managers, officers, employees, equityholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to SPAC or its Affiliates and no such party shall be liable in respect of the accuracy or completeness of any information provided to SPAC or its Affiliates.

<div align="center">

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF SPAC**

</div>

Except as set forth in (i) any SPAC SEC Filings filed or submitted on or prior to the date hereof (excluding (a) any disclosures in any risk factors section that do not constitute statements of fact, disclosures in any forward-looking statements disclaimer and other disclosures that are generally cautionary, predictive or forward-looking in nature and (b) any exhibits or other documents appended thereto) (it being acknowledged that nothing disclosed in such SPAC SEC Filings will be deemed to modify or qualify the representations and warranties set forth in Section 5.1, Section 5.2, Section 5.9, Section 5.13 and Section 5.16), or (ii) in the disclosure letter delivered by SPAC to the Company (the "SPAC Disclosure Letter") on the date of this Agreement (each section of which, subject to Section 12.9, qualifies the correspondingly numbered and lettered representations in this Article V), SPAC represents and warrants to the Company as follows:

**Section 5.1 SPAC Organization**. SPAC has been duly incorporated, organized or formed and is validly existing as an exempted company in good standing (or equivalent status, to the extent that such concept exists) under the Laws of its jurisdiction of incorporation, organization or formation, and has the requisite company power and authority to own, lease or operate all of its properties and assets and to conduct its business as it is now being conducted. The copies of SPAC's Governing Documents previously delivered by SPAC to the Company, are true, correct and complete. SPAC is duly licensed or qualified and in good standing as a foreign corporation or company in all jurisdictions in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified would not reasonably be expected to be, individually or in the aggregate, material to SPAC.

**Section 5.2 Due Authorization.**

(a) SPAC has all requisite corporate power and authority to (a) execute and deliver this Agreement and the documents contemplated hereby, and (b) consummate the transactions contemplated hereby and thereby and perform all obligations to be performed by it hereunder and thereunder. The execution and delivery of this Agreement and the documents contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been (i) duly and validly authorized and approved by SPAC Board and (ii) determined by SPAC Board as advisable to SPAC and SPAC Shareholders and recommended for approval by SPAC Shareholders. No other company proceeding on the part of SPAC is necessary to authorize this Agreement and the documents contemplated hereby (other than SPAC Shareholder Approval). This Agreement has been, and at or prior to the Closing, the other documents contemplated hereby will be, duly and validly executed and delivered by SPAC, and this Agreement constitutes, and at or prior to the Closing, the other documents contemplated hereby will constitute, a legal, valid and binding obligation of SPAC, enforceable against SPAC in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(b) Assuming that a quorum (as determined pursuant to SPAC's Governing Documents) is present, each of those Transaction Proposals identified in Section 9.2(b), in each case, shall require approval by an affirmative vote of the holders of at least a two-thirds majority of the outstanding SPAC Ordinary Shares entitled to vote, who attend and vote thereupon (as determined in accordance with SPAC's Governing Documents) at a shareholders' meeting duly called by SPAC Board and held for such purpose.

<div align="center">A-48</div>

Exhibit 6
Page 1343

Table of Contents

(c) The foregoing votes are the only votes of any of SPAC's share capital necessary in connection with entry into this Agreement by SPAC and the consummation of the transactions contemplated hereby, including the Closing.

(d) At a meeting duly called and held, SPAC Board has unanimously approved the transactions contemplated by this Agreement as a Business Combination.

**Section 5.3 No Conflict**. Subject to SPAC Shareholder Approval, the execution and delivery of this Agreement by SPAC and the other documents contemplated hereby by SPAC and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate or conflict with any provision of, or result in the breach of or default under the Governing Documents of SPAC, (b) violate or conflict with any provision of, or result in the breach of, or default under any applicable Law or Governmental Order applicable to SPAC, (c) violate or conflict with any provision of, or result in the breach of, result in the loss of any right or benefit, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which SPAC is a party or by which SPAC may be bound, or terminate or result in the termination of any such Contract or (d) result in the creation of any Lien upon any of the properties or assets of SPAC, except, in the case of clauses (b) through (d), to the extent that the occurrence of the foregoing would not (i) have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of SPAC to enter into and perform their obligations under this Agreement or (ii)  be material to SPAC.

**Section 5.4 Subsidiaries**. SPAC has no Subsidiaries. SPAC is not obligated to make nor bound by any written, oral or other agreement, contract, subcontract, lease, binding understanding, instrument, note, option, warranty, purchase order, license, sublicense, insurance policy, benefit plan, commitment or undertaking of any nature, directly or indirectly, as of the date hereof or as may hereafter be in effect under which it may become obligated to make, any future investment in or capital contribution to any other entity. SPAC does not directly or indirectly own any equity or similar interest in or any interest convertible, exchangeable or exercisable for, any equity or similar interest in, any corporation, partnership, joint venture or other business, association or entity.

**Section 5.5 Litigation and Proceedings**. There are no pending or, to the knowledge of SPAC, threatened Legal Proceedings against SPAC, its properties or assets, or, to the knowledge of SPAC, any of its directors, managers, officers or employees (in their capacity as such). There are no investigations or other inquiries pending or, to the knowledge of SPAC, threatened by any Governmental Authority, against SPAC, its properties or assets, or, to the knowledge of SPAC, any of its directors, managers, officers or employees (in their capacity as such). There is no outstanding Governmental Order imposed upon SPAC, nor are any assets of SPAC's businesses bound or subject to any Governmental Order the violation of which would, individually or in the aggregate, reasonably be expected to be material to SPAC. As of the date hereof, each of SPAC is in compliance with all applicable Laws in all material respects. Since December 10, 2018, SPAC has not received any written notice of or been charged with the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to SPAC.

**Section 5.6 SEC Filings**. SPAC has timely filed or furnished all statements, prospectuses, registration statements, forms, reports and documents required to be filed by it with the SEC since July 16, 2019, pursuant to the Exchange Act or the Securities Act (collectively, as they have been amended since the time of their filing through the date hereof, the "SPAC SEC Filings"). Each of SPAC SEC Filings, as of the respective date of its filing, and as of the date of any amendment, complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act and any rules and regulations promulgated thereunder applicable to SPAC SEC Filings. As of the respective date of its filing (or if amended or superseded by a filing prior to the date of this Agreement or the Closing Date, then on the date of such filing), SPAC SEC Filings did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date hereof, there are no outstanding or unresolved comments in comment letters

A-49

Exhibit 6
Page 1344

Table of Contents

received from the SEC with respect to SPAC SEC Filings. To the knowledge of SPAC, none of SPAC SEC Filings filed on or prior to the date hereof is subject to ongoing SEC review or investigation as of the date hereof.

**Section 5.7 Internal Controls; Listing; Financial Statements.**

(a) Except as not required in reliance on exemptions from various reporting requirements by virtue of SPAC's status as an "emerging growth company" within the meaning of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"), SPAC has established and maintains disclosure controls and procedures (as defined in Rule 13a-15 under the Exchange Act). Such disclosure controls and procedures are designed to ensure that material information relating to SPAC, including its consolidated Subsidiaries, if any, is made known to SPAC's principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared. Such disclosure controls and procedures are effective in timely alerting SPAC's principal executive officer and principal financial officer to material information required to be included in SPAC's periodic reports required under the Exchange Act. Since July 16, 2019, SPAC has established and maintained a system of internal controls over financial reporting (as defined in Rule 13a-15 under the Exchange Act) sufficient to provide reasonable assurance regarding the reliability of SPAC's financial reporting and the preparation of SPAC Financial Statements for external purposes in accordance with GAAP.

(b) Each director and executive officer of SPAC has filed with the SEC on a timely basis all statements required by Section 16(a) of the Exchange Act and the rules and regulations promulgated thereunder.

(c) Since July 16, 2019, SPAC has complied in all material respects with the applicable listing and corporate governance rules and regulations of the New York Stock Exchange (the "NYSE"). SPAC Class A Ordinary Shares are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NYSE. There is no Legal Proceeding pending or, to the knowledge of SPAC, threatened against SPAC by the NYSE or the SEC with respect to any intention by such entity to deregister SPAC Class A Ordinary Shares or prohibit or terminate the listing of SPAC Class A Ordinary Shares on the NYSE.

(d) SPAC SEC Filings contain true and complete copies of the audited balance sheets and statements of cash flows, statement of operations, and changes in shareholders' equity of SPAC from inception through December 31, 2020, together with the auditor's reports thereon (the "SPAC Financial Statements"). SPAC Financial Statements (i) fairly present in all material respects the financial position of SPAC, as at the respective dates thereof, and the results of operations and cash flows for the respective periods then ended, (ii) were prepared in conformity with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and (iii) comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof. The books and records of SPAC have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements.

(e) There are no outstanding loans or other extensions of credit made by SPAC to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of SPAC. SPAC has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(f) Neither SPAC (including any employee thereof) nor SPAC's independent auditors has identified or been made aware of (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by SPAC, (ii) any fraud, whether or not material, that involves SPAC's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by SPAC or (iii) any claim or allegation regarding any of the foregoing.

**Section 5.8 Governmental Authorities; Consents**. Assuming the truth and completeness of the representations and warranties of the Company contained in this Agreement, no consent, waiver, approval or authorization of, or

A-50

Exhibit 6
Page 1345

Table of Contents

designation, declaration or filing with, or notification to, any Governmental Authority or other Person is required on the part of SPAC with respect to SPAC's execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) applicable requirements of the HSR Act, and (ii) as otherwise disclosed on Section 5.8 of SPAC Disclosure Letter.

**Section 5.9 Trust Account**. As of the date of this Agreement, SPAC has at least $150,000,000 in the Trust Account, such monies invested in United States government securities or money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act pursuant to the Investment Management Trust Agreement, dated as of July 11, 2019, between SPAC and American Stock Transfer & Trust Company, LLC, as trustee (the "Trustee") (the "Trust Agreement"). There are no separate Contracts, side letters or other arrangements or understandings (whether written or unwritten, express or implied) that would cause the description of the Trust Agreement in SPAC SEC Filings to be inaccurate or that would entitle any Person (other than SPAC Shareholders holding SPAC Ordinary Shares sold in SPAC's initial public offering who shall have elected to redeem their SPAC Ordinary Shares pursuant to SPAC's Governing Documents and the underwriters of SPAC's initial public offering with respect to deferred underwriting commissions) to any portion of the proceeds in the Trust Account. Prior to the Closing, none of the funds held in the Trust Account may be released other than to pay Taxes and payments with respect to all SPAC Share Redemptions. There are no claims or proceedings pending or, to the knowledge of SPAC, threatened with respect to the Trust Account. SPAC has performed all material obligations required to be performed by it to date under, and is not in default, breach or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default or breach thereunder. As of the Merger Effective Time, the obligations of SPAC to dissolve or liquidate pursuant to SPAC's Governing Documents shall terminate, and as of the Merger Effective Time, SPAC shall have no obligation whatsoever pursuant to SPAC's Governing Documents to dissolve and liquidate the assets of SPAC by reason of the consummation of the transactions contemplated hereby. To SPAC's knowledge, as of the date hereof, following the Merger Effective Time, no SPAC Shareholder shall be entitled to receive any amount from the Trust Account except to the extent such SPAC Shareholder is exercising an SPAC Share Redemption. As of the date hereof, assuming the accuracy of the representations and warranties of the Company contained herein and the compliance by the Company with its obligations hereunder, SPAC does not have any reason to believe that any of the conditions to the use of funds in the Trust Account will not be satisfied or funds available in the Trust Account will not be available to SPAC on the Closing Date.

**Section 5.10 Investment Company Act; JOBS Act**. SPAC is not an "investment company" or a Person directly or indirectly "controlled" by or acting on behalf of an "investment company", in each case within the meaning of the Investment Company Act. SPAC constitutes an "emerging growth company" within the meaning of the JOBS Act and a "smaller reporting company" (as defined in 17 CFR § 229.10(f)(1)).

**Section 5.11 Absence of Changes**. Since December 10, 2018, (a) there has not been any event or occurrence that has had, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of SPAC to enter into and perform their obligations under this Agreement and (b) except as set forth in Section 5.11 of SPAC Disclosure Letter, SPAC has, in all material respects, conducted its business and operated its properties in the ordinary course of business consistent with past practice.

**Section 5.12 No Undisclosed Liabilities**. Except as set forth on Section 5.12 of SPAC Disclosure Letter, as of the date of this Agreement, there is no other liability, debt (including Indebtedness) or obligation of, or claim or judgement against, SPAC (whether direct or indirect, absolute or contingent, accrued or unaccrued, known or unknown, liquidated or unliquidated, or due or to become due), except for liabilities, debts, obligations, claims or judgments (a) reflected or reserved for on SPAC's financial statements in SPAC SEC Filings or disclosed in the notes thereto, (b) that have arisen since the date of the most recent balance sheet included in SPAC SEC Filings in the ordinary course of business, consistent with past practice, (c) that will be discharged or paid off to or at the Closing, (d) obligations for future performance under any contract to which SPAC is a party or (e) any other liabilities and obligations which are not, individually or in the aggregate, material to SPAC.

Exhibit 6
Page 1346

Table of Contents

**Section 5.13 Capitalization of SPAC.**

(a) As of the date of this Agreement, the authorized share capital of SPAC is $20,100 divided into (i) 180,000,000 SPAC Class A Ordinary Shares, 17,250,000 of which are issued and outstanding as of the date of this Agreement, (ii) 25,000,000 SPAC Class B Ordinary Shares, of which 5,562,500 shares are issued and outstanding as of the date of this Agreement, and (iii) 1,000,000 preference shares of par value $0.0001 each, of which no shares are issued and outstanding as of the date of this Agreement ((i), (ii) and (iii) collectively, the "SPAC Securities"). The foregoing represents all of the issued and outstanding SPAC Securities as of the date of this Agreement. All issued and outstanding SPAC Securities (i) have been duly authorized and validly issued and are fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) SPAC's Governing Documents, and (2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, SPAC's Governing Documents or any Contract to which SPAC is a party or otherwise bound.

(b) Subject to the terms and conditions of the Warrant Agreement, SPAC Warrants will be exercisable after giving effect to the Merger for one SPAC Ordinary Share at an exercise price of eleven Dollars fifty cents ($11.50) per share. As of the date of this Agreement, 7,500,000 SPAC Ordinary Warrants and 5,450,000 SPAC Private Placement Warrants are issued and outstanding. SPAC Warrants are not exercisable until the later of (x) July 16, 2020 and (y) thirty (30) days after the Closing. All outstanding SPAC Warrants (i) have been duly authorized and validly issued and constitute valid and binding obligations of SPAC, enforceable against SPAC in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) SPAC's Governing Documents and (2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, SPAC's Governing Documents or any Contract to which SPAC is a party or otherwise bound. Except for the Subscription Agreements, SPAC's Governing Documents, the Forward Purchase Agreement (which shall be terminated in accordance with Section 8.7) and this Agreement, there are no outstanding Contracts of SPAC to repurchase, redeem or otherwise acquire any SPAC Securities.

(c) Except as set forth in this Section 5.13 or as contemplated by this Agreement, the Forward Purchase Agreement (which shall be terminated in accordance with Section 8.7) or the other documents contemplated hereby, SPAC has not granted any outstanding options, stock appreciation rights, warrants, rights or other securities convertible into or exchangeable or exercisable for SPAC Securities, or any other commitments or agreements providing for the issuance of additional shares, the sale of treasury shares, for the repurchase or redemption of any SPAC Securities or the value of which is determined by reference to SPAC Securities, and there are no Contracts of any kind which may obligate SPAC to issue, purchase, redeem or otherwise acquire any of its SPAC Securities.

(d) On or prior to the date of this Agreement, SPAC and HoldCo have entered into Subscription Agreements, in the forms attached to Section 5.13(d) of SPAC Disclosure Letter, with PIPE Investors, true and correct copies of which have been provided to the Company prior to the date of this Agreement, pursuant to which, and on the terms and subject to the conditions of which, such PIPE Investors have agreed, in connection with the transactions contemplated hereby, to purchase HoldCo Ordinary Shares from HoldCo for a PIPE Investment Amount of at least $150,000,000 (such amount, the "Minimum PIPE Investment Amount"). On or prior to the date of this Agreement, SPAC has identified to the Company each of the PIPE Investors (or has caused the identification of each such PIPE Investor to the Company) and, to the knowledge of SPAC, the Company has not exercised its right to reasonably object to any such PIPE Investor as of the date of this

A-52

Exhibit 6
Page 1347

Table of Contents

Agreement. Such Subscription Agreements are in full force and effect with respect to, and binding on, SPAC and, to the knowledge of SPAC, on HoldCo and each PIPE Investor party thereto, in accordance with their terms.

**Section 5.14 Brokers' Fees**. Except fees described on Section 5.14 of SPAC Disclosure Letter, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated hereby based upon arrangements made by SPAC or any of its Affiliates.

**Section 5.15 Indebtedness**. SPAC has no Indebtedness.

**Section 5.16 Taxes.**

(a) All material Tax Returns required to be filed by SPAC have been timely filed (taking into account any applicable extensions), all such Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects and all material Taxes due and payable (whether or not shown on any Tax Return) by SPAC have been paid, other than Taxes being contested in good faith and for which adequate reserves have been established in accordance with GAAP.

(b) SPAC has withheld from amounts owing to any employee, creditor or other Person all material Taxes required by Law to be withheld, paid over to the proper Governmental Authority in a timely manner all such withheld amounts required to have been so paid over and otherwise complied in all material respects with all applicable withholding and related reporting requirements with respect to such Taxes.

(c) There are no Liens for any material Taxes (other than Liens described in clause (ii) of the definition of Permitted Liens) upon the property or assets of SPAC.

(d) No claim, assessment, deficiency or proposed adjustment for any material amount of Tax has been asserted or assessed by any Governmental Authority against SPAC that remains unresolved or unpaid.

(e) There are no audits, examinations or other Legal Proceedings with respect to any Taxes of SPAC in excess of $15,000 (determined individually or in the aggregate) presently in progress, and there are no waivers, extensions or requests for any waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of SPAC.

(f) No written claim has been made by any Governmental Authority where SPAC does not file Tax Returns that it is or may be subject to taxation in that jurisdiction.

(g) SPAC is not a party to any Tax indemnification or Tax sharing or similar agreement (other than customary commercial Contracts not primarily related to Taxes that were entered into with persons who are not Affiliates or equity owners of SPAC).

(h) SPAC has not been a party to any transaction treated by the parties as a distribution of stock qualifying for tax-free treatment under Section 355 of the Code.

(i) SPAC is not liable for Taxes of any other Person (other than SPAC) under Treasury Regulations Section 1.1502-6 or any similar provision of state, local or foreign Tax Law or as a transferee or successor or by Contract (other than customary commercial Contracts not primarily related to Taxes).

(j) SPAC has not taken any action or agreed to take any action, nor to the knowledge of SPAC are there any facts or circumstances, that would reasonably be expected to prevent the Transactions from qualifying for the Intended U.S. Tax Treatment.

(k) SPAC has not ever owned any equity interest in another Person.

Exhibit 6
Page 1348

Table of Contents

**Section 5.17 Business Activities.**

(a) Since formation, SPAC has not conducted any business activities other than activities related to SPAC's initial public offering or directed toward the accomplishment of a Business Combination. Except as set forth in SPAC's Governing Documents or as otherwise contemplated by this Agreement or the Ancillary Agreements and the transactions contemplated hereby and thereby, there is no agreement, commitment, or Governmental Order binding upon SPAC or to which SPAC is a party which has or would reasonably be expected to have the effect of prohibiting or impairing any business practice of SPAC or any acquisition of property by SPAC or the conduct of business by SPAC as currently conducted or as contemplated to be conducted as of the Closing, other than such effects, individually or in the aggregate, which have not been and would not reasonably be expected to be material to SPAC.

(b) Except for the transactions contemplated by this Agreement and the Ancillary Agreements, SPAC does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity. Except for this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, SPAC has no material interests, rights, obligations or liabilities with respect to, and is not party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or would reasonably be interpreted as constituting, a Business Combination.

(c) As of the date hereof and except for this Agreement, the Ancillary Agreements and the other documents and transactions contemplated hereby and thereby (including with respect to expenses and fees incurred in connection therewith), SPAC is not party to any Contract with any other Person that would require payments by SPAC or any of its Subsidiaries after the date hereof in excess of $500,000 in the aggregate with respect to any individual Contract, other than Working Capital Loans. As of the date hereof, the amount outstanding under any Working Capital Loans is set out in Section 5.17 of the SPAC Disclosure Letter.

**Section 5.18 NYSE Stock Market Quotation**. SPAC Class A Ordinary Shares are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NYSE under the symbol "SCPE". SPAC Ordinary Warrants are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NYSE under the symbol "SCPE WS". SPAC is in compliance with the rules of the NYSE, as applicable, and there is no Action or proceeding pending or, to the knowledge of SPAC, threatened against SPAC by the NYSE or the SEC with respect to any intention by such entity to deregister SPAC Class A Ordinary Shares or SPAC Warrants or terminate the listing of SPAC Class A Ordinary Shares or SPAC Warrants on the NYSE, as applicable. None of SPAC or its Affiliates has taken any action in an attempt to terminate the registration of SPAC Class A Ordinary Shares or SPAC Warrants under the Exchange Act except as contemplated by this Agreement.

**Section 5.19 Registration Statement, Proxy Statement and Proxy Statement/Registration Statement**. On the effective date of the Registration Statement, the Registration Statement, and when first filed in accordance with Rule 424(b) and/or filed pursuant to Section 14A, the Proxy Statement and the Proxy Statement/Registration Statement (or any amendment or supplement thereto), shall comply in all material respects with the applicable requirements of the Securities Act and the Exchange Act. On the effective date of the Registration Statement, the Registration Statement will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading. On the date of any filing pursuant to Rule 424(b) and/or Section 14A, the date the Proxy Statement/Registration Statement and the Proxy Statement, as applicable, is first mailed to SPAC Shareholders and certain or all of the Company Shareholders (including as a component of an information statement or other shareholder disclosure to Company Shareholders in connection with the Transactions), as applicable, and at the time of SPAC Shareholders' Meeting, the Proxy Statement/Registration Statement and the Proxy Statement or Company Shareholder disclosure, as applicable (together with any amendments or supplements thereto) will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in

A-54

Exhibit 6
Page 1349

Table of Contents

the light of the circumstances under which they were made, not misleading; provided, however, that SPAC makes no representations or warranties as to the information contained in or omitted from the Registration Statement, Proxy Statement or the Proxy Statement/Registration Statement in reliance upon and in conformity with information furnished in writing to SPAC by or on behalf of the Company specifically for inclusion in the Registration Statement, Proxy Statement or the Proxy Statement/Registration Statement.

**Section 5.20 No Outside Reliance**. Notwithstanding anything contained in this Article V or any other provision hereof, SPAC and any of its directors, managers, officers, employees, equityholders, partners, members or representatives, acknowledge and agree that SPAC has made its own investigation of the Company and that neither the Company, HoldCo, Merger Sub, nor any of their respective Affiliates, agents or representatives is making any representation or warranty whatsoever, express or implied, beyond those expressly given by the Company in Article IV, including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Company or its Subsidiaries. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions that may be contained or referred to in the Company Disclosure Letter or elsewhere, as well as any information, documents or other materials (including any such materials contained in any "data room" (whether or not accessed by SPAC or its representatives) or reviewed by SPAC pursuant to the Confidentiality Agreement) or management presentations that have been or shall hereafter be provided to SPAC or any of its Affiliates, agents or representatives are not and will not be deemed to be representations or warranties of the Company, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing except as may be expressly set forth in Article IV of this Agreement. Except as otherwise expressly set forth in this Agreement, SPAC understands and agrees that any assets, properties and business of the Company and its Subsidiaries are furnished "as is", "where is" and subject to and except as otherwise provided in the representations and warranties contained in Article IV, with all faults and without any other representation or warranty of any nature whatsoever.

**Section 5.21 No Additional Representation or Warranties**. Except as provided in this Article V, SPAC nor its Affiliates, nor any of its directors, managers, officers, employees, shareholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to the Company, Merger Sub, HoldCo or their respective Affiliates and no such party shall be liable in respect of the accuracy or completeness of any information provided to the Company, Merger Sub, HoldCo or their respective Affiliates. Without limiting the foregoing, the Company acknowledges that the Company, Merger Sub and HoldCo and their advisors, have made their own investigation of SPAC and, except as provided in this Article V, are not relying on any representation or warranty whatsoever as to the condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of SPAC or any of its Subsidiaries, the prospects (financial or otherwise) or the viability or likelihood of success of the business of SPAC as conducted after the Closing, as contained in any materials provided by SPAC or any of its Affiliates or any of its directors, officers, employees, shareholders, partners, members or representatives or otherwise.

**Section 5.22 Affiliate Arrangements**. Except as set forth on Section 5.22 of the SPAC Disclosure Letter, SPAC does not have any rights, obligations or liabilities with respect to, or arising from, any contract with Sponsor nor any anyone related by blood, marriage or adoption to Sponsor or, to the knowledge of Sponsor, any Person in which Sponsor has a direct or indirect legal, contractual or beneficial ownership of 5% or greater.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF HOLDCO AND MERGER SUB

Each of HoldCo and Merger Sub hereby represents and warrants to SPAC as follows:

**Section 6.1 Corporate Organization**. Each of HoldCo and Merger Sub is a company duly organized, validly existing and in good standing (insofar as such concept exists in the relevant jurisdiction) under the laws of the

A-55

Exhibit 6
Page 1350

**Table of Contents**

jurisdiction of its incorporation and has the requisite corporate power and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as it is now being conducted.

**Section 6.2 Certificate of Incorporation and By-laws**. Each of HoldCo and Merger Sub has heretofore furnished to SPAC complete and correct copies of the HoldCo Organizational Documents and Merger Sub Organizational Documents, respectively, Each of the HoldCo Organizational Documents and Merger Sub Organizational Documents are in full force and effect and neither HoldCo nor Merger Sub is in violation of any of the provisions of such organizational documents.

**Section 6.3 Capitalization**.

(a) As of the date hereof, the authorized share capital of HoldCo consists of $50,000 divided into ordinary shares of $0.00001 each.

(b) As of the date hereof, the authorized share capital of Merger Sub consists of $50,000 divided into ordinary shares of $0.00001 each.

(c) The outstanding HoldCo Ordinary Shares have been issued and granted in compliance with all applicable securities Laws and other applicable Laws and were issued free and clear of all Liens other than transfer restrictions under applicable securities Laws and the HoldCo Organizational Documents.

(d) The shares constituting the Merger Consideration being delivered by HoldCo hereunder shall be duly and validly issued, fully paid and nonassessable, and each such share or other security shall be issued free and clear of preemptive rights and all Liens, other than transfer restrictions under applicable securities Laws and the HoldCo Organizational Documents. The HoldCo Ordinary Shares constituting the Merger Consideration being delivered by HoldCo hereunder will be issued in compliance with all applicable securities Laws and other applicable Laws and will not be subject to or give rise to any preemptive rights or rights of first refusal.

(e) Except as contemplated by this Agreement and the transactions contemplated hereunder, (i) there are no other options, warrants, preemptive rights, calls, convertible securities, conversion rights or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued share capital of HoldCo or obligating HoldCo to issue or sell any shares in the capital of, or other equity interests in, HoldCo, (ii) HoldCo is not a party to, or otherwise bound by, and HoldCo has not granted, any equity appreciation rights, participations, phantom equity or similar rights and (iii) there are no voting trusts, voting agreements, proxies, shareholder agreements or other similar agreements with respect to the voting or transfer of the HoldCo Ordinary Shares or any of the equity interests or other securities of HoldCo. As of the date hereof, except for Merger Sub, HoldCo does not own any equity interests in any person. As of the date hereof, Merger Sub does not own any equity interests in any person.

**Section 6.4 Authority Relative to this Agreement**. Each of HoldCo and Merger Sub have all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party, to perform its obligations hereunder and thereunder and the transactions contemplated hereby and thereby and to perform all of its obligations hereunder and thereunder. The execution and delivery of this Agreement and such Ancillary Agreements by each of HoldCo and Merger Sub and the consummation by each of HoldCo and Merger Sub of the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of HoldCo or Merger Sub are necessary to authorize this Agreement, each such Ancillary Agreement or consummation of the transactions contemplated hereby and thereby (other than, (a) with respect to the transactions contemplated hereby, the approval and adoption of this Agreement by the holders of a relevant majority of the then-outstanding HoldCo Ordinary Shares and by HoldCo (as the holder of all of the then outstanding Merger Sub share capital), and the filing and recordation of appropriate merger documents as required by the laws of the Cayman Islands, as

A-56

Exhibit 6
Page 1351

**Table of Contents**

the case may be, and (b) with respect to the issuance of HoldCo Ordinary Shares, the Exchange and the amendment and restatement of the HoldCo Organizational Documents pursuant to this Agreement, the approval a relevant majority of the then-outstanding HoldCo Ordinary Shares). This Agreement and each such Ancillary Agreement have been duly and validly executed and delivered by HoldCo and Merger Sub and, assuming due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of HoldCo or Merger Sub, enforceable against HoldCo or Merger Sub in accordance with its terms.

**Section 6.5 No Conflict; Required Filings and Consents.**

(a) The execution and delivery by HoldCo and Merger Sub of this Agreement and each Ancillary Agreement to which it is a party does not, and the performance of this Agreement and each such Ancillary Agreement by HoldCo and Merger Sub will not (i) conflict with or violate the HoldCo Organizational Documents or Merger Sub Organizational Documents (as the case may be), (ii) assuming that all consents, approvals, authorizations and other actions described in Section 6.5(b) have been obtained and all filings and obligations described in Section 6.5(b) have been made, conflict with or violate any Law, rule, regulation, order, judgment or decree applicable to HoldCo or Merger Sub or by which any of their respective property or assets is bound or affected or (iii) result in any breach of, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any property or asset of HoldCo or Merger Sub pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which each of HoldCo or Merger Sub is a party or by which HoldCo or Merger Sub or any of their respective property or assets is bound or affected, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not (i) have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the HoldCo or Merger Sub to enter into and perform their obligations under this Agreement or (ii) be material to the business of the HoldCo or Merger Sub, taken as a whole.

(b) The execution and delivery by HoldCo and Merger Sub of this Agreement and each Ancillary Agreement to which it is a party does not, and the performance of this Agreement and each such Ancillary Agreement by HoldCo or Merger Sub, as applicable, will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) for applicable requirements, if any, of the Exchange Act, Blue Sky Laws and state takeover laws, the premerger notification requirements of the HSR Act and filing and recordation of appropriate merger documents as required by the laws of the Cayman Islands and (ii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually or in the aggregate, prevent or materially delay consummation of any of the Transactions or otherwise prevent HoldCo and Merger Sub from performing their respective material obligations under this Agreement and each such Ancillary Agreement.

**Section 6.6 Compliance**. Neither HoldCo nor Merger Sub is or has been in conflict with, or in default, breach or violation of, (a) any Law applicable to HoldCo or Merger Sub or by which any property or asset of HoldCo or Merger Sub is bound or affected, or (b) any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which HoldCo or Merger Sub is a party or by which HoldCo or Merger Sub or any property or asset of HoldCo or Merger Sub is bound. HoldCo and Merger Sub are in possession of all material franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Authority necessary for HoldCo and Merger Sub to own, lease and operate their respective properties or to carry on their respective businesses as they are now being conducted.

**Section 6.7 Board Approval; Vote Required.**

(a) The HoldCo Board has, by resolutions duly adopted by written consent and not subsequently rescinded or modified in any way, has duly (i) determined that this Agreement and the Transactions are in the best interests of HoldCo and (ii) approved this Agreement and the Transactions.

A-57

Exhibit 6
Page 1352

Table of Contents

(b) The only vote of the holders of any class or series of share capital of HoldCo that is necessary to approve this Agreement, the Exchange and the Transactions is the HoldCo Requisite Approval.

(c) Merger Sub Board has, by resolutions duly adopted by written consent and not subsequently rescinded or modified in any way, has duly (i) determined that this Agreement and the Transactions are fair to and in the best interests of Merger Sub and HoldCo (as the sole shareholder of Merger Sub), (ii) approved this Agreement and the Transactions and declared their advisability and (iii) recommended that HoldCo (as the sole shareholder of Merger Sub) approve and adopt this Agreement and approve the Transactions and directed that this Agreement and the Transactions be submitted for consideration by HoldCo (as the sole shareholder of Merger Sub).

(d) The only vote of the holders of any class or series of share capital of Merger Sub that is necessary to approve this Agreement and the transactions contemplated hereby is the affirmative vote of HoldCo as sole shareholder of all outstanding shares in the capital of Merger Sub.

**Section 6.8 No Prior Operations of HoldCo or Merger Sub; Post-Closing Operations**. HoldCo and Merger Sub were formed for the sole purposes of entering into this Agreement and the Ancillary Agreements to which they are party and engaging in the transactions contemplated hereby and thereby. Since the date of the HoldCo Organizational Documents and the Merger Sub Organizational Documents, as the case may be, neither HoldCo nor Merger Sub has engaged in any business or activities whatsoever, nor incurred any liabilities, except in connection with this Agreement, the Ancillary Agreements or in furtherance of the transactions contemplated hereby and thereby. Neither HoldCo nor Merger Sub has any employees or liabilities under any Plan. HoldCo and Merger Sub are qualified and able to acquire and hold or control each Company Permit necessary for the conduct of the business of the Company and the Company Subsidiaries after the Closing under applicable Law, including the rules and regulations of the Governmental Authority that issued such Company Permit and there are no facts or circumstances that exist which would materially impair, delay or preclude SPAC's ability to obtain any Company Permits necessary for HoldCo to conduct the business of the Company and the Company Subsidiaries.

**Section 6.9 No Indebtedness. Neither HoldCo nor Merger Sub has incurred or assumed any indebtedness for borrowed money with any third party lender.**

**Section 6.10 Brokers' Fees**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of HoldCo or Merger Sub.

**Section 6.11 Information Supplied**. None of the information relating to HoldCo or Merger Sub supplied by HoldCo or Merger Sub specifically in writing for inclusion in the Proxy Statement/ Registration Statement will, as of the date on which the Registration Statement is declared effective (and in the case of any amendment thereto, at the time of such amendment), as of the date the Proxy Statement/Prospectus is mailed to SPAC Shareholders, at the time of SPAC Shareholders' Meeting, or at the Merger Effective Time, contain any misstatement of a material fact or omission of any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading; provided, however, that HoldCo and Merger Sub make no representation with respect to any forward-looking statements supplied by or on behalf of HoldCo or Merger Sub for inclusion in, or relating to information to be included in the Proxy Statement/ Registration Statement.

ARTICLE VII

COVENANTS OF THE COMPANY, HOLDCO AND MERGER SUB

**Section 7.1 Conduct of Business.**

(a) From the date of this Agreement through the earlier of the Closing or valid termination of this Agreement pursuant to Article XI (the "Interim Period"), the Company shall, and shall cause its Subsidiaries to,

A-58

Exhibit 6
Page 1353

Table of Contents

except in connection with COVID-19 Measures or as otherwise explicitly contemplated by this Agreement or the Ancillary Agreements or as explicitly contemplated in connection with the Transactions or required by Law or as consented to by SPAC in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), use reasonable best efforts to operate the business of the Company in the ordinary course consistent with past practices. Without limiting the generality of the foregoing, except as set forth on Section 7.1(a) of the Company Disclosure Letter or as consented to by SPAC in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied) the Company shall not, and the Company shall cause its Subsidiaries not to, except as otherwise contemplated by this Agreement or the Ancillary Agreements or required by Law or in connection with COVID-19 Measures:

(i) change or amend the Governing Documents of the Company;

(ii) make or declare any dividend or distribution to the Company Shareholders or make any other distributions in respect of any of the Company Capital Stock or equity interests;

(iii) split, combine, reclassify, recapitalize or otherwise amend any terms of any shares or series of the Company Capital Stock or equity interests in a manner that would increase the Merger Consideration payable to the Company Shareholders;

(iv) purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, membership interests or other equity interests of the Company, except for (i) the acquisition by the Company of any shares of capital stock, membership interests or other equity interests of the Company or of any Company Options and Company Restricted Stock in connection with the repurchase, forfeiture or cancellation of such interests, Company Options and Company Restricted Stock, (ii) the acquisition by the Company of shares of Company Ordinary Shares in connection with the surrender of shares of Company Ordinary Shares by holders of Company Options in order to pay the exercise price of the Company Options, and (iii) the withholding of shares of Company Ordinary Shares to satisfy Tax obligations with respect to the Company Options and Company Restricted Stock;

(v) enter into, modify in any material respect or terminate (other than expiration in accordance with its terms) any Contract of a type required to be listed on Section 4.12(a) of the Company Disclosure Letter, or any Real Property Lease, in each case, other than in the ordinary course of business or as required by Law;

(vi) sell, assign, transfer, license, sublicense, convey, lease, covenant not to assert, pledge or otherwise encumber or subject to any Lien, abandon, cancel, let lapse, or otherwise dispose of any material tangible assets or properties of the Company or its Subsidiaries, except for (i) the sale of inventory in the ordinary course of business consistent with past practice, (ii) dispositions of obsolete or worthless equipment, (iii) transactions among the Company and its Subsidiaries or among its Subsidiaries and (iv) transactions in the ordinary course of business consistent with past practice;

(vii) acquire any ownership interest in any real property;

(viii) except as otherwise required by Law, existing Company Benefit Plans or the Contracts listed on Section 4.12 of the Company Disclosure Letter, (i) grant any severance, retention, change in control or termination or similar pay except in the ordinary course of business consistent with past practice, (ii) terminate, adopt, enter into or materially amend or grant any new awards under any Company Benefit Plan or any plan, policy, practice, program, agreement or other arrangement that would be deemed a Company Benefit Plan as of the date hereof except in the ordinary course of business consistent with past practice, (iii) increase the cash compensation or bonus opportunity of any employee, officer, director or other individual service provider, except such increases to any such individuals who are not directors or officers of the Company or its Subsidiaries in the ordinary course of business consistent with past practice, (iv) take any action to amend or waive any performance or vesting criteria or to accelerate the time of payment or vesting of any compensation or benefit payable by the Company or any of the Company's Subsidiaries, (v) hire or engage any new employee or independent contractor if such new employee or independent contractor will receive annual base compensation in excess of $250,000, other than in the ordinary course of business consistent with past practice, or (vi) terminate the employment or engagement,

A-59

Exhibit 6
Page 1354

Table of Contents

other than for cause, death or disability, of any employee or independent contractor with an annual base compensation in excess of $250,000;

(ix) acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all or a material portion of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof;

(x) incur or assume any indebtedness for borrowed money under its term facility with Argentum Securities Ireland plc and/or its facility with Silicon Valley Bank and/or any other third party debt facilities, in each case, other than in the ordinary course of business, which is not in excess of $100,000;

(xi) (i) make or change any material election in respect of Taxes in a manner inconsistent with past practice, (ii) amend, modify or otherwise change any filed Tax Return in a manner that is material to the Company and its Subsidiaries, (iii) adopt or request permission of any taxing authority to change any accounting method in respect of material Taxes, (iv) enter into any closing agreement in respect of material Taxes executed on or prior to the Closing Date or enter into any Tax sharing or similar agreement (other than customary commercial contracts entered into in the ordinary course of business not primarily related to Taxes), (v) settle any claim or assessment in respect of material Taxes, (vi) surrender or allow to expire any right to claim a refund of material Taxes, (vii), file any Tax Return of the Company or its Subsidiaries in a manner that is materially inconsistent with the past practices of the Company, or (viii) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material Taxes or in respect to any material Tax attribute that would give rise to any claim or assessment of Taxes;

(xii) authorize for issuance, issue, sell, transfer, encumber, dispose or deliver any additional shares of Company Capital Stock or securities exercisable for or convertible into Company Capital Stock or grant any additional equity or equity-based compensation (including Company Restricted Stock) other than (i) in the ordinary course of business not to exceed the amount of Company Ordinary Shares available for grant under the Company Incentive Plan on the date of this Agreement, or (ii) upon the exercise or settlement of Company Options under the Company Incentive Plan and applicable award agreement outstanding on the date of this Agreement in accordance with their terms as in effect as of the date of this Agreement, and (iii) as required to comply with any Company Benefit Plan as in effect on the date of this Agreement;

(xiii) adopt a plan of, or otherwise enter into or effect a, complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of the Company or its Subsidiaries (other than the Merger);

(xiv) waive, release, settle, compromise or otherwise resolve any inquiry, investigation, claim, Action, litigation or other Legal Proceedings, except in the ordinary course of business or where such waivers, releases, settlements or compromises are covered by insurance or involve only the payment of monetary damages in an amount less than $250,000 in the aggregate;

(xv) (A) sell, assign, transfer, license, sublicense, covenant not to assert, pledge, encumber, subject to a Lien (other than a Permitted Lien), or grant to, or agree to grant to, any Person rights in or to any Company IP that is material to the Company and its Subsidiaries (other than non-exclusive licenses of Company IP granted to customers or distributors in the ordinary course of business consistent with past practice), or dispose of, cancel, abandon or permit to lapse any rights to any Intellectual Property that is material to the Company and its Subsidiaries except for the expiration of Company Registered Intellectual Property in accordance with the applicable statutory term (or in the case of immaterial domain names, applicable registration period) or (B) subject any material Company IP to any Copyleft Licenses;

(xvi) disclose or agree to disclose to any Person (other than SPAC or any of its representatives) any Trade Secret or any other material confidential or proprietary information, know-how or process of the Company or any of its Subsidiaries other than in the ordinary course of business and pursuant to obligations to maintain the confidentiality thereof;

(xvii) make or commit to make capital expenditures other than in an amount not in excess of the amount set forth on Section 7.1(a)(xvii) of the Company Disclosure Letter, in the aggregate;

A-60

Exhibit 6
Page 1355

**Table of Contents**

(xviii) enter into or extend any collective bargaining agreement or similar labor agreement, other than as required by applicable Law, or recognize or certify any labor union, labor organization, or group of employees of the Company or its Subsidiaries as the bargaining representative for any employees of the Company or its Subsidiaries;

(xix) (i) limit the right of the Company or any of the Company's Subsidiaries to engage in any line of business or in any geographic area, to develop, market or sell products or services, or to compete with any Person or (ii) grant any exclusive or similar rights to any Person, in each case, except where such limitation or grant does not, and would not be reasonably likely to, individually or in the aggregate, materially and adversely affect, or materially disrupt, the ordinary course operation of the businesses of the Company and its Subsidiaries, taken as a whole;

(xx) terminate without replacement or amend in a manner materially adverse to the Company and its Subsidiaries, taken as a whole, any material insurance policy insuring the business of the Company or any of the Company's Subsidiaries;

(xxi) cease conducting, or enter into any new line of business outside of the business currently conducted by the Company and its Subsidiaries as of the date of this Agreement;

(xxii) make any material change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable Law; or

(xxiii) enter into any agreement to do any action prohibited under this Section 7.1.

(b) During the Interim Period, except as set forth on Section 7.1(b) of the Company Disclosure Letter or as consented to by SPAC in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied) HoldCo and Merger Sub shall not, except as otherwise contemplated by this Agreement or the Ancillary Agreements or as explicitly contemplated in connection with the Transactions or required by Law or in connection with COVID-19 Measures:

(i) engage in any business or activity other than the consummation of the Exchange;

(ii) amend or otherwise change the HoldCo Organizational Documents or organizational documents of Merger Sub except as otherwise required to implement the transactions contemplated hereby;

(iii) declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock;

(iv) reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of the HoldCo Ordinary Shares;

(v) issue, sell, pledge, dispose of, grant or encumber, or authorize, solicit, propose, or negotiate with respect to the issuance, sale, pledge, disposition, grant or encumbrance of, any shares of any class of capital stock or other securities of HoldCo or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of HoldCo or of Merger Sub;

(vi) liquidate, dissolve, reorganize or otherwise wind up the business and operations of HoldCo or of Merger Sub;

(vii) amend any agreement directly related to the Exchange;

(viii) permit any Company Shareholder who acquires HoldCo Ordinary Shares pursuant to the Exchange to transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or otherwise dispose of any HoldCo Ordinary Shares, or recognize any such transfer, sale, lease, license, mortgage, pledge, surrender, encumbrances, divestment, cancellation, abandonment or other disposition of HoldCo Ordinary Shares;

(ix) transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any Company Shares acquired pursuant to the Exchange and

A-61

Exhibit 6
Page 1356

**Table of Contents**

any such attempted action shall be null and void and HoldCo will not inscribe any such transfer (of any kind as contemplated in this provision) in the shareholder register;

(x) acquire or hold any equity securities or rights thereto in any person other than the Company pursuant to the Exchange except for new HoldCo Ordinary Shares held by the Company upon the Exchange which shall be distributed in kind by the Company to HoldCo to be held in treasury by HoldCo following completion of the Exchange; or

(xi) enter into any formal or informal agreement or otherwise make a binding commitment to do any of the foregoing.

**Section 7.2 Inspection**. Subject to confidentiality obligations that may be applicable to information furnished to the Company or any of the Company's Subsidiaries by third parties that may be in the Company's or any of its Subsidiaries' possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent possible, the parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable Law, (a) the Company shall, and shall cause its Subsidiaries to, afford to SPAC and its accountants, counsel and other representatives reasonable access during the Interim Period, during normal business hours and with reasonable advance notice, in such manner as to not materially interfere with the ordinary course of business of the Company and its Subsidiaries, to all of their respective properties, books, Contracts, commitments, Tax Returns, records and appropriate officers and employees of the Company and its Subsidiaries, and shall furnish such representatives with all financial and operating data and other information concerning the affairs of the Company and its Subsidiaries as such representatives may reasonably request; provided, that such access shall not include any unreasonably invasive or intrusive investigations or other testing, sampling or analysis of any properties, facilities or equipment of the Company or its Subsidiaries without the prior written consent of the Company, and (b) the Company shall, and shall cause its Subsidiaries to, provide to SPAC and, if applicable, its accountants, counsel or other representatives, (x) such information and such other materials and resources relating to any Legal Proceeding initiated, pending or threatened during the Interim Period, or to the compliance and risk management operations and activities of the Company and its Subsidiaries during the Interim Period, in each case, as SPAC or such representative may reasonably request, (y) prompt written notice of any material status updates in connection with any such Legal Proceedings or otherwise relating to any compliance and risk management matters or decisions of the Company or its Subsidiaries, and (z) copies of any communications sent or received by the Company or its Subsidiaries in connection with such Legal Proceedings, matters and decisions (and, if any such communications occurred orally, the Company shall, and shall cause its Subsidiaries to, memorialize such communications in writing to SPAC). All information obtained by SPAC or their respective representatives pursuant to this Section 7.1(a) shall be subject to the Confidentiality Agreement.

**Section 7.3 Preparation and Delivery of Additional Company Financial Statements.**

(a) As soon as reasonably practicable following the date of this Agreement and in any event by no later than April 9, 2021, the Company shall deliver to SPAC audited consolidated balance sheets and statements of operations, comprehensive loss, shareholders' equity, and cash flows of the Company and its Subsidiaries as of and for the years ended December 31, 2020 and December 31, 2019, together with the auditor's reports thereon, which comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act (collectively, the "PCAOB Financial Statements"); provided, that upon delivery of such PCAOB Financial Statements, such financial statements shall be deemed "Audited GAAP Financial Statements" for the purposes of this Agreement and the representation and warranties set forth in Section 4.8 (other than those set forth in Section 4.8(a)) shall be deemed to apply to such Audited GAAP Financial Statements with the same force and effect as if made as of the date of this Agreement.

(b) If the Merger Effective Time has not occurred prior to May 14, 2021, as soon as reasonably practicable following May 14, 2021, the Company shall deliver to SPAC the unaudited consolidated balance sheets and

A-62

Exhibit 6
Page 1357

**Table of Contents**

statements of operations, comprehensive loss, shareholders' equity, and cash flows of the Company and its Subsidiaries as of and for the three-month period ending March 31, 2021 (the "Q1 Financial Statements"), which comply with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act; provided, that upon delivery of such Q1 Financial Statements, the representations and warranties set forth in Section 4.8 (other than those set forth in Section 4.8(a)) shall be deemed to apply to the Q1 Financial Statements, with the same force and effect as if made as of the date of this Agreement.

(c) The Company shall use its reasonable best efforts (i) to assist, upon advance written notice, during normal business hours and in a manner such as to not unreasonably interfere with the normal operation of the Company, SPAC in causing to be prepared in a timely manner any other financial information or statements (including customary pro forma financial statements) that are required to be included in the Proxy Statement/Registration Statement and any other filings to be made by SPAC with the SEC in connection with the transactions contemplated by this Agreement or any Ancillary Agreement and (ii) to obtain the consents of its auditors with respect thereto as may be required by applicable Law or requested by the SEC.

**Section 7.4 Affiliate Agreements**. All Affiliate Agreements set forth on Section 7.4 of the Company Disclosure Letter shall be terminated or settled at or prior to the Closing without further liability to HoldCo, the Company or any of the Company's Subsidiaries, in each case, except as otherwise set forth on Section 7.4 of the Company Disclosure Letter.

**Section 7.5 Acquisition Proposals.**

(a) From the date hereof until the Closing Date or, if earlier, the termination of this Agreement in accordance with Article XI, the Company and its Subsidiaries shall not, and the Company shall instruct and use its reasonable best efforts to cause its representatives, not to, directly or indirectly: (i) initiate, solicit or engage in any negotiations with any Person with respect to, or provide any non-public information or data concerning the Company or any of the Company's Subsidiaries to any Person relating to, an Acquisition Proposal or afford to any Person access to the business, properties, assets or personnel of the Company or any of the Company's Subsidiaries in connection with an Acquisition Proposal, (ii) execute or enter into any acquisition agreement, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other arrangement or agreement relating to an Acquisition Proposal, (iii) grant any waiver, amendment or release under any confidentiality agreement or the anti-takeover laws of any state, (iv) otherwise knowingly encourage or facilitate any such inquiries, proposals, discussions, or negotiations or any effort or attempt by any Person to make an Acquisition Proposal or (v) agree or otherwise commit to enter into or engage in any of the foregoing. The Company also agrees that immediately following the execution of this Agreement it shall, and shall cause each of its Subsidiaries and shall use its reasonable best efforts to cause its and their representatives to, cease any solicitations, discussions or negotiations with any Person (other than the parties and their respective representatives) conducted heretofore in connection with an Acquisition Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal. The Company shall promptly (and in any event within two Business Days) notify, in writing, SPAC of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal, which notice shall include a summary of the material terms of such inquiry, proposal, offer or request for information. The Company shall promptly (and in any event within twenty-four (24) hours) keep SPAC reasonably informed of any material developments with respect to any such inquiry, proposal, offer, request for information or Acquisition Proposal (including any material changes thereto).

**Section 7.6 Shareholder Litigation**. In the event that any litigation related to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby is brought, or, to the knowledge of the Company or any of its Subsidiaries, threatened in writing, against the Company or any of its Subsidiaries or any of their boards by any of their shareholders prior to the Closing, the Company shall promptly notify SPAC of any such litigation and keep SPAC reasonably informed with respect to the status thereof. The Company and any of its

A-63

Exhibit 6
Page 1358

Table of Contents

Subsidiaries shall provide SPAC the opportunity to participate in (subject to a customary joint defense agreement), but not control, the defense of any such litigation, shall give due consideration to SPAC's advice with respect to such litigation and shall not settle or agree to settle any such litigation without the prior written consent of SPAC, such consent not to be unreasonably withheld, conditioned or delayed.

**Section 7.7 Employment Agreement Amendments**. The Company shall use its reasonable efforts to agree the Employment Agreement Amendments with the relevant employees by Closing and to arrange for all agreed Employment Agreement Amendments to be entered into by the relevant employer entities and employees on Closing.

**Section 7.8 Indemnification and Insurance.**

(a) From and after the Effective Time, HoldCo agrees that it shall indemnify and hold harmless each present and former director and officer of the (x) Company and each of its Subsidiaries (in each case, solely to the extent acting in their capacity as such and to the extent such activities are related to the business of the Company being acquired under this Agreement) (the "Company Indemnified Parties") and (y) SPAC and each of its Subsidiaries (the "SPAC Indemnified Parties" together with the Company Indemnified Parties, the "D&O Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any Legal Proceeding, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that the Company, SPAC or their respective Subsidiaries, as the case may be, would have been permitted under applicable Law and its respective certificate of incorporation, certificate of formation, bylaws, limited liability company agreement or other organizational documents in effect on the date of this Agreement to indemnify such D&O Indemnified Parties (including the advancing of expenses as incurred to the fullest extent permitted under applicable Law). Without limiting the foregoing, HoldCo shall, and shall cause its Subsidiaries to (i) maintain for a period of not less than six (6) years from the Effective Time provisions in its Governing Documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of HoldCo's and its Subsidiaries' former and current officers, directors, employees, and agents that are no less favorable to those Persons than the provisions of the Governing Documents of the Company, and its Subsidiaries' or SPAC, as applicable, in each case, as of the date of this Agreement, and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law. HoldCo shall assume, and be liable for, each of the covenants in this Section 7.8.

(b) For a period of six (6) years from the Effective Time, HoldCo shall maintain in effect directors' and officers' liability insurance covering those Persons who are currently covered by SPAC's, the Company's, HoldCo's, Merger Sub's or their respective Subsidiaries' directors' and officers' liability insurance policies (true, correct and complete copies of which have been heretofore made available to the Company or its agents or representatives) on terms not less favorable than the terms of such current insurance coverage; provided, however, that (i) HoldCo may cause coverage to be extended under the current directors' and officers' liability insurance by obtaining a six (6) year "tail" policy containing terms not materially less favorable than the terms of such current insurance coverage with respect to claims existing or occurring at or prior to the Effective Time and (ii) if any claim is asserted or made within such six (6) year period, any insurance required to be maintained under this Section 7.8 shall be continued in respect of such claim until the final disposition thereof.

(c) Notwithstanding anything contained in this Agreement to the contrary, this Section 7.8 shall survive the consummation of the Merger indefinitely and shall be binding, jointly and severally, on HoldCo and all successors and assigns of HoldCo. In the event that HoldCo or any of its successors or assigns consolidates with or merges into any other Person and shall not be the continuing or Surviving Company or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, HoldCo shall ensure that proper provision shall be made so that the successors and assigns of HoldCo shall succeed to the obligations set forth in this Section 7.8.

A-64

Exhibit 6
Page 1359

Table of Contents

(d) On or prior to the Closing Date, HoldCo shall enter into customary indemnification agreements reasonably satisfactory to each of the Company and SPAC with the post-Closing directors and officers of HoldCo, which indemnification agreements shall continue to be effective following the Closing.

<div align="center">

ARTICLE VIII

COVENANTS OF SPAC

</div>

**Section 8.1 Trust Account**. As of the Effective Time, the obligations of SPAC to dissolve or liquidate within a specified time period as contained in SPAC Articles of Association will be terminated and SPAC shall have no obligation whatsoever to dissolve and liquidate the assets of SPAC by reason of the consummation of the Merger or otherwise, and no SPAC Shareholders shall be entitled to receive any amount from the Trust Account. At least 48 hours prior to the Merger Effective Time, SPAC shall provide notice to the Trustee in accordance with the Trust Agreement and shall deliver any other documents, opinions or notices required to be delivered to the Trustee pursuant to the Trust Agreement and shall cause the Trustee prior to the Effective Time to transfer all funds held in the Trust Account to SPAC (to be held as available cash on the balance sheet of SPAC, and to be used for working capital and other general corporate purposes of the business following the Closing) and thereafter shall cause the Trust Account and the Trust Agreement to terminate.

**Section 8.2 No Solicitation by SPAC**. From the date hereof until the Closing Date or, if earlier, the termination of this Agreement in accordance with Article XI, SPAC shall not, and shall cause its Subsidiaries not to, and SPAC shall instruct its and their representatives, not to, (i) make any proposal or offer that constitutes a Business Combination Proposal, (ii) initiate any discussions or negotiations with any Person with respect to a Business Combination Proposal or (iii) enter into any acquisition agreement, business combination, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other agreement relating to a Business Combination Proposal, in each case, other than to or with the Company and its respective representatives. From and after the date hereof, SPAC shall, and shall instruct its officers and directors to, and SPAC shall instruct and cause its representatives, its Subsidiaries and their respective representatives to, immediately cease and terminate all discussions and negotiations with any Persons that may be ongoing with respect to a Business Combination Proposal (other than the Company and its representatives).

**Section 8.3 SPAC Conduct of Business.**

(a) During the Interim Period, SPAC shall, except as contemplated by this Agreement (including as contemplated by the PIPE Investment or FPA Termination), or as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), operate its business in the ordinary course and consistent with past practice. Without limiting the generality of the foregoing, except as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), SPAC shall not, except as otherwise contemplated by this Agreement (including as contemplated by the PIPE Investment) or the Ancillary Agreements or as required by Law:

(i) seek any approval from SPAC Shareholders, to change, modify or amend the Trust Agreement or the Governing Documents of SPAC, except as contemplated by the Transaction Proposals or otherwise to obtain SPAC Extension;

(ii) (x) make or declare any dividend or distribution to SPAC Shareholders or make any other distributions in respect of any of SPAC's Capital Stock, share capital or equity interests, (y) split, combine, reclassify or, save pursuant to the FPA Termination, otherwise amend any terms of any shares or series of SPAC's Capital Stock or equity interests, or (z) purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, share capital or membership interests, warrants or other equity interests of SPAC, other than a redemption of SPAC Class A Ordinary Shares made as part of SPAC Share Redemptions;

<div align="center">A-65</div>

Exhibit 6
Page 1360

Table of Contents

(iii) make or change any material election in respect of Taxes, (A) amend, modify or otherwise change any filed material Tax Return, (B) adopt or request permission of any taxing authority to change any accounting method in respect of material Taxes, (C) enter into any closing agreement in respect of material Taxes or enter into any Tax sharing or similar agreement, (D) settle any claim or assessment in respect of material Taxes, (E) surrender or allow to expire any right to claim a refund of material Taxes, (F) file any Tax Return in a manner that is inconsistent with the past practices of SPAC or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material Taxes or in respect to any material Tax attribute that would give rise to any claim or assessment of Taxes;

(iv) other than as expressly required by the SPAC Investor Support Agreement or to give effect to the FPA Termination, enter into, renew or amend in any material respect, any transaction or Contract with an Affiliate of SPAC (including, for the avoidance of doubt, (x) the Sponsor and (y) any Person in which the Sponsor has a direct or indirect legal, contractual or beneficial ownership interest of 5% or greater);

(v) incur or assume any Indebtedness or guarantee any Indebtedness of another Person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of the Company's Subsidiaries or guaranty any debt securities of another Person, other than any indebtedness for borrowed money or guarantee incurred in the ordinary course of business consistent with past practice and in an aggregate amount not to exceed $100,000;

(vi) incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness or otherwise knowingly and purposefully incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any other material liabilities, debts or obligations, other than fees and expenses for professional services incurred in support of the transactions contemplated by this Agreement and the Ancillary Agreements or in support of the ordinary course operations of SPAC (which the parties agree shall include any Indebtedness in respect of any Working Capital Loan incurred in the ordinary course of business);

(vii) (A) issue any SPAC Securities or securities exercisable for or convertible into SPAC Securities, (B) grant any options, warrants or other equity-based awards with respect to SPAC Securities not outstanding on the date hereof, or (C) save pursuant to the FPA Termination, amend, modify or waive any of the material terms or rights set forth in any SPAC Warrant or the Warrant Agreement, including any amendment, modification or reduction of the warrant price set forth therein; or

(viii) enter into any agreement to do any action prohibited under this Section 8.3.

(b) During the Interim Period, SPAC shall, comply with, and continue performing under, as applicable, SPAC's Governing Documents, the Trust Agreement and all other agreements or Contracts to which SPAC may be a party, except that SPAC agrees that it shall cause the FPA Termination to occur in accordance with and as contemplated by Section 8.7.

**Section 8.4 Inspection**. Subject to confidentiality obligations that may be applicable to information furnished to SPAC by third parties that may be in SPAC's possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent possible, the parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable Law, SPAC shall provide to the Company and, if applicable, its accountants, counsel or other representatives, (x) such information concerning the affairs of SPAC and such other information, materials and resources relating to any Legal Proceeding initiated, pending or threatened during the Interim Period, or to the compliance and risk management operations and activities of SPAC during the Interim Period, in each case, as the Company or such representative may reasonably request, (y) prompt written notice of any material status updates in connection with any such Legal Proceedings or otherwise relating to any compliance and risk management matters or decisions of the Company or its Subsidiaries, and (z) copies of any communications sent or received by the Company or its Subsidiaries in connection with such Legal Proceedings, matters and decisions (and, if any such communications occurred

A-66

Exhibit 6
Page 1361

**Table of Contents**

orally, the Company shall, and shall cause its Subsidiaries to, memorialize such communications in writing to SPAC). All information obtained by the Company, HoldCo, Merger Sub or their respective representatives pursuant to this Section 8.4) shall be subject to the Confidentiality Agreement.

**Section 8.5 SPAC Public Filings**. From the date hereof through the Effective Time, SPAC will keep current and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable Laws.

**Section 8.6 Shareholder Litigation**. In the event that any litigation related to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby is brought, or, to the knowledge of SPAC, threatened in writing, against SPAC or SPAC Board by any of SPAC Shareholders prior to the Closing, SPAC shall promptly notify the Company of any such litigation and keep the Company reasonably informed with respect to the status thereof. SPAC shall provide the Company the opportunity to participate in (subject to a customary joint defense agreement), but not control, the defense of any such litigation, shall give due consideration to the Company's advice with respect to such litigation and shall not settle or agree to settle any such litigation without the prior written consent of the Company, such consent not to be unreasonably withheld, conditioned or delayed.

**Section 8.7 Forward Purchase Agreement Termination**. Prior to the FPS Closing (as such term is defined in the Forward Purchase Agreement), the SPAC will procure the termination of the Forward Purchase Agreement (including, for the avoidance of doubt, termination of the rights and obligations of SC Health Group Limited with respect to the SPAC Forward Purchase Warrants under the Warrant Agreement) without liability or further obligation of SPAC or SC Health Group Limited (the "FPA Termination").

## ARTICLE IX

## JOINT COVENANTS

**Section 9.1 HSR Act; Other Filings.**

(a) In connection with the transactions contemplated hereby, to the extent required under any Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or creation or strengthening of a dominant position through merger or acquisition, including the HSR Act and the Laws of any jurisdiction or Governmental Authority outside of the United States ("Antitrust Laws"), each party hereto agrees to promptly (and, to the extent required, shall cause its Affiliates to) substantially comply with and take reasonably necessary and appropriate actions with respect to Antitrust Laws, including in no event later than ten (10) Business Days after the date hereof complying with the notification and reporting requirements of the HSR Act. Each of the parties hereto shall substantially comply with any Antitrust Information or Document Requests. For the avoidance of doubt, this Section 9.1 shall not apply to any notices or filings made with CFIUS pursuant to the DPA.

(b) Each of the parties hereto shall (and, to the extent required, shall cause its Affiliates to) request early termination of any waiting period under the HSR Act and exercise its reasonable best efforts to (i) obtain termination or expiration of the waiting period under the HSR Act and (ii) prevent the entry, in any Legal Proceeding brought by an Antitrust Authority or any other Person, of any Governmental Order which would prohibit, make unlawful or delay the consummation of the transactions contemplated hereby.

(c) The parties hereto shall cooperate in good faith with Governmental Authorities and use reasonable best efforts to complete lawfully the transactions contemplated hereby as soon as practicable (but in any event prior to the Agreement End Date) and use reasonable best efforts to avoid, prevent, eliminate or remove the actual or threatened commencement of any proceeding in any forum by or on behalf of any Governmental Authority or the

A-67

Exhibit 6
Page 1362

**Table of Contents**

issuance of any Governmental Order that would delay, enjoin, prevent, restrain or otherwise prohibit the consummation of the Merger, including, with the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned, delayed or denied), (i) proffering and consenting and/or agreeing to a Governmental Order or other agreement providing for (A) the sale, licensing or other disposition, or the holding separate, of particular assets, categories of assets or lines of business of the Company or SPAC or (B) the termination, amendment or assignment of existing relationships and contractual rights and obligations of the Company or SPAC and (ii) promptly effecting the disposition, licensing or holding separate of assets or lines of business or the termination, amendment or assignment of existing relationships and contractual rights, in each case, at such time as may be necessary to permit the lawful consummation of the transactions contemplated hereby on or prior to the Agreement End Date.

(d) With respect to each of the above filings, and any other requests, filings, inquiries, Actions or other proceedings by or from Governmental Authorities, each of the parties hereto (i) diligently and expeditiously defend and use reasonable best efforts to obtain any necessary clearance, approval, consent, or Governmental Authorization under Laws prescribed or enforceable by any Governmental Authority for the transactions contemplated by this Agreement and to resolve any objections as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement; and (ii) cooperate fully with each other in the defense of such matters. To the extent not prohibited by Law, the Company shall promptly furnish to SPAC, and SPAC shall promptly furnish to the Company, copies of any notices or written communications received by such party or any of its Affiliates from any third party or any Governmental Authority with respect to the transactions contemplated hereby, and each party shall permit counsel to the other parties an opportunity to review in advance, and each party shall consider in good faith the views of such counsel in connection with, any proposed written communications by such party and/or its Affiliates to any Governmental Authority concerning the transactions contemplated hereby; provided, that none of the parties shall extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Authority without the written consent of the other parties. To the extent not prohibited by Law, the Company agrees to provide SPAC and its counsel, and SPAC agrees to provide the Company and its counsel, the opportunity, on reasonable advance notice, to participate in any substantive meetings or discussions, either in person or by telephone, between such party and/or any of its Affiliates, agents or advisors, on the one hand, and any Governmental Authority, on the other hand, concerning or in connection with the transactions contemplated hereby.

**Section 9.2 Preparation of Proxy Statement/Registration Statement; Shareholders' Meeting and Approvals.**

(a) Registration Statement and Prospectus.

(i) As promptly as practicable after the execution of this Agreement and receipt of the PCAOB Financial Statements, (x) HoldCo, SPAC and the Company shall jointly prepare and file with the SEC, mutually acceptable materials which shall include the proxy statement to be filed with the SEC as part of the Registration Statement and sent to SPAC Shareholders relating to SPAC Shareholders' Meeting (such proxy statement, together with any amendments or supplements thereto, the "Proxy Statement"), and (y) SPAC, HoldCo and the Company shall prepare and file with the SEC the Registration Statement, in which the Proxy Statement will be included as a prospectus (the "Proxy Statement/Registration Statement"), in connection with the registration under the Securities Act of the HoldCo Ordinary Shares and HoldCo Warrants to be issued in the Merger and Exchange or otherwise in connection with the transactions contemplated hereby and the units comprising such (collectively, the "Registration Statement Securities"). Each of the parties hereto shall use its reasonable best efforts to cause the Proxy Statement/Registration Statement to comply with the rules and regulations promulgated by the SEC, to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and to keep the Registration Statement effective as long as is necessary to consummate the transactions contemplated hereby. SPAC also agrees to use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions contemplated hereby, and the

Exhibit 6
Page 1363

Table of Contents

Company shall furnish all information concerning the Company, its Subsidiaries and any of their respective members or shareholders as may be reasonably requested in connection with any such action. Each of the parties hereto agrees to furnish to the other parties all information concerning itself, its Subsidiaries, officers, directors, managers, shareholders, and other equityholders and information regarding such other matters as may be reasonably necessary or advisable or as may be reasonably requested in connection with the Proxy Statement/Registration Statement, a Current Report on Form 8-K pursuant to the Exchange Act in connection with the transactions contemplated by this Agreement, or any other statement, filing, notice or application made by or on behalf of SPAC, the Company or their respective Subsidiaries to any regulatory authority (including the NYSE) in connection with the Merger and the other transactions contemplated hereby (the "Offer Documents"). SPAC will cause the Proxy Statement/Registration Statement to be mailed to SPAC Shareholders, in each case, as promptly as reasonably practicable after the Registration Statement is declared effective under the Securities Act.

(ii) To the extent not prohibited by Law, SPAC will advise the Company, reasonably promptly after SPAC receives notice thereof, of the time when the Proxy Statement/Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order or the suspension of the qualification of SPAC Ordinary Shares for offering or sale in any jurisdiction, of the initiation or written threat of any proceeding for any such purpose, or of any request by the SEC for the amendment or supplement of the Proxy Statement/Registration Statement or for additional information. To the extent not prohibited by Law, the Company and their counsel shall be given a reasonable opportunity to review and comment on the Proxy Statement/Registration Statement and any Offer Document each time before any such document is filed with the SEC, and SPAC shall give reasonable and good faith consideration to any comments made by the Company and its counsel. To the extent not prohibited by Law, SPAC shall provide the Company and their counsel with (i) any comments or other communications, whether written or oral, that SPAC or its counsel may receive from time to time from the SEC or its staff with respect to the Proxy Statement/Registration Statement or Offer Documents as promptly as reasonably practicable after receipt of those comments or other communications and (ii) a reasonable opportunity to participate in the response of SPAC to those comments and to provide comments on that response (to which reasonable and good faith consideration shall be given), including by participating with the Company or its counsel in any discussions or meetings with the SEC.

(iii) Each of SPAC and the Company shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in (A) the Registration Statement will, at the time the Registration Statement is filed with the SEC, at each time at which it is amended and at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, not misleading or (B) the Proxy Statement will, at the date it is first mailed to SPAC Shareholders and at the time of SPAC Shareholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

(iv) Not in limitation, but in furtherance of the immediately preceding clause (iii), at any time prior to the Effective Time, any information relating to SPAC, the Company or HoldCo or any of their respective affiliates, directors or officers, should be discovered by SPAC, the Company or HoldCo which should be set forth in an amendment or supplement to either the Registration Statement or the Proxy Statement/Prospectus, so that either such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by Law, disseminated to SPAC Shareholder.

(v) The Registration Statement, to the extent permitted by applicable rules and regulations of the SEC, also will register the resale of the HoldCo Ordinary Shares that constitute the Merger Consideration or was issued in connection with the Exchange or Transactions, other than certain equity securities issuable under

A-69

Exhibit 6
Page 1364

Table of Contents

the Incentive Equity Plan that are based on HoldCo Ordinary Shares and constitute a portion of the Merger Consideration, which shall instead be registered pursuant to an effective registration statement on Form S-8 (or other applicable form, including Form S-1 or Form S-3) in accordance with Section 9.2(a).

(b) SPAC Shareholder Approval. SPAC shall (a) as promptly as practicable after the Registration Statement is declared effective under the Securities Act, (i) cause the Proxy Statement to be disseminated to SPAC Shareholders in compliance with applicable Law, (ii) solely with respect to the following clause (1), duly (1) give notice of and (2) convene and hold an extraordinary general meeting of SPAC Shareholders (the "SPAC Shareholders' Meeting") in accordance with SPAC's Governing Documents and Section 710 of the NYSE Listing Rules for a date no later than thirty (30) Business Days following the date the Registration Statement is declared effective, and (iii) solicit proxies from the holders of SPAC Ordinary Shares to vote in favor of each of the Transaction Proposals, and (b) provide SPAC Shareholders with the opportunity to elect to effect a SPAC Share Redemption. Subject to any Permitted Withdrawal, SPAC shall, through its Board of Directors, recommend to SPAC Shareholders the (A) the adoption and approval of this Agreement and the transactions contemplated hereby in accordance with applicable Law and exchange rules and regulations, (B) adoption and approval of the Plan of Merger in accordance with section 233(6) of the Cayman Statute (C) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Registration Statement or correspondence related thereto, (E) adoption and approval of any other proposals as reasonably agreed by SPAC and the Company to be necessary or appropriate in connection with the transactions contemplated hereby, and (F) adjournment of SPAC Shareholders' Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in (A) through (D), together, the "Transaction Proposals"), and include such recommendation in the Proxy Statement. SPAC Board shall not withdraw, amend, qualify or modify its recommendation to SPAC Shareholders that they vote in favor of the Transaction Proposals (together with any withdrawal, amendment, qualification or modification of its recommendation to SPAC Shareholders described in the Recitals hereto, a "Modification in Recommendation"); provided that, in the event that the SPAC Board determines a Company Material Adverse Effect has occurred, the SPAC Board may make a withdrawal of such recommendation or an amendment, qualification or modification of such recommendation to the extent required, upon the advice of counsel, in order to comply with its fiduciary duties (a "Permitted Withdrawal"). SPAC shall, subject to any Permitted Withdrawal, promptly notify (and in any event, no later than three (3) Business Days prior to making any such Permitted Withdrawal or amendment, qualification or modification) the Company in writing of any determination to make any Permitted Withdrawal of its recommendation or amendment, qualification or modification of its recommendation in a manner adverse to the Company. To the fullest extent permitted by applicable Law, (x) SPAC's obligations to establish a record date for, duly call, give notice of, convene and hold SPAC Shareholders' Meeting shall not be affected by any Modification in Recommendation, save for any Permitted Withdrawal, (y) SPAC agrees to establish a record date for, duly call, give notice of, convene and hold SPAC Shareholders' Meeting and submit for approval the Transaction Proposals and (z) SPAC agrees that if SPAC Shareholder Approval shall not have been obtained at any such SPAC Shareholders' Meeting, then SPAC shall promptly continue to take all such necessary actions, including the actions required by this Section 9.2(b), and hold additional SPAC Shareholders' Meetings in order to obtain SPAC Shareholder Approval. SPAC may only adjourn SPAC Shareholders' Meeting (i) to solicit additional proxies for the purpose of obtaining SPAC Shareholder Approval, (ii) for the absence of a quorum and (iii) to allow reasonable additional time for the filing or mailing of any supplemental or amended disclosure that SPAC has determined in good faith after consultation with outside legal counsel is required under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by SPAC Shareholders prior to SPAC Shareholders' Meeting; provided, that, without the consent of the Company, SPAC Shareholders' Meeting (x) may not be adjourned to a date that is more than fifteen (15) days after the date for which SPAC Shareholders' Meeting was originally scheduled (excluding any adjournments required by applicable Law) and (y) shall not be held later than three (3) Business Days prior to the Agreement End Date. SPAC agrees that it shall provide the holders of SPAC Class A Ordinary Shares the opportunity to elect redemption of such SPAC Class A Ordinary Shares in connection with SPAC Shareholders' Meeting, as required by SPAC's Governing Documents.

<div style="text-align:center">A-70</div>

Exhibit 6
Page 1365

**Table of Contents**

(c) <u>Company Shareholder Approvals of Scheme of Arrangement</u>. Upon the terms set forth in this Agreement, the Company and HoldCo shall use its reasonable best efforts to solicit and obtain approvals to the Resolutions and the HoldCo Shareholder Approval including, for the avoidance of doubt, HoldCo circulating the HoldCo Shareholder Approval to its member for approval prior to the Initial Exchange.

**Section 9.3 Support of Transaction**. Without limiting any covenant contained in <u>Article VII</u>, or <u>Article VIII</u>, HoldCo, SPAC (subject to its right of Permitted Withdrawal only), Merger Sub and the Company shall each, and each shall cause its Subsidiaries to (a) use reasonable best efforts to obtain all material consents and approvals of third parties that any of SPAC, or the Company or their respective Affiliates are required to obtain in order to consummate the Merger, and (b) take such other action as may be reasonably necessary or as another party hereto may reasonably request to satisfy the conditions of <u>Article X</u> or otherwise to comply with this Agreement and to consummate the transactions contemplated hereby as soon as practicable (including any applicable actions or filings required under or in connection with the NSIB). Notwithstanding anything to the contrary contained herein, no action taken by the Company under this <u>Section 9.3</u> will constitute a breach of <u>Section 7.1</u>.

**Section 9.4 Tax Matters**. All transfer, documentary, sales, use, real property, stamp, registration and other similar Taxes, fees and costs (including any associated penalties and interest) incurred in connection with this Agreement that are payable by SPAC, HoldCo, Merger Sub, the Company or its Subsidiaries ("<u>Transfer Taxes</u>") shall constitute Transaction Expenses. The Company and its Subsidiaries shall, at their own expense, file all necessary Tax Returns with respect to all such Taxes, and, if required by applicable Law, SPAC will cooperate and join in the execution of any such Tax Returns.

**Section 9.5 Section 16 Matters**. Prior to the Effective Time, each of the HoldCo, Company and SPAC shall take all such steps as may be required (to the extent permitted under applicable Law) to cause any dispositions of shares of the HoldCo Ordinary Shares, Company Capital Stock or acquisitions of SPAC Ordinary Shares (including, in each case, securities deliverable upon exercise, vesting or settlement of any derivative securities) resulting from the transactions contemplated hereby by each individual who may become subject to the reporting requirements of Section 16(a) of the Exchange Act in connection with the transactions contemplated hereby to be exempt under Rule 16b-3 promulgated under the Exchange Act.

**Section 9.6 Cooperation; Consultation.**

(a) Prior to Closing, each of HoldCo, the Company and SPAC shall, and each of them shall cause its respective Subsidiaries (as applicable) and its and their officers, directors, managers, employees, consultants, counsel, accounts, agents and other representatives to, reasonably cooperate in a timely manner in connection with any financing arrangement the parties mutually agree to seek in connection with the transactions contemplated by this Agreement (it being understood and agreed that the consummation of any such financing by HoldCo, the Company or SPAC shall be subject to the parties' mutual agreement), including (if mutually agreed by the parties) (a) by providing such information and assistance as the other parties may reasonably request, (b) granting such access to the other parties and its representatives as may be reasonably necessary for their due diligence, and (c) participating in a reasonable number of meetings, presentations, road shows, drafting sessions, due diligence sessions with respect to such financing efforts (including direct contact between senior management and other representatives of HoldCo, the Company and its Subsidiaries at reasonable times and locations). All such cooperation, assistance and access shall be granted during normal business hours and shall be granted under conditions that shall not unreasonably interfere with the business and operations of HoldCo, the Company, SPAC, or their respective auditors.

(b) From the date of the announcement of this Agreement or the transactions contemplated hereby (pursuant to any applicable public communication made in compliance with <u>Section 12.12</u>), until the Closing Date, SPAC shall use its reasonable best efforts to, and shall instruct its financial advisors to, keep the Company and its financial advisors reasonably informed with respect to the PIPE Investment during such period, including by (i) providing regular updates and (ii) consulting and cooperating with, and considering in good faith any feedback from, the Company or its financial advisors with respect to such matters.

Exhibit 6
Page 1366

Table of Contents

**Section 9.7 Commercially Reasonable Efforts; Further Assurances**. Subject to the terms and conditions set forth in this Agreement, and to applicable Laws, prior to Closing, the Parties shall cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action (including executing and delivering and documents, certificates, instruments and other papers that are necessary for the consummation of the Transactions), and do, or cause to be done, and assist and cooperate with the other Parties in doing, all things necessary to consummate and make effective, in the most expeditious manner practicable the Transactions. The Company shall, and shall cause its Subsidiaries to, use its and their commercially reasonable efforts to send the requisite notice to or to solicit and obtain the consents of as applicable, the contractual counterparties to the Contracts listed on Section 9.7 of the Company Disclosure Letter prior to the Closing; provided, however, that no Party nor any of their Affiliates shall be required to pay or commit to pay any amount to (or incur any obligation in favor of) any Person from whom any such consent may be required (unless such payment is explicitly required in accordance with the terms of the relevant Contract requiring such consent); provided, further, that the Parties acknowledge and agree that the failure to obtain any such consents is not, and shall not be, a condition to Closing.

**Section 9.8 Employee Matters.**

(a) Equity Plan. Prior to the effectiveness of the Proxy Statement/Registration Statement, HoldCo shall approve and adopt, subject to receipt of HoldCo Shareholder Approval, (w) an incentive equity plan in the form attached hereto as Exhibit E and an employee stock purchase plan in the form attached as Exhibit F (with such changes that may be agreed in writing by SPAC and the Company (such agreement not to be unreasonably withheld, conditioned or delayed by either SPAC or the Company, as applicable)) (the "Incentive Equity Plans"), (x) a form of stock option agreement, which such form shall be distributed to SPAC not later than ten (10) Business Days prior to HoldCo approval and adoption for SPAC's (or SPAC's designee's) review and comment, and (y) a form of restricted stock unit agreement, which such form shall be distributed to SPAC not later than ten (10) Business Days prior to HoldCo approval and adoption for SPAC's (or SPAC's designee's) review and comment, and (z) a form of restricted stock agreement, which such form shall be distributed to SPAC not later than ten (10) Business Days prior to HoldCo approval and adoption for SPAC's (or SPAC's designee's) review and comment, in each case, effective as of the Closing Date. Within two (2) Business Days following the expiration of the sixty (60) day period following the date HoldCo has filed current Form 10 information with the SEC reflecting its status as an entity that is not a shell company, HoldCo shall file an effective registration statement on Form S-8 (or other applicable form, including Form S-3) with respect to the HoldCo Ordinary Shares issuable under the Incentive Equity Plans, and HoldCo shall use reasonable best efforts to maintain the effectiveness of such registration statement(s) (and maintain the current status of the prospectus or prospectuses contained therein) for so long as awards granted pursuant to the Incentive Equity Plans remain outstanding.

(b) No Third-Party Beneficiaries. Notwithstanding anything herein to the contrary, each of the parties to this Agreement acknowledges and agrees that all provisions contained in this Section 9.8 are included for the sole benefit of SPAC, HoldCo and the Company, and that nothing in this Agreement, whether express or implied, (i) shall be construed to establish, amend, or modify any employee benefit plan, program, agreement or arrangement, (ii) shall limit the right of SPAC, HoldCo, the Company or their respective Affiliates to amend, terminate or otherwise modify any Company Benefit Plan or other employee benefit plan, agreement or other arrangement following the Closing Date, or (iii) shall confer upon any Person who is not a party to this Agreement (including any equityholder, any current or former director, manager, officer, employee or independent contractor of the Company, or any participant in any Company Benefit Plan or other employee benefit plan, agreement or other arrangement (or any dependent or beneficiary thereof)), any right to continued or resumed employment or recall, any right to compensation or benefits, or any third-party beneficiary or other right of any kind or nature whatsoever.

**Section 9.9 Post-Closing Directors and Officers of HoldCo**. Subject to the terms of HoldCo's Governing Documents and the applicable rules and regulations of the NYSE, SPAC, the Company and HoldCo shall take all

A-72

Exhibit 6
Page 1367

**Table of Contents**

such action within its power as may be necessary or appropriate such that immediately following the Effective Time:

(a) unless and until the CFIUS Approval has been obtained, the Board of Directors of HoldCo shall consist of up to seven (7) director nominees, with such initial director nominees, to be designated by the Company pursuant to written notice to SPAC as soon as reasonably practicable following the date of this Agreement (one of whom shall be the current Chairman of the Company's Board of Directors), subject to SPAC's reasonable acceptance of such initial director nominees:

(b) following the date that the CFIUS Approval is obtained (if at all), the Board of Directors of HoldCo shall consist of up to nine (9) directors, which shall initially include:

(i) so long as the Sponsor and its Affiliates continue to own HoldCo Ordinary Shares, two (2) Class II director nominees to be designated by the Sponsor pursuant to written notice to be delivered to the Company or HoldCo (as applicable) as soon as reasonably practicable following receipt of the CFIUS Approval (which notice must, in any event, be delivered prior to the date that is the later of (x) June 30, 2022 and (y) the date of the 2022 Annual Meeting of HoldCo shareholders), and SPAC shall consult with the Company or HoldCo (as applicable) with regards to the identity of such director nominees;

(ii) two (2) director nominees to be designated by the Company (one of whom shall be the current Chairman of the Company's Board of Directors), and the Company shall consult with SPAC with regards to the identity of the non-Chairman director nominee; and

(iii) five (5) director nominees to be designated by the Company, subject to SPAC's reasonable acceptance of the initial director nominees pursuant to Section 9.9(a).

(c) the Board of Directors of HoldCo shall have a majority of "independent" directors for the purposes of NYSE rules, each of whom shall serve in such capacity in accordance with the terms of the HoldCo's Governing Documents following the Effective Time; and

(d) the initial officers of HoldCo shall be as set forth on Section 2.7 of the Company Disclosure Letter (as may be updated by the Company prior to Closing following written notice to SPAC subject to the foregoing provisions of this Section 9.9), who shall serve in such capacity in accordance with the terms of HoldCo's Governing Documents following the Effective Time.

(e) The Company and SPAC shall (i) jointly file a draft of the Notice with CFIUS (the "CFIUS filing") contemplated under 31 C.F.R. § 800.501 with respect to SPAC's director nominee rights pursuant to Section 9.8(a)(i) of this Agreement (the "Designation Right") as soon as reasonably practicable following the execution of this Agreement, and (ii) as soon as reasonably practicable after receiving CFIUS notification that the draft Notice meets all requirements of 31 C.F.R. § 800.502 and is, accordingly, complete, jointly file with CFIUS a voluntary notice as contemplated under 31 C.F.R. § 800.501(a). Any filings fees or similar costs associated with the CFIUS Filing shall be borne by SPAC.

(f) The Company and SPAC shall (i) cooperate and coordinate with the other in the making of the CFIUS filing except as prohibited by applicable law or order or as directed by CFIUS, including any U.S. Government agency that is a member of CFIUS including, (x) providing copies of all such documents and materials to each other (or their outside counsel) prior to filing, and (y) considering all reasonable additions, deletions or changes suggested in connection therewith and in connection with resolving any investigation, request or other inquiry from CFIUS under the applicable laws or orders with respect to any such filing, (ii) supply the other party (or its outside counsel) with any information and reasonable assistance that may be required or reasonably requested by CFIUS in connection with the making of the filing, (iii) supply any certifications, additional information, documents or other materials that may be required or reasonably requested by CFIUS in connection with the notice filing or the Designation Right as soon as practicable and in all cases within the amount of time allowed by CFIUS, and (iv) use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be

A-73

Exhibit 6
Page 1368

Table of Contents

done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to obtain the CFIUS Approval as soon as practicable. Notwithstanding the foregoing or anything else to the contrary in this Agreement, in no event shall SPAC or any of its Affiliates be obligated in connection with the CFIUS Approval, to (A) propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture or accept any operational restriction, or take or commit to make payments or enter into any commercial arrangement, or commit, or commit to take, any action which action limits the freedom of action of SPAC or any of its Affiliates with respect to its or its Affiliates' or the Company's or the Company's subsidiaries' businesses, product lines or assets, (B) defend through litigation, any Action asserted by any Person in any court before any Governmental Authority with respect to any notifications, filings, registrations and other materials required or necessary under the DPA or appeal any adverse decision or order by any such governmental body with respect to CFIUS, or (C) take any actions that would reasonably be expected to have a material and adverse impact on the Company, the Company's subsidiaries, SPAC or any of its Affiliates.

(g) Notwithstanding any provision in this Agreement to the contrary, prior to receipt of CFIUS Approval, SPAC shall not request or obtain from the Company or its subsidiaries, and the Company and its subsidiaries shall not provide to the Sponsor or its Affiliates, either directly or indirectly (through any other person or otherwise), (i) control rights (as defined in 31 C.F.R. § 800.208); (ii) access to material nonpublic technical information (as defined in 31 C.F.R. § 800.232); (iii) the right to appoint any member or observer to the board or equivalent governing body of the Company or any of its subsidiaries; or (iv) the right to have involvement with substantive decision making, as those terms are defined in 31 C.F.R. § 800.229 and 31 C.F.R. § 800.245, respectively, regarding (x) the use, development, acquisition, safekeeping, or release of any sensitive personal data of U.S. citizens (as defined in 31 C.F.R. § 800.241) maintained or collected by the Company or any of its subsidiaries; (y) the use, development, acquisition, or release of critical technologies (as defined in 31 C.F.R. § 800.215); or (z) the management, operation, manufacture, maintenance, or supply of covered investment critical infrastructure identified in column 1 of Appendix A to 31 C.F.R. Part 800.

**Section 9.10 NYSE Listing and De-Listing.**

(a) The Company, HoldCo and SPAC shall use their respective reasonable best efforts to cause the HoldCo Ordinary Shares and HoldCo Warrants issuable in the Merger or the Exchange and the HoldCo Ordinary Shares that will become issuable upon the exercise of the HoldCo Warrants to be approved for listing on NYSE, subject to official notice of issuance, as promptly as practicable after the date of this Agreement, and in any event prior to the Closing Date.

(b) The Company, HoldCo and SPAC shall use their respective reasonable best efforts to cause SPAC Units, SPAC Class A Ordinary Shares and SPAC Warrants to be delisted from NYSE (or be succeeded by the respective HoldCo securities) and to terminate its registration with the SEC pursuant to Sections 12(b), 12(g) and 15(d) of the Exchange Act (or be succeeded by HoldCo) as of the Closing Date or as soon as practicable thereafter.

**Section 9.11 PIPE Subscriptions**. Unless otherwise approved in writing by HoldCo and SPAC (which approval shall not be unreasonably withheld, conditioned or delayed), SPAC and HoldCo shall not permit any amendment or modification to be made to, any waiver (in whole or in part) of, or provide consent to modify (including consent to terminate), any provision or remedy under, or any replacements of, any of the Subscription Agreements. Subject to the immediately preceding sentence, SPAC and HoldCo shall use reasonable best efforts to take, or to cause to be taken, all actions required, necessary or that it otherwise deems to be proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms described therein, including each using its reasonable best efforts to enforce its rights under the Subscription Agreements to cause the PIPE Investors to pay to (or as directed by) HoldCo, the applicable purchase price under each PIPE Investor's applicable Subscription Agreement in accordance with its terms.

**Section 9.12 Confidentiality**. From the date of this Agreement until Closing, each Party shall be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein,

A-74

Exhibit 6
Page 1369

**Table of Contents**

and such provisions are hereby incorporated herein by reference; provided, that effective as of and subject to the consummation of the Closing, the Confidentiality Agreement shall terminate and be of no further force and effect (other than the terms that expressly survive the termination of the Confidentiality Agreement as set forth therein) without any further action of any of the parties thereto. Each Party acknowledges and agrees that each is aware, and each of their respective Affiliates and representatives is aware (or upon receipt of any material nonpublic information of the other Party, will be advised), of the restrictions imposed by the United States federal securities Laws and other applicable foreign and domestic Laws on Persons possessing material nonpublic information about a public company. Each Party hereby agrees, that until Closing, except in connection with or support of the transactions contemplated by this Agreement, while any of them are in possession of such material nonpublic information, none of such Persons shall, directly or indirectly (through its Affiliates or otherwise), acquire, offer or propose to acquire, agree to acquire, sell or transfer or offer or propose to sell or transfer any securities of SPAC, communicate such information to any other Person or cause or encourage any Person to do any of the foregoing in violation of such US federal securities Laws and other applicable foreign and domestic Laws.

## ARTICLE X

## CONDITIONS TO OBLIGATIONS

**Section 10.1 Conditions to Obligations of SPAC, HoldCo, Merger Sub, and the Company**. The obligations of SPAC, HoldCo, Merger Sub, and the Company to consummate, or cause to be consummated, the Merger is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by all of such parties:

(a) SPAC Shareholder Approval shall have been obtained;

(b) The Resolutions (other than the Creditor Scheme Court Meeting Resolution) being duly passed by the requisite majorities at the Equity Court Meeting and the General Meeting and the Equity Scheme and (if applicable) the Capital Reduction being sanctioned or confirmed (as applicable) by the Court;

(c) The Equity Scheme Document approved by the Court shall have been filed with the Registrar of Companies (England and Wales);

(d) The Registration Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC and not withdrawn;

(e) The waiting period or periods under the HSR Act applicable to the transactions contemplated by this Agreement and the Ancillary Agreements shall have expired or been terminated;

(f) There shall not be in force any Governmental Order, statute, rule or regulation enjoining or prohibiting the consummation of the Merger (including any restriction or prohibition under or in connection with the NSIB); <u>provided</u>, that the Governmental Authority issuing such Governmental Order has jurisdiction over the parties hereto with respect to the transactions contemplated hereby;

(g) SPAC shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act); and

(h) The HoldCo Ordinary Shares shall have been approved for listing on NYSE, subject to official notice of issuance.

**Section 10.2 Conditions to Obligations of SPAC**(a) . The obligations of SPAC to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more

A-75

Exhibit 6
Page 1370

**Table of Contents**

of which may be waived in writing by SPAC**:**(i) The representations and warranties of the Company contained in the first sentence of Section 4.6(a) shall be true and correct in all but *de minimis* respects as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all but *de minimis* respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Ancillary Agreements; (ii) the representations and warranties made pursuant to the first and second sentences of Section 4.1 (*Company Organization*), the first and second sentences of Section 4.2 (*Subsidiaries*), Section 4.3 (*Due Authorization*), Section 4.6 (*Capitalization of the Company*) (other than the first sentence of Section 4.6(a)), Section 4.7 (*Capitalization of Subsidiaries*), and Section 4.16 (*Brokers' Fees*) shall be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Ancillary Agreements; and (iii) each of the representations and warranties of the Company contained in this Agreement other than the representations and warranties made pursuant to the first and second sentences of Section 4.1 (Company Organization), the first and second sentences of Section 4.2 (*Subsidiaries*), Section 4.3 (*Due Authorization*), Section 4.6 (*Capitalization of the Company*), Section 4.7 (*Capitalization of Subsidiaries*), and Section 4.16 (*Brokers' Fees*), (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect and Company Material Adverse Effect or any similar qualification or exception) shall be true and correct as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, inaccuracies or omissions that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect;

(b) The representations and warranties of the HoldCo and Merger Sub contained in Section 6.3(a) and Section 6.3(b), respectively, shall be true and correct in all but *de minimis* respects as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all but *de minimis* respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Ancillary Agreements; (ii) the representations and warranties made pursuant to Section 6.1 (*Corporate Organization*), Section 6.3 (*Capitalization*), Section 6.4 (*Authority Relative to this Agreement*), Section 6.8 (*Post-Closing Operations; No Prior Obligations of HoldCo or Merger Sub*) and Section 6.10 (*Brokers' Fees*) shall be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Ancillary Agreements; and (iii) each of the representations and warranties of the HoldCo and Merger Sub contained in this Agreement other than the representations and warranties made pursuant to the Section 6.1 (*Corporate Organization*), Section 6.3 (*Capitalization*), Section 6.4 (*Authority Relative to this Agreement*), Section 6.8 (*Post-Closing Operations; No Prior Obligations of HoldCo or Merger Sub*) and Section 6.10 (*Brokers' Fees*) (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect or any similar qualification or exception) shall be true and correct as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, inaccuracies or omissions that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect; and

(c) Each of the covenants of the Company and HoldCo to be performed as of or prior to the Closing shall have been performed in all material respects; provided, that for purposes of this Section 10.2(c), a covenant of the Company shall only be deemed to have not been performed if the Company has failed to cure within twenty (20) days after notice (or if earlier, the Agreement End Date).

Exhibit 6
Page 1371

Table of Contents

**Section 10.3 Conditions to the Obligations of the Company**. The obligation of HoldCo, Merger Sub and the Company to consummate, or cause to be consummated, the Merger is subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Company:

(a) (i) The representations and warranties of SPAC contained in Section 5.13 shall be true and correct in all but *de minimis* respects as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all but *de minimis* respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement and (ii) each of the representations and warranties of SPAC contained in this Agreement (other than Section 5.13) (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect or any similar qualification or exception) shall be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Ancillary Agreements;

(b) Each of the covenants of SPAC to be performed as of or prior to the Closing shall have been performed in all material respects; and

(c) The amount of cash actually received by HoldCo substantially concurrently with the Closing from the PIPE Investments shall be no less than $150,000,000.

## ARTICLE XI

### TERMINATION/EFFECTIVENESS

**Section 11.1 Termination**. This Agreement may be terminated and the transactions contemplated hereby abandoned:

(a) by written consent of the Company and SPAC;

(b) by the Company or SPAC if any Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which has become final and non-appealable and has the effect of making consummation of the Merger illegal or otherwise preventing or prohibiting or restricting consummation of the Merger; provided, that the Governmental Authority issuing such Governmental Order has jurisdiction over the parties hereto with respect to the transactions contemplated hereby;

(c) by the Company if SPAC Shareholder Approval shall not have been obtained by reason of the failure to obtain the required vote at SPAC Shareholders' Meeting duly convened therefor or at any adjournment thereof;

(d) by SPAC if the Resolutions in connection with the Equity Scheme have not been approved by the requisite majorities;

(e) by either the Company or SPAC if the Court shall decline or refuse to sanction the Equity Scheme, unless both the Company and SPAC agree in writing that the decision of the Court shall be appealed;

(f) prior to the Closing by written notice to the Company from SPAC if, pursuant to the articles of association of SPAC, SPAC is required to cease all operations as a result of not completing a business combination;

(g) prior to the Closing by written notice to the Company from SPAC if (i) there is any breach of any representation, warranty, covenant or agreement on the part of the Company, Merger Sub or HoldCo set forth in

A-77

Exhibit 6
Page 1372

Table of Contents

this Agreement, such that the conditions specified in <u>Section 10.2(a)</u>, <u>Section 10.2(b)</u> or <u>Section 10.2(c)</u> would not be satisfied at the Closing (a "<u>Terminating Company Breach</u>"), except that, if such Terminating Company Breach is curable by the Company, HoldCo or Merger Sub through the exercise of its reasonable best efforts, then, for a period of up to thirty (30) days after receipt by the Company of notice from SPAC of such breach, but only as long as the Company, HoldCo or Merger Sub continues to use its respective reasonable best efforts to cure such Terminating Company Breach (the "<u>Company Cure Period</u>"), such termination shall not be effective, and such termination shall become effective only if the Terminating Company Breach is not cured within the Company Cure Period, or (ii) the Closing has not occurred on or before December 31, 2021 (the "<u>Agreement End Date</u>"), unless SPAC is in material breach hereof and such breach may be cured; or

(h) prior to the Closing, by written notice to SPAC from the Company if (i) there is any breach of any representation, warranty, covenant or agreement on the part of SPAC set forth in this Agreement, such that the conditions specified in <u>Section 10.3(a)</u> and <u>Section 10.3(b)</u> would not be satisfied at the Closing (a "<u>Terminating SPAC Breach</u>"), except that, if any such Terminating SPAC Breach is curable by SPAC through the exercise of its reasonable best efforts, then, for a period of up to thirty (30) days after receipt by SPAC of notice from the Company of such breach, but only as long as SPAC continues to exercise such reasonable best efforts to cure such Terminating SPAC Breach (the "<u>SPAC Cure Period</u>"), such termination shall not be effective, and such termination shall become effective only if the Terminating SPAC Breach is not cured within SPAC Cure Period or (ii) the Closing has not occurred on or before the Agreement End Date, unless the Company is in material breach hereof and such breach may be cured.

**Section 11.2 Effect of Termination**. In the event of the termination of this Agreement pursuant to <u>Section 11.1</u>, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party hereto or its respective Affiliates, officers, directors or shareholders, other than liability of the Company, HoldCo, SPAC or Merger Sub, as the case may be, for any willful and material breach of this Agreement occurring prior to such termination, except that the provisions of this <u>Section 11.2</u> and <u>Article XII</u> and the Confidentiality Agreement shall survive any termination of this Agreement.

<div align="center">

ARTICLE XII

MISCELLANEOUS

</div>

**Section 12.1 Trust Account Waiver**. The Company, HoldCo or Merger Sub acknowledge that SPAC is a blank check company with the powers and privileges to effect a Business Combination. The Company, HoldCo or Merger Sub further acknowledge that, as described in the prospectus dated June 21, 2019 (the "<u>Prospectus</u>") available at www.sec.gov, substantially all of SPAC assets consist of the cash proceeds of SPAC's initial public offering and private placements of its securities and substantially all of those proceeds have been deposited in a the trust account for the benefit of SPAC, certain of its public shareholders and the underwriters of SPAC's initial public offering (the "<u>Trust Account</u>"). The Company, HoldCo or Merger Sub acknowledge that it has been advised by SPAC that, except with respect to interest earned on the funds held in the Trust Account that may be released to SPAC to pay its franchise Tax, income Tax and similar obligations, the Trust Agreement provides that cash in the Trust Account may be disbursed only (i) if SPAC completes the transactions which constitute a Business Combination, then to those Persons and in such amounts as described in the Prospectus; (ii) if SPAC fails to complete a Business Combination within the allotted time period and liquidates, subject to the terms of the Trust Agreement, to SPAC in limited amounts to permit SPAC to pay the costs and expenses of its liquidation and dissolution, and then to SPAC's public shareholders; and (iii) if SPAC holds a shareholder vote to amend SPAC's amended and restated memorandum and articles of association to modify the substance or timing of the obligation to redeem 100% of SPAC Ordinary Shares if SPAC fails to complete a Business Combination within the allotted time period, then for the redemption of any SPAC Ordinary Shares properly tendered in connection with such vote. For and in consideration of SPAC entering into this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Company, HoldCo or Merger Sub hereby irrevocably waive

<div align="center">

A-78

</div>

Exhibit 6
Page 1373

**Table of Contents**

any right, title, interest or claim of any kind they have or may have in the future in or to any monies in the Trust Account and agree not to seek recourse against the Trust Account or any funds distributed therefrom as a result of, or arising out of, this Agreement and any negotiations, Contracts or agreements with SPAC; provided, that (x) nothing herein shall serve to limit or prohibit the Company's, HoldCo's or Merger Sub's right to pursue a claim against SPAC for legal relief against monies or other assets held outside the Trust Account, for specific performance or other equitable relief in connection with the consummation of the transactions (including a claim for SPAC to specifically perform its obligations under this Agreement and cause the disbursement of the balance of the cash remaining in the Trust Account (after giving effect to SPAC Share Redemptions) to the Company in accordance with the terms of this Agreement and the Trust Agreement) so long as such claim would not affect SPAC's ability to fulfill its obligation to effectuate SPAC Share Redemptions, or for fraud and (y) nothing herein shall serve to limit or prohibit any claims that the Company, HoldCo or Merger Sub may have in the future against SPAC's assets or funds that are not held in the Trust Account (including any funds that have been released from the Trust Account and any assets that have been purchased or acquired with any such funds).

**Section 12.2 Waiver**. Any party to this Agreement may, at any time prior to the Closing, by action taken by its Board of Directors, Board of Managers, Managing Member or other officers or Persons thereunto duly authorized, (a) extend the time for the performance of the obligations or acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties (of another party hereto) that are contained in this Agreement or (c) waive compliance by the other parties hereto with any of the agreements or conditions contained in this Agreement, but such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party granting such extension or waiver.

**Section 12.3 Notices**. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iv) when delivered by email (in each case in this clause (iv), solely if receipt is confirmed, but excluding any automated reply, such as an out-of-office notification), addressed as follows:

    (a)    If to SPAC prior to the Closing, or to SPAC after the Effective Time, to:

> SC Health Corporation
> 108 Robinson Road #10-00
> Singapore 068900
> Republic of Singapore
> Attention: Jeri Kwek
>     AJ Coloma
>     Eric Teo
>     Terence Fong
>     Aaron Wee
>     Clement Chen
> Email:jeri.kwek@sincapital.com
>     aj.coloma@sincapital.com
>     eric.teo@sincapital.com
>     terence.fong@sincapital.com
>     aaron.wee@sincapital.com
>     Clement.Chen@sincapital.com

<p style="text-align:center">A-79</p>

Exhibit 6<br>Page 1374

**Table of Contents**

with copies to (which shall not constitute notice):

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
United States of America
Attention: Carl Marcellino
            Elizabeth Todd
Email: Carl.Marcellino@ropesgray.com
        Elizabeth.Todd@ropesgray.com

(b) If to the Company, HoldCo or Merger Sub prior to the Closing, or to the Surviving Company or HoldCo after the Effective Time, to:

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email: andrew.rickman@rockleyphotonics.com

with copies to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
United States of America
Attention: James Masetti
            Jarrod Murphy
Email: jim.masetti@pillsburylaw.com
        jarrod.murphy@pillsburylaw.com

or to such other address or addresses as the parties may from time to time designate in writing. Copies delivered solely to outside counsel shall not constitute notice.

**Section 12.4 Assignment**. No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties and any such transfer without prior written consent shall be void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

**Section 12.5 Rights of Third Parties**. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties hereto, any right or remedies under or by reason of this Agreement; provided, however, that the D&O Indemnified Parties and the past, present and future directors, managers, officers, employees, incorporators, members, partners, shareholders, Affiliates, agents, attorneys, advisors and representatives of the parties, and any Affiliate of any of the foregoing (and their successors, heirs and representatives), are intended third-party beneficiaries of, and may enforce, Section 12.16.

**Section 12.6 Expenses**. Except as otherwise set forth in this Agreement, each party hereto shall be responsible for and pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of its legal counsel, financial advisers and accountants; provided, that if the Closing shall occur, the Surviving Entity shall (x) pay or cause to be paid, the Unpaid Transaction Expenses, and (y) pay or cause to be paid, any transaction expenses of SPAC, in each of case (x) and (y), in accordance with Section 2.5(c); and

A-80

Exhibit 6
Page 1375

Table of Contents

For the avoidance of doubt, any payments to be made (or to cause to be made) by the Surviving Entity pursuant to Section  12.60 shall be paid upon consummation of the Merger and release of proceeds from the Trust Account.

**Section  12.7 Governing Law**. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of Laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

**Section 12.8 Headings; Counterparts**. The headings in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 12.9 Company and SPAC Disclosure Letters**. The Company Disclosure Letter and SPAC Disclosure Letter (including, in each case, any section thereof) referenced herein are a part of this Agreement as if fully set forth herein. All references herein to the Company Disclosure Letter and/or SPAC Disclosure Letter (including, in each case, any section thereof) shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Any disclosure made by a party in the applicable Disclosure Letter, or any section thereof, with reference to any section of this Agreement or section of the applicable Disclosure Letter shall be deemed to be a disclosure with respect to such other applicable sections of this Agreement or sections of applicable Disclosure Letter if it is reasonably apparent on the face of such disclosure that such disclosure is responsive to such other section of this Agreement or section of the applicable Disclosure Letter. Certain information set forth in the Disclosure Letters is included solely for informational purposes and may not be required to be disclosed pursuant to this Agreement. The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made in this Agreement, nor shall such information be deemed to establish a standard of materiality.

**Section 12.10 Entire Agreement**. (i) This Agreement (together with the Company Disclosure Letter and SPAC Disclosure Letter), (ii) SPAC Investor Support Agreement and Company Holders Support Agreement, and (iii) the Employment Agreement Amendments, (iv) the Registration Rights and Lock-Up Agreement; (v) the Andrew Rickman Employment Agreement Amendment and (vi) the Non-Disclosure Agreement, dated as of December 8, 2020, between SPAC and the Company or its Affiliate (the "Confidentiality Agreement") (clause (ii), (iii), (iv), (v) and (vi), each an "Ancillary Agreement" and collectively, the "Ancillary Agreements") constitute the entire agreement among the parties to this Agreement relating to the transactions contemplated hereby and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto or any of their respective Subsidiaries relating to the transactions contemplated hereby. No representations, warranties, covenants, understandings, agreements, oral or otherwise, relating to the transactions contemplated hereby exist between such parties except as expressly set forth in this Agreement and the Ancillary Agreements.

**Section 12.11 Amendments**. This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement and which makes reference to this Agreement.

**Section 12.12 Publicity.**

(a) All press releases or other public communications relating to the transactions contemplated hereby, and the method of the release for publication thereof, shall prior to the Closing be subject to the prior mutual approval of SPAC and the Company, which approval shall not be unreasonably withheld by any party; provided, that no party shall be required to obtain consent pursuant to this Section 12.12(a) to the extent any proposed release or

A-81

Exhibit 6
Page 1376

**Table of Contents**

statement is substantially equivalent to the information that has previously been made public without breach of the obligation under this Section 12.12(a).

(b) The restriction in Section 12.12(a) shall not apply to the extent the public announcement is required by applicable securities Law, any Governmental Authority or stock exchange rule; provided, however, that in such an event, the party making the announcement shall use its commercially reasonable efforts to consult with the other party in advance as to its form, content and timing. Disclosures resulting from the parties' efforts to obtain approval or early termination under the HSR Act and to make any relating filing shall be deemed not to violate this Section 12.12.

**Section 12.13 Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

**Section 12.14 Jurisdiction; Waiver of Jury Trial.**

(a) Any proceeding or Action based upon, arising out of or related to this Agreement or the transactions contemplated hereby must be brought in the Court of Chancery of the State of Delaware (or, to the extent such court does not have subject matter jurisdiction, the Superior Court of the State of Delaware), or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, Delaware, except to the extent mandatorily governed by (x) the laws of Cayman Islands, including the provisions effecting the Merger or (y) the laws of England and Wales, including the provisions relating to the Scheme of Arrangement and the Exchange, and each of the parties irrevocably (i) submits to the exclusive jurisdiction of each such court in any such proceeding or Action, (ii) waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, (iii) agrees that all claims in respect of the proceeding or Action shall be heard and determined only in any such court, and (iv) agrees not to bring any proceeding or Action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence Legal Proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action, suit or proceeding brought pursuant to this Section 12.14.

(b) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Enforcement**. The parties hereto agree that irreparable damage could occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific enforcement of the terms and provisions of this Agreement, in addition to any other remedy to which any party is entitled at law or in equity. In the event that any Action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law, and each party agrees to waive any requirement for the securing or posting of any bond in connection therewith.

A-82

Exhibit 6
Page 1377

Table of Contents

**Section 12.16 Non-Recourse**. Except in the case of claims against a Person in respect of such Person's actual fraud:

(a) Solely with respect to the Company, HoldCo, SPAC and Merger Sub, this Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the Company, HoldCo, SPAC and Merger Sub as named parties hereto; and

(b) except to the extent a party hereto (and then only to the extent of the specific obligations undertaken by such party hereto), (i) no past, present or future director, officer, employee, incorporator, member, partner, direct or indirect equityholder, Affiliate, agent, attorney, advisor or representative or Affiliate of HoldCo, the Company, SPAC or Merger Sub and (ii) no past, present or future director, officer, employee, incorporator, member, partner, direct or indirect equityholder, shareholder, Affiliate, agent, attorney, advisor or representative or Affiliate of any of the foregoing shall have any liability (whether in Contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of HoldCo, the Company, SPAC or Merger Sub under this Agreement for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby.

**Section 12.17 Non-Survival of Representations, Warranties and Covenants**. Except (x) as otherwise contemplated by Section 11.2 or (y) in the case of claims against a Person in respect of such Person's actual fraud, none of the representations, warranties, covenants, obligations or other agreements in this Agreement or in any certificate, statement or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants, obligations, agreements and other provisions, shall survive the Closing and shall terminate and expire upon the occurrence of the Effective Time (and there shall be no liability after the Closing in respect thereof), except for (a) those covenants and agreements contained herein that by their terms expressly apply in whole or in part after the Closing and then only with respect to any breaches occurring after the Closing and (b) this Article XII.

**Section 12.18 Conflicts and Privilege.**

(a) HoldCo, SPAC and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Company), hereby agree that, in the event a dispute with respect to this Agreement or the transactions contemplated hereby arises after the Closing between or among (x) the Sponsor, the Surviving Company, shareholders or holders of other equity interests of SPAC or the Sponsor and/or any of their respective directors, members, partners, officers, employees or Affiliates (other than the Surviving Company) (collectively, the "SPAC Group"), on the one hand, and (y) HoldCo, Merger Sub, the Company and/or any member of the Rockley Group, on the other hand, any legal counsel, including Ropes & Gray LLP ("Ropes"), that represented SPAC and/or the Sponsor prior to the Closing may represent the Sponsor and/or any other member of SPAC Group, in such dispute even though the interests of such Persons may be directly adverse to the Surviving Company or HoldCo, and even though such counsel may have represented SPAC in a matter substantially related to such dispute, or may be handling ongoing matters for the Surviving Company and/or the Sponsor. HoldCo, SPAC and the Company, on behalf of their respective successors and assigns, further agree that, as to all legally privileged communications prior to the Closing (made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the transactions contemplated hereby or thereby) between or among SPAC, the Sponsor and/or any other member of SPAC Group, on the one hand, and Ropes, on the other hand, the attorney/client privilege and the expectation of client confidence shall survive the Merger and belong to SPAC Group after the Closing, and shall not pass to or be claimed or controlled by the Surviving Company. Notwithstanding the foregoing, any privileged communications or information shared by the Company prior to the Closing with SPAC or the Sponsor under a common interest agreement shall remain the privileged communications or information of the Surviving Company.

A-83

Exhibit 6
Page 1378

Table of Contents

(b) SPAC, HoldCo and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Company), hereby agree that, in the event a dispute with respect to this Agreement or the transactions contemplated hereby arises after the Closing between or among (x) the shareholders or holders of other equity interests of the Company, HoldCo, the Surviving Company and/or any of their respective directors, members, partners, officers, employees or Affiliates (collectively, the "Rockley Group"), on the one hand, and (y) any member of SPAC Group, on the other hand, any legal counsel, including Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") that represented the Company prior to the Closing may represent any member of the Rockley Group in such dispute even though the interests of such Persons may be directly adverse to SPAC Group, and even though such counsel may have represented SPAC and/or the Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Surviving Company, further agree that, as to all legally privileged communications prior to the Closing (made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the transactions contemplated hereby or thereby) between or among the Company and/or any member of the Rockley Group, on the one hand, and Pillsbury, on the other hand, the attorney/client privilege and the expectation of client confidence shall survive the Merger and belong to the Rockley Group after the Closing, and shall not pass to or be claimed or controlled by the Surviving Company. Notwithstanding the foregoing, any privileged communications or information shared by SPAC prior to the Closing with the Company under a common interest agreement shall remain the privileged communications or information of the Surviving Company.

[*Remainder of page intentionally left blank*]

A-84

Exhibit 6
Page 1379

**Table of Contents**

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

**SC HEALTH CORPORATION**

By:     /s/ Angelo John Coloma

Name:  Angelo John Coloma

Title:    Chief Executive Officer

*[Signature Page to Business Combination Agreement]*

A-85

Exhibit 6
Page 1380

**Table of Contents**

**ROCKLEY MERGERSUB LIMITED**

By:      /s/ Dr. Andrew George Rickman

Name:  Dr. Andrew George Rickman

Title:    Director

*[Signature Page to Business Combination Agreement]*

A-86

Exhibit 6
Page 1381

Table of Contents

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By:    /s/ Dr. Andrew George Rickman

Name:  Dr. Andrew George Rickman

Title:   Director

*[Signature Page to Business Combination Agreement]*

A-87

Exhibit 6
Page 1382

Table of Contents

**ROCKLEY PHOTONICS LIMITED**

By:    /s/ Dr. Andrew George Rickman

Name:  Dr. Andrew George Rickman

Title:   Chief Executive Officer

*[Signature Page to Business Combination Agreement]*

A-88

Exhibit 6
Page 1383

**Table of Contents**

**Exhibit A**

Memorandum of Association of HoldCo

(See Attached)

A-89

Exhibit 6
Page 1384

**Table of Contents**

**THE COMPANIES ACT (REVISED)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES**

**[   ] AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**[     ]**

(adopted by a Special Resolution passed on [          ] and
effective [          ])

1    The name of the Company is [          ].

2    The registered office of the Company shall be at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KYI-1106, Cayman Islands, British West Indies or at such other place as the Directors may from time to time decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Companies Act (Revised) or as the same may be revised from time to time, or any other law of the Cayman Islands.

4    The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

5    The authorized share capital of the Company is US$50,000 divided into 5,000,000,000 shares of a nominal or par value of US$0.00001 each. The Company has the power to redeem or purchase any of its shares and to increase or reduce the said capital subject to the provisions of the Companies Act (Revised) and the Articles of Association and to issue any part of its capital, whether original, redeemed or increased with or without any preference, priority or special privilege or subject to any postponement of rights or to any conditions or restrictions and so that unless the conditions of issue shall otherwise expressly declare every issue of shares whether declared to be preference or otherwise shall be subject to the powers hereinbefore contained.

6    The Company has the power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalized terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.

A-90

Exhibit 6
Page 1385

**Table of Contents**

**Exhibit B**

Articles of Association of HoldCo

(See Attached)

A-91

Exhibit 6
Page 1386

Table of Contents

THE COMPANIES ACT (REVISED)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES

[   ] AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

[          ]

(adopted by a Special Resolution passed on [          ] and
effective [          ])

**INTERPRETATION**

1       In these Articles, Table A in the Schedule in the Companies Act does not apply and unless otherwise defined, the defined terms shall have the meanings assigned to them as follows:

| | |
|---|---|
| "**Articles**" | these Articles of Association of the Company as altered or added to, from time to time; |
| "**Board**" or "**Board of Directors**" | the board of Directors for the time being of the Company; |
| "**Business Day**" | a day (excluding Saturdays or Sundays), on which banks in London, United Kingdom, California, United States and New York, United States are open for general banking business throughout their normal business hours; |
| "**Chairman**" | the Chairman appointed pursuant to Article 78; |
| "**Commission**" | Securities and Exchange Commission of the United States of America or any other federal agency for the time being administering the Securities Act; |
| "**Companies Act**" | the Companies Act (Revised) of the Cayman Islands and any statutory amendment or re-enactment thereof. Where any provision of the Companies Act is referred to, the reference is to that provision as amended by any law for the time being in force; |
| "**Company**" | [          ], a Cayman Islands company limited by shares; |
| "**Company's Website**" | the website of the Company, the address or domain name of which has been notified to Members; |
| "**Designated Stock Exchange**" | The New York Stock Exchange or any other internationally recognized stock exchange where the Company's securities are traded; |
| "**Directors**" | the directors of the Company for the time being, or as the case may be, the Directors assembled as a Board or as a committee thereof; |
| "**electronic**" | the meaning given to it in the Electronic Transactions Act; |
| "**electronic communication**" | electronic posting to the Company's Website, transmission to any number, address or internet website or other electronic delivery methods as otherwise decided and approved by not less than two-thirds of the vote of the Board; |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Act; |

A-92

Exhibit 6
Page 1387

**Table of Contents**

| | |
|---|---|
| **"Electronic Transactions Act"** | the Electronic Transactions Act (Revised) of the Cayman Islands and any statutory amendment or re-enactment thereof. Where any provision of the Electronic Transactions Act is referred to, the reference is to that provision as amended by any law for the time being in force; |
| **"in writing"** | includes writing, printing, lithograph, photograph, type-writing and every other mode of representing words or figures in a legible and non-transitory form and, only where used in connection with a notice served by the Company on Members or other persons entitled to receive notices hereunder, shall also include a record maintained in an electronic medium which is accessible in visible form so as to be useable for subsequent reference; |
| **"Member"** | the meaning given to it in the Companies Act; |
| **"Memorandum of Association"** | the Memorandum of Association of the Company, as amended and re-stated from time to time; |
| **"month"** | calendar month; |
| **"Ordinary Resolution"** | a resolution: |
| | (a) passed by a simple majority of votes cast by such Members as, being entitled to do so, vote in person or, in the case of any Member being an organization, by its duly authorized representative or, where proxies are allowed, by proxy at a general meeting of the Company; or |
| | (b) approved in writing by all of the Members entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Members and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments if more than one, is executed; |
| **"paid up"** | paid up as to the par value and any premium payable in respect of the issue of any shares and includes credited as paid up; |
| **"Register of Members"** | the register to be kept by the Company in accordance with the Companies Act; |
| **"seal"** | the Common Seal of the Company (if adopted) including any facsimile thereof; |
| **"Securities Act"** | the Securities Act of 1933 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time; |
| **"share"** | any share in the capital of the Company and includes a fraction of a share; |
| **"signed"** | includes a signature or representation of a signature affixed by mechanical means or an electronic symbol or process attached to or logically associated with an electronic communication and executed or adopted by a person with the intent to sign the electronic communication; |
| **"Special Resolution"** | the meaning given to it in the Companies Act and includes a unanimous written resolution; |
| **"Statutes"** | the Companies Act and every other laws and regulations of the Cayman Islands for the time being in force concerning companies and affecting the Company; |
| **"Treasury Share"** | means a Share held in the name of the Company as a treasury share in accordance with the Companies Act; |
| **"year"** | calendar year. |

A-93

Exhibit 6
Page 1388

**Table of Contents**

2    In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

(b)    words importing the masculine gender only shall include the feminine gender;

(c)    words importing persons only shall include companies or associations or bodies of persons, whether corporate or not;

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)    "may" shall be construed as permissive and "shall" shall be construed as imperative;

(f)    a reference to a dollar or dollars (or $) is a reference to dollars of the United States;

(g)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced;

(h)    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(i)    the term "and/or" is used herein to mean both "and" as well as "or." The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others. The term "or" shall not be interpreted to be exclusive and the term "and" shall not be interpreted to require the conjunctive (in each case, unless the context otherwise requires);

(j)    headings are inserted for reference only and shall be ignored in construing the Articles;

(k)    any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(l)    any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act;

(m)    Section 8 and 19(3) of the Electronic Transactions Act shall not reply;

(n)    the term "clear days" in relation to the period of a notice means that period excluding the day when the notice is received or deemed to be received and the day for which it is given or on which it is to take effect;

(o)    the term "holder" in relation to a Share means a person whose name is entered in the Register of Members as the holder of such Share.

3    Subject to the last two preceding Articles, any words defined in the Companies Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

<div align="center">

**PRELIMINARY**

</div>

4    The business of the Company may be conducted as the Directors see fit.

5    The registered office of the Company shall be at such address in the Cayman Islands as the Directors shall from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

<div align="center">

**ISSUE OF SHARES**

</div>

6    Subject to the provisions, if any, in the Memorandum of Association, these Articles and to any direction that may be given by the Company in a general meeting, the Directors may, in their absolute discretion and

<div align="center">

A-94

</div>

Exhibit 6

Page 1389

**Table of Contents**

without approval of the existing Members, issue shares, grant rights over existing shares or issue other securities in one or more series as they deem necessary and appropriate and determine designations, powers, preferences, privileges and other rights, including dividend rights, conversion rights, terms of redemption and liquidation preferences, any or all of which may be greater than the powers and rights associated with the shares held by existing Members, at such times and on such other terms as they think proper. The Company shall not issue shares in bearer form.

7    The Directors may provide, out of the unissued shares, for series of preferred shares. Before any preferred shares of any such series are issued, the Directors shall fix, by resolution or resolutions, the following provisions of the preferred shares thereof:

(a)    the designation of such series, the number of preferred shares to constitute such series and the subscription price thereof if different from the par value thereof;

(b)    whether the shares of such series shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(c)    the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of any other class or any other series of preferred shares;

(d)    whether the preferred shares of such series shall be subject to redemption by the Company, and, if so, the times, prices and other conditions of such redemption;

(e)    the amount or amounts payable upon preferred shares of such series upon, and the rights of the holders of such series in, a voluntary or involuntary liquidation, dissolution or winding up, or upon any distribution of the assets, of the Company;

(f)    whether the preferred shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the preferred shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

(g)    whether the preferred shares of such series shall be convertible into, or exchangeable for, shares of any other class or any other series of preferred shares or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

(h)    the limitations and restrictions, if any, to be effective while any preferred shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Company of, the existing shares or shares of any other class of shares or any other series of preferred shares;

(i)    the conditions or restrictions, if any, upon the creation of indebtedness of the Company or upon the issue of any additional shares, including additional shares of such series or of any other class of shares or any other series of preferred shares; and

(j)    any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof.

Without limiting the foregoing and subject to Article 78, the voting powers of any series of preferred shares may include the right, in the circumstances specified in the resolution or resolutions providing for the issuance of such preferred shares, to elect one or more Directors who shall serve for such term and have such voting powers as shall be stated in the resolution or resolutions providing for the issuance of such preferred shares. The term of office and voting powers of any Director elected in the manner provided in the immediately preceding sentence of this Article 7 may be greater than or less than those of any other Director or class of Directors.

A-95

Exhibit 6
Page 1390

Table of Contents

8    The powers, preferences and relative, participating, optional and other special rights of each series of preferred shares, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding. All shares of any one series of preferred shares shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

## REGISTER OF MEMBERS AND SHARE CERTIFICATES

9    The Company shall maintain a Register of its Members and a Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates (if any) shall specify the share or shares held by that person and the amount paid up thereon, provided that in respect of a share or shares held jointly by several persons the Company shall not be bound to issue more than one certificate, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all. All certificates for shares shall be delivered personally or sent through the post addressed to the Member entitled thereto at the Member's registered address as appearing in the register.

10    All share certificates shall bear legends required under the applicable laws, including the Securities Act.

11    Any two or more certificates representing shares of any one class held by any Member may at the Member's request be cancelled and a single new certificate for such shares issued in lieu on payment (if the Directors shall so require) of US$1.00 or such smaller sum as the Directors shall determine.

12    If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same shares may be issued to the relevant Member upon request subject to delivery up of the old certificate or (if alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and the payment of out-of-pocket expenses of the Company in connection with the request as the Directors may think fit.

13    In the event that shares are held jointly by several persons, any request may be made by any one of the joint holders and if so made shall be binding on all of the joint holders.

## TRANSFER OF SHARES

14    (a)    Subject to the terms of the Articles, any Member may transfer all or any of his Shares by an instrument of transfer provided that such transfer complies with the rules and regulations of the Designated Stock Exchange, the United States Securities and Exchange Commission and/or any other competent regulatory authority or otherwise under Applicable Law. If the Shares in question were issued in conjunction with rights, options or warrants issued pursuant to the Articles on terms that one cannot be transferred without the other, the Directors shall refuse to register the transfer of any such Share without evidence satisfactory to them of the like transfer of such option or warrant.

(b)    The instrument of transfer of any Share shall be in writing in the usual or common form or in a form prescribed by the rules and regulations of the Designated Stock Exchange, the United States Securities and Exchange Commission and/or any other competent regulatory authority or otherwise under Applicable Law or in any other form approved by the Directors and shall be executed by or on behalf of the transferor (and if the Directors so require, signed by or on behalf of the transferee) and may be under hand or, if the transferor or transferee is a Clearing House or its nominee(s), by hand or by machine imprinted signature or by such other manner of execution as the Directors may approve from time to time. The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

15    The registration of transfers may, on 14 days' notice being given by advertisement in such one or more newspapers or by electronic means, be suspended and the register closed at such times and for such periods

A-96

Exhibit 6
Page 1391

Table of Contents

as the Board may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year.

16  The instrument of transfer of any share shall be in writing and executed by or on behalf of the transferor (and if the Directors so require, signed by the transferee). The transferor shall be deemed to remain a holder of the share until the name of the transferee is entered in the Register of Members.

17  All instruments of transfer that shall be registered shall be retained by the Company.

## REDEMPTION AND PURCHASE OF OWN SHARES

18  Subject to the provisions of the Companies Act the Company may issue Shares that are to be redeemed or are liable to be redeemed at the option of the Member or the Company. The redemption of such Shares shall be effected in such manner and upon such other terms as the Company may, by Special Resolution, determine before the issue of the Shares.

19  Subject to the provisions of the Companies Act, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

20  The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Companies Act, including out of capital.

21  The Directors may accept the surrender for no consideration of any fully paid Share.

## TREASURY SHARES

22  The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

23  The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## VARIATION OF RIGHTS ATTACHING TO SHARES

24  If at any time the share capital of the Company is divided into different classes of Shares, all or any of the rights attached to any class (unless otherwise provided by the terms of issue of the Shares of that class) may, whether or not the Company is being wound up, be varied without the consent of the holders of the issued Shares of that class where such variation is considered by the Directors not to have a material adverse effect upon such rights; otherwise, any such variation shall be made only with the consent in writing of the holders of not less than two thirds of the issued Shares of that class, or with the approval of a resolution passed by a majority of not less than two thirds of the votes cast at a separate meeting of the holders of the Shares of that class. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of Shares of the relevant class.

25  The provisions of these Articles relating to general meetings shall apply to every such general meeting of the holders of one class or series of shares except the following:

(a)  separate general meetings of the holders of a class or series of shares may be called only by (i) the Chairman of the Board, or (ii) a majority of the entire Board of Directors (unless otherwise specifically provided by the terms of issue of the shares of such class or series). Nothing in this Article 25 or Article 24 shall be deemed to give any Member or Members the right to call a class or series meeting.

A-97

Exhibit 6
Page 1392

Table of Contents

(b)    the necessary quorum shall be one or more persons holding or representing by proxy at least one-third of the issued shares of the class or series and that any holder of shares of the class or series present in person or by proxy may demand a poll.

26    The rights conferred upon the holders of the shares of any class or series shall not, unless otherwise expressly provided by the terms of issue of the shares of that class or series, be deemed to be varied by the creation or issue of further shares ranking in priority thereto or pari passu therewith.

## COMMISSION ON SALE OF SHARES

27    The Company may in so far as the Statutes from time to time permit pay a commission to any person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any shares of the Company. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up shares or partly in one way and partly in the other. The Company may also on any issue of shares pay such brokerage as may be lawful.

## NON-RECOGNITION OF TRUSTS

28    No person shall be recognised by the Company as holding any share upon any trust and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future, or partial interest in any share, or any interest in any fractional part of a share, or (except only as is otherwise provided by these Articles or the Statutes) any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder.

## CALLS ON SHARES

29    Subject to the terms of allotment, the Directors may from time to time make calls upon the Members in respect of any money unpaid on their shares, and each Member shall (subject to receiving at least 14 calendar days notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on his shares. A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

30    The joint holders of a share shall be jointly and severally liable to pay calls in respect thereof.

31    If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

32    The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the amount of the share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

33    The Directors may make arrangements on the issue of shares for a difference between the Members, or the particular shares, in the amount of calls to be paid and in the times of payment.

34    The Directors may, if they think fit, receive from any Member willing to advance the same all or any part of the monies uncalled and unpaid upon any shares held by him, and upon all or any of the monies so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Member paying the sum in advance and the Directors. No such sum paid in advance of calls shall entitle the Member paying such sum to any portion of a dividend declared in respect of any period prior to the date upon which such sum would, but for such payment, become presently payable.

Exhibit 6
Page 1393

Table of Contents

## FORFEITURE OF SHARES

35    If a Member fails to pay any call or instalment of a call on the day appointed for payment thereof, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of such much of the call or instalment as is unpaid, together with any interest which may have accrued.

36    The notice shall name a further day (not earlier than the expiration of 14 calendar days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the shares in respect of which the call was made will be liable to be forfeited.

37    If the requirements of any such notice as aforesaid are not complied with, any share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

38    A forfeited share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

39    A person whose shares have been forfeited shall cease to be a Member in respect of the forfeited shares, but shall, notwithstanding, remain liable to pay to the Company all monies which at the date of forfeiture were payable by him to the Company in respect of the shares, but his liability shall cease if and when the Company receives payment in full of the fully paid up amount of the shares.

40    A certificate in writing under the hand of a Director of the Company, which certifies that a share has been forfeited on a date stated in the certificate, shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share. The Company may receive the consideration, if any, given for the share or any sale or disposition thereof and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of and he shall thereupon be registered as the holder of the share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

41    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a share becomes due and payable, whether on account of the amount of the share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSMISSION OF SHARES

42    The legal personal representative of a deceased sole holder of a share shall be the only person recognised by the Company as having any title to the share. In the case of a share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only person recognised by the Company as having any title to the share.

43    Any person becoming entitled to a share in consequence of the death or bankruptcy of a Member shall upon such evidence being produced as may from time to time be properly required by the Directors, have the right either to be registered as a Member in respect of the share or, instead of being registered himself, to make such transfer of the share as the deceased or bankrupt person could have made. If the person so becoming entitled shall elect to be registered himself as holder he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.

44    A person becoming entitled to a share by reason of the death or bankruptcy of the holder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share, except that he shall not, before being registered as a Member in respect of the share, be entitled in

A-99

Exhibit 6
Page 1394

**Table of Contents**

respect of it to exercise any right conferred by membership in relation to meetings of the Company, provided however, that the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the share, and if the notice is not complied with within 90 calendar days, the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the share until the requirements of the notice have been complied with.

### ALTERATION OF CAPITAL

45    The Company may by Ordinary Resolution:

(a)    increase the share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

(c)    sub-divide its existing shares or any of them into shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived;

(d)    cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of its share capital by the amount of the shares so cancelled.

46    Subject to the provisions of the Statutes and these Articles as regards to the matters to be dealt with by Ordinary Resolution, the Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorized by law.

47    All new shares created hereunder shall be subject to the same provisions with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the shares in the original share capital.

### CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE

48    For the purpose of determining those Members that are entitled to receive notice of, attend or vote at any meeting of Members or any adjournment thereof, or those Members that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Member for any other purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period but not to exceed in any case 30 calendar days. If the Register of Members shall be so closed for the purpose of determining those Members that are entitled to receive notice of, attend or vote at a meeting of Members such register shall be so closed for at least 10 calendar days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register of Members.

49    In lieu of or apart from closing the Register of Members, the Directors may fix in advance a date as the record date for any such determination of those Members that are entitled to receive notice of, attend or vote at a meeting of the Members and for the purpose of determining those Members that are entitled to receive payment of any dividend, the Directors may, at or within 90 calendar days prior to the date of declaration of such dividend fix a subsequent date as the record date of such determination.

50    If the Register of Members is not so closed and no record date is fixed for the determination of those Members entitled to receive notice of, attend or vote at a meeting of Members or those Members that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of those Members that are entitled to receive notice of, attend or vote at a meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof.

A-100

Exhibit 6
Page 1395

**Table of Contents**

## GENERAL MEETINGS

51    All general meetings of the Company other than annual general meetings shall be called extraordinary general meetings.

52    (a)    The Company may hold an annual general meeting and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as the Directors shall determine.

    (b)    At these meetings the report of the Directors (if any) shall be presented.

53    (a)    The Directors may call general meetings, and they shall on a Members requisition forthwith proceed to convene an extraordinary general meeting of the Company.

    (b)    A Members requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than one-third of the share capital of the Company as at that date carries the right of voting at general meetings of the Company.

    (c)    The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the principal place of business of the Company (with a copy forwarded to the registered office), and may consist of several documents in like form each signed by one or more requisitionists.

    (d)    If the Directors do not within 21 calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further 21 calendar days, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the second said 21 calendar days.

    (e)    A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

## NOTICE OF GENERAL MEETINGS

54    At least seven calendar days' notice shall be given for any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this regulation has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

    (a)    in the case of an annual general meeting by all the Members (or their proxies) entitled to attend and vote thereat; and

    (b)    in the case of an extraordinary general meeting by a majority in number of the Members (or their proxies) having a right to attend and vote at the meeting, being a majority together holding not less than ninety five percent in par value of the shares giving that right.

55    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Member shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

56    No business shall be transacted at any general meeting unless a quorum of Members is present at the time when the meeting proceeds to business. One or more Members holding not less than an aggregate of one-third of all voting share capital of the Company in issue present in person or by proxy and entitled to vote shall be a quorum for all purposes.

A-101

Exhibit 6
Page 1396

**Table of Contents**

57    If provided for by the Company, a person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

58    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting, the meeting shall be dissolved.

59    The Chairman of the Board of Directors shall preside as chairman at every general meeting of the Company.

60    If at any meeting the Chairman of the Board of Directors is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, the Directors present shall elect one of their members to be chairman of the meeting, or, if no Director is so elected and willing to be chairman of the meeting, the Members present shall choose a chairman of the meeting.

61    The chairman may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting is adjourned for 10 calendar days or more, not less than 7 Business Days' notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

62    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by one or more Members present in person or by proxy entitled to vote and who together hold not less than 10 percent of the paid up voting share capital of the Company, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

63    If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

64    In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

65    A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF MEMBERS**

66    Subject to any rights and restrictions for the time being attached to any class or classes of shares, every Member present in person and every person representing a Member by proxy at a general meeting of the Company shall have one vote for each share registered in his name in the Register of Members.

67    In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members.

68    A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, or other person in the

A-102

Exhibit 6
Page 1397

**Table of Contents**

nature of a committee appointed by that court, and any such committee or other person, may on a poll, vote by proxy.

69    No Member shall be entitled to vote at any general meeting unless all calls or other sums presently payable by him in respect of shares in the Company have been paid.

70    On a poll, votes may be given either personally or by proxy.

71    The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorized in writing or, if the appointor is a corporation, either under seal or under the hand of an officer or attorney duly authorized. A proxy need not be a Member of the Company.

72    An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

73    The instrument appointing a proxy shall be deposited at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company:

(a)    not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

(b)    in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

(c)    where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded, be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any Director;

provided that the Directors may in the notice convening the meeting, or in an instrument of proxy sent out by the Company, direct that the instrument appointing a proxy may be deposited (no later than the time for holding the meeting or adjourned meeting) at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company. The chairman may in any event at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted shall be invalid.

74    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or transfer was received by the Company before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETING

75    Any corporation or other non-natural person which is a Member may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual Member.

## DEPOSITARY AND CLEARING HOUSES

76    If a recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) is a Member of the Company it may, by resolution of its directors or other governing body or by power of attorney, authorise

A-103

Exhibit 6
Page 1398

**Table of Contents**

such Person(s) as it thinks fit to act as its representative(s) at any general meeting of the Company or of any Class of Shareholders of the Company provided that, if more than one Person is so authorised, the authorisation shall specify the number and Class of Shares in respect of which each such Person is so authorised. A Person so authorised pursuant to this Article shall be entitled to exercise the same powers on behalf of the recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) which he represents as that recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) could exercise if it were an individual Member holding the number and Class of Shares specified in such authorisation, including the right to vote individually on a show of hands.

<div align="center">

**SHARES THAT MAY NOT BE VOTED**

</div>

77    Shares in the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

<div align="center">

**DIRECTORS**

</div>

78    (a)    Unless otherwise determined by the Company in general meeting, the number of Directors shall not be less than one or more than nine Directors. The Directors shall be elected or appointed in the first place by the subscribers to the Memorandum of Association or by a majority of them and thereafter by the Members at general meeting.

(b)    The Directors shall be divided into three (3) classes designated as Class I, Class II and Class III, respectively. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the board of Directors. At the 2022 annual general meeting of the Company, the term of office of the Class I Directors shall expire and Class I Directors shall be elected for a full term of three (3) years. At the 2023 annual general meeting of the Company, the term of office of the Class II Directors shall expire and Class II Directors shall be elected for a full term of three (3) years. At the 2024 annual general meeting of the Company, the term of office of the Class III Directors shall expire and Class III Directors shall be elected for a full term of three (3) years. At each succeeding annual general meeting of the Company, Directors shall be elected for a full term of three (3) years to succeed the Directors of the class whose terms expire at such annual general meeting. Notwithstanding the foregoing provisions of this Article, each Director shall hold office until the expiration of his term, until his successor shall have been duly elected and qualified or until his earlier death, resignation or removal. No decrease in the number of Directors constituting the board of Directors shall shorten the term of any incumbent Director.

(c)    The Board of Directors shall have a Chairman (the "**Chairman**") elected and appointed by a majority of the Directors then in office. The Directors may also elect a Co-Chairman or a Vice-Chairman of the Board of Directors (the "**Co-Chairman**"). The Chairman shall preside as chairman at every meeting of the Board of Directors. To the extent the Chairman is not present at a meeting of the Board of Directors, the Co-Chairman, or in his absence, the attending Directors may choose one Director to be the chairman of the meeting. The Chairman's voting right as to the matters to be decided by the Board of Directors shall be the same as other Directors.

(d)    The Company may by Ordinary Resolution elect any person to be a Director either to fill a casual vacancy on the Board or, subject to the first sentence of Article 78(a), as an addition to the existing Board.

(e)    The Directors by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting, or the sole remaining Director, shall have the power from time to time and at any time to appoint any person as a Director to fill a casual vacancy on the Board or, subject to the

<div align="center">

A-104

</div>

Exhibit 6
Page 1399

Table of Contents

first sentence of Article 78(a), as an addition to the existing Board, subject to the Company's compliance with director nomination procedures required under applicable corporate governance rules of the Designated Stock Exchange, as long as the Company's securities are traded on the Designated Stock Exchange. Any Director appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal. When the number of Directors is increased or decreased, the board of Directors shall, subject to Article [78(b)], determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director. In the event of a vacancy in the board of Directors, the remaining Directors, except as otherwise provided by law, shall exercise the powers of the full board of Directors until the vacancy is filled.

79    Subject to Article 78, a Director may be removed from office but only for cause and only by Ordinary Resolution at any time before the expiration of his term.

80    A vacancy on the Board created by the removal of a Director under the provisions of Article 79 above may be filled by the election or appointment by Ordinary Resolution at the meeting at which such Director is removed or by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting. Any Director elected or appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal. When the number of Directors is increased or decreased, the board of Directors shall, subject to Article 78 above, determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director. In the event of a vacancy in the board of Directors, the remaining Directors, except as otherwise provided by law, shall exercise the powers of the full board of Directors until the vacancy is filled.

81    The Board may, from time to time, and except as required by applicable law or the listing rules of the Designated Stock Exchange where the Company's securities are traded, adopt, institute, amend, modify or revoke the corporate governance policies or initiatives, which shall be intended to set forth the policies of the Company and the Board on various corporate governance related matters as the Board shall determine by resolution from time to time.

82    A Director shall not be required to hold any shares in the Company by way of qualification. A Director who is not a Member of the Company shall nevertheless be entitled to receive notice of and to attend and speak at general meetings of the Company and all classes of shares of the Company.

## DIRECTORS' FEES AND EXPENSES

83    The Directors may receive such remuneration as the Board may from time to time determine. The Directors may be entitled to be repaid all travelling, hotel and incidental expenses reasonably incurred or expected to be incurred by him in attending meetings of the Board or committees of the Board or general meetings or separate meetings of any class of shares or of debentures of the Company or otherwise in connection with the discharge of his duties as a Director.

84    Any Director who, by request, goes or resides abroad for any purpose of the Company or who performs services which in the opinion of the Board go beyond the ordinary duties of a Director may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as the Board may determine and such extra remuneration shall be in addition to or in substitution for any ordinary remuneration provided for by or pursuant to any other Article.

A-105

Exhibit 6
Page 1400

Table of Contents

**ALTERNATE DIRECTOR**

85    Any Director may in writing appoint another person to be his alternate to act in his place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to notice of meetings of the Directors and to attend and vote thereat as a Director when the person appointing him is not personally present and, where he is a Director, to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall be deemed for all purposes to be a Director and shall not be deemed to be the agent of the Director appointing him. An alternate Director shall cease to be an alternate Director if his appointor ceases to be a Director.

86    Any Director may appoint any person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

87    Subject to the provisions of the Companies Act, these Articles and to any resolutions made in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution made by the Company in a general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been made.

88    Subject to these Articles, the Directors may from time to time appoint any person, whether or not a Director of the Company, to hold such office in the Company as the Directors may think necessary for the administration of the Company, including without prejudice to the foregoing generality, the office of the Chief Executive Officer, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer, one or more Vice Presidents, Manager or Controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. The Directors may also appoint one or more of their body (but not an alternate Director) to the office of Managing Director upon like terms, but any such appointment shall ipso facto determine if any Managing Director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

89    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

90    The Directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to delegate all or any of the powers, authorities and discretion vested in him.

91    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the following paragraphs shall be without prejudice to the general powers conferred by this paragraph.

A-106

Exhibit 6
Page 1401

Table of Contents

92    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any persons to be members of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any of the aforesaid.

93    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill up any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any person so appointed and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

94    Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretions for the time being vested to them.

95    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

96    The Company intends that it shall be UK tax resident and the Board of Directors shall conduct its business in a manner consistent with that intention.

## VACATION OF OFFICE OF DIRECTOR

97    Notwithstanding anything in these Articles, the office of Director shall be vacated if the Director:

(a)    dies, becomes bankrupt or makes any arrangement or composition with his creditors;

(b)    is found to be or becomes of unsound mind;

(c)    resigns his office by notice in writing to the Company; or

(d)    shall be removed from office pursuant to Articles 78 or 79 or the Statutes.

## PROCEEDINGS OF DIRECTORS

98    The Directors may meet together (whether within or outside the Cayman Islands) for the dispatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.

99    A Board meeting may be called by a Director by giving notice in writing to the Board specifying a date, time and agenda for such meeting. The Board shall upon receipt of such notice give a copy of such notice of such meeting to all Directors and their respective alternates (if any).

100  (a)    At least ten (10) Business Days' notice shall be given to all Directors and their respective alternates (if any) for a Board meeting, provided that such notice period may be reduced or waived with the consent of all the Directors or their respective alternates (if any).

(b)    An agenda identifying in reasonable detail the issues to be considered by the Directors at any such meeting and copies (in printed or electronic form) of any relevant papers to be discussed at the meeting together with all relevant information shall be provided to and received by all Directors and their alternates (if any) at least five (5) Business Days prior to the date for such meeting. The agenda for each meeting shall include any matter submitted to the Company by any Director at least one (1) Business Day prior to the date for such meeting.

A-107

Exhibit 6
Page 1402

Table of Contents

(c)    Unless approved by all Directors (whether or not present or represented at such meeting), matters not set out in the agenda need not be considered at a Board meeting.

101    A Director or Directors may participate in any meeting of the Board of Directors, or of any committee appointed by the Board of Directors of which such Director or Directors are members, by means of conference telephone, video conference or similar communication equipment by way of which all persons participating in such meeting can hear each other and such participation shall be deemed to constitute presence in person at the meeting.

102    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors and unless so fixed shall be a majority of the Directors then in office, provided that a Director and his appointed alternate Director shall be considered only one person for this purpose.

103    If a quorum is not present at a Board meeting within thirty (30) minutes following the time appointed for such Board meeting, the relevant meeting shall be adjourned for a period of at least three (3) Business Days and the presence of any three (3) Directors shall constitute a quorum at such adjourned meeting. A meeting of the Directors at which a quorum is present when the meeting proceeds to business shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

104    Questions arising at any meeting of the Directors shall be decided by a majority of votes and each Director shall be entitled to one (1) vote in deciding matters deliberated at any meeting of the Directors.

105    A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

106    A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

107    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

108    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)    all appointments of officers made by the Directors;

(b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

A-108

Exhibit 6
Page 1403

Table of Contents

(c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

109    When the chairman of a meeting of the Directors signs the minutes of such meeting, the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

110    A resolution signed by all the Directors shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted and when signed, a resolution may consist of several documents each signed by one or more of the Directors.

111    The continuing Directors may act, notwithstanding any vacancy in their body, but if their number is reduced below the number fixed pursuant to these Articles as the necessary quorum of Directors, then the continuing Directors may act only to increase the number or to summon a general meeting of the Company, but for no other purpose.

112    A committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the members present may choose one of their number to be chairman of the meeting.

113    A committee appointed by the Directors may meet and adjourn as it thinks proper. Questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

114    All acts done by any meeting of the Directors or of a committee of Directors, or by any person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.

## PRESUMPTION OF ASSENT

115    A Director who is present at a meeting of the Board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the chairman or secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## DIRECTORS' INTERESTS

116  (a)    A Director or alternate Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

(b)    A Director or alternate Director may act by himself or by, through or on behalf of his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director or alternate Director.

(c)    A Director or alternate Director may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as a shareholder, a contracting party or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

A-109

Exhibit 6
Page 1404

Table of Contents

(d)    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by or arising in connection with any such contract or transaction by reason of such Director or alternate Director holding office or of the fiduciary relationship thereby established. A Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon.

(e)    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## DIVIDENDS, DISTRIBUTIONS AND RESERVE

117    Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118    Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

119    The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may, at the like discretion, either be employed in the business of the Company or be invested in such investments (other than shares of the Company) as the Directors may from time to time think fit.

120    Any dividend may be paid by cheque or wire transfer to the registered address of the Member or person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such person and such address as the Member or person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the person to whom it is sent or to the order of such other person as the Member or person entitled, or such joint holders as the case may be, may direct.

121    The Directors when paying dividends to the Members in accordance with the foregoing provisions may make such payment either in cash or in specie.

122    No dividend shall be paid otherwise than out of profits or, subject to the restrictions of the Companies Act, the share premium account.

123    Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends shall be declared and paid according to the amounts paid or credited as fully paid on the shares, but if and so long as nothing is paid up on any of the shares in the Company dividends may be declared and paid according to the amounts of the shares. No amount paid on a share in advance of calls shall, while carrying interest, be treated for the purposes of this Article as paid on the share.

A-110

Exhibit 6
Page 1405

Table of Contents

124   If several persons are registered as joint holders of any share, any of them may give effectual receipts for any dividend or other monies payable on or in respect of the share.

125   No dividend shall bear interest against the Company.

126   Any Dividend or other distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date on which such Dividend or other distribution becomes payable may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the Dividend or other distribution shall remain as a debt due to the Member. Any Dividend or other distribution which remains unclaimed after a period of six years from the date on which such Dividend or other distribution becomes payable shall be forfeited and shall revert to the Company.

## BOOK OF ACCOUNTS

127   The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

128   The Directors shall determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statutes or authorised by the Directors or by the Company in general meeting.

129   The Directors may cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

130   Subject to the requirements of applicable law and the listing rules of the Designated Stock Exchange, the accounts relating to the Company's affairs shall be audited in such manner and with such financial year end as may be determined from time to time by the Company by Ordinary Resolution or failing any such determination by the Directors or failing any determination as aforesaid shall not be audited.

## ANNUAL RETURNS AND FILINGS

131   The Board shall make the requisite annual returns and any other requisite filings in accordance with the Companies Act.

## AUDIT

132   The Directors may appoint an Auditor of the Company who shall hold office until removed from office by a resolution of the Directors and may fix his or their remuneration.

133   Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the auditors.

A-111

Exhibit 6
Page 1406

**Table of Contents**

134   Auditors shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next special meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any time during their term of office, upon request of the Directors at any general meeting of the Members.

### THE SEAL

135   The Seal of the Company shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of any one or more persons as the Directors may appoint for the purpose and every person as aforesaid shall sign every instrument to which the Seal of the Company is so affixed in their presence.

136   The Company may maintain a facsimile of its Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such person or persons as the Directors shall for this purpose appoint, and such person or persons as aforesaid shall sign every instrument to which the facsimile Seal of the Company is so affixed in their presence .

137   Notwithstanding the foregoing, a Director shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

### OFFICERS

138   Subject to Article 86, the Company may have Chief Executive Officer, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer, one or more Vice Presidents, Manager or Controller, appointed by the Directors. The Directors may also from time to time appoint such other officers as they consider necessary, all for such terms, at such remuneration and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors from time to time subscribe.

### CAPITALISATION OF PROFITS

139   Subject to the Companies Act and these Articles, the Board may, [with the authority of an Ordinary Resolution]:

(a)   resolve to capitalise an amount standing to the credit of reserves (including a share premium account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)   appropriate the sum resolved to be capitalised to the Members in proportion to the nominal amount of shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)   paying up the amounts (if any) for the time being unpaid on shares held by them respectively; or

(ii)   paying up in full unissued shares or debentures of a nominal amount equal to that sum,

and allot the shares or debentures, credited as fully paid, to the Members (or as they may direct) in those proportions, or partly in one way and partly in the other, but the share premium account, the

A-112

Exhibit 6
Page 1407

**Table of Contents**

capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued shares to be allotted to Members credited as fully paid;

(c)     make any arrangements it thinks fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where shares or debentures become distributable in fractions the Board may deal with the fractions as it thinks fit;

(d)     authorise a person to enter (on behalf of all the Members concerned) an agreement with the Company providing for either:

(i)     the allotment to the Members respectively, credited as fully paid, of shares or debentures to which they may be entitled on the capitalisation, or

(ii)    the payment by the Company on behalf of the Members (by the application of their respective operations of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing shares,

an agreement made under the authority being effective and binding on all those Members; and

(e)     generally do all acts and things required to give effect to the resolution.

<div align="center">

**NOTICES**

</div>

140   Except as otherwise provided in these Articles, any notice shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to him or to his address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member). or by placing it on the Company's Website. In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register of Members in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

141   Notices posted to addresses outside the Cayman Islands shall be forwarded by prepaid airmail.

142   Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

143   Any notice or other document, if served by:

(a)     post, service of the notice shall be deemed to have been served five calendar days after the time when the letter containing the same is posted (in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted);

(b)     cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted;

(c)     recognised courier service, service of the notice shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service and in proving such service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly delivered to the courier; or

(d)     e-mail, service of the notice shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

144   Any notice or document delivered or sent to any Member in accordance with the terms of these Articles shall notwithstanding that such Member be then dead or bankrupt, and whether or not the Company has

<div align="center">A-113</div>

<div align="right">

Exhibit 6
Page 1408

</div>

Table of Contents

notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register of Members as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the share.

145   Notice of every general meeting shall be given to:

(a)      all Members who have supplied to the Company an address for the giving of notices to them;

(b)      every person entitled to a share in consequence of the death or bankruptcy of a Member, who but for his death or bankruptcy would be entitled to receive notice of the meeting; and

(c)      each Director and Alternate Director.

No other person shall be entitled to receive notices of general meetings.

## INFORMATION

146   No Member shall be entitled to require discovery of any information in respect of any detail of the Company's trading or any information which is or may be in the nature of a trade secret or secret process which may relate to the conduct of the business of the Company and which in the opinion of the Board would not be in the interests of the Members of the Company to communicate to the public.

147   The Board shall be entitled to release or disclose any information in its possession, custody or control regarding the Company or its affairs to any of its members including, without limitation, information contained in the Register of Members and transfer books of the Company.

## INDEMNITY

148   Every Director (including for the purposes of this Article any Alternate Director appointed pursuant to the provisions of these Articles) and officer of the Company or a Group Company for the time being and from time to time including for 6 years following ceasing to be a director or officer shall be indemnified and secured harmless out of the assets and funds of the Company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him in connection with the execution or discharge of his duties, powers, authorities or discretions as a Director or officer of the Company or a Group Company, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Company or a Group Company or its affairs in any court whether in the Cayman Islands or elsewhere.

149   No such Director or officer of the Company or a Group Company shall be liable to the Company or the relevant Group Company for any loss or damage unless such liability arises through the wilful neglect or wilful default of such Director or officer.

150   The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

## FINANCIAL YEAR

151   Unless the Directors otherwise prescribe, the financial year of the Company shall end on December 31st in each year and shall begin on January 1st in each year.

A-114

Exhibit 6
Page 1409

**Table of Contents**

## WINDING UP

152  If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit. Subject to the rights attaching to any Shares, in a winding up:

(a)  if the assets available for distribution amongst the Members shall be insufficient to repay the whole of the Company's issued share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the Members in proportion to the par value of the Shares held by them; or

(b)  if the assets available for distribution amongst the Members shall be more than sufficient to repay the whole of the Company's issued share capital at the commencement of the winding up, the surplus shall be distributed amongst the Members in proportion to the par value of the Shares held by them at the commencement of the winding up subject to a deduction from those Shares in respect of which there are monies due, of all monies payable to the Company for unpaid calls or otherwise.

153  If the Company shall be wound up the liquidator may, subject to the rights attaching to any Shares and with the approval of a Special Resolution of the Company and any other approval required by the Statutes, divide amongst the Members in kind the whole or any part of the assets of the Company (whether such assets shall consist of property of the same kind or not) and may for that purpose value any assets and determine how the division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like approval, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Members as the liquidator, with the like approval, shall think fit, but so that no Member shall be compelled to accept any asset upon which there is a liability.

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION AND
## NAME OF COMPANY

154  The Company may at any time and from time to time by Special Resolution alter or amend these Articles or the Memorandum of Association of the Company, in whole or in part, or change the name of the Company.

## REGISTRATION BY WAY OF CONTINUATION

155  The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATIONS

156  The Company shall have the power to merge or consolidate with one or more other constituent companies (as defined in the Companies Act) upon such terms as the Directors may determine and (to the extent required by the Companies Act) with the approval of a Special Resolution.

A-115

Exhibit 6
Page 1410

**Table of Contents**

**Exhibit C**

Form of Registration Rights and Lock-Up Agreement

(See Attached)

A-116

Exhibit 6
Page 1411

**Table of Contents**

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "***Agreement***"), dated as of                , 2021, is made and entered into by and among Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability (the "***Company***"), SC Health Holdings Limited, a Cayman Islands exempted company ("***Sponsor***") and certain shareholders or optionholders of Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 ("***Target***"), set forth on Schedule 1 hereto (such shareholders, the "***Target Holders***" and, collectively with the Sponsor and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 6.4 or Section 6.12 of this Agreement, the "***Holders***" and each, a "***Holder***").

## RECITALS

**WHEREAS**, the Company has entered into a Business Combination Agreement, dated as of March 19, 2021 (as it may be amended, supplemented or otherwise modified from time to time, the "***Business Combination Agreement***"), by and among the Company, SC Health Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("***SPAC***"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of the Company that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("***Merger Sub***") and Target, pursuant to which, among other things, (a) the Target became a wholly-owned subsidiary of the Company, and (b) Merger Sub, merged with and into SPAC (the "***Merger***"), with SPAC continuing as the surviving corporation as a direct, wholly owned subsidiary of the Company, (the "***Business Combination***");

**WHEREAS**, on or about the date hereof, pursuant to the Business Combination Agreement, the Holders received shares of the Company's Ordinary Shares, nominal value $0.00001 per share;

**WHEREAS**, the parties hereto desire to enter into this Agreement, pursuant to which the Company shall grant the Holders certain registration rights with respect to certain securities of the Company, as set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

### DEFINITIONS

1.1 Definitions. The terms defined in this Article I shall, for all purposes of this Agreement, have the respective meanings set forth below:

"***Additional Holder***" shall have the meaning given in Section 6.12.

"***Additional Holder Ordinary Shares***" shall have the meaning given in Section 6.12.

"***Adverse Disclosure***" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Board, after consultation with counsel to the Company, (a) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact

A-117

Exhibit 6
Page 1412

Table of Contents

necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (b) would not be required to be made at such time if the Registration Statement were not being filed, declared effective or used, as the case may be and (c) the Company has a bona fide business purpose for not making such information public.

"*Agreement*" shall have the meaning given in the Preamble hereto.

"*Block Trade*" shall have the meaning given in Section 2.4.1.

"*Board*" shall mean the Board of Directors of the Company.

"*Closing*" shall have the meaning given in the Business Combination Agreement.

"*Closing Date*" shall have the meaning given in the Business Combination Agreement.

"*Commission*" shall mean the Securities and Exchange Commission.

"*Company*" shall have the meaning given in the Preamble hereto and includes the Company's successors by recapitalization, merger, consolidation, spin-off, reorganization or similar transaction.

"*Demanding Holder*" shall have the meaning given in Section 2.1.4.

"*Equity Awards*" shall mean those options and/or awards, exercisable into Ordinary Shares, granted to certain Target Holders under the Incentive Equity Plans (each as defined in the Business Combination Agreement).

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time.

"*Form S-1 Shelf*" shall have the meaning given in Section 2.1.1.

"*Form S-3 Shelf*" shall have the meaning given in Section 2.1.1.

"*Holder Information*" shall have the meaning given in Section 4.1.2.

"*Holders*" shall have the meaning given in the Preamble hereto, for so long as such person or entity holds any Registrable Securities.

"*Joinder*" shall have the meaning given in Section 6.12.

"*Lock-up*" shall have the meaning given in Section 5.1.

"*Lock-up Parties*" shall mean, as applicable, the Sponsor, the Target Holders and their respective Permitted Transferees.

"*Lock-up Period*" shall mean:

(A) with respect to the Target Holders, the period beginning on the Closing Date and ending on the date that is 180 days after the Closing Date;

(B) with respect to the Sponsor in respect of Lock-up Shares other than any of the Ordinary Shares issued or issuable upon the exercise or conversion of the Private Placement Warrants, the period beginning on the Closing Date and ending on the earlier of (i) 365 days after the Closing Date and (ii) (x) if the closing price of an Ordinary Share equals or exceeds $12.00 per share (as adjusted for share sub-divisions, share capitalizations,

A-118

Exhibit 6
Page 1413

Table of Contents

reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing Date, or (y) the date on which the Company completes a liquidation, merger, share exchange, reorganization or other similar transaction that results in all the Company's stockholders having the right to exchange their Ordinary Shares for cash, securities or other property; and

(C) with respect to the to the Sponsor in respect of Ordinary Shares issued or issuable upon the exercise or conversion of the Private Placement Warrants, the period beginning on the Closing Date and ending on the date that is 30 days after the Closing Date.

"**Lock-up Shares**" shall mean the Ordinary Shares and any other equity securities convertible into or exercisable or exchangeable for the Ordinary Shares (including any Private Placement Warrants) held by the Sponsor or Target Holders immediately following the Closing or Ordinary Shares issued with respect to or in exchange for Equity Awards on or after the Closing as permitted by this Agreement (other than Ordinary Shares acquired in the public market and, in respect of SC Health Group Limited, other than, for the avoidance of doubt, those Ordinary Shares acquired pursuant to SC Health Group Limited's forward purchase agreement with the SPAC).

"**Maximum Number of Securities**" shall have the meaning given in Section 2.1.5.

"**Merger**" shall have the meaning given in the Recitals hereto.

"**Merger Sub**" shall have the meaning given in the Recitals hereto.

"**Minimum Takedown Threshold**" shall have the meaning given in Section 2.1.4.

"**Misstatement**" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus or necessary to make the statements in a Registration Statement or Prospectus (in the case of a Prospectus, in the light of the circumstances under which they were made) not misleading.

"**Ordinary Shares**" means the ordinary shares in the capital of the Company with a nominal value of $0.00001 per share.

"**Other Coordinated Offering**" shall have the meaning given in Section 2.4.1.

"**Permitted Transferees**" shall mean (a) with respect to the Target Holders and Sponsor and their respective Permitted Transferees, (i) prior to the expiration of the Lock-up Period, any person or entity to whom such Holder is permitted to transfer such Registrable Securities prior to the expiration of the Lock-up Period pursuant to Section 5.2 and (ii) after the expiration of the Lock-up Period, any person or entity to whom such Holder is permitted to transfer such Registrable Securities, subject to and in accordance with any applicable agreement between such Holder and/or their respective Permitted Transferees and the Company and any transferee thereafter, and (b) with respect to all other Holders and their respective Permitted Transferees, any person or entity to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities, including prior to the expiration of any lock-up period applicable to such Registrable Securities, subject to and in accordance with any applicable agreement between such Holder and/or their respective Permitted Transferees and the Company and any transferee thereafter.

"**Piggyback Registration**" shall have the meaning given in Section 2.2.1.

"**Private Placement Warrants**" shall mean the warrants held by the Sponsor, purchased by the Sponsor in the private placement that occurred concurrently with the closing of the SPAC's initial public offering, including any Ordinary Shares issued or issuable upon conversion or exchange of such warrants in accordance with the Business Combination Agreement.

A-119

Exhibit 6
Page 1414

Table of Contents

"***Prospectus***" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

"***Registrable Security***" shall mean (a) any outstanding Ordinary Shares and any other equity security (including the Private Placement Warrants and any other warrants to purchase Ordinary Shares and Ordinary Shares issued or issuable upon the exercise or conversion of any other equity security) of the Company held by a Holder immediately following the Closing (including any securities distributable pursuant to the Business Combination Agreement), (b) any Additional Holder Ordinary Shares, and (c) any other equity security of the Company or any of its subsidiaries issued or issuable with respect to any securities referenced in clause (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a recapitalization, merger, consolidation, spin-off, reorganization or similar transaction; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities upon the earliest to occur of: (A) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement by the applicable Holder; (B) (i) such securities shall have been otherwise transferred (other than to a Permitted Transferee), (ii) new certificates for such securities not bearing (or book entry positions not subject to) a legend restricting further transfer shall have been delivered by the Company and (iii) subsequent public distribution of such securities shall not require registration under the Securities Act; (C) such securities shall have ceased to be outstanding; (D) such securities may be sold without registration pursuant to Rule 144 or any successor rule promulgated under the Securities Act (but with no volume or other restrictions or limitations including as to manner or timing of sale); (E) such securities have been sold without registration pursuant to Section 4(a)(1) of the Securities Act or Rule 145 promulgated under the Securities Act or any successor rules promulgated under the Securities Act and (F) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

"***Registration***" shall mean a registration, including any related Shelf Takedown, effected by preparing and filing a registration statement, Prospectus or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"***Registration Expenses***" shall mean the documented, out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any national securities exchange on which the Ordinary Shares are then listed;

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of outside counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company;

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(F) in an Underwritten Offering or Other Coordinated Offering, reasonable fees and expenses not to exceed $50,000 in the aggregate for each Registration of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders.

A-120

Exhibit 6
Page 1415

Table of Contents

"**Registration Statement**" shall mean any registration statement that covers Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

"**Requesting Holders**" shall have the meaning given in Section 2.1.5.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time.

"**Shelf**" shall mean the Form S-1 Shelf, the Form S-3 Shelf or any Subsequent Shelf Registration Statement, as the case may be.

"**Shelf Registration**" shall mean a registration of securities pursuant to a registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"**Shelf Takedown**" shall mean an Underwritten Shelf Takedown or any proposed transfer or sale using a Registration Statement, including a Piggyback Registration.

"**Sponsor**" shall have the meaning given in the Preamble hereto.

"**Sponsor Member**" shall mean a member of Sponsor who becomes party to this Agreement as a Permitted Transferee of Sponsor.

"**Subscription Agreement**" shall have the meaning given in the Preamble hereto.

"**Subsequent Shelf Registration Statement**" shall have the meaning given in Section 2.1.2.

"**Target**" shall have the meaning given in the Preamble hereto.

"**Target Holders**" shall have the meaning given in the Preamble hereto.

"**Transfer**" shall mean the (a) sale or assignment of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b).

"**Underwriter**" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"**Underwritten Offering**" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

"**Underwritten Shelf Takedown**" shall have the meaning given in Section 2.1.4.

"**Withdrawal Notice**" shall have the meaning given in Section 2.1.6.

A-121

Exhibit 6
Page 1416

**Table of Contents**

## ARTICLE II

## REGISTRATIONS AND OFFERINGS

2.1 <u>Shelf Registration</u>.

      2.1.1 <u>Filing</u>. Within thirty (30) calendar days following the Closing Date, the Company shall submit to or file with the Commission a Registration Statement for a Shelf Registration on Form S-1 (the "***Form S-1 Shelf***") or a Registration Statement for a Shelf Registration on Form S-3 (the "***Form S-3 Shelf***"), if the Company is then eligible to use a Form S-3 Shelf, in each case, covering the resale of all the Registrable Securities (determined as of two (2) business days prior to such submission or filing) on a delayed or continuous basis and shall use its commercially reasonable efforts to have such Shelf declared effective as soon as practicable after the filing thereof, but no later than the earlier of (a) the ninetieth (90th) calendar day following the filing date thereof (or the one hundred and twentieth (120th) calendar day following the filing date thereof if the Commission notifies the Company that it will "review" the Registration Statement) and (b) the tenth (10th) business day after the date the Company is notified in writing by the Commission that the Registration Statement will not be "reviewed" or will not be subject to further review. Such Shelf shall provide for the resale of the Registrable Securities included therein pursuant to any method or combination of methods legally available to, and requested by, any Holder named therein. The Company shall maintain a Shelf in accordance with the terms hereof, and shall prepare and file with the Commission such amendments, including post-effective amendments, and supplements as may be necessary to keep a Shelf continuously effective, available for use to permit the Holders named therein to sell their Registrable Securities included therein and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. In the event the Company files a Form S-1 Shelf, the Company shall use its commercially reasonable efforts to convert the Form S-1 Shelf (and any Subsequent Shelf Registration Statement) to a Form S-3 Shelf as soon as practicable after the Company is eligible to use a Form S-3 Shelf. The Company's obligation under this <u>Section 2.1.1</u>, shall, for the avoidance of doubt, be subject to <u>Section 3.4</u>.

      2.1.2 <u>Subsequent Shelf Registration</u>. If any Shelf ceases to be effective under the Securities Act for any reason at any time while Registrable Securities are still outstanding, the Company shall, subject to <u>Section 3.4</u>, use its commercially reasonable efforts to as promptly as is reasonably practicable cause such Shelf to again become effective under the Securities Act (including using commercially efforts to obtain the prompt withdrawal of any order suspending the effectiveness of such Shelf), and shall use its commercially reasonable efforts to as promptly as is reasonably practicable amend such Shelf in a manner reasonably expected to result in the withdrawal of any order suspending the effectiveness of such Shelf or file an additional registration statement as a Shelf Registration (a "***Subsequent Shelf Registration Statement***") registering the resale of all Registrable Securities (determined as of two (2) business days prior to such filing). If a Subsequent Shelf Registration Statement is filed, the Company shall use its commercially reasonable efforts to (i) cause such Subsequent Shelf Registration Statement to become effective under the Securities Act as promptly as is reasonably practicable after the filing thereof (it being agreed that the Subsequent Shelf Registration Statement shall be an automatic shelf registration statement (as defined in Rule 405 promulgated under the Securities Act) if the Company is a well-known seasoned issuer at the time of filing (as defined in Rule 405 promulgated under the Securities Act) at the most recent applicable eligibility determination date) and (ii) keep such Subsequent Shelf Registration Statement continuously effective, available for use to permit the Holders named therein to sell their Registrable Securities included therein and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. Any such Subsequent Shelf Registration Statement shall be on Form S-3 to the extent that the Company is eligible to use such form at the time of filing. Otherwise, such Subsequent Shelf Registration Statement shall be on another appropriate form. The Company's obligation under this <u>Section 2.1.2</u>, shall, for the avoidance of doubt, be subject to <u>Section 3.4</u>.

      2.1.3 <u>Additional Registrable Securities</u>. Subject to <u>Section 3.4</u>, in the event that any Holder holds Registrable Securities that are not registered for resale on a delayed or continuous basis, the Company, upon

A-122

Exhibit 6
Page 1417

Table of Contents

written request of such Holder, shall promptly use its commercially reasonable efforts to cause the resale of such Registrable Securities to be covered by either, at the Company's option, any then available Shelf (including by means of a post-effective amendment) or by filing a Subsequent Shelf Registration Statement and cause the same to become effective as soon as practicable after such filing and such Shelf or Subsequent Shelf Registration Statement shall be subject to the terms hereof; provided, however, that the Company shall only be required to cause such additional Registrable Securities to be so covered twice per calendar year for each of the Sponsor and the Target Holders.

2.1.4 Requests for Underwritten Shelf Takedowns. Subject to Section 3.4, at any time and from time to time when an effective Shelf is on file with the Commission, the Sponsor, or a majority-in-interest of the Target Holder (any of the Sponsor or a Target Holder being in such case, a "**Demanding Holder**") may request to sell all or any portion of its Registrable Securities in an Underwritten Offering that is registered pursuant to the Shelf (each, an "**Underwritten Shelf Takedown**"); provided that the Company shall only be obligated to effect an Underwritten Shelf Takedown if such offering shall include Registrable Securities proposed to be sold by the Demanding Holder, either individually or together with other Demanding Holders, with a total offering price of at least $30 million in the aggregate (the "**Minimum Takedown Threshold**"). All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company, which shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown. Subject to Section 2.4.4, the Company shall have the right to select the Underwriters for such offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the initial Demanding Holder's prior approval (which shall not be unreasonably withheld, conditioned or delayed). The Sponsor may demand not more than two (2) Underwritten Shelf Takedown and the Target Holders may not demand more than three (3) Underwritten Shelf Takedowns, in each case, pursuant to this Section 2.1.4 in any twelve (12) month period. Notwithstanding anything to the contrary in this Agreement, the Company may effect any Underwritten Offering pursuant to any then effective Registration Statement, including a Form S-3, that is then available for such offering.

2.1.5 Reduction of Underwritten Offering. If the managing Underwriter or Underwriters in an Underwritten Shelf Takedown, advises the Company, the Demanding Holders and the Holders requesting piggy back rights pursuant to this Agreement with respect to such Underwritten Shelf Takedown (the "**Requesting Holders**") (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other Ordinary Shares or other equity securities that the Company desires to sell and all other Ordinary Shares or other equity securities, if any, that have been requested to be sold in such Underwritten Offering pursuant to separate written contractual piggy-back registration rights held by any other stockholders, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "**Maximum Number of Securities**"), then the Company shall include in such Underwritten Offering, before including any Ordinary Shares or other equity securities proposed to be sold by Company or by other holders of Ordinary Shares or other equity securities, the Registrable Securities of (i) first, the Demanding Holders that can be sold without exceeding the Maximum Number of Securities (pro rata based on the respective number of Registrable Securities that each Demanding Holder has requested be included in such Underwritten Shelf Takedown and the aggregate number of Registrable Securities that all of the Demanding Holders have requested be included in such Underwritten Shelf Takedown) and (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Requesting Holders (if any) (pro rata based on the respective number of Registrable Securities that each Requesting Holder (if any) has requested be included in such Underwritten Shelf Takedown and the aggregate number of Registrable Securities that all of the Requesting Holders have requested be included in such Underwritten Shelf Takedown) that can be sold without exceeding the Maximum Number of Securities.

2.1.6 Withdrawal. Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used for marketing such Underwritten Shelf Takedown, a majority-in-interest of the Demanding

Exhibit 6
Page 1418

Table of Contents

Holders initiating an Underwritten Shelf Takedown shall have the right to withdraw from such Underwritten Shelf Takedown for any or no reason whatsoever upon written notification (a "**Withdrawal Notice**") to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Underwritten Shelf Takedown; provided that the Sponsor or a Target Holder may elect to have the Company continue an Underwritten Shelf Takedown if the Minimum Takedown Threshold would still be satisfied by the Registrable Securities proposed to be sold in the Underwritten Shelf Takedown by the Sponsor or the Target Holders or any of their respective Permitted Transferees, as applicable. If withdrawn, a demand for an Underwritten Shelf Takedown shall constitute a demand for an Underwritten Shelf Takedown by the withdrawing Demanding Holder for purposes of Section 2.1.4, unless either (i) such Demanding Holder has not previously withdrawn any Underwritten Shelf Takedown or (ii) such Demanding Holder reimburses the Company for all Registration Expenses with respect to such Underwritten Shelf Takedown (or, if there is more than one Demanding Holder, a pro rata portion of such Registration Expenses based on the respective number of Registrable Securities that each Demanding Holder has requested be included in such Underwritten Shelf Takedown); provided that, if the Sponsor or a Target Holder elects to continue an Underwritten Shelf Takedown pursuant to the proviso in the immediately preceding sentence, such Underwritten Shelf Takedown shall instead count as an Underwritten Shelf Takedown demanded by the Sponsor or such Target Holder, as applicable, for purposes of Section 2.1.4. Following the receipt of any Withdrawal Notice, the Company shall promptly forward such Withdrawal Notice to any other Holders that had elected to participate in such Shelf Takedown. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Shelf Takedown prior to its withdrawal under this Section 2.1.6, other than if a Demanding Holder elects to pay such Registration Expenses pursuant to clause (ii) of the second sentence of this Section 2.1.6.

2.2 Piggyback Registration.

2.2.1 Piggyback Rights. Subject to Section 2.4.3, if the Company or any Holder proposes to conduct a registered offering of, or if the Company proposes to file a Registration Statement under the Securities Act with respect to the Registration of, equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company including, without limitation, an Underwritten Shelf Takedown pursuant to Section 2.1), other than a Registration Statement (or any registered offering with respect thereto) (i) filed in connection with any employee stock option or other benefit plan, (ii) pursuant to a Registration Statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), (iii) for an offering of debt that is convertible into equity securities of the Company, (iv) for a dividend reinvestment plan, (v) a Block Trade or (vi) an Other Coordinated Offering, then the Company shall give written notice of such proposed offering to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement or, in the case of an Underwritten Offering pursuant to a Shelf Registration, the applicable "red herring" prospectus or prospectus supplement used for marketing such offering, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to include in such registered offering such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such registered offering, a "**Piggyback Registration**"). The rights provided under this Section 2.2.1 shall not be available to any Holder at such time as there is an effective Shelf available for the resale of the Registrable Securities pursuant to Section 2.1. Subject to Section 2.2.2, the Company shall, in good faith, cause such Registrable Securities to be included in such Piggyback Registration and, if applicable, shall use its commercially reasonable efforts to cause the managing Underwriter or Underwriters of such Piggyback Registration to permit the Registrable Securities requested by the Holders pursuant to this Section 2.2.1 to be included therein on the same terms and conditions as any similar securities of the Company included in such registered offering and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. The inclusion of any Holder's Registrable Securities in a

A-124

Exhibit 6
Page 1419

Table of Contents

Piggyback Registration shall be subject to such Holder's agreement to enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering.

2.2.2 <u>Reduction of Piggyback Registration</u>. If the managing Underwriter or Underwriters in an Underwritten Offering that is to be a Piggyback Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of Ordinary Shares or other equity securities that the Company desires to sell, taken together with (i) Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder, (ii) the Registrable Securities as to which registration has been requested pursuant to <u>Section 2.2</u> hereof, and (iii) Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, exceeds the Maximum Number of Securities, then:

(a) if the Registration or registered offering is undertaken for the Company's account, the Company shall include in any such Registration or registered offering (A) first, Ordinary Shares or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to <u>Section 2.2.1</u>, pro rata, based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering, which can be sold without exceeding the Maximum Number of Securities; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, which can be sold without exceeding the Maximum Number of Securities;

(b) if the Registration or registered offering is pursuant to a demand by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration or registered offering (A) first, the Ordinary Shares or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to <u>Section 2.2.1</u>, pro rata, based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering, which can be sold without exceeding the Maximum Number of Securities; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Ordinary Shares or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, which can be sold without exceeding the Maximum Number of Securities; and

(c) if the Registration or registered offering and Underwritten Shelf Takedown is pursuant to a request by Holder(s) of Registrable Securities pursuant to <u>Section 2.1</u> hereof, then the Company shall include in any such Registration or registered offering securities in the priority set forth in <u>Section 2.1.5</u>.

2.2.3 <u>Piggyback Registration Withdrawal</u>. Any Holder of Registrable Securities (other than a Demanding Holder, whose right to withdraw from an Underwritten Shelf Takedown, and related obligations,

A-125

Exhibit 6
Page 1420

**Table of Contents**

shall be governed by Section 2.1.6) shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration or, in the case of a Piggyback Registration pursuant to a Shelf Registration, the filing of the applicable "red herring" prospectus or prospectus supplement with respect to such Piggyback Registration used for marketing such transaction. The Company (whether on its own good faith determination or as the result of a request for withdrawal by persons or entities pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration (which, in no circumstance, shall include a Shelf) at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement (other than Section 2.1.6), the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this Section 2.2.3.

2.2.4 Unlimited Piggyback Registration Rights. For purposes of clarity, subject to Section 2.1.6, any Piggyback Registration effected pursuant to Section 2.2 hereof shall not be counted as a demand for an Underwritten Shelf Takedown under Section 2.1.4 hereof.

2.3 Market Stand-off. In connection with any Underwritten Offering of equity securities of the Company (other than a Block Trade or Other Coordinated Offering), if requested by the managing Underwriters, each Holder agrees that it shall not Transfer any Ordinary Shares or other equity securities of the Company (other than those included in such offering pursuant to this Agreement), without the prior written consent of the Company, during the ninety (90)-day period (or such shorter time agreed to by the managing Underwriters) beginning on the date of pricing of such offering, except as expressly permitted by such lock-up agreement or in the event the managing Underwriters otherwise agree by written consent. Each such Holder agrees to execute a customary lock-up agreement in favor of the Underwriters to such effect (in each case on substantially the same terms and conditions as all such Holders).

2.4 Block Trades; Other Coordinated Offerings.

2.4.1 Notwithstanding any other provision of this Article II, but subject to Section 3.4, at any time and from time to time when an effective Shelf is on file with the Commission, if a Demanding Holder wishes to engage in (a) an underwritten registered offering not involving a "roadshow," an offer commonly known as a "block trade" (a "**Block Trade**"), or (b) an "at the market" or similar registered offering through a broker, sales agent or distribution agent, whether as agent or principal (an "**Other Coordinated Offering**"), in each case, (x) with a total offering price of at least $30 million in the aggregate or (y) with respect to all remaining Registrable Securities held by the Demanding Holder, then such Demanding Holder only needs to notify the Company of the Block Trade or Other Coordinated Offering at least five (5) business days prior to the day such offering is to commence and the Company shall use its commercially reasonable efforts to facilitate such Block Trade or Other Coordinated Offering; provided that the Demanding Holders representing a majority of the Registrable Securities wishing to engage in the Block Trade or Other Coordinated Offering shall use commercially reasonable efforts to work with the Company and any Underwriters, brokers, sales agents or placement agents prior to making such request in order to facilitate preparation of the registration statement, prospectus and other offering documentation related to the Block Trade or Other Coordinated Offering.

2.4.2 Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used in connection with a Block Trade or Other Coordinated Offering, a majority-in-interest of the Demanding Holders initiating such Block Trade or Other Coordinated Offering shall have the right to submit a Withdrawal Notice to the Company, the Underwriter or Underwriters (if any) and any brokers, sales agents or placement agents (if any) of their intention to withdraw from such Block Trade or Other Coordinated Offering. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Block Trade or Other Coordinated Offering prior to its withdrawal under this Section 2.4.2.

A-126

Exhibit 6
Page 1421

**Table of Contents**

2.4.3 Notwithstanding anything to the contrary in this Agreement, Section 2.2 shall not apply to a Block Trade or Other Coordinated Offering initiated by a Demanding Holder pursuant to this Agreement.

2.4.4 The Demanding Holder in a Block Trade or Other Coordinated Offering shall have the right to select the Underwriters and any brokers, sales agents or placement agents (if any) for such Block Trade or Other Coordinated Offering (in each case, which shall consist of one or more reputable nationally recognized investment banks).

2.4.5 A Demanding Holder in the aggregate may demand no more than two (2) Block Trades or Other Coordinated Offerings pursuant to this Section 2.4 in any twelve (12) month period. For the avoidance of doubt, any Block Trade or Other Coordinated Offering effected pursuant to this Section 2.4 shall not be counted as a demand for an Underwritten Shelf Takedown pursuant to Section 2.1.4 hereof.

## ARTICLE III

### COMPANY PROCEDURES

3.1 General Procedures. In connection with any Shelf and/or Shelf Takedown, the Company shall use its commercially reasonable efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall:

3.1.1 prepare and file with the Commission as soon as practicable a Registration Statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or have ceased to be Registrable Securities;

3.1.2 prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be reasonably requested by any Holder that holds at least two and a half percent (2.5%) of the Registrable Securities registered on such Registration Statement or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus or have ceased to be Registrable Securities;

3.1.3 prior to filing a Registration Statement or Prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and the Holders of Registrable Securities included in such Registration, and such Holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the Underwriters and the Holders of Registrable Securities included in such Registration or the legal counsel for any such Holders may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Holders; provided that the Company shall have no obligation to furnish any documents publicly filed or furnished with the Commission pursuant to the Electronic Data Gathering, Analysis and Retrieval System ("*EDGAR*");

3.1.4 prior to any public offering of Registrable Securities, use its commercially reasonable efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as the Holders of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request (or provide evidence

A-127

Exhibit 6
Page 1422

**Table of Contents**

satisfactory to such Holders that the Registrable Securities are exempt from such registration or qualification) and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5 cause all such Registrable Securities to be listed on each national securities exchange on which similar securities issued by the Company are then listed;

3.1.6 provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7 advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8 at least three (3) days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus (or such shorter period of time as may be (a) necessary in order to comply with the Securities Act, the Exchange Act, and the rules and regulations promulgated under the Securities Act or Exchange Act, as applicable or (b) advisable in order to reduce the number of days that sales are suspended pursuant to Section 3.4), furnish a copy thereof to each seller of such Registrable Securities or its counsel (excluding any exhibits thereto and any filing made under the Exchange Act that is to be incorporated by reference therein);

3.1.9 notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4;

3.1.10 in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering, or sale by a broker, placement agent or sales agent pursuant to such Registration permit a representative of the Holders, the Underwriters or other financial institutions facilitating such Underwritten Offering, Block Trade, Other Coordinated Offering or other sale pursuant to such Registration, if any, and any attorney, consultant or accountant retained by such Holders or Underwriter to participate, at each such person's or entity's own expense, in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, financial institution, attorney, consultant or accountant in connection with the Registration; provided, however, that such representatives, Underwriters or financial institutions agree to confidentiality arrangements in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information;

3.1.11 obtain a "comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration (subject to such broker, placement agent or sales agent providing such certification or representation reasonably requested by the Company's independent registered public accountants and the Company's counsel) in customary form and covering such matters of the type customarily covered by "comfort" letters as the managing Underwriter may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

A-128

Exhibit 6
Page 1423

**Table of Contents**

3.1.12 in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration, on the date the Registrable Securities are delivered for sale pursuant to such Registration obtain an opinion, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the participating Holders, the broker, placement agents or sales agent, if any, and the Underwriters, if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the participating Holders, broker, placement agent, sales agent or Underwriter may reasonably request and as are customarily included in such opinions and negative assurance letters;

3.1.13 in the event of any Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration, enter into and perform its obligations under an underwriting or other purchase or sales agreement, in usual and customary form, with the managing Underwriter or the broker, placement agent or sales agent of such offering or sale;

3.1.14 make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any successor rule then in effect);

3.1.15 with respect to an Underwritten Offering pursuant to Section 2.1.4, use its commercially reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter in such Underwritten Offering; and

3.1.16 otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the participating Holders, consistent with the terms of this Agreement, in connection with such Registration.

Notwithstanding the foregoing, the Company shall not be required to provide any documents or information to an Underwriter, broker, sales agent or placement agent if such Underwriter, broker, sales agent or placement agent has not then been named with respect to the applicable Underwritten Offering or other offering involving a registration as an Underwriter, broker, sales agent or placement agent, as applicable.

3.2 Registration Expenses. The Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders.

3.3 Requirements for Participation in Registration Statement in Offerings. Notwithstanding anything in this Agreement to the contrary, if any Holder does not provide the Company with its requested Holder Information, the Company may exclude such Holder's Registrable Securities from the applicable Registration Statement or Prospectus if the Company determines, based on the advice of counsel, that it is necessary or advisable to include such information in the applicable Registration Statement or Prospectus and such Holder continues thereafter to withhold such information. In addition, no person or entity may participate in any Underwritten Offering or other offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person or entity (i) agrees to sell such person's or entity's securities on the basis provided in any underwriting, sales, distribution or placement arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting or other agreements and other customary documents as may be reasonably required under the terms of such underwriting, sales, distribution or placement arrangements. For the avoidance of doubt, the exclusion of a Holder's Registrable Securities as a result of this Section 3.3 shall not affect the registration of the other Registrable Securities to be included in such Registration.

A-129

Exhibit 6
Page 1424

Table of Contents

3.4 <u>Suspension of Sales; Adverse Disclosure; Restrictions on Registration Rights</u>.

3.4.1 Upon receipt of written notice from the Company that: (a) a Registration Statement or Prospectus contains a Misstatement; (b) any request by the Commission for any amendment or supplement to any Registration Statement or Prospectus or for additional information or of the occurrence of an event requiring the preparation of a supplement or amendment to such Prospectus so that, as thereafter delivered to the purchasers of the securities covered by such Registration Statement or Prospectus, such Registration Statement or Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; or (c) upon any suspension by the Company, pursuant to a written insider trading compliance program adopted by the Board, of the ability of all "insiders" covered by such program to transact in the Company's securities because of the existence of material non-public information, each of the Holders shall forthwith discontinue disposition of Registrable Securities pursuant to such Registration Statement covering such Registrable Securities until (x) in the case of (a) or (b), it has received copies of a supplemented or amended Prospectus (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as reasonably practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed, or (y) in the case of (c), until the restriction on the ability of "insiders" to transact in the Company's securities is removed, and, if so directed by the Company, each such Holder will deliver to the Company all copies, other than permanent file copies then in such Holder's possession, of the most recent Prospectus covering such Registrable Securities at the time of receipt of such notice.

3.4.2 Subject to <u>Section 3.4.4</u>, if the submission, filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would (a) require the Company to make an Adverse Disclosure, (b) require the Company to update the financial statements included in the Registration Statement in order to comply with Regulation S-X age of financial statement requirements, (c) require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, or (d) in the good faith judgment of the majority of the Board such Registration, be detrimental to the Company and the majority of the Board concludes as a result that it is advisable to defer such submission, filing, initial effectiveness or continued use at such time, the Company may, upon giving prompt written notice of such action to the Holders (which notice shall not specify the nature of the event giving rise to such delay or suspension), delay the submission, filing or initial effectiveness of, or suspend use of, such Registration Statement for the shortest period of time determined in good faith by the Company to be necessary for such purpose notwithstanding the requirements of any other provision contained herein, including, without limitation, <u>Section 2.1</u>. In the event the Company exercises its rights under this <u>Section 3.4.2</u>, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities until such Holder receives written notice from the Company that such sales or offers of Registrable Securities may be resumed, and in each case maintain the confidentiality of such notice and its contents.

3.4.3 Subject to <u>Section 3.4.4</u>, (a) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending on a date one hundred and twenty (120) days after the effective date of, a Company-initiated Registration and provided that the Company continues to actively employ, in good faith, all commercially reasonable efforts to maintain the effectiveness of the applicable Shelf Registration Statement, or (b) if, pursuant to <u>Section 2.1.4</u>, Holders have requested an Underwritten Shelf Takedown and the Company and Holders are unable to obtain the commitment of underwriters to firmly underwrite such offering, the Company may, upon giving prompt written notice of such action to the Holders, delay any other registered offering pursuant to <u>Section 2.1.4</u> or <u>2.4</u>.

3.4.4 The right to delay or suspend any submission, filing, initial effectiveness or continued use of a Registration Statement pursuant to clause (a) or (d) of <u>Section 3.4.2</u> or a registered offering pursuant to <u>Section 3.4.3</u> shall be exercised by the Company, in the aggregate, for not more than one hundred and twenty (120) consecutive calendar days or more than one hundred and twenty (120) total calendar days in each case, during any twelve (12)-month period.

A-130

Exhibit 6
Page 1425

Table of Contents

3.5 Reporting Obligations. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be a reporting company under the Exchange Act, covenants to file timely (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Sections 13(a) or 15(d) of the Exchange Act and to promptly furnish the Holders with true and complete copies of all such filings; provided that any documents publicly filed or furnished with the Commission pursuant to EDGAR shall be deemed to have been furnished or delivered to the Holders pursuant to this Section 3.5. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of Ordinary Shares held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act (or any successor rule then in effect). Upon the request of any Holder, the Company shall deliver to such Holder a written certification of a duly authorized officer as to whether it has complied with such requirements.

<div align="center">

**ARTICLE IV**

**INDEMNIFICATION AND CONTRIBUTION**

</div>

4.1 Indemnification.

4.1.1 The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers, directors and agents and each person or entity who controls such Holder (within the meaning of the Securities Act), against all losses, claims, damages, liabilities and out-of-pocket expenses (including, without limitation, reasonable and documented outside attorneys' fees) resulting from any untrue or alleged untrue statement of material fact contained in or incorporated by reference in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information or affidavit so furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person or entity who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

4.1.2 In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish (or cause to be furnished) to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus (the "***Holder Information***") and, to the extent permitted by law, shall indemnify the Company, its directors, officers and agents and each person or entity who controls the Company (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and out-of-pocket expenses (including, without limitation, reasonable and documented outside attorneys' fees) resulting from any untrue or alleged untrue statement of material fact contained or incorporated by reference in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement is contained in (or not contained in, in the case of an omission) any information or affidavit so furnished in writing by or on behalf of such Holder expressly for use therein; provided, however, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder of Registrable Securities shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement. The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person or entity who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company.

<div align="center">

A-131

</div>

Exhibit 6
Page 1426

Table of Contents

4.1.3 Any person or entity entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's or entity's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement includes a statement or admission of fault and culpability on the part of such indemnified party or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4 The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person or entity of such indemnified party and shall survive the transfer of securities. The Company and each Holder of Registrable Securities participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

4.1.5 If the indemnification provided under Section 4.1 from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and out-of-pocket expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and out-of-pocket expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by (or not made by, in the case of an omission), or relates to information supplied by (or not supplied by in the case of an omission), such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this Section 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or out-of-pocket expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4.1.5 were determined by pro rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this Section 4.1.5. No person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 4.1.5 from any person or entity who was not guilty of such fraudulent misrepresentation.

A-132

Exhibit 6
Page 1427

**Table of Contents**

## ARTICLE V

### LOCK-UP

5.1 <u>Lock-Up</u>. Subject to <u>Section 5.2</u> and <u>Section 5.3</u>, each Lock-up Party agrees that it shall not Transfer any Lock-up Shares prior to the end of, in respect of such Lock-up Party, the applicable Lock-up Period (the "***Lock-up***").

5.2 <u>Permitted Transferees</u>. Notwithstanding the provisions set forth in <u>Section 5.1</u>, each Lock-up Party may Transfer the Lock-up Shares during the Lock-up Period (a) to (i) the Company's officers or directors, (ii) any affiliates or family members of the Company's officers or directors, (iii) if the undersigned is a corporation, partnership (whether general, limited or otherwise), limited liability company, trust or other business entity, (i) transfers to another corporation, partnership, limited liability company, trust, syndicate, association or other business entity that controls, is controlled by or is under common control or management with the undersigned, and (ii) distributions of Ordinary Shares to its partners, limited liability company members, equity holders or shareholders of the undersigned; , or (iv) any other Lock-up Party or any direct partners, members or equity holders of such other Lock-up Party, any affiliates of such other Lock-up Party or any related investment funds or vehicles controlled or managed by such persons or entities or their respective affiliates, (b) in the case of an individual, by gift to a member of the individual's immediate family or to a trust, the beneficiary of which is a member of the individual's immediate family or an affiliate of such person or entity, or to a charitable organization, (c) in the case of an individual, by virtue of laws of descent and distribution upon death of the individual, (d) in the case of an individual, pursuant to a qualified domestic relations order, (e) in the case of a trust, by distribution to one or more of the permissible beneficiaries of such trust, (f) to the partners, members or equity holders of such Lock-up Party by virtue of the Lock-up Party's organizational documents, as amended, upon dissolution of the Lock-up Party, (g) bona fide pledges of Ordinary Shares as security or collateral in connection with any bona fide borrowing or incurrence of any indebtedness by any Holder or any member of its group; provided, that any Holder who is subject to any pre-clearance and trading policies of the Company must also comply with any additional restrictions on the pledging of Ordinary Shares imposed on such Holder by the Company's policies, (h) to the Company, or (i) in connection with a liquidation, merger, stock exchange, reorganization, tender offer approved by the Board or a duly authorized committee thereof or other similar transaction which results in all of the Company's stockholders having the right to exchange their Ordinary Shares for cash, securities or other property subsequent to the Closing Date. The parties acknowledge and agree that any Permitted Transferee of a Lock-up Party shall be subject to the transfer restrictions set forth in this <u>ARTICLE V</u> with respect to the Lock-Up Shares upon and after acquiring such Lock-Up Shares.

## ARTICLE VI

### MISCELLANEOUS

6.1 <u>SPAC Board Appointment Right.</u> Subject to and in accordance with Section 9.9 of the Business Combination Agreement, each of the parties hereby agrees that the Sponsor shall be entitled to the director nomination rights set forth in Section 9.9(b)(i) of the Business Combination Agreement.

6.2 <u>Indemnification and Insurance.</u> The Company hereby agrees that its insurance and indemnification obligations contained in Section 7.8 of the Business Combination Agreement shall apply *mutatis mutandis* to any directors appointed to the Board in accordance with <u>Section 6.1</u>.

6.3 <u>Notices</u>. Any notice or communication under this Agreement must be in writing and given by (i) recorded mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, or electronic mail. Each notice or communication that is mailed, delivered, or transmitted in the

A-133

Exhibit 6
Page 1428

**Table of Contents**

manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery or electronic mail, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed, if to the Company, to: 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT, Attention: Dr. Andrew Rickman or by email: andrew.rickman@rockleyphotonics.com, and, if to any Holder, at such Holder's address, electronic mail address as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this Section 6.3.

6.4 Assignment; No Third Party Beneficiaries.

6.4.1 This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company in whole or in part.

6.4.2 Subject to Section 6.4.4 and Section 6.4.5, this Agreement and the rights, duties and obligations of a Holder hereunder may be assigned in whole or in part to such Holder's Permitted Transferees to which it transfers Registrable Securities; provided that with respect to the Sponsor and the Target Holders, the rights hereunder that are personal to such Holders may not be assigned or delegated in whole or in part, except that the Sponsor shall be permitted to transfer its rights hereunder to one or more affiliates or any direct or indirect partners, members or equity holders of the Sponsor (including Sponsor Members), which, for the avoidance of doubt, shall include a transfer of its rights in connection with a distribution of any Registrable Securities held by Sponsor to Sponsor Members (it being understood that no such transfer shall reduce or multiply any rights of the Sponsor or such transferees).

6.4.3 This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties and its successors and the permitted assigns of the Holders, which shall include Permitted Transferees.

6.4.4 This Agreement shall not confer any rights or benefits on any persons or entities that are not parties hereto, other than as expressly set forth in this Agreement and Section 6.4.

6.4.5 No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in Section 6.3 hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement, including the joinder in the form of Exhibit A attached hereto). Any transfer or assignment made other than as provided in this Section 6.4 shall be null and void.

6.5 Counterparts. This Agreement may be executed in multiple counterparts (including PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

6.6 Governing Law; Venue. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT (1) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK AND (2) THE VENUE FOR ANY ACTION TAKEN WITH RESPECT TO THIS AGREEMENT SHALL BE EXCLUSIVELY IN THE SUPREME COURT OF THE STATE OF NEW YORK, NEW YORK COUNTY, AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF NEW YORK, NEW YORK COUNTY, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

A-134

Exhibit 6
Page 1429

Table of Contents

6.7 <u>Trial by Jury</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

6.8 <u>Amendments and Modifications</u>. Upon the written consent of (a) the Company and (b) the Holders of a majority of the total Registrable Securities in number of Registrable Securities, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, any amendment hereto or waiver hereof shall also require the written consent of the Sponsor for so long as Sponsor and its affiliates and its Permitted Transferees hold, in the aggregate, at least five percent (5%) of the outstanding Ordinary Shares of the Company; provided, further, that notwithstanding the foregoing, any amendment hereto or waiver hereof shall also require the written consent of each Target Holder so long as such Target Holder and its affiliates hold, in the aggregate, at least five percent (5%) of the outstanding Ordinary Shares; and <u>provided</u>, <u>further</u>, that any amendment hereto or waiver hereof that adversely affects one Holder, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party.

6.9 <u>Other Registration Rights</u>. Other than the certain Holders and third-party investor Stockholders who each have registration rights pursuant to (i) their respective Subscription Agreements and (ii) as provided in the Warrant Agreement, dated as of 29 September 2020, between the Company and Continental Stock Transfer & Trust Company, the Company represents and warrants that no person or entity, other than a Holder of Registrable Securities, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration Statement filed by the Company for the sale of securities for its own account or for the account of any other person or entity. The Company hereby agrees and covenants that it will not grant rights to register any Ordinary Shares (or securities convertible into or exchangeable for Ordinary Shares) pursuant to the Securities Act that are more favorable, pari passu or senior to those granted to the Holders hereunder without (a) the prior written consent of the Sponsor for so long as the Sponsor and its affiliates and its Permitted Transferees hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares, and the prior written consent of each other Holder, for so long as such Holder and its affiliates hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares, or (b) granting economically and legally equivalent rights to the Holders hereunder such that the Holders shall receive the benefit of such more favorable or senior terms and/or conditions. Further, the Company represents and warrants that this Agreement supersedes any other registration rights agreement or agreement with similar terms and conditions and in the event of a conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

6.10 <u>Term</u>. This Agreement shall terminate on the earlier of (a) the seventh anniversary of the date of this Agreement or (b) with respect to any Holder, on the date that such Holder no longer holds any Registrable Securities. The provisions of <u>Section 3.5</u> and <u>Article IV</u> shall survive any termination.

6.11 <u>Holder Information</u>. Each Holder agrees, if requested in writing, to represent to the Company the total number of Registrable Securities held by such Holder in order for the Company to make determinations hereunder.

<p style="text-align:center">A-135</p>

Exhibit 6
Page 1430

Table of Contents

6.12 <u>Additional Holders; Joinder</u>. In addition to persons or entities who may become Holders pursuant to <u>Section 6.4</u> hereof, subject to the prior written consent of each Holder (so long as such Holder and its affiliates hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares), the Company may make any person or entity who acquires Ordinary Shares or rights to acquire Ordinary Shares after the date hereof a party to this Agreement (each such person or entity, an "***Additional Holder***") by obtaining an executed joinder to this Agreement from such Additional Holder in the form of Exhibit A attached hereto (a "***Joinder***"). Such Joinder shall specify the rights and obligations of the applicable Additional Holder under this Agreement. Upon the execution and delivery and subject to the terms of a Joinder by such Additional Holder, the Ordinary Shares then owned, or underlying any rights then owned, by such Additional Holder (the "***Additional Holder Ordinary Shares***") shall be Registrable Securities to the extent provided herein and therein and such Additional Holder shall be a Holder under this Agreement with respect to such Additional Holder Ordinary Shares.

6.13 <u>Severability</u>. It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

6.14 <u>Entire Agreement</u>. This Agreement constitutes the full and entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

6.15 <u>Adjustments</u>. If, and as often as, there are any changes in the Registrable Securities by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Registrable Securities as so changed.

<div align="center">

**[SIGNATURE PAGES FOLLOW]**

A-136

</div>

Exhibit 6
Page 1431

Table of Contents

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

**COMPANY:**

ROCKLEY PHOTONICS HOLDINGS LIMITED

By:  _____
Name:
Title:

*[Signature Page to Registration Rights Agreement]*

A-137

Exhibit 6
Page 1432

**Table of Contents**

**SPONSOR:**

SC HEALTH HOLDINGS LIMITED

By: _____

Name:

Title:

*[Signature Page to Registration Rights Agreement]*

A-138

Exhibit 6
Page 1433

Table of Contents

**TARGET:**

ROCKLEY PHOTONICS LIMITED

By:  _____
Name:
Title:

*[Signature Page to Registration Rights Agreement]*

A-139

Exhibit 6
Page 1434

**Table of Contents**

**HOLDERS:**

DR. ANDREW GEORGE RICKMAN

By: _____

   Name:

*[Signature Page to Registration Rights Agreement]*

A-140

Exhibit 6

Page 1435

**Table of Contents**

HENGTONG OPTIC-ELECTRIC INTERNATIONAL CO. LIMITED

By: _____

　　Name:
　　Title:

*[Signature Page to Registration Rights Agreement]*

A-141

Exhibit 6
Page 1436

Table of Contents

MORNINGSIDE TECHNOLOGY VENTURES LTD

By: _____
    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

A-142

Exhibit 6
Page 1437

Table of Contents

MOULTON GOODIES LTD

By: _____

    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

A-143

Exhibit 6
Page 1438

Table of Contents

RICHARD VON TSCHARNER

By: _____
　　　Name: Richard von Tscharner

*[Signature Page to Registration Rights Agreement]*

A-144

Exhibit 6
Page 1439

Table of Contents

AARON ZILKIE

By:   _____
      Name: Aaron Zilkie

*[Signature Page to Registration Rights Agreement]*

A-145

Exhibit 6
Page 1440

Table of Contents

**Schedule 1**

**Target Holders**

Dr. Andrew George Rickman

Hengtong Optic-Electric International Co. Limited

Morningside Technology Ventures Ltd

Moulton Goodies Ltd

Richard von Tscharner

Aaron Zilkie

A-146

Exhibit 6
Page 1441

Table of Contents

**Exhibit A**

**REGISTRATION RIGHTS AGREEMENT JOINDER**

The undersigned is executing and delivering this joinder (this "***Joinder***") pursuant to the Registration Rights Agreement, dated as of                    , 2021 (as the same may hereafter be amended, the "***Registration Rights Agreement***"), among Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability (the "***Company***"), and the other persons or entities named as parties therein. Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Registration Rights Agreement.

By executing and delivering this Joinder to the Company, and upon acceptance hereof by the Company upon the execution of a counterpart hereof, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the Registration Rights Agreement as a Holder of Registrable Securities in the same manner as if the undersigned were an original signatory to the Registration Rights Agreement, and the undersigned's Ordinary Shares shall be included as Registrable Securities under the Registration Rights Agreement to the extent provided therein.

Accordingly, the undersigned has executed and delivered this Joinder as of the      day of                , 20   .

_____
Signature of Stockholder

_____
Print Name of Stockholder
Its:

Address:  _____
____
_____
_____

Agreed and Accepted as of                , 20

**Rockley Photonics Holdings Limited**

By:  _____
Name:
Its:

A-147

Exhibit 6
Page 1442

Table of Contents

**Exhibit D**

Form of Plan of Merger and Director Declaration

(See Attached)

A-148

Exhibit 6
Page 1443

Table of Contents

PLAN OF MERGER

THIS PLAN OF MERGER (the "**Plan of Merger**") is made on [                ], 2021.

BETWEEN

(1)    **Rockley Mergersub Limited**, an exempted company with limited liability incorporated under the laws of the Cayman Islands on March 11, 2021, with its registered office situated at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KY1-1106, Cayman Islands (the "**Merging Company**"); and

(2)    **SC Health Corporation**, an exempted company with limited liability incorporated under the laws of the Cayman Islands on December 10, 2018, with its registered office situated at the offices of Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands (the "**Surviving Company**" and together with the Merging Company, the "**Constituent Companies**").

WHEREAS

(a)    The Surviving Company and the Merging Company have agreed to merge (the "**Merger**") on the terms and conditions contained or referred to in a Business Combination Agreement and Plan of Merger (the "**Agreement**") dated [●] made by and among Rockley Photonics Limited, a company incorporated under the laws of England and Wales ("**Rockley**"), Rockley Photonics Holdings Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("**HoldCo**")), the Merging Company, a wholly owned subsidiary of HoldCo, and the Surviving Company, a copy of which is attached as Appendix I to this Plan of Merger, and under the provisions of Part XVI of the Companies Act (Revised) of the Cayman Islands (the "**Companies Act**").

(b)    This Plan of Merger is made in accordance with section 233 of the Companies Act.

(c)    Terms used in this Plan of Merger and not otherwise defined in this Plan of Merger shall have the meanings given to them under the Agreement.

W I T N E S S E T H

CONSTITUENT COMPANIES

1    The constituent companies to the Merger are the Merging Company and the Surviving Company.

NAME OF THE SURVIVING COMPANY

2    The name of the surviving company is SC Health Corporation (which at the Effective Time shall be renamed Rockley Photonics Cayman Limited).

REGISTERED OFFICE

3    The registered office of the Merging Company is situated at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KY1-1106.

4    The Surviving Company shall have its registered office at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KY1-1106.

AUTHORISED AND ISSUED SHARE CAPITAL

5    Immediately prior to the Effective Time (as defined below), the authorized share capital of the Merging Company shall be US$[50,000] divided into [500,000,000] ordinary shares of [US$0.00001] par value per share, of which [one ordinary share] has been issued as fully paid.

A-149

Exhibit 6
Page 1444

Table of Contents

6    Immediately prior to the Effective Time, each SPAC Class B Ordinary Share issued and outstanding on the register of members of the Surviving Company shall be converted and exchanged for SPAC Class A Ordinary Shares at the Class B Conversion Ratio, so that the authorized share capital of the Surviving Company shall be US$20,100 divided into 180,000,000 SPAC Class A Ordinary Shares of US$0.0001 par value per share (the "**SPAC Class A Ordinary Shares**") of which [•] shall be issued as fully paid and outstanding; 25,000,000 SPAC Class B Ordinary Shares of US$0.00008 par value per share, none of which shall be issued and outstanding; and 1,000,000 preference shares of US$0.0001 per share, none of which shall be issued and outstanding.

7    Simultaneous with the adoption of the Third Amended and Restated Memorandum and Articles of Association of the Surviving Company in the form attached hereto as Appendix II to this Plan of Merger, the authorized share capital of the Surviving Company from the Effective Time shall be US$[50,000] divided into [50,000,000] ordinary shares of [US$0.0001] par value per share.

**EFFECTIVE TIME**

8    The Merger shall take effect following the consummation of the Exchange (as such term is defined in the Agreement) (the "**Effective Time**").

9    At the Effective Time, and in accordance with the terms and conditions of the Agreement:

(a)    each SPAC Class A Ordinary Share (other than any SPAC Class A Ordinary Shares held in treasury by the Surviving Company (if any) (each, an "**Excluded Share**" and, collectively, "**Excluded Shares**")) issued and outstanding immediately prior to the Effective Time shall automatically be exchanged for one HoldCo Ordinary Share, in accordance with Section 233(5) of the Companies Act following a share capital increase realized by HoldCo by virtue of the Merger, to be subscribed for by the contributing holders of SPAC Class A Ordinary Shares (the "**Merger Consideration**"), which HoldCo Ordinary Shares HoldCo shall cause to be issued and delivered in accordance with the Agreement;

(b)    all SPAC Class A Ordinary Shares (other than the Excluded Shares) shall cease to be outstanding, shall be cancelled and shall cease to exist and (A) each certificate formerly representing SPAC Class A Ordinary Shares (other than Excluded Shares) and (B) each entry in the Surviving Company's register of members formerly representing SPAC Class A Ordinary Shares (other than Excluded Shares) issued and outstanding immediately prior to the Effective Time shall thereafter, in case of both (A) and (B), only represent the right to receive Merger Consideration into which such SPAC Class A Ordinary Shares have been exchanged (and contributed-in-kind) pursuant to Section 3.2 of the Agreement and any distribution or dividend pursuant to Section 3.3(c) of the Agreement;

(c)    each Excluded Share shall, by virtue of the Merger and without any further action on the part of the Surviving Company, the Merging Company, HoldCo or Rockley or holder thereof, cease to be outstanding, shall be cancelled without payment of any consideration therefor and shall cease to exist; and

(d)    each ordinary share, par value US$0.00001 per share, of the Merging Company issued and outstanding immediately prior to the Effective Time shall be converted into and exchanged for one (1) validly issued, fully paid and non-assessable ordinary share, par value US$0.0001 per share, of the Surviving Company.

10    At the Effective Time, the ordinary shares of the Surviving Company shall:

(a)    be entitled to one vote per share;

(b)    be entitled to such dividends as the board of directors of the Surviving Company may from time to time declare;

(c)    in the event of a winding-up or dissolution of the Surviving Company, whether voluntary or involuntary or for the purpose of a reorganization or otherwise or upon any distribution of capital, be entitled to the surplus assets; and

A-150

Exhibit 6
Page 1445

**Table of Contents**

(d)        generally be entitled to enjoy all of the rights attaching to ordinary shares;

in each case as set out in the Third Amended and Restated Memorandum and Articles of Association of the Surviving Company in the form attached as Appendix II to this Plan of Merger.

## PROPERTY

11    At the Effective Time, the rights, property of every description including choses in action, and the business, undertaking, goodwill, benefits, immunities and privileges of each of the Constituent Companies shall immediately vest in the Surviving Company which shall be liable for and subject, in the same manner as the Constituent Companies, to all mortgages, charges, or security interests and all contracts, obligations, claims, debts and liabilities of each of the Constituent Companies.

## MEMORANDUM AND ARTICLES OF ASSOCIATION

12    The memorandum and articles of association of the Surviving Company shall be amended and restated and replaced by the Third Amended and Restated Memorandum and Articles of Association in the form attached as Appendix II to this Plan of Merger at the Effective Time.

## DIRECTORS BENEFITS

13    The following directors and officers of the [Merging Company] and the Surviving Company will receive the following benefits consequent upon the Merger:

[●]

## SECURED CREDITORS

14    (a)        The Merging Company has no secured creditors and has granted no fixed or floating security interests that are outstanding as at the date of this Plan of Merger; and

(b)        the Surviving Company has [no secured creditors and has granted no fixed or floating security interests that are outstanding] as at the date of this Plan of Merger.

## DIRECTORS OF THE SURVIVING COMPANY

15    The names and addresses of the directors of the Surviving Company from the Effective Time are as follows:

**NAME**                                                                              **ADDRESS**
[●]                                                                                        [●]

## RIGHT OF TERMINATION

16    At any time prior to the Effective Time, this Plan of Merger may be:

(a)        terminated by the board of directors of either the Surviving Company or the Merging Company; or

(b)        amended by the board of directors of both the Surviving Company and the Merging Company to:

(a)        change the Effective Time provided that such changed date shall not be a date later than the ninetieth day after the date of registration of this Plan of Merger with the Registrar of Companies; and

A-151

Exhibit 6
Page 1446

Table of Contents

(b)     effect any other changes to this Plan of Merger which the directors of both the Surviving Company and the Merging Company deem advisable, provided that such changes do not materially adversely affect any rights of the shareholders of the Surviving Company or the Merging Company, as determined by the directors of both the Surviving Company and the Merging Company, respectively.

**APPROVAL AND AUTHORIZATION**

17     This Plan of Merger has been approved by the board of directors of each of the Surviving Company and the Merging Company pursuant to section 233(3) of the Companies Act.

18     This Plan of Merger has been authorised by the shareholders of each of the Surviving Company and the Merging Company pursuant to section 233(6) of the Companies Act.

**COUNTERPARTS**

19     This Plan of Merger may be executed by facsimile and in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**GOVERNING LAW**

20     This Plan of Merger shall be governed by and construed in accordance with the laws of the Cayman Islands.

For and on behalf of
**Rockley Mergersub Limited**

_____

[Andrew Rickman]
Director

For and on behalf of
**SC Health Corporation**

_____

[●]
Director

A-152

Exhibit 6
Page 1447

Table of Contents

APPENDIX I

**BUSINESS COMBINATION AGREEMENT AND PLAN OF MERGER**

A-153

Exhibit 6
Page 1448

**Table of Contents**

**APPENDIX II**

**THIRD AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES**

**OF ASSOCIATION**

**OF SC HEALTH CORPORATION**

**(THE SURVIVING COMPANY)**

A-154

Exhibit 6
Page 1449

Table of Contents

IN THE MATTER OF

THE COMPANIES ACT (AS AMENDED)

AND

IN THE MATTER OF

ROCKLEY MERGERSUB LIMITED

AFFIDAVIT

I, **[Andrew Rickman]**, of [●], **MAKE OATH AND SAY** as follows:

1    I am the sole director of **ROCKLEY MERGERSUB LIMITED** (the "**Merging Company**"), a company incorporated in the Cayman Islands whose registered office is located at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KY1-1106, Cayman Islands;

2    the other party to the proposed merger is **SC HEALTH CORPORATION** (the "**Surviving Company**" and, together with the Merging Company, the "**Constituent Companies**"), a company incorporated in the Cayman Islands whose registered office is located at the offices of Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands;

3    the Merging Company is able to pay its debts as they fall due;

4    the merger between the Constituent Companies is *bona fide* and not intended to defraud unsecured creditors of the Merging Company;

5    no petition or other similar proceeding has been filed and remains outstanding, and no order has been made or resolution adopted to wind-up the Merging Company in any jurisdiction;

6    no receiver, trustee, administrator or other similar person has been appointed in any jurisdiction and is acting in respect of the Merging Company, its affairs, its property or any part thereof; and

7    no scheme, order, compromise or other similar arrangement has been entered into or made in any jurisdiction whereby the rights of creditors of the Merging Company are, and continue to be, suspended or restricted;

8    the assets and liabilities of the Merging Company made up to the latest practicable date before the making of this declaration are as set out in Exhibit 1 to this declaration;

9    the Merging Company has held no fiduciary office prior to the merger;

10   I undertake to ensure that the certificate of merger will be given to the shareholders and creditors of the Merging Company and published in the Gazette; and

11   there are no requirements under the regulatory laws applicable to this merger.

**SWORN** before me at                                          )
                                                               )
on [    ]                , 2021                                 )
                                                               )
                                                               )
                                                               )
                                                               )    **[Andrew Rickman]**
                                                               )    Director

NOTARY PUBLIC

A-155

Exhibit 6
Page 1450

**Table of Contents**

**EXHIBIT 1**

As at [    ]                    , 2021, the Merging Company (ROCKLEY MERGERSUB LIMITED) has the following assets and liabilities:

**Assets**

**Liabilities**

A-156

Exhibit 6
Page 1451

Table of Contents

IN THE MATTER OF

THE COMPANIES ACT (AS AMENDED)

AND

IN THE MATTER OF

SC HEALTH CORPORATION

AFFIDAVIT

I, **[●]**, of **[●]**, **MAKE OATH AND SAY** as follows:

1   I am a director of **SC HEALTH CORPORATION** (the "**Surviving Company**", a company incorporated in the Cayman Islands whose registered office is located at the offices of Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands;

2   The other party to the proposed merger is **ROCKLEY MERGERSUB LIMITED** (the "**Merging Company**" and, together with the Surviving Company, the "**Constituent Companies**"), a company incorporated in the Cayman Islands whose registered office is located at the offices of International Corporation Services Ltd., PO Box 472, 2nd Floor, Harbour Place, 103 South Church Street, George Town, Grand Cayman KY1-1106, Cayman Islands;

3   the Surviving Company is and will be immediately after merger able to pay its debts as they fall due;

4   the merger between the Constituent Companies is *bona fide* and not intended to defraud unsecured creditors of the Surviving Company;

5   no petition or other similar proceeding has been filed and remains outstanding, and no order has been made or resolution adopted to wind-up the Surviving Company in any jurisdiction;

6   no receiver, trustee, administrator or other similar person has been appointed in any jurisdiction and is acting in respect of the Surviving Company, its affairs, its property or any part thereof; and

7   no scheme, order, compromise or other similar arrangement has been entered into or made in any jurisdiction whereby the rights of creditors of the Surviving Company are, and continue to be, suspended or restricted;

8   the assets and liabilities of the Surviving Company made up to the latest practicable date before the making of this declaration are as set out in Exhibit 1 to this declaration;

9   I undertake to ensure that the certificate of merger will be given to the shareholders and creditors of the Surviving Company and published in the Gazette; and

10  there are no requirements under the regulatory laws applicable to this merger.

**SWORN** before me at                     )
                                           )
on                , 2021                   )
                                           )
                                           )
                                           )
                                           )    _____
                                           )    **[●]**
                                           )    Director

_____
NOTARY PUBLIC

A-157

Exhibit 6
Page 1452

**Table of Contents**

**EXHIBIT 1**

As at **[●]**, 2021, the Surviving Company (SC Health Corporation) had the following assets and liabilities:

**Assets**

**Liabilities**

A-158

Exhibit 6
Page 1453

**Table of Contents**

**Exhibit E**

Form of Incentive Equity Plan

(See Attached)

A-159

Exhibit 6
Page 1454

**Table of Contents**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 STOCK INCENTIVE PLAN**

(Adopted by the Board of Directors on            , 2021)

(Approved by the Shareholders on            , 2021)

Effective Date:            , 2021

A-160

Exhibit 6
Page 1455

**Table of Contents**

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **SECTION 1.** | **ESTABLISHMENT AND PURPOSE** |  | **A-165** |
| **SECTION 2.** | **DEFINITIONS** |  | **A-165** |
| (a) | "2013 Plan" |  | A-165 |
| (b) | "Affiliate" |  | A-165 |
| (c) | "Award" |  | A-165 |
| (d) | "Award Agreement" |  | A-165 |
| (e) | "Board of Directors" or "Board" |  | A-165 |
| (f) | "Cash-Based Award" |  | A-165 |
| (g) | "Change in Control" |  | A-165 |
| (h) | "Code" |  | A-166 |
| (i) | "Committee" |  | A-166 |
| (j) | "Company" |  | A-166 |
| (k) | "Consultant" |  | A-166 |
| (l) | "Disability" |  | A-166 |
| (m) | "Employee" |  | A-166 |
| (n) | "Exchange Act" |  | A-166 |
| (o) | "Exercise Price" |  | A-167 |
| (p) | "Fair Market Value" |  | A-167 |
| (q) | "ISO" |  | A-167 |
| (r) | "Nonstatutory Option" or "NSO" |  | A-167 |
| (s) | "Option" |  | A-167 |
| (t) | "Outside Director" |  | A-167 |
| (u) | "Parent" |  | A-167 |
| (v) | "Participant" |  | A-167 |
| (w) | "Plan" |  | A-167 |
| (x) | "Purchase Price" |  | A-167 |
| (y) | "Restricted Share" |  | A-168 |
| (z) | "Restricted Stock Unit" |  | A-168 |
| (aa) | "Returning Shares" |  | A-168 |
| (bb) | "SAR" |  | A-168 |
| (cc) | "Section 409A" |  | A168 |
| (dd) | "Securities Act" |  | A-168 |
| (ee) | "Service" |  | A-168 |

A-161

Exhibit 6
Page 1456

Table of Contents

| | | Page |
|---|---|---|
| (ff) | "Share" | A-168 |
| (gg) | "Stock" | A-168 |
| (hh) | "Subsidiary" | A-168 |
| **SECTION 3.** | **ADMINISTRATION** | **A-168** |
| (a) | Committee Composition | A-168 |
| (b) | Committee Appointment | A-169 |
| (c) | Committee Responsibilities | A-169 |
| **SECTION 4.** | **ELIGIBILITY** | **A-170** |
| (a) | General Rule | A-170 |
| (b) | Ten-Percent Shareholders | A-170 |
| (c) | Attribution Rules | A-170 |
| (d) | Outstanding Stock | A-170 |
| **SECTION 5.** | **STOCK SUBJECT TO PLAN; DIRECTOR COMPENSATION LIMIT** | **A-170** |
| (a) | Basic Limitation | A-170 |
| (b) | Additional Shares | A-171 |
| (c) | Substitution and Assumption of Awards | A-171 |
| (d) | Outside Director Compensation Limit | A-171 |
| **SECTION 6.** | **RESTRICTED SHARES** | **A-172** |
| (a) | Restricted Share Award Agreement | A-172 |
| (b) | Payment for Awards | A-172 |
| (c) | Vesting | A-172 |
| (d) | Voting and Dividend Rights | A-172 |
| (e) | Restrictions on Transfer of Shares | A-172 |
| **SECTION 7.** | **TERMS AND CONDITIONS OF OPTIONS** | **A-172** |
| (a) | Option Award Agreement | A-172 |
| (b) | Number of Shares | A-172 |
| (c) | Exercise Price | A-172 |
| (d) | Withholding Taxes | A-173 |
| (e) | Exercisability and Term | A-173 |
| (f) | Exercise of Options | A-173 |
| (g) | No Rights as a Shareholder | A-173 |
| (h) | Modification, Extension and Renewal of Options | A-173 |
| (i) | Restrictions on Transfer of Shares | A-173 |
| (j) | Buyout Provisions | A-174 |

A-162

Exhibit 6
Page 1457

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **SECTION 8.** | | **PAYMENT FOR SHARES** | **A-174** |
| | (a) | General Rule | A-174 |
| | (b) | Surrender of Stock | A-174 |
| | (c) | Services Rendered | A-174 |
| | (d) | Cashless Exercise | A-174 |
| | (e) | Exercise/Pledge | A-174 |
| | (f) | Net Exercise | A-174 |
| | (g) | Promissory Note | A-174 |
| | (h) | Other Forms of Payment | A-174 |
| | (i) | Limitations under Applicable Law | A-175 |
| **SECTION 9.** | | **STOCK APPRECIATION RIGHTS** | **A-175** |
| | (a) | SAR Award Agreement | A-175 |
| | (b) | Number of Shares | A-175 |
| | (c) | Exercise Price | A-175 |
| | (d) | Exercisability and Term | A-175 |
| | (e) | Exercise of SARs | A-175 |
| | (f) | Modification, Extension or Assumption of SARs | A-175 |
| | (g) | Buyout Provisions | A-175 |
| **SECTION 10.** | | **RESTRICTED STOCK UNITS** | **A-175** |
| | (a) | Restricted Stock Unit Award Agreement | A-175 |
| | (b) | Payment for Awards | A-176 |
| | (c) | Vesting Conditions | A-176 |
| | (d) | Voting and Dividend Rights | A-176 |
| | (e) | Form and Time of Settlement of Restricted Stock Units | A-176 |
| | (f) | Death of Participant | A-176 |
| | (g) | Creditors' Rights | |
| **SECTION 11.** | | **CASH-BASED AWARDS** | **A-177** |
| **SECTION 12.** | | **ADJUSTMENT OF SHARES** | **A-177** |
| | (a) | Adjustments | A-177 |
| | (b) | Dissolution or Liquidation | A-177 |
| | (c) | Merger or Reorganization | A-177 |
| | (d) | Change in Control | A-178 |
| | (e) | Reservation of Rights | A-178 |
| **SECTION 13.** | | **DEFERRAL OF AWARDS** | **A-179** |

A-163

Exhibit 6
Page 1458

**Table of Contents**

| | | Page |
|---|---|---|
| (a) | Committee Powers | A-179 |
| (b) | General Rules | A-179 |
| **SECTION 14.** | **AWARDS UNDER OTHER PLANS** | **A-179** |
| **SECTION 15.** | **PAYMENT OF DIRECTOR'S FEES IN SECURITIES** | **A-180** |
| (a) | Effective Date | A-180 |
| (b) | Elections to Receive NSOs, SARs, Restricted Shares, or Restricted Stock Units | A-180 |
| (c) | Number and Terms of NSOs, SARs, Restricted Shares or Restricted Stock Units | A-180 |
| **SECTION 16.** | **LEGAL AND REGULATORY REQUIREMENTS** | **A-180** |
| **SECTION 17.** | **TAXES** | **A-180** |
| (a) | Withholding Taxes | A-180 |
| (b) | Share Withholding | A-180 |
| (c) | Section 409A | A-180 |
| **SECTION 18.** | **TRANSFERABILITY** | **A-181** |
| **SECTION 19.** | **PERFORMANCE BASED AWARDS** | **A-181** |
| **SECTION 20.** | **RECOUPMENT OF AWARDS** | **A-181** |
| **SECTION 21.** | **NO EMPLOYMENT RIGHTS** | **A-182** |
| **SECTION 22.** | **DURATION AND AMENDMENTS** | **A-182** |
| (a) | Term of the Plan | A-182 |
| (b) | Right to Amend the Plan | A-182 |
| (c) | Effect of Termination | A-182 |
| **SECTION 23.** | **AWARDS TO NON-U.S. PARTICIPANTS** | **A-182** |
| **SECTION 24.** | **GOVERNING LAW** | **A-183** |
| **SECTION 25.** | **SUCCESSORS AND ASSIGNS** | **A-183** |
| **SECTION 26.** | **EXECUTION** | **A-183** |

A-164

Exhibit 6
Page 1459

**Table of Contents**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 STOCK INCENTIVE PLAN**

**SECTION 1. ESTABLISHMENT AND PURPOSE.**

The Plan was adopted by the Board of Directors on                    , 2020 and is effective on                    , 2020 (the "**Effective Date**"). The Plan's purpose is to enhance the Company's ability to attract, retain, incent, reward, and motivate persons who make (or are expected to make) important contributions to the Company and its Subsidiaries and Affiliates by providing Participants with equity ownership and other incentive opportunities.

**SECTION 2. DEFINITIONS.**

(a) "2013 Plan" means the 2013 Equity Incentive Plan of Rockley Photonics Limited, as amended.

(b) "Affiliate" means any entity other than a Subsidiary, if the Company and/or one or more Subsidiaries own not less than 50% of such entity.

(c) "Award" means any award of an Option, a SAR, a Restricted Share, a Restricted Stock Unit, a Stock-Based Award or a Cash-Based Award under the Plan.

(d) "Award Agreement" means the agreement between the Company and the recipient of an Award which contains the terms, conditions and restrictions pertaining to such Award.

(e) "Board of Directors" or "Board" means the Board of Directors of the Company, as constituted from time to time.

(f) "Cash-Based Award" means an Award that entitles the Participant to receive a cash-denominated payment.

(g) "Change in Control" means the occurrence of any of the following events:

(i)     A change in the composition of the Board occurs, as a result of which fewer than one-half of the incumbent directors are directors who either:

(A)     Had been directors of the Company on the "look-back date" (as defined below) (the "original directors"); or

(B)     Were elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the aggregate of the original directors who were still in office at the time of the election or nomination and the directors whose election or nomination was previously so approved (the "continuing directors");

provided, however, that for this purpose, the "original directors" and "continuing directors" shall not include any individual whose initial assumption of office occurred as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents, by or on behalf of a person other than the Board;

(ii)    Any "person" (as defined below) who by the acquisition or aggregation of securities, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities ordinarily (and apart from rights accruing under special circumstances) having the right to vote at elections of directors (the "Base Capital Stock"); except that any change in the relative beneficial ownership of the Company's securities by any person resulting solely from a reduction in the aggregate number of outstanding Shares of Base

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-165

Exhibit 6
Page 1460

Table of Contents

Capital Stock, and any decrease thereafter in such person's ownership of securities, shall be disregarded until such person increases in any manner, directly or indirectly, such person's beneficial ownership of any securities of the Company;

(iii)    The consummation of a merger or consolidation of the Company or a Subsidiary of the Company with or into another entity or any other corporate reorganization, if persons who were not shareholders of the Company immediately prior to such merger, consolidation or other reorganization own immediately after such merger, consolidation or other reorganization 50% or more of the voting power of the outstanding securities of each of (A) the Company (or its successor) and (B) any direct or indirect parent corporation of the Company (or its successor); or

(iv)    The sale, transfer, or other disposition of all or substantially all of the Company's assets.

For purposes of subsection (g)(i) above, the term "look-back" date means the later of (1) the Effective Date and (2) the date that is 24 months prior to the date of the event that may constitute a Change in Control.

For purposes of subsection (g)(ii) above, the term "person" shall have the same meaning as when used in Sections 13(d) and 14(d) of the Exchange Act, but shall exclude (1) a trustee or other fiduciary holding securities under an employee benefit plan maintained by the Company or a Parent or Subsidiary and (2) a corporation owned directly or indirectly by the shareholders of the Company in substantially the same proportions as their ownership of the Stock.

Any other provision of this Section 2(g) notwithstanding, a transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction, and a Change in Control shall not be deemed to occur if the Company files a registration statement with the United States Securities and Exchange Commission in connection with an initial or secondary public offering of securities or debt of the Company to the public.

(h) "Code" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(i) "Committee" means the Compensation Committee as designated by the Board, which is authorized to administer the Plan, as described in Section  3 hereof.

(j) "Company" means Rockley Photonics Holding Limited, a Cayman Islands exempted company limited by shares, or any successor thereto.

(k) "Consultant" means an individual who is a consultant or advisor and who provides bona fide services to the Company, a Parent, a Subsidiary, or an Affiliate as an independent contractor (not including service as a member of the Board) or a member of the board of directors of a Parent or a Subsidiary, in each case who is not an Employee.

(l) "Disability"(i) means any permanent and total disability as defined by Section 22(e)(3) of the Code.

(m) "Employee" means any individual who is a common-law employee of the Company, a Parent, a Subsidiary, or an Affiliate.

(n) "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-166

Exhibit 6
Page 1461

Table of Contents

(o) "Exercise Price" means, in the case of an Option, the amount for which one Share may be purchased upon exercise of such Option, as specified in the applicable Option Award Agreement. "Exercise Price" means, in the case of a SAR, an amount, as specified in the applicable SAR Award Agreement, which is subtracted from the Fair Market Value of one Share in determining the amount payable upon exercise of such SAR.

(p) "Fair Market Value" with respect to a Share, means the market price of one Share, determined by the Committee as follows:

    (i)    If the Stock was traded over-the-counter on the date in question, then the Fair Market Value shall be equal to the last transaction price quoted for such date by the OTC Bulletin Board or, if not so quoted, shall be equal to the mean between the last reported representative bid and asked prices quoted for such date by the principal automated inter-dealer quotation system on which the Stock is quoted or, if the Stock is not quoted on any such system, by the Pink Quote system;

    (ii)    If the Stock was traded on any established stock exchange (such as the New York Stock Exchange, The Nasdaq Global Market or The Nasdaq Global Select Market) or national market system on the date in question, then the Fair Market Value shall be equal to the closing price reported for such date by the applicable exchange or system; or

    (iii)    If none of the foregoing provisions is applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate.

For any date that is not a trading day, the Fair Market Value of a share of Stock for such date shall be determined under clauses (i) and (ii) above with reference to the immediately preceding trading day. In all cases, the determination of Fair Market Value by the Committee shall be conclusive and binding on all persons and shall be consistent with the rules of Section 409A and Section 422 of the Code to the extent applicable.

(q) "ISO" means an Option intended to be an "incentive stock option" described in Section 422 of the Code. Each Option granted pursuant to the Plan will be treated as providing by its terms that it is to be an NSO unless, as of the date of grant, it is expressly designated as an ISO in the applicable Award Agreement.

(r) "Nonstatutory Option" or "NSO" means an Option that is not an ISO.

(s) "Option" means an option entitling the holder to acquire Shares upon payment of the exercise price.

(t) "Outside Director" means a member of the Board who is not a common-law employee of the Company, a Parent or a Subsidiary.

(u) "Parent" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be a Parent commencing as of such date.

(v) "Participant" means a person who holds an Award.

(w) "Plan" means this 2021 Stock Incentive Plan of Rockley Photonics Limited, as amended from time to time.

(x) "Purchase Price" means the consideration for which one Share may be acquired under the Plan (other than upon exercise of an Option), as specified by the Committee.

<div style="text-align:center">

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-167

</div>

Exhibit 6
Page 1462

Table of Contents

(y) "Restricted Share" means a Share subject to restrictions requiring that it be forfeited, redelivered or offered for sale to the Company if specified performance or other vesting conditions are not satisfied awarded under the Plan.

(z) "Restricted Stock Unit" means a bookkeeping entry representing the Company's obligation to deliver one Share (or distribute cash) measured by the value of a Share on a future date and may be subject to the satisfaction of performance or other vesting conditions.

(aa) "Returning Shares" means Shares subject to outstanding stock awards granted under the 2013 Plan and that following the Effective Date: (A) are subsequently forfeited or terminated for any reason before being exercised or settled; (B) are not issued because such stock award or any portion thereof is settled in cash; (C) are subject to vesting restrictions and are subsequently forfeited; (D) are withheld or reacquired to satisfy the exercise, strike or purchase price; or (E) are withheld or reacquired to satisfy a tax withholding obligation.

(bb) "SAR" means a right entitling the holder upon exercise to receive an amount (payable in cash or in Shares of equivalent value) equal to the excess of the Fair Market Value of the Shares subject to the right over the Exercise Price from which appreciation under the SAR is to be measured.

(cc) "Section 409A" means Section 409A of the Code.

(dd) "Securities Act" means the United States Securities Act of 1933, as amended, the rules and regulations promulgated thereunder.

(ee) "Service" means service as an Employee, Consultant or Outside Director, subject to such further limitations as may be set forth in the Plan or the applicable Award Agreement. Service does not terminate when an Employee goes on a bona fide leave of absence, that was approved by the Company in writing, if the terms of the leave provide for continued Service crediting, or when continued Service crediting is required by applicable law. However, for purposes of determining whether an Option is entitled to ISO status, an Employee's employment will be treated as terminating three months after such Employee went on leave, unless such Employee's right to return to active work is guaranteed by law or by a contract. Service terminates in any event when the approved leave ends, unless such Employee immediately returns to active work. The Company determines which leaves of absence count toward Service, and when Service terminates for all purposes under the Plan.

(ff) "Share" means one Share of Stock, as adjusted in accordance with Section 12 (if applicable).

(gg) "Stock" means the Common Shares of the Company.

(hh) "Stock-Based Award"(ii) means an Award other than an Option, a SAR, a Restricted Share, a Restricted Stock Unit that is convertible into or otherwise based on Stock.

(jj) "Subsidiary" means any corporation, if the Company owns and/or one or more other Subsidiaries own not less than 50% of the total combined voting power of all classes of outstanding stock of such corporation. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date. The determination of whether an entity is a "Subsidiary" shall be made in accordance with Section 424(f) of the code.

## SECTION 3. ADMINISTRATION.

(a) *Committee Composition*. The Plan shall be administered by a Committee appointed by the Board, or by the Board acting as the Committee. The Committee shall consist of two or more directors of the Company. In

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-168

Exhibit 6
Page 1463

Table of Contents

addition, to the extent required by the Board, the composition of the Committee shall satisfy such requirements of the New York Stock Exchange or the Nasdaq Stock Market, as applicable, and as the Securities and Exchange Commission may establish for administrators acting under plans intended to qualify for exemption under Rule 16b-3 (or its successor) under the Exchange Act.

(b) *Committee Appointment*. The Board may also appoint one or more separate committees of the Board, each composed of one or more directors of the Company who need not satisfy the requirements of Section 3(a), who may administer the Plan, grant Awards under the Plan and determine all terms of such grants, in each case with respect to all Employees, Consultants and Outside Directors (except such as may be on such committee), provided that such committee or committees may perform these functions only with respect to Employees who are not considered officers or directors of the Company under Section 16 of the Exchange Act. Within the limitations of the preceding sentence, any reference in the Plan to the Committee shall include such committee or committees appointed pursuant to the preceding sentence. To the extent permitted by applicable laws, the Board or Committee may also authorize one or more officers of the Company to designate Employees, other than officers under Section 16 of the Exchange Act, to receive Awards and/or to determine the number of such Awards to be received by such persons; provided, however, that the Board or Committee shall specify the total number of Awards that such officers may so award.

(c) *Committee Responsibilities*. Subject to the provisions of the Plan, the Committee shall have full authority and discretion to take the following actions:

(i)    To interpret the Plan and to apply its provisions;

(ii)   To adopt, amend, or rescind rules, procedures, and forms relating to the Plan;

(iii)  To adopt, amend, or terminate sub-plans established for the purpose of satisfying applicable foreign laws including qualifying for preferred tax treatment under applicable foreign tax laws;

(iv)   To authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan;

(v)    To determine when Awards are to be granted under the Plan;

(vi)   To select the Participants to whom Awards are to be granted;

(vii)  To determine the type of Award and number of Shares or amount of cash to be made subject to each Award;

(viii) To prescribe the terms and conditions of each Award, including (without limitation) the Exercise Price and Purchase Price, and the vesting or duration of the Award (including accelerating the vesting of Awards, either at the time of the Award or thereafter, without the consent of the Participant), to determine whether an Option is to be classified as an ISO or as an NSO, and to specify the provisions of the agreement relating to such Award;

(ix)   To amend any outstanding Award Agreement, subject to applicable legal restrictions and to the consent of the Participant if the Participant's rights or obligations would be materially impaired;

(x)    To prescribe the consideration for the grant of each Award or other right under the Plan and to determine the sufficiency of such consideration;

(xi)   To determine the disposition of each Award or other right under the Plan in the event of a Participant's divorce or dissolution of marriage;

(xii)  To determine whether Awards under the Plan will be granted in replacement of other grants under an incentive or other compensation plan of an acquired business;

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-169

Exhibit 6
Page 1464

**Table of Contents**

(xiii)  To correct any defect, supply any omission, or reconcile any inconsistency in the Plan or any Award Agreement;

(xiv)  To establish or verify the extent of satisfaction of any performance goals or other conditions applicable to the grant, issuance, exercisability, vesting, and/or ability to retain any Award; and

(xv)  To take any other actions deemed necessary or advisable for the administration of the Plan.

Subject to the requirements of applicable law, the Committee may designate persons other than members of the Committee to carry out its responsibilities and may prescribe such conditions and limitations as it may deem appropriate, except that the Committee may not delegate its authority with regard to the selection for participation of or the granting of Awards under the Plan to persons subject to Section 16 of the Exchange Act. All decisions, interpretations and other actions of the Committee shall be final and binding on all Participants and all persons deriving their rights from a Participant. No member of the Committee shall be liable for any action that the member has taken or has failed to take in good faith with respect to the Plan or any Award under the Plan.

**SECTION 4. ELIGIBILITY.**

(a) *General Rule*. The Committee will select Participants from among Employees, Consultants and Outside Directors. Eligibility for ISOs is limited to individuals described in the first sentence of this Section 4(a) who are employees of the Company or of a "parent corporation" or "subsidiary corporation" of the Company as those terms are defined in Section 424 of the Code. Eligibility for Stock Options, other than ISOs, and SARs is limited to individuals described in the first sentence of this Section 4(a) who are providing direct services on the date of grant of the Award to the Company or to a subsidiary of the Company that would be described in the first sentence of Section 1.409A-1(b)(5)(iii)(E) of the Treasury Regulations.

(b) *Ten-Percent Shareholders*. An Employee who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Company, a Parent or Subsidiary shall not be eligible for the grant of an ISO unless such grant satisfies the requirements of Section 422(c)(5) of the Code.

(c) *Attribution Rules*. For purposes of Section 4(b) above, in determining stock ownership, an Employee shall be deemed to own the stock owned, directly or indirectly, by or for such Employee's brothers, sisters, spouse, ancestors, and lineal descendants. Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be deemed to be owned proportionately by or for its shareholders, partners, or beneficiaries.

(d) *Outstanding Stock*. For purposes of Section 4(b) above, "outstanding stock" shall include all stock actually issued and outstanding immediately after the grant. "Outstanding stock" shall not include Shares authorized for issuance under outstanding options held by the Employee or by any other person.

**SECTION 5. STOCK SUBJECT TO PLAN; DIRECTOR COMPENSATION LIMIT.**

(a) *Basic Limitation*. Shares offered under the Plan shall be authorized but unissued Shares, treasury Shares, or previously issued Shares acquired by the Company. No fractional Shares will be delivered under the Plan. The maximum aggregate number of Shares authorized for issuance as Awards under the Plan shall not exceed the sum of (i) [          ][1]Shares, plus (ii) the number of reserved Shares not issued or subject to outstanding grants remaining available for issuance under the 2013 Plan immediately prior to the Effective Date, plus (iii) the sum

---

[1]     Initial pool to approximate 5% of outstanding shares

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-170

Exhibit 6
Page 1465

Table of Contents

of any Returning Shares which become available from time to time, plus (iv) an annual increase on the first day of each fiscal year for a period of not more than ten (10) years beginning on January 1, 2022, and ending on (and including) January 1, 2031, in an amount equal to (x) four percent (4%) of the outstanding Shares on the last day of the immediately preceding fiscal year or (y) such lesser amount (including zero) that the Committee or Board determines for purposes of the annual increase for that fiscal year. Notwithstanding the foregoing, the number of Shares that may be delivered in the aggregate pursuant to the exercise of ISOs granted under the Plan shall not exceed five (5) times the number of Shares provided under clause (i) above plus, to the extent allowable under Section 422 of the Code, any Shares that become available for issuance under the Plan pursuant to Section 5(b), but nothing in this Section 5 will be construed as requiring that any, or any fixed number of, ISOs be awarded under the Plan. The limitations of this Section 5(a) shall be subject to adjustment pursuant to Section 12. The number of Shares that are subject to Awards outstanding at any time under the Plan shall not exceed the number of Shares which then remain available for issuance under the Plan. The Company shall at all times reserve and keep available sufficient Shares to satisfy the requirements of the Plan.

(b) *Additional Shares*. If Restricted Shares or Shares issued upon the exercise of options are forfeited, then such Shares shall again become available for Awards under the Plan. If Restricted Stock Units, Options, or SARs are forfeited or terminate for any reason before being exercised or settled, or an Award is settled in cash without the delivery of Shares to the holder, then the corresponding Shares shall again become available for Awards under the Plan. If Restricted Stock Units or SARs are settled, then only the number of Shares (if any) actually issued in settlement of such Restricted Stock Units or SARs shall reduce the number available in Section 5(a) and the balance (including any Shares withheld to satisfy tax withholding obligations) shall again become available for Awards under the Plan. Any Shares withheld to satisfy the Exercise Price or tax withholding obligation pursuant to any Award of Options or SARs shall be added back to the Shares available for Awards under the Plan. Notwithstanding the foregoing provisions of this Section 5(b), Shares that have actually been issued shall not again become available for Awards under the Plan, except for Shares that are forfeited and do not become vested.

(c) *Substitution and Assumption of Awards*. The Committee may make Awards under the Plan by assumption, substitution, or replacement of stock options, stock appreciation rights, restricted stock units, or similar awards granted by another entity (including a Parent or Subsidiary), if such assumption, substitution, or replacement is in connection with an asset acquisition, stock acquisition, merger, consolidation, or similar transaction involving the Company (and/or its Parent or Subsidiary) and such other entity (and/or its affiliate). The terms of such assumed, substituted, or replaced Awards shall be as the Committee, in its discretion, determines is appropriate, notwithstanding limitations on Awards in the Plan. Any such substitute or assumed Awards shall not count against the Share limitation set forth in Section 5(a) (nor shall Shares subject to such Awards be added to the Shares available for Awards under the Plan as provided in Section 5(b) above), except that Shares acquired by exercise of substitute ISOs will count against the maximum number of Shares that may be issued pursuant to the exercise of ISOs under the Plan.

(d) *Outside Director Compensation Limit*. The maximum number of Shares subject to Awards granted under the Plan during any one calendar year to any Outside Director taken together with any cash fees paid by the Company to such Outside Director during such calendar year for service on the Board (other than the calendar year in which an Outside Director commences service on the Board), will not exceed seven hundred fifty thousand dollars ($750,000) in total value (calculating the value of any such Awards based on the grant date fair value of such Awards for financial reporting purposes). Initial Awards granted under the Plan to Outside Directors who are members of the Board on the Effective Date or who first join the Board in the calendar year of the Effective Date shall not be taken into account for purposes of this limitation.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-171

Exhibit 6
Page 1466

**Table of Contents**

**SECTION 6. RESTRICTED SHARES.**

(a) *Restricted Share Award Agreement*. Each grant of Restricted Shares under the Plan shall be evidenced by a Restricted Share Award Agreement between the Participant and the Company. Such Restricted Shares shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various Restricted Share Award Agreements entered into under the Plan need not be identical.

(b) *Payment for Awards*. Restricted Shares may be sold or awarded under the Plan for such consideration as the Committee may determine, including (without limitation) cash, cash equivalents, full-recourse promissory notes, past services, and future services.

(c) *Vesting*. Each Award of Restricted Shares may or may not be subject to vesting. Vesting shall occur, in full or in installments, upon satisfaction of the conditions specified in the Restricted Share Award Agreement. A Restricted Share Award Agreement may provide for accelerated vesting in the event of the Participant's death, Disability or retirement or other events.

(d) *Voting and Dividend Rights*. A holder of Restricted Shares awarded under the Plan shall have the same voting, dividend, and other rights as the Company's other shareholders, except that in the case of any unvested Restricted Shares, the holder shall not be entitled to any dividends or other distributions paid or distributed by the Company in respect of outstanding Shares. Notwithstanding the foregoing, at the Committee's discretion, the holder of unvested Restricted Shares may be credited with such dividends and other distributions, provided that such dividends and other distributions shall be paid or distributed to the holder only if, when and to the extent such unvested Restricted Shares vest. The value of dividends and other distributions payable or distributable with respect to any unvested Restricted Shares that do not vest shall be forfeited. At the Committee's discretion, the Restricted Share Award Agreement may require that the holder of Restricted Shares invest any cash dividends received in additional Restricted Shares. Such additional Restricted Shares shall be subject to the same conditions as the Award with respect which the dividend was paid. For the avoidance of doubt, other than with respect to the right to receive dividends and other distributions, the holders of unvested Restricted Shares shall have the same voting rights and other rights as the Company's other shareholders in respect of such unvested Restricted Shares.

(e) *Restrictions on Transfer of Shares*. Restricted Shares shall be subject to such rights of repurchase, rights of first refusal, or other restrictions as the Committee may determine. Such restrictions shall be set forth in the applicable Restricted Share Award Agreement and shall apply in addition to any general restrictions that may apply to all holders of Shares.

**SECTION 7. TERMS AND CONDITIONS OF OPTIONS.**

(a) *Option Award Agreement*. Each grant of an Option under the Plan shall be evidenced by an Option Award Agreement between the Participant and the Company. Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Committee deems appropriate for inclusion in an Option Award Agreement. The Option Award Agreement shall specify whether the Option is an ISO or an NSO. The provisions of the various Option Award Agreements entered into under the Plan need not be identical.

(b) *Number of Shares*. Each Option Award Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 12.

(c) *Exercise Price*. Each Option Award Agreement shall specify the Exercise Price. The Exercise Price of an ISO shall not be less than 100% of the Fair Market Value of a Share on the date of grant (110% for ISOs granted

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-172

Exhibit 6
Page 1467

**Table of Contents**

to Employees described in Section 4(b)), and the Exercise Price of an NSO shall not be less than 100% of the Fair Market Value of a Share on the date of grant. Subject to the foregoing in this Section 7(c), the Exercise Price under any Option shall be determined by the Committee in its sole discretion. The Exercise Price shall be payable in one of the forms described in Section 8.

(d) *Withholding Taxes*. As a condition to the exercise of an Option, the Participant shall make such arrangements as the Committee may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise. The Participant shall also make such arrangements as the Committee may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with the disposition of Shares acquired by exercising an Option.

(e) *Exercisability and Term*. Each Option Award Agreement shall specify the date when all or any installment of the Option is to become exercisable. The Option Award Agreement shall also specify the term of the Option; provided that the term of an ISO shall in no event exceed 10 years from the date of grant (five years for ISOs granted to Employees described in Section 4(b)). An Option Award Agreement may provide for accelerated exercisability in the event of the Participant's death, Disability, or retirement or other events and may provide for expiration prior to the end of its term in the event of the termination of the Participant's Service. Options may be awarded in combination with SARs, and such an Award may provide that the Options will not be exercisable unless the related SARs are forfeited. Subject to the foregoing in this Section 7(e), the Committee in its sole discretion shall determine when all or any installment of an Option is to become exercisable and when an Option is to expire.

(f) *Exercise of Options*. Each Option Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the Option following termination of the Participant's Service with the Company and its Subsidiaries, and the right to exercise the Option of any executors or administrators of the Participant's estate or any person who has acquired such Option(s) directly from the Participant by bequest or inheritance. Such provisions shall be determined in the sole discretion of the Committee, need not be uniform among all Options issued pursuant to the Plan, and may reflect distinctions based on the reasons for termination of Service.

(g) *No Rights as a Shareholder*. A Participant shall have no rights as a shareholder with respect to any Shares covered by an Option until the date of the issuance of a share certificate for such Shares. No adjustments shall be made, except as provided in Section 12.

(h) *Modification, Extension and Renewal of Options*. Within the limitations of the Plan, the Committee may modify, extend, or renew outstanding options or may accept the cancellation of outstanding options (to the extent not previously exercised), whether or not granted hereunder, in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price, or in return for the grant of a different Award for the same or a different number of Shares or for cash. The foregoing notwithstanding, no modification of an Option shall, without the consent of the Participant, materially impair the Participant's rights or obligations under such Option; provided, however, that an amendment or modification that may cause an ISO to become a NSO, and any amendment or modification that is required to comply with the rules applicable to ISOs, shall not be treated as materially impairing the rights or obligations of the Participant.

(i) *Restrictions on Transfer of Shares*. Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal, and other transfer restrictions as the Committee may determine. Such restrictions shall be set forth in the applicable Option Award Agreement and shall apply in addition to any general restrictions that may apply to all holders of Shares.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-173

Exhibit 6
Page 1468

**Table of Contents**

(j) *Buyout Provisions*. The Committee may at any time (i) offer to buy out for a payment in cash or cash equivalents an Option previously granted or (ii) authorize a Participant to elect to cash out an Option previously granted, in either case at such time and based upon such terms and conditions as the Committee shall establish.

**SECTION 8. PAYMENT FOR SHARES.**

(a) *General Rule*. The entire Exercise Price or Purchase Price of Shares issued under the Plan shall be payable in lawful money of the United States of America at the time when such Shares are purchased, except as provided in Section 8(b) through Section 8(h) below.

(b) *Surrender of Stock*. To the extent that an Option Award Agreement so provides, payment may be made all or in part by surrendering, or attesting to the ownership of, Shares which have already been owned by the Participant or the Participant's representative. Such Shares shall be valued at their Fair Market Value on the date when the new Shares are purchased under the Plan. The Participant shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if such action would cause the Company to recognize compensation expense (or additional compensation expense) with respect to the Option for financial reporting purposes.

(c) *Services Rendered*. At the discretion of the Committee, Shares may be awarded under the Plan in consideration of services rendered to the Company or a Subsidiary. If Shares are awarded without the payment of a Purchase Price in cash, the Committee shall make a determination (at the time of the Award) of the value of the services rendered by the Participant and the sufficiency of the consideration to meet the requirements of Section 6(b).

(d) *Cashless Exercise*. To the extent that an Option Award Agreement so provides, if the Stock is traded on an established securities market, payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of the aggregate Exercise Price.

(e) *Exercise/Pledge*. To the extent that an Option Award Agreement so provides, payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker or lender to pledge Shares, as security for a loan, and to deliver all or part of the loan proceeds to the Company in payment of the aggregate Exercise Price.

(f) *Net Exercise*. To the extent that an Option Award Agreement so provides, by a "net exercise" arrangement pursuant to which the number of Shares issuable upon exercise of the Option shall be reduced by the largest whole number of Shares having an aggregate Fair Market Value that does not exceed the aggregate Exercise Price (plus tax withholdings, if applicable) and any remaining balance of the aggregate Exercise Price (and/or applicable tax withholdings) not satisfied by such reduction in the number of whole Shares to be issued shall be paid by the Participant in cash or any other form of payment permitted under the Option Award Agreement.

(g) *Promissory Note*. To the extent that an Option Award Agreement or Restricted Share Award Agreement so provides, payment may be made all or in part by delivering (on a form prescribed by the Company) a full-recourse promissory note.

(h) *Other Forms of Payment*. To the extent that an Option Award Agreement or Restricted Share Award Agreement so provides, payment may be made in any other form that is consistent with applicable laws, regulations, and rules.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-174

Exhibit 6
Page 1469

**Table of Contents**

(i) *Limitations under Applicable Law*. Notwithstanding anything herein or in an Option Award Agreement or Restricted Share Award Agreement to the contrary, payment may not be made in any form that is unlawful, as determined by the Committee in its sole discretion.

## SECTION 9. STOCK APPRECIATION RIGHTS.

(a) *SAR Award Agreement*. Each grant of a SAR under the Plan shall be evidenced by a SAR Award Agreement between the Participant and the Company. Such SAR shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various SAR Award Agreements entered into under the Plan need not be identical.

(b) *Number of Shares*. Each SAR Award Agreement shall specify the number of Shares to which the SAR pertains and shall provide for the adjustment of such number in accordance with Section 12.

(c) *Exercise Price*. Each SAR Award Agreement shall specify the Exercise Price. The Exercise Price of a SAR shall not be less than 100% of the Fair Market Value of a Share on the date of grant. Subject to the foregoing in this Section 9(c), the Exercise Price under any SAR shall be determined by the Committee in its sole discretion.

(d) *Exercisability and Term*. Each SAR Award Agreement shall specify the date when all or any installment of the SAR is to become exercisable. The SAR Award Agreement shall also specify the term of the SAR. A SAR Award Agreement may provide for accelerated exercisability in the event of the Participant's death, Disability, retirement, or other events and may provide for expiration prior to the end of its term in the event of the termination of the Participant's Service. SARs may be awarded in combination with Options, and such an Award may provide that the SARs will not be exercisable unless the related Options are forfeited. A SAR may be included in an ISO only at the time of grant but may be included in an NSO at the time of grant or thereafter. A SAR granted under the Plan may provide that it will be exercisable only in the event of a Change in Control.

(e) *Exercise of SARs*. Upon exercise of a SAR, the Participant (or any person having the right to exercise the SAR after the Participant's death) shall receive from the Company (i) Shares, (ii) cash or (iii) a combination of Shares and cash, as the Committee shall determine. The amount of cash and/or the Fair Market Value of Shares received upon exercise of SARs shall, in the aggregate, be equal to the amount by which the Fair Market Value (on the date of surrender) of the Shares subject to the SARs exceeds the Exercise Price.

(f) *Modification, Extension or Assumption of SARs*. Within the limitations of the Plan, the Committee may modify, extend, or assume outstanding SARs or may accept the cancellation of outstanding SARs (whether granted by the Company or by another issuer) in return for the grant of new SARs for the same or a different number of Shares and at the same or a different Exercise Price, or in return for the grant of a different Award for the same or a different number of Shares or cash. The foregoing notwithstanding, no modification of a SAR shall, without the consent of the holder, materially impair the holder's rights or obligations under such SAR.

(g) *Buyout Provisions*. The Committee may at any time (i) offer to buy out for a payment in cash or cash equivalents a SAR previously granted, or (ii) authorize a Participant to elect to cash out a SAR previously granted, in either case at such time and based upon such terms and conditions as the Committee shall establish.

## SECTION 10. RESTRICTED STOCK UNITS.

(a) *Restricted Stock Unit Award Agreement*. Each grant of Restricted Stock Units under the Plan shall be evidenced by a Restricted Stock Unit Award Agreement between the Participant and the Company. Such

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-175

Exhibit 6
Page 1470

**Table of Contents**

Restricted Stock Units shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various Restricted Stock Unit Award Agreements entered into under the Plan need not be identical.

(b) *Payment for Awards*. To the extent that an Award is granted in the form of Restricted Stock Units, no cash consideration shall be required of the Award recipients.

(c) *Vesting Conditions*. Each Award of Restricted Stock Units may or may not be subject to vesting. Vesting shall occur, in full or in installments, upon satisfaction of the conditions specified in the Restricted Stock Unit Award Agreement. A Restricted Stock Unit Award Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, retirement, or other events.

(d) *Voting and Dividend Rights*. The holders of Restricted Stock Units shall have no voting rights. Prior to settlement or forfeiture, any Restricted Stock Unit awarded under the Plan may, at the Committee's discretion, carry with it a right to dividend equivalents. Such right, if awarded, entitles the holder to be credited with an amount equal to all cash dividends paid on one Share while the Restricted Stock Unit is outstanding. Settlement of dividend equivalents may be made in the form of cash, in the form of Shares, or in a combination of both. Dividend equivalents may also be converted into additional Restricted Stock Units at the Committee's discretion. Dividend equivalents shall not be distributed prior to settlement of the Restricted Stock Unit to which the dividend equivalents pertain. Prior to distribution, any dividend equivalents shall be subject to the same conditions and restrictions (including without limitation, any forfeiture conditions) as the Restricted Stock Units to which they attach. The value of dividend equivalents payable or distributable with respect to any unvested Restricted Stock Units that do not vest shall be forfeited. Any entitlement to dividend equivalents or similar entitlements will be established and administered either consistent with an exemption from, or in compliance with, the applicable requirements of Section 409A.

(e) *Form and Time of Settlement of Restricted Stock Units*. Settlement of vested Restricted Stock Units may be made in the form of (i) cash, (ii) Shares or (iii) any combination of both, as determined by the Committee. The actual number of Restricted Stock Units eligible for settlement may be larger or smaller than the number included in the original Award, based on predetermined performance factors. Methods of converting Restricted Stock Units into cash may include (without limitation) a method based on the average Fair Market Value of Shares over a series of trading days. A Restricted Stock Unit Award Agreement may provide that vested Restricted Stock Units may be settled in a lump sum or in installments. A Restricted Stock Unit Award Agreement may provide that the distribution may occur or commence when all vesting conditions applicable to the Restricted Stock Units have been satisfied or have lapsed, or it may be deferred to any later date, subject to compliance with Section 409A. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until an Award of Restricted Stock Units is settled, the number of such Restricted Stock Units shall be subject to adjustment pursuant to Section 12.

(f) *Death of Participant*. Any Restricted Stock Unit Award that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. Each recipient of a Restricted Stock Unit Award under the Plan shall designate one or more beneficiaries for this purpose by filing the prescribed form with the Company. A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock Units Award that becomes payable after the Participant's death shall be distributed to the Participant's estate.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-176

Exhibit 6
Page 1471

Table of Contents

**SECTION 11. CASH-BASED AWARDS AND STOCK-BASED AWARDS**

The Committee may, in its sole discretion, grant Cash-Based Awards and Stock-Based Awards to any Participant in such number or amount and upon such terms, and subject to such conditions, as the Committee shall determine at the time of grant and specify in an applicable Award Agreement. The Committee shall determine the maximum duration of the Cash-Based Award or Stock-Based Award, the amount of cash which may be payable pursuant to the Cash-Based Award, the conditions upon which the Cash-Based Award or Stock-Based Award shall become vested or payable, and such other provisions as the Committee shall determine. Each Cash-Based Award shall specify a cash-denominated payment amount, formula, or payment ranges as determined by the Committee. Payment, if any, with respect to a Cash-Based Award or Stock-Based Award shall be made in accordance with the terms of the Award and may be made in cash or in Shares, as the Committee determines.

**SECTION 12. ADJUSTMENT OF SHARES.**

(a) *Adjustments*.

(i) <u>Recapitalization transactions.</u> In the event of a subdivision of the outstanding Stock, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Stock (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, the Committee shall make appropriate and equitable adjustments in:

(A)     The class(es) and number of securities available for future Awards and the limitations set forth under Section 5;

(B)     The class(es) and number of securities covered by each outstanding Award; and

(C)     The Exercise Price under each outstanding Option and SAR.

(ii) <u>Other adjustments</u>. In the event of other transactions, the Committee may make such changes as provided in subsection (a) herein, as it determines are necessary or appropriate to avoid distortion in the operation of the Plan.

(iii) The Committee's determinations hereunder will be final, binding and conclusive.

(b) *Dissolution or Liquidation*. To the extent not previously exercised or settled, Options, SARs, and Restricted Stock Units shall terminate immediately prior to the dissolution or liquidation of the Company.

(c) *Merger or Reorganization*. In the event that the Company is a party to a merger or other reorganization, outstanding Awards shall be subject to the agreement of merger or reorganization. Such agreement may provide, without limitation, for one or more of the following:

(i)     The continuation of the outstanding Awards by the Company, if the Company is a surviving corporation;

(ii)     The assumption of the outstanding Awards by the surviving corporation or its parent or subsidiary;

(iii)     The substitution by the surviving corporation or its parent or subsidiary of its own awards for the outstanding Awards;

(iv)     Immediate vesting, exercisability, or settlement of outstanding Awards followed by the cancellation of such Awards upon or immediately prior to the effectiveness of such transaction;

<div align="center">

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-177

</div>

Exhibit 6
Page 1472

**Table of Contents**

    (v)    Cancellation of the Award, to the extent not vested or not exercised prior to the effective time of the merger or reorganization, in exchange for such cash or equity consideration (including no consideration) as the Committee, in its sole discretion, may consider appropriate; or

    (vi)    Settlement of the intrinsic value of the outstanding Awards (whether or not then vested or exercisable) in cash or cash equivalents or equity (including cash or equity subject to deferred vesting and delivery consistent with the vesting restrictions applicable to such Awards or the underlying Shares) followed by the cancellation of such Awards (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction the Committee determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment), provided that any such amount may be delayed to the same extent that payment of consideration to the holders of Stock in connection with the merger or reorganization is delayed as a result of escrows, earnouts, holdbacks or other contingencies;

in each case without the Participant's consent. Any acceleration of payment of an amount that is subject to Section 409A will be delayed, if necessary, until the earliest time that such payment would be permissible under Section 409A without triggering any additional taxes applicable under Section 409A. Any actions hereunder will comply with, or be exempt from, Section 409A to the extent determined by the Committee to be reasonably practicable.

The Company will have no obligation to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly.

    (d) *Change in Control*. In addition to (and not in limitation of) the actions that may be taken under Section 12(c), in the event of a Change in Control in which the surviving corporation or acquiring corporation (or the surviving or acquiring corporation's parent company) does not continue or assume or settle (subject to vesting) outstanding Awards, or substitute similar stock awards for outstanding Awards, then with respect to any such Awards that have not been continued, assumed, settled or substituted, the Committee may determine, at the time of granting an Award or thereafter, that the vesting (and exercisability, if applicable) of any such Awards (or portion thereof) will be accelerated in full (and with respect to any Awards subject to performance-based vesting, that vesting shall be deemed satisfied at the target level, or based on actual performance measured in accordance with the applicable performance goals as of the date of the Change in Control, or the greater thereof) to a date prior to the effective time of the Change in Control (contingent upon the closing or completion of the Change in Control) as the Committee will determine (or, if the Committee does not determine such a date, to the date that is five days prior to the effective time of the Change in Control), and any reacquisition or repurchase rights held by the Company with respect to such vested Awards will lapse (contingent upon the closing or completion of the Change in Control). In addition, the Committee may determine, at the time of granting an Award or thereafter, that such Award shall become exercisable or vested as to all or part of the Shares subject to such Award in the event that a Change in Control occurs with respect to the Company. The Committee will have no obligation to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly. Upon consummation of a Change in Control, all Awards that are not assumed, substituted or continued will terminate without payment therefor, except as otherwise determined by the Committee in accordance with this Section 12.

    (e) *Reservation of Rights*. Except as provided in this Section 12, a Participant shall have no rights by reason of any subdivision or consolidation of Shares of stock of any class, the payment of any dividend or any other increase or decrease in the number of Shares of stock of any class. Any issue by the Company of Shares of stock of any class, or securities convertible into Shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares subject to an Award. The

<div align="center">

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-178

</div>

Exhibit 6
Page 1473

**Table of Contents**

grant of an Award pursuant to the Plan shall not affect in any way the right or power of the Company to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell, or transfer all or any part of its business or assets. In the event of any change affecting the Shares or the Exercise Price of Shares subject to an Award, including a merger or other reorganization, for reasons of administrative convenience, the Company in its sole discretion may refuse to permit the exercise of any Award during a period of up to 30 days prior to the occurrence of such event.

**SECTION 13. DEFERRAL OF AWARDS.**

(a) *Committee Powers*. Subject to compliance with Section 409A, the Committee (in its sole discretion) may permit or require a Participant to:

(i)   Have cash that otherwise would be paid to such Participant as a result of the exercise of a SAR or the settlement of Restricted Stock Units credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books;

(ii)  Have Shares that otherwise would be delivered to such Participant as a result of the exercise of an Option or SAR converted into an equal number of Restricted Stock Units; or

(iii) Have Shares that otherwise would be delivered to such Participant as a result of the exercise of an Option or SAR or the settlement of Restricted Stock Units converted into amounts credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books.

Such amounts shall be determined by reference to the Fair Market Value of such Shares as of the date when they otherwise would have been delivered to such Participant.

(b) *General Rules*. A deferred compensation account established under this Section 13 may be credited with interest or other forms of investment return, as determined by the Committee. A Participant for whom such an account is established shall have no rights other than those of a general creditor of the Company. Such an account shall represent an unfunded and unsecured obligation of the Company and shall be subject to the terms and conditions of the applicable agreement between such Participant and the Company. If the deferral or conversion of Awards is permitted or required, the Committee (in its sole discretion) may establish rules, procedures, and forms pertaining to such Awards, including (without limitation) the settlement of deferred compensation accounts established under this Section 13.

**SECTION 14. AWARDS UNDER SUB-PLANS.**

The Committee may at any time and from time to time (including before or after an Award is granted) establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan for Participants based outside of the U.S. and/or subject to the laws of countries other than the U.S., including by establishing one or more sub-plans, supplements or appendices under the Plan or any Award Agreement for the purpose of complying or facilitating compliance with non-U.S. laws or taking advantage of tax favorable treatment or for any other legal or administrative reason determined by the Committee. Any such sub-plan, supplement or appendix may contain, in each case, (i) such limitations on the Committee's discretion under the Plan and (ii) such additional or different terms and conditions, as the Committee deems necessary or desirable and will be deemed to be part of the Plan but will apply only to Participants within the group to which the sub-plan, supplement or appendix applies (as determined by the Committee); *provided*, *however*, that no sub-plan, supplement or appendix, rule or regulation established pursuant to this provision shall increase the number of Shares available under Section 5.

<div align="center">

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-179

</div>

Exhibit 6
Page 1474

Table of Contents

**SECTION 15. PAYMENT OF DIRECTOR'S FEES IN SECURITIES.**

(a) *Effective Date*. No provision of this Section 15 shall be effective unless and until the Board has determined to implement such provision.

(b) *Elections to Receive NSOs, SARs, Restricted Shares, or Restricted Stock Units*. An Outside Director may elect to receive annual retainer payments and/or meeting fees from the Company in the form of cash, NSOs, SARs, Restricted Shares, Restricted Stock Units, or a combination thereof, as determined by the Board. Alternatively, the Board may mandate payment in any of such alternative forms. Such NSOs, SARs, Restricted Shares, and Restricted Stock Units shall be issued under the Plan. An election under this Section 15 shall be filed with the Company on the prescribed form.

(c) *Number and Terms of NSOs, SARs, Restricted Shares or Restricted Stock Units*. The number of NSOs, SARs, Restricted Shares, or Restricted Stock Units to be granted to Outside Directors in lieu of annual retainers and meeting fees that would otherwise be paid in cash shall be calculated in a manner determined by the Board. The terms of such NSOs, SARs, Restricted Shares, or Restricted Stock Units shall also be determined by the Board.

**SECTION 16. LEGAL AND REGULATORY REQUIREMENTS.**

Shares shall not be issued under the Plan unless the issuance and delivery of such Shares complies with (or is exempt from) all applicable requirements of law, including (without limitation) the United States Securities Act, state securities laws and regulations and the regulations of any stock exchange on which the Company's securities may then be listed, and the Company has obtained the approval or favorable ruling from any governmental agency which the Company determines is necessary or advisable. The Company shall not be liable to a Participant or other persons as to: (a) the non-issuance or sale of Shares as to which the Company has not obtained from any regulatory body having jurisdiction the authority deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares under the Plan; and (b) any tax consequences expected, but not realized, by any Participant or other person due to the receipt, exercise or settlement of any Award granted under the Plan.

**SECTION 17. TAXES.**

(a) *Withholding Taxes*. To the extent required by applicable federal, state, local, or foreign law, a Participant or the Participant's successor shall make arrangements satisfactory to the Company for the satisfaction of any withholding tax obligations that arise in connection with the Plan. The Company shall not be required to issue any Shares or make any cash payment under the Plan until such obligations are satisfied.

(b) *Share Withholding*. The Committee may permit a Participant to satisfy all or part of the Participant's withholding or income tax obligations by having the Company withhold all or a portion of any Shares that otherwise would be issued to the Participant or by surrendering all or a portion of any Shares that the Participant previously acquired. Such Shares shall be valued at their Fair Market Value on the date when taxes otherwise would be withheld in cash. In no event may a Participant have Shares withheld that would otherwise be issued to the Participant in excess of the number necessary to satisfy the maximum legally required tax withholding.

(c) *Section 409A*.

    (i)    Without limiting the generality of Section 24(b) hereof, each Award will contain such terms as the Committee determines and will be construed and administered such that the Award either qualifies for an exemption from the requirements of Section 409A or satisfies such requirements.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-180

Exhibit 6
Page 1475

Table of Contents

(ii)    Each Award that provides for "nonqualified deferred compensation" within the meaning of Section 409A shall be subject to such additional rules and requirements as specified by the Committee from time to time in order to comply with Section 409A. If any amount under such an Award is payable upon a "separation from service" (within the meaning of Section 409A) to a Participant who is then considered a "specified employee" (within the meaning of Section 409A), then no such payment shall be made prior to the date that is the earlier of (i) six months and one day after the Participant's separation from service, or (ii) the Participant's death, but only to the extent such delay is necessary to prevent such payment from being subject to interest, penalties, and/or additional tax imposed pursuant to Section 409A. In addition, the settlement of any such Award may not be accelerated except to the extent permitted by Section 409A. With regard to any payment considered to be nonqualified deferred compensation under Section 409A, to the extent applicable, that is payable upon a Change in Control of the Company or other similar event, to the extent required to avoid the imposition of an additional tax, interest or penalty under Section 409A, no amount will be payable unless such change in control constitutes a "change in control event" within the meaning of Section 1.409A-3(i)(5) of the Treasury Regulations.

(iii)   Notwithstanding anything to the contrary in the Plan or any Award Agreement, the Committee may unilaterally amend, modify or terminate the Plan or any outstanding Award, including but not limited to changing the form of the Award, if the Committee determines that such amendment, modification or termination is necessary or desirable to avoid the imposition of an additional tax, interest or penalty under Section 409A.

(iv)    For purposes of Section 409A, each payment made under the Plan or any Award will be treated as a separate payment.

## SECTION 18. TRANSFERABILITY.

Unless the agreement evidencing an Award (or an amendment thereto authorized by the Committee) expressly provides otherwise, no Award granted under the Plan, nor any interest in such Award, may be sold, assigned, conveyed, gifted, pledged, hypothecated, or otherwise transferred in any manner (prior to the vesting and lapse of any and all restrictions applicable to Shares issued under such Award), other than by will or the laws of descent and distribution; provided, however, that an ISO may be transferred or assigned only to the extent consistent with Section 422 of the Code. Any purported assignment, transfer, or encumbrance in violation of this Section 17 shall be void and unenforceable against the Company.

## SECTION 19. PERFORMANCE BASED AWARDS.

The number of Shares or other benefits granted, issued, retained, and/or vested under an Award may be made subject to the attainment of performance goals. The Committee may utilize any performance criteria selected by it in its sole discretion to establish performance goals.

## SECTION 20. RECOUPMENT OF AWARDS.

The Company will recoup incentive-based compensation from executive officers to the extent required under the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules, regulations and listing standards that may be issued under that act. Any right of recoupment under this provision will be in addition to, and not in lieu of, any other rights of recoupment that may be available to the Company. No recovery of compensation under any clawback policy or this Section 20 will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with the Company or any of its Subsidiaries or Affiliates.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-181

Exhibit 6
Page 1476

Table of Contents

**SECTION 21. NO EMPLOYMENT RIGHTS.**

No provision of the Plan, nor any Award granted under the Plan, shall be construed to give any person any right to become, to be treated as, or to remain an Employee or Consultant. The Company and its Subsidiaries reserve the right to terminate any person's Service at any time and for any reason, with or without notice.

**SECTION 22. DURATION AND AMENDMENTS.**

(a) *Term of the Plan*. The Plan, as set forth herein, shall come into existence on the date of its adoption by the Board; provided, however, that no Award may be granted hereunder prior to the Effective Date. The Board or the Committee may suspend or terminate the Plan at any time. No ISOs may be granted after the tenth (10th) anniversary of the earlier of (i) the date the Plan is adopted by the Board, or (ii) the date the Plan is approved by the shareholders of the Company.

(b) *Right to Amend the Plan*. The Board or the Committee may amend the Plan at any time and from time to time. Rights and obligations under any Award granted before amendment of the Plan shall not be materially impaired by such amendment, except with consent of the Participant. An amendment of the Plan shall be subject to the approval of the Company's shareholders only to the extent required by applicable laws, regulations or rules.

(c) *Effect of Termination*. No Awards shall be granted under the Plan after the termination thereof. The termination of the Plan shall not affect Awards previously granted under the Plan.

**SECTION 23. AWARDS TO NON-U.S. PARTICIPANTS.**

Awards may be granted to Participants who are non-United States nationals or employed or providing services outside the United States, or both, on such terms and conditions different from those applicable to Awards to Participants who are employed or providing services in the United States as may, in the judgment of the Committee, be necessary or desirable to recognize differences in local law, tax policy, or custom. The Committee also may impose conditions on the exercise, vesting, or settlement of Awards in order to minimize the Company's obligation with respect to tax equalization for Participants on assignments outside their home country.

**SECTION 24. MISCELLANEOUS**

(a) *Waiver of Jury Trial*. By accepting or being deemed to have accepted an Award under the Plan, each Participant waives (or will be deemed to have waived), to the maximum extent permitted under applicable law, any right to a trial by jury in any action, proceeding or counterclaim concerning any rights under the Plan or any Award, or under any amendment, waiver, consent, instrument, document or other agreement delivered or which in the future may be delivered in connection therewith, and agrees (or will be deemed to have agreed) that any such action, proceedings or counterclaim will be tried before a court and not before a jury. By accepting or being deemed to have accepted an Award under the Plan, each Participant certifies that no officer, representative, or attorney of the Company has represented, expressly or otherwise, that the Company would not, in the event of any action, proceeding or counterclaim, seek to enforce the foregoing waivers. Notwithstanding anything to the contrary in the Plan, nothing herein is to be construed as limiting the ability of the Company and a Participant to agree to submit any dispute arising under the terms of the Plan or any Award to binding arbitration or as limiting the ability of the Company to require any individual to agree to submit such disputes to binding arbitration as a condition of receiving an Award hereunder.

(b) *Limitation of Liability*. Notwithstanding anything to the contrary in the Plan or any Award, neither the Company, nor any of its Subsidiaries, nor the Committee, nor any person acting on behalf of the Company, any

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 STOCK INCENTIVE PLAN

A-182

Exhibit 6
Page 1477

Table of Contents

of its Subsidiaries, or the Committee, will be liable to any Participant, to any permitted transferee, to the estate or beneficiary of any Participant or any permitted transferee, or to any other person by reason of any acceleration of income, any additional tax, or any penalty, interest or other liability asserted by reason of the failure of an Award to satisfy the requirements of Section 422 or Section 409A or by reason of Section 4999 of the Code, or otherwise asserted with respect to any Award.

(c) *Unfunded Plan*. The Company's obligations under the Plan are unfunded, and no Participant will have any right to specific assets of the Company in respect of any Award. Participants will be general unsecured creditors of the Company with respect to any amounts due or payable under the Plan.

## SECTION 25. GOVERNING LAW.

The Plan and each Award Agreement shall be governed by the laws of the state of California, without application of the conflicts of law principles thereof.

## SECTION 26. SUCCESSORS AND ASSIGNS.

The terms of the Plan shall be binding upon and inure to the benefit of the Company and any successor entity, including any successor entity contemplated by Section 12(c).

## SECTION 27. EXECUTION.

To record the adoption of the Plan by the Board, the Company has caused its authorized officer to execute the same.

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____

Name:

Title:

A-183

Exhibit 6
Page 1478

**Table of Contents**

<div align="center">Schedule A</div>

**The Equity Scheme**

The Equity Scheme will be implemented either by way of a cancellation or a transfer scheme of arrangement under Part 26 of the Act. Company Shareholders will be invited to vote in favor of the Equity Scheme at the Equity Scheme Court Meeting, which is a meeting of Company Shareholders convened by the Company with the permission of the Court.

The Equity' Scheme will become effective in accordance with its terms:

(a) if it is approved by a majority (in person or by proxy) in number, representing at least 75 per cent. in value, of the members present and voting at the Equity Scheme Court Meeting;

(b) if it is subsequently sanctioned by an order of the Court (the "Equity Scheme Court Order"); and

(c) upon an office copy of the Equity Scheme Court Order being delivered to the UK Registrar of Companies for registration.

If the Equity Scheme becomes effective, then either:

(a) in the case of a cancellation scheme, the Company Ordinary Shares of the Company Shareholders shall be cancelled and Company Ordinary Shares shall be issued to HoldCo, resulting in HoldCo becoming the holding company of the Company. In consideration for the cancellation of the Company Ordinary Shares and issuance of shares to HoldCo, HoldCo shall issue an identical number of HoldCo Ordinary Shares to those cancelled to the Company Shareholders; or

(b) in the case of a transfer scheme, the Company Ordinary Shares of the Company Shareholders shall be transferred to HoldCo. In consideration for the transfer of the Company Ordinary Shares to HoldCo, HoldCo shall issue an identical number of HoldCo Ordinary Shares to the Company Shareholders, resulting in HoldCo becoming the holding company of the Company.

**The Creditor Scheme**

The Creditor's Scheme will be implemented by way of a creditor's scheme of arrangement under Part 26 of the Act. Pursuant to the Creditors Scheme:

(a) if the Equity Scheme is a cancellation scheme, the Company proposes to novate its obligations under the Company Convertible Notes to HoldCo and the Scheme Creditors will accept the performance by HoldCo of the Company Convertible Notes in place of performance by the Company and discharge HoldCo from further obligations under the Company Convertible Notes. The consideration for the novation shall be an inter-company loan equal to the market value of the Scheme Convertible Notes; and

(b) if the Equity Scheme is a transfer scheme, HoldCo proposes to acquire Scheme Convertible Notes from each Scheme Creditor in consideration of HoldCo entering into new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company.

The Scheme Creditors will be invited to vote in favor of the Creditors' Scheme at the Creditors' Scheme Court Meeting, being a meeting convened by the Company with the permission of the Court. The Creditors' Scheme will become effective in accordance with its terms:

(a) if it is approved by a majority (in person or by proxy) in number, and at least 75 per cent. in value, of the members of the class of creditors present and voting at the Creditors' Scheme Court Meeting;

(b) if it is subsequently sanctioned by an order of the Court (the "Creditor Scheme Court Order"); and

(c) upon an office copy of the Creditor Scheme Court Order being delivered to the UK Registrar of Companies for registration.

<div align="center">A-184</div>

Exhibit 6
Page 1479

Table of Contents

**Exhibit F**

Form of Employee Stock Purchase Plan

(See Attached)

A-185

Exhibit 6
Page 1480

**Table of Contents**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 EMPLOYEE STOCK PURCHASE PLAN**

(Adopted by the Board of Directors on              , 2021)

(Approved by the Stockholders on              , 2021)

Effective Date:              , 2021

A-186

Exhibit 6
Page 1481

Table of Contents

|  |  |  | Page |
|---|---|---|---|
| SECTION 1 | Purpose Of The Plan | | A-189 |
| SECTION 2 | Definitions | | A-189 |
|  | (a) | "Board" | A-189 |
|  | (b) | "Code" | A-189 |
|  | (c) | "Committee" | A-189 |
|  | (d) | "Company" | A-189 |
|  | (e) | "Compensation" | A-189 |
|  | (f) | "Corporate Reorganization" | A-189 |
|  | (g) | "Eligible Employee" | A-189 |
|  | (h) | "Exchange Act" | A-190 |
|  | (i) | "Fair Market Value" | A-190 |
|  | (j) | "Offering" | A-190 |
|  | (k) | "Offering Date" | A-190 |
|  | (l) | "Offering Period" | A-190 |
|  | (m) | "Participant" | A-190 |
|  | (n) | "Participating Company" | A-190 |
|  | (o) | "Plan" | A-190 |
|  | (p) | "Plan Account" | A-190 |
|  | (q) | "Purchase Date" | A-190 |
|  | (r) | "Purchase Period" | A-190 |
|  | (s) | "Purchase Price" | A-190 |
|  | (t) | "Stock" | A-190 |
|  | (u) | "Subsidiary" | A-190 |
| SECTION 3 | Administration Of The Plan | | A-191 |
|  | (a) | Administrative Powers and Responsibilities | A-191 |
|  | (b) | International Administration | A-191 |
| SECTION 4 | Enrollment And Participation | | A-191 |
|  | (a) | Offering Periods | A-191 |
|  | (b) | Enrollment | A-192 |
|  | (c) | Duration of Participation | A-192 |
| SECTION 5 | Employee Contributions | | A-192 |
|  | (a) | Frequency of Payroll Deductions | A-192 |
|  | (b) | Amount of Payroll Deductions | A-192 |
|  | (c) | Changing Withholding Rate | A-192 |
|  | (d) | Discontinuing Payroll Deductions | A-193 |
| SECTION 6 | Withdrawal From The Plan | | A-193 |
|  | (a) | Withdrawal | A-193 |
|  | (b) | Re-enrollment After Withdrawal | A-193 |
| SECTION 7 | Change In Employment Status | | A-193 |
|  | (a) | Termination of Employment | A-193 |
|  | (b) | Leave of Absence | A-193 |
|  | (c) | Death | A-193 |
| SECTION 8 | Plan Accounts and Purchase Of Shares | | A-193 |
|  | (a) | Plan Accounts | A-193 |
|  | (b) | Purchase Price | A-193 |
|  | (c) | Number of Shares Purchased | A-194 |

A-187

Exhibit 6
Page 1482

| | | Page |
|---|---|---|
| (d) | Available Shares Insufficient | A-194 |
| (e) | Issuance of Stock | A-194 |
| (f) | Unused Cash Balances | A-194 |
| (g) | Stockholder Approval | A-194 |
| SECTION 9 | Limitations On Stock Ownership | A-195 |
| (a) | Five Percent Limit | A-195 |
| (b) | Dollar Limit | A-195 |
| SECTION 10 | Rights Not Transferable | A-195 |
| SECTION 11 | No Rights As An Employee | A-195 |
| SECTION 12 | No Rights As A Stockholder | A-195 |
| SECTION 13 | Securities Law Requirements | A-196 |
| SECTION 14 | Stock Offered Under The Plan | A-196 |
| (a) | Authorized Shares | A-196 |
| (b) | Antidilution Adjustments | A-196 |
| (c) | Reorganizations | A-196 |
| SECTION 15 | Amendment Or Discontinuance | A-196 |
| SECTION 16 | Execution | A-197 |

A-188

Exhibit 6
Page 1483

**Table of Contents**

ROCKLEY PHOTONICS HOLDINGS LIMITED

2021 EMPLOYEE STOCK PURCHASE PLAN

SECTION 1 <u>Purpose Of The Plan.</u>

The Plan was adopted by the Board of Directors on                 , 2021 and is effective on                 , 2021 (the "Effective Date"). The purpose of the Plan is to provide a broad-based employee benefit to attract the services of new Eligible Employees, to retain the services of existing Eligible Employees, and to provide incentives for such individuals to exert maximum efforts toward the Company's success by purchasing Stock from the Company on favorable terms and to pay for such purchases through payroll deductions. The Plan is intended to qualify under section 423 of the Code and to be exempt from the application and requirements of Section 409A of the Code, and is to be construed accordingly.

SECTION 2 <u>Definitions.</u>

(a) "<u>Board</u>" means the Board of Directors of the Company, as constituted from time to time.

(b) "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(c) "<u>Committee</u>" means the Compensation Committee of the Board or such other committee, comprised exclusively of one or more directors of the Company, as may be appointed by the Board from time to time to administer the Plan.

(d) "<u>Company</u>" means Rockley Photonics Holdings Limited, a Cayman Islands exempted company limited by shares.

(e) "<u>Compensation</u>" means, unless provided otherwise by the Committee in the terms and conditions of an Offering, base salary and wages paid in cash to a Participant by a Participating Company, without reduction for any pre-tax contributions made by the Participant under sections 401(k) or 125 of the Code. "Compensation" shall, unless provided otherwise by the Committee in the terms and conditions of an Offering, exclude variable compensation (including commissions, bonuses, incentive compensation, overtime pay and shift premiums), all non-cash items, moving or relocation allowances, cost-of-living equalization payments, car allowances, tuition reimbursements, imputed income attributable to cars or life insurance, severance pay, fringe benefits, contributions or benefits received under employee benefit plans, income attributable to the exercise of stock options, and similar items. The Committee shall determine whether a particular item is included in Compensation.

(f) "<u>Corporate Reorganization</u>" means:

(i) The consummation of a merger or consolidation of the Company with or into another entity, or any other corporate reorganization; or

(ii) The sale, transfer or other disposition of all or substantially all of the Company's assets or the complete liquidation or dissolution of the Company.

(g) "<u>Eligible Employee</u>" means any employee of a Participating Company whose customary employment is for more than five months per calendar year and for more than 20 hours per week.

The foregoing notwithstanding, an individual shall not be considered an Eligible Employee if such individual's participation in the Plan is prohibited by the law of any country which has jurisdiction over the individual.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-189

Exhibit 6
Page 1484

**Table of Contents**

(h) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(i) "Fair Market Value" means the fair market value of a share of Stock, determined as follows:

(i) If Stock was traded on any established national securities exchange including the New York Stock Exchange or The Nasdaq Stock Market on the date in question, then the Fair Market Value shall be equal to the closing price as quoted on such exchange (or the exchange with the greatest volume of trading in the Stock) on such date as reported in the Wall Street Journal or such other source as the Committee deems reliable; or

(ii) If the foregoing provision is not applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate.

For any date that is not a Trading Day, the Fair Market Value of a share of Stock for such date shall be determined by using the closing sale price for the immediately preceding Trading Day. Determination of the Fair Market Value pursuant to the foregoing provisions shall be conclusive and binding on all persons.

(j) "Offering" means the grant of options to purchase shares of Stock under the Plan to Eligible Employees.

(k) "Offering Date" means the first day of an Offering.

(l) "Offering Period" means a period with respect to which the right to purchase Stock may be granted under the Plan, as determined pursuant to Section 4(a).

(m) "Participant" means an Eligible Employee who elects to participate in the Plan, as provided in Section 4(b).

(n) "Participating Company" means (i) the Company and (ii) each present or future Subsidiary designated by the Committee as a Participating Company.

(o) "Plan" means this Rockley Photonics Limited 2021 Employee Stock Purchase Plan, as it may be amended from time to time.

(p) "Plan Account" means the account established for each Participant pursuant to Section 8(a).

(q) "Purchase Date" means one or more dates during an Offering on which shares of Stock may be purchased pursuant to the terms of the Offering.

(r) "Purchase Period" means one or more successive periods during an Offering, beginning on the Offering Date or on the day after a Purchase Date, and ending on the next succeeding Purchase Date.

(s) "Purchase Price" means the price at which Participants may purchase shares of Stock under the Plan, as determined pursuant to Section 8(b).

(t) "Stock" means the Common Stock of the Company.

(u) "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-190

Exhibit 6
Page 1485

**Table of Contents**

(r) "Trading Day" means a day on which the national stock exchange on which the Stock is traded is open for trading.

SECTION 3 Administration Of The Plan.

(a) Administrative Powers and Responsibilities. The Plan shall be administered by the Committee. The Committee shall have full power and authority, subject to the provisions of the Plan, to promulgate such rules and regulations as it deems necessary for the proper administration of the Plan, to interpret the provisions and supervise the administration of the Plan, and to take all action in connection therewith or in relation thereto as it deems necessary or advisable. Any decision reduced to writing and signed by all of the members of the Committee shall be fully effective as if it had been made at a meeting duly held. The Committee's determinations under the Plan, unless otherwise determined by the Board, shall be final and binding on all persons. The Company shall pay all expenses incurred in the administration of the Plan. No member of the Committee shall be personally liable for any action, determination, or interpretation made in good faith with respect to the Plan, and all members of the Committee shall be fully indemnified by the Company with respect to any such action, determination or interpretation. The Committee may adopt such rules, guidelines and forms as it deems appropriate to implement the Plan. Subject to the requirements of applicable law, the Committee may designate persons other than members of the Committee to carry out its responsibilities and may prescribe such conditions and limitations as it may deem appropriate. All decisions, interpretations and other actions of the Committee shall be final and binding on all Participants and all persons deriving their rights from a Participant. No member of the Committee shall be liable for any action that he has taken or has failed to take in good faith with respect to the Plan. Notwithstanding anything to the contrary in the Plan, the Board may, in its sole discretion, at any time and from time to time, resolve to administer the Plan. In such event, the Board shall have all of the authority and responsibility granted to the Committee herein.

(b) International Administration. The Committee may establish sub-plans (which need not qualify under section 423 of the Code) and initiate separate Offerings through such sub-plans for the purpose of (i) facilitating participation in the Plan by non-U.S. employees in compliance with foreign laws and regulations without affecting the qualification of the remainder of the Plan under section 423 of the Code or (ii) qualifying the Plan for preferred tax treatment under foreign tax laws (which sub-plans, at the Committee's discretion, may provide for allocations of the authorized shares reserved for issue under the Plan as set forth in Section 14(a)). The rules, guidelines and forms of such sub-plans (or the Offerings thereunder) may take precedence over other provisions of the Plan, with the exception of Section 4(a)(i), Section 5(b), Section 8(b) and Section 14(a), but unless otherwise superseded by the terms of such sub-plan, the provisions of the Plan shall govern the operation of such sub-plan. Alternatively and in order to comply with the laws of a foreign jurisdiction, the Committee shall have the power, in its discretion, to grant options in an Offering to citizens or residents of a non-U.S. jurisdiction (without regard to whether they are also citizens of the United States or resident aliens) that provide terms which are less favorable than the terms of options granted under the same Offering to employees resident in the United States, subject to compliance with section 423 of the Code.

SECTION 4 Enrollment And Participation.

(a) Offering Periods. While the Plan is in effect, the Committee may from time to time grant options to purchase shares of Stock pursuant to the Plan to Eligible Employees during a specified Offering Period. Each such Offering shall be in such form and shall contain such terms and conditions as the Committee shall determine, subject to compliance with the terms and conditions of the Plan (which may be incorporated by reference) and the requirements of section 423 of the Code, including the requirement that all Eligible Employees have the same rights and privileges. The Committee shall specify prior to the commencement of each Offering (i) the period during which the Offering shall be effective, which may not exceed 27 months from the Offering Date and may include

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-191

Exhibit 6
Page 1486

**Table of Contents**

one or more successive Purchase Periods within the Offering, (ii) the Purchase Dates and Purchase Price for shares of Stock which may be purchased pursuant to the Offering, and (iii) if applicable, any limits on the number of shares purchasable by a Participant, or by all Participants in the aggregate, during any Offering Period or, if applicable, Purchase Period, in each case consistent with the limitations of the Plan. The Committee shall have the discretion to provide for the automatic termination of an Offering following any Purchase Date on which the Fair Market Value of a share of Stock is equal to or less than the Fair Market Value of a share of Stock on the Offering Date, and for the Participants in the terminated Offering to be automatically re-enrolled in a new Offering that commences immediately after such Purchase Date. The terms and conditions of each Offering need not be identical, and shall be deemed incorporated by reference and made a part of the Plan.

(b) Enrollment. Any individual who, on the day preceding the first day of an Offering Period, qualifies as an Eligible Employee may elect to become a Participant in the Plan for such Offering Period by completing the enrollment process prescribed and communicated for this purposes from time to time by the Company to Eligible Employees.

(c) Duration of Participation. Once enrolled in the Plan, a Participant shall continue to participate in the Plan until the Participant ceases to be an Eligible Employee or withdraws from the Plan under Section 6(a). A Participant who withdrew from the Plan under Section 6(a) may again become a Participant, if the Participant then is an Eligible Employee, by following the procedure described in Subsection (b) above. A Participant whose employee contributions were discontinued automatically under Section 9(b) shall automatically resume participation at the beginning of the earliest Offering Period ending in the next calendar year, if the Participant then is an Eligible Employee. When a Participant reaches the end of an Offering Period but the Participant's participation is to continue, then such Participant shall automatically be re-enrolled for the Offering Period that commences immediately after the end of the prior Offering Period.

SECTION 5 Employee Contributions.

(a) Frequency of Payroll Deductions. A Participant may purchase shares of Stock under the Plan solely by means of payroll deductions; provided, however, that to the extent provided in the terms and conditions of an Offering, a Participant may also make contributions through payment by cash or check prior to one or more Purchase Dates during the Offering. Payroll deductions, subject to the provisions of Subsection (b) below or as otherwise provided under the terms and conditions of an Offering, shall occur on each payday during participation in the Plan.

(b) Amount of Payroll Deductions. An Eligible Employee shall designate during the enrollment process the portion of Compensation that such Eligible Employee elects to have withheld for the purchase of Stock. Such portion shall be a whole percentage of the Eligible Employee's Compensation, but not less than 1% nor more than 15% (or such lower rate of Compensation specified as the limit in the terms and conditions of the applicable Offering).

(c) Changing Withholding Rate. Unless otherwise provided under the terms and conditions of an Offering, a Participant may not increase the rate of payroll withholding during the Offering Period, but may discontinue or decrease the rate of payroll withholding during the Offering Period to a whole percentage of the Participant's Compensation in accordance with such procedures and subject to such limitations as the Company may establish for all Participants. A Participant may also increase or decrease the rate of payroll withholding effective for a new Offering Period by submitting an authorization to change the payroll deduction rate pursuant to the process prescribed by the Company from time to time. The new withholding rate shall be a whole percentage of the Eligible Employee's Compensation consistent with Subsection (b) above.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-192

Exhibit 6
Page 1487

**Table of Contents**

(d) <u>Discontinuing Payroll Deductions</u>. If a Participant wishes to discontinue employee contributions entirely, the Participant may do so by withdrawing from the Plan pursuant to Section 6(a). In addition, employee contributions may be discontinued automatically pursuant to Section 9(b).

SECTION 6 <u>Withdrawal From The Plan.</u>

(a) <u>Withdrawal</u>. A Participant may elect to withdraw from the Plan by giving notice pursuant to the process prescribed and communicated by the Company from time to time. Such withdrawal may be elected at any time before the last day of an Offering Period, except as otherwise provided in the Offering. In addition, if payment by cash or check is permitted under the terms and conditions of an Offering, Participants may be deemed to withdraw from the Plan by declining or failing to remit timely payment to the Company for the shares of Stock. As soon as reasonably practicable thereafter, payroll deductions shall cease and the entire amount credited to the Participant's Plan Account shall be refunded to the Participant in cash, without interest. No partial withdrawals shall be permitted.

(b) <u>Re-enrollment After Withdrawal</u>. A former Participant who has withdrawn from the Plan shall not be a Participant until the Participant re-enrolls in the Plan under Section 4(b). Re-enrollment may be effective only at the commencement of an Offering Period.

SECTION 7 <u>Change In Employment Status</u>.

(a) <u>Termination of Employment</u>. Termination of employment as an Eligible Employee for any reason, including death, shall be treated as an automatic withdrawal from the Plan under Section 6(a). A transfer from one Participating Company to another shall not be treated as a termination of employment.

(b) <u>Leave of Absence</u>. For purposes of the Plan, employment shall not be deemed to terminate when the Participant goes on a military leave, a sick leave or another bona fide leave of absence, if the leave was approved by the Company in writing. Employment, however, shall be deemed to terminate three months after the Participant goes on a leave, unless a contract or statute guarantees the Participant's right to return to work. Employment shall be deemed to terminate in any event when the approved leave ends, unless the Participant immediately returns to work.

(c) <u>Death</u>. In the event of the Participant's death, the amount credited to the Participant's Plan Account shall be paid to the Participant's estate.

SECTION 8 <u>Plan Accounts and Purchase Of Shares</u>.

(a) <u>Plan Accounts</u>. The Company shall maintain a Plan Account on its books in the name of each Participant. Whenever an amount is deducted from the Participant's Compensation under the Plan, such amount shall be credited to the Participant's Plan Account. Amounts credited to Plan Accounts shall not be trust funds and may be commingled with the Company's general assets and applied to general corporate purposes. No interest shall be credited to Plan Accounts.

(b) <u>Purchase Price</u>. The Purchase Price for each share of Stock purchased during an Offering Period shall be the lesser of:

(i) 85% of the Fair Market Value of such share on the Purchase Date; or

(ii) 85% of the Fair Market Value of such share on the Offering Date.

The Committee may specify an alternate Purchase Price amount or formula in the terms and conditions of an Offering, but in no event may such amount or formula result in a Purchase Price less than that calculated pursuant to the immediately preceding formula.

<div align="center">

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-193

</div>

Exhibit 6
Page 1488

Table of Contents

(c) <u>Number of Shares Purchased</u>. As of each Purchase Date, each Participant shall be deemed to have elected to purchase the number of shares of Stock calculated in accordance with this Subsection (c), unless the Participant has previously elected to withdraw from the Plan in accordance with Section 6(a). The amount then in the Participant's Plan Account shall be divided by the Purchase Price, and the number of shares that results shall be purchased from the Company with the funds in the Participant's Plan Account. Unless provided otherwise by the Committee prior to commencement of an Offering, the maximum number of shares of Stock which may be purchased by an individual Participant during such Offering is [          ] shares. The foregoing notwithstanding, no Participant shall purchase more than such number of shares of Stock as may be determined by the Committee with respect to the Offering Period, or Purchase Period, if applicable, nor more than the amounts of Stock set forth in Sections 9(b) and 14(a). For each Offering Period and, if applicable, Purchase Period, the Committee shall have the authority to establish additional limits on the number of shares purchasable by all Participants in the aggregate.

(d) <u>Available Shares Insufficient</u>. In the event that the aggregate number of shares that all Participants elect to purchase during an Offering Period exceeds the maximum number of shares remaining available for issuance under Section 14(a), or which may be purchased pursuant to any additional aggregate limits imposed by the Committee, then the number of shares to which each Participant is entitled shall be determined by multiplying the number of shares available for issuance by a fraction, the numerator of which is the number of shares that such Participant has elected to purchase and the denominator of which is the number of shares that all Participants have elected to purchase.

(e) <u>Issuance of Stock</u>. Certificates representing the shares of Stock purchased by a Participant under the Plan shall be issued to the Participant as soon as reasonably practicable after the applicable Purchase Date, except that the Company may determine that such shares shall be held for each Participant's benefit by a broker designated by the Company. Shares may be registered in the name of the Participant or jointly in the name of the Participant and the Participant's spouse as joint tenants with right of survivorship or as community property.

(f) <u>Unused Cash Balances</u>. An amount remaining in the Participant's Plan Account that represents the Purchase Price for any fractional share may be carried over in the Participant's Plan Account to the next Purchase Period or Offering Period or refunded to the Participant in cash at the end of the Purchase Period or Offering Period, without interest, if the Participant's participation is not continued. Any amount remaining in the Participant's Plan Account that represents the Purchase Price for whole shares that could not be purchased by reason of Subsection (c) or (d) above, Section 9(b) or Section  14(a) shall be refunded to the Participant in cash, without interest.

(g) <u>Stockholder Approval</u>. The Plan shall be submitted to the stockholders of the Company for their approval within twelve (12) months after the date the Plan is adopted by the Board. Any other provision of the Plan notwithstanding, no shares of Stock shall be purchased under the Plan unless and until the Company's stockholders have approved the adoption of the Plan.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-194

Exhibit 6
Page 1489

Table of Contents

SECTION 9 Limitations On Stock Ownership.

(a) Five Percent Limit. Any other provision of the Plan notwithstanding, no Participant shall be granted a right to purchase Stock under the Plan if such Participant, immediately after the Participant's election to purchase such Stock, would own stock possessing 5% or more of the total combined voting power or value of all classes of stock of the Company or any parent or Subsidiary of the Company. For purposes of this Subsection (a), the following rules shall apply:

(i) Ownership of stock shall be determined after applying the attribution rules of section 424(d) of the Code;

(ii) Each Participant shall be deemed to own any stock that the Participant has a right or option to purchase under this or any other plan; and

(iii) Each Participant shall be deemed to have the right to purchase up to the maximum number of shares of Stock that may be purchased by a Participant under this Plan under the individual limit specified pursuant to Section 8(c) with respect to each Offering Period.

(b) Dollar Limit. Any other provision of the Plan notwithstanding, no Participant shall accrue the right to purchase Stock at a rate which exceeds $25,000 of Fair Market Value of such Stock per calendar year (under this Plan and all other employee stock purchase plans of the Company or any parent or Subsidiary of the Company), determined in accordance with the provisions of section 423(b)(8) of the Code and applicable Treasury Regulations promulgated thereunder.

For purposes of this Subsection (b), the Fair Market Value of Stock shall be determined as of the beginning of the Offering Period in which such Stock is purchased. Employee stock purchase plans not described in section 423 of the Code shall be disregarded. If a Participant is precluded by this Subsection (b) from purchasing additional Stock under the Plan, then the Participant's employee contributions may automatically be discontinued.

SECTION 10 Rights Not Transferable.

The rights of any Participant under the Plan, or any Participant's interest in any Stock or moneys to which the Participant may be entitled under the Plan, shall not be transferable by voluntary or involuntary assignment or by operation of law, or in any other manner other than by the laws of descent and distribution. If a Participant in any manner attempts to transfer, assign or otherwise encumber the Participant's rights or interest under the Plan, other than by the laws of descent and distribution, then such act shall be treated as an election by the Participant to withdraw from the Plan under Section 6(a).

SECTION 11 No Rights As An Employee.

Nothing in the Plan or in any right granted under the Plan shall confer upon the Participant any right to continue in the employ of a Participating Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Participating Companies or of the Participant, which rights are hereby expressly reserved by each, to terminate the Participant's at-will employment at any time and for any reason, with or without cause.

SECTION 12 No Rights As A Stockholder.

A Participant shall have no rights as a stockholder with respect to any shares of Stock that the Participant may have a right to purchase under the Plan until such shares have been purchased on the applicable Purchase Date.

<div align="center">
ROCKLEY PHOTONICS HOLDINGS LIMITED<br>
2021 EMPLOYEE STOCK PURCHASE PLAN<br><br>
A-195
</div>

Exhibit 6
Page 1490

**Table of Contents**

SECTION 13 Securities Law Requirements.

Shares of Stock shall not be issued under the Plan unless the issuance and delivery of such shares comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded.

SECTION 14 Stock Offered Under The Plan.

(a) Authorized Shares. The maximum aggregate number of shares of Stock available for purchase under the Plan is [            ]1 shares plus an annual increase to be added on the first day of each of the Company's fiscal years for a period of up to ten years, beginning with the fiscal year that begins [January 1, 2022], equal to the least of (i) one percent (1%) of the outstanding shares of Stock on such date, (ii) [            ] shares, or (iii) a lesser amount determined by the Committee or Board. The aggregate number of shares available for purchase under the Plan (and the limit in clause (ii) to the annual increase thereto) shall at all times be subject to adjustment pursuant to Section  14(b).

(b) Antidilution Adjustments. The aggregate number of shares of Stock offered under the Plan, the individual and aggregate Participant share limitations described in Section 8(c) and the price of shares that any Participant has elected to purchase shall be adjusted proportionately by the Committee in the event of any change in the number of issued shares of Stock (or issuance of shares other than Common Stock) by reason of any forward or reverse share split, subdivision or consolidation, or share dividend or bonus issue, recapitalization, reclassification, merger, amalgamation, consolidation, split-up, spin-off, reorganization, combination, exchange of shares of Stock, the issuance of warrants or other rights to purchase shares of Stock or other securities, or any other change in corporate structure or in the event of any extraordinary distribution (whether in the form of cash, shares of Stock, other securities or other property), in any case, in a manner that complies with Section 423 of the Code.

(c) Reorganizations. Any other provision of the Plan notwithstanding, in the event of a Corporate Reorganization in which the Plan is not assumed by the surviving corporation or its parent corporation pursuant to the applicable plan of merger or consolidation, the Offering Period then in progress shall terminate immediately prior to the effective time of such Corporate Reorganization and either shares shall be purchased pursuant to Section 8 or, if so determined by the Board or Committee, all amounts in all Participant Accounts shall be refunded pursuant to Section 15 without any purchase of shares. The Plan shall in no event be construed to restrict in any way the Company's right to undertake a dissolution, liquidation, merger, consolidation or other reorganization.

SECTION 15 Amendment Or Discontinuance.

The Board or Committee shall have the right to amend, suspend or terminate the Plan at any time and without notice; *provided*, *however*, that any amendment that would be treated as the adoption of a new plan for purposes of Section 423 of the Code will have no force or effect unless approved by the shareholders of the Company within twelve (12) months before or after its adoption. Upon any such amendment, suspension or termination of the Plan during an Offering Period, the Board or Committee may in its discretion determine that the applicable Offering shall immediately terminate and that all amounts in the Participant Accounts shall be carried forward into a payroll deduction account for each Participant under a successor plan, if any, or promptly refunded to each Participant. Except as provided in Section 14, any increase in the aggregate number of shares of Stock to be issued under the Plan shall be subject to approval by a vote of the stockholders of the Company. In addition, any other amendment of the Plan shall be subject to approval by a vote of the stockholders of the

---

1    Initial pool to approximate 1% of outstanding shares

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-196

Exhibit 6
Page 1491

Table of Contents

Company to the extent required by an applicable law or regulation. This Plan shall continue until the earlier to occur of (a) termination of this Plan pursuant to this Section 15 or (b) issuance of all of the shares of Stock reserved for issuance under this Plan.

SECTION 16 Limitation on Liability.

Notwithstanding anything to the contrary in the Plan, neither the Company, nor any of its Subsidiaries, nor the Committee, nor any person acting on behalf of the Company, any of its Subsidiaries, or the Committee, will be liable to any Participant, to any permitted transferee, to the estate or beneficiary of any Participant or any permitted transferee, or to any other person by reason of any acceleration of income, any additional tax, or any penalty, interest or other liability asserted by reason of the failure of the Plan or any option to purchase Stock to satisfy the requirements of Section 423, or otherwise asserted with respect to the Plan or any option to purchase Stock.

SECTION 17 Unfunded Plan.

The Company's obligations under the Plan are unfunded, and no Participant will have any right to specific assets of the Company in respect of any option to purchase Stock. Participants will be general unsecured creditors of the Company with respect to any amounts due or payable under the Plan.

SECTION 18 Governing Law

The Plan shall be governed by the laws of the state of California, without application of the conflicts of law principles thereof.

SECTION 19 Execution.

To record the adoption of the Plan by the Board, the Company has caused its authorized officer to execute the same.

ROCKLEY PHOTONICS HOLDINGS LIMITED

By: _____

Name:

Title:

Date:

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

A-197

Exhibit 6
Page 1492

**Table of Contents**

ANNEX B

**Execution Version**

**SPAC INVESTOR SUPPORT AGREEMENT**

This SPAC Investor Support Agreement (this "SPAC Investor Support Agreement") is dated as of March 19, 2021 by and among SC Health Holdings Limited (the "Sponsor"), SC Health Corporation., a blank check exempted company incorporated in the Cayman Islands with limited liability ("SPAC"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("HoldCo"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("Merger Sub") and Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Business Combination Agreement.

**RECITALS**

WHEREAS, as of the date hereof the Sponsor is, and as of immediately prior to the Closing will be, the holder of record and the "beneficial owner" (within the meaning of Rule 13d-3 under the Exchange Act) of 5,487,500 SPAC Class B Ordinary Shares, 5,450,000 SPAC Private Placement Warrants, in each case as set forth on Schedule I attached hereto, which such SPAC Class B Ordinary Shares constitute 98.7% of the Class B ordinary shares of SPAC and such SPAC Private Placement Warrants constitute all of the issued and outstanding Private Placement Warrants (as such term is defined in the Warrant Agreement).

WHEREAS, as a result of the Initial Exchange, the Company will become a wholly-owned subsidiary of HoldCo;

WHEREAS, contemporaneously with the execution and delivery of this SPAC Investor Support Agreement, SPAC, HoldCo, Merger Sub, and the Company, have entered into a business combination agreement (as amended or modified from time to time, the "Business Combination Agreement"), dated as of the date hereof, pursuant to which, among other transactions, SPAC is to merge with and into Merger Sub, with SPAC continuing on as the surviving entity as a directly wholly-owned subsidiary of HoldCo, on the terms and conditions set forth therein (the "Merger"); and

WHEREAS, as an inducement to SPAC, HoldCo, Merger Sub and the Company to enter into the Business Combination Agreement and to consummate the transactions contemplated therein, the parties hereto desire to agree to certain matters as set forth herein.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

**ARTICLE I**
**SPONSOR SUPPORT AGREEMENT; COVENANTS**

Section 1.1 Binding Effect of Business Combination Agreement. The Sponsor hereby acknowledges that it has read the Business Combination Agreement and this SPAC Investor Support Agreement and has had the

B-1

Exhibit 6
Page 1493

**Table of Contents**

opportunity to consult with its tax and legal advisors. The Sponsor shall be bound by and comply with Sections 8.2 (*No Solicitation by SPAC*) (but only with respect to Business Combination Proposals involving SPAC), 9.12 (*Confidentiality*) and 12.12 (*Publicity*) of the Business Combination Agreement (and any relevant definitions contained in such Sections) as if the Sponsor was an original signatory to the Business Combination Agreement with respect to such provisions.

Section 1.2 <u>No Transfer</u>. During the period commencing on the date hereof and ending on the earlier of (a) the Merger Effective Time and (b) such date and time as the Business Combination Agreement shall be terminated in accordance with Section 11.1 (*Termination*) thereof, the Sponsor shall not, directly or indirectly, (i) sell (including short sells), offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase, tender, convert, encumber, assign or otherwise transfer or dispose of or agree to transfer or dispose of, directly or indirectly, file (or participate in the filing of) a registration statement with the SEC (other than the Proxy Statement/Registration Statement) or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, with respect to any SPAC Ordinary Shares or SPAC Warrants owned by the Sponsor, (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any shares of SPAC Ordinary Shares or SPAC Warrants owned by the Sponsor, either voluntarily or involuntarily (clauses (i) and (ii) collectively, a "<u>Transfer</u>"); or enter into any contract, option, derivative, hedging or other agreement or arrangement or understanding (including any profit-sharing arrangement) with respect to, or consent to, a Transfer of, any or all of the SPAC Ordinary Shares or SPAC Warrants owned by the Sponsor or (iii) publicly announce any intention to effect any transaction specified in clause (i) or (ii); <u>provided</u>, however, that the foregoing shall not prohibit Transfers between the Sponsor and any Affiliate of the Sponsor, so long as, prior to and as a condition to the effectiveness of any such Transfer, such Affiliate executes and delivers to SPAC a joinder to this SPAC Investor Support Agreement in the form attached hereto as Annex A. The Sponsor hereby authorizes SPAC and HoldCo to maintain a copy of this SPAC Investor Support Agreement at either the executive office or the registered office of SPAC and/or HoldCo. In furtherance of this SPAC Investor Support Agreement, the Sponsor hereby authorizes and will instruct SPAC, promptly after the date hereof, to enter, or cause its transfer agent to enter, a stop transfer order with respect to all of such Sponsor's SPAC Ordinary Shares and SPAC Warrants with respect to any Transfer not permitted hereunder.

Section 1.3 <u>New Shares</u>. In the event that (a) any SPAC Ordinary Shares, SPAC Warrants or other equity securities of SPAC are issued to the Sponsor after the date of this SPAC Investor Support Agreement pursuant to any stock dividend, stock split, recapitalization, reclassification, combination or exchange of SPAC Ordinary Shares or SPAC Warrants of, on or affecting the SPAC Ordinary Shares or SPAC Warrants owned by the Sponsor or otherwise, (b) the Sponsor purchases or otherwise acquires beneficial ownership of any SPAC Ordinary Shares, SPAC Warrants or other equity securities of SPAC after the date of this SPAC Investor Support Agreement, or (c) the Sponsor acquires the right to vote or share in the voting of any SPAC Ordinary Shares or other equity securities of SPAC after the date of this SPAC Investor Support Agreement (such SPAC Ordinary Shares, SPAC Warrants or other equity securities of SPAC, collectively the "<u>New Securities</u>"), then such New Securities acquired or purchased by the Sponsor shall be subject to the terms of this SPAC Investor Support Agreement to the same extent as if they constituted the SPAC Ordinary Shares or SPAC Warrants owned by the Sponsor as of the date hereof.

Section 1.4 <u>Closing Date Deliverables</u>. On the Closing Date, the Sponsor shall deliver to SPAC, HoldCo and the Company a duly executed copy of that certain Registration Rights and Lock-Up Agreement, by and among others, SPAC, the Sponsor and certain former Company Shareholders.

Section 1.5 <u>Sponsor Support Agreements</u>.

(a) The Sponsor agrees irrevocably and unconditionally that at any meeting of the shareholders of SPAC, however called, or at any adjournment or postponement thereof, or in any other circumstance in which the vote, consent or other approval of the shareholders of SPAC is sought and in connection with any similar vote or

B-2

Exhibit 6
Page 1494

**Table of Contents**

consent of the holders of Private Placement Warrants, the Sponsor shall (i) appear at each such meeting or otherwise cause all of its SPAC Ordinary Shares to be counted as present thereat for purposes of calculating a quorum and (ii) vote (or cause to be voted), or execute and deliver a written consent (or cause a written consent to be executed and delivered) covering, all of its SPAC Ordinary Shares:

(i) in favor of the transactions contemplated by the Business Combination Agreement;

(ii) in favor of the Transaction Proposals;

(iii) against any merger agreement, merger, exchange, consolidation, combination, sale of substantial assets, reorganization, recapitalization, dissolution, liquidation or winding up of or by SPAC or any other business combination proposal involving SPAC (other than the Business Combination Agreement and the transactions contemplated thereby);

(iv) against any change in the business, management or Board of Directors of SPAC (other than in connection with Transaction Proposals); and

(v) against any proposal, action or agreement that would reasonably be expected to (A) impede, nullify, frustrate, prevent, interfere with, materially delay the consummation of, or otherwise adversely affect, any of the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger or any provision of this SPAC Investor Support Agreement, (B) result in a breach in any respect of any covenant, representation, warranty or any other obligation or agreement of SPAC under the Business Combination Agreement or any Ancillary Agreement, (C) result in any of the conditions set forth in Article X of the Business Combination Agreement not being fulfilled or (D) change in any manner the dividend policy or capitalization of, including the voting rights of any class of capital stock of, SPAC.

The Sponsor hereby agrees that it shall not commit or agree to take any action inconsistent with the foregoing. The obligations of the Sponsor hereunder shall apply whether or not the SPAC Board or other governing body or any committee, subcommittee or subgroup thereof recommends any of the Transaction Proposals and whether or not such board or other governing body, committee, subcommittee or subgroup thereof changes, withdraws, withholds, qualifies or modifies, or publicly proposes to change, withdraw, withhold, qualify or modify, the SPAC Board's recommendation to its stockholders.

(b) During the period commencing on the date hereof and ending on the earlier of the consummation of the Closing and the termination of the Business Combination Agreement pursuant to Article XI thereof, the Sponsor shall not modify or amend any contract between or among the Sponsor, anyone related by blood, marriage or adoption to the Sponsor or any Affiliate of the Sponsor, on the one hand, and SPAC on the other hand.

Section 1.6 Waiver of Certain Rights. Notwithstanding anything to the contrary in any other agreement or contract to which the Sponsor is bound, the Sponsor (for itself and for its successors, heirs and assigns) hereby (but subject to the consummation of the Merger) irrevocably and unconditionally:

(a) waives, to the fullest extent permitted by law and SPAC's Governing Documents, and agrees not to exercise, assert or perfect, any rights to adjustment or other anti-dilution protections with respect to the rate at which SPAC Ordinary Shares held by the Sponsor convert into HoldCo Ordinary Shares, whether resulting from the transactions contemplated by the Business Combination Agreement, the Subscription Agreements or otherwise;

(b) agrees not to (i) demand that SPAC redeem its SPAC Class B Ordinary Shares in connection with the transactions contemplated by the Business Combination Agreement or (ii) otherwise participate in any such redemption by tendering or submitting any of its SPAC Class B Ordinary Shares for redemption; and

B-3

Exhibit 6
Page 1495

Table of Contents

(c) (i) waives any rights for working capital loans made by or on its behalf to SPAC or any of its affiliates to be converted into warrants exercisable for securities of SPAC, HoldCo or any of their affiliates or their successors and assigns and (ii) agrees that no such loans shall be converted into such warrants or any such other securities.

Section 1.7 <u>Further Assurances</u>. The Sponsor shall, and shall cause its affiliates to, take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to consummate the Merger and the other applicable transactions contemplated by the Business Combination Agreement on the terms and subject to the conditions set forth therein and herein and shall not, and shall cause its affiliates not to, take any action that would reasonably be expected to prevent or materially delay the satisfaction of any of the conditions to the Merger and the other applicable transactions contemplated by the Business Combination Agreement set forth in Article X of the Business Combination Agreement.

Section 1.8 <u>No Inconsistent Agreement</u>. The Sponsor hereby represents and covenants that the Sponsor has not entered into, and shall not enter into, any agreement that would restrict, limit or interfere with the performance of the Sponsor's obligations hereunder.

<div align="center">

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES**

</div>

Section 2.1 <u>Representations and Warranties of the Sponsor</u>. Except as set forth in (i) any SPAC SEC Filings filed or submitted on or prior to the date hereof (excluding (a) any disclosures in any risk factors section that do not constitute statements of fact, disclosures in any forward-looking statements disclaimer and other disclosures that are generally cautionary, predictive or forward-looking in nature and (b) any exhibits or other documents appended thereto) (it being acknowledged that nothing disclosed in such SPAC SEC Filings will be deemed to modify or qualify the representations and warranties set forth in Article II, or (ii) in the SPAC Disclosure Letter, Sponsor represents and warrants as of the date hereof to HoldCo, SPAC and the Company as follows:

(a) <u>Organization; Due Authorization</u>. It is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is incorporated, formed, organized or constituted, and the execution, delivery and performance of this SPAC Investor Support Agreement and the consummation of the transactions contemplated hereby are within the Sponsor's corporate power and authority and have been (i) duly and validly authorized and approved by Sponsor's Board and (ii) determined by Sponsor's Board as advisable to Sponsor and Sponsor's Shareholders and recommended for approval by Sponsor's Shareholders. This SPAC Investor Support Agreement has been duly executed and delivered by the Sponsor and, assuming due authorization, execution and delivery by the other parties to this SPAC Investor Support Agreement, this SPAC Investor Support Agreement constitutes a legally valid and binding obligation of the Sponsor, enforceable against the Sponsor in accordance with the terms hereof (except as enforceability may be limited by bankruptcy Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies).

(b) <u>Ownership</u>. The Sponsor is the record and beneficial owner (as defined in the Securities Act) of, and has good title to, all of the Sponsor's SPAC Ordinary Shares and SPAC Warrants listed on Schedule I hereto, and there exist no Liens or any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such SPAC Shares or SPAC Warrants (other than transfer restrictions under the Securities Act)) affecting any such SPAC Shares or SPAC Warrants, other than Liens pursuant to (i) this SPAC Investor Support Agreement, (ii) the SPAC's Governing Documents, (iii) the Business Combination Agreement, or (iv) any applicable securities Laws. The Sponsor's SPAC Ordinary Shares and SPAC Warrants are the only equity securities in SPAC owned of record or beneficially by the Sponsor or any of its Affiliates on the date of this SPAC Investor Support Agreement, and none of the Sponsor's SPAC Ordinary Shares or SPAC Warrants are subject to any proxy, voting trust or other agreement or arrangement with respect to the voting of such SPAC Ordinary Shares or SPAC Warrants, except as provided hereunder. Other than the SPAC Warrants, the Sponsor

<div align="center">B-4</div>

<div align="right">Exhibit 6
Page 1496</div>

Table of Contents

does not hold or own any rights to acquire (directly or indirectly) any equity securities of SPAC or any equity securities convertible into, or which can be exchanged for, equity securities of SPAC.

(c) <u>No Conflicts</u>. The execution and delivery of this SPAC Investor Support Agreement by the Sponsor does not, and the performance by the Sponsor of its obligations hereunder will not, (i) conflict with or result in a violation of the organizational documents of the Sponsor or (ii) require any consent or approval that has not been given or other action that has not been taken by any Person (including under any Contract binding upon the Sponsor or the Sponsor's SPAC Ordinary Shares or SPAC Warrants), in each case, to the extent such consent, approval or other action would prevent, enjoin or materially delay the performance by the Sponsor of its, his or her obligations under this SPAC Investor Support Agreement.

(d) <u>Litigation</u>. There are no Actions pending against the Sponsor, or to the knowledge of the Sponsor threatened against the Sponsor, before (or, in the case of threatened Actions, that would be before) any arbitrator or any Governmental Authority, which in any manner challenges or seeks to prevent, enjoin or materially delay the performance by the Sponsor of its, his or her obligations under this SPAC Investor Support Agreement.

(e) <u>Brokerage Fees</u>. No broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by the Business Combination Agreement based upon arrangements made by the Sponsor, for which SPAC or any of its Affiliates may become liable.

(f) <u>Acknowledgment</u>. The Sponsor understands and acknowledges that each of SPAC, the Company and HoldCo is entering into the Business Combination Agreement in reliance upon the Sponsor's execution and delivery of this SPAC Investor Support Agreement.

(g) <u>Affiliate Arrangements</u>. Neither Sponsor nor any anyone related by blood, marriage or adoption to Sponsor or, to the knowledge of Sponsor, any Person in which Sponsor has a direct or indirect legal, contractual or beneficial ownership of 5% or greater is party to, or has any rights with respect to, or arising from, any contract with SPAC.

(h) <u>No Other Representations or Warranties</u>. Except for the representations and warranties made by the Sponsor in this ARTICLE II or in any other Ancillary Agreement to which Sponsor is a party, Sponsor does not make any express or implied representation or warranty to SPAC, HoldCo, Merger Sub or the Company in connection with this SPAC Investor Support Agreement or the transactions contemplated by this SPAC Investor Support Agreement, and the Sponsor expressly disclaims any such other representations or warranties.

<div align="center">

**ARTICLE III**
**<u>MISCELLANEOUS</u>**

</div>

Section 3.1 <u>Termination</u>. This SPAC Investor Support Agreement and all of its provisions shall terminate and be of no further force or effect upon the earlier of (a) the termination of the Business Contribution Agreement in accordance with its terms, (b) the Merger Effective Time, or (c) the written agreement of the Sponsor, SPAC, HoldCo, Merger Sub and the Company. Upon such termination of this SPAC Investor Support Agreement, all obligations of the parties under this SPAC Investor Support Agreement will terminate, without any liability or other obligation on the part of any party hereto to any Person in respect hereof or the transactions contemplated hereby, and no party hereto shall have any claim against another (and no person shall have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter hereof; provided, however, that the termination of this SPAC Investor Support Agreement shall not relieve any party hereto from liability arising in respect of any breach of this SPAC Investor Support Agreement prior to such termination. This <u>ARTICLE III</u> shall survive the termination of this SPAC Investor Support Agreement.

<div align="center">B-5</div>

Exhibit 6
Page 1497

**Table of Contents**

Section 3.2 <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. Sections 12.7 (*Governing Law*) and 12.14 (*Jurisdiction; Waiver of Jury Trial*) of the Business Combination Agreement are incorporated herein by reference, *mutatis mutandis*.

Section 3.3 <u>Non-Circumvention</u>. The Sponsor agrees that it shall not, and shall cause its Affiliates not to, indirectly accomplish that which it is not permitted to accomplish directly under this SPAC Investor Support Agreement pursuant to provisions of this SPAC Investor Support Agreement that have not been terminated pursuant to <u>Section 3.1</u>.

Section 3.4 <u>Inconsistent Actions</u>. The Sponsor agrees, while this SPAC Investor Support Agreement is in effect, not to take or agree or commit to take any action that would make any representation and warranty of the Sponsor contained in this SPAC Investor Support Agreement inaccurate or has the effect of preventing or disabling the Sponsor from performing its obligations under this SPAC Investor Support Agreement

Section 3.5 <u>Assignment</u>. This SPAC Investor Support Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Neither this SPAC Investor Support Agreement nor any of the rights, interests or obligations hereunder will be assigned (including by operation of law) without the prior written consent of all of the other parties hereto.

Section 3.6 <u>Specific Performance</u>. The parties hereto agree that irreparable damage may occur in the event that any of the provisions of this SPAC Investor Support Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this SPAC Investor Support Agreement and to enforce specifically the terms and provisions of this SPAC Investor Support Agreement in the chancery court or any other state or federal court within the State of Delaware, this being in addition to any other remedy to which such party is entitled at law or in equity.

Section 3.7 <u>Amendment</u>. This SPAC Investor Support Agreement may not be amended, changed, supplemented, waived or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by SPAC, HoldCo, Merger Sub, the Company and the Sponsor.

Section 3.8 <u>Severability</u>. If any provision of this SPAC Investor Support Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this SPAC Investor Support Agreement will remain in full force and effect. Any provision of this SPAC Investor Support Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this SPAC Investor Support Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger be consummated as originally contemplated to the fullest extent possible.

<div align="center">B-6</div>

Exhibit 6
Page 1498

**Table of Contents**

Section 3.9 <u>Notices</u>. All notices and other communications among the parties hereto shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (c) when delivered by FedEx or other nationally recognized overnight delivery service or (d) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

(a) If to SPAC, prior to the Closing, or to SPAC after the Effective Time, to:

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Republic of Singapore
Attention: Jeri Kewk
        AJ Coloma
        Eric Teo
        Terence Fong
        Aaron Wee
        Clement Chen
Email: jeri.kwek@sincapital.com
        aj.coloma@sincapital.com
        eric.teo@sincapital.com
        terence.fong@sincapital.com
        aaron.wee@sincapital.com
        Clement.Chen@sincapital.com

with copies to (which shall not constitute notice):

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
United States of America
Attention: Carl Marcellino
        Elizabeth Todd
Email: Carl.Marcellino@ropesgray.com
        Elizabeth.Todd@ropesgray.com

(b) If to the Company, HoldCo or Merger Sub:

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email: andrew.rickman@rockleyphotonics.com

with copies to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
United States of America
Attention: James Masetti
        Jarrod Murphy
Email: jim.masetti@pillsburylaw.com
        jarrod.murphy@pillsburylaw.com

B-7

Exhibit 6
Page 1499

**Table of Contents**

(c) If to Sponsor, to:

SC Health Holdings Limited
108 Robinson Road #10-00
Singapore 068900
Republic of Singapore
Attention: David Sin
Email: david.sin@sincapital.com

Section 3.10 <u>Counterparts</u>. This SPAC Investor Support Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

Section 3.11 <u>Entire Agreement</u>. This SPAC Investor Support Agreement and the agreements referenced herein and contemplated hereby constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties hereto to the extent they relate in any way to the subject matter hereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]**

B-8

Exhibit 6
Page 1500

Table of Contents

IN WITNESS WHEREOF, the Sponsor, SPAC, HoldCo, Merger Sub and the Company have each caused this SPAC Investor Support Agreement to be duly executed as of the date first written above.

**SPONSOR:**

SC HEALTH HOLDINGS LIMITED

By:  /s/ David Sin

Name: David Sin
Title:   Director

[Signature Page to SPAC Investor Support Agreement]

B-9

Exhibit 6
Page 1501

**Table of Contents**

**SPAC:**

SC HEALTH CORPORATION

By:  /s/ Angelo John Coloma
      Name: Angelo John Coloma
      Title:   Chief Executive Officer

[Signature Page to SPAC Investor Support Agreement]

B-10

Exhibit 6
Page 1502

Table of Contents

**COMPANY:**

ROCKLEY PHOTONICS LIMITED

By:  /s/ Dr. Andrew George Rickman
         Name: Dr. Andrew George Rickman
         Title:   Chief Executive Officer

[Signature Page to SPAC Investor Support Agreement]

B-11

Exhibit 6
Page 1503

Table of Contents

**HOLDCO:**

ROCKLEY PHOTONICS HOLDINGS LIMITED

By: /s/ Dr. Andrew George Rickman

Name: Dr. Andrew George Rickman
Title: Director

[Signature Page to SPAC Investor Support Agreement]

B-12

Exhibit 6
Page 1504

Table of Contents

**MERGER SUB:**

ROCKLEY MERGERSUB LIMITED

By:  /s/ Dr. Andrew George Rickman
      Name: Dr. Andrew George Rickman
      Title:   Director

[Signature Page to SPAC Investor Support Agreement]

B-13

Exhibit 6
Page 1505

Table of Contents

## Schedule I

**Sponsor SPAC Ordinary Shares and SPAC Warrants**

| Sponsor | SPAC Class A Ordinary Shares | SPAC Class B Ordinary Shares | SPAC Private Placement Warrants |
|---|---|---|---|
| SC Health Holdings Limited | N/A | 5,487,500 | 5,450,000 |

[Schedule I to SPAC Investor Support Agreement]

B-14

Exhibit 6
Page 1506

**Table of Contents**

<u>**Annex A**</u>

**Form of Joinder Agreement**

This Joinder Agreement (this "<u>Joinder Agreement</u>") is made as of the date written below by the undersigned (the "<u>Joining Party</u>") in accordance with the SPAC Investor Support Agreement, dated as of March 19, 2021 (as amended, supplemented or otherwise modified from time to time, the "<u>Support Agreement</u>"), by and among SC Health Holdings Limited (the "<u>Sponsor</u>"), SC Health Corporation., a blank check exempted company incorporated in the Cayman Islands with limited liability ("<u>SPAC</u>"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("<u>HoldCo</u>"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("<u>Merger Sub</u>") and Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "<u>Company</u>"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Business Combination Agreement

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Sponsor" under, the SPAC Investor Support Agreement as of the date hereof and shall have all of the rights and obligations of a Sponsor as if it had executed the SPAC Investor Support Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the SPAC Investor Support Agreement.

IN WITNESS WHEREOF, the undersigned has duly executed this Joinder Agreement as of the date written below.

Date:                     , 20

By:     _____
Name:
Title:

Address for Notices:

With copies to:

[Schedule II to SPAC Investor Support Agreement]

B-15

Exhibit 6
Page 1507

**Table of Contents**

ANNEX C

**Execution Version**

**COMPANY HOLDERS SUPPORT AGREEMENT**

This Company Holders Support Agreement (the "Company Holders Support Agreement") is dated as of March 19, 2021 by and among SC Health Corporation., a blank check exempted company incorporated in the Cayman Islands with limited liability ("SPAC"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("HoldCo"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("Merger Sub"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company") and certain of the shareholders of the Company, whose names appear on the signature pages of this Company Holders Support Agreement (each, a "Shareholder" and collectively, the "Shareholders"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Business Combination Agreement.

RECITALS

WHEREAS, as of the date hereof each Shareholder is the holder of record and the "beneficial owner" (within the meaning of Rule 13d-3 under the Exchange Act) of the number of Company Ordinary Shares as set forth on Schedule I attached hereto (collectively, with respect to each Shareholder, such Shareholder's "Owned Shares," and such Owned Shares, together with (1) any additional Company Ordinary Shares in which such Shareholder acquires record and beneficial ownership after the date hereof, including by exercise or exchange of securities convertible or exercisable into Company Ordinary Shares, purchase, as a result of a stock dividend, stock split, recapitalization, combination, reclassification, exchange or change of such shares, or upon exercise or conversion of any securities and (2) any additional shares of Company Ordinary Shares with respect to which such Shareholder has the right to vote through a proxy, the "Covered Shares");

WHEREAS, contemporaneously with the execution and delivery of this Company Holders Support Agreement, SPAC, HoldCo, Merger Sub, and the Company, have entered into a business combination agreement (as amended or modified from time to time, the "Business Combination Agreement"), dated as of the date hereof, pursuant to which, among other transactions, the Company will become a wholly-owned subsidiary of HoldCo as a result of the Exchange and SPAC will be merged with and into Merger Sub, with SPAC continuing on as the surviving entity as a directly wholly-owned subsidiary of HoldCo, on the terms and conditions set forth therein (the "Merger"); and

WHEREAS, as an inducement to SPAC, HoldCo, Merger Sub and the Company to enter into the Business Combination Agreement and to consummate the transactions contemplated therein, the parties hereto desire to agree to certain matters as set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

C-1

Exhibit 6
Page 1508

**Table of Contents**

**ARTICLE I**
**COMPANY HOLDERS SUPPORT; COVENANTS**

Section 1.1 <u>Support of Company Holders</u>.

(a) Each Shareholder, solely in his, her or its capacity as a shareholder or proxy holder of the Company, agrees irrevocably and unconditionally, subject to <u>Section 1.1(b)</u>, that at any meeting of the shareholders of the Company, however called, or at any adjournment or postponement thereof, or in any other circumstance in which the vote, consent or other approval of the shareholders of the Company is sought, such Shareholder shall (i) appear at each such meeting in person or by proxy or otherwise cause all of its Covered Shares to be counted as present threat for purposes of calculating a quorum and (ii) vote or provide consent (or cause to be voted or consented), in person or by proxy, or execute and deliver a written consent (or cause a written consent to be executed and delivered) covering, all of its Covered Shares owned as of the record date for such meeting (or the date that any written consent is executed by such Shareholder):

(i) in favor of the transactions contemplated by the Business Combination Agreement;

(ii) in favor of the Resolutions;

(iii) against any merger agreement, merger, exchange, consolidation, combination, sale of substantial assets, reorganization, recapitalization, dissolution, liquidation or winding up of or by the Company or any other business combination proposal (other than the Business Combination Agreement and the transactions contemplated thereby);

(iv) against any proposal, action or agreement that would reasonably be expected to (A) impede, nullify, frustrate, prevent, interfere with, materially delay the consummation of, or otherwise adversely affect, any of the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger or any provision of this Company Holders Support Agreement, (B) result in a breach in any respect of any covenant, representation, warranty or any other obligation or agreement of the Company under the Business Combination Agreement or any Ancillary Agreement, or (C) result in any of the conditions set forth in Article X of the Business Combination Agreement not being fulfilled; and

(v) undertakes, hereafter, to take all other necessary and desirable actions reasonably requested by the Company in connection with the transactions contemplated by the Business Combination Agreement or any Ancillary Agreement.

Each Shareholder hereby agrees that it shall not commit or agree to take any action inconsistent with the foregoing. The obligations of each Shareholder hereunder shall apply whether or not the Company Board or other governing body or any committee, subcommittee or subgroup thereof recommends any of the Resolutions and whether or not such board or other governing body, committee, subcommittee or subgroup thereof changes, withdraws, withholds, qualifies or modifies, or publicly proposes to change, withdraw, withhold, qualify or modify, the Company Board's recommendation to its shareholders.

(b) The agreement of each Shareholder contained in <u>Section 1.1(a)</u> is conditional on HM Revenue and Customs granting clearance (a) under section 138 Taxation of Chargeable Gains Act 1992 ("<u>TCGA</u>") that the anti-avoidance provisions of section 137 TCGA will not apply, and as such will not prevent section 135 TCGA from applying to the proposed transactions described in the Business Combination Agreement and (b) under section 707 Income Tax Act 2007 ("<u>ITA</u>") that no notice under s698 ITA will be given in relation to the proposed transactions described in the Business Combination Agreement (the "<u>Tax Clearance Condition</u>").

(c) Each Shareholder hereby covenants and agrees that such Shareholder shall not (i) enter into any voting agreement or voting trust with respect to any of such Shareholder's Covered Shares that is inconsistent with such Shareholder's obligations pursuant to this Company Holders Support Agreement, (ii) grant

C-2

Exhibit 6
Page 1509

Table of Contents

a proxy or power of attorney with respect to any of such Shareholder's Covered Shares that is inconsistent with such Shareholder's obligations pursuant to this Company Holders Support Agreement, or (iii) enter into any agreement or undertaking that is otherwise inconsistent with, or would restrict, limit or interfere with, or prohibit or prevent it from satisfying, its obligations pursuant to this Company Holders Support Agreement.

Section 1.2 <u>No Transfer</u>. During the period commencing on the date hereof and ending on the earlier of (a) the Merger Effective Time and (b) such date and time as the Business Combination Agreement shall be terminated in accordance with Section 11.1 (*Termination*) thereof, each Shareholder shall not, except in each case pursuant to or as contemplated by the Business Combination Agreement (including pursuant to the Schemes), directly or indirectly, sell (including short sells), offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase, tender, convert, encumber, assign or otherwise transfer or dispose of or agree to transfer or dispose of, directly or indirectly, file (or participate in the filing of) a registration statement with the SEC (other than the Proxy Statement/Registration Statement) or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, with respect to any Covered Shares owned by such Shareholder, either voluntarily or involuntarily (collectively, a "<u>Transfer</u>"); or enter into any contract, option, derivative, hedging or other agreement or arrangement or understanding (including any profit-sharing arrangement) with respect to, or consent to, a Transfer of, any or all of the Covered Shares, <u>provided</u>, however, that the foregoing shall not prohibit either (i) the conversion or exchange of securities convertible into or exchangeable for Company Ordinary Shares in accordance with their terms or (ii) Transfers between such Shareholder and any Affiliate of such Shareholder or to another Shareholder of the Company that is a party to this Company Holders Support Agreement and bound by the terms and obligations hereof, so long as, prior to and as a condition to the effectiveness of any such Transfer, such transferee executes and delivers to the Company a joinder to this Company Holders Support Agreement in the form attached hereto as Annex A. Each Shareholder hereby authorizes the Company to maintain a copy of this Company Holders Support Agreement at either the executive office or the registered office of the Company.

Section 1.3 <u>Closing Date Deliverables</u>. On the Closing Date, each Shareholder shall deliver to SPAC, HoldCo and the Company a duly executed copy of the Registration Rights and Lock-Up Agreement, by and among HoldCo, each Shareholder and the Other SPAC Investors.

Section 1.4 <u>Further Assurances</u>. Subject to the satisfaction of the Tax Clearance Condition, each Shareholder shall take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to consummate the Schemes, Exchange and Merger and the other applicable transactions contemplated by the Business Combination Agreement on the terms and subject to the conditions set forth therein and herein and shall not take any action that would reasonably be expected to prevent or delay the satisfaction of any of the conditions to the Schemes, Exchange and Merger and the other applicable transactions contemplated by the Business Combination Agreement set forth in Article X of the Business Combination Agreement. Each Shareholder further agrees not to commence or participate in, and to take all actions necessary to opt out of any class in any class action with respect to, any action or claim, derivative or otherwise, against SPAC, SPAC's Affiliates, the Sponsor, Holdco, or the Company or any of their respective successors and assigns with respect to the negotiation, execution or delivery of this Company Holders Support Agreement , the Business Combination Agreement (including all transactions contemplated by the Business Combination Agreement) or any other Ancillary Document, in each case to the extent relating to facts, matters, circumstances or events that existed or occurred on prior to the Closing. Further, each Shareholder also agrees that Articles 9.12 (*Confidentiality*) and 12.12 (*Publicity*) of the Business Combination Agreement should apply to such Shareholder *mutatis mutandis* and such Shareholder shall agree to be bound by the same as if such Shareholder were a party to the Business Combination Agreement.

Section 1.5 <u>Acquisition Proposals</u>.

(a) From the date hereof until the Closing Date or, if earlier, the termination of this Company Holders Support Agreement in accordance with Section 3.1, each Shareholder: (i) shall not, directly or indirectly initiate, solicit or engage in any negotiations with any Person with respect to, or provide any non-public

Exhibit 6
Page 1510

Table of Contents

information or data concerning the Company or any of the Company's Subsidiaries to any Person relating to, an Acquisition Proposal or afford to any Person access to the business, properties, assets or personnel of the Company or any of the Company's Subsidiaries in connection with an Acquisition Proposal, (ii) execute or enter into any acquisition agreement, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other arrangement or agreement relating to an Acquisition Proposal, (iii) grant any waiver, amendment or release under any confidentiality agreement or the anti-takeover laws of any state, (iv) otherwise knowingly encourage or facilitate any such inquiries, proposals, discussions, or negotiations or any effort or attempt by any Person to make an Acquisition Proposal or (v) agree or otherwise commit to enter into or engage in any of the foregoing. Each Shareholder also agrees that immediately following the execution of this Company Holders Support Agreement it shall cease any solicitations, discussions or negotiations with any Person (other than the parties to the Business Combination Agreement and their respective representatives) conducted heretofore in connection with an Acquisition Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal. Each Shareholder shall promptly (and in any event within two (2) Business Days) notify, in writing, SPAC of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal, which notice shall include a summary of the material terms of such inquiry, proposal, offer or request for information. Each Shareholder shall promptly (and in any event within twenty-four (24) hours) keep SPAC reasonably informed of any material developments with respect to any such inquiry, proposal, offer, request for information or Acquisition Proposal (including any material changes thereto).

(b) Notwithstanding anything in this Company Holders Support Agreement to the contrary, (i) each such Shareholder shall not be responsible for the actions of the Company or the Company Board (or any committee thereof), any subsidiary of the Company, or any officers, directors (in their capacity as such), employees and professional advisors of any of the foregoing (collectively, the "Company Related Parties"), (ii) each such Shareholder makes no representations or warranties with respect to the actions of any of the Company Related Parties, and (iii) any breach by the Company of its obligations under Section 7.5 (*Acquisition Proposals*) of the Business Combination Agreement shall not be considered a breach of this Section 1.5 (it being understood that, for the avoidance of doubt, such Shareholder or his, her or its representatives (other than any such representative that is a Company Related Party) shall remain responsible for any breach by such Shareholder or his, her or its representatives of this Section 1.5).

Section 1.6 Disclosure. Such Shareholder hereby authorizes the Company, HoldCo and SPAC to publish and disclose in any announcement or disclosure required by the SEC such Shareholder's identity and ownership of the Covered Shares and the nature of such Shareholder's obligations under this Company Holders Support Agreement. The Shareholder will promptly provide any information reasonably requested by SPAC, Holdco or the Company for any regulatory application or filing made or approval sought in connection with the transactions contemplated by the Business Combination Agreement (including filings with the SEC), except for any information that is subject to attorney-client privilege (provided, that to the extent reasonably possible, the parties shall cooperate in good faith to permit the provision and/or disclosure of such information in a manner that preserves such privilege), to the extent permitted by applicable Law.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1 Representations and Warranties of each Shareholder. Each Shareholder represents and warrants, severally (and not jointly and severally) as to itself only, as of the date hereof to HoldCo, SPAC and the Company as follows:

(a) Organization; Due Authorization. (i) if the Shareholder is a natural person, he or she has all the requisite power and authority and has taken all action necessary in order to execute and deliver this Company

C-4

Exhibit 6
Page 1511

Table of Contents

Holders Support Agreement, to perform his or her obligations hereunder and to consummate the transaction contemplated hereby, and (ii) if the Shareholder is not a natural person, (A) is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is incorporated, formed, organized or constituted, and the execution, delivery and performance of this Company Holders Support Agreement and the consummation of the transactions contemplated hereby are within each Shareholder's power and authority and have been (i) duly and validly authorized and approved by such Shareholder's Board and (ii) determined by such Shareholder's Board as advisable to such Shareholder and such Shareholder's shareholders and recommended for approval by such Shareholder's shareholders. This Company Holders Support Agreement has been duly executed and delivered by each Shareholder and, assuming due authorization, execution and delivery by the other parties to this Company Holders Support Agreement, this Company Holders Support Agreement constitutes a legally valid and binding obligation of each Shareholder, enforceable against each Shareholder in accordance with the terms hereof (except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and general principles of equity). If this Company Holders Support Agreement is being executed in a representative or fiduciary capacity, the Person signing this Company Holders Support Agreement has full power and authority to enter into this Company Holders Support Agreement on behalf of said Shareholder.

(b) Ownership. Each Shareholder is the record, legal and beneficial owner (as defined in the Securities Act) of, and has good title to, all of such Shareholder's Covered Shares listed on Schedule I hereto, and there exist no Liens or any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Covered Shares (other than transfer restrictions under the Securities Act)) affecting any such Covered Shares, other than Liens pursuant to (i) this Company Holders Support Agreement, (ii) if applicable, the Shareholder's Governing Documents, (iii) the Business Combination Agreement, or (iv) any applicable securities Laws. The execution, delivery and performance of this Company Holders Support Agreement by each Shareholder does not, and the consummation of the transactions contemplated hereby and the other transactions contemplated by the Business Combination Agreement will not, constitute or result in, with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) of or a default under, the loss of any benefit under, the creation, modification or acceleration of any obligations under or the creation of a Lien on any of the properties, rights or assets of each Shareholder pursuant to any Contracts binding upon any Shareholder or, assuming (solely with respect to performance of this Company Holders Support Agreement and the transactions contemplated hereby) compliance with the matters referred to in Section 2.1(i), under any applicable Law to which each Shareholder is subject. Each Shareholder's Covered Shares are the only equity securities in the Company owned of record or beneficially by such Shareholder on the date of this Company Holders Support Agreement, and none of such Shareholder's Covered Shares are subject to any proxy, voting trust or other agreement or arrangement with respect to the voting of such Covered Shares, except as provided hereunder.

(c) No Conflicts. The execution and delivery of this Company Holders Support Agreement by each Shareholder does not, and the performance by each Shareholder of its obligations hereunder and other transactions contemplated by the Business Combination Agreement will not, (i) conflict with or result in a violation of the organizational documents of such Shareholder that is not a natural person or (ii) require any consent or approval that has not been given or other action that has not been taken by any Person (including under any Contract binding upon such Shareholder or such Shareholder's Covered Shares), in each case, to the extent such consent, approval or other action would prevent, enjoin or materially delay the performance by such Shareholder of its, his or her obligations under this Company Holders Support Agreement.

(d) Litigation. There is no action, proceeding or investigation pending against any Shareholder or, to the knowledge of any Shareholder, threatened against any Shareholder that questions the beneficial or record ownership of the Shareholder's Owned Shares, the validity of this Company Holders Support Agreement or which in any manner challenges or seeks to prevent, enjoin or materially delay the performance by each Shareholder of its, his or her obligations under this Company Holders Support Agreement.

C-5

Exhibit 6
Page 1512

**Table of Contents**

(e) <u>Brokerage Fees</u>. Except as described on Section 4.16 of the Company Disclosure Letter provided in connection with the Business Combination Agreement, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by the Business Combination Agreement based upon arrangements made by each Shareholder, for which SPAC or any of its Affiliates may become liable.

(f) <u>Acknowledgment</u>. Each Shareholder understands and acknowledges that each of SPAC, the Company and HoldCo is entering into the Business Combination Agreement in reliance upon such Shareholder's execution and delivery of this Company Holders Support Agreement.

(g) Each Shareholder has had adequate information concerning the business and financial condition of SPAC and the Company to make an informed decision regarding this Company Holders Support Agreement and the transactions contemplated by the Business Combination Agreement and has independently and without reliance upon the SPAC or the Company and based on such information as each Shareholder has deemed appropriate, made its own analysis and decision to enter into this Company Holders Support Agreement . The Shareholder acknowledges that SPAC and the Company have not made and do not make any representation or warranty, whether express or implied, of any kind or character except as expressly set forth in this Company Holders Support Agreement. Each Shareholder acknowledges that the agreements contained herein with respect to the Covered Shares held by each Shareholder are irrevocable.

(h) Each Shareholder understands and acknowledges that each of SPAC Holdco, the Company and Merger Sub is entering into the Business Combination Agreement in reliance upon each Shareholder's execution and delivery of this Company Holders Support Agreement and the representations, warranties, covenants and other agreements of each Shareholder contained herein.

(i) Other than the filings, notices and reports pursuant to, in compliance with or required to be made under the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "Exchange Act"), no filings, notices, reports, consents, registrations, approvals, permits, waivers, expirations of waiting periods or authorizations are required to be obtained by each Shareholder from, or to be given by each Shareholder to, or be made by each Shareholder with, any Governmental Entity in connection with the execution, delivery and performance by each Shareholder of this Company Holders Support Agreement , the consummation of the transactions contemplated hereby and the other transactions contemplated by the Business Combination Agreement.

(j) <u>No Other Representations or Warranties</u>. Except for the representations and warranties made by each Shareholder in this ARTICLE II or in any other Ancillary Agreement to which such Shareholder is a party, no Shareholder makes any express or implied representation or warranty to SPAC, the Company or HoldCo in connection with this Company Holders Support Agreement or the transactions contemplated by this Company Holders Support Agreement, and each Shareholder expressly disclaims any such other representations or warranties.

<div align="center">

**ARTICLE III**
**<u>MISCELLANEOUS</u>**

</div>

Section 3.1 <u>Termination</u>. This Company Holders Support Agreement and all of its provisions shall terminate and be of no further force or effect upon the earlier of (a) the termination of the Business Combination Agreement in accordance with its terms, (b) the Merger Effective Time and (c) the written agreement of each Shareholder, SPAC, HoldCo, Merger Sub and the Company. Upon such termination of this Company Holders Support Agreement, all obligations of the parties under this Company Holders Support Agreement will terminate, without any liability or other obligation on the part of any party hereto to any Person in respect hereof or the transactions contemplated hereby, and no party hereto shall have any claim against another (and no person shall

<div align="center">

C-6

</div>

Exhibit 6
Page 1513

Table of Contents

have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter hereof; provided, however, that the termination of this Company Holders Support Agreement shall not relieve any party hereto from liability arising in respect of any breach of this Company Holders Support Agreement prior to such termination. This ARTICLE III shall survive the termination of this Company Holders Support Agreement.

Section 3.2 Governing Law; Jurisdiction; Waiver of Jury Trial. Sections 12.7 (*Governing Law*) and 12.14 (*Jurisdiction; Waiver of Jury Trial*) of the Business Combination Agreement are incorporated herein by reference, *mutatis mutandis*.

Section 3.3 Non-Circumvention. Each Shareholder agrees that it shall not, and shall cause its Affiliates not to, indirectly accomplish that which it is not permitted to accomplish directly under this Company Holders Support Agreement pursuant to provisions of this Company Holders Support Agreement that have not been terminated pursuant to Section 3.1.

Section 3.4 Inconsistent Actions. Each Shareholder agrees, while this Company Holders Support Agreement is in effect, not to take or agree or commit to take any action that would make any representation and warranty of such Shareholder contained in this Company Holders Support Agreement inaccurate or has the effect of preventing or disabling such Shareholder from performing its obligations under this Company Holders Support Agreement.

Section 3.5 Assignment. This Company Holders Support Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Neither this Company Holders Support Agreement nor any of the rights, interests or obligations hereunder will be assigned (including by operation of law) without the prior written consent of all of the other parties hereto.

Section 3.6 Specific Performance. The parties hereto agree that irreparable damage may occur in the event that any of the provisions of this Company Holders Support Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Company Holders Support Agreement and to enforce specifically the terms and provisions of this Company Holders Support Agreement in the chancery court or any other state or federal court within the State of Delaware, this being in addition to any other remedy to which such party is entitled at law or in equity.

Section 3.7 Amendment. This Company Holders Support Agreement may not be amended, changed, supplemented, waived or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by SPAC, HoldCo, Merger Sub, the Company and each Shareholder.

Section 3.8 Severability. If any provision of this Company Holders Support Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Company Holders Support Agreement will remain in full force and effect. Any provision of this Company Holders Support Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Company Holders Support Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger be consummated as originally contemplated to the fullest extent possible.

Section 3.9 Notices. All notices and other communications among the parties hereto shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid,

Exhibit 6
Page 1514

**Table of Contents**

(c) when delivered by FedEx or other nationally recognized overnight delivery service or (d) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

(a) If to SPAC, prior to the Closing, or to SPAC after the Effective Time, to:

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Republic of Singapore
Attention: Jeri Kewk
        AJ Coloma
        Eric Teo
        Terence Fong
        Aaron Wee
        Clement Chen
Email: jeri.kwek@sincapital.com
        aj.coloma@sincapital.com
        eric.teo@sincapital.com
        terence.fong@sincapital.com
        aaron.wee@sincapital.com
        Clement.Chen@sincapital.com

with copies to (which shall not constitute notice):

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
United States of America
Attention: Carl Marcellino
        Elizabeth Todd
Email: Carl.Marcellino@ropesgray.com
        Elizabeth.Todd@ropesgray.com

(b) If to the Company, HoldCo or Merger Sub to:

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email: andrew.rickman@rockleyphotonics.com

with copies to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
United States of America
Attention: James Masetti
                Jarrod Murphy
Email: jim.masetti@pillsburylaw.com
jarrod.murphy@pillsburylaw.com

C-8

Exhibit 6
Page 1515

Table of Contents

(c) If to each Shareholder, to the address or email address set forth opposite such Shareholder's name on Schedule I, or in the absence of such address or email address being set forth on Schedule I, the address (including email) set forth in the Company's books and records, with copies (which shall not constitute notice) to:

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
United States of America
Attention: James Masetti
        Jarrod Murphy
Email: jim.masetti@pillsburylaw.com
    jarrod.murphy@pillsburylaw.com

Section 3.10 Counterparts. This Company Holders Support Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

Section 3.11 Entire Agreement. This Company Holders Support Agreement and the agreements referenced herein and contemplated hereby constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties hereto to the extent they relate in any way to the subject matter hereof.

Section 3.12 Capacity as a Shareholder. Notwithstanding anything herein to the contrary, each Shareholder signs this Company Holders Support Agreement solely in the Shareholder's capacity as a Shareholder or proxy holder of the Company, and not in any other capacity and this Company Holders Support Agreement shall not limit, prevent or otherwise affect the actions of such Shareholder or any Affiliate, employee or designee of such Shareholder or any of their respective Affiliates in his or her capacity, if applicable, as an officer or director of the Company (or any Subsidiary of the Company) or any other Person, including in the exercise of his or her fiduciary duties as a director or officer of the Company or any Subsidiary of the Company. No Shareholder shall be liable or responsible for any breach, default, or violation of any representation, warranty, covenant or agreement by any other Shareholder that is also a party hereto and each Shareholder shall solely be required to perform its obligations hereunder in its individual capacity.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]**

C-9

Exhibit 6
Page 1516

Table of Contents

IN WITNESS WHEREOF, the SPAC, HoldCo, Merger Sub, the Company and the Shareholders have each caused this Company Holders Support Agreement to be duly executed as of the date first written above.

**SPAC:**

SC HEALTH CORPORATION.

By: /s/ Angelo John Coloma
    Name: Angelo John Coloma
    Title:   Chief Executive Officer

[Signature Page to Company Holders Support Agreement]

C-10

Exhibit 6
Page 1517

Table of Contents

COMPANY:

ROCKLEY PHOTONICS LIMITED

By:  /s/ Dr. Andrew George Rickman
      Name: Dr. Andrew George Rickman
      Title:   Chief Executive Officer

[Signature Page to Company Holders Support Agreement]

C-11

Exhibit 6
Page 1518

Table of Contents

**HOLDCO:**

ROCKLEY PHOTONICS HOLDINGS LIMITED

By:  /s/ Dr. Andrew George Rickman
       Name: Dr. Andrew George Rickman
       Title:   Director

[Signature Page to Company Holders Support Agreement]

C-12

Exhibit 6
Page 1519

Table of Contents

**MERGER SUB:**

ROCKLEY MERGERSUB LIMITED

By: /s/ Dr. Andrew George Rickman
     Name: Dr. Andrew George Rickman
     Title:   Director

[Signature Page to Company Holders Support Agreement]

C-13

Exhibit 6
Page 1520

Table of Contents

SHAREHOLDERS:

HENGTONG OPTIC-ELECTRIC INTERNATIONAL CO.
LIMITED

By:  /s/ Jicheng Yin
      Name: Jicheng Yin
      Title:   Director

[Signature Page to Company Holders Support Agreement]

C-14

Exhibit 6
Page 1521

Table of Contents

MORNINGSIDE TECHNOLOGY VENTURES LTD

By:  /s/ Jill Marie Franklin
       Name: Jill Marie Franklin
       Title:   Authorized Signatory

[Signature Page to Company Holders Support Agreement]

C-15

Exhibit 6
Page 1522

**Table of Contents**

MOULTON GOODIES LTD

By:  /s/ Justin Jager

Name: Justin Jager
Title:   Director of Artemis Corporate Services
Limited

[Signature Page to Company Holders Support Agreement]

C-16

Exhibit 6
Page 1523

Table of Contents

RICHARD VON TSCHARNER

By:  /s/ Richard Von Tscharner

Name:

[Signature Page to Company Holders Support Agreement]

C-17

Exhibit 6
Page 1524

**Table of Contents**

AARON ZILKIE

By: /s/ Aaron Zilkie

Name:

[Signature Page to Company Holders Support Agreement]

C-18

Exhibit 6
Page 1525

**Table of Contents**

<u>Schedule I</u>

**Shareholder Covered Shares**

| Shareholder | Notice | Company Ordinary Shares |
|---|---|---|
| Hengtong Optic-Electric International Co. Limited | 88 Hengtong Road, Qidu Town, Wujiang District, Jiangsu Province, China | 2,798,195 |
| Morningside Technology Ventures Ltd | 2nd Floor, Le Prince de Galles, 3-5 Avenue des Citronniers, MC 98000, Monaco | 1,073,711 |
| Moulton Goodies Ltd | Trafalgar Court, 2nd Floor East Wing, Admiral Park, St Peter Port, GY1 3EL, Guernsey | 1,194,410 |
| Richard von Tscharner | Villa 42, 353/AL SAFFA FIRST - 25th Street, PO Box 900179, Al Safa, Dubai, United Arab Emirates | 2,397,801 |
| Aaron Zilkie | 2190 Paloma Street, Pasadena CA 91104, United States | 1,000,000 |

[Schedule I to Company Holders Support Agreement]

C-19

Exhibit 6
Page 1526

**Table of Contents**

**Annex A**

**Form of Joinder Agreement**

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Company Holders Support Agreement, dated as of March 19, 2021 (as amended, supplemented or otherwise modified from time to time, the "Support Agreement"), by and among SC Health Corporation., a blank check exempted company incorporated in the Cayman Islands with limited liability ("SPAC"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("HoldCo"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("Merger Sub"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company") and certain of the shareholders of the Company, whose names appear on the signature pages of this Company Holders Support Agreement (each, a "Shareholder" and collectively, the "Shareholders"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Company Holders Support Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Shareholder" under, the Company Holders Support Agreement as of the date hereof and shall have all of the rights and obligations of a Shareholder as if it had executed the Company Holders Support Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Company Holders Support Agreement.

IN WITNESS WHEREOF, the undersigned has duly executed this Joinder Agreement as of the date written below.

Date:                    , 20

By:    _____

Name:

Title:

Address for Notices:

With copies to:

[Annex A to Company Holders Support Agreement]

C-20

Exhibit 6
Page 1527

**Table of Contents**

ANNEX D

**Execution Version**

**COMPANY HOLDERS SUPPORT AGREEMENT**

This Company Holders Support Agreement (the "Company Holders Support Agreement") is dated as of March 19, 2021 by and among SC Health Corporation, a blank check exempted company incorporated in the Cayman Islands with limited liability ("SPAC"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("HoldCo"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("Merger Sub"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "Company") and Dr. Andrew George Rickman, a shareholder of the Company and the sole shareholder of HoldCo, whose name appears on the signature pages of this Company Holders Support Agreement (the "Shareholder"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Business Combination Agreement.

RECITALS

WHEREAS, as of the date hereof the Shareholder is the holder of record and the "beneficial owner" (within the meaning of Rule 13d-3 under the Exchange Act) of 7,031,500 Company Ordinary Shares and one (1) HoldCo ordinary share, (the "HoldCo Shares"), as set forth on Schedule I attached hereto (collectively, with respect to the Shareholder, the Shareholder's "Owned Shares," and such Owned Shares, together with (1) any additional Company Ordinary Shares or HoldCo ordinary shares in which the Shareholder acquires record and beneficial ownership after the date hereof, including by exercise or exchange of securities convertible or exercisable into Company Ordinary Shares or HoldCo Shares, purchase, as a result of a stock dividend, stock split, recapitalization, combination, reclassification, exchange or change of such shares, or upon exercise or conversion of any securities and (2) any additional Company Ordinary Shares or HoldCo ordinary shares with respect to which the Shareholder has the right to vote through a proxy, the "Covered Shares");

WHEREAS, contemporaneously with the execution and delivery of this Company Holders Support Agreement, SPAC, HoldCo, Merger Sub, and the Company, have entered into a business combination agreement (as amended or modified from time to time, the "Business Combination Agreement"), dated as of the date hereof, pursuant to which, among other transactions, the Company will become a wholly-owned subsidiary of HoldCo as a result of the Exchange and SPAC will be merged with and into Merger Sub, with SPAC continuing on as the surviving entity as a directly wholly-owned subsidiary of HoldCo, on the terms and conditions set forth therein (the "Merger"); and

WHEREAS, as an inducement to SPAC, HoldCo, Merger Sub and the Company to enter into the Business Combination Agreement and to consummate the transactions contemplated therein, the parties hereto desire to agree to certain matters as set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

Exhibit 6
Page 1528

**Table of Contents**

**ARTICLE I**
**COMPANY HOLDERS SUPPORT; COVENANTS**

Section 1.1 <u>Support of Company Holders</u>.

(a) The Shareholder, solely in his, her or its capacity as a shareholder or proxy holder of the Company and/or HoldCo (as the case may be), agrees irrevocably and unconditionally, subject to <u>Section 1.1(b)</u>, that at any meeting of the shareholders of the Company or Holdco, however called, or at any adjournment or postponement thereof, or in any other circumstance in which the vote, consent or other approval of the shareholders of the Company or Holdco is sought, the Shareholder shall (i) appear at each such meeting in person or by proxy or otherwise cause all of his Covered Shares to be counted as present thereat for purposes of calculating a quorum and (ii) vote, approve or consent (or cause to be voted, approved or consented), in person or by proxy, or execute and deliver a written approval or consent (or cause a written approval or consent to be executed and delivered) covering, all of his Covered Shares owned as of the record date for such meeting (or the date that any written consent is executed by the Shareholder):

(i) in favor of the transactions contemplated by the Business Combination Agreement;

(ii) in favor of the Resolutions;

(iii) in favour of the HoldCo resolutions, prior to the Initial Exchange, save for any changes or amendments agreed with SPAC (acting reasonably), appended hereto in Annex B of this Company Holders Support Agreement (the "<u>HoldCo Shareholder Approval</u>");

(iv) against any merger agreement, merger, exchange, consolidation, combination, sale of substantial assets, reorganization, recapitalization, dissolution, liquidation or winding up of or by the Company or Holdco or any other business combination proposal requested by HoldCo (other than the Business Combination Agreement and the transactions contemplated thereby unless approved in writing with by both SPAC and the Company);

(v) against any proposal, action or agreement that would reasonably be expected to (A) impede, nullify, frustrate, prevent, interfere with, materially delay the consummation of, or otherwise adversely affect, any of the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger or any provision of this Company Holders Support Agreement, (B) result in a breach in any respect of any covenant, representation, warranty or any other obligation or agreement of the Company or Holdco under the Business Combination Agreement or any Ancillary Agreement (unless approved in writing with by both SPAC and the Company), or (C) result in any of the conditions set forth in Article X of the Business Combination Agreement not being fulfilled; and

(vi) undertakes, hereafter, to take all other necessary and desirable actions reasonably requested by the Company in connection with the transactions contemplated by the Business Combination Agreement or any Ancillary Agreement.

The Shareholder solely in his, her or its capacity as a shareholder or proxy holder of the Company and/or HoldCo (as the case may be), hereby agrees that he shall not commit or agree to take any action inconsistent with the foregoing. The obligations of the Shareholder hereunder shall apply whether or not the Company Board, the board of directors of HoldCo, other governing body or any committee, subcommittee or subgroup thereof recommends any of the Resolutions or HoldCo Shareholder Approval, and whether or not such board or other governing body, committee, subcommittee or subgroup thereof changes, withdraws, withholds, qualifies or modifies, or publicly proposes to change, withdraw, withhold, qualify or modify, the Company Board's or the board of directors for HoldCo, recommendation to its shareholders.

(b) The agreement of the Shareholder contained in <u>Section 1.1(a)</u> is conditional on HM Revenue and Customs granting clearance (a) under section 138 Taxation of Chargeable Gains Act 1992 ("<u>TCGA</u>") that the

D-2

Exhibit 6
Page 1529

**Table of Contents**

anti-avoidance provisions of section 137 TCGA will not apply, and as such will not prevent section 135 TCGA from applying to the proposed transactions described in the Business Combination Agreement and (b) under section 707 Income Tax Act 2007 ("ITA") that no notice under s698 ITA will be given in relation to the proposed transactions described in the Business Combination Agreement (the "Tax Clearance Condition").

(c) The Shareholder hereby covenants and agrees that he shall not: (i) enter into any voting agreement or voting trust with respect to any of the Covered Shares that is inconsistent with the Shareholder's obligations pursuant to this Company Holders Support Agreement, (ii) grant a proxy or power of attorney with respect to any of the Covered Shares that is inconsistent with the Shareholder's obligations pursuant to this Company Holders Support Agreement, or (iii) enter into any agreement or undertaking that is otherwise inconsistent with, or would restrict, limit or interfere with, or prohibit or prevent him from satisfying, its obligations pursuant to this Company Holders Support Agreement, in each case save with the written approval of SPAC and the Company.

Section 1.2 No Transfer. During the period commencing on the date hereof and ending on the earlier of (a) the Merger Effective Time and (b) such date and time as the Business Combination Agreement shall be terminated in accordance with Section 11.1 (*Termination*), the Shareholder shall not, except in each case pursuant to or as contemplated by the Business Combination Agreement (including pursuant to the Schemes), directly or indirectly, sell (including short sells), offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase, tender, convert, encumber, assign or otherwise transfer or dispose of or agree to transfer or dispose of, directly or indirectly, file (or participate in the filing of) a registration statement with the SEC (other than the Proxy Statement/Registration Statement) or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, with respect to any Covered Shares owned by the Shareholder, either voluntarily or involuntarily (collectively, a "Transfer"); or enter into any contract, option, derivative, hedging or other agreement or arrangement or understanding (including any profit-sharing arrangement) with respect to, or consent to, a Transfer of, any or all of the Covered Shares, provided, however, that the foregoing shall not prohibit either (i) the conversion or exchange of securities convertible into or exchangeable for Company Ordinary Shares or HoldCo Shares in accordance with their terms or (ii) Transfers between the Shareholder and any Affiliate of the Shareholder, so long as, prior to and as a condition to the effectiveness of any such Transfer, such transferee executes and delivers to the Company a joinder to this Company Holders Support Agreement in the form attached hereto as Annex A. The Shareholder hereby authorizes the Company to maintain a copy of this Company Holders Support Agreement at either the executive office or the registered office of the Company.

Section 1.3 Closing Date Deliverables. On the Closing Date, the Shareholder shall deliver to SPAC, HoldCo and the Company a duly executed copy of the Registration Rights and Lock-Up Agreement, by and among HoldCo, the Shareholder and the Other SPAC Investors.

Section 1.4 Further Assurances. Subject to the satisfaction of the Tax Clearance Condition, the Shareholder shall take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to consummate the Schemes, Exchange and Merger and the other applicable transactions contemplated by the Business Combination Agreement on the terms and subject to the conditions set forth therein and herein and shall not take any action that would reasonably be expected to prevent or delay the satisfaction of any of the conditions to the Schemes, Exchange and Merger and the other applicable transactions contemplated by the Business Combination Agreement set forth in Article X of the Business Combination Agreement. The Shareholder further agrees not to commence or participate in, and to take all actions necessary to opt out of any class in any class action with respect to, any action or claim, derivative or otherwise, against SPAC, SPAC's Affiliates, the Sponsor, HoldCo, or the Company or any of their respective successors and assigns with respect to the negotiation, execution or delivery of this Company Holders Support Agreement , the Business Combination Agreement (including all transactions contemplated by the Business Combination Agreement) or any other Ancillary Document, in each case to the extent relating to facts, matters, circumstances or events that existed or occurred on prior to the Closing. Further, the Shareholder also agrees that Articles 9.12

D-3

Exhibit 6
Page 1530

**Table of Contents**

(*Confidentiality*) and 12.12 (*Publicity*) of the Business Combination Agreement should apply to the Shareholder *mutatis mutandis* and the Shareholder shall agree to be bound by the same as if the Shareholder were a party to the Business Combination Agreement.

Section 1.5 <u>Acquisition Proposals</u>.

(a) From the date hereof until the Closing Date or, if earlier, the termination of this Company Holders Support Agreement in accordance with Section 3.1, the Shareholder: (i) shall not, directly or indirectly initiate, solicit or engage in any negotiations with any Person with respect to, or provide any non-public information or data concerning the Company or HoldCo (as the case may be) or any of the Company's Subsidiaries to any Person relating to, an Acquisition Proposal or afford to any Person access to the business, properties, assets or personnel of the Company or any of the Company's Subsidiaries in connection with an Acquisition Proposal, (ii) execute or enter into any acquisition agreement, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other arrangement or agreement relating to an Acquisition Proposal, (iii) grant any waiver, amendment or release under any confidentiality agreement or the anti-takeover laws of any state, (iv) otherwise knowingly encourage or facilitate any such inquiries, proposals, discussions, or negotiations or any effort or attempt by any Person to make an Acquisition Proposal or (v) agree or otherwise commit to enter into or engage in any of the foregoing. The Shareholder also agrees that immediately following the execution of this Company Holders Support Agreement he shall cease any solicitations, discussions or negotiations with any Person (other than the parties to the Business Combination Agreement and their respective representatives) conducted heretofore in connection with an Acquisition Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal. The Shareholder shall promptly (and in any event within two (2) Business Days) notify, in writing, SPAC of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal, which notice shall include a summary of the material terms of such inquiry, proposal, offer or request for information. The Shareholder shall promptly (and in any event within twenty-four (24) hours) keep SPAC reasonably informed of any material developments with respect to any such inquiry, proposal, offer, request for information or Acquisition Proposal (including any material changes thereto).

(b) Notwithstanding anything in this Company Holders Support Agreement to the contrary, (i) the Shareholder shall not be responsible for the actions of the Company, HoldCo, the Company Board (or any committee thereof) or the board of directors of HoldCo, any subsidiary of the Company, or any officers, directors (in their capacity as such), employees and professional advisors of any of the foregoing (collectively, the "<u>Company Related Parties</u>"), (ii) the Shareholder makes no representations or warranties with respect to the actions of any of the Company Related Parties, and (iii) any breach by the Company of its obligations under Section 7.5 (*Acquisition Proposals*) of the Business Combination Agreement shall not be considered a breach of this Section 1.5 (it being understood that, for the avoidance of doubt, the Shareholder or his representatives (other than any such representative that is a Company Related Party) shall remain responsible for any breach by the Shareholder or his representatives of this Section 1.5).

Section 1.6 <u>Disclosure</u>. The Shareholder hereby authorizes the Company, HoldCo and SPAC to publish and disclose in any announcement or disclosure required by the SEC the Shareholder's identity and ownership of the Covered Shares and the nature of the Shareholder's obligations under this Company Holders Support Agreement. The Shareholder will promptly provide any information reasonably requested by SPAC, HoldCo or the Company for any regulatory application or filing made or approval sought in connection with the transactions contemplated by the Business Combination Agreement (including filings with the SEC), except for any information that is subject to attorney-client privilege (provided, that to the extent reasonably possible, the parties shall cooperate in good faith to permit the provision and/or disclosure of such information in a manner that preserves such privilege), to the extent permitted by applicable Law.

D-4

Exhibit 6
Page 1531

Table of Contents

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES**

Section 2.1 Representations and Warranties of the Shareholder. The Shareholder represents and warrants, severally (and not jointly and severally) as to itself only, as of the date hereof to HoldCo, SPAC and the Company as follows:

(a) Organization; Due Authorization. he has all the requisite power and authority and has taken all actions necessary in order to execute and deliver this Company Holders Support Agreement, to perform his obligations hereunder and to consummate the transaction contemplated hereby. This Company Holders Support Agreement has been duly executed and delivered by the Shareholder and, assuming due authorization, execution and delivery by the other parties to this Company Holders Support Agreement, this Company Holders Support Agreement constitutes a legally valid and binding obligation of the Shareholder, enforceable against the Shareholder in accordance with the terms hereof (except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and general principles of equity).

(b) Ownership. The Shareholder is the record, legal and beneficial owner (as defined in the Securities Act) of, and has good title to, all of such Shareholder's Covered Shares listed on Schedule I hereto, and there exist no Liens or any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Covered Shares (other than transfer restrictions under the Securities Act)) affecting any such Covered Shares, other than Liens pursuant to (i) this Company Holders Support Agreement, (ii) if applicable, the Shareholder's Governing Documents, (iii) the Business Combination Agreement, or (iv) any applicable securities Laws. The execution, delivery and performance of this Company Holders Support Agreement by the Shareholder does not, and the consummation of the transactions contemplated hereby and the other transactions contemplated by the Business Combination Agreement will not, constitute or result in, with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) of or a default under, the loss of any benefit under, the creation, modification or acceleration of any obligations under or the creation of a Lien on any of the properties, rights or assets of the Shareholder pursuant to any Contracts binding upon the Shareholder or, assuming (solely with respect to performance of this Company Holders Support Agreement and the transactions contemplated hereby) compliance with the matters referred to in Section 2.1(i), under any applicable Law to which the Shareholder is subject. The Shareholder's Covered Shares are the only equity securities in the Company and HoldCo owned of record or beneficially by the Shareholder on the date of this Company Holders Support Agreement, and none of the Shareholder's Covered Shares are subject to any proxy, voting trust or other agreement or arrangement with respect to the voting of such Covered Shares, except as provided hereunder. Further, the Shareholder's Owned Shares in HoldCo (as set forth on Schedule 1 attached hereto) represent the entire issued share capital of HoldCo, and the Shareholder will procure that, save as in accordance with the Business Combination Agreement, no further shares in HoldCo are issued.

(c) No Conflicts. The execution and delivery of this Company Holders Support Agreement by the Shareholder does not, and the performance by the Shareholder of its obligations hereunder and other transactions contemplated by the Business Combination Agreement will not require any consent or approval that has not been given or other action that has not been taken by any Person (including under any Contract binding upon the Shareholder or the Shareholder's Covered Shares), in each case, to the extent such consent, approval or other action would prevent, enjoin or materially delay the performance by the Shareholder of his obligations under this Company Holders Support Agreement.

(d) Litigation. There is no action, proceeding or investigation pending against the Shareholder or, to the knowledge of the Shareholder, threatened against the Shareholder that questions the Shareholder's beneficial or record ownership of the Owned Shares, the validity of this Company Holders Support Agreement or which in any manner challenges or seeks to prevent, enjoin or materially delay the performance by the Shareholder of his obligations under this Company Holders Support Agreement.

D-5

Exhibit 6
Page 1532

**Table of Contents**

(e) <u>Acknowledgment</u>. The Shareholder understands and acknowledges that each of SPAC, the Company and HoldCo is entering into the Business Combination Agreement in reliance upon the Shareholder's execution and delivery of this Company Holders Support Agreement.

(f) The Shareholder has had adequate information concerning the business and financial condition of SPAC and the Company to make an informed decision regarding this Company Holders Support Agreement and the transactions contemplated by the Business Combination Agreement and has independently and without reliance upon SPAC or the Company and based on such information as the Shareholder has deemed appropriate, made his own analysis and decision to enter into this Company Holders Support Agreement. The Shareholder acknowledges that SPAC and the Company have not made and do not make any representation or warranty, whether express or implied, of any kind or character except as expressly set forth in this Company Holders Support Agreement. The Shareholder acknowledges that the agreements contained herein with respect to the Covered Shares held by the Shareholder are irrevocable.

(g) Other than the filings, notices and reports pursuant to, in compliance with or required to be made under the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "<u>Exchange Act</u>"), no filings, notices, reports, consents, registrations, approvals, permits, waivers, expirations of waiting periods or authorizations are required to be obtained by the Shareholder from, or to be given by the Shareholder to, or be made by the Shareholder with, any Governmental Entity in connection with the execution, delivery and performance by the Shareholder of this Company Holders Support Agreement , the consummation of the transactions contemplated hereby and the other transactions contemplated by the Business Combination Agreement.

(h) <u>No Other Representations or Warranties</u>. Except for the representations and warranties made by the Shareholder in this ARTICLE II or in any other Ancillary Agreement to which the Shareholder is a party, the Shareholder does not make any express or implied representation or warranty to SPAC, the Company or HoldCo in connection with this Company Holders Support Agreement or the transactions contemplated by this Company Holders Support Agreement, and the Shareholder expressly disclaims any such other representations or warranties.

**ARTICLE III**
**MISCELLANEOUS**

Section 3.1 <u>Termination</u>. This Company Holders Support Agreement and all of its provisions shall terminate and be of no further force or effect upon the earlier of (a) the termination of the Business Combination Agreement in accordance with its terms, (b) the Merger Effective Time and (c) the written agreement of the Shareholder, SPAC, HoldCo, Merger Sub and the Company. Upon such termination of this Company Holders Support Agreement, all obligations of the parties under this Company Holders Support Agreement will terminate, without any liability or other obligation on the part of any party hereto to any Person in respect hereof or the transactions contemplated hereby, and no party hereto shall have any claim against another (and no person shall have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter hereof; provided, however, that the termination of this Company Holders Support Agreement shall not relieve any party hereto from liability arising in respect of any breach of this Company Holders Support Agreement prior to such termination. This <u>ARTICLE III</u> shall survive the termination of this Company Holders Support Agreement.

Section 3.2 <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. Sections 12.7 (*Governing Law*) and 12.14 (*Jurisdiction; Waiver of Jury Trial*) of the Business Combination Agreement are incorporated herein by reference, *mutatis mutandis*.

Section 3.3 <u>Non-Circumvention.</u> The Shareholder agrees that he shall not, and shall cause his Affiliates not to, indirectly accomplish that which he is not permitted to accomplish under this Company Holders Support

D-6

Exhibit 6
Page 1533

Table of Contents

Agreement pursuant to provisions of this Company Holders Support Agreement that have not been terminated pursuant to Section 3.1.

Section 3.4 <u>Inconsistent Actions.</u> The Shareholder agrees, while this Company Holders Support Agreement is in effect, not to take or agree or commit to take any action that would make any representation and warranty of the Shareholder contained in this Company Holders Support Agreement inaccurate or has the effect of preventing or disabling the Shareholder from performing his obligations under this Company Holders Support Agreement.

Section 3.5 <u>Assignment</u>. This Company Holders Support Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Neither this Company Holders Support Agreement nor any of the rights, interests or obligations hereunder will be assigned (including by operation of law) without the prior written consent of all of the other parties hereto.

Section 3.6 <u>Specific Performance</u>. The parties hereto agree that irreparable damage may occur in the event that any of the provisions of this Company Holders Support Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Company Holders Support Agreement and to enforce specifically the terms and provisions of this Company Holders Support Agreement in the chancery court or any other state or federal court within the State of Delaware, this being in addition to any other remedy to which such party is entitled at law or in equity.

Section 3.7 <u>Amendment</u>. This Company Holders Support Agreement may not be amended, changed, supplemented, waived or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by SPAC, HoldCo, Merger Sub, the Company and the Shareholder.

Section 3.8 <u>Severability</u>. If any provision of this Company Holders Support Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Company Holders Support Agreement will remain in full force and effect. Any provision of this Company Holders Support Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Company Holders Support Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by the Business Combination Agreement, any Ancillary Agreement, the Exchange or the Merger be consummated as originally contemplated to the fullest extent possible.

Section 3.9 <u>Notices</u>. All notices and other communications among the parties hereto shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (c) when delivered by FedEx or other nationally recognized overnight delivery service or (d) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

(a) If to SPAC, prior to the Closing, or to SPAC after the Effective Time, to:

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Republic of Singapore
Attention: Jeri Kewk
      AJ Coloma
      Eric Teo
      Terence Fong
      Aaron Wee
      Clement Chen

D-7

Exhibit 6
Page 1534

**Table of Contents**

Email:    jeri.kwek@sincapital.com
aj.coloma@sincapital.com
eric.teo@sincapital.com
terence.fong@sincapital.com
aaron.wee@sincapital.com
Clement.Chen@sincapital.com

with copies to (which shall not constitute notice):

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
United States of America
Attention: Carl Marcellino
        Elizabeth Todd
Email:    Carl.Marcellino@ropesgray.com
Elizabeth.Todd@ropesgray.com

(b) If to the Company, HoldCo or Merger Sub to:

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email:   andrew.rickman@rockleyphotonics.com

with copies to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street,
New York, New York 10019
United States of America
Attention:  James Masetti
     Jarrod Murphy
Email:   jim.masetti@pillsburylaw.com
jarrod.murphy@pillsburylaw.com

(c) If to the Shareholder, to the address or email address set forth opposite the Shareholder's name on Schedule I, or in the absence of such address or email address being set forth on Schedule I, the address (including email) set forth in the Company's books and records,

with copies (which shall not constitute notice) to:

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
United States of America
Attention: James Masetti
     Jarrod Murphy
Email: jim.masetti@pillsburylaw.com
jarrod.murphy@pillsburylaw.com

D-8

Exhibit 6
Page 1535

**Table of Contents**

Section 3.10 <u>Counterparts</u>. This Company Holders Support Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

Section 3.11 <u>Entire Agreement</u>. This Company Holders Support Agreement and the agreements referenced herein and contemplated hereby constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties hereto to the extent they relate in any way to the subject matter hereof.

Section 3.12 <u>Capacity as a Shareholder</u>. Notwithstanding anything herein to the contrary, the Shareholder signs this Company Holders Support Agreement solely in the Shareholder's capacity as a shareholder or proxy holder of the Company and HoldCo (as the case may be), and not in any other capacity and this Company Holders Support Agreement shall not limit, prevent or otherwise affect the actions of the Shareholder or any Affiliate, employee or designee of the Shareholder or any of their respective Affiliates in his or her capacity, if applicable, as an officer or director of the Company (or any Subsidiary of the Company) or any other Person, including in the exercise of his fiduciary duties as a director or officer of the Company, any Subsidiary of the Company or HoldCo.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]**

D-9

Exhibit 6
Page 1536

Table of Contents

IN WITNESS WHEREOF, the SPAC, HoldCo, Merger Sub, the Company and the Shareholder have each caused this Company Holders Support Agreement to be duly executed as of the date first written above.

SPAC:

SC HEALTH CORPORATION.

By:  /s/ Angelo John Coloma
       Name: Angelo John Coloma
       Title:   Chief Executive Officer

[Signature Page to Company Holders Support Agreement]

D-10

Exhibit 6
Page 1537

Table of Contents

**COMPANY:**

ROCKLEY PHOTONICS LIMITED

By: /s/ Dr. Andrew George Rickman

    Name: Dr. Andrew George Rickman
    Title:  Chief Executive Officer

[Signature Page to Company Holders Support Agreement]

D-11

Exhibit 6
Page 1538

Table of Contents

**HOLDCO:**

ROCKLEY PHOTONICS HOLDINGS LIMITED

By:  /s/ Dr. Andrew George Rickman
       Name: Dr. Andrew George Rickman
       Title:   Director

[Signature Page to Company Holders Support Agreement]

D-12

Exhibit 6
Page 1539

Table of Contents

**MERGER SUB:**

ROCKLEY MERGERSUB LIMITED

By: /s/ Dr. Andrew George Rickman

Name: Dr. Andrew George Rickman
Title:   Director

[Signature Page to Company Holders Support Agreement]

D-13

Exhibit 6
Page 1540

**Table of Contents**

**SHAREHOLDER:**

DR. ANDREW GEORGE RICKMAN

By:  /s/ Dr. Andrew George Rickman
      Name: Dr. Andrew George Rickman

[Signature Page to Company Holders Support Agreement]

D-14

Exhibit 6
Page 1541

Table of Contents

## Schedule I

### Shareholder Covered Shares

| Shareholder | Notice – See above for notice provisions | Company Ordinary Shares |
|---|---|---|
| Andrew George Rickman | Haredown, Great Bedwyn, Marlborough, SN8 3ND, United Kingdom | 7,031,500 |

| Shareholder | Notice – See above for notice provisions | HoldCo Shares |
|---|---|---|
| Andrew George Rickman | Haredown, Great Bedwyn, Marlborough, SN8 3ND, United Kingdom | 1 |

[Schedule I to Company Holders Support Agreement]

D-15

Exhibit 6
Page 1542

**Table of Contents**

<u>Annex A</u>

**Form of Joinder Agreement**

This Joinder Agreement (this "<u>Joinder Agreement</u>") is made as of the date written below by the undersigned (the "<u>Joining Party</u>") in accordance with the Company Holders Support Agreement, dated as of March 19, 2021 (as amended, supplemented or otherwise modified from time to time, the "<u>Support Agreement</u>"), by and among SC Health Corporation, a blank check exempted company incorporated in the Cayman Islands with limited liability ("<u>SPAC</u>"), Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement (as defined below), ("<u>HoldCo</u>"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("<u>Merger Sub</u>"), Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 (the "<u>Company</u>") and Dr. Andrew George Rickman, a shareholder of the Company and the sole shareholder of HoldCo, whose name appears on the signature pages of this Company Holders Support Agreement (the "<u>Shareholder</u>"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Company Holders Support Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Shareholder" under, the Company Holders Support Agreement as of the date hereof and shall have all of the rights and obligations of a Shareholder as if it had executed the Company Holders Support Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Company Holders Support Agreement.

IN WITNESS WHEREOF, the undersigned has duly executed this Joinder Agreement as of the date written below.

Date: _____, 20____

By: _____
    Name:
    Title:

    Address for Notices:

    With copies to:

D-16

Exhibit 6
Page 1543

**Table of Contents**

**Annex B**

**HoldCo Shareholder Approval**

D-17

Exhibit 6
Page 1544

Table of Contents

ANNEX E

**SUBSCRIPTION AGREEMENT**

March 19, 2021

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900

Rockley Photonics Holdings Limited
3rd Floor 1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT

Ladies and Gentlemen:

In connection with the proposed business combination (the "Transaction") between SC Health Corporation, a Cayman Islands exempted company ("SC Health"), and Rockley Photonics, Ltd., a company incorporated under the laws of England and Wales with company number 08683015 ("Target"), pursuant to that certain Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (as it may be amended, the "Transaction Agreement"), by and among SC Health, Target, Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("HoldCo") and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo, SC Health is seeking commitments to purchase ordinary shares (the "Ordinary Shares"), of HoldCo for a purchase price of $10.00 per share (the "Purchase Price"), in a private placement to be conducted by HoldCo and SC Health (the "Offering"). In connection therewith, the undersigned subscriber ("Subscriber"), SC Health and HoldCo agree in this subscription agreement (this "Subscription Agreement") as follows:

**1. Subscription**. As of the date written above (the "Subscription Date"), the Subscriber hereby irrevocably subscribes for and agrees to purchase from HoldCo such number of Ordinary Shares as is set forth on the signature page of this Subscription Agreement (the "Shares") at the Purchase Price per Share and on the terms provided for herein.

SC Health and HoldCo have entered into separate subscription agreements (the "Other Subscription Agreements") with certain other "qualified institutional buyers" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act")) or "accredited investors" (within the meaning of Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act) (each, an "Other Subscriber"), pursuant to which such investors have agreed to purchase Ordinary Shares on the Closing Date and the aggregate gross proceeds from the securities to be sold by HoldCo pursuant to this Subscription Agreement and the Other Subscription Agreements equals, as of the date hereof, $150,000,000.

**2. Closing; Delivery of Shares.**

(a) The closing of the sale of Shares contemplated hereby (the "Closing", and the date that the Closing actually occurs, the "Closing Date") is contingent upon the substantially concurrent consummation of the Transaction (the "Transaction Closing"). The Closing shall occur on the date of the Transaction Closing, and immediately prior to, the Merger Effective Time (as defined in the Transaction Agreement).

(b) HoldCo shall provide written notice (which may be via email) to the Subscriber (the "Closing Notice") that HoldCo reasonably expects the Transaction Closing to occur on a date specified in the notice (the

E-1

Exhibit 6
Page 1545

Table of Contents

"Scheduled Closing Date") that is not less than three (3) business days from the date of the Subscriber's receipt of the Closing Notice, which Closing Notice shall contain HoldCo's wire instructions for an escrow account (the "Escrow Account") established by HoldCo with a third party escrow agent (the "Escrow Agent") to be identified in the Closing Notice. At least two (2) business days prior to the Scheduled Closing Date, the Subscriber shall deliver to the Escrow Account the aggregate Purchase Price for the Shares subscribed by wire transfer of United States dollars in immediately available funds. Upon the Closing, HoldCo shall provide instructions to the Escrow Agent to release the funds in the Escrow Account to HoldCo against delivery to the Subscriber of the Shares, free and clear of any liens or other restrictions whatsoever (other than those arising under state or federal securities laws), in book-entry form as set forth in Section 2(c) below. If this Subscription Agreement is terminated prior to the Closing and any funds have already been sent by the Subscriber to the Escrow Account, then promptly (but in no event later than five (5) business days after the Scheduled Closing Date specified in the Closing Notice) after such termination, HoldCo will instruct the Escrow Agent to promptly return such funds to the Subscriber.

(c) On the Closing Date, promptly after the Closing, HoldCo shall deliver (or cause the delivery of) the Shares in book-entry form with restrictive legends in the amount as set forth on the signature page to the Subscriber as indicated on the signature page.

3. **Closing Conditions**. In addition to the condition set forth in the first sentence of Section 2(a) above:

(a) The Closing is also subject to the satisfaction or valid waiver by each party to this Subscription Agreement of the conditions that, on the Closing Date:

(i) no suspension of the qualification of the Shares for offering or sale or trading in any jurisdiction, or initiation or threatening of any proceedings for any of such purposes, shall have occurred;

(ii) no governmental authority of competent jurisdiction shall have rendered, issued, promulgated, enforced or entered any judgment, order, law, rule or regulation (whether temporary, preliminary or permanent) which is then in effect and which then makes the consummation of the transactions contemplated hereby illegal or then restrains or prohibits the consummation of the transactions contemplated hereby; and

(iii) all material conditions precedent to the Transaction Closing set forth in the Transaction Agreement shall have been satisfied or waived (other than those conditions which, by their nature, are to be satisfied at the Transaction Closing).

(b) The obligations of SC Health and HoldCo to consummate the Closing are also subject to the satisfaction or valid waiver by SC Health and HoldCo of the additional conditions that, on the Closing Date:

(i) all representations and warranties of the Subscriber contained in this Subscription Agreement shall be true and correct in all material respects at and as of the Closing Date (except for representations and warranties made as of a specific date, which shall be true and correct in all material respects as of such date); and

(ii) the Subscriber shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to Closing.

(c) The obligations of the Subscriber to consummate the Closing are also subject to the satisfaction or valid waiver by the Subscriber of the additional conditions that, on the Closing Date:

(i) all representations and warranties of SC Health and HoldCo contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect (as defined herein), which representations and warranties shall be true in all respects) at and as of the Closing Date (except for representations and warranties made as of a specific date, which shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true in all respects) as of such date);

E-2

Exhibit 6
Page 1546

Table of Contents

(ii) SC Health and HoldCo shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to Closing; and

(iii) no amendment, modification or waiver of the Transaction Agreement shall have occurred that reasonably would be expected to materially and adversely affect the economic benefits that the Subscriber reasonably would expect to receive under this Subscription Agreement.

**4. SC Health and HoldCo Representations and Warranties**. Each of SC Health (other than in respect of paragraph (b) below) and HoldCo represents and warrants to the Subscriber severally (and not jointly and severally), as to itself only, that:

(a) As of the date hereof, each of SC Health and HoldCo is an exempted company duly organized, validly existing and in good standing under the laws of the Cayman Islands. Immediately following the Transaction Closing under the Transaction Agreement, each of SC Health and HoldCo will be validly existing and in good standing under the laws of its jurisdiction of organization. Each of SC Health and HoldCo has the corporate power and authority to own, lease and operate its respective properties and conduct its respective business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

(b) All issued and outstanding Ordinary Shares have been duly authorized and validly issued, are fully paid and are non-assessable and are not subject to pre-emptive rights. The Shares have been duly authorized and, when issued and delivered to the Subscriber against full payment therefor in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and will not have been issued in violation of or subject to any preemptive or similar rights created under HoldCo's Articles of Association or under the laws of the Cayman Islands.

(c) This Subscription Agreement has been duly authorized, executed and delivered by each of SC Health and HoldCo and is enforceable against each of SC Health and HoldCo in accordance with its terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

(d) The issuance and sale of the Shares by HoldCo and the compliance by each of SC Health and HoldCo with all of the provisions of this Subscription Agreement and the consummation of the transactions herein will be done in accordance with the NYSE listing rules and will not conflict with or result in a material breach or material violation of any of the terms or provisions of, or constitute a material default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of SC Health or HoldCo or any of their respective subsidiaries pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, license, lease or any other agreement or instrument to which SC Health or HoldCo or any of their respective subsidiaries is a party or by which SC Health or HoldCo or any of their respective subsidiaries is bound or to which any of the property or assets of SC Health or HoldCo is subject, which would have a material adverse effect on the business, properties, financial condition, stockholders' equity or results of operations of SC Health or HoldCo (a "Material Adverse Effect") or materially affect the validity of the Shares or the legal authority of SC Health or HoldCo to comply in all material respects with the terms of this Subscription Agreement; (ii) result in any material violation of the provisions of the organizational documents of SC Health or HoldCo; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over SC Health or HoldCo or any of its properties that would have a Material Adverse Effect or materially affect the validity of the Shares or the legal authority of SC Health or HoldCo to comply with this Subscription Agreement; subject, in the case of the foregoing clauses (i) and (iii) with respect to the consummation of the transactions therein contemplated.

(e) Neither SC Health nor HoldCo has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other person to any broker's or finder's fee or any other

E-3

Exhibit 6
Page 1547

**Table of Contents**

commission or similar fee in connection with the transactions contemplated by this Subscription Agreement for which the Subscriber could become liable. Other than Merrill Lynch (Singapore) Pte. Ltd. (and its affiliates) and Cowen and Company, LLC. (collectively, the "Placement Agents"), neither SC Health nor HoldCo is aware of any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any shares of Ordinary Shares in the Offering.

(f) HoldCo is not, and immediately after receipt of payment for the Shares, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(g) Assuming the accuracy of the Subscriber's representations and warranties set forth in Section 5, in connection with the offer, sale and delivery of the Shares in the manner contemplated by this Subscription Agreement, it is not necessary to register the Shares under the Securities Act.

(h) Neither SC Health, HoldCo, nor any person acting on their behalf has, directly or indirectly, made any offers or sales of any HoldCo security or solicited any offers to buy any security under circumstances that would adversely affect reliance by HoldCo on either Regulation S under the Securities Act or Section 4(a)(2) of the Securities Act for the exemption from registration for the transactions contemplated hereby or would require registration of the issuance of the Shares under the Securities Act.

(i) There are no Other Subscription Agreements, side letter agreements or other agreements or understandings (including written summaries of any oral understandings) with any Other Subscriber that include terms and conditions that are materially more advantageous to any such Other Subscriber (as compared to Subscriber) containing any of the following: (i) any rights or benefits granted to an Other Subscriber in connection with such Other Subscriber's compliance with any law, regulation or policy specifically applicable to such Other Subscriber or in connection with the taxable status of an Other Subscriber, (ii) any rights or benefits which are personal to an Other Subscriber based solely on its place of organization or headquarters, organizational form of, or other particular restrictions applicable to, such Other Subscriber, or (iii) any rights with respect to the confidentiality or disclosure of an Other Subscriber's identity, and such Other Subscription Agreements, other agreements and understandings, as applicable, have not been amended in any material respect following the date of this Subscription Agreement and reflect the same Per Share Purchase Price and terms that are not more favorable in any material respect to such Other Subscriber thereunder than the terms of this Subscription Agreement.

(j) SC Health has made available to Subscriber (including via the SEC's EDGAR system) a true, correct and complete copy of each form, report, statement, schedule, prospectus, proxy, registration statement and other documents filed by SC Health with the SEC prior to the date of this Subscription Agreement (the "SEC Documents"). None of the SEC Documents filed under the Exchange Act, contained, when filed or, if amended prior to the date of this Subscription Agreement, as of the date of such amendment with respect to those disclosures that are amended, any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. SC Health has timely filed each report, statement, schedule, prospectus, and registration statement that SC Health was required to file with the SEC since its inception and through the date hereof. There are no material outstanding or unresolved comments in comment letters from the SEC staff with respect to any of the SEC Documents.

(k) Each of HoldCo and SC Health understands that the foregoing representations and warranties shall be deemed material to and have been relied upon by the Subscriber.

**5. Subscriber Representations, Warranties and Covenants**. The Subscriber represents and warrants to SC Health and HoldCo that:

(a) At the time the Subscriber was offered the Shares, it was, and as of the date hereof, the Subscriber is (i) (A) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an "accredited

Exhibit 6
Page 1548

**Table of Contents**

investor" (within the meaning of Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act) satisfying the applicable requirements as set forth on Schedule I, (B) an "Institutional Account" as such term is defined in FINRA Rule 4512(c), (C) acquiring the Shares only for its own account and (D) not acquiring the Shares for the account of others, and not on behalf of any other account or person or with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act or (ii) is not a "U.S. person" within the meaning of Regulation S under the Securities Act. The Subscriber is not an entity formed for the specific purpose of acquiring the Shares.

(b) The Subscriber understands that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares delivered at the Closing have not been registered under the Securities Act. The Subscriber understands that the Shares may not be resold, transferred, pledged or otherwise disposed of by the Subscriber absent an effective registration statement under the Securities Act except (i) to HoldCo or a subsidiary thereof, (ii) to non-U.S. persons pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act or (iii) pursuant to another applicable exemption from the registration requirements of the Securities Act, and in accordance with applicable securities laws of the states and other jurisdictions, and that any certificates (if any) or any book-entry shares representing the Shares delivered at the Closing shall contain a legend or restrictive notation to such effect. The Subscriber understands and agrees that the Shares, until registered under an effective registration statement, will be subject to transfer restrictions and, as a result of these transfer restrictions, the Subscriber may not be able to readily resell the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. The Subscriber understands that it has been advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the Shares.

(c) The Subscriber understands and agrees that the Subscriber is purchasing Shares directly from HoldCo. The Subscriber further acknowledges that there have been no representations, warranties, covenants and agreements made to the Subscriber by SC Health or HoldCo, or any of its officers or directors, expressly (other than those representations, warranties, covenants and agreements included in this Subscription Agreement) or by implication.

(d) The Subscriber's acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended, Section 4975 of the Internal Revenue Code of 1986, as amended, or any applicable similar law.

(e) The Subscriber acknowledges and agrees that the Subscriber has received such information as the Subscriber deems necessary in order to make an investment decision with respect to the Shares. Without limiting the generality of the foregoing, the Subscriber acknowledges that it has received and carefully reviewed the following items (collectively, the "Disclosure Documents"): (i) the final prospectus of SC Health, dated as of July 11, 2019 and filed with the U.S. Securities and Exchange Commission (the "SEC") (File No. 333-232240) on July 12, 2019 (the "Prospectus"), (ii) each filing made by SC Health with the SEC following the filing of the Prospectus through the date of this Subscription Agreement, (iii) the Transaction Agreement, a copy of which will be filed by HoldCo and SC Health with the SEC and (iv) the investor presentation by SC Health and the Target, a copy of which will be furnished by HoldCo and SC Health to the SEC. The undersigned understands the significant extent to which certain of the disclosures contained in items (i) and (ii) above shall not apply following the Transaction Closing. The Subscriber represents and agrees that the Subscriber and the Subscriber's professional advisor(s), if any, have had the full opportunity to ask SC Health's and the Target's management questions, receive such answers and obtain such information as the Subscriber and such Subscriber's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares. The Subscriber has conducted its own investigation of SC Health, HoldCo, the Target and the Shares and the Subscriber has made its own assessment and has satisfied itself concerning the relevant tax and other economic considerations relevant to its investment in the Shares.

(f) The Subscriber became aware of this Offering of the Shares solely by means of direct contact between the Subscriber and SC Health, HoldCo, the Placement Agents or a representative of SC Health, HoldCo or the

<div align="center">E-5</div>

<div align="right">Exhibit 6
Page 1549</div>

Table of Contents

Placement Agents, and the Shares were offered to the Subscriber solely by direct contact between the Subscriber and SC Health, HoldCo, the Placement Agents or a representative of SC Health, HoldCo or the Placement Agents. The Subscriber acknowledges that SC Health and HoldCo each represents and warrants severally (and not jointly and severally), as to itself only, that the Shares (i) were not offered by any form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws. Neither the Subscriber, nor any of its directors, officers, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder, (i) to its knowledge, engaged in any general solicitation, or (ii) published any advertisement in connection with the Offering.

(g) The Subscriber acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in the Disclosure Documents and in SC Health's filings with the SEC. The Subscriber is able to fend for itself in the transactions contemplated herein and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and the Subscriber has sought such accounting, legal and tax advice as the Subscriber has considered necessary to make an informed investment decision.

(h) Alone, or together with any professional advisor(s), the Subscriber has adequately analyzed and fully considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for the Subscriber and that the Subscriber is able at this time and in the foreseeable future to bear the economic risk of a total loss of the Subscriber's investment in HoldCo. The Subscriber acknowledges specifically that a possibility of total loss exists.

(i) In making its decision to purchase the Shares, the Subscriber has relied solely upon independent investigation made by the Subscriber and the representations and warranties of SC Health and HoldCo set forth herein. Without limiting the generality of the foregoing, the Subscriber has not relied on any statements or other information provided by the Placement Agents concerning SC Health, HoldCo, Target or the Shares or the offer and sale of the Shares.

(j) The Subscriber understands and agrees that no federal or state agency has passed upon or endorsed the merits of this Offering of the Shares or made any findings or determination as to the fairness of this investment or the accuracy or adequacy of SC Health's filings with the SEC.

(k) The Subscriber has been duly formed or incorporated and is validly existing in good standing under the laws of its jurisdiction of incorporation or formation.

(l) The execution, delivery and performance by the Subscriber of this Subscription Agreement are within the powers of the Subscriber, have been duly authorized and will not constitute or result in a breach or default under or conflict with any federal or state statute, rule or regulation applicable to the Subscriber, any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Subscriber is a party or by which the Subscriber is bound, and, if the Subscriber is not an individual, will not violate any provisions of the Subscriber's charter documents, including its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Subscription Agreement is genuine, and the signatory, if the Subscriber is an individual, has legal competence and capacity to execute the same or, if the Subscriber is not an individual the signatory has been duly authorized to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.

(m) Neither the due diligence investigation conducted by the Subscriber in connection with making its decision to acquire the Shares nor any representations and warranties made by the Subscriber herein shall modify, amend or affect the Subscriber's right to rely on the truth, accuracy and completeness of SC Health's and HoldCo's representations and warranties contained herein.

E-6

Exhibit 6
Page 1550

**Table of Contents**

(n) The Subscriber is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank (collectively, a "Prohibited Investor"). The Subscriber agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, provided that the Subscriber is permitted to do so under applicable law. If the Subscriber is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended by the USA PATRIOT Act of 2001, and its implementing regulations (collectively, the "BSA/PATRIOT Act"), the Subscriber maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. To the extent required, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. To the extent required, it maintains policies and procedures reasonably designed to ensure that the funds held by the Subscriber and used to purchase the Shares were legally derived.

(o) As of the date hereof and at the Closing, neither the Subscriber, nor, to the extent it has them, any of its direct beneficial owners or (only so far as the Subscriber is aware) its indirect beneficial owners or its directors, affiliates or executive officers (collectively with the Subscriber, the "Covered Persons"), are subject to any of the "Bad Actor" disqualifications described in Rule 506(d) under the Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Subscriber has exercised reasonable care to determine whether any Covered Person is subject to a Disqualification Event. The acquisition of Shares by the Subscriber will not subject SC Health or HoldCo to any Disqualification Event.

(p) Subscriber is not currently (and at all times through Closing will refrain from being or becoming) a member of a "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or any successor provision), other than with those persons or entities who may be deemed affiliates or control persons, acting for the purpose of acquiring, holding or disposing of or taking any other action relating to the equity securities of the Issuer (within the meaning of Rule 13d-5(b)(1) under the Exchange Act).

(q) No foreign person (as defined in 31 C.F.R. Part 800.224) in which the national or subnational governments of a single foreign state have a substantial interest (as defined in 31 C.F.R. Part 800.244) will acquire a substantial interest in HoldCo as a result of the purchase and sale of Shares hereunder such that a declaration to the Committee on Foreign Investment in the United States would be mandatory under 31 C.F.R. Part 800.401, and no foreign person will have control (as defined in 31 C.F.R. Part 800.208) over HoldCo from and after the Closing as a result of the purchase and sale of Shares hereunder.

(r) No disclosure or offering document has been prepared by the Placement Agents in connection with the offer and sale of the Shares. The Placement Agents and each of their respective members, directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to HoldCo, SC Health, the Target, any of their respective businesses, or the Shares or the accuracy, completeness or adequacy of any information supplied to the Subscriber by SC Health and/or HoldCo. In connection with the issue and purchase of the Shares, the Placement Agents have not acted as the Subscriber's financial advisor or fiduciary.

(s) The Subscriber acknowledges its obligations under applicable securities laws with respect to the treatment of non-public information relating to SC Health and HoldCo.

**6. Registration Rights.** HoldCo agrees that, within thirty (30) calendar days after the Transaction Closing, HoldCo will file with the SEC (at HoldCo's sole cost and expense) a registration statement registering the resale of the Shares (the "Registration Statement"), and HoldCo shall use its commercially reasonable efforts to have

E-7

Exhibit 6
Page 1551

Table of Contents

the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) ninety (90) calendar days after the filing thereof (or one hundred and twenty (120) calendar days after the filing thereof in the event the SEC reviews and has written comments to the Registration Statement), and (ii) the tenth (10th) business day after the date HoldCo is notified in writing by the SEC that the Registration Statement will not be "reviewed" or will not be subject to further review. HoldCo will provide a draft of the Registration Statement to the Subscriber for review at least three (3) business days in advance of the filing the Registration Statement, and shall advise the Subscriber upon the Registration Statement being declared effective by the SEC. If the SEC prevents HoldCo from including any or all of the Shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 under the Securities Act for the resale of the Shares by the Holders or otherwise, HoldCo shall use its best efforts to ensure that the SEC determines that (1) the offering contemplated by the Registration Statement is a bona fide secondary offering and not an offering "by or on behalf of the issuer" as defined in Rule 415 of the Securities Act and (2) the Subscriber is not a statutory underwriter. If HoldCo is unsuccessful in the efforts described in the preceding sentence then (i) HoldCo shall cause such Registration Statement to register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC and (ii) the Subscriber shall have an opportunity to withdraw its Shares. In such event, the number of Shares to be registered for each selling shareholder named in the Registration Statement shall be reduced pro rata among all such selling shareholders. HoldCo agrees that HoldCo will cause such Registration Statement or another registration statement (which may be a "shelf" registration statement) to remain effective until the earlier of (i) two years from the issuance of the Shares, (ii) the date on which the Subscriber ceases to hold the Shares covered by such Registration Statement or any such other registration statement, or (iii) on the first date on which the Subscriber can sell all of its Shares under Rule 144 of the Securities Act without limitation as to the manner of sale or the amount of such securities that may be sold. The Subscriber agrees to disclose its beneficial ownership, as determined in accordance with Rule 13d-3 of the Exchange Act, of the Shares to HoldCo (or its successor) upon request to assist HoldCo in making the determination described above. HoldCo's obligations to include the Shares in the Registration Statement or any such other registration statement are contingent upon the Subscriber furnishing in writing to HoldCo such information regarding the Subscriber, the securities of HoldCo held by the Subscriber and the intended method of disposition of the Shares as shall be reasonably requested by HoldCo to effect the registration of the Shares, and shall execute such documents in connection with such registration as HoldCo may reasonably request that are customary of a selling stockholder in similar situations; provided that, in connection therewith, the undersigned shall not be required to enter into any lock-up or similar arrangement or otherwise be subject to any contractual restrictions with HoldCo on the ability to transfer the Shares. HoldCo may delay filing, delay effectiveness or suspend the use of any such registration statement if it determines that (i) the financial statements included in such registration statement are required to be updated in order to comply with Regulation S-X age of financial statement requirements or (ii) in order for such registration statement to not contain a material misstatement or omission of a material fact, an amendment thereto or a supplement to the related prospectus would be needed, or if such filing or use could materially affect a bona fide business or financing transaction of HoldCo or would require premature disclosure of information that could materially adversely affect HoldCo (each such circumstance, a "Suspension Event"); provided, however, that HoldCo may not delay or suspend any such registration statement on more than two (2) occasions or for more than 60 consecutive calendar days, or more than 90 total calendar days, in each case during any twelve-month period. Upon receipt of any written notice from HoldCo of the happening of any Suspension Event during the period that the Registration Statement or any such other registration statement is effective or if as a result of a Suspension Event the Registration Statement or any such other registration statement or related prospectus contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the related prospectus), not misleading, the Subscriber agrees that it will (i) immediately discontinue offers and sales of the Shares under the Registration Statement or any such other registration statement until the Subscriber receives (A) (x) copies of a supplemental or amended prospectus that corrects the misstatement(s) or omission(s) referred to above and (y) notice that any post-effective amendment has become effective or (B) notice from HoldCo that it may resume such offers and sales, and (ii) maintain the confidentiality of any information included in such written notice delivered by HoldCo unless otherwise required by applicable law. If so directed by HoldCo, the Subscriber will deliver to

E-8

Exhibit 6
Page 1552

**Table of Contents**

HoldCo or destroy all copies of the prospectus covering the Shares in the Subscriber's possession; provided, however, that this obligation to deliver or destroy all copies of the prospectus covering the Shares shall not apply to (i) the extent the Subscriber is required to retain a copy of such prospectus (A) in order to comply with applicable legal, regulatory, self-regulatory or professional requirements or (B) in accordance with a bona fide pre-existing document retention policy or (ii) copies stored electronically on archival servers as a result of automatic data back-up.

HoldCo shall, if requested by Subscriber to (i) cause the removal of the restrictive legends from any Shares while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act and (ii) cause its legal counsel to deliver an opinion, if necessary, to HoldCo's transfer agent in connection with the removal of such restrictive legends promptly after the effectiveness date of the applicable registration statement, in each case upon the receipt of customary representations and other documentation from the Subscriber that is necessary to establish that restrictive legends are no longer required as reasonably requested by HoldCo, its counsel or transfer agent. HoldCo agrees that following the relevant effectiveness date and the delivery by the undersigned to HoldCo or the transfer agent of a certificate representing Shares issued with a restrictive legend, it will deliver or cause to be delivered to such Subscriber a certificate representing such Shares that is free from all restrictive and other legends. Certificates for Shares subject to legend removal hereunder shall be transmitted by the transfer agent to the undersigned by crediting the account of the undersigned's prime broker with the Depository Trust Company System as directed by such Subscriber. HoldCo shall pay all transfer agent fees (including, without limitation, any fees required for same-day processing of any instruction letter delivered by HoldCo and any exercise notice delivered by the undersigned), stamp taxes and other taxes and duties levied in connection with the delivery of any Shares to the undersigned other than income and capital gains taxes of the undersigned that may be incurred in connection with the transactions contemplated hereby. The Subscriber agrees with HoldCo that it will sell any Shares pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery requirements, or an exemption therefrom, and that if Shares are sold pursuant to a registration statement, they will be sold in compliance with the plan of distribution set forth therein, and acknowledges that the removal of the restrictive legend from certificates representing Shares as set forth in this Section 6 is predicated upon HoldCo's reliance upon this understanding.

HoldCo shall, notwithstanding any termination of this Subscription Agreement, indemnify, defend and hold harmless Subscriber (to the extent a seller under the Registration Statement), and any of its respective officers, directors, agents, partners, members, stockholders, affiliates, managers, investment advisers and employees, and each person who controls Subscriber (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), to the fullest extent permitted by applicable law, from and against any and all out-of-pocket losses, claims, damages, liabilities, costs (including, without limitation, reasonable external attorneys' fees and expenses incurred in connection with defending or investigating any such action or claim) and expenses (collectively, "Losses"), as incurred, that arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except insofar as and to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding the Subscriber furnished in writing to HoldCo by such Subscriber expressly for use therein or such Subscriber has omitted a material fact from such information or otherwise violated the Securities Act, the Exchange Act or any state securities law or any rule or regulation thereunder; provided, however, that the indemnification contained in this Section 6 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of HoldCo (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall HoldCo be liable for any Losses to the extent they arise out of or are based upon a violation which occurs (A) in reliance upon and in conformity with written information furnished by such Subscriber, (B) in connection with any failure of such person to deliver or

E-9

Exhibit 6
Page 1553

Table of Contents

cause to be delivered a prospectus made available by HoldCo in a timely manner, (C) as a result of offers or sales effected by or on behalf of any person by means of a "free writing prospectus" (as defined in Rule 405 under the Securities Act) that was not authorized in writing by HoldCo, or (D) in connection with any offers or sales effected by or on behalf of such Subscriber in violation of Section 6 hereof. HoldCo shall notify the Subscriber promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 6 of which HoldCo is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Securities by Subscriber or any other Holder.

7. **Termination**. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earlier to occur of: (a) the mutual written agreement of each of the parties hereto to terminate this Subscription Agreement; (b) such date and time as the Transaction Agreement is terminated in accordance with its terms; or (c) written notice by either party to the other party to terminate this Subscription Agreement if the transactions contemplated by this Subscription Agreement are not consummated on or prior to December 31, 2021; *provided* that (i) nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from such breach. SC Health and shall notify the Subscriber of the termination of the Transaction Agreement promptly after the termination of such agreement and (ii) the provisions of Sections 8 through 10 of this Subscription Agreement will survive any termination of this Subscription Agreement and continue indefinitely.

8. **Trust Account Waiver**. The Subscriber hereby represents and warrants that it has read the Prospectus and understands that SC Health has established a trust account (the "Trust Account") containing the proceeds of its initial public offering (the "IPO") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of SC Health's public stockholders (including overallotment shares acquired by SC Health's underwriters, the "Public Stockholders"), and that, except as otherwise described in the Prospectus, SC Health may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their SC Health shares in connection with the consummation of SC Health's initial business combination (as such term is used in the Prospectus, the "Business Combination") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if SC Health fails to consummate a Business Combination within 21 months after the closing of the IPO, which is subject to extension by amendment to SC Health's organizational documents, (c) with respect to any interest earned on the amounts held in the Trust Account, amounts necessary to pay for any franchise and income tax obligations and up to $100,000 in dissolution expenses, or (d) to SC Health after or concurrently with the consummation of a Business Combination. For and in consideration of SC Health entering into this Subscription Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Subscriber hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this Subscription Agreement, neither the Subscriber nor any of its affiliates do now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Subscription Agreement, the Transaction or any proposed or actual business relationship between SC Health or its Representatives, on the one hand, and the Subscriber or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "Released Claims"); provided, however, that nothing in this Section 8 shall be deemed to limit any Subscriber's right to distributions from the Trust Account in accordance with its rights as a Public Stockholder in respect of shares of SC Health acquired by any means other than pursuant to this Subscription Agreement. The Subscriber on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that the Subscriber or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with SC Health or its Representatives and

E-10

Exhibit 6
Page 1554

Table of Contents

will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of this Subscription Agreement or any other agreement with SC Health or its affiliates). The Subscriber agrees and acknowledges that such irrevocable waiver is material to this Subscription Agreement and specifically relied upon by SC Health and its affiliates to induce SC Health to enter in this Subscription Agreement, and the Subscriber further intends and understands such waiver to be valid, binding and enforceable against the Subscriber and each of its affiliates under applicable law. To the extent the Subscriber or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SC Health or its Representatives, which proceeding seeks, in whole or in part, monetary relief against SC Health or its Representatives, the Subscriber hereby acknowledges and agrees that the Subscriber's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit the Subscriber or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein. In the event the Subscriber or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SC Health or its Representatives, which proceeding seeks, in whole or in part, relief against the Trust Account (including any distributions therefrom) or against SC Health or the Public Stockholders, whether in the form of money damages or injunctive relief, SC Health and its Representatives, as applicable, shall be entitled to recover from the Subscriber and its affiliates the associated legal fees and costs in connection with any such action in the event SC Health or its Representatives, as applicable, prevails in such action or proceeding. For purposes of this Subscription Agreement, "Representatives" with respect to any person shall mean such person's affiliates and its and its affiliate's respective directors, officers, employees, consultants, advisors, agents and other representatives. Notwithstanding anything to the contrary contained in this Subscription Agreement, the provisions of this Section 8 shall survive the Closing or any termination of this Subscription Agreement and last indefinitely.

9. **Miscellaneous.**

(a) SC Health shall, no later than 9:00 a.m., New York City time, on the first business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "Signing 8-K") disclosing all material terms of the transactions contemplated hereby, the Transaction and any other material, nonpublic information that SC Health or any of its officers, directors, employees or agents (including the Placement Agents) has provided to the undersigned at any time prior to the filing of the Signing 8-K. From and after the issuance of the Signing 8-K, the undersigned shall not be in possession of any material, non-public information received from SC Health or any of its officers, directors, employees or agents (including the Placement Agents) and the Subscriber shall no longer be subject to any confidentiality or similar obligations under any current agreement, whether written or oral with SC Health, the Placement Agents, or any of their respective affiliates. Except with the express written consent of the Subscriber and unless prior thereto the Subscriber shall have executed a written agreement regarding the confidentiality and use of such information, neither SC Health nor Holdco shall, and shall cause its officers, directors, employees and agents, not to, provide Subscriber with any material, non-public information regarding SC Health, Holdco or the Transaction from and after the filing of the Signing 8-K.

(b) Neither this Subscription Agreement nor any rights that may accrue to the Subscriber hereunder (other than the Shares acquired hereunder, if any, subject to applicable securities laws) may be transferred or assigned by the Subscriber without the prior written consent of SC Health and HoldCo, and any purported transfer or assignment without such consent shall be null and void ab initio.

(c) HoldCo and SC Health may request from the Subscriber such additional information as SC Health and/or HoldCo may deem necessary to evaluate the eligibility of the Subscriber to acquire the Shares, and the Subscriber shall provide such information to SC Health and HoldCo upon such request provided that SC Health and HoldCo keep any such information so provided confidential, it being understood by the Subscriber that HoldCo and SC Health may without any liability hereunder reject the Subscriber's subscription prior to the Closing Date in the event the Subscriber fails to provide such additional information requested by SC Health and HoldCo to evaluate the Subscriber's eligibility or SC Health and HoldCo determines that the Subscriber is not eligible.

E-11

Exhibit 6
Page 1555

Table of Contents

(d) The Subscriber acknowledges that SC Health, HoldCo, the Placement Agent, the Target and others will rely on the acknowledgments, understandings, agreements, representations and warranties of the Subscriber contained in this Subscription Agreement. Prior to the Closing, the Subscriber agrees to promptly notify SC Health and HoldCo if any of the acknowledgments, understandings, agreements, representations and warranties set forth herein are no longer accurate. The Subscriber agrees that the purchase by the Subscriber of Shares from HoldCo will constitute a reaffirmation of the acknowledgments, understandings, agreements, representations and warranties herein (as modified by any such notice) by the Subscriber as of the time of such purchase. The Subscriber acknowledges and agrees that each of the Placement Agents and the Target and their respective affiliates is a third-party beneficiary of the representations, warranties and covenants of the Subscriber contained in Section 5 of this Subscription Agreement, and that the Target is otherwise an express third party beneficiary of this Subscription Agreement, entitled to enforce the terms hereof against Subscriber as if it were an original party hereto. Except as expressly set forth herein, this Subscription Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successor and assigns.

(e) Each of SC Health and HoldCo is entitled to rely upon this Subscription Agreement and is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby to the extent required by law or regulatory bodies. Neither party shall issue any press release or make any other similar public statement with respect to the transactions contemplated hereby without the prior written consent of SC Health and HoldCo (such consent not to be unreasonably withheld or delayed).

(f) All the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

(g) This Subscription Agreement may not be amended, modified, waived or terminated except by an instrument in writing, signed by the party against whom enforcement of such modification, waiver, or termination is sought.

(h) This Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof (other than any confidentiality agreement entered into by SC Health and/or HoldCo and the Subscriber in connection with the Offering).

(i) This Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

(j) If any provision of this Subscription Agreement shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

(k) This Subscription Agreement may be executed in one or more counterparts (including by facsimile or electronic mail or in .pdf) and by different parties in separate counterparts, with the same effect as if all parties hereto had signed the same document. All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

(l) The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Subscription Agreement and to enforce specifically the terms and provisions of this Subscription

E-12

Exhibit 6
Page 1556

**Table of Contents**

Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

     (m) **THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER STATE. EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION PURSUANT TO THIS SUBSCRIPTION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.**

     (n) All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered by facsimile or email, with affirmative confirmation of receipt, (iii) one business day after being sent, if sent by reputable, internationally recognized overnight courier service or (iv) three (3) business days after being mailed, if sent by registered or certified mail, prepaid and return receipt requested, in each case to the applicable party at the following addresses (or at such other address for a party as shall be specified by like notice):

*If to SC Health, to:*

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Attention: Jeri Kwerk
    AJ Coloma
    Eric Teo
    Terence Fong
    Aaron Wee
    Clement Chen
Email: jeri.kwek@sincapital.com
    aj.coloma@sincapital.com
    eric.teo@sincapital.com
    terence.fong@sincapital.com
    aaron.wee@sincapital.com
    Clement.Chen@sincapital.com

*with copies (which shall not constitute notice) to:*

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn: Paul Tropp, Chris Capuzzi and Carl P. Marcellino
Email: carl.marcellino@ropesgray.com
Telephone No.: (212) 841-0623

and

Merrill Lynch (Singapore) Pte. Ltd.
50 Collyer Quay, #14-01
OUE Bayfront
Singapore 049321
Attention: Clemente Antonio Puno
Telephone No.: +65 6678 0157
Email: antonio.puno@bofa.com

Cowen and Company, LLC.
599 Lexington Avenue, 25th Floor
New York, NY 10022
Attention: Vinni Trehan
Email: vinni.trehan@cowen.com

*If to HoldCo, to:*

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email:andrew.rickman@rockleyphotonics.com

*with copies (which shall not constitute notice) to:*

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019

Attention: James Masetti and Jarrod Murphy
Email:jim.masetti@pillsburylaw.com
jarrod.murphy@pillsburylaw.com

Notice to the Subscriber shall be given to the address underneath the Subscriber's name on the signature page hereto.

     (o) The headings set forth in this Subscription Agreement are for convenience of reference only and shall not be used in interpreting this Subscription Agreement. In this Subscription Agreement, unless the context otherwise requires: (i) whenever required by the context, any pronoun used in this Subscription Agreement shall

E-13

Exhibit 6
Page 1557

**Table of Contents**

include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa; (ii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; and (iii) the words "herein", "hereto" and "hereby" and other words of similar import in this Subscription Agreement shall be deemed in each case to refer to this Subscription Agreement as a whole and not to any particular portion of this Subscription Agreement. As used in this Subscription Agreement, the term: (x) "business day" shall mean any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in New York, New York (or as such term is used in Section 6 hereof, Washington, D.C.) are authorized to close for business (excluding as a result of "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems, including for wire transfers, of commercially banking institutions in New York, New York are generally open for use by customers on such day); (y) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (z) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this Subscription Agreement to an affiliate of the SC Health will include SC Health's sponsor, SC Health Holdings Limited.

(p) At Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties may reasonably deem practical and necessary in order to consummate the Offering as contemplated by this Subscription Agreement.

**10. <u>Non-Reliance and Exculpation</u>**. The Subscriber acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person other than the statements, representations and warranties contained in this Subscription Agreement in making its investment or decision to invest in HoldCo. The Subscriber agrees that neither (i) any other purchaser pursuant to other subscription agreements entered into in connection with the Offering (including the controlling persons, members, officers, directors, partners, agents, or employees of any such other purchaser) nor (ii) each Placement Agent, each of their respective affiliates or any of their respective affiliates' respective control persons, officers, directors or employees, shall be liable to the Subscriber pursuant to this Subscription Agreement, the negotiation hereof or thereof or its subject matter, or the transactions contemplated hereby or thereby, including, without limitation, for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Shares or with respect to any claim (whether in tort, contract or otherwise) for breach of this Subscription Agreement or in respect of any written or oral representations made or alleged to be made in connection herewith, as expressly provided herein, or for any actual or alleged inaccuracies, misstatements or omissions with respect to any information or materials of any kind furnished.

*{SIGNATURE PAGES FOLLOW}*

E-14

Exhibit 6
Page 1558

Table of Contents

IN WITNESS WHEREOF, the parties hereto have caused this Subscription Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

SC HEALTH CORPORATION

By: _____

Name:
Title:

*{Signature Page to Subscription Agreement}*

E-15

Exhibit 6
Page 1559

Table of Contents

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____

    Name:

    Title:

*{Signature Page to Subscription Agreement}*

E-16

Exhibit 6
Page 1560

**Table of Contents**

**{SUBSCRIBER SIGNATURE PAGE TO THE SUBSCRIPTION AGREEMENT}**

IN WITNESS WHEREOF, the undersigned has caused this Subscription Agreement to be duly executed by its authorized signatory as of the date first indicated above.

Name(s) of Subscriber:_____

*Signature of Authorized Signatory of Subscriber*:_____

Name of Authorized Signatory:_____

Title of Authorized Signatory:_____

Address for Notice to Subscriber:

_____

_____

_____

Attention:_____

Email:_____

Facsimile No.:_____

Telephone No.:_____

Address for Delivery of Shares to Subscriber (if not same as address for notice):

_____

_____

_____

**Subscription Amount**: $_____

**Number of Shares**:_____

EIN Number:_____

E-17

Exhibit 6
Page 1561

**Table of Contents**

**SCHEDULE I**
**ELIGIBILITY REPRESENTATIONS OF SUBSCRIBER**

A.    NOT A U.S. PERSON (please check the applicable subparagraphs)

☐ I am not a "U.S. Person" (as defined in Regulation S under the Securities Act of 1933, as amended (the "**Securities Act**")) and I am not acquiring Shares for the account or benefit of any U.S. Person.

\*\*\* OR \*\*\*

B.    QUALIFIED INSTITUTIONAL BUYER STATUS

(Please check the applicable subparagraphs):

1.    ☐    We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) (a "**QIB**") and have marked and initialed the appropriate box on the following pages indicating the provision under which we qualify as a QIB.

2.    ☐    We are subscribing for the Shares as a fiduciary or agent for one or more investor accounts, and each owner of such account is a QIB.

\*\*\* OR \*\*\*

C.    INSTITUTIONAL ACCREDITED INVESTOR STATUS (Please check the applicable subparagraphs):

1.    ☐    We are an "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3), (7), or (8) under the Securities Act) and have marked and initialed the appropriate box on the following pages indicating the provision under which we qualify as an "accredited investor."

2.    ☐    We are not a natural person.

\*\*\* AND \*\*\*

D.    AFFILIATE STATUS (Please check the applicable box)

SUBSCRIBER:

☐    is:

☐    is not:

an "affiliate" (as defined in Rule 144 under the Securities Act) of the Issuer or acting on behalf of an affiliate of the Issuer.

E-18

Exhibit 6
Page 1562

**Table of Contents**

*This page should be completed by Subscriber*
*and constitutes a part of the Subscription Agreement.*

The Subscriber is a "qualified institutional buyer" (within the meaning of Rule 144A under the Securities Act) if it is an entity that meets any one of the following categories at the time of the sale of securities to the Subscriber (Please check the applicable subparagraphs):

☐ The Subscriber is an entity that, acting for its own account or the accounts of other qualified institutional buyers, in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the Subscriber and:

☐ is an insurance company as defined in section 2(a)(13) of the Securities Act;

☐ is an investment company registered under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), or any business development company as defined in section 2(a)(48) of the Securities Act;

☐ is a Small Business Investment Company licensed by the US Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958, as amended ("**Small Business Investment Act**") or any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act;

☐ is a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees;

☐ is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**");

☐ is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, of (b) employee benefit plan within the meaning of Title I of the ERISA, except, in each case, trust funds that include as participants individual retirement accounts or H.R. 10 plans;

☐ is a business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "**Investment Advisers Act**");

☐ is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), corporation (other than a bank as defined in section 3(a)(2) of the Securities Act, a savings and loan association or other institution referenced in section 3(a)(5)(A) of the Securities Act, or a foreign bank or savings and loan association or equivalent institution), partnership, limited liability company, or Massachusetts or similar business trust; or

☐ is an investment adviser registered under the Investment Advisers Act;

☐ The Subscriber is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with the Subscriber;

☐ The Subscriber is a dealer registered pursuant to Section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer;

☐ The Subscriber is an investment company registered under the Investment Company Act, acting for its own account or for the accounts of other qualified institutional buyers, that is part of a family of investment

E-19

Exhibit 6
Page 1563

**Table of Contents**

companies[1] which own in the aggregate at least $100 million in securities of issuers, other than issuers that are affiliated with Subscriber or are part of such family of investment companies;

☐ The Subscriber is an entity, all of the equity owners of which are qualified institutional buyers, acting for its own account or the accounts of other qualified institutional buyers; or

☐ The Subscriber is a bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act, or any foreign bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the Subscriber and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of sale of securities in the case of a US bank or savings and loan association, and not more than 18 months preceding the date of sale of securities for a foreign bank or savings and loan association or equivalent institution.

Rule 501(a) under the Securities Act, in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. Subscriber has indicated, by marking and initialing the appropriate box(es) below, the provision(s) below which apply to Subscriber and under which Subscriber accordingly qualifies as an "accredited investor."

☐    Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity;

☐    Any broker or dealer registered pursuant to section 15 of the Exchange Act;

☐    Any investment adviser registered pursuant to section 203 of the Investment Advisers Act or registered pursuant to the laws of a state;

☐    Any investment adviser relying on the exemption from registering with the SEC under section 203(l) or (m) of the Investment Advisers Act;

☐    Any insurance company as defined in section 2(a)(13) of the Securities Act;

☐    Any investment company registered under the Investment Company Act or a business development company as defined in section 2(a)(48) of the Investment Company Act;

☐    Any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act;

☐    Any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act;

---

[1]    "**Family of investment companies**" means any two or more investment companies registered under the Investment Company Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser (or, in the case of unit investment trusts, the same depositor); provided that, (a) each series of a series company (as defined in Rule 18f-2 under the Investment Company Act) shall be deemed to be a separate investment company and (b) investment companies shall be deemed to have the same adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent, or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor).

E-20

Exhibit 6
Page 1564

Table of Contents

☐    Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

☐    Any employee benefit plan within the meaning of Title I of the ERISA, if (i) the investment decision is made by a plan fiduciary, as defined in section 3(21) of ERISA, which is either a bank, a savings and loan association, an insurance company, or a registered investment adviser, (ii) the employee benefit plan has total assets in excess of $5,000,000 or, (iii) such plan is a self-directed plan, with investment decisions made solely by persons that are "accredited investors";

☐    Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act;

☐    Any (i) corporation, limited liability company or partnership, (ii) Massachusetts or similar business trust, or (iii) organization described in section 501(c)(3) of the Internal Revenue Code, in each case that was not formed for the specific purpose of acquiring the securities offered and that has total assets in excess of $5,000,000;

☐    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) of Regulation D under the Securities Act; or

☐    Any entity in which all of the equity owners are "accredited investors."

E-21

Exhibit 6
Page 1565

Table of Contents

ANNEX F

**SUBSCRIPTION AGREEMENT**

March 19, 2021

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900

Rockley Photonics Holdings Limited
3rd Floor 1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT

Ladies and Gentlemen:

In connection with the proposed business combination (the "Transaction") between SC Health Corporation, a Cayman Islands exempted company ("SC Health"), and Rockley Photonics, Ltd., a company incorporated under the laws of England and Wales with company number 08683015 ("Target"), pursuant to that certain Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (as it may be amended, the "Transaction Agreement"), by and among SC Health, Target, Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability ("HoldCo") and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of HoldCo, SC Health is seeking commitments to purchase ordinary shares (the "Ordinary Shares"), of HoldCo for a purchase price of $10.00 per share (the "Purchase Price"), in a private placement to be conducted by HoldCo and SC Health (the "Offering"). In connection therewith, the undersigned subscriber ("Undersigned"), SC Health and HoldCo agree in this subscription agreement (this "Subscription Agreement") as follows:

**1. Subscription**. As of the date written above (the "Subscription Date"), the Undersigned hereby irrevocably subscribes for and agrees to purchase from HoldCo such number of Ordinary Shares as is set forth on the signature page of this Subscription Agreement (the "Shares") at the Purchase Price per Share and on the terms provided for herein.

SC Health and HoldCo has entered into separate subscription agreements (the "Other Subscription Agreements") with certain other "qualified institutional buyers" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act")) or "accredited investors" (within the meaning of Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act) (each, an "Other Subscriber"), pursuant to which such investors have agreed to purchase Ordinary Shares on the Closing Date and the aggregate gross proceeds from the securities to be sold by HoldCo pursuant to this Subscription Agreement and the Other Subscription Agreements equals, as of the date hereof, $150,000,000.

**2. Closing; Delivery of Shares.**

(a) The closing of the sale of Shares contemplated hereby (the "Closing", and the date that the Closing actually occurs, the "Closing Date") is contingent upon the substantially concurrent consummation of the Transaction (the "Transaction Closing"). The Closing shall occur on the date of the Transaction Closing, and immediately prior to, the Merger Effective Time (as defined in the Transaction Agreement).

(b) HoldCo shall provide written notice (which may be via email) to the Undersigned (the "Closing Notice") that HoldCo reasonably expects the Transaction Closing to occur on a date specified in the notice (the "Scheduled Closing Date") that is not less than three (3) business days from the date of the Undersigned's receipt

F-1

Exhibit 6
Page 1566

Table of Contents

of the Closing Notice, which Closing Notice shall contain HoldCo's wire instructions for an escrow account (the "Escrow Account") established by HoldCo with a third party escrow agent (the "Escrow Agent") to be identified in the Closing Notice. At least two (2) business days prior to the Scheduled Closing Date, the Undersigned shall deliver to the Escrow Account the aggregate Purchase Price for the Shares subscribed by wire transfer of United States dollars in immediately available funds. Upon the Closing, HoldCo shall provide instructions to the Escrow Agent to release the funds in the Escrow Account to HoldCo against delivery to the Undersigned of the Shares, free and clear of any liens or other restrictions whatsoever (other than those arising under state or federal securities laws), in book-entry form as set forth in Section 2(c) below. If this Subscription Agreement is terminated prior to the Closing and any funds have already been sent by the Undersigned to the Escrow Account, then promptly (but in no event later than five (5) business days after the Scheduled Closing Date specified in the Closing Notice) after such termination, HoldCo will instruct the Escrow Agent to promptly return such funds to the Undersigned.

(c) On the Closing Date, promptly after the Closing, HoldCo shall deliver (or cause the delivery of) the Shares in book-entry form with restrictive legends in the amount as set forth on the signature page to the Undersigned as indicated on the signature page.

3. **Closing Conditions**. In addition to the condition set forth in the first sentence of Section 2(a) above:

(a) The Closing is also subject to the satisfaction or valid waiver by each party to this Subscription Agreement of the conditions that, on the Closing Date:

(i) no suspension of the qualification of the Shares for offering or sale or trading in any jurisdiction, or initiation or threatening of any proceedings for any of such purposes, shall have occurred;

(ii) no governmental authority of competent jurisdiction shall have rendered, issued, promulgated, enforced or entered any judgment, order, law, rule or regulation (whether temporary, preliminary or permanent) which is then in effect and which then makes the consummation of the transactions contemplated hereby illegal or then restrains or prohibits the consummation of the transactions contemplated hereby; and

(iii) all material conditions precedent to the Transaction Closing set forth in the Transaction Agreement shall have been satisfied or waived (other than those conditions which, by their nature, are to be satisfied at the Transaction Closing).

(b) The obligations of SC Health and HoldCo to consummate the Closing are also subject to the satisfaction or valid waiver by SC Health and HoldCo of the additional conditions that, on the Closing Date:

(i) all representations and warranties of the Undersigned contained in this Subscription Agreement shall be true and correct in all material respects at and as of the Closing Date (except for representations and warranties made as of a specific date, which shall be true and correct in all material respects as of such date); and

(ii) the Undersigned shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to Closing.

(c) The obligations of the Undersigned to consummate the Closing are also subject to the satisfaction or valid waiver by the Undersigned of the additional conditions that, on the Closing Date:

(i) all representations and warranties of SC Health and HoldCo contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect (as defined herein), which representations and warranties shall be true in all respects) at and as of the Closing Date (except for representations and warranties made as of a specific date, which shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true in all respects) as of such date); and

F-2

Exhibit 6
Page 1567

Table of Contents

(ii) SC Health and HoldCo shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to Closing.

4. **SC Health and HoldCo Representations and Warranties**. Each of SC Health (other than in respect of paragraph (b) below) and HoldCo represents and warrants to the Undersigned severally (and not jointly and severally), as to itself only, that:

(a) As of the date hereof, each of SC Health and HoldCo is an exempted company duly organized, validly existing and in good standing under the laws of the Cayman Islands. Immediately following the Transaction Closing under the Transaction Agreement, each of SC Health and HoldCo will be validly existing and in good standing under the laws of its jurisdiction of organization. Each of SC Health and HoldCo has the corporate power and authority to own, lease and operate its respective properties and conduct its respective business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

(b) All issued and outstanding Ordinary Shares have been duly authorized and validly issued, are fully paid and are non-assessable and are not subject to pre-emptive rights. The Shares have been duly authorized and, when issued and delivered to the Undersigned against full payment therefor in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and will not have been issued in violation of or subject to any preemptive or similar rights created under HoldCo's Articles of Association or under the laws of the Cayman Islands.

(c) This Subscription Agreement has been duly authorized, executed and delivered by each of SC Health and HoldCo and is enforceable against each of SC Health and HoldCo in accordance with its terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

(d) The issuance and sale of the Shares by HoldCo and the compliance by each of SC Health and HoldCo with all of the provisions of this Subscription Agreement and the consummation of the transactions herein will be done in accordance with the NYSE listing rules and will not conflict with or result in a material breach or material violation of any of the terms or provisions of, or constitute a material default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of SC Health or HoldCo or any of their respective subsidiaries pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, license, lease or any other agreement or instrument to which SC Health or HoldCo or any of their respective subsidiaries is a party or by which SC Health or HoldCo or any of their respective subsidiaries is bound or to which any of the property or assets of SC Health or HoldCo is subject, which would have a material adverse effect on the business, properties, financial condition, stockholders' equity or results of operations of SC Health or HoldCo (a "Material Adverse Effect") or materially affect the validity of the Shares or the legal authority of SC Health or HoldCo to comply in all material respects with the terms of this Subscription Agreement; (ii) result in any material violation of the provisions of the organizational documents of SC Health or HoldCo; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over SC Health or HoldCo or any of its properties that would have a Material Adverse Effect or materially affect the validity of the Shares or the legal authority of SC Health or HoldCo to comply with this Subscription Agreement; subject, in the case of the foregoing clauses (i) and (iii) with respect to the consummation of the transactions therein contemplated.

(e) Neither SC Health nor HoldCo has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other person to any broker's or finder's fee or any other commission or similar fee in connection with the transactions contemplated by this Subscription Agreement for which the Undersigned could become liable. Other than Merrill Lynch (Singapore) Pte. Ltd. (and its affiliates) and Cowen and Company, LLC. (collectively, the "Placement Agents"), neither SC Health nor HoldCo is aware

F-3

Exhibit 6
Page 1568

**Table of Contents**

of any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any shares of Ordinary Shares in the Offering. Without limiting the foregoing, SC Health and HoldCo acknowledge, and the Undersigned understands, that SC Health has engaged the Placement Agents in connection with the placement of Ordinary Shares under the Other Subscription Agreements, in connection with the Transaction, pursuant to which the Other Subscribers have, together with the Undersigned pursuant to this Subscription Agreement, agreed to purchase, severally and not jointly, Ordinary Shares at the Purchase Price (each such investor, including the Undersigned, a "Subscriber" and together with the Undersigned, the "Subscribers") and SC Health is obligated to compensate the Placement Agents for their services as set forth in the Other Subscription Agreements.

(f) HoldCo is not, and immediately after receipt of payment for the Shares, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(g) Assuming the accuracy of the Undersigned's representations and warranties set forth in Section 5, in connection with the offer, sale and delivery of the Shares in the manner contemplated by this Subscription Agreement, it is not necessary to register the Shares under the Securities Act.

(h) Neither SC Health, HoldCo, nor any person acting on their behalf has, directly or indirectly, made any offers or sales of any HoldCo security or solicited any offers to buy any security under circumstances that would adversely affect reliance by HoldCo on either Regulation S under the Securities Act or Section 4(a)(2) of the Securities Act for the exemption from registration for the transactions contemplated hereby or would require registration of the issuance of the Shares under the Securities Act.

(i) There are no Other Subscription Agreements, side letter agreements or other agreements or understandings (including written summaries of any oral understandings) with any Other Undersigned that include terms and conditions that are materially more advantageous to any such Other Undersigned (as compared to Undersigned) containing any of the following: (i) any rights or benefits granted to an Other Undersigned in connection with such Other Undersigned's compliance with any law, regulation or policy specifically applicable to such Other Undersigned or in connection with the taxable status of an Other Undersigned, (ii) any rights or benefits which are personal to an Other Undersigned based solely on its place of organization or headquarters, organizational form of, or other particular restrictions applicable to, such Other Undersigned, or (iii) any rights with respect to the confidentiality or disclosure of an Other Undersigned's identity.

(j) SC Health has made available to Undersigned (including via the SEC's EDGAR system) a true, correct and complete copy of each form, report, statement, schedule, prospectus, proxy, registration statement and other documents filed by SC Health with the Commission prior to the date of this Subscription Agreement (the "SEC Documents"). None of the SEC Documents filed under the Exchange Act, contained, when filed or, if amended prior to the date of this Subscription Agreement, as of the date of such amendment with respect to those disclosures that are amended, any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. SC Health has timely filed each report, statement, schedule, prospectus, and registration statement that SC Health was required to file with the SEC since its inception and through the date hereof. There are no material outstanding or unresolved comments in comment letters from the SEC staff with respect to any of the SEC Documents.

(k) Each of HoldCo and SC Health understands that the foregoing representations and warranties shall be deemed material to and have been relied upon by the Undersigned.

**5. Undersigned Representations, Warranties and Covenants**. The Undersigned represents and warrants to SC Health and HoldCo that:

(a) At the time the Undersigned was offered the Shares, it was, and as of the date hereof, the Undersigned (i) (A) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an "accredited

Exhibit 6
Page 1569

**Table of Contents**

investor" (within the meaning of Rule 501(a)(1), (2), (3), (5), (7) or (8) under the Securities Act) as certified by the Undersigned on <u>Schedule I</u>, (ii) is not an "Institutional Account" as such term is defined in FINRA Rule 4512(c), (iii) is acquiring the Shares only for its own account and not acquiring the Shares for the account of others, and not on behalf of any other account or person or with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act or (ii) is a "U.S. person" within the meaning of Regulation S under the Securities Act. The Undersigned is not an entity formed for the specific purpose of acquiring the Shares. The Undersigned is a sophisticated investor, experienced in investing in private equity transactions and capable of evaluating investment risks independently, both in general and with regard to all transactions and investment strategies involving a security or securities, and has exercised independent judgment in evaluating its participation in the purchase of the Shares.

(b) The Undersigned understands that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares delivered at the Closing have not been registered under the Securities Act. The Undersigned understands that the Shares may not be resold, transferred, pledged or otherwise disposed of by the Undersigned absent an effective registration statement under the Securities Act except (i) to HoldCo or a subsidiary thereof, (ii) to non-U.S. persons pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act or (iii) pursuant to another applicable exemption from the registration requirements of the Securities Act, and in accordance with applicable securities laws of the states and other jurisdictions, and that any certificates (if any) or any book-entry shares representing the Shares delivered at the Closing shall contain a legend or restrictive notation to such effect. The Undersigned understands and agrees that the Shares, until registered under an effective registration statement, will be subject to transfer restrictions and, as a result of these transfer restrictions, the Undersigned may not be able to readily resell the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. The Undersigned understands that it has been advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the Shares.

(c) The Undersigned understands and agrees that the Undersigned is purchasing Shares directly from HoldCo. The Undersigned further acknowledges that there have been no representations, warranties, covenants and agreements made to the Undersigned by SC Health or HoldCo, or any of its officers or directors, expressly (other than those representations, warranties, covenants and agreements included in this Subscription Agreement) or by implication.

(d) The Undersigned's acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended, Section 4975 of the Internal Revenue Code of 1986, as amended, or any applicable similar law.

(e) The Undersigned acknowledges and agrees that the Undersigned has received such information as the Undersigned deems necessary in order to make an investment decision with respect to the Shares. Without limiting the generality of the foregoing, the Undersigned acknowledges that it has received and carefully reviewed the following items (collectively, the "<u>Disclosure Documents</u>"): (i) the final prospectus of SC Health, dated as of July 11, 2019 and filed with the U.S. Securities and Exchange Commission (the "<u>SEC</u>") (File No. 333-232240) on July 12, 2019 (the "<u>Prospectus</u>"), (ii) each filing made by SC Health with the SEC following the filing of the Prospectus through the date of this Subscription Agreement, (iii) the Transaction Agreement, a copy of which will be filed by HoldCo and SC Health with the SEC and (iv) the investor presentation by SC Health and the Target, a copy of which will be furnished by HoldCo and SC Health to the SEC. The undersigned understands the significant extent to which certain of the disclosures contained in items (i) and (ii) above shall not apply following the Transaction Closing. The Undersigned represents and agrees that the Undersigned and the Undersigned's professional advisor(s), if any, have had the full opportunity to ask SC Health's and the Target's management questions, receive such answers and obtain such information as the Undersigned and such Undersigned's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares. The Undersigned has conducted its own investigation of SC Health, HoldCo, the Target and the Shares and the Undersigned has made its own assessment and has satisfied itself concerning the relevant tax and other economic considerations relevant to its investment in the Shares.

<div align="center">F-5</div>

Exhibit 6
Page 1570

Table of Contents

(f) The Undersigned acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in the Disclosure Documents and in SC Health's filings with the SEC. The Undersigned is able to fend for itself in the transactions contemplated herein and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and the Undersigned has sought such accounting, legal and tax advice as the Undersigned has considered necessary to make an informed investment decision.

(g) Alone, or together with any professional advisor(s), the Undersigned has adequately analyzed and fully considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for the Undersigned and that the Undersigned is able at this time and in the foreseeable future to bear the economic risk of a total loss of the Undersigned's investment in HoldCo. The Undersigned acknowledges specifically that a possibility of total loss exists.

(h) In making its decision to purchase the Shares, the Undersigned has relied solely upon independent investigation made by the Undersigned and the representations and warranties of SC Health and HoldCo set forth herein. Without limiting the generality of the foregoing, the Undersigned has not relied on any statements or other information provided by the Placement Agents concerning SC Health, HoldCo, Target or the Shares or the offer and sale of the Shares.

(i) The Undersigned understands and agrees that no federal or state agency has passed upon or endorsed the merits of this Offering of the Shares or made any findings or determination as to the fairness of this investment or the accuracy or adequacy of SC Health's filings with the SEC.

(j) The Undersigned has been duly formed or incorporated and is validly existing in good standing under the laws of its jurisdiction of incorporation or formation.

(k) The execution, delivery and performance by the Undersigned of this Subscription Agreement are within the powers of the Undersigned, have been duly authorized and will not constitute or result in a breach or default under or conflict with any federal or state statute, rule or regulation applicable to the Undersigned, any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Undersigned is a party or by which the Undersigned is bound, and, if the Undersigned is not an individual, will not violate any provisions of the Undersigned's charter documents, including its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Subscription Agreement is genuine, and the signatory, if the Undersigned is an individual, has legal competence and capacity to execute the same or, if the Undersigned is not an individual the signatory has been duly authorized to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of the Undersigned, enforceable against the Undersigned in accordance with its terms.

(l) Neither the due diligence investigation conducted by the Undersigned in connection with making its decision to acquire the Shares nor any representations and warranties made by the Undersigned herein shall modify, amend or affect the Undersigned's right to rely on the truth, accuracy and completeness of SC Health's and HoldCo's representations and warranties contained herein.

(m) The Undersigned is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank (collectively, a "Prohibited Investor"). The Undersigned agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, provided that the Undersigned is permitted to do so under applicable law. If the Undersigned is a financial institution subject to

F-6

Exhibit 6
Page 1571

Table of Contents

the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended by the USA PATRIOT Act of 2001, and its implementing regulations (collectively, the "BSA/PATRIOT Act"), the Undersigned maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. To the extent required, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. To the extent required, it maintains policies and procedures reasonably designed to ensure that the funds held by the Undersigned and used to purchase the Shares were legally derived.

(n) As of the date hereof and at the Closing, neither the Undersigned, nor, to the extent it has them, any of its direct beneficial owners or (only so far as the Undersigned is aware) its indirect beneficial owners or its directors, affiliates or executive officers (collectively with the Undersigned, the "Covered Persons"), are subject to any of the "Bad Actor" disqualifications described in Rule 506(d) under the Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Undersigned has exercised reasonable care to determine whether any Covered Person is subject to a Disqualification Event. The acquisition of Shares by the Undersigned will not subject SC Health or HoldCo to any Disqualification Event.

(o) Undersigned is not currently (and at all times through Closing will refrain from being or becoming) a member of a "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or any successor provision) other than with those persons or entities who may be deemed affiliates or control persons, including any group acting for the purpose of acquiring, holding or disposing of equity securities of the Issuer (within the meaning of Rule 13d-5(b)(1) under the Exchange Act).

(p) No foreign person (as defined in 31 C.F.R. Part 800.224) in which the national or subnational governments of a single foreign state have a substantial interest (as defined in 31 C.F.R. Part 800.244) will acquire a substantial interest in HoldCo as a result of the purchase and sale of Shares hereunder such that a declaration to the Committee on Foreign Investment in the United States would be mandatory under 31 C.F.R. Part 800.401, and no foreign person will have control (as defined in 31 C.F.R. Part 800.208) over HoldCo from and after the Closing as a result of the purchase and sale of Shares hereunder.

(q) The Undersigned became aware of this Offering of the Shares solely by means of direct contact between the Undersigned and SC Health, HoldCo, the Placement Agents or a representative of SC Health, HoldCo or the Placement Agents, and the Shares were offered to the Undersigned solely by direct contact between the Undersigned and SC Health, HoldCo, the Placement Agents or a representative of SC Health, HoldCo or the Placement Agents. The Undersigned acknowledges that SC Health and HoldCo each represents and warrants severally (and not jointly and severally), as to itself only, that the Shares (i) were not offered by any form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws. Neither the Undersigned, nor any of its directors, officers, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder, (i) to its knowledge, engaged in any general solicitation, or (ii) published any advertisement in connection with the Offering.

(r) The Undersigned understands, acknowledges and agrees that (i) the Placement Agents, which have been engaged by SC Health in connection with the placement of Ordinary Shares under the Other Subscription Agreements, have not been engaged by SC Health in connection with the Undersigned's Subscription of Shares under this Subscription Agreement and are not participating in any manner in the Subscription, including but not limited to the negotiation between SC Health, HoldCo and the Undersigned with respect to the Subscription, the execution by the Undersigned of this Subscription Agreement or the issuance or sale of Shares by HoldCo to the Undersigned as contemplated herein; (ii) no Placement Agent has introduced the Undersigned to SC Health or HoldCo (nor SC Health or HoldCo to the Undersigned), or otherwise solicited or arranged, directly or indirectly, HoldCo's proposed sale of Shares to the Undersigned or the Undersigned's Subscription hereunder; (iii) it has not received any information from any of the Placement Agents or any of their respective affiliates in connection

F-7

Exhibit 6
Page 1572

Table of Contents

with the Subscription and has not relied on any statements made or purported to be made directly or indirectly by the Placement Agents or any of the Placement Agents' respective affiliates with respect to the Undersigned's decision to invest in the Shares; (iv) although the Placement Agents are participating in the placement of Ordinary Shares in connection with the Other Subscription Agreements, the Placement Agents and their respective directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to SC Health, HoldCo or the Shares or the accuracy, completeness or adequacy of any information supplied to the Undersigned by SC Health and HoldCo and none of the Placement Agents or any of their respective affiliates has prepared any disclosure or offering document in connection with the offer and sale of the Shares; and (v) No disclosure or offering document has been prepared by the Placement Agents in connection with the offer and sale of the Shares. The Placement Agents and each of their respective members, directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to HoldCo, SC Health, the Target, any of their respective businesses, or the Shares or the accuracy, completeness or adequacy of any information supplied to the Undersigned by SC Health and/or HoldCo. In connection with the issue and purchase of the Shares, the Placement Agents have not acted as the Undersigned's financial advisor or fiduciary, nor has any Placement Agent otherwise advised the Undersigned or made any recommendation whatsoever to the Undersigned with respect to its decision to subscribe for the Shares.

(s) In recognition of Sections 5(q) and 5(r) above, the Undersigned further acknowledges and agrees that it has not received any recommendation with respect to the Subscription from a Placement Agent and thus will not be deemed to form a relationship with a Placement Agent in connection with the Subscription that would require such Placement Agent to treat the Undersigned as a "retail customer" for purposes of Regulation Best Interest pursuant to Rule 15I-1 of the Exchange Act, or a "retail investor" for purposes of Form CRS pursuant to Rule 17a-14 of the Exchange Act. Accordingly, the Undersigned acknowledges and agrees that it is not entitled to the protections or disclosures required by Regulation Best Interest or Form CRS with respect to the Subscription.

(t) The Undersigned acknowledges its obligations under applicable securities laws with respect to the treatment of non-public information relating to SC Health and HoldCo.

**6. Registration Rights.** HoldCo agrees that, within thirty (30) calendar days after the Transaction Closing, HoldCo will file with the SEC (at HoldCo's sole cost and expense) a registration statement registering the resale of the Shares (the "Registration Statement"), and HoldCo shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) ninety (90) calendar days after the filing thereof (or one hundred and twenty (120) calendar days after the filing thereof in the event the SEC reviews and has written comments to the Registration Statement), and (ii) the tenth (10th) business day after the date HoldCo is notified in writing by the SEC that the Registration Statement will not be "reviewed" or will not be subject to further review. HoldCo will provide a draft of the Registration Statement to the Undersigned for review at least three (3) business days in advance of the filing the Registration Statement, and shall advise the Undersigned upon the Registration Statement being declared effective by the SEC. If the SEC prevents HoldCo from including any or all of the Shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 under the Securities Act for the resale of the Shares by the Holders or otherwise, HoldCo shall use its best efforts to ensure that the SEC determines that (1) the offering contemplated by the Registration Statement is a bona fide secondary offering and not an offering "by or on behalf of the issuer" as defined in Rule 415 of the Securities Act and (2) the Undersigned is not a statutory underwriter. If HoldCo is unsuccessful in the efforts described in the preceding sentence then (i) HoldCo shall cause such Registration Statement to register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC and (ii) the Undersigned shall have an opportunity to withdraw its Shares. In such event, the number of Shares to be registered for each selling shareholder named in the Registration Statement shall be reduced pro rata among all such selling shareholders. HoldCo agrees that HoldCo will cause such Registration Statement or another registration statement (which may be a "shelf" registration statement) to remain effective until the earlier of (i) two years from the issuance of the Shares, (ii) the date on which the Undersigned ceases to hold the Shares covered by such Registration Statement or any such other registration statement, or (iii) on the first date on which the Undersigned can sell all of its

F-8

Exhibit 6
Page 1573

Table of Contents

Shares under Rule 144 of the Securities Act without limitation as to the manner of sale or the amount of such securities that may be sold. The Undersigned agrees to disclose its beneficial ownership, as determined in accordance with Rule 13d-3 of the Exchange Act, of the Shares to HoldCo (or its successor) upon request to assist HoldCo in making the determination described above. HoldCo's obligations to include the Shares in the Registration Statement or any such other registration statement are contingent upon the Undersigned or any other Subscriber furnishing in writing to HoldCo such information regarding the Undersigned or any other Subscriber, the securities of HoldCo held by the Undersigned or any other Subscriber and the intended method of disposition of the Shares as shall be reasonably requested by HoldCo to effect the registration of the Shares, and shall execute such documents in connection with such registration as HoldCo may reasonably request that are customary of a selling stockholder in similar situations. HoldCo may delay filing, delay effectiveness or suspend the use of any such registration statement if it determines that (i) the financial statements included in such registration statement are required to be updated in order to comply with Regulation S-X age of financial statement requirements or (ii) in order for such registration statement to not contain a material misstatement or omission of a material fact, an amendment thereto or a supplement to the related prospectus would be needed, or if such filing or use could materially affect a bona fide business or financing transaction of HoldCo or would require premature disclosure of information that could materially adversely affect HoldCo (each such circumstance, a "Suspension Event"); provided, that HoldCo shall use commercially reasonable efforts to make such registration statement available for the sale by the Undersigned or any other Subscriber of such securities as soon as practicable thereafter. Upon receipt of any written notice from HoldCo of the happening of any Suspension Event during the period that the Registration Statement or any such other registration statement is effective or if as a result of a Suspension Event the Registration Statement or any such other registration statement or related prospectus contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the related prospectus), not misleading, the Undersigned agrees that it will (i) immediately discontinue offers and sales of the Shares under the Registration Statement or any such other registration statement until the Undersigned receives (A) (x) copies of a supplemental or amended prospectus that corrects the misstatement(s) or omission(s) referred to above and (y) notice that any post-effective amendment has become effective or (B) notice from HoldCo that it may resume such offers and sales, and (ii) maintain the confidentiality of any information included in such written notice delivered by HoldCo unless otherwise required by applicable law. If so directed by HoldCo, the Undersigned will deliver to HoldCo or destroy all copies of the prospectus covering the Shares in the Undersigned's possession; provided, however, that this obligation to deliver or destroy all copies of the prospectus covering the Shares shall not apply to (i) the extent the Undersigned is required to retain a copy of such prospectus (A) in order to comply with applicable legal, regulatory, self-regulatory or professional requirements or (B) in accordance with a bona fide pre-existing document retention policy or (ii) copies stored electronically on archival servers as a result of automatic data back-up.

HoldCo shall, notwithstanding any termination of this Subscription Agreement, indemnify, defend and hold harmless Undersigned (to the extent a seller under the Registration Statement), and any of its respective officers, directors, agents, partners, members, stockholders, affiliates, managers, investment advisers and employees, and each person who controls Undersigned (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), to the fullest extent permitted by applicable law, from and against any and all out-of-pocket losses, claims, damages, liabilities, costs (including, without limitation, reasonable external attorneys' fees and expenses incurred in connection with defending or investigating any such action or claim) and expenses (collectively, "Losses"), as incurred, that arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except insofar as and to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding the Undersigned furnished in writing to HoldCo by such

F-9

Exhibit 6
Page 1574

Table of Contents

Undersigned expressly for use therein or such Undersigned has omitted a material fact from such information or otherwise violated the Securities Act, the Exchange Act or any state securities law or any rule or regulation thereunder; provided, however, that the indemnification contained in this Section 6 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of HoldCo (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall HoldCo be liable for any Losses to the extent they arise out of or are based upon a violation which occurs (A) in reliance upon and in conformity with written information furnished by such Undersigned, (B) in connection with any failure of such person to deliver or cause to be delivered a prospectus made available by HoldCo in a timely manner, (C) as a result of offers or sales effected by or on behalf of any person by means of a "free writing prospectus" (as defined in Rule 405 under the Securities Act) that was not authorized in writing by HoldCo, or (D) in connection with any offers or sales effected by or on behalf of such Undersigned in violation of Section 6 hereof. HoldCo shall notify the Undersigned promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 6 of which HoldCo is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Securities by Undersigned or any other Holder.

      **7. <u>Termination</u>**. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earlier to occur of: (a) the mutual written agreement of each of the parties hereto to terminate this Subscription Agreement; (b) such date and time as the Transaction Agreement is terminated in accordance with its terms; or (c) written notice by either party to the other party to terminate this Subscription Agreement if the transactions contemplated by this Subscription Agreement are not consummated on or prior to December 31, 2021; *provided* that (i) nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from such breach. SC Health and shall notify the Undersigned of the termination of the Transaction Agreement promptly after the termination of such agreement and (ii) the provisions of <u>Sections 8</u> through <u>10</u> of this Subscription Agreement will survive any termination of this Subscription Agreement and continue indefinitely.

      **8. <u>Trust Account Waiver</u>**. The Undersigned hereby represents and warrants that it has read the Prospectus and understands that SC Health has established a trust account (the "<u>Trust Account</u>") containing the proceeds of its initial public offering (the "<u>IPO</u>") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of SC Health's public stockholders (including overallotment shares acquired by SC Health's underwriters, the "<u>Public Stockholders</u>"), and that, except as otherwise described in the Prospectus, SC Health may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their SC Health shares in connection with the consummation of SC Health's initial business combination (as such term is used in the Prospectus, the "<u>Business Combination</u>") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if SC Health fails to consummate a Business Combination within 24 months after the closing of the IPO, which is subject to extension by amendment to SC Health's organizational documents, (c) with respect to any interest earned on the amounts held in the Trust Account, amounts necessary to pay for any franchise and income tax obligations and up to $100,000 in dissolution expenses, or (d) to SC Health after or concurrently with the consummation of a Business Combination. For and in consideration of SC Health entering into this Subscription Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Undersigned hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this Subscription Agreement, neither the Undersigned nor any of its affiliates do now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Subscription Agreement, the Transaction or any proposed or actual business relationship between SC Health or its Representatives, on the one hand, and the Undersigned or its Representatives, on the other hand, or any other

Exhibit 6
Page 1575

**Table of Contents**

matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "Released Claims"); provided, however, that nothing in this Section 8 shall be deemed to limit any Undersigned's right to distributions from the Trust Account in accordance with its rights as a Public Stockholder in respect of shares of SC Health acquired by any means other than pursuant to this Subscription Agreement. The Undersigned on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that the Undersigned or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with SC Health or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of this Subscription Agreement or any other agreement with SC Health or its affiliates). The Undersigned agrees and acknowledges that such irrevocable waiver is material to this Subscription Agreement and specifically relied upon by SC Health and its affiliates to induce SC Health to enter in this Subscription Agreement, and the Undersigned further intends and understands such waiver to be valid, binding and enforceable against the Undersigned and each of its affiliates under applicable law. To the extent the Undersigned or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SC Health or its Representatives, which proceeding seeks, in whole or in part, monetary relief against SC Health or its Representatives, the Undersigned hereby acknowledges and agrees that the Undersigned's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit the Undersigned or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein. In the event the Undersigned or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SC Health or its Representatives, which proceeding seeks, in whole or in part, relief against the Trust Account (including any distributions therefrom) or against SC Health or the Public Stockholders, whether in the form of money damages or injunctive relief, SC Health and its Representatives, as applicable, shall be entitled to recover from the Undersigned and its affiliates the associated legal fees and costs in connection with any such action in the event SC Health or its Representatives, as applicable, prevails in such action or proceeding. For purposes of this Subscription Agreement, "Representatives" with respect to any person shall mean such person's affiliates and its and its affiliate's respective directors, officers, employees, consultants, advisors, agents and other representatives. Notwithstanding anything to the contrary contained in this Subscription Agreement, the provisions of this Section 8 shall survive the Closing or any termination of this Subscription Agreement and last indefinitely.

9. **Miscellaneous.**

(a) Neither this Subscription Agreement nor any rights that may accrue to the Undersigned hereunder (other than the Shares acquired hereunder, if any, subject to applicable securities laws) may be transferred or assigned by the Undersigned without the prior written consent of SC Health and HoldCo, and any purported transfer or assignment without such consent shall be null and void ab initio.

(b) HoldCo and SC Health may request from the Undersigned such additional information as SC Health and/or HoldCo may deem necessary to evaluate the eligibility of the Undersigned to acquire the Shares, and the Undersigned shall provide such information to SC Health and HoldCo upon such request provided that SC Health and HoldCo keep any such information so provided confidential, it being understood by the Undersigned that HoldCo and SC Health may without any liability hereunder reject the Undersigned's subscription prior to the Closing Date in the event the Undersigned fails to provide such additional information requested by SC Health and HoldCo to evaluate the Undersigned's eligibility or SC Health and HoldCo determines that the Undersigned is not eligible.

(c) The Undersigned acknowledges that SC Health, HoldCo, the Target and others will rely on the acknowledgments, understandings, agreements, representations and warranties of the Undersigned contained in this Subscription Agreement. Prior to the Closing, the Undersigned agrees to promptly notify SC Health and HoldCo if any of the acknowledgments, understandings, agreements, representations and warranties set forth herein are no longer accurate. The Undersigned agrees that the purchase by the Undersigned of Shares from

F-11

Exhibit 6
Page 1576

Table of Contents

HoldCo will constitute a reaffirmation of the acknowledgments, understandings, agreements, representations and warranties herein (as modified by any such notice) by the Undersigned as of the time of such purchase. The Undersigned acknowledges and agrees that each of the Target and their respective affiliates is a third-party beneficiary of the representations, warranties and covenants of the Undersigned contained in Section 5 of this Subscription Agreement, and that the Target is otherwise an express third party beneficiary of this Subscription Agreement, entitled to enforce the terms hereof against Undersigned as if it were an original party hereto. Except as expressly set forth herein, this Subscription Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successor and assigns.

(d) Each of SC Health and HoldCo is entitled to rely upon this Subscription Agreement and is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby to the extent required by law or regulatory bodies. Neither party shall issue any press release or make any other similar public statement with respect to the transactions contemplated hereby without the prior written consent of SC Health and HoldCo (such consent not to be unreasonably withheld or delayed).

(e) All the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

(f) This Subscription Agreement may not be amended, modified, waived or terminated except by an instrument in writing, signed by the party against whom enforcement of such modification, waiver, or termination is sought.

(g) This Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof (other than any confidentiality agreement entered into by SC Health and/or HoldCo and the Undersigned in connection with the Offering).

(h) This Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

(i) If any provision of this Subscription Agreement shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

(j) This Subscription Agreement may be executed in one or more counterparts (including by facsimile or electronic mail or in .pdf) and by different parties in separate counterparts, with the same effect as if all parties hereto had signed the same document. All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

(k) The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Subscription Agreement and to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

(l) **THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE**

F-12

Exhibit 6
Page 1577

**Table of Contents**

**PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER STATE. EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION PURSUANT TO THIS SUBSCRIPTION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.**

(m) All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered by facsimile or email, with affirmative confirmation of receipt, (iii) one business day after being sent, if sent by reputable, internationally recognized overnight courier service or (iv) three (3) business days after being mailed, if sent by registered or certified mail, prepaid and return receipt requested, in each case to the applicable party at the following addresses (or at such other address for a party as shall be specified by like notice):

*If to SC Health, to:*

SC Health Corporation
108 Robinson Road #10-00
Singapore 068900
Attention: Jeri Kwerk
     AJ Coloma
     Eric Teo
     Terence Fong
     Aaron Wee
     Clement Chen
Email: jeri.kwek@sincapital.com
     aj.coloma@sincapital.com
     eric.teo@sincapital.com
     terence.fong@sincapital.com
     aaron.wee@sincapital.com
     Clement.Chen@sincapital.com

*with copies (which shall not constitute notice) to:*

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn: Paul Tropp, Chris Capuzzi and Carl P. Marcellino
Email: carl.marcellino@ropesgray.com
Telephone No.: (212) 841-0623

and

Merrill Lynch (Singapore) Pte. Ltd.
50 Collyer Quay, #14-01
OUE Bayfront
Singapore 049321
Attention: Clemente Antonio Puno
Telephone No.: +65 6678 0157
Email: antonio.puno@bofa.com

Cowen and Company, LLC.
599 Lexington Avenue, 25th Floor
New York, NY 10022
Attention: Vinni Trehan
Email: vinni.trehan@cowen.com

*If to HoldCo, to:*

Rockley Photonics Holdings Limited
3rd Floor
1 Ashley Road
Altrincham, Cheshire
United Kingdom, WA14 2DT
Attention: Dr. Andrew Rickman
Email:andrew.rickman@rockleyphotonics.com

*with copies (which shall not constitute notice) to:*

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019

Attention: James Masetti and Jarrod Murphy
Email:jim.masetti@pillsburylaw.com
jarrod.murphy@pillsburylaw.com

Notice to the Undersigned shall be given to the address underneath the Undersigned's name on the signature page hereto.

(n) The headings set forth in this Subscription Agreement are for convenience of reference only and shall not be used in interpreting this Subscription Agreement. In this Subscription Agreement, unless the context otherwise requires: (i) whenever required by the context, any pronoun used in this Subscription Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and

F-13

Exhibit 6
Page 1578

**Table of Contents**

verbs shall include the plural and vice versa; (ii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; and (iii) the words "herein", "hereto" and "hereby" and other words of similar import in this Subscription Agreement shall be deemed in each case to refer to this Subscription Agreement as a whole and not to any particular portion of this Subscription Agreement. As used in this Subscription Agreement, the term: (x) "business day" shall mean any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in New York, New York (or as such term is used in Section 6 hereof, Washington, D.C.) are authorized to close for business (excluding as a result of "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems, including for wire transfers, of commercially banking institutions in New York, New York are generally open for use by customers on such day); (y) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (z) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this Subscription Agreement to an affiliate of the SC Health will include SC Health's sponsor, SC Health Holdings Limited.

(o) At Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties may reasonably deem practical and necessary in order to consummate the Offering as contemplated by this Subscription Agreement.

**10.** **<u>Non-Reliance and Exculpation</u>**. The Undersigned acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person other than the statements, representations and warranties contained in this Subscription Agreement in making its investment or decision to invest in HoldCo. The Undersigned agrees that neither (i) any other purchaser pursuant to other subscription agreements entered into in connection with the Offering (including the controlling persons, members, officers, directors, partners, agents, or employees of any such other purchaser) nor (ii) each Placement Agent, each of their respective affiliates or any of their respective affiliates' respective control persons, officers, directors or employees, shall be liable to the Undersigned pursuant to this Subscription Agreement, the negotiation hereof or thereof or its subject matter, or the transactions contemplated hereby or thereby, including, without limitation, for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Shares or with respect to any claim (whether in tort, contract or otherwise) for breach of this Subscription Agreement or in respect of any written or oral representations made or alleged to be made in connection herewith, as expressly provided herein, or for any actual or alleged inaccuracies, misstatements or omissions with respect to any information or materials of any kind furnished.

*{SIGNATURE PAGES FOLLOW}*

F-14

Exhibit 6
Page 1579

Table of Contents

IN WITNESS WHEREOF, the parties hereto have caused this Subscription Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**SC HEALTH CORPORATION**

By:   _____
             Name:
             Title:

*{Signature Page to Subscription Agreement}*

F-15

Exhibit 6
Page 1580

Table of Contents

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____
Name:
Title:

*{Signature Page to Subscription Agreement}*

F-16

Exhibit 6
Page 1581

**Table of Contents**

**{SUBSCRIBER SIGNATURE PAGE TO THE SUBSCRIPTION AGREEMENT}**

IN WITNESS WHEREOF, the undersigned has caused this Subscription Agreement to be duly executed by its authorized signatory as of the date first indicated above.

Name(s) of Undersigned:

*Signature of Authorized Signatory of Undersigned*:

Name of Authorized Signatory:

Title of Authorized Signatory:

Address for Notice to Undersigned:

Attention:

Email:

Facsimile No.:

Telephone No.:

Address for Delivery of Shares to Undersigned (if not same as address for notice):

**Subscription Amount**: $

**Number of Shares**:

EIN Number:

F-17

Exhibit 6
Page 1582

Table of Contents

**SCHEDULE I**
**ELIGIBILITY REPRESENTATIONS OF SUBSCRIBER**

A. **QUALIFIED INSTITUTIONAL BUYER STATUS**
(Please check the applicable subparagraphs):

1.    ☐ We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) (a "QIB") and have marked and initialed the appropriate box on the following pages indicating the provision under which we qualify as a QIB.

2.    ☐ We are subscribing for the Shares as a fiduciary or agent for one or more investor accounts, and each owner of such account is a QIB.

B. **INSTITUTIONAL ACCREDITED INVESTOR STATUS**
(Please check the applicable subparagraphs):

☐ We are an "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3), (5), (7) or (8) under the Securities Act).

C. **AFFILIATE STATUS**
(Please check the applicable subparagraphs):

THE SUBSCRIBER:

☐ is not an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company or acting on behalf of an affiliate of the Company.

*This page should be completed by the Undersigned and constitutes a part of the Subscription Agreement.*

F-18

Exhibit 6
Page 1583

**Table of Contents**

**ANNEX G**

**REGISTRATION RIGHTS AGREEMENT**

THIS REGISTRATION RIGHTS AGREEMENT (this "*Agreement*"), dated as of               , 2021, is made and entered into by and among Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability (the "*Company*"), SC Health Holdings Limited, a Cayman Islands exempted company ("*Sponsor*") and certain shareholders or optionholders of Rockley Photonics Limited, a company incorporated under the laws of England and Wales with company number 08683015 ("*Target*"), set forth on Schedule 1 hereto (such shareholders, the "*Target Holders*" and, collectively with the Sponsor and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 6.4 or Section 6.12 of this Agreement, the "*Holders*" and each, a "*Holder*").

**RECITALS**

**WHEREAS**, the Company has entered into a Business Combination Agreement, dated as of March 19, 2021 (as it may be amended, supplemented or otherwise modified from time to time, the "*Business Combination Agreement*"), by and among the Company, SC Health Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("*SPAC*"), Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands with limited liability and a direct wholly owned subsidiary of the Company that was formed for the purposes of consummating the transactions contemplated by the Business Combination Agreement ("*Merger Sub*") and Target, pursuant to which, among other things, (a) the Target became a wholly-owned subsidiary of the Company, and (b) Merger Sub, merged with and into SPAC (the "*Merger*"), with SPAC continuing as the surviving corporation as a direct, wholly owned subsidiary of the Company, (the "*Business Combination*");

**WHEREAS**, on or about the date hereof, pursuant to the Business Combination Agreement, the Holders received shares of the Company's Ordinary Shares, nominal value $0.00001 per share;

**WHEREAS**, the parties hereto desire to enter into this Agreement, pursuant to which the Company shall grant the Holders certain registration rights with respect to certain securities of the Company, as set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

1.1 Definitions. The terms defined in this Article I shall, for all purposes of this Agreement, have the respective meanings set forth below:

"*Additional Holder*" shall have the meaning given in Section 6.12.

"*Additional Holder Ordinary Shares*" shall have the meaning given in Section 6.12.

"*Adverse Disclosure*" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Board, after consultation with counsel to the Company, (a) would be

G-1

Exhibit 6
Page 1584

**Table of Contents**

required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (b) would not be required to be made at such time if the Registration Statement were not being filed, declared effective or used, as the case may be and (c) the Company has a bona fide business purpose for not making such information public.

"*Agreement*" shall have the meaning given in the Preamble hereto.

"*Block Trade*" shall have the meaning given in Section 2.4.1.

"*Board*" shall mean the Board of Directors of the Company.

"*Closing*" shall have the meaning given in the Business Combination Agreement.

"*Closing Date*" shall have the meaning given in the Business Combination Agreement.

"*Commission*" shall mean the Securities and Exchange Commission.

"*Company*" shall have the meaning given in the Preamble hereto and includes the Company's successors by recapitalization, merger, consolidation, spin-off, reorganization or similar transaction.

"*Demanding Holder*" shall have the meaning given in Section 2.1.4.

"*Equity Awards*" shall mean those options and/or awards, exercisable into Ordinary Shares, granted to certain Target Holders under the Incentive Equity Plans (each as defined in the Business Combination Agreement).

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time.

"*Form S-1 Shelf*" shall have the meaning given in Section 2.1.1.

"*Form S-3 Shelf*" shall have the meaning given in Section 2.1.1.

"*Holder Information*" shall have the meaning given in Section 4.1.2.

"*Holders*" shall have the meaning given in the Preamble hereto, for so long as such person or entity holds any Registrable Securities.

"*Joinder*" shall have the meaning given in Section 6.12.

"*Lock-up*" shall have the meaning given in Section 5.1.

"*Lock-up Parties*" shall mean, as applicable, the Sponsor, the Target Holders and their respective Permitted Transferees.

"*Lock-up Period*" shall mean:

(A) with respect to the Target Holders, the period beginning on the Closing Date and ending on the date that is 180 days after the Closing Date;

(B) with respect to the Sponsor in respect of Lock-up Shares other than any of the Ordinary Shares issued or issuable upon the exercise or conversion of the Private Placement Warrants, the period beginning on the Closing

G-2

Exhibit 6
Page 1585

Table of Contents

Date and ending on the earlier of (i) 365 days after the Closing Date and (ii) (x) if the closing price of an Ordinary Share equals or exceeds $12.00 per share (as adjusted for share sub-divisions, share capitalizations, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing Date, or (y) the date on which the Company completes a liquidation, merger, share exchange, reorganization or other similar transaction that results in all the Company's stockholders having the right to exchange their Ordinary Shares for cash, securities or other property; and

(C) with respect to the to the Sponsor in respect of Ordinary Shares issued or issuable upon the exercise or conversion of the Private Placement Warrants, the period beginning on the Closing Date and ending on the date that is 30 days after the Closing Date.

"*Lock-up Shares*" shall mean the Ordinary Shares and any other equity securities convertible into or exercisable or exchangeable for the Ordinary Shares (including any Private Placement Warrants) held by the Sponsor or Target Holders immediately following the Closing or Ordinary Shares issued with respect to or in exchange for Equity Awards on or after the Closing as permitted by this Agreement (other than Ordinary Shares acquired in the public market and, in respect of SC Health Group Limited, other than, for the avoidance of doubt, those Ordinary Shares acquired pursuant to SC Health Group Limited's forward purchase agreement with the SPAC).

"*Maximum Number of Securities*" shall have the meaning given in Section 2.1.5.

"*Merger*" shall have the meaning given in the Recitals hereto.

"*Merger Sub*" shall have the meaning given in the Recitals hereto.

"*Minimum Takedown Threshold*" shall have the meaning given in Section 2.1.4.

"*Misstatement*" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus or necessary to make the statements in a Registration Statement or Prospectus (in the case of a Prospectus, in the light of the circumstances under which they were made) not misleading.

"*Ordinary Shares*" means the ordinary shares in the capital of the Company with a nominal value of $0.00001 per share.

"*Other Coordinated Offering*" shall have the meaning given in Section 2.4.1.

"*Permitted Transferees*" shall mean (a) with respect to the Target Holders and Sponsor and their respective Permitted Transferees, (i) prior to the expiration of the Lock-up Period, any person or entity to whom such Holder is permitted to transfer such Registrable Securities prior to the expiration of the Lock-up Period pursuant to Section 5.2 and (ii) after the expiration of the Lock-up Period, any person or entity to whom such Holder is permitted to transfer such Registrable Securities, subject to and in accordance with any applicable agreement between such Holder and/or their respective Permitted Transferees and the Company and any transferee thereafter, and (b) with respect to all other Holders and their respective Permitted Transferees, any person or entity to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities, including prior to the expiration of any lock-up period applicable to such Registrable Securities, subject to and in accordance with any applicable agreement between such Holder and/or their respective Permitted Transferees and the Company and any transferee thereafter.

"*Piggyback Registration*" shall have the meaning given in Section 2.2.1.

"*Private Placement Warrants*" shall mean the warrants held by the Sponsor, purchased by the Sponsor in the private placement that occurred concurrently with the closing of the SPAC's initial public offering, including

G-3

Exhibit 6
Page 1586

Table of Contents

any Ordinary Shares issued or issuable upon conversion or exchange of such warrants in accordance with the Business Combination Agreement.

"***Prospectus***" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

"***Registrable Security***" shall mean (a) any outstanding Ordinary Shares and any other equity security (including the Private Placement Warrants and any other warrants to purchase Ordinary Shares and Ordinary Shares issued or issuable upon the exercise or conversion of any other equity security) of the Company held by a Holder immediately following the Closing (including any securities distributable pursuant to the Business Combination Agreement), (b) any Additional Holder Ordinary Shares, and (c) any other equity security of the Company or any of its subsidiaries issued or issuable with respect to any securities referenced in clause (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a recapitalization, merger, consolidation, spin-off, reorganization or similar transaction; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities upon the earliest to occur of: (A) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement by the applicable Holder; (B) (i) such securities shall have been otherwise transferred (other than to a Permitted Transferee), (ii) new certificates for such securities not bearing (or book entry positions not subject to) a legend restricting further transfer shall have been delivered by the Company and (iii) subsequent public distribution of such securities shall not require registration under the Securities Act; (C) such securities shall have ceased to be outstanding; (D) such securities may be sold without registration pursuant to Rule 144 or any successor rule promulgated under the Securities Act (but with no volume or other restrictions or limitations including as to manner or timing of sale); (E) such securities have been sold without registration pursuant to Section 4(a)(1) of the Securities Act or Rule 145 promulgated under the Securities Act or any successor rules promulgated under the Securities Act and (F) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

"***Registration***" shall mean a registration, including any related Shelf Takedown, effected by preparing and filing a registration statement, Prospectus or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"***Registration Expenses***" shall mean the documented, out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any national securities exchange on which the Ordinary Shares are then listed;

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of outside counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company;

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

<div align="center">G-4</div>

Exhibit 6
Page 1587

**Table of Contents**

(F) in an Underwritten Offering or Other Coordinated Offering, reasonable fees and expenses not to exceed $50,000 in the aggregate for each Registration of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders.

"***Registration Statement***" shall mean any registration statement that covers Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

"***Requesting Holders***" shall have the meaning given in Section 2.1.5.

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time.

"***Shelf***" shall mean the Form S-1 Shelf, the Form S-3 Shelf or any Subsequent Shelf Registration Statement, as the case may be.

"***Shelf Registration***" shall mean a registration of securities pursuant to a registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"***Shelf Takedown***" shall mean an Underwritten Shelf Takedown or any proposed transfer or sale using a Registration Statement, including a Piggyback Registration.

"***Sponsor***" shall have the meaning given in the Preamble hereto.

"***Sponsor Member***" shall mean a member of Sponsor who becomes party to this Agreement as a Permitted Transferee of Sponsor.

"***Subscription Agreement***" shall have the meaning given in the Preamble hereto.

"***Subsequent Shelf Registration Statement***" shall have the meaning given in Section 2.1.2.

"***Target***" shall have the meaning given in the Preamble hereto.

"***Target Holders***" shall have the meaning given in the Preamble hereto.

"***Transfer***" shall mean the (a) sale or assignment of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b).

"***Underwriter***" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"***Underwritten Offering***" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

"***Underwritten Shelf Takedown***" shall have the meaning given in Section 2.1.4.

"***Withdrawal Notice***" shall have the meaning given in Section 2.1.6.

G-5

Exhibit 6
Page 1588

**Table of Contents**

## ARTICLE II

## REGISTRATIONS AND OFFERINGS

2.1 <u>Shelf Registration</u>.

2.1.1 <u>Filing</u>. Within thirty (30) calendar days following the Closing Date, the Company shall submit to or file with the Commission a Registration Statement for a Shelf Registration on Form S-1 (the "***Form S-1 Shelf***") or a Registration Statement for a Shelf Registration on Form S-3 (the "***Form S-3 Shelf***"), if the Company is then eligible to use a Form S-3 Shelf, in each case, covering the resale of all the Registrable Securities (determined as of two (2) business days prior to such submission or filing) on a delayed or continuous basis and shall use its commercially reasonable efforts to have such Shelf declared effective as soon as practicable after the filing thereof, but no later than the earlier of (a) the ninetieth (90th) calendar day following the filing date thereof (or the one hundred and twentieth (120th) calendar day following the filing date thereof if the Commission notifies the Company that it will "review" the Registration Statement) and (b) the tenth (10th) business day after the date the Company is notified in writing by the Commission that the Registration Statement will not be "reviewed" or will not be subject to further review. Such Shelf shall provide for the resale of the Registrable Securities included therein pursuant to any method or combination of methods legally available to, and requested by, any Holder named therein. The Company shall maintain a Shelf in accordance with the terms hereof, and shall prepare and file with the Commission such amendments, including post-effective amendments, and supplements as may be necessary to keep a Shelf continuously effective, available for use to permit the Holders named therein to sell their Registrable Securities included therein and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. In the event the Company files a Form S-1 Shelf, the Company shall use its commercially reasonable efforts to convert the Form S-1 Shelf (and any Subsequent Shelf Registration Statement) to a Form S-3 Shelf as soon as practicable after the Company is eligible to use a Form S-3 Shelf. The Company's obligation under this <u>Section 2.1.1</u>, shall, for the avoidance of doubt, be subject to <u>Section 3.4</u>.

2.1.2 <u>Subsequent Shelf Registration</u>. If any Shelf ceases to be effective under the Securities Act for any reason at any time while Registrable Securities are still outstanding, the Company shall, subject to <u>Section 3.4</u>, use its commercially reasonable efforts to as promptly as is reasonably practicable cause such Shelf to again become effective under the Securities Act (including using commercially efforts to obtain the prompt withdrawal of any order suspending the effectiveness of such Shelf), and shall use its commercially reasonable efforts to as promptly as is reasonably practicable amend such Shelf in a manner reasonably expected to result in the withdrawal of any order suspending the effectiveness of such Shelf or file an additional registration statement as a Shelf Registration (a "***Subsequent Shelf Registration Statement***") registering the resale of all Registrable Securities (determined as of two (2) business days prior to such filing). If a Subsequent Shelf Registration Statement is filed, the Company shall use its commercially reasonable efforts to (i) cause such Subsequent Shelf Registration Statement to become effective under the Securities Act as promptly as is reasonably practicable after the filing thereof (it being agreed that the Subsequent Shelf Registration Statement shall be an automatic shelf registration statement (as defined in Rule 405 promulgated under the Securities Act) if the Company is a well-known seasoned issuer at the time of filing (as defined in Rule 405 promulgated under the Securities Act) at the most recent applicable eligibility determination date) and (ii) keep such Subsequent Shelf Registration Statement continuously effective, available for use to permit the Holders named therein to sell their Registrable Securities included therein and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. Any such Subsequent Shelf Registration Statement shall be on Form S-3 to the extent that the Company is eligible to use such form at the time of filing. Otherwise, such Subsequent Shelf Registration Statement shall be on another appropriate form. The Company's obligation under this <u>Section 2.1.2</u>, shall, for the avoidance of doubt, be subject to <u>Section 3.4</u>.

2.1.3 <u>Additional Registrable Securities</u>. Subject to <u>Section 3.4</u>, in the event that any Holder holds Registrable Securities that are not registered for resale on a delayed or continuous basis, the Company, upon

G-6

Exhibit 6
Page 1589

**Table of Contents**

written request of such Holder, shall promptly use its commercially reasonable efforts to cause the resale of such Registrable Securities to be covered by either, at the Company's option, any then available Shelf (including by means of a post-effective amendment) or by filing a Subsequent Shelf Registration Statement and cause the same to become effective as soon as practicable after such filing and such Shelf or Subsequent Shelf Registration Statement shall be subject to the terms hereof; provided, however, that the Company shall only be required to cause such additional Registrable Securities to be so covered twice per calendar year for each of the Sponsor and the Target Holders.

2.1.4 <u>Requests for Underwritten Shelf Takedowns</u>. Subject to <u>Section 3.4</u>, at any time and from time to time when an effective Shelf is on file with the Commission, the Sponsor, or a majority-in-interest of the Target Holder (any of the Sponsor or a Target Holder being in such case, a "***Demanding Holder***") may request to sell all or any portion of its Registrable Securities in an Underwritten Offering that is registered pursuant to the Shelf (each, an "***Underwritten Shelf Takedown***"); <u>provided</u> that the Company shall only be obligated to effect an Underwritten Shelf Takedown if such offering shall include Registrable Securities proposed to be sold by the Demanding Holder, either individually or together with other Demanding Holders, with a total offering price of at least $30 million in the aggregate (the "***Minimum Takedown Threshold***"). All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company, which shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown. Subject to <u>Section 2.4.4</u>, the Company shall have the right to select the Underwriters for such offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the initial Demanding Holder's prior approval (which shall not be unreasonably withheld, conditioned or delayed). The Sponsor may demand not more than two (2) Underwritten Shelf Takedown and the Target Holders may not demand more than three (3) Underwritten Shelf Takedowns, in each case, pursuant to this <u>Section 2.1.4</u> in any twelve (12) month period. Notwithstanding anything to the contrary in this Agreement, the Company may effect any Underwritten Offering pursuant to any then effective Registration Statement, including a Form S-3, that is then available for such offering.

2.1.5 <u>Reduction of Underwritten Offering</u>. If the managing Underwriter or Underwriters in an Underwritten Shelf Takedown, advises the Company, the Demanding Holders and the Holders requesting piggy back rights pursuant to this Agreement with respect to such Underwritten Shelf Takedown (the "***Requesting Holders***") (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other Ordinary Shares or other equity securities that the Company desires to sell and all other Ordinary Shares or other equity securities, if any, that have been requested to be sold in such Underwritten Offering pursuant to separate written contractual piggy-back registration rights held by any other stockholders, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "***Maximum Number of Securities***"), then the Company shall include in such Underwritten Offering, before including any Ordinary Shares or other equity securities proposed to be sold by Company or by other holders of Ordinary Shares or other equity securities, the Registrable Securities of (i) first, the Demanding Holders that can be sold without exceeding the Maximum Number of Securities (pro rata based on the respective number of Registrable Securities that each Demanding Holder has requested be included in such Underwritten Shelf Takedown and the aggregate number of Registrable Securities that all of the Demanding Holders have requested be included in such Underwritten Shelf Takedown) and (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Requesting Holders (if any) (pro rata based on the respective number of Registrable Securities that each Requesting Holder (if any) has requested be included in such Underwritten Shelf Takedown and the aggregate number of Registrable Securities that all of the Requesting Holders have requested be included in such Underwritten Shelf Takedown) that can be sold without exceeding the Maximum Number of Securities.

2.1.6 <u>Withdrawal</u>. Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used for marketing such Underwritten Shelf Takedown, a majority-in-interest of the Demanding

G-7

Exhibit 6
Page 1590

**Table of Contents**

Holders initiating an Underwritten Shelf Takedown shall have the right to withdraw from such Underwritten Shelf Takedown for any or no reason whatsoever upon written notification (a "***Withdrawal Notice***") to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Underwritten Shelf Takedown; provided that the Sponsor or a Target Holder may elect to have the Company continue an Underwritten Shelf Takedown if the Minimum Takedown Threshold would still be satisfied by the Registrable Securities proposed to be sold in the Underwritten Shelf Takedown by the Sponsor or the Target Holders or any of their respective Permitted Transferees, as applicable. If withdrawn, a demand for an Underwritten Shelf Takedown shall constitute a demand for an Underwritten Shelf Takedown by the withdrawing Demanding Holder for purposes of Section 2.1.4, unless either (i) such Demanding Holder has not previously withdrawn any Underwritten Shelf Takedown or (ii) such Demanding Holder reimburses the Company for all Registration Expenses with respect to such Underwritten Shelf Takedown (or, if there is more than one Demanding Holder, a pro rata portion of such Registration Expenses based on the respective number of Registrable Securities that each Demanding Holder has requested be included in such Underwritten Shelf Takedown); provided that, if the Sponsor or a Target Holder elects to continue an Underwritten Shelf Takedown pursuant to the proviso in the immediately preceding sentence, such Underwritten Shelf Takedown shall instead count as an Underwritten Shelf Takedown demanded by the Sponsor or such Target Holder, as applicable, for purposes of Section 2.1.4. Following the receipt of any Withdrawal Notice, the Company shall promptly forward such Withdrawal Notice to any other Holders that had elected to participate in such Shelf Takedown. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Shelf Takedown prior to its withdrawal under this Section 2.1.6, other than if a Demanding Holder elects to pay such Registration Expenses pursuant to clause (ii) of the second sentence of this Section 2.1.6.

2.2 Piggyback Registration.

2.2.1 Piggyback Rights. Subject to Section 2.4.3, if the Company or any Holder proposes to conduct a registered offering of, or if the Company proposes to file a Registration Statement under the Securities Act with respect to the Registration of, equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company including, without limitation, an Underwritten Shelf Takedown pursuant to Section 2.1), other than a Registration Statement (or any registered offering with respect thereto) (i) filed in connection with any employee stock option or other benefit plan, (ii) pursuant to a Registration Statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), (iii) for an offering of debt that is convertible into equity securities of the Company, (iv) for a dividend reinvestment plan, (v) a Block Trade or (vi) an Other Coordinated Offering, then the Company shall give written notice of such proposed offering to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement or, in the case of an Underwritten Offering pursuant to a Shelf Registration, the applicable "red herring" prospectus or prospectus supplement used for marketing such offering, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to include in such registered offering such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such registered offering, a "***Piggyback Registration***"). The rights provided under this Section 2.2.1 shall not be available to any Holder at such time as there is an effective Shelf available for the resale of the Registrable Securities pursuant to Section 2.1. Subject to Section 2.2.2, the Company shall, in good faith, cause such Registrable Securities to be included in such Piggyback Registration and, if applicable, shall use its commercially reasonable efforts to cause the managing Underwriter or Underwriters of such Piggyback Registration to permit the Registrable Securities requested by the Holders pursuant to this Section 2.2.1 to be included therein on the same terms and conditions as any similar securities of the Company included in such registered offering and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. The inclusion of any Holder's Registrable Securities in a

G-8

Exhibit 6
Page 1591

Table of Contents

Piggyback Registration shall be subject to such Holder's agreement to enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering.

2.2.2 <u>Reduction of Piggyback Registration</u>. If the managing Underwriter or Underwriters in an Underwritten Offering that is to be a Piggyback Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of Ordinary Shares or other equity securities that the Company desires to sell, taken together with (i) Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder, (ii) the Registrable Securities as to which registration has been requested pursuant to <u>Section 2.2</u> hereof, and (iii) Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, exceeds the Maximum Number of Securities, then:

(a) if the Registration or registered offering is undertaken for the Company's account, the Company shall include in any such Registration or registered offering (A) first, Ordinary Shares or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to <u>Section 2.2.1</u>, pro rata, based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering, which can be sold without exceeding the Maximum Number of Securities; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, which can be sold without exceeding the Maximum Number of Securities;

(b) if the Registration or registered offering is pursuant to a demand by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration or registered offering (A) first, the Ordinary Shares or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to <u>Section 2.2.1</u>, pro rata, based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering, which can be sold without exceeding the Maximum Number of Securities; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Ordinary Shares or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the Ordinary Shares or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of persons or entities other than the Holders of Registrable Securities hereunder, which can be sold without exceeding the Maximum Number of Securities; and

(c) if the Registration or registered offering and Underwritten Shelf Takedown is pursuant to a request by Holder(s) of Registrable Securities pursuant to <u>Section 2.1</u> hereof, then the Company shall include in any such Registration or registered offering securities in the priority set forth in <u>Section 2.1.5</u>.

2.2.3 <u>Piggyback Registration Withdrawal</u>. Any Holder of Registrable Securities (other than a Demanding Holder, whose right to withdraw from an Underwritten Shelf Takedown, and related obligations,

G-9

Exhibit 6
Page 1592

**Table of Contents**

shall be governed by <u>Section 2.1.6</u>) shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration or, in the case of a Piggyback Registration pursuant to a Shelf Registration, the filing of the applicable "red herring" prospectus or prospectus supplement with respect to such Piggyback Registration used for marketing such transaction. The Company (whether on its own good faith determination or as the result of a request for withdrawal by persons or entities pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration (which, in no circumstance, shall include a Shelf) at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement (other than <u>Section 2.1.6</u>), the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this <u>Section 2.2.3</u>.

2.2.4 <u>Unlimited Piggyback Registration Rights</u>. For purposes of clarity, subject to <u>Section 2.1.6</u>, any Piggyback Registration effected pursuant to <u>Section 2.2</u> hereof shall not be counted as a demand for an Underwritten Shelf Takedown under <u>Section 2.1.4</u> hereof.

2.3 <u>Market Stand-off</u>. In connection with any Underwritten Offering of equity securities of the Company (other than a Block Trade or Other Coordinated Offering), if requested by the managing Underwriters, each Holder agrees that it shall not Transfer any Ordinary Shares or other equity securities of the Company (other than those included in such offering pursuant to this Agreement), without the prior written consent of the Company, during the ninety (90)-day period (or such shorter time agreed to by the managing Underwriters) beginning on the date of pricing of such offering, except as expressly permitted by such lock-up agreement or in the event the managing Underwriters otherwise agree by written consent. Each such Holder agrees to execute a customary lock-up agreement in favor of the Underwriters to such effect (in each case on substantially the same terms and conditions as all such Holders).

2.4 <u>Block Trades; Other Coordinated Offerings</u>.

2.4.1 Notwithstanding any other provision of this <u>Article II</u>, but subject to <u>Section 3.4</u>, at any time and from time to time when an effective Shelf is on file with the Commission, if a Demanding Holder wishes to engage in (a) an underwritten registered offering not involving a "roadshow," an offer commonly known as a "block trade" (a "***Block Trade***"), or (b) an "at the market" or similar registered offering through a broker, sales agent or distribution agent, whether as agent or principal (an "***Other Coordinated Offering***"), in each case, (x) with a total offering price of at least $30 million in the aggregate or (y) with respect to all remaining Registrable Securities held by the Demanding Holder, then such Demanding Holder only needs to notify the Company of the Block Trade or Other Coordinated Offering at least five (5) business days prior to the day such offering is to commence and the Company shall use its commercially reasonable efforts to facilitate such Block Trade or Other Coordinated Offering; <u>provided</u> that the Demanding Holders representing a majority of the Registrable Securities wishing to engage in the Block Trade or Other Coordinated Offering shall use commercially reasonable efforts to work with the Company and any Underwriters, brokers, sales agents or placement agents prior to making such request in order to facilitate preparation of the registration statement, prospectus and other offering documentation related to the Block Trade or Other Coordinated Offering.

2.4.2 Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used in connection with a Block Trade or Other Coordinated Offering, a majority-in-interest of the Demanding Holders initiating such Block Trade or Other Coordinated Offering shall have the right to submit a Withdrawal Notice to the Company, the Underwriter or Underwriters (if any) and any brokers, sales agents or placement agents (if any) of their intention to withdraw from such Block Trade or Other Coordinated Offering. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Block Trade or Other Coordinated Offering prior to its withdrawal under this <u>Section 2.4.2</u>.

G-10

Exhibit 6
Page 1593

**Table of Contents**

2.4.3 Notwithstanding anything to the contrary in this Agreement, Section 2.2 shall not apply to a Block Trade or Other Coordinated Offering initiated by a Demanding Holder pursuant to this Agreement.

2.4.4 The Demanding Holder in a Block Trade or Other Coordinated Offering shall have the right to select the Underwriters and any brokers, sales agents or placement agents (if any) for such Block Trade or Other Coordinated Offering (in each case, which shall consist of one or more reputable nationally recognized investment banks).

2.4.5 A Demanding Holder in the aggregate may demand no more than two (2) Block Trades or Other Coordinated Offerings pursuant to this Section 2.4 in any twelve (12) month period. For the avoidance of doubt, any Block Trade or Other Coordinated Offering effected pursuant to this Section 2.4 shall not be counted as a demand for an Underwritten Shelf Takedown pursuant to Section 2.1.4 hereof.


### ARTICLE III

### COMPANY PROCEDURES

3.1 General Procedures. In connection with any Shelf and/or Shelf Takedown, the Company shall use its commercially reasonable efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall:

3.1.1 prepare and file with the Commission as soon as practicable a Registration Statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or have ceased to be Registrable Securities;

3.1.2 prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be reasonably requested by any Holder that holds at least two and a half percent (2.5%) of the Registrable Securities registered on such Registration Statement or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus or have ceased to be Registrable Securities;

3.1.3 prior to filing a Registration Statement or Prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and the Holders of Registrable Securities included in such Registration, and such Holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the Underwriters and the Holders of Registrable Securities included in such Registration or the legal counsel for any such Holders may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Holders; provided that the Company shall have no obligation to furnish any documents publicly filed or furnished with the Commission pursuant to the Electronic Data Gathering, Analysis and Retrieval System ("*EDGAR*");

3.1.4 prior to any public offering of Registrable Securities, use its commercially reasonable efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as the Holders of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request (or provide evidence

G-11

Exhibit 6
Page 1594

**Table of Contents**

satisfactory to such Holders that the Registrable Securities are exempt from such registration or qualification) and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5 cause all such Registrable Securities to be listed on each national securities exchange on which similar securities issued by the Company are then listed;

3.1.6 provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7 advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8 at least three (3) days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus (or such shorter period of time as may be (a) necessary in order to comply with the Securities Act, the Exchange Act, and the rules and regulations promulgated under the Securities Act or Exchange Act, as applicable or (b) advisable in order to reduce the number of days that sales are suspended pursuant to Section 3.4), furnish a copy thereof to each seller of such Registrable Securities or its counsel (excluding any exhibits thereto and any filing made under the Exchange Act that is to be incorporated by reference therein);

3.1.9 notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4;

3.1.10 in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering, or sale by a broker, placement agent or sales agent pursuant to such Registration permit a representative of the Holders, the Underwriters or other financial institutions facilitating such Underwritten Offering, Block Trade, Other Coordinated Offering or other sale pursuant to such Registration, if any, and any attorney, consultant or accountant retained by such Holders or Underwriter to participate, at each such person's or entity's own expense, in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, financial institution, attorney, consultant or accountant in connection with the Registration; provided, however, that such representatives, Underwriters or financial institutions agree to confidentiality arrangements in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information;

3.1.11 obtain a "comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration (subject to such broker, placement agent or sales agent providing such certification or representation reasonably requested by the Company's independent registered public accountants and the Company's counsel) in customary form and covering such matters of the type customarily covered by "comfort" letters as the managing Underwriter may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

G-12

Exhibit 6
Page 1595

Table of Contents

3.1.12 in the event of an Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration, on the date the Registrable Securities are delivered for sale pursuant to such Registration obtain an opinion, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the participating Holders, the broker, placement agents or sales agent, if any, and the Underwriters, if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the participating Holders, broker, placement agent, sales agent or Underwriter may reasonably request and as are customarily included in such opinions and negative assurance letters;

3.1.13 in the event of any Underwritten Offering, a Block Trade, an Other Coordinated Offering or sale by a broker, placement agent or sales agent pursuant to such Registration, enter into and perform its obligations under an underwriting or other purchase or sales agreement, in usual and customary form, with the managing Underwriter or the broker, placement agent or sales agent of such offering or sale;

3.1.14 make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any successor rule then in effect);

3.1.15 with respect to an Underwritten Offering pursuant to Section 2.1.4, use its commercially reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter in such Underwritten Offering; and

3.1.16 otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the participating Holders, consistent with the terms of this Agreement, in connection with such Registration.

Notwithstanding the foregoing, the Company shall not be required to provide any documents or information to an Underwriter, broker, sales agent or placement agent if such Underwriter, broker, sales agent or placement agent has not then been named with respect to the applicable Underwritten Offering or other offering involving a registration as an Underwriter, broker, sales agent or placement agent, as applicable.

3.2 Registration Expenses. The Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders.

3.3 Requirements for Participation in Registration Statement in Offerings. Notwithstanding anything in this Agreement to the contrary, if any Holder does not provide the Company with its requested Holder Information, the Company may exclude such Holder's Registrable Securities from the applicable Registration Statement or Prospectus if the Company determines, based on the advice of counsel, that it is necessary or advisable to include such information in the applicable Registration Statement or Prospectus and such Holder continues thereafter to withhold such information. In addition, no person or entity may participate in any Underwritten Offering or other offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person or entity (i) agrees to sell such person's or entity's securities on the basis provided in any underwriting, sales, distribution or placement arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting or other agreements and other customary documents as may be reasonably required under the terms of such underwriting, sales, distribution or placement arrangements. For the avoidance of doubt, the exclusion of a Holder's Registrable Securities as a result of this Section 3.3 shall not affect the registration of the other Registrable Securities to be included in such Registration.

G-13

Exhibit 6
Page 1596

**Table of Contents**

3.4 <u>Suspension of Sales; Adverse Disclosure; Restrictions on Registration Rights</u>.

3.4.1 Upon receipt of written notice from the Company that: (a) a Registration Statement or Prospectus contains a Misstatement; (b) any request by the Commission for any amendment or supplement to any Registration Statement or Prospectus or for additional information or of the occurrence of an event requiring the preparation of a supplement or amendment to such Prospectus so that, as thereafter delivered to the purchasers of the securities covered by such Registration Statement or Prospectus, such Registration Statement or Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; or (c) upon any suspension by the Company, pursuant to a written insider trading compliance program adopted by the Board, of the ability of all "insiders" covered by such program to transact in the Company's securities because of the existence of material non-public information, each of the Holders shall forthwith discontinue disposition of Registrable Securities pursuant to such Registration Statement covering such Registrable Securities until (x) in the case of (a) or (b), it has received copies of a supplemented or amended Prospectus (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as reasonably practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed, or (y) in the case of (c), until the restriction on the ability of "insiders" to transact in the Company's securities is removed, and, if so directed by the Company, each such Holder will deliver to the Company all copies, other than permanent file copies then in such Holder's possession, of the most recent Prospectus covering such Registrable Securities at the time of receipt of such notice.

3.4.2 Subject to <u>Section 3.4.4</u>, if the submission, filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would (a) require the Company to make an Adverse Disclosure, (b) require the Company to update the financial statements included in the Registration Statement in order to comply with Regulation S-X age of financial statement requirements, (c) require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, or (d) in the good faith judgment of the majority of the Board such Registration, be detrimental to the Company and the majority of the Board concludes as a result that it is advisable to defer such submission, filing, initial effectiveness or continued use at such time, the Company may, upon giving prompt written notice of such action to the Holders (which notice shall not specify the nature of the event giving rise to such delay or suspension), delay the submission, filing or initial effectiveness of, or suspend use of, such Registration Statement for the shortest period of time determined in good faith by the Company to be necessary for such purpose notwithstanding the requirements of any other provision contained herein, including, without limitation, <u>Section 2.1</u>. In the event the Company exercises its rights under this <u>Section 3.4.2</u>, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities until such Holder receives written notice from the Company that such sales or offers of Registrable Securities may be resumed, and in each case maintain the confidentiality of such notice and its contents.

3.4.3 Subject to <u>Section 3.4.4</u>, (a) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending on a date one hundred and twenty (120) days after the effective date of, a Company-initiated Registration and provided that the Company continues to actively employ, in good faith, all commercially reasonable efforts to maintain the effectiveness of the applicable Shelf Registration Statement, or (b) if, pursuant to <u>Section 2.1.4</u>, Holders have requested an Underwritten Shelf Takedown and the Company and Holders are unable to obtain the commitment of underwriters to firmly underwrite such offering, the Company may, upon giving prompt written notice of such action to the Holders, delay any other registered offering pursuant to <u>Section 2.1.4</u> or <u>2.4</u>.

3.4.4 The right to delay or suspend any submission, filing, initial effectiveness or continued use of a Registration Statement pursuant to clause (a) or (d) of <u>Section 3.4.2</u> or a registered offering pursuant to <u>Section 3.4.3</u> shall be exercised by the Company, in the aggregate, for not more than one hundred and twenty (120) consecutive calendar days or more than one hundred and twenty (120) total calendar days in each case, during any twelve (12)-month period.

G-14

Exhibit 6
Page 1597

Table of Contents

3.5 <u>Reporting Obligations</u>. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be a reporting company under the Exchange Act, covenants to file timely (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Sections 13(a) or 15(d) of the Exchange Act and to promptly furnish the Holders with true and complete copies of all such filings; <u>provided</u> that any documents publicly filed or furnished with the Commission pursuant to EDGAR shall be deemed to have been furnished or delivered to the Holders pursuant to this <u>Section 3.5</u>. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of Ordinary Shares held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act (or any successor rule then in effect). Upon the request of any Holder, the Company shall deliver to such Holder a written certification of a duly authorized officer as to whether it has complied with such requirements.

<div align="center">

**ARTICLE IV**

**<u>INDEMNIFICATION AND CONTRIBUTION</u>**

</div>

4.1 <u>Indemnification</u>.

4.1.1 The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers, directors and agents and each person or entity who controls such Holder (within the meaning of the Securities Act), against all losses, claims, damages, liabilities and out-of-pocket expenses (including, without limitation, reasonable and documented outside attorneys' fees) resulting from any untrue or alleged untrue statement of material fact contained in or incorporated by reference in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information or affidavit so furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person or entity who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

4.1.2 In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish (or cause to be furnished) to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus (the "***Holder Information***") and, to the extent permitted by law, shall indemnify the Company, its directors, officers and agents and each person or entity who controls the Company (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and out-of-pocket expenses (including, without limitation, reasonable and documented outside attorneys' fees) resulting from any untrue or alleged untrue statement of material fact contained or incorporated by reference in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement is contained in (or not contained in, in the case of an omission) any information or affidavit so furnished in writing by or on behalf of such Holder expressly for use therein; <u>provided, however</u>, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder of Registrable Securities shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement. The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person or entity who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company.

4.1.3 Any person or entity entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give

<div align="center">G-15</div>

Exhibit 6
Page 1598

**Table of Contents**

prompt notice shall not impair any person's or entity's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement includes a statement or admission of fault and culpability on the part of such indemnified party or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4 The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person or entity of such indemnified party and shall survive the transfer of securities. The Company and each Holder of Registrable Securities participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

4.1.5 If the indemnification provided under Section 4.1 from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and out-of-pocket expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and out-of-pocket expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by (or not made by, in the case of an omission), or relates to information supplied by (or not supplied by in the case of an omission), such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this Section 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or out-of-pocket expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4.1.5 were determined by pro rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this Section 4.1.5. No person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 4.1.5 from any person or entity who was not guilty of such fraudulent misrepresentation.

G-16

Exhibit 6
Page 1599

**Table of Contents**

# ARTICLE V

## LOCK-UP

5.1 <u>Lock-Up</u>. Subject to <u>Section 5.2</u> and <u>Section 5.3</u>, each Lock-up Party agrees that it shall not Transfer any Lock-up Shares prior to the end of, in respect of such Lock-up Party, the applicable Lock-up Period (the "***Lock-up***").

5.2 <u>Permitted Transferees</u>. Notwithstanding the provisions set forth in <u>Section 5.1</u>, each Lock-up Party may Transfer the Lock-up Shares during the Lock-up Period (a) to (i) the Company's officers or directors, (ii) any affiliates or family members of the Company's officers or directors, (iii) if the undersigned is a corporation, partnership (whether general, limited or otherwise), limited liability company, trust or other business entity, (i) transfers to another corporation, partnership, limited liability company, trust, syndicate, association or other business entity that controls, is controlled by or is under common control or management with the undersigned, and (ii) distributions of Ordinary Shares to its partners, limited liability company members, equity holders or shareholders of the undersigned; , or (iv) any other Lock-up Party or any direct partners, members or equity holders of such other Lock-up Party, any affiliates of such other Lock-up Party or any related investment funds or vehicles controlled or managed by such persons or entities or their respective affiliates, (b) in the case of an individual, by gift to a member of the individual's immediate family or to a trust, the beneficiary of which is a member of the individual's immediate family or an affiliate of such person or entity, or to a charitable organization, (c) in the case of an individual, by virtue of laws of descent and distribution upon death of the individual, (d) in the case of an individual, pursuant to a qualified domestic relations order, (e) in the case of a trust, by distribution to one or more of the permissible beneficiaries of such trust, (f) to the partners, members or equity holders of such Lock-up Party by virtue of the Lock-up Party's organizational documents, as amended, upon dissolution of the Lock-up Party, (g) bona fide pledges of Ordinary Shares as security or collateral in connection with any bona fide borrowing or incurrence of any indebtedness by any Holder or any member of its group; provided, that any Holder who is subject to any pre-clearance and trading policies of the Company must also comply with any additional restrictions on the pledging of Ordinary Shares imposed on such Holder by the Company's policies, (h) to the Company, or (i) in connection with a liquidation, merger, stock exchange, reorganization, tender offer approved by the Board or a duly authorized committee thereof or other similar transaction which results in all of the Company's stockholders having the right to exchange their Ordinary Shares for cash, securities or other property subsequent to the Closing Date. The parties acknowledge and agree that any Permitted Transferee of a Lock-up Party shall be subject to the transfer restrictions set forth in this <u>ARTICLE V</u> with respect to the Lock-Up Shares upon and after acquiring such Lock-Up Shares.

# ARTICLE VI

## MISCELLANEOUS

6.1 <u>SPAC Board Appointment Right.</u> Subject to and in accordance with Section 9.9 of the Business Combination Agreement, each of the parties hereby agrees that the Sponsor shall be entitled to the director nomination rights set forth in Section 9.9(b)(i) of the Business Combination Agreement.

6.2 <u>Indemnification and Insurance.</u> The Company hereby agrees that its insurance and indemnification obligations contained in Section 7.8 of the Business Combination Agreement shall apply *mutatis mutandis* to any directors appointed to the Board in accordance with <u>Section 6.1</u>.

6.3 <u>Notices</u>. Any notice or communication under this Agreement must be in writing and given by (i) recorded mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, or electronic mail. Each notice or communication that is mailed, delivered, or transmitted in the

G-17

Exhibit 6
Page 1600

**Table of Contents**

manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery or electronic mail, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed, if to the Company, to: 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT, Attention: Dr. Andrew Rickman or by email: andrew.rickman@rockleyphotonics.com, and, if to any Holder, at such Holder's address, electronic mail address as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this Section 6.3.

6.4 Assignment; No Third Party Beneficiaries.

6.4.1 This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company in whole or in part.

6.4.2 Subject to Section 6.4.4 and Section 6.4.5, this Agreement and the rights, duties and obligations of a Holder hereunder may be assigned in whole or in part to such Holder's Permitted Transferees to which it transfers Registrable Securities; provided that with respect to the Sponsor and the Target Holders, the rights hereunder that are personal to such Holders may not be assigned or delegated in whole or in part, except that the Sponsor shall be permitted to transfer its rights hereunder to one or more affiliates or any direct or indirect partners, members or equity holders of the Sponsor (including Sponsor Members), which, for the avoidance of doubt, shall include a transfer of its rights in connection with a distribution of any Registrable Securities held by Sponsor to Sponsor Members (it being understood that no such transfer shall reduce or multiply any rights of the Sponsor or such transferees).

6.4.3 This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties and its successors and the permitted assigns of the Holders, which shall include Permitted Transferees.

6.4.4 This Agreement shall not confer any rights or benefits on any persons or entities that are not parties hereto, other than as expressly set forth in this Agreement and Section 6.4.

6.4.5 No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in Section 6.3 hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement, including the joinder in the form of Exhibit A attached hereto). Any transfer or assignment made other than as provided in this Section 6.4 shall be null and void.

6.5 Counterparts. This Agreement may be executed in multiple counterparts (including PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

6.6 Governing Law; Venue. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT (1) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK AND (2) THE VENUE FOR ANY ACTION TAKEN WITH RESPECT TO THIS AGREEMENT SHALL BE EXCLUSIVELY IN THE SUPREME COURT OF THE STATE OF NEW YORK, NEW YORK COUNTY, AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF NEW YORK, NEW YORK COUNTY, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

Exhibit 6
Page 1601

**Table of Contents**

6.7 <u>Trial by Jury</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

6.8 <u>Amendments and Modifications</u>. Upon the written consent of (a) the Company and (b) the Holders of a majority of the total Registrable Securities in number of Registrable Securities, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, any amendment hereto or waiver hereof shall also require the written consent of the Sponsor for so long as Sponsor and its affiliates and its Permitted Transferees hold, in the aggregate, at least five percent (5%) of the outstanding Ordinary Shares of the Company; provided, further, that notwithstanding the foregoing, any amendment hereto or waiver hereof shall also require the written consent of each Target Holder so long as such Target Holder and its affiliates hold, in the aggregate, at least five percent (5%) of the outstanding Ordinary Shares; and <u>provided</u>, <u>further</u>, that any amendment hereto or waiver hereof that adversely affects one Holder, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party.

6.9 <u>Other Registration Rights</u>. Other than the certain Holders and third-party investor Stockholders who each have registration rights pursuant to (i) their respective Subscription Agreements and (ii) as provided in the Warrant Agreement, dated as of 29 September 2020, between the Company and Continental Stock Transfer & Trust Company, the Company represents and warrants that no person or entity, other than a Holder of Registrable Securities, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration Statement filed by the Company for the sale of securities for its own account or for the account of any other person or entity. The Company hereby agrees and covenants that it will not grant rights to register any Ordinary Shares (or securities convertible into or exchangeable for Ordinary Shares) pursuant to the Securities Act that are more favorable, pari passu or senior to those granted to the Holders hereunder without (a) the prior written consent of the Sponsor for so long as the Sponsor and its affiliates and its Permitted Transferees hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares, and the prior written consent of each other Holder, for so long as such Holder and its affiliates hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares, or (b) granting economically and legally equivalent rights to the Holders hereunder such that the Holders shall receive the benefit of such more favorable or senior terms and/or conditions. Further, the Company represents and warrants that this Agreement supersedes any other registration rights agreement or agreement with similar terms and conditions and in the event of a conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

6.10 <u>Term</u>. This Agreement shall terminate on the earlier of (a) the seventh anniversary of the date of this Agreement or (b) with respect to any Holder, on the date that such Holder no longer holds any Registrable Securities. The provisions of <u>Section 3.5</u> and <u>Article IV</u> shall survive any termination.

6.11 <u>Holder Information</u>. Each Holder agrees, if requested in writing, to represent to the Company the total number of Registrable Securities held by such Holder in order for the Company to make determinations hereunder.

<div align="center">G-19</div>

Exhibit 6
Page 1602

Table of Contents

6.12 <u>Additional Holders; Joinder</u>. In addition to persons or entities who may become Holders pursuant to <u>Section 6.4</u> hereof, subject to the prior written consent of each Holder (so long as such Holder and its affiliates hold, in the aggregate, Registrable Securities representing at least five percent (5%) of the outstanding Ordinary Shares), the Company may make any person or entity who acquires Ordinary Shares or rights to acquire Ordinary Shares after the date hereof a party to this Agreement (each such person or entity, an "***Additional Holder***") by obtaining an executed joinder to this Agreement from such Additional Holder in the form of Exhibit A attached hereto (a "***Joinder***"). Such Joinder shall specify the rights and obligations of the applicable Additional Holder under this Agreement. Upon the execution and delivery and subject to the terms of a Joinder by such Additional Holder, the Ordinary Shares then owned, or underlying any rights then owned, by such Additional Holder (the "***Additional Holder Ordinary Shares***") shall be Registrable Securities to the extent provided herein and therein and such Additional Holder shall be a Holder under this Agreement with respect to such Additional Holder Ordinary Shares.

6.13 <u>Severability</u>. It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

6.14 <u>Entire Agreement</u>. This Agreement constitutes the full and entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

6.15 <u>Adjustments</u>. If, and as often as, there are any changes in the Registrable Securities by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Registrable Securities as so changed.

**[SIGNATURE PAGES FOLLOW]**

G-20

Exhibit 6
Page 1603

**Table of Contents**

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

**COMPANY:**

ROCKLEY PHOTONICS HOLDINGS LIMITED

By: _____

Name:

Title:

*[Signature Page to Registration Rights Agreement]*

G-21

Exhibit 6
Page 1604

**Table of Contents**

**SPONSOR:**

SC HEALTH HOLDINGS LIMITED

By:       _____
Name:
Title:

*[Signature Page to Registration Rights Agreement]*

G-22

Exhibit 6
Page 1605

Table of Contents

**TARGET:**

ROCKLEY PHOTONICS LIMITED

By: _____

Name:

Title:

*[Signature Page to Registration Rights Agreement]*

G-23

Exhibit 6
Page 1606

Table of Contents

**HOLDERS:**

DR. ANDREW GEORGE RICKMAN

By: _____

Name:

*[Signature Page to Registration Rights Agreement]*

G-24

Exhibit 6
Page 1607

Page ID #:1762

**Table of Contents**

HENGTONG OPTIC-ELECTRIC INTERNATIONAL CO. LIMITED

By: _____

    Name:

    Title:

*[Signature Page to Registration Rights Agreement]*

G-25

Exhibit 6

Page 1608

Table of Contents

MORNINGSIDE TECHNOLOGY VENTURES LTD

By: _____
    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

G-26

Exhibit 6
Page 1609

Table of Contents

MOULTON GOODIES LTD

By: _____
    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

G-27

Exhibit 6
Page 1610

Table of Contents

RICHARD VON TSCHARNER

By: _____
Name: Richard von Tscharner

*[Signature Page to Registration Rights Agreement]*

G-28

Exhibit 6
Page 1611

**Table of Contents**

AARON ZILKIE

By: _____

Name: Aaron Zilkie

*[Signature Page to Registration Rights Agreement]*

G-29

Exhibit 6
Page 1612

Table of Contents

**Schedule 1**

**Target Holders**

Dr. Andrew George Rickman

Hengtong Optic-Electric International Co. Limited

Morningside Technology Ventures Ltd

Moulton Goodies Ltd

Richard von Tscharner

Aaron Zilkie

G-30

Exhibit 6
Page 1613

Table of Contents

Exhibit A

**REGISTRATION RIGHTS AGREEMENT JOINDER**

The undersigned is executing and delivering this joinder (this "***Joinder***") pursuant to the Registration Rights Agreement, dated as of          , 2021 (as the same may hereafter be amended, the "***Registration Rights Agreement***"), among Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability (the "***Company***"), and the other persons or entities named as parties therein. Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Registration Rights Agreement.

By executing and delivering this Joinder to the Company, and upon acceptance hereof by the Company upon the execution of a counterpart hereof, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the Registration Rights Agreement as a Holder of Registrable Securities in the same manner as if the undersigned were an original signatory to the Registration Rights Agreement, and the undersigned's Ordinary Shares shall be included as Registrable Securities under the Registration Rights Agreement to the extent provided therein.

Accordingly, the undersigned has executed and delivered this Joinder as of the          day of          , 20   .

_____
Signature of Stockholder

_____
Print Name of Stockholder
Its:

Address: _____
_____
_____
_____

Agreed and Accepted as of

          , 20

**Rockley Photonics Holdings Limited**

By: _____
Name:
Its:

G-31

Exhibit 6
Page 1614

Table of Contents

**ANNEX H**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 STOCK INCENTIVE PLAN**

(Adopted by the Board of Directors on March 31, 2021)

(Approved by the Shareholders on            , 2021)

Effective Date:            , 2021

H-1

Exhibit 6
Page 1615

**Table of Contents**

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **SECTION 1.** | **ESTABLISHMENT AND PURPOSE** |  | **H-6** |
| **SECTION 2.** | **DEFINITIONS** |  | **H-6** |
| (a) | "2013 Plan" |  | H-6 |
| (b) | "Affiliate" |  | H-6 |
| (c) | "Award" |  | H-6 |
| (d) | "Award Agreement" |  | H-6 |
| (e) | "Board of Directors" or "Board" |  | H-6 |
| (f) | "Cash-Based Award" |  | H-6 |
| (g) | "Change in Control" |  | H-6 |
| (h) | "Code" |  | H-7 |
| (i) | "Committee" |  | H-7 |
| (j) | "Company" |  | H-7 |
| (k) | "Consultant" |  | H-7 |
| (l) | "Disability" |  | H-7 |
| (m) | "Employee" |  | H-7 |
| (n) | "Exchange Act" |  | H-8 |
| (o) | "Exercise Price" |  | H-8 |
| (p) | "Fair Market Value" |  | H-8 |
| (q) | "ISO" |  | H-8 |
| (r) | "Nonstatutory Option" or "NSO" |  | H-8 |
| (s) | "Option" |  | H-8 |
| (t) | "Outside Director" |  | H-8 |
| (u) | "Parent" |  | H-8 |
| (v) | "Participant" |  | H-8 |
| (w) | "Plan" |  | H-8 |
| (x) | "Purchase Price" |  | H-9 |
| (y) | "Restricted Share" |  | H-9 |
| (z) | "Restricted Stock Unit" |  | H-9 |
| (aa) | "Returning Shares" |  | H-9 |
| (bb) | "SAR" |  | H-9 |
| (cc) | "Section 409A" |  | H-9 |
| (dd) | "Securities Act" |  | H-9 |
| (ee) | "Service" |  | H-9 |

H-2

Exhibit 6
Page 1616

| | | Page |
|---|---|---|
| (ff) | "Share" | H-9 |
| (gg) | "Stock" | H-9 |
| (hh) | "Subsidiary" | H-9 |
| **SECTION 3.** | **ADMINISTRATION** | **H-10** |
| (a) | Committee Composition | H-10 |
| (b) | Committee Appointment | H-10 |
| (c) | Committee Responsibilities | H-10 |
| **SECTION 4.** | **ELIGIBILITY** | **H-11** |
| (a) | General Rule | H-11 |
| (b) | Ten-Percent Shareholders | H-11 |
| (c) | Attribution Rules | H-11 |
| (d) | Outstanding Stock | H-11 |
| **SECTION 5.** | **STOCK SUBJECT TO PLAN; DIRECTOR COMPENSATION LIMIT** | **H-11** |
| (a) | Basic Limitation | H-11 |
| (b) | Additional Shares | H-12 |
| (c) | Substitution and Assumption of Awards | H-12 |
| (d) | Outside Director Compensation Limit | H-12 |
| **SECTION 6.** | **RESTRICTED SHARES** | **H-13** |
| (a) | Restricted Share Award Agreement | H-13 |
| (b) | Payment for Awards | H-13 |
| (c) | Vesting | H-13 |
| (d) | Voting and Dividend Rights | H-13 |
| (e) | Restrictions on Transfer of Shares | H-13 |
| **SECTION 7.** | **TERMS AND CONDITIONS OF OPTIONS** | **H-13** |
| (a) | Option Award Agreement | H-13 |
| (b) | Number of Shares | H-13 |
| (c) | Exercise Price | H-14 |
| (d) | Withholding Taxes | H-14 |
| (e) | Exercisability and Term | H-14 |
| (f) | Exercise of Options | H-14 |
| (g) | No Rights as a Shareholder | H-14 |
| (h) | Modification, Extension and Renewal of Options | H-14 |
| (i) | Restrictions on Transfer of Shares | H-14 |
| (j) | Buyout Provisions | H-15 |

H-3

Exhibit 6
Page 1617

**Table of Contents**

| | | Page |
|---|---|---|
| **SECTION 8.** | **PAYMENT FOR SHARES** | **H-15** |
| (a) | General Rule | H-15 |
| (b) | Surrender of Stock | H-15 |
| (c) | Services Rendered | H-15 |
| (d) | Cashless Exercise | H-15 |
| (e) | Exercise/Pledge | H-15 |
| (f) | Net Exercise | H-15 |
| (g) | Promissory Note | H-15 |
| (h) | Other Forms of Payment | H-15 |
| (i) | Limitations under Applicable Law | H-16 |
| **SECTION 9.** | **STOCK APPRECIATION RIGHTS** | **H-16** |
| (a) | SAR Award Agreement | H-16 |
| (b) | Number of Shares | H-16 |
| (c) | Exercise Price | H-16 |
| (d) | Exercisability and Term | H-16 |
| (e) | Exercise of SARs | H-16 |
| (f) | Modification, Extension or Assumption of SARs | H-16 |
| (g) | Buyout Provisions | H-16 |
| **SECTION 10.** | **RESTRICTED STOCK UNITS** | **H-16** |
| (a) | Restricted Stock Unit Award Agreement | H-16 |
| (b) | Payment for Awards | H-17 |
| (c) | Vesting Conditions | H-17 |
| (d) | Voting and Dividend Rights | H-17 |
| (e) | Form and Time of Settlement of Restricted Stock Units | H-17 |
| (f) | Death of Participant | H-17 |
| (g) | Creditors' Rights | H- |
| **SECTION 11.** | **CASH-BASED AWARDS** | **H-18** |
| **SECTION 12.** | **ADJUSTMENT OF SHARES** | **H-18** |
| (a) | Adjustments | H-18 |
| (b) | Dissolution or Liquidation | H-18 |
| (c) | Merger or Reorganization | H-18 |
| (d) | Change in Control | H-19 |
| (e) | Reservation of Rights | H-19 |
| **SECTION 13.** | **DEFERRAL OF AWARDS** | **H-20** |

H-4

Exhibit 6
Page 1618

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| (a) | Committee Powers | | H-20 |
| (b) | General Rules | | H-20 |
| **SECTION 14.** | **AWARDS UNDER OTHER PLANS** | | **H-20** |
| **SECTION 15.** | **PAYMENT OF DIRECTOR'S FEES IN SECURITIES** | | **H-20** |
| (a) | Effective Date | | H-20 |
| (b) | Elections to Receive NSOs, SARs, Restricted Shares, or Restricted Stock Units | | H-21 |
| (c) | Number and Terms of NSOs, SARs, Restricted Shares or Restricted Stock Units | | H-21 |
| **SECTION 16.** | **LEGAL AND REGULATORY REQUIREMENTS** | | **H-21** |
| **SECTION 17.** | **TAXES** | | **H-21** |
| (a) | Withholding Taxes | | H-21 |
| (b) | Share Withholding | | H-21 |
| (c) | Section 409A | | H-21 |
| **SECTION 18.** | **TRANSFERABILITY** | | **H-22** |
| **SECTION 19.** | **PERFORMANCE BASED AWARDS** | | **H-22** |
| **SECTION 20.** | **RECOUPMENT OF AWARDS** | | **H-22** |
| **SECTION 21.** | **NO EMPLOYMENT RIGHTS** | | **H-22** |
| **SECTION 22.** | **DURATION AND AMENDMENTS** | | **H-23** |
| (a) | Term of the Plan | | H-23 |
| (b) | Right to Amend the Plan | | H-23 |
| (c) | Effect of Termination | | H-23 |
| **SECTION 23.** | **AWARDS TO NON-U.S. PARTICIPANTS** | | **H-23** |
| **SECTION 24.** | **GOVERNING LAW** | | **H-23** |
| **SECTION 25.** | **SUCCESSORS AND ASSIGNS** | | **H-24** |
| **SECTION 26.** | **EXECUTION** | | **H-24** |

H-5

Exhibit 6
Page 1619

**Table of Contents**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 STOCK INCENTIVE PLAN**

**SECTION 1. ESTABLISHMENT AND PURPOSE.**

The Plan was adopted by the Board of Directors on                    , 2020 and is effective on                    , 2020 (the "**Effective Date**"). The Plan's purpose is to enhance the Company's ability to attract, retain, incent, reward, and motivate persons who make (or are expected to make) important contributions to the Company and its Subsidiaries and Affiliates by providing Participants with equity ownership and other incentive opportunities.

**SECTION 2. DEFINITIONS.**

(a) "2013 Plan" means the 2013 Equity Incentive Plan of Rockley Photonics Limited, as amended.

(b) "Affiliate" means any entity other than a Subsidiary, if the Company and/or one or more Subsidiaries own not less than 50% of such entity.

(c) "Award" means any award of an Option, a SAR, a Restricted Share, a Restricted Stock Unit, a Stock-Based Award or a Cash-Based Award under the Plan.

(d) "Award Agreement" means the agreement between the Company and the recipient of an Award which contains the terms, conditions and restrictions pertaining to such Award.

(e) "Board of Directors" or "Board" means the Board of Directors of the Company, as constituted from time to time.

(f) "Cash-Based Award" means an Award that entitles the Participant to receive a cash-denominated payment.

(g) "Change in Control" means the occurrence of any of the following events:

(i)     A change in the composition of the Board occurs, as a result of which fewer than one-half of the incumbent directors are directors who either:

(A)     Had been directors of the Company on the "look-back date" (as defined below) (the "original directors"); or

(B)     Were elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the aggregate of the original directors who were still in office at the time of the election or nomination and the directors whose election or nomination was previously so approved (the "continuing directors");

provided, however, that for this purpose, the "original directors" and "continuing directors" shall not include any individual whose initial assumption of office occurred as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents, by or on behalf of a person other than the Board;

(ii)     Any "person" (as defined below) who by the acquisition or aggregation of securities, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities ordinarily (and apart from rights accruing under special circumstances) having the right to vote at elections of directors (the "Base Capital Stock"); except that any change in the relative beneficial ownership of the Company's securities by any person resulting solely from a reduction in the aggregate number of outstanding Shares of Base

H-6

Exhibit 6
Page 1620

**Table of Contents**

Capital Stock, and any decrease thereafter in such person's ownership of securities, shall be disregarded until such person increases in any manner, directly or indirectly, such person's beneficial ownership of any securities of the Company;

(iii) The consummation of a merger or consolidation of the Company or a Subsidiary of the Company with or into another entity or any other corporate reorganization, if persons who were not shareholders of the Company immediately prior to such merger, consolidation or other reorganization own immediately after such merger, consolidation or other reorganization 50% or more of the voting power of the outstanding securities of each of (A) the Company (or its successor) and (B) any direct or indirect parent corporation of the Company (or its successor); or

(iv) The sale, transfer, or other disposition of all or substantially all of the Company's assets.

For purposes of subsection (g)(i) above, the term "look-back" date means the later of (1) the Effective Date and (2) the date that is 24 months prior to the date of the event that may constitute a Change in Control.

For purposes of subsection (g)(ii) above, the term "person" shall have the same meaning as when used in Sections 13(d) and 14(d) of the Exchange Act, but shall exclude (1) a trustee or other fiduciary holding securities under an employee benefit plan maintained by the Company or a Parent or Subsidiary and (2) a corporation owned directly or indirectly by the shareholders of the Company in substantially the same proportions as their ownership of the Stock.

Any other provision of this Section 2(g) notwithstanding, a transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction, and a Change in Control shall not be deemed to occur if the Company files a registration statement with the United States Securities and Exchange Commission in connection with an initial or secondary public offering of securities or debt of the Company to the public.

(h) "Code" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(i) "Committee" means the Compensation Committee as designated by the Board, which is authorized to administer the Plan, as described in Section  3 hereof.

(j) "Company" means Rockley Photonics Holding Limited, a Cayman Islands exempted company limited by shares, or any successor thereto.

(k) "Consultant" means an individual who is a consultant or advisor and who provides bona fide services to the Company, a Parent, a Subsidiary, or an Affiliate as an independent contractor (not including service as a member of the Board) or a member of the board of directors of a Parent or a Subsidiary, in each case who is not an Employee.

(l) "Disability"(i) means any permanent and total disability as defined by Section 22(e)(3) of the Code.

(m) "Employee" means any individual who is a common-law employee of the Company, a Parent, a Subsidiary, or an Affiliate.

(n) "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(o) "Exercise Price" means, in the case of an Option, the amount for which one Share may be purchased upon exercise of such Option, as specified in the applicable Option Award Agreement. "Exercise Price" means, in the case of a SAR, an amount, as specified in the applicable SAR Award Agreement, which is subtracted from the Fair Market Value of one Share in determining the amount payable upon exercise of such SAR.

H-7

Exhibit 6
Page 1621

**Table of Contents**

(p) "Fair Market Value" with respect to a Share, means the market price of one Share, determined by the Committee as follows:

(i)   If the Stock was traded over-the-counter on the date in question, then the Fair Market Value shall be equal to the last transaction price quoted for such date by the OTC Bulletin Board or, if not so quoted, shall be equal to the mean between the last reported representative bid and asked prices quoted for such date by the principal automated inter-dealer quotation system on which the Stock is quoted or, if the Stock is not quoted on any such system, by the Pink Quote system;

(ii)   If the Stock was traded on any established stock exchange (such as the New York Stock Exchange, The Nasdaq Global Market or The Nasdaq Global Select Market) or national market system on the date in question, then the Fair Market Value shall be equal to the closing price reported for such date by the applicable exchange or system; or

(iii)   If none of the foregoing provisions is applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate.

For any date that is not a trading day, the Fair Market Value of a share of Stock for such date shall be determined under clauses (i) and (ii) above with reference to the immediately preceding trading day. In all cases, the determination of Fair Market Value by the Committee shall be conclusive and binding on all persons and shall be consistent with the rules of Section 409A and Section 422 of the Code to the extent applicable.

(q) "ISO" means an Option intended to be an "incentive stock option" described in Section 422 of the Code. Each Option granted pursuant to the Plan will be treated as providing by its terms that it is to be an NSO unless, as of the date of grant, it is expressly designated as an ISO in the applicable Award Agreement.

(r) "Nonstatutory Option" or "NSO" means an Option that is not an ISO.

(s) "Option" means an option entitling the holder to acquire Shares upon payment of the exercise price.

(t) "Outside Director" means a member of the Board who is not a common-law employee of the Company, a Parent or a Subsidiary.

(u) "Parent" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be a Parent commencing as of such date.

(v) "Participant" means a person who holds an Award.

(w) "Plan" means this 2021 Stock Incentive Plan of Rockley Photonics Limited, as amended from time to time.

(x) "Purchase Price" means the consideration for which one Share may be acquired under the Plan (other than upon exercise of an Option), as specified by the Committee.

(y) "Restricted Share" means a Share subject to restrictions requiring that it be forfeited, redelivered or offered for sale to the Company if specified performance or other vesting conditions are not satisfied awarded under the Plan.

(z) "Restricted Stock Unit" means a bookkeeping entry representing the Company's obligation to deliver one Share (or distribute cash) measured by the value of a Share on a future date and may be subject to the satisfaction of performance or other vesting conditions.

H-8

Exhibit 6
Page 1622

**Table of Contents**

(aa) "Returning Shares" means Shares subject to outstanding stock awards granted under the 2013 Plan and that following the Effective Date: (A) are subsequently forfeited or terminated for any reason before being exercised or settled; (B) are not issued because such stock award or any portion thereof is settled in cash; (C) are subject to vesting restrictions and are subsequently forfeited; (D) are withheld or reacquired to satisfy the exercise, strike or purchase price; or (E) are withheld or reacquired to satisfy a tax withholding obligation.

(bb) "SAR" means a right entitling the holder upon exercise to receive an amount (payable in cash or in Shares of equivalent value) equal to the excess of the Fair Market Value of the Shares subject to the right over the Exercise Price from which appreciation under the SAR is to be measured.

(cc) "Section 409A" means Section 409A of the Code.

(dd) "Securities Act" means the United States Securities Act of 1933, as amended, the rules and regulations promulgated thereunder.

(ee) "Service" means service as an Employee, Consultant or Outside Director, subject to such further limitations as may be set forth in the Plan or the applicable Award Agreement. Service does not terminate when an Employee goes on a bona fide leave of absence, that was approved by the Company in writing, if the terms of the leave provide for continued Service crediting, or when continued Service crediting is required by applicable law. However, for purposes of determining whether an Option is entitled to ISO status, an Employee's employment will be treated as terminating three months after such Employee went on leave, unless such Employee's right to return to active work is guaranteed by law or by a contract. Service terminates in any event when the approved leave ends, unless such Employee immediately returns to active work. The Company determines which leaves of absence count toward Service, and when Service terminates for all purposes under the Plan.

(ff) "Share" means one Share of Stock, as adjusted in accordance with Section 12 (if applicable).

(gg) "Stock" means the Common Shares of the Company.

(hh) "Stock-Based Award"(ii) means an Award other than an Option, a SAR, a Restricted Share, a Restricted Stock Unit that is convertible into or otherwise based on Stock.

(jj) "Subsidiary" means any corporation, if the Company owns and/or one or more other Subsidiaries own not less than 50% of the total combined voting power of all classes of outstanding stock of such corporation. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date. The determination of whether an entity is a "Subsidiary" shall be made in accordance with Section 424(f) of the code.

**SECTION 3. ADMINISTRATION.**

(a) *Committee Composition*. The Plan shall be administered by a Committee appointed by the Board, or by the Board acting as the Committee. The Committee shall consist of two or more directors of the Company. In addition, to the extent required by the Board, the composition of the Committee shall satisfy such requirements of the New York Stock Exchange or the Nasdaq Stock Market, as applicable, and as the Securities and Exchange Commission may establish for administrators acting under plans intended to qualify for exemption under Rule 16b-3 (or its successor) under the Exchange Act.

(b) *Committee Appointment*. The Board may also appoint one or more separate committees of the Board, each composed of one or more directors of the Company who need not satisfy the requirements of Section 3(a), who may administer the Plan, grant Awards under the Plan and determine all terms of such grants, in each case with respect to all Employees, Consultants and Outside Directors (except such as may be on such committee),

H-9

Exhibit 6
Page 1623

**Table of Contents**

provided that such committee or committees may perform these functions only with respect to Employees who are not considered officers or directors of the Company under Section 16 of the Exchange Act. Within the limitations of the preceding sentence, any reference in the Plan to the Committee shall include such committee or committees appointed pursuant to the preceding sentence. To the extent permitted by applicable laws, the Board or Committee may also authorize one or more officers of the Company to designate Employees, other than officers under Section 16 of the Exchange Act, to receive Awards and/or to determine the number of such Awards to be received by such persons; provided, however, that the Board or Committee shall specify the total number of Awards that such officers may so award.

(c) *Committee Responsibilities*. Subject to the provisions of the Plan, the Committee shall have full authority and discretion to take the following actions:

(i)     To interpret the Plan and to apply its provisions;

(ii)    To adopt, amend, or rescind rules, procedures, and forms relating to the Plan;

(iii)   To adopt, amend, or terminate sub-plans established for the purpose of satisfying applicable foreign laws including qualifying for preferred tax treatment under applicable foreign tax laws;

(iv)    To authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan;

(v)     To determine when Awards are to be granted under the Plan;

(vi)    To select the Participants to whom Awards are to be granted;

(vii)   To determine the type of Award and number of Shares or amount of cash to be made subject to each Award;

(viii)  To prescribe the terms and conditions of each Award, including (without limitation) the Exercise Price and Purchase Price, and the vesting or duration of the Award (including accelerating the vesting of Awards, either at the time of the Award or thereafter, without the consent of the Participant), to determine whether an Option is to be classified as an ISO or as an NSO, and to specify the provisions of the agreement relating to such Award;

(ix)    To amend any outstanding Award Agreement, subject to applicable legal restrictions and to the consent of the Participant if the Participant's rights or obligations would be materially impaired;

(x)     To prescribe the consideration for the grant of each Award or other right under the Plan and to determine the sufficiency of such consideration;

(xi)    To determine the disposition of each Award or other right under the Plan in the event of a Participant's divorce or dissolution of marriage;

(xii)   To determine whether Awards under the Plan will be granted in replacement of other grants under an incentive or other compensation plan of an acquired business;

(xiii)  To correct any defect, supply any omission, or reconcile any inconsistency in the Plan or any Award Agreement;

(xiv)   To establish or verify the extent of satisfaction of any performance goals or other conditions applicable to the grant, issuance, exercisability, vesting, and/or ability to retain any Award; and

(xv)    To take any other actions deemed necessary or advisable for the administration of the Plan.

Subject to the requirements of applicable law, the Committee may designate persons other than members of the Committee to carry out its responsibilities and may prescribe such conditions and limitations as it may deem appropriate, except that the Committee may not delegate its authority with regard to the selection for participation of or the granting of Awards under the Plan to persons subject to Section 16 of the Exchange Act. All decisions, interpretations and other actions of the Committee shall be final and binding on all Participants and

H-10

Exhibit 6
Page 1624

**Table of Contents**

all persons deriving their rights from a Participant. No member of the Committee shall be liable for any action that the member has taken or has failed to take in good faith with respect to the Plan or any Award under the Plan.

**SECTION 4. ELIGIBILITY.**

(a) *General Rule*. The Committee will select Participants from among Employees, Consultants and Outside Directors. Eligibility for ISOs is limited to individuals described in the first sentence of this Section 4(a) who are employees of the Company or of a "parent corporation" or "subsidiary corporation" of the Company as those terms are defined in Section 424 of the Code. Eligibility for Stock Options, other than ISOs, and SARs is limited to individuals described in the first sentence of this Section 4(a) who are providing direct services on the date of grant of the Award to the Company or to a subsidiary of the Company that would be described in the first sentence of Section 1.409A-1(b)(5)(iii)(E) of the Treasury Regulations.

(b) *Ten-Percent Shareholders*. An Employee who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Company, a Parent or Subsidiary shall not be eligible for the grant of an ISO unless such grant satisfies the requirements of Section 422(c)(5) of the Code.

(c) *Attribution Rules*. For purposes of Section 4(b) above, in determining stock ownership, an Employee shall be deemed to own the stock owned, directly or indirectly, by or for such Employee's brothers, sisters, spouse, ancestors, and lineal descendants. Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be deemed to be owned proportionately by or for its shareholders, partners, or beneficiaries.

(d) *Outstanding Stock*. For purposes of Section 4(b) above, "outstanding stock" shall include all stock actually issued and outstanding immediately after the grant. "Outstanding stock" shall not include Shares authorized for issuance under outstanding options held by the Employee or by any other person.

**SECTION 5. STOCK SUBJECT TO PLAN; DIRECTOR COMPENSATION LIMIT.**

(a) *Basic Limitation*. Shares offered under the Plan shall be authorized but unissued Shares, treasury Shares, or previously issued Shares acquired by the Company. No fractional Shares will be delivered under the Plan. The maximum aggregate number of Shares authorized for issuance as Awards under the Plan shall not exceed the sum of (i) 7,631,196 Shares, plus (ii) the number of reserved Shares on an as converted basis[1] which, but for their cancellation immediately prior to the Effective Date, were at such time reserved under the 2013 Plan but not issued or subject to outstanding grants remaining available for issuance under the 2013 Plan plus (iii) the sum of any Returning Shares which become available from time to time, plus (iv) an annual increase on the first day of each fiscal year for a period of not more than ten (10) years beginning on January 1, 2022, and ending on (and including) January 1, 2031, in an amount equal to (x) four percent (4%) of the outstanding Shares on the last day of the immediately preceding fiscal year or (y) such lesser amount (including zero) that the Committee or Board determines for purposes of the annual increase for that fiscal year. Notwithstanding the foregoing, the number of Shares that may be delivered in the aggregate pursuant to the exercise of ISOs granted under the Plan shall not exceed five (5) times the number of Shares provided under clause (i) above plus, to the extent allowable under Section 422 of the Code, any Shares that become available for issuance under the Plan pursuant to Section 5(b), but nothing in this Section 5 will be construed as requiring that any, or any fixed number of, ISOs be awarded under the Plan. The limitations of this Section 5(a) shall be subject to adjustment pursuant to Section 12. The number of Shares that are subject to Awards outstanding at any time under the Plan shall not exceed the number of Shares which then remain available for issuance under the Plan. The Company shall at all times reserve and keep available sufficient Shares to satisfy the requirements of the Plan.

(b) *Additional Shares*. If Restricted Shares or Shares issued upon the exercise of options are forfeited, then such Shares shall again become available for Awards under the Plan. If Restricted Stock Units, Options, or SARs

---

[1] Such conversion shall be accomplished by multiplying such number of shares reserved for issuance under the 2013 Plan by the Exchange Ratio, as such term is defined under the Business Combination Agreement and Plan of Merger executed by and among SC Health Corporation, Rockley Photonics Limited and the Company on March 19, 2021.

H-11

Exhibit 6
Page 1625

**Table of Contents**

are forfeited or terminate for any reason before being exercised or settled, or an Award is settled in cash without the delivery of Shares to the holder, then the corresponding Shares shall again become available for Awards under the Plan. If Restricted Stock Units or SARs are settled, then only the number of Shares (if any) actually issued in settlement of such Restricted Stock Units or SARs shall reduce the number available in Section 5(a) and the balance (including any Shares withheld to satisfy tax withholding obligations) shall again become available for Awards under the Plan. Any Shares withheld to satisfy the Exercise Price or tax withholding obligation pursuant to any Award of Options or SARs shall be added back to the Shares available for Awards under the Plan. Notwithstanding the foregoing provisions of this Section 5(b), Shares that have actually been issued shall not again become available for Awards under the Plan, except for Shares that are forfeited and do not become vested.

(c) *Substitution and Assumption of Awards*. The Committee may make Awards under the Plan by assumption, substitution, or replacement of stock options, stock appreciation rights, restricted stock units, or similar awards granted by another entity (including a Parent or Subsidiary), if such assumption, substitution, or replacement is in connection with an asset acquisition, stock acquisition, merger, consolidation, or similar transaction involving the Company (and/or its Parent or Subsidiary) and such other entity (and/or its affiliate). The terms of such assumed, substituted, or replaced Awards shall be as the Committee, in its discretion, determines is appropriate, notwithstanding limitations on Awards in the Plan. Any such substitute or assumed Awards shall not count against the Share limitation set forth in Section 5(a) (nor shall Shares subject to such Awards be added to the Shares available for Awards under the Plan as provided in Section 5(b) above), except that Shares acquired by exercise of substitute ISOs will count against the maximum number of Shares that may be issued pursuant to the exercise of ISOs under the Plan.

(d) *Outside Director Compensation Limit*. The maximum number of Shares subject to Awards granted under the Plan during any one calendar year to any Outside Director taken together with any cash fees paid by the Company to such Outside Director during such calendar year for service on the Board (other than the calendar year in which an Outside Director commences service on the Board), will not exceed seven hundred fifty thousand dollars ($750,000) in total value (calculating the value of any such Awards based on the grant date fair value of such Awards for financial reporting purposes). Initial Awards granted under the Plan to Outside Directors who are members of the Board on the Effective Date or who first join the Board in the calendar year of the Effective Date shall not be taken into account for purposes of this limitation.

**SECTION 6. RESTRICTED SHARES.**

(a) *Restricted Share Award Agreement*. Each grant of Restricted Shares under the Plan shall be evidenced by a Restricted Share Award Agreement between the Participant and the Company. Such Restricted Shares shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various Restricted Share Award Agreements entered into under the Plan need not be identical.

(b) *Payment for Awards*. Restricted Shares may be sold or awarded under the Plan for such consideration as the Committee may determine, including (without limitation) cash, cash equivalents, full-recourse promissory notes, past services, and future services.

(c) *Vesting*. Each Award of Restricted Shares may or may not be subject to vesting. Vesting shall occur, in full or in installments, upon satisfaction of the conditions specified in the Restricted Share Award Agreement. A Restricted Share Award Agreement may provide for accelerated vesting in the event of the Participant's death, Disability or retirement or other events.

(d) *Voting and Dividend Rights*. A holder of Restricted Shares awarded under the Plan shall have the same voting, dividend, and other rights as the Company's other shareholders, except that in the case of any unvested Restricted Shares, the holder shall not be entitled to any dividends or other distributions paid or distributed by the

H-12

Exhibit 6
Page 1626

**Table of Contents**

Company in respect of outstanding Shares. Notwithstanding the foregoing, at the Committee's discretion, the holder of unvested Restricted Shares may be credited with such dividends and other distributions, provided that such dividends and other distributions shall be paid or distributed to the holder only if, when and to the extent such unvested Restricted Shares vest. The value of dividends and other distributions payable or distributable with respect to any unvested Restricted Shares that do not vest shall be forfeited. At the Committee's discretion, the Restricted Share Award Agreement may require that the holder of Restricted Shares invest any cash dividends received in additional Restricted Shares. Such additional Restricted Shares shall be subject to the same conditions as the Award with respect which the dividend was paid. For the avoidance of doubt, other than with respect to the right to receive dividends and other distributions, the holders of unvested Restricted Shares shall have the same voting rights and other rights as the Company's other shareholders in respect of such unvested Restricted Shares.

(e) *Restrictions on Transfer of Shares*. Restricted Shares shall be subject to such rights of repurchase, rights of first refusal, or other restrictions as the Committee may determine. Such restrictions shall be set forth in the applicable Restricted Share Award Agreement and shall apply in addition to any general restrictions that may apply to all holders of Shares.

**SECTION 7. TERMS AND CONDITIONS OF OPTIONS.**

(a) *Option Award Agreement*. Each grant of an Option under the Plan shall be evidenced by an Option Award Agreement between the Participant and the Company. Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Committee deems appropriate for inclusion in an Option Award Agreement. The Option Award Agreement shall specify whether the Option is an ISO or an NSO. The provisions of the various Option Award Agreements entered into under the Plan need not be identical.

(b) *Number of Shares*. Each Option Award Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 12.

(c) *Exercise Price*. Each Option Award Agreement shall specify the Exercise Price. The Exercise Price of an ISO shall not be less than 100% of the Fair Market Value of a Share on the date of grant (110% for ISOs granted to Employees described in Section 4(b)), and the Exercise Price of an NSO shall not be less than 100% of the Fair Market Value of a Share on the date of grant. Subject to the foregoing in this Section 7(c), the Exercise Price under any Option shall be determined by the Committee in its sole discretion. The Exercise Price shall be payable in one of the forms described in Section  8.

(d) *Withholding Taxes*. As a condition to the exercise of an Option, the Participant shall make such arrangements as the Committee may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise. The Participant shall also make such arrangements as the Committee may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with the disposition of Shares acquired by exercising an Option.

(e) *Exercisability and Term*. Each Option Award Agreement shall specify the date when all or any installment of the Option is to become exercisable. The Option Award Agreement shall also specify the term of the Option; provided that the term of an ISO shall in no event exceed 10 years from the date of grant (five years for ISOs granted to Employees described in Section 4(b)). An Option Award Agreement may provide for accelerated exercisability in the event of the Participant's death, Disability, or retirement or other events and may provide for expiration prior to the end of its term in the event of the termination of the Participant's Service. Options may be awarded in combination with SARs, and such an Award may provide that the Options will not be exercisable unless the related SARs are forfeited. Subject to the foregoing in this Section 7(e), the Committee in its sole discretion shall determine when all or any installment of an Option is to become exercisable and when an Option is to expire.

H-13

Exhibit 6
Page 1627

**Table of Contents**

(f) *Exercise of Options*. Each Option Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the Option following termination of the Participant's Service with the Company and its Subsidiaries, and the right to exercise the Option of any executors or administrators of the Participant's estate or any person who has acquired such Option(s) directly from the Participant by bequest or inheritance. Such provisions shall be determined in the sole discretion of the Committee, need not be uniform among all Options issued pursuant to the Plan, and may reflect distinctions based on the reasons for termination of Service.

(g) *No Rights as a Shareholder*. A Participant shall have no rights as a shareholder with respect to any Shares covered by an Option until the date of the issuance of a share certificate for such Shares. No adjustments shall be made, except as provided in Section 12.

(h) *Modification, Extension and Renewal of Options*. Within the limitations of the Plan, the Committee may modify, extend, or renew outstanding options or may accept the cancellation of outstanding options (to the extent not previously exercised), whether or not granted hereunder, in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price, or in return for the grant of a different Award for the same or a different number of Shares or for cash. The foregoing notwithstanding, no modification of an Option shall, without the consent of the Participant, materially impair the Participant's rights or obligations under such Option; provided, however, that an amendment or modification that may cause an ISO to become a NSO, and any amendment or modification that is required to comply with the rules applicable to ISOs, shall not be treated as materially impairing the rights or obligations of the Participant.

(i) *Restrictions on Transfer of Shares*. Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal, and other transfer restrictions as the Committee may determine. Such restrictions shall be set forth in the applicable Option Award Agreement and shall apply in addition to any general restrictions that may apply to all holders of Shares.

(j) *Buyout Provisions*. The Committee may at any time (i) offer to buy out for a payment in cash or cash equivalents an Option previously granted or (ii) authorize a Participant to elect to cash out an Option previously granted, in either case at such time and based upon such terms and conditions as the Committee shall establish.

**SECTION 8. PAYMENT FOR SHARES.**

(a) *General Rule*. The entire Exercise Price or Purchase Price of Shares issued under the Plan shall be payable in lawful money of the United States of America at the time when such Shares are purchased, except as provided in Section 8(b) through Section 8(h) below.

(b) *Surrender of Stock*. To the extent that an Option Award Agreement so provides, payment may be made all or in part by surrendering, or attesting to the ownership of, Shares which have already been owned by the Participant or the Participant's representative. Such Shares shall be valued at their Fair Market Value on the date when the new Shares are purchased under the Plan. The Participant shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if such action would cause the Company to recognize compensation expense (or additional compensation expense) with respect to the Option for financial reporting purposes.

(c) *Services Rendered*. At the discretion of the Committee, Shares may be awarded under the Plan in consideration of services rendered to the Company or a Subsidiary. If Shares are awarded without the payment of a Purchase Price in cash, the Committee shall make a determination (at the time of the Award) of the value of the services rendered by the Participant and the sufficiency of the consideration to meet the requirements of Section 6(b).

(d) *Cashless Exercise*. To the extent that an Option Award Agreement so provides, if the Stock is traded on an established securities market, payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of the aggregate Exercise Price.

<div align="center">H-14</div>

Exhibit 6
Page 1628

Table of Contents

(e) *Exercise/Pledge*. To the extent that an Option Award Agreement so provides, payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker or lender to pledge Shares, as security for a loan, and to deliver all or part of the loan proceeds to the Company in payment of the aggregate Exercise Price.

(f) *Net Exercise*. To the extent that an Option Award Agreement so provides, by a "net exercise" arrangement pursuant to which the number of Shares issuable upon exercise of the Option shall be reduced by the largest whole number of Shares having an aggregate Fair Market Value that does not exceed the aggregate Exercise Price (plus tax withholdings, if applicable) and any remaining balance of the aggregate Exercise Price (and/or applicable tax withholdings) not satisfied by such reduction in the number of whole Shares to be issued shall be paid by the Participant in cash or any other form of payment permitted under the Option Award Agreement.

(g) *Promissory Note*. To the extent that an Option Award Agreement or Restricted Share Award Agreement so provides, payment may be made all or in part by delivering (on a form prescribed by the Company) a full-recourse promissory note.

(h) *Other Forms of Payment*. To the extent that an Option Award Agreement or Restricted Share Award Agreement so provides, payment may be made in any other form that is consistent with applicable laws, regulations, and rules.

(i) *Limitations under Applicable Law*. Notwithstanding anything herein or in an Option Award Agreement or Restricted Share Award Agreement to the contrary, payment may not be made in any form that is unlawful, as determined by the Committee in its sole discretion.

**SECTION 9. STOCK APPRECIATION RIGHTS.**

(a) *SAR Award Agreement*. Each grant of a SAR under the Plan shall be evidenced by a SAR Award Agreement between the Participant and the Company. Such SAR shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various SAR Award Agreements entered into under the Plan need not be identical.

(b) *Number of Shares*. Each SAR Award Agreement shall specify the number of Shares to which the SAR pertains and shall provide for the adjustment of such number in accordance with Section 12.

(c) *Exercise Price*. Each SAR Award Agreement shall specify the Exercise Price. The Exercise Price of a SAR shall not be less than 100% of the Fair Market Value of a Share on the date of grant. Subject to the foregoing in this Section 9(c), the Exercise Price under any SAR shall be determined by the Committee in its sole discretion.

(d) *Exercisability and Term*. Each SAR Award Agreement shall specify the date when all or any installment of the SAR is to become exercisable. The SAR Award Agreement shall also specify the term of the SAR. A SAR Award Agreement may provide for accelerated exercisability in the event of the Participant's death, Disability, retirement, or other events and may provide for expiration prior to the end of its term in the event of the termination of the Participant's Service. SARs may be awarded in combination with Options, and such an Award may provide that the SARs will not be exercisable unless the related Options are forfeited. A SAR may be included in an ISO only at the time of grant but may be included in an NSO at the time of grant or thereafter. A SAR granted under the Plan may provide that it will be exercisable only in the event of a Change in Control.

(e) *Exercise of SARs*. Upon exercise of a SAR, the Participant (or any person having the right to exercise the SAR after the Participant's death) shall receive from the Company (i) Shares, (ii) cash or (iii) a combination of Shares and cash, as the Committee shall determine. The amount of cash and/or the Fair Market Value of Shares received upon exercise of SARs shall, in the aggregate, be equal to the amount by which the Fair Market Value (on the date of surrender) of the Shares subject to the SARs exceeds the Exercise Price.

H-15

Exhibit 6
Page 1629

**Table of Contents**

(f) *Modification, Extension or Assumption of SARs*. Within the limitations of the Plan, the Committee may modify, extend, or assume outstanding SARs or may accept the cancellation of outstanding SARs (whether granted by the Company or by another issuer) in return for the grant of new SARs for the same or a different number of Shares and at the same or a different Exercise Price, or in return for the grant of a different Award for the same or a different number of Shares or cash. The foregoing notwithstanding, no modification of a SAR shall, without the consent of the holder, materially impair the holder's rights or obligations under such SAR.

(g) *Buyout Provisions*. The Committee may at any time (i) offer to buy out for a payment in cash or cash equivalents a SAR previously granted, or (ii) authorize a Participant to elect to cash out a SAR previously granted, in either case at such time and based upon such terms and conditions as the Committee shall establish.

**SECTION 10. RESTRICTED STOCK UNITS.**

(a) *Restricted Stock Unit Award Agreement*. Each grant of Restricted Stock Units under the Plan shall be evidenced by a Restricted Stock Unit Award Agreement between the Participant and the Company. Such Restricted Stock Units shall be subject to all applicable terms of the Plan and may be subject to any other terms that are not inconsistent with the Plan. The provisions of the various Restricted Stock Unit Award Agreements entered into under the Plan need not be identical.

(b) *Payment for Awards*. To the extent that an Award is granted in the form of Restricted Stock Units, no cash consideration shall be required of the Award recipients.

(c) *Vesting Conditions*. Each Award of Restricted Stock Units may or may not be subject to vesting. Vesting shall occur, in full or in installments, upon satisfaction of the conditions specified in the Restricted Stock Unit Award Agreement. A Restricted Stock Unit Award Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, retirement, or other events.

(d) *Voting and Dividend Rights*. The holders of Restricted Stock Units shall have no voting rights. Prior to settlement or forfeiture, any Restricted Stock Unit awarded under the Plan may, at the Committee's discretion, carry with it a right to dividend equivalents. Such right, if awarded, entitles the holder to be credited with an amount equal to all cash dividends paid on one Share while the Restricted Stock Unit is outstanding. Settlement of dividend equivalents may be made in the form of cash, in the form of Shares, or in a combination of both. Dividend equivalents may also be converted into additional Restricted Stock Units at the Committee's discretion. Dividend equivalents shall not be distributed prior to settlement of the Restricted Stock Unit to which the dividend equivalents pertain. Prior to distribution, any dividend equivalents shall be subject to the same conditions and restrictions (including without limitation, any forfeiture conditions) as the Restricted Stock Units to which they attach. The value of dividend equivalents payable or distributable with respect to any unvested Restricted Stock Units that do not vest shall be forfeited. Any entitlement to dividend equivalents or similar entitlements will be established and administered either consistent with an exemption from, or in compliance with, the applicable requirements of Section 409A.

(e) *Form and Time of Settlement of Restricted Stock Units*. Settlement of vested Restricted Stock Units may be made in the form of (i) cash, (ii) Shares or (iii) any combination of both, as determined by the Committee. The actual number of Restricted Stock Units eligible for settlement may be larger or smaller than the number included in the original Award, based on predetermined performance factors. Methods of converting Restricted Stock Units into cash may include (without limitation) a method based on the average Fair Market Value of Shares over a series of trading days. A Restricted Stock Unit Award Agreement may provide that vested Restricted Stock Units may be settled in a lump sum or in installments. A Restricted Stock Unit Award Agreement may provide that the distribution may occur or commence when all vesting conditions applicable to the Restricted Stock Units have been satisfied or have lapsed, or it may be deferred to any later date, subject to compliance with Section 409A. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until an Award of Restricted Stock Units is settled, the number of such Restricted Stock Units shall be subject to adjustment pursuant to Section 12.

H-16

Exhibit 6
Page 1630

**Table of Contents**

(f) *Death of Participant*. Any Restricted Stock Unit Award that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. Each recipient of a Restricted Stock Unit Award under the Plan shall designate one or more beneficiaries for this purpose by filing the prescribed form with the Company. A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock Units Award that becomes payable after the Participant's death shall be distributed to the Participant's estate.

**SECTION 11. CASH-BASED AWARDS AND STOCK-BASED AWARDS**

The Committee may, in its sole discretion, grant Cash-Based Awards and Stock-Based Awards to any Participant in such number or amount and upon such terms, and subject to such conditions, as the Committee shall determine at the time of grant and specify in an applicable Award Agreement. The Committee shall determine the maximum duration of the Cash-Based Award or Stock-Based Award, the amount of cash which may be payable pursuant to the Cash-Based Award, the conditions upon which the Cash-Based Award or Stock-Based Award shall become vested or payable, and such other provisions as the Committee shall determine. Each Cash-Based Award shall specify a cash-denominated payment amount, formula, or payment ranges as determined by the Committee. Payment, if any, with respect to a Cash-Based Award or Stock-Based Award shall be made in accordance with the terms of the Award and may be made in cash or in Shares, as the Committee determines.

**SECTION 12. ADJUSTMENT OF SHARES.**

(a) *Adjustments*.

(i) <u>Recapitalization transactions.</u> In the event of a subdivision of the outstanding Stock, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Stock (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, the Committee shall make appropriate and equitable adjustments in:

    (A)    The class(es) and number of securities available for future Awards and the limitations set forth under Section 5;

    (B)    The class(es) and number of securities covered by each outstanding Award; and

    (C)    The Exercise Price under each outstanding Option and SAR.

(ii) <u>Other adjustments</u>. In the event of other transactions, the Committee may make such changes as provided in subsection (a) herein, as it determines are necessary or appropriate to avoid distortion in the operation of the Plan.

(iii) The Committee's determinations hereunder will be final, binding and conclusive.

(b) *Dissolution or Liquidation*. To the extent not previously exercised or settled, Options, SARs, and Restricted Stock Units shall terminate immediately prior to the dissolution or liquidation of the Company.

(c) *Merger or Reorganization*. In the event that the Company is a party to a merger or other reorganization, outstanding Awards shall be subject to the agreement of merger or reorganization. Such agreement may provide, without limitation, for one or more of the following:

    (i)    The continuation of the outstanding Awards by the Company, if the Company is a surviving corporation;

    (ii)    The assumption of the outstanding Awards by the surviving corporation or its parent or subsidiary;

H-17

Exhibit 6
Page 1631

**Table of Contents**

(iii)   The substitution by the surviving corporation or its parent or subsidiary of its own awards for the outstanding Awards;

(iv)   Immediate vesting, exercisability, or settlement of outstanding Awards followed by the cancellation of such Awards upon or immediately prior to the effectiveness of such transaction;

(v)   Cancellation of the Award, to the extent not vested or not exercised prior to the effective time of the merger or reorganization, in exchange for such cash or equity consideration (including no consideration) as the Committee, in its sole discretion, may consider appropriate; or

(vi)   Settlement of the intrinsic value of the outstanding Awards (whether or not then vested or exercisable) in cash or cash equivalents or equity (including cash or equity subject to deferred vesting and delivery consistent with the vesting restrictions applicable to such Awards or the underlying Shares) followed by the cancellation of such Awards (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction the Committee determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment), provided that any such amount may be delayed to the same extent that payment of consideration to the holders of Stock in connection with the merger or reorganization is delayed as a result of escrows, earnouts, holdbacks or other contingencies;

in each case without the Participant's consent. Any acceleration of payment of an amount that is subject to Section 409A will be delayed, if necessary, until the earliest time that such payment would be permissible under Section 409A without triggering any additional taxes applicable under Section 409A. Any actions hereunder will comply with, or be exempt from, Section 409A to the extent determined by the Committee to be reasonably practicable.

The Company will have no obligation to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly.

(d) *Change in Control*. In addition to (and not in limitation of) the actions that may be taken under Section 12(c), in the event of a Change in Control in which the surviving corporation or acquiring corporation (or the surviving or acquiring corporation's parent company) does not continue or assume or settle (subject to vesting) outstanding Awards, or substitute similar stock awards for outstanding Awards, then with respect to any such Awards that have not been continued, assumed, settled or substituted, the Committee may determine, at the time of granting an Award or thereafter, that the vesting (and exercisability, if applicable) of any such Awards (or portion thereof) will be accelerated in full (and with respect to any Awards subject to performance-based vesting, that vesting shall be deemed satisfied at the target level, or based on actual performance measured in accordance with the applicable performance goals as of the date of the Change in Control, or the greater thereof) to a date prior to the effective time of the Change in Control (contingent upon the closing or completion of the Change in Control) as the Committee will determine (or, if the Committee does not determine such a date, to the date that is five days prior to the effective time of the Change in Control), and any reacquisition or repurchase rights held by the Company with respect to such vested Awards will lapse (contingent upon the closing or completion of the Change in Control). In addition, the Committee may determine, at the time of granting an Award or thereafter, that such Award shall become exercisable or vested as to all or part of the Shares subject to such Award in the event that a Change in Control occurs with respect to the Company. The Committee will have no obligation to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly. Upon consummation of a Change in Control, all Awards that are not assumed, substituted or continued will terminate without payment therefor, except as otherwise determined by the Committee in accordance with this Section 12.

(e) *Reservation of Rights*. Except as provided in this Section 12, a Participant shall have no rights by reason of any subdivision or consolidation of Shares of stock of any class, the payment of any dividend or any other increase or decrease in the number of Shares of stock of any class. Any issue by the Company of Shares of stock

H-18

Exhibit 6
Page 1632

**Table of Contents**

of any class, or securities convertible into Shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares subject to an Award. The grant of an Award pursuant to the Plan shall not affect in any way the right or power of the Company to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell, or transfer all or any part of its business or assets. In the event of any change affecting the Shares or the Exercise Price of Shares subject to an Award, including a merger or other reorganization, for reasons of administrative convenience, the Company in its sole discretion may refuse to permit the exercise of any Award during a period of up to 30 days prior to the occurrence of such event.

**SECTION 13. DEFERRAL OF AWARDS.**

(a) *Committee Powers*. Subject to compliance with Section 409A, the Committee (in its sole discretion) may permit or require a Participant to:

(i)     Have cash that otherwise would be paid to such Participant as a result of the exercise of a SAR or the settlement of Restricted Stock Units credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books;

(ii)    Have Shares that otherwise would be delivered to such Participant as a result of the exercise of an Option or SAR converted into an equal number of Restricted Stock Units; or

(iii)   Have Shares that otherwise would be delivered to such Participant as a result of the exercise of an Option or SAR or the settlement of Restricted Stock Units converted into amounts credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books. Such amounts shall be determined by reference to the Fair Market Value of such Shares as of the date when they otherwise would have been delivered to such Participant.

(b) *General Rules*. A deferred compensation account established under this Section 13 may be credited with interest or other forms of investment return, as determined by the Committee. A Participant for whom such an account is established shall have no rights other than those of a general creditor of the Company. Such an account shall represent an unfunded and unsecured obligation of the Company and shall be subject to the terms and conditions of the applicable agreement between such Participant and the Company. If the deferral or conversion of Awards is permitted or required, the Committee (in its sole discretion) may establish rules, procedures, and forms pertaining to such Awards, including (without limitation) the settlement of deferred compensation accounts established under this Section 13.

**SECTION 14. AWARDS UNDER SUB-PLANS.**

The Committee may at any time and from time to time (including before or after an Award is granted) establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan for Participants based outside of the U.S. and/or subject to the laws of countries other than the U.S., including by establishing one or more sub-plans, supplements or appendices under the Plan or any Award Agreement for the purpose of complying or facilitating compliance with non-U.S. laws or taking advantage of tax favorable treatment or for any other legal or administrative reason determined by the Committee. Any such sub-plan, supplement or appendix may contain, in each case, (i) such limitations on the Committee's discretion under the Plan and (ii) such additional or different terms and conditions, as the Committee deems necessary or desirable and will be deemed to be part of the Plan but will apply only to Participants within the group to which the sub-plan, supplement or appendix applies (as determined by the Committee); *provided*, *however*, that no sub-plan, supplement or appendix, rule or regulation established pursuant to this provision shall increase the number of Shares available under Section 5.

**SECTION 15. PAYMENT OF DIRECTOR'S FEES IN SECURITIES.**

(a) *Effective Date*. No provision of this Section 15 shall be effective unless and until the Board has determined to implement such provision.

H-19

Exhibit 6
Page 1633

**Table of Contents**

(b) *Elections to Receive NSOs, SARs, Restricted Shares, or Restricted Stock Units*. An Outside Director may elect to receive annual retainer payments and/or meeting fees from the Company in the form of cash, NSOs, SARs, Restricted Shares, Restricted Stock Units, or a combination thereof, as determined by the Board. Alternatively, the Board may mandate payment in any of such alternative forms. Such NSOs, SARs, Restricted Shares, and Restricted Stock Units shall be issued under the Plan. An election under this Section 15 shall be filed with the Company on the prescribed form.

(c) *Number and Terms of NSOs, SARs, Restricted Shares or Restricted Stock Units*. The number of NSOs, SARs, Restricted Shares, or Restricted Stock Units to be granted to Outside Directors in lieu of annual retainers and meeting fees that would otherwise be paid in cash shall be calculated in a manner determined by the Board. The terms of such NSOs, SARs, Restricted Shares, or Restricted Stock Units shall also be determined by the Board.

## SECTION 16. LEGAL AND REGULATORY REQUIREMENTS.

Shares shall not be issued under the Plan unless the issuance and delivery of such Shares complies with (or is exempt from) all applicable requirements of law, including (without limitation) the United States Securities Act, state securities laws and regulations and the regulations of any stock exchange on which the Company's securities may then be listed, and the Company has obtained the approval or favorable ruling from any governmental agency which the Company determines is necessary or advisable. The Company shall not be liable to a Participant or other persons as to: (a) the non-issuance or sale of Shares as to which the Company has not obtained from any regulatory body having jurisdiction the authority deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares under the Plan; and (b) any tax consequences expected, but not realized, by any Participant or other person due to the receipt, exercise or settlement of any Award granted under the Plan.

## SECTION 17. TAXES.

(a) *Withholding Taxes*. To the extent required by applicable federal, state, local, or foreign law, a Participant or the Participant's successor shall make arrangements satisfactory to the Company for the satisfaction of any withholding tax obligations that arise in connection with the Plan. The Company shall not be required to issue any Shares or make any cash payment under the Plan until such obligations are satisfied.

(b) *Share Withholding*. The Committee may permit a Participant to satisfy all or part of the Participant's withholding or income tax obligations by having the Company withhold all or a portion of any Shares that otherwise would be issued to the Participant or by surrendering all or a portion of any Shares that the Participant previously acquired. Such Shares shall be valued at their Fair Market Value on the date when taxes otherwise would be withheld in cash. In no event may a Participant have Shares withheld that would otherwise be issued to the Participant in excess of the number necessary to satisfy the maximum legally required tax withholding.

(c) *Section 409A*.

(i)     Without limiting the generality of Section 24(b) hereof, each Award will contain such terms as the Committee determines and will be construed and administered such that the Award either qualifies for an exemption from the requirements of Section 409A or satisfies such requirements.

(ii)    Each Award that provides for "nonqualified deferred compensation" within the meaning of Section 409A shall be subject to such additional rules and requirements as specified by the Committee from time to time in order to comply with Section 409A. If any amount under such an Award is payable upon a "separation from service" (within the meaning of Section 409A) to a Participant who is then considered a "specified employee" (within the meaning of Section 409A), then no such payment shall be made prior to the date that is the earlier of (i) six months and one day after the Participant's separation from service, or (ii) the Participant's death, but only to the

H-20

Exhibit 6
Page 1634

Table of Contents

extent such delay is necessary to prevent such payment from being subject to interest, penalties, and/or additional tax imposed pursuant to Section 409A. In addition, the settlement of any such Award may not be accelerated except to the extent permitted by Section 409A. With regard to any payment considered to be nonqualified deferred compensation under Section 409A, to the extent applicable, that is payable upon a Change in Control of the Company or other similar event, to the extent required to avoid the imposition of an additional tax, interest or penalty under Section 409A, no amount will be payable unless such change in control constitutes a "change in control event" within the meaning of Section 1.409A-3(i)(5) of the Treasury Regulations.

(iii)  Notwithstanding anything to the contrary in the Plan or any Award Agreement, the Committee may unilaterally amend, modify or terminate the Plan or any outstanding Award, including but not limited to changing the form of the Award, if the Committee determines that such amendment, modification or termination is necessary or desirable to avoid the imposition of an additional tax, interest or penalty under Section 409A.

(iv)  For purposes of Section 409A, each payment made under the Plan or any Award will be treated as a separate payment.

## SECTION 18. TRANSFERABILITY.

Unless the agreement evidencing an Award (or an amendment thereto authorized by the Committee) expressly provides otherwise, no Award granted under the Plan, nor any interest in such Award, may be sold, assigned, conveyed, gifted, pledged, hypothecated, or otherwise transferred in any manner (prior to the vesting and lapse of any and all restrictions applicable to Shares issued under such Award), other than by will or the laws of descent and distribution; provided, however, that an ISO may be transferred or assigned only to the extent consistent with Section 422 of the Code. Any purported assignment, transfer, or encumbrance in violation of this Section 17 shall be void and unenforceable against the Company.

## SECTION 19. PERFORMANCE BASED AWARDS.

The number of Shares or other benefits granted, issued, retained, and/or vested under an Award may be made subject to the attainment of performance goals. The Committee may utilize any performance criteria selected by it in its sole discretion to establish performance goals.

## SECTION 20. RECOUPMENT OF AWARDS.

The Company will recoup incentive-based compensation from executive officers to the extent required under the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules, regulations and listing standards that may be issued under that act. Any right of recoupment under this provision will be in addition to, and not in lieu of, any other rights of recoupment that may be available to the Company. No recovery of compensation under any clawback policy or this Section 20 will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with the Company or any of its Subsidiaries or Affiliates.

## SECTION 21. NO EMPLOYMENT RIGHTS.

No provision of the Plan, nor any Award granted under the Plan, shall be construed to give any person any right to become, to be treated as, or to remain an Employee or Consultant. The Company and its Subsidiaries reserve the right to terminate any person's Service at any time and for any reason, with or without notice.

## SECTION 22. DURATION AND AMENDMENTS.

(a) *Term of the Plan*. The Plan, as set forth herein, shall come into existence on the date of its adoption by the Board; provided, however, that no Award may be granted hereunder prior to the Effective Date. The Board or

H-21

Exhibit 6
Page 1635

Table of Contents

the Committee may suspend or terminate the Plan at any time. No ISOs may be granted after the tenth (10th) anniversary of the earlier of (i) the date the Plan is adopted by the Board, or (ii)  the date the Plan is approved by the shareholders of the Company.

(b) *Right to Amend the Plan*. The Board or the Committee may amend the Plan at any time and from time to time. Rights and obligations under any Award granted before amendment of the Plan shall not be materially impaired by such amendment, except with consent of the Participant. An amendment of the Plan shall be subject to the approval of the Company's shareholders only to the extent required by applicable laws, regulations or rules.

(c) *Effect of Termination*. No Awards shall be granted under the Plan after the termination thereof. The termination of the Plan shall not affect Awards previously granted under the Plan.

## SECTION 23. AWARDS TO NON-U.S. PARTICIPANTS.

Awards may be granted to Participants who are non-United States nationals or employed or providing services outside the United States, or both, on such terms and conditions different from those applicable to Awards to Participants who are employed or providing services in the United States as may, in the judgment of the Committee, be necessary or desirable to recognize differences in local law, tax policy, or custom. The Committee also may impose conditions on the exercise, vesting, or settlement of Awards in order to minimize the Company's obligation with respect to tax equalization for Participants on assignments outside their home country.

## SECTION 24. MISCELLANEOUS

(a) *Waiver of Jury Trial*. By accepting or being deemed to have accepted an Award under the Plan, each Participant waives (or will be deemed to have waived), to the maximum extent permitted under applicable law, any right to a trial by jury in any action, proceeding or counterclaim concerning any rights under the Plan or any Award, or under any amendment, waiver, consent, instrument, document or other agreement delivered or which in the future may be delivered in connection therewith, and agrees (or will be deemed to have agreed) that any such action, proceedings or counterclaim will be tried before a court and not before a jury. By accepting or being deemed to have accepted an Award under the Plan, each Participant certifies that no officer, representative, or attorney of the Company has represented, expressly or otherwise, that the Company would not, in the event of any action, proceeding or counterclaim, seek to enforce the foregoing waivers. Notwithstanding anything to the contrary in the Plan, nothing herein is to be construed as limiting the ability of the Company and a Participant to agree to submit any dispute arising under the terms of the Plan or any Award to binding arbitration or as limiting the ability of the Company to require any individual to agree to submit such disputes to binding arbitration as a condition of receiving an Award hereunder.

(b) *Limitation of Liability*. Notwithstanding anything to the contrary in the Plan or any Award, neither the Company, nor any of its Subsidiaries, nor the Committee, nor any person acting on behalf of the Company, any of its Subsidiaries, or the Committee, will be liable to any Participant, to any permitted transferee, to the estate or beneficiary of any Participant or any permitted transferee, or to any other person by reason of any acceleration of income, any additional tax, or any penalty, interest or other liability asserted by reason of the failure of an Award to satisfy the requirements of Section 422 or Section 409A or by reason of Section 4999 of the Code, or otherwise asserted with respect to any Award.

(c) *Unfunded Plan*. The Company's obligations under the Plan are unfunded, and no Participant will have any right to specific assets of the Company in respect of any Award. Participants will be general unsecured creditors of the Company with respect to any amounts due or payable under the Plan.

<div align="center">H-22</div>

Exhibit 6
Page 1636

**Table of Contents**

**SECTION 25. GOVERNING LAW.**

The Plan and each Award Agreement shall be governed by the laws of the state of California, without application of the conflicts of law principles thereof.

**SECTION 26. SUCCESSORS AND ASSIGNS.**

The terms of the Plan shall be binding upon and inure to the benefit of the Company and any successor entity, including any successor entity contemplated by Section 12(c).

**SECTION 27. EXECUTION.**

To record the adoption of the Plan by the Board, the Company has caused its authorized officer to execute the same.

<div align="right">

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____

Name  : 

Title: 

</div>

<div align="center">H-23</div>

<div align="right">

Exhibit 6

Page 1637

</div>

**Table of Contents**

<u>Schedule A</u>

**The Equity Scheme**

The Equity Scheme will be implemented either by way of a cancellation or a transfer scheme of arrangement under Part 26 of the Act. Company Shareholders will be invited to vote in favor of the Equity Scheme at the Equity Scheme Court Meeting, which is a meeting of Company Shareholders convened by the Company with the permission of the Court.

The Equity' Scheme will become effective in accordance with its terms:

(a) if it is approved by a majority (in person or by proxy) in number, representing at least 75 per cent. in value, of the members present and voting at the Equity Scheme Court Meeting;

(b) if it is subsequently sanctioned by an order of the Court (the "<u>Equity Scheme Court Order</u>"); and

(c) upon an office copy of the Equity Scheme Court Order being delivered to the UK Registrar of Companies for registration.

If the Equity Scheme becomes effective, then either:

(a) in the case of a cancellation scheme, the Company Ordinary Shares of the Company Shareholders shall be cancelled and Company Ordinary Shares shall be issued to HoldCo, resulting in HoldCo becoming the holding company of the Company. In consideration for the cancellation of the Company Ordinary Shares and issuance of shares to HoldCo, HoldCo shall issue an identical number of HoldCo Ordinary Shares to those cancelled to the Company Shareholders; or

(b) in the case of a transfer scheme, the Company Ordinary Shares of the Company Shareholders shall be transferred to HoldCo. In consideration for the transfer of the Company Ordinary Shares to HoldCo, HoldCo shall issue an identical number of HoldCo Ordinary Shares to the Company Shareholders, resulting in HoldCo becoming the holding company of the Company.

**The Creditor Scheme**

The Creditor's Scheme will be implemented by way of a creditor's scheme of arrangement under Part 26 of the Act. Pursuant to the Creditors Scheme:

(a) if the Equity Scheme is a cancellation scheme, the Company proposes to novate its obligations under the Company Convertible Notes to Holdco and the Scheme Creditors will accept the performance by HoldCo of the Company Convertible Notes in place of performance by the Company and discharge Holdco from further obligations under the Company Convertible Notes. The consideration for the novation shall be an inter-company loan equal to the market value of the Scheme Convertible Notes; and

(b) if the Equity Scheme is a transfer scheme, HoldCo proposes to acquire Scheme Convertible Notes from each Scheme Creditor in consideration of HoldCo entering into new convertible loan note with each Scheme Creditor on substantially the same terms, and the Scheme Convertible Notes will be amended to a form of inter-company loan between HoldCo and the Company.

The Scheme Creditors will be invited to vote in favor of the Creditors' Scheme at the Creditors' Scheme Court Meeting, being a meeting convened by the Company with the permission of the Court. The Creditors' Scheme will become effective in accordance with its terms:

(a) if it is approved by a majority (in person or by proxy) in number, and at least 75 per cent. in value, of the members of the class of creditors present and voting at the Creditors' Scheme Court Meeting;

H-24

Exhibit 6
Page 1638

**Table of Contents**

(b) if it is subsequently sanctioned by an order of the Court (the "<u>Creditor Scheme Court Order</u>"); and

(c) upon an office copy of the Creditor Scheme Court Order being delivered to the UK Registrar of Companies for registration.

<div align="center">H-25</div>

Exhibit 6
Page 1639

**Table of Contents**

**ANNEX I**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**2021 EMPLOYEE STOCK PURCHASE PLAN**

(Adopted by the Board of Directors on March 31, 2021)

(Approved by the Stockholders on             , 2021)

Effective Date:             , 2021

Exhibit 6
Page 1640

Table of Contents

|  |  | **Page** |
|---|---|---|
| SECTION 1 | Purpose Of The Plan | I-4 |
| SECTION 2 | Definitions | I-4 |
| (a) | "Board" | I-4 |
| (b) | "Code" | I-4 |
| (c) | "Committee" | I-4 |
| (d) | "Company" | I-4 |
| (e) | "Compensation" | I-4 |
| (f) | "Corporate Reorganization" | I-4 |
| (g) | "Eligible Employee" | I-4 |
| (h) | "Exchange Act" | I-5 |
| (i) | "Fair Market Value" | I-5 |
| (j) | "Offering" | I-5 |
| (k) | "Offering Date" | I-5 |
| (l) | "Offering Period" | I-5 |
| (m) | "Participant" | I-5 |
| (n) | "Participating Company" | I-5 |
| (o) | "Plan" | I-5 |
| (p) | "Plan Account" | I-5 |
| (q) | "Purchase Date" | I-5 |
| (r) | "Purchase Period" | I-5 |
| (s) | "Purchase Price" | I-5 |
| (t) | "Stock" | I-5 |
| (u) | "Subsidiary" | I-5 |
| SECTION 3 | Administration Of The Plan | I-6 |
| (a) | Administrative Powers and Responsibilities | I-6 |
| (b) | International Administration | I-6 |
| SECTION 4 | Enrollment And Participation | I-6 |
| (a) | Offering Periods | I-6 |
| (b) | Enrollment | I-7 |
| (c) | Duration of Participation | I-7 |
| SECTION 5 | Employee Contributions | I-7 |
| (a) | Frequency of Payroll Deductions | I-7 |
| (b) | Amount of Payroll Deductions | I-7 |
| (c) | Changing Withholding Rate | I-7 |
| (d) | Discontinuing Payroll Deductions | I-8 |
| SECTION 6 | Withdrawal From The Plan | I-8 |
| (a) | Withdrawal | I-8 |
| (b) | Re-enrollment After Withdrawal | I-8 |
| SECTION 7 | Change In Employment Status | I-8 |
| (a) | Termination of Employment | I-8 |
| (b) | Leave of Absence | I-8 |
| (c) | Death | I-8 |
| SECTION 8 | Plan Accounts and Purchase Of Shares | I-8 |
| (a) | Plan Accounts | I-8 |
| (b) | Purchase Price | I-8 |
| (c) | Number of Shares Purchased | I-9 |
| (d) | Available Shares Insufficient | I-9 |

Exhibit 6
Page 1641

**Table of Contents**

| | | | Page |
|---|---|---|---|
| | (e) | Issuance of Stock | I-9 |
| | (f) | Unused Cash Balances | I-9 |
| | (g) | Stockholder Approval | I-9 |
| SECTION 9 | | Limitations On Stock Ownership | I-9 |
| | (a) | Five Percent Limit | I-9 |
| | (b) | Dollar Limit | I-10 |
| SECTION 10 | | Rights Not Transferable | I-10 |
| SECTION 11 | | No Rights As An Employee | I-10 |
| SECTION 12 | | No Rights As A Stockholder | I-10 |
| SECTION 13 | | Securities Law Requirements | I-10 |
| SECTION 14 | | Stock Offered Under The Plan | I-11 |
| | (a) | Authorized Shares | I-11 |
| | (b) | Antidilution Adjustments | I-11 |
| | (c) | Reorganizations | I-11 |
| SECTION 15 | | Amendment Or Discontinuance | I-11 |
| SECTION 16 | | Execution | I-12 |

Exhibit 6
Page 1642

**Table of Contents**

ROCKLEY PHOTONICS HOLDINGS LIMITED

2021 EMPLOYEE STOCK PURCHASE PLAN

SECTION 1 Purpose Of The Plan.

    The Plan was adopted by the Board of Directors on       , 2021 and is effective on       , 2021 (the "Effective Date"). The purpose of the Plan is to provide a broad-based employee benefit to attract the services of new Eligible Employees, to retain the services of existing Eligible Employees, and to provide incentives for such individuals to exert maximum efforts toward the Company's success by purchasing Stock from the Company on favorable terms and to pay for such purchases through payroll deductions. The Plan is intended to qualify under section 423 of the Code and to be exempt from the application and requirements of Section 409A of the Code, and is to be construed accordingly.

SECTION 2 Definitions.

    (a) "Board" means the Board of Directors of the Company, as constituted from time to time.

    (b) "Code" means the Internal Revenue Code of 1986, as amended.

    (c) "Committee" means the Compensation Committee of the Board or such other committee, comprised exclusively of one or more directors of the Company, as may be appointed by the Board from time to time to administer the Plan.

    (d) "Company" means Rockley Photonics Holdings Limited, a Cayman Islands exempted company limited by shares.

    (e) "Compensation" means, unless provided otherwise by the Committee in the terms and conditions of an Offering, base salary and wages paid in cash to a Participant by a Participating Company, without reduction for any pre-tax contributions made by the Participant under sections 401(k) or 125 of the Code. "Compensation" shall, unless provided otherwise by the Committee in the terms and conditions of an Offering, exclude variable compensation (including commissions, bonuses, incentive compensation, overtime pay and shift premiums), all non-cash items, moving or relocation allowances, cost-of-living equalization payments, car allowances, tuition reimbursements, imputed income attributable to cars or life insurance, severance pay, fringe benefits, contributions or benefits received under employee benefit plans, income attributable to the exercise of stock options, and similar items. The Committee shall determine whether a particular item is included in Compensation.

    (f) "Corporate Reorganization" means:

        (i) The consummation of a merger or consolidation of the Company with or into another entity, or any other corporate reorganization; or

        (ii) The sale, transfer or other disposition of all or substantially all of the Company's assets or the complete liquidation or dissolution of the Company.

    (g) "Eligible Employee" means any employee of a Participating Company whose customary employment is for more than five months per calendar year and for more than 20 hours per week.

    The foregoing notwithstanding, an individual shall not be considered an Eligible Employee if such individual's participation in the Plan is prohibited by the law of any country which has jurisdiction over the individual.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-4

Exhibit 6
Page 1643

**Table of Contents**

(h) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(i) "Fair Market Value" means the fair market value of a share of Stock, determined as follows:

(i) If Stock was traded on any established national securities exchange including the New York Stock Exchange or The Nasdaq Stock Market on the date in question, then the Fair Market Value shall be equal to the closing price as quoted on such exchange (or the exchange with the greatest volume of trading in the Stock) on such date as reported in the Wall Street Journal or such other source as the Committee deems reliable; or

(ii) If the foregoing provision is not applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate.

For any date that is not a Trading Day, the Fair Market Value of a share of Stock for such date shall be determined by using the closing sale price for the immediately preceding Trading Day. Determination of the Fair Market Value pursuant to the foregoing provisions shall be conclusive and binding on all persons.

(j) "Offering" means the grant of options to purchase shares of Stock under the Plan to Eligible Employees.

(k) "Offering Date" means the first day of an Offering.

(l) "Offering Period" means a period with respect to which the right to purchase Stock may be granted under the Plan, as determined pursuant to Section 4(a).

(m) "Participant" means an Eligible Employee who elects to participate in the Plan, as provided in Section 4(b).

(n) "Participating Company" means (i) the Company and (ii) each present or future Subsidiary designated by the Committee as a Participating Company.

(o) "Plan" means this Rockley Photonics Limited 2021 Employee Stock Purchase Plan, as it may be amended from time to time.

(p) "Plan Account" means the account established for each Participant pursuant to Section 8(a).

(q) "Purchase Date" means one or more dates during an Offering on which shares of Stock may be purchased pursuant to the terms of the Offering.

(r) "Purchase Period" means one or more successive periods during an Offering, beginning on the Offering Date or on the day after a Purchase Date, and ending on the next succeeding Purchase Date.

(s) "Purchase Price" means the price at which Participants may purchase shares of Stock under the Plan, as determined pursuant to Section 8(b).

(t) "Stock" means the Common Stock of the Company.

(u) "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-5

Exhibit 6
Page 1644

**Table of Contents**

(r) "Trading Day" means a day on which the national stock exchange on which the Stock is traded is open for trading.

SECTION 3 Administration Of The Plan.

(a) Administrative Powers and Responsibilities. The Plan shall be administered by the Committee. The Committee shall have full power and authority, subject to the provisions of the Plan, to promulgate such rules and regulations as it deems necessary for the proper administration of the Plan, to interpret the provisions and supervise the administration of the Plan, and to take all action in connection therewith or in relation thereto as it deems necessary or advisable. Any decision reduced to writing and signed by all of the members of the Committee shall be fully effective as if it had been made at a meeting duly held. The Committee's determinations under the Plan, unless otherwise determined by the Board, shall be final and binding on all persons. The Company shall pay all expenses incurred in the administration of the Plan. No member of the Committee shall be personally liable for any action, determination, or interpretation made in good faith with respect to the Plan, and all members of the Committee shall be fully indemnified by the Company with respect to any such action, determination or interpretation. The Committee may adopt such rules, guidelines and forms as it deems appropriate to implement the Plan. Subject to the requirements of applicable law, the Committee may designate persons other than members of the Committee to carry out its responsibilities and may prescribe such conditions and limitations as it may deem appropriate. All decisions, interpretations and other actions of the Committee shall be final and binding on all Participants and all persons deriving their rights from a Participant. No member of the Committee shall be liable for any action that he has taken or has failed to take in good faith with respect to the Plan. Notwithstanding anything to the contrary in the Plan, the Board may, in its sole discretion, at any time and from time to time, resolve to administer the Plan. In such event, the Board shall have all of the authority and responsibility granted to the Committee herein.

(b) International Administration. The Committee may establish sub-plans (which need not qualify under section 423 of the Code) and initiate separate Offerings through such sub-plans for the purpose of (i) facilitating participation in the Plan by non-U.S. employees in compliance with foreign laws and regulations without affecting the qualification of the remainder of the Plan under section 423 of the Code or (ii) qualifying the Plan for preferred tax treatment under foreign tax laws (which sub-plans, at the Committee's discretion, may provide for allocations of the authorized shares reserved for issue under the Plan as set forth in Section 14(a)). The rules, guidelines and forms of such sub-plans (or the Offerings thereunder) may take precedence over other provisions of the Plan, with the exception of Section 4(a)(i), Section 5(b), Section 8(b) and Section 14(a), but unless otherwise superseded by the terms of such sub-plan, the provisions of the Plan shall govern the operation of such sub-plan. Alternatively and in order to comply with the laws of a foreign jurisdiction, the Committee shall have the power, in its discretion, to grant options in an Offering to citizens or residents of a non-U.S. jurisdiction (without regard to whether they are also citizens of the United States or resident aliens) that provide terms which are less favorable than the terms of options granted under the same Offering to employees resident in the United States, subject to compliance with section 423 of the Code.

SECTION 4 Enrollment And Participation.

(a) Offering Periods. While the Plan is in effect, the Committee may from time to time grant options to purchase shares of Stock pursuant to the Plan to Eligible Employees during a specified Offering Period. Each such Offering shall be in such form and shall contain such terms and conditions as the Committee shall determine, subject to compliance with the terms and conditions of the Plan (which may be incorporated by reference) and the requirements of section 423 of the Code, including the requirement that all Eligible Employees have the same rights and privileges. The Committee shall specify prior to the commencement of each Offering (i) the period during which the Offering shall be effective, which may not exceed 27 months from the Offering

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-6

Exhibit 6
Page 1645

**Table of Contents**

Date and may include one or more successive Purchase Periods within the Offering, (ii) the Purchase Dates and Purchase Price for shares of Stock which may be purchased pursuant to the Offering, and (iii) if applicable, any limits on the number of shares purchasable by a Participant, or by all Participants in the aggregate, during any Offering Period or, if applicable, Purchase Period, in each case consistent with the limitations of the Plan. The Committee shall have the discretion to provide for the automatic termination of an Offering following any Purchase Date on which the Fair Market Value of a share of Stock is equal to or less than the Fair Market Value of a share of Stock on the Offering Date, and for the Participants in the terminated Offering to be automatically re-enrolled in a new Offering that commences immediately after such Purchase Date. The terms and conditions of each Offering need not be identical, and shall be deemed incorporated by reference and made a part of the Plan.

(b) <u>Enrollment</u>. Any individual who, on the day preceding the first day of an Offering Period, qualifies as an Eligible Employee may elect to become a Participant in the Plan for such Offering Period by completing the enrollment process prescribed and communicated for this purposes from time to time by the Company to Eligible Employees.

(c) <u>Duration of Participation</u>. Once enrolled in the Plan, a Participant shall continue to participate in the Plan until the Participant ceases to be an Eligible Employee or withdraws from the Plan under Section 6(a). A Participant who withdrew from the Plan under Section 6(a) may again become a Participant, if the Participant then is an Eligible Employee, by following the procedure described in Subsection (b) above. A Participant whose employee contributions were discontinued automatically under Section 9(b) shall automatically resume participation at the beginning of the earliest Offering Period ending in the next calendar year, if the Participant then is an Eligible Employee. When a Participant reaches the end of an Offering Period but the Participant's participation is to continue, then such Participant shall automatically be re-enrolled for the Offering Period that commences immediately after the end of the prior Offering Period.

SECTION 5 <u>Employee Contributions.</u>

(a) <u>Frequency of Payroll Deductions</u>. A Participant may purchase shares of Stock under the Plan solely by means of payroll deductions; provided, however, that to the extent provided in the terms and conditions of an Offering, a Participant may also make contributions through payment by cash or check prior to one or more Purchase Dates during the Offering. Payroll deductions, subject to the provisions of Subsection (b) below or as otherwise provided under the terms and conditions of an Offering, shall occur on each payday during participation in the Plan.

(b) <u>Amount of Payroll Deductions</u>. An Eligible Employee shall designate during the enrollment process the portion of Compensation that such Eligible Employee elects to have withheld for the purchase of Stock. Such portion shall be a whole percentage of the Eligible Employee's Compensation, but not less than 1% nor more than 15% (or such lower rate of Compensation specified as the limit in the terms and conditions of the applicable Offering).

(c) <u>Changing Withholding Rate</u>. Unless otherwise provided under the terms and conditions of an Offering, a Participant may not increase the rate of payroll withholding during the Offering Period, but may discontinue or decrease the rate of payroll withholding during the Offering Period to a whole percentage of the Participant's Compensation in accordance with such procedures and subject to such limitations as the Company may establish for all Participants. A Participant may also increase or decrease the rate of payroll withholding effective for a new Offering Period by submitting an authorization to change the payroll deduction rate pursuant to the process prescribed by the Company from time to time. The new withholding rate shall be a whole percentage of the Eligible Employee's Compensation consistent with Subsection (b) above.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-7

Exhibit 6
Page 1646

**Table of Contents**

(d) <u>Discontinuing Payroll Deductions</u>. If a Participant wishes to discontinue employee contributions entirely, the Participant may do so by withdrawing from the Plan pursuant to Section 6(a). In addition, employee contributions may be discontinued automatically pursuant to Section 9(b).

SECTION 6 <u>Withdrawal From The Plan.</u>

(a) <u>Withdrawal</u>. A Participant may elect to withdraw from the Plan by giving notice pursuant to the process prescribed and communicated by the Company from time to time. Such withdrawal may be elected at any time before the last day of an Offering Period, except as otherwise provided in the Offering. In addition, if payment by cash or check is permitted under the terms and conditions of an Offering, Participants may be deemed to withdraw from the Plan by declining or failing to remit timely payment to the Company for the shares of Stock. As soon as reasonably practicable thereafter, payroll deductions shall cease and the entire amount credited to the Participant's Plan Account shall be refunded to the Participant in cash, without interest. No partial withdrawals shall be permitted.

(b) <u>Re-enrollment After Withdrawal</u>. A former Participant who has withdrawn from the Plan shall not be a Participant until the Participant re-enrolls in the Plan under Section 4(b). Re-enrollment may be effective only at the commencement of an Offering Period.

SECTION 7 <u>Change In Employment Status</u>.

(a) <u>Termination of Employment</u>. Termination of employment as an Eligible Employee for any reason, including death, shall be treated as an automatic withdrawal from the Plan under Section 6(a). A transfer from one Participating Company to another shall not be treated as a termination of employment.

(b) <u>Leave of Absence</u>. For purposes of the Plan, employment shall not be deemed to terminate when the Participant goes on a military leave, a sick leave or another bona fide leave of absence, if the leave was approved by the Company in writing. Employment, however, shall be deemed to terminate three months after the Participant goes on a leave, unless a contract or statute guarantees the Participant's right to return to work. Employment shall be deemed to terminate in any event when the approved leave ends, unless the Participant immediately returns to work.

(c) <u>Death</u>. In the event of the Participant's death, the amount credited to the Participant's Plan Account shall be paid to the Participant's estate.

SECTION 8 <u>Plan Accounts and Purchase Of Shares</u>.

(a) <u>Plan Accounts</u>. The Company shall maintain a Plan Account on its books in the name of each Participant. Whenever an amount is deducted from the Participant's Compensation under the Plan, such amount shall be credited to the Participant's Plan Account. Amounts credited to Plan Accounts shall not be trust funds and may be commingled with the Company's general assets and applied to general corporate purposes. No interest shall be credited to Plan Accounts.

(b) <u>Purchase Price</u>. The Purchase Price for each share of Stock purchased during an Offering Period shall be the lesser of:

(i) 85% of the Fair Market Value of such share on the Purchase Date; or

(ii) 85% of the Fair Market Value of such share on the Offering Date.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-8

Exhibit 6
Page 1647

Table of Contents

The Committee may specify an alternate Purchase Price amount or formula in the terms and conditions of an Offering, but in no event may such amount or formula result in a Purchase Price less than that calculated pursuant to the immediately preceding formula.

(c) <u>Number of Shares Purchased</u>. As of each Purchase Date, each Participant shall be deemed to have elected to purchase the number of shares of Stock calculated in accordance with this Subsection (c), unless the Participant has previously elected to withdraw from the Plan in accordance with Section 6(a). The amount then in the Participant's Plan Account shall be divided by the Purchase Price, and the number of shares that results shall be purchased from the Company with the funds in the Participant's Plan Account. Unless provided otherwise by the Committee prior to commencement of an Offering, the maximum number of shares of Stock which may be purchased by an individual Participant during such Offering is 5,000 shares. The foregoing notwithstanding, no Participant shall purchase more than such number of shares of Stock as may be determined by the Committee with respect to the Offering Period, or Purchase Period, if applicable, nor more than the amounts of Stock set forth in Sections 9(b) and 14(a). For each Offering Period and, if applicable, Purchase Period, the Committee shall have the authority to establish additional limits on the number of shares purchasable by all Participants in the aggregate.

(d) <u>Available Shares Insufficient</u>. In the event that the aggregate number of shares that all Participants elect to purchase during an Offering Period exceeds the maximum number of shares remaining available for issuance under Section 14(a), or which may be purchased pursuant to any additional aggregate limits imposed by the Committee, then the number of shares to which each Participant is entitled shall be determined by multiplying the number of shares available for issuance by a fraction, the numerator of which is the number of shares that such Participant has elected to purchase and the denominator of which is the number of shares that all Participants have elected to purchase.

(e) <u>Issuance of Stock</u>. Certificates representing the shares of Stock purchased by a Participant under the Plan shall be issued to the Participant as soon as reasonably practicable after the applicable Purchase Date, except that the Company may determine that such shares shall be held for each Participant's benefit by a broker designated by the Company. Shares may be registered in the name of the Participant or jointly in the name of the Participant and the Participant's spouse as joint tenants with right of survivorship or as community property.

(f) <u>Unused Cash Balances</u>. An amount remaining in the Participant's Plan Account that represents the Purchase Price for any fractional share may be carried over in the Participant's Plan Account to the next Purchase Period or Offering Period or refunded to the Participant in cash at the end of the Purchase Period or Offering Period, without interest, if the Participant's participation is not continued. Any amount remaining in the Participant's Plan Account that represents the Purchase Price for whole shares that could not be purchased by reason of Subsection (c) or (d) above, Section 9(b) or Section 14(a) shall be refunded to the Participant in cash, without interest.

(g) <u>Stockholder Approval</u>. The Plan shall be submitted to the stockholders of the Company for their approval within twelve (12) months after the date the Plan is adopted by the Board. Any other provision of the Plan notwithstanding, no shares of Stock shall be purchased under the Plan unless and until the Company's stockholders have approved the adoption of the Plan.

SECTION 9 <u>Limitations On Stock Ownership.</u>

(a) <u>Five Percent Limit</u>. Any other provision of the Plan notwithstanding, no Participant shall be granted a right to purchase Stock under the Plan if such Participant, immediately after the Participant's election to purchase such Stock, would own stock possessing 5% or more of the total combined voting power or value of all classes of

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-9

Exhibit 6
Page 1648

Table of Contents

stock of the Company or any parent or Subsidiary of the Company. For purposes of this Subsection (a), the following rules shall apply:

(i) Ownership of stock shall be determined after applying the attribution rules of section 424(d) of the Code;

(ii) Each Participant shall be deemed to own any stock that the Participant has a right or option to purchase under this or any other plan; and

(iii) Each Participant shall be deemed to have the right to purchase up to the maximum number of shares of Stock that may be purchased by a Participant under this Plan under the individual limit specified pursuant to Section 8(c) with respect to each Offering Period.

(b) Dollar Limit. Any other provision of the Plan notwithstanding, no Participant shall accrue the right to purchase Stock at a rate which exceeds $25,000 of Fair Market Value of such Stock per calendar year (under this Plan and all other employee stock purchase plans of the Company or any parent or Subsidiary of the Company), determined in accordance with the provisions of section 423(b)(8) of the Code and applicable Treasury Regulations promulgated thereunder.

For purposes of this Subsection (b), the Fair Market Value of Stock shall be determined as of the beginning of the Offering Period in which such Stock is purchased. Employee stock purchase plans not described in section 423 of the Code shall be disregarded. If a Participant is precluded by this Subsection (b) from purchasing additional Stock under the Plan, then the Participant's employee contributions may automatically be discontinued.

SECTION 10 Rights Not Transferable.

The rights of any Participant under the Plan, or any Participant's interest in any Stock or moneys to which the Participant may be entitled under the Plan, shall not be transferable by voluntary or involuntary assignment or by operation of law, or in any other manner other than by the laws of descent and distribution. If a Participant in any manner attempts to transfer, assign or otherwise encumber the Participant's rights or interest under the Plan, other than by the laws of descent and distribution, then such act shall be treated as an election by the Participant to withdraw from the Plan under Section 6(a).

SECTION 11 No Rights As An Employee.

Nothing in the Plan or in any right granted under the Plan shall confer upon the Participant any right to continue in the employ of a Participating Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Participating Companies or of the Participant, which rights are hereby expressly reserved by each, to terminate the Participant's at-will employment at any time and for any reason, with or without cause.

SECTION 12 No Rights As A Stockholder.

A Participant shall have no rights as a stockholder with respect to any shares of Stock that the Participant may have a right to purchase under the Plan until such shares have been purchased on the applicable Purchase Date.

SECTION 13 Securities Law Requirements.

Shares of Stock shall not be issued under the Plan unless the issuance and delivery of such shares comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Securities Act of

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-10

Exhibit 6
Page 1649

Table of Contents

1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded.

SECTION 14 Stock Offered Under The Plan.

(a) Authorized Shares. The maximum aggregate number of shares of Stock available for purchase under the Plan is 1,526,239 shares plus an annual increase to be added on the first day of each of the Company's fiscal years for a period of up to ten years, beginning with the fiscal year that begins January 1, 2022, equal to the least of (i) one percent (1%) of the outstanding shares of Stock on such date, (ii) 7,631,196 shares, or (iii) a lesser amount determined by the Committee or Board. The aggregate number of shares available for purchase under the Plan (and the limit in clause (ii) to the annual increase thereto) shall at all times be subject to adjustment pursuant to Section 14(b).

(b) Antidilution Adjustments. The aggregate number of shares of Stock offered under the Plan, the individual and aggregate Participant share limitations described in Section 8(c) and the price of shares that any Participant has elected to purchase shall be adjusted proportionately by the Committee in the event of any change in the number of issued shares of Stock (or issuance of shares other than Common Stock) by reason of any forward or reverse share split, subdivision or consolidation, or share dividend or bonus issue, recapitalization, reclassification, merger, amalgamation, consolidation, split-up, spin-off, reorganization, combination, exchange of shares of Stock, the issuance of warrants or other rights to purchase shares of Stock or other securities, or any other change in corporate structure or in the event of any extraordinary distribution (whether in the form of cash, shares of Stock, other securities or other property), in any case, in a manner that complies with Section 423 of the Code.

(c) Reorganizations. Any other provision of the Plan notwithstanding, in the event of a Corporate Reorganization in which the Plan is not assumed by the surviving corporation or its parent corporation pursuant to the applicable plan of merger or consolidation, the Offering Period then in progress shall terminate immediately prior to the effective time of such Corporate Reorganization and either shares shall be purchased pursuant to Section 8 or, if so determined by the Board or Committee, all amounts in all Participant Accounts shall be refunded pursuant to Section 15 without any purchase of shares. The Plan shall in no event be construed to restrict in any way the Company's right to undertake a dissolution, liquidation, merger, consolidation or other reorganization.

SECTION 15 Amendment Or Discontinuance.

The Board or Committee shall have the right to amend, suspend or terminate the Plan at any time and without notice; *provided*, *however*, that any amendment that would be treated as the adoption of a new plan for purposes of Section 423 of the Code will have no force or effect unless approved by the shareholders of the Company within twelve (12) months before or after its adoption. Upon any such amendment, suspension or termination of the Plan during an Offering Period, the Board or Committee may in its discretion determine that the applicable Offering shall immediately terminate and that all amounts in the Participant Accounts shall be carried forward into a payroll deduction account for each Participant under a successor plan, if any, or promptly refunded to each Participant. Except as provided in Section 14, any increase in the aggregate number of shares of Stock to be issued under the Plan shall be subject to approval by a vote of the stockholders of the Company. In addition, any other amendment of the Plan shall be subject to approval by a vote of the stockholders of the Company to the extent required by an applicable law or regulation. This Plan shall continue until the earlier to occur of (a) termination of this Plan pursuant to this Section 15 or (b) issuance of all of the shares of Stock reserved for issuance under this Plan.

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-11

Exhibit 6
Page 1650

**Table of Contents**

SECTION 16 Limitation on Liability.

Notwithstanding anything to the contrary in the Plan, neither the Company, nor any of its Subsidiaries, nor the Committee, nor any person acting on behalf of the Company, any of its Subsidiaries, or the Committee, will be liable to any Participant, to any permitted transferee, to the estate or beneficiary of any Participant or any permitted transferee, or to any other person by reason of any acceleration of income, any additional tax, or any penalty, interest or other liability asserted by reason of the failure of the Plan or any option to purchase Stock to satisfy the requirements of Section 423, or otherwise asserted with respect to the Plan or any option to purchase Stock.

SECTION 17 Unfunded Plan.

The Company's obligations under the Plan are unfunded, and no Participant will have any right to specific assets of the Company in respect of any option to purchase Stock. Participants will be general unsecured creditors of the Company with respect to any amounts due or payable under the Plan.

SECTION 18 Governing Law

The Plan shall be governed by the laws of the state of California, without application of the conflicts of law principles thereof.

SECTION 19 Execution.

To record the adoption of the Plan by the Board, the Company has caused its authorized officer to execute the same.

ROCKLEY PHOTONICS HOLDINGS LIMITED

By: _____
Name:
Title:

Date:

ROCKLEY PHOTONICS HOLDINGS LIMITED
2021 EMPLOYEE STOCK PURCHASE PLAN

I-12

Exhibit 6
Page 1651

Table of Contents

**ANNEX J**

**THE COMPANIES ACT (REVISED)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

**OF**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

Registered Office:
c/o International Corporation Services Ltd.
P.O. Box 472
Harbour Place, 2nd Floor
103 South Church Street
George Town
Grand Cayman KY1-1106
Cayman Islands

Exhibit 6
Page 1652

Table of Contents

THE COMPANIES ACT (REVISED)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

ROCKLEY PHOTONICS HOLDINGS LIMITED

1      The name of the Company is Rockley Photonics Holdings Limited.

2      The registered office of the Company shall be at the offices of International Corporation Services Ltd., P.O. Box 472, Harbour Place, 2nd Floor, 103 South Church Street, George Town, Grand Cayman KY1-1106, Cayman Islands, or at such other place as the Directors may from time to time decide.

3      The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Companies Act (Revised) as the same may be revised from time to time, or any other law of the Cayman Islands.

4      The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

5      The share capital of the Company is US$50,000 divided into 5,000,000,000 shares of a par value of US$0.00001 each.

6      The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7      Capitalised terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.

WE, the subscriber to this Memorandum of Association, wish to be formed into a company pursuant to this Memorandum of Association, and we agree to take the number of shares shown opposite our name.

Dated this 11th day of March 2021.

| Name | Address and Description of Subscriber | Number of Shares taken by Subscriber |
|---|---|---|
| International Corporation Services Ltd. | P.O. Box 472, Harbour Place, 2nd Floor, 103 South Church Street, George Town, Grand Cayman KY1-1106, Cayman Islands | One share |

Per:  /s/ Darryl Myers
        Darryl Myers
        Director

WITNESS to the above signature

/s/ Jordan McLauchlan
Jordan McLauchlan

Exhibit 6
Page 1653

Table of Contents

**THE COMPANIES ACT (REVISED)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

**Registered Office:**
**c/o International Corporation Services Ltd.**
**P.O. Box 472**
**Harbour Place, 2nd Floor**
**South Church Street**
**George Town**
**Grand Cayman KY1-1106**
**Cayman Islands**

Exhibit 6
Page 1654

**Table of Contents**

**THE COMPANIES ACT (REVISED)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

1. INTERPRETATION

1.1    In these Articles Table A in the First Schedule to the Statute does not apply and, unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Articles**" | means these articles of association of the Company. |
| "**Auditor**" | means the person for the time being performing the duties of auditor of the Company (if any). |
| "**Company**" | means the above named company. |
| "**Directors**" | means the directors for the time being of the Company. |
| "**Dividend**" | includes an interim dividend. |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Act (Revised) of the Cayman Islands, as may be amended from time to time. |
| "**Member**" | has the same meaning as in the Statute. |
| "**Memorandum**" | means the memorandum of association of the Company. |
| "**Ordinary Resolution**" | means a resolution passed by a simple majority of the Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. In computing the majority when a poll is demanded regard shall be had to the number of votes to which each Member is entitled by the Articles. |
| "**Register of Members**" | means the register maintained in accordance with the Statute and includes (except where otherwise stated) any duplicate Register of Members. |
| "**Registered Office**" | means the registered office for the time being of the Company. |
| "**Seal**" | means the common seal of the Company and includes every duplicate seal. |
| "**Share**" and "**Shares**" | means a share or shares in the Company and includes a fraction of a share. |
| "**Special Resolution**" | has the same meaning as in the Statute, and includes a unanimous written resolution. |
| "**Statute**" | means the Companies Act (Revised) of the Cayman Islands, as may be amended from time to time. |
| "**Treasury Share**" | means a Share held in the name of the Company as a treasury share in accordance with the Statute. |

1.2    In the Articles:

(a)    words importing the singular number include the plural number and vice versa;

Exhibit 6
Page 1655

**Table of Contents**

(b)      words importing the masculine gender include the feminine gender;

(c)      words importing persons include corporations;

(d)      "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)      references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(f)      any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(g)      headings are inserted for reference only and shall be ignored in construing these Articles; and

(h)      in these Articles Section 8 of the Electronic Transactions Act (Revised) of the Cayman Islands shall not apply.

2.    **COMMENCEMENT OF BUSINESS**

2.1    The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2    The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and establishment of the Company, including the expenses of registration.

3.    **ISSUE OF SHARES**

3.1    Subject to the provisions, if any, in the Memorandum (and to any direction that may be given by the Company in general meeting) and without prejudice to any rights attached to any existing Shares, the Directors may allot, issue, grant options over or otherwise dispose of Shares (including fractions of a Share) with or without preferred, deferred or other rights or restrictions, whether in regard to Dividend, voting, return of capital or otherwise and to such persons, at such times and on such other terms as they think proper.

3.2    The Company shall not issue shares to bearer. The Company may hold Treasury Shares.

4.    **REGISTER OF MEMBERS**

The Company shall maintain or cause to be maintained the Register of Members in accordance with the Statute.

5.    **CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE**

5.1    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any Dividend, or in order to make a determination of Members for any other purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed forty days. If the Register of Members shall be closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members the Register of Members shall be closed for at least ten days immediately preceding the meeting.

5.2    In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any Dividend or in order to make a determination of Members for any other purpose.

5.3    If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a Dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such Dividend is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

Exhibit 6
Page 1656

Table of Contents

6.     **CERTIFICATES FOR SHARES**

6.1     A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine. Share certificates shall be signed by one or more Directors or other person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process. All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate. All certificates surrendered to the Company for transfer shall be cancelled and subject to these Articles no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

6.2     The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

6.3     If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) upon delivery of the old certificate.

7.     **TRANSFER OF SHARES**

7.1     Shares are transferable subject to the consent of the Directors who may, in their absolute discretion, decline to register any transfer of Shares without giving any reason. If the Directors refuse to register a transfer they shall notify the transferee within two months of such refusal.

7.2     The instrument of transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and if the Directors so require, signed by the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

8.     **REDEMPTION AND REPURCHASE OF SHARES**

8.1     Subject to the provisions of the Statute the Company may issue Shares that are to be redeemed or are liable to be redeemed at the option of the Member or the Company.

8.2     Subject to the provisions of the Statute, the Company may redeem its own Shares or purchase its own Shares (including any redeemable Shares) provided that the Members shall have approved the manner and terms of the redemption or purchase by Ordinary Resolution or as determined by a resolution of the Directors.

8.3     The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

9.     **TREASURY SHARES**

9.1     The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

9.2     The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

10.     **VARIATION OF RIGHTS OF SHARES**

10.1     If at any time the share capital of the Company is divided into different classes of Shares, the rights attached to any class (unless otherwise provided by the terms of issue of the Shares of that class) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-quarters of the issued Shares of that class, or with the sanction of a Special Resolution passed at a general meeting of the holders of the Shares of that class.

10.2     The provisions of these Articles relating to general meetings shall apply to every class meeting of the holders of one class of Shares except that the necessary quorum shall be one person holding or representing by proxy at least one third of the issued Shares of the class and that any holder of Shares of the class present in person or by proxy may demand a poll.

Exhibit 6
Page 1657

**Table of Contents**

10.3    The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the Shares of that class, be deemed to be varied by the creation or issue of further Shares ranking pari passu therewith.

11.    **COMMISSION ON SALE OF SHARES**

The Company may, in so far as the Statute permits, pay a commission to any person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares of the Company. Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Shares. The Company may also on any issue of Shares pay such brokerage as may be lawful.

12.    **NON RECOGNITION OF TRUSTS**

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

13.    **LIEN ON SHARES**

13.1    The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or his estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article. The registration of a transfer of any such Share shall operate as a waiver of the Company's lien thereon. The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

13.2    The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

13.3    To give effect to any such sale the Directors may authorise any person to execute an instrument of transfer of the Shares sold to, or in accordance with the directions of, the purchaser. The purchaser or his nominee shall be registered as the holder of the Shares comprised in any such transfer, and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

13.4    The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any residue shall (subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

14.    **CALL ON SHARES**

14.1    Subject to the terms of the allotment the Directors may from time to time make calls upon the Members in respect of any monies unpaid on their Shares (whether in respect of par value or premium), and each Member shall (subject to receiving at least fourteen days notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on the Shares. A call may be revoked or postponed as the Directors may determine. A call may be required to be paid by instalments. A person upon whom a call is made shall remain liable for calls made upon him notwithstanding the subsequent transfer of the Shares in respect of which the call was made.

14.2    A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

14.3    The joint holders of a Share shall be jointly and severally liable to pay all calls in respect thereof.

Exhibit 6
Page 1658

**Table of Contents**

14.4   If a call remains unpaid after it has become due and payable, the person from whom it is due shall pay interest on the amount unpaid from the day it became due and payable until it is paid at such rate as the Directors may determine, but the Directors may waive payment of the interest wholly or in part.

14.5   An amount payable in respect of a Share on allotment or at any fixed date, whether on account of the par value of the Share or premium or otherwise, shall be deemed to be a call and if it is not paid all the provisions of these Articles shall apply as if that amount had become due and payable by virtue of a call.

14.6   The Directors may issue Shares with different terms as to the amount and times of payment of calls, or the interest to be paid.

14.7   The Directors may, if they think fit, receive an amount from any Member willing to advance all or any part of the monies uncalled and unpaid upon any Shares held by him, and may (until the amount would otherwise become payable) pay interest at such rate as may be agreed upon between the Directors and the Member paying such amount in advance.

14.8   No such amount paid in advance of calls shall entitle the Member paying such amount to any portion of a Dividend declared in respect of any period prior to the date upon which such amount would, but for such payment, become payable.

15.   **FORFEITURE OF SHARES**

15.1   If a call remains unpaid after it has become due and payable the Directors may give to the person from whom it is due not less than fourteen clear days notice requiring payment of the amount unpaid together with any interest, which may have accrued. The notice shall specify where payment is to be made and shall state that if the notice is not complied with the Shares in respect of which the call was made will be liable to be forfeited.

15.2   If the notice is not complied with any Share in respect of which it was given may, before the payment required by the notice has been made, be forfeited by a resolution of the Directors. Such forfeiture shall include all Dividends or other monies declared payable in respect of the forfeited Share and not paid before the forfeiture.

15.3   A forfeited Share may be sold, re-allotted or otherwise disposed of on such terms and in such manner as the Directors think fit and at any time before a sale, re-allotment or disposition the forfeiture may be cancelled on such terms as the Directors think fit. Where for the purposes of its disposal a forfeited Share is to be transferred to any person the Directors may authorise some person to execute an instrument of transfer of the Share in favour of that person.

15.4   A person any of whose Shares have been forfeited shall cease to be a Member in respect of them and shall surrender to the Company for cancellation the certificate for the Shares forfeited and shall remain liable to pay to the Company all monies which at the date of forfeiture were payable by him to the Company in respect of those Shares together with interest, but his liability shall cease if and when the Company shall have received payment in full of all monies due and payable by him in respect of those Shares.

15.5   A certificate in writing under the hand of one Director or officer of the Company that a Share has been forfeited on a specified date shall be conclusive evidence of the fact as against all persons claiming to be entitled to the Share. The certificate shall (subject to the execution of an instrument of transfer) constitute a good title to the Share and the person to whom the Share is disposed of shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the Share.

15.6   The provisions of these Articles as to forfeiture shall apply in the case of non payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the par value of the Share or by way of premium as if it had been payable by virtue of a call duly made and notified.

16.   **TRANSMISSION OF SHARES**

16.1   If a Member dies the survivor or survivors where he was a joint holder or his legal personal representatives where he was a sole holder, shall be the only persons recognised by the Company as having any title to his

Exhibit 6
Page 1659

**Table of Contents**

interest. The estate of a deceased Member is not thereby released from any liability in respect of any Share, which had been jointly held by him.

16.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy or liquidation or dissolution of a Member (or in any other way than by transfer) may, upon such evidence being produced as may from time to time be required by the Directors, elect, by a notice in writing sent by him, either to become the holder of such Share or to have some person nominated by him become the holder of such Share but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution, as the case may be.

16.3    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of a Member (or in any other case than by transfer) shall be entitled to the same Dividends and other advantages to which he would be entitled if he were the registered holder of such Share. However, he shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all Dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

17.    **AMENDMENTS OF MEMORANDUM AND ARTICLES OF ASSOCIATION AND ALTERATION OF CAPITAL**

17.1    The Company may by Ordinary Resolution:

(a)    increase the share capital by such sum as the resolution shall prescribe and with such rights, priorities and privileges annexed thereto, as the Company in general meeting may determine;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)    by subdivision of its existing Shares or any of them divide the whole or any part of its Share capital into Shares of smaller amount than is fixed by the Memorandum or into Shares without par value; and

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

17.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of the Articles with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the Shares in the original share capital.

17.3    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution, the Company may by Special Resolution:

(a)    change its name;

(b)    alter or add to these Articles;

(c)    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)    reduce its share capital and any capital redemption reserve fund.

18.    **REGISTERED OFFICE**

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.

Exhibit 6
Page 1660

Table of Contents

19.    **GENERAL MEETINGS**

19.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.

19.2    The Company shall, if required by the Statute, in each year hold a general meeting as its annual general meeting, and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as the Directors shall appoint and if no other time and place is prescribed by them, it shall be held at the Registered Office on the second Wednesday in December of each year at ten o'clock in the morning. At these meetings the report of the Directors (if any) shall be presented.

19.3    The Company may hold an annual general meeting, but shall not (unless required by Statute) be obliged to hold an annual general meeting.

19.4    The Directors may call general meetings, and they shall on a Members requisition forthwith proceed to convene an extraordinary general meeting of the Company.

19.5    A Members requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than ten per cent. in par value of the capital of the Company as at that date carries the right of voting at general meetings of the Company.

19.6    The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more requisitionists.

19.7    If the Directors do not within twenty-one days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further twenty- one days, the requisitionists, or any of them representing more than one-half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the said twenty-one days.

19.8    A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

20.    **NOTICE OF GENERAL MEETINGS**

20.1    At least five days' notice shall be given of any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this regulation has been given and whether or not the provisions of the Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

    (a)    in the case of an annual general meeting, by all the Members (or their proxies) entitled to attend and vote thereat; and

    (b)    in the case of an extraordinary general meeting, by a majority in number of the Members (or their proxies) having a right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent in par value of the Shares giving that right.

20.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings of that meeting.

21.    **PROCEEDINGS AT GENERAL MEETINGS**

21.1    No business shall be transacted at any general meeting unless a quorum is present. Two Members being individuals present in person or by proxy or if a corporation or other non-natural person by its duly authorised representative or proxy shall be a quorum unless the Company has only one Member entitled to vote at such general meeting in which case the quorum shall be that one Member present in person or by proxy or (in the case of a corporation or other non-natural person) by a duly authorised representative or proxy.

Exhibit 6
Page 1661

Table of Contents

21.2    A person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

21.3    A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

21.4    If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

21.5    The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if he shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

21.6    If no Director is willing to act as chairman or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

21.7    The chairman may, with the consent of a meeting at which a quorum is present, (and shall if so directed by the meeting), adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

21.8    A resolution put to the vote of the meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman demands a poll, or any other Member or Members collectively present in person or by proxy and holding at least ten per cent. in par value of the Shares giving a right to attend and vote at the meeting demand a poll.

21.9    Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

21.10   The demand for a poll may be withdrawn.

21.11   Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

21.12   A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

21.13   In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall be entitled to a second or casting vote.

Exhibit 6
Page 1662

Table of Contents

22. **VOTES OF MEMBERS**

22.1    Subject to any rights or restrictions attached to any Shares, on a show of hands every Member who (being an individual) is present in person or by proxy or, if a corporation or other non-natural person is present by its duly authorised representative or proxy, shall have one vote and on a poll every Member shall have one vote for every Share of which he is the holder.

22.2    In the case of joint holders of record the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders, and seniority shall be determined by the order in which the names of the holders stand in the Register of Members.

22.3    A Member of unsound mind, or in respect of whom an order has been made by any court, having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, curator bonis, or other person on such Member's behalf appointed by that court, and any such committee, receiver, curator bonis or other person may vote by proxy.

22.4    No person shall be entitled to vote at any general meeting or at any separate meeting of the holders of a class of Shares unless he is registered as a Member on the record date for such meeting nor unless all calls or other monies then payable by him in respect of Shares have been paid.

22.5    No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is given or tendered and every vote not disallowed at the meeting shall be valid. Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

22.6    On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

22.7    A Member holding more than one Share need not cast the votes in respect of his Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing him, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which he is appointed either for or against a resolution and/or abstain from voting.

23. **PROXIES**

23.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of his attorney duly authorised in writing, or, if the appointor is a corporation under the hand of an officer or attorney duly authorised for that purpose. A proxy need not be a Member of the Company.

23.2    The instrument appointing a proxy shall be deposited at the Registered Office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company:

(a)    not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

(b)    in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

(c)    where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any director; provided that the Directors may in the notice convening the meeting, or in an instrument of proxy sent out by the Company, direct that the instrument appointing a proxy may be deposited (no later than the time for holding the meeting or adjourned meeting) at the Registered Office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company. The chairman may in any event at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted shall be invalid.

Exhibit 6
Page 1663

Table of Contents

23.3    The instrument appointing a proxy may be in any usual or common form and may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked. An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

23.4    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

24.    **CORPORATE MEMBERS**

Any corporation or other non-natural person which is a Member may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual Member.

25.    **SHARES THAT MAY NOT BE VOTED**

Shares in the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

26.    **DIRECTORS**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors. The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the subscriber(s) to the Memorandum.

27.    **POWERS OF DIRECTORS**

27.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company. No alteration of the Memorandum or Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given. A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

27.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

27.3    The Directors on behalf of the Company may pay a gratuity or pension or allowance on retirement to any Director who has held any other salaried office or place of profit with the Company or to his widow or dependants and may make contributions to any fund and pay premiums for the purchase or provision of any such gratuity, pension or allowance.

27.4    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

28.    **APPOINTMENT AND REMOVAL OF DIRECTORS**

28.1    The Company may by Ordinary Resolution appoint any person to be a Director or may by Ordinary Resolution remove any Director.

Exhibit 6
Page 1664

**Table of Contents**

28.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with the Articles as the maximum number of Directors.

29.    **VACATION OF OFFICE OF DIRECTOR**

The office of a Director shall be vacated if:

(a)    he gives notice in writing to the Company that he resigns the office of Director; or

(b)    if he absents himself (without being represented by proxy or an alternate Director appointed by him) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that he has by reason of such absence vacated office; or

(c)    if he dies, becomes bankrupt or makes any arrangement or composition with his creditors generally; or

(d)    if he is found to be or becomes of unsound mind; or

(e)    if all the other Directors of the Company (being not less than two in number) resolve that he should be removed as a Director.

30.    **PROCEEDINGS OF DIRECTORS**

30.1    The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director. A person who holds office as an alternate Director shall, if his appointor is not present, be counted in the quorum. A Director who also acts as an alternate Director shall, if his appointor is not present, count twice towards the quorum.

30.2    Subject to the provisions of the Articles, the Directors may regulate their proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In the case of an equality of votes, the chairman shall have a second or casting vote. A Director who is also an alternate Director shall be entitled in the absence of his appointor to a separate vote on behalf of his appointor in addition to his own vote.

30.3    A person may participate in a meeting of the Directors or committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting. Unless otherwise determined by the Directors the meeting shall be deemed to be held at the place where the chairman is at the start of the meeting.

30.4    A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of his appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

30.5    A Director or alternate Director may, or other officer of the Company on the requisition of a Director or alternate Director shall, call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

30.6    The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

30.7    The Directors may elect a chairman of their board and determine the period for which he is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

Exhibit 6
Page 1665

**Table of Contents**

30.8    All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

30.9    A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by him. The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

31.    **PRESUMPTION OF ASSENT**

A Director of the Company who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the chairman or secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

32.    **DIRECTORS' INTERESTS**

32.1    A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

32.2    A Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director or alternate Director.

32.3    A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

32.4    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relation thereby established. A Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon.

32.5    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

33.    **MINUTES**

The Directors shall cause minutes to be made in books kept for the purpose of all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

34.    **DELEGATION OF DIRECTORS' POWERS**

34.1    The Directors may delegate any of their powers to any committee consisting of one or more Directors. They may also delegate to any managing director or any Director holding any other executive office such

Exhibit 6
Page 1666

**Table of Contents**

of their powers as they consider desirable to be exercised by him provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if he ceases to be a Director. Any such delegation may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers and may be revoked or altered. Subject to any such conditions, the proceedings of a committee of Directors shall be governed by the Articles regulating the proceedings of Directors, so far as they are capable of applying.

34.2    The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards. Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers and may be revoked or altered. Subject to any such conditions, the proceedings of a committee of Directors shall be governed by the Articles regulating the proceedings of Directors, so far as they are capable of applying.

34.3    The Directors may by power of attorney or otherwise appoint any person to be the agent of the Company on such conditions as the Directors may determine, provided that the delegation is not to the exclusion of their own powers and may be revoked by the Directors at any time.

34.4    The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised signatory to delegate all or any of the powers, authorities and discretions vested in him.

34.5    The Directors may appoint such officers as they consider necessary on such terms, at such remuneration and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit. Unless otherwise specified in the terms of his appointment an officer may be removed by resolution of the Directors or Members.

35.    **ALTERNATE DIRECTORS**

35.1    Any Director (other than an alternate Director) may by writing appoint any other Director, or any other person willing to act, to be an alternate Director and by writing may remove from office an alternate Director so appointed by him.

35.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of all meetings of committees of Directors of which his appointor is a member, to attend and vote at every such meeting at which the Director appointing him is not personally present, and generally to perform all the functions of his appointor as a Director in his absence.

35.3    An alternate Director shall cease to be an alternate Director if his appointor ceases to be a Director.

35.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

35.5    An alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for his own acts and defaults and shall not be deemed to be the agent of the Director appointing him.

36.    **NO MINIMUM SHAREHOLDING**

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director is not required to hold Shares.

37.    **REMUNERATION OF DIRECTORS**

37.1    The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine. The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors,

Exhibit 6
Page 1667

**Table of Contents**

or general meetings of the Company, or separate meetings of the holders of any class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

37.2    The Directors may by resolution approve additional remuneration to any Director for any services other than his ordinary routine work as a Director. Any fees paid to a Director who is also counsel or solicitor to the Company, or otherwise serves it in a professional capacity shall be in addition to his remuneration as a Director.

38.    **SEAL**

38.1    The Company may, if the Directors so determine, have a Seal. The Seal shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors. Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person appointed by the Directors for the purpose.

38.2    The Company may have for use in any place or places outside the Cayman Islands a duplicate Seal or Seals each of which shall be a facsimile of the common Seal of the Company and, if the Directors so determine, with the addition on its face of the name of every place where it is to be used.

38.3    A Director or officer, representative or attorney of the Company may without further authority of the Directors affix the Seal over his signature alone to any document of the Company required to be authenticated by him under seal or to be filed with the Registrar of Companies in the Cayman Islands or elsewhere wheresoever.

39.    **DIVIDENDS, DISTRIBUTIONS AND RESERVE**

39.1    Subject to the Statute and this Article, the Directors may declare Dividends and distributions on Shares in issue and authorise payment of the Dividends or distributions out of the funds of the Company lawfully available therefor. No Dividend or distribution shall be paid except out of the realised or unrealised profits of the Company or out of the share premium account or as otherwise permitted by the Statute.

39.2    Except as otherwise provided by the rights attached to Shares, all Dividends shall be declared and paid according to the par value of the Shares that a Member holds. If any Share is issued on terms providing that it shall rank for Dividend as from a particular date, that Share shall rank for Dividend accordingly.

39.3    The Directors may deduct from any Dividend or distribution payable to any Member all sums of money (if any) then payable by him to the Company on account of calls or otherwise.

39.4    The Directors may declare that any Dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures, or securities of any other company or in any one or more of such ways and where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

39.5    Any Dividend, distribution, interest or other monies payable in cash in respect of Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct. Every such cheque or warrant shall be made payable to the order of the person to whom it is sent. Any one of two or more joint holders may give effectual receipts for any Dividends, bonuses, or other monies payable in respect of the Share held by them as joint holders.

39.6    No Dividend or distribution shall bear interest against the Company.

39.7    Any Dividend which cannot be paid to a Member and/or which remains unclaimed after six months from the date of the declaration of such Dividend may, in the discretion of the Directors, be paid into a separate

Exhibit 6
Page 1668

**Table of Contents**

account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the Dividend shall remain as a debt due to the Member. Any Dividend which remains unclaimed after a period of six years from the date of the declaration of such dividend shall be forfeited and shall revert to the Company.

40.    **CAPITALISATION**

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve fund) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of Dividend and to apply such sum on their behalf in paying up in full unissued Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter on behalf of all of the Members interested into an agreement with the Company providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

41.    **BOOKS OF ACCOUNT**

41.1    The Directors shall cause proper books of account to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions. The Company shall cause all books of account to be maintained for a minimum period of five years from the date on which they were prepared.

41.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute or authorised by the Directors or by the Company in general meeting.

41.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

42.    **AUDIT**

42.1    The Directors may appoint an Auditor of the Company who shall hold office until removed from office by a resolution of the Directors, and may fix his or their remuneration.

42.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

42.3    Auditors shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

43.    **NOTICES**

43.1    Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to him or to his address as shown in the Register of

Exhibit 6
Page 1669

Table of Contents

Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member). Any notice, if posted from one country to another, is to be sent airmail.

43.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays) following the day on which the notice was posted. Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted. Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

43.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

43.4    Notice of every general meeting shall be given in any manner hereinbefore authorised to every person shown as a Member in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of his being a legal personal representative or a trustee in bankruptcy of a Member of record where the Member of record but for his death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

44.    **WINDING UP**

44.1    If the Company shall be wound up and the assets available for distribution amongst the Members shall be insufficient to pay the whole of the share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the Members in proportion to the par value of the Shares held by them.

44.2    If in a winding up the assets available for distribution amongst the Members shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, the surplus shall be distributed amongst the Members in proportion to the par value of the Shares held by them at the commencements of the winding up subject to a deduction from those Shares in respect of which there are monies due, of all monies payable to the Company for unpaid calls or otherwise. This Article is without prejudice to the rights of the holders of Shares issued upon special terms and conditions.

44.3    If the Company shall be wound up the liquidator may, with the sanction of a Special Resolution of the Company and any other sanction required by the Statute, divide in kind amongst the Members the whole or any part of the assets of the Company (whether such assets shall consist of property of the same kind or not) and may for that purpose value any assets and determine how the division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Members as the liquidator, with the like sanction, shall think fit, but so that no Member shall be compelled to accept any asset upon which there is a liability.

45.    **INDEMNITY**

Subject in the Statute, every Director or officer of the Company shall be indemnified out of the assets of the Company against any liability incurred by him as a result of any act or failure to act in carrying out his

Exhibit 6
Page 1670

Table of Contents

functions other than such liability (if any) that he may incur by his own actual fraud or wilful default. No such Director or officer shall be liable to the Company for any loss or damage in carrying out his functions unless that liability arises through the actual fraud or wilful default of such Director or officer. References in this Article to actual fraud or wilful default mean a finding to such effect by a competent court in relation to the conduct of the relevant party.

46.    **FINANCIAL YEAR**

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

47.    **TRANSFER BY WAY OF CONTINUATION**

If the Company is exempted as defined in the Statute, it shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

48.    **MERGERS AND CONSOLIDATIONS**

The Company shall have the power to merge or consolidate with one or more other constituent companies (as defined in the Statute) upon such terms as the Directors may determine and (to the extent required by the Statute) with the approval of a Special Resolution.

Dated this 11th day of March 2021.

INTERNATIONAL CORPORATION SERVICES LTD.

Harbour Place, 2nd Floor, 103 South Church Street, PO Box 472, Grand Cayman KY1-1106

Per:  /s/ Darryl Myers
          Darryl Myers
          Director

WITNESS to the above signature

/s/ Jordan McLauchlan
Jordan McLauchlan

Exhibit 6
Page 1671

**Table of Contents**

**ANNEX K**

**FORM OF PROPOSED ORGANIZATIONAL DOCUMENTS**

**THE COMPANIES ACT (REVISED)**
**OF THE CAYMAN ISLANDS**
**COMPANY LIMITED BY SHARES**

**[    ] AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**[      ]**

(adopted by a Special Resolution passed on [           ] and effective [           ])

1    The name of the Company is [            ].

2    The registered office of the Company shall be at the offices of International Corporation Services Ltd., Harbour Place 2nd Floor, 103 South Church Street, P.O. Box 472, George Town, Grand Cayman KYI-1106, Cayman Islands, British West Indies or at such other place as the Directors may from time to time decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Companies Act (Revised) or as the same may be revised from time to time, or any other law of the Cayman Islands.

4    The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

5    The authorized share capital of the Company is US$50,000 divided into 5,000,000,000 shares of a nominal or par value of US$0.00001 each. The Company has the power to redeem or purchase any of its shares and to increase or reduce the said capital subject to the provisions of the Companies Act (Revised) and the Articles of Association and to issue any part of its capital, whether original, redeemed or increased with or without any preference, priority or special privilege or subject to any postponement of rights or to any conditions or restrictions and so that unless the conditions of issue shall otherwise expressly declare every issue of shares whether declared to be preference or otherwise shall be subject to the powers hereinbefore contained.

6    The Company has the power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalized terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.

K-1

Exhibit 6
Page 1672

Table of Contents

THE COMPANIES ACT (REVISED)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES

[   ] AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

[            ]

(adopted by a Special Resolution passed on [            ] and
effective [            ])

**INTERPRETATION**

1    In these Articles, Table A in the Schedule in the Companies Act does not apply and unless otherwise defined, the defined terms shall have the meanings assigned to them as follows:

| | |
|---|---|
| "**Articles**" | these Articles of Association of the Company as altered or added to, from time to time; |
| "**Board**" or "**Board of Directors**" | the board of Directors for the time being of the Company; |
| "**Business Day**" | a day (excluding Saturdays or Sundays), on which banks in London, United Kingdom, California, United States and New York, United States are open for general banking business throughout their normal business hours; |
| "**Chairman**" | the Chairman appointed pursuant to Article 78; |
| "**Commission**" | Securities and Exchange Commission of the United States of America or any other federal agency for the time being administering the Securities Act; |
| "**Companies Act**" | the Companies Act (Revised) of the Cayman Islands and any statutory amendment or re-enactment thereof. Where any provision of the Companies Act is referred to, the reference is to that provision as amended by any law for the time being in force; |
| "**Company**" | [            ], a Cayman Islands company limited by shares; |
| "**Company's Website**" | the website of the Company, the address or domain name of which has been notified to Members; |
| "**Designated Stock Exchange**" | The New York Stock Exchange or any other internationally recognized stock exchange where the Company's securities are traded; |
| "**Directors**" | the directors of the Company for the time being, or as the case may be, the Directors assembled as a Board or as a committee thereof; |
| "**electronic**" | the meaning given to it in the Electronic Transactions Act; |
| "**electronic communication**" | electronic posting to the Company's Website, transmission to any number, address or internet website or other electronic delivery methods as otherwise decided and approved by not less than two-thirds of the vote of the Board; |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Act; |

K-2

Exhibit 6
Page 1673

**Table of Contents**

| | |
|---|---|
| **"Electronic Transactions Act"** | the Electronic Transactions Act (Revised) of the Cayman Islands and any statutory amendment or re-enactment thereof. Where any provision of the Electronic Transactions Act is referred to, the reference is to that provision as amended by any law for the time being in force; |
| **"in writing"** | includes writing, printing, lithograph, photograph, type-writing and every other mode of representing words or figures in a legible and non-transitory form and, only where used in connection with a notice served by the Company on Members or other persons entitled to receive notices hereunder, shall also include a record maintained in an electronic medium which is accessible in visible form so as to be useable for subsequent reference; |
| **"Member"** | the meaning given to it in the Companies Act; |
| **"Memorandum of Association"** | the Memorandum of Association of the Company, as amended and re-stated from time to time; |
| **"month"** | calendar month; |
| **"Ordinary Resolution"** | a resolution: |
| | (a) passed by a simple majority of votes cast by such Members as, being entitled to do so, vote in person or, in the case of any Member being an organization, by its duly authorized representative or, where proxies are allowed, by proxy at a general meeting of the Company; or |
| | (b) approved in writing by all of the Members entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Members and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments if more than one, is executed; |
| **"paid up"** | paid up as to the par value and any premium payable in respect of the issue of any shares and includes credited as paid up; |
| **"Register of Members"** | the register to be kept by the Company in accordance with the Companies Act; |
| **"seal"** | the Common Seal of the Company (if adopted) including any facsimile thereof; |
| **"Securities Act"** | the Securities Act of 1933 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time; |
| **"share"** | any share in the capital of the Company and includes a fraction of a share; |
| **"signed"** | includes a signature or representation of a signature affixed by mechanical means or an electronic symbol or process attached to or logically associated with an electronic communication and executed or adopted by a person with the intent to sign the electronic communication; |
| **"Special Resolution"** | the meaning given to it in the Companies Act and includes a unanimous written resolution; |
| **"Statutes"** | the Companies Act and every other laws and regulations of the Cayman Islands for the time being in force concerning companies and affecting the Company; |
| **"Treasury Share"** | means a Share held in the name of the Company as a treasury share in accordance with the Companies Act; |
| **"year"** | calendar year. |

Exhibit 6
Page 1674

Table of Contents

2       In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender;

(c)     words importing persons only shall include companies or associations or bodies of persons, whether corporate or not;

(d)     "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)     "may" shall be construed as permissive and "shall" shall be construed as imperative;

(f)     a reference to a dollar or dollars (or $) is a reference to dollars of the United States;

(g)     references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced;

(h)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(i)     the term "and/or" is used herein to mean both "and" as well as "or." The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others. The term "or" shall not be interpreted to be exclusive and the term "and" shall not be interpreted to require the conjunctive (in each case, unless the context otherwise requires);

(j)     headings are inserted for reference only and shall be ignored in construing the Articles;

(k)     any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(l)     any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act;

(m)     Section 8 and 19(3) of the Electronic Transactions Act shall not reply;

(n)     the term "clear days" in relation to the period of a notice means that period excluding the day when the notice is received or deemed to be received and the day for which it is given or on which it is to take effect;

(o)     the term "holder" in relation to a Share means a person whose name is entered in the Register of Members as the holder of such Share.

3       Subject to the last two preceding Articles, any words defined in the Companies Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

<div align="center">**PRELIMINARY**</div>

4       The business of the Company may be conducted as the Directors see fit.

5       The registered office of the Company shall be at such address in the Cayman Islands as the Directors shall from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

<div align="center">**ISSUE OF SHARES**</div>

6       Subject to the provisions, if any, in the Memorandum of Association, these Articles and to any direction that may be given by the Company in a general meeting, the Directors may, in their absolute discretion and

<div align="center">K-4</div>

Exhibit 6
Page 1675

**Table of Contents**

without approval of the existing Members, issue shares, grant rights over existing shares or issue other securities in one or more series as they deem necessary and appropriate and determine designations, powers, preferences, privileges and other rights, including dividend rights, conversion rights, terms of redemption and liquidation preferences, any or all of which may be greater than the powers and rights associated with the shares held by existing Members, at such times and on such other terms as they think proper. The Company shall not issue shares in bearer form.

7    The Directors may provide, out of the unissued shares, for series of preferred shares. Before any preferred shares of any such series are issued, the Directors shall fix, by resolution or resolutions, the following provisions of the preferred shares thereof:

(a)    the designation of such series, the number of preferred shares to constitute such series and the subscription price thereof if different from the par value thereof;

(b)    whether the shares of such series shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(c)    the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of any other class or any other series of preferred shares;

(d)    whether the preferred shares of such series shall be subject to redemption by the Company, and, if so, the times, prices and other conditions of such redemption;

(e)    the amount or amounts payable upon preferred shares of such series upon, and the rights of the holders of such series in, a voluntary or involuntary liquidation, dissolution or winding up, or upon any distribution of the assets, of the Company;

(f)    whether the preferred shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the preferred shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

(g)    whether the preferred shares of such series shall be convertible into, or exchangeable for, shares of any other class or any other series of preferred shares or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

(h)    the limitations and restrictions, if any, to be effective while any preferred shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Company of, the existing shares or shares of any other class of shares or any other series of preferred shares;

(i)    the conditions or restrictions, if any, upon the creation of indebtedness of the Company or upon the issue of any additional shares, including additional shares of such series or of any other class of shares or any other series of preferred shares; and

(j)    any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof.

Without limiting the foregoing and subject to Article 78, the voting powers of any series of preferred shares may include the right, in the circumstances specified in the resolution or resolutions providing for the issuance of such preferred shares, to elect one or more Directors who shall serve for such term and have such voting powers as shall be stated in the resolution or resolutions providing for the issuance of such preferred shares. The term of office and voting powers of any Director elected in the manner provided in the immediately preceding sentence of this Article 7 may be greater than or less than those of any other Director or class of Directors.

K-5

Exhibit 6
Page 1676

**Table of Contents**

8    The powers, preferences and relative, participating, optional and other special rights of each series of preferred shares, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding. All shares of any one series of preferred shares shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

<div align="center">

**REGISTER OF MEMBERS AND SHARE CERTIFICATES**

</div>

9    The Company shall maintain a Register of its Members and a Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates (if any) shall specify the share or shares held by that person and the amount paid up thereon, provided that in respect of a share or shares held jointly by several persons the Company shall not be bound to issue more than one certificate, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all. All certificates for shares shall be delivered personally or sent through the post addressed to the Member entitled thereto at the Member's registered address as appearing in the register.

10   All share certificates shall bear legends required under the applicable laws, including the Securities Act.

11   Any two or more certificates representing shares of any one class held by any Member may at the Member's request be cancelled and a single new certificate for such shares issued in lieu on payment (if the Directors shall so require) of US$1.00 or such smaller sum as the Directors shall determine.

12   If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same shares may be issued to the relevant Member upon request subject to delivery up of the old certificate or (if alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and the payment of out-of-pocket expenses of the Company in connection with the request as the Directors may think fit.

13   In the event that shares are held jointly by several persons, any request may be made by any one of the joint holders and if so made shall be binding on all of the joint holders.

<div align="center">

**TRANSFER OF SHARES**

</div>

14   (a)    Subjectto the terms of the Articles, any Member may transfer all or any of his Shares by an instrument of transfer provided that such transfer complies with the rules and regulations of the Designated Stock Exchange, the United States Securities and Exchange Commission and/or any other competent regulatory authority or otherwise under Applicable Law. If the Shares in question were issued in conjunction with rights, options or warrants issued pursuant to the Articles on terms that one cannot be transferred without the other, the Directors shall refuse to register the transfer of any such Share without evidence satisfactory to them of the like transfer of such option or warrant.

     (b)    The instrument of transfer of any Share shall be in writing in the usual or common form or in a form prescribed by the rules and regulations of the Designated Stock Exchange, the United States Securities and Exchange Commission and/or any other competent regulatory authority or otherwise under Applicable Law or in any other form approved by the Directors and shall be executed by or on behalf of the transferor (and if the Directors so require, signed by or on behalf of the transferee) and may be under hand or, if the transferor or transferee is a Clearing House or its nominee(s), by hand or by machine imprinted signature or by such other manner of execution as the Directors may approve from time to time. The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

15   The registration of transfers may, on 14 days' notice being given by advertisement in such one or more newspapers or by electronic means, be suspended and the register closed at such times and for such periods

<div align="center">

K-6

</div>

Exhibit 6
Page 1677

**Table of Contents**

as the Board may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year.

16    The instrument of transfer of any share shall be in writing and executed by or on behalf of the transferor (and if the Directors so require, signed by the transferee). The transferor shall be deemed to remain a holder of the share until the name of the transferee is entered in the Register of Members.

17    All instruments of transfer that shall be registered shall be retained by the Company.

### REDEMPTION AND PURCHASE OF OWN SHARES

18    Subject to the provisions of the Companies Act the Company may issue Shares that are to be redeemed or are liable to be redeemed at the option of the Member or the Company. The redemption of such Shares shall be effected in such manner and upon such other terms as the Company may, by Special Resolution, determine before the issue of the Shares.

19    Subject to the provisions of the Companies Act, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

20    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Companies Act, including out of capital.

21    The Directors may accept the surrender for no consideration of any fully paid Share.

### TREASURY SHARES

22    The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

23    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

### VARIATION OF RIGHTS ATTACHING TO SHARES

24    If at any time the share capital of the Company is divided into different classes of Shares, all or any of the rights attached to any class (unless otherwise provided by the terms of issue of the Shares of that class) may, whether or not the Company is being wound up, be varied without the consent of the holders of the issued Shares of that class where such variation is considered by the Directors not to have a material adverse effect upon such rights; otherwise, any such variation shall be made only with the consent in writing of the holders of not less than two thirds of the issued Shares of that class, or with the approval of a resolution passed by a majority of not less than two thirds of the votes cast at a separate meeting of the holders of the Shares of that class. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of Shares of the relevant class.

25    The provisions of these Articles relating to general meetings shall apply to every such general meeting of the holders of one class or series of shares except the following:

(a)    separate general meetings of the holders of a class or series of shares may be called only by (i) the Chairman of the Board, or (ii) a majority of the entire Board of Directors (unless otherwise specifically provided by the terms of issue of the shares of such class or series). Nothing in this Article 25 or Article 24 shall be deemed to give any Member or Members the right to call a class or series meeting.

K-7

Exhibit 6
Page 1678

Table of Contents

(b)    the necessary quorum shall be one or more persons holding or representing by proxy at least one-third of the issued shares of the class or series and that any holder of shares of the class or series present in person or by proxy may demand a poll.

26    The rights conferred upon the holders of the shares of any class or series shall not, unless otherwise expressly provided by the terms of issue of the shares of that class or series, be deemed to be varied by the creation or issue of further shares ranking in priority thereto or pari passu therewith.

## COMMISSION ON SALE OF SHARES

27    The Company may in so far as the Statutes from time to time permit pay a commission to any person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any shares of the Company. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up shares or partly in one way and partly in the other. The Company may also on any issue of shares pay such brokerage as may be lawful.

## NON-RECOGNITION OF TRUSTS

28    No person shall be recognised by the Company as holding any share upon any trust and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future, or partial interest in any share, or any interest in any fractional part of a share, or (except only as is otherwise provided by these Articles or the Statutes) any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder.

## CALLS ON SHARES

29    Subject to the terms of allotment, the Directors may from time to time make calls upon the Members in respect of any money unpaid on their shares, and each Member shall (subject to receiving at least 14 calendar days notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on his shares. A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

30    The joint holders of a share shall be jointly and severally liable to pay calls in respect thereof.

31    If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

32    The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the amount of the share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

33    The Directors may make arrangements on the issue of shares for a difference between the Members, or the particular shares, in the amount of calls to be paid and in the times of payment.

34    The Directors may, if they think fit, receive from any Member willing to advance the same all or any part of the monies uncalled and unpaid upon any shares held by him, and upon all or any of the monies so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Member paying the sum in advance and the Directors. No such sum paid in advance of calls shall entitle the Member paying such sum to any portion of a dividend declared in respect of any period prior to the date upon which such sum would, but for such payment, become presently payable.

K-8

Exhibit 6
Page 1679

**Table of Contents**

## FORFEITURE OF SHARES

35   If a Member fails to pay any call or instalment of a call on the day appointed for payment thereof, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of such much of the call or instalment as is unpaid, together with any interest which may have accrued.

36   The notice shall name a further day (not earlier than the expiration of 14 calendar days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the shares in respect of which the call was made will be liable to be forfeited.

37   If the requirements of any such notice as aforesaid are not complied with, any share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

38   A forfeited share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

39   A person whose shares have been forfeited shall cease to be a Member in respect of the forfeited shares, but shall, notwithstanding, remain liable to pay to the Company all monies which at the date of forfeiture were payable by him to the Company in respect of the shares, but his liability shall cease if and when the Company receives payment in full of the fully paid up amount of the shares.

40   A certificate in writing under the hand of a Director of the Company, which certifies that a share has been forfeited on a date stated in the certificate, shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share. The Company may receive the consideration, if any, given for the share or any sale or disposition thereof and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of and he shall thereupon be registered as the holder of the share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

41   The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a share becomes due and payable, whether on account of the amount of the share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSMISSION OF SHARES

42   The legal personal representative of a deceased sole holder of a share shall be the only person recognised by the Company as having any title to the share. In the case of a share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only person recognised by the Company as having any title to the share.

43   Any person becoming entitled to a share in consequence of the death or bankruptcy of a Member shall upon such evidence being produced as may from time to time be properly required by the Directors, have the right either to be registered as a Member in respect of the share or, instead of being registered himself, to make such transfer of the share as the deceased or bankrupt person could have made. If the person so becoming entitled shall elect to be registered himself as holder he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.

44   A person becoming entitled to a share by reason of the death or bankruptcy of the holder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share, except that he shall not, before being registered as a Member in respect of the share, be entitled in

K-9

Exhibit 6
Page 1680

**Table of Contents**

respect of it to exercise any right conferred by membership in relation to meetings of the Company, provided however, that the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the share, and if the notice is not complied with within 90 calendar days, the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the share until the requirements of the notice have been complied with.

## ALTERATION OF CAPITAL

45    The Company may by Ordinary Resolution:

(a)    increase the share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

(c)    sub-divide its existing shares or any of them into shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived;

(d)    cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of its share capital by the amount of the shares so cancelled.

46    Subject to the provisions of the Statutes and these Articles as regards to the matters to be dealt with by Ordinary Resolution, the Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorized by law.

47    All new shares created hereunder shall be subject to the same provisions with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the shares in the original share capital.

## CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE

48    For the purpose of determining those Members that are entitled to receive notice of, attend or vote at any meeting of Members or any adjournment thereof, or those Members that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Member for any other purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period but not to exceed in any case 30 calendar days. If the Register of Members shall be so closed for the purpose of determining those Members that are entitled to receive notice of, attend or vote at a meeting of Members such register shall be so closed for at least 10 calendar days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register of Members.

49    In lieu of or apart from closing the Register of Members, the Directors may fix in advance a date as the record date for any such determination of those Members that are entitled to receive notice of, attend or vote at a meeting of the Members and for the purpose of determining those Members that are entitled to receive payment of any dividend, the Directors may, at or within 90 calendar days prior to the date of declaration of such dividend fix a subsequent date as the record date of such determination.

50    If the Register of Members is not so closed and no record date is fixed for the determination of those Members entitled to receive notice of, attend or vote at a meeting of Members or those Members that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of those Members that are entitled to receive notice of, attend or vote at a meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof.

K-10

Exhibit 6
Page 1681

**Table of Contents**

### GENERAL MEETINGS

51  All general meetings of the Company other than annual general meetings shall be called extraordinary general meetings.

52  (a)  The Company may hold an annual general meeting and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as the Directors shall determine.

(b)  At these meetings the report of the Directors (if any) shall be presented.

53  (a)  The Directors may call general meetings, and they shall on a Members requisition forthwith proceed to convene an extraordinary general meeting of the Company.

(b)  A Members requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than one-third of the share capital of the Company as at that date carries the right of voting at general meetings of the Company.

(c)  The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the principal place of business of the Company (with a copy forwarded to the registered office), and may consist of several documents in like form each signed by one or more requisitionists.

(d)  If the Directors do not within 21 calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further 21 calendar days, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the second said 21 calendar days.

(e)  A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

### NOTICE OF GENERAL MEETINGS

54  At least seven calendar days' notice shall be given for any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this regulation has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)  in the case of an annual general meeting by all the Members (or their proxies) entitled to attend and vote thereat; and

(b)  in the case of an extraordinary general meeting by a majority in number of the Members (or their proxies) having a right to attend and vote at the meeting, being a majority together holding not less than ninety five percent in par value of the shares giving that right.

55  The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Member shall not invalidate the proceedings at any meeting.

### PROCEEDINGS AT GENERAL MEETINGS

56  No business shall be transacted at any general meeting unless a quorum of Members is present at the time when the meeting proceeds to business. One or more Members holding not less than an aggregate of one-third of all voting share capital of the Company in issue present in person or by proxy and entitled to vote shall be a quorum for all purposes.

K-11

Exhibit 6
Page 1682

Table of Contents

57    If provided for by the Company, a person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

58    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting, the meeting shall be dissolved.

59    The Chairman of the Board of Directors shall preside as chairman at every general meeting of the Company.

60    If at any meeting the Chairman of the Board of Directors is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, the Directors present shall elect one of their members to be chairman of the meeting, or, if no Director is so elected and willing to be chairman of the meeting, the Members present shall choose a chairman of the meeting.

61    The chairman may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting is adjourned for 10 calendar days or more, not less than 7 Business Days' notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

62    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by one or more Members present in person or by proxy entitled to vote and who together hold not less than 10 percent of the paid up voting share capital of the Company, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

63    If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

64    In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

65    A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF MEMBERS

66    Subject to any rights and restrictions for the time being attached to any class or classes of shares, every Member present in person and every person representing a Member by proxy at a general meeting of the Company shall have one vote for each share registered in his name in the Register of Members.

67    In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members.

68    A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, or other person in the

K-12

Exhibit 6
Page 1683

**Table of Contents**

nature of a committee appointed by that court, and any such committee or other person, may on a poll, vote by proxy.

69    No Member shall be entitled to vote at any general meeting unless all calls or other sums presently payable by him in respect of shares in the Company have been paid.

70    On a poll, votes may be given either personally or by proxy.

71    The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorized in writing or, if the appointor is a corporation, either under seal or under the hand of an officer or attorney duly authorized. A proxy need not be a Member of the Company.

72    An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

73    The instrument appointing a proxy shall be deposited at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company:

(a)    not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

(b)    in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

(c)    where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded, be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any Director;

provided that the Directors may in the notice convening the meeting, or in an instrument of proxy sent out by the Company, direct that the instrument appointing a proxy may be deposited (no later than the time for holding the meeting or adjourned meeting) at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company. The chairman may in any event at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted shall be invalid.

74    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or transfer was received by the Company before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETING

75    Any corporation or other non-natural person which is a Member may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual Member.

## DEPOSITARY AND CLEARING HOUSES

76    If a recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) is a Member of the Company it may, by resolution of its directors or other governing body or by power of attorney, authorise

K-13

Exhibit 6
Page 1684

**Table of Contents**

such Person(s) as it thinks fit to act as its representative(s) at any general meeting of the Company or of any Class of Members of the Company provided that, if more than one Person is so authorised, the authorisation shall specify the number and Class of Shares in respect of which each such Person is so authorised. A Person so authorised pursuant to this Article shall be entitled to exercise the same powers on behalf of the recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) which he represents as that recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) could exercise if it were an individual Member holding the number and Class of Shares specified in such authorisation, including the right to vote individually on a show of hands.

<div align="center">**SHARES THAT MAY NOT BE VOTED**</div>

77 Shares in the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

<div align="center">**DIRECTORS**</div>

78 (a) Unless otherwise determined by the Company in general meeting, the number of Directors shall not be less than one or more than nine Directors. The Directors shall be elected or appointed in the first place by the subscribers to the Memorandum of Association or by a majority of them and thereafter by the Members at general meeting.

(b) The Directors shall be divided into three (3) classes designated as Class I, Class II and Class III, respectively. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the board of Directors. At the 2022 annual general meeting of the Company, the term of office of the Class I Directors shall expire and Class I Directors shall be elected for a full term of three (3) years. At the 2023 annual general meeting of the Company, the term of office of the Class II Directors shall expire and Class II Directors shall be elected for a full term of three (3) years. At the 2024 annual general meeting of the Company, the term of office of the Class III Directors shall expire and Class III Directors shall be elected for a full term of three (3) years. At each succeeding annual general meeting of the Company, Directors shall be elected for a full term of three (3) years to succeed the Directors of the class whose terms expire at such annual general meeting. Notwithstanding the foregoing provisions of this Article, each Director shall hold office until the expiration of his term, until his successor shall have been duly elected and qualified or until his earlier death, resignation or removal. No decrease in the number of Directors constituting the board of Directors shall shorten the term of any incumbent Director.

(c) The Board of Directors shall have a Chairman (the "**Chairman**") elected and appointed by a majority of the Directors then in office. The Directors may also elect a Co-Chairman or a Vice-Chairman of the Board of Directors (the "**Co-Chairman**"). The Chairman shall preside as chairman at every meeting of the Board of Directors. To the extent the Chairman is not present at a meeting of the Board of Directors, the Co-Chairman, or in his absence, the attending Directors may choose one Director to be the chairman of the meeting. The Chairman's voting right as to the matters to be decided by the Board of Directors shall be the same as other Directors.

(d) The Company may by Ordinary Resolution elect any person to be a Director either to fill a casual vacancy on the Board or, subject to the first sentence of Article 78(a), as an addition to the existing Board.

(e) The Directors by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting, or the sole remaining Director, shall have the power from time to time and at any time to appoint any person as a Director to fill a casual vacancy on the Board or, subject to the

<div align="center">K-14</div>

<div align="right">Exhibit 6<br>Page 1685</div>

**Table of Contents**

first sentence of Article 78(a), as an addition to the existing Board, subject to the Company's compliance with director nomination procedures required under applicable corporate governance rules of the Designated Stock Exchange, as long as the Company's securities are traded on the Designated Stock Exchange. Any Director appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal. When the number of Directors is increased or decreased, the board of Directors shall, subject to Article [78(b)], determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director. In the event of a vacancy in the board of Directors, the remaining Directors, except as otherwise provided by law, shall exercise the powers of the full board of Directors until the vacancy is filled.

79    Subject to Article 78, a Director may be removed from office but only for cause and only by Ordinary Resolution at any time before the expiration of his term.

80    A vacancy on the Board created by the removal of a Director under the provisions of Article 79 above may be filled by the election or appointment by Ordinary Resolution at the meeting at which such Director is removed or by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting. Any Director elected or appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal. When the number of Directors is increased or decreased, the board of Directors shall, subject to Article 78 above, determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director. In the event of a vacancy in the board of Directors, the remaining Directors, except as otherwise provided by law, shall exercise the powers of the full board of Directors until the vacancy is filled.

81    The Board may, from time to time, and except as required by applicable law or the listing rules of the Designated Stock Exchange where the Company's securities are traded, adopt, institute, amend, modify or revoke the corporate governance policies or initiatives, which shall be intended to set forth the policies of the Company and the Board on various corporate governance related matters as the Board shall determine by resolution from time to time.

82    A Director shall not be required to hold any shares in the Company by way of qualification. A Director who is not a Member of the Company shall nevertheless be entitled to receive notice of and to attend and speak at general meetings of the Company and all classes of shares of the Company.

<div align="center">

**DIRECTORS' FEES AND EXPENSES**

</div>

83    The Directors may receive such remuneration as the Board may from time to time determine. The Directors may be entitled to be repaid all travelling, hotel and incidental expenses reasonably incurred or expected to be incurred by him in attending meetings of the Board or committees of the Board or general meetings or separate meetings of any class of shares or of debentures of the Company or otherwise in connection with the discharge of his duties as a Director.

84    Any Director who, by request, goes or resides abroad for any purpose of the Company or who performs services which in the opinion of the Board go beyond the ordinary duties of a Director may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as the Board may determine and such extra remuneration shall be in addition to or in substitution for any ordinary remuneration provided for by or pursuant to any other Article.

<div align="center">

K-15

</div>

<div align="right">

Exhibit 6
Page 1686

</div>

**Table of Contents**

**ALTERNATE DIRECTOR**

85    Any Director may in writing appoint another person to be his alternate to act in his place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to notice of meetings of the Directors and to attend and vote thereat as a Director when the person appointing him is not personally present and, where he is a Director, to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall be deemed for all purposes to be a Director and shall not be deemed to be the agent of the Director appointing him. An alternate Director shall cease to be an alternate Director if his appointor ceases to be a Director.

86    Any Director may appoint any person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

87    Subject to the provisions of the Companies Act, these Articles and to any resolutions made in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution made by the Company in a general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been made.

88    Subject to these Articles, the Directors may from time to time appoint any person, whether or not a Director of the Company, to hold such office in the Company as the Directors may think necessary for the administration of the Company, including without prejudice to the foregoing generality, the office of the Chief Executive Officer, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer, one or more Vice Presidents, Manager or Controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. The Directors may also appoint one or more of their body (but not an alternate Director) to the office of Managing Director upon like terms, but any such appointment shall ipso facto determine if any Managing Director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

89    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

90    The Directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to delegate all or any of the powers, authorities and discretion vested in him.

91    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the following paragraphs shall be without prejudice to the general powers conferred by this paragraph.

K-16

Exhibit 6
Page 1687

**Table of Contents**

92    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any persons to be members of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any of the aforesaid.

93    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill up any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any person so appointed and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

94    Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretions for the time being vested to them.

95    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

96    The Company intends that it shall be UK tax resident and the Board of Directors shall conduct its business in a manner consistent with that intention.

## VACATION OF OFFICE OF DIRECTOR

97    Notwithstanding anything in these Articles, the office of Director shall be vacated if the Director:

(a)    dies, becomes bankrupt or makes any arrangement or composition with his creditors;

(b)    is found to be or becomes of unsound mind;

(c)    resigns his office by notice in writing to the Company; or

(d)    shall be removed from office pursuant to Articles 78 or 79 or the Statutes.

## PROCEEDINGS OF DIRECTORS

98    The Directors may meet together (whether within or outside the Cayman Islands) for the dispatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.

99    A Board meeting may be called by a Director by giving notice in writing to the Board specifying a date, time and agenda for such meeting. The Board shall upon receipt of such notice give a copy of such notice of such meeting to all Directors and their respective alternates (if any).

100  (a)    At least ten (10) Business Days' notice shall be given to all Directors and their respective alternates (if any) for a Board meeting, provided that such notice period may be reduced or waived with the consent of all the Directors or their respective alternates (if any).

(b)    An agenda identifying in reasonable detail the issues to be considered by the Directors at any such meeting and copies (in printed or electronic form) of any relevant papers to be discussed at the meeting together with all relevant information shall be provided to and received by all Directors and their alternates (if any) at least five (5) Business Days prior to the date for such meeting. The agenda for each meeting shall include any matter submitted to the Company by any Director at least one (1) Business Day prior to the date for such meeting.

Exhibit 6
Page 1688

Table of Contents

(c)    Unless approved by all Directors (whether or not present or represented at such meeting), matters not set out in the agenda need not be considered at a Board meeting.

101    A Director or Directors may participate in any meeting of the Board of Directors, or of any committee appointed by the Board of Directors of which such Director or Directors are members, by means of conference telephone, video conference or similar communication equipment by way of which all persons participating in such meeting can hear each other and such participation shall be deemed to constitute presence in person at the meeting.

102    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors and unless so fixed shall be a majority of the Directors then in office, provided that a Director and his appointed alternate Director shall be considered only one person for this purpose.

103    If a quorum is not present at a Board meeting within thirty (30) minutes following the time appointed for such Board meeting, the relevant meeting shall be adjourned for a period of at least three (3) Business Days and the presence of any three (3) Directors shall constitute a quorum at such adjourned meeting. A meeting of the Directors at which a quorum is present when the meeting proceeds to business shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

104    Questions arising at any meeting of the Directors shall be decided by a majority of votes and each Director shall be entitled to one (1) vote in deciding matters deliberated at any meeting of the Directors.

105    A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

106    A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

107    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

108    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)    all appointments of officers made by the Directors;

(b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

K-18

Exhibit 6
Page 1689

**Table of Contents**

(c)       all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

109    When the chairman of a meeting of the Directors signs the minutes of such meeting, the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

110    A resolution signed by all the Directors shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted and when signed, a resolution may consist of several documents each signed by one or more of the Directors.

111    The continuing Directors may act, notwithstanding any vacancy in their body, but if their number is reduced below the number fixed pursuant to these Articles as the necessary quorum of Directors, then the continuing Directors may act only to increase the number or to summon a general meeting of the Company, but for no other purpose.

112    A committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the members present may choose one of their number to be chairman of the meeting.

113    A committee appointed by the Directors may meet and adjourn as it thinks proper. Questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

114    All acts done by any meeting of the Directors or of a committee of Directors, or by any person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.

## PRESUMPTION OF ASSENT

115    A Director who is present at a meeting of the Board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the chairman or secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## DIRECTORS' INTERESTS

116  (a)       A Director or alternate Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

(b)       A Director or alternate Director may act by himself or by, through or on behalf of his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director or alternate Director.

(c)       A Director or alternate Director may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as a shareholder, a contracting party or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

K-19

Exhibit 6
Page 1690

Table of Contents

(d)     No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by or arising in connection with any such contract or transaction by reason of such Director or alternate Director holding office or of the fiduciary relationship thereby established. A Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon.

(e)     A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## DIVIDENDS, DISTRIBUTIONS AND RESERVE

117     Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118     Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

119     The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may, at the like discretion, either be employed in the business of the Company or be invested in such investments (other than shares of the Company) as the Directors may from time to time think fit.

120     Any dividend may be paid by cheque or wire transfer to the registered address of the Member or person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such person and such address as the Member or person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the person to whom it is sent or to the order of such other person as the Member or person entitled, or such joint holders as the case may be, may direct.

121     The Directors when paying dividends to the Members in accordance with the foregoing provisions may make such payment either in cash or in specie.

122     No dividend shall be paid otherwise than out of profits or, subject to the restrictions of the Companies Act, the share premium account.

123     Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends shall be declared and paid according to the amounts paid or credited as fully paid on the shares, but if and so long as nothing is paid up on any of the shares in the Company dividends may be declared and paid according to the amounts of the shares. No amount paid on a share in advance of calls shall, while carrying interest, be treated for the purposes of this Article as paid on the share.

K-20

Exhibit 6
Page 1691

**Table of Contents**

124   If several persons are registered as joint holders of any share, any of them may give effectual receipts for any dividend or other monies payable on or in respect of the share.

125   No dividend shall bear interest against the Company.

126   Any Dividend or other distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date on which such Dividend or other distribution becomes payable may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the Dividend or other distribution shall remain as a debt due to the Member. Any Dividend or other distribution which remains unclaimed after a period of six years from the date on which such Dividend or other distribution becomes payable shall be forfeited and shall revert to the Company.

## BOOK OF ACCOUNTS

127   The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

128   The Directors shall determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statutes or authorised by the Directors or by the Company in general meeting.

129   The Directors may cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

130   Subject to the requirements of applicable law and the listing rules of the Designated Stock Exchange, the accounts relating to the Company's affairs shall be audited in such manner and with such financial year end as may be determined from time to time by the Company by Ordinary Resolution or failing any such determination by the Directors or failing any determination as aforesaid shall not be audited.

## ANNUAL RETURNS AND FILINGS

131   The Board shall make the requisite annual returns and any other requisite filings in accordance with the Companies Act.

## AUDIT

132   The Directors may appoint an Auditor of the Company who shall hold office until removed from office by a resolution of the Directors and may fix his or their remuneration.

133   Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the auditors.

K-21

Exhibit 6
Page 1692

Table of Contents

134  Auditors shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next special meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any time during their term of office, upon request of the Directors at any general meeting of the Members.

## THE SEAL

135  The Seal of the Company shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of any one or more persons as the Directors may appoint for the purpose and every person as aforesaid shall sign every instrument to which the Seal of the Company is so affixed in their presence.

136  The Company may maintain a facsimile of its Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such person or persons as the Directors shall for this purpose appoint, and such person or persons as aforesaid shall sign every instrument to which the facsimile Seal of the Company is so affixed in their presence .

137  Notwithstanding the foregoing, a Director shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## OFFICERS

138  Subject to Article 86, the Company may have Chief Executive Officer, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer, one or more Vice Presidents, Manager or Controller, appointed by the Directors. The Directors may also from time to time appoint such other officers as they consider necessary, all for such terms, at such remuneration and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors from time to time subscribe.

## CAPITALISATION OF PROFITS

139  Subject to the Companies Act and these Articles, the Board may, [with the authority of an Ordinary Resolution]:

(a)     resolve to capitalise an amount standing to the credit of reserves (including a share premium account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)     appropriate the sum resolved to be capitalised to the Members in proportion to the nominal amount of shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)     paying up the amounts (if any) for the time being unpaid on shares held by them respectively; or

(ii)    paying up in full unissued shares or debentures of a nominal amount equal to that sum,

Exhibit 6
Page 1693

Table of Contents

and allot the shares or debentures, credited as fully paid, to the Members (or as they may direct) in those proportions, or partly in one way and partly in the other, but the share premium account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued shares to be allotted to Members credited as fully paid;

(c)     make any arrangements it thinks fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where shares or debentures become distributable in fractions the Board may deal with the fractions as it thinks fit;

(d)     authorise a person to enter (on behalf of all the Members concerned) an agreement with the Company providing for either:

(i)     the allotment to the Members respectively, credited as fully paid, of shares or debentures to which they may be entitled on the capitalisation, or

(ii)     the payment by the Company on behalf of the Members (by the application of their respective operations of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing shares,

an agreement made under the authority being effective and binding on all those Members; and

(e)     generally do all acts and things required to give effect to the resolution.

## NOTICES

140     Except as otherwise provided in these Articles, any notice shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to him or to his address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member). or by placing it on the Company's Website. In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register of Members in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

141     Notices posted to addresses outside the Cayman Islands shall be forwarded by prepaid airmail.

142     Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

143     Any notice or other document, if served by:

(a)     post, service of the notice shall be deemed to have been served five calendar days after the time when the letter containing the same is posted (in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted);

(b)     cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted;

(c)     recognised courier service, service of the notice shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service and in proving such service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly delivered to the courier; or

(d)     e-mail, service of the notice shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

K-23

Exhibit 6
Page 1694

**Table of Contents**

144  Any notice or document delivered or sent to any Member in accordance with the terms of these Articles shall notwithstanding that such Member be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register of Members as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the share.

145  Notice of every general meeting shall be given to:

(a)      all Members who have supplied to the Company an address for the giving of notices to them;

(b)      every person entitled to a share in consequence of the death or bankruptcy of a Member, who but for his death or bankruptcy would be entitled to receive notice of the meeting; and

(c)      each Director and Alternate Director.

No other person shall be entitled to receive notices of general meetings.

<div align="center">

**INFORMATION**

</div>

146  No Member shall be entitled to require discovery of any information in respect of any detail of the Company's trading or any information which is or may be in the nature of a trade secret or secret process which may relate to the conduct of the business of the Company and which in the opinion of the Board would not be in the interests of the Members of the Company to communicate to the public.

147  The Board shall be entitled to release or disclose any information in its possession, custody or control regarding the Company or its affairs to any of its members including, without limitation, information contained in the Register of Members and transfer books of the Company.

<div align="center">

**INDEMNITY**

</div>

148  Every Director (including for the purposes of this Article any Alternate Director appointed pursuant to the provisions of these Articles) and officer of the Company or a Group Company for the time being and from time to time including for 6 years following ceasing to be a director or officer shall be indemnified and secured harmless out of the assets and funds of the Company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him in connection with the execution or discharge of his duties, powers, authorities or discretions as a Director or officer of the Company or a Group Company, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Company or a Group Company or its affairs in any court whether in the Cayman Islands or elsewhere.

149  No such Director or officer of the Company or a Group Company shall be liable to the Company or the relevant Group Company for any loss or damage unless such liability arises through the wilful neglect or wilful default of such Director or officer.

150  The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

<div align="center">

**FINANCIAL YEAR**

</div>

151  Unless the Directors otherwise prescribe, the financial year of the Company shall end on December 31st in each year and shall begin on January 1st in each year.

<div align="center">

K-24

</div>

Exhibit 6
Page 1695

**Table of Contents**

## WINDING UP

152    If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit. Subject to the rights attaching to any Shares, in a winding up:

   (a)    if the assets available for distribution amongst the Members shall be insufficient to repay the whole of the Company's issued share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the Members in proportion to the par value of the Shares held by them; or

   (b)    if the assets available for distribution amongst the Members shall be more than sufficient to repay the whole of the Company's issued share capital at the commencement of the winding up, the surplus shall be distributed amongst the Members in proportion to the par value of the Shares held by them at the commencement of the winding up subject to a deduction from those Shares in respect of which there are monies due, of all monies payable to the Company for unpaid calls or otherwise.

153    If the Company shall be wound up the liquidator may, subject to the rights attaching to any Shares and with the approval of a Special Resolution of the Company and any other approval required by the Statutes, divide amongst the Members in kind the whole or any part of the assets of the Company (whether such assets shall consist of property of the same kind or not) and may for that purpose value any assets and determine how the division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like approval, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Members as the liquidator, with the like approval, shall think fit, but so that no Member shall be compelled to accept any asset upon which there is a liability.

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION AND NAME OF COMPANY

154    The Company may at any time and from time to time by Special Resolution alter or amend these Articles or the Memorandum of Association of the Company, in whole or in part, or change the name of the Company.

## REGISTRATION BY WAY OF CONTINUATION

155    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATIONS

156    The Company shall have the power to merge or consolidate with one or more other constituent companies (as defined in the Companies Act) upon such terms as the Directors may determine and (to the extent required by the Companies Act) with the approval of a Special Resolution.

## LOCK-UP

157    Each Member shall enter into a customary lock-up agreement on the terms and to the extent required by the financial advisors engaged by the Company (or by any entity to which the Company is successor in interest) in connection with the business combination of Rockley Photonics Limited and SC Health Corporation in

Exhibit 6
Page 1696

**Table of Contents**

order to facilitate the admission of all or any of the Shares on the Designated Stock Exchange, including provision that any lock-up shall not exceed 180 days from the effective date of the Company's registration statement on Form S-4 (Registration No. 333-255019).

158   If any Member fails to comply with the provisions of Article 157, the Company shall be constituted the agent of each defaulting Member for taking such actions as are necessary to effect the lock-up and the Directors may authorise an officer or member to execute and deliver on behalf of such defaulting Member the necessary documents to effect the lock-up, including, without limitation, a lock-up agreement, in a form approved by the Board.

<div align="center">K-26</div>

<div align="right">Exhibit 6
Page 1697</div>