# EXHIBIT 12

Exhibit 12
Page 2486

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of Report (Date of earliest event reported): December 21, 2021**

---

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

---

| **Cayman Islands** | **001-40735** | **Not Applicable** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom**
(Address of principal executive offices)

**WA14 2DT**
(Zip Code)

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

Exhibit 12
Page 2487

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 12
Page 2488

**Item 7.01. Regulation FD Disclosure.**

On December 21, 2021, Rockley Photonics Holdings Limited (the "Company") issued a press release attached hereto as Exhibit 99.1. The full text of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K (this "Current Report") and is incorporated herein by reference.

The information furnished in this Current Report (including Exhibit 99.1) shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, nor shall it be deemed to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release, dated December 21, 2021 |
| 104 | Cover Page Interactive Date File (embedded within the Inline XBRL document). |

Exhibit 12
Page 2489

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

Date:     December 21, 2021

By:       /s/ Mahesh Karanth

Name:     Mahesh Karanth

Title:    Chief Financial Officer

Exhibit 12
Page 2490

EX-99.1 2 rklybusinessupdatefinal.htm EX-99.1

FOR IMMEDIATE RELEASE



## Rockley Photonics Provides Business Update Following the U.S. Bureau of Industry and Security Action Relating to Its Joint Venture Partner

*Adjusts Outlook for Full Year 2021 and 2022*

*Momentum in Core Business, Health and Wellness Sensing Platform Continues, Outlook Unchanged*

OXFORD, England, and PASADENA, Calif., December 15, 2021 – Rockley Photonics (NYSE: RKLY) ("the Company" or "Rockley"), a global leader in photonics-based health monitoring and communications solutions, today announced its intention not to proceed, under current circumstances, with its data-communications-related technical sale to Hengtong Rockley Technology Co. Ltd., its joint venture ("the JV") with Jiangsu Hengtong Optic-Electric Co., Ltd. ("Hengtong"). As a result, Rockley issued an updated business outlook for full year 2021 and 2022. The decision not to proceed with the sale is due to the U.S. Bureau of Industry and Security (BIS) of the U.S. Department of Commerce placing Hengtong and certain of its affiliates on the BIS "Entity List" with an effective date of December 17, 2021, which means the U.S. Export Administration Regulations (EAR) prohibits companies from providing products and technologies to organizations on the "Entity List" without prior authorization. The Company is currently reviewing its relationship with the JV and will make appropriate decisions based on its findings.

"Rockley's primary focus has been and continues to be on the development and commercialization of our sensing platform in the health monitoring space. We continue to make outstanding progress in this arena, as outlined in our recent customer and technology announcements, and our outlook for this business continues to show momentum," said Andrew Rickman, founder and chief executive officer of Rockley. "The technical sale to the JV was intended as an efficient way to monetize Rockley's innovative data communications technology without distracting from our primary focus on our health and wellness solutions."

Dr. Rickman went on to say, "We continue to fully comply with the regulations and have decided not to proceed with our technical sale to the JV under the current circumstances. The BIS action will require us to adjust our strategy for monetizing our communications technology. While we are disappointed in the near-term impact on our company, we believe that this decision will be a net positive for Rockley and will not affect the long-term outlook for our business because these solutions were not core to our future growth prospects. We will continue to focus our resources on bringing solutions to the health and wellness market to satisfy the significant consumer and medtech demand we have reported. We are evaluating options to monetize our ultra-high-speed fiber optic communication solutions, which we believe could have a net positive impact on our cash."

Accordingly, the Company is updating its outlook for full year 2021 and full year 2022 to reflect its current expectations.

Exhibit 12
Page 2491

Exhibit 12
Page 2492

**Revised Outlook for Full Year**

|  | *2021* | *2022* |
|---|---|---|
| Revenue | $7 - $8 million | $25 - $30 million |

As of September 30, 2021, the Company had cash, cash equivalents and investments of $125 million.

**About Rockley Photonics**

A global leader in photonics-based health monitoring and communications solutions, Rockley Photonics is developing a comprehensive range of photonic integrated circuits and associated modules, sensors, and full-stack solutions. From next-generation sensing platforms specifically designed for mobile health monitoring and machine vision to high-speed, high-volume solutions for data communications, Rockley is laying the foundation for a new generation of applications across multiple industries. Rockley believes that photonics will eventually become as pervasive as micro-electronics, and it has developed a platform with the power and flexibility needed to address both mass markets and a wide variety of vertical applications.

Formed in 2013, Rockley is uniquely positioned to support hyper-scale manufacturing and address a multitude of high-volume markets. Rockley has partnered with numerous Tier-1 customers across a diverse range of industries to deliver the complex optical systems required to bring transformational products to market.

To learn more about Rockley, visit rockleyphotonics.com.

**Cautionary Note Regarding Forward-Looking Statements**

Statements in this press release that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "accelerate," "advance," "allow," "anticipate," "believe," "can," "continue," "could," "develop," "enable," "estimate," "eventual," "expand, "expect," "focus," "forecast," "future," "goal," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "vision," "will," "would" or other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this press release include, but are not limited to, statements regarding the following: (a) Rockley's continued focus on the commercialization of its platform in the health monitoring space and progress thereof; (b) the potential impact on Rockley's business (including the JV, the Company's review of its relationship with the JV, and the data communications business), focus, resource allocation, revenue, outlook, and prospects, as well as its business plan and goals in relation to the health and wellness market, as a result of its intention

Exhibit 12
Page 2493

Exhibit 12
Page 2494

not to proceed with its data-communications-related technical sale to the JV and the placing of Hengtong and certain of its affiliates by the U.S. Bureau of Industry and Security (BIS) of the U.S. Department of Commerce on the Bureau's Entity List; (c) Rockley's strategy for monetizing its communications technology (d) Rockley's outlook for 2021 and 2022; (e) the Company's focus on efficiently deploying capital in the near-term and evaluation of options for its ultra-high-speed data communications solutions; (f) the anticipated aspects, focus, goals, opportunities, and benefits of Rockley's silicon photonics solutions, including the potential to create an opportunity to revolutionize the data communications industry and accelerate the development and production of ultra-high-speed solutions for such market; (g) the anticipated and potential features and benefits of Rockley's platform, products, and technology; (h) its development of a range of photonic integrated circuits and associated modules, sensors, and full-stack solutions; (i) Rockley's belief that photonics will eventually become as pervasive as micro-electronics; and (j) Rockley's potential to support hyper-scale manufacturing, address a multitude of high-volume markets, and deliver the complex optical systems required to bring transformational products to market.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond Rockley's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following: (i) Rockley's ability to achieve customer acceptance and commercial production of its products and technology, including in a timely and cost-effective manner; (ii) Rockley's ability to achieve customer design wins and convert memoranda of understanding and development contracts into production contracts; (iii) risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases; (iv) Rockley's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated therewith; (v) legal and regulatory risks; (vi) risks associated with its fabless manufacturing model and dependency on third-party suppliers; (vii) Rockley's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base; (viii) Rockley's financial performance; (ix) the impacts of COVID-19 on Rockley, its customers and suppliers, its target markets, and the global economy; (x) Rockley's ability to successfully manage growth and its operations as a public company; (xi) fluctuations in Rockley's stock price and Rockley's ability to maintain the listing of its ordinary shares on the NYSE; (xii) Rockley's ability to anticipate and respond to industry trends and customer requirements; (xiii) changes in the current and future markets in which Rockley is or may be engaged; (xiv) risks related to competition and intellectual property; (xv) market opportunity and demand for Rockley's products and technology, as well as the customer products into which Rockley's products and technology are incorporated; (xvi) risks related to international operations; (xvii) risks related to cybersecurity, privacy, and infrastructure; (xviii) risks related to financial and accounting matters; (xix) general economic, financial, political, and business conditions, both domestic and foreign; (xx) Rockley's ability to realize the anticipated benefits of its business combination with SC Health Corporation; and (xxi) Rockley's ability to utilize its equity line of credit, as well as other factors described under the heading "Risk Factors" in Rockley's quarterly report on Form 10-Q for the quarter ended September 30, 2021, and in other documents Rockley files with the Securities and Exchange Commission in the future.

The forward-looking statements contained in this press release are based on various assumptions, whether or not identified in this press release, and on Rockley's current expectations, beliefs, and assumptions and are not predictions of actual performance. If any of these risks or uncertainties

Exhibit 12
Page 2495

materialize, or should any of these assumptions prove incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting Rockley will be those that have been anticipated. These forward-looking statements speak only as of the date hereof and Rockley does not intend to any obligation to update or revise any forward-looking statements, whether because of new information, future events, or otherwise, except as required by law.

###

**Contact Information**

***Media***
Justin Heath
**Resonates**
Telephone: +44 1635 898 698
Email: rockley@resonates.com


***Investors***
Gwyn Lauber
**Rockley Photonics**
Telephone: +1 626-995-0001
Email: investors@rockleyphotonics.com

Exhibit 12
Page 2496

# EXHIBIT 13

Exhibit 13
Page 2497

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of Report (Date of earliest event reported): May 12, 2022**

---

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

---

| Cayman Islands | 001-40735 | 98-1644526 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom**
**(Address of principal executive offices)**

**WA14 2DT**
**(Zip Code)**

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

Exhibit 13
Page 2498

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 13
Page 2499

**Item 1.01. Entry Into a Material Definitive Agreement.**

***Private Placement of Convertible Senior Secured Notes due 2026 and Warrants***

*Subscription Agreement*

On May 12, 2022, Rockley Photonics Holdings Limited (the "Company"), together with its subsidiaries named therein, entered into a subscription agreement (the "Subscription Agreement") with the subscribers listed therein (the "Purchasers"), relating to the sale by the Company to the Purchasers of $81.5 million aggregate principal amount of Convertible Senior Secured Notes due 2026 (the "Notes") and warrants to purchase 26.5 million Rockley ordinary shares (the "Warrants") at an exercise price of $5.00 per share, subject to certain anti-dilution adjustments. The Company has also granted the Purchasers an option to purchase up to an additional $81.5 million aggregate principal amount of Notes and Warrants for a period of 12 months following the date that a registration statement covering the ordinary shares issuable upon conversion of the Notes and upon exercise of the Warrants becomes effective. The Notes will initially be guaranteed by Rockley Photonics, Inc., Rockley Photonics Limited, Rockley Photonics Ireland Limited and Rockley Photonics Oy, each a wholly owned subsidiary of the Company (the "Guarantor Subsidiaries"). The Notes will also be guaranteed by the Company's future subsidiaries (other than subsidiaries treated as excluded entities). The transactions contemplated by the Subscription Agreement (the "Transactions") are expected to close on or about May 23, 2022 (the date on which the closing occurs, the "Closing"), subject to obtaining the approval of the New York Stock Exchange and satisfaction of customary closing conditions set forth in the Subscription Agreement.

*Indenture and Issuance of Convertible Notes*

The Notes will be governed by an indenture (the "Indenture") among the Company, the Guarantor Subsidiaries, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee (the "Trustee") and collateral agent (the "Collateral Agent"). The Notes will be senior secured obligations of the Company and the Guarantor Subsidiaries secured by substantially all assets of each of the Company and each Subsidiary Guarantor. Interest on the Notes will be payable quarterly in arrears at a rate of 9.5% per annum if paid in cash or, subject to the satisfaction of certain conditions, at a rate of 12.0% per annum payable at a rate of 5.75% per annum in cash and 6.25% per annum through the issuance of additional Notes ("PIK Interest"), which will also bear interest. Interest on the Notes will be payable quarterly in arrears on February 15, May 15, August 15 and November 15, commencing on August 15, 2022. The Notes will mature on May 15, 2026 (the "Maturity Date") unless redeemed, repurchased or converted in accordance with their terms prior to such date.

The Notes will be convertible at an initial conversion price equal to $3.08 per ordinary share of the Company (the "Conversion Price"), $0.000004026575398 par value per share (the "Ordinary Shares"). Holders of the Notes will have the right to convert all or a portion of their Notes at any time prior to close of business on the second scheduled trading day immediately preceding the maturity date. Upon conversion, holders of the Notes will receive Ordinary Shares and cash for fractional interests and an interest make whole for interest that would have accrued from the date of conversion until the Maturity Date, which interest make whole shall be paid in cash or subject to certain conditions, in Ordinary Shares at the Company's election.

The Company may redeem the Notes in whole, and not in part, at its option, at any time prior to the maturity date, for a cash purchase price equal to the aggregate principal amount of any Notes to be redeemed plus accrued and unpaid interest thereon plus a make-whole premium as provided in the Indenture. At any time prior to the Maturity Date, the Company may also redeem the Notes in whole, or from time to time in part, if the last reported sale price of the Ordinary Shares exceeds 250% of the conversion price then in effect for at least 20 trading days (which need not be consecutive), including at least one of the five trading days preceding the date on which the Company provides a notice of redemption preceding the date on which the Company provides a notice for such redemption, during any 30 consecutive trading day period ending on, and including, the trading day preceding such notice date, for a cash purchase price equal to the aggregate principal amount of any Notes to be redeemed plus accrued and unpaid interest thereon. The Notes are also subject to redemption at the option of the Company in the event of certain changes in tax law or listing status of the Company.

In addition, following certain corporate events that occur prior to the maturity date or following issuance by the Company of a notice of redemption, in each case as provided in the Indenture, in certain circumstances, the Company will increase the conversion rate for a holder who elects to convert its Notes in connection with such a corporate event or who elects to convert any Notes called for redemption during the related redemption period. Additionally, in the event of a fundamental change (such term as defined in the Indenture), holders of the Notes will have the right to require the Company to repurchase all or a portion of their Notes at a price equal to the aggregate principal amount of any Notes to be repurchased plus accrued and unpaid interest thereon plus a make-whole premium.

The Indenture will include restrictive covenants that, subject to specified exceptions, limit the ability of the Company and its subsidiaries to (a) incur debt or issue preferred shares or disqualified stock; (b) make (i) dividends and distributions, (ii) redemptions and repurchases of equity, (iii) investments and (iv) prepayments, redemptions and repurchases of subordinated debt; (c) incurring liens; (d) making asset sales; (e) entering into transactions with affiliates and (f) entering into agreements limiting subsidiary distributions. In addition, the Company will be required to maintain minimum unrestricted cash and cash equivalents of $20,000,000. The Indenture will also include customary events of default after which the holder of the Notes may accelerate the maturity of the Notes to become due and payable immediately; provided, however, that the notes will be automatically accelerated upon certain events of bankruptcy, insolvency and reorganization involving the Company or any of its subsidiaries. Such events of default include: (i) certain payment defaults on the Notes (which, in the case of a default in the payment of interest and liquidated damages on the Notes, will be subject to a 30-day cure period); (ii) the Company's failure in its obligation to convert a Note, if such default is not cured within three business days; (iii) the Company's failure to send certain notices under the Indenture within specified periods of time, if such failure is not cured within three business days; (iv) the Company's failure to comply with certain covenants in the Indenture relating to the Company's ability to consolidate with or merge with or into, or sell, lease or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Company

Exhibit 13
Page 2500

and its subsidiaries, taken as a whole, to another person; (v) a default by the Company in its other obligations or agreements under the Indenture or the other note documents (as defined in the Indenture) if such default is not

Exhibit 13
Page 2501

cured or waived within 30 days after written notice is given by the Trustee or the holders of 25% in aggregate principal amount of the Notes; (vi) certain defaults by the Company or any of its subsidiaries with respect to indebtedness for borrowed money of at least $3,500,000; (vii) final judgments of at least $3,500,000 (excluding amounts not covered by insurance) rendered against the Company or any of its subsidiaries, which judgments are not discharged or stayed within 60 days; (viii) certain events of bankruptcy, insolvency and reorganization involving the Company or any of its subsidiaries; (ix) any material provision of any note document ceases to be valid and binding on or enforceable against the Company or any Guarantor Subsidiary or the Company or any Guarantor Subsidiary shall so state in writing or any note security document (as defined in the Indenture) ceases to create a valid security interest in the collateral (as defined in the Indenture), excepted as permitted pursuant to the terms thereof or the Indenture; and (x) except as permitted under the Indenture, the Company or any Guarantor Subsidiary shall contest in any manner the validity or enforceability of a permitted intercreditor agreement (as defined in the Indenture) or deny that it has any further liability or obligation thereunder, or the note obligations or the liens securing the note obligations, for any reason shall not have the priority contemplated by the Indenture, the note security documents or such permitted intercreditor Agreement.

*Issuance of Warrants*

The Warrants will have a ten-year term and a $5.00 per share exercise price, and include a ratchet anti-dilution adjustment in the event any Ordinary Shares or other equity or equity equivalent securities payable in Ordinary Shares are granted, issued or sold (or the Company enters into any agreement to grant, issue or sell), in each case, at a price less than the exercise price then in effect, which automatically decreases the exercise price of the Warrants upon the occurrence of such event, and increases the number of shares of Ordinary Shares issuable upon exercise of the Warrants, such that the aggregate exercise price of all Warrants remains the same before and after any such dilutive event; provided, that the exercise price may not be less than $3.08 per Ordinary Share. Upon the occurrence of a fundamental transaction, the Warrant Agreement provides each holder a put right in respect of the Warrants. Upon the exercise of a put right by the holder, the Company is obligated to repurchase the Warrants for the fair market value of the Warrants repurchased, as calculated in the Warrant Agreement. The Warrants also include cashless exercise rights.

*Registration Rights Agreement*

The Company also agreed to enter into a Registration Rights Agreement (the "Registration Rights Agreement") with the Purchasers, which provides, subject to certain limitations, the Purchasers with certain registration rights for the Company's ordinary shares issuable upon conversion of the Notes and exercise of the Warrants. The Registration Rights Agreement requires the Company to prepare and file a registration statement with the U.S. Securities and Exchange Commission (the "SEC") as soon as reasonably practicable after the Closing to register the resale of the shares underlying the Notes and the Warrants.

*Exclusivity Agreement*

The Company and the Subscribers have agreed to exclusive discussions in furtherance of the transactions described above until May 26, 2022. In the event that the Company or any of its subsidiaries consummate an alternative financing transaction other than with the Subscribers during this exclusive period, subject to certain exceptions, the Company would be required to pay to the Subscribers an aggregate amount of $8.15 million as an alternative transaction fee.

The foregoing summaries of the Subscription Agreement, the Indenture, the Notes, the Warrants and the Registration Rights Agreement do not purport to be complete and are subject to, and qualified in their entirety by, the full text of, as applicable, the Subscription Agreement, which is attached as Exhibit 10.1 to this Current Report, and the Indenture (including the form of Note attached thereto), form of Warrant and the Registration Rights Agreement, which will be filed with the SEC following and subject to the Closing.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information required by Item 2.03 relating to the Notes, the Warrants and the Indenture is contained in Item 1.01 of this Current Report and incorporated herein by reference.

**Item 3.02. Unregistered Sales of Equity Securities.**

On May 12, 2022, the Company entered into the Subscription Agreement, pursuant to which it agreed to sell $81.5 million in aggregate principal amount of the Notes (including an option to purchase an additional $81.5 million in aggregate principal amount of the Notes) and Warrants to purchase 26.5 million Rockley ordinary shares to the Purchasers in a private placement pursuant to an exemption from the registration requirements of the Securities Act of 1933 (the "Securities Act"). The Company is selling the Notes to the Purchasers in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act. The Company is relying on this exemption from registration based in part on representations made by the Purchasers in the Subscription Agreement.

The information related to the issuance of the Notes contained in Item 1.01 of this Current Report on Form 8-K is incorporated by reference.

**Item 7.01. Regulation FD Disclosure.**

In connection with the due diligence process for the transaction described above, the Company provided investors with an updated view of anticipated full year 2023 financial results. The Company's forecasts and projections included below are based on assumptions, analyses, and internal estimates developed by the Company's management. If these assumptions, analyses, or internal estimates prove to be incorrect or inaccurate, the Company's actual operating results may differ materially from those forecasted or projected. The Company has in the past had to adjust its estimates and experienced actual results that differed materially from its internal estimates. Forecasts are subject to change and inherently subject to significant uncertainties and contingencies, many of which are

Exhibit 13
Page 2502

Exhibit 13
Page 2503

beyond the Company's control. These assumptions, analyses, and estimates are subject to risks and uncertainties outside of the Company's control. The assumptions and estimates underlying these financial projections, including with respect to revenue, net cash used in operations and free cash flow, include the following:

- Projected revenue is based on a variety of operational assumptions, including the number of customer contracts and design wins; conversion of existing MOUs and development contracts into commercial production contracts; form of customer arrangements (e.g., purchase versus licensing agreements); timing of the development and commercial launch of the Company's products or the customer's products incorporating the Company's products; pricing and volume fluctuation, including with respect to average selling prices; and timing and execution of customer agreements, including the ability of the Company to achieve development milestones in a timely manner; and

- Projected free cash flow is driven by the Company's cash flow from operations less capital expenditures. Annual capital expenditures primarily include costs related to purchases in property and operating equipment to be used in the ordinary course of business, investment in the ordinary course of business and strategic investment in the Company's partners' silicon fabrication plants.

|  | Fiscal 2023 (in millions) |
|---|---|
| Revenue | $300.0 to $320.0 |
| Non-GAAP Operating Expenses (1) | ($140.0) to ($160.0) |
| Net Cash used in Operations | ($100.0) to ($130.0) |
| Capital Expenditures | ($10.0) to ($20.0) |
| Free Cash Flow (2) | ($120.0) to ($140.0) |

(1) Operating expenses are presented on a non-GAAP basis and exclude stock-based compensation and depreciation expenses. A reconciliation to GAAP is not available on a forward-looking basis due to high variability and low visibility with respect to the assumptions underlying these expenses that are excluded from these non-GAAP amounts.

(2) The Company defines Free Cash Flow, a non-GAAP financial measure, as net cash provided by (used in) operations minus purchases of property and equipment.

Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information in compliance with GAAP, and may not be comparable to similarly titled measures used by other companies.

The Company also reviewed with investors various hypothetical operating scenarios for illustrative purposes only, across a variety of different assumptions to demonstrate an ability for the Company to continue to execute its business plans through 2023, including illustrative downside scenarios where the Company would decrease its operating expenses and, if necessary, raise additional capital. The Company does not believe these hypothetical operating scenarios are informative to investors, because those scenarios are not forecasts of the Company and were discussed with lenders solely as a sensitivity analysis to determine the appropriate amount of funding in the transaction described above.

Cautionary Statement Regarding Forward-Looking Statements

Certain statements in this Current Report on Form 8-K (the "Current Report") that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "anticipate," "believe," "continue," "could," "develop," "enable," "estimate," "eventual," "expect," "future," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "will," "would" and other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this Current Report include, but are not limited to, statements regarding the following: (a) the anticipated financial results for fiscal 2023; and (b) the private placement transaction closing by the anticipated timeframe, or at all; and (c) the satisfaction or waiver (if applicable) of the conditions to closing the private placement transaction.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond the Company's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following: (i) the Company's ability to achieve commercial production of its products and technology, including in a timely and cost-effective manner; (ii) the Company's ability to close the private placement transaction and its ability to satisfy the conditions to closing of the private placement transaction, including but not limited to its ability to obtain the any applicable regulatory approval for the private placement transaction, including but not limited to approval of the New York Stock Exchange; (iii) the Company's ability to achieve customer design wins, convert memoranda of understanding and development contracts into production contracts, and achieve customer

Exhibit 13
Page 2504

acceptance of its products and technology; (iv) risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other

Exhibit 13
Page 2505

changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases; (v) the Company's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated with any future financings; (vi) legal and regulatory risks, including those related to its products and technology and any threatened or actual litigation; (vii) risks associated with its fabless manufacturing model and dependency on third-party suppliers; (viii) the Company's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base; (ix) the Company's financial performance; (x) the impacts of COVID-19 on the Company, its customers and suppliers, its target markets, and the economy; (xi) the Company's ability to successfully manage growth and its operations as a public company; (xii) fluctuations in the Company's stock price and the Company's ability to maintain the listing of its ordinary shares on the NYSE; (xiii) the Company's ability to anticipate and respond to industry trends and customer requirements; (xiv) changes in the Company's current and future target markets; (xv) intellectual property risks; (xvi) the Company's ability to compete successfully; (xvii) market opportunity and market demand for, and acceptance of, the Company's products and technology, as well as the customer products into which the Company's products and technology are incorporated; (xviii) risks related to international operations; (xix) risks related to cybersecurity, privacy, and infrastructure; (xx) risks related to financial and accounting matters; (xxi) general economic, financial, legal, political, and business conditions and changes in domestic and foreign markets; (xxii) the Company's ability to realize the anticipated benefits of the business combination; (xxiii) changes adversely affecting the businesses or markets in which the Company is engaged; and (xxiv) risks related to the Company's backlog, including the risk that backlog may not translate into future revenue, as well as other factors described under the heading "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended 2021, and in other documents the Company files with the Securities and Exchange Commission in the future. The forward-looking statements contained in this Current Report are based on various assumptions, whether or not identified in this Current Report, and on the Company's current expectations, beliefs, and assumptions and are not predictions of actual performance. If any of these risks or uncertainties materialize, or should any of these assumptions prove incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting the Company will be those that have been anticipated. These forward-looking statements speak only as of the date hereof and the Company does not intend to update or revise any forward-looking statements, whether because of new information, future events, or otherwise, except as required by law.

**Item 8.01. Other Events.**

On May 12, 2022, the Company issued a press release announcing the private placement. A copy of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 10.1 | Subscription Agreement dated May 12, 2022 by and between the Company, each of the Subsidiaries (as defined therein) of the Company and the Subscribers named therein. |
| 99.1 | Press Release of Rockley Photonics Holdings Limited dated May 12, 2022 entitled "Rockley Photonics Announces $81.5 Million Private Placement" |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

The information furnished in this Current Report (including Exhibit 99.1) shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, nor shall it be deemed to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

Date:    May 12, 2022                    By:      /s/ Mahesh Karanth
                                         Name:    Mahesh Karanth
                                         Title:   Chief Financial Officer

Exhibit 13
Page 2506

Exhibit 13
Page 2507

EX-99.1 3 pressrelease-convertibleno.htm EX-99.1



## Rockley Photonics Announces $81.5 Million Private Placement

**OXFORD, England, and PASADENA, Calif., May 12, 2022** – Rockley Photonics Holdings Limited ("Rockley") (NYSE: RKLY) today announced that it has entered into definitive agreements with certain institutional investors for a $81.5 million private placement of convertible senior secured notes and warrants.

Participating investors have agreed to purchase $81.5 million aggregate principal amount of Convertible Senior Secured Notes due 2026 (the "Notes") and warrants to purchase 26.5 million Rockley ordinary shares (the "Warrants") at an exercise price of $5.00 per share, subject to certain anti-dilution adjustments. The Warrants will expire ten years from the date of issuance. Rockley also intends to grant the initial purchasers of the Notes an option to purchase up to an additional $81.5 million aggregate principal amount of Notes and Warrants.

The Notes will bear cash interest at a rate of 9.5% per annum (or, if Rockley elects to pay interest partially in cash and partially through the issuance of additional Notes, at a rate of 5.75% payable in cash and 6.25% payable in kind through the issuance of additional Notes). Certain of Rockley's wholly owned subsidiaries will initially guarantee the Notes. The Notes will be convertible at an initial conversion price equal to $3.08 per ordinary share and are expected to include equity based make-whole terms. The Notes will mature on four years from the date of closing, unless redeemed, repurchased, or converted prior to such date.

The transaction is subject to customary closing conditions and is expected to close on May 23, 2022. Rockley intends to use the net proceeds from the sale of the Notes along with its other liquidity sources to continue the development of its biosensing platforms, which are designed for mobile health monitoring, for the repayment of approximately $24.9 million of existing debt, and for general corporate purposes.

The Notes, any ordinary shares issuable upon conversion of the Notes, the Warrants and any ordinary shares issuable upon of the Warrants have not been registered under the Securities Act of 1933, as amended, or any state securities laws and may not be offered or sold in the United States absent registration or an applicable exemption from such registration requirements. Rockley has agreed to file a registration statement with the Securities and Exchange Commission as soon as reasonably practicable after the closing, registering the

Exhibit 13
Page 2508

resale of the ordinary shares issuable upon the conversion of the Notes and the exercise of the Warrants.

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of these securities (including the Rockley ordinary shares, if any, issuable upon conversion of the Notes and exercise of the Warrants) and shall not constitute an offer, solicitation, or sale in any jurisdiction in which such offer, solicitation or sale is unlawful.

**About Rockley Photonics**

A global leader in photonics-based health monitoring and communications solutions, Rockley Photonics is developing a comprehensive range of photonic integrated circuits and associated modules, sensors, and full-stack solutions. From next-generation sensing platforms specifically designed for mobile health monitoring and machine vision to high-speed, high-volume solutions for data communications, Rockley is laying the foundation for a new generation of applications across multiple industries. Rockley believes that photonics will eventually become as pervasive as micro-electronics, and it has developed a platform with the power and flexibility needed to address both mass markets and a wide variety of vertical applications.

Formed in 2013, Rockley is uniquely positioned to support hyper-scale manufacturing and address a multitude of high-volume markets. Rockley has partnered with numerous tier-1 customers across a diverse range of industries to deliver the complex optical systems required to bring transformational products to market.

**Cautionary Note Regarding Forward-Looking Statements**

Statements in this press release that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "accelerate," "advance," "anticipate," "believe," "can," "capability," "continue," "could," "develop," "enable," "estimate," "eventual," "expand, "expect," "focus," "forward," "future," "goal," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "vision," "will," "would" or other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this press release include, but are not limited to, statements regarding the following: (a) the private placement transaction closing by the anticipated timeframe, or at all; (b) the satisfaction or waiver (if applicable) of the conditions to closing the private placement transaction; (c) the occurrence of any other event, change, or other circumstances that could give rise to the modification or termination of the private placement transaction; (d) the

2

Exhibit 13
Page 2509

anticipated uses of net proceeds from the private placement transaction; (e) the anticipated and potential features, scope, goals, and benefits of Rockley's platform, products, and technology; (f) its development of a range of photonic integrated circuits and associated modules, sensors, and full-stack solutions; (g) Rockley's belief that photonics will eventually become as pervasive as micro-electronics; and (h) Rockley's potential to support hyper-scale manufacturing, address a multitude of high-volume markets, and deliver the complex optical systems required to bring transformational products to market.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond Rockley's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following: (i) Rockley's ability to achieve customer acceptance and commercial production of its products and technology, including in a timely and cost-effective manner; (ii) Rockley's ability to achieve customer design wins and convert memoranda of understanding and development contracts into production contracts; (iii) risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases; (iv) Rockley's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated therewith; (v) legal and regulatory risks; (vi) risks associated with its fabless manufacturing model and dependency on third-party suppliers; (vii) Rockley's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base; (viii) Rockley's financial performance; (ix) the impacts of COVID-19 on Rockley, its customers and suppliers, its target markets, and the global economy; (x) Rockley's ability to successfully manage growth and its operations as a public company; (xi) fluctuations in Rockley's stock price and Rockley's ability to maintain the listing of its ordinary shares on the NYSE; (xii) Rockley's ability to anticipate and respond to industry trends and customer requirements; (xiii) changes in the current and future markets in which Rockley is or may be engaged; (xiv) risks related to competition and intellectual property; (xv) market opportunity and demand for Rockley's products and technology, as well as the customer products into which Rockley's products and technology are incorporated; (xvi) risks related to international operations; (xvii) risks related to cybersecurity, privacy, and infrastructure; (xviii) risks related to financial and accounting matters; (xix) general economic, financial, political, and business conditions, both domestic and foreign; and (xx) Rockley's ability to realize the anticipated benefits of strategic partnerships, as well as other factors described under the heading "Risk Factors" in Rockley's Annual Report on Form 10-K for the fiscal year ended December 31, 2021, and in other documents Rockley files with the Securities and Exchange Commission in the future.

The forward-looking statements contained in this press release are based on various assumptions, whether or not identified in this press release, and on Rockley's current

Exhibit 13
Page 2510

Exhibit 13
Page 2511

expectations, beliefs, and assumptions and are not predictions of actual performance. If any of these risks or uncertainties materialize, or should any of these assumptions prove incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting Rockley will be those that have been anticipated. These forward-looking statements speak only as of the date hereof and Rockley does not intend to update or revise any forward-looking statements, whether because of new information, future events, or otherwise, except as required by law.

###

**Contact Information**

*Media*

Debra Raine

Rainemakers

Telephone: +1 415-349-7432

Email: rockleyphotonics@rainemakers.com

*Investors*

Gwyn Lauber

Rockley Photonics

Telephone: +1 626-995-0001

Email: investors@rockleyphotonics.com

4

Exhibit 13
Page 2512

# EXHIBIT 14

Exhibit 14
Page 2513

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934
Date of Report (Date of earliest event reported): June 13, 2022**

---

# Rockley Photonics Holdings Limited

**(Exact name of registrant as specified in its charter)**

---

| Cayman Islands | 001-40735 | 98-1644526 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3rd Floor 1 Ashley Road
Altrincham, Cheshire
United Kingdom**
(Address of principal executive offices)

**WA14 2DT**
(Zip Code)

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company                    ☒

Exhibit 14
Page 2514

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 14
Page 2515

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangement of Certain Officers.**

On June 15, 2022, Rockley Photonics Holdings Limited (the "Company") announced the appointment of Chad Becker as interim Chief Financial Officer to succeed Mahesh Karanth, who resigned from his position as Chief Financial Officer effective June 13, 2022. Mr. Karanth's final day of employment with the Company will be June 17, 2022.

Mr. Becker, age 47, has 20 years of corporate finance experience and has served as the Company's Vice President, Financial Planning and Analysis since March 2022. Prior to joining the Company, Mr. Becker served as Vice President, Finance at Tuft & Needle from February 2021 to August 2021. Prior to that position, Mr. Becker served as Director, Treasury at NetApp, Inc. (NASDAQ: NTAP) from August 2017 to January 2021, and from July 2006 to August 2017, Mr. Becker served as Manager, Treasury at Microsoft Corporation (NASDAQ: MSFT). Mr. Becker holds a Chartered Financial Analyst designation and received his bachelor's degree in finance and economics from the University of Arizona and Master of Business Administration degree from the University of Nevada at Las Vegas. Mr. Becker serves on the board of trustees for the University of Arizona Foundation.

While serving as interim Chief Financial Officer, Mr. Becker's annual base salary will be $370,000 with a target bonus opportunity equal to 60% of his annual base salary on a pro rata basis during his time as interim Chief Financial Officer. Mr. Becker is not a party to any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.

In connection with Mr. Karanth's departure, it is anticipated that the Company and Mr. Karanth will enter into a separation agreement and release pursuant to which Mr. Karanth will receive severance in accordance with the terms of his employment agreement, as well as an extension of the post-termination exercise period of Mr. Karanth's outstanding stock options originally granted under the Rockley Photonics Limited 2013 Stock Incentive Plan through June 13, 2024.

**Item 7.01. Regulation FD Disclosure.**

The Company has issued a press release entitled "Rockley Photonics Announces Senior Leadership Changes" which is attached as Exhibit 99.1 and incorporated herein.

The information in this Item 7.01 and the document attached as Exhibit 99.1 are being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities and Exchange Act of 1934 (the "Exchange Act"), as amended, nor otherwise subject to the liabilities of that section, nor incorporated by reference in any filings under the Securities Act of 1933 or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release of Rockley Photonics Holdings Limited dated June 15, 2022 entitled "Rockley Photonics Announces Senior Leadership Changes" |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

Date:    June 15, 2022        By:    /s/ Tom Adams

Name:    Tom Adams

Title:    General Counsel

Exhibit 14
Page 2516

Exhibit 14
Page 2517

# EXHIBIT 15

Exhibit 15
Page 2518

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934
Date of Report (Date of earliest event reported): August 16, 2021**

---

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

---

| Cayman Islands | 001-40735 | Not Applicable |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |
| **3rd Floor 1 Ashley Road Altrincham, Cheshire United Kingdom** | | **WA14 2DT** |
| **(Address of principal executive offices)** | | **(Zip Code)** |

**+44 (0) 1865 292017
(Registrant's telephone number, including area code)**

**Not Applicable
(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $.000004026575398 per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLYW | The New York Stock Exchange |

Exhibit 15
Page 2519

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company                    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 15
Page 2520

**Item 2.02. Results of Operations and Financial Condition.**

On August 16, 2021, Rockley Photonics Holdings Limited (the "Company") issued a press release announcing certain financial and other results for the fiscal quarter ended June 30, 2021. The full text of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K (this "Current Report") and is incorporated herein by reference.

The information furnished in this Current Report (including Exhibit 99.1) shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, nor shall it be deemed to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Item 9.01. Financial Statements and Exhibits.**
(d) Exhibits.

| <u>Exhibit No.</u> | <u>Description</u> |
| --- | --- |
| 99.1 | Press release, dated August 16, 2021, reporting earnings for the fiscal quarter ended June 30, 2021 |
| 104 | Cover Page Interactive Date File (embedded within the Inline XBRL document). |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

| Date: | August 16, 2021 | By: | /s/ Mahesh Karanth |
| --- | --- | --- | --- |
| | | Name: | Mahesh Karanth |
| | | Title: | Chief Financial Officer |

Exhibit 15
Page 2521

EX-99.1 2 rockley991pressrelease.htm EX-99.1

**Exhibit 99.1**



### Rockley Photonics Reports Second Quarter 2021 Financial Results

*Revenue of $2.2 million and backlog[1] of $23.0 million*

**OXFORD, England and PASADENA, California** – August 16, 2021 – Rockley Photonics Holdings Limited (NYSE: RKLY) ("the Company" or "Rockley"), a leading global silicon photonics technology company, today announced its financial results for the second quarter ended June 30, 2021.

The second quarter results for Rockley reflect the results for the three months ended June 30, 2021, for Rockley Photonics Limited, prior to the closing on August 11, 2021, of the recent business combination among Rockley's predecessor, Rockley Photonics Limited, SC Health Corporation, a public investment vehicle, and the Company, pursuant to which Rockley Photonics Limited became a wholly owned subsidiary of the Company.[2]

"I am pleased to announce our first financial results as a publicly-traded company. I believe that as a public company, we are in a stronger position than ever before to develop new solutions with potentially life-changing benefits to people across the globe," said Dr. Andrew Rickman, chief executive officer and founder of Rockley Photonics. "We're excited about the advances we've made over the past few years and, more recently, in the development of our new sensing platform. By designing the ability to measure a new range of biomarkers non-invasively into a single, compact module, we believe our mobile sensing solution has the potential to transform the landscape of health and wellness solutions by significantly increasing the functionality of wearable devices. Our success in the development of photonic solutions like this, along with our entrance into the public markets, has attracted world-renowned customers and partners who understand the unique opportunities that Rockley presents."

In recent months, Rockley achieved several key milestones. During second quarter, the Company announced its new end-to-end platform for monitoring biomarkers non-invasively. Additionally, through existing agreements and joint ventures, Rockley has continued to develop commercial opportunities for the application of silicon photonics in data communications and has increased its efforts to enhance these relationships and explore new partnerships.

**Additional Business Highlights:**

- Completed business combination with SC Health on August 11, 2021, and commenced trading on the NYSE under the ticker "RKLY," advancing the Company's development of exciting new health and wellness solutions for the next generation of consumer wearables and medical devices;

[1] Backlog is signed contract revenue that is currently in progress or the portion of contracts that have not been invoiced.

[2] References in this press release to the Company and Rockley may also refer to Rockley Photonics Limited or the combined company as the context requires.

Exhibit 15
Page 2522

Exhibit 15
Page 2523

- Increased cash position to $145.5 million which will fund the continued development of our portfolio of integrated photonics solutions following the Company's business combination with SC Health;

- Unveiled end-to-end digital health monitoring solution based on spectrophotometer-on-a-chip sensing module to augment the Company's wearables capabilities and to accelerate the deployment for customers and partners;

- Bolstered its operational capability for future growth with the continued development of a resilient and scalable supply chain; and

- Completed the construction of its Irvine, CA laboratory to capitalize on the deep silicon photonics and biomedical talent pool located in the area.

**Pre-Business Combination Second Quarter 2021 Financial Highlights:**

- Revenue of $2.2 million, compared to $1.8 million in the first quarter of 2021;

- Gross profit of $(2.4) million, compared to $(2.0) million in the first quarter of 2021;

- GAAP selling, general, and administrative expenses of $6.7 million, compared to $7.3 million in the first quarter of 2021. Non-GAAP selling, general, and administrative expenses of $6.2 million, compared to $5.9 million in the first quarter of 2021;

- GAAP research and development expenses of $17.6 million, compared to $16.0 million in the first quarter of 2021. Non-GAAP research and development expenses of $16.4 million, compared to $14.9 million in the first quarter of 2021;

- Net loss of $30.6 million, compared to a $64.8 million net loss in the first quarter of 2021;

- Adjusted EBITDA totaled $(23.4) million, compared to $(21.4) million in the first quarter of 2021;

- Cash position, with cash and cash equivalents of $35.4 million as of June 30, 2021; and

- Cash used in operations of $29.6 million, compared to $24.9 million in the first quarter of 2021.

A reconciliation of GAAP financial measures to Adjusted EBITDA (Non-GAAP) financial measures is included in the financial statement tables included in this press release.

**Conference Call Information**

Rockley Photonics will host a conference call and webcast to discuss its second quarter 2021 results at 5:00 p.m. Eastern Time today. The live audio webcast along with accompanying presentation materials will be accessible on the Company's Investor Relations website at investors.rockleyphotonics.com.

The U.S. dial-in for the call is 844-200-6205 or +44 208-0682-558 for international callers. Please reference access code 821259. A replay of the conference call will be available until August 30, 2021, at 11:59 p.m. Eastern Time, while an archived version of the webcast will be available on Rockley's Investor Relations website for one year. The U.S. dial-in for the conference call replay is +1 929-458-6194 or +44 204-525-0658. The replay access code is 348691.

**About Rockley Photonics**

A global leader in silicon photonics, Rockley is developing a comprehensive range of photonic integrated circuits and associated modules, sensors, and full-stack solutions. From next-generation sensing platforms specifically designed for mobile health monitoring and machine vision to high-speed, high-volume solutions for data communications, Rockley is laying the foundation for a new generation of applications across multiple industries. Rockley believes that photonics will eventually become as pervasive as micro-electronics, and it has developed a platform with the power and flexibility needed to address both mass markets and a wide variety of vertical applications.

Formed in 2013 by Dr. Andrew Rickman (who previously founded the first commercial silicon photonics company, Bookham Technology), Rockley is uniquely positioned to support hyper-scale manufacturing and address a multitude of high-volume markets. Rockley has partnered with numerous Tier-1 customers across a

Exhibit 15
Page 2524

Exhibit 15
Page 2525

diverse range of industries to deliver the complex optical systems required to bring transformational products to market.

To learn more about Rockley, visit rockleyphotonics.com.

**Cautionary Statement Regarding Forward-Looking Statements**

Certain statements in this press release that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "anticipate," "believe," "continue," "could," "enable," "estimate," "eventual," "expect," "future," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "will," "would" and other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this press release include, but are not limited to, statements regarding the following: (a) the Company's position to develop new solutions with potentially life-changing benefits; (b) the potential of the Company's mobile sensing solution to transform the landscape of health and wellness solutions; (c) the unique opportunities that Rockley presents; (d) the Company's continued development of commercial opportunities for the application of silicon photonics and its efforts to enhance existing and explore new partnerships; (e) the Company's plans and anticipated use of cash to fund the continued development of its portfolio of integrated photonics solutions; (f) the potential to accelerate the deployment of the Company's digital health monitoring solution for customers and partners; (g) the Company's ability to bolster its operational capability for future growth with the continued development of a resilient and scalable supply chain; and (h) the anticipated and potential features and benefits of the Company's platform, products, and technology.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond the Company's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following: (i) the Company's ability to achieve commercial production of its products and technology, including in a timely and cost-effective manner; (ii) the Company's ability to achieve customer design wins, convert memoranda of understanding and development contracts into production contracts, and achieve customer acceptance of its products and technology; (iii) risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases; (iv) the Company's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated with any future financings; (v) legal and regulatory risks, including those related to its products and technology and any threatened or actual litigation; (vi) risks associated with its fabless manufacturing model and dependency on third-party suppliers; (vii) the Company's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base; (viii) the Company's financial performance; (ix) the impacts of COVID-19 on the Company, its customers and suppliers, its target markets, and the economy; (x) the Company's ability to successfully manage growth and its operations as a public company; (xi) fluctuations in the Company's stock price and the Company's ability to maintain the listing of its ordinary shares on the NYSE; (xii) the Company's ability to anticipate and respond to industry trends and customer requirements; (xiii) changes in the Company's current and future target markets; (xiv) intellectual property risks; (xv) the Company's ability to compete successfully; (xvi) market opportunity and market demand for, and acceptance of, the Company's products and technology, as well as the customer products into which the Company's products and technology are incorporated; (xvii) risks related to international operations; (xviii) risks related to cybersecurity, privacy, and infrastructure; (xix) risks related to financial and accounting matters; (xx) general economic, financial, legal, political, and business conditions and changes in domestic and foreign markets; (xxi) the Company's ability to realize the anticipated benefits of the business combination; and (xxii) changes adversely affecting the businesses or markets in which the Company is engaged, as well as other factors described under the heading "Risk Factors" in the prospectus/proxy statement filed by the Company on July 22, 2021, the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2021, and in other documents the Company files with the Securities and Exchange Commission in the future. The forward-looking statements contained in this press release are based on various assumptions, whether or not identified in this press release, and on the Company's current expectations, beliefs, and assumptions and are not predictions of actual performance. If any of these risks or uncertainties materialize, or should any of these assumptions prove

Exhibit 15
Page 2526

incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting the Company will be those that have been anticipated. These forward-looking statements speak only as of the date hereof and the Company specifically disclaims any obligation to update or revise any forward-looking statements, whether because of new information, future events, or otherwise.

###

**Contact Information**

**For Rockley**

*Media*
John Christiansen, Camilla Scassellati Sforzolini
Sard Verbinnen & Co
Rockley-SVC@sardverb.com

*Investors*
Gwyn Lauber
Rockley Photonics Holdings Limited
investors@rockleyphotonics.com

Exhibit 15
Page 2527

**Second Quarter 2021 Financial Results**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Condensed Consolidated Statements of Operations and Comprehensive Loss**
*(Unaudited and in thousands, except share and per share amounts)*

| | Three Months Ended | | | Six Months Ended | |
|---|---|---|---|---|---|
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2020 |
| Revenue | $ 2,195 | $ 1,771 | $ 7,881 | $ 3,966 | $ 14,544 |
| Cost of revenue | 4,549 | 3,734 | 6,522 | 8,283 | 13,085 |
| Gross profit | (2,354) | (1,963) | 1,359 | (4,317) | 1,459 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses | 6,715 | 7,305 | 3,604 | 14,020 | 7,249 |
| Research and development expenses | 17,551 | 15,980 | 7,746 | 33,531 | 16,217 |
| Total operating expenses | 24,266 | 23,285 | 11,350 | 47,551 | 23,466 |
| **Loss from operations** | (26,620) | (25,248) | (9,991) | (51,868) | (22,007) |
| Other income (expense): | | | | | |
| Forgiveness of PPP loan | 2,860 | — | — | 2,860 | — |
| Interest expense, net | (179) | (147) | (34) | (326) | (74) |
| Equity method investment loss | (597) | (163) | (102) | (760) | (252) |
| Change in fair value of debt instruments | (6,008) | (39,653) | 312 | (45,661) | (2,222) |
| Gain (loss) on foreign currency | 97 | 534 | (108) | 631 | (1,654) |
| Total other income (expense) | (3,827) | (39,429) | 68 | (43,256) | (4,202) |
| **Loss before income taxes** | (30,447) | (64,677) | (9,923) | (95,124) | (26,209) |
| Provision for income tax | 110 | 100 | 80 | 210 | 220 |
| **Net loss and comprehensive loss** | $ (30,557) | $ (64,777) | $ (10,003) | $ (95,334) | $ (26,429) |
| **Net loss per share:** | | | | | |
| Basic and diluted | $ (0.90) | $ (1.92) | $ (0.30) | $ (2.82) | $ (0.79) |
| **Weighted-average shares outstanding:** | | | | | |
| Basic and diluted | 33,922,973 | 33,776,356 | 33,625,899 | 33,850,070 | 33,554,441 |

Exhibit 15
Page 2528

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Condensed Consolidated Balance Sheets**
*(in thousands, except share amounts and par value)*

|  | As of | |
|---|---|---|
|  | **June 30, 2021** | **December 31, 2020** |
|  | *(Unaudited)* | |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 35,395 | $ 19,228 |
| Accounts receivable, net of allowance for doubtful accounts of $377 and $0 as of June 30, 2021 and December 31, 2020, respectively | 2,411 | 4,925 |
| Other receivables | 23,037 | 18,024 |
| Prepaid expenses | 7,724 | 1,605 |
| Other current assets | 258 | 609 |
| Total current assets | 68,825 | 44,391 |
| Property, equipment, and finance lease right-of-use assets, net | 8,170 | 6,182 |
| Equity method investment | 4,711 | 5,202 |
| Intangible assets, net | 3,048 | 3,048 |
| Other non-current assets | 11,715 | 1,607 |
| Total assets | $ 96,469 | $ 60,430 |
| | | |
| **Liabilities and Stockholders' Deficit** | | |
| Current liabilities | | |
| Trade payables | $ 8,692 | $ 4,413 |
| Accrued expenses | 12,104 | 10,395 |
| Other current liabilities | 1,020 | 998 |
| Total current liabilities | 21,816 | 15,806 |
| Long-term debt | 194,328 | 74,804 |
| Other long-term liabilities | 2,719 | 1,127 |
| Total liabilities | 218,863 | 91,737 |
| | | |
| Stockholders' deficit | | |
| Ordinary shares, $0.00001 par value; 55,982,833 authorized as of June 30, 2021 and December 31, 2020; 33,825,620 and 33,637,762 issued and outstanding as of June 30, 2021 and December 31, 2020, respectively | — | — |
| Additional paid-in-capital | 205,823 | 201,576 |
| Accumulated deficit | (328,217) | (232,883) |
| Total stockholders' deficit | (122,394) | (31,307) |
| Total liabilities and stockholders' deficit | $ 96,469 | $ 60,430 |

Exhibit 15
Page 2529

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Condensed Consolidated Statements of Cash Flows**
*(Unaudited and in thousands)*

| | Three Months Ended | | | Six Months Ended | |
|---|---|---|---|---|---|
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2020 |
| **Cash flows from operating activities:** | | | | | |
| Net loss | $ (30,557) | $ (64,777) | $ (10,003) | $ (95,334) | $ (26,429) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | |
| Depreciation and amortization of property, equipment and finance lease right-of-use assets | 1,069 | 930 | 706 | 1,999 | 1,395 |
| Gain on disposal of property and equipment | | | | — | (98) |
| Bad debt expense | — | 377 | — | 377 | — |
| Stock-based compensation | 1,976 | 1,725 | 2,545 | 3,701 | 4,189 |
| Change in equity-method investment | 604 | (113) | 102 | 491 | 252 |
| Change in fair value of debt instrument | 6,008 | 39,653 | (312) | 45,661 | 2,222 |
| Forgiveness of Paycheck Protection Program loan | (2,860) | — | — | (2,860) | — |
| Changes in operating assets and liabilities: | — | | — | | |
| Accounts receivable | (106) | 2,243 | (921) | 2,137 | (1,382) |
| Other receivables | (2,644) | (2,369) | 10,588 | (5,013) | 8,602 |
| Prepaid expenses and other current assets | (63) | (5,706) | 697 | (5,769) | 1,263 |
| Other non-current assets | (236) | (1,497) | 180 | (1,733) | 357 |
| Trade payables | (2,102) | 1,972 | (709) | (130) | (4,347) |
| Accrued expenses | (441) | 843 | (1,432) | 402 | 1,708 |
| Other current and long-term liabilities | (206) | 1,820 | (38) | 1,614 | (838) |
| Net cash used in operating activities | (29,558) | (24,899) | 1,403 | (54,457) | (13,106) |
| **Cash flows from investing activities:** | | | | | |
| Purchase of property and equipment | (2,109) | (437) | (713) | (2,822) | (650) |
| Payment for asset acquisition | (500) | — | — | (500) | — |
| Investment in equity method investee | — | (2,500) | — | — | (2,500) |
| Net cash used in investing activities | (2,609) | (2,937) | (713) | (3,322) | (3,150) |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from convertible loan notes | — | 76,723 | 3,900 | 76,723 | 12,250 |
| Principal payments on long-term debt | — | — | (1,033) | — | (1,952) |
| Proceeds from issuance of ordinary shares, net of issuance costs | — | — | (2,213) | — | (126) |
| Proceeds from Paycheck Protection Program loan | — | — | — | — | 2,860 |
| Proceeds from exercise of options | 146 | 137 | 2,094 | 283 | 2,114 |
| Proceeds for warrants to be exercised | — | 263 | — | 233 | — |
| Proceeds from issuance of warrants | 233 | — | (7) | 263 | — |
| Debt issuance costs incurred | (2,416) | (1,140) | 649 | (3,556) | — |
| Principal payments on finance lease | — | — | (1,231) | — | (1,231) |
| Net cash provided by financing activities | (2,037) | 75,983 | 2,159 | 73,946 | 13,915 |
| **Net increase (decrease) in cash and cash equivalents** | (34,204) | 48,147 | 2,849 | 16,167 | (2,341) |
| **Cash and cash equivalents:** | | | | | |
| Beginning of period | 69,599 | 19,228 | 15,176 | 19,228 | 20,904 |
| End of period | $ 35,395 | $ 69,599 | $ 18,563 | $ 35,395 | $ 18,563 |

Exhibit 15
Page 2530

Exhibit 15
Page 2531

**Use of Non-GAAP Financial Measures**

This press release references certain financial measures that are not prepared in accordance with generally accepted accounting principles in the United States (GAAP), including Adjusted EBITDA, non-GAAP cost of revenue, non-GAAP selling, general, and administrative expense and non-GAAP research and development expense. The Company defines Adjusted EBITDA as earnings before interest expense, taxes, depreciation and amortization, stock-based compensation, and certain other items the Company believes are not indicative of its core operating performance. The Company defines non-GAAP cost of revenue as cost of revenue as cost of revenue other than stock-based compensation, non-GAAP selling, general, and administrative expenses as selling, general, and administrative expenses other than stock-based compensation, non-capitalized transaction costs and forgiveness of PPP loan, and non-GAAP research and development expenses as research and development expenses other than stock-based compensation. None of these non-GAAP financial measures is a substitute for or superior to measures of financial performance prepared in accordance with GAAP and should not be considered as an alternative to any other performance measures derived in accordance with GAAP.

The Company believes that presenting these non-GAAP financial measures provides useful supplemental information to investors about the Company in understanding and evaluating its operating results, enhancing the overall understanding of its past performance and future prospects, and allowing for greater transparency with respect to key financial metrics used by its management in financial and operational-decision making. The Company uses these non-GAAP measures to help assess its operating performance and operating leverage in its business, analyze its financial results, establish operational goals, develop operating budgets, and make strategic decisions. The Company also believes that the presentation of these non-GAAP financial measures provides an additional tool for investors to use in comparing its core business and results of operations over multiple periods with other companies in its industry, many of which present similar non-GAAP financial measures to investors, and to help analyze the Company's cash performance.

Other companies may calculate non-GAAP measures differently, or may use other measures to calculate their financial performance, and therefore any non-GAAP measures the Company uses may not be directly comparable to similarly titled measures of other companies. Further, there are a number of limitations related to the use of non-GAAP measures and their nearest GAAP equivalents. Accordingly, these non-GAAP financial measures should be considered as supplemental in nature, should not be considered as the sole measure of the Company's performance, and are not intended to be construed, and should not be considered, in isolation from, or as a substitute for, the comparable or related financial information calculated in accordance with GAAP.

These limitations of the non-GAAP financial measures presented in this press release include the following:

- *Adjusted EBITDA*: (i) The exclusion of certain recurring, non-cash charges, such as depreciation of property and equipment and stock-based compensation expense. While these are non-cash charges, the Company may need to replace the assets being depreciated and amortized in the future and Adjusted EBITDA does not reflect cash requirements for these replacements or new capital expenditure requirements; and ii the exclusion of stock-based compensation expense, which has been a significant recurring expense and the Company expects will continue to constitute a significant recurring expense for the foreseeable future, as equity awards are expected to continue to be an important component of the Company's compensation strategy.

- *Non-GAAP cost of revenue, non-GAAP selling, general, and administrative expenses, and non-GAAP research and development expenses*: The exclusion of stock-based compensation expense, which has been a significant recurring expense and the Company expects will continue to constitute a significant recurring expense for the foreseeable future, as equity awards are expected to continue to be an important component of the Company's compensation strategy.

In addition, non-GAAP selling, general, and administrative expenses exclude non-recurring expense related to non-capitalized transaction costs. While the Company expects this non-recurring expense to cease, the Company expects new non-recurring expense will be introduced following the Business Combination such as

Exhibit 15
Page 2532

Exhibit 15
Page 2533

change in fair value of the Company's outstanding warrants which the Company expects will constitute to be a significant expense until all warrants are exercised and/or redeemed.

Because of these limitations, you should consider Adjusted EBITDA, non-GAAP cost of revenue, non-GAAP selling, general, and administrative expenses, and non-GAAP research and development expenses alongside other financial performance measures, including net loss and the Company's other GAAP results. The information in the tables below sets forth the non-GAAP financial measures along with the most directly comparable GAAP financial measures.

A reconciliation of Adjusted EBITDA to net loss for the three months ended June 30, 2021, March 31, 2021 and June 30, 2021 and six months ended June 30, 2021 and 2020, respectively, are set forth below:

| *(Unaudited and in thousands)* | Three Months Ended | | | Six Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2021 |
| **Net Loss** | $ (30,557) | $ (64,777) | $ (10,003) | $ (95,334) | $ (26,429) |
| Interest expense, net | 179 | 147 | 34 | 326 | 74 |
| Income tax expense | 110 | 100 | 80 | 210 | 220 |
| Depreciation and amortization | 1,069 | 930 | 706 | 1,999 | 1,395 |
| **EBITDA** | (29,199) | (63,600) | (9,183) | (92,799) | (24,740) |
| Non-capitalized transaction costs* | 79 | 961 | 30 | 1,040 | 30 |
| Stock-based compensation | 1,976 | 1,725 | 2,545 | 3,701 | 4,189 |
| Forgiveness of PPP Loan | (2,860) | — | — | (2,860) | — |
| Equity method investment loss | 604 | (113) | 102 | 491 | 252 |
| Change in fair value of debt instruments | 6,008 | 39,653 | (312) | 45,661 | 2,222 |
| **Adjusted EBITDA** | $ (23,392) | $ (21,374) | $ (6,818) | $ (44,766) | $ (18,047) |

A reconciliation of cost of revenue to non-GAAP cost of revenue for the three months ended June 30, 2021, March 31, 2021, June 30, 2020 and six months ended June 30, 2021 and 2020, respectively, are set forth below:

| *(Unaudited and in thousands)* | Three Months Ended | | | Six Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2020 |
| Cost of revenue | $ 4,549 | $ 3,734 | $ 6,522 | $ 8,283 | $ 13,085 |
| Stock-based compensation | 363 | 268 | 870 | 631 | 1,341 |
| Non-GAAP Cost of revenue | $ 4,186 | $ 3,466 | $ 5,652 | $ 7,652 | $ 11,744 |

Exhibit 15
Page 2534

A reconciliation of selling, general, and administrative expenses to non-GAAP selling, general, and administrative expenses for the three months ended June 30, 2021, March 31, 2021, June 30, 2020 and six months ended June 30, 2021 and 2020, respectively, are set forth below:

| *(Unaudited and in thousands)* | Three Months Ended | | | Six Months Ended | |
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2020 |
| --- | --- | --- | --- | --- | --- |
| Selling, general and administrative expenses | $ 6,715 | $ 7,305 | $ 3,604 | $ 14,020 | $ 7,249 |
| Stock-based compensation | 442 | 409 | 345 | 851 | 767 |
| Non-capitalized transaction costs* | 79 | 961 | 30 | 1,040 | 30 |
| Non-GAAP selling, general, administration expenses | $ 6,194 | $ 5,935 | $ 3,229 | $ 12,129 | $ 6,452 |

A reconciliation of research and development expenses to non-GAAP research and development expenses for the three months ended June 30, 2021, March 31, 2021, June 30, 2020 and six months ended June 30, 2021 and 2020, respectively, are set forth below:

| *(Unaudited and in thousands)* | Three Months Ended | | | Six Months Ended | |
| | June 30, 2021 | March 31, 2021 | June 30, 2020 | June 30, 2021 | June 30, 2020 |
| --- | --- | --- | --- | --- | --- |
| Research and development expenses | $ 17,551 | $ 15,980 | $ 7,746 | $ 33,531 | $ 16,217 |
| Stock-based compensation | 1,171 | 1,048 | 1,330 | 2,219 | 2,081 |
| Non-GAAP Research and development expenses | $ 16,380 | $ 14,932 | $ 6,416 | $ 31,312 | $ 14,136 |

---

\* Non-capitalized transaction costs include non-recurring expense related to the issuance of convertible loan notes and the Business Combination.

Exhibit 15
Page 2535

# EXHIBIT 16

Exhibit 16
Page 2536

**NewsRoom**

8/11/22 FD (Fair Disclosure) Wire 20:00:00

FD (Fair Disclosure) Wire
Copyright (c) 2022 Thomson Financial and VIQ Media Transcription, Inc.

August 11, 2022

Q2 2022 Rockley Photonics Holdings Ltd Earnings Call - Final

Presentation

OPERATOR: Welcome, and thank you for joining us today for this Rockley Photonics Second Quarter 2022 Conference Call. As a reminder, all phone participants are in a listen-only mode and later you will have the opportunity to ask questions. Please remember, today's conference is being recorded. And now to get us started with opening remarks and introduction time, I'm pleased to turn the floor over to your host, Gwyn Lauber. Please go ahead.

GWYN LAUBER, VP OF IR, ROCKLEY PHOTONICS HOLDINGS LIMITED: Thank you, operator, and welcome, everyone. This is Gwyn Lauber, Vice President of Investor Relations at Rockley Photonics. Today, we released the results for the second quarter ended June 30, 2022. A copy of our earnings press release, along with supplemental financial tables are available on the Investor Relations section of our website at investor.rockleyphotonics.com.

With me on today's call are Dr. Andrew Rickman, OBE, Chairman and Chief Executive Officer; and Chad Becker, Interim Chief Financial Officer. This call is being webcast and will be archived on the Investor Relations section of Rockley's website.

Before I turn the call over to Andrew, I'd like to note that today's discussion will contain forward-looking statements. These forward-looking statements include, but are not limited to, the anticipated features, benefits, scope, focus, status and goals of our platform, technology, products, studies and partnerships with third parties, our ability to bring and the timing of bringing our products to market, our product development schedules, our strategies, our research and development plans, our customers, our commercial and market opportunities and trends, our debt obligations, our cost and expenses, our cash resources, cash burn, revenue guidance, financial projections and financial performance, and outlook and factors affecting the foregoing.

These forward-looking statements are subject to risks and uncertainties that may cause actual results to vary materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those discussed in our earnings press release and the Risk Factors section of our annual report on Form 10-K, as well as our other filings with the SEC. Any forward-looking statements that are made on this call are based on assumptions as of today. We undertake no obligation to update these statements as a result of new information or future events.

In addition to U.S. GAAP reporting, Rockley reports certain non-GAAP financial measures that do not conform to generally accepted accounting principles. We believe that these non-GAAP measures enhance the understanding of our performance. Reconciliations of these GAAP and non-GAAP measures are included in the tables found in our earnings press release.

Now I'll turn the call over to Andrew.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 16    1
Page 2537

ANDREW G. RICKMAN, FOUNDER, CHAIRMAN OF THE BOARD, PRESIDENT & CEO, ROCKLEY PHOTONICS HOLDINGS LIMITED: Thank you, Gwyn, and thank you all for joining us for our second quarter 2022 earnings conference call. Today, I'll start by briefly discussing our results and then talk about our business. In the second quarter, we generated revenues of $1.5 million. Our GAAP net loss for the second quarter was $54.2 million, plus noncash charges related to the CRM of $67.6 million for a total of $121.8 million. This compares to a loss of $41.8 million in the first quarter of 2022, which included an interest payment for our debt and expenses for our datacom business. We ended the quarter with $46.6 million in cash, cash equivalents and investments. In a few moments, Chad will provide more detail on our financials. A full summary of our financial statements is available on the Investor Relations section of our website.

Turning to our business. I'm especially happy to speak with you on the first anniversary of our business combination. One year ago, I could not have imagined how far our business would have come. As I addressed you, we are at an extraordinary point for the company as we move from R&D to starting production of a solution that, I believe, will truly change the way we approach health care and will help improve the health and wellness of people worldwide. As you know, there's an ongoing convergence of med tech and consumer wearable markets as they buy predominance in the health and wellness marketplace. We believe that Rockley solution fits firmly at the center of this convergence and that our biosensing solution will help to provide competitive differentiation to our partners and customers.

At our core is our commitment to helping to change the health care landscape, from a sick care system to a truly health care system. We believe that not only is technology enabling this change, but also society's realization that we can and must do better. We need to learn how to improve our baseline health. And by providing a comprehensive biomarker monitoring solution, we believe that we will offer tools to enable consumers, patients and health care providers to improve health outcomes by acting on the data received from our products.

In the U.S., nearly 20% of the U.S. GDP is spent on sick care. We believe that our solution has the potential to reduce the cost of treatment and improve health outcomes by identifying symptoms of illness and chronic disease much earlier. By helping people understand their physiology as they work towards positive outcomes, we believe our devices will help to enable wellness proactively rather than waiting to treat illness reactively.

Now I'd like to provide some insights into our markets. Today, we have 19 customers across the consumer wearables med tech market, representing 6 of the top 10 largest wearable companies and 2 of the 5 largest med tech companies. We continue to increase our engagement with these and other customers. It's worth noting that in med tech we have customer interest across multiple segments, including patient monitoring, clinical trials, health and wellness monitoring, lifestyle management, pharmaceuticals and fitness. We believe that this expanded customer base should provide us with multiple opportunities in the market and will allow us to not be overly reliant on any one customer.

Turning to consumer wearables. In June, we announced that one of our Tier 1 consumer wearable customers have begun an evaluation program using Rockley's photonic-based sensing technology. Under the program, Rockley's VitalSpex Pro comprehensive noninvasive biomarker measurement solution has been evaluated for potential integration into the customers' future wearable products. The Tier 1 customer adds to Rockley's growing list of global consumer electronics manufacturers to receive shipments of our VitalSpex Pro technology, which is expected to enable the noninvasive measurement of alcohol, glucose and lactate from a wrist-worn device. This evaluation is a big milestone as it will further the development of our Pro solution.

In med tech, during the quarter, we signed a supply agreement and received our first purchase order for our Bioptx baseline band from a global health technology provider. This was a very exciting accomplishment for us. We plan to begin shipping units to the customer in the fourth quarter. The customer also provided their forecast for 2023 purchases, which includes a significant ramp throughout the year as we achieve ISO and other regulatory qualifications. This first order is truly exciting as it means that we could have some devices on the wrist of end users by year-end. To that end, we received production of Bioptx baseline band

devices from our manufacturing partner. I'm delighted to have this near final version in my hand and look forward to showing the device to you throughout the quarter.

Another important announcement for us was our agreement to partner with a top 10 clinical research organization. This new customer will work with us to develop and evaluate our Bioptx wristband, our cloud services and other elements of our biosensing platform. We believe this partnership will provide the first opportunity to integrate our health monitoring solution into a CRO's clinical research studies. By offering an expanded range of biomarkers, including core body temperature, hydration, blood pressure, alcohol, glucose and lactate, this partnership not only will expand our reach in med tech, but it also has the potential to significantly aid CROs by creating opportunities for clinicians and researchers to conduct decentralized trials and gain crucial insight into the health and well-being of patients throughout the trials regardless of their location.

We recently made several announcements that I believe will help to enhance our understanding of our markets and regulatory landscape as well as sharpening our overall strategic vision. First, I am delighted to welcome Richard Kuntz to our Board of Directors. Rick brings an incredibly broad background in multiple areas of health care. Most recently, he served as Chief Medical and Scientific Officer at Medtronic. He was also the Founder and Chief Scientific Officer of the Harvard Clinical Research Institute, a university-based contract research organization which coordinates National Institute of Health and industrial clinical trials with the FDA. Additionally, he directed numerous multi-center clinical trials, authored more than 250 original peer-reviewed publications and served as an Associate Professor of Medicine at the Harvard Medical School. I am very excited to have Rick on board.

We also announced the formation of our Scientific Advisory Board, or SAB. This group of experts brings experience in therapies for diseases associated with diabetes and cardiology, as well as human hydration and fundamental spectroscopy and is tasked with helping to further the company's ongoing efforts to revolutionize wearable biosensing technology. The newly formed SAB will support Rockley's mission to empower people to make better informed decisions about their health and well-being.

Now I'll update you on our human trials. In the second quarter we expanded on our preliminary human studies into core body temperature, hydration and blood pressure with larger follow-on studies of these biomarkers ahead of the launch of Bioptx baseline band. Our focus was on a broad range of study participants and use cases, and additional validation data was collected. Our Bioptx baseline band is expected to launch in the fourth quarter. The data that we've collected continues to support the results of our previous studies and helps us fine-tune the performance of the Rockley sensing platform with the goal of providing accuracy that is closer to the gold standard than any of the commercially available devices.

As a reminder, core body temperature, blood pressure and hydration biomarkers, along with heart rate, heart rate variability, respiration and blood oxygen levels will be measured in our baseline solution. We are also conducting early-stage studies of our Pro solution, which includes the measurement of alcohol, glucose and lactate, in addition to the biomarkers available in our baseline technology. We are very pleased with the early results. We plan to update you on the results of our human studies for each biomarker as we complete various programs throughout the year.

Now I'd like to update you on our move to production. To ready ourselves for our production ramp in 2023, we've assembled a network of suppliers to support our manufacturing. We built a dual source strategy to ensure a diversified supply chain that we hope will help mitigate potential issues with any one supplier. We've made significant progress in our wristband manufacturing capability. As we move to the next phase of production, I'm very optimistic as the team we've assembled is world-class and has the know-how to steer us through this stage.

Now I'd like to update you on our datacom asset. In the second quarter, we received what we thought was a very good offer for this business. As we moved through the negotiations, it became apparent that the buyer was trying to have a step in terms of the original agreement. We realized that it was crucial to protect our IP and our business. With our focus on the production of our baseline band, it became clear that actively trying to monetize our datacom asset have become a distraction. Since stopping the

Case 2:23-cv-09501-MRA-MAA    Document 34-10    Filed 12/22/23    Page 55 of 607 Page ID #:2694

transaction, we repurposed most of the datacom staff and resources. We are not proactively pursuing a similar type of transaction for the datacom business.

We have eliminated its expenses, making the transaction cash flow neutral, thereby achieving our financial objectives. We still believe there is an opportunity to monetize our datacom asset. But as we move to production, all our energies must be focused on our baseline band. I strongly believe that Rockley is pursuing the right path for our future. We continue to develop highly sophisticated solutions that will provide individuals and health care professionals with a powerful holistic view of human health through insights provided by multiple biomarkers. Our solution will allow these audiences to monitor and track trends on individual's health and wellness. I believe this will profoundly change today's system as we move from providing sick care to true health care.

The insights that our products will enable have the potential to change one's daily life by providing a deeper understanding of the impact of lifestyle choices on one's health, helping physicians identify serious health conditions and possible disease states earlier, allowing for more affordable prevention measures and providing a real opportunity for remote patient monitoring. I believe our solution, which utilizes our very powerful technology, will help to profoundly change health care for the better. We've reached a very exciting time at Rockley. As I sit in our office in Pasadena, I'm amazed at how far we've come. I truly feel the excitement around the office as we move towards the production stage. We believe what we are doing is truly exceptional as we're building a technology that will truly change the current health care system and will help improve the health and wellness of people worldwide.

With that, I will turn the call over to Chad for a review of our financial performance in the quarter. Thank you.

CHAD BECKER, INTERIM CFO, ROCKLEY PHOTONICS HOLDINGS LIMITED: Thank you, Andrew, and good afternoon, everyone. On today's call, I will discuss some key topics and will provide you with a deeper understanding of our business. I will end by providing an update on our outlook for the remainder of 2022. We recorded revenue of approximately $1.5 million in the second quarter. Revenue for the quarter was solely related to nonrecurring engineering services from our customers and revenue is recognized based on mutually agreed performance, obligation and acceptance.

Cost of revenue was $2.3 million, resulting in a gross profit of negative $800,000. It is important to note that expenses are recorded as incurred even if revenue has not been recognized. In Q2, R&D expenditures were $26.3 million, which includes a slight increase in product design services and third-party engineering, as well as other expenses as we build our infrastructure to support our product efforts ahead of our second half 2022 production ramp. This compares to R&D expenditures of $24.8 million in Q1.

SG&A expenses increased from $10.9 million in Q1 to $21 million in the second quarter due to noncapitalized fees related to the recent issuance of our convertible notes. For the second quarter, our cash burn was impacted by several expenses, which resulted in higher cash outlays. These expenses included $10 million in noncapitalized deal fees and other onetime expenses, including expenses for our datacom business of roughly $1.6 million related mainly to salaries and (inaudible) partner spend. As Andrew noted, our efforts to repurpose our datacom employees and eliminate those expenses is expected to be cash flow neutral compared to our previous divestment plan.

Excluding these expenses, cash used in operating activities during the quarter totaled approximately $29.6 million, an improvement from the first quarter as we implemented programs to preserve capital and reduce cash burn. We believe that our cash burn will be lower in the second half of 2022 as we work towards reducing expenses. We ended the quarter with $46.6 million in cash, cash equivalents and investments. We did not utilize any funds from our e-lock. And as a reminder, we believe that we will receive additional funds from a U.K. R&D tax credit.

Looking ahead to 2022, our core product revenue guidance is $5 million to $10 million. While we believe that there may be future opportunities to monetize our datacom assets, we have not included any revenue from it in our guidance. For 2023, we plan to issue revenue guidance on our third quarter earnings call.

In wrapping up my prepared remarks, I'll just add that we believe the opportunity in front of us is large and that with discipline, we will execute on our road map ahead. I will now turn the call back to the operator to open up the call for questions.

Questions and Answers

OPERATOR: (Operator Instructions) We'll hear first from Quinn Bolton at Needham.

NATHANIEL QUINN BOLTON, SENIOR ANALYST, NEEDHAM & COMPANY, LLC, RESEARCH DIVISION: Congratulations on the first volume purchase order for the Bioptx platform. I guess I was hoping you might be able to provide a little bit more detail on that initial contract, and Andrew, you mentioned the possibility or a forecast for a pretty significant ramp in 2023. Can you just quantify how much this initial purchase order might generate in revenue and then give us a sense as you look into 2023, could this customer generate tens of millions of dollars, single-digit millions of dollars, just any kind of ballpark we could think about as we're trying to model 2023?

ANDREW G. RICKMAN: Yes. This is a very, very, very big opportunity. This alone could make the company extremely substantial. So this customer has provided us with initial purchase order, but has given us also the forecast for the year ahead, and we have a good grasp of the overall market opportunity associated with this particular channel over the next couple of years. And so it's a very, very large opportunity.

NATHANIEL QUINN BOLTON: Just maybe -- would that be hundreds of thousands potentially of wristbands? Or I mean, is it substantial? And it sounds like it's pretty large order or potential.

ANDREW G. RICKMAN: Yes. The addressable market through this channel is in the millions of units in due course.

NATHANIEL QUINN BOLTON: Second question for me, just I was wondering if you might be able to update us on your efforts in the consumer electronics segment. I believe you were going to be providing samples to a Tier 1 customer in the fourth quarter with a potential launch of a customer device sometime in 2023. Is that still the right time frame to be thinking about for the consumer electronics opportunity?

ANDREW G. RICKMAN: We are working very closely with all of the consumer customers that we've got on their design and processes. At this point in time, we can't say anything about the specific launch plans. But those design-in activities are going very, very well. It is worth noting that since we took the company public a year ago, there really has been a shift around in terms of the timing that our own respond and the Bioptx respond that you now see has really accelerated ahead of everything else and is our focus in terms of revenue for next year.

The design-in activities associated with the consumer device companies are very exciting. They represent tens of thousands of units just in their own sort of qualification and ramp-up phase and then building inventory. But what we can see at this time is with great firmness is around our own wristband, which gives us a lot of confidence as we look forward for the business in 2023.

NATHANIEL QUINN BOLTON: And then just maybe one for Chad. How should we think about OpEx? I know you've said that on the one hand you've taken actions to reduce OpEx in the second half, but it sounds like much of the staff that was deployed on datacom has been redeployed to focus on the health care and the medical device opportunity. And so I'm just trying to sort of think about those 2 comments and what it implies for OpEx on a quarterly basis into the second half of this year?

CHAD BECKER: Yes. I would just like to say that the entire company is committed to the efficiency of cash and I'm just pleased how the entire organization is committed to that cause. So whether it's hiring employees or investing in the CapEx, we just continue to be very diligent with the cash usage. And as we've mentioned in the past, our target for the cash burn, we are focusing on doing our best to be on the lower range of that band.

OPERATOR: Next, we'll move to Paul Silverstein at Cowen.

PAUL JONAS SILVERSTEIN, MD & SENIOR RESEARCH ANALYST, COWEN AND COMPANY, LLC, RESEARCH DIVISION: Andrew, before I ask my real question, I want to make sure I understood you correctly on this call and from your press release. I think what you're telling us is that the consumer wearable opportunity, which, correct me if I'm wrong, you previously projected $300 million to $320 million of revenue for '23, you've now removed that guidance. So I heard you just say the initial opportunities tens of thousands of units, but I think you're telling us that you no longer expect any of the consumer wearable companies to go forward in a meaningful way in '23. I just want to make sure that I understand that correctly before I ask you some other questions.

ANDREW G. RICKMAN: No, it's not quite what we've said, but we said that the -- our own respond going into the medical applications and it's designed specifically for that area is dominating us for 2023 in terms of our expectations for the year. From the consumer device customer point of view, there's still a huge amount of activity and design-in activity going on in that area. But it is predicated on those customers launching their products for us to be able to forecast those customers beyond the tens of thousands of units that are relevant to the buildup, if you like, of their own qualification of their own devices. So as we look forward, we're seeing a greater level of certainty in terms of our revenues for 2023, driven by our own device, which is exceeding our previous expectations in terms of its potential.

PAUL JONAS SILVERSTEIN: But Andrew, I'm not trying to be argumentative, but I'm confused. You had a $300 million to $320 million guidance out there based on consumer wearables. You now have your med tech that stepped up. The way you're presenting it, it sounds like it's a choice, which it shouldn't be. I would think that the med tech opportunity, which has manifested itself faster than you all had previously conveyed that, that should increase your confidence as to $300 million to $320 million and frankly, even more than increase the confidence, should augment, it should be something north of that.

But by virtue of taking away that guidance, again, I'm not trying to be argumentative here. I'm just trying to understand, by taking away, it sounds like you don't have the confidence on the wearable side anymore. Otherwise, you want to remove the guidance you've been telling us, now with the strength of med tech having materialized, you're looking at something even greater than $300 million to $320 million. What am I not understanding?

ANDREW G. RICKMAN: I think it's a good point, Paul. There's definitely -- as we look at our projections going out into future years and when you think about it earlier in this year, then the certainty associated with any of the revenues had a particular risk associated with it. Now we find ourselves in a situation where we are much, much more certain about the prospects of our own wristband and where that is much more in our control. So there's always going to be risks associated with our customers in terms of -- particularly in the consumer device area in terms of their launch and their particular ramp. So our confidence in the mix has definitely moved towards the med tech area.

And you are right to point out that in the consumer device area, there is an element of less certainty in terms of the ramp-up. But the fundamental point is that our overall business prospects in our view are actually stronger than they have been before because when you look at the wearable device ourselves, you look at the average selling price, you look at the margin associated with it, you look at the diversity of customers that we've got in that particular area, this is a very exciting prospect for the business. And it leads the way now in a way where initially we thought the consumer device customers were going to lead the way. Now we're in a position where that order book, if you like, and visibility is firming up earlier on the med tech side, which is a more profitable and in the sense exciting business.

And then when you look at the overall size of the individual markets, if you look at those 2 markets in terms of their dollar representation for us, they're about equal in terms of size. They're both still strongly there, but the med tech, you're right to observe, the med tech has definitely accelerated ahead.

PAUL JONAS SILVERSTEIN: But Andrew, if they're equal in size, why are you all backing away from the original guidance? And the real question is on the consumer wearables side, given that time has marched on and one would think objectively that at this point in time you would have greater visibility, and I'm trying to understand what's happened. It's not just one customer, it's not just Apple. It sounds like as a general proposition, the consumer wearable companies are taking more time. Not that it won't materialize.

The real question is, what -- if we dialed back the clock in time, you all had stated that there were no meaningful hurdles from a technology standpoint that remaining to be overcome for adoption and deployment. And I'm trying to understand what's changed. It sounds like something has changed with consumer wearable companies where they're not moving forward consistent with what your original expectations were. And again, the question is, what's changed? Is it a technology hurdle issue? Is it a commercial issue? What's changed?

ANDREW G. RICKMAN: I don't think anything has changed. But from our point of view, in terms of our emphasis and our effort in terms of getting product out there, clearly, we're seeing a stronger pull with more profitability from the med tech area. So if you look at the utilization of our own cash and capital in terms of our own efforts to meet the numbers for 2023, it's just so much clearer for us in the med tech area than it is in the consumer device area.

And in the consumer device area, we continue the design-in processes, but our hands are in a sense in -- our position is in the hands of those consumer device companies in terms of their launch program. So I think we're making the message pretty clear that the emphasis has moved towards the medical device companies. The opportunity, as you rightly point out in the consumer device area, is still there, but we are in the hands of those companies in terms of their own launch programs.

PAUL JONAS SILVERSTEIN: My last question, again, I just want to make sure I understand this. If Xiaomi or another consumer wearable technology company placed a significant order with you for inclusion in their devices shipping in '23, you're not telling us that you don't have the production capability to satisfy both your med tech customers and your consumer wearable customers, and this is all about a choice you're making to focus on med tech as opposed to consumer wearables. That -- I would think that would be crazy, but I'll let you respond.

ANDREW G. RICKMAN: Yes. I'm not sure I fully understood the question. But the -- in terms of the production capacity, obviously, the utilization of production capacity to sell products that sell for -- how will I put it, 10 times as much as the components that go in a consumer wearable is within -- very much within the interest of the company to be able to do that. So there is a clear prioritization that we're communicating here that we have a much, much higher selling price for our own medical-orientated wearable and we have a much higher margin potential in that area.

OPERATOR: And our next question is going to come from the line of Tim Savageaux with Northland Capital Markets.

TIMOTHY PAUL SAVAGEAUX, MD & SENIOR RESEARCH ANALYST, NORTHLAND CAPITAL MARKETS, RESEARCH DIVISION: I just want to follow up on the size of the potential volume opportunities. I think last call, and I don't know whether this is in reference to a combination of consumer and med tech or what have you. But I think you thought you could ship something under 1 million units in calendar '22, in the hundreds of thousands and multimillion in '23. And again, that could be a range of ASPs there. But even then I think we were talking more about the wristband than anything else. I mean, can you provide some sort of update on those expectations? It sounds like maybe '22 might be a little lighter, but '23 might be pretty similar in terms of those metrics that you set out last quarter? And I'll follow up from there.

CHAD BECKER: Tim, I think at this point, from my perspective, we have not -- and we won't be providing guidance for the number of units that we expect to sell next year. But what I -- we do believe that the majority of the sales next year will come from our med tech customers. And these are the units that have the higher ASP and higher gross margin potential.

TIMOTHY PAUL SAVAGEAUX: And I think you may have done that. Maybe you didn't -- the company may have at least talked in broad strokes about those numbers. So I don't think I made this up, but I suppose it's possible. From a customer count standpoint, it looks like you mentioned being at 19 currently. I think that's up 2 from the last count. Anything notable to discuss in terms of new customer additions, either on consumer or med tech?

ANDREW G. RICKMAN: With the -- I mean, we've gotten in the sense more than enough customers. Yes, we did added a further 2 in the med tech area. And I mean, the engagement with these customers, we've made some announcements associated with shipment of our components to these companies. The engagement is very deep and at a corporate level with many of them, and we're very excited with the progress. In a sense, we don't need any more customers. We've got the pipeline full.

TIMOTHY PAUL SAVAGEAUX: And then finally for me on ASPs. Andrew, I think you made an interesting comment about -- and I don't know whether this is an end product ASP or kind of a wholesale, but you mentioned 10 times the components. We variably talked about optical engines at $10 or $20 and modules at $20 or $30. If I were to go halfway in between there and say, $20 is your kind of component ASP, if you will, is that a reasonable expectation for either Rockley's or kind of an end retail ASP? Or can you kind of talk us through that a little bit?

ANDREW G. RICKMAN: Yes, that you've got the right kind of idea in terms of the ASP there. And we haven't been explicit about that, but we were explicit about the chipsets and modules into the consumer market. So you're absolutely on the money there, but basically the work that the team has done in order to produce our own Bioptx wearable, which by the way, is an extremely good reference for the consumer market. But it's specifically designed for a whole range of different sectors in the medical field and in the health and wellness field, and in kind of the professional deployment.

And as a complete device, you've got various different price points. You've got the price point of what we would call an unregulated device. You then got a price point that goes up that relates to when that device receives FDA approval for the biomarkers. And then we're talking here about the baseline band. And then, of course, what follows that is the Pro band, which again, is a more powerful device and would have a higher selling price and again go up in terms of selling price in terms of regulated. So we're trying to get the message across here that through incredible efforts to build the Bioptx band ourselves and the customer reception associated with the device, we've been able to elevate the average selling price very, very dramatically with a road map that just continues to take it up with further enhancements in performance through going from unregulated to regulated and creating an extremely exciting opportunity for us in that product line -- that product area alone.

The other element of it, which we don't have a full handle on in terms of our own kind of internal view at this point in time, is on the recurring revenues associated with the use of the platform with what we call connect software, discover software and the inferred applications that sit on the platform. Now those areas could turn out to be extremely profitable as well. And if you look at the metrics in terms of what people in wearable devices charge for functions on a monthly basis, those numbers are typically in the kind of $10 to $30 range, they are significant upside for the model.

And the way that we've architected things here is that we've created a platform that's very open, and that platform means that, for example, when you look at the use of this technology in clinical research trials, for example, it's very, very data intensive. There's a particular software kind of architecture that one's got to sit into. We've already done with one partner, the integration into that software architecture.

So we've created a platform that can adapt to whether it's in-hospital patient monitoring, remote patient monitoring, clinical trials monitoring, we've created a platform that can easily adapt into each one of these environments plug-in, very efficiently and

where as the data flows through our connect and cloud elements through into our customers' environments, that is a continued ongoing repeatable revenue opportunity for us, which we see as upside in terms of where we've been looking so far.

OPERATOR: And thank you to everyone that posed a question during today's conference. At this time, we have no further signals from our queue. So I'd like to turn it back to you, Mr. Rickman for any additional or closing remarks you may have.

ANDREW G. RICKMAN: Thank you for participating in our call today. We are very excited about the opportunities ahead of us and are looking forward to providing you with updates as we move through 2022 and beyond. Thank you, everybody.

OPERATOR: Ladies and gentlemen, this does conclude today's teleconference and we do thank you all for your participation. You may now disconnect your lines, and we hope that you enjoy the rest of your day.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2022 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2022 VIQ Media Transcript, Inc. ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and VIQ Media so long as they provide conspicuous attribution to Thomson Financial and VIQ Media as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]


---- Index References ----

Company: NEEDHAM & COMPANY, LLC; U.S. SECURITIES AND EXCHANGE COMMISSION; XIAOMI CORPORATION; APPLE INC.; MEDTRONIC PUBLIC LIMITED COMPANY; VIQ MEDIA TRANSCRIPTION INC.; Arabian Steel Pipes Manufacturing Company PSC; Harvard Medical School; National Institute of Health-1; SG&G Corporation;

Rockley Photonics Holdings Limited; Opex Technologies, LLC; AHMEDABAD STEEL CRAFT LIMITED; ISOTEAM LTD.; HARVARD CLINICAL RESEARCH INSTITUTE, INC.; CAPEX S.A.; THOMSON REUTERS CORPORATION

News Subject: (Business Management (1BU42); Chief Financial Officer (CFO) Changes (1CH08); Corporate Events (1CR05); Corporate Financial Data (1XO59); Corporate Performance (1XO12); Earnings Calls (1EA37); Executive Personnel Changes (1EX23); Financial Earnings Releases (1FI86); HR & Labor Management (1HR87); Meeting Announcements (1ME17))

Industry: (Accounting (1AC78); Accounting, Consulting & Legal Services (1AC73); I.T. (1IT96); I.T. Industry Highlights (1IT04); Press Releases (1PR19))

Language: EN

Other Indexing: (U.S.; BOARD, PRESIDENT & CEO; Bioptx; industrial clinical trials; FDA; Scientific Advisory Board; CHAD; RESEARCH ANALYST, COWEN AND COMPANY, LLC; med tech; Northland Capital Markets; TIMOTHY; NEEDHAM & COMPANY, LLC; SEC; Xiaomi; Apple; Medtronic; VIQ Media Transcript, Inc.; ASP; Harvard Medical School; National Institute of Health; SG&A; Rockley Photonics Holdings Ltd; OpEx; ASC; ISO; Harvard Clinical Research Institute; CapEx; Thomson Financial) (Gwyn Lauber; GWYN LAUBER; Andrew Rickman; Andrew Rickman; OBE; Chad Becker; Chad L. Becker; Rockley; ANDREW G. RICKMAN; Andrew Rickman; Richard Kuntz; Richard E. Kuntz; NATHANIEL QUINN BOLTON; CHAD BECKER; Chad L. Becker; Paul Silverstein; Paul Silverstein; PAUL JONAS SILVERSTEIN; Paul Silverstein; Tim Savageaux; TIMOTHY PAUL SAVAGEAUX)

Word Count: 6295

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

---

# EXHIBIT 17

Exhibit 17
Page 2547

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of Report (Date of earliest event reported): October 20, 2022**

---

# Rockley Photonics Holdings Limited

**(Exact name of registrant as specified in its charter)**

---

| **Cayman Islands** | **001-40735** | **98-1644526** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom**
(Address of principal executive offices)

**WA14 2DT**
(Zip Code)

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

Exhibit 17
Page 2548

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 17
Page 2549

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangement of Certain Officers.**

On October 20, 2022, Rockley Photonics Holdings Limited (the "Company") announced that Richard A. Meier was appointed the Company's President and Chief Financial Officer effective immediately. In connection with his appointment, Mr. Meier was also designated the Company's principal financial officer and principal accounting officer.

Mr. Meier, 63, will join the Company from Intersect ENT, Inc., a medical technology company, where he served as Executive Vice President and Chief Financial Officer from November 2019 until its recent acquisition by Medtronic plc. Previously, from 2013 to 2018, Mr. Meier served as President – International & Executive Vice President & Chief Financial Officer at Owens & Minor, Inc., a global healthcare services company. Prior to joining Owens & Minor, Mr., Meier served as Executive Vice President and Chief Financial Officer at Teleflex, Inc., a global medical device company, from 2010 to 2012. From 2007 to 2009, Mr. Meier served as President and Chief Operating Officer of Advanced Medical Optics, Inc., a global ophthalmic medical device company acquired by Abbott Laboratories, and from 2002 to 2007, Mr. Meier served as Vice President and Chief Financial Officer at Advanced Medical Optics, Inc. Mr. Meier also worked for ICN Pharmaceuticals Inc., now Bausch Health, a global pharmaceutical company, from 1998 to 2002, where he served as Executive Vice President and Chief Financial Officer, and as Treasurer. Mr. Meier has also served on the Board of Directors at BioMarin Pharmaceutical Inc. since 2006 and as the Lead Independent Director since 2015. Mr. Meier is also a member of the Supervisory Board of Syntellix AG, a private medical technology company, and he was a Director of Staar Surgical Inc., an ophthalmic medical device company, from 2009 through June 2016, where he also served on the Governance, Compensation and Audit Committees. Mr. Meier holds a B.A. in economics from Princeton University.

There are no family relationships between Mr. Meier and any director or executive officer of the Company nor are there any transactions between Mr. Meier or any member of his family and the Company or any of its subsidiaries that would be reportable as a related party transaction under the rules of the Securities and Exchange Commission.

Mr. Meier has entered into a contract of employment with the Company, pursuant to which he will receive a base salary of $500,000 with a target bonus opportunity equal to 80% of his annual base salary, including a $400,000 bonus opportunity for 2022. Mr. Meier will also receive an initial equity grant of restricted stock units with respect to 1,891,521 ordinary shares and stock options to purchase 1,891,521 ordinary shares at a price equal to the fair market value of such shares on the grant date, with both initial equity grants vesting over four years, with 25% of each award vesting on the first anniversary of that award's date of grant and the remaining portion vesting in quarterly installments over the remaining three years, subject to Mr. Meier's continued service. In addition, in the event Mr. Meier's employment is terminated by the Company without cause or by Mr. Meier for good reason, subject to his execution of a release, Mr. Meier will be eligible to receive (i) a lump sum equal to his annual salary and target bonus, plus any earned but unpaid annual bonus for the prior completed calendar year, and (ii) 12 months of Company paid COBRA premiums. If such a termination occurs on or within 12 months following a change in control of the Company, subject to Mr. Meier's executing a release, Mr. Meier's initial equity grants will vest in full. In connection with his appointment as President and Chief Financial Officer, the Company expects to enter into its form of indemnification agreement with Mr. Meier.

In connection with the appointment of Mr. Meier as President and Chief Financial Officer, Chad Becker will step down from his role as Interim Chief Financial Officer and will return to his role as Vice President of Financial Planning and Analysis.

**Item 7.01. Regulation FD Disclosure.**

On October 20, 2022, the Company issued a press release entitled "Rockley Photonics Appoints Healthcare Industry Veteran Richard "Randy" A. Meier Chief Financial Officer" a copy of which is furnished as Exhibit 99.1 hereto.

The information in Item 7.01 of this Current Report on Form 8-K, including Exhibit 99.1, shall not be deemed to be filed for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), or otherwise subject to the liability of that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933 or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

Exhibit 17
Page 2550

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 10.1 | Employment Agreement between Rockley Photonics and Richard A. Meier dated October 20, 2022 |
| 99.1 | Press release dated October 20, 2022 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

Date:     October 20, 2022

By:          /s/ Tom Adams

Name:     Tom Adams

Title:     General Counsel

Exhibit 17
Page 2551

# EXHIBIT 18

Exhibit 18
Page 2552

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of Report (Date of earliest event reported): December 12, 2022**

---

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

---

| Cayman Islands | 001-40735 | 98-1644526 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom**
**(Address of principal executive offices)**

**WA14 2DT**
**(Zip Code)**

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company                    ☒

Exhibit 18
Page 2553

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 18
Page 2554

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangement of Certain Officers.**

On December 12, 2022, the Board of Directors (the "Board") of Rockley Photonics Holdings Limited (the "Company") appointed Richard A. Meier as the Company's President and Chief Executive Officer and as a member of the Board, effective immediately. Mr. Meier will serve as a Class III director, with his initial term expiring at the 2024 annual meeting of shareholders. Mr. Meier will succeed Dr. Andrew Rickman, who resigned from his position as Chief Executive Officer on December 12, 2022 and was appointed Executive Chair of the Company. Chad Becker has been appointed as interim Chief Financial Officer to succeed Mr. Meier, effective immediately. In connection with his appointment, Mr. Becker was also designated the Company's principal financial officer and principal accounting officer.

Also on December 12, 2022, Dr. Caroline Brown resigned from the Board to pursue other business interests. Dr. Brown served as chair of the Audit Committee of the Board and a member of the Nominating and Corporate Governance Committee of the Board. Dr. Brown's resignation was not the result of any dispute or disagreement with the Company or the Board. The Board has appointed Nicolaus Henke to join the Audit Committee to fill the vacancy resulting from Dr. Brown's departure and Brian Blaser to serve as the new chair of the Audit Committee.

Mr. Meier, 63, joined the Company as its President and Chief Financial Officer in October 2022. He previously served as Executive Vice President and Chief Financial Officer of Intersect ENT, Inc., a medical technology company, from November 2019 until its recent acquisition by Medtronic plc. Previously, from 2013 to 2018, Mr. Meier served as President – International & Executive Vice President & Chief Financial Officer at Owens & Minor, Inc., a global healthcare services company. Prior to joining Owens & Minor, Mr., Meier served as Executive Vice President and Chief Financial Officer at Teleflex, Inc., a global medical device company, from 2010 to 2012. From 2007 to 2009, Mr. Meier served as President and Chief Operating Officer of Advanced Medical Optics, Inc., a global ophthalmic medical device company acquired by Abbott Laboratories, and from 2002 to 2007, Mr. Meier served as Vice President and Chief Financial Officer at Advanced Medical Optics, Inc. Mr. Meier also worked for ICN Pharmaceuticals Inc., now Bausch Health, a global pharmaceutical company, from 1998 to 2002, where he served as Executive Vice President and Chief Financial Officer, and as Treasurer. Mr. Meier has also served on the Board of Directors at BioMarin Pharmaceutical Inc. since 2006 and as the Lead Independent Director since 2015. Mr. Meier is also a member of the Supervisory Board of Syntellix AG, a private medical technology company, and he was a Director of Staar Surgical Inc., an ophthalmic medical device company, from 2009 through June 2016, where he also served on the Governance, Compensation and Audit Committees. Mr. Meier holds a B.A. in economics from Princeton University.

Mr. Becker, age 47, has 20 years of corporate finance experience and has served as the Company's Vice President, Financial Planning and Analysis since October 2022. He previously served as the Company's interim Chief Financial Officer from June 2022 to October 2022. Prior to joining the Company, Mr. Becker served as Vice President, Finance at Tuft & Needle from February 2021 to August 2021. Prior to that position, Mr. Becker served as Director, Treasury at NetApp, Inc. (NASDAQ: NTAP) from August 2017 to January 2021, and from July 2006 to August 2017, Mr. Becker served as Manager, Treasury at Microsoft Corporation (NASDAQ: MSFT). Mr. Becker holds a Chartered Financial Analyst designation and received his bachelor's degree in finance and economics from the University of Arizona and Master of Business Administration degree from the University of Nevada at Las Vegas. Mr. Becker serves on the board of trustees for the University of Arizona Foundation.

There are no family relationships between Mr. Meier or Mr. Becker and any director or executive officer of the Company nor are there any transactions between Mr. Meier or Mr. Becker or any member of their respective families and the Company or any of its subsidiaries that would be reportable as a related party transaction under the rules of the Securities and Exchange Commission.

There were no changes made at this time to Mr. Meier's previously disclosed compensation and contract of employment with the Company in connection with his new role.

Exhibit 18
Page 2555

As interim Chief Financial Officer, Mr. Becker's annual base salary is $370,000 with a target bonus opportunity equal to 60% of his annual base salary on a pro rata basis during his time as interim Chief Financial Officer.

**Item 7.01. Regulation FD Disclosure.**

On December 12, 2022, the Company issued a press release entitled "Rockley Photonics Announces Promotion of Richard A. (Randy) Meier to Chief Executive Officer" a copy of which is furnished as Exhibit 99.1 hereto.

The information in Item 7.01 of this Current Report on Form 8-K, including Exhibit 99.1, shall not be deemed to be filed for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), or otherwise subject to the liability of that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933 or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

Exhibit 18
Page 2556

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press release dated December 12, 2022 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

| Date: | December 12, 2022 | By: | /s/ Richard A. Meier |
|---|---|---|---|
| | | Name: | Richard A. Meier |
| | | Title: | President and Chief Executive Officer |

Exhibit 18
Page 2557

# EXHIBIT 19

Exhibit 19
Page 2558

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ROCKLEY PHOTONICS HOLDINGS LIMITED,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-10081 (LGB) |

**DECLARATION OF KEN GROSSMAN IN SUPPORT OF**
**THE OBJECTING SHAREHOLDERS' OBJECTION TO CONFIRMATION OF JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS**
**HOLDINGS LIMITED**

I, Ken Grossman, declare under penalty of perjury as follows pursuant to 28 U.S.C. § 1746:

1. I make this declaration (the "**Declaration**") in support of the Objection to Confirmation of Joint Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited (the "**Objection**") (Docket No. 61). All terms not otherwise defined herein have the same meanings as defined in the Objection.

2. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the underlying events, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge, and information concerning this matter.

3. I have been a long time investor in the Debtor. Indeed, I was an investor in Rockley Photonics, Ltd. ("**Rockley UK**"), now a wholly-owned subsidiary of the Debtor, prior to the DeSPAC.

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, United Kingdom WA14 2DT.

1

Exhibit 19
Page 2559

4.      I have been involved in investing and investment advisory services for over 50 years.  I am currently responsible for co-managing the Cedar Street Funds and Partner in SG Capital Management, which was formed in 2002.  In 1983, I founded the investment advisory firm of Hahn, Holland and Grossman, which subsequently became HGT Advisors.  I helped grow HH&G to over $1 billion in assets by 1990 and developed a strong presence in the management of municipal pension plans.  In 1996, Mesirow Financial purchased HGT Advisors, retaining all of its professionals to manage the growth of Mesirow Financial Asset Management.  I co-managed Mesirow Financial Asset Management, responsible for the Small Cap Equity portfolio, Fixed Income portfolio management, marketing and client-servicing.  I served on Mesirow Financial's executive committee and was a Senior Managing Director of the firm.

5.      I have held positions as instructor and lecturer in finance at Roosevelt University (Chicago) and was an advisor to the Pension Fund Committee for the State of Illinois Governor's Commission.  I have spoken before the International Foundation for Employee Benefit Plans, Public Fund and Institutional Investor conferences, and pension, actuarial and investment analyst societies throughout the country.  I received my bachelor's degree in finance *cum laude* in 1968 from the University of Miami and my master's degree in finance and economics from the University of Chicago in 1970.

6.      I currently own 415,272 shares of the Debtor.

7.      I regularly reviewed public filings by the Debtor, including Form 10-K, Form 10-Q, Form 8-K disclosures, as well as investor presentations made available by the Debtor.  I also either have attended earnings calls or have read transcripts of such calls within a day or two of the earnings calls.

2

Exhibit 19
Page 2560

8. Based on the Debtor's disclosures and representations, I believe that the technology being developed by Rockley UK is today, and will remain, very valuable over time. I know that Rockley UK has had operating losses, which I would expect for a company heavily invested in research and development, and which has been repeatedly disclosed by the Debtor in public filings.

9. In July 2021, prior to and in connection with the DeSPAC, there was investor presentation that, upon the DeSPAC, valued the enterprise at over $1.2 billion. I am not aware that prior to the Petition Date that the Debtor has not disclaimed this valuation. Numerous other investor presentations through 2022 indicate management's strong belief in the projected financial success of the enterprise.

10. On the deSPAC date, I acquired 100,000 shares of the Debtor. I later acquired an additional 100,000 shares when the Debtor's stock was trading above $6.00 a share. I did sell 94,728 shares on January 13, 2023. I can confirm I neither bought nor sold shares on December 9, 2022; December 12, 2022; January 5, 2023; or January 17, 2023. When I learned that Debtor's counsel was asking about these dates, I reviewed publicly available trading and noticed that there was an unusual volume of trading on each day. I am speculating, but my guess is that short sellers were involved.

***Events in December 2022 and January 2023***

11. On December 15, 2022, the Debtor issued a press release that it had received a notice from the New York Stock Exchange that the Debtor's stock would be de-listed, and stated Rockley intended submit a business plan to the NYSE within 45 days that shows how the Debtor plans to regain compliance with this continued listing standard within 18 months from the date of the notice.

3

Exhibit 19
Page 2561

12.     On December 20, 2022, I wrote an e-mail to Michael Tierney (a fellow objector to the Plan), Mr. Meier and Mr. Huyett, asking Mr. Tierney to sign a non-disclosure agreement ("**Prepetition NDA**").

13.     Shortly thereafter, a representative of Jefferies sent an invitation for call on December 22 for a "private side" discussion with Mr. Meier and Jefferies.

14.     On December 22, 2022, I participated on a video conference with Mr. Tierney, Mr. Meier, and two representatives of Jefferies.

15.     Mr. Meier described the following:



16.     After December 26, 2022, there were no further communications between either the Debtor or Jefferies on the one hand, and me on the other.

17.     On January 6, 2023, Mr. Grossman sent a letter to the Debtor's lead director, William Huyett, copying me.

4

Exhibit 19
Page 2562

18.    I understand that the next day, Mr. Huyett confirmed that he would distribute the January 6 letter to the full board.  Since January 7, 2023, I am not aware of any response to my letter.

### The Bankruptcy Filing and Subsequent Events

19.    The Debtor, but not Rockley UK, filed for bankruptcy, proposed the Plan that would ensure that the Debtor's shareholders (other than management and perhaps certain Noteholders) received nothing and yet lost out on potentially valuable claims.

20.    Mr., Tierney and I have sought out shareholders to consider whether there was a way to find value that would show that the Debtor was in fact solvent and that the Plan should not be confirmed.  These options include finding a buyer for the entire company, monetizing the intellectual property with a license back to Rockley UK (the "**IP Monetization Concept**"), offering to acquire claims of the Debtor's estate that are being, or providing debtor-in-possession financing to bridge any short-term liquidity issues.

21.    But I and other shareholders lacked requisite information to make any concrete proposals; I believe the Disclosure Statement is insufficient for any person to understand the Debtor's prospects, much less propose financing of any type.

22.    My counsel was able to arrange for me to have access to the VDR.  My understanding is that the VDR contains two types of documents.  The first was the same information provided to prospective investors that constitutes the "marketing process" referenced in the Disclosure Statement.  In this regard, the VDR contains a folder titled ▮▮▮▮▮▮▮▮  I have reviewed this folder, and believe that numerous categories of information relevant to a prospective investor are not present.

5

Exhibit 19
Page 2563

23.     The second category of documents are ones that were not provided as part of ████

████ but are responsive, in part, to requests made in the February 6 letter.  What I saw concerned

me.

24.     One, I reviewed the Jefferies Process Overview.  I have been in dozens of capital

raising projects in my career.  I believe that the marketing process was severely lacking, especially

when I observed no expedited or emergency need for a shortened process.

25.     ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

26.     I understand that there were no valuations of the Debtor available, or any valuations

of intellectual property.

27.     ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

28.     I am not aware of any public announcement prior to the bankruptcy filing and since

October 25, 2022, that the Debtor had defaulted any Notes.  I note that on the day of the bankruptcy

filing, the Debtor did issue a Form 8-k disclosing that the bankruptcy filing itself was a default.

6

Exhibit 19
Page 2564

29.     On February 23, 2023, the Objection was filed on behalf of six other investors and me.  I have also opted out of the releases the Plan seeks to grant to the Debtor's management and others.

30.     But despite that Objection, Mr. Tierney and I are still working to try to find a commercial, and consensual, resolution that would provide short-term liquidity to sustain operations while providing sufficient time to either pursue a robust marketing effort for the entire enterprise or a marketing effort for certain categories of assets.

31.     My goal in this effort is to see existing shareholders who have stood by this company for years not be wiped out, only for the company to become extraordinarily valuable as it reaches the commercialization this year and beyond.

Dated: February 27, 2023

/s/ Ken Grossman
Ken Grossman

7

Exhibit 19
Page 2565

# EXHIBIT 20

Exhibit 20
Page 2566

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| | Case No. 23-10081 (LGB) |
| **ROCKLEY PHOTONICS HOLDINGS LIMITED**, | (Jointly Administered) |
| *Debtor*.[1] | |

**CORRECTED OBJECTION TO CONFIRMATION OF JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS LIMITED**

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, United Kingdom WA14 2DT.

Exhibit 20
Page 2567

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ........................................................................................5

    A.      The Debtor ...............................................................................................5

    B.      Rockley UK, the "DeSpac" and the Investors .........................................5

    C.      The ELOC Transaction.............................................................................9

    D.      The May 2022 Lumentum IP Letter of Intent..........................................10

    E.      The Debtor Borrows Money in May 2022..................................................10

    F.      The Debtor Purportedly defaults in September 2022 and Obtains Additional Secured Debt Financing in October 2022............................................11

    G.      The Debtor Begins Plan Negotiations with Noteholders and Engages in a Truncated "marketing" Effort that fails to appropriately consider the valuable ip ....................................................................................................13

    H.      Investors Attempt to Engage With the Debtor But Are Told Their Options Are Limited.............................................................................................16

    I.      The Debtor Files for Bankruptcy in the United States and in the Cayman Islands .....................................................................................................18

    J.      Lack of Fundamental Information in This Case and the Investors' Efforts to Seek a Consensual Resolution ..........................................................20

    K.      The UK Tax Credit Payments, IP Assets, and Potential Litigation Claims...........22

OPPOSITION ...............................................................................................................26

    L.      The Disclosure Statement Does Not Satisfy 11 U.S.C. § 1125 and This Cannot Satisfy 11 U.S.C. §§ 1129(a)(1)and (a)(2) ..............................................26

    M.      The Plan Was Not Proposed in Good Faith ...........................................30

    N.      The Plan Does Not Satisfy 1129(a)(7) or 1129(b)...............................35

    O.      The Plan's Release Provision Is Plainly Illegal ....................................37

i

Exhibit 20
Page 2568

P.  DENIAL OF CONFIRMATION DOES NOT HARM THE "BUSINESS"
AND THE INVESTORS ARE NOT LOOKING TO "SHAKEDOWN"
ANYONE...................................................................................................38

CONCLUSION.....................................................................................................................40

ii

Exhibit 20
Page 2569

## <u>TABLE OF AUTHORITIES</u>

**Page**

### Cases

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019)......................................................................... 38

*In re Boylan Int'l, Ltd.*,
  452 B.R. 43 (Bankr. S.D.N.Y. 2011)........................................................................... 27

*In re Cardinal Congregate I*,
  121 B.R. 760 (Bankr. S.D. Ohio 1990)........................................................................ 30

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009)......................................................................... 26

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)......................................................................... 36

*Citicorp Leasing, Inc. v. United American Funding, Inc.*,
  No. 03 Civ. 1586(WHP), 2005 WL 1847300 (S.D.N.Y. Aug. 5, 2005)...................... 33

*In re Draiman*,
  450 B.R. 777 (Bankr. N.D. Ill. 2011) .......................................................................... 30

*In re Exide Techs.*,
  303 B.R. 48, 66 (Bankr. D. Del. 2003) ........................................................................ 36

*First Bank and Trust Company of Ithaca v. Mitchell, et al.*,
  473 N.Y.S.2d 697 (1984).............................................................................................. 33

*In re Fisker Automotive Holdings, Inc.*,
  510 B.R. 55 (Bankr. D. Del. 2014)............................................................................... 32

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014)............................................................ 33, 34, 36, 39

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*,
  994 F.2d 1160 (5th Cir. 1993) ...................................................................................... 26

*In re Hirt*,
  97 B.R. 981 (Bankr. E.D. Wis. 1989)........................................................................... 30

*In re Innkeepers USA Tr.*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010).......................................................................... 32

*Kunica v. St. Jean Fin., Inc.*,
  233 B.R. 46 (S.D.N.Y. 1999)........................................................................................ 27

*In re Metrocraft Pub. Servs., Inc.*,
  39 B.R. 567 (Bankr. N.D. Ga. 1984) ............................................................................ 27

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005).......................................................................................... 38

iii

Exhibit 20
Page 2570

*In re Nortel Networks, Inc.*,
   532 B.R. 494 (Bankr. D. Del. 2015) ................................................................ 28, 29

*In re Phoenix Petroleum*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................... 27

*In re River Vill. Assocs.*,
   161 B.R. 127 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) ............................. 30

*In re SunEdison, Inc.*,
   575 B.R. 220 (Bankr. S.D.N.Y. 2017) ...................................................................... 35

*Washington County Trust Co. v. Cloud Dancer, Inc.*,
   1994 WL 474836 (RI Super., May 25, 1994) ........................................................ 33

*Westland Oil Dev. Corp. v. MCorp Management Solutions, Inc.*,
   157 B.R. 100 (S.D. Tex. 1993) ................................................................................. 27

*In re XO Commc'ns, Inc.*,
   330 B.R. 394 (Bankr. S.D.N.Y. 2005) ..................................................................... 38

**Statutory Authorities**

11 U.S.C. § 1125 ............................................................................................................ 4, 27

11 U.S.C. § 1129(a) ........................................................................................................ 26

11 U.S.C. § 1129(a)(1) ............................................................................................. 26, 27

11 U.S.C. § 1129(a)(2) .................................................................................................... 27

11 U.S.C. § 1129(a)(3) .............................................................................................. 4, 30

11 U.S.C. § 1129(a)(7) ................................................................................... 4, 24, 35, 37

11 U.S.C. § 1129(b) ......................................................................................... 4, 35, 36

11 U.S.C. § 1129(b)(2)(C) ............................................................................................. 35

11 U.S.C. § 341 ............................................................................................................... 20

11 U.S.C. § 363 ............................................................................................................... 32

**Rules and Regulations**

Fed. R. Bankr. P. 2015.3 ............................................................................................ 4, 21

Fed. R. Bankr. P. 9019 ................................................................................................... 21

Rule 415(a)(4) ................................................................................................................ 11

UCC § 9-610 ................................................................................................................... 33

UCC § 9-627(a) .............................................................................................................. 33

**Additional Authorities**

*https://www.expertmarketresearch.com/articles/top-6-companies-global-silicon-photonics-market.* .......................................................................................................... 15

Exhibit 20
Page 2571

https://www.mayerbrown.com/en/perspectives-events/events/2022/11/patent-monetization-and-ma-transactions-a-match-made-in-heaven .................................................................... 28

https://www.pillsburylaw.com/en/services/intellectual-property/ ................................................ 28

https://www.reuters.com/article/us-nortel/apple-rim-group-top-google-in-4-5-billion-nortel-sale-idUSTRE7600PF20110701 ..................................................................................................... 28

https://www.skadden.com/-/media/files/publications/2014/09/sept2014_spotlighton.pdf. ........... 28

v

Exhibit 20
Page 2572

The investors listed on Schedule A attached hereto ("**Investors**"), each of whom is a longtime holder of equity interests in debtor Rockley Photonics Holding Ltd. ("**Debtor**"),[2] submits this Objection to the adequacy of the DISCLOSURE STATEMENT FOR THE PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS LIMITED ("**Disclosure Statement**") (Dkt. No. 3) and confirmation of the CHAPTER 11 PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS LIMITED ("**Plan**") (Dkt. No. 2), and respectfully represents as follows.

## INTRODUCTION

In July 2021 the Debtor told the market that the Debtor was worth $1.2 billion, based on the business of its non-debtor operating subsidiary, Rockley UK. Ex. "A". Since then, nothing has changed with respect to Rockley UK's business: it has continued to develop intellectual property, has been granted additional patents, and is projecting bringing at least two products to market this year. Despite Rockley UK's steady trajectory, the Debtor now claims it is somehow worth only $80 million, pursuant to an artificial "Agreed Plan Value." Nothing filed with this Court provides a basis for a more than 90% decrease in valuation since July 2021; in fact the Disclosure Statement *admits* that the "Agreed Plan Value" is invented.

Despite this absurdity, pursuant to the Plan and the treatment of Class 7, the Debtor seeks to wipe out existing shareholders, including the Investors who supported the business enterprise for years, and hand the entire value of Rockley UK, a non-debtor business with substantial existing assets and tremendous promise, to a small group of noteholders and existing management. If successful, the Noteholders and existing management will come to own this non-debtor business

---

[2] The Investors all were former equity investors or convertible debt investors in non-debtor Rockley Photonics Ltd. ("**Rockley UK**") prior to the "deSPAC" transaction that occurred in August 2021.

1

Exhibit 20
Page 2573

enterprise that has spent years and hundreds of millions of dollars developing valuable intellectual property, just before it is on the verge of commercialization of multiple products.

There are fatal flaws in this scheme. As a threshold matter, the Disclosure Statement is facially inadequate and materially incomplete, and confirmation of the Plan should be denied on that basis alone. But even if the Disclosure Statement were fixed to provide the requisite adequate information, the Plan is still not confirmable. Indeed, just the limited information that the Investors have recently uncovered, but which was omitted from the Disclosure Statement, raises serious questions as to the valuation of the Debtor, the pre-petition marketing process, the release of company claims, and the need for bankruptcy at all. Given these serious issues, the best course is to provide reasonable time to adequately market the Debtor's assets, as the Investors have requested, but which the Debtor has refused. Barring this, the best remaining options are to convert the case to chapter 7, with the appointment of an independent fiduciary who can adequately market assets and investigate claims, or to simply dismiss the case.

The Debtor's attempt to paint this case as involving a financially distressed, yet operating, business with substantial employees and immediate need for operating capital ignores a fundamental truth: the Debtor is a Cayman Islands holding company, with virtually no employees, almost no operating expenses, and no business other than direct and indirect equity ownership in various non-debtor subsidiaries ("**Non-Debtor Subsidiaries**"). As of the Petition Date, the Debtor had in excess of $4.47 million in cash, more than enough to sustain its minimal operations for months. The Debtor's repeated assertions that there is an emergency need for a rushed outcome is simply not true *as to the Debtor*.

The actual operations, employees, and material assets are in the Non-Debtor Subsidiaries, and in particular Rockley UK. The Non-Debtor Subsidiaries are not debtors in this Court, or in

2

Exhibit 20
Page 2574

any insolvency proceeding.  They continue to operate in the ordinary course, and can negotiate or address their capital needs without any "reorganization" of the Debtor.  If the Noteholders believe that there are defaults under their Notes—a claim not made in this Court to-date, they have their remedies under applicable law against the Non-Debtor Subsidiaries, who guaranteed their Notes.

Debtor's debt as of the Petition Date was roughly $120 million in two sets of convertible notes, issued in May and October 2022, and guaranteed by various Non-Debtor Subsidiaries, with less than $500,000 in unsecured claims.  The Notes do not mature until May 2026.

For several months prior to the Petition Date, the Noteholders and Debtor's existing management (who under the Plan get lucrative employment contracts assumed, a lucrative management incentive plan, and releases of claims against them) were negotiating what has become the Plan, with the goal of handing all of the value of the Debtor's Non-Debtor Subsidiaries to themselves.  The "marketing" process, which the First Day Declaration touts as robust, was in fact rudimentary, months old, and designed to fail.  No independent fiduciary was appointed to oversee the marketing process or determine its fairness.  Public shareholders were shut out of it.

All of this begs the question of why this case was filed at all, much less as an expensive cross-border chapter 11 case.  The only Debtor is a sufficiently capitalized holding company and does not require reorganization at all.   The actual operating entities are the Non-Debtor Subsidiaries, none of which apparently need insolvency protection.  Indeed, in numerous recent public pronouncements to investors, fiduciaries of the Debtor—a publicly traded company—described the Rockley business enterprise as executing on its business plan and on the verge of commercialization of valuable intellectual property to be used in a wide array of industries with massive total addressable markets in the tens of billions of dollars ("**TAM**").  Tellingly, Dr. Andrew Rickman, one such fiduciary, who was the CEO and is now Executive Chairman, stands

3

Exhibit 20
Page 2575

to obtain lucrative benefits and releases of claims if the Plan is confirmed.

The Investors thus have no choice but to object.[3] The Disclosure Statement is woefully deficient, including failing to recognize the immense value of the Non-Debtor Subsidiaries' intellectual property, the failure to disclose the existence of a $50 million equity line of credit ("**ELOC**"), the existence of United Kingdom tax credit payments worth tens of millions of dollars ("**Tax Credits**"), and potential claims against fiduciaries or third parties. The Disclosure Statement also improperly describes the "marketing" process, which was equally deficient, with a stunted process and no attempt made to monetize that IP by engaging IP monetization specialists or approaching purchasers of patents. On these bases alone, confirmation must be denied because the Disclosure Statement does not satisfy 11 U.S.C. § 1125.

The Court should also deny confirmation because the Plan violates 11 U.S.C. §§ 1129(a)(3), 1129(a)(7), and 1129(b). Simply put, there is substantial and immediate risk that the Debtor's stockholders are entitled to a recovery because the Debtor's assets are sufficient to pay in full all allowed claims, and the rushed and improvident effort to wipe out existing shareholders (and fully release company claims)—with no Bankruptcy Code required schedules of assets and liabilities, no statement of financial affairs, and no Rule 2015.3 filings—is in contravention of the protections afforded to shareholders.

---

[3]     The Plan permits "opt-outs" for third party releases, and every Investor has in fact timely opted out. But there are well over 100 stockholders, and they may not have the knowledge to even know to opt out. The Investors note that the United States Securities & Exchange Commission ("**SEC**") has objected to the Plan's third-party release provisions, and the fact that the Investors themselves exercised their opt-out option should not undermine the important issue the SEC has raised. For avoidance of doubt, nothing herein waives, releases, or otherwise affects the Investors' claims against any Released Party (as defined in the Plan), including any securities fraud, applicable English law, or fraudulent inducement claims.

4

Exhibit 20
Page 2576

## FACTUAL BACKGROUND[4]

### A. THE DEBTOR

The Debtor is a Cayman Islands corporate entity that was formed in August 2021 as part of a "deSPAC" business combination with SC Health Corporation. Upon the consummation of the business combination, the Debtor's shares were publicly traded on the New York Stock Exchange (ticker symbol RKLY).

The Debtor itself is nothing more than a holding company. It has no employees, almost no trade vendors, and virtually no assets other than stock ownership in the Non-Debtor Subsidiaries (and potential litigation claims against fiduciaries and other third parties). As of the Petition Date, according to the First Day Declaration, the Debtor had a single bank account at Wells Fargo Bank containing approximately $4.47 million in cash. It has a single leased real property, located in the United Kingdom. Prior to the Petition Date, the Debtor itself would have easily been able to pay its minimal ordinary course debts as they came due and was not itself facing any liquidity crisis.

In addition, the Debtor was an unsecured lender to Rockley UK, pursuant to a January 24, 2022 Intra Group Loan Agreement. This loan is not mentioned in the Disclosure Statement, and no details of what is owed under this agreement have been provided, but the Debtor is seeking to assume it. *See* Dkt No. 43 at Ex. "C." If the Debtor is not just an equity owner of Rockley UK but is owed money on an unsecured basis, this may represent value that has not been addressed.

### B. ROCKLEY UK, THE "DESPAC" AND THE INVESTORS

The Disclosure Statement uses the term "Company" throughout, rather than specifying between the Debtor or its non-debtor subsidiaries, but in actuality the "Company" must almost

---

[4] The information set forth herein is gleaned from the Disclosure Statement, First Day Declaration, documents the Debtors provided to Investors (who signed NDAs) in a virtual data room ("**VDR**"), and publicly available information. But as set forth herein, there are many unanswered questions that demonstrate why the Disclosure Statement lacks adequate information.

5

Exhibit 20
Page 2577

always be referencing Rockley UK.[5]  This because the actual entity with the vast majority of the value of the Rockley enterprise is Rockley UK.  Rockley UK is currently a wholly-owned subsidiary of the Debtor, but is not itself a debtor.  Virtually all of the business of the Rockley enterprise is conducted by Rockley UK (either directly or through its subsidiaries), *not* by the Debtor.  While the Debtor is the entity that files the required public-company SEC disclosures, there again the description of the business operations is largely concerning Rockley UK.

Rockley UK was not always a wholly-owned subsidiary of the Debtor.  On August 11, 2021, Rockley UK, SC Health, and Rockley Mergersub Limited consummated a business combination, in what is commonly referred to as a "deSPAC" transaction ("**DeSPAC**").  Immediately upon the consummation of the Business Combination, Rockley UK became a wholly owned subsidiary of the Debtor, and the Debtor's ordinary shares and warrants began trading on the NYSE under the symbols "RKLY" and "RKLY.WS," respectively.

Prior to the DeSPAC, Rockley UK was a privately held company.  Pursuant to the DeSPAC, on August 9, 2021, all of UK Rockley's ordinary shares, including shares issued as a result of the conversion of then-outstanding convertible loan notes and the exercise of warrants, were transferred in exchange for an equivalent number of shares in the Debtor.  In addition, certain investors purchased an aggregate of 15 million ordinary shares for a purchase price of $10.00 per share, or an aggregate purchase price of $150.0 million.  However, on information and belief the DeSPAC was supposed to have provided an additional $50 million in equity which did not materialize.[6]

---

[5]    On page iii, the Disclosure Statement defines "Company" as the Debtor and its subsidiaries, but makes no attempt to explain the Debtor itself has almost nothing, and the "Company" is really Rockley UK.

[6]    As noted above, the Investors have exercised their opt-outs, and are evaluating securities fraud and other claims, including associated with the DeSPAC, all of which are reserved.

6

Exhibit 20
Page 2578

As for the objecting Investors, each Investor was either a shareholder or a holder of a convertible debt instrument in Rockley UK. As explained above, they were forced to take shares in the Debtor and lose their direct investments in Rockley UK as part of the DeSPAC. In other words, each Investor had been a long-time investor in Rockley UK, the operating entity which, as described further below, is also the owner of valuable IP and other assets and credits.

As to IP, Rockley UK owns nearly all of the enterprises' IP, including more than 235 issued and 300 pending patents. These patents range across a number of uses and potential industries. Rockley UK, but not the Debtor, is also party to multiple contracts with counterparties to explore development of products involving Rockley UK's IP. This IP, which has not been valued or individually marketed by the Debtor or its advisors as part of the "Project Rocket" three-week marketing process (described in greater detail below), is believed to represent the overwhelming value of the Rockley enterprise.

A visit to the "Rockley" website—www.rockleyphotonics.com—confirms that nearly every activity is conducted by Rockley UK, and that such activity is ongoing. For example, the website speaks to Rockley's Bioptx Band, which is Rockley UK's product, and which is expected to ship in 2023. Similarly, the Disclosure Statement states that in 2023, the VitalSpex health monitoring product offering is expected to launch in 2023; that is Rockley UK's product. Indeed, as recently as October 19, 2022, Rockley UK published a white paper. There are multiple investor presentations from 2022; all of which paint a rosy picture of Rockley UK's business.

In fact, the website contains an investor presentation from January 16, 2023—*just one week before the filing of this case*—reporting on fourth quarter 2022 results and in which the Debtor and

7

Exhibit 20
Page 2579

Rockley UK make no mention of any financial hardships or loan defaults.[7]   Rather, this January 16 presentation lauds Rockley UK's IP and a $48 billion TAM consumer and health markets.  *See* Ex. "B".  Slide 19 of this same presentation has ten examples of "significant execution and traction [regarding Rockley UK's product development] since going public in August 2021," and notes that there are 236 granted patents and 311 patents pending as of September 2022.[8] *See id.* at 19.

In addition, and as further described below, Rockley UK also has significant UK Tax Credits and net operating losses.  Notably, these potentially valuable credits and losses are not disclosed (or accounted for) in any material way in the Disclosure Statement.

The Disclosure Statement discusses the fact that the "Company" has had net losses, including over $151 million in net losses in the first nine months of 2022.  That is entirely expected for a technology-based company heavily engaged in research and development throughout its corporate existence.  Historically, Rockley UK used the capital markets to fund its operations, and had success in doing so, including in October 2022.  When the Noteholders made their loans to the Debtor in May and October 2022, they did so with full knowledge that the "Company" had experienced significant operating losses, and was not projected to turn a profit until 2024 at the earliest because the Debtor's Form 10-K and Form 10-Qs all disclosed this.

In fact, the Debtor's only Form 10-K (for year 2021, issued on March 10, 2022) unambiguously discloses the emphasis on research and development: "We believe that our future success depends on our ability to develop new products for both existing and new markets, development enhancements to our products once developed or if and when commercially

---

[7]     As further explained herein, the Debtor allegedly defaulted on the October 2022 Notes on January 15, 2023. It is not mentioned anywhere in this presentation.

[8]     This conflicts with information provided to prospective investors as part of the "marketing" process bragged about in the First Day Declaration.

8

Exhibit 20
Page 2580

launched, to stay ahead of our competition by being leaders in extending the boundaries of our technologies. As a result, a significant amount of our operating expenses has been allocated towards next-generation platform development." Ex. "C". The Form 10-K adds: "[a]s of December 31, 2021, we had 302 employees globally with over 75% of our workforce focused on research, product development, and engineering." *Id.* A company that invests hundreds of millions of dollars in research and development is going to lose money in such projects until they commercialize, as the Noteholders well knew when entering into their transactions.

## C.    THE ELOC TRANSACTION

In November 2021, the Debtor obtained the ELOC, which was a $50 million equity line of credit[9] provided by Lincoln Park Capital Fund, LLC ("**Lincoln Park**") pursuant to an equity purchase agreement executed as of November 15, 2021. *See* Ex. "D". The agreement obligated Lincoln Park to pay cash to buy ordinary shares of the Debtor, up to $50 million, if requested by the Debtor, subject to minimal conditions. The Debtor never sought to use the ELOC prior to the Petition Date, even when Rockley UK had liquidity concerns.

The existence of the ELOC, or any analysis or evaluation of the Debtor's rights thereunder, is omitted entirely from the Disclosure Statement. While it is clear that the Debtor never sought to use the ELOC prior to the Petition Date, the reasons (if any) as to why not remain unclear.[10] In response to a query by Investors' counsel shortly prior to the filing of this Objection, the Debtor's counsel communicated only high-level explanations, including that ███████████████████████████

---

[9]    Notably, this $50 million is equivalent to the amount of the promised, but never materialized value, as part of the DeSPAC. Thus, it appears that this ELOC may have been intended to bridge this gap if needed.

[10]    It appears that there were two means to direct Lincoln Park to acquire shares. In one scenario, as long as the NYSE trading price was above $1.00, the Debtor could compel Lincoln Park to acquire at least 160,000 shares at such price. From November 19, 2021 (when the share trading price was at $6.34 a share) to September 16, 2022, the share price was above $1.00. Had the Debtor exercised this option on November 19, it could have received in excess of $1 million. In a second scenario, the Debtor could compel an accelerated purchase price, which might have generated more cash had it been utilized.

9

Exhibit 20
Page 2581

 .[11]  However, this explanation not only fails to explain *why* the Debtor did not attempt to exercise its rights under the ELOC, but also is in direct contradiction of public statements made by the Debtor in November 2021, that Rockley "strengthened our balance sheet with [the DeSpac] and our financing arrangement with Lincoln Park Capital."  Ex. "E" (November 2021 Earning Release).  In any event, insufficient disclosure of this arrangement and consideration of its use with respect to ongoing capitalization of the Rockley enterprise has been made.

**D.    THE** ████████████████████████████

It appears that by May 2022, Rockley UK (as had been its business model) required additional capital to refinance existing debt and to provide working capital.  On May 5, 2022,

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ .  The transaction was not consummated—on information and belief, it was Rockley UK that chose not to proceed—████████████████████████

████████████████████████████ .  Nothing about this transaction has been disclosed to this Court.

**E.    THE DEBTOR BORROWS MONEY IN MAY 2022**

Also in May 2022, ████████████████████████████████████

████████ , the Debtor issued pursuant to an indenture $81.5 million in convertible senior secured notes due May 2026 ("**May 2022 Notes**") (and related warrants).  The May 2022 Notes had a

---

[11]    The other high-level explanations provided thus far appear to contradict the terms of the equity purchase agreement.

Exhibit 20
Page 2582

liquidity covenant requiring a $20 million minimum cash and cash equivalent. The Non-Debtor Subsidiaries guaranteed the May 2022 Notes. No Investor was contacted by the Debtor or Rockley UK in May 2022 to discuss providing additional equity financing instead of the Debtor borrowing money on a secured basis.

The Disclosure Statement states that in August 2022, the May 2022 Notes indenture was amended and, among other things, holders of May 2022 Notes converted $4.75 million of their notes into shares of the Debtor, suggesting that the converting May 2022 Note holders believed as of that date that the Debtor was solvent.

## F. THE DEBTOR PURPORTEDLY DEFAULTS IN SEPTEMBER 2022 AND OBTAINS ADDITIONAL SECURED DEBT FINANCING IN OCTOBER 2022

The Investors understand that in September 2022, the Debtor purportedly breached the minimum cash covenant and the Debtor and the May 2022 Note holders entered into a forbearance agreement. Despite this default, the Debtor was able to obtain bridge debt financing. Further, on October 7, 2022, the Debtor and Jefferies entered into an open market sales agreement pursuant to which Jefferies, as agent to the Debtor, was authorized to sell Debtor shares up to $100 million in transactions deemed to be an "at-the-market" offering as defined in Rule 415(a)(4) under the Securities Act of 1933.[12]

However, those defaults were apparently waived just a few weeks later pursuant to an October 25, 2022 Noteholder Agreement that as part of a series of transactions brought additional debt financing to the Debtor and Rockley UK. According to the Disclosure Statement, on that day the Debtor issued $90.65 million in super senior secured notes ("**October 2022 Notes**") and related warrants. The note proceeds were used to repay the bridge notes, pay down $50 million of the

---

[12] The Disclosure Statement does not disclose what Jefferies did under this agreement.

11

Exhibit 20
Page 2583

May 2022 Notes, fund a $14.5 million escrow,[13] and for working capital.

According to the Disclosure Statement, one "existing shareholder" acquired 11.58% of the October 2022 Notes[14] and 1.17% of the October 2022 Notes were acquired by Andrew Rickman, who at the time was the CEO of Rockley UK.[15] In referring to the (unknown) existing shareholder and Dr. Rickman, the Disclosure Statement is likely referring to a "Repurchase and Subscription Agreement" dated October 24, 2022. The agreement identifies the subscribers (none of whom are Investors), indicates that the Debtor represents no "Material Adverse Effect" had occurred (which again suggests Rockley UK was operating as expected), and required the Debtor to make 12 separate representations regarding intellectual property.

At the same time as the Debtor issued the October 2022 Notes, the Debtor, Rockley UK and Noteholders entered into the Noteholder Agreement. The Disclosure Statement at page 33 states that the "noteholder agreement continued the material terms of the forbearance agreement referred to above," but what is omitted from the Disclosure Statement is that existing defaults were resolved by the Noteholder Agreement. As of October 25, 2022, the Debtor was not in default under any debt instrument.

Also important is that the Noteholder Agreement effectively gave meaningful control to the Noteholders to pick a path that best favored the Noteholders. It imposed a series of "Strategic Milestones" that, if not met, would immediately result in a default, regardless of the fact that the Debtor was not in default under the Notes. *See* Ex. "F" (Noteholder Agreement at § 5(g)). These

---

[13] The Disclosure Statement does not state what has happened to this escrow.

[14] The Investors do not know who this "existing shareholder" is or why it had the opportunity to acquire the October 2022 Notes.

[15] The First Day Declaration asserts in paragraph 38 that the unknown existing shareholder and Dr. Rickman "were the only existing shareholders willing to provide the Company the Super Senior Notes." The Investors are not aware of the Debtor even asking any shareholder to acquire the October 2022 Notes.

12

Exhibit 20
Page 2584

Strategic Milestones imposed a 20-day marketing process with prospective investors (beginning October 26, 2022 and ending November 15, 2022). By November 15, Noteholders had to be satisfied, in their sole discretion, "with the prospects of a successful transaction." The Noteholders also had certain consent rights over the "Company's" selection of a financial advisor[16] and strategic advisor (which was Jefferies).

### G. THE DEBTOR BEGINS PLAN NEGOTIATIONS WITH NOTEHOLDERS AND ENGAGES IN A TRUNCATED "MARKETING" EFFORT THAT FAILS TO APPROPRIATELY CONSIDER THE VALUABLE IP

As noted above, the Noteholder Agreement required the Debtor to engage an investment banker and begin a marketing process. Information provided to the Investors after February 9, 2023, indicates that the Debtor engaged Jefferies and Jefferies began contacting prospective investors on October 20, 2022. ████████████████████████████████

████████████████████████████████████

██████████

The First Day Declaration touts that the Debtor contacted 102 potential investors, and the Disclosure Statement describes the process as a "robust prepetition marketing process for the sale of all or a portion of the Debtor's assets" and that the "Debtor, with the assistance of its advisors, launched a review of strategic alternatives and canvassed and evaluated a wide array of potential restructuring alternatives, including a sale of all or a portion of the Company's business, third-party financing alternatives, and various permutations of the foregoing." Disclosure Statement at 33.[17]

---

[16] The Noteholder Agreement stated that Alvarez & Marsal Cayman Islands Limited ("**Alvarez Cayman**") was an acceptable company financial advisor. This entity apparently employs the two individuals who serve as "restructuring officers" for the Caymans Islands proceeding.

[17] The Investors have no idea what this is referring to. The Debtor has not provided any documents that purport to be this strategic review.

Exhibit 20
Page 2585

This Court should take these statements with a pound of salt. The "marketing process,"



*See* Ex. "H" (Jefferies process letter). All this occurred when the Debtor was not in default under any Note indenture, and yet the entire marketing process was geared towards a sale of the entire business on a hurried basis.

While certain well-known technology companies and private equity firms were apparently contacted by Jefferies,

*See* Ex. "I" (CIM at 7).[19] Particularly surprising is that Jefferies apparently failed to contact

, or Lincoln Park, which was the party to the ELOC. Despite this, it appeared that several parties did express concrete interest or were interested in revisiting, but the Debtor did nothing to further gauge this interest. *See* Ex. "G" at 2 (identifying at least two parties expressing some level of interest).

, it is clear the Debtor was not particularly interested in truly testing the market.

---

[18]     *See* Ex. "G" (Jefferies process powerpoint). Given that Rockley UK had an extensive patent portfolio and was pursuing product commercialization in multiple, and distinct, industries, it is stunning that the process lasted only two weeks.

[19]   203 issued patents reported in the CIM, which was dated November 3, 2022, is inconsistent with the 238 issued patents as of September 30, 2022, as disclosed by the Debtor in January 2023. 35 extra issued patents may make a significant difference, as well as the extra patent applications.

14

Exhibit 20
Page 2586

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[20]

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████. They might have scared off

prospective investors. █████████████████████████████████████

█████████████████████████████████████████████████████████

████████████.

| YEAR | ███████████████ | DISCLOSURE STATEMENT PROJECTED OPERATING INCOME |
|------|------|------|
| 2023 | ████████ | ($86.3 million) |
| 2024 | | ($68 million) |
| 2025 | | ($29.3 million) |
| 2026 | | $10 million |
| NET | ███████ | ($173.6 MILLION)[21] |

███████████████████████████████████████, as made clear in

the Jefferies process overview, not a single Investor was contacted by Jefferies.  No effort was

made to reach out to any Investor, even though many of them had been equity and debt investors

prior to the DeSPAC.  There is a reason.  The entire truncated "marketing process" occurred in a

---

[20]    See https://www.expertmarketresearch.com/articles/top-6-companies-global-silicon-photonics-market.

[21]    While Rockley UK was projected to lose money over the next three years, that is solely because the ramp-up of product revenues would take a few years while the company continued to incur significant engineering and G&A costs.  In other words, it was entirely expected for the company to have negative operating income in the short term. But the difference between the projections ████████ and in the Disclosure Statement is both immense and unexplained.

15

Exhibit 20
Page 2587

backdrop to negotiations between management and the Noteholders. During this entire process, there appears to have been no independent board committee appointed to ensure fairness and completeness of the process. Indeed, as far as can be discerned, the board was minimally involved if at all.

**H.** **INVESTORS ATTEMPT TO ENGAGE WITH THE DEBTOR BUT ARE TOLD THEIR OPTIONS ARE LIMITED**

In December 2022, the Debtor's stock traded down, and the Debtor received a de-listing notice from the New York Stock Exchange on December 9, 2022. On December 15, 2022 the Debtor issued a press release that "Rockley intends to respond to the NYSE within ten business days of receipt of the notice of its intent to submit a business plan to the NYSE within 45 days that shows how the Company plans to regain compliance with this continued listing standard within 18 months from the date of the notice." The Investors do not know whether this business plan exists; the Disclosure Statement makes no mention of it.

Shortly after this notice, various Investors reached out to the Debtor's management to understand what was happening with the business and to express concrete interests in providing liquidity to bridge any immediate cash needs, but were ultimately rebuffed. Specifically, throughout the second half of December 2022 and through January 2023, numerous investors contacted and sought to have meetings with the Debtor's CEO (Andrew Rickman) and other management executives, to understand what was happening with the Debtor and to discuss ways to provide financing solutions. Dr. Rickman and the other executives declined to give specifics and instead provided only high-level platitudes while making clear that the only path being considered by the Debtor was a deal with the Noteholders, and that shareholders should expect to receive no go-forward value.

This is confirmed by documents recently made available to the Investors, which show that

16

Exhibit 20
Page 2588

the Debtor and Rockley UK focused only on an (expensive) bankruptcy restructuring with the Noteholders, even though the Notes were not in default and not due until May 2026.  The reason why the Investors were not actively solicited for investment discussions no doubt is because the Debtor, Rockley UK, and management had already agreed in principle to a restructuring through a chapter 11 case, one that was very lucrative to the Noteholders and to management.

Pursuant to the proposed Plan, not only do the Noteholders receive 100% of the equity of the reorganized Debtor (and therefore 100% of the equity of the Non-Debtor Subsidiaries without them proceeding through an insolvency), but also receive the exclusive opportunity to provide exit financing and the exclusive opportunity to acquire, for $20 million, additional reorganized Debtor equity through a private placement, at a 20% discount of an artificially agreed upon $80 million "Agreed Equity Value."

The only other party to benefit from the Plan is the Debtor's current management—the same management who oversaw the losses but failed to ensure an adequate marketing process, and may have allowed defaults under the October 2022 Notes they had negotiated only a few months earlier.  Despite acknowledging operating losses and purportedly failing to attract third-party investments, under the Plan management receives assumed employment contracts, claim releases, and a "Management Incentive Plan."  According to Article IVECO of the Plan, management can receive up to 10% of reorganized Debtor equity.  Dkt. No. 43 at 19.  This includes Dr. Rickman, who throughout 2022 was the CEO and board member, including when the Debtor and Rockley UK were touting their success and promise.

Thus, at every turn, and despite their clear duties to equity investors, instead of actively trying to solicit capital from existing equity investors, sell the business to someone who might not employ them, or even consider monetizing the IP that Rockley UK invented, management sided

Exhibit 20
Page 2589

with the Noteholders.  As discussed below, this conduct continued during this chapter 11 case.

## I.    THE DEBTOR FILES FOR BANKRUPTCY IN THE UNITED STATES AND IN THE CAYMAN ISLANDS

The Debtor commenced this case in this Court on January 23, 2023.  It is a "pre-pack,"
meaning that the Debtor already solicited votes for the proposed Plan well before the Petition Date.
According to the First Day Declaration, "[f]ollowing extensive due diligence and arm's length,
good faith negotiations, the Debtor and the Prepetition Noteholders have agreed to the terms of the
Restructuring Transactions embodied in the Plan."  First Day Decl. at ¶ 49.[22]  These facts strongly
suggest the Debtor's management had concluded long ago to proceed solely on the chapter 11
path, arm-in-arm with the Noteholders.

There was no need for bankruptcy.  It does not appear that the May 2022 Notes were in
default prior to the Petition Date.  The Noteholder Agreement's strategic milestones had been
satisfied (there is no claim that the Debtor defaulted under that agreement).  As to the October
2022 Notes, although neither the First Day Declaration nor the Disclosure Statement actually
indicate that the October 2022 Notes were in default prior to the Petition Date, footnote 3 of Exhibit
D to the First Day Declaration suggests that the Debtor may have missed an interest payment on
these Notes due on January 15, 2023, just eight days prior to the bankruptcy filing.  *See* Dkt No. 4
at 49.

There is reason to question both this alleged failure to pay, as well as any assertion that
might now be made (notwithstanding the lack of any such assertion in the prior filings) that this
was a missed interest default.  Pursuant to Article 6 of the October 2022 Note Indenture, the

---

[22]    The First Day Declaration does not indicate what the "due diligence" is that was conducted.  The Investors have served document requests for all communications between the Debtor and Noteholders concerning drafts of the Plan, Disclosure Statement, the "Agreed Plan Value," and "due diligence" referred to in this paragraph, but the Investors will not receive any documents until after the filing of this Objection.

18

Exhibit 20
Page 2590

indenture trustee may exercise remedies only upon an "Event of Default" as defined therein. October 2022 Indenture at § 6.02. In the case of a missed interest payment, the Debtor has 30 days to cure before it ripens into an Event of Default. *See id.* at 6.01(a). Moreover, pursuant to section 2.03(b), the Debtor has the option to pay interest in cash or payment-in-kind ("**PIK**") interest. It is hard to imagine that the Debtor would have actually triggered an Event of Default, irrespective of payment or not on January 15, 2023, by failing to cure any missed interest payment within 30 days, given the ability to have at least some of the interest be PIK interest. Notably, no Form 8-K was filed disclosing the missed interest payment default and the Debtor has not provided any communications indicating there had been a notice of default.[23] Moreover, by controlling the $15 million escrow account, the Noteholders were in a position to deny the company the liquidity it needed to avoid default. Apparently, the Noteholders took advantage of that opportunity.

The Debtor has filed a few "first day" motions and sought to employ certain professionals. For example, the Debtor proposes to pay its investment banker a $100,000 monthly fee, a $2 million restructuring fee upon the consummation of any confirmed plan, a M&A Fee that ranges between $2 million and 2.5% of Transaction Value, and a financing fee. This is based on an engagement letter dated January 23, 2023 that amends and restates an engagement letter dated October 14, 2022.[24]

The Debtor has filed an application to employ Alvarez & Marsal North America LLC as a financial advisor and designate two individuals as the Debtor's joint restructuring officers. The Debtor simultaneously field a petition to commence an insolvency proceeding in the Cayman

---

[23] On January 23, 2023, the Debtor filed a Form 8-K disclosing the existence of the bankruptcy and expressly stating that the filing caused a default under the Notes. *See* Ex. "J". But no similar Form 8-K was filed the alleged missed interest default.

[24] Given Jefferies was implementing the marketing process ███████████████ ██████████ which the Debtor has asserted was "robust" and important for these cases, it is not clear why the terms of the prior Jefferies engagement letter, whatever they are, would have changed.

19

Exhibit 20<br/>Page 2591

Islands. The "restructuring officers" for the Cayman Islands proceeding are the same two Alvarez Cayman employees identified in the A&M Application, and were appointed to this role on February 14, 2023. On February 16, 2023, the two Alvarez Cayman individuals apparently wrote a letter to the Debtor's shareholders and are obligated to "prepare a report about the financial condition" of the Debtor by March 13, 2023. That is obviously after the confirmation hearing date.

**J.      LACK OF FUNDAMENTAL INFORMATION IN THIS CASE AND THE INVESTORS' EFFORTS TO SEEK A CONSENSUAL RESOLUTION**

The Debtor has commenced this case with the stated goal of an immediate exit—in 39 days. While generally it may be laudable to desire to exit quickly from chapter 11 and minimize cost and business disruption, the cost and business disruption for this Debtor is *de minimis*. Here the lightning-fast pace comes at substantial cost to the bankruptcy system (and, of course, the rights of equity security holders of the publicly traded Debtor). As the schedule currently stands, the Debtor is seeking to confirm its Plan before any of the following occurs:

- Schedules of Assets and Liabilities and the Statement of Financial Affairs (collectively, the "**Schedules/SOFA**") are filed;[25]

- The United States Trustee conducts a meeting of creditors under 11 U.S.C. § 341;[26]

- The Debtor files mandatory disclosures concerning the Non-Debtor Subsidiaries under Bankruptcy Rule 2015.3; and

- The financial report is published in the Cayman Islands proceeding.

---

[25]     According to the Schedules Extension Motion, the Debtor asserted that "the Debtor's restructuring efforts might have been hindered had the Debtor's key personnel and advisors been required to prepare the Schedules and SOFAs immediately before and after the commencement of this case, which would have required a meaningful expenditure of time and effort." Dkt No. 6 at ¶ 8. It is hard to imagine that the Debtor's few employees could not have prepared the Schedules/SOFA for the Debtor, which has virtually no meaningful operations. More telling is the contention later on in the motion, when the Debtor asserts "Requiring the Schedules and SOFAs to be filed would only impose an additional administrative burden and expense on the Debtor's estate, without any corresponding benefit to parties in interest." Dkt. No. 6 at ¶ 9. The Debtor ignores that the Debtor's public shareholders are parties in interest, and are entitled to the basic benefits of bankruptcy like any other constituency.

[26]     It is worth noting that there is no creditors committee in this case. As these objections make clear, the Investors have a reasonable basis to seek appointment of an Equity Committee.

20

Exhibit 20
Page 2592

Given the expensive (and well regarded) advisors to the Debtor, who have been in place for months, it is surprising that the Debtor chose not to provide this basic information before confirmation on the basis that it would time-consuming and expensive.

The Disclosure Statement states at Article IV.A that the Plan is a settlement pursuant to Bankruptcy Rule 9019, but there is no disclosure of what is being compromised or why there is anything to settle. If it is claims of the Noteholders against the Debtor, there is nothing to compromise according to the Debtor. The Plan allows the claims in full. If it is a compromise of claims against the Noteholders, there is no indication what those claims are, or what the Debtor's estate is receiving, because every claim is released with no additional consideration.[27]

Despite the lack of fundamental information, once the Investors realized that the Debtor had filed for bankruptcy and was seeking to zero out their equity interests, the Investors banded together in early February 2023 to try to achieve a consensual resolution that would provide value equal to the present value of all claims and provide some return to equity security holders.

On February 6, 2023, counsel for the Investors sent a letter requesting access to information and signaling several paths for a consensual resolution, including acquiring Rockley UK's patent portfolio and licensing it back to Rockley UK—in effect monetizing the IP into a separate vehicle without disrupting the business. *See* Ex. "K". This concept was proposed because any larger transaction would require significant due diligence and the schedule the Debtor acquiesced to in favor of the Noteholders and management made clear no delay would be tolerated.

Needless to say, the Noteholders soon enough said they were not interested in this structure because it would undermine their "investment thesis," even though all the Noteholders are entitled

---

[27] Most likely, this provision was added because, as has become common in chapter 11 plans, plan proponents simply state that the plan is a deemed motion under the (very liberal) Bankruptcy Rule 9019 standard. This Court can and should disregard this boilerplate.

21

Exhibit 20
Page 2593

to is payment in full of their claims. *See* Ex. "L" (Feb. 10, 2023 Ltr.). They and the Debtor also made thinly veiled threats that any objection to confirmation was mere hold-up value for an out of the money constituency. *Id.*

Nonetheless, the Investors did not give up. Several of them signed NDAs to access a data room,[28] and are actively pursuing numerous solutions, both to immediate liquidity needs and a process that pays in full the Noteholders with all excess value provided to shareholders. But the schedule the Debtor and the Noteholders have imposed, without any evidence of any imminent harm to this Debtor, has made it effectively impossible.

## K. THE UK TAX CREDIT PAYMENTS, IP ASSETS, AND POTENTIAL LITIGATION CLAIMS

The First Day Declaration and Disclosure Statement provide surprisingly little information regarding key assets of Rockley UK and, by extension, the Debtor. Further, what little information is provided is, in some cases, incomplete and misleading. In fact, the First Day Declaration and Disclosure Statement fail to disclose certain assets; consideration of these omitted assets strongly suggest the enterprise value actually exceeds all claims by millions of dollars.

### *Tax Assets*

One significant asset of Rockley is the ability to utilize tax assets. For example, according to a press release dated December 29, 2022, Rockley UK received $15.5 million in cash from English taxing authorities on account of a tax year 2020 "research and development" Tax Credit, submitted a claim for a similar credit for tax year 2021, and expects to submit one for tax year 2022. *See* Ex. "M". Given Rockley UK's sizeable investments in research and development, one

---

[28] The NDA expressly permitted the Investor to review information for any purpose in this case, whether to seek a consensual resolution or to object to confirmation. Until February 19, 2023, Debtor's counsel had been very responsive in providing information and access to the data room when requested for these multiple purposes. However, on February 19, 2023, counsel took a different, far more confrontational, position when the Investors' counsel inquired about the ELOC, including accusing the Investors and/or their counsel of engaging in a "ruse," a "playbook," and revealing "true" intentions of not trying to seek a consensual resolution.

Exhibit 20
Page 2594

can expect that these anticipated Tax Credit payments will be worth tens of millions of dollars each.

These Tax Credits are effectively ignored in the submissions to this Court. For example, Exhibit D to the First Day Declaration states in footnote 1 that "[t]here has been no material change in the assets of the Company since September 30, 2022 other than receipt of proceeds related to the issuance of the Super Senior Notes . . . ." Dkt. 4, Ex. D at n.1. But that cannot be true because Rockley UK did receive $15.5 million in cash on account of the 2020 Tax Credit, per the December 29, 2022 press release.

Further, the financial projections attached as Exhibit C to the Disclosure Statement expressly state that the "total revenue" is "primarily comprised of product revenue and subscription revenue." Nothing in the "total revenue" lines for 2023 and 2024 indicates expected payments for Tax Credits for tax years 2021 and 2022, even though the Debtor has already indicated it plans to seek such credits. Those Tax Credit payments go straight to the bottom line, but are entirely omitted.[29]

The Disclosure Statement at page 68 states that the "U.K. Tax Entities are expected to undergo a 'change in ownership' within the meaning of" English tax laws, but "the Debtor expects the business of Legacy Rockley to operate after the Effective Date in a manner which will not result in the restriction of its attributes." Disclosure Statement at 68. However, the Disclosure Statement entirely fails to explain what these "attributes" are. English law actually almost assuredly will permit Rockley UK to utilize net operating losses, as long as it operates for the next three years, even if there is a change in ownership. That is a valuable asset when, as the Disclosure

---

[29] A supporting document provided to the Investors a few weeks ago makes clear that the projections in the Disclosure Statement assume no Tax Credits. The Disclosure Statement is seriously flawed in this respect.

Exhibit 20
Page 2595

Statement projects, in a few years Rockley UK will begin generating substantial positive EBITDA.

### *The Valuable IP*

Rockley UK has always been, and likely will continue to be for the near future, a research and development company. It currently has over 235 issued patents and over 300 pending patents, along with technical know-how and trade secrets. Rockley UK has been actively developing IP in 2022; according to its year-end 2021 Form 10-K, as of December 31, 2021, Rockley UK had 182 issued patents and 298 other patent applications pending worldwide, meaning the patent portfolio increased in 2022. ████████████████████████████████████

████████████████████████████████. Further, upon information and belief, many of these patents are valuable for technologies that do not compete with the go-to-market products being developed by Rockley, or are not implicated in these products (and thus are not being utilized) at all.

Based on the information that is publicly available or provided to the Investors, the Debtor has made no attempt to value its IP, other than on a liquidation analysis basis for purposes of satisfying section 1129(a)(7), claiming that it would only be worth $3 million. The "liquidation analysis" in the Disclosure Statement provides no information to explain the Debtor's $3 million liquidation value basis, and it makes no commercial sense. Indeed, ████████████████████████

███████ valued just a portion of the IP at no less than $10 million. Shockingly, the Debtor did not engage in any valuation of its IP on a stand-alone basis prior to the Petition Date, including in the CIM. No one has done any of the typical analysis on valuing patents, either individually or on a portfolio basis.[30] The value of a patent portfolio relates to the patent holder's ability to license

---

[30] Valuing patents requires specialized knowledge and experience; traditional valuation experts in chapter 11 cases are not usually so skilled.

24

Exhibit 20
Page 2596

the patents or sue for infringement. While it may be valuable to Rockley UK to use IP as part of its ongoing operations, it is also valuable on a stand-alone basis. And, as noted above, there may be patents that are valuable to non-competing business, and/or which are not being utilized by the Rockley enterprise. Several prominent chapter 11 cases, such as *Nortel Networks*, have resulted in vigorous auctions for patent portfolios, generating substantial returns for stakeholders.

### Litigation Claims

The last category are litigation claims. The Disclosure Statement ascribes no value to any litigation claims. Indeed, the Schedule of Retained Causes of Action filed with the Plan Supplement does not identify any specific claims (but does specifically release claims against Noteholders). For a company that is allegedly insolvent, it is surprising not a single fraudulent transfer or preference claim is identified.[31]

And for a company that was publicly traded and had stock trading above option value for most of its existence, it is surprising that there is not any analysis of potential fiduciary duty or other similar claims. For example, in connection with the August 2021 DeSPAC, the Investors understood that the Debtor was supposed to receive $200 million in cash not $150 million, and thus there might be claims associated with the August 2021 DeSPAC. There may be claims related to the failure to pursue ███████████████████████████████, or with the failure to exercise rights under the ELOC, or with the entrance into the ELOC itself, if, as Debtor's counsel now suggests, Lincoln Park never had the requisite liquidity to provide funding, notwithstanding Dr. Rickman's public statements touting the strengthening of Debtor's balance sheet as a result of

---

[31] Documents supporting the liquidation analysis indicate the Debtor believes even in a hypothetical chapter 7 case there would be no avoidance actions—not one. Given the failure to file the Schedules and SOFA prior to the objection deadline and no other document evidencing an analysis of any litigation claims, the Investors have no way to tell. But the notion that there is not a single insolvency-based avoidance action supports the proposition that the Debtor is in fact solvent.

Exhibit 20
Page 2597

the Lincoln Park transaction.

Similarly, there could, of course, be substantial breach of fiduciary duty claims associated with the decisions of directors and officers throughout 2022 and 2023 before the Petition Date.[32] Dr. Rickman is the fiduciary who oversaw the Debtor as it raised capital from equity investors and made public statements relied on by shareholders. He is the person on whose watch the Debtor borrowed money from the Noteholders, and became a Noteholder himself. And now he stands to gain in multiple ways if the Plan is confirmed. No one representing the Debtor has analyzed his culpability or liability to the Debtor and its stakeholders.

### OPPOSITION

Bankruptcy Code section 1129(a) provides that "[t]he court shall confirm a plan only if" it complies with all of the requirements of section 1129(a). 11 U.S.C. § 1129(a). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *In re Charter Commc'ns*, 419 B.R. 221, 243-44 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown")).

### L.  THE DISCLOSURE STATEMENT DOES NOT SATISFY 11 U.S.C. § 1125 AND THIS CANNOT

---

[32]     There are directors and officer insurance policies available.

26

Exhibit 20
Page 2598

**SATISFY 11 U.S.C. §§ 1129(A)(1)AND (A)(2)**

This Court should deny confirmation because the Disclosure Statement does not satisfy 11 U.S.C. § 1125 and, as a result, the Plan does not satisfy sections 1129(a)(1) and (a)(2). *See In re Boylan Int'l, Ltd.*, 452 B.R. 43, 51 n.4 (Bankr. S.D.N.Y. 2011) (section 1129(a)(2) requires a plan proponent to comply with section 1125); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("Disclosure is the 'pivotal' concept in Chapter 11 reorganization.").

If there is a colorable argument that there is value available to pay all allowed claims in full, and the Investors would be entitled to a recovery, the Disclosure Statement must provide adequate information to show why the Plan's proposed treatment of equity security interests is permissible. It is the Debtor's burden to show why it is appropriate to wipe out equity, disclosing all material information relating to valuation. The Debtor cannot meet its burden because the Disclosure Statement falls short in numerous critical areas. Indeed, the Disclosure Statement, coupled with the other facts demonstrated in these objections, support the conclusion that the Plan was designed in bad faith.

First, the Disclosure Statement is inadequate in describing the assets that ultimately flow to the Debtor. It is beyond dispute that a full and complete disclosure of assets available to parties in interest is a paramount requirement of adequate information. *See, e.g., In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568–69 (Bankr. N.D. Ga. 1984); *In re Phoenix Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); and *Westland Oil Dev. Corp. v. MCorp Management Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993).

As demonstrated above, there are at least three categories of assets as to which there is effectively no information. The Disclosure Statement wholly omits any mention of Tax Credits, and they are not included in the projected revenues. That is tens of millions of dollars of value being ignored.

27

Exhibit 20
Page 2599

The Disclosure Statement also all but dismisses the value of Rockley UK's IP on a stand-alone basis, and there is no disclosure at all about any attempt to value such IP. ████████ ███████████████████████████████████████████. Since February 6, 2023, the Investors expressed a willingness to explore a monetization strategy with a license back to Rockley UK. The Disclosure Statement also fails to disclose that the Debtor did not even attempt to contact, as part of Project Rocket, any patent monetization firms, such as Acacia, Ocean Tomo, Intellectual Ventures, Patent Monetization, Inc., and UnitedLex.[33]

*Nortel Networks* is paradigm of the benefit of adequately marketing and auctions intellectual property. In that case, the debtor commenced a chapter 11 case and selected one technology company as the bidder for the debtor's patent portfolio. But then a bidding war broke out, and the end result was that a consortium acquired Nortel Network's extensive patent portfolio, paying approximately $4.5 billion. *See* https://www.reuters.com/article/us-nortel/apple-rim-group-top-google-in-4-5-billion-nortel-sale-idUSTRE7600PF20110701. As one reporter described it, the sale price went for three times more than certain experts expected. *Id.*

Importantly, the patent portfolio that was auctioned was separate from Nortel Network's business lines, which were sold separately. Nortel Networks and its stakeholders considered selling the portfolio versus retaining the portfolio and setting up a captive licensing company. The company hired an IP specialty firm to provide advice. *See In re Nortel Networks, Inc.*, 532 B.R. 494, 515–16 (Bankr. D. Del. 2015). None of what happened in Nortel Networks was even considered, much less analyzed and pursued as part of Project Rocket.

---

[33] Law firms routinely publish client alerts or white papers on exploring patent monetization. *See, e.g.*, https://www.mayerbrown.com/en/perspectives-events/events/2022/11/patent-monetization-and-ma-transactions-a-match-made-in-heaven; https://www.skadden.com/-/media/files/publications/2014/09/sept2014_spotlighton.pdf. The Debtor's counsel itself paints itself as having a robust IP monetization advisory practice. https://www.pillsburylaw.com/en/services/intellectual-property/

Exhibit 20
Page 2600

There is also no disclosure of any analysis of any litigation claims, because the Disclosure Statement assumes there are none. Yet under the Plan, any claims of the estate against directors and officers and the Noteholders are released for all prepetition conduct going back years, or the decision to file the chapter 11 case for the Debtor, including virtually any form of securities fraud, breach of fiduciary duty, or similar misconduct. *See* Disclosure Statement at 13. The Disclosure Statement does not indicate any exclusions for fraudulent, willful or grossly negligent misconduct. *Id.* There is no explanation as to why this is beneficial (or even legal).

The Disclosure Statement states that all of the Debtor's releases and third-party releases "were an essential element of the negotiations among the Debtor and their stakeholders in obtaining their support for the Plan." Disclosure Statement at 12. The "stakeholders" are the Noteholders and management, and not any other party in interest. In other words, somehow releases of claims the Debtor asserts do not even exist and have not been analyzed were essential to getting the only people to truly benefit from the Plan to agree to the Plan.

Separate from the specific assets, the Disclosure Statement contains incomplete information regarding the Debtor's projections. As explained above ████████████████████ ████████████████████████████████████—are materially different than those used in the Disclosure Statement. There is no disclosure of the existence of this disparity, or any discussion why the Debtor did not attempt to re-engage in a marketing process with the updated projections. And the projections in the Disclosure Statement do not disclose any methodologies or assumptions like a discount rate or terminal year multiple.

Without full disclosure of the detailed assumptions, analysis, and calculations performed by Jefferies, the Disclosure Statement does nothing more than assert an unsubstantiated opinion. To be adequate, a disclosure statement must provide information, data, and objective facts. *See In*

29

Exhibit 20
Page 2601

*re Cardinal Congregate I*, 121 B.R. 760, 766 (Bankr. S.D. Ohio 1990); *In re Hirt*, 97 B.R. 981, 983 (Bankr. E.D. Wis. 1989).  Here, the Disclosure Statement fails to satisfy section 1125.

Finally, the Disclosure Statement omits material information which, if included, would suggest that there is no true liquidity crisis, and thus undercut the stated justification for the hurried schedule.  In addition to the lack of disclosure concerning the existence of a default under any Note indenture, on February 17, 2023, the Debtor filed its Plan Supplement (Dkt. No. 43) that includes a list of contracts to be assumed.  One contract to be assumed is the loan agreement between the Debtor and Rockley UK, but the Disclosure Statement says nothing about it.[34]  One contract to be rejected is the ELOC, and, again, no disclosure concerning it, even though in November 2021, the Debtor told the market the ELOC was obtained to strengthen the Debtor's balance sheet.

## M. THE PLAN WAS NOT PROPOSED IN GOOD FAITH

One of the confirmation requirements is Bankruptcy Code section 1129(a)(3), which provides that a "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Courts recognize that a plan is not proposed in good faith if there are ulterior motives and/or if there have been serious omissions of material facts.  *See In re Draiman*, 450 B.R. 777, 804 (Bankr. N.D. Ill. 2011); *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995).

This Court should deny confirmation because the Plan was not proposed in good faith.  It is the product of fatally flawed marketing process, that ran for only three weeks and used outdated

---

[34]    One is a "financial guaranty agreement" between the Debtor and TSMC North America.  According to that agreement, if Rockley UK fails to pay for any goods ordered from TSMC, the Debtor agrees to pay for such goods and indemnify TSMC.  According to the Plan Supplement, the Debtor desires to assume this agreement (which means in the Debtor's business judgment assuming a guaranty is a smart business decision) and that there is no cure amount. In other words, as of the Petition Date, the Debtor was current on this contract to be assumed.

30

Exhibit 20
Page 2602

information, that is being used as cover for what amounts to an insider deal between the Noteholders and management that does not satisfy the entire fairness standard, and there are numerous, serious, omissions of material facts.

What the Debtor and the Noteholders have agreed to is, in effect, a friendly foreclosure on the stock of the Non-Debtor Subsidiaries, with the added problems that the Debtor was not in default under any Notes prior to bankruptcy (so there was no legal right to foreclose) and the Noteholders and management are receiving claim releases that they could not get in a foreclosure. To convince the Court this is justified, the Debtor knows it has to appear to have tried valiantly to maximize value prior to the Petition Date and thus touts a three-week process than ran between October 20 and November 15.

But given how often the First Day Declaration and the Disclosure Statement tout the "robust" marketing process, the fact that it was anything but firmly demonstrates a lack of good faith. The following facts are undisputed:[35]



- 
- The Debtor was not in default at the time;
- 
- 
- 
- 
- 

---

[35] If the Debtor disputes these facts, that means there is information that it has not provided to the Investors.

31

Exhibit 20
Page 2603

- ████████████████████

- ████████████████████████████████████████████
████████████████████████████████; and

- ████████████████████████ the Debtor made no effort to refresh any
marketing efforts for two months.

These facts show that the prepetition marketing was not robust at all, and this Court should not accept it as evidence of good faith. By analogy, courts do not approve truncated asset sale processes pursuant to 11 U.S.C. § 363, especially ones with confusing or misleading information provided to prospective investors. *See In re Innkeepers USA Tr.*, 442 B.R. 227, 233–34 (Bankr. S.D.N.Y. 2010) (finding the debtor acted in bad faith to the detriment of the estate in refusing to market subject transaction); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) ("[secured party] if unchecked of its purchase, might well have frozen out other suitors for [debtor's] assets").

*Fisker Automotive* is analogous; it involved a prepetition marketing effort to justify a first day sale of substantially all assets of the debtor. In *Fisker Automotive*, the court took issue with the timeline proposed by the debtors and secured creditor for the bankruptcy sale, which provided only 24 business days to challenge the sale motion over the winter holidays. *Fisker Automotive*, 510 B.R. at 60. The debtors and secured creditor could not provide the court with a satisfactory response as to why the timing was so rushed, and the court viewed the timing as "inconsistent with the notions of fairness in the bankruptcy process." *Id*. at 60-61.

The facts here are worse than in *Fisker*. The "marketing" timeline is significantly shorter, and was not refreshed at all ████████████████████████████████████. There was no default at the time of the truncated marketing effort or thereafter. The only debtor is not the operating entity, and no jobs are at risk. If the Non-Debtor Subsidiaries themselves need capital to operate, which is not a consideration for this Court as part of confirmation of the Debtor, nothing

32

Exhibit 20
Page 2604

prevents them from seeking such capital.

Another analogy is useful: a UCC foreclosure of collateral requires commercially reasonable efforts to market the stock, and a number of factors can affect commercial reasonableness, *see Citicorp Leasing, Inc. v. United American Funding, Inc.*, No. 03 Civ. 1586 (WHP), 2005 WL 1847300, at *8 (S.D.N.Y. Aug. 5, 2005) ("The commercial reasonableness of a sale of collateral incorporates the time of the sale and the means used by the creditor to attract bidders."), but adequate marketing is key. *See* UCC §§ 9-610, 9-627(a); *see also Shelbourne BRF v. SR 677 BWAY LLC*, Index No. 652971/2020 (N.Y. Sup. Ct. Aug. 3, 2020) (Schechter, J.); *see, e.g., Washington County Trust Co. v. Cloud Dancer, Inc.*, 1994 WL 474836 (RI Super., May 25, 1994) (no aspect of aircraft sale was commercially reasonable where, among other infirmities, notice was not published in a commercial, airline industry, publication); *First Bank and Trust Company of Ithaca v. Mitchell, et al.*, 473 N.Y.S.2d 697, 394-95 (1984) (denying creditor's summary judgment motion where fact issue existed as to whether property's sale price would have increased had seller placed advertisements in more than two papers and where no effort was made to telephone businesses that would have been interested in the items for sale). The marketing process would not satisfy "commercial reasonableness" by ignoring obvious candidates who could be interested in the assets of the "Company".

Two cases from this District where the court confirmed a "prepack" plan where equity security owners were out of the money highlight the differences here. In *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014), multiple debtors filed chapter 11 cases to implement a "prepack" plan. Though the debtors took the position that they were insolvent by hundreds of millions of dollars, the plan did provide a small recovery to equity security holders. Nonetheless, equity security holders raised concerns, the US Trustee appointed an official

33

Exhibit 20
Page 2605

committee of equity holders,[36] and there was a lengthy confirmation hearing months later. *See id.* at 239-40. The court confirmed the plan, finding that the plan was proposed in good faith and that the debtor had proved that the value of the enterprise was substantially less than the debt. Unlike here, the adequacy of the disclosure statement was not at issue in that confirmation hearing.

*Genco* shows the right way to proceed, in a case that involved the entire debtor enterprise, and not simply a single holding company, where equity was not wiped out on Day 1, there was an estate fiduciary to advocate for equity, and there was a two-month schedule in place before confirmation. Importantly, the court pointed out that no equity security holder itself "expressed any interest in investing its own money in a transaction involving the Debtors." *Id.* at 260 (citing cases). That clearly is not the case here. The Investors have expressed interest in investing their own money (in December, January, and now).

*Genco* also noted that a plan is not proposed in good faith if there are ulterior motives. *See id.* at 261. The equity committee in that case argued that business plan projections had been manipulated, but the court found otherwise. The record showed that the debtor and secured creditors spent months negotiating, an independent director had been appointed to lead the restructuring efforts, and actual valuations of the debtors' assets were obtained. *See id.* at 262-63. There was no concern expressed in *Genco* about management and secured noteholders teaming up. And the debtors "repeatedly advocated for a recovery for equity in the form of a 'gift' from senior creditors." *Id.* at 263.

Here, no one advocated for the public shareholders at all; the person who should have is himself a Noteholder and is getting special treatment if the Plan is confirmed. No valuations have

---

[36] The firm representing the equity committee in *Genco* is the same firm representing the Noteholders here. *See* 513 B.R. at 237.

34

Exhibit 20
Page 2606

been prepared and vetted, including no patent portfolio valuations. No independent fiduciary was appointed.

In *In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017), the court overruled individual *pro se* shareholder objections to confirmation where a plan wiped out equity. The court rejected the shareholders' argument that the debtor had to be solvent because its book value showed solvency. But the court correctly declined to adopt book value as a basis for solvency, stating, "the unrefuted evidence received by the Court on three occasions, including the confirmation hearing, showed that the Debtors are hopelessly insolvent. They have approximately $1 billion in assets and over $6 billion in debt. They would have to come up with $5 billion more in assets before equity would be entitled to a share." *Id.* at 227. Moreover, the court pointed to a 15-month period, including prepetition and postpetition investigations into potential claims, as further evidence that there was no possible way to bridge this enormous gap. *Id.* at 227-28.

Here, the gap between the artificial "Agreed Plan Value" and what it would take to pay claims in full is less than $50 million, and the Investors have already identified—despite no independent investigations and an exceedingly short period of time—several concrete assets that may help to bridge this gap.

## N. THE PLAN DOES NOT SATISFY 1129(A)(7) OR 1129(B)

Because the Investors have objected and the Plan proposes to wipe out equity interests, the Plan must satisfy both Bankruptcy Code sections 1129(a)(7) and 1129(b). Section 1129(a)(7), of course, is that the Plan provides at least as much as shareholders would receive in a hypothetical chapter 7, and section 1129(b)(2)(C) mandates that creditors cannot be paid more than their allowed claims, such that any excess value must be provided to equity interests. Given the equity interest holders receive zero, $1 of value available to pay equity interests means the Plan is not confirmable. As *Genco* made clear, courts will "deny confirmation 'if a plan undervalues a debtor

35

Exhibit 20
Page 2607

and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims.'" 513 B.R. at 242 (quoting *In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010)); *see generally In re Exide Techs.*, 303 B.R. 48, 61, 66 (Bankr. D. Del. 2003) (denying confirmation due to low valuation because, *inter alia,* debtor could not meet requirements of Section 1129(b)). *Genco* further explained, "[a] determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)." (internal quotations and citations omitted).

The key to the Plan is the $80 million "Agreed Plan Value." This is wholly artificial. There is nothing in the Plan or Disclosure Statement, including the projections contained in Exhibit C to the Disclosure Statement, that explains how this number was determined. There is no discounted cash flow valuation, no comparable companies or comparable transactions valuation, or ***anything*** that shows how this was determined. Even Exhibit "B" to the First Day Declaration, which was filed ***on the same day as the Disclosure Statement***, states that the unsecured deficiency claims of the Noteholders are "unknown." Dkt. No. 4 at 47. How can that be if the "Agreed Plan Value" determined as of that same date is $80 million.

What this "Agreed Plan Value" actually means is that the Debtor's fiduciaries and Noteholders have decided amongst themselves that there is $40 million to $50 million hole to fill. The Investors believe it can be easily filled by prospective investors in the IP, if there is a reasonable amount of time to conduct to a credible marketing effort and permit reasonable due diligence.

Further, the projections in Exhibit C—even without adding in the missing Tax Credits— easily support a conclusion that the Debtor is solvent. Again, the Debtor has not disclosed what discount rate or terminal year multiple it is using, but for a company that has gone public and has

36

Exhibit 20
Page 2608

historically attracted both equity and debt financing, it is not as risky as a true start-up. For example, using a 7.5x multiple for the terminal year and a 30% discount rate, the present value of future cash flows is $132.04 million, which itself exceeds the Notes and general unsecured claims. Then adding in the expected tax credits for tax years 2021-2025 (when the company has operating losses) generates a substantial equity cushion. It is not wonder that until recently the "Company" had no problems raising financing.

In July 2021, Rockley UK was involved in an investor presentation that, upon the DeSPAC, valued the enterprise at over $1.2 billion. The presentation had far more detailed valuations than either the CIM or the Disclosure Statement. But like other documents, it showed Rockley UK incurring operating losses for several years until its products reached commercialization. The Debtor has not disclaimed this valuation.

As for section 1129(a)(7), to be clear, liquidation of *the Debtor* does not mean liquidation of Rockley UK, and thus the same economics exist. There is no evidence that Rockley UK would have to liquidate its assets simply because a hypothetical chapter 7 trustee for the Debtor is marketing the stock of Rockley UK. The Debtor may argue that a hypothetical chapter 7 liquidation necessarily means a liquidation of non-debtors, but that is not the law. Indeed, the liquidation analysis presented appears to assume a liquidation of the Non-Debtor Subsidiaries, but there is no reason for that assumption. The hypothetical liquidation test looks *only* to the debtor, not to any other entity.

## O.    THE PLAN'S RELEASE PROVISION IS PLAINLY ILLEGAL

Disclosure Statement page 13, which is titled "Debtor Release Provision," states that the Debtor and its estate "in each case on behalf of itself and its Related Parties and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through or for the foregoing Entities" each release claims against the Released Parties. The scope

37

Exhibit 20
Page 2609

of releases is extraordinarily broad, and there is no exclusion of fraud, willful misconduct or gross negligence. *Id.* This is plainly impermissible. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (forbidding nondebtor releases that grant "blanket immunity" to nondebtor parties); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 437 (Bankr. S.D.N.Y. 2005) (observing that the Second Circuit does not tolerate nondebtor releases absent the finding of "unique" circumstances); *see also In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720–21 (Bankr. S.D.N.Y. 2019).

The Investors have elected to opt out, and thus none of their direct claims should be impacted. *See* Plan § VIII.E. But the definition of "Related Parties" creates tension because the Debtor and Debtor's estate and their "Related Parties" provide an independent release to the Released Parties under section VIII.D, separate from the "Releasing Parties" release in section VIII.E. The Disclosure Statement and Plan section VIII.D both use the phrase "directly and derivatively," suggesting that "Related Parties" of the Debtor do release claims, even if direct. The definition of Related Parties includes equity security holders of the Debtor. *See* Plan § I.A.100 (definition of Related Party includes equity security holders). There is no exclusion either in the definition of "Related Party" or Plan § VIII.D for any person electing to opt out. The Plan easily could be read to foist upon unsuspecting parties who opt out but do not object a backdoor release. To the extent the Court disagrees with the SEC's objection, at minimum the Plan has to modified to correct for this confusing language.

## P. DENIAL OF CONFIRMATION DOES NOT HARM THE "BUSINESS" AND THE INVESTORS ARE NOT LOOKING TO "SHAKEDOWN" ANYONE

The Debtor will no doubt cry that absent confirmation, the "Company" will crater, jobs will be lost, and a long parade of horribles. And the Debtor and the Noteholders likely will assert (because they have already hinted at it) that the Investors are looking to leverage an objection into

38

Exhibit 20
Page 2610

an inappropriate payoff. This Court should not be fooled.

As the background makes clear, until very recently, there were no defaults under the Notes (and as of the Petition Date, only the October 2022 Notes were in default). The Debtor took months to craft this prepack after taking just weeks to run a truncated marketing process. And this Debtor —which is the only entity before this Court—in no way requires an immediate resolution that has such a draconian outcome for equity; this is not the fiduciary in *Genco* who advocated for equity security holders to receive something.

The Debtor has had minimal expenses and will continue to have minimal expenses. No employee is at risk of losing her or his job unless the Noteholders, in another jurisdiction, decide to attempt to call on the Non-Debtor Subsidiaries' guarantees and foreclose on Non-Debtor Subsidiary assets. That they have not done so is telling that they want to own an operating business with substantial "upside" value.

There is no creditors' committee. The United States Trustee has not appointed any fiduciary, like an equity committee, to counter the Debtor's narrative. The Investors are paying out of their own pockets to seek a fair and legally just outcome. They have not asked for a "tip," or a "gift," or any other "hold up" consideration on account of their specific equity interests. Instead, they have tried to consider multiple avenues to maximize value in a shortened time frame, in the face of a determined effort to make sure the enterprise ends up in the hands of the Noteholders and management.

The right answer is to deny confirmation for a short period of time and, at minimum, require fundamental disclosures and additional time to investigate, conduct due diligence, and examine any reasonable alternative to wiping out hundreds of public shareholders.

Exhibit 20
Page 2611

## **CONCLUSION**

For the reasons set forth herein and based on the evidence and argument at the confirmation

hearing, this Court should deny confirmation.

DATED:   New York, New York
          March 3, 2023

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By:  */s/ Rachel E. Epstein*
Rachel E. Epstein
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
rachelepstein@quinnemanuel.com

Harry Olivar
Eric D. Winston (admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
harryolivar@quinnemanuel.com
ericwinston@quinnemanuel.com

*Counsel for the Investors Listed on
Schedule A*

40

Exhibit 20
Page 2612

## SCHEDULE A

The Investor Group comprises of the following persons who directly own, and/or in certain cases also are trustees or investment advisors for entities owning, common stock of the Debtor:

Michael Tierney
Bernd Buehner
Ken Grossman
Steeve Montandon-Varoda
Olivier Mettraux
Glen Schneider
Patrick Vollenweider

41

Exhibit 20
Page 2613

Filed by Rockley Photonics Holdings Limited
Pursuant to Rule 425 under the Securities Act of 1933, and
deemed filed pursuant to Rule 14a-12 under the
Securities Exchange Act of 1934
Form S-4 File No. 333-255019

Subject Companies:
Rockley Photonics Limited
SC Health Corporation
(Commission File No. 001-38972)

Exhibit 20
Page 2614

Exhibit 20
Page 2615

# Notice to Recipient



This investor presentation ("Investor Presentation") is strictly private and confidential and is intended solely for the information of the Recipient. It is not an invitation for public subscription and should not be reproduced or circulated or used for any purpose other than assisting with the assessment of the SC Health Corporation ("SC Health") and Rockley Photonics, Ltd. ("Rockley Photonics" or the "Company") by the persons to whom this Investor Presentation is delivered. Each Recipient agrees that neither it nor its agents, representatives, directors or employees will copy, reproduce or distribute to others this Investor Presentation, in whole or in part, at any time without the prior written consent of each of SC Health and Rockley Photonics, and that it will keep permanently confidential all information contained herein not already in the public domain and will use this Investor Presentation only for the purpose of evaluating the proposed business combination (the "Business Combination"). This Investor Presentation shall remain the property of SC Health and Rockley Photonics and each company reserves the right to require the return of this Investor Presentation together with any copies or extracts thereof at any time.

In no circumstances will SC Health, Rockley Photonics or any of their company's subsidiaries, affiliates, representatives, partners, directors, officers, employees, advisers or agents (each a "Relevant Party" and collectively "the Relevant Parties") be responsible for any of the information in this Investor Presentation, including the forecasts and details on the market described herein. These are modified as a guide only and do not purport to contain all the information that an interested party may require. By accepting this Investor Presentation each Recipient acknowledges that it will be solely responsible for making its own investigations, including all such costs and expenses incurred with such investigations, or its investment in SC Health, Rockley Photonics or any parent company of either company, and forming its own view as to the condition and prospects of such investment, and the accuracy and completeness of the statements contained herein.

This information contained herein does not, and will not, form any part of a contract or offer for sale. Furthermore it does not constitute an offer to sell or invitation to purchase shares SC Health, Rockley Photonics or any parent company of either company that is capable of acceptance, and no binding commitment may be entered into on the basis of the information contained herein. Any offers and sales of securities will be made only by means of a definitive investment agreement with SC Health, Rockley Photonics or any parent company of either company.

Neither the receipt of this Investor Presentation nor any information (whether written, electronic or oral) made available in connection with the proposed issue of securities constitutes, or is to be taken as constituting, the giving of investment advice by any of the Relevant Parties. This Investor Presentation should not be considered as a recommendation by any of the Relevant Parties to invest in SC Health, Rockley Photonics or any parent company of either company, and Recipients interested in investing are recommended to seek their own independent financial, legal and other advice from persons authorised and specialising, as necessary, in investments of this kind in question and should rely solely on their own judgment, review and analysis in evaluating the investment. Recipients should be aware that any investment activity may expose them to a risk of losing the property invested.

Recipients in the United Kingdom

In the United Kingdom, members of the public have not been invited to, and are not eligible to invest in SC Health, Rockley Photonics or any parent company of either company. The distribution of this Investor Presentation is exempt from the general restriction contained in section 21 of the Financial Services and Markets Act 2000 ("FSMA") in relation to the communication of invitations or inducements to engage in investment activity on the grounds that it is being distributed to and is directed only at persons who i) are persons having professional experience in matters relating to investments within the meaning of Article 19 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 ("Order") or are iii) persons falling within Article 49(2)(a)(b)(d) ("high net worth companies, unincorporated associations, etc") of the Order (all such persons together being referred to as "relevant persons"). This communication must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this communication relates is available only to relevant persons and will be engaged in only with relevant persons. Each Recipient represents and warrants that it is a relevant person and agrees to inform himself or itself about and observe all applicable legal requirements in this UK and/or in the jurisdiction(s) in which he or it is situated. Any Recipient who is not a relevant person should return this document to SC Health or Rockley Photonics and should not act or rely upon this Investor Presentation or any of its contents.

Recipients in the European Economic Area

In relation to each member state of the European Economic Area which has implemented Directive 2003/71/EC (as amended, and including any relevant implementing measure in each relevant member state ("Prospectus Directive"), this Investor Presentation is being distributed to and is directed only at "qualified investors as defined in the Prospectus Directive.

Recipients in the United States

This Investor Presentation has been provided to each Recipient on the basis that the Recipient is a "qualified institutional buyer" (as defined in Rule 144A under the U.S. Securities Act of 1933, as amended (the "Act")) or an "accredited investor" within the meaning of Rule 501(a) (1), (2), (3), or (7) or (8) under the Act), and that each such Recipient has confirmed its status as an "accredited investor". If any Recipient is not, or are no longer able to confirm that it is an "accredited investor" it must immediately return this Investor Presentation to SC Health or Rockley Photonics.

Neither the U.S. Securities and Exchange Commission nor any state securities commission or other regulatory authority in the U.S. has approved or disapproved of the investment opportunity described herein or determined if this Investor Presentation is truthful or complete. Any representation to the contrary is a U.S. criminal offense.

Recipients outside of the United Kingdom, European Economic Area or United States

Recipients in jurisdictions outside the UK, European Economic Area or United States should inform themselves about and observe all applicable legal requirements in their jurisdictions. In particular, the distribution of this Investor Presentation in certain jurisdictions may be restricted by law and, accordingly, Recipients represent that they are able to receive this Investor Presentation without contravention of any unfulfilled registration requirements or other legal restrictions in the jurisdiction in which they reside or conduct business.

The information contained in this Investor Presentation is strictly confidential and has been prepared by SC Health and Rockley Photonics with respect to certain financial metrics of Rockley Photonics for informational purposes only to assist interested parties in making their own evaluation with respect to the proposed Business Combination between SC Health and Rockley Photonics, and for no other purpose. The information contained herein does not purport to be all-inclusive and none of the Relevant Parties makes any representation or warranty, express or implicit, as to the accuracy, completeness or correctness of this information contained in this Investor Presentation or any other written or oral communication communicated to the recipient in the course of the recipient's evaluation of the Company or SC Health. Only those particular warranties which are made, in a definitive written investment agreement, when and if one is executed, and subject to such exclusions and limitations, as may be specified in such agreement, shall have any legal effect. Such final agreement will not contain any representations, warranties or undertakings as to this Investor Presentation.

This Investor Presentation does not constitute (i) a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the proposed Business Combination or (ii) an offer to sell, a solicitation of an offer to buy, or a recommendation to purchase any security of SC Health, the Company, or any of their respective affiliates. You should not construe the contents of this Investor Presentation as legal, tax, accounting or investment advice or a recommendation. You should consult your own counsel and tax and finance advisors as to legal and related matters concerning the matters described herein and, by accepting this Investor Presentation, you confirm that you are not relying upon the information contained herein to make any decision. The distribution of this Investor Presentation may also be restricted by law and persons into whose possession this Investor Presentation comes should inform themselves about and observe any such restrictions. This recipient acknowledges that (i) it is aware that the United States securities laws prohibit any person who has material, non-public information concerning a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) familiar with the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "Exchange Act"), and that the recipient will neither use, nor cause any third party to use, this Investor Presentation or any information contained herein in contravention of the Exchange Act, including, without limitation, Rule 10b-5 thereunder. This Investor Presentation has not be taken away or reproduced or redistributed or disclosed, in whole or in part, to any other person, by any medium or in any form for any purpose. You agree to keep the contents of this Investor Presentation confidential and each document and contents form a part of confidential information. No securities commission or securities regulatory authority in the United States or any other jurisdiction has in any way passed upon the merits of the Business Combination or the accuracy or adequacy of the information contained in this Investor Presentation. By attending the meeting in relation to this document, or by reading this document, you agree to be bound by the limitations set out herein. None of the Relevant Parties shall have any responsibility or liability whatsoever (for negligence or otherwise) for any loss howsoever arising from any use of this document or its contents or otherwise arising in connection with this document.

Exhibit 20
Page 2616



# Notice to Recipient (Cont'd)

This Investor Presentation does not contain all material information concerning SC Health, Rockley Photonics or any parent company of either company, or any securities of any such entity, and the information set forth in this document is subject to change without notice. No Relevant Party is under an obligation to update or keep current the information contained herein. Certain data in this Investor Presentation was obtained from various external data sources, and no Relevant Party has verified such data with independent sources. This Investor Presentation may include trademarks, service marks, trade names and copyrights of other companies, which are the property of their respective owners. Solely for convenience, some of the trademarks, service marks, trade names and copyrights referred to in this Investor Presentation may be listed without the ™, ®, © or ℠ symbols, but SC Health and Rockley Photonics will assert, to the fullest extent under applicable law, the rights of the applicable owners, if any, to these trademarks, service marks, trade names and copyrights.

The information contained herein and any further information (whether written, electronic or oral) relating to SC Health or Rockley Photonics supplied by any of the Relevant Parties is, and will be, supplied on the condition that none of the Relevant Parties or any other person whatsoever is liable for any direct, indirect or inconsequential loss or damage sustained by any party placing reliance on such information.

## Forward-Looking Statements

This Investor Presentation may contain forward-looking statements that involve risks and uncertainties, which include all statements other than statements of historical facts...

## Use of Projections

Any financial projections in this Investor Presentation have not been prepared in conformity with U.S. GAAP, International Financial Reporting Standards...

## Non-GAAP Financial Measures

This Investor Presentation includes certain financial measures not presented in accordance with U.S. GAAP or the IFRS, including EBITDA and Free Cash Flow, which are different from financial measures calculated in accordance with IFRS or U.S. GAAP...

## Additional Information

In connection with the proposed Business Combination, Rockley Photonics Holdings Limited ("HoldCo") has filed with the U.S. Securities and Exchange Commission (the "SEC") a registration statement on Form S-4...

By accepting or reading this Investor Presentation you acknowledge that you will be solely responsible for your own assessment of the market and the market position of SC Health, Rockley Photonics and any parent company of either company, and that you will conduct your own analysis and be solely responsible for forming your own view of the potential future performance of the business of either such company.

This Investor Presentation speaks as of the date of this document unless otherwise indicated. Neither the delivery of this document nor any further discussions of SC Health or Rockley Photonics with any of the recipients shall, under any circumstances, create any implication that there has been no change in the affairs of either company or any affiliate thereof since that date.

Exhibit 20
Page 2617

# Presenters







### Dr. Andrew Rickman, OBE[1]
**Founder, CEO and Chairman, Rockley Photonics**

- Founder & CEO of Bookham, the first silicon photonics company
- Chairman of Kotura (acquired by Mellanox)
- Awarded OBE[1] in the Queen's Millennium Honors



[1] Order of the British Empire.



### Mahesh Karanth
**CFO, Rockley Photonics**

- CFO, Enlighted
- CFO, Invensense (acquired by TDK)
- Partner at Ernst & Young
- Various senior roles at CPQ and HP





### Ciaran Rooney
**VP, Corporate Development**

- Senior Associate, Cooley
- Associate, WilmerHale



### AJ Coloma
**Chief Executive Officer, SC Health**

- Managing Director, SINCap
- Head of M&A, Fullerton Health
- Director, Credit Suisse's investment banking division





Exhibit 20
Page 2618



# SIN Capital is a Premier Multi-Asset Investment Firm with an Extensive Track Record of Value Creation



## Pan-Asia Multi-asset Investment Firm with a Differentiated Investment Approach

### Private Investments

- Partner with and invest in family or entrepreneur owned / controlled businesses across Asia

 

### Real Estate

- Portfolio of prime mixed-use or specialty commercial properties in Singapore and other Asian gateway cities
- Exclusive focus on prime city centre locations and high-quality assets

### Differentiated Investment Approach

- Long-term investment horizon, partnering closely with management
- Build platforms in under-invested but high growth industries
- "Investor Operator" model focused on operational value-add

## Proven Investor, Business Builder, Owner and Operator Across the Healthcare Value Chain

- **SC Health Corp. (NYSE:SCPE)** – Sponsored the $172.5M IPO in July 2019
- **Fullerton Health Corp.** – Backed the management buyout in 2012
- "Win-win" partnership between SIN Capital, management and investors

 

**Building Fullerton Health into a scaled, leading platform**
- ✓ Nearly 50 control investments across ten markets
- ✓ Renowned for investing in business benefiting from strong secular trends delivering substantial value creation

**Hand-in-hand partners with Fullerton Health management**
- ✓ Driving strategic partnerships
- ✓ Leading Fullerton Health's innovative approach to funding and capital structuring
- ✓ Driving key areas of operations

Exhibit 20
Page 2619

# Transaction Overview



## Pro Forma Valuation ($M)

| | |
|---|---|
| Pro Forma Equity Value | $1,448 |
| Expected Net Cash at Closing | (22) |
| Transaction Proceeds | (198) |
| **Pro Forma Firm Value** | **$1,227** |

## Pro Forma Ownership[1]



PIPE Investors[5]
6.9%

SC Health IPO Investors[4]
6.4%

Sponsor[3]
7.3%

Existing Shareholders of
the Company[2]
79.4%

## Sources & Uses ($M)

| Sources of Funds | |
|---|---|
| IPO Proceeds Held in Trust, Net of Redemptions[4] | $94 |
| PIPE Equity Placement Proceeds[6] | 150 |
| Rockley Photonics Shareholders Rollover Equity[2] | 1,148 |
| **Total Sources of Funds** | **$1,392** |

| Uses of Funds | |
|---|---|
| Cash to Balance Sheet | $198 |
| Transaction Fees[7] | 46 |
| Rollover Equity[2] | 1,148 |
| **Total Uses of Funds** | **$1,392** |

**SC Health and Rockley Photonics are partnering to accelerate Rockley's product development and commercialization outlook**

(1) Adjusted for the conversion of Class B ordinary shares of SC Health held by SC Health Holdings Limited ("Sponsor") into Class A ordinary shares in the post Transaction Company. Excludes the impact of warrants and a management incentive plan.
(2) Assumes that the Company Shareholders roll over 100.0% of existing stake into the post Transaction Company.
(3) Consists of: a) the conversion of Class B ordinary shares of SC Health held by Sponsor into Class A ordinary shares in the post Transaction Company and b) US$50 million participation in the PIPE by Sponsor Holdco.
(4) Net of redemptions as per latest 6-K filed on April 16, 2021.

(5) Includes participation from Medtronic; excludes US$50 million participation by Sponsor Holdco.
(6) Includes participation from Medtronic and US$50 million participation by Sponsor Holdco.
(7) Including approximately US$1 million of promissory note payable upon consummation of the Business Combination.

Exhibit 20
Page 2620





# Rockley Photonics at a Glance

- Rockley has developed a unique sensing platform targeting applications in consumer health and wellness → driving an exponential increase in application capabilities for non-invasive, multi-modal biomarker monitoring

- Built on its highly disruptive silicon photonics technology, Rockley's platform delivers compelling and peerless sensor performance, power, resolution and density

- Engaged or contracted with 4 consumer electronics customers holding >55% of smartphone and >50% of wearables markets and 2 medical device companies including one of the largest players in the MedTech space

- Rockley has seeded a manufacturing ecosystem with its wholly-owned, proprietary processes for rapid scalability





(1) Wearable and smartphone markets in term of units
(2) As of March 31, 2021.



### Unique Spectrometer Chip

| | | |
|---|---|---|
| Improved Performance | **Up to 1,000,000x** | Higher resolution than LED |
| High Accuracy | **1,000x** | Higher accuracy than LED |
| Best-in-Class Spectral Range | **100x** | Broader range than LED |
| World-leading Integration | **Numerous** | Lasers on a single chip |

**"Clinic-on-the-Wrist"**
Condensing technology the size of clinical machines onto a wearable chip

Exhibit 20
Page 2622



## Rockley's Unique Technology Solution

  

**Rockley Spectra-Sense Module**

**Optical Sensing Frontside**

Photonic Integrated Circuits
- ① Infrared
- ② Visible Spectrum

 

**Electrical Interface Backside**

- ③ Electronic Pin Contacts
- ④ ASIC Controller, MUX, AFE, Drivers

**Rockley's proprietary clinic-on-the-wrist module condenses traditional tabletop technology onto a wearable chip**

Exhibit 20
Page 2623





Exhibit 20
Page 2624



# The Full-Stack Rockley Platform



**Photonic Integrated Circuits in Silicon with Integrated III-V**



**Electronic Integrated Circuits (ASICs)**



**Biosensing Algorithms and AI Cloud Analytics**

*The Full Stack Rockley Platform*



**Photonic + Electronic Co-Packaging**



**Firmware / Software**



**System Architecture & Hardware Design**

**Rockley's technology platform offers a full suite of capabilities across hardware and software**

Exhibit 20
Page 2625



# Rockley's Commercialization Roadmap








**Immediate Focus**

**Health and Wellness**

- Current commercial focus of the company and have built out complete vertical capability
- Underlying technology platform leverages development in other optical fields
- Engaged or contracted customers hold >55% of smartphone and >50% of wearables markets

**Near-Term Commercial Opportunity**

**MedTech**

- Offers AI / cloud analytics tools to impact disease detection and prevention
- Potential application include diabetes and other major diseases
- Started discussion with MedTech companies

**Additional Avenues for Growth**

**Data Center Connectivity**
Optical transceivers

**Machine Vision**
Robotic and automotive Lidar

**Computer Connectivity**
In-Package Optics

While Rockley's immediate focus is health and wellness, its technology can be applied to other industry verticals and use cases

12

Exhibit 20
Page 2626



Exhibit 20
Page 2627



# Agenda

Rockley Photonics Overview

**Investment Highlights**

Business Details

Financial Overview

14

Exhibit 20
Page 2628



# Investment Highlights

 **1** **Massive Consumer Health Market Opportunity:** Significantly increased consumer focus on health and wellness – smart wearable technology rapidly proliferating with emerging monitoring capabilities

 **2** **Industry-Revolutionizing Technology Platform:** Unique, differentiated and IP protected silicon photonics and optical measurement technology unlocking new use cases in healthcare monitoring, sensing, and datacoms

 **3** **Validated by Leading Blue-Chip Customers:** Engaged or contracted with 4 customers collectively holding >55% of smartphone and >50% of wearables markets and 2 MedTech customers including one of the largest medical device players globally; $70M+ NRE committed by a leading developer of smartphones, smart watches, and consumer electronics

 **4** **Capex-light and Scalable Manufacturing Model:** Fabless model with a seeded global manufacturing ecosystem running proprietary processes wholly owned by Rockley and ready for rapid and efficient high-volume scaling

 **5** **Multiple Avenues for Consistent Growth with Compelling Financial Profile:** Short-term commercial focus on health and wellness is supplemented by platform capability that creates substantial mid- and longer-term revenue opportunities leveraging big data and predictive analytics

 **6** **World Class Management Team with Extensive Track Record:** Leadership team with significant public company experience with highly disruptive technologies

15

Exhibit 20
Page 2629







Exhibit 20
Page 2630



# The Emerging Healthcare Need Is Driving a Massive Opportunity

**Strong market demand and societal growth trends...**  ...**are unmet by existing technology**



### Health & Wellbeing Awareness

✓ Increasing consumer focus on preventative health

✓ Wearable tech rapidly proliferating with emerging monitoring capabilities

✓ Covid-driven rethinking of "at-home" monitoring solutions



### Chronic Conditions & Diseases

✓ Growing need for costly chronic care

✓ Health systems strained by demand

✓ High-cost, non-invasive monitoring solutions are only available in-clinic



### Current Technology Solutions[1]

✗ Lack integration across devices and technologies

✗ Inability to miniaturize

✗ Limited use cases

✗ Not scalable

**There is growing demand for miniaturized, non-invasive sensing technology with real-time diagnostics and analytics that is affordable and accessible outside of a clinical setting → existing technology cannot meet these consumer healthcare needs**

(1) Existing Technology Solutions: 1. PPG – simple technique from which vitals are extracted 2. IR spectroscopy – Ability to interrogate many complex biomarkers of chronic conditions and other diseases.

17

Exhibit 20
Page 2631

Case 1:23-cv-00095-LMB-WEF Document 34 Entered 08/03/22 17:09:19 Page 147 of 607
Case 1:21-cv-00095-LMB-MAA Filed 03/03/23 Page 19 of 49
Rockley - Investor Presentation 2027.86 (CORRECTED) Pg 19 of 49



Exhibit 20
Page 2632









Exhibit 20
Page 2633



Exhibit 20
Page 2634



Exhibit 20
Page 2635



  

   

   



Exhibit 20
Page 2636



# Agenda

**Rockley Photonics Overview**

**Investment Highlights**

**Business Details**

**Financial Overview**

Exhibit 20
Page 2637





Exhibit 20
Page 2638



Exhibit 20
Page 2639





Exhibit 20
Page 2640



# Rockley's Module Has the Broadest Biomarker Detection Capabilities

| Biomarkers Detection | Rockley | ams | ANALOG DEVICES | SiTime | Melexis |
|---|:---:|:---:|:---:|:---:|:---:|
| HR / HRV | ✓ | ✓ | ✓ | ✓ | ✗ |
| Pulse Oximetry | ✓ | ✓ | ✓ | ✗ | ✗ |
| BP | ✓ | ✓ | ✗ | ✗ | ✗ |
| Breath rate | ✓ | ✗ | ✗ | ✗ | ✗ |
| Body temp | ✓ | ✗ | ✗ | ✗ | ✓ |
| Body hydration | ✓ | ✗ | ✗ | ✗ | ✗ |
| Blood flow | ✓ | ✗ | ✗ | ✗ | ✗ |
| Hemoglobin Constituent | ✓ | ✗ | ✗ | ✗ | ✗ |
| Blood alcohol | ✓ | ✗ | ✗ | ✗ | ✗ |
| Lactate | ✓ | ✗ | ✗ | ✗ | ✗ |
| Glucose | ✓ | ✗ | ✗ | ✗ | ✗ |

**Rockley's technology is uniquely capable of sensing numerous biomarkers across LED and infrared wavelengths**

27

Exhibit 20
Page 2641



Exhibit 20
Page 2642







Exhibit 20
Page 2643



# Impacting Disease Prevention and Management by Partnering with MedTech Companies











Rockley's technology capabilities offer MedTech OEMs and patients enhanced tools for potential disease detection and management

(1)   Sources: Center of Disease Control and Prevention, enforcinews.

30

Exhibit 20
Page 2644



Exhibit 20
Page 2645



# Rockley Benefits from Several Hard-to-Replicate Strengths Creating a Competitive Moat

### Robust Patent Portfolio Covering Numerous Domains



- 131 issued patents
- 81 pending applications
- Extensive geographic coverage over numerous relevant technology domains

### Technology & Process Complexity



- End-to-end control over design, manufacturing and packaging process, algorithms and software
- Disciplined and systematic documentation and protection of critical know-how, trade secrets and proprietary information



### Research & Development



- $300M+ of R&D, NRE and >7 years of continuous specialization create a frontier technology that unlocks new use cases
- R&D has been supported through partnerships with leading research institutions and consumer electronics and MedTech companies

### World Class Management and Engineering Team



- Highly regarded silicon photonics and measurement science experts, with advanced technical degrees and world recognition of scientific capabilities
- Led by a pioneer in silicon photonics industry

**Revolutionary technology is protected by deep moat of patents, know-how and trade secrets covering numerous domains**

32

Exhibit 20
Page 2646

# Creating Next-Generation Health Care Impact



## ESG Value Proposition

- Rockley Photonics is driving the future of digital health monitoring by unlocking equitable access to necessary health information across developed and emerging markets through affordable wearable, mobile, and medical device technology

- Rockley is enabling underserved communities to receive the health information they need through telehealth and remote monitoring. In essence, the company provides condition monitoring without the costly and inconvenient trips to clinics

- Additionally, IR wavelengths utilized in Rockley's products are less susceptible to skin tone variations than visible LEDs. As such, the company provides the first of its kind in eliminating racial bias commonly found in health care wearable technology to date

### Awards



The IEEE Communications Society's 2021 Charles Kao Award Winner for Best Optical Communications & Networking Paper

### Industry Affiliations



### Industry Landscape

- The World Health Organization (WHO) estimates that **12% of the global population spends more than 10% of their household income** on healthcare spending

- The 2020 global health crisis escalated the urgent need to establish fair and equal pathways to proper health care access

- Rockley Photonics' technology is positioned to alter the way the world accesses critical health information through telehealth, condition monitoring, and racially unbiased wearable technology in underserved communities

33

Exhibit 20
Page 2647

# We Are Contributing to the UN Sustainable Development Goals



**The UN Sustainable Development Goals are a Collection of 17 Interlinked Global Goals Designed to be a "Blueprint to Achieve a Better and more sustainable Future for All"**



✓ Rockley's solution increases access to affordable health care and health-related information
✓ Monitor numerous biomarkers, some of which are life crucial
✓ Employees have access to numerous health and wellness programs



✓ Increasing female representation on the Board of Directors
  ✓ Female representation on BoD increased from 14% in 2019 to 33% in 2021



✓ Work closely with strategic partners that:
  ✓ Use renewable energy (TSMC)
  ✓ Implement energy-efficient production methods (TSMC and NWF)



✓ High-value job creation in a growing industry
✓ Workforce compensation is benchmarked between the 50th and 90th percentile with total pay averaging at the 75th percentile
✓ Multiple opportunities for career starters (students, graduates) to join the growing photonics industry



✓ Award winning technology which improves data center energy consumption and efficiency
✓ Streamlined, proprietary high-volume / throughput manufacturing which allows to produce more with lower environmental footprint
✓ Collaborative partnerships with leading research institutions and consumer electronics and medical devices companies to drive innovation



✓ Supply partner network of ESG leaders
  ✓ Manufacturing outsourced to suppliers with industry-leading environmental efficiency
✓ Lean and resilient supply chain



✓ Emission-reducing supply chain and technology
✓ Rockley's innovative technology facilitates energy efficiency, reducing GHG emissions from power consumption

34

Exhibit 20
Page 2648



Exhibit 20
Page 2649



# Agenda

**Rockley Photonics Overview**

**Investment Highlights**

**Business Details**

**Financial Overview**

36

Exhibit 20
Page 2650



Exhibit 20
Page 2651

## P&L Outlook



| (in $M) | FY 2020A | FY 2021E | FY 2022E | FY 2023E | FY 2024E |
|---|---|---|---|---|---|
| **Revenue** | 22.3 | 27.5 | 78.6 | 426.5 | 1,125.1 |
| % YoY Growth | 9.0% | 22.9% | 186.5% | 442.3% | 163.8% |
| **Gross Profit** | (1.9) | 3.3 | 20.7 | 234.1 | 595.5 |
| Margin | (8.5%) | 12.2% | 26.3% | 54.9% | 52.9% |
| **EBITDA** | (76.7) | (109.4) | (95.6) | 48.9 | 260.1 |
| Margin | (343.4%) | (398.7%) | (121.5%) | 11.5% | 23.1% |
| **CAPEX**[1] | (1.7) | (10.4) | (18.5) | (38.5) | (50.0) |
| % of Revenue | (7.5%) | (38.0%) | (23.6%) | (9.0%) | (4.4%) |
| **Free Cash Flow**[2] | (50.0) | (115.0) | (120.9) | (9.9) | 148.8 |

1. Revenue growth accelerates in 2023E as commercial sensor delivery ramps up

2. Gross and EBITDA margins expand as efficiencies from mass production are realized

3. Limited CAPEX requirement of US$10M – US$50M per annum
   - Aimed at funding portion of backend processing – improve IP protection, quality control, and process

4. Free cash flow expected to turn positive by 2024E

[1] 2020A CapEx = Purchase of Property and Equipment + Purchase of Assets Accels
[2] Free Cash Flow = Operating Cash Flow – Capital Expenditure

Exhibit 20
Page 2652



# Improved Growth and Margins Post-Commercialization



(1) Customer contributing to product revenue.
(2) Share of serviceable available market of wearables.
(3) Blended margin across all products.
(4) Not meaningful as EBITDA is forecasted to be negative.

Exhibit 20
Page 2653



Exhibit 20
Page 2654





Exhibit 20
Page 2655



# Transaction Priced at Highly Conservative Entry Valuation

### Conservative Entry Valuation

- Rockley's $1.2B pro forma enterprise value implies a ~1.1x EV / 2024E revenue

    - Semiconductor peers are trading at ~2.9x EV / 2022E revenue and medical devices peers are trading at ~12.0x EV / 2022E revenue

    - On an equivalent year basis, Rockley's high growth SPAC peers are trading on ~6.9x EV / 2024E revenue

- 2024E revenue projection of $1.1B assumes the following:

    - Conservative ~4% market penetration rate → a 10% market penetration rate would imply ~$2.8B revenue

    - Excludes attractive commercial opportunities beyond consumer health and wellness

### Implied Downside Protection Based on Target 20% Return

**Key Assumptions:**

- Entry EV: $1,227m
- Investment Period: 3 years
- Required IRR: 20%
- Implied Future EV: $2,120m

**Required 2024 Revenue to Achieve $2.1bn Future EV in 3 Years (US$M):**



Only ~50% of 2024 revenue is priced into the de-SPAC valuation

Exhibit 20
Page 2656



Exhibit 20
Page 2657

Exhibit 20
Page 2658

# Historical P&L and 4-Year Outlook



| (in $M) | FY 2020A | FY 2021E | FY 2022E | FY 2023E | FY 2024E |
|---|---|---|---|---|---|
| Product Revenue | 0.0 | 0.0 | 15.8 | 426.5 | 1,125.1 |
| Sample Revenue & NRE Revenue | 22.3 | 27.5 | 62.9 | 0.0 | 0.0 |
| **Total Revenue** | **22.3** | **27.5** | **78.6** | **426.5** | **1,125.1** |
| % YoY Growth | 9.0% | 22.9% | 186.5% | 442.3% | 163.8% |
| **COGS** | **24.2** | **24.1** | **57.9** | **192.3** | **529.6** |
| % of Revenue | 108.5% | 87.8% | 73.7% | 45.1% | 47.1% |
| **Gross Profit** | **(1.9)** | **3.3** | **20.7** | **234.1** | **595.5** |
| Margin | (8.5%) | 12.2% | 26.3% | 54.9% | 52.9% |
| **Sales, General, and Administrative** | **(20.3)** | **(32.1)** | **(32.8)** | **(43.8)** | **(100.0)** |
| % of Revenue | (90.7%) | (116.9%) | (41.7%) | (10.3%) | (8.9%) |
| **Research and Development** | **(35.9)** | **(83.2)** | **(88.6)** | **(154.8)** | **(255.1)** |
| % of Revenue | (160.7%) | (303.3%) | (112.6%) | (36.3%) | (22.7%) |
| **Total Opex** | **(56.2)** | **(115.3)** | **(121.4)** | **(198.6)** | **(355.1)** |
| % of Revenue | (251.4%) | (420.2%) | (154.4%) | (46.6%) | (31.6%) |
| **EBITDA** | **(76.7)** | **(109.4)** | **(95.6)** | **48.9** | **260.1** |
| Margin | (343.4%) | (398.7%) | (121.5%) | 11.5% | 23.1% |
| **CAPEX**[1] | **(1.7)** | **(10.4)** | **(18.5)** | **(38.5)** | **(50.0)** |
| % of Revenue | (7.5%) | (38.0%) | (23.6%) | (9.0%) | (4.4%) |
| **Free Cash Flow**[2] | **(50.0)** | **(115.0)** | **(120.9)** | **(9.9)** | **148.8** |

[1] 2020A CapEx = Purchase of Property and Equipment + Purchase of Asset Acquisition
[2] Free Cash Flow = Operating Cash Flow – Capital Expenditure

Exhibit 20
Page 2659

# Comparable Companies



| Company | Share Price | % of 52 Wk High | Market Cap | Enterprise Value | Revenue Growth | | Gross Profit Margin | | EBITDA Margin | | EV / Revenue | | EV / EBITDA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | CY21E | CY22E | CY21E | CY22E | CY21E | CY22E | CY21E | CY22E | CY21E | CY22E |
| **Recent de-SPACs** | | | | | | | | | | | | | | |
| ChargePoint | $24.06 | 48.6% | $8,066 | $7,456 | 57.3% | 65.6% | 26.6% | 30.3% | (71.3%) | (35.5%) | 37.06x | 22.38x | NM | NM |
| Luminar Technologies | 17.94 | 37.5% | 6,187 | 6,161 | 18.6% | 39.1% | 14.9% | 23.9% | (175.5%) | (171.3%) | 55.40 | 155.8x | NM | NM |
| Evgo | 12.38 | 50.9% | 3,291 | 2,676 | 37.2% | 170.0% | NA | NA | (290.0%) | (79.6%) | 131.78 | 49.55 | NM | NM |
| Aeva | 8.88 | 90.8% | 2,049 | 1,565 | 829.5% | 118.9% | 52.0% | 52.1% | (705.0%) | (355.8%) | 115.71 | 35.50 | NM | NM |
| Velodyne Lidar Inc. | 8.20 | 25.2% | 1,650 | 1,266 | (10.6%) | 59.6% | 21.5% | 39.4% | (127.6%) | (36.9%) | 14.85 | 7.44 | NM | NM |
| Indi Semiconductor | 8.39 | 51.1% | 1,115 | 798 | 97.3% | 108.0% | 89.3% | 49.0% | (92.2%) | (50.0%) | 17.30 | 8.48 | NM | NM |
| | | | Mean | 58.2% | 116.6% | 29.8% | 39.7% | (290.5%) | (122.1%) | 96.55x | 49.87x | NM | NM |
| | | | Median | 62.4% | 103.0% | 26.6% | 39.4% | (208.8%) | (65.3%) | 85.42x | 34.04x | NM | NM |
| **Semiconductors** | | | | | | | | | | | | | | |
| IPG Photonics Corporation | $212.09 | 80.3% | $11,495 | $10,094 | 24.5% | 10.7% | 48.6% | 49.5% | 31.2% | 34.9% | 6.75x | 6.10x | 20.13x | 17.46x |
| Smart Communications Holding PLC | 54.52 | 84.3% | 6,281 | 10,762 | 24.1% | 7.6% | 83.3% | 84.6% | 74.3% | 81.8% | 3.95 | 4.65 | 11.8 | 10.7 |
| II-VI Incorporated | 71.17 | 78.9% | 8,279 | 9,422 | 17.4% | 9.8% | 40.3% | 41.6% | 26.1% | 26.7% | 2.93 | 2.67 | 11.2 | 10.0 |
| Uniphase Holdings Inc. | 82.47 | 73.9% | 6,392 | 6,704 | 1.6% | 8.7% | 50.3% | 50.7% | 38.5% | 35.4% | 3.48 | 3.11 | 9.0 | 9.8 |
| ams AG | 18.54 | 67.0% | 4,834 | 6,503 | 52.4% | 1.6% | 30.6% | 31.3% | 19.8% | 21.0% | 1.07 | 1.05 | 5.4 | 5.0 |
| MACOM Technology Solutions Holdings | 60.05 | 81.7% | 3,187 | 3,421 | 13.6% | 8.8% | 58.6% | 53.0% | 30.6% | 30.4% | 7.17 | 6.84 | 29 | 21.2 |
| | | | Mean | 22.1% | 7.4% | 43.6% | 44.5% | 28.6% | 28.9% | 4.02x | 3.70x | 13.4x | 12.3x |
| | | | Median | 20.7% | 8.3% | 44.4% | 45.5% | 28.8% | 28.0% | 3.11x | 2.89x | 11.5x | 10.3x |
| **Medical Technology** | | | | | | | | | | | | | | |
| Edwards Lifesciences Corporation | $107.06 | 98.7% | $67,587 | $66,945 | 18.0% | 11.3% | 75.7% | 75.8% | 33.6% | 34.1% | 12.93x | 11.62x | 38.54x | 34.07x |
| DexCom Inc. | 410.80 | 93.8% | 40,457 | 39,102 | 71.6% | 21.6% | 65.3% | 65.5% | 17.8% | 17.5% | 43.09 | 16.72 | NM | NM |
| Insulet Corporation | 271.46 | 83.6% | 19,469 | 19,263 | 19.7% | 20.7% | 68.0% | 69.5% | 17.5% | 19.4% | 17.79 | 14.74 | NM | NM |
| Masimo Corporation | 241.67 | 93.0% | 14,171 | 15,438 | 5.5% | 9.1% | 67.0% | 67.4% | 30.3% | 31.3% | 1.99 | 1.11 | 43.1 | 38.0 |
| Tandem Diabetes Care, Inc. | 103.52 | 83.7% | 6,561 | 6,561 | 27.6% | 18.2% | 54.6% | 56.4% | 14.5% | 16.6% | 10.31 | 8.77 | 71.1 | 52.4 |
| Senhouse Medical Inc. | 139.81 | 91.2% | 8,193 | 8,424 | 289.3% | 64.7% | 75.0% | 78.7% | (20.0%) | 4.29 | 31.90 | 11.16 | NM | NM |
| Inspire Medical Systems, Inc. | 176.75 | 70.1% | 4,997 | 4,801 | 69.7% | 37.2% | 84.9% | 85.0% | (26.3%) | (13.9%) | 24.51 | 17.87 | NM | NM |
| Novocure Inc. | 85.88 | 91.8% | 2,205 | 1,859 | 40.0% | 37.5% | 63.0% | 62.7% | (35.1%) | (11.3%) | 4.30 | 13.58 | NM | NM |
| iRhythm Technologies, Inc. | 51.18 | 17.9% | 1,493 | 1,355 | 14.2% | 9.9% | 67.4% | 67.9% | (15.6%) | (11.4%) | 4.4 | 4.07 | NM | NM |
| | | | Mean | 48.1% | 25.5% | 69.0% | 70.4% | 1.7% | 9.9% | 16.67x | (2.85x) | 50.8x | 41.5x |
| | | | Median | 21.6% | 20.7% | 67.4% | 67.5% | 14.5% | 16.6% | 15.90x | 11.97x | 43.1x | 38.0x |
| | | | **Total Mean** | 43.6% | 46.4% | 51.6% | 54.9% | (78.1%) | (22.4%) | 35.88x | 20.81x | 25.98x | 22.03x |
| | | | **Total Median** | 24.5% | 20.7% | 52.4% | 54.2% | 14.5% | 16.6% | 14.85x | 11.58x | 20.33x | 17.46x |

Source: Company filings, Factset and Wall Street Research.
Note: Market data as of July 22, 2021.

16

Exhibit 20
Page 2660



# Glossary

**ASIC** – Application-Specific Integrated Circuit

**AFE** – Analog front-end

**BP** – Blood Pressure

**CAD** – Coronary Artery Disease

**CGM** – Continuous Glucose Monitoring

**CHF** – Congestive Heart Failure

**CKD** – Chronic Kidney disease

**COPD** – Chronic Obstructive Pulmonary Disease

**ECG** – Electrocardiogram

**EV** – Enterprise Value

**Hep C** – Hepatitis C

**HR** – Heart Rate

**HRV** – Heart Rate Variability

**Hypo** – hypoglycemia

**IC** – Integrated Circuit

**IoT** – Internet of Things

**IP** – Intellectual Property

**IR** – Infrared Radiation

**LED** – Light-Emitting Diode

**MOU** – Memorandum of Understanding

**MUX** – Multiplexer

**NRE** – Non-recurring engineering

**PAD** – Peripheral Arterial Disease

**PPG** – Photoplethysmography

**RR** – Respiratory Rate

**R&D** – Research and Development

**SAM** – Serviceable Available Market

**SiPh** – Silicon Photonics

**SPAC** – Special Purpose Acquisition Company

**SpO2** – Peripheral Capillary Oxygen Saturation

**TAM** – Total Addressable Market

**TT** – TruTouch

Exhibit 20
Page 2661



Exhibit 20
Page 2662



# Enabling Next Generation Health and Wellness Monitoring

The Power of Silicon Photonics to Deliver Health Insights

**January 2023**

Exhibit 20
Page 2663

# Safe Harbor Statement

## Forward-Looking Statements

This Investor Presentation may contain forward-looking statements that involve risks and uncertainties, which include all statements other than statements of historical facts, including, without limitation, any statements preceded by, followed by or that include the words "targets", "believes", "expects", "aims", "intends", "will", "may", "anticipates", "would", "could" or similar expressions or the negative thereof. Actual future performance, outcomes and results may differ materially from those expressed in forward-looking statements as a result of a number of risks, uncertainties and assumptions. Forward-looking statements in this Investor Presentation may include, but are not limited to, statements about: (a) the potential of Rockley's solutions to improve individuals' health and well-being and enable the transition from reactive to proactive healthcare; (b) the timing of and strategy for the Company's product development and the commercial launch of the Company's products and cloud platform, including timing for launch of regulated products; (c) the size and growth potential of Rockley's target markets; (d) the anticipated and potential features, scope, goals, use cases and benefits of the Company's platform, products, technology, and partnerships with third parties; (e) the Company's continued development of a range of photonic integrated circuits and associated modules, sensors, and full-stack solutions; (f) Rockley's belief that photonics will eventually become as pervasive as microelectronics; (g) Rockley's potential to support hyper-scale manufacturing, address a multitude of high-volume markets, and deliver the complex optical systems required to bring transformational products to market; (h) the growing demand for non-invasive remote monitoring solutions outside of clinic or hospital settings; (i) the ability of Rockley's technology to provide continuous health insights and diagnostic information; (j) the Company's ability to leverage cloud analytics to monetize data collected with its products; (k) the Company's long-term roadmap beyond health and wellness; (l) the Company's ability to target biomarkers to identify prevalent human diseases; (m) the expected timing for completion of human studies and product launches relating to individual biomarkers; (n) the Company's ability to ensure that its AI platform achieves and maintains compliance with HIPAA (Health Insurance Portability and Accountability Act) and the GDPRR (General Data Protection Regulation); (o) the Company's ability to obtain any required regulatory approvals, including any required Food and Drug Administration ("FDA") approvals; (p) the Company's expected near-term milestones, including expected timing for purchase orders, engineering samples and commercial shipments; and (q)  estimates and forecast of other financial and performance metrics and projections with respect to the Company's product development timeline and revenue opportunities. The forward-looking statements contained herein are based on Rockley's current expectations and beliefs concerning future developments and their potential effects. Certain statements contained in this Investor Presentation may be statements of future expectations and other forward-looking statements and involve known and unknown risks, assumptions, uncertainties and other factors that may cause the actual results, performance and financial condition of Rockley, or industry results, to be materially different from any future results, performance or financial condition, expressed or implied by such forward-looking statements, including, but not limited to, the risks discussed in Rockley's most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and as detailed from time to time in Rockley's other filings with the SEC. Statements contained in this Investor Presentation regarding past trends or activities should not be taken as a representation that such trends or activities will continue in the future. No assurance can be given that future events will occur, that projections will be achieved, or that the assumptions contained herein are correct. Actual results may differ materially from those projected and you should not place undue reliance on forward-looking statements. Rockley disclaims any obligation to update or otherwise revise these forward-looking statements to reflect future events or developments.



Exhibit 20
Page 2664



# Rockley Differentiation

Exhibit 20
Page 2665








Exhibit 20
Page 2666

# Rockley Photonics: By The Numbers

## $48bn+
Consumer and Health TAM*

## 60%+
Contracted customers' market share in wearables market

## 236
Patents, with another 311 pending applications**

## 9+
Years of product development

- **Continuous, non-invasive monitoring of key biomarkers**
- **At the intersection of consumer and healthcare markets**
- **Miniaturizing clinical machines onto a wearable chip**
- **Technology stack to serve multiple disciplines**
- **7 medical device customers***
- **12 consumer electronics customers***
- **Expanding product roadmap and creating long-term growth opportunities**

### Biomarkers for healthcare applications

 Blood Oxygen  Heart Rate / HRV  Breathing Rate  Core Body Temperature  Hydration  Blood Pressure  Alcohol  Lactate — Glucose Monitoring



## Clinic-on-the-Wrist™
Miniaturizing clinical technology onto a wearable chip

PPG Green LED
PPG PD
PPG PD
PPG Red/IR LED
SWIR Emitter
SWIR Receiver



*Source: Yole (customized report), IDTechEx, IDC. **As of September 30, 2022. ***Memorandum of Understanding (MOU) in place,

3

Exhibit 20
Page 2667



# Rockley's Silicon Photonics Platform Enables a Unique Form Factor

## Rockley solution covers a much wider bandwidth than LED-only solutions.



**Typical LED Range** Smaller biomarker signals combined with low fidelity = inability to extract biomarkers

**RKLY SWIR platform operates at a range well beyond typical LED,** enabling the extraction and measurement of many more biomarkers

- Opening up *new wavelength window* for wearables
- *Application science* demonstration done
- Need for a disruptive hardware technology to *miniaturize* high-performing *spectrophotometer*
- Biomarkers are extracted from *spectral fingerprint* using established spectroscopy science

## Unique Spectrometer Chip

**Improved Performance** — **Up to 1,000,000x** higher resolution than LED

**High Accuracy** — **1,000x** higher accuracy than LED

**Best-in-Class Spectral Range** — **100x** broader range than LED

**World-Leading Integration** — **Numerous Lasers** on a single chip

Exhibit 20
Page 2668



# Substantial Technology Lead by Innovating Across Technology Stack

## Rockley's innovative technology stack entrenches users with a unique form factor paired with novel data insights.

236 Issued Patents and 311 Pending Patents.*

### Semiconductor Technology and Process



Photonic ICs in silicon with integrated III-V



Electronic ICs



Photonic and electronic co-packaging



High-volume manufacturing process and ecosystem

### Full Module and Product Capability



System architecture and hardware design



Photonics-based sensing module (LED and IR)



Firmware / software

### Measurement Science and Data Analytics



Biosensing algorithms, cloud analytics, and AI



Biomarker data collection



AI/ML-based analytics

### Highlights



Robust multi-disciplinary patent portfolio: 236 issued, 311 pending*



Technology and process complexity: End-to-end manufacturing process and design technology



Huge technological commitment: 9 years and $450mm of R&D*



World class multi-disciplinary team: 89 PhDs, 190 engineers*

*As of September 30, 2022



Exhibit 20
Page 2669

# Target Biomarkers to Identify Prevalent Human Diseases

## Multi-biomarker approaches exponentially increases potential use cases and growth opportunities

| | | Heart | | | Liver | | Kidney | | Lung | | Brain | | Thyroid | | Pancreas | Infection | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAD[1] | HTN[2] | CHF[3] | Cirrhosis | Hep C | CKD[4] | Kidney Stones | Asthma | COPD[5] | AD[6] | Stroke | Hyper | Hypo | Diabetes | Flu / Pneumonia | COVID-19 | Sepsis |
| **Baseline** | O₂ Saturation | ● | | ● | | | | | ● | ● | | ● | ● | ● | | ● | ● | ● |
| | Respiratory Rate | ● | ● | ● | | | | | ● | ● | | ● | ● | ● | ● | ● | ● | ● |
| | Heart Rate / Heart Rate Variability | ● | ● | ● | | | ● | | ● | ● | ● | ● | ● | ● | | ● | ● | ● |
| | Blood Pressure | ● | ● | ● | | | ● | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| | Core Body Temperature | | | ● | | | ● | | | | | | ● | ● | | ● | ● | ● |
| | Hydration | | | ● | | | | ● | | | ● | ● | | | ● | ● | ● | ● |
| **Pro** | Glucose | ● | ● | ● | ● | ● | ● | | | ● | | | ● | ● | ● | | ● | ● |
| | Lactate | | | | | | | | | ● | | ● | | | ● | ● | ● | ● |
| | Alcohol | ● | ● | ● | ● | | | | | | ● | ● | | | | | | |
| **Future** | Urea | | | ● | | | ● | ● | | | | | ● | ● | | | ● | ● |
| | Creatinine | | | | | | ● | ● | | | | | ● | ● | ● | | ● | ● |
| | Albumin | | | ● | ● | ● | ● | | | | | | | | ● | | ● | ● |
| | Bilirubin | | | ● | ● | ● | | | ● | ● | | | | | | | ● | ● |
| | Hemoglobin | | | ● | ● | | ● | | | ● | | | | | | | ● | ● |

(1) Coronary Artery Disease
(2) Hypertension
(3) Congestive Heart Failure
(4) Chronic Kidney Disease
(5) Chronic Obstructive Pulmonary Disease
(6) Alzheimer's Disease

6

**Rockley** PHOTONICS

Exhibit 20
Page 2670

# Summary of Biomarker Status

| | Prelim / Feasibility Human Study | Human Study* | Anticipated Launch* |
|---|:---:|:---:|:---:|
| Heart Rate / HRV | ✓ | ✓ | H2 2023 |
| Breath Rate | ✓ | Q1 2023 | H2 2023 |
| Blood Oxygen | ✓ | ✓ | H2 2023 |
| Core Body Temp. | ✓ | ✓ | H2 2023 |
| Hydration | ✓ | ✓ | H2 2023 |
| Blood Pressure | ✓ | Q4 2022 | H2 2024 |
| Glucose Indicator | ✓ | Q4 2022 | Q1 2025 |
| Alcohol | ✓ | H1 2023 | Q1 2025 |
| Lactate | ✓ | H1 2023 | Q1 2025 |

* Based on current estimates only and subject to change.

7

**Rockley** PHOTONICS

Exhibit 20
Page 2671



# Commercialization Strategy

Demo unit shown

Exhibit 20
Page 2672

# Targeting Two Markets with One Differentiated Platform & Customized Products

## Markets

**Medical Devices**



**$17bn TAM***

**Consumer Technology**

**$31bn TAM***

## Use Cases Include

- In-hospital patient monitoring
- Remote patient monitoring
- Clinical trials

- Fitness and exercise
- Health monitoring
- General health and wellness

## Rockley Solutions

**Unique SWIR** Platform**



**Bioptx™**
Medical Segment

**VitalSpex™**
Consumer Segment





*Source: Yole (customized report), IDTechEx, IDC. **Short-wave infrared. Note: Images not to scale.

8

Exhibit 20
Page 2673

# Medtech & Consumer Tech Market – Key Differences

## Medtech

- FDA 510(k) clearance(s) optimize market opportunity

- Better unit economics

- Deeper partnership opportunities

- Regulated ramp longer but more entrenched

- Increasing functionality/regulatory approval(s) provides additional revenues

## Consumer Tech

- FDA 510(k) clearance(s) provide use-case validation and a competitive advantage

- Higher volume / lower margin

- Faster ramp with shorter product lifecycles

- Module level engagement instead of full Rockley wearable deployment

9



Exhibit 20
Page 2674

# Rockley's Cloud Infrastructure Drives Platform Functionality and Value Capture



## Rockley AI Platform

**Scalable, secure** platform expected to be HIPAA and GDPR compliant



### Connect
**Data Collection**

- Deploy and manage a fleet of wearables
- Utilize spectral and multi-modal data at scale



### Discover
**Model Development**

- Search for patterns and correlations
- Build AI models for partners to leverage



### Infer
**Inference / Insight Development**

- Serve Rockley and third-party AI models
- **Leverage AI Cloud Suite**

## Rockley AI Cloud Suite

**Will allow partners to:**

- Build and monetize their models
- Discover and deploy third-party models into their applications
- Create customized applications
- Accelerate product development



Exhibit 20
Page 2675

# Established Capex-Light, Scalable Manufacturing Model

- Fabless model enables extremely strong product margins whilst remaining cap-ex light

- Rockley's proprietary manufacturing process already ported into volume manufacturing ecosystem with capacity to support business needs

**Proprietary Process Wholly-Owned by Rockley and IP Protected**

| High-Volume IC/ Wafer Foundry Partners | High-Volume III-V Semiconductor Foundry Partners | Leading Global IC Foundry Partners | Leading North America and Global Module and Wearable Assembly Partners |

   

**Silicon photonics ICs and wafer-scale integration**

- Health, auto, and consumer qualified
- 400K+ wafers per year capacity

**III-V semiconductor active optics**

- Telecom and consumer qualified
- Large wafer scale, fully automated

**Electronic Integrated Circuits**

- Used by most major consumer OEMs
- Qualified ultra-high-volume process node

**Module and Wearable Integration and Manufacture**

- Leading Assembly Partner
- Qualified for high volume



Exhibit 20
Page 2676



Exhibit 20
Page 2677



# Investment Highlights

Demo unit shown

Exhibit 20
Page 2678

# World Class Multi-Disciplinary Management Team

## Executive Team



**Dr. Andrew Rickman, OBE***

Founder and Executive Chairman

- Founder & CEO of Bookham, the first silicon photonics company
- Chairman of Kotura (acquired by Mellanox)
- Awarded OBE in the Queen's Millennium Honors



**Randy Meier**

President & CEO

- EVP and CFO, Intersect ENT
- President-Int'l, EVP & CFO, Owens & Minor
- EVP & CFO, Teleflex



**Aaron Zilkie**

CTO of Photonics

- PM, Kotura and Mellanox
- Sr. Optical Scientist. Oclaro



**Ben Ver Steeg**

SVP of Sensing Product Dev

- CEO, TruTouch Technologies
- Co-Founder and CTO, Morelight Technologies



**Cas Wierzynski**

SVP of Cloud and AI

- Senior Director AI Product, Intel
- Research Lead, Qualcomm
- PhD, Caltech



**Ciaran Rooney**

SVP of Corporate Dev

- Corporate Development
- General Counsel
- Attorney, Cooley



**89** PhDs**

**190** Engineers**



**Hooman Abediasl**

EVP of Engineering

- Nokia Bell Labs  Award Winner
- Annenberg Fellow



**Sanjiv Kapoor**

EVP of Operations

- Senior Director, TDK InvenSense
- Director, Lenovo



**Vish Kulkarni**

SVP of Commercial

- Head of Product Mgmt and Marketing, Mammoth Biosciences
- Director, Global Marketing, Cepheid
- Product Management, iRhythm Tech

## Deep Bench of Industry Expertise and Talent

                

* Order of the British Empire. **As of June 30, 2022.

14

Exhibit 20
Page 2679

# Board of Directors Comprising Prolific Business Leaders

## Board of Directors



### Dr. Andrew Rickman, OBE*
Founder and Executive Chairman
- Founder & CEO of Bookham, the first silicon photonics company
- Chairman of Kotura (acquired by Mellanox)
- Awarded OBE in the Queen's Millennium Honors



### Brian Blaser
Board Member
- Former EVP of Diagnostic Products, Abbott Laboratories



### Randy Meier
President & CEO and Board Member
- Lead Director, BioMarin Pharmaceutical
- Board Member, Syntellix



### Karim Karti
Board Member
- Chair, Med Tech Acquisitions
- Former COO, iRhythm Technologies



### Michele Klein
Board Member
- Director, Aviat Networks
- Director, Intevac



### Nicolaus Henke
Board Member
- Senior Partner Emeritus, McKinsey & Co.



### Pamela Puryear
Board Member
- EVP of Global HR, Walgreen Boots
- Former SVP, Zimmer Biomet



### Richard Kuntz
Board Member
- Former Chief Medical and Scientific Officer, Medtronic
- Founder and Chief Scientific Officer, Harvard Clinical Research Institute (HCRI)



### William Huyett
Board Member
- Director Emeritus, McKinsey & Co.
- Former CFO, Cyclerion Therapeutics

## Scientific Advisory Board



### David Klonoff
Advisor
- Medical Director, Dorothy L. and James E. Frank Diabetes Research Institute of Mills-Peninsula Medical Center



### Mark Arnold
Advisor
- Edwin B. Green Chair in Laser Chemistry, University of Iowa



### Stavros Kavouras
Advisor
- Assistant Dean of Graduate Education, Arizona State University



### Zahi Fayad
Advisor
- Professor of Radiology and Medicine, Icahn School of Medicine at Mount Sinai

\* Order of the British Empire.

15



Exhibit 20
Page 2680

# Investment Highlights

 **$48bn+ consumer and health market opportunity***

 **Industry-revolutionizing technology platform**

 **Validated by leading blue-chip customers**

 **Capex-light and scalable manufacturing model**

 **Multiple avenues for consistent growth with compelling value creation**

 **World-class multi-disciplinary management team with an extensive track record**

*Source: Yole (customized report), IDTechEx, IDC.

17



Exhibit 20
Page 2681

Case 1:23-cv-00095-UNA Document 34 Filed 03/03/23 Page 20 of 23 PageID #: 607
Case 1:23-cv-00095-MRA Document 1 Filed 03/03/23 Entered 03/03/23 09:10 Page 197 of 607
2023.01.16 - Rockley Investor Presentation (CORRECTED)    Pg 20 of 23



# Appendix

Exhibit 20
Page 2682

Exhibit 20
Page 2683

# Significant Execution and Traction Since Going Public in August 2021

**1** **Acceleration of medical devices market access. Delivery of pre-alpha modules.** $48bn+ TAM*. Faster deployment. Significant ASP uplift projected opportunity (wearable and recurring revenue). Delivery of pre-alpha modules and wearable devices. Significant customer pull.

**2** **Completion of preliminary stages of human studies. Encouraging results.** Multiple human studies using Rockley's wearable wristband. Encouraging results across the range of biomarkers. Refining the overall performance of the biomarker sensing platform.

**3** **Launch of full biosensing platforms.** Full end-to-end platforms for both consumer (*VitalSpex™*) and medical markets *(Bioptx™)*, incorporating hardware, software, measurement science, sensing algorithms, cloud-based analytics.

**4** **12 CE customers. Deep design wins and commitment. Negotiating volume POs.** Significant increase in committed consumer devices customers, now contracted with 6 of the top 10 wearables providers in the world and 12 in total.

**5** **7 leading medical equipment customers. Negotiating volume POs.** Includes 2 of the top 5 medical equipment and devices manufacturers with strong pipeline. Acceleration of opportunity via Rockley's full wearable device and very strong pipeline.

**6** **Significant IP portfolio increases.** 236 granted patents (311 pending).**

**7** **Established a Scientific Advisory Board.** Gathers world-renowned experts across several key disciplines in biomedical science and technology, including spectroscopy, diabetes technology, hydration science, and cardiology.

**8** **Signed Supply Agreement and Received First Purchase Order for its Biosensing Wristband.** A global healthcare technology provider signed a commercial supply agreement with intent to expand throughout 2023.

**9** **Made Prominent Addition to the Board of Directors.** Richard Kuntz, M.D., M.Sc., former chief medical and scientific officer at Medtronic, joined the Board as an independent director.

**10** **Strategic Partnership with Leading Contract Research Organization.** The CRO and Rockley will collaborate on strategic programs to integrate Rockley's health monitoring solutions into clinical research studies.

*Source: Yole (customized report), IDTechEx, IDC. **As of September 30, 2022.

19

Exhibit 20
Page 2684

**Rockley** PHOTONICS



**Transforming Lives Through the Power of Light**

Exhibit 20
Page 2685

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 2021

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For transition period from          to

Commission file number 001-40735



# Rockley Photonics Holdings Limited

(Exact name of Registrant as specified in its charter)

| **Cayman Islands** | | **98-1644526** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification Number) |

3rd Floor, 1 Ashley Road

Altrincham, Cheshire

WA14 2DT, United Kingdom

+44 (0) 1865 292017

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | New York Stock Exchange |

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Exhibit 20
Page 2686

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☐ No ☒

The aggregate market value of voting stock held by non-affiliates of the Registrant on August 12, 2021, based on the closing price of $15.33 for shares of the Registrant's ordinary shares as reported by the New York Stock Exchange, was approximately $1.2 billion. The Registrant has elected to use August 12, 2021, which was the date of its initial listing of ordinary shares, as the calculation date because on June 30, 2021 (the last business day of the Registrant's most recently completed second fiscal quarter), the Registrant was a privately held company.

As of March 3, 2022, there were 128,470,241 shares of the Registrant's ordinary shares, par value $0.000004026575398, issued and outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive Proxy Statement relating to the 2022 Annual Meeting of Stockholders are incorporated herein by references in Part III of this Annual Report on Form 10-K to the extent stated herein. Such Proxy Statement will be filed with the Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2021.

Exhibit 20
Page 2687

Table of Contents

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Cautionary Note Regarding Forward-Looking Statements | |
| Risk Factor Summary | |
| | |
| **Part I** | |
| Item 1. Business | 1 |
| Item 1A. Risk Factors | 21 |
| Item 2. Properties | 50 |
| Item 3. Legal Proceedings | 50 |
| Item 4. Mine Safety Disclosures | 50 |
| | |
| **Part II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 51 |
| Item 6. Selected Financial Data | 51 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 65 |
| Item 8. Financial Statements and Supplementary Data | 66 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 102 |
| Item 9A. Controls and Procedures | 102 |
| Item 9B. Other Information | 103 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 103 |
| | |
| **Part III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 104 |
| Item 11. Executive Compensation | 104 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 104 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 104 |
| Item 14. Principal Accounting Fees and Services | 104 |
| | |
| **Part IV** | |
| Item 15. Exhibits, Financial Statement Schedules | 105 |
| Item 16. Form 10–K Summary | 106 |
| Signatures | 107 |

Exhibit 20
Page 2688

Table of Contents

Case 1:23-cv-00095-MRA-8MA Filed 03/03/23 Entered 03/03/23 09:19 Page 204 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 4 of 126



Exhibit 20
Page 2689

Table of Contents

Case 1:23-cv-00095-MN-JLH Document 34-11 Filed 08/03/23 Page 205 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 5 of 126



Exhibit 20
Page 2690



Exhibit 20
Page 2691



Exhibit 20
Page 2692

**Cautionary Statement Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley Photonics Holdings Limited's (the "Company") future expectations, beliefs, plans, prospects, objectives, and assumptions regarding future events or performance, as well as the Company's strategies, future operations, financial position, and estimated future financial results and anticipated costs. The words "anticipate," "believe," "continue," "could," "enable," "estimate," "eventual," "expect," "future," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "will," "would," and other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking.

The forward-looking statements contained in this Annual Report on Form 10-K are based on information available as of the date of this Annual Report on Form 10-K, and current expectations, forecasts, and assumptions, (whether or not identified herein), and involve a number of risks and uncertainties. Accordingly, forward-looking statements in this Annual Report on Form 10-K should not be relied upon as representing the Company's views as of any subsequent date, and the Company does not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. Forward-looking statements in this report include, but are not limited to, statements regarding the following:

• Rockley's ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition and the ability of the combined business to grow and manage growth profitably;

• Rockley's financial and business performance following the Business Combination, including anticipated financial outlook or information and business metrics;

• Rockley's strategy, future operations, financial position, estimated revenue and losses, projected costs, prospects and plans;

• the implementation, market acceptance, and success of Rockley's business model;

• developments and expectations relating to Rockley's competitors, target markets, and industry;

• Rockley's future capital requirements and sources and uses of cash;

• Rockley's ability to obtain funding for its product development plans, execution of its business strategy, and its operations;

• Rockley's business, product development plans, and opportunities;

• the outcome of any known and unknown litigation and regulatory proceedings;

• Rockley's anticipated financial outlook or information, anticipated growth rate, and market opportunities;

• Rockley's plans to commercialize its products and services, and anticipated timing thereof;

• Rockley's expectations as to when it may generate sufficient revenue from the sale of its products and services to cover expansion plans, operating expenses, working capital, and capital expenditures;

• the development status and anticipated timeline for commercial production of Rockley's products;

• Rockley's plans for products under development and future products and anticipated features and benefits thereof;

•    the status and expectations regarding Rockley's customer and strategic partner relationships, and potential customer and strategic partner relationships;

• the total addressable markets for Rockley's products and technology;

• the ability of Rockley to increase market share in its existing markets or any new markets it may enter;

• Rockley's ability to obtain any required regulatory approvals, including any required Food and Drug Administration ("FDA") approvals, in connection with its anticipated products and technology;

• Rockley's ability to maintain an effective system of internal control over financial reporting;

• Rockley's ability to maintain and protect its intellectual property;

8

Exhibit 20
Page 2693

Case 1:23-cv-00895-MN-SRF Document 34-10 Filed 08/03/23 Page 209 of 607
Case 1:21-cv-01095-MN-SRF Document 34-10 Filed 08/03/23 Page 209 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 9 of 126
Table of Contents

• Rockley's success in retaining or recruiting, or changes required in, officers, key employees, or directors; the ability of Rockley to manage its growth effectively;

• the ability of Rockley to achieve and maintain profitability in the future;

• Rockley's sale of ordinary shares to Lincoln Park pursuant to the terms of the Purchase Agreement and its ability to register and maintain the registration of the shares issued and issuable thereunder;

• Rockley's anticipated use of the net proceeds from the potential sale of ordinary shares to Lincoln Park; and

• the impact of the COVID-19 pandemic.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond the Company's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following:

• the Company's ability to achieve commercial production of its products and technology, including in a timely and cost-effective manner;

• the Company's ability to achieve customer design wins, convert memoranda of understanding and development contracts into production contracts, and achieve customer acceptance of its products and technology;

• risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases;

• the Company's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated with any future financings;

• legal and regulatory risks, including those related to its products and technology and any threatened or actual litigation;

• risks associated with its fabless manufacturing model and dependency on third-party suppliers;

• the Company's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base;

• the Company's financial performance;

• the impacts of COVID-19 on the Company, its customers and suppliers, its target markets, and the economy;

• the Company's ability to successfully manage growth and its operations as a public company;

• fluctuations in the Company's share price and the Company's ability to maintain the listing of its ordinary shares on the New York Stock Exchange ("NYSE");

• the Company's ability to anticipate and respond to industry trends and customer requirements;

• changes in the Company's current and future target markets;

• intellectual property risks;

• the Company's ability to compete successfully;

• market opportunity and market demand for, and acceptance of, the Company's products and technology, as well as the customer products into which the Company's products and technology are incorporated;

• risks related to international operations;

• risks related to cybersecurity, privacy, and infrastructure;

• risks related to financial and accounting matters;

• general economic, financial, legal, political, and business conditions and changes in domestic and foreign markets;

• the Company's ability to realize the anticipated benefits of the Business Combination (as defined herein) and costs associated with the Business Combination;

• statements of belief and any statement of assumptions underlying any of the foregoing;

Exhibit 20
Page 2694

- the Company's ability to sell ordinary to Lincoln Park pursuant to the terms of the Purchase Agreement and its ability to register and maintain the registration of the shares issued and issuable thereunder;

- the Company's anticipated use of the net proceeds from the potential sale of shares of ordinary shares to Lincoln Park; and

- changes adversely affecting the businesses or markets in which the Company is engaged, and other factors described under the heading "Risk Factors" herein and in other documents the Company files with the Securities and Exchange Commission (the "SEC") in the future.

10

Exhibit 20

Page 2695

Table of Contents

Case 1:23-cv-00795-MRA-SN Filed 03/03/23 Entered 03/03/23 09:17 Page Exhibit C 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 11 of 126

**RISK FACTOR SUMMARY**

The following risk factor summary should be read together with the more detailed discussion of risks and uncertainties set forth in the "Risk Factors" section of this report.

**Risks Related to the Company's Business and Industry; Customer-Related Risks**

- If the Company does not fully develop or commercialize its products and services, or if such products and services experience significant delays, the Company's business, financial condition, and results of operation will be materially and adversely affected;

- The Company has a history of recurring losses and a significant accumulated deficit, which raises substantial doubt about its ability to continue as a "going concern." The Company expects to incur significant research and development expenses and devote substantial resources to commercializing new products, which could increase its losses and negatively impact its ability to achieve or maintain profitability;

- If the end products into which the Company's products are incorporated are not fully developed and commercialized or do not achieve widespread market acceptance, or if such products experience delays, cancellations, or reductions, or if the Company's products are not selected for inclusion in its customers' end products, are not adopted in other industry verticals or use cases, or are not adopted by leading consumer and medical device companies, the Company's business will be materially and adversely affected;

- Changes to our product offerings (cancellation of a product line or significant changes in requirements)

- The Company's forecasts and projections are based upon assumptions, analyses, and internal estimates developed by the Company's management. If these assumptions, analyses, or estimates prove to be incorrect or inaccurate, the Company's actual operating results may differ materially from those forecasted or projected;

- The Company expects its results of operations to fluctuate on a quarterly and annual basis, which could cause its share price to fluctuate or decline;

- If the Company is unable to manage its growth or scale its operations, its business and operating results could be materially and adversely affected;

- Market opportunity estimates and growth forecasts are subject to significant uncertainty and are based on assumptions and estimates (for example on cost, volume, and ASP) that may not prove to be accurate;

- The Company's international operations expose it to operational, financial, and regulatory risks, which could harm the Company's business;

- The Company is susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt its supply chain and could delay deliveries of its products to customers, which in turn could adversely affect the Company's business, results of operations, and financial condition;

- If the Company is unable to sell its products to its target customers, including large corporations with substantial negotiating power, or is unable to enter into agreements with customers and suppliers on satisfactory terms, its prospects and results of operations will be adversely affected;

- The Company currently depends on a few large customers for a substantial portion of its revenue. The loss of, or a significant reduction in, orders from the Company's customers, or the Company's failure to diversify its customer base, could significantly reduce its revenue and adversely impact the Company's operating results;

- Because the Company does not anticipate long-term purchase commitments with its customers, orders may be cancelled, reduced, or rescheduled with little or no notice, which in turn exposes the Company to inventory risk, and may cause its business and results of operations to suffer; and

- The Company's business depends substantially on the efforts of its executive officers, including its Chief Executive Officer and founder, Dr. Andrew Rickman.

Exhibit 20
Page 2696

**Regulatory, Intellectual Property, Infrastructure, Cybersecurity and Privacy Risks**

- The Company's failure to comply with applicable governmental export and import control laws and regulations, including those related to the use, distribution, and sale of its products, U.S. Food and Drug Administration clearance or approval requirements, or privacy, data protection, and information security requirements in the jurisdictions in which the Company operates could materially harm its business and operating results;

- The Company may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Further, the Company's intellectual property applications, including patent applications, may not be approved or granted; and

- A network or data security incident or disruption or performance issues with the Company's network infrastructure could harm its brand, reputation, and business, as well as its operating results.

**Risks Related to Financial and Accounting Matters**

- The Company's failure to raise additional capital or generate the significant capital necessary to expand its operations could reduce its ability to compete and could harm its business; and

- In preparing the Company's consolidated financial statements, the Company makes good faith estimates and judgments that may change or turn out to be erroneous, which could adversely affect the Company's operating results.

**Risks Related to Being a Public Company, our Ordinary Shares, and General Risks**

- The requirements of being a public company may strain the Company's resources, divert management's attention, and affect its ability to attract and retain qualified board members;

- Our share price may be volatile and sales of substantial volumes of our ordinary shares into the public market or the perception that such sales may occur could cause our share price to decline, including substantially; and

- The global COVID-19 pandemic could harm the Company's business and results of operations.

12

Exhibit 20
Page 2697

**PART I**

**Item 1.        Business**

**INFORMATION ABOUT ROCKLEY**

*The following discussion contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this section, the terms "may," "might," "will," "objective," "intend," "should," "could," "can," "would," "expect," "believe," "estimate," "predict," "potential," "plan," "anticipate," "seek," "future," "strategy," "likely," or the negative of these terms, and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these or any other forward-looking statements. These risks and uncertainties include, but are not limited to, those risks set forth under "Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which are based on current expectations and reflect management's opinions only as of the date hereof. These forward-looking statements speak only as of the date of hereof. Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or any changes in events, conditions or circumstances on which any such statement is based.*

Rockley®, RayDriver™, RPFabric™, RPStack™, Topanga™, LightDriver™, SpectraCloud™, SpectraSense™, VitalSpex™, Bioptx™, and clinic-on-the-wrist™ are among the trademarks, registered trademarks, or service marks owned by Rockley.

**Company Overview**

We have developed a comprehensive range of silicon photonics technologies that have both the power and the flexibility to support a wide range of potential applications. Our silicon-phonics platform will incorporate several key components to support these solutions, including photonic integrated circuits and associated modules, sensors, and end-to-end solutions. We expect that our immediate focus over the next two years will be on developing and commercializing our products for incorporation in consumer wearables, medical devices, and dedicated solutions for the healthcare market. As testament to the relevance of our product development, we have captured the attention of several consumer electronics companies and, as of the date of this Annual Report on Form 10-K, we have non-binding memoranda of understanding ("MOUs") or development and supply agreements with entities that collectively account for over 60% market share of wearable devices, including six of the top 10 consumer wearables companies. These agreements will help shape our development of our consumer and medical device capabilities.

The summation of our technologies and manufacturing expertise is Rockley's "cohesive end-to-end platform." Our end-to-end platform encompasses photonic integrated circuits ("PICs") in silicon with integrated III-V devices (devices incorporating certain conductor elements that offer superior electronic properties, such as lasers), application-specific electronic integrated circuits ("ASICs"), and photonic and electronic co-packaging, which are all supported by and coupled with biosensing algorithms, AI, cloud analytics, firmware/software, system architecture, and hardware design.

With this unique sensing platform, we believe we can reshape several important markets of the healthcare sector such as consumer wellness, long term health trend monitoring, patient monitoring, early disease detection, nutrition management and the treatment of certain chronic diseases. Our biosensing platform will enable multiple applications using our non-invasive, continuous, multi-modal biomarker monitoring capabilities.

Our end-to-end solutions include hardware with the potential to detect multiple biomarkers, related algorithms, and cloud-based analytics and artificial intelligence ("AI"). We have shipped early engineering samples to some of our customers to support research and development efforts.

Our platform has been built upon our silicon photonics technology, which enables highly advanced sensor performance, power, resolution, and formfactor. This technology has the potential to allow monitoring devices, currently the size of clinical laboratory machines, to be miniaturized to the size of a wearable device. We believe that this miniaturization capability has the potential to unlock additional applications in consumer electronics and medical devices. Our technology is built on over 190 patents, over eight years of product development, and over approximately $450 million in total funding as of the date of this Annual Report on Form 10-K, through the issuance of convertible loan notes and ordinary shares.

Our target biomarkers for consumer healthcare include lactate, alcohol, glucose (indicator), hydration, blood pressure, blood oxygen, and core body temperature, among others. Our lasers will deliver an extremely high level of performance,

1

Exhibit 20
Page 2698

supporting up to 1,000,000 times higher resolution, 1,000 times higher accuracy, and 100 times broader range in wavelengths than existing LED offerings in wearable solutions (based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing solutions). With this performance, we believe that Rockley's platform will be able to address existing applications in consumer wearable and medical devices with significantly higher resolution, accuracy, and range.

We have established a manufacturing ecosystem based upon our wholly-owned, proprietary processes in several areas. We believe that this manufacturing ecosystem will support rapid scalability, providing us with a significant competitive advantage.

As we do not currently have any products in commercial production, our current customer relationships are in the following stages: (a) customers with whom we are "engaged," or in discussions with, regarding potential product features for incorporation into such customer's end products, or (b) customers with whom we are "contracted," where we have non-binding MOUs or development and supply agreements. These MOUs and development and supply agreements provide a general framework for our transactions with the customer and typically provide that we will develop and deliver new products meeting the customer's specifications. There are no binding purchase commitments under our MOUs and supply agreements. We currently anticipate that sales of our products will be primarily made pursuant to standard purchase orders, which orders may be cancelled, reduced, changed, or rescheduled with little or no notice or penalty. Our ability to grow our business will depend on our ability to attract and retain customers with whom we are engaged in discussions only and successfully transition such customers to contracted customers with whom we have MOUs or development and supply agreements, and to otherwise attract new customers.

Our vision is to address many pressing healthcare concerns using our technology, and we believe that there exists a large market opportunity for our platform. We estimate that the total addressable market ("TAM") for the consumer wearables, mobile device, and medical device markets is projected to be over $48 billion by 2025, based on data sourced from IDC, as the universe of healthcare and consumer wearable devices incorporating additional sensing capabilities emerges. Our products are being designed for utilization in: (a) medical devices, including blood pressure, body temperature, blood glucose, and alcohol monitoring devices, pulse oximetry, and near infra-red ("NIR") spectrometers, with an aggregate forecasted TAM of $15.1 billion by 2025, according to the Yole Report, and mobile cardiac telemetry/general patient monitoring patch devices, with an aggregate forecasted TAM of $2.7 billion by 2025, according to the IDtechEx Report; and (b) consumer wearables and mobile devices, including smartwatches, smart earbuds, fitness bands, and mobile phones, which, based on our internal estimates, are expected to have a TAM of $2.7 billion, $3.0 billion, $1.5 billion, and $23.5 billion, respectively, or an aggregate TAM of $30.7 billion, by 2025. We estimated our TAM in the consumer wearables and mobile device sectors by multiplying third-party forecasted total volumes in 2025 for the devices for which our products are being designed, by our currently anticipated and estimated average selling prices for these products. The volume estimate for smartwatches was based on the benchmarked figure forecasted by annual volume for smartwatches for 2022 according to the TrendForce Report. The volume estimate for smart earbuds was based a 20% volume CAGR between 2020-2025, with 2020 annual shipments estimated at 230 million units, according to the TrendForce Report. According to the Yole Report, fitness bands were forecasted to reach 89 million units by 2025. The volume estimates for smartphones were based on multiple third-party forecasted volumes for mobile phones, multiplied by the average selling price.

**Product Applications and Development Status**

We believe that our innovative and differentiated silicon photonics platform positions us to make photonics-based solutions increasingly pervasive, while unlocking previously unaddressed applications. Consequently, we believe that the potential applications for our technology will be wide-ranging. Leveraging the flexibility and power of our innovative silicon photonics platform, we believe that we are positioned to become a leading supplier of end-to-end solutions (including integrated optical components, algorithms, data analytics, and AI) for dynamic, high-growth market sectors, including consumer sensors, medtech and healthcare.

Exhibit 20
Page 2699

*Figure 1: Rockley end-to-end sensing platform*



To date, we have been engaged in developing customer-specific designs of our silicon photonics chipsets and modules for incorporation into our consumer electronics customers' end products. We are working with leading customers in the medtech market to deliver a standalone wrist-wearable product for targeted use cases. In parallel, we are shaping and developing our own standard offerings that could have different shapes and form factors. Currently, we do not have any of our own end products in commercial production. We have started delivering samples to strategic customers, and we intend to deliver final samples and begin production of these products in the second half of 2022. During 2022, our aim is to build a collaboration model for our AI/analytics cloud platform before proceeding to a commercial launch of a subscription platform, planned for the first half of 2023.

*Figure 2: Product development and commercial roadmap*



**Healthcare: Consumer Wearables**

We believe the high-density optical integration capabilities of our platform can personalize healthcare monitoring of multiple biomarkers and can significantly improve how individuals track and monitor their health and well-being. Our VitalSpex™ biomarker sensing platform will address the consumer wearable market. Further, as part of our product offering, we believe that our cloud-based analytics and AI platform will offer further insight by leveraging data collected through our unique and broad sensing platform and will provide meaningful and actionable insights to end users. Our plans for the VitalSpex™ biomarker sensing platform include a Baseline module and a Pro module, each of which will have a wide array of current and potential applications, as shown in the figure below. Depending on the needs of each customer and market trends, multiple generations of products could be built on each of these platforms addressing different set of biomarkers, form factors, performance specifications, and potential use cases.

3

Exhibit 20
Page 2700

*Figure 3: Targeted biomarker sensing capabilities*



    These products are intended to address the needs of the consumer market and will provide information about general health and wellness. (i.e., they do not require regulatory approval for offered applications and end uses.) As we move forward, we intend to monitor and comply with regulations to the extent they become applicable to us, including any requirements for clearance by the U.S. Food and Drug Administration (FDA) and/or other regulatory bodies.

**Healthcare: Medical Devices**

    Our Bioptx™ healthcare sensing platform will address the medical and professional healthcare market. We plan to incorporate our biomarker sensing technology into existing devices (such as medical patches, wearable bands, and other monitoring devices) to provide additional biomarker sensing capabilities not currently available to consumers. Also, as part of the Bioptx product offering, we intend to deliver a complete standalone finished product with targeted use cases for healthcare and health monitoring.

    We believe that these product offerings will enhance point-of-care and remote monitoring and will have the potential to ultimately transform and disrupt the delivery of patient monitoring and healthcare. In the medical device space, we currently anticipate that we will develop two types of devices: an advisory device that will not need regulatory clearance and a clinical device that will need regulatory clearance from the FDA or other regulatory bodies.

    These products are still under development. Even though there can be no assurance that these product development efforts will succeed or that, even if developed, these products will be approved by regulators or achieve widespread market acceptance, we believe that there are significant market opportunities in addition to our consumer wearables applications.

4

Exhibit 20
Page 2701

Table of Contents

**Data Communications: Transceiver Chipsets and Co-Packaged Optics**

Data centers, which are the nerve centers of the digital economy, require interconnected communications for which we believe our datacom chipset technology offers several advantages. Business, entertainment, vital medical research, and other aspects of daily life are in many ways connected to hyperscale data centers, which in turn rely on cost-effective, power-efficient optical communication links. Whether incorporated in pluggable optical transceiver modules or in co-packaged optics, we believe hyperscale data centers will benefit from the unique advantages that our silicon photonics platform has to offer. Furthermore, we believe our go-to-market approach of partnering with Transceiver manufacturers and Switch/Networking equipment OEM companies has economic benefits over participating directly in this margin-sensitive market. By selling/licensing our assets/technology, we offer the third party the opportunity to create an economically compelling solution without any margin stacking while Rockley can keep expenses low/minimal and benefit from upfront/ongoing fees. Note that given Jiangsu Hengtong Optic-Electric Co., Ltd. (a shareholder in our joint venture partner) was placed on the "Entity List" by the U.S. Bureau of Industry and Security (BIS) of the U.S. Department of Commerce in December 2021, we have widened our potential partner network significantly and are evaluating various options for this business.

**Other Applications**

We believe that our silicon photonic platform is suited for delivering the sensing capabilities needed for machine perception and interrogation at depth, which has become increasingly necessary in industrial automation, robotic vision (including surgical applications), safety, and other autonomous applications. Finely tuned light, delivered through a PIC via a free-space aperture or fiber optic interconnect with accompanying detection receiver capabilities, enables substantially better capabilities than previously available technology, such as frequency modulated continuous wave ("FMCW") LiDAR for automotive safety solutions, as well as future autonomous vehicle offerings. Our team has extensive experience in the design of PICs for use in the LiDAR domain, and we have prototyped the key components of the system and demonstrated their superior performance. Although we believe the inflection point for LiDAR and the automotive market may be approaching, we plan to leverage our core technology readiness and economies of scale from our consumer business to position ourselves for this potential market opportunity.

**Market Opportunity**

*Health and Wellness*

There is growing demand for miniaturized, wearable solutions that offer an affordable way to provide key insights into a person's health and well-being, outside the clinical environment. Delivering relevant insights will require non-invasive, continuous, real-time sensing and measurement of multiple biomarkers, coupled with advanced analytics to interpret the data. We believe that this demand is driven and will continue to be driven by two major market and secular trends:

- Consumer health and well-being awareness. While there is an existing market for athletes in training and for highly active and health-conscious users, there has been an increasing global consumer focus on preventative healthcare, with users desiring greater control and visibility over their own health and well-being. In parallel, amid the proliferation of wearable technologies with emerging health monitoring capabilities, there is greater demand for more sophisticated and comprehensive sensing technology that can measure and track a broad range of conditions and biomarkers. Generating a holistic view of the human body through access to multiple biomarkers will enable a more sophisticated ability to monitor and track general trends of changing health conditions. This has the potential to help physicians identify health conditions and possible disease states earlier and allow for more affordable prevention measures and effective patient treatment, perhaps long before requiring aggressive disease management. More recently, COVID-19 has had a profound impact on the way consumers perceive their need for "at-home" monitoring solutions.

- Treatment of chronic conditions and disease care. With increased life expectancies, a growing number of chronic conditions and diseases has placed a strain on healthcare systems. Furthermore, non-invasive monitoring solutions for chronic conditions have historically been costly and available only in a medical facility. With our potential for delivering individual non-invasive wearable monitoring solutions, we believe that we have a great opportunity to impact patients' compliance with healthcare guidance and subsequent efficient treatment of patients, which will lead to better quality of life and drastic reductions in the overall cost of healthcare. Non-invasive, continuous monitoring also has the potential to detect and possibly prevent chronic conditions and diseases at a much earlier stage, resulting in reduced overall healthcare cost.

We believe that existing monitoring and sensing technologies are not capable of delivering on the needs of consumers and healthcare professionals. Meeting these needs require solutions that provide access to a broad range of biomarkers non-invasively; that can be miniaturized and operate with power low enough to be integrated into consumer wearables, medical

5

Exhibit 20
Page 2702

Table of Contents

patches, and other compact form factors; and that can scale cost effectively to high volumes. We believe that our silicon photonics-based platform is poised to serve at the confluence of the above two market and secular trends.

Beyond these opportunities, we believe there may be significant potential for us in the field of genomics. As the field of genomics grows, as shown in the development of personalized medicines and treatment, the value and effectiveness are enhanced when genomic information is combined and processed along with continuous biomarker monitoring for the users. We believe this emerging field could play to the strengths of our platform and potentially represents a high-value growth opportunity for the future.

**Data Communications**

Datacenter operators continue to build and upgrade their datacenter infrastructure to meet the continuing growth in public, private, and hybrid cloud capacity. As these datacenters rely heavily on fiber optics to interconnect compute, storage, accelerators and other resources, this trend is reflected with substantial growth in demand in the high-speed Ethernet optics. LightCounting forecasts that the market for Ethernet optics will grow from approximately $3.0 billion in 2018 to approximately over $8.0 billion in 2026. The market segment that we are primarily targeting comprises 400Gb/s and 800Gb/s modules and their addressable market are expected at a CAGR of approximately 35%, according to LightCounting's forecasts. We believe our silicon photonics platform is well positioned to address this market with highly integrated Si PICs and class leading III-V technology to implement the optical functionality required for such transceiver modules. We believe that our platform will provide a substantial cost advantage over conventional discrete-optics-based solutions, as well as over competing integrated photonics solutions due to our platform's inherent benefits.

**Competitive Advantages**

We believe our silicon photonics solutions and technology offer the following key healthcare monitoring benefits: We believe that we have 7 sources of advantage over our competitors in meeting these healthcare needs:

- Superior sensing performance. Our silicon photonics-based spectrometer chip provides up to one million times higher resolution, approximately one thousand times higher accuracy, and approximately one hundred times broader spectral range than existing LED-based solutions, based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing LED-based solutions. We believe that our unique silicon photonics technology and the entire product ecosystem we are developing will make our end-to-end offerings in the health and wellness domain difficult to replicate. Current optical-based sensing solutions rely on LED-based sensing (PPG signals for SpO2, heart rate, heart rate variability, breath rate, and blood pressure). However, there are many biomarkers present in the body (such as in blood or interstitial fluid) that are not detectable in the visible LED range. We believe that our silicon photonics technology delivers several ingredients that will be required to bring a powerful and meaningful product into the healthcare market: the accuracy and width of our wavelength span in the infrared spectrum, the capability of our silicon photonics solutions to integrate many wavelengths, and the high signal-to-noise ratio ("SNR") generated by our chips.

6

Exhibit 20
Page 2703

Table of Contents

Case 1:23-cv-00095-DMR-MA Filed 03/03/23 Entered 08/03/22/23 09:17 Page 219 of 607
2022.03.10 - Rockley 2021 10-K Filing   Pg 19 of 126

*Figure 4: Enabling a new class of sensor by combining visible light and infrared*



- Flexible platform architecture. We have designed our platform from the ground up and, leveraging our team's extensive experience, have developed a highly flexible platform architecture. As a result, we believe our innovative platform architecture will allow us to easily configure core building blocks to produce a wide range of functional components and modules for high-volume applications across a broad range of market sectors.

- Differentiated biomarker sensing algorithms and analytics. Our biomarker detection algorithms are optimized for our unique and optimized hardware technology platform. We believe that the data analytics and biomarker processing capabilities of our AI / cloud offering will further expand our ability to offer additional insights into a person's health.

- Deep understanding of market opportunity and customer priorities. We are developing many applications and systems with our silicon photonics solutions that are driven by industry leaders in the consumer sensors, healthcare, and data communications markets. Through our established relationships with industry leaders, we have consistently demonstrated our ability to address their technological challenges. As a result, we have signed memoranda of understanding and have contracted with several industry leaders in wearable consumer technology to establish product specifications and desirable features. We believe we are well-positioned to develop high-volume optical sensing modules and algorithms for their emerging architectures. We have ongoing, collaborative discussions with consumer wearables, healthcare, and communication companies and original equipment manufacturers ("OEM") and module and component vendors to address their next-generation product offering to end users.

- Fabless, scalable business model with manufacturing process expertise and ownership. We plan to operate in a fabless business model by using third-party foundries to manufacture and test our products. We believe that outsourcing our product manufacturing and test processes and procedures simplifies our operations, significantly reduces capital commitments, and provides greater flexibility to respond to new market opportunities and scale with our customer demand. We also believe this approach will allow us to invest and focus our resources on proprietary process development and sales and marketing efforts.

- Highly differentiated manufacturing process. Our manufacturing processes in several key areas (PICs, III-V actives, Integration) are unique and well-suited to meeting our customers' economic and performance needs for their applications. In particular, we believe our silicon PIC process on multi-micron thick Silicon-On-Insulator ("SOI") is a key differentiator. Our manufacturing processes utilize standard semiconductor manufacturing equipment but are optimized for photonics performance through incorporating innovative features to facilitate easier integration and packaging.

- Extensive intellectual property portfolio. We believe our extensive intellectual property provides us with a significant competitive advantage. Our know-how is based on over 30 years of leadership in the development and commercialization of silicon photonics, and we have established strong and deep technical foundations and expertise for high-volume product delivery that would be difficult for a competitor to replicate.

- Established and committed foundry partner network. We have built a high-volume foundry network comprised of strategic partners who share our growth vision, and our engineering team continues to work to push new boundaries in photonic component manufacturing processes.

7

Exhibit 20
Page 2704

Our high-performance optical sensing products and technology with broad biomarker detection capabilities, combined with the power of our algorithms and AI platform, enable us to target unmet needs and challenges in the health and wellness markets. We have ongoing formal and informal collaborative discussions with industry and technology leaders in consumer sensor, healthcare, and data communications companies, with original equipment manufacturer ("OEMs"), and with module and component vendors concerning the design of architectures and products to address existing and next-generation applications. Based on these interactions, we believe that we are one of a limited number of suppliers to these companies for the type of products we plan to sell, and in some cases, we may be the sole supplier for certain applications.

**Our Strategy**

Our strategy is to become the leading global provider of sensing products that incorporate integrated optical modules with supporting electronics, software, application algorithms, and cloud-based AI platforms for high-volume and high-margin applications in dynamic high-growth market sectors and for use-case specific opportunities with a focus on medtech and healthcare. Key elements of our strategy include:

- Extend our silicon photonics leadership. We intend, through continuous platform engineering and advanced research and development, to continue driving innovation in the silicon photonics market and to improve the performance of our current solutions across a variety of key metrics, including size, power, and signal quality. Such innovation will be a key to opening new market opportunities.

- Identify and promote new and emerging applications for our technologies. We are actively engaged with our science and technology partners to explore new potential markets and applications for our technology. We intend to continue to collaborate with our partners to understand the challenges in their end-product roadmaps and to demonstrate how our technologies can help them design and enable innovative solutions.

- Develop our product portfolio. Beginning with our first target products in the consumer and medtech domains and for on-the-wrist applications, we intend to develop and broaden our product portfolio by continuing to invest in research and development so we can expand our platform capabilities as well as enhance our existing product roadmap. We are actively conducting research and development on other form factors and domains. We believe our differentiated technology will play an important role in delivering products for remote patient monitoring needs and for other niche markets such as diet and weight management, women's health, and early detection and monitoring of chronic diseases such as diabetes.

- Continue forming strategic partnerships in products and applications: Working with our partners, we have developed many potential product application opportunities with our unique technology that can be researched and unlocked in the future. Our partners operate in various domains such as hardware development, algorithm development, AI, and clinical research.

- Continue to attract and acquire new customers. We intend to expand our customer base beyond our 17 existing customers in consumer electronics and medtech by focusing on direct dialogue with large strategic accounts, as well as by partnering with large distributors and resellers, when necessary. We believe this multi-track strategy will allow us to provide differentiated solutions to a broad array of customers.

- Sustain margin through expansion of our products into higher-end markets. We intend to use our technological expertise to deliver higher value and high product margins. In addition, we intend to continue to reduce our costs through operational improvements and supply-chain management initiatives.

**Our Technology Platform and Product Offerings**

Our solutions leverage our developed knowledge of silicon photonics, application science, and our innovative platform architecture to address high-volume applications in the consumer sensors, medtech and healthcare. We believe our leadership position in developing silicon photonics-based sensing solutions is a result of the following core strengths:

- We have developed a unique and proprietary silicon photonics platform technology that addresses a broad set of requirements in the healthcare and wellness industries.

- Our custom multi-micron-waveguide photonics-optimized process with integrated III-V semiconductor actives brings multiple competitive advantages in terms of performance and manufacturability, offering lower waveguide losses, higher waveguide power handling, polarization independence, ubiquitous integration of III-V actives in their native known-good-die form, ultra-broad-band performance, and lower sensitivity to manufacturing variations while enabling compact circuitry with high integration densities.

Exhibit 20
Page 2705

Table of Contents

Case 12-81-left-095D1oc-MRA-8A File Doc 03/03/23t 34-110ered F08/03223/7309:1Pag E22bi of C607
2022.03.10 - Rockley 2021 #1086 Filing   Pg 21 of 126
Page 2021 #1086 Filing

*Figure 5: Rockley spectrophotometer chip solution, as compared to conventional LED- and spectrometer-based solutions*



Additional key points concerning the photonics technology include the following:

- The optical-loss-per-unit distance is much lower than for other technologies, enabling lower-power solutions and/or larger-scale PICs, which enables a high signal-to-noise ratio and hence high-fidelity signal detection and helps reduce overall power consumption;

- The platform provides broadband performance and is suitable for the visible, short-wave, and mid-infrared bands. This is a key enabler for sensing applications that other platforms cannot serve. Broadband optical performance also enables sensing a large optical spectrum to cover a wide range of measurands;

- The platform is well suited to power-efficient integration of III-V waveguide devices such as lasers and modulators that also have a multi-micron mode size. Low-loss coupling from III-V to Si waveguide drives down power consumption for long battery life;

- A larger waveguide is much less sensitive to manufacturing variations that can affect its shape and hence its refractive index, thereby achieving much better center wavelength registration than small waveguides enabling accurate wavelength filters. The large waveguides also offer a much higher optical power handling capability than small waveguides;

- Rockley's waveguides exhibit low dispersion (low signal distortion) and low polarization dependent loss (simplifying receiver architectures in particular);

- Strong optical confinement enables tight packing of waveguides and sharp waveguide bends, thereby yielding dense layout capability and compact PICs. Compact PIC layouts result in small chip sizes to fit within consumer device form factors and reduce product cost;

- Accurate wavelength targeting enables using many finely-spaced wavelengths for accurate detection;

- Known-good-die integration of active elements improved yields, which leads to cost-effective solutions.

The following are the key components of our end-to-end (full-stack) platform model:

- Photonic integrated circuits in silicon with integrated III-V: The design and large-scale manufacturing of silicon photonic PICs and integration of active "III-V" elements onto these PICs are the foundational competencies of Rockley. These PICs are manufactured using our proprietary and highly differentiated process flow deployed at our foundry partners;

- Application-specific integrated circuits ("ASICs"): The design of electronic ICs to complement our PICs and facilitate their integration into a specific end-product is the second key component of our platform offering. The ICs are designed in

9

Exhibit 20
Page 2706

volume complementary metal-oxide-semiconductor ("CMOS") or bipolar CMOS ("BiCMOS") technology nodes using standard design flows and are manufactured at volume-scale foundries;

- Photonic & electronic co-packaging: The next layer of the stack conjoins photonic and electronic ICs into opto-electronic engines through advanced co-packaging technologies, including 2.5D and 3D integration. Such dense integration is key and enables us to achieve the energy efficiency and physical size requirements for our core use cases. We partner with specialized packaging houses to provide the capacity required for serving consumer markets;

- System architecture & hardware design: We have built deep expertise in architecting photonic systems for sensing solutions in healthcare and wellness, machine vision, and data communications. This enables us to go beyond making chips and allows us to deliver higher value-add photonic subsystems, modules, and chipsets that fit seamlessly into our end-product partners' designs;

- Firmware/software: Any system requires some degree of firmware and software to operate and inter-operate, and our photonic systems are no exception. We have in-house expertise to develop the necessary firmware and software to complement our hardware offerings and facilitate system integration, testing, and monitoring by our customers; and

- Sensing algorithms, AI, and cloud analytics: At the highest level of the stack, we develop algorithms, AI models, and cloud-based infrastructure to gain deeper insights into health and wellness trends from the volume of sensor data collected by our wearable modules.

*Figure 6: Rockley cloud analytics and AI*



We believe the key benefits that our solutions can provide to our customers are as follows:

- Broad set of biomarkers with data analytics. Leveraging our unique integrated solution, we enable the detection and monitoring of multiple biomarkers. Analyzing the underlying spectral data with our growing base of machine learning and AI models has the potential to provide further insights into a person's health;

- Low power and small footprint. In each of the markets that we expect to serve, the power budget of the overall system is a key consideration. Power consumption greatly impacts system operation cost, footprint, and cooling requirements and is increasingly becoming a point of focus for our current customers and for other market participants that we are targeting as future customers. We believe that our silicon photonics solutions enable our customers to implement system architectures that reduce overall system power consumption. Moreover, in many of our applications, we are able to design and deliver semiconductors that have a smaller footprint and therefore reduce the overall system size; and

- Faster time to market. To meet our customers' time-to-market requirements, we work closely with them early in their design cycles and are actively involved in their development processes. Our hardware, algorithm, data analytics, and AI roadmaps provide flexibility in meeting our customers' schedules.

10

Exhibit 20
Page 2707

**Rockley's Silicon Photonics Toolbox Elements**

Rockley's proprietary silicon photonics platform covers a unique end-to-end solution, including generation of the light, manipulation of the light (modulation, multiplexing), radiation out of the module, and collection and processing of the returned light. The following provides an overview of the key components of our platform:

- Lasers: Our lasers offer precise wavelength control and robust power efficiency. The waveguide platform allows efficient wafer-scale integration of laser-devices through a flip-chip process;

- Modulators and detectors: We have developed optical modulators and detectors that are ultra-compact, power-efficient and high-speed, capable of handling high data rates and a broad range of wavelengths;

- Combiners and splitters: Our platform is capable of wavelength division multiplexing ("WDM") and demultiplexing, enabling in excess of 100 wavelengths on a single optical path;

- Fiber optic coupling: Our PIC contains on-chip embedded interfaces to the optical fibers. These interfaces allow the fiber to be passively attached directly to the PIC without external light coupling elements;

- Free-space optics: Our platform allows for efficient light coupling from free space into and out of the photonics circuits, with either edge or perpendicular coupling. This feature enables a broad range of sensing applications;

- Photonic integrated circuits: Our development platform enables integration of light sources, active devices, passive devices, and optical coupling elements into a single compact silicon chip;

- Wafer-scale processing: Our silicon photonics platform enables high throughput wafer-scale processing of monolithic and multi-die structures for chip-on-wafer integration;

- Interface electronics: We have in-house design expertise for custom analog circuitry to translate high-speed data streams into signals that actuate the PICs (drivers) and receive signals from them (amplifiers). This is complemented by our digital design capability for device control, signal processing, and interfaces to our customers systems; and

- Packaged assembly: The assembly of electrical ASICs, PICs, and fiber optics (if needed) into a single, highly integrated product requires a test and manufacturing flow that enables high-volume scale.

Further application-based expertise is focused on the following:

- Tissue optics design: Our sensing module products will include probe and hardware design to optimize sensing through the skin;

- Biomarker application: Our sensing algorithms are being developed through various levels of validation to provide state-of-the-art sensing capabilities, from proof of concept in the lab to clinical validation in human studies; and

- Applied data science: Our AI and cloud analytics will aggregate, analyze, and assess spectral data from our sensing products to extract additional insights and algorithm improvements.

**Current Product Offerings**

We have developed two separate product offerings to address our target markets: (i) VitalSpex (consume domain); and (ii) Bioptx (healthcare and medtech).

In respect of the VitalSpex biomarker sensing platform:

- We will target applications in the consumer health and wellness industry and expect strong customer engagement in the consumer electronics and wearables market. The VitalSpex platform represents a breakthrough that will empower consumer electronic devices, primarily personal wearables, smartphones and homecare devices, with the capacity for new powerful healthcare and wellness monitoring;

- The VitalSpex line will include a range of hardware and software solutions that enable non-invasive, continuous, and real-time monitoring of multiple biomarkers, from modules and chipsets that can be integrated into a wearable form factor to cloud analytics and artificial intelligence (AI);

- The VitalSpex line will include a Baseline module, which will target the measurement of core body temperature, body, hydration, blood pressure, and more, and a Pro module, which will add the measurement of alcohol, lactate, and glucose trends. Our first health monitoring product offering is expected to launch in the second half of 2022; and

11

Exhibit 20
Page 2708

- The VitalSpex Baseline and Pro modules will each combine existing LED-based optical sensing with Rockley's proprietary infrared optical sensing to expand the range of biomarkers that wearable devices can measure. Our VitalSpex modules will include the hardware and software capabilities to collect information available and relevant to the target biomarkers.

- We also plan to offer additional cloud-based subscription services that enhance the capabilities of the VitalSpex platform.

In respect of the Bioptx healthcare sensing platform:

- The Bioptx platform will target medical institutions, such as hospitals, research clinics, pharmaceutical companies, medical device manufacturers, and other healthcare providers, offering them the ability to monitor the general health and wellness of individuals. The measurement capabilities of the Bioptx platform the potential to transform healthcare by providing real-time insights into a variety of health conditions and by enabling early detection of multiple disease states;

- The Bioptx platform will include a range of hardware and software solutions that enable non-invasive, continuous, and real-time monitoring of multiple biomarkers, from a stand-alone wearable wristband to cloud analytics and artificial intelligence (AI);

- The Bioptx platform will include Baseline products (for core body temperature, body, hydration, blood pressure, and more) and Pro products (which will add the measurement of alcohol, lactate, and glucose trends). Our first health monitoring product offering is expected to ship in the second half of 2022;

- We also plan to offer additional cloud-based subscription services that enhance the capabilities of the Bioptx platform;

- The intended markets for Bioptx products, including our wristband, are markets in the medical professional healthcare domain (i.e., not consumer) that require an optimized and dedicated solution for health monitoring. tracking, and detection; and

- We expect that our customers will initially use the Bioptx platform to monitor the general wellness of individuals under care or in studies. After products in the Bioptx line receive approval from the FDA or other regulatory bodies, we anticipate that customers will expand product use into preventive and diagnostic care, such as remote patient monitoring and diagnosis.

12

Exhibit 20
Page 2709

Table of Contents

**Future Product Capabilities**

We plan to incorporate our biomarker sensing technology into a range of existing devices, such as patches, wearable bands, and other monitoring devices, to provide additional biomarker measurement capabilities not currently available. We continuously research, evaluate, and prioritize the addition of new biomarkers into our product offerings, with the objective of providing more valuable information and improving health insights. Our broad range of addressable biomarkers are at various stage of validation and demonstration, from proven science to miniaturization. The chart below illustrates a few examples of biomarkers for which we have validated their addressability using its IR wavelengths.

*Figure 7: Lab validation of Rockley's sensing technology*



These biomarkers along a few others we are investigating are key in early detection, prevention, and monitoring of major chronic illnesses, as illustrated in the table below:

13

Exhibit 20
Page 2710

Table of Contents

Case 1:23-cv-01095-MFK Doc 190-8 Filed 06/03/23 Entered 06/03/23 09:1 Page 226 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 26 of 126

*Figure 8: Disease detection and management potential of Rockley's biomarker sensing platform*

These products are still under development, and there can be no assurance that these product development efforts will succeed or that, even if developed, that these products will achieve widespread market acceptance.

**Customers**

Our customers' design cycle from initial engagement to volume shipment typically ranges from three to five years, with product life cycles of two years or more. For many of our products, which are technically complex, we must engage early with our customers' technical staff. To ensure an adequate level of early engagement, our sales, marketing, and development engineers must work closely with our customers and channel partners to understand, identify, and propose solutions to meet their systems' challenges. We work closely with our customers to anticipate end customer market needs. In some cases, we work with ecosystem partners to better understand market trends and new requirements that are being placed on our end customers.

We believe that our existing commercial relationships with leading consumer and medtech customers validate our unique technology and the business opportunity at hand. Our near-term commercial focus is on a robust pipeline in consumer devices, medical devices, and life sciences companies. We have a sales funnel of over 100 potential customer targets, of which we have started discussions with 54 and entered into contracts with 17. The customers with which we are contracted represent more than 60% of wearable global volumes, six of the top ten wearables companies, and two of the top ten medtech companies. Although our near-term focus through 2024 is on our consumer wearables and medtech strategy, we believe that other markets also represent upside potential.

To date, we have generated revenue primarily from non-recurring engineering ("NRE") and development services for customer-specific designs of silicon photonics chipsets for incorporation into customers' end products. Our two largest customers collectively accounted for 82% and 100% of our revenue in 2021 and 2020, respectively. We anticipate that revenue attributable to these customers will fluctuate from period to period, although we expect to remain dependent on these customers for a significant portion of our revenue for the foreseeable future. See "Risk Factors – Customer-Related Risks." Our current projections anticipate that we will achieve increased revenue beginning in 2023, assuming commercial adoption of our products by consumer device manufacturers in the wearable space.

We work closely with our end customers throughout their design cycles and will develop long-term relationships as our differentiated technology becomes embedded into their products. For example, we currently hold a development and supply agreement with one customer since 2017 and have successfully designed and delivered critical sample chips to them. As a result, we believe we are well-positioned to be designed into their product roadmaps and develop next-generation solutions for their future products. Because many of our target customers or their OEMs are located in North America and Asia Pacific, we anticipate that a majority of our future revenue will come from sales in these regions. Although a large percentage of our sales are made to customers in North America, we believe that a significant number of the systems and devices designed by these

14

Exhibit 20
Page 2711

Table of Contents

Case 1:23-cv-00095-MRA-8MA Filed 03/03/23 Entered 08/03/23 09:1 Page 227 of 607
2022.03.10 - Rockley 2021 10K Filing    Pg 27 of 126

customers will incorporate our semiconductor products which are then sold to end-users globally. We expect that once our modules are commercially available, we will enter into standard supply agreements with each of these parties.

## Manufacturing

### Our Proprietary Production and Manufacturing Ecosystem

We have built, and plan to continue to develop, a global manufacturing ecosystem designed with the ability to scale in a rapid and efficient manner. Several key areas within this manufacturing ecosystem run on our proprietary process and manufacturing technologies and are protected by our intellectual property portfolio. We possess end-to-end control over design, manufacturing and packaging processes, algorithms, and software. Our disciplined and systematic documentation and protection of critical know-how, trade secrets, and proprietary information further underpins our manufacturing ecosystem. To the best of our knowledge, there are no other turnkey options with the components and technologies needed to put together our sensing product. In addition to the intellectual property arrangements, we also have commercial exclusivity agreements with some of the key manufacturing ecosystem partners to prevent replication of this capability.

In addition to providing what we believe to be unmatched capabilities at the product level, our platform and the associated technology have been designed from bottom up to consider the relative ease and cost of manufacturing and scaling. Elements like waveguide dimensions for ease of wafer fabrication and high yields, robust and position tolerant coupling strategies for III-V integration, wafer scale back-end activities for III-V manufacturing, and all known good die integration at the module are integral to the product and the process technology. These elements are covered by the intellectual property which we have licensed to partners in our manufacturing ecosystem.

### Manufacturing Model Overview

We plan to operate a fabless business model and use third-party foundries and Outsource Assembly & Test (OSAT) contractors to produce our products. In several key areas, our third-party partners operate a proprietary process wholly owned by us and protected by our intellectual property portfolio. This outsourced manufacturing approach allows us to focus our resources on the design, sale, and marketing of our products. In addition, we believe that outsourcing many of our manufacturing and assembly activities provides us with the flexibility needed to respond to new market opportunities and scale for customer demand, simplifies our operations, and significantly reduces our capital commitments.

We believe our fabless model will allow us to scale in a capex efficient manner. We have contracted with global tier-1 foundries, including Skywater ("SW") for silicon PICs and wafer-scale III-V device integration and testing. This US based foundry is qualified for health, consumer and defense applications and has the capacity to meet our production needs. Our high-volume III-V semiconductor foundry is consumer and telecom qualified, supports very high volumes, and runs fully automated processes at one of the largest wafer scale in III-V manufacturing globally. Finally, our global IC foundry supplier handles the manufacturing of the electronic integrated circuits for our sensing modules. The foundry is used by most major consumer OEMs and is qualified for the ultra-high volume process node that we have chosen.

- **Raw Materials and Wafer Supply:** The starting raw materials (SOI wafers) for our silicon photonics have been customized by world leading silicon providers for the Rockley proprietary specification. For the active III-V components, we have arrangements in place with the world's leading epitaxial wafer supplier. We also have volume ready suppliers for commercial off-the shelf-components ("COTS") that go into the visible sensing and the overall module.

- **Wafer Fabrication:** Our SOI wafers are converted into fully processed silicon photonics PIC wafers at Skywater. The process used by SW is wholly owned by Rockley and licensed for use by SW only in Rockley products. The process design kit ("PDK") for this process is developed and maintained by us and constitutes our intellectual property.

  For the III-V active components, epitaxial materials are processed into finished wafers at a world leading dedicated III-V foundry making detectors, lasers and LEDs using state-of-the-art wafer-scale levels of automation. We have adapted the base process technology from this foundry to incorporate the previously discussed elements that allow for ease of integration into our platform and ease of manufacturing. These elements are exclusively for use in Rockley products.

  Finally, for ASIC manufacturing, we use a standard process node and PDK provided to us by Taiwan Semiconductor Manufacturing Company, Limited. While the manufacturing process is widely used in high volume (good for product economics), the design know-how belongs to Rockley. The custom ASIC matches our silicon photonics platform optimally for low noise, low power and high level of integration.

15

Exhibit 20
Page 2712

- **Chipset and module integration:** The chipset integration of the III-V active components into the silicon PICs is done at wafer scale and using passive alignment techniques that are uniquely enabled in our platform. Furthermore, we have ensured that the III-V components are in arrays of devices (reduces amount of alignment and integration activities) and on pretested known good die ("KGD") which ensures very high compounded yields. The process intellectual property ("IP") is developed and owned by Rockley and the integration is currently done in the UK at pilot production volumes, with plans to outsource higher volume in the future.

The integration of the overall module is in-line with assemblies used for wearables and mobile devices and there are many global suppliers with this capability. We have engaged with leading suppliers that serve Tier-1 consumers in this space and expect to finalize these arrangements for assembly within 2022.

We have development and supply agreements in place with our key suppliers. These agreements cover the development program, economic framework, IP licenses, exclusivity terms and other matters. Although we have commenced long-term supply agreement discussions in parallel with the detailed manufacturing ramp discussions, we do not currently have any long-term supply agreements in place and transact business with our third-party suppliers on a purchase-order basis with no minimum supply obligations on their part. We have designed our manufacturing partner network to be resilient by having multiple sources of supply for several key processes/components and we have plans for the appropriate inventory and stocking strategies to mitigate risks to our ramp plans.

## Commitment to Quality

We are committed to excellence by creating class-leading silicon photonics-based products and services. We intend to meet or exceed our global customer expectations by executing the following:

- Creating long-lasting, trusting, and mutually beneficial relationships with customers and partners;

- Establishing a full understanding of our customers' requirements and ensuring our products and services meet their expectations;

- Building a team of highly trained, empowered, and accountable employees;

- Innovating in the creation of technology that drives our products and services;

- Improving the effectiveness and efficiency of our quality management system through review of results, learning, and enhancement on a continual basis

We achieved ISO 9001:2015 certification in January 2022. We subject our third-party manufacturing contractors to rigorous qualification requirements to meet the high quality and reliability standards required of our products. We carefully qualify each of our partners and their processes. Our engineers work closely with our foundries (we even have teams embedded at partners sites in some critical areas) and other contractors to perfect the in-house processes, increase yield, lower manufacturing costs, and improve product quality. See "Risk Factors – Risks Related to Rockley's Business and Industry" for a discussion of risks related to the semiconductor industry and Rockley's manufacturing processes and foundry relationships.

## Research and Development

We believe that our future success depends on our ability to develop new products for both existing and new markets, development enhancements to our products once developed or if and when commercially launched, to stay ahead of our competition by being leaders in extending the boundaries of our technologies. As a result, a significant amount of our operating expenses has been allocated towards next-generation platform development. Our research and development efforts are focused primarily on extending the functionality and addressable markets of our integrated photonics platform, as well as continually increasing its performance, efficiency, and volume manufacturing competitiveness. We have assembled a core team of experienced engineers and systems designers with an extremely broad range of skill sets across different disciplines who conduct research and development activities in the United States and various European locations, and we are supported by partnerships with leading research institutions and consumer electronics and medical devices companies. As of December 31, 2021, we had 302 employees globally with over 75% of our workforce focused on research, product development, and engineering.

## Competition

The global optical components and full-stack solution market in general, and the consumer sensor, healthcare, and data communications markets in particular are highly competitive. We expect competition to increase and intensify as additional

Exhibit 20
Page 2713

companies enter our target markets. Our competitors range from large, international companies offering a wide range of services and optical components, such as LEDs, lasers, detectors, or PICs, to smaller companies specializing in narrow vertical markets. We expect competition in our target markets to increase in the future as existing competitors improve or expand their product offerings and as new competitors enter these markets. However, we believe that we are currently the only provider with the capability to integrate the technologies, features, and performance required by customers in our target markets. We believe that our unique silicon-photonic-based platform and the entire product ecosystem that we have developed around it will make our end-to-end offerings in the health and wellness domain difficult to replicate and provide us with a significant competitive moat. We believe this will be particularly true as we incorporate our AI and cloud-based offerings, currently under development.

## Intellectual Property

We rely on a combination of intellectual property rights, including patents, trade secrets, copyrights and trademarks, and contractual protections, to protect our core technology and intellectual property. As of December 31, 2021, we had 182 issued patents and 298 other patent applications pending worldwide. The 101 issued and allowed patents in the United States expire in the years beginning in 2022 through 2040. Many of our issued patents and pending patent applications relate to sensors and sensor chips, and we have extensive geographic coverage over numerous relevant technology domains.

In addition to our own intellectual property, we also use third-party licensors for certain technologies embedded in our silicon photonics solutions. These are typically non-exclusive contracts provided under paid-up licenses. These licenses are generally perpetual or automatically renewed for as long as we continue to pay any maintenance fees that may be due. To date, maintenance fees have not constituted a significant portion of our annual capital expenditures. We have entered into a number of licensing arrangements pursuant to which we license third-party technologies. We do not believe our business is dependent to any significant degree on any individual third-party license.

We generally control access to and use of our confidential information and trade secrets through the use of internal and external controls, including contractual protections with employees, contractors, and customers. We rely in part on the laws of the United States and international laws to protect our work. All employees and consultants are required to execute confidentiality agreements in connection with their employment and consulting relationships with us. We also require them to agree to disclose and assign to us all inventions conceived or made in connection with the employment or consulting relationship. However, we cannot guarantee that we have entered into such agreements with every such party, and we may not have adequate remedies in case of a breach of any such agreements. Our trade secrets could be disclosed to our competitors or others may independently develop substantially equivalent technologies or otherwise gain access to our trade secrets. Trade secrets can be difficult to protect and some courts inside and outside of the United States are less willing or unwilling to protect trade secrets.

## Government Regulation

### *Healthcare-Related Regulation*

Our solutions may be incorporated into multi-application, health-related sensing, and monitoring applications, including healthcare consumer wearables. Accordingly, the end products into which our solutions are incorporated may be subject to FDA and similar or related regulations, and demand for these end products or future regulated products could be adversely affected if such end products do not comply with applicable requirements. Although our target market is consumer wellness rather than medical, we intend to monitor and comply with regulations to the extent they become applicable to us, including any requirements for FDA clearance. Certain healthcare-related products may be regulated by the FDA and corresponding state regulatory agencies in the United States and separate governmental authorities outside of the United States. In the United States, the medical device industry is regulated by governmental authorities, principally the FDA and corresponding state regulatory agencies. Before a new regulated product or a significant modification to an existing medical device may be marketed or sold in the United States, it must comply with FDA Quality Management System regulations, and must obtain regulatory clearance or approval from the FDA, unless an exemption from pre-market review applies. In addition, certain future software functionality, whether standalone or embedded in existing or future devices, may be regulated as a medical device and require pre-market review and clearance or approval by the FDA. The process of obtaining regulatory clearances or approvals to market a medical device can be costly and time consuming, and our end customers may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any medical device products under development could prevent us from generating revenue from our solutions incorporated into these products.

Medical devices are also subject to numerous ongoing compliance requirements under the regulations of the FDA and corresponding state regulatory agencies, which can be costly and time consuming. For example, under FDA regulations medical

17

Exhibit 20
Page 2714

Table of Contents

device manufacturers are required to, among other things: (i) establish a quality management system to help ensure that their products consistently meet applicable requirements and specifications; (ii) establish and maintain procedures for receiving, reviewing, and evaluating complaints; (iii) establish and maintain a corrective and preventive action procedure; (iv) report certain device-related adverse events and product problems to the FDA; and (v) report to the FDA the removal or correction of a distributed product. If our solutions are incorporated into any medical device products of our end customers and these customers experience any product problems requiring reporting to the FDA or otherwise fail to comply with applicable FDA regulations or the regulations of corresponding state regulatory agencies, it could harm our ability to sell our solutions. In addition, if our end customers in the healthcare market are subject to enforcement actions such as fines, civil penalties, injunctions, recalls of products, delays in the introduction of products into the market, and refusal of the FDA or other regulators to grant future clearances or approvals, it could harm our reputation, business, operating results, and financial condition. In addition, in the United States, the FDA has taken the position that device manufacturers are prohibited from promoting their products other than for the uses and indications set forth in the approved product labeling, and any failure to comply could subject our end customers to significant civil or criminal exposure, administrative obligations and costs, and/or other potential penalties from, and/or agreements with, the federal government.

Government regulations outside the United States have, and may continue to, become increasingly stringent and common. In the European Union, for example, the European Union Medical Device Regulation was published in 2017 and, when it entered into full force in 2020, included significant additional pre-market and post-market requirements. Penalties for regulatory non-compliance could be severe, including fines and revocation or suspension of a company's business license, mandatory price reductions, and criminal sanctions. Future laws and regulations may have a material adverse effect on our end customers in the healthcare market, which in turn may negatively impact our ability to sell our solutions and otherwise harm our business and financial results.

### Export Regulation

Our business activities are also subject to various restrictions under U.S. export and similar laws and regulations, as well as various economic and trade sanctions administered by the U.S. Treasury Department's Office of Foreign Assets Control. Further, various countries regulate the import of certain technology and have enacted or could enact laws that could limit our ability to provide customers with our products in those countries.

We are also subject to various domestic and international anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act, as well as other similar anti-bribery and anti-kickback laws and regulations. These laws and regulations generally prohibit companies, their employees, and their intermediaries from authorizing, offering, providing, and/or accepting improper payments or other benefits for improper purposes. Although we take precautions to prevent violations of these laws, our exposure for violating these laws increases as our international presence expands and as we increase sales and operations in foreign jurisdictions.

New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to technology in the wearables industry generally could result in significant additional compliance costs and responsibilities for our business.

### Privacy

We are or may become subject to a variety of laws and regulations in the United States and abroad regarding privacy, data protection, and data security. These laws and regulations are continuously evolving and developing. The scope and interpretation of the laws that are or may be applicable to us are often uncertain and may be conflicting, particularly with respect to foreign laws.

In particular, there are numerous U.S. federal, state, and local laws and regulations and foreign laws and regulations regarding privacy and the collection, sharing, use, processing, disclosure, and protection of personal data. Such laws and regulations often have changes in scope, may be subject to differing interpretations, and may be inconsistent among different jurisdictions. For example, the General Data Protection Regulation (the "GDPR"), which became effective in May 2018, includes operational requirements for companies that receive or process personal data of residents of the European Union that are broader and more stringent than those previously in place in the European Union. The GDPR includes significant penalties for non-compliance, including fines of up to €20 million or 4% of total worldwide revenue. Additionally, in June 2018, California enacted the California Consumer Privacy Act (the "CCPA"), which became effective in January 2020. The CCPA requires covered companies to provide California consumers with new disclosures and expands the rights afforded consumers regarding their data. Fines for noncompliance may be up to $7,500 per violation. We cannot currently estimate the potential impact of the CCPA on our business or operations.

18

Exhibit 20
Page 2715

Table of Contents

Case 1:23-cv-10951-MPA-SAF Document 34-10 Filed 08/03/23 09:1Page 26 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 31 of 126

Additionally, we rely on various legal mechanisms for transferring certain personal data outside of the European Economic Area, or EEA, including the EU-U.S. Privacy Shield Framework, or Privacy Shield, and EU Standard Contractual Clauses, or SCCs. If we fail or are perceived to fail to meet the Privacy Shield principles or our obligations under the SCCs, or if any of these legal mechanisms for transferring data from the EEA are invalidated by European courts or otherwise become defunct, European Union data protection authorities or the U.S. Federal Trade Commission, or FTC, could bring enforcement actions seeking to prohibit or suspend our data transfers or alleging unfair or deceptive practices. In such cases, we could be required to make potentially expensive changes to our information technology infrastructure and business operations, and we could face legal liability, fines, negative publicity, and resulting loss of business.

Certain health-related laws and regulations such as the Health Insurance Portability and Accountability Act of 1996, or HIPAA, and the Health Information Technology for Economic and Clinical Health Act, or HITECH, may also have an impact on our business. If we are unable to comply with the applicable privacy and security requirements under HIPAA, HITECH, or PCI DSS, or we fail to comply with BAAs that we enter into with covered entities, we could be subject to claims, legal liabilities, penalties, fines, and negative publicity, which could harm our operating results.

Governments are continuing to focus on privacy and data security, and it is possible that new privacy or data security laws will be passed, or existing laws will be amended in a way that is material to our business. Any significant change to applicable laws, regulations, or industry practices regarding our users' data could require us to modify our services and features, possibly in a material manner, and may limit our ability to develop new products, services, and features. Although we have made efforts to design our policies, procedures, and systems to comply with the current requirements of applicable state, federal, and foreign laws, changes to applicable laws and regulations in this area could subject us to additional regulation and oversight, any of which could significantly increase our operating costs.

We strive to comply with all applicable laws, policies, legal obligations, and industry codes of conduct relating to privacy, data security, and data protection. The costs of compliance with, and other burdens imposed by, the GDPR, CCPA, HIPAA, and similar laws may limit the use and adoption of our products and services, and/or require us to incur substantial compliance costs, which could have an adverse impact on our business. In addition, given that the scope, interpretation, and application of these laws and regulations are often uncertain and may be conflicting, it is possible that these obligations may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. Any failure or perceived failure by us, our end customers, or third-party service-providers to comply with our privacy or security policies or privacy-related legal obligations, the failure or perceived failure by our end customers to comply with their privacy policies or privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of personal data, may result in governmental enforcement actions, litigation, damages, penalties, and negative publicity, and could also have an adverse effect on our brand and operating results.

*Cybersecurity*

We have designed and implemented and continue to maintain a security program consisting of policies, procedures, and technology intended to maintain the privacy, security and integrity of our information, systems, and networks. Among other things, the program includes controls designed to limit and monitor access to authorized systems, networks, and data, prevent inappropriate access or modification, and monitor for threats or vulnerability.

**Employees and Human Capital Resources**

Our workforce represents a highly regarded team of silicon photonics and measurement science experts under the same organization. A significant number of our employees have advanced degrees, including a large percentage holding PhDs. As of December 31, 2021, we had 302 employees, a large percentage of whom are in technical roles, including engineering.

- The quality of our employees is well recognized in the industry and has a strong and positive impact on our ability to develop and capitalize on our strategic operating model and business plan;

- Our leadership team is recognized for world-leading expertise in silicon photonics design and process, microelectronics design, packaging and test, software and algorithms including cloud and AI, and applications in data communications and medical sensing; and

- We have strong relationship with our employees and have never experienced a work stoppage.

Despite the significant challenges facing the world economy in light of the COVID-19 pandemic, we have remained focused on our business plan and priorities. We intend to continue to focus on:

- Protecting the well-being of our employees and keeping them healthy and engaged;

19

Exhibit 20
Page 2716

Table of Contents

Case 1:23-cv-00591-MN-8MA Filed 03/03/23 Entered 03/03/23 09:1? Page 232 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 32 of 126

- Making our physical workplaces safe and compliant;

- Building out efficient global human resource information systems and processes;

- Recruiting and staff retention for critical skills and competencies;

- Investing in the development of current and future leadership; and

- Creating sustainable operations, while building resilience, efficiency and flexibility into everything, from strategy to work design.

## Facilities

Our headquarters are currently located in the United Kingdom. We have premises in Pasadena, California under multiple leases for approximately 18,000 square feet, with most leases for these premises expiring around June 2023. The premises in Pasadena are predominantly used for engineering, finance, and general administration services. We lease a property in San Jose, California of approximately 4,600 square feet under a lease expiring in 2024, which is predominantly used for sales and marketing, finance, and general administration services. To support headcount growth over the past year, we continue to explore options and timing for improving and expanding our facilities. In the United States, we recently expanded our premises in Irvine, California to accommodate our sensor application facility and additional office space and have under multiple leases for approximately 12,000 square feet, all expiring in July 2027. In the United Kingdom, we have a lease on our lab facilities in Wales for approximately 1,733 square feet due to expire in 2024. We also recently entered into a facilities access agreement for new premises at the Tyndall Institute in Cork, Ireland for a new laboratory and office space of approximately 600 square feet. We believe that our current facilities are sufficient to support our operations and growth plans and that additional space, if needed, will be available on commercially reasonably terms.

## Website Access to Company's Reports

Our website address is www.rockleyphotonics.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are available free of charge through our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC.

## Disclosure Information

In compliance with disclosure obligations under Regulation FD, we announce material information to the public through a variety of means, including filings with the Securities and Exchange Commission, press releases, company blog posts, public conference calls and webcasts, as well as our investor relations website.

Exhibit 20
Page 2717

## Item 1A.    Risk Factors

*Shareholders should carefully consider the following risk factors, together with all of the other information included in this Annual Report on Form 10-K, including the financial statements and notes to the financial statements included herein, before they decide whether to vote or instruct their vote to be cast to approve the proposals described in this Annual Report on Form 10-K. If any of the following risks occur, or if Rockley fail to manage these risks and uncertainties successfully, it may have a material adverse effect on the business, results of operations, or financial condition of Rockley. Further, if any of the following risks or events occur, it could have a material adverse effect on the trading price of the ordinary shares of Rockley. If any of the risks or events described below occur, shareholders may lose all or part of their investment. The risks and uncertainties described in this "Risk Factors" section or elsewhere in this Annual Report on Form 10-K may also be incorrect or may change and should be read together with the financial statements and notes to the financial statements included herein. Additional risks and uncertainties presently unknown to Rockley may also have a material and adverse impact on the company.*

*As used in the risks described in this subsection, references to "the Company," "Rockley," "we," "us," and "our," are intended to refer to the business and operations of Rockley, unless the context clearly indicates otherwise.*

### Risks Related to Rockley's Business and Industry; Customer-Related Risks

***Rockley has incurred net losses since inception and expects to continue to incur losses for the foreseeable future. If Rockley does not fully develop or commercialize its products and services, including its silicon photonics chipsets, or if such products and services experience significant delays, Rockley's business, financial condition, and results of operation will be materially and adversely affected and Rockley may never achieve or sustain profitability.***

Rockley has to date generated revenue primarily from non-recurring engineering ("NRE") and development services for customer-specific designs of silicon photonics chipsets for incorporation into its customers' end products. Rockley incurred a net loss of $168.0 million and $80.3 million for the years ended December 31, 2021 and 2020, respectively. For the years ended December 31, 2021 and 2020, Rockley had an accumulated deficit of $400.9 million and $232.9 million, respectively. Rockley believes that it will continue to incur operating and net losses for the foreseeable future, including for a period of time after commercialization of its silicon photonics chipsets, which is not currently expected to begin until the second half of 2022; provided that any such commercialization may occur later than the second half of 2022 or not at all. Even if Rockley is able to successfully develop and sell its products, there can be no guarantee that it will do so within its anticipated timeframe or that its products will be commercially successful. Rockley's potential future profitability is dependent upon the successful development, commercial introduction, and acceptance of its products and services, including its silicon photonics chipsets for the consumer wearables market and its module applications with biomarker detection capabilities for advanced health metrics. Because Rockley will incur costs to develop and commercialize its products and services, including its chipsets and module applications, before it receives any significant revenue from any sales of such products or services, Rockley's losses in future periods may continue. Rockley may never achieve or sustain profitability.

Rockley expects to continue to incur operating losses for the foreseeable future as it:

- continues to invest in its technology and its silicon photonics chipsets and modules, as well as its cloud-based analytics subscription service;

- continues to develop innovative solutions and applications for its technology;

- commercializes its silicon photonics solutions;

- continues to invest in its sales and marketing activities and distribution channels;

- invests and improves its operational, financial, and management information systems;

- increases its headcount;

- expands its intellectual property portfolio; and

- enhances internal functions, systems, and infrastructure to support its anticipated transition to a public company.

***Rockley has a history of recurring losses and negative cash flows from operations, and a significant accumulated deficit, which raises substantial doubt about its ability to continue as a "going concern."***

Since inception, Rockley has financed its operations primarily through the issuance and sale of convertible loan notes, ordinary shares and revenue received from agreed-upon projects. As of December 31, 2021, Rockley's cash and cash

21

Exhibit 20
Page 2718

equivalents balance was $36.8 million and it had an accumulated deficit of $400.9 million. Due to Rockley's history of recurring losses from operations, negative cash flows from operations, and a significant accumulated deficit, its management concluded that there is substantial doubt about Rockley's ability to continue as a going concern. There have been no adjustments to the accompanying financial statements of Rockley to reflect this uncertainty. Rockley's ability to continue as a going concern is dependent upon it becoming profitable in the future or obtaining the necessary capital to meet its obligations. Rockley's determination of substantial doubt about its ability to continue as a going concern could materially limit its ability to raise additional funds through the issuance of equity securities, debt financing or otherwise. There can be no assurance that any such issuance of equity securities, debt financing or other means of financing will be available in the future, or the terms of any such financing will be acceptable to Rockley. Further, there can be no assurance that Rockley will ever become profitable or continue as a going concern.

***Rockley is subject to restrictive debt covenants that may limit its ability to finance its future operations and capital needs and to pursue business opportunities and activities.***

Rockley's existing financing agreements contain restrictive covenants, including a requirement to maintain at least $35 million cash on hand, that limit its ability to take certain actions. These restrictions may limit Rockley's ability to operate its businesses and may prohibit or limit its activity to enhance its operations or take advantage of potential business opportunities as they arise. All of these limitations are subject to significant exceptions and qualifications. These covenants could limit Rockley's ability to finance its future operations and capital needs and its ability to pursue business opportunities and activities that may be in its interest. If Rockley breaches any of these covenants it may be in default under its indebtedness, which may then become immediately due and payable. Rockley may not have, or be able to obtain, sufficient funds to make these accelerated payments. Rockley's ability to comply with the provisions of its financing arrangements may be affected by changes in economic or business conditions or other events beyond its control.

***If the end products into which Rockley's products are incorporated are not fully developed and commercialized or do not achieve widespread market acceptance, or if such products experience delays, cancellations, or reductions, Rockley's business, financial condition, and results of operations will be materially and adversely affected.***

Rockley's success in developing and commercializing its products depends in large part on its customers' success in developing, commercializing, and achieving widespread market acceptance of their end products that incorporate Rockley's products. Rockley's customers may be unable to fully develop and commercialize, or achieve widespread market acceptance of, their end products that incorporate Rockley's products. Further, these customers may not continue to incorporate Rockley's products into their end products either in the short or long term. If such customers' end products are not fully developed and commercialized, fail to achieve or maintain widespread market acceptance, experience delays, or if Rockley's customers otherwise choose not incorporate Rockley's products into their end products, Rockley's business, financial condition, and results of operations will be materially and adversely affected.

***If Rockley's products are not selected for inclusion in its customers' end products, including products for the consumer health and wellness market, or adopted in other industry verticals or use cases or are not adopted by leading consumer and medical device companies, life sciences companies, or their respective suppliers, Rockley's business will be materially and adversely affected.***

Rockley is currently developing products for use in its customers' end products, which are in varying stages of development. Many of these products, including products for consumer device, medical device, and life sciences companies, require extensive testing or qualification processes, which involve testing of Rockley's products in the customers' end products and systems, as well as testing for reliability. These qualification processes may continue for several months or longer. However, qualification of any of Rockley's products by a customer does not assure any sales of such product by Rockley to that customer. Even after successful qualification and sales by Rockley of a product to a customer, a subsequent revision in Rockley's third-party contractors' manufacturing process or Rockley's selection of a new supplier may require a new qualification process with Rockley's customers, which may result in delays in the sale of such product and could also result in Rockley holding excess or obsolete inventory. After Rockley's products are qualified, it can take several months before the customer commences production of end products that incorporate Rockley's products. Rockley spends significant time and resources to have its products selected for incorporation into these end products, which is known as a "design win." If Rockley fails to win a significant number of design wins in its target markets, its business, results of operations, and financial condition will be materially and adversely affected.

Rockley is targeting the deployment of its products in the consumer health and wellness and medical device sectors and any estimates of Rockley's future results contained in this Annual Report on Form 10-K assume that Rockley will successfully

Exhibit 20
Page 2719

commercialize its products and achieve significant market penetration in these sectors. As a result, if Rockley's products are not selected for inclusion by consumer device and medical device companies or life sciences companies, or their suppliers, Rockley's actual results may differ materially from its estimates included in this Annual Report on Form 10-K and Rockley's business would be materially and adversely affected.

***Rockley's limited operating history makes it difficult to evaluate its future prospects and the risks and challenges which may impact its business.***

Rockley was founded in 2013, completed development of its advanced sensing platform in 2019, launched its healthcare module offering in 2020, and has not yet fully developed and commercialized any of its products. This relatively limited operating history makes it difficult to evaluate Rockley's future prospects and the risks and challenges it may encounter. The risks and challenges which may impact Rockley's future prospects and business include, but are not limited to, its ability to:

- successfully commercialize its products and services, including its silicon photonics chipsets, module applications, and analytics subscription service;

- develop innovative applications for its silicon photonics and sensing technology;

- expand its sales and marketing activities and distribution channels;

- improve its operational, financial, and management information systems;

- attract, hire, integrate, and retain qualified talent to support the growth of its business. This includes increasing headcount to appropriately staff to projected growth;

- protect its intellectual property portfolio;

- enhance internal, systems, functions, and infrastructure to support its anticipated transition to a public company;

- comply with existing and new or modified laws and regulations applicable to its business;

- manage capital expenditures for its current and future products, as well as its supply chain and supplier relationships;

- anticipate and respond to macroeconomic changes and changes in the markets in which it operates;

- effectively manage its growth and business operations, including the impacts of the COVID-19 pandemic on its business; and

- hire, integrate, and retain qualified talent to support the growth of its business.

If Rockley fails to successfully manage the risks and difficulties that it faces, including those associated with the challenges listed above and those described elsewhere in this "*Risk Factors Related to Rockley*" section, its business, financial condition, and results of operations could be materially and adversely affected. Further, because Rockley has a limited operating history and has not yet commercialized its products, it is difficult to accurately assess its future prospects or financial performance. Rockley has encountered in the past, and will encounter in the future, risks and uncertainties frequently experienced by growing companies with limited operating histories in rapidly changing industries. If Rockley's assumptions regarding these risks and uncertainties, which it uses to plan and operate its business, are incorrect or change, or if it does not address these risks successfully, its results of operations could differ materially from its expectations and its business, financial condition, and results of operations could be materially and adversely affected.

***Rockley's estimates and expectations as to its financial performance are based upon assumptions, analyses, and internal estimates developed by Rockley's management. If these assumptions, analyses, or estimates prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from any such estimates and expectations.***

Rockley's estimates and expectations as to its future financial performance included in this Annual Report on Form 10-K are subject to uncertainty and are based on assumptions, analyses, and internal estimates developed by Rockley's management, all or some of which may not prove to be correct or accurate. If these assumptions, analyses, or estimates prove to be incorrect or inaccurate, Rockley's actual operating results may differ materially from any such estimates or expectations. We have in the past experienced actual results which varied from our estimates. These assumptions, analyses, or estimates are subject to risks and uncertainties, some of which are outside of Rockley's control. These risks and uncertainties include, but are not limited to, risks discussed elsewhere in this "*Risk Factors Related to Rockley*" section and in this Annual Report on Form 10-K, as well as those discussed below:

23

Exhibit 20
Page 2720

Table of Contents

- Revenue-related assumptions:

  ◦ Customer contracts and design wins: Rockley's existing memoranda of understanding ("MOUs") and development contracts may not ultimately convert into production contracts. In addition, Rockley may be unable to secure design wins from additional customers in a timely manner;

  ◦ Form of customer arrangement: It is possible that instead of entering into agreements with customers for the purchase of a significant amount of Rockley's products, Rockley may be required to enter into license arrangements with certain customers, any of which would have a significant impact on the revenue Rockley expects to achieve;

  ◦ Timing of launch and delivery: Rockley or Rockley's customers may encounter delays in the launch or delivery of Rockley's product or the customer's end product incorporating Rockley's product, including due to a customer's decision to delay the launch of a product, Rockley's ability to deliver its product in a timely manner to a customer, which in turn may result in the customer canceling a contract, technical challenges, or customer-related delays in its development program;

  ◦ Pricing and volume fluctuation: Rockley may experience pricing and volume fluctuations due to price negotiations, lower than anticipated unit volumes, delays in volume ramp, decreases in average selling prices due to competition or market dynamics, or other factors;

  ◦ Timing and execution of customer agreements: Rockley may face difficulties in meeting customer milestones in a timely manner or achieving required technical specifications. In addition, Rockley may experience execution delays under its NRE programs, including with its largest customer, due to resource constraints or customer delay. Further, to the extent Rockley were to enter into licensing arrangements in lieu of a product sale with a customer, including its largest customer, it could have a significant negative impact on Rockley's anticipated revenue; and

  ◦ Commercialization of products and services: Rockley must successfully commercialize its products and services, including its silicon photonics chipsets, module applications, and analytics subscription service.

- Production cost-related assumptions:

  ◦ Production volume and ramp: Rockley has in the past, and may in the future experience delays in contract execution, lower than expected manufacturing yields, manufacturing delays, and technical challenges, including if and when Rockley commences commercial production of its products, any of which could negatively impact forecasted production volume and ramp;

  ◦ Production cost: Rockley may be unable to secure the volume pricing or yield cost levels underlying its assumptions and indirect materials and production overhead costs may exceed forecasted amounts; and

  ◦ Inventory and obsolescence: Rockley's quality, warranty, return merchandise authorization, and inventory obsolescence may exceed forecasted amounts. Rockley may also experience product recalls which are not included in Rockley's assumptions. Further, Rockley may incur greater than expected costs in connection with its NRE programs.

- Operating expenses and cash utilization-related assumptions: Rockley's cash utilization may exceed currently anticipated rates due to a variety of factors, including lower than expected revenue, revenue delays, higher than anticipated production and manufacturing costs, operating expenses, and capital expenditures, lower than anticipated average selling prices, greater than anticipated cash needs for internal resources and organic growth, and potential strategic investments and acquisitions not currently anticipated.

Rockley's estimates and expectations may also be based in part on in this Annual Report on Form 10-K the expected size and growth of the markets in which Rockley operates or intends to enter, including the consumer wearables, mobile device, and medical device markets. Such markets may not develop or grow, or may develop and grow at a lower rate than expected, and even if these markets experience the forecasted growth described in this Annual Report on Form 10-K, Rockley may not grow its business at similar rates, or at all. Accordingly, the forecasts and estimates of market size and growth described in this Annual Report on Form 10-K should not be taken as a guarantee or other indication of Rockley's future growth or results of operations. In addition, these forecasts may be materially and adversely affected by a number of factors outside of Rockley's control, including, but limited to, factors associated with the ongoing COVID-19 pandemic.

24

Exhibit 20
Page 2721

***The strategic initiatives Rockley has undertaken or may undertake in the future may be more costly than currently anticipated and Rockley may not generate sufficient revenue to offset the costs of these initiatives, which in turn would negatively impact Rockley's ability to achieve and maintain profitability.***

Rockley continues to invest in initiatives designed to grow its business, including:

- partnering with customers and potential customers to develop and commercialize Rockley's products;

- investing in research and development;

- investing in its workforce, including its engineering talent;

- expanding its sales, marketing, and distribution efforts;

- investing in new applications and markets for its products;

- partnering with third-parties to develop manufacturing processes; and

- investing in legal, accounting, and other administrative and internal functions necessary to support its operations as a public company.

These initiatives may be more costly than anticipated and Rockley may not generate sufficient revenue to offset the costs of these initiatives. Certain of Rockley's market opportunities, such as healthcare monitoring devices incorporating sensing capabilities for disease detection and management, are at an early stage of development, and it may be years before these end markets generate demand for Rockley's products at scale, if at all. Rockley's revenue may be adversely affected for a number of reasons, including the rate and degree of development or market acceptance of new technology that competes with its products, failure of Rockley's customers to develop and commercialize their end products that incorporate Rockley's products, Rockley's inability to effectively manage production of its products to scale, Rockley's inability to enter new markets or help its customers adopt Rockley's products for new applications, and Rockley's failure to attract new customers or expand orders from existing customers. Further, it is difficult to predict the size and growth rate of Rockley's target markets, customer demand for its products, commercialization timelines, developments in silicon photonics technology, the entry of competitive products, or the success of existing competitive products and services. As a result, Rockley does not expect to achieve profitability until 2023 at the earliest. If Rockley's revenue does not grow over the short or long term, its ability to achieve and maintain profitability will be adversely affected, and the value of its business may significantly decrease.

***Rockley expects its results of operations to fluctuate on a quarterly and annual basis, which could cause the stock price of Rockley to fluctuate or decline.***

Rockley's revenue and operating results have fluctuated in the past and may vary significantly in the future. Historical comparisons of its operating results may not be relevant, or indicative of future results. In particular, because Rockley's revenue to date has been generated from NRE and development services for customer-specific designs of silicon photonics chipsets for testing in the customers' end products, revenue in any given quarter or period can fluctuate based on the timing and success of its customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Rockley's quarterly and annual financial results may fluctuate as a result of a variety of factors, many of which are outside of its control and may not fully reflect the underlying performance of Rockley's business. These fluctuations could adversely affect Rockley's ability to meet its expectations or those of securities analysts, ratings agencies, or investors. If Rockley does not meet these expectations for any reporting period, the value of its business and its securities, could decline significantly. Factors that may cause these quarterly and annual fluctuations include, but are not limited to, those listed below:

- the timing and magnitude of NRE services revenue in any quarter;

- the timing and magnitude of operating expenses incurred, including research and development expenses;

- Rockley's ability to meet product development roadmaps and timelines, which in turn may be impacted by resource constraints and must meet certain technical standards;

- the timing and degree of success of commercialization of Rockley's products;

- Rockley's ability to attract and retain customers and successfully transition customers with which it is engaged in discussions to contracted customers and to attract new customers;

- changes in terms of customer agreements;

25

Exhibit 20
Page 2722

- the ability of Rockley's customers to commercialize and achieve widespread market adoption of products incorporating Rockley's products;

- the timing and magnitude of orders and shipments of Rockley's products in any quarter;

- the mix of product sales and licensing arrangements in lieu of product sales;

- the actual timing and magnitude of sales returns and warranty claims of Rockley's products in any quarter may differ from estimate;

- Rockley's ability to develop, introduce, commercialize, manufacture, and ship in a timely manner products that meet customer requirements;

- disruptions in Rockley's sales channels or termination of its relationships with key channel partners;

- customer demand and product life cycles;

- the receipt, reduction, or cancellation of, or changes in the forecasts or timing of, orders by customers;

- fluctuations in the levels of inventories held by distributors or end customers;

- the gain or loss of significant customers, including Rockley's largest customer;

- fluctuations in sales by customers who incorporate Rockley's products into their end products;

- cyclicality, seasonality, and the competitive landscape in Rockley's target markets;

- fluctuations in manufacturing yields;

- changes in pricing, product cost, product volume, and product mix;

- sales of subscriptions to Rockley's cloud-based analytics subscription service, if and when commercially launched, and in the future, the rate of renewal of subscriptions by existing customers, the extent the use of subscription offerings and related services is expanded under such subscriptions, and timing and magnitude of any such subscriptions which are not renewed;

- the mix of customers licensing the service on a subscription basis as compared to a perpetual license;

- the size, timing, and terms of its subscription agreements with new customers;

- supply chain disruptions, delays, shortages, and capacity limitations as a result of the COVID-19 pandemic or other reasons;

- the impact and duration of the global COVID-19 pandemic;

- the timing and rate of broader market adoption of consumer and medical devices utilizing Rockley's products or technology across the consumer wearables, mobile device, and medical device sectors;

- changes in the competitive landscape in Rockley's target markets, including industry consolidation, regulatory developments, and new market entrants;

- Rockley's ability to effectively manage its third-party suppliers and manufacturing partners;

- changes in the source, cost, and availability of materials and components incorporated in Rockley's products;

- adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs;

- general economic, industry, and market conditions, including trade disputes; and

- Rockley's estimates of potential or future market growth in this Annual Report on From 10-K may not be accurate.

***Rockley expects to incur significant research and development expenses and devote substantial resources to commercializing new products, which could increase its losses and negatively impact its ability to achieve or maintain profitability.***

Rockley's future growth depends on developing and commercializing its products, achieving widespread market adoption of its products, adapting existing products to new applications and customer requirements, and introducing new products to address changing customer and market demands. Rockley plans to incur substantial research and development expenses as part

Exhibit 20
Page 2723

Table of Contents

of its efforts to design, develop, manufacture, and commercialize new products and enhance existing products. Rockley's research and development expenditures could increase its losses and adversely affect its results of operations in the future. Further, Rockley's research and development efforts may not be successful or result in additional revenue. This in turn would negatively impact Rockley's ability to achieve or maintain profitability.

**If Rockley is unable to manage its growth or expansion of operations, including in a cost-efficient manner, its business, operations, and financial condition, as well as its ability to scale its operations, could be materially and adversely affected.**

Rockley's ability to effectively manage its anticipated growth and expansion of operations and manage its transition to operating as a public company will also require it to enhance its operational, financial, and management controls and infrastructure, human resources policies, and reporting systems. These enhancements and improvements will require significant capital expenditures, investments in additional headcount and other operating expenditures, and allocation of valuable management and employee resources. Rockley's future financial performance and ability to execute on its business plan will depend, in part, on its ability to effectively manage any future growth and expansion. Rockley may be unable to effectively manage any future growth or expansion in an efficient or timely manner. Further, Rockley may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems, and procedures, which could have an adverse effect on its business, reputation, and financial results.

**Market opportunity estimates and growth forecasts included in this Annual Report on Form 10-K are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate.**

The forecasts and estimates in this Annual Report on Form 10-K relating to the expected size and growth of the markets for consumer wearables, mobile devices, and medical devices may prove to be inaccurate. Even if these markets experience the forecasted growth described in this Annual Report on Form 10-K, Rockley may not grow its business at similar rates, or at all. Rockley's future growth is subject to many factors, including market adoption of its products, which is subject to many risks and uncertainties. Accordingly, the forecasts and estimates of market size and growth described in this Annual Report on Form 10-K, including Rockley's estimates that the consumer wearables, mobile device, and medical devices markets will represent, in the aggregate, an approximately over $48 billion of total addressable market for healthcare monitoring devices incorporating additional sensing capabilities by 2025, should not be taken as indicative of Rockley's future growth. In addition, these forecasts may be materially and adversely affected as a result of the COVID-19 pandemic.

**If Rockley is unable to accurately forecast long-term end-customer adoption rates and demand for Rockley's products, it could materially and adversely affect its current and future financial results of operations.**

Rockley is pursuing opportunities in markets that are undergoing rapid changes, including technological and regulatory changes, and it is difficult to predict the timing and size of the opportunities. For example, consumer health and wellness applications and healthcare monitoring devices require complex technology. Because these products may incorporate technology from other companies, commercialization of these products could be delayed or impaired on account of certain technological components of Rockley or others not being ready to be deployed. Although Rockley currently has MOUs or development and supply agreements with various consumer and medical device companies, these companies may not be able to commercialize products incorporating Rockley's products immediately, or at all. Regulatory developments, many of which are outside of Rockley's control, could also cause delays or otherwise impair commercial adoption of these products. Rockley's future financial performance will depend on its ability to make timely investments in the correct market opportunities. Given the evolving nature of the markets in which Rockley operates in, it is difficult to predict customer demand or adoption rates for its products or the future growth of the markets in which it operates. As a result, Rockley's estimates included in this Annual Report on Form 10-K may not necessarily reflect various estimates and assumptions that may not prove accurate and any such estimates could differ materially from actual results due to the risks included in this "*Risk Factors Related to Rockley*" section, among others. If demand does not develop or if Rockley cannot accurately forecast customer demand, the size of its markets, inventory requirements, or its future financial results, its business, results of operations, and financial condition will be adversely affected.

**Rockley's target customer and product markets may not grow or develop as Rockley currently expects, and if Rockley fails to penetrate new markets and scale successfully within those markets, Rockley's revenue and financial condition would be harmed.**

Rockley's target markets include the consumer wearables, mobile device, and medical device markets. Any deterioration in Rockley's target customer or product markets or reduction in capital spending to support these markets could lead to a reduction in demand for Rockley's products, which would adversely affect its revenue and results of operations. Further, if

27

Exhibit 20
Page 2724

Rockley's target customer markets do not grow or develop in ways that Rockley currently expects, demand for Rockley's products may not materialize as expected, which would also negatively impact its business, financial condition, and results of operations. Rockley may be unable to predict the timing or development of trends in its target markets with any accuracy. If Rockley fails to accurately predict market requirements or market demand for these solutions, Rockley's business may suffer.

Rockley's future revenue growth, if any, will depend in part on Rockley's ability to penetrate Rockley's current target markets, and to enter emerging markets, such as the market for consumer healthcare monitoring devices and predictive analytics. Meeting the technical requirements and securing design wins in any of these new markets will require a substantial investment of Rockley's time and resources. Rockley may not secure design wins from these or other new markets, or achieve meaningful revenue from sales in these markets. If any of these markets do not develop as Rockley currently anticipates or if Rockley is unable to penetrate and scale them successfully, it may adversely affect Rockley's ability to grow its business.

### *Rockley's target markets are characterized by rapid technological change, which requires Rockley to continue to develop new products and technology innovations and could adversely affect market adoption of its products.*

Rapid technological changes in the markets for sensing technology, including the consumer wearables, mobile device, and medical device markets, could adversely affect adoption of Rockley's products, either generally or for particular applications. Rockley's future success will depend upon its ability to develop and introduce a variety of new capabilities and innovations to its products, as well as introduce new products, to address the changing needs of its target markets. Delays in delivering new products that meet customers' requirements could damage Rockley's relationships with its customers and lead them to seek alternative sources of supply. Further, the introduction of new products by Rockley's competitors, the delay or cancellation of any of Rockley's customers' end products into which Rockley's products are designed, the market acceptance of products based on new or alternative technologies, or the emergence of new industry standards could render Rockley's existing or future products uncompetitive, obsolete, and/or otherwise unmarketable.

In addition, Rockley's success to date has been based on the delivery of prototypes and services to research and development programs in which customers are investing substantial capital to develop new products. Delays in introducing products and innovations, the failure to choose correctly among technical alternatives, or the failure to offer innovative products at competitive prices may cause existing and potential customers to purchase Rockley's competitors' products or turn to alternative sensing technology. If Rockley is unable to successfully develop products that meet changing customer or market requirements on a timely basis or that remain competitive with technological alternatives, its products may fail to achieve commercial adoption, its revenue will decline, it may experience operating losses, and its business and prospects will be adversely affected.

### *Rockley may be unable to make the substantial investments that are required to remain competitive.*

The silicon photonics industry requires substantial and continuous investment in research and development in order to bring to market new and enhanced solutions. Rockley expects its research and development expenditures to increase in the future as part of its strategy to increase demand for Rockley's solutions in Rockley's current target markets and to expand into additional markets. Rockley may not have sufficient resources to maintain the level of investment in research and development required to remain competitive. In addition, Rockley cannot assure you that the technologies that are the focus of its research and development expenditures will become commercially successful or generate any revenue.

### *If Rockley fails to compete effectively, it may lose or fail to gain market share, which could negatively impact Rockley's operating results and Rockley's business.*

The global optical components market in general, and the consumer sensor, healthcare, and data communications markets in particular, are highly competitive. Rockley expects competition to increase and intensify as additional companies enter Rockley's target markets. Increased competition could result in price pressure, reduced gross margins, and difficulty achieving market penetration, any of which could harm Rockley's business, financial condition, and results of operations. Rockley's competitors range from large, international companies offering a wide range of services and optical components, such as LEDs, lasers, detectors, or photonic integrated circuit ("PICs"), to smaller companies specializing in narrow market verticals. Some of Rockley's key competitors across various verticals include: ams AG, Analog Devices, Inc., Broadcom Inc., DexCom, Inc. GlobalFoundries Inc., Intel Corporation, Lightwave Logic, Inc. Lumentum Holdings Inc. ("Lumentum"), Masimo Corporation, Osram Licht AG, and Tower Semiconductor Ltd. Rockley expects competition in its target markets to increase in the future as existing competitors improve or expand their product offerings and as new competitors enter these markets.

Exhibit 20
Page 2725

Table of Contents

Case 1:23-cr-00195-MR-8AA Filed 08/03/23 Entered 08/03/22 17:09:10 Page 241 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 41 of 126

Rockley's ability to compete successfully depends, in part, on factors that are outside of its control, including industry and general economic trends. Rockley's ability to compete successfully will depend on a number of factors, including its ability to:

- define, design, and regularly introduce new products that anticipate the functionality and integration needs of Rockley's customers' next-generation products and applications;

- build strong and long-lasting relationships with Rockley's customers and other industry participants;

- cost-effectively develop and commercialize products which compete favorably with competitors' products;

- achieve design wins;

- accurately estimate the effectiveness and success of Rockley's customers' end products incorporating Rockley's products in their competitive end markets;

- expand its research and development capabilities to provide innovative solutions and maintain Rockley's product roadmap;

- strengthen its sales and marketing efforts, brand awareness and reputation;

- deliver products in volume on a timely basis at competitive prices;

- withstand or respond to significant price competition;

- build and expand international operations in a cost-effective manner;

- obtain, maintain, protect, and enforce Rockley's intellectual property rights;

- defend potential patent infringement claims arising from third parties;

- promote and support Rockley's customers' incorporation of Rockley's products into their end products; and

- attract, hire, and retain high-level talent, including Rockley's management team and engineers.

Rockley's competitors may also establish cooperative relationships among themselves or with third parties or may acquire companies that provide similar products to Rockley's. As a result, new competitors or alliances may emerge that could capture significant market share. Any of these factors, alone or in combination with others, could harm Rockley's business, financial condition, and results of operations and result in a loss of market share and an increase in pricing pressure.

***Rockley may pursue strategic investments or acquisitions in the future. If Rockley fails to successfully select, execute, or integrate its acquisitions, then its business, results of operations, and financial condition could be materially and adversely affected, and the stock price could decline.***

From time to time, Rockley may pursue investments or acquisitions to add new products and technologies, acquire talent, gain new sales channels, or enter into new markets or sales territories. In addition to possible shareholder approval, Rockley may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, which could result in increased delay and costs. Furthermore, acquisitions and the subsequent integration of new assets, businesses, key talent, customers, vendors, and suppliers require significant attention from Rockley's management and could result in a diversion of resources from Rockley's existing business, which in turn could have an adverse effect on Rockley's operations. Acquired assets or businesses may not generate the financial results Rockley expects. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets, and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

Failure to successfully identify, complete, manage, and integrate acquisitions could materially and adversely affect its business, financial condition, and results of operations and could cause Rockley's stock price to decline.

Exhibit 20
Page 2726

***Rockley's international operations expose it to operational, financial, and regulatory risks, including possible unfavorable regulatory, political, tax, and labor conditions, which could harm Rockley's business.***

Rockley is committed to growing its international sales, and while it has committed resources to expanding its international operations and sales channels, these efforts may not be successful. International operations are subject to a number of other risks, including:

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue;

- political and economic instability, international terrorism, and anti-American or British sentiment, particularly in emerging markets;

- disadvantages of competing against companies from countries that are not subject to U.S. and U.K. laws and regulations, including the Foreign Corrupt Practices Act, Office of Foreign Assets Control regulations, and U.S. anti-money laundering regulations, as well as exposure of Rockley's foreign operations to liability under these regulatory regimes;

- preference for locally branded products, and laws and business practices favoring local competition;

- potential consequences of, and uncertainty related to, the "Brexit" process in the United Kingdom, which could lead to additional expense and complexity in doing business there;

- less effective protection of intellectual property;

- stringent regulation of the end products incorporating Rockley's products and stringent consumer protection and product compliance regulations, including but not limited to General Data Protection Regulation in the European Union, European competition law, the Restriction of Hazardous Substances Directive, the Waste Electrical and Electronic Equipment Directive, and the European Ecodesign Directive that are costly to comply with and may vary from country to country;

- difficulties and costs of staffing and managing foreign operations;

- foreign taxes, including withholding of payroll taxes; and

- the U.S. government's and U.K. government's restrictions on certain technology transfer to certain countries of concern.

For example, we have significant international operations that are denominated in foreign currencies, primarily the British Pound and Euro, subjecting us to foreign currency exchange risk that may adversely impact our financial results. The occurrence of any of these risks could negatively affect Rockley's international business and consequently its business, operating results, and financial condition.

***The average selling prices of Rockley's products could decrease rapidly over the life of the product, which may negatively affect Rockley's revenue and margins. In addition, the selling prices Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may be less than what Rockley currently anticipates, which may cause Rockley's actual operating results to differ materially from its expectations.***

The prices that Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may experience declines for a variety of reasons, many of which are outside of Rockley's control. In order to sell products that have a falling average unit selling price and maintain margins at the same time, Rockley will need to continually reduce product and manufacturing costs. To manage manufacturing costs, Rockley must engineer the most cost-effective design for its products and collaborate with its manufacturing counterparties to reduce manufacturing costs. Rockley also needs to continually introduce new products with higher sales prices and gross margin in order to maintain its overall gross margin. If Rockley is unable to manage the cost of older products or successfully introduce new products with higher gross margin, its revenue and overall gross margin would likely decline. In addition, the selling prices Rockley is able to ultimately charge in the future for the products it is currently developing or commercializing may be less than what Rockley currently projects, which may cause Rockley's actual operating results to differ materially from its estimates.

***Rockley's gross margins may fluctuate due to a variety of factors, which could negatively impact Rockley's results of operations and Rockley's financial condition.***

Exhibit 20
Page 2727

Case 1:23-cv-01095-MRA-SMA   Document 34-10   Entered 08/03/23 09:1   Page 243 of 607
2022.03.10 - Rockley 2021 10-K Filing   Pg 43 of 126

Table of Contents

Rockley's gross margins may fluctuate due to a number of factors, including customer and product mix, market acceptance of Rockley's new products, yield, wafer pricing, packaging and testing costs, competitive pricing dynamics, the impact of the COVID-19 pandemic, and geographic and market pricing strategies. To the extent Rockley may offer certain customers favorable prices, it would decrease Rockley's average selling prices and likely impact gross margins. Further, Rockley may in the future offer pricing incentives to Rockley's customers on earlier generations of products that inherently have a higher cost structure, which would negatively affect Rockley's gross margins. In addition, in the event Rockley's customers, including Rockley's larger customers, exert more pressure with respect to pricing and other terms, it could put downward pressure on Rockley's margins.

Because Rockley does not operate its own manufacturing, assembly, or testing facilities, it may not be able to reduce its costs as rapidly as companies that operate their own facilities, and Rockley's costs may even increase, which could further reduce Rockley's gross margins. Rockley relies primarily on obtaining yield improvements and volume-based cost reductions to drive cost reductions. To the extent that such cost reductions do not occur at a sufficient level and in a timely manner, Rockley's business, financial condition, and results of operations could be adversely affected and may vary from Rockley's estimates.

In addition, Rockley may in the future maintain an inventory of Rockley's products at various stages of production and in finished goods inventory. Rockley will hold these inventories in anticipation of customer orders. If those customer orders do not materialize in a timely manner, Rockley may have excess or obsolete inventory which Rockley would have to reserve or write-down, and Rockley's gross margins would be adversely affected.

***Because some of the raw materials and key components in its products come from limited or single source suppliers, Rockley is susceptible to supply shortages, long lead times for components, and supply changes, including as a result of industry consolidation, any of which could disrupt its supply chain and could delay deliveries of its products to customers, which could adversely affect Rockley's business, results of operations, and financial condition.***

Some of the components used in the manufacturing of Rockley's products are sourced from third-party suppliers. To date, Rockley has produced its products in relatively limited quantities for use in products. Rockley does not have extensive experience in managing its supply chain to manufacture and deliver its products at scale. Some of the key components used to manufacture Rockley's products come from limited or single source suppliers. Rockley is therefore subject to the risk of shortages and long lead times in the supply of these components and the risk that its suppliers discontinue or modify components used in its products. Rockley has a global supply chain and the COVID-19 pandemic and other health epidemics and outbreaks may adversely affect its ability to source components in a timely or cost effective manner from its third-party suppliers due to, among other things, work stoppages or interruptions. For example, Rockley relies on third-party foundries to manufacture its silicon photonic integrated circuits and for wafer scale integration. Any disruptions to those foundries could materially and adversely affect Rockley's ability to manufacture its products. In addition, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules. Rockley has in the past experienced and may in the future experience component shortages and price fluctuations of certain key components and materials, and the predictability of the availability and pricing of these components may be limited. In the event of a component shortage, supply interruption or material pricing change from suppliers of these components, Rockley may not be able to develop alternate sources in a timely manner or at all in the case of sole or limited sources. These risks may be exacerbated if any of Rockley's suppliers were to cease operations or be acquired by a third party. If this were to occur, Rockley may need to re-qualify the supplier and/or otherwise confirm that such an event would not cause concerns with Rockley's end customers or otherwise negatively impact Rockley's relationships with its end customers. Developing alternate sources of supply for these components may be time-consuming, difficult, and costly and Rockley may not be able to source these components on terms that are acceptable to it, or at all, which may undermine Rockley's ability to meet its requirements or to fill customer orders in a timely manner. Any interruption or delay in the supply of any of these parts or components, or the inability to obtain these parts or components from alternate sources at acceptable prices and within a reasonable amount of time, would adversely affect Rockley's ability to meet its scheduled product deliveries to its customers. This could adversely affect Rockley's relationships with its customers and channel partners and could cause delays in shipment of its products and adversely affect its operating results. In addition, increased component costs could result in lower gross margins. Even where Rockley is able to pass increased component costs along to its customers, there may be a lapse of time before it is able to do so such that Rockley must absorb the increased cost. If Rockley is unable to buy these components in quantities sufficient to meet its requirements on a timely basis, it will not be able to deliver products to its customers. This in turn could materially and adversely affect Rockley's business, financial condition, and results of operations.

***If the foundries with which Rockley contracts do not achieve satisfactory yields or quality, Rockley's reputation and customer relationships could be harmed.***

31

Exhibit 20
Page 2728

Rockley depends on satisfactory wafer foundry manufacturing capacity, wafer prices, and production yields, as well as timely wafer delivery, to meet customer demand and enable it to maintain gross margins. The fabrication of Rockley's products is a complex and technically demanding process. Minor deviations in the manufacturing process can cause substantial decreases in yields and, in some cases, cause production to be suspended. Rockley's foundry vendors may experience manufacturing defects and reduced manufacturing yields from time to time. Further, any new foundry vendors Rockley employs, whether due to industry consolidation, customer requirements, or otherwise, may present additional and unexpected manufacturing challenges that could require significant management time and focus. Changes in manufacturing processes or the inadvertent use of defective or contaminated materials by the foundries that Rockley employs could result in lower than anticipated production yields or unacceptable performance of Rockley's products. Many of these problems are difficult to detect at an early stage of the manufacturing process and may be time-consuming and expensive to correct. Poor production yields from the foundries that Rockley employs, or defects, integration issues, or other performance problems in Rockley's products could significantly harm Rockley's customer relationships and financial results, and give rise to financial or other damages to Rockley's customers. Any product liability claim brought against Rockley, even if unsuccessful, would likely be time-consuming and costly to defend.

Manufacturing yields for new products initially tend to be lower as Rockley completes product development and commence volume manufacturing, and typically increase as Rockley brings the product to full production. While Rockley's business model includes this assumption of improving manufacturing yields its assumptions may be incorrect and, as a result, material variances between projected and actual manufacturing yields will have a direct effect on Rockley's gross margin and profitability. The difficulty of accurately forecasting manufacturing yields and maintaining cost competitiveness through improving manufacturing yields will continue to be magnified by the increasing process complexity of manufacturing silicon photonics products.

***Raw material price fluctuations can increase the cost of Rockley's products, impact Rockley's ability to meet customer commitments, and may adversely affect its results of operations.***

The cost of raw materials is a key element in the cost of Rockley's products. Rockley's inability to offset material price inflation through increased prices to customers, suppliers, productivity actions, or through commodity hedges could adversely affect Rockley's results of operations. Many major components, product equipment items, and raw materials are procured or subcontracted on a single or sole-source basis. Although Rockley maintains a qualification and performance surveillance process and Rockley believes that sources of supply for raw materials and components are generally adequate, it is difficult to predict what effects shortages or price increases may have in the future. Rockley's inability to fill its supply needs would jeopardize its ability to fulfill its contractual obligations, which could, in turn, result in reduced revenue, contract penalties or terminations, and damage to Rockley's customer relationships.

Furthermore, increases in the price of wafers, testing costs, and commodities, which may result in increased production costs, mainly assembly and packaging costs, may result in a decrease in Rockley's gross margins. Moreover, Rockley's suppliers may pass the increase in raw materials and commodity costs onto it which would further reduce the gross margin of Rockley's products. In addition, as Rockley is a fabless company, global market trends such as a shortage of capacity to fulfill Rockley's fabrication needs also may increase Rockley's raw material costs and thus decrease its gross margin.

***Rockley is subject to the cyclical nature of the semiconductor industry.***

The semiconductor industry is highly cyclical and is characterized by constant and rapid technological change, rapid product obsolescence, price erosion, evolving standards, short product life cycles, industry consolidation, and wide fluctuations in product supply and demand. The industry experienced significant downturns during past global recessions. These downturns have been characterized by diminished product demand, production overcapacity, high inventory levels, and accelerated erosion of average selling prices. While these downturns have not directly impacted Rockley's business to date, any prolonged or significant downturn in the semiconductor industry could adversely affect Rockley's business and reduce demand for Rockley's products. Any future downturns in the semiconductor industry could also harm Rockley's business, financial condition, and results of operations. Furthermore, any significant upturn in the semiconductor industry could result in increased competition for access to third-party foundry and assembly capacity. Rockley is dependent on the availability of this capacity to manufacture and assemble Rockley's products and Rockley can provide no assurance that adequate capacity will be available to it in the future.

***If Rockley or its suppliers do not maintain sufficient inventory or if they do not adequately manage their respective inventory, Rockley could lose sales or incur higher inventory-related expenses, which could negatively affect Rockley's operating results.***

Exhibit 20
Page 2729

Table of Contents

Case 1:23-cv-01095-MRA-8MA Filed 03/03/23 Entered 03/03/23 09:1 Page 245 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 45 of 126

To ensure adequate inventory supply, Rockley and its suppliers must forecast inventory needs and expenses, place orders sufficiently in advance with their respective suppliers and manufacturing counterparties, and manufacture products based on its estimates of future demand for particular products. Changes in customer purchasing patterns may affect Rockley's ability to forecast its future operating results, including revenue, gross margins, cash flows, and profitability. Rockley's ability to accurately forecast demand for its products could be affected by many factors, including the growth rate, if any, in Rockley's target markets or the market adoption of the end products into which Rockley's products are incorporated, the emergence of new markets, an increase or decrease in customer demand for Rockley's products or for products and services of its competitors, product introductions by competitors, the COVID-19 pandemic, other health epidemics and outbreaks, and any associated work stoppages or interruptions, unanticipated changes in general market conditions, and the weakening of economic conditions or consumer confidence in future economic conditions. If Rockley's products are commercialized in markets that are quickly growing, including the consumer wearables, mobile device, and medical device markets, Rockley may face challenges acquiring adequate supplies to manufacture its products and/or Rockley and its manufacturing counterparties may not be able to manufacture its products at a rate necessary to satisfy the levels of demand, which would negatively affect Rockley's revenue. This risk may be exacerbated by the fact that Rockley may not carry or be able to obtain for its manufacturers a significant amount of inventory to satisfy short-term demand increases. If it fails to accurately forecast customer demand, Rockley may experience excess inventory levels or a shortage of products available for sale.

Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would adversely affect Rockley's financial results, including its gross margin, and have a negative effect on its brand. Conversely, if Rockley underestimates customer demand for its products, Rockley, or its manufacturing counterparties, may not be able to deliver products to meet its requirements, and this could result in damage to Rockley's brand and customer relationships and adversely affect its revenue and operating results.

### If Rockley's products do not conform to, or are not compatible with, existing or emerging industry standards, demand for Rockley's products may decrease, which in turn would harm Rockley's business and operating results.

Rockley's ability to compete in the future will depend on its ability to identify and ensure compliance with evolving industry standards in its target markets, as well as in the silicon photonics and sensing technology industry generally. The emergence of new industry standards could render Rockley's products incompatible with products developed by third-party suppliers or make it difficult for Rockley's products to meet the requirements of certain device manufacturers and their suppliers. If Rockley's customers or Rockley's third-party suppliers adopt new or competing industry standards with which Rockley's solutions are not compatible, or if industry groups fail to adopt standards with which Rockley's products are compatible, Rockley's products would become less desirable to its current or prospective customers. As a result, Rockley's sales would suffer and it could be required to make significant expenditures to develop new products. Although Rockley designs its products to be compliant with applicable industry standards, proprietary enhancements may not in the future result in conformance with existing industry standards under all circumstances. If Rockley's products do not conform to, or are not compatible with, existing or emerging standards, it would harm its business, financial condition, and results of operations.

### Rockley may be subject to warranty or product liability claims, which could result in unexpected expenses and loss of market share.

Rockley may be subject to warranty or product liability claims. These claims may require Rockley to make significant expenditures to defend those claims, replace Rockley's solutions, refund payments, or pay damage awards. Rockley has not yet commercialized its products. Accordingly, the operation of Rockley's products and technology has not been validated over longer periods. If a customer's end product fails in use, the customer may incur significant monetary damages, including a product recall or associated replacement expenses as well as lost revenue. The customer may claim that a defect in Rockley's product caused the product failure and assert a claim against Rockley to recover monetary damages. The cost of defending these claims and satisfying any arbitration award or judgment with respect to these claims would result in unexpected expenses, which could be substantial, and could harm Rockley's business, financial condition, and results of operations. Although Rockley carries product liability insurance, this insurance is subject to significant deductibles and may not adequately cover Rockley's costs arising from defects in its products or otherwise.

### The complexity of Rockley's products and its anticipated future product and service offerings could result in unforeseen delays or expenses from undetected defects, errors, or reliability issues in hardware or software that could reduce the market adoption of its new products, damage its reputation with current or prospective customers, and adversely affect its operating costs.

Exhibit 20
Page 2730

Rockley's current and future products and service offerings are or are expected to be highly technical and very complex and require high standards to manufacture or distribute and have in the past and will likely in the future experience defects, errors, or reliability issues at various stages of development. Rockley may be unable to timely release new products, product updates, manufacture existing products, correct problems that have arisen, or correct such problems to its customers' satisfaction. Additionally, undetected errors, defects, or security vulnerabilities, especially as new products or updates are introduced or as new versions are released, could result in inaccurate data to the end users of products incorporating Rockley's products. Any of the foregoing could negatively impact Rockley's ability to commercialize a product or service offering, result in litigation against Rockley, and damage Rockley's credibility. These risks may be heightened in the medical device industry, one of Rockley's target markets, where the end user may act in reliance upon inaccurate data as a result of errors or defects, or where there may be a privacy or data breach of an end user's personal health information. Some errors or defects in Rockley's products and service offerings may only be discovered after they have been tested, commercialized, and deployed by customers. In these cases, Rockley may incur significant additional development costs and product recall, repair, or replacement costs. These problems may also result in claims, including class actions, against Rockley by its customers or others. Rockley's reputation or brand may be damaged as a result of these problems and customers may be reluctant to buy its products, which could adversely affect its ability to retain existing customers and attract new customers and could adversely affect its financial results.

In addition to product liability claims, Rockley could face material legal claims for breach of contract, fraud, tort, or breach of warranty as a result of these problems. Defending a lawsuit, regardless of its merit, could be costly and may divert management's attention and adversely affect the market's perception of Rockley and its products. In addition, Rockley's business liability insurance coverage could prove inadequate with respect to a claim and future coverage may be unavailable on acceptable terms or at all. These product-related issues could result in claims against Rockley and its business could be adversely affected.

***Rockley currently expects to recognize subscription revenue from its future cloud-based analytics subscription offering ratably over the term of these subscriptions and, to a lesser extent, perpetual licenses ratably over an expected period of benefit and, as a result, downturns in sales may not be immediately reflected in its operating results.***

If Rockley is able to commercially launch its cloud-based analytics subscription service, which is currently expected to occur as early as 2023, it expects to recognize revenue ratably over the terms of its subscriptions with customers. As a result, a substantial portion of the revenue that it will report in each period will be derived from the recognition of deferred revenue relating to agreements entered into during previous periods. Consequently, a decline in new sales or renewals in any one period may not be immediately reflected in its revenue results for that period. This decline, however, will negatively affect its revenue in future periods. Accordingly, the effect of significant downturns in sales and market acceptance of its subscription service and potential changes in the rate of renewals may not be fully reflected in its results of operations until future periods. This will also make it difficult for Rockley to rapidly increase revenue growth through additional sales in any period, as revenue from new customers generally will be recognized over the term of the applicable agreement. Rockley may be unable to commercially launch its subscription service offering in a timely manner or at all and such subscription offering may not achieve widespread customer adoption.

***Any decline in customer renewals, terminations, or failure to convince customers to use Rockley's cloud-based analytics subscription service would harm its business, results of operations, and financial condition.***

The rate at which Rockley's customers purchase subscriptions to its cloud-based analytics service will depend on a number of factors, including the perceived value of the service. Rockley anticipates that its subscription offerings for enterprise customers will range from one to two years subject to renewal terms. Rockley's ability to grow revenue from its cloud-based analytics subscription offering, if and when commercially launched, will depend on a significant percentage of customer renewals when the then-existing subscription terms expire, as well as renewals on the same or more favorable terms. Customers will have no obligation to renew their subscriptions, and Rockley may not be able to accurately predict customer renewal rates. The growth of Rockley's business will depend in part on its customers adopting and expanding their use of Rockley's cloud-based analytics subscription offering and related services. If Rockley's customers do not maintain or renew their subscriptions or renew on less favorable terms, Rockley's future business prospects and growth opportunities may suffer.

***If Rockley's future platform offerings do not interoperate with its customers' network and security infrastructure or with third-party products, websites, or services, it would negatively impact its business and results of operations.***

Rockley's cloud-based analytics subscription offering, which is under development and is currently expected to be commercially launched as early as 2023, is expected to allow for the deployment of Rockley's technology through a cloud-

Exhibit 20
Page 2731

based software-as-a-service model. As a result, it must interoperate with Rockley's customers' existing network and security infrastructure. The components of Rockley's customers' infrastructure have different specifications, rapidly evolve, utilize multiple protocol standards, include multiple versions and generations of products, and may be highly customized. Rockley must be able to interoperate and provide its software service to customers with highly complex and customized networks, which requires careful planning and execution between its customers, its customer support teams, and its channel partners. Further, whenever there are new or updated elements of the customers' infrastructure or new industry standards or protocols, Rockley may have to update or enhance its cloud platform to continue to provide service to customers. Rockley's competitors or other vendors may refuse to work with Rockley to allow their products to interoperate with Rockley's, which could make it difficult for Rockley's cloud-based analytics subscription service to function properly in customer networks that include these third-party products.

Rockley may not deliver or maintain interoperability quickly or cost-effectively, or at all. If Rockley fails to maintain compatibility of its cloud-based analytics subscription service with its customers' network and security infrastructures, its customers may not be able to fully utilize the service, and Rockley may, among other consequences, fail to achieve widespread customer adoption of this subscription service and experience reduced demand for its products and services, which would materially harm its business, operating results, and financial condition.

***Rockley licenses technology from third parties, and its inability to maintain those licenses could harm its business.***

Rockley incorporates technology that it licenses from third parties, including software, into its software subscriptions. Rockley cannot be certain that its licensors are not infringing the intellectual property rights of
third parties or that its licensors have sufficient rights to the licensed intellectual property in all jurisdictions in which Rockley may sell its software subscriptions. In addition, some licenses may be non-exclusive, and therefore its competitors may have access to the same technology licensed to Rockley. Some of Rockley's license agreements may be terminated for convenience by the licensors. Rockley may also be subject to additional fees or be required to obtain new licenses if any of its licensors allege that Rockley has not properly paid for such licenses or that it has improperly used the technologies under such licenses, and such licenses may not be available on terms acceptable to Rockley or at all. If Rockley is unable to continue to license any of this technology because of intellectual property infringement claims brought by third parties against its licensors or against it, or claims against Rockley by its licensors, or if Rockley is unable to continue its license agreements or enter into new licenses on commercially reasonable terms, its ability to develop and sell software subscriptions containing such technology would be severely limited, and its business could be harmed. Additionally, if Rockley is unable to license necessary technology from third parties, it may be forced to acquire or develop alternative technology, which it may be unable to do in a commercially feasible manner or at all, and Rockley may be required to use alternative technology of lower quality or performance standards. This would limit and delay its ability to offer new or competitive software subscriptions and increase its costs of production. As a result, Rockley's margins, market share, and operating results could be significantly harmed.

***Portions of Rockley's cloud-based analytics subscription offering utilize open source software, and any failure to comply with the terms of one or more of these open source licenses could negatively affect its business.***

Rockley's cloud-based analytics subscription offering contains software made available by third parties under so-called "open source" licenses. From time to time, there have been claims against companies that distribute or use open source software in their products and services, asserting that such open source software infringes the claimants' intellectual property rights. Rockley could be subject to suits by parties claiming that what Rockley believes to be licensed open source software infringes their intellectual property rights. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide warranties or other contractual protections regarding infringement claims or the quality of the code. In addition, certain open source licenses require that source code for software programs that are subject to the license be made available to the public and that any modifications or derivative works to such open source software continue to be licensed under the same terms. Further, certain open source licenses also include a provision that if Rockley enforces any patents against the software programs that are subject to the license, it will lose the license to such software. If Rockley were to fail to comply with the terms of such open source software licenses, such failures could result in costly litigation, lead to negative public relations, or require that it quickly find replacement software which may be difficult to accomplish in a timely manner.

Although Rockley monitors its use of open source software in an effort both to comply with the terms of the applicable open source licenses and to avoid subjecting its software to conditions it does not intend, the terms of many open source licenses have not been interpreted by U.S. or international courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on its ability to commercialize its product or operate its business. By the terms of certain open source licenses, Rockley could be required to release the source code of its software and to make its proprietary software available under open source licenses, if Rockley combines or distributes its software with open source

Exhibit 20
Page 2732

Table of Contents

software in a certain manner. In the event that portions of its software are determined to be subject to an open source license, Rockley could be required to publicly release the affected portions of its source code, re-engineer all, or a portion of, that software or otherwise be limited in the licensing of its software, each of which could reduce or eliminate the value of its product. Many of the risks associated with usage of open source software cannot be eliminated, and could negatively affect its business, results of operations, and financial condition.

### Customer-Related Risks

***Rockley currently has, and intends to target, customers and suppliers that are large corporations with substantial negotiating power, exacting product, quality, and warranty standards, and potentially competitive internal solutions. If Rockley is unable to sell its products to these customers or is unable to enter into agreements with customers and suppliers on satisfactory terms, its prospects and results of operations will be adversely affected.***

Many of Rockley's customers and suppliers, and potential customers, are large corporations with substantial negotiating power relative to it and, in some instances, may have internal solutions that are competitive to Rockley's products. Many of these large corporations that are customers or potential customers also have significant development resources, which may allow them to acquire or develop independently, or in partnership with others, competitive technologies. Meeting the technical requirements and securing design wins with any of these companies will require a substantial investment of Rockley's time and resources. Rockley cannot assure you that its products or technology will secure design wins from these or other companies or that it will generate meaningful revenue from the sales of its products to these key customers and potential customers. If Rockley's products are not selected by these large corporations or if these corporations develop or acquire competitive technology, it will have an adverse effect on Rockley's business.

***Rockley currently depends on a few large customers for a substantial portion of its revenue. The loss of, or a significant reduction in, orders from Rockley's customers, including its largest customer, could significantly reduce its revenue and adversely impact Rockley's operating results.***

Rockley believes that its operating results for the foreseeable future will continue to depend to a significant extent on revenue attributable to a few large customers, including Apple Inc., Rockley's largest customer, and Hengtong Rockley Technology Co., Ltd. ("HRT"), its second largest customer. Rockley's two largest customers collectively accounted for 82% and 100% of Rockley's revenue in 2021 and 2020, respectively. Revenue attributable to Rockley's largest customer accounted for the majority of its revenue in 2021 and 2020, respectively. Rockley anticipates revenue attributable to this customer will fluctuate from period to period, although it expects to remain dependent on this customer for a significant portion of its revenue for the foreseeable future. Rockley has a master supply and development agreement with this customer, which provides a general framework for Rockley's transactions with it. This agreement continues until either party terminates for material breach. Under this agreement, Rockley has agreed to develop and deliver new products to this customer at its request, provided it also meets Rockley's business purposes, and has agreed to indemnify it for intellectual property infringement or any injury or damages caused by Rockley's products. This customer does not have any minimum or binding purchase obligations to Rockley under this agreement and could elect to discontinue or reduce making purchases from Rockley with little or no notice.

HRT is a joint venture (the "JV") formed by Rockley with Jiangsu Hengtong Optic-Electric Co., Ltd. ("Hengtong"), a subsidiary of Hengtong Group, Co., Ltd., in 2017. Under the Sino-Foreign Equity Joint Venture Contract dated December 19, 2017 by and between Hengtong and Rockley Photonics Ltd, a wholly-owned subsidiary of Rockley (the "JV Agreement") and the related technology development agreement and license agreement, HRT must procure chipsets from Rockley for use in finished products and HRT owns the copyright in the final designs. HRT has a license to the underlying intellectual property in the reference designs and Rockley has certain non-compete obligations under the JV Agreement. During the years ended December 31, 2021 and 2020, Rockley made sales to HRT of $0.3 million and $5.3 million, respectively. See "*Certain Relationships and Related Party Transactions – Rockley – Hengtong JV*" and Notes 4 and 13 to the notes to Rockley's consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

In addition, customers may seek to enter into licensing arrangements in lieu of product purchases, which could negatively impact Rockley's revenue, and, to a lesser extent, Rockley's gross margins. If Rockley's customers were to choose to work with other manufacturers or its relationships with its customers is disrupted for any reason, it could have a significant negative impact on Rockley's business. Any reduction in sales attributable to Rockley's larger customers would have a significant and disproportionate impact on Rockley's business, financial condition, and results of operations.

Rockley's customers, or the distributors through which it sells to these customers, may choose to use products in addition to Rockley's, use a different product altogether, or develop an in-house solution. Any of these events could significantly harm its business, financial condition, and results of operations. In addition, if Rockley's distributors' relationships with Rockley's

36

Exhibit 20
Page 2733

end customers, including its larger end customers, are disrupted for inability to deliver sufficient products or for any other reason, it could have a significant negative impact on Rockley's business, financial condition, and results of operations.

***Rockley is dependent in part upon its relationships and alliances with industry participants to generate revenue, which involves risks and uncertainties.***

Rockley has, and in the future may, acquire interests in joint ventures, which may subject Rockley to risk because, among other things, Rockley cannot exercise sole decision-making power and its partners may have different economic interests than Rockley has. For example, Rockley currently holds a 24.9% share in a strategic joint venture with another industry participant and is currently in discussions regarding potential licensing of technology to the joint venture in return for future payments. Rockley is therefore dependent on the successful execution of a licensing agreement with this joint venture partner to generate additional revenue. Rockley may also acquire interests in other joint ventures with third parties. There are additional risks involved in joint venture transactions. For example, as a co-investor in a joint venture, Rockley may not be in a position to exercise sole decision-making authority relating to the joint venture or other entity. As a result, the operations of any joint venture are subject to the risk that third parties may make business, financial, or management decisions with which Rockley does not agree, or the management of the joint venture may take risks or otherwise act in a manner that does not serve Rockley's interests. Further, there may be a potential risk of impasse in some business decisions because Rockley may not be in a position to exercise sole decision-making authority. In such situations, it is possible that Rockley may not be able to exit the relationship because it may not have the funds necessary to complete a buy-out of the other partner or it may be difficult to locate a third-party purchaser for its interest. Because Rockley may not have the ability to exercise control over such operations, it may not be able to realize some or all of the benefits that it believes will be created from its involvement. In addition, there is the potential that a joint venture partner may become bankrupt or have divergent, conflicting, or inconsistent economic or business interests from Rockley. This could result in, among other things, exposing Rockley to liabilities of the joint venture in excess of its proportionate share of these liabilities. If any of the foregoing were to occur, Rockley's business, financial condition, and results of operations could suffer.

***If Rockley is unable to expand or further diversify its customer base, its business, financial condition, and results of operations could suffer.***

Rockley currently expects the composition of its largest customers to vary over time, and that revenue attributable to its largest customers in any given period may decline over time. Rockley's relationships with existing customers may deter potential customers who compete with these customers from buying Rockley's products. If Rockley is unable to expand or further diversify its customer base, it could harm its business, financial condition, and results of operations.

Rockley does not currently have any products in commercial production. Accordingly, Rockley views its current customer relationships in the following stages: (a) customers with whom it is "engaged", or in discussions with, regarding potential product features for incorporation into such customer's end products or (b) customers with whom it is "contracted" where Rockley has non-binding MOUs or development and supply agreements. These non-binding MOUs and development and supply agreements provide a general framework for Rockley's transactions with the customer and typically provide that Rockley will develop and deliver new products meeting the customer's specifications. These agreements do not contain any minimum or binding purchase obligations. If Rockley is unable to transition customers with whom it is engaged in discussions to contracted customers or if Rockley fails to otherwise attract new customers, it would negatively impact Rockley's ability to grow its business and gain market share, which in turn would harm Rockley's financial condition and results of operations.

***Because Rockley does not anticipate long-term purchase commitments with its customers, orders may be cancelled, reduced, or rescheduled with little or no notice, which in turn exposes Rockley to inventory risk, and may cause its business and results of operations to suffer.***

Rockley anticipates that its products will be sold directly to customers as well as through distributors and resellers, with, in certain cases, no long-term or minimum purchase commitments from them or their end customers. Rockley expects that sales of its products will be primarily made pursuant to standard purchase orders, which orders may be cancelled, reduced, changed, or rescheduled with little or no notice or penalty. Cancellations of orders could result in the loss of anticipated sales without allowing Rockley sufficient time to reduce its inventory and operating expenses. In addition, changes in forecasts or the timing of orders from its customers expose Rockley to the risks of inventory shortages or excess inventory. As a result, Rockley's revenue and operating results could fluctuate materially and could be materially and disproportionately impacted by purchasing decisions of Rockley's customers, including Rockley's larger customers. In the future, Rockley's customers or its distributors or their end customers may decide to purchase fewer units than expected, may alter their purchasing patterns at any time with

Exhibit 20
Page 2734

Table of Contents

Case 1:23-cv-10095-DLC Doc MRA-8 AA Filed 08/03/23 Document 34-10 Entered 08/03/22 17 09:1 Page 250 of Exhibit C 607
2022.03.10 - Rockley 2021 10-K Filing    Page 2021 10-K    Pg 50 of 126

limited or no notice, or may decide not to continue to purchase Rockley's products at all, any of which could cause Rockley's revenue to decline materially and materially harm Rockley's business, financial condition, and results of operations.

Cancellations of, reductions in, or rescheduling of customer orders could also result in the loss of anticipated sales without allowing Rockley sufficient time to reduce its inventory and operating expenses, as a substantial portion of Rockley's expenses are fixed at least in the short term. In addition, changes in forecasts or the timing of orders expose Rockley to the risks of inventory shortages or excess inventory. Any of the foregoing events could materially and adversely affect Rockley's business, financial condition, and results of operations.

***If Rockley is unable to establish and maintain confidence in its long-term business prospects among customers and analysts and within its industry or is subject to negative publicity, then Rockley's financial condition, operating results, business prospects, and access to capital may suffer materially.***

Rockley has not yet fully developed or commercialized its products or services and the successful commercialization of Rockley's products depends in part on Rockley's customers and potential customers committing to use Rockley's products in their own products. Customers may be less likely to purchase Rockley's products if they are not convinced that Rockley's business will succeed or that its service and support and other operations will continue in the long term. Similarly, suppliers and other third parties will be less likely to invest time and resources in developing business relationships with Rockley if they are not convinced that Rockley's business will succeed. If Rockley is unable to establish and maintain confidence in its long-term business prospects among customers, suppliers, analysts, ratings agencies, and within its industry or is subject to negative publicity, then Rockley's financial condition, operating results, business prospects, and access to capital may suffer materially.

***Rockley's investments in educating its customers and potential customers about the advantages of Rockley's silicon photonics and sensing technology and its applications will require significant financial and talent resources and may not result in sales of Rockley's products.***

Educating Rockley's prospective customers, and to a lesser extent, its existing customers, about Rockley's silicon photonics and sensing technology and its applications in health monitoring devices, its advantages over competitive technologies, and the potential application of Rockley's products in different industries and use cases is an integral part of Rockley's strategy to expand into additional markets. Rockley's efforts to educate potential customers and the market generally will require significant financial and talent resources. These educational efforts may not be successful and Rockley may not offset the costs of such efforts with revenue from the new customers. If Rockley is unable to acquire new customers to offset these expenses, its financial condition will be adversely affected.

***Rockley's business depends substantially on the efforts of its executive officers, including its Chief Executive Officer and founder, Dr. Andrew Rickman, OBE, and highly skilled talent, and its operations may be severely disrupted if it lost their services.***

Rockley is highly dependent on its founder, Dr. Andrew Rickman, OBE as well its other executive officers, and the loss of his services would adversely affect Rockley's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Rockley's research and development activities, and retain existing customers or cultivate new ones. Competition for highly-skilled talent is often intense and Rockley may incur significant costs to attract highly-skilled talent. Rockley may not be successful in attracting, integrating, or retaining qualified talent to fulfill its current or future needs. Rockley has, from time to time, experienced, and it expects to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications.

In addition, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of Rockley's equity or equity awards declines, it may adversely affect Rockley's ability to retain highly skilled employees. If Rockley fails to attract new talent or fails to retain and motivate its current talent, its business and future growth prospects could be adversely affected.

**Legal and Regulatory Risks Related to Rockley's Business**

***Rockley is subject to governmental export and import control laws and regulations. Rockley's failure to comply with these laws and regulations could have an adverse effect on its business, prospects, financial condition, and results of operations.***

Certain of Rockley's products and services are subject to export control and import laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations, and various economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Controls. U.S. export control laws and regulations

38

Exhibit 20
Page 2735

and economic sanctions prohibit the shipment of certain products and services to U.S. embargoed or sanctioned countries, governments and persons. In addition, complying with export control and sanctions regulations for a particular sale may be time-consuming and result in the delay or loss of sales opportunities. Exports of Rockley's products and technology must be made in compliance with these laws and regulations. If Rockley fails to comply with these laws and regulations, Rockley and certain of its employees could be subject to substantial civil or criminal penalties, including the possible loss of export or import privileges, fines, which may be imposed on Rockley and responsible employees or managers, and, in extreme cases, the incarceration of responsible employees or managers.

### Changes to trade policy, tariffs, and import/export regulations may have a material adverse effect on Rockley's business, financial condition, and results of operations.

Changes in global political, regulatory, and economic conditions, or in laws and policies governing foreign trade, manufacturing, development, and investment in the territories or countries where Rockley may purchase its components, sell its products, or conduct its business, could adversely affect Rockley's business. The United States has in the past instituted or proposed changes in trade policies that included the negotiation or termination of trade agreements, the imposition of higher tariffs on imports into the United States, economic sanctions on individuals, corporations, or countries, and other government regulations affecting trade between the United States and other countries where Rockley conducts its business. For instance, effective December 17, 2021, the U.S. Bureau of Industry and Security ("BIS") of the U.S. Department of Commerce placed Hengtong and certain of its affiliates on the BIS "Entity List," meaning that the U.S. Export Administration Regulations prohibit companies from providing products and technologies to organizations on the "Entity List" without prior authorization. In response to this decision, the Company terminated a planned technical sale to the JV. A number of other nations have proposed or instituted similar measures directed at trade with the United States in response. As a result of these developments or any future similar developments, there may be greater restrictions and economic disincentives on international trade and economic cooperation that could adversely affect Rockley's business. It may be time-consuming and expensive for Rockley to alter its business operations to adapt to or comply with any such changes, and any failure to do so could have a material adverse effect on its business, financial condition, and results of operations.

### Rockley may become involved in legal and regulatory proceedings and commercial or contractual disputes, which could have an adverse effect on its profitability and financial position.

Rockley may be, from time to time, involved in litigation, regulatory proceedings, and commercial or contractual disputes that may be significant. These matters may include, without limitation, disputes with Rockley's suppliers and customers, intellectual property claims, shareholder litigation, government investigations, class action lawsuits, personal injury claims, environmental issues, customs and value-added tax disputes, and employment and tax issues. In addition, Rockley could face in the future a variety of labor and employment claims against it, which could include but is not limited to general discrimination, wage and hour, privacy, ERISA, or disability claims. In such matters, government agencies or private parties may seek to recover from Rockley indeterminate amounts in penalties or monetary damages (including, in some cases, treble or punitive damages) or seek to limit Rockley's operations in some way. These types of lawsuits could require significant management time and attention or could involve substantial legal liability, adverse regulatory outcomes, and/or substantial expenses to defend. Often these cases raise complex factual and legal issues and create risks and uncertainties. No assurances can be given that any proceedings and claims will not have a material adverse impact on Rockley's operating results and financial position or that its established reserves or its available insurance will mitigate this impact.

### Rockley is subject to, and must remain in compliance with, numerous laws and governmental regulations across various jurisdictions concerning the use, distribution, and sale of its products. Some of Rockley's customers also require that it comply with their own unique requirements relating to these matters.

Rockley sells products that contain electronic components, and such components may contain materials that are subject to government regulation in locations where Rockley sells its products. For example, certain regulations limit the use of lead in electronic components. Since Rockley operates on a global basis, compliance with regulations is a complex process which requires continual monitoring of regulations and an ongoing compliance process to ensure that Rockley and its suppliers are in compliance with existing regulations in each market where it operates. If there is an unanticipated new regulation that significantly impacts Rockley's use and sourcing of various components or requires more expensive components, that regulation could materially and adversely affect its business, results of operations, and financial condition. Rockley's products may also be used in healthcare monitoring and other medical devices, which are subject to additional regulation. If Rockley fails to adhere to these new regulations or fails to continually monitor the updates, it may be subject to litigation, loss of customers, or negative publicity and its business, results of operations, and financial condition will be adversely affected.

Exhibit 20
Page 2736

***Rockley may in the future become subject to additional regulations, including Food and Drug Administration (the "FDA") clearance or approval, for health monitoring products in which Rockley's products are incorporated. Achieving and maintaining compliance and approval under applicable regulations may be difficult to achieve.***

Rockley's products may be incorporated into end products in the health monitoring sector, including products which collect clinical data. Accordingly, it is possible that certain of Rockley's products, or the end products which incorporate Rockley's products will be subject to current and future regulation by the FDA, as well as by other federal, state, and local agencies. As Rockley's target market is consumer wellness rather than medical, Rockley currently anticipates that FDA clearance will be unnecessary for its products targeting the consumer wearables market; however, Rockley intends to monitor and comply with regulations to the extent they become applicable to Rockley.

Manufacturers of medical devices are required to comply with applicable laws and regulations governing development, testing, manufacturing, labeling, marketing, and distribution of medical devices. Devices are generally subject to varying levels of regulatory control, based on the risk level of the device. Governmental regulations specific to medical devices are wide-ranging and govern, among other things:

- product design, development, and manufacture;

- laboratory, pre-clinical and clinical testing, labeling, packaging, storage, and distribution;

- premarketing clearance or approval;

- record-keeping;

- product marketing, promotion and advertising, sales, and distribution; and

- post-marketing surveillance, including reporting of deaths or serious injuries and recalls and correction and removals.

Rockley or its customers may not be able to obtain the necessary clearances or approvals for their products or may be unduly delayed in doing so, which could harm Rockley's business. Furthermore, even if Rockley is granted regulatory clearances or approvals, they may include significant limitations on the permitted uses for the product, which may limit the market potential for the product. Delays in obtaining clearance or approval could increase Rockley's costs and harm Rockley's revenue and growth.

Additionally, Rockley's products may be subject to regulation by similar agencies in other states and foreign countries. While Rockley believes that it has complied with all applicable laws and regulations, continued compliance with such laws or regulations, including any new laws or regulations, might impose additional costs on Rockley which could adversely affect its financial performance and results of operations.

***Rockley is subject to various environmental laws and regulations that could impose substantial costs upon Rockley.***

Concerns over environmental pollution and climate change have produced significant legislative and regulatory efforts on a global basis, and Rockley believes this will continue both in scope and in the number of countries participating. In addition, as climate change issues become more prevalent, foreign, federal, state, and local governments and Rockley's customers have been responding to these issues. The increased focus on environmental sustainability may result in new regulations and customer requirements, or changes in current regulations and customer requirements, which could materially and adversely impact Rockley's business, results of operations, and financial condition. If Rockley is unable to effectively manage real or perceived issues, including concerns about environmental impacts or similar matters, sentiments toward Rockley or its products could be negatively impacted, and its business, results of operations, or financial condition could suffer.

Rockley's operations are and will be subject to foreign, federal, state, and local environmental laws and regulations, and such laws and regulations could directly increase the cost of energy, which may have an effect on the way Rockley manufactures products or utilizes energy to produce its products. In addition, any new regulations or laws in the environmental area might increase the cost of raw materials or key components Rockley uses in its products. Environmental regulations require Rockley to reduce product energy usage, monitor and exclude an expanding list of restricted substances, and to participate in required recovery and recycling of its products. Environmental and health and safety laws and regulations can be complex, and Rockley has limited experience complying with them. Capital and operating expenses needed to comply with environmental laws and regulations can be significant, and violations may result in substantial fines and penalties, third-party damages, suspension of production, or a cessation of Rockley's operations.

Exhibit 20
Page 2737

The costs of complying with environmental laws and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on Rockley's financial condition or operating results. Rockley may face unexpected delays in obtaining the required permits and approvals in connection with its planned production facilities that could require significant time and financial resources and delay its ability to operate these facilities, which would adversely impact Rockley's business, prospects, financial condition, and operating results.

**Rockley is subject to U.S. and foreign anti-corruption and anti-money laundering laws and regulations. Rockley can face criminal liability and other serious consequences for violations, which can harm its business.**

Rockley is subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act, the U.K. Bribery Act of 2010, and possibly other anti-bribery and anti-money laundering laws in countries in which Rockley conducts activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and other collaborators from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. Rockley can be held liable for the corrupt or other illegal activities of its employees, agents, contractors, and other collaborators, even if Rockley does not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm, and other consequences.

**Failures, or perceived failures, to comply with privacy, data protection, and information security requirements in the variety of jurisdictions in which Rockley operates may adversely impact its business, and such legal requirements are evolving, uncertain, and may require improvements in, or changes to, Rockley's policies and operations.**

Rockley's current and potential future operations and sales are subject to laws and regulations addressing privacy and the collection, use, storage, disclosure, transfer, and protection of a variety of types of data. For example, the European Commission has adopted the General Data Protection Regulation and California recently enacted the California Consumer Privacy Act of 2018, both of which provide for potentially material penalties for non-compliance. These regimes may, among other things, impose data security requirements, disclosure requirements, and restrictions on data collection, uses, and sharing that may impact Rockley's operations and the development of its business. Rockley has limited access to collect, store, process, or share certain information collected by its products, and Rockley's products may evolve to collect additional information. Therefore, the full impact of these privacy regimes on Rockley's business is rapidly evolving across jurisdictions and remains uncertain at this time.

Rockley may also be affected by cyber-attacks and other means of gaining unauthorized access to its products, systems, and data. For instance, cyber criminals or insiders may target Rockley or third parties with which it has business relationships to obtain data, or in a manner that disrupts Rockley's operations or compromises its products or the systems into which its products are integrated. Due to the political uncertainty involving Russia and Ukraine, there is an increased likelihood that escalation of tensions could result in cyber attacks that could either directly or indirectly impact our operations.

Rockley is assessing the continually evolving privacy and data security regimes and measures it believes are appropriate in response. Since these data security regimes are evolving, uncertain, and complex, especially for a global business like Rockley, Rockley may need to update or enhance its compliance measures and these updates or enhancements may require implementation costs. In addition, Rockley may not be able to monitor and react to all developments in a timely manner. The compliance measures Rockley does adopt may prove ineffective. Any failure, or perceived failure, by Rockley to comply with current and future regulatory or customer-driven privacy, data protection, and information security requirements, or to prevent or mitigate security breaches, cyber-attacks, or improper access to, use of, or disclosure of data, or any security issues or cyber-attacks affecting Rockley, could result in significant liability, costs (including the costs of mitigation and recovery), and a material loss of revenue resulting from the adverse impact on its reputation and brand, loss of proprietary information and data, disruption to its business and relationships, and diminished ability to retain or attract customers and business partners. Such events may result in governmental enforcement actions and prosecutions, private litigation, fines, and penalties or adverse publicity, and could cause customers and business partners to lose trust in Rockley, which could have an adverse effect on its reputation and business.

Further, in the event Rockley's products, or the end products into which Rockley's products are incorporated, involve the collection of personal medical or clinical data, Rockley would be subject to additional privacy regulations. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regulations apply U.S. national standards for some types of electronic health information transactions and the data elements used in those transactions to ensure the integrity, security, and confidentiality of health information and standards to protect the privacy of individually identifiable health

41

Exhibit 20
Page 2738

Table of Contents

Case 1:23-cv-10095-DJC   Document 34-10   Filed 08/03/23   Entered 08/03/23 09:1P   Page 254 of 607
2022.03.10 - Rockley 2021 10-K Filing     Pg 54 of 126

information businesses receive, maintain or transmit. The Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act") expanded the scope of the privacy and security requirements under HIPAA and increased penalties for violations. In addition, the HITECH Act enacted federal breach notification rules requiring notification to affected individuals and the Department of Health and Human Services (and in some cases, relevant media outlets) whenever a breach of protected health information occurs. Rockley's failure to maintain confidentiality of sensitive protected health information or other personal information in accordance with the applicable regulatory requirements could damage its reputation and expose Rockley to claims, fines, and penalties. Rockley's business, operating results, and financial condition could also be negatively impacted by a violation of the HIPAA privacy or security rules or any other applicable privacy or data security law.

Many U.S. states and international jurisdictions in which Rockley operates also have laws and regulations that protect the privacy and security of confidential, protected health information, or other personal information and have similar or even more protection than U.S. federal regulations. Furthermore, state data breach notification laws continue to expand the type of protected health information and other personal information they encompass, and in many cases are more burdensome than the HIPAA/HITECH breach reporting requirements.

***Regulations related to conflict minerals may cause Rockley to incur additional expenses and could limit the supply and increase the costs of certain metals used in the manufacturing of its products.***

As a public company, Rockley is subject to the requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, that will require it to determine, disclose, and report whether its products contain conflict minerals. The implementation of these requirements could adversely affect the sourcing, availability, and pricing of the materials used in the manufacture of components used in Rockley's products. In addition, Rockley will incur additional costs to comply with the disclosure requirements, including costs related to conducting diligence procedures to determine the sources of conflict minerals that may be used in or necessary to the production of its products and, if applicable, potential changes to products, processes, or sources of supply as a consequence of such verification activities. It is also possible that its reputation may be adversely affected if Rockley determines that certain of its products contain minerals not determined to be conflict-free or if Rockley is unable to alter its products, processes, or sources of supply to avoid use of such materials.

**Risks Related to Rockley's Intellectual Property**

***Despite the actions Rockley is taking to defend and protect its intellectual property, Rockley may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Rockley's efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.***

The success of Rockley's products and its business depend in part on Rockley's ability to obtain patents and other intellectual property rights and maintain adequate legal protection for its products in the United States and other international jurisdictions. Rockley relies on a combination of patent, trademark, and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect its proprietary rights, all of which provide only limited protection.

As of December 31, 2021, Rockley had 192 issued and allowed patents and 90 other patent applications pending in the United States and 81 patents in foreign jurisdictions. The 192 issued and allowed patents in the United States expire in the years beginning in 2022 through 2040. The 81 patents in foreign jurisdictions include 51 in the United Kingdom, 26 in China, 1 in Europe, and 3 in Japan, and they expire in the years beginning 2027 through 2039. Many of Rockley's issued patents and pending patent applications relate to sensors and sensor chips.

Rockley cannot assure you that any patents will be issued with respect to its currently pending patent applications or that any trademarks will be registered with respect to its currently pending applications in a manner that gives Rockley adequate defensive protection or competitive advantages, if at all, or that any patents issued to Rockley or any trademarks registered by it will not be challenged, invalidated, or circumvented. Rockley may file for patents and trademarks in the United States and in certain international jurisdictions, but such protections may not be available in all countries in which it operates or in which Rockley seeks to enforce its intellectual property rights, or may be difficult to enforce in practice. For example, the legal environment relating to intellectual property protection in certain emerging market countries where Rockley may operate in the future is relatively weaker, often making it difficult to create and enforce such rights. Rockley's currently registered trademarks and any patents and trademarks that may be issued or registered, as applicable, in the future with respect to pending or future applications may not provide sufficiently broad protection or may not prove to be enforceable in actions against alleged infringers. Rockley cannot be certain that the steps it has taken will prevent unauthorized use of its technology or the reverse engineering of its technology. Moreover, others may independently develop technologies that are competitive to Rockley or infringe Rockley's intellectual property.

Exhibit 20
Page 2739

Table of Contents

Protecting against the unauthorized use of Rockley's intellectual property, products, and other proprietary rights is expensive and difficult, particularly internationally. Unauthorized parties may attempt to copy or reverse engineer Rockley's sensing technology or certain aspects of Rockley's products or manufacturing processes that it considers proprietary. Litigation may be necessary in the future to enforce or defend Rockley's intellectual property rights, to prevent unauthorized parties from copying or reverse engineering its products, or technology to determine the validity and scope of the proprietary rights of others or to block the importation of infringing products into the United States.

Any such litigation, whether initiated by Rockley or a third party, could result in substantial costs and diversion of management resources, either of which could adversely affect Rockley's business, operating results, and financial condition. Even if it obtains favorable outcomes in litigation, Rockley may not be able to obtain adequate remedies, especially in the context of unauthorized parties copying or reverse engineering its products or technology.

Further, many of Rockley's current and potential competitors have the ability to dedicate substantially greater resources to defending intellectual property infringement claims and to enforcing their intellectual property rights than Rockley has. Attempts to enforce its rights against third parties could also provoke these third parties to assert their own intellectual property or other rights against Rockley or result in a holding that invalidates or narrows the scope of Rockley's rights, in whole or in part. Effective patent, trademark, service mark, copyright, and trade secret protection may not be available in every country in which Rockley's products are available and competitors based in other countries may sell infringing products in one or more markets. Failure to adequately protect Rockley's intellectual property rights could result in Rockley's competitors offering similar products, potentially resulting in the loss of some of Rockley's competitive advantage and a decrease in its revenue, which would adversely affect Rockley's business, operating results, financial condition, and prospects.

***Third-party claims that Rockley is infringing intellectual property, whether successful or not, could subject Rockley to costly and time-consuming litigation or expensive licenses, and its business could be adversely affected.***

Although Rockley has applied for patents related to its products and technology, a number of companies hold patents covering aspects of sensing and photonic chip technologies. In addition to these patents, participants in this industry typically also protect their technology, especially embedded software, through copyrights and trade secrets. As a result, there is frequent litigation based on allegations of infringement, misappropriation, or other violations of intellectual property rights. Rockley may in the future receive inquiries from other intellectual property holders and may become subject to claims that it infringes their intellectual property rights, particularly as Rockley expands its presence in the market, expands to new use cases, and faces increasing competition. In addition, parties may claim that the names and branding of Rockley's products infringe their trademark rights in certain countries or territories. If such a claim were to prevail, Rockley may have to change the names and branding of its products in the affected territories and it could incur other costs.

Rockley currently has a number of agreements in effect pursuant to which it has agreed to defend, indemnify, and hold harmless its customers, suppliers, and channel partners and other counterparties from damages and costs which may arise from the infringement by Rockley's products of third-party patents or other intellectual property rights. The scope of these indemnity obligations varies, and, in some instances, include indemnification for damages and expenses, including attorneys' fees. Rockley's insurance may not cover all intellectual property infringement claims. A claim that its products infringe a third party's intellectual property rights, even if untrue, could adversely affect Rockley's relationships with its customers, may deter future customers from purchasing its products, and could expose Rockley to costly litigation and settlement expenses. Even if Rockley is not a party to any litigation between a customer and a third party relating to infringement by its products, an adverse outcome in any such litigation could make it more difficult for Rockley to defend its products against intellectual property infringement claims in any subsequent litigation in which it is a named party. Any of these results could adversely affect Rockley's brand and operating results.

Rockley may in the future need to initiate infringement claims or litigation to try to protect its intellectual property rights. In addition to litigation where Rockley is a plaintiff, Rockley's defense of intellectual property rights claims brought against it or its customers, suppliers, and channel partners, with or without merit, could be time-consuming, expensive to litigate or settle, divert management resources and attention, and force Rockley to acquire intellectual property rights and licenses, which may involve substantial royalty or other payments and may not be available on acceptable terms or at all. Further, a party making such a claim, if successful, could secure a judgment that requires Rockley to pay substantial damages or obtain an injunction and also Rockley may lose the opportunity to license its technology to others or to collect royalty payments. An adverse determination also could invalidate or narrow Rockley's intellectual property rights and adversely affect its ability to offer its products to its customers and may require that Rockley procure or develop substitute products that do not infringe, which could require significant effort and expense. Any of these events could adversely affect Rockley's business, reputation, operating results, financial condition, and prospects.

43

Exhibit 20
Page 2740

Table of Contents

***Rockley's intellectual property applications, including patent applications, may not be approved or granted or may take longer than expected to result in approval or grant, which may have a material adverse effect on Rockley's ability to prevent others from commercially exploiting products similar to Rockley's.***

Rockley cannot be certain that it is the first inventor of the subject matter to which it has filed a particular patent application, or if it is the first party to file such a patent application. If another party has filed a patent application to the same subject matter as Rockley has, Rockley may not be entitled to the protection sought by the patent application. Rockley also cannot be certain whether the claims included in a patent application will ultimately be allowed in the applicable issued patent or the timing of any approval or grant of a patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, Rockley cannot be certain that the patent applications that it files will issue, or that its issued patents will afford protection against competitors with similar technology. In addition, Rockley's competitors may design around Rockley's registered or issued intellectual property, which may adversely affect Rockley's business, prospects, financial condition, and operating results.

***In addition to patented technology, Rockley relies on its unpatented proprietary technology, trade secrets, designs, experiences, workflows, data, processes, software, and know-how.***

Rockley relies on proprietary information (such as trade secrets, designs, experiences, workflows, data, know-how, and confidential information) to protect intellectual property that may not be patentable or subject to copyright, trademark, trade dress, or service mark protection, or that Rockley believes is best protected by means that do not require public disclosure. Rockley generally seeks to protect this proprietary information by entering into confidentiality agreements, or consulting, services, or employment agreements that contain non-disclosure and non-use provisions with its employees, consultants, contractors, and third parties. However, these agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement, or misappropriation of its proprietary information, may be limited as to their term, and may not provide an adequate remedy in the event of unauthorized disclosure or use of proprietary information. Rockley has limited control over the protection of trade secrets used by its current or future manufacturing counterparties and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, Rockley's proprietary information may otherwise become known or be independently developed by its competitors or other third parties. To the extent that its employees, consultants, contractors, advisors, and other third parties use intellectual property owned by others in their work for Rockley, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of Rockley's proprietary rights, and failure to obtain or maintain protection for its proprietary information could adversely affect its competitive business position. Furthermore, laws regarding trade secret rights in certain markets where Rockley operates may afford little or no protection to its trade secrets.

Rockley also relies on physical and electronic security measures to protect its proprietary information, but it cannot provide assurance that these security measures will not be breached or provide adequate protection for its property. There is a risk that third parties may obtain and improperly utilize Rockley's proprietary information to its competitive disadvantage. Rockley may not be able to detect or prevent the unauthorized use of such information or take appropriate and timely steps to enforce its intellectual property rights.

***Rockley may be subject to damages resulting from claims that it or its current or former employees have wrongfully used or disclosed alleged trade secrets of its current or former employees' former employers. Rockley may be subject to damages if its current or former employees wrongfully use or disclose Rockley's trade secrets.***

Rockley may be subject to claims that it or its current or former employees have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of a current or former employee's former employers. Litigation may be necessary to defend against these claims. If Rockley fails to defend against such claims, in addition to paying monetary damages, it may lose valuable intellectual property rights or talent. A loss of key talent or their work product could hamper or prevent Rockley's ability to commercialize its products, which could severely harm its business. Even if Rockley is successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

**Risks Related to Infrastructure, Cybersecurity and Privacy**

***A network or data security incident may allow unauthorized access to Rockley's network or data, harm its reputation, create additional liability, and adversely impact its financial results.***

Rockley and its third-party service providers may face security threats and attacks from a variety of sources. In addition to traditional computer "hackers," malicious code (such as viruses and worms), phishing attempts, employee theft or misuse,

44

Exhibit 20
Page 2741

and denial of service attacks, sophisticated nation-state and nation-state supported actors engage in attacks (including advanced persistent threat intrusions) and increase the risks to Rockley's internal networks and customer facing environments and the information they store and process. These risks may increase due to COVID-19. A breach in Rockley's data or an attack against its service availability, or that of its third-party service providers, could impact Rockley's networks, creating system disruptions or slowdowns and exploiting security vulnerabilities of Rockley's products, and the information stored on Rockley's networks or those of its third-party service providers could be accessed, publicly disclosed, altered, lost, or stolen, which could subject Rockley to liability and cause it financial harm.

Unauthorized access by a third party to Rockley's internal network, any actual or perceived breach of network security in its systems or networks, or any other actual or perceived data security incident Rockley or its third-party service providers suffer, could result in damage to its reputation, negative publicity, loss of channel partners, end-customers and sales, loss of competitive advantages over its competitors, increased costs to remedy any problems and otherwise respond to any incident, regulatory investigations and enforcement actions, costly litigation, and other liability. In addition, Rockley may incur significant costs to investigate and remediate any security breaches and other security incidents. Rockley's data, corporate systems, third-party systems, and security measures may be breached due to the actions of outside parties, employee error, malfeasance, a combination of these, or otherwise, and, as a result, an unauthorized party may obtain access to its data. For example, in late 2020, Rockley was subject to phishing attacks, one involving a spoofed email whereby certain vendor account information was charged and payment was made to a fraudulent account and a second closely timed incident where a "forwarding" rule was applied to the spoofed email's recipient. While no personal data was accessed and the issue was addressed, the incident resulted in a net loss of approximately $66,345, which loss has been accounted for in Rockley's 2020 financial statements (which amount has been offset by a payout under our cybersecurity insurance policy in March 2021). While Rockley maintains cybersecurity insurance, such insurance may be insufficient to cover all liabilities incurred by these incidents, and any incidents may result in loss or increased costs of its cybersecurity insurance. Any of these negative outcomes could adversely impact the market perception of, and investor confidence in, Rockley.

***Any disruption or performance issues with Rockley's network infrastructure could harm its brand, reputation, and business.***

Rockley has experienced, and may in the future experience, disruptions, outages, and other performance problems due to a variety of factors, including infrastructure changes, human or software errors, capacity constraints, and fraud. Any disruptions or other performance problems with Rockley's products or reliability or security of Rockley's systems could harm its reputation, brand, and Rockley's business and operating results. In addition, Rockley must continually improve its computer network and infrastructure to avoid service interruptions or slower system performance. Rockley will need to devote additional resources to improving its platform architecture and its infrastructure. Any failure or delays in Rockley's computer systems could cause service interruptions or slower system performance. These performance issues could harm Rockley's business operations and financial condition.

***Rockley relies on third parties to maintain and operate certain elements of its network infrastructure.***

Rockley relies on third parties to operate and maintain certain elements of its network infrastructure. Interruptions in Rockley's systems or the third-party systems on which it relies, whether due to system failures, computer viruses, physical or electronic break-ins, or other factors, could affect the security or availability of Rockley's network infrastructure and website. Rockley's existing data center facilities and third-party hosting providers have no obligations to renew their agreements with Rockley on commercially reasonable terms or at all, and certain of the agreements governing these relationships may be terminated by either party at any time, with no or limited notice. If any of these arrangements with third parties are terminated, Rockley could experience interruptions, as well as downtime, delays, and additional expenses in arranging alternative cloud infrastructure services. Rockley may incur significant liability from those customers and from third parties with respect to any breach of security affecting third parties' infrastructure.

**Risks Related to Financial and Accounting Matters**

***Rockley's failure to raise additional capital or generate the significant capital necessary to expand its operations could reduce its ability to compete and could harm its business.***

Rockley intends to continue to make investments to support its product development efforts and overall business growth and may require additional funds to respond to business challenges, including the need to develop new features to enhance its products or acquire complementary businesses and technologies. Accordingly, Rockley may in the long-term need to engage in equity or debt financings to secure additional funds. If Rockley raises additional equity or equity-linked financing, shareholders may experience dilution of their ownership interests. Current and future indebtedness may also contain terms that, among other things, restrict Rockley's ability to incur additional indebtedness. Rockley may also be required to take other actions that would

Exhibit 20
Page 2742

otherwise be in the interests of the debt holders and would require it to maintain specified liquidity or other ratios, any of which could harm Rockley's business, operating results, and financial condition. Rockley may not be able to obtain additional financing on terms favorable to it, if at all. If Rockley is unable to obtain adequate financing or financing on satisfactory terms when required, Rockley's ability to continue to support its business growth and to respond to business challenges could be significantly impaired, and its business may be adversely affected.

***The nature of Rockley's business requires the application of complex revenue recognition rules. Significant changes in current principles will affect its consolidated financial statements and changes in financial accounting standards or practices may cause adverse, unexpected financial reporting fluctuations and harm its results of operations.***

The accounting rules and regulations with which Rockley must comply with are complex and subject to interpretation by the Financial Accounting Standards Board ("FASB"), the U.S. Securities and Exchange Commission (the "SEC"), and various bodies formed to promulgate and interpret appropriate accounting principles. In addition, many companies' accounting disclosures are being subjected to heightened scrutiny by regulators and the public. Further, the accounting rules and regulations are continually changing in ways that could impact Rockley's financial statements.

***In preparing Rockley's consolidated financial statements, Rockley makes good faith estimates and judgments that may change or turn out to be erroneous, which could adversely affect Rockley's operating results.***

In preparing Rockley's consolidated financial statements in conformity with GAAP, Rockley must make estimates and judgments in applying Rockley's most critical accounting policies. Those estimates and judgments have a significant impact on the results Rockley reports in its consolidated financial statements. The most difficult estimates and subjective judgments that Rockley makes relate to (i) revenue recognition including variable consideration, (ii) useful lives and recoverability of property and equipment and long-lived assets, (iii) incremental borrowing rates on the Company's finance and operating leases, (iv) valuation of our convertible loan notes, (v) valuation allowances for income taxes, (vi) stock-based compensation including the valuation of ordinary shares, (vii) valuation of warrants and (viii) contingencies. Rockley bases its estimates on historical experience, input from outside experts, and on various other assumptions that Rockley believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Rockley also has other key accounting policies that are not as subjective, and therefore, their application would not require Rockley to make estimates or judgments that are as difficult, but which nevertheless could significantly affect its financial reporting. Actual results may differ materially from these estimates. In general, if Rockley's estimates, judgments, or assumptions relating to its critical accounting policies are inaccurate or change or if actual circumstances differ from its estimates, judgments, or assumptions, including uncertainty in the current economic environment due to COVID-19, its operating results may be adversely affected and could fall below Rockley's publicly announced projections or the expectations of securities analysts and investors.

Additionally, Rockley regularly monitors its compliance with applicable financial reporting standards and review new pronouncements and drafts thereof that are relevant to it. As a result of new standards, changes to existing standards, and changes in their interpretation, Rockley might be required to change its accounting policies, alter its operational policies, and implement new or enhance existing systems so that they reflect new or amended financial reporting standards, or Rockley may be required to restate its published financial statements. Such changes to existing standards or changes in their interpretation may have an adverse effect on Rockley's reputation, business, financial position, and profit, or cause an adverse deviation from Rockley's revenue and operating profit target, which may negatively impact Rockley's financial results. For more information, refer to the section entitled *Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates*" in this Annual Report on Form 10-K.

***Rockley's ability to use its net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2021, Rockley had $132.3 million of U.K. net operating loss carryforwards available to reduce future taxable income and will be carried forward indefinitely. To the extent Rockley is not able to offset future taxable income with its net operating losses, Rockley's cash flows may be adversely affected.

**Risks Related to Being a Public Company**

***Rockley's management team has varying degrees of experience managing and operating a public company.***

Members of Rockley's management team have varying degrees of experience managing and operating a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Rockley's management team may not successfully or efficiently manage their new roles and responsibilities.

Exhibit 20
Page 2743

Rockley's transition to being a public company subjects it to significant regulatory oversight and reporting obligations under the U.S. securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from Rockley's senior management and could divert their attention away from the day-to-day management of Rockley's business. Rockley may not have adequate key talent with the appropriate level of knowledge, experience, and training in the accounting policies, practices, or internal controls over financial reporting required of public companies. The development and implementation of the standards and controls necessary to achieve the level of accounting standards required of a public company may require costs greater than expected. It is possible that Rockley will be required to expand its employee base and hire additional employees to support its operations as a public company which will increase its operating costs in future periods. These factors could adversely affect Rockley's business, financial condition, and operating results.

***If Rockley fails to maintain an effective system of internal controls, its ability to produce timely and accurate financial statements or comply with applicable regulations could be adversely affected.***

Rockley is subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, and the rules and regulations of the New York Stock Exchange ("NYSE"). Rockley expects that the requirements of these rules and regulations will continue to increase its legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on its talent, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that Rockley maintain effective disclosure controls and procedures and internal control over financial reporting. Rockley is continuing to develop and refine its disclosure controls, internal control over financial reporting, and other procedures that are designed to ensure that information required to be disclosed by it in the reports that it will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to Rockley's principal executive and financial officers.

Rockley's current controls and any new controls that it develops may be inadequate because of changes in conditions in its business. Further, additional weaknesses in Rockley's internal controls may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in their implementation or improvement, could adversely affect Rockley's operating results or cause it to fail to meet its reporting obligations and may result in a restatement of Rockley's financial statements for prior periods. Any failure to implement and maintain effective internal controls also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of Rockley's internal control over financial reporting that it is required to include in its periodic reports Rockley will file with the SEC under Section 404 of the Sarbanes-Oxley Act. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in Rockley's reported financial and other information.

In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, Rockley has expended and anticipates that it will continue to expend significant resources, including accounting-related costs, and provide significant management oversight. Any failure to maintain the adequacy of its internal controls, or consequent inability to produce accurate financial statements on a timely basis, could increase Rockley's operating costs and could materially and adversely affect its ability to operate its business. If Rockley's internal controls are perceived as inadequate or if it is unable to produce timely or accurate financial statements, investors may lose confidence in Rockley's operating results and the stock price could decline.

Rockley's independent registered public accounting firm is not required to formally attest to the effectiveness of its internal control over financial reporting until after Rockley is no longer an emerging growth company. At such time, Rockley's independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which Rockley's controls are documented, designed, or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the Rockley's business and operating results.

In addition to Rockley's results determined in accordance with GAAP, Rockley believes certain non-GAAP measures may be useful in evaluating its operating performance. Rockley presents certain non-GAAP financial measures in this Annual Report on Form 10-K and intends to continue to present certain non-GAAP financial measures in future filings with the SEC and other public statements. Any failure to accurately report and present its non-GAAP financial measures could cause investors to lose confidence in its reported financial and other information, which would likely have a negative effect on the trading price of its ordinary shares.

Exhibit 20
Page 2744

***The requirements of being a public company may strain Rockley's resources, divert management's attention, and affect its ability to attract and retain qualified board members.***

Rockley is subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Compliance with these rules and regulations will increase Rockley's legal and financial compliance costs, make some activities more difficult, time-consuming, or costly, and increase demand on its systems and resources. Among other things, the Exchange Act requires that public companies file annual, quarterly, and current reports with respect to their business and operating results. In addition, the Sarbanes-Oxley Act requires, among other things, that companies maintain effective disclosure controls and procedures and internal control over financial reporting. In order to meet the requirements of this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could harm Rockley's business and operating results. Although Rockley has already hired additional employees to comply with these requirements, it may need to hire even more employees in the future and will need to engage its auditors to review its quarterly and annual reports, which will increase its costs and expenses.

In addition, changing laws, regulations, and standards related to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs, and making some activities more time-consuming. These laws, regulations, and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. Rockley intends to invest resources to comply with evolving laws, regulations, and standards, and this investment may result in increased general and administrative expense and a diversion of management's time and attention from revenue-generating activities to compliance activities. If Rockley's efforts to comply with new laws, regulations, and standards differ from the activities intended by regulatory or governing bodies, regulatory authorities may initiate legal proceedings against Rockley and its business may be harmed.

## General Risks

***The global COVID-19 pandemic could harm Rockley's business and results of operations.***

On March 11, 2020, the World Health Organization characterized the outbreak of COVID-19 as a global pandemic and recommended containment and mitigation measures. Since then, extraordinary actions have been taken by international, federal, state, and local public health and governmental authorities and organizations to contain and combat the outbreak and spread of COVID-19 in regions throughout the world. These actions include travel bans, quarantines, "stay-at-home" orders, and similar mandates and guidelines for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations.

The COVID-19 pandemic has negatively impacted, and will likely continue to have a negative impact on, worldwide economic activity and financial markets and has impacted, and will further impact, Rockley's workforce and operations, the operations of its customers, and those of their respective channel partners, vendors, and suppliers. In light of the uncertain and evolving situation and various international and government restrictions and guidelines, Rockley has taken measures intended to mitigate the spread of the virus and minimize the risk to its employees, channel partners, end-customers, and the communities in which it operates. Certain key laboratory employees and facilities were designated as Essential Critical Infrastructure and Rockley was able to continue internal testing and laboratory work to the extent necessary to service customer commitments. To facilitate on-site operations, revised operational and manufacturing plans were implemented that conform to COVID-19 precautionary health guidelines, including universal requirement of facial coverings, rearranging facilities to follow social distancing protocols, conducting active daily temperature checks, regular and thorough disinfecting of surfaces and tools, and regular testing of its employees for COVID-19. The remaining non-essential workforce was required to perform their duties from home.

Rockley intends to continue to monitor the situation and may adjust its current policies as more information and public health guidance become available. Any precautionary measures that Rockley has adopted or may adopt could negatively affect Rockley's sales and marketing efforts, delay and lengthen its sales cycles, and create operational or other challenges, any of which could harm its business and results of operations. In addition, COVID-19 may disrupt the operations of Rockley's customers and channel partners for an indefinite period of time, including as a result of travel restrictions and/or business shutdowns, all of which could negatively impact Rockley's business and results of operations, including cash flows.

The ongoing impact will depend on the duration of the pandemic, which is being mitigated by advances in the treatment of the disease, prevention efforts including vaccines, broad government measures to contain the spread of the virus, and related government stimulus measures. However, should Rockley experience sustained impact from the pandemic, additional actions

48

Exhibit 20
Page 2745

such as cost reduction measures may need to be implemented. The impact of COVID-19 is fluid and uncertain, but it has caused and may continue to cause various negative effects, including an inability to meet with actual or potential customers; customers deciding to delay or abandon their planned product development programs and product commercialization timelines; increased requests for delayed payment terms by customers and channel partners; changes in the demand of Rockley's products, which may cause it to reprioritize its engineering and research and development efforts; and delays or possible disruptions in its supply chain. Until the COVID-19 pandemic is contained and global economic activity stabilizes, it will continue to be more difficult for Rockley to forecast its operating results.

***The recurrence or continued effects of a global economic downturn as a result of the COVID-19 pandemic, political instability, and geopolitical conflicts could have an adverse effect on Rockley's business and operating results.***

Rockley operates globally and as a result its business and revenue are impacted by global macroeconomic conditions. The multinational efforts to contain the spread of COVID-19 had a significant adverse effect on the global macroeconomic environment. In addition, the instability in the global credit markets, uncertainties regarding the effects of Brexit, uncertainties related to the timing of the lifting of governmental restrictions to mitigate the spread of COVID-19, uncertainties related to changes in public policies such as domestic and international regulations, taxes, or international trade agreements, international trade disputes, government shutdowns, geopolitical turmoil such as the conflict between Russian and Ukraine, and other disruptions to global and regional economies and markets could continue to add uncertainty to global economic conditions.

These adverse conditions could result in longer sales, development, and production cycles, slower adoption of new technologies, and increased price competition. As a result, any continued or further uncertainty, weakness, or deterioration in global macroeconomic and market conditions may cause Rockley's customers to modify spending priorities or delay purchasing decisions, and result in lengthened sales, development, and production cycles, any of which could harm its business and operating results.

***Rockley is an "emerging growth company" within the meaning of the Securities Act, and if it takes advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make Rockley's securities less attractive to investors and may make it more difficult to compare Rockley's performance to the performance of other public companies.***

Rockley is an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups, or JOBS Act. As such, the Company is eligible for and intends to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as it continues to be an emerging growth company, including (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act, (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements and (iii) reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements. The Company will remain an emerging growth company until the earliest of (i) the last day of the fiscal year in which the market value of Company ordinary shares that are held by non-affiliates exceeds $700 million as of June 30 of that fiscal year, (ii) the last day of the fiscal year in which it has total annual gross revenue of $1.07 billion or more during such fiscal year (as indexed for inflation), (iii) the date on which it has issued more than $1 billion in non-convertible debt in the prior three-year period or (iv) the last day of the fiscal year following the fifth anniversary of the date of the first sale of SC Health Ordinary shares in the IPO. In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as the Company is an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. Rockley has elected not to opt out of such extended transition period and, therefore, Rockley may not be subject to the same new or revised accounting standards as other public companies that are not emerging growth companies. Investors may find Rockley's ordinary shares less attractive because the Company will rely on these exemptions, which may result in a less active trading market for Rockley's ordinary shares and their price may be more volatile.

***Several of Rockley's directors and officers live outside the United States and certain assets of Rockley are located outside the United States; therefore, investors may not be able to enforce federal securities laws or their other legal rights.***

Several of Rockley's directors and officers reside outside of the United States and certain assets of the Company are located outside of the United States. As a result, it may be difficult, or in some cases not possible, for investors in the United States to enforce their legal rights, to effect service of process upon Rockley or any of its directors or officers or to enforce

Exhibit 20

Page 2746

Table of Contents

judgments of U.S. courts predicated upon civil liabilities and criminal penalties on its directors and officers under U.S. laws, including federal securities laws.

***If securities or industry analysts do not publish or cease publishing research or reports about Rockley, its business, or its market, or if they change their recommendations regarding Rockley's securities adversely, the price and trading volume of Rockley's securities could decline.***

The trading market for Rockley's securities will be influenced by the research and reports that industry or securities analysts may publish about the Company, its business, market or competitors. If any of the analysts who cover Rockley change their recommendation regarding Rockley's shares adversely, or provide more favorable relative recommendations about Rockley's competitors, the price of Rockley's shares would likely decline. If any analyst who covers Rockley were to cease coverage of Rockley or fail to regularly publish reports on it, Rockley could lose visibility in the financial markets, which in turn could cause its share price or trading volume to decline.

**Item 2.          Properties**

As at December 31, 2021, we held interest in 13 properties. All of our facilities are located on real estate that is leased from third parties. Our properties consisted of (1) 10 office and/or lab properties, (2) two corporate apartment properties, and (3) one clinical trials property. Our headquarters are currently located in the United Kingdom.

In the US, we have premises in Pasadena, California, US under multiple leases for approximately 18,000 square feet. The majority of the premises in Pasadena leased expire in June 2023 and are predominantly used for engineering and finance and general administration services. We also lease spaces in Irvine, California for approximately 12,800 square feet under multiple leases all expiring in 2027, predominantly used for engineering and general administration services; we lease a property in San Jose, California for approximately 4,600 square feet under a lease expiring in 2024, which is predominantly used for finance and general administration services; we lease separate small office spaces in Irvine, California and Bloomington, Minnesota and; we also lease two corporate apartments in Pasadena, California.

In the United Kingdom, we have a lease on our lab facilities in Wales for approximately 1,733 square feet, due to expire in 2024. Across Europe, we also operate our research, administrative and support functions out of small leased office spaces in Wiltshire, UK; Oxford, UK; Espoo, Finland; Cork, Ireland; Zug, Switzerland.

**Item 3.          Legal Proceedings**

We are from time to time subject to various claims, lawsuits and other legal and administrative proceedings arising in the ordinary course of business. Some of these claims, lawsuits and other proceedings may involve highly complex issues that are subject to substantial uncertainties, and could result in damages, fines, penalties, non-monetary sanctions or relief. However, we do not consider any such claims, lawsuits or proceedings that are currently pending, individually or in the aggregate, to be material to our business or likely to result in a material adverse effect on our future operating results, financial condition or cash flows.

**Item 4.          Mine Safety Disclosures**

Not applicable.

Exhibit 20
Page 2747

Case 1:23-cv-00095-MRD-PAS   Document 34-10   Entered 08/03/23 09:11   Page 263 of 607
Case 1:23-cv-00095   Doc RAI-84   Filed 03/03/23   Exhibit C

2022.03.10 - Rockley 2021 10-K Filing    Pg 63 of 126

Table of Contents

# PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

### Market Information

Our ordinary shares and public warrants are traded on the NYSE under the symbol "RKLY" and "RKLY.WS."

### Holders

As of March 10, 2022, there were approximately 153 holders of record of our ordinary shares.

### Dividend Policy

We have not paid any cash dividends on our ordinary shares to date. We may retain future earnings, if any, for future operations, expansion and debt repayment and we have no current plans to pay cash dividends for the foreseeable future. Any decision to declare and pay dividends in the future will be made at the discretion of our board of directors and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that our board of directors may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness we or our subsidiaries incur. We do not anticipate declaring any cash dividends to holders of the ordinary shares in the foreseeable future.

### Recent Sales of Unregistered Equity Securities

None.

### Purchases of Equity Securities by the Issuer and Affiliated Purchaser

None.

**Item 6.    Selected Financial Data**

The Company is a smaller reporting company, as defined by Rule 12b-2 of the Securities Exchange Act of 1934, as amended, and is not required to provide this item.

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operation**

*The following discussion and analysis provides information that Rockley's management believes is relevant to an assessment and understanding of Rockley's consolidated results of operations and financial condition. The discussion should be read together with the audited annual consolidated financial statements as of and for the years ended December 31, 2021 and 2020 and the related notes thereto, included elsewhere in this Annual Report on Form 10-K. This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements. Unless the context otherwise requires, references in these notes to "Rockley", the "Company", "we", "us", or "our" and any related terms are intended to mean the Company, Rockley Photonics Holdings Limited, while "Legacy Rockley" and "SC Health" refers to the entities prior to the Business Combination.*

### Overview

We have developed a unique sensing platform that we believe can reshape the wellness and healthcare industries through multiple applications in non-invasive, multi-modal biomarker monitoring. We believe products based on our technology platform could have the potential to unlock and accelerate advancements in areas such as early disease detection, nutrition management, and preventative healthcare delivery through continuous health and wellness monitoring.

51

Exhibit 20
Page 2748

To date, we have been engaged in developing customer-specific designs of our silicon photonics chipsets for incorporation into our customers' end products. Accordingly, all of our products are presently in the development stage and we do not currently have any of our own end products in commercial production and have not yet shipped any products commercially. Our unique sensing platform has been built upon our silicon photonics technology, which enables compelling sensor performance, power, resolution, and density. This technology has the potential to allow monitoring devices, currently the size of clinical machines, to be condensed to the size of a wearable device. We believe this in turn has the potential to unlock additional uses in consumer electronics and medical devices. The resulting combination of technologies and manufacturing know-how is the "full-stack Rockley Platform" which is made up of PICs in silicon with integrated III-V devices (devices incorporating certain conductor elements that offer superior electronic properties, such as lasers), ASICs, photonic and electronic co-packaging, together with biosensing algorithms and AI cloud analytics, firmware/software, system architecture, and hardware design.

As testament to the relevance of our product development, we have captured the attention of several consumer electronics companies and, as of the date of this Annual Report on Form 10-K, we have established strategic relationships with six of the world's top-ten largest manufacturers of smart watches and wristbands (based on volume as reported by IDC). We plan to leverage this attention to develop new capabilities in consumer wearables in the near term, and to expand over time into medical devices and other industry applications.

Our vision is to address many pressing healthcare concerns using our technology and we believe that there exists a large market opportunity for our platform. We estimate that the TAM for the consumer wearables, mobile device, and medical device markets is projected to be over $48 billion by 2025, based on data sourced from the Yole Report, the IDtexEx Report, the TrendForce Report, and our internal volume forecasts for smartphone, smart watch, and smart earbuds through 2025 (based on customer data), as the universe of healthcare and consumer wearable devices incorporating additional sensing capabilities emerges. Our target biomarkers for consumer healthcare include lactate, alcohol, glucose (indicator), carbon monoxide, blood pressure, blood oxygen, and core body temperature, among others. Our high-performance lasers have up to 1,000,000 times higher resolution, 1,000 times higher accuracy and 100 times broader range in wavelengths compared with existing LED offerings in wearable solutions (based on product analysis undertaken by Rockley comparing the Rockley silicon photonics-based spectrometer chip to existing solutions). We believe our platform will also be able to address existing applications in consumer wearable devices with significantly higher resolution, accuracy, and range. Further, we believe there are multiple additional markets and concrete opportunities for our technology platform in areas such as data center connectivity (optical transceivers), machine vision (robotic and automotive LiDAR), and compute connectivity (co-packaged optics, or CPO).

To date, we have generated revenue primarily from non-recurring engineering ("NRE") and development services for customer-specific designs of silicon photonics chipsets for incorporation into their customers' end products and we have financed our operations primarily through the Business Combination, issuance of convertible loan notes, as well as private placements of ordinary shares. From the date of our formation through December 31, 2021, we have raised aggregate gross proceeds of approximately $290.0 million from the issuance of convertible loan notes and ordinary shares. For the year ended December 31, 2021, we incurred a net loss of $168.0 million and utilized $126.0 million in cash to fund our operations.

We expect both our capital and operating expenditures will increase significantly in connection with our ongoing activities, as we:

- continue to invest in our technology and our silicon photonics solutions;

- continue to develop innovative solutions and applications for our technology;

- commercialize our silicon photonics solutions;

- continue to invest in our sales and marketing activities and distribution channels;

- invest and improve our operational, financial, and management information systems;

- retain key talent and increase our headcount;

- maintain and expand our intellectual property portfolio; and

- enhance internal functions to support our operations as a public company.

**Impact of COVID-19**

The COVID-19 global pandemic has prompted extraordinary measures by governments and businesses to contain and combat the spread of COVID-19 in regions throughout the world. These actions include travel bans, quarantines, "stay-at-

Exhibit 20
Page 2749

home" orders, and similar mandates for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations.

The COVID–19 pandemic has adversely impacted our operational efficiency and caused delays in operational activities. For the year ended December 31, 2021, we continue to take cautious steps to protect our workforce, support community efforts, and follow local government guidelines. Certain key laboratory employees and facilities have continued internal testing and laboratory work to the extent necessary to service customer commitments. The remaining non-essential workforce were recommended to continue performing their duties from home. The ongoing impact will depend on the duration of the pandemic which is being mitigated by the vaccination of the general population and gradual easing of restrictions. For more information on risks associated with the COVID-19 pandemic and regulatory actions, see "Risk Factors — General Risks."

**Comparability of Financial Information**

Our results of operations and statements of assets and liabilities may not be comparable between periods as a result of the Business Combination and becoming a public company. As a consequence of the Business Combination, we became a NYSE listed company, which will require us to hire additional personnel and implement procedures and processes to address public company regulatory requirements and customary practices. We expect to incur additional annual expenses as a public company for, among other things, directors' and officers' liability insurance, director fees and additional internal and external accounting, legal and administrative resources, including increased audit, compliance, and legal fees.

**Business Combination and Public Company Costs**

As described in "Note 1 – Description of Business and Significant Accounting Policies" and "Note 2 – Note 2 – Business Combination" of the notes to the consolidated financial statements, we completed the Business Combination on August 11, 2021, with Legacy Rockley surviving the Business Combination as a wholly owned subsidiary of the Company.

Prior to the Business Combination, Legacy Rockley financed its operations primarily from the issuance of convertible loan notes and private placements of ordinary shares. From the date Legacy Rockley was incorporated in 2013 through August 11, 2021, the date of the consummation of the Business Combination, Legacy Rockley raised aggregate gross proceeds of approximately $290.0 million from the issuance of convertible loan notes and ordinary shares.

Upon the consummation of the Business Combination, we issued 104.0 million shares of ordinary shares for all the issued and outstanding equity interests of Legacy Rockley inclusive of ordinary shares issued in exchange for the issued and outstanding convertible loan notes (inclusive of interest accrued thereon) and warrants, as if each had converted into the Company's ordinary shares immediately prior to the Business Combination. In addition, certain accredited investors (including entities affiliated with the SC Health Sponsor) purchased an aggregate of 15.0 million ordinary shares for a purchase price of $10.00 per share, or an aggregate purchase price of $150.0 million. The net cash received from the Business Combination after underwriter and transaction costs was $122.5 million.

Exhibit 20
Page 2750

Table of Contents

The Business Combination was accounted for as a forward recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, SC Health was treated as the acquired company and Rockley was deemed to be the accounting acquirer for financial reporting purposes. This determination was primarily based on the evaluation of the following facts and circumstances:

- Legacy Rockley's existing shareholders hold a majority voting interest in the combined company, and as such, have the power to appoint a majority of the members of the Company's Board;

- Legacy Rockley's senior management team comprise the majority of the senior management of the combined company;

- Legacy Rockley is the larger of the companies based on historical operating activity and employee base; and

- Legacy Rockley's operations comprise the ongoing operations of the combined entity.

Accordingly, for accounting purposes, the financial statements of the Company represent a continuation of the financial statements of Legacy Rockley with the acquisition being treated as the equivalent of Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization.

As a consequence of the Business Combination, the Company became an SEC-registered and NYSE-listed company, which requires us to hire additional talent and implement procedures and processes to address public company regulatory requirements and customary practices. We expect to incur incremental annual expenses as a public company for, among other things, increased directors' and officers' liability insurance; director fees; and additional internal and external accounting, legal, and administrative resources.

**Key Factors Affecting Operating Results**

We believe that our performance and future success depend on several factors that present significant opportunities for us but also pose risks and challenges, including, without limitation, the following:

*Resource Constraints*

Our products are currently under development and we do not have any products in commercial production. Our ability to achieve our product roadmaps and development timelines, including our ability to commence commercial production of our products, may be impacted by resource constraints, including the need for additional capital. We have a history of losses and our determination of substantial doubt as a going concern could materially limit our ability to raise additional funds through the issuance of equity securities or otherwise. Further, our products must also meet certain technical standards and customer requirements, which in turn require additional funds and other resources. Additional financing and resources may not be available to us when needed or on commercially reasonable terms.

*Ability to Achieve Design Wins or Long-Term Production Contracts*

We may engage in discussions with customers and co-develop products but we may not be able to convert the relationship into a design win or a long-term production contract due to resource constraints, delays, or technical challenges. We work closely with our customers and potential customers to understand their product roadmaps and strategies. Our customers also continuously develop new products in existing and new application areas. We believe achieving design wins and the ability to secure long-term production contracts will be critical to our future success. The selection process is typically lengthy and may require us to incur significant design and development expenditures in pursuit of a design win with no assurance that our products will be selected. The failure to secure a design win or long-term production contract could adversely affect our business.

*Customer Orders and Forecasts*

We currently anticipate that sales of our future products will be made pursuant to standard purchase orders, which may be cancelled, reduced, or rescheduled with little or no notice and without penalty. Cancellations of orders could result in the loss of anticipated sales without allowing us sufficient time to reduce our inventory and operating expenses. In addition, changes in forecasts or the timing of orders from customers, including if and when we commence commercial production of our products, could expose us to the risks of inventory shortages or excess inventory.

54

Exhibit 20
Page 2751

### Pricing and Customer Demand

We expect our operating results, including if and when we commence commercial production of our products, will be impacted by the pricing of our products, our average selling prices, and fluctuations in customer purchasing volumes. If and when we begin commercial production of our products, we may not be able to fulfill customer demand in a timely manner or at all. We monitor and work to reduce our product manufacturing costs and improve the potential value our products can provide to our customers' end products. The cost of raw materials and components critical for the manufacture of our anticipated products is largely out of our control and may fluctuate significantly. Since we rely on third-party wafer foundries and assembly and test contractors to manufacture, assemble, and test our products, we maintain a close relationship with our suppliers to improve quality, increase yields, and lower manufacturing costs.

### New Markets and Applications

As we evaluate potential markets and applications for the products we are developing, we analyze forecasts by industry analysts, the adoption curve of technology, and potential competing forces that could hinder such adoption. If we fail to anticipate or respond to technological shifts or market demands, or to timely develop products or technologies in response to the same, it could result in our inability to achieve revenue growth and could harm our business and operations.

### Cyclical Nature of the Semiconductor Industry

The semiconductor industry is highly cyclical and is characterized by constant and rapid technological change, rapid product obsolescence, price erosion, evolving standards, short product life cycles, and wide fluctuations in product supply and demand. Downturns in the semiconductor industry have been characterized by diminished product demand, production overcapacity, high inventory levels, and accelerated erosion of average selling prices. Any prolonged or significant downturn in the semiconductor industry generally could adversely affect our business and reduce demand for our products and otherwise harm our financial condition and results of operations.

See the *"Risk Factors"* section of this annual report on Form 10-K for additional discussion of the risks and challenges facing our business.

### Basis of Presentation

Currently, we conduct business through one operating and reportable segment. All long-lived assets are maintained in, and all losses are attributable to the one segment. See Note 1 in our accompanying audited consolidated financial statements for more information about our operating segment.

### Components of Results of Operations

The following discusses certain line items in our consolidated statements of operations and comprehensive loss.

### Revenue

To date, we have primarily generated revenue from development services, which entail developing customer-specific designs of silicon photonics chipsets. Our contracts with customers include specific achievement of agreed-upon projects and a substantive acceptance criteria for each agreed-upon project. In the event an agreed-upon project is successful and the customer provides acceptance, we allocate the contract consideration related to the performance obligations that are satisfied during the period and recognize the revenue at that point in time.

Following the completion of our product development phase and introduction of our spectra-sense chipsets to the wearable devices market, we expect the majority of our revenue to be derived from sales of high-volume consumer wearable products. In addition, we plan to offer advanced module applications with biomarker detection capabilities for advanced health metrics that can detect, classify, and potentially prevent disease. We also expect to offer a cloud analytics platform to provide a full range of subscription services, including the deployment of our technology through a subscription and cloud-based software as a service.

### Cost of Revenue

To date, our cost of revenue has included cost related to our development services, which include cost of materials, cost associated with packaging and assembly, testing and shipping, cost of talent, including stock-based compensation, and

Exhibit 20
Page 2752

equipment associated with manufacturing support, logistics, and quality assurance, overhead, and occupancy costs. Once we commence commercial production of our silicon photonics chipsets, cost of revenues will include direct parts, material, and labor costs, manufacturing overhead, including amortized tooling costs, shipping and logistics costs, and reserves for estimated warranty expenses.

### Gross Profit and Gross Margin

Gross profit is calculated based on the difference between our revenue and cost of revenue. Gross margin is the percentage obtained by dividing gross profit by our revenue. As we approach commercial production of spectra-sense chipsets, advanced module applications, and Rockley Photonics Cloud Analytics technology, we expect our gross profit and gross margin to vary.

### Selling, General, and Administrative Expense

Selling, general, and administrative expenses consist of human capital related expenses for employees involved in general corporate functions, including executive management and administration, accounting, finance, tax, legal, information technology, marketing, and human resources; depreciation expense and rent relating to facilities; travel costs; professional fees; and other general corporate costs. Human capital expenses primarily include salaries, benefits, bonuses, and stock-based compensation. We expect our selling, general and administrative expense to increase in absolute dollars for the foreseeable future as we increase our headcount to support the growth of our business, and as a result of operating as a public company, including compliance with the rules and regulations of the SEC, legal, audit, additional general and director and officer insurance expenses, investor relations activities, and other administrative and professional services.

### Research and Development Expense

Research and development expense consists primarily of talent costs for engineers and third parties engaged in the design and development of products, software, and technologies, including salary, bonus, and stock-based compensation expense, project material costs, services, and depreciation of our research and development facilities and equipment. We expense research and development costs as they are incurred. Research and development expense also includes the research and development tax credits that we are able to claim in accordance with the relevant U.K. tax legislation. These tax credits are payable to us in cash and are carried on the consolidated balance sheets at the amount claimed and expected to be received from the U.K. government within the next 12 months. We expect research and development expense to increase in absolute dollars as we continue to invest in the development of our products and technology.

### Other Income (Expense)

Other income consists of miscellaneous non-operating items, such as forgiveness of debt and related accrued interest.

### Interest Income (Expense)

Interest income consists primarily of interest received or earned on our cash, cash equivalents, and investment balances held in interest-bearing deposit accounts. Interest expense consists of interest paid on our convertible loan notes and capital lease obligations.

### Equity Method Investment

Equity method investments consist of entities over which we have significant influence but not control or joint control. Under the equity method of accounting, all of our investments are initially recognized at cost and adjusted thereafter to recognize our share of the post-acquisition profits or losses of the investee in our consolidated statements of operations.

### Change in Fair Value of Debt Instruments

Gains or losses from the change in fair value of debt instruments are recorded from the remeasurement of the fair value of our convertible loan notes using a discounted cash flow methodology based upon certain valuation assumptions.

56

Exhibit 20
Page 2753

Table of Contents

Case 1:23-cv-01095-MRA-8AA Filed 03/03/23 Entered 08/03/22 23:09:19 Exhibit C
2022.03.10 - Rockley 2021 10-K Filing     Pg 69 of 126

*Change in Fair Value of Warrant Liabilities*

Gains or losses from the change in fair value of warrants are recorded from the remeasurement of the fair value of our private placement warrants based upon certain valuation assumptions.

*Gain (Loss) on Foreign Currency*

We have significant international operations that are denominated in foreign currencies, primarily the British Pound and Euro, subjecting us to foreign currency exchange risk that may adversely impact our financial results. We calculate the year-over-year impact of foreign currency movement on our business using foreign currency exchange rates that are applied to transactional currency amounts.

*Provision for Income Tax*

We are subject to income taxes in the United Kingdom, the United States, Finland, Ireland, and Switzerland. Our income tax provision consists of an estimate of federal, state, and foreign income taxes based on enacted federal, state, and foreign tax rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws. Due to cumulative losses, we maintain a valuation allowance against our U.S. federal and foreign deferred tax assets.

**Results of Operations for the Years Ended December 31, 2021 and 2020**

The following table sets forth our historical operating results for the periods indicated (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| Revenue | $ 8,213 | $ 22,343 |
| Cost of revenue | 11,416 | 24,240 |
| Gross profit | (3,203) | (1,897) |
| Operating expenses: |  |  |
| Selling, general, and administrative expenses | 39,976 | 20,260 |
| Research and development expenses | 72,573 | 35,900 |
| Total operating expenses | 112,549 | 56,160 |
| **Loss from operations** | (115,752) | (58,057) |
| Other income (expense): |  |  |
| Forgiveness of PPP loan | 2,860 | — |
| Interest expense, net | (4,781) | (189) |
| Equity method investment loss | (703) | (1,274) |
| Change in fair value of debt instruments | (59,916) | (20,163) |
| Change in fair value of warrant liabilities | 10,827 | — |
| Gain (loss) on foreign currency | 119 | (25) |
| Total other income (expense) | (51,594) | (21,651) |
| **Loss before income taxes** | (167,346) | (79,708) |
| Provision for income tax | 667 | 569 |
| **Net loss and comprehensive loss** | $ (168,013) | $ (80,277) |

Exhibit 20
Page 2754

**Discussion and Analysis of Results of Operations**

*Revenue (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| Revenue | $ 8,213 | $ 22,343 | $ (14,130) | (63)% |

Revenue decreased by $14.1 million, or 63% to $8.2 million for the year ended December 31, 2021 from $22.3 million for the year ended December 31, 2020. This decrease is primarily driven by an ongoing backlog of project deliverables in fiscal 2021 when compared to fiscal 2020 where we completed and delivered on project milestones for our significant customers.

*Cost of Revenue and Gross Profit (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| Cost of revenue | $ 11,416 | $ 24,240 | $ (12,824) | (53)% |
| Gross Profit | $ (3,203) | $ (1,897) | $ (1,306) | NM |
| Gross Margin | (28)% | (8)% | NM | NM |

NM – Not meaningful

Cost of revenue decreased by $12.8 million, or 53%, to $11.4 million for the year ended December 31, 2021 from $24.2 million for the year ended December 31, 2020. This decrease in cost of revenue was primarily driven by a decrease of $9.9 million from engineering, fab, partner and stock-based compensation costs. The decrease was partially offset by an increase of $1.6 million in research and development tax credits and grants we received in 2021 compared to the prior period due to higher claims for our research and development activities. Gross profit decreased by $1.3 million to $(3.2) million for the year ended December 31, 2021 from $(1.9) million for the year ended December 31, 2020. The decrease in gross profit was primarily driven by a decrease in revenue for the year ended December 31, 2021. Our revenue is recognized at the achievement of milestones and is not necessarily aligned with the timing of costs we incur. In the quarter ended December 31, 2021, we revised the rate of accrual of a certain R&D tax credit based on new information received from Her Majesty's Revenue and Customs. The one-time revision of the accrual resulted in an offset to cost of revenue and R&D expense in the quarter ended December 31, 2021.

Our gross margin has fluctuated and may fluctuate from period to period based on a number of factors, including the timing of completion of project milestones, with each project requiring differing levels of time and costs. The projects we undertake are determined by our customer commitments and our long-term strategy goals.

*Selling, General and Administrative Expenses (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| Selling, general and administrative expenses | $ 39,976 | $ 20,260 | $ 19,716 | 97 % |

Selling, general and administrative expenses increased by $19.7 million, or 97%, to $40.0 million for the year ended December 31, 2021 from $20.3 million for the year ended December 31, 2020. The increase was primarily due to general corporate growth, of which $6.0 million was from additional professional fees related to accounting, legal and audit matters, and $6.0 million and $1.5 million were due to increased human capital and stock-based compensation costs, respectively.

58

Exhibit 20
Page 2755

*Research and Development Expenses (in thousands, except for percentages)*

| | | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | $ | % |
| Research and development expenses | $ | 72,573 | $ 35,900 | $ 36,673 | 102 % |

Research and development expenses increased by $36.7 million, or 102%, to $72.6 million for the year December 31, 2021 from $35.9 million for the year ended December 31, 2020. The increase was primarily attributable to growth of $17.8 million from engineering, fab partners, and engineering research and development headcount. This also led to an increase in human capital and stock-based compensation expenses of $22.0 million and $4.7 million, respectively. In addition, the increase is also driven by $11.0 million in research and development tax credits and grants we received in 2021 compared to the prior period due to higher claims for our research and development activities and grants.

*Other income, net (in thousands, except for percentages)*

| | | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | $ | % |
| Other income, net | $ | 2,860 | $ — | $ 2,860 | 100 % |

Other income, net during the year ended December 31, 2021 consisted of debt forgiveness and related accrued interest of the $2.9 million PPP Loan.

*Interest Expense, net (in thousands, except for percentages)*

| | | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | $ | % |
| Interest expense, net | $ | (4,781) | $ (189) | $ (4,592) | 2,430 % |

The change in interest expense, net by $4.6 million, or 2,430%, for the years ended December 31, 2021 and December 31, 2020, respectively was primarily due to the interest expense recorded in 2021 related to the 2020 Term Facility Loan using the effective interest rate method.

*Equity Method Investment Loss (in thousands, except for percentages)*

| | | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | $ | % |
| Equity method investment loss | $ | (703) | $ (1,274) | $ 571 | (45)% |

Change in equity method investment captures our share of losses of the investment in HRT according to our percentage of ownership.

*Change in Fair Value of Debt Instruments (in thousands, except for percentages)*

| | | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | $ | % |
| Change in fair value of debt instruments | $ | (59,916) | $ (20,163) | $ (39,753) | 197 % |

Change in fair value of debt instruments captures losses from a change in fair value estimates using discounted cash flow and binomial lattice methodologies that are based upon a set of valuation assumptions. As of December 31, 2021, there were no debt instruments requiring fair value adjustments. All convertible debt instruments previously held by the Company were converted to ordinary shares in the Company as part of the Business Combination, completed in August 2021.

59

Exhibit 20
Page 2756

Table of Contents

*Change in Fair Value of Warrant Liabilities (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **$** | **%** |
| Change in fair value of warrant liabilities | 10,827 $ | — $ | 10,827 | NM |

Change in fair value of warrant liabilities captures activity from a change in fair value estimates based upon a set of valuation assumptions. The Private Placement Warrants were assumed from SC Health and recorded as part of the Business Combination in August 2021.

*Gain (Loss) on Foreign Currency (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **$** | **%** |
| Gain (loss) on foreign currency | $ 119 | $ (25) | $ 144 | (576)% |

Change in gain (loss) on foreign currency captures losses from the impact of foreign currency exchange rates as a result of the translation of foreign functional currencies into our reporting currency and the re-measurement of foreign currency transactions and balances. For the years ended December 31, 2021 and 2020, most of our balances are held in the reporting currency, which decrease the impact of foreign currency fluctuations on the results of our operations.

*Provision for Income Tax (in thousands, except for percentages)*

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **$** | **%** |
| Provision for income tax | $ 667 | $ 569 | $ 98 | 17 % |

Change in provision for income tax expense for the years ended December 31, 2021 and 2020 is due to an overall increase in expenditures. The effective income tax rate was less than 1.0% for the years ended December 31, 2021 and 2020. Our effective tax rate differs from the U.K. statutory rate primarily due to a substantially full valuation allowance against our net deferred tax assets where it is more likely than not that some or all of the deferred tax assets will not be realized. The income tax expenses shown above are primarily related to corporate income taxes in the United States, which operates on a cost-plus arrangement and minimum filing fees in the foreign jurisdictions where we have operations.

## Non-GAAP Financial Measures

In addition to our results determined in accordance with GAAP, we believe the following non-GAAP measures are useful in evaluating our operational performance. We use the following non-GAAP financial information to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that non-GAAP financial information, when taken collectively and in context, may be helpful to investors in assessing our operating performance and trends and in comparing our financial measures with those of comparable companies which may present similar non-GAAP financial measures.

## Limitations of Non-GAAP Measures

These non-GAAP financial measures are not prepared in accordance with GAAP, are supplemental in nature, and are not intended, and should not be construed, as the sole measure of our performance, and should not be considered in isolation from or as a substitute for comparable financial measures prepared in accordance with GAAP. There are a number of limitations related to EBITDA and Adjusted EBITDA, including the following:

- EBITDA and Adjusted EBITDA exclude certain recurring, non-cash charges, such as depreciation of property and equipment and/or amortization of intangible assets. While these are non-cash charges, we may need to replace the assets being depreciated and amortized in the future and Adjusted EBITDA and Adjusted EBITDA Margin do not reflect cash requirements for these replacements or new capital expenditure requirements.

- EBITDA and Adjusted EBITDA do not reflect interest expense, net, which may constitute a significant recurring expense in the future.

Exhibit 20
Page 2757

- Adjusted EBITDA excludes stock-based compensation, which may constitute a significant recurring expense in the future, as equity awards are expected to continue to be an important component of our compensation strategy.

- Future expenses may be similar to the non-recurring special items that are excluded from Adjusted EBITDA.

Because of these limitations, you should consider EBITDA and Adjusted EBITDA alongside other financial performance measures, including net loss and our other GAAP results.

### *EBITDA and Adjusted EBITDA*

We define "EBITDA" as net loss before interest expense, net, income tax expense, and depreciation and amortization. We define "Adjusted EBITDA" as EBITDA adjusted for stock-based compensation, non-capitalized transaction costs, and other non-recurring special items determined by management that are not considered representative of our underlying operating performance. Adjusted EBITDA is intended as a supplemental measure of our performance that is neither required by, nor presented in accordance with, GAAP. Our presentation of these measures should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items. Our computation of EBITDA and Adjusted EBITDA may not be comparable to other similarly titled measures computed by other companies, because all companies may not calculate EBITDA or Adjusted EBITDA in the same fashion.

Because of these limitations, EBITDA and Adjusted EBITDA should not be considered in isolation or as a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and using EBITDA and Adjusted EBITDA on a supplemental basis. You should review the reconciliation of our net loss to EBITDA and Adjusted EBITDA below and not rely on any single financial measure to evaluate our business.

### *Reconciliation*

The following table reconciles our net loss (the most directly comparable GAAP measure to EBITDA and Adjusted EBITDA) to EBITDA and Adjusted EBITDA for the years ended December 31, 2021 and 2020 (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Net Loss** | $ (168,013) | $ (80,277) |
| Interest expense, net | 4,781 | 189 |
| Provision for income tax | 667 | 569 |
| Depreciation and amortization | 4,640 | 2,787 |
| **EBITDA** | (157,925) | (76,732) |
| Non-capitalized transaction costs* | $ 4,337 | $ 3,611 |
| Stock-based compensation | 12,013 | 8,043 |
| Equity-method investment loss | 323 | 1,274 |
| Change in fair value of debt instruments | 59,916 | 20,163 |
| Change in fair value of warrants liabilities | (10,827) | — |
| Forgiveness of PPP loan | (2,860) | — |
| **Adjusted EBITDA** | $ (95,023) | $ (43,641) |

---

\*    Non-capitalized transaction costs include non-recurring expense related to the issuance of convertible loan notes in 2021 and the Business Combination.

### Liquidity and Capital Resources

Due to Rockley's history of recurring losses from operations, negative cash flows from operations, and a significant accumulated deficit, management concluded that there is substantial doubt about Rockley's ability to continue as a going concern. In addition, our independent registered public accounting firm has included an explanatory paragraph in their opinion for the year ended December 31, 2021 as to the substantial doubt about our ability to continue as a going concern. Since inception, Rockley has financed its operations primarily through the issuance and sale of convertible loan notes, ordinary shares and agreed-upon projects. As of December 31, 2021, the Company had cash, cash equivalents and investments of approximately $81.4 million.

Exhibit 20

Page 2758

Table of Contents

Case 1:23-elg-b095D1c-MRA-8/AAFiled 03/03/23 34 Entered 08/03/22 321 239:1 Page 274 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 74 of 126

### Short-Term Liquidity Requirements

As of the date of this Annual Report on Form 10-K, we have yet to generate any material revenue from our business operations. On August 11, 2021, the consummation of the Business Combination resulted in net cash proceeds of $122.5 million of cash, net of transaction costs, which will be used to fund our future capital and liquidity needs in order to support our core business operations and overall growth of our business and to execute our current growth strategies.

As of the date of this Annual Report on Form 10-K, management believes that the cash generated by the closing of the Business Combination and the PIPE Financing is sufficient to fund both our cash needs for the execution of our business strategy for the next 9 months, including (1) investing in research and developments activities, including completion and commercialization of our wearables, smart phone and point-of-care technologies, (2) investing in backend processing, intellectual property protection, quality control and process, (3) expanding sales and marketing activities, and (4) pursuing strategic partnerships. However, our anticipated cash needs could vary materially and negatively as a result of a number of factors, including:

- Timing and the costs involved in bringing our products to market;

- Anticipated customer contracts and design wins may not materialize;

- Delay in launching our products due to technical challenges from our customers or our product development team;

- Pricing and the volume of sales of our products may be different from our forecast;

- Execution delays due to resources constraints;

- Assisting our fab partners with expansion of production capacity;

- The cost of maintaining, expanding and protecting our intellectual property portfolio, including litigation costs and liabilities;

- The cost of additional general and administrative talent, including accounting and finance, legal and human resources, as a result of becoming a public company;

- Rockley's additional investment requirement needed for HRT to be self-sufficient; and

- Other risks discussed in the section entitled "Risk Factors."

### Long-Term Liquidity Requirements

If we do not generate sufficient revenue, we will be required to explore various options to fund future cash needs through sale of additional equity, debt financing, and others. There can be no assurance that any such issuance of equity securities, debt financing or other means of financing will be available in the future, or the terms of any such financing will be acceptable to us. If we raise funds by issuing equity securities, there will be dilution to the existing shareholders. If we raise funds by issuing debt securities, these debt securities would have rights, preferences, and privileges senior to the holders of ordinary shares. The term of debt securities or borrowing could impose significant restriction on our operations. The credit market and financial service industry have in the past, and may in the future, experience periods of upheaval that could impact the availability and cost of equity and debt financing.

If adequate funds are not available, we will need to curb our expansion plans or limit our research and development activities, which would have a material adverse impact on our business prospects and results of operations.

Exhibit 20
Page 2759

*Historical Cash flows*

**For the Years Ended December 31, 2021 and 2020**

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2021 | 2020 |
| *(in thousands)* | | |
| Net cash used in operating activities | $ (126,001) | $ (48,354) |
| Net cash used in investing activities | (52,842) | (6,656) |
| Net cash provided by financing activities | 196,401 | 53,334 |
| Net increase (decrease) in cash and cash equivalents | $ 17,558 | $ (1,676) |

*Cash Flows from Operating Activities*

During the year ended December 31, 2021, net cash used in operating activities was $126.0 million, primarily consisting of net losses of $168.0 million, adjusted by non-cash depreciation and amortization of $4.6 million, bad debt expense and allowance for doubtful accounts of $0.8 million, stock-based compensation of $12.0 million, equity-method investment loss of $0.3 million, and changes in fair value of debt instruments and warrants of $59.9 million and $(10.8) million, respectively. Changes in assets and liabilities for the year ended December 31, 2021 included the following: decreases in accounts receivable, offset by increases in other receivables, trade payables and accrued expenses.

During the year ended December 31, 2020, net cash used in operating activities was $48.4 million, primarily consisting of net losses of $80.3 million, adjusted by non-cash depreciation and amortization of $2.8 million, stock-based compensation of $8.0 million, equity-method investment loss of $1.3 million, and change in fair value of debt instruments of $20.2 million. Changes in assets and liabilities for the year ended December 31, 2020 included the following: increases in other receivables and accrued expenses offset by decreases in accounts receivable, other current assets, and trade payables.

*Cash Flows from Investing Activities*

Net cash used in investing activities was $52.8 million for the year ended December 31, 2021, primarily related to the purchase and the sale of marketable securities of $54.7 million and $10.0 million, respectively, and also from the purchases of property and equipment to be used in the ordinary course of business. Net cash used in investing activities was $6.7 million for the year ended December 31, 2020, primarily related to the investment in our HRT of $5.0 million and the remaining 1.4 million was related to purchases of property and equipment to be used in the ordinary course of business.

*Cash Flows from Financing Activities*

Net cash provided by financing activities was $196.4 million for the year ended December 31, 2021, primarily related to the proceeds received from the Business Combination and convertible loan notes. Net cash provided by financing activities was $53.3 million for the year ended December 31, 2020, primarily consisting of proceeds received for convertible loan notes and Paycheck Protection Program.

**Contractual Obligations and Commitments**

Purchase obligations include commitments to third-party suppliers for various research and development activities. As of December 31, 2021 and December 31, 2020, we had $13.6 million and $3.0 million, respectively in contractual obligations for which we have not yet received services.

**Off-Balance Sheet Arrangements**

Since the date of our incorporation, we have not engaged in any off-balance sheet arrangements, as defined in the rules and regulations of the SEC.

Exhibit 20
Page 2760

**Recent Accounting Pronouncements**

Please refer to Note 1 - Description of Business and Significant Accounting Policies of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for more information about recent accounting pronouncements, the timing of their adoption, and our assessment, to the extent we have made one, of their potential impact on our financial condition and our results of operations.

**Critical Accounting Policies and Estimates**

Our financial statements have been prepared in accordance with GAAP as set forth in the Financial Accounting Standards Board's Accounting Standards Codification, and we consider the various staff accounting bulletins and other applicable guidance issued by the SEC. The preparation of our consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Our actual results may differ from these estimates under different assumptions or conditions. To the extent that there are material differences between these estimates and our actual results, our future financial statements will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

See Note 1 - Description of Business and Significant Accounting Policies of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for a summary of our significant accounting policies and the effect on our financial statements.

*Revenue Recognition*

We generate revenue principally from development services, which entails developing customer-specific designs of photonics chipsets. Our contracts with customers include specific achievement milestones and a substantive acceptance criteria for each milestone. In the event a milestone is achieved and the customer provides acceptance, the Company allocates the contract consideration related to the performance obligations that are satisfied during the period and recognizes the revenue at that point in time.

*Stock-based Compensation*

We recognize the cost of stock-based awards granted to our employees and directors based on the estimated grant-date fair value of the awards. Cost is recognized on a straight-line basis over the service period, which is generally the vesting period of the award. We have elected to recognize the effect of forfeitures in the period they occur. We determine the fair value of stock options using the Black-Scholes option pricing model, which is impacted by the following assumptions:

- Expected Term—This is the period that the awards that have been granted are expected to remain unexercised. The Company employs the average period the awards are expected to remain outstanding;

- Volatility—Our stock was not publicly traded prior to August 11, 2021. The volatility used in stock grants made prior to that date was based on a benchmark of comparable companies within the silicon photonics industries;

- Risk-Free Interest Rate—The interest rates used are based on the implied yield available on U.S. Treasury zero-coupon issues with an equivalent remaining term equal to the expected life of the award; and

- Dividend Yield—The dividend rate used is zero as we have never paid any cash dividends on our ordinary shares and do not anticipate doing so in the foreseeable future.

Following the Business Combination, the fair value of our ordinary shares is now determined based on the quoted market price. Prior to the Business Combination, our management and board of directors considered various objectives and subjective factors to determine the fair value of Legacy's Rockley ordinary shares as of each grant date, including the value determined by a third-party valuation firm. These factors included, among other things, financial performance, capital structure, forecasted operating results and market performance analyses of similar companies in our industry.

64

Exhibit 20
Page 2761

### Warrants

We classify the Private Placement Warrants as long-term liability on our consolidated balance sheet as of December 31, 2021. The Private Placement Warrants were traded on the NYSE prior to their redemption and recorded at fair value using a Black-Scholes option-pricing model. The Private Placement Warrants are re-measured to fair value at each subsequent reporting date. We will continue to adjust the liability for changes in fair value for the Private Placement Warrants until the warrants are exercised, redeemed or cancelled and present the changes in fair value in the consolidated statement of operations at each reporting period.

We classify the Public Warrants as equity and present within Additional Paid-In Capital on our consolidated balance sheet as of December 31, 2021. Although an event such as a qualifying cash tender offer could occur outside of the company's control that would require net cash settlement, equity classification for the Public Warrants is not precluded per ASC 815-40-25. The Public Warrants were initially recorded using the closing stock price as of the measurement date, with no subsequent measurement.

### Income Taxes

We record income tax expense for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, we recognize deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial reporting and tax basis of asset and liabilities, as well as for operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using tax rates that are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. We record valuation allowances to reduce its deferred tax assets to the net amount that it believes is more likely than not to be realized. Its assessment considers the realization of deferred tax assets on a jurisdictional basis. We recognize the income tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by taxing authorities, based on the technical merits of the position. The income tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

### Item 7A.    Quantitative and Qualitative Disclosures about Market Risk

The Company is a smaller reporting company, as defined by Rule 12b-2 of the Securities Exchange Act of 1934, as amended, and is not required to provide this item.

65

Exhibit 20
Page 2762

Table of Contents

Case 12:08-cv-095 Doc 190-8 Filed 03/03/23 Entered 03/03/23 09:11 Page 278 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 78 of 126

Item 8.            **Financial Statements and Supplementary Data**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Years Ended December 31, 2021 and 2020

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID:42) | 67 |
| Consolidated Balance Sheets | 68 |
| Consolidated Statements of Operations and Comprehensive Loss | 69 |
| Consolidated Statements of Shareholders' Equity (Deficit) | 70 |
| Consolidated Statements of Cash Flows | 71 |
| Notes to Consolidated Financial Statements | 72 |
| 1. Description of Business and Significant Accounting Policies | 72 |
| 2. Business Combination | 79 |
| 3. Segment, Geographic, and Significant Customer Information | 80 |
| 4. Equity Method Investment | 81 |
| 5. Fair Value Measurements | 81 |
| 6. Balance Sheet Components | 86 |
| 7. Debt | 88 |
| 8. Warrants | 92 |
| 9. Income Taxes | 93 |
| 10. Shareholders' Equity (Deficit) | 95 |
| 11. Net loss Per Share | 96 |
| 12. Stock-Based Compensation | 96 |
| 13. Related Party Transactions | 99 |
| 14. Leases | 100 |
| 15. Commitments and Contingencies | 101 |
| 16. Defined Contribution Plan | 101 |
| 17. Supplemental Cash Flow Information | 102 |

66

Exhibit 20
Page 2763

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Rockley Photonics Holdings Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Rockley Photonics Holdings Limited (the Company) as of December 31, 2021 and 2020, the related consolidated statements of operations and comprehensive loss, stockholders' equity (deficit) and cash flows for each of the two years in the period ended December 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2021 in conformity with U.S. generally accepted accounting principles.

**The Company's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has incurred losses from operations since inception and has stated that substantial doubt exists about the Company's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2020.

San Jose, California
March 10, 2022

67

Exhibit 20
Page 2764

Table of Contents

Case 1:23-cv-01095-MFK-SMA Filed 03/03/23 Entered 08/03/22 23:09:1P Page 280 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 80 of 126

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Consolidated Balance Sheets**
*(in thousands, except share amounts and par value)*

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 36,786 | $ 19,228 |
| Short-term investments, at fair value | 26,965 | — |
| Accounts receivable, net of allowance of $302 and $0 | 1,359 | 4,925 |
| Other receivables, net of allowance of $141 and $0 | 47,462 | 18,024 |
| Prepaid expenses | 6,795 | 1,605 |
| Other current assets | 7 | 609 |
| Total current assets | 119,374 | 44,391 |
| Long-term investments, at fair value | 17,659 | — |
| Property, equipment, net | 10,187 | 6,182 |
| Equity method investment | 4,879 | 5,202 |
| Intangible assets | 3,048 | 3,048 |
| Other non-current assets | 7,683 | 1,607 |
| Total assets | $ 162,830 | $ 60,430 |
| | | |
| **Liabilities and Shareholders' Equity (Deficit)** | | |
| Current liabilities | | |
| Trade payables | $ 6,882 | $ 4,413 |
| Accrued expenses | 17,360 | 10,395 |
| Debt, current portion | 26,312 | — |
| Other current liabilities | 1,238 | 998 |
| Total current liabilities | 51,792 | 15,806 |
| Long-term debt, net of current portion | — | 74,804 |
| Warrant liabilities | 3,477 | — |
| Other long-term liabilities | 3,743 | 1,127 |
| Total liabilities | 59,012 | 91,737 |
| | | |
| Commitments and contingencies (Note 15) | | |
| | | |
| Shareholders' equity (deficit) | | |
| Ordinary shares, $0.000004 par value; 12,417,500,000 and 139,033,366 authorized as of December 31, 2021 and December 31, 2020; 127,860,639 and 83,539,382 issued and outstanding as of December 31, 2021 and December 31, 2020, respectively | — | — |
| Additional paid-in-capital | 504,714 | 201,576 |
| Accumulated deficit | (400,896) | (232,883) |
| Total shareholders' equity (deficit) | 103,818 | (31,307) |
| Total liabilities and shareholders' equity (deficit) | $ 162,830 | $ 60,430 |

*See accompanying notes to consolidated financial statements.*

68

Exhibit 20
Page 2765

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Consolidated Statements of Operations and Comprehensive Loss**
*(in thousands, except share and per share amounts)*

|  | Years Ended December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| Revenue | $ 8,213 | $ 22,343 |
| Cost of revenue | 11,416 | 24,240 |
| Gross profit | (3,203) | (1,897) |
| Operating expenses: | | |
| Selling, general, and administrative expenses | 39,976 | 20,260 |
| Research and development expenses | 72,573 | 35,900 |
| Total operating expenses | 112,549 | 56,160 |
| **Loss from operations** | (115,752) | (58,057) |
| Other income (expense): | | |
| Forgiveness of PPP loan | 2,860 | — |
| Interest expense, net | (4,781) | (189) |
| Equity method investment loss | (703) | (1,274) |
| Change in fair value of debt instruments | (59,916) | (20,163) |
| Change in fair value of warrant liabilities | 10,827 | — |
| Gain (loss) on foreign currency | 119 | (25) |
| Total other income (expense) | (51,594) | (21,651) |
| **Loss before income taxes** | (167,346) | (79,708) |
| Provision for income tax | 667 | 569 |
| **Net loss and comprehensive loss** | $ (168,013) | $ (80,277) |
| | | |
| **Net loss per share:** | | |
| Basic and diluted | $ (1.66) | $ (0.96) |
| | | |
| **Weighted-average shares outstanding:** | | |
| Basic and diluted | 100,917,939 | 83,457,400 |

*See accompanying notes to consolidated financial statements.*

69

Exhibit 20
Page 2766

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Consolidated Statements of Shareholders' Equity (Deficit)**
*(in thousands, except share amounts)*

| | Number of Ordinary Shares | | Ordinary Shares and Additional Paid-in Capital | | Accumulated Deficit | | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2019** | 82,792,725 | $ | 188,865 | $ | (152,606) | $ | 36,259 |
| Net loss | — | | — | | (80,277) | | (80,277) |
| Exercise of stock options | 19,404 | | 42 | | — | | 42 |
| Exercise of warrants | 13,716 | | 7 | | — | | 7 |
| Issuance of warrants | — | | 360 | | — | | 360 |
| Stock-based compensation | — | | 8,043 | | — | | 8,043 |
| Ordinary share issuance for acquisition of in-process research and development | 347,389 | | 2,298 | | — | | 2,298 |
| Ordinary share issuance, net of issuance costs | 366,148 | | 1,961 | | — | | 1,961 |
| **Balance, December 31, 2020** | 83,539,382 | $ | 201,576 | $ | (232,883) | $ | (31,307) |
| Net loss | — | | — | | (168,013) | | (168,013) |
| Exercise of stock options | 1,557,218 | | 932 | | — | | 932 |
| Exercise of warrants | 4,115,118 | | 379 | | — | | 379 |
| Issuance of warrants | — | | 263 | | — | | 263 |
| Conversion of convertible notes to ordinary shares | 15,896,210 | | 181,404 | | — | | 181,404 |
| Equity consideration issued to SC Health | 1,777,031 | | 17,966 | | — | | 17,966 |
| Equity consideration issued to PIPE | 10,000,000 | | 100,000 | | — | | 100,000 |
| Equity consideration issued to SC Health Sponsor | 10,562,500 | | 50,000 | | — | | 50,000 |
| Vesting of restricted stock units | 24,668 | | — | | — | | — |
| Stock-based compensation | — | | 12,013 | | — | | 12,013 |
| Transaction costs | — | | (45,515) | | — | | (45,515) |
| Private warrants | — | | (14,304) | | — | | (14,304) |
| Ordinary share issuance, net of issuance costs | 388,512 | | — | | — | | — |
| **Balance, December 31, 2021** | 127,860,639 | $ | 504,714 | $ | (400,896) | $ | 103,818 |

*See accompanying notes to consolidated financial statements.*

70

Exhibit 20
Page 2767

Table of Contents

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Consolidated Statements of Cash Flows**
*(in thousands)*

|  | Years Ended December 31, | |
|  | 2021 | 2020 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $ (168,013) | $ (80,277) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation of property and equipment | 4,640 | 2,787 |
| Gain on disposal of property and equipment | — | (107) |
| Bad debt expense and allowance for doubtful accounts | 820 | — |
| Accretion of marketable securities to redemption value | (122) | — |
| Stock-based compensation | 12,013 | 8,043 |
| Change in equity-method investment | 323 | 1,274 |
| Change in fair value of debt instrument | 59,916 | 20,163 |
| Change in fair value of warrant liabilities | (10,827) | — |
| Forgiveness of Paycheck Protection Program loan | (2,860) | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 2,887 | 1,458 |
| Other receivables | (29,579) | (2,074) |
| Prepaid expenses and other current assets | (4,868) | 1,307 |
| Other non-current assets | (5,795) | 604 |
| Trade payables | 1,663 | (3,126) |
| Accrued expenses | 10,946 | 3,537 |
| Other current and long-term liabilities | 2,855 | (1,943) |
| Net cash used in operating activities | (126,001) | (48,354) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (7,840) | (1,416) |
| Purchase of marketable securities | (54,688) | — |
| Proceeds from sale of marketable securities | 10,000 | — |
| Proceeds from maturity of marketable securities | 186 | — |
| Payment for asset acquisition | (500) | (250) |
| Investment in equity method investee | — | (4,990) |
| Net cash used in investing activities | (52,842) | (6,656) |
| **Cash flows from financing activities:** | | |
| Proceeds from convertible loan notes | 76,723 | 51,781 |
| Principal payments on long-term debt | (5,000) | (1,952) |
| Proceeds from issuance of ordinary shares | 167,966 | 1,961 |
| Proceeds from Paycheck Protection Program loan | — | 2,860 |
| Proceeds from exercise of options | 932 | 42 |
| Proceeds from the exercise of warrants | 379 | 7 |
| Proceeds from issuance of warrants | 263 | 360 |
| Debt issuance costs incurred | (383) | (494) |
| Transaction costs | (44,479) | — |
| Principal payments on finance lease | — | (1,231) |
| Net cash provided by financing activities | 196,401 | 53,334 |
| **Net increase (decrease) in cash and cash equivalents** | 17,558 | (1,676) |
| **Cash and cash equivalents:** | | |
| Beginning of period | 19,228 | 20,904 |
| End of period | $ 36,786 | $ 19,228 |

*See accompanying notes to consolidated financial statements.*

71

Exhibit 20
Page 2768

**ROCKLEY PHOTONICS HOLDINGS LIMITED**
**Notes to Consolidated Financial Statements**

**1.    Description of Business and Significant Accounting Policies**

*Description of Business*

Rockley specializes in the research and development of integrated silicon photonics chipsets. Rockley has developed a versatile, application specific, third-generation silicon photonics platform specifically designed for the optical integration challenges facing numerous mega-trend markets. Rockley has partnered with multiple tier-1 customers across the markets to deliver complex optical systems required for transformational sensors, communications, and medical product realization.

On August 11, 2021, Rockley Photonics Limited ("Legacy Rockley") completed a business combination (the "Business Combination") with SC Health Corporation, a special purpose acquisition company ("SC Health"), with Rockley Photonics Holdings Limited and its subsidiaries surviving the merger. Upon the consummation of the Business Combination, the Company became a publicly traded company listed on the New York Stock Exchange ("NYSE") under the symbol "RKLY". For additional information on the Business Combination, please refer to Note 2, *Business Combination*, to these consolidated financial statements. Unless the context otherwise requires, references in these notes to "Rockley", the "Company", "we", "us", or "our" and any related terms are intended to mean the post-Business Combination consolidated company, Rockley Photonics Holdings Limited, while "Legacy Rockley" and "SC Health" refers to the entities prior to the Business Combination.

*Going Concern*

The Company has incurred net losses since inception, has an accumulated deficit of $400.9 million as of December 31, 2021 and negative cash flow from operations of $126.0 million for the year ended December 31, 2021 and expects to incur losses from operations for the foreseeable future. As of December 31, 2021, the Company had cash, cash equivalents and investments of approximately $81.4 million. The Company's ability to meet its obligations in the ordinary course of business is dependent on its ability to obtain additional financing. As a result, there is substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might result from the outcome of this uncertainty.

The Company's future liquidity needs, and ability to address those needs, will largely be determined by its ability to obtain additional financing on terms acceptable to us. The Company will continue to seek additional capital through the sale of debt or equity, or other arrangements, however, there can be no assurance that we will be able to raise additional capital when needed or under acceptable terms, if at all. The sale of additional equity may dilute existing shareholders. If the Company raises funds by issuing debt securities, these debt securities would have rights, preferences, and privileges senior to the holders of ordinary shares. Issued debt securities may contain covenants that limit the Company's ability to pay dividends or make other distributions to shareholders. If we are unable to obtain additional financing, operations may be scaled back or discontinued.

*Global Pandemic*

The COVID-19 global pandemic has prompted extraordinary measures by governments and businesses to control the spread of COVID-19 in most or all regions throughout the world. These actions have included travel bans, quarantines, and similar mandates for individuals to substantially restrict normal activities and for businesses to curtail normal operations.

The COVID–19 pandemic has adversely impacted our operational efficiency and caused delays in operational activities. During the year ended December 31, 2021, we continued to take cautious steps to protect our workforce, support community efforts, and follow local government guidelines. Certain key laboratory employees and facilities have continued internal testing and laboratory work to the extent necessary to service customer commitments. The remaining non-essential workforce were recommended to continue performing their duties from home. The ongoing impact will depend on the duration of the pandemic which is being mitigated by the vaccination of the general population and gradual easing of restrictions.

Exhibit 20
Page 2769

*Basis of Presentation and Preparation*

The accompanying consolidated financial statements have been prepared by the Company, and reflect all adjustments, consisting only of normal recurring adjustments, that are, in the opinion of management, necessary for the fair presentation of our financial position, results of operations, comprehensive income, cash flows and shareholders' equity for the periods presented. The consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and pursuant to the rules and regulations of the U.S. SEC. All intercompany transactions and balances between the various legal entities comprising the Company have been eliminated in consolidation.

We accounted for the Business Combination as a forward recapitalization in accordance with GAAP (the "Forward Recapitalization"). Under this method of accounting, SC Health was treated as the acquired company and Legacy Rockley was deemed to be the accounting acquirer for financial reporting purposes. Accordingly, for accounting purposes, the Forward Recapitalization was treated as the equivalent of Legacy Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization. The net assets of SC Health are stated at historical cost, with no goodwill or other intangible assets recorded. The consolidated assets, liabilities and results of operations prior to the Forward Recapitalization are those of Legacy Rockley. The consolidated financial statements of the combined company post-Forward Recapitalization represents the combined results of Rockley and SC Health beginning August 11, 2021, the date the Business Combination was consummated. The shares, corresponding capital amounts and earnings per share available for shareholders of Legacy Rockley, prior to the Business Combination, converted into the right to receive 2.4835 shares (the "Exchange Ratio") of ordinary shares, par value $0.000004 (the "ordinary shares"). The recapitalization of the number of ordinary shares attributable to Legacy Rockley is reflected retroactively as shares reflecting the Exchange Ratio to the earliest period presented and is utilized for calculating earnings per share in all prior periods presented.

The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting periods. Such estimates include, but are not limited to, revenue recognition, reserves and allowances; valuation of intangibles; product warranties; employee compensation and benefit accruals; stock-based compensation; loss contingencies; income taxes; fair value measurements; and warrant liabilities. Actual results could differ materially from those estimates. Management's estimates include, as applicable, the anticipated impacts of the COVID-19 pandemic.

*Cash and Cash Equivalents*

Cash and cash equivalents include short-term, highly liquid investments with an original maturity of three months or less at the time of purchase.

*Accounts Receivable*

Accounts receivable is recorded at the invoiced amount and do not bear interest. We assess the need for an allowance for doubtful accounts based upon an analysis of past credit history and the current financial condition of its customers, as well as the consideration of expected trends based upon characteristics of the accounts and general economic conditions. Account balances are written off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote.

*Equity Method Investments*

Equity method investments are all entities over which we have significant influence but not control or joint control. Under the equity method of accounting, the investments are initially recognized at cost and adjusted thereafter to recognize the Company's share of the post-acquisition profits or losses of the investee in the consolidated statement of operations and comprehensive loss. Earnings and losses of equity method investments are based on the most recently available financial statements of the investee. Basis differences between the cost of an equity method investment and the underlying equity in the long-lived assets are amortized over the estimated economic useful life of the underlying long-lived asset. We periodically review our equity method investments for impairment and record a reduction in the carrying value, if and when necessary. To date, no such impairment losses have been recorded.

Exhibit 20
Page 2770

Table of Contents

*Available-for-Sale Investments*

The investments in debt securities are classified as available-for-sale investments. Debt securities primarily consist of corporate bonds, commercial paper and U.S. Treasury debt securities. These investments are primarily held in the custody of a major financial institution. A specific identification method is used to determine the cost basis of debt securities sold. These investments are recorded in the consolidated balance sheets at fair value.

Unrealized gains and temporary losses, net of related taxes, are included in accumulated other comprehensive income (loss) ("AOCI"). Upon realization, those amounts are reclassified from AOCI to earnings. The amortization of premiums and discounts on the investments are included in our results of operations. Realized gains and losses are calculated based on the specific identification method.

We classify our investments as current or non-current based on the nature of the investment and their availability for use in current operations.

*Other-than-Temporary Impairments on Investments*

All of our available-for-sale investments are subject to periodic impairment review. When the fair value of a debt security is less than its amortized cost, it is deemed impaired, and we assess whether the impairment is other-than-temporary. An impairment is considered other-than-temporary if (i) we have the intent to sell the security, (ii) it is more likely than not that we will be required to sell the security before recovery of the entire amortized cost basis, or (iii) we do not expect to recover the entire amortized cost basis of the security. If impairment is considered other-than-temporary based on condition (i) or (ii) described above, the entire difference between the amortized cost and the fair value of the debt security is recognized in the results of operations. If an impairment is considered other-than-temporary based on condition (iii) described above, the amount representing credit losses (defined as the difference between the present value of the cash flows expected to be collected and the amortized cost basis of the debt security) is recognized in earnings, and the amount relating to all other factors is recognized in other comprehensive income (OCI).

*Property and Equipment, Net*

Property and equipment are recorded at cost and presented net of accumulated depreciation and amortization. Significant additions or improvements extending the useful life of an asset are capitalized, while repairs and maintenance costs are expensed as incurred. Leasehold improvements are amortized on a straight-line basis over the shorter of the term of the lease or the useful life of the assets. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the related assets.

| | |
|---|---|
| Computer equipment | 3 years |
| Lab equipment | 3 years |
| Furnitures and fixtures | 4 years |
| Leasehold improvements | Shorter of the lease term and the useful life |

*Impairment of Long-Lived Assets*

We evaluate our long-lived assets, such as property and equipment, and right-of-use assets for impairment whenever events or changes in circumstances indicate that the carrying value of assets or asset group may not be recoverable. Recoverability of these assets or asset groups is measured by comparing their carrying value to the future net undiscounted cash flows the assets are expected to generate over their remaining economic life. If such assets or asset groups are considered impaired, the impairment to be recognized is measured by the amount by which the carrying value of the assets exceeds their fair value.

The Company tests other intangible assets not subject to amortization for impairment annually and more frequently if events or changes in circumstances between annual tests indicate that it is more likely than not that the asset is impaired.

For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash inflows which are largely independent of the cash inflows from other assets or groups of assets. To date, no such impairment losses have been recorded.

74

Exhibit 20
Page 2771

Table of Contents

*Revenue Recognition*

We generate our revenue principally from development services, which entails developing the customer-specific designs of photonics chips. Revenue is recognized when control of promised goods and services are transferred to customers in an amount that reflects the expected consideration in exchange for those products and services. This principle is achieved by applying the following five-step approach:

- *Identification of the contract with a customer*—A contract with a customer exists when we enter into an enforceable contract with a customer that defines each party's rights and obligations regarding the goods or services to be transferred and identifies the payment terms related to these goods or services, the contract has commercial substance, and we determine that collection of substantially all consideration for goods or services that are transferred is probable based on the customer's intent and ability to pay the promised consideration. We consider the terms and conditions of the contracts and customary business practices in identifying contracts under Topic 606 Revenue from Contracts with Customers. Our contracts with a customer generally consist of a development services contract against which statements of work ("SOW") are issued. Each SOW contains one or more agreed-upon projects. We consider the arrangement to be the development services contract combined with the SOW. While the typical duration of a development services contract is multiple years, we generally expect the duration of agreed-upon projects to be six months or less. Generally, our customers have the right to cancel their contracts at any time.

- *Identification of the performance obligations in the contract*—Performance obligations promised in a contract are identified based on the goods or services that will be transferred to the customer that are both capable of being distinct and are distinct in the context of the contract. To the extent a contract includes multiple promised goods or services, we apply judgment to determine whether promised goods or services are capable of being distinct and distinct in the context of the contract. If these criteria are not met, the promised goods or services are accounted for as a combined performance obligation. The individual components of the development services are generally capable of being distinct but not distinct in the context of the contract unless all the goods and services within a certain agreed-upon project of the contract are completed. Generally, the deliverables associated with each agreed-upon project, when combined, are considered a distinct performance obligation.

- *Determination of the transaction price*—The transaction price is determined based on the consideration to which we are entitled in exchange for transferring goods or services to the customer. Our contracts generally do not contain a significant amount of variable consideration as the price of our services are generally fixed at the inception of the agreed-upon project. The Company excludes sales taxes and other taxes from the measurement of transaction price. None of the contracts contain a significant financing component.

- *Allocation of the transaction price to the performance obligations in the contract*—Contracts that contain multiple performance obligations require an allocation of the transaction price to each performance obligation based on a relative standalone selling price ("SSP"). The Company prices each agreed-upon project with an SOW at SSP based on the expected cost plus a margin approach.

- *Recognition of revenue when or as performance obligations are satisfied*—We satisfy performance obligations at a point in time for the development services since the customers do not simultaneously receive and consume the benefits, we do not create or enhance an asset that the customer controls, and we do not have an enforceable right to payment for the performance completed to date. The contracts also contain substantive acceptance terms for each agreed-upon project. Revenue is recognized at the time the related performance obligation is satisfied through the transfer of control of a promised good or service to a customer, which is upon achievement of the agreed-upon project and acceptance by the customer.

*Contract balances*—The timing of revenue recognition may differ from the timing of invoicing to customers. Accounts receivable is recorded when the right to consideration is unconditional. We generally have the right to invoice the customer upon acceptance of the agreed-upon project. The payment terms on invoiced amounts are typically 30-45 days, and such amounts are nonrefundable. In situations where revenue recognition occurs before invoicing, an unbilled receivable is recorded, which represents a contract asset. Deferred revenue is recognized if we have an unconditional right to bill or have collected consideration in advance of the right to recognize revenue. There have been no contract balances recorded to date.

*Costs to obtain and fulfill a contract*—Incremental costs incurred to obtain a contract with a customer are required to be capitalized and amortized over the period in which the goods and services to which the asset relates are transferred to the customer. We have not incurred any incremental costs in connection with obtaining the revenue contracts. We recognize an asset from the costs to fulfill a contract only if, the costs relate directly to a contract or an anticipated

75

Exhibit 20

Page 2772

contract, the costs generate or enhance resources of the Company that will be used in satisfying a performance obligation in the future, and the costs are expected to be recovered. These costs have been insignificant to date.

*Foreign Currency Transactions*

The Company's reporting currency is the U.S. dollar and the functional currency of the Company's foreign subsidiaries is the U.S. dollar. Assets and liabilities that are not denominated in the functional currency are remeasured into the functional currency with any related gain or loss recorded in earnings.

Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in realized and unrealized losses/(gains) on foreign currency in the accompanying consolidated statements of operations and comprehensive loss.

*Segment Information*

Operating segments are defined as components of an entity for which discrete financial information is available that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the CODM. The CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company determined that it has one operating and reportable segment.

*Concentration of Risk*

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash and cash equivalents, available-for-sale investments, accounts receivable and revenue. We maintain cash balances at financial institutions that management believes are high-credit, quality financial institutions, where deposits, at times, exceed the Federal Deposit Insurance Corporation limits.

*Net Loss Per Share*

Basic earnings per share is calculated using our weighted-average outstanding ordinary shares. Diluted earnings per share is calculated using our weighted-average outstanding ordinary shares including the dilutive effect of outstanding equity instruments as determined under the treasury stock method. For periods in which we report net losses, diluted net loss per ordinary share attributable to ordinary stockholders is the same as basic net loss per ordinary share attributable to ordinary stockholders, because all potentially dilutive ordinary shares are anti-dilutive.

*Stock-Based Compensation*

We recognize all stock-based awards to employees and directors as stock-based compensation expense based upon their fair values on the date of grant. Compensation expense is generally recognized as expense on a straight-line basis over the service period based on the vesting requirements. We recognize forfeitures as they occur. We estimate the fair value of stock options granted to employees using the Black-Scholes option pricing model, which requires the input of subjective assumptions, including (i) the fair value of ordinary shares, (ii) the expected stock price volatility, (iii) the expected term of the award, (iv) the risk-free interest rate and (v) expected dividends. The grant-date fair value of restricted stock is calculated based on the fair value of the underlying ordinary shares .

We measure nonemployee awards at their fair value on the adoption date of ASU No. 2018-07. Following the adoption of ASU No. 2018-07 on January 1, 2018, the accounting for nonemployee awards is consistent with the accounting for employee stock-based compensation as described above.

We granted options and restricted stock units which vest on the satisfaction of a service-based condition.

*Warrants*

We determine the accounting classification of warrants, as either liability or equity classified, by first assessing whether the warrants meet liability classification in accordance with ASC 480-10, Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity, then in accordance with ASC 815-40, Accounting for Derivative Financial Instruments Indexed to and Potentially Settled in, a Company's Own Stock. Under ASC 480,

76

Exhibit 20
Page 2773

warrants are considered liability classified if the warrants are mandatorily redeemable, obligate the Company to settle the warrants or the underlying shares by paying cash or other assets, and warrants that must or may require settlement by issuing variable number of shares. If warrants do not meet the liability classification under ASC 480-10, the Company assesses the requirements under ASC 815-40, which states that contracts that require or may require the issuer to settle the contract for cash are liabilities recorded at fair value, irrespective of the likelihood of the transaction occurring that triggers the net cash settlement feature. If the warrants do not require liability classification under ASC 815-40, in order to conclude equity classification, the company also assesses whether the warrants are indexed to the Company's ordinary shares and whether the warrants are classified as equity under ASC 815-40 or other U.S. GAAP. After all such assessments, the Company concludes whether the warrants are classified as liability or equity. Liability classified warrants require fair value accounting at issuance and subsequent to initial issuance with all changes in fair value after the issuance date recorded in the statements of operations and comprehensive loss. Equity classified warrants only require fair value accounting at issuance with no changes recognized subsequent to the issuance date.

*Leases*

Our lease portfolio is comprised of two major classes: real estate leases, which are the majority of our leased assets, are accounted for as operating leases and a manufacturing equipment lease accounted for as a finance lease on the consolidated balance sheet.

We classify leases as either operating or financing. We determine if an arrangement is a lease at inception by evaluating whether the arrangement conveys the right to use an identified asset and whether we obtain substantially all the economic benefits from and have the ability to direct the use of the asset. Operating lease assets are included under other non-current assets and operating lease liabilities under other current and long-term liabilities, respectively in the consolidated balance sheets. We recognize lease expense for operating leases on a straight-line basis over the term of the lease. Finance lease asset is included under property, equipment, and finance lease right-of-use assets, net and finance lease liabilities, current portion under other current liabilities in the consolidated balance sheets. Finance ROU assets are amortized on a straight-line basis over their estimated useful lives.

ROU assets represent the right to use an underlying asset for the lease term and lease liabilities represent the obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As the Company's leases do not provide an implicit rate, an incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments is used. The operating lease ROU asset includes any lease payments made and excludes lease incentives. Lease terms may include options to extend or terminate the lease when it is reasonably certain that the option will be exercised. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company has lease agreements with lease and non-lease components, which are generally combined.

We elected, as an accounting policy for leases of real estate, to account for lease and non-lease components in a contract as a single lease component. In addition, the recognition requirements are not applied to leases with a term of twelve months or less. Rather, the lease payments for short-term leases are recognized on the consolidated statements of operations and comprehensive loss on a straight-line basis over the lease term.

Variable payments, such as common area charges, maintenance, insurance and taxes, are primarily based on the amount of space occupied. These payments in the Company's leases are not dependent on an index or a rate and are excluded from the measurement of the lease liabilities and recognized in the consolidated statements of operations and comprehensive loss in the period in which the obligation for those payments is incurred. The Company remeasures lease payments when the contingency underlying such variable payments is resolved such that some or all of the remaining payments become fixed.

*Cost of Revenue*

Our cost of revenue consists of costs related to the Company's development services which includes cost of materials, cost associated with packaging and assembly, testing and shipping, cost of personnel, including stock-based compensation, and equipment associated with manufacturing support, logistics and quality assurance, overhead and occupancy costs.

Exhibit 20
Page 2774

*Research and Development Expenses (R&D)*

Research and development expense consists primarily of personnel costs for engineers and third parties engaged in the design and development of products, software and technologies, including salary, bonus and share-based compensation expense, project material costs, services and depreciation. The Company expenses research and development costs as they are incurred.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses consist of human capital related expenses for employees involved in general corporate functions, including executive management and administration, accounting, finance, tax, legal, information technology, marketing, and human resources; depreciation expense and rent relating to facilities; travel costs; professional fees; and other general corporate costs. Human capital expenses primarily include salaries, benefits, bonuses and stock-based compensation. As we continue to grow as a company, we expect that our selling, general and administrative costs will increase on an absolute dollar basis.

*Income Taxes*

Deferred income taxes are provided on a liability method, whereby deferred income tax assets are recognized for deductible temporary differences, operating losses, and tax loss carryforwards, and deferred income tax liabilities are recognized for taxable temporary differences. Deferred income tax balances reflect the effects of temporary differences between the carrying amounts of assets and liabilities and their tax bases and are stated at enacted tax rates expected to be in effect when taxes are actually paid or recovered. Deferred income tax assets are reduced by a valuation allowance when, considering all sources of taxable income, in the opinion of management, it is more likely than not that some portion or all of the deferred income tax assets will not be realized. Deferred income tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company recognizes the income tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by taxing authorities, based on the technical merits of the position. The income tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

*Recently Adopted Accounting Pronouncements*

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes,* which affects general principles within Topic 740, and are meant to simplify and reduce the cost of accounting for income taxes. It removes certain exceptions to the general principles in Topic 740 and simplifies areas including franchise taxes that are partially based on income, transactions with a government that result in a step up in the tax basis of goodwill, the incremental approach for intraperiod tax allocation, interim period income tax accounting for year-to-date losses that exceed anticipated losses and enacted changes in tax laws in interim periods. ASU 2019-12 is effective for fiscal years beginning after December 15, 2020. The Company adopted this standard as of January 1, 2021. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2020, the FASB issued ASU 2020-06, *Debt-Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging – Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity*. This ASU simplifies the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts in an entity's own equity. The Company adopted this guidance on January 1, 2021. The adoption of the guidance did not have a material impact on the consolidated financial statements.

*Accounting Pronouncements Issued but Not Yet Adopted*

In May 2021, the FASB issued ASU 2021-04, *Modification of Equity Classified Written Call Options*, to clarify and reduce diversity in an issuer's accounting for modifications or exchanges of freestanding equity-classified written call options such as warrants that remain equity classified after modification or exchange based on consideration of the economic substance of the modification or exchange. ASU 2021-04 is effective for fiscal years beginning after December 15, 2021 and early adoption is permitted. While the Company is continuing to assess the timing of adoption and the

Exhibit 20
Page 2775

Table of Contents

potential impacts of ASU 2021-04, it does not expect ASU 2021-04 to have a material effect on its consolidated financial statements.

In November 2021, the FASB issued ASU 2021-10, *Government Assistance (Topic 832) Disclosures by Business Entities about Government Assistance*. This amendment in ASU 2021-10 aims to increase transparency about government assistance transactions that are not in the scope of other GAAP guidance. The ASU requires disclosure of the nature and significant terms and considerations of the transactions, the accounting policies used and the effects of those transactions. The ASU is effective for fiscal years beginning after December 15, 2021, with early adoption permitted. The Company is in the process of assessing the impacts of ASU 2021-10 on its consolidated financial statements.

## 2. Business Combination

On August 11, 2021 (the "Closing Date"), Legacy Rockley, SC Health, and Rockley Mergersub Limited, an exempted company incorporated in the Cayman Islands as a direct wholly owned subsidiary of the Company ("Merger Sub"), consummated the business combination contemplated by the Business Combination Agreement and Plan of Merger, dated as of March 19, 2021 (the "Business Combination Agreement"). Immediately upon the consummation of the Business Combination, Legacy Rockley became a wholly owned subsidiary of the Company and Merger Sub merged with and into SC Health, with SC Health surviving the merger and becoming a direct wholly owned subsidiary of the Company. Subsequently, SC Health's ordinary shares and warrants ceased trading on the NYSE while the Company's ordinary shares and warrants began trading on the NYSE under the symbols "RKLY" and "RKLY.WS," respectively.

Pursuant to the Business Combination Agreement, each of the following transactions occurred in the following order: (i) pursuant to a scheme of arrangement approved by the UK courts (the "Scheme"), on August 9, 2021, all of Legacy Rockley's ordinary shares, including shares issued immediately prior to the Scheme becoming effective as a result of the conversion of then-outstanding convertible loan notes and the exercise of warrants, were transferred by Rockley shareholders in exchange for an equivalent number of shares in the Company; (ii) the holders of options over shares in Legacy Rockley rolled over their options into new options to purchase shares in the Company; (iii) warrants to purchase shares in Legacy Rockley (other than one warrant instrument that by its terms was replicated at the Company) not exercised for shares in Legacy Rockley prior to the effectiveness of the Scheme described above were cancelled, such that immediately following the Scheme, Legacy Rockley became a direct wholly-owned subsidiary of the Company; (iv) the Company subsequently completed a stock-split to prepare its share capital for Merger Sub's merger into SC Health; (v) certain accredited investors (including entities affiliated with the SC Health Sponsor) purchased an aggregate of 15 million ordinary shares for a purchase price of $10.00 per share, or an aggregate purchase price of $150.0 million; (vi) on August 11, 2021, Merger Sub was merged with and into SC Health, with SC Health surviving the merger and becoming a direct wholly-owned subsidiary of the Company; and (vii) the ordinary shares and warrants in SC Health were exchanged for ordinary shares and warrants in the Company.

The Business Combination was accounted for as a forward recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, SC Health was treated as the acquired company and Legacy Rockley was deemed to be the accounting acquirer for financial reporting purposes. This determination was primarily based on the existing shareholders of Legacy Rockley obtaining a majority voting power in the Company, and as such, having the power to appoint a majority of the members of the Company's board of directors (the "Board"); the operations of Legacy Rockley prior to the acquisition comprising the only ongoing operations of the combined entity based on the historical operating activity and employee base; and the senior management of Legacy Rockley comprising the majority of the senior management of the Company. Accordingly, for accounting purposes, the financial statements of the Company represent a continuation of the financial statements of Legacy Rockley with the acquisition being treated as the equivalent of Legacy Rockley issuing stock for the net assets of SC Health, accompanied by a recapitalization.

Exhibit 20
Page 2776

As a result of the Business Combination, the Company incurred equity issuance costs and other costs considered direct and incremental to the transaction, totaling $45.5 million and consisting of legal, accounting, financial advisory and other professional fees. These amounts are reflected within additional paid-in capital in the consolidated balance sheet as of December 31, 2021.

*Summary of Net Proceeds*

The following table reconciles the elements of the net proceeds from the Business Combination as of December 31, 2021 (in thousands):

|  | Recapitalization |
|---|---|
| Cash inflow from SC Health's trust account, net of redemptions | $ 17,966 |
| Cash inflow from PIPE | 100,000 |
| Cash inflow from SC Health Sponsor | 50,000 |
| Less: Transaction Costs | (45,515) |
| Net cash received from the Business Combination | $ 122,451 |

*Summary of Shares Issued*

The total number of shares of the Company's ordinary shares issued and outstanding immediately following the consummation of the Business Combination was approximately 126.7 million, comprising (in thousands):

|  | Number of Shares |
|---|---|
| Current Rockley's shareholders prior to the Business Combination | 104,016 |
| SC Health Shareholders | 1,777 |
| Sponsor Shareholders | 10,563 |
| PIPE Investors | 10,000 |
| Other Shareholders [1] | 319 |
| Total number of shares | 126,675 |

[1] The Company issued 319,000 ordinary shares at a value of $10.0 per share to Cowen and Company LLC ("Cowen") and BCW Securities LLC in lieu of cash payment for a portion of the fees payable $3.2 million to Cowen as part of the transaction costs.

## 3.    Segment, Geographic, and Significant Customer Information

The following table presents our revenue disaggregated by primary geographical market where revenues are attributable to the region in which the billing address of the customer is located (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| United States | $ 6,778 | $ 17,037 |
| Rest of World | 1,435 | 5,306 |
| Total revenue | $ 8,213 | $ 22,343 |

The following tables summarize our most significant customers as of and for the years ended December 31, 2021 and 2020:

|  | Revenue | | Accounts receivable | |
|---|---|---|---|---|
|  | December 31, | | December 31, | |
|  | 2021 | 2020 | 2021 | 2020 |
| Customer A | 82 % | 76 % | 72 % | 33 % |
| Customer B | 4 % | 24 % | — % | 67 % |

80

Exhibit 20

Page 2777

The following table presents property, equipment and intangible assets held in the U.S. and internationally in various foreign subsidiaries as of December 31, 2021 and 2020:

| | December 31, | | |
|---|---|---|---|
| | 2021 | | 2020 |
| United States | $ | 8,442 | $ | 6,390 |
| Rest of World | | 3,031 | | 708 |
| Total property, equipment and intangible assets | $ | 11,473 | $ | 7,098 |

## 4. Equity Method Investment

As of December 31, 2021 and 2020, we held an investment in Hengtong Rockley Technology Co., Ltd ("HRT") and we appointed two of the HRT's five board members. HRT manufactures and sells optical fiber transceivers based on silicon photonics chipsets. HRT has share capital consisting solely of ordinary shares. We hold 24.9% of HRT's ordinary shares, and the same proportion of its voting rights. We consider HRT to be a variable interest entity upon which the Company does exercise significant influence. However, considering key factors, such as ownership interest, representation on the board of directors, and participation in policy-making decisions, the Company concluded it does not control the investment. Accordingly, the investment in HRT is accounted for under the equity method. We elected to use a three-month lag to record our share of HRT's results. See Note 13, Related Party Transactions for details of the Company's transactions with HRT.

The following table summarizes our investment in HRT for the years ended December 31, 2021 and 2020 (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2021 | | 2020 |
| Balance at the beginning of the year | $ | 5,202 | $ | 1,486 |
| Investment in HRT | | — | | 4,990 |
| Remeasurement gain on HRT | | 380 | | — |
| Share of loss of HRT | | (703) | | (1,274) |
| Balance at the end of the year | $ | 4,879 | $ | 5,202 |

Our maximum exposure to loss as a result of our involvement with HRT is limited to the balance of our investment.

## 5. Fair Value Measurements

The accounting guidance for fair value measurements provides a framework for measuring fair value on either a recurring or nonrecurring basis, whereby the inputs used in valuation techniques are assigned a hierarchical level. The following are the three levels of inputs to measure fair value:

*Level 1:* Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

*Level 2:* Inputs that reflect quoted prices for identical assets or liabilities in less active markets; quoted prices for similar assets or liabilities in active markets; benchmark yields, reported trades, broker/dealer quotes, inputs other than quoted prices that are observable for the assets or liabilities; or inputs that are derived principally from or corroborated by observable market data by correlation or other means.

*Level 3:* Unobservable inputs that reflect our own assumptions incorporated in valuation techniques used to measure fair value. These assumptions are required to be consistent with market participant assumptions that are reasonably available.

We consider an active market to be one in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis, and consider an inactive market to be one in which there are infrequent or few transactions for the asset or liability, the prices are not current, or price quotations vary substantially either over time or among market makers. Where appropriate, our own or the counterparty's non-performance risk is considered in measuring the fair values of liabilities and assets, respectively.

Exhibit 20
Page 2778

*Investments*

The following is a summary of our investments at their cost or amortized cost for the years ended December 31, 2021 and 2020 (in thousands):

| | As of | |
| --- | --- | --- |
| | December 31, 2021 | December 31, 2020 |
| Corporate bonds and commercial paper | $ 20,042 | $ — |
| U.S. Treasury securities | 24,587 | — |
| Total investments | $ 44,629 | $ — |

The fair value of our investments approximates their cost or amortized cost for both periods presented.

The following table presents the contractual maturities of our debt investments as of December 31, 2021 (in thousands):

| | Amortized Cost | Fair Value |
| --- | --- | --- |
| Due in one year or less | $ 26,945 | $ 26,961 |
| Due after one year through five years | 17,684 | 17,663 |
| | $ 44,629 | $ 44,624 |

Actual maturities may differ from the contractual maturities because borrowers may have the right to call or prepay certain obligations.

*Fair Value of Financial Instruments*

The following table summarizes our financial assets measured at fair value on a recurring basis (in thousands):

| | December 31, 2021 | | |
| --- | --- | --- | --- |
| | | Fair Value Measurements at Reporting Date Using | |
| | Total | Level 1 | Level 2 |
| Cash and cash equivalents | $ 36,786 | $ 36,786 | $ — |
| Corporate bonds and commercial paper | 20,037 | — | 20,037 |
| U.S. Treasury securities | 24,587 | 24,587 | — |
| Total cash, cash equivalents and investments | $ 81,410 | $ 61,373 | $ 20,037 |

| | December 31, 2020 | | |
| --- | --- | --- | --- |
| | | Fair Value Measurements at Reporting Date Using | |
| | Total | Level 1 | Level 2 |
| Cash and cash equivalents | $ 19,228 | $ 19,228 | $ — |
| Total cash and cash equivalents | $ 19,228 | $ 19,228 | $ — |

The financial liabilities subject to fair value measurement on a recurring basis, were as follows (in thousands):

| | As of | |
| --- | --- | --- |
| | December 31, 2021 | December 31, 2020 |
| **Financial Liabilities** | | |
| 3.00% – 2020 Convertible Notes | $ — | $ 32,106 |
| 8.00% – 2020 Convertible Notes | — | 14,789 |
| 2020 Term Facility Loan | — | 25,049 |
| Private Placement Warrants | 3,477 | — |
| Total financial liabilities | $ 3,477 | $ 71,944 |

82

Exhibit 20
Page 2779

As of December 31, 2021, there was no fair value associated with the convertible debt instruments due to the conversion of the debt securities into the Company's ordinary shares in connection with the Business Combination. The estimated fair value of the debt securities prior to their conversion into the Company's ordinary shares was $208.6 million. The estimated fair value of the convertible securities on the Closing Date was calculated as the product of (i) the number of conversion shares at the Closing Date and (ii) the marketable value per ordinary share at the Closing Date. Changes in the fair value of debt that is accounted for at fair value are presented as gains or losses in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments.

*3.00% – 2020 Convertible Notes*

On March 9, 2020, Legacy Rockley issued $21.3 million of the 3.00% Convertible Notes and elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination on August 11, 2021, the outstanding principal and interest of the 3.00% Convertible Notes Due 2025 were cancelled and converted into the right to receive ordinary shares of the Company, resulting in $0.0 million outstanding balance on the 3.00% Convertible Notes at December 31, 2021.

For the year ended December 31, 2021 and 2020, we recorded a loss of $6.0 million and $10.8 million, respectively from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 3.00% Convertible Notes, as follows (in thousands):

| | | |
|---|---|---:|
| Fair value at March 9, 2020 | $ | 21,281 |
| Plus: Loss from change in fair value | | 10,825 |
| Fair value at December 31, 2020 | | 32,106 |
| Plus: Loss from change in fair value | | 5,986 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (38,092) |
| Fair value at December 31, 2021 | $ | — |

A binomial lattice model was used to determine the fair value of the 3.00% Convertible Notes based on assumptions as to when the notes would be converted or redeemed at each decision point. Within the lattice model, the following assumptions were made: (i) upon IPO/Sale/Merger/SPAC or maturity, the convertible notes may be converted to ordinary shares or redeemed at principal and accrued interest; and (ii) upon qualified financing event, the convertible notes will automatically convert to ordinary shares. The lattice model used the share price, conversion price, maturity date, risk-free rate, estimated stock volatility and estimated credit spread. The remeasurement of the fair value of the debt instrument was recorded as a gain or loss in the statements of operations and comprehensive loss for each reporting period.

*8.00% – 2020 Convertible Notes*

On February 19, 2020, Legacy Rockley issued $8.0 million of 8.00% Convertible Notes and elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination on August 11, 2021, the outstanding principal, interest and warrants of the 8.00% Convertible Notes were cancelled and converted into the right to receive ordinary shares of the Company, resulting in $0.0 million outstanding balance on the 8.00% Convertible Notes at December 31, 2021.

For the years ended December 31, 2021 and 2020, we recorded a loss of $16.1 million and $4.4 million, respectively from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 8.00% Convertible Notes, as follows (in thousands):

| | | |
|---|---|---:|
| Fair value at February 19, 2020 | $ | 10,415 |
| Plus: Loss from change in fair value | | 4,374 |
| Fair value at December 31, 2020 | | 14,789 |
| Plus: Loss from change in fair value | | 16,108 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (30,897) |
| Fair value at December 31, 2021 | $ | — |

Exhibit 20

Page 2780

A binomial lattice model was used to determine the fair value of the 8.00% Convertible Notes Due 2025 based on assumptions as to when the notes would be converted or redeemed at each decision point. Within the lattice model, the following assumptions were made: (i) upon IPO/Sale/Merger/SPAC or maturity, the convertible notes may be converted to ordinary shares or put at 125.0% of principal and accrued interest; and (ii) upon financing event, the convertible notes may be converted to ordinary shares. The remeasurement of the fair value of the debt instrument was recorded as a gain or loss in the statements of operations and comprehensive loss for each reporting period.

*2020 Term Facility Loan*

On September 29, 2020, Legacy Rockley issued $35.0 million of convertible notes and at inception elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination on August 11, 2021, thirty percent (30%) of the outstanding principal and interest balance of the 2020 Term Facility Loan were cancelled and converted into the right to receive ordinary shares of the Company and seventy percent (70%) of the outstanding principal and interest balance is required to be repaid in full on or prior to August 31, 2022. At December 31, 2021, the remaining contractual outstanding principal and interest on the 2020 Term Facility Loan was $32.3 million.

For the years ended December 31, 2021 and 2020, we recorded a loss of $15.1 million and $1.7 million, respectively from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 2020 Term Facility Loans, as follows (in thousands):

| | | |
|---|---|---:|
| Fair value at September 29, 2020 | $ | 23,320 |
| Plus: Loss from change in fair value | | 1,729 |
| Fair value at December 31, 2020 | | 25,049 |
| Plus: Loss from change in fair value | | 15,134 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (13,003) |
| Fair value at August 11, 2021 | $ | 27,180 |

At August 11, 2021, the fair value of the 2020 Term Facility Loan was $27.2 million. The interest expense is subsequently accreted to statements of operations and comprehensive loss using the effective interest rate method over the term of the loan. See Note 7, Debt for information regarding the subsequent accounting for the 2020 Term Facility Loan.

A binomial lattice model was used to determine the fair value of the 2020 Term Facility Loan based on assumptions as to when the loan would be converted upon IPO/Sale/Merger/SPAC. Upon such event, the convertible notes may be paid off as following: (i) if par value exit, repayment of base multiple times principal plus unpaid interest; (ii) if greater value exit, repayment of base multiple plus add-on multiple ratio times principal plus unpaid interest.

*5.00% – $50.0 Million Convertible Notes*

On January 11, 2021, Legacy Rockley issued $50.0 million of the 5.00% – $50.0 Million Convertible Notes (the "5.00% – $50.0 Million Convertible Notes") and at inception elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination, the outstanding principal and interest of the 5.00% – $50.0 Million Convertible Notes were cancelled and converted into the right to receive ordinary shares of the Company, resulting in $0.00 million outstanding balance on the 5.00% – $50.0 Million Convertible Notes at December 31, 2021.

For the year ended December 31, 2021, we recorded a loss of $2.3 million, from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 5.00% – $50.0 Million Convertible Notes, as follows (in thousands):

| | | |
|---|---|---:|
| Fair value at January 11, 2021 | $ | 10,274 |
| Plus: Loss from change in fair value | | 2,310 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (12,584) |
| Fair value at December 31, 2021 | $ | — |

A binomial lattice model was used to determine the fair value of the 5.00% – $50.0 Million Convertible Notes Due 2026 based on assumptions as to when the notes would be converted or redeemed at each decision point. Within the lattice model, the following assumptions were made: (i) upon IPO/Sale/Merger/SPAC, the convertible notes may be converted to

Exhibit 20
Page 2781

ordinary shares or put at principal and accrued interest; and (ii) upon qualified financing event or maturity, the convertible notes will automatically convert to ordinary shares at base price. The lattice model used the share price, conversion price, maturity date, risk-free rate, estimated stock volatility and estimated credit spread. The remeasurement of the fair value of the debt instrument was recorded as a gain or loss in the statements of operations and comprehensive loss for each reporting period.

*5.00% – $25.0 Million Convertible Notes*

On December 31, 2020, Legacy Rockley issued $25.0 million of the 5.00% – $25.0 Million Convertible Notes and at inception elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination, the outstanding principal, interest and warrants of the 5.00% – $25.0 Million Convertible Notes were cancelled and converted into the right to receive ordinary shares of the Company, resulting in $0.0 million outstanding balance on the 5.00% – $25.0 Million Convertible Notes at December 31, 2021.

For the year ended December 31, 2021, we recorded an adjustment of $5.0 million from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 5.00% – $25.0 Million Convertible Notes, as follows (in thousands):

| | | |
|---|---|---|
| Fair value at December 31, 2020 | $ | 37,592 |
| Plus: Loss from change in fair value | | 4,977 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (42,569) |
| Fair value at December 31, 2021 | $ | — |

A binomial lattice model was used to determine the fair value of the 5.00% – $25.0 Million Convertible Notes Due 2025 based on assumptions as to when the notes would be converted or redeemed at each decision point. Within the lattice model, the following assumptions were made: (i) upon SPAC, the convertible notes may be converted to ordinary shares or put at principal and accrued interest; (ii) upon qualified financing event, the convertible notes may be converted to ordinary shares with discount any time after financing date; and (iii) upon maturity, the convertible notes may be converted to ordinary shares at $675.0 million divided by the number of fully diluted shares. The remeasurement of the fair value of the debt instrument was recorded as a gain or loss in the statements of operations and comprehensive loss for each reporting period.

*5.00% – $30.0 Million Convertible Notes*

On January 11, 2021, Legacy Rockley issued $30.0 million of the 5.00% Convertible Notes and at inception elected the fair value option of accounting for this debt instrument (see Note 7, Debt for details). In connection with the closing of the Business Combination, the outstanding principal and interest of the 5.00% – $30.0 Million Convertible Notes were cancelled and converted into the right to receive ordinary shares of the Company, resulting in $0.0 million outstanding balance on the 5.00% – $30.0 Million Convertible Notes at December 31, 2021.

For the year ended December 31, 2021, we recorded an adjustment of $5.9 million from a change in fair value of debt in connection with the subsequent fair value remeasurement of the 5.00% – $30.0 Million Convertible Notes, as follows (in thousands):

| | | |
|---|---|---|
| Fair value at January 11, 2021 | $ | 38,403 |
| Plus: Loss from change in fair value | | 5,855 |
| Less: Fair value adjustment extinguished upon conversion of debt | | (44,258) |
| Fair value at December 31, 2021 | $ | — |

A binomial lattice model was used to determine the fair value of the 5.00% Convertible Notes Due 2026 based on assumptions as to when the notes would be converted or redeemed at each decision point. Within the lattice model, the following assumptions were made: (i) upon SPAC, the convertible notes may be converted to ordinary shares or put at principal and accrued interest; and (ii) upon qualified financing event or maturity, the convertible notes will automatically convert to ordinary shares at base price. The lattice model used the share price, conversion price, maturity date, risk-free rate, estimated stock volatility and estimated credit spread. The remeasurement of the fair value of the debt instrument was recorded as a gain or loss in the statements of operations and comprehensive loss for each reporting period.

Exhibit 20
Page 2782

At December 31, 2021 and 2020, the carrying value of certain financial instruments, such as cash, accounts receivable, other receivable, prepaid expenses and other current assets, trade payable and other current accrued liabilities, approximate fair value due to their relatively short maturities and low market interest rates, if applicable.

*Private Placement Warrants*

The Private Placement Warrants are accounted for as liabilities in accordance with the FASB's Accounting Standards Codification ("ASC") 815-40 and are presented within the Warrants Liabilities on the consolidated balance sheet. The warrant liabilities were measured at fair value at inception and are measured on a recurring basis, with changes in fair value presented within change in fair value of warrants liabilities in the consolidated statement of operations and comprehensive loss.

The Private Placement Warrants are measured at fair value on a recurring basis. The measurement of the warrants as of December 31, 2021 was $3.5 million. The Company has classified the Private Placement Warrants as a liability due to certain settlement terms and provisions related to certain tender offers and indexation characteristics following the Business Combination and has accounted for them as liability instruments in accordance with ASC 815, adjusting the fair value at the end of each reporting period. Additionally, the Company has determined that the Private Placement Warrants are classified within Level 3 of the fair value hierarchy as the fair value is estimated using the Modified Black Scholes Option Pricing Model.

The following table presents the changes in the fair value of the Private Placement Warrants (in thousands):

| | | |
|---|---|---|
| Initial measurement, August 11, 2021 | $ | 14,304 |
| Mart-to-market adjustment | | (10,827) |
| Warrant Liabilities balance, December 31, 2021 | $ | 3,477 |

## 6. Balance Sheet Components

*Cash and cash equivalents*

Our cash and cash equivalents balances were concentrated by location as follows:

| | December 31, | |
|---|---|---|
| | 2021 | 2020 |
| United Kingdom | 97 % | 96 % |
| United States | 3 % | 3 % |
| Other | — % | 1 % |

*Other receivables*

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| R&D tax credit receivable | $ | 45,632 | $ | 17,4 |
| Grants receivable | | 753 | | |
| VAT receivable | | 1,073 | | 6 |
| Other receivable, net | | 4 | | |
| Total other receivables | $ | 47,462 | $ | 18,0 |

86

Exhibit 20
Page 2783

Table of Contents

Case 1:23-cv-10095-DJC Doc 1-8 Filed 03/03/23 Entered 03/03/23 09:1 Page 299 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 99 of 126

*Property and equipment, net (in thousands):*

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Computer equipment | $ | 1,998 | $ | 1,218 |
| Lab equipment | | 13,940 | | 7,607 |
| Motor vehicles | | 31 | | 31 |
| Furniture and fixtures | | 315 | | 265 |
| Leasehold improvements | | 1,230 | | 704 |
| Assets under construction | | — | | 27 |
| Total property and equipment | $ | 17,514 | $ | 9,852 |
| Less: accumulated depreciation | | (9,088) | | (5,802) |
| Total property and equipment, net | $ | 8,426 | $ | 4,050 |

Total depreciation expense was $4.2 million and $2.3 million for the years ended December 31, 2021, and 2020, respectively.

*Finance lease right-of-use assets, net (in thousands):*

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Finance lease right-of-use assets | $ | 2,966 | $ | 2,966 |
| Less: accumulated amortization | | (1,205) | | (834) |
| Total finance lease right-of-use assets, net | $ | 1,761 | $ | 2,132 |

Amortization expense was $0.4 million and $0.4 million for the years ended December 31, 2021, and 2020, respectively.

*Intangible assets, net (in thousands):*

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| In-process research and development | $ | 3,048 | $ | 3,0 |
| Total intangible assets, net | $ | 3,048 | $ | 3,0 |

The Company reviews its intangible assets for potential impairment whenever events or circumstances indicate that the carrying value of the intangible assets may not be recoverable. No impairment charges were recorded for the years ended December 31, 2021, and 2020, respectively.

*Other non-current assets (in thousands):*

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Capitalized transaction costs | $ | — | $ | 1 |
| Security deposits | | 280 | | |
| Operating right of use assets | | 4,577 | | 1,4 |
| Prepaid asset, net of current portion | $ | 2,826 | $ | |
| Total other non-current assets | $ | 7,683 | $ | 1,6 |

87

Exhibit 20
Page 2784

*Accrued expenses (in thousands):*

| | December 31, | | |
|---|---|---|---|
| | **2021** | | **2020** |
| Accrued bonus | $ 7,546 | $ | 3,3... |
| Accrued payroll and benefits | 2,750 | | 1,5... |
| Accrued taxes | 439 | | 3... |
| Accrued fabrication costs | 3,110 | | 2,3... |
| Share appreciation rights | — | | 7... |
| Accrued transaction costs | 1,004 | | 3... |
| Other accrued expenses | 2,511 | | 1,8... |
| Total accrued expenses | $ 17,360 | $ | 10,3... |

## 7. Debt

The following table summarizes information relating to our long-term debt, (in thousands):

| | December 31, 2021 | | | | | |
|---|---|---|---|---|---|---|
| | **Principal** | **Change in Fair Value** | **Conversion of Debt** | **Accreted Debt Interest** | **Principal Payments in Cash** | **Net** |
| 3.00% – 2020 Convertible Notes | $ 21,281 | $ 16,811 | (38,092) | — | — | $ — |
| 8.00% – 2020 Convertible Notes | 8,000 | 22,897 | (30,897) | — | — | — |
| 2020 Term Facility Loan | 33,949 | 6,234 | (13,003) | 4,132 | (5,000) | 26,312 |
| 5.00% – $50.0 Million Convertible Notes | 10,274 | 2,310 | (12,584) | — | — | — |
| 5.00% – $25.0 Million Convertible Notes | 25,000 | 17,569 | (42,569) | — | — | — |
| 5.00% – $30.0 Million Convertible Notes | 30,000 | 14,258 | (44,258) | — | — | — |
| Total Long-term debt | $ 128,504 | $ 80,079 | (181,403) | 4,132 | (5,000) | $ 26,312 |
| Less: current portion of long-term debt | | | | | | (26,312) |
| Long-term debt, net of current portion | | | | | | $ — |

| | December 31, 2020 | | |
|---|---|---|---|
| | **Principal** | **Change in Fair Value** | **Net** |
| 3.00% – 2020 Convertible Notes | $ 21,281 | $ 10,825 | $ 32,106 |
| 8.00% – 2020 Convertible Notes | 8,000 | 6,789 | 14,789 |
| 2020 Term Facility Loan | 22,500 | 2,549 | 25,049 |
| Paycheck Protection Program | 2,860 | — | 2,860 |
| Total long-term debt | $ 54,641 | $ 20,163 | $ 74,804 |
| Less: current portion of long-term debt | | | — |
| Long-term debt, net of current portion | | | $ 74,804 |

88

Exhibit 20
Page 2785

Future minimum payments under the debt agreements as of December 31, 2021 are as follows (in thousands):

| | 2020 Term Faci Loan |
|---|---|
| 2022 | $ 32,3 |
| 2023 | |
| 2024 | |
| 2025 | |
| 2026 | |
| Thereafter | |
| Total future minimum payments | 32,3 |
| Less: current portion of debt principal | (32,3 |
| Non-current portion of debt principal | $ |

*3.00% – 2020 Convertible Notes*

On March 9, 2020, Legacy Rockley issued convertible loan notes in an aggregate principal amount of $21.3 million (the "3.0% Convertible Notes"). The 3.00% – 2020 Convertible Notes had an interest rate of 3.00% per annum and contained no financial covenants. The 3.00% – 2020 Convertible Notes were issued in two tranches $20.0 million on March 9, 2020 and $1.3 million on October 20, 2020.

The 3.00% – 2020 Convertible Notes were subject to conversion as follows:

(a) If in an equity financing raised total proceeds for the Company of not less than $10.0 million then the outstanding principal amount of all notes and any unpaid accrued interest shall automatically convert into the most senior class of equity share at a conversion price of $14.298 per share; or

(b) if an equity financing is not raised for the Company, then the outstanding principal amount of all notes and any unpaid accrued interest may convert into the most senior class of share at a conversion price of $14.298 per share.

(c) At an exit event, redeem the outstanding notes for an amount equal to the outstanding principal plus accrued interests or convert the outstanding principal amount of all notes and any unpaid accrued interest thereon into the most senior class of share of the Company, at a conversion price equal to the issuance price of $14.298 per share.

(d) At the maturity date, convert into the most senior class of shares at a conversion price equal to the issuance price of $14.298 per share.

Legacy Rockley elected to account for the 3.00% – 2020 Convertible Notes at fair value as of the issuance date, with the changes in fair value reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments.

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, the total outstanding principal and accrued unpaid interest of $21.9 million for the 3.00% – 2020 Convertible Notes were cancelled and converted into the right to receive 3.8 million ordinary shares of the Company, with a fair value of $38.1 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recorded a $38.1 million adjustment upon extinguishment of the 3.00% – 2020 Convertible Notes.

*8.00% – 2020 Convertible Notes*

On February 19, 2020, Legacy Rockley issued convertible loan notes to our board member in an aggregate principal amount of $8.0 million (the "8.00% Convertible Notes"). The 8.00% Convertible Notes had an interest rate of 8.00% per annum and contained no financial covenants.

The 8.00% Convertible Notes were convertible as follows:

(a) In the event of an equity financing, the outstanding principal amount of all notes and any unpaid accrued interest shall automatically convert into the most senior class of share at a conversion price being the lower of $14.298 per share or a discounted subscription price of the equity shares; or

89

Exhibit 20

Page 2786

Table of Contents

(b)  At an exit event, convert the outstanding principal amount of all notes and any unpaid accrued interest thereon into the most senior class of share of the Company, at a conversion price, equal to a 25% discount to the Series E issuance price of $14.298 per share.

(c)  At the maturity date, convert into the most senior class of equity share at a conversion price of $14.298.

Legacy Rockley elected to account for the 8.00% Convertible Notes s at fair value as of the issuance date, with the changes in fair value reported in the consolidated statements of operations and comprehensive loss under Change in Fair Value of Debt Instruments.

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, the total outstanding principal and accrued unpaid interest of $8.9 million for the 8.00% Convertible Notes were cancelled and converted into the right to receive 1.5 million ordinary shares of the Company, with a fair value of $15.5 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. In addition, the warrants issued in conjunction with the 8.00% Convertible Note were also cancelled and converted into the right to receive 1.5 million ordinary shares of the Company, with a fair value of $15.5 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recorded a $30.9 million adjustment upon extinguishment of the 8.00% Convertible Notes and warrants.

*2020 Term Facility Loan*

On September 29, 2020, Legacy Rockley secured a term facility loan of $35.0 million ("2020 Term Facility Loan"). Legacy Rockley had the option to repay the aggregate amount of the loans utilized in full on the maturity date, subject to no Qualified Exit occurring at the time plus the applicable repayment premium payable. The Qualified Exit meant: 1) qualified listing—a flotation or a public offering, the value of which is equal to or exceeds the free float value of $350.0 million; 2) non-qualified trade. Upon any occurrence of a non-qualified trade sale or qualified listing, amounts due to Argentum would have been discharged in full by way of conversion into the Company's most senior class of shares.

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, thirty percent (30%) of the outstanding principal and interest balance of $10.2 million for the 2020 Term Facility Loan were cancelled and converted into the right to receive 1.3 million ordinary shares of the Company, with a fair value of $13.0 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recorded a $13.0 million adjustment upon extinguishment of debt. The seventy percent (70%) of the outstanding principal and interest balance remained as debt and is required to be repaid in full on or prior to August 31, 2022, in the total amount of $37.3 million. At August 11, 2021, the Company recorded a fair value of $27.1 million for the seventy percent (70%) of the outstanding principal and interest balance. The Company accreted the adjusted interest expense over the amended term of the loan using the effective interest rate method. The Company accrued interest expense of $4.1 million for the year ended December 31, 2021. As of December 31, 2021, the total outstanding debt for the 2020 Term Facility Loan balance was $26.3 million. The 2020 Term Facility Loan includes a financial covenant that requires the Company to maintain a cash balance of at least $35.0 million. As of December 31, 2021, the Company was not in default on any covenants.

*5.00% – $50.0 Million Convertible Notes*

On January 11, 2021, Legacy Rockley issued convertible loan notes for an aggregate principal amount of $50.0 million. The 5.00% – $50.0 Million Convertible Notes had an interest rate of 5.00% per annum and contained no financial covenants. The total amount borrowed was $10.3 million.

The 5.00% – $50.0 Million Convertible Notes were subject to conversion as follows:

(a)  In the event of a qualified financing even with total proceeds raised not less than $25.0 million, the outstanding principal amount and any unpaid accrued interest automatically convert into the most senior class of share at a conversion price being lower of 15% discount to the per share subscription price of the equity shares or the price obtained by diving $1,500.0 million by fully diluted share capital of the Company at the date of conversion;

(b)  At an exit event, redeem the outstanding principal amount and any unpaid accrued interest on the original principal or convert the outstanding principal amount of all notes and any unpaid accrued interest into the most senior class of share of the Company at a conversion price equal to the lower of 15% discount to the price per share and the price obtained by dividing $1,500.0 million by fully diluted share capital of the Company at the date of conversion;

Exhibit 20
Page 2787

Table of Contents

(c) At the maturity date, convert into the most senior class of shares at a conversion price by dividing $1,500.0 million by fully diluted share capital of the Company at the date of conversion.

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, the total outstanding principal and accrued unpaid interest of $10.6 million for the 5.00% – $50.0 Million Convertible Notes were cancelled and converted into the right to receive 1.3 million ordinary shares of the Company, with a fair value of $12.6 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recognized a $12.6 million adjustment upon extinguishment of the 5.00% – $50.0 Million Convertible Notes.

*5.00% – $25.0 Million Convertible Notes*

On December 31, 2020, Legacy Rockley issued convertible loan notes in an aggregate principal amount of $25.0 million. The 5.00% – $25.0 Million Convertible Notes had an interest rate of 5.00% per annum and contained no financial covenants.

The 5.00% – $25.0 Million Convertible Notes were subject to conversion as follows:

(a) In an equity qualified financing event with total proceeds raised not less than $25.0 million, the outstanding principal amount and any unpaid accrued interest automatically convert into the most senior class of share at a conversion price being lower of 25% discount to the per share subscription price of the equity shares or the price obtained by diving $800.0 million by fully diluted share capital of the Company at the date of conversion;

(b) At an exit event, redeem the outstanding notes for an amount equal to 100% of the outstanding principal plus accrued interest or convert the outstanding principal amount into the most senior class of share of the Company, at a conversion price equal to the lower of 25% discount to the price per share and the price obtained by dividing $800.0 million by fully diluted share capital of the Company at the date of conversion; or

(c) At the maturity date, convert into the most senior class of shares at a conversion price by dividing $675.0 million by the number of issued shares in the capital of the Company on a fully diluted basis or repay the amount equal to 100% of the outstanding principal amount plus any accrued interest.

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, the total outstanding principal and accrued unpaid interest of $25.7 million for the 5.00% – $25.0 Million Convertible Notes were cancelled and converted into the right to receive 3.6 million ordinary shares of the Company, with a fair value of $35.6 million, recorded in the consolidated balance sheet. In addition, the warrants issued in conjunction with the 5.00% – $25.0 Million Convertible Notes were also cancelled and converted into the right to receive 0.7 million ordinary shares of the Company, with a fair value of $7.0 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recorded a total $42.6 million adjustment upon extinguishment of the 5.00% – $25.0 Million Convertible Notes and warrants.

*5.00% – $30.0 Million Convertible Notes*

On January 11, 2021, Legacy Rockley issued the 5.00% – $30.0 Million Convertible Notes. The 5.00% – $30.0 Million Convertible Notes had an interest rate of 5.00% per annum and contained no financial covenants.

The 5.00% – $30.0 Million Convertible Notes were subject to conversion as follows:

(a) In an equity qualified financing event with total proceeds raised not less than $25.0 million, the outstanding principal amount and any unpaid accrued interest automatically convert into the most senior class of share at a conversion price being lower of 25% discount to the per share subscription price of the equity shares or the price obtained by diving $800.0 million by fully diluted share capital of the Company at the date of conversion;

(b) At an exit event, redeem the outstanding notes for an amount equal to the outstanding principal plus any unpaid accrued interest or convert the outstanding principal amount of all notes and any unpaid accrued interest into the most senior class of share of the Company, at a conversion price equal to the lower of a 25% discount to the price per share and the price obtained by dividing $800.0 million by fully diluted share capital of the Company at the date of conversion; or

(c) At the maturity date, convert into the most senior class of shares at a conversion price by dividing $800.0 million by fully diluted share capital of the Company at the date of conversion.

91

Exhibit 20
Page 2788

Table of Contents

Case 1:23-cv-10095-MRA-8MA Filed 08/03/23 Entered 08/03/22 13:09:10 Page 304 of 607
2022.03.10 - Rockley 2021 #0043 Filing    Pg 104 of 126

Upon consummation of the Business Combination discussed in Note 2, *Business Combination*, the total outstanding principal and accrued unpaid interest of $30.8 million for the 5.00%– $30.0 Million Convertible Notes were cancelled and converted into the right to receive 4.4 million ordinary shares of the Company, with a fair value of $44.3 million, recorded in the consolidated statement of shareholders' equity (deficit) with a corresponding decrease to the convertible note in the consolidated balance sheet. The Company recorded a $44.3 million adjustment upon extinguishment of the 5.00%– $30.0 Million Convertible Notes.

*Paycheck Protection Program Loan*

On April 21, 2020 (the "Origination Date"), Legacy Rockley received loan proceeds of approximately $2.9 million ("PPP Loan") from Silicon Valley Bank (the "Lender") pursuant to the Paycheck Protection Program ("PPP") established under the CARES (the Coronavirus Aid, Relief and Economic Security) Act of 2020. Payments of principal and interest were deferred for the first six months following the Origination Date, and the PPP Loan was maturing in two years after the Origination Date. The PPP Loan bore interest at 1.0% per annum.

In June 2021, the $2.9 million of borrowings outstanding under the PPP was forgiven in full. Forgiveness income was recorded as a component of other income, net in the consolidated statements of operations and comprehensive loss.

## 8.    Warrants

As of December 31, 2021, the Company had 8,625,000 Public Warrants outstanding with a balance of $28.0 million, and classified as equity, and 5,450,000 Private Placement Warrants outstanding with a balance of $3.5 million, and classified as liability. These warrants are exercisable for the Company's ordinary shares. Warrants may only be exercised for a whole number of shares at an exercise price of $11.50. These warrants expire five years from the closing of the Forward Recapitalization.

The ordinary shares underlying the warrants were registered on Rockley Photonics Holdings Limited's Registration Statement on Form S-4 (File No. 333-255019), filed with the SEC on April 2, 2021 and declared effective on July 22, 2021. The Company is obligated to issue ordinary shares upon exercise of a warrant.

Redemption of warrants when the ordinary share price equals or exceeds $18.00. Once the warrants become exercisable, the Company may redeem the warrants in whole and not in part, at a price of $0.01 per warrant, upon not less than 30 days' prior written notice of redemption to each warrant holder and if, and only if, the closing price of the Company's ordinary shares equals or exceeds $18.00 per share (as adjusted for share sub-divisions, share capitalizations, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the notice of redemption is given to the warrant holders.

The Company may redeem the warrants in whole and not in part no earlier than 90 days after they are first exercisable and prior to their expiration at a price equal to a number of the Company's ordinary shares based on the redemption date and the "fair market value" of the ordinary shares, upon not less than 30 days' prior written notice of redemption each warrant holder, and if, and only if, the closing price of the ordinary shares equals or exceeds $10.00 per share (as adjusted for share sub-divisions, share dividends, reorganizations, reclassifications, recapitalizations and the like) on the trading day before the Company sends the notice of redemption to the warrant holders.

The Private Placement Warrants were accounted for as liabilities in accordance with ASC 815-40, *Derivatives and Hedging-Contracts in Entity's Own Equity*, and are presented within warrant liabilities on our balance sheet. The warrant liabilities assumed from SC Health, and on a recurring basis, changes in fair value will be presented in the consolidated statement of operations at each reporting period. The Private Placement Warrants are considered to be a Level 3 liability, see Note 5 – Fair Value Measurements for description of the valuation methodology of the Private Placement Warrants.

The Public Warrants were accounted for as equity and are presented within Additional Paid-In Capital on our balance sheet. Although an event such as a qualifying cash tender offer could occur outside of the company's control that would require net cash settlement, equity classification for the public warrants is not precluded per ASC 815-40-25 as such an event would be in connection with a change in control and all of the Company's ordinary shareholders, as well as warrant holders, could participate and receive cash from the settlement.

92

Exhibit 20
Page 2789

## 9.    Income Taxes

For the years ended December 31, 2021 and 2020, loss before income taxes were as follows (in thousands):

| | Years Ended December 31, | |
| | 2021 | 2020 |
| --- | --- | --- |
| U.K. Operations | $ (174,298) | $ (82,705) |
| Foreign operations | 6,952 | 2,997 |
| Loss before income taxes | $ (167,346) | $ (79,708) |

The components of provision for income tax for the years ended December 31, 2021 and 2020 are as follows (in thousands):

| | Current | Deferred | Total |
| --- | --- | --- | --- |
| **Year ended December 31, 2021** | | | |
| U.K. operations | $ — | $ — | $ — |
| Foreign jurisdictions | 667 | — | 667 |
| | $ 667 | $ — | $ 667 |

| | Current | Deferred | Total |
| --- | --- | --- | --- |
| **Year ended December 31, 2020** | | | |
| U.K. operations | $ — | $ — | $ — |
| Foreign jurisdictions | 569 | — | 569 |
| | $ 569 | $ — | $ 569 |

The effective tax rate of the Company's provision for income taxes differs from the 19% statutory rate of the Company's U.K. headquarters entity (in thousands, except percentages):

| | December 31, | | | |
| | 2021 | | 2020 | |
| --- | --- | --- | --- | --- |
| U.K. Statutory Rate | $ (31,796) | 19.0 % | $ (15,145) | 19.0 % |
| Foreign income tax | 8 | — % | 308 | (0.4)% |
| Research & Development credit | (2,061) | 1.2 % | (628) | 0.8 % |
| Stock-based compensation | 34 | — % | 1,293 | (1.6)% |
| Permanent differences | (156) | 0.1 % | 3,325 | (4.2)% |
| Change in valuation allowance | 32,402 | (19.4)% | 7,480 | (9.4)% |
| Rate Change on Deferred Taxes | (11,197) | 6.7 % | (977) | 1.2 % |
| Uncertain Tax Liabilities | 64 | — % | 245 | (0.3)% |
| Losses not benefited | 12,625 | (7.5)% | 3,999 | (5.0)% |
| Others, net | 744 | (0.4)% | 668 | (0.8)% |
| Total | $ 667 | (0.40)% | $ 569 | (0.71)% |

*Deferred Tax Assets and Liabilities*

Deferred income taxes reflect the net effects of (a) temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes, and (b) operating losses and tax credit carryforwards.

We record income tax expense for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, the Company recognizes deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial reporting and tax basis of assets and liabilities, as well as for operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using tax rates that

93

Exhibit 20
Page 2790

are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. The Company records valuation allowances to reduce its deferred tax assets to the net amount that it believes is more likely than not to be realized. Its assessment considers the realization of deferred tax assets on a jurisdictional basis.

The significant components of the Company's deferred taxes are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| Deferred tax assets: |  |  |
| Net operating loss carryforwards | $ 33,068 | $ 15,066 |
| Research and development credits | 549 | — |
| Stock-based compensation | 4,859 | 1,476 |
| Lease liabilities | 1,394 | 482 |
| Interest Limitation | 10,202 | — |
| Accounts and other receivables | — | — |
| Accrued liabilities | 1,765 | 788 |
| Other | 64 | 2 |
| Total gross deferred tax assets | 51,900 | 17,814 |
| Less valuation allowance | (50,139) | (16,377) |
| Net deferred tax assets | 1,761 | 1,437 |
|  |  |  |
| Deferred tax liabilities: |  |  |
| Right-of-use Assets | $ (1,281) | $ (821) |
| Property and equipment, principally due to differences in depreciation | (480) | (592) |
| Other | — | (24) |
| Total gross deferred tax liabilities | (1,761) | (1,437) |
| Net deferred tax assets | $ — | $ — |

ASC 740 requires that the tax benefit of net operating losses ("NOLs"), temporary differences and credit carryforwards be recorded as an asset to the extent that management assesses that realization is "more likely than not." Realization of our future tax benefits is dependent on our ability to generate sufficient taxable income within the carryforward period. Management believes that recognition of the deferred tax assets arising from the above-mentioned future tax benefits from operating loss carryforwards is currently not likely to be realized and, accordingly, has provided a valuation allowance has provided a full valuation allowance against its deferred tax assets.

The changes in valuation allowance related to operating activity was an increase in the amount of $33.8 million and $6.9 million during the years ended December 31, 2021 and 2020, respectively.

NOLs and tax credit gross carryforwards as of December 31, 2021 are as follows (in thousands):

|  | Amount | Expiration Years |
|---|---|---|
| NOLs, Federal | $ 132,272 | *carried forward indefinitely* |
| NOLs, State | $ — | — |
| Tax credits, Federal | $ 467 | — |
| Tax credits, State | $ — | — |

**Uncertain Tax Positions**

The Company recognizes tax benefits from uncertain tax positions only if it believes that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. As the Company expands, it will face increased complexity in determining the appropriate tax jurisdictions for revenue and expense items. The Company's policy is to adjust these reserves when facts and circumstances change, such as the closing of a tax audit or refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the income tax expense in the period in which such determination is made and could have a material impact on its financial condition and operating results. The income tax expense includes the effects of any accruals that the Company believes are appropriate, as well as the related net interest

94

Exhibit 20
Page 2791

and penalties. As of December 31, 2021 and 2020, the Company had total uncertain tax positions of $3.2 million and $2.2 million, which is recorded as a reduction of the deferred tax asset related research and developments. No interest or penalties have been recorded related to the uncertain tax positions. None of the unrecognized tax benefits, if recognized, would affect the effective tax rate. A reconciliation of the beginning and ending balances of unrecognized tax benefits is as follows (in thousands):

| | Years Ended December 31, | | | |
| | 2021 | | 2020 | |
| --- | --- | --- | --- | --- |
| Balance at beginning of the year | $ | 2,236 | $ | 405 |
| Increases based on tax positions related to current year | | 1,061 | | 733 |
| Increases based on tax positions related to prior years | | 165 | | 1,199 |
| Decreases based on tax positions related to prior years | | (245) | | (101) |
| Balance at end of year | $ | 3,217 | $ | 2,236 |

It is not expected that there will be a significant change in uncertain tax position in the next 12 months. We are subject to income tax in the U.K., U.S. federal and various states and three other foreign jurisdictions. Our U.S. income tax filings are currently under audit for the tax year ended December 31, 2018. The statute of limitations for U.K. and foreign tax jurisdictions other than the U.S. are no longer subject to audit for tax years before December 31, 2019. We are no longer subject to U.S. federal income tax audit for the tax years before the year ended December 31, 2018 and are no longer subject to state income tax audit for tax years before December 31, 2015.

**10.  Shareholders' Equity (Deficit)**

The Company is authorized to issue 12,417,500,000 ordinary shares with par value of $0.000004 per share. Each holder of the Company's ordinary shares is entitled to one vote per share. As of December 31, 2021, there were 127,860,639 of the Company's ordinary shares issued and outstanding. Holders of the Company's ordinary shares do not have cumulative voting rights. Additionally, the Company has 14,074,986 warrants outstanding as of December 31, 2021. See Note 8, *Warrants* for additional information.

Each holder of the Company's ordinary shares is entitled to the payment of dividends and other distributions as may be declared by the Board from time to time out of the Company's assets or funds legally available for dividends or other distributions. The Company has not declared or paid any dividends with respect to its ordinary shares for the periods presented.

If the Company is involved in voluntary or involuntary liquidation, dissolution or winding up of the Company's affairs, or a similar event, each holder of the Company ordinary shares will participate pro rata in all assets remaining after payment of liabilities, subject to prior distribution rights of the Company preferred shares, if any, then outstanding.

*Equity Line of Credit*

In October 2021, the Company entered into an equity line of credit arrangement ("ELOC") with Lincoln Park Capital Fund, LLC, an Illinois limited liability company ("LPCF"). The ELOC is a private placement with registration rights, providing LPCF the ability to purchase up to 7.8 million of the Company's ordinary shares for $50.0 million over 24 months. Proceeds from the sale of shares will go towards the Company to be used for working capital.

No amounts were drawn against the ELOC during any of the periods presented.

Exhibit 20
Page 2792

## 11.  Net Loss per Share

The following is a calculation of basic and diluted net loss per share (in thousands, except for share and per share amounts):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| **Basic and diluted:** | | |
| Net loss | $ (168,013) | $ (80,277) |
| Weighted average ordinary shares outstanding | 100,917,939 | 83,457,400 |
| Basic and diluted net loss per share | $ (1.66) | $ (0.96) |

Basic net loss per share is calculated by dividing net loss for the period by the weighted average number of the ordinary shares outstanding plus outstanding warrants with a 0.01 exercise price during the period.

For the years ended December 31, 2021 and 2020, we excluded the potential effect of outstanding and exercisable options (including performance options) and warrants in the calculation of the diluted loss per share, as the effect would be anti-dilutive due to losses incurred. As of December 31, 2021 and 2020, there were approximately 12.6 million and 13.8 million potentially issuable shares respectively, with dilutive effect.

## 12.  Stock-Based Compensation

The Company has established a number of share-based incentive plans for current employees, directors and others, which include Share Appreciation Rights ("SARs"), 2013 Share Option Plan (the "2013 Plan"), 2021 Share Option Plan (the "2021 Plan"), Restricted Stock Units ("RSUs"), 2021 Employee Stock Purchase Plan (the "ESPP"),  and Warrants.

*Share Appreciation Rights*

As of December 31, 2021, there were no SARs outstanding. As of December 31, 2020, there were 30,000 SARs outstanding at an exercise price of $0.00001 per share. In connection with the Business Combination on August 11, 2021, the liability associated with outstanding SARs was settled with a cash payment of $0.7 million.

*2013 Share Option Plan*

The holders of Legacy Rockley options under the 2013 Plan continue to hold such options and such options remain subject to the same vesting, exercise and other terms and conditions. In connection with the Business Combination, the holders of Legacy Rockley options may exercise their options to purchase a number of ordinary shares equal to the number of Legacy Rockley ordinary shares subject to such Legacy Rockley options multiplied by the Exchange Ratio of 2.4835 (rounded down to the nearest whole share) at an exercise price per share divided by the Exchange Ratio (rounded to the nearest whole cent). The information presented herein is as if the exchange of stock options occurred as of the earliest period presented.

As of December 31, 2021, there were no options available for grant. Any new grants will become available for issuance under the 2021 Plan.

Exhibit 20
Page 2793

Table of Contents

The following table summarizes the stock option activity related to the 2013 Plan:

| | Number of Options Outstanding | Average Exercise Price Per Share | Remaining Contractual Life (Years) | Intrinsic Value[4] |
|---|---|---|---|---|
| | | | | *(In thousands)* |
| **Options outstanding at December 31, 2019** | 14,663,610 | $ 4.05 | 6.94 | $ 54,100 |
| Granted | 5,782,544 | $ 8.67 | | |
| Exercised | (19,404) | $ 5.36 | | |
| Forfeited | (2,052,583) | $ 8.62 | | |
| Expired | (475,548) | $ 6.92 | | |
| **Options outstanding at December 31, 2020** | 17,898,619 | $ 4.94 | 6.75 | $ 110,552 |
| Granted | — | $ — | | |
| Exercised | (1,557,214) | $ 0.60 | | |
| Forfeited | (912,912) | $ 4.07 | | |
| Expired | (46,757) | $ 3.08 | | |
| **Options outstanding at December 31, 2021** | 15,381,736 | $ 2.00 | 5.83 | $ 36,093 |
| **Options exercisable at December 31, 2021** | 12,546,315 | $ 1.68 | 5.25 | $ 33,464 |

[4] The aggregated intrinsic value represents the difference between the exercise price and the closing stock price of $4.35 for the Company's ordinary shares on December 31, 2021.

*2021 Share Option Plan*

On March 31, 2021, the Board approved the 2021 Plan. The purpose of the 2021 Plan is to attract, retain, incentivize and reward top talent through stock ownership, to improve operating and financial performance and strengthen the mutuality of interest between eligible service providers and shareholders.

As of December 31, 2021, there were 15,375,644 shares authorized for issuance under the Plan, of which 10,207,656 shares were available for grant.

The following table summarizes the stock option activity related to the 2021 Plan:

| | Number of Options Outstanding | Average Exercise Price Per Share | Remaining Contractual Life (Years) | Intrinsic Value |
|---|---|---|---|---|
| | | | | *(In thousands)* |
| **Options outstanding at December 31, 2020** | — | $ — | 0.00 | — |
| Granted | 1,013,480 | $ 15.84 | | |
| Exercised | — | $ — | | |
| Forfeited | — | $ — | | |
| Expired | — | $ — | | |
| **Options outstanding at December 31, 2021** | 1,013,480 | $ 15.84 | 9.61 | $ 11,645 |
| **Options exercisable at December 31, 2021** | 81,538 | $ 15.84 | 9.61 | $ 937 |

97

Exhibit 20
Page 2794

*Restricted Stock Units*

During the year ended December 31, 2021, the Company granted restricted RSUs to employees. Each award will vest based on continued service which is generally over a four-year period. The grant date fair value of the award will be recognized as stock-based compensation expense over the requisite service period. The fair value of RSUs was estimated on the date of grant based on the fair value of the Company's ordinary shares.

Employee RSUs activity for the year ended December 31, 2021 was as follows:

| | Number of RSUs Outstanding | Weighted Average Grant Date Fair Value | Remaining Contractual Life (Years) | Intrinsic Value |
|---|---|---|---|---|
| | | | | *(In thousands)* |
| Outstanding at December 31, 2020 | — | $ — | 0.00 | $ — |
| Granted | 4,181,607 | $ 6.71 | | |
| Exercised | (24,668) | $ 7.07 | | |
| Forfeited | (2,431) | $ 7.07 | | |
| Expired | — | $ — | | |
| Outstanding at December 31, 2021 | 4,154,508 | $ 6.71 | 1.76 | $ 18,072 |

*2021 Employee Stock Purchase Plan*

On October 2021, the Company adopted the 2021 Employee Stock Purchase Plan (the "ESPP"), which became effective on December 1, 2021. The purpose of the ESPP is to provide eligible employees with an opportunity to purchase shares of our ordinary shares at a discounted price through payroll deductions with the goal of enhancing employees' sense of participation in the Company and further align employee interests with those of the Company's shareholders.

Under the ESPP, eligible employees may purchase shares of Company ordinary shares through payroll deductions of between 1% to 15% of after-tax compensation each pay period, with a maximum participation of $25,000 annually. The shares are purchased at the end of each six-month offering period at a 15% discount from the closing market price as reported on the New York Stock Exchange on the last trading day of the offering period.

Subject to adjustments provided in the ESPP, the maximum number of ordinary shares available for purchase under the ESPP is 1,526,239 plus an annual increase to be added on the first day of each of the Company's fiscal years for a period of up to 10 years, beginning with the fiscal year that begins on January 1, 2022, equal to the least of (i) 1% of the outstanding shares on such date, (ii) 7,631,196 shares, or (iii) a lesser amount determined by the Board. As of December 31, 2021, 1,526,239 shares were available for issuance under the ESPP.

The initial offering period for the ESPP is one year, commencing on December 1, 2021 and ending on November 30, 2022. As of the date of this report, no shares of the Company's ordinary shares have been purchased or distributed pursuant to the ESPP.

The assumptions that the Company used in the Black-Scholes option-pricing model to determine the fair value of the purchase rights under the ESPP for the year ended December 31, 2021, were as follows:

| | Year Ended December 31, 2021 |
|---|---|
| Expected term (in years) | 0.5-1.0 |
| Expected volatility (%) | 54% |
| Risk-free interest rate (%) | 0.10 - 0.25 |
| Dividend yield | — |

98

Exhibit 20
Page 2795

Case 1:23-cv-00695-MRA-SM Filed 03/03/23 Entered 03/03/23 09:1 Page 311 of 607
Table of Contents
2022.03.10 - Rockley 2021 10-K filing    Pg 111 of 126

*Stock-based compensation expense*

The following table summarizes our stock-based compensation expense for all equity arrangements and is included in the consolidated statements of operations and comprehensive loss as follows (in thousands):

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2021 | | 2020 | |
| Cost of revenue | $ | 1,825 | $ | 2,271 |
| Research and development | | 7,182 | | 4,313 |
| Selling, general, and administrative | | 3,006 | | 1,459 |
| Total stock-based compensation expense | $ | 12,013 | $ | 8,043 |

As of December 31, 2021 and 2020, there was approximately $40.5 million and $19.5 million, respectively of total unrecognized stock based compensation expense related to our equity awards, which is expected to be recognized over a weighted average period of 1.5 years and 1.4 years, respectively.

*Performance Awards*

For the years December 31, 2021 and 2020, we recognized a total expense of $0.3 million and $0.2 million respectively in relation to the performance-based options. As of December 31, 2021 and 2020, there were approximately $0.9 million and $1.2 million of unrecognized stock-based compensation expense related to the performance-based awards. During the year ended December 31, 2021, no additional performance-based awards were granted.

*Valuation of Stock Options*

The fair values of options granted during the period were determined using a Black-Scholes option pricing model. The determination of the fair value of stock-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as assumptions regarding complex and subjective variables. These variables include the expected stock price volatility over the term of the awards, risk-free interest rate and expected dividends.

We estimated expected volatility based on historical data of the price of our ordinary shares over the expected term of the options. The expected term, which represents the period of time that options granted are expected to be outstanding, is estimated based on guidelines provided in U.S. SEC Staff Accounting Bulletin No. 110 and represents the average of the vesting tranches and contractual terms. The risk-free rate assumed in valuing the options is based on the U.S. Treasury rate in effect at the time of grant for the expected term of the option. We do not anticipate paying any cash dividends in the foreseeable future and, therefore, used an expected dividend yield of zero in the option pricing model. Stock-based compensation awards (i.e. options and RSUs) are amortized on over a four-year period with 25% cliff vest at the first year anniversary of the grant and ratably over the next three years. We made an accounting policy election to account for forfeitures in the period they occur.

The weighted average assumptions used to value the grants are as follows:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Expected term (in years) | 6.05 | 4.86 - 6.25 |
| Expected volatility (%) | 53.0 | 50.29 - 52.45 |
| Risk-free interest rate (%) | 0.96 | 0.30 - 1.75 |
| Dividend yield | — | — |

*Warrants*

During the year ended December 31, 2020, Legacy Rockley issued warrants to intermediaries for introducing new investors related to equity financings. In connection with the Business Combination on August 11, 2021, all outstanding warrants of Legacy Rockley were exercised on a cashless basis and converted into the right to receive 1.8 million ordinary shares of the Company, with a fair value of $18.1 million.

**13.   Related Party Transactions**

The Company formed HRT, a joint venture with Hengtong Optic-Electric Co., Ltd. in 2017, which was recognized by the Company as an equity method investment. As of and in the year ended December 31, 2020, we made sales to and

99

Exhibit 20
Page 2796

Table of Contents

were owed from the HRT joint venture, $5.3 million and $3.3 million, respectively. The balance owed by the joint venture was included in accounts receivable in the consolidated balance sheet. As of and in the year ended December 31, 2021, sales to and balances owed from the HRT joint venture were immaterial.

## 14. Leases

We have operating leases for office space and finance leases for manufacturing equipment. These leases have remaining lease terms of 1 year to 5 years. Some leases include extension options for up to 5 years. These options are included in the lease term when it is reasonably certain that the option will be exercised.

The weighted average remaining lease term was approximately 4 years for operating leases as of December 31, 2021. The weighted average discount rate was 6.0% for operating leases as of December 31, 2021.

The components of lease cost for the years ended December 31, 2021 and 2020, were as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Operating Lease Cost:** | | |
| Fixed lease cost | $ 1,103 | 851 |
| Variable lease cost | 354 | 154 |
| Total operating lease cost | $ 1,457 | $ 1,005 |

The supplemental cash flow information related to our operating leases is as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Supplemental Cash Flow Information:** | | |
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows for operating leases | $ 936 | $ 916 |
| Operating cash flows for finance leases | $ — | $ 15 |
| Financing cash flows for finance leases | $ — | $ 1,192 |
| Right-of-use assets obtained in exchange of lease obligations: | | |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ 4,008 | $ — |

There are no finance lease liabilities as of December 31, 2021. Maturities of operating lease liabilities as of December 31, 2021, were as follows (in thousands):

| | Operating Leases |
| --- | --- |
| **Year Ending December 31:** | |
| 2022 | $ 1,5 |
| 2023 | 1,3 |
| 2024 | 9 |
| 2025 | 8 |
| 2026 | 8 |
| Thereafter | 1 |
| Total lease obligation | $ 5,6 |
| Less: Imputed interest | (6 |
| Total lease liabilities | $ 4,9 |
| Less: Current lease liabilities | (1,2 |
| Total non-current lease liabilities | $ 3,7 |

100

Exhibit 20
Page 2797

**15.   Commitments and Contingencies**

*Legal Contingencies*

From time to time, we are a party to various lawsuits, claims and other legal proceedings that arise in the ordinary course of business. We apply accounting for contingencies to determine when and how much to accrue for and disclose related to legal and other contingencies. Accordingly, we disclose contingencies deemed to be reasonably possible and accrue loss contingencies when, in consultation with legal advisors, it is concluded that a loss is probable and reasonably estimable. Although the ultimate aggregate amount of monetary liability or financial impact with respect to these matters is subject to many uncertainties and is therefore not predictable with assurance, management believes that as of December 31, 2021 there are no litigation pending that could have, individually and in the aggregate, a material adverse effect on our financial position, results of operations or cash flows.

*Financial Commitments*

In the ordinary course of business, we make commitments to third-party suppliers for various research and development activities. As of December 31, 2021 and 2020, we had $13.6 million and $3.0 million, respectively, in contractual obligations for which we have not yet received the services.

**16.   Defined Contribution Plan**

We have defined contribution plans, under which we contribute based on a percentage of the employees' elected contributions. We will have no legal or constructive obligation to pay further amounts. Obligations for contributions to defined contribution plans are recognized within selling, general and administrative expenses and research and development in the consolidated statements of operations and comprehensive loss. Defined contributions were $0.7 million and $0.5 million for years ended December 31, 2021 and 2020, respectively.

Exhibit 20
Page 2798

Table of Contents

Case 1:23-cv-00095-MN-SRF Document 34-10 Filed 03/03/23 Entered 08/03/22 17:09:17 Page 114 of 607
2022.03.10 - Rockley 2021 #0253 Filing    Pg 114 of 126

## 17. Supplemental Cash Flow Information

Non-cash operating, investing, and financing activities, and supplemental cash flow information are as follows (in thousands):

| | Years Ended December 31, | |
| | 2021 | 2020 |
|---|---:|---:|
| **Supplemental Cash Flow Information:** | | |
| Cash payments for: | | |
| Interest paid | $ 658 | $ 47 |
| Income tax paid | $ 978 | $ 313 |
| | | |
| **Non-cash Operating Activities:** | | |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ 4,008 | $ — |
| | $ 4,008 | $ — |
| **Non-cash Investing Activities:** | | |
| Unpaid property and equipment received | $ 805 | $ 166 |
| Unpaid balance related to the Trutouch Asset Acquisition | — | 500 |
| | $ 805 | $ 666 |
| **Non-cash Financing Activities:** | | |
| Conversion of convertible debt and accrued interest to ordinary shares | $ 181,404 | $ — |
| Conversion of Legacy Rockley ordinary shares to Rockley ordinary shares | 206,888 | — |
| Private Placement Warrants | 14,304 | — |
| Public Warrants | 28,031 | — |
| Issuance of ordinary shares in lieu of cash payment of transaction costs | 3,190 | — |
| Forgiveness of Paycheck Protection Program loan | 2,860 | $ — |
| Unpaid deferred transaction costs | 1,034 | — |
| Issuance of ordinary shares related to the Trutouch Asset Acquisition | — | 2,298 |
| Issuance of ordinary shares related to ELOC | 472 | — |
| | $ 438,183 | $ 2,298 |

## Item 9.    Changes In and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A.    Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We maintain a system of disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) designed to ensure that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and is accumulated and communicated to our management, including our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (our principal financial officer and principal accounting officer), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures under the Exchange Act as of and for the year ended December 31, 2021. Based on such evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and internal control over financial reporting were effective at the reasonable level.

Exhibit 20
Page 2799

**Management's Report on Internal Controls Over Financial Reporting**

This Annual Report on Form 10-K does not include a report of management's assessment regarding internal control over financial reporting due to a transition period established by rules of the Securities and Exchange Commission for newly public companies.

**No Attestation Report of Registered Public Accounting Firm**

This Annual Report on Form 10-K does not contain an attestation report of our registered public accounting firm regarding internal control over financial reporting since the Company, as an "emerging growth company," is not required to provide such report pursuant to Section 404 until we are no longer an 'emerging growth company" as defined by the JOBS Act.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the year ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

The effectiveness of any system of internal control over financial reporting, including ours, is subject to inherent limitations, including the exercise of judgment in designing, implementing, operating, and evaluating the controls and procedures, and the inability to eliminate misconduct completely. Accordingly, in designing and evaluating the disclosure controls and procedures, management recognizes that any system of internal control over financial reporting, including Rockley's, no matter how well designed and operated, can only provide reasonable, not absolute assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints, and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs. Moreover, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. We intend to continue to monitor and upgrade our internal controls as necessary or appropriate for our business, but cannot assure you that such improvements will be sufficient to provide us with effective internal control over financial reporting.

**Item 9B.        Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

Exhibit 20

Page 2800

**PART III**

**Item 10.          Directors, Executive Officers and Corporate Governance**

We will provide information that is responsive to this Item in our definitive proxy statement or in an amendment to this Annual Report on Form 10-K not later than 120 days after December 31, 2021. Such information is incorporated into this Item by reference.

Our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers, and directors, including our Chief Executive Officer, Chief Financial Officer and other executive and senior financial officers. The full text of our code of conduct is posted on the investor relations section on our website, which is located at https://investors.rockleyphotonics.com. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Business Conduct and Ethics by posting such information in the investor relations section of our website.

**Item 11.          Executive Compensation**

We will provide information that is responsive to this Item in our definitive proxy statement or in an amendment to this Annual Report on Form 10-K not later than 120 days after December 31, 2021. Such information is incorporated into this Item by reference.

**Item 12.          Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

We will provide information that is responsive to this Item in our definitive proxy statement or in an amendment to this Annual Report on Form 10-K not later than 120 days after December 31, 2021. Such information is incorporated into this Item by reference.

**Item 13.          Certain Relationships and Related Transactions, and Director Independence**

We will provide information that is responsive to this Item in our definitive proxy statement or in an amendment to this Annual Report on Form 10-K not later than 120 days after December 31, 2021. Such information is incorporated into this Item by reference.

**Item 14.          Principal Accounting Fees and Services**

We will provide information that is responsive to this Item in our definitive proxy statement or in an amendment to this Annual Report on Form 10-K not later than 120 days after December 31, 2021. Such information is incorporated into this Item by reference.

104

Exhibit 20
Page 2801

**PART IV**

Item 15.        **Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report**

1.    **All Financial Statements**

**See index to Consolidated Financial Statements, Item 8 of this Form 10-K.**

2.    **Financial Statement Schedules**

All financial statement schedules have been omitted, since the required information is not applicable or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and notes thereto included in this Form 10-K.

3.    **Exhibits required by Item 601 of Regulation S-K**

The information required by this Section (a)(3) of Item 15 is as follows:

| Exhibit Number | Description |
|---|---|
| 2.1 | Business Combination Agreement and Plan of Merger, dated as of March 19, 2021, by and among SC Health Corporation, Rockley Photonics Limited, Rockley Photonics Holdings Limited and Rockley Mergersub Limited (incorporated by reference from Annex A contained in the Registration Statement on Form S-4 (File No. 333-255109)). |
| 3.1 | Second Amended and Restated Memorandum and Articles of Association of Rockley Photonics Holdings Limited. (incorporated by reference from Exhibit 3.1 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 4.1 | Assignment, Assumption and Amendment Agreement among Computershare Trust Company, N.A., Computershare Inc., SC Health Corporation, SC Health Holdings Limited and Rockley Photonics Holdings Limited (incorporated by reference from Exhibit 4.2 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 4.2 | Form of Specimen Warrant Certificate of Rockley Photonics Holdings Limited (incorporated by reference from Exhibit 4.3 to the Registration Statement on Form S-4 (File No. 333-255109)). |
| 4.3 | Form of Specimen Ordinary Share Certificate of Rockley Photonics Holdings Limited (incorporated by reference from Exhibit 4.4 to the Registration Statement on Form S-4 (File No. 333-255109)). |
| 4.4 | Form of Lock-Up Agreement (incorporated by reference from Exhibit 4.5 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 10.1† | Form of Registration Rights and Lock-up Agreement (incorporated by reference from Annex G contained in the Registration Statement on Form S-4 (File No. 333-255109)). |
| 10.2+ | Form of Indemnification Agreement between Rockley Photonics Holdings Limited and its officers and directors (incorporated by reference from Exhibit 10.7 to the Registration Statement on Form S-4 (File No. 333-255109)). |
| 10.3+ | Rockley Photonics Holdings Limited 2021 Stock Incentive Plan and the Forms of Stock Option Agreement, Restricted Stock Unit Agreement and Restricted Stock Agreement (incorporated by reference from Exhibit 10.3 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |
| 10.4+ | Equity Side Letter with Andrew Rickman (incorporated by reference from Exhibit 10.25 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 10.5+† | Deed of Amendment to Andrew Rickman's Employment Agreement (incorporated by reference from Exhibit 10.26 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 10.6+ | Deed of Termination to Rockley Ventures Limited Consultancy Agreement (incorporated by reference from Exhibit 10.27 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 10.7+ | Amended and Restated Employment Agreement for Mahesh Karanth (incorporated by reference from Exhibit 10.28 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021) |
| 10.8+ | Amended and Restated Employment Agreement for Amit Nagra (incorporated by reference from Exhibit 10.29 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 10.9 | Purchase Agreement, dated November 15, 2021, by and between Rockley Photonics Holdings Limited and Lincoln Park Capital Fund, LLC(incorporated by reference from Exhibit 10.9 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |

Exhibit 20

Page 2802

| Exhibit Number | Description |
|---|---|
| 10.10 | Registration Rights Agreement, dated November 15, 2021, by and between Rockley Photonics Holdings Limited and Lincoln Park Capital Fund, LLC (incorporated by reference from Exhibit 10.10 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |
| 10.11 | Eighth Amendment to Lease Agreement, dated November 1, 2021, by and between 21st Century Techbanq Pasadena LLC and Rockley Photonics, Inc. (incorporated by reference from Exhibit 10.11 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |
| 10.12 | Second Amendment to Office Lease, dated October 7, 2021 by and between Boardwalk Office Associates, LLC and Rockley Photonics, Inc.(incorporated by reference from Exhibit 10.12 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |
| 10.13 | Consulting Agreement by and between Rockley Photonics Holdings Limited and HealthKapital LLC, dated March 15, 2021 Consulting Agreement by and between Rockley Photonics Holdings Limited and HealthKapital LLC, dated March 15, 2021 (incorporated by reference from Exhibit 10.13 to the Registrant's quarterly report on Form 10-Q for the quarter ended September 30, 2021). |
| 10.14+ | Rockley Photonics Limited 2013 Equity Incentive Plan and Forms of Stock Option Agreements (incorporated by reference from Exhibit 10.6 to the Registrant's quarterly report on Form 10-Q for the quarter ended June 30, 2021). |
| 21.1* | List of Subsidiaries |
| 23.1* | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm |
| 24.1* | Power of Attorney (included on signature page) |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1# | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2# | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | Interactive data files pursuant to Rule 405 of Regulation S-T. |

\#    In accordance with Item 601(b)(32)(ii) of Regulation S-K and SEC Release No. 34 - 47986, the certifications furnished in Exhibits 32.1 and 32.2 hereto are deemed to accompany this Form 10 Q and will not be deemed "filed" for purposes of Section 18 of the Exchange Act or deemed to be incorporated by reference into any filing under the Exchange Act or the Securities Act of 1933 except to the extent that the Company specifically incorporates it by reference.

†    Certain exhibits and schedules to this exhibit have been omitted pursuant to Item 601(a)(5) of Regulation S-K. The Registrant hereby agrees to furnish a copy of any omitted exhibits or schedules to the SEC upon request.

+    Indicates a management contract or compensatory plan.

\*    Filed herewith.

**Item 16.    Form 10-K Summary**

None.

Exhibit 20
Page 2803

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

|  |  |
|---|---|
| By: | /s/ Dr. Andrew Rickman, OBE |
| Name: | Dr. Andrew Rickman, OBE |
| Title: | Chief Executive Officer and Chairman of the Board of Directors |

|  |  |
|---|---|
|  | /s/ Mahesh Karanth |
| Name: | Mahesh Karanth |
| Title: | Chief Financial Officer (Principal Financial and Accounting Officer) |

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Dr. Andrew Rickman and Mahesh Karanth, and each of them, his or her true and lawful attorneys-in-fact and agents, each with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments, including post-effective amendments, to this Registration Statement, and any registration statement relating to the offering covered by this Registration Statement and filed pursuant to Rule 462(b) under the Securities Act of 1933, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that each of said attorneys-in-fact and agents, or his or her substitute or substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Dr. Andrew Rickman, OBE<br>Dr. Andrew Rickman, OBE | Chief Executive Officer<br>(Principal Executive Officer) | March 10, 2022 |
| /s/ Mahesh Karanth<br>Mahesh Karanth | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 10, 2022 |
| /s/ William Huyett<br>William Huyett | Lead Independent Director | March 10, 2022 |
| /s/ Dr. Caroline Brown<br>Dr. Caroline Brown | Director | March 10, 2022 |
| /s/ Karim Karti<br>Karim Karti | Director | March 10, 2022 |
| /s/ Michele Klein<br>Michele Klein | Director | March 10, 2022 |

107

Exhibit 20
Page 2804

| Name | Title | Date |
|---|---|---|
| /s/ Pamela Puryear | Director | March 10, 2022 |
| Pamela Puryear | | |
| /s/ Brian Blaser | Director | March 10, 2022 |
| Brian Blaser | | |
| /s/ Dr. Nicolaus Henke | Director | March 10, 2022 |
| Dr. Nicolaus Henke | | |

108

Exhibit 20
Page 2805

**Exhibit 21.1**

**Subsidiaries of the Registrant**

| Legal Name | Jurisdiction of Incorporation |
|---|---|
| Rockley Photonics Holdings Limited | Cayman Islands |
| Rockley Photonics Cayman Limited | Cayman Islands |
| Rockley Photonics Limited | England and Wales |
| Rockley Photonics, Inc. | Delaware, US |
| Rockley Photonics Oy | Finland |
| Rockley Photonics Ireland Limited | Republic of Ireland |
| Rockley Photonics Hong Kong Limited | Hong Kong |

Exhibit 20
Page 2806

Case 1:23-cv-00095-D-MR 90-8 A Filed 08/03/23 34 Entered 08/03/22 17 09:1 Page 822 of 607
2022.03.10 - Rockley 2021 #0366 Filing  Pg 122 of 126

Exhibit 23.1

**Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

- (Form S-8 No. 333-260329) pertaining to the 2021 Stock Incentive Plan of Rockley Photonics Holdings Limited and the 2021 Employee Stock Purchase Plan of Rockley Photonics Holdings Limited;
- (Form S-8 POS No. 333-255019) pertaining to the 2013 Stock Incentive Plan of Rockley Photonics Limited

of our report dated March 10, 2022, with respect to the consolidated financial statements of Rockley Photonics Holdings Limited included in this Annual Report (Form 10-K) for the year ended December 31, 2021.

/s/ Ernst & Young LLP

San Jose, California
March 10, 2022

Exhibit 20
Page 2807

Case 1:23-cv-00095-MRB-SMA   Document 34-10   Filed 08/03/23   Page 323 of 607
2022.03.10 - Rockley 2021 10-K Filing    Pg 123 of 126

Exhibit 31.1

**Certification of Principal Executive Officer**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Andrew Rickman, certify that:

1. I have reviewed this Annual Report on Form 10-K of Rockley Photonics Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Andrew Rickman
————————————————————
 Andrew Rickman
Chief Executive Officer
*(Principal Executive Officer)*

Date: March 10, 2022

Exhibit 20
Page 2808

**Certification of Principal Financial Officer**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Mahesh Karanth, certify that:

1. I have reviewed this Annual Report on Form 10-K of Rockley Photonics Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Mahesh Karanth
　Mahesh Karanth
Chief Financial Officer
*(Principal Financial Officer)*

Date: March 10, 2022

Exhibit 20
Page 2809

**Exhibit 32.1**

**Certification of Chief Executive Officer**
**Pursuant to 18 U.S.C. Section 1350,**
**As adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Rockley Photonics Holdings Limited (the "Company") on Form 10-K for the period ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

    1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2. The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company as of and for the period covered by the Report.


/s/ Andrew Rickman
 Andrew Rickman
Chief Executive Officer
*(Principal Executive Officer)*


Date: March 10, 2022

Exhibit 20
Page 2810

**Certification of Chief Financial Officer**
**Pursuant to 18 U.S.C. Section 1350,**
**As adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Rockley Photonics Holdings Limited (the "Company") on Form 10-K for the period ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.


/s/ Mahesh Karanth
 Mahesh Karanth
Chief Financial Officer
*(Principal Financial Officer)*


Date: March 10, 2022

Exhibit 20
Page 2811

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the "Agreement"), dated as of November 15, 2021, is made by and between **ROCKLEY PHOTONICS HOLDINGS LIMITED**, a Cayman Islands exempted company (the "Company"), and **LINCOLN PARK CAPITAL FUND, LLC**, an Illinois limited liability company (the "Investor"). Capitalized terms used herein and not otherwise defined herein are defined in Section 1 hereof.

### WHEREAS:

Subject to the terms and conditions set forth in this Agreement, the Company may, in its sole discretion, sell to the Investor, and the Investor wishes to buy from the Company, up to Fifty Million Dollars ($50,000,000) of the Company's ordinary shares, nominal value $0.000004026575398 per share (the "Ordinary Shares"). The Ordinary Shares to be purchased hereunder are referred to herein as the "Purchase Shares."

NOW THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Investor hereby agree as follows:

1.      **CERTAIN DEFINITIONS.**

For purposes of this Agreement, the following terms shall have the following meanings:

(a)      "Accelerated Purchase Date" means, with respect to any Accelerated Purchase made pursuant to Section 2(b) hereof, the Business Day immediately following the applicable Regular Purchase Date with respect to the corresponding Regular Purchase made pursuant to Section 2(a) hereof.

(b)      "Accelerated Purchase Minimum Price Threshold" means, with respect to any Accelerated Purchase made pursuant to Section 2(b) hereof, any minimum per share price threshold set forth by the Company in the applicable Accelerated Purchase Notice.

(c)      "Accelerated Purchase Notice" means, with respect to an Accelerated Purchase made pursuant to Section 2(b) hereof, an irrevocable written notice from the Company to the Investor directing the Investor to purchase the applicable Accelerated Purchase Share Amount at the Accelerated Purchase Price on the Accelerated Purchase Date for such Accelerated Purchase in accordance with this Agreement, and specifying any Additional Accelerated Purchase Minimum Price Threshold determined by the Company.

(d)      "Accelerated Purchase Price" means, with respect to an Accelerated Purchase made pursuant to Section 2(b) hereof, the lower of ninety-seven percent (97%) of (i) the VWAP for the period beginning at 9:30:01 a.m., Eastern time, on the applicable Accelerated Purchase Date, or such other time publicly announced by the Principal Market as the official open (or commencement) of trading on the Principal Market on such applicable Accelerated Purchase Date (the "Accelerated Purchase Commencement Time"), and ending at the earliest of (A) 4:00:00 p.m., Eastern time, on such applicable Accelerated Purchase Date, or such other time publicly announced by the Principal Market as the official close of trading on the Principal Market on such applicable Accelerated Purchase Date, (B) such time, from and after the Accelerated Purchase Commencement Time for such Accelerated Purchase, that the total

1

Exhibit 20
Page 2812

number (or volume) of Ordinary Shares traded on the Principal Market has exceeded the applicable Accelerated Purchase Share Volume Maximum, and (C) such time, from and after the Accelerated Purchase Commencement Time for such Accelerated Purchase, that the Sale Price has fallen below the applicable Accelerated Purchase Minimum Price Threshold (such earliest of (i)(A), (i)(B) and (i)(C) above, the "Accelerated Purchase Termination Time"), and (ii) the Closing Sale Price of the Ordinary Shares on such applicable Accelerated Purchase Date (to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split, reverse stock split or other similar transaction).

(e)    "Accelerated Purchase Share Amount" means, with respect to an Accelerated Purchase made pursuant to Section 2(b) hereof or an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, the number of Purchase Shares directed by the Company to be purchased by the Investor in a Purchase Notice, which number of Purchase Shares shall not exceed the lesser of (i) 300% of the applicable Regular Purchase Share Limit for the corresponding Regular Purchase and (ii) 20% of the total volume of Ordinary Shares traded on the Principal Market during the Accelerated Purchase Period or the Additional Accelerated Purchase Period, as applicable.

(f)    "Accelerated Purchase Share Percentage" means, with respect to an Accelerated Purchase made pursuant to Section 2(b) hereof, twenty percent (20%).

(g)    "Accelerated Purchase Share Volume Maximum" means, with respect to an Accelerated Purchase made pursuant to Section 2(b) hereof, a number of Ordinary Shares equal to (i) the applicable Accelerated Purchase Share Amount properly directed by the Company to be purchased by the Investor in the applicable Accelerated Purchase Notice for such Accelerated Purchase, divided by (ii) the Accelerated Purchase Share Percentage (to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split, reverse stock split or other similar transaction).

(h)    "Additional Accelerated Purchase Date" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, the Business Day (i) that is the Accelerated Purchase Date with respect to the corresponding Accelerated Purchase referred to in Section 2(b) hereof and (ii) on which the Investor receives, prior to 1:00 p.m., Eastern time, on such Business Day, a valid Additional Accelerated Purchase Notice for such Additional Accelerated Purchase in accordance with this Agreement.

(i)    "Additional Accelerated Purchase Minimum Price Threshold" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, any minimum per share price threshold set forth by the Company in the applicable Additional Accelerated Purchase Notice.

(j)    "Additional Accelerated Purchase Notice" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, an irrevocable written notice from the Company to the Investor directing the Investor to purchase the applicable Additional Accelerated Purchase Share Amount at the Additional Accelerated Purchase Price for such Additional Accelerated Purchase in accordance with this Agreement, and specifying any Additional Accelerated Purchase Minimum Price Threshold determined by the Company.

(k)    "Additional Accelerated Purchase Price" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, the lower of ninety-seven percent (97%) of (i) the VWAP for the period on the applicable Additional Accelerated Purchase Date, beginning at the latest of (A) the applicable Accelerated Purchase Termination Time with respect to the corresponding Accelerated Purchase referred to in Section 2(c) hereof on such Additional Accelerated Purchase Date, (B) the applicable

2

Exhibit 20
Page 2813

Additional Accelerated Purchase Termination Time with respect to the most recently completed prior Additional Accelerated Purchase on such Additional Accelerated Purchase Date, as applicable, and (C) the time at which all Purchase Shares subject to all prior Accelerated Purchases and Additional Accelerated Purchases (as applicable), including, without limitation, those that have been effected on the same Business Day as the applicable Additional Accelerated Purchase Date with respect to which the applicable Additional Accelerated Purchase relates, have theretofore been received by the Investor as DWAC Shares in accordance with this Agreement (such latest of (i)(A), (i)(B) and (i)(C) above, the "Additional Accelerated Purchase Commencement Time"), and ending at the earliest of (X) 4:00 p.m., Eastern time, on such Additional Accelerated Purchase Date, or such other time publicly announced by the Principal Market as the official close of trading on the Principal Market on such Additional Accelerated Purchase Date, (Y) such time, from and after the Additional Accelerated Purchase Commencement Time for such Additional Accelerated Purchase, that the total number (or volume) of Ordinary Shares traded on the Principal Market has exceeded the applicable Additional Accelerated Purchase Share Volume Maximum, and (Z) such time, from and after the Additional Accelerated Purchase Commencement Time such Additional Accelerated Purchase, that the Sale Price has fallen below the applicable Additional Accelerated Purchase Minimum Price Threshold (such earliest of (i)(X), (i)(Y) and (i)(Z) above, the "Additional Accelerated Purchase Termination Time"), and (ii) the Closing Sale Price of the Ordinary Shares on such Additional Accelerated Purchase Date (to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split, reverse stock split or other similar transaction).

(l)     "Additional Accelerated Purchase Share Amount" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, the number of Purchase Shares directed by the Company to be purchased by the Investor on an Additional Accelerated Purchase Notice, which number of Purchase Shares shall not exceed the lesser of (i) 300% of the number of Purchase Shares directed by the Company to be purchased by the Investor pursuant to the corresponding Regular Purchase Notice for the corresponding Regular Purchase referred to in Section 2(c) hereof (subject to the Purchase Share limitations contained in Section 2(a) hereof) and (ii) an amount equal to (A) the Additional Accelerated Purchase Share Percentage multiplied by (B) the total number (or volume) of Ordinary Shares traded on the Principal Market during the period on the applicable Additional Accelerated Purchase Date beginning at the Additional Accelerated Purchase Commencement Time for such Additional Accelerated Purchase and ending at the Additional Accelerated Purchase Termination Time for such Additional Accelerated Purchase.

(m)     "Additional Accelerated Purchase Share Percentage" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, twenty percent (20%).

(n)     "Additional Accelerated Purchase Share Volume Maximum" means, with respect to an Additional Accelerated Purchase made pursuant to Section 2(c) hereof, a number of Ordinary Shares equal to (i) the applicable Additional Accelerated Purchase Share Amount properly directed by the Company to be purchased by the Investor pursuant to the applicable Additional Accelerated Purchase Notice for such Additional Accelerated Purchase, divided by (ii) the Additional Accelerated Purchase Share Percentage (to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split, reverse stock split or other similar transaction).

(o)     "Alternate Adjusted Regular Purchase Share Limit" means, with respect to a Regular Purchase made pursuant to Section 2(a) hereof, the maximum number of Purchase Shares which, taking into account the applicable per share Purchase Price therefor calculated in accordance with this Agreement, would enable the Company to deliver to the Investor, on the applicable Purchase Date for such Regular

3

Exhibit 20
Page 2814

Purchase, a Regular Purchase Notice for a Purchase Amount equal to, or as closely approximating without exceeding, Five Hundred Thousand Dollars ($500,000).

(p)     "Available Amount" means, initially, Fifty Million Dollars ($50,000,000) in the aggregate, which amount shall be reduced by the Purchase Amount each time the Investor purchases Ordinary Shares pursuant to Section 2 hereof.

(q)     "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal, state or similar laws applicable to Cayman Island corporations for the relief of debtors.

(r)     "Business Day" means any day on which the Principal Market is open for trading, including any day on which the Principal Market is open for trading for a period of time less than the customary time.

(s)     "Closing Sale Price" means, for any security as of any date, the last closing sale price for such security on the Principal Market as reported by the Principal Market.

(t)     "Commitment Shares" shall have the meaning ascribed to such term in Section 4(cc) herein.

(u)     "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including, without limitation, documents, prototypes, samples, plant and equipment), which is designated as "Confidential," "Proprietary" or some similar designation. Information communicated orally shall be considered Confidential Information if such information is confirmed in writing as being Confidential Information within ten (10) Business Days after the initial disclosure. Confidential Information may also include information disclosed to a disclosing party by third parties. Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party without confidential restriction at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession; or (vi) is required by law to be disclosed by the receiving party, provided that the receiving party gives the disclosing party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure.

(v)     "DTC" means The Depository Trust Company, or any successor performing substantially the same function for the Company.

(w)     "DWAC Shares" means Ordinary Shares that are (i) issued in electronic form, (ii) freely tradable and transferable and without restriction on resale and (iii) timely credited by the Company to the Investor's or its designee's specified Deposit/Withdrawal at Custodian (DWAC) account with DTC under its Fast Automated Securities Transfer (FAST) Program, or any similar program hereafter adopted by DTC performing substantially the same function.

[5.5.2.3.2] [Rockley - Purchase Agreement (Executed) 4880-3819-1107 v.1.pdf] [Page 4 of 45]

Exhibit 20
Page 2815

(x)     "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(y)     "Floor Price" means $1.00, which shall be adjusted for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction and, effective upon the consummation of any of the foregoing, the Floor Price shall mean the lower of (i) the adjusted price and (ii) $1.00.

(z)     "Fully Adjusted Regular Purchase Share Limit" means, with respect to any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction from and after the date of this Agreement, the Regular Purchase Share Limit (as defined in Section 2(a) hereof) in effect on the applicable date of determination, after giving effect to the full proportionate adjustment thereto made pursuant to Section 2(b) hereof for or in respect of such reorganization, recapitalization, non-cash dividend, stock split or other similar transaction.

(aa)     "Material Adverse Effect" means any material adverse effect on (i) the enforceability of any Transaction Document, (ii) the results of operations, assets, business or financial condition of the Company and its Subsidiaries, taken as a whole, other than any material adverse effect that resulted exclusively from (A) any change in the United States or foreign economies or securities or financial markets in general that does not have a disproportionate effect on the Company and its Subsidiaries, taken as a whole, (B) any change that generally affects the industry in which the Company and its Subsidiaries operate that does not have a disproportionate effect on the Company and its Subsidiaries, taken as a whole, (C) any change arising in connection with earthquakes, other acts of God, a pandemic, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such pandemic, hostilities, acts of war, sabotage or terrorism or military actions existing as of the date hereof, (D) any action taken by the Investor, its affiliates or its or their successors and assigns with respect to the transactions contemplated by this Agreement, (E) the effect of any change in Applicable Laws or accounting rules that does not have a disproportionate effect on the Company and its Subsidiaries, taken as a whole, or (F) any change resulting from compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement, or (iii) the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document to be performed as of the date of determination.

(bb)     "Maturity Date" means the first day of the month immediately following the twenty-four (24) month anniversary of the Commencement Date.

(cc)     "New Registration Statement" has the meaning set forth in the Registration Rights Agreement.

(dd)     "PEA Period" means the period commencing at 9:30 a.m., Eastern time, on the tenth (10th) Business Day immediately prior to the filing of any post-effective amendment to the Registration Statement (as defined herein) or New Registration Statement (as such term is defined in the Registration Rights Agreement), and ending at 9:30 a.m., Eastern time, on the Business Day immediately following, the effective date of any post-effective amendment to the Registration Statement (as defined herein) or New Registration Statement (as such term is defined in the Registration Rights Agreement).

(ee)     "Person" means an individual or entity including but not limited to any limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

5

Exhibit 20
Page 2816

(ff)    "Principal Market" means the New York Stock Exchange (or any nationally recognized successor thereto); provided, however, that in the event the Company's Ordinary Shares are ever listed or traded on The Nasdaq Capital Market, The Nasdaq Global Select Market, The Nasdaq Global Market, NYSE American, the NYSE Arca, the OTC Bulletin Board, or the OTCQX or OTCQB operated by the OTC Markets Group, Inc. (or any nationally recognized successor to any of the foregoing), then the "Principal Market" shall mean such other market or exchange on which the Company's Ordinary Shares are then listed or traded.

(gg)    "Purchase" means any Regular Purchase, Accelerated Purchase or Additional Accelerated Purchase made hereunder, as applicable.

(hh)    "Purchase Amount" means, with respect to any Regular Purchase, Accelerated Purchase or Additional Accelerated Purchase made hereunder, as applicable, the portion of the Available Amount to be purchased by the Investor pursuant to Section 2 hereof.

(ii)    "Purchase Notice" means a notice delivered to the Investor pursuant to Section 2 with respect to any Regular Purchase, Accelerated Purchase or Additional Accelerated Purchase, respectively.

(jj)    "Purchase Price" means, with respect to a Regular Purchase made pursuant to Section 2(a) hereof, the lower of: (i) the lowest Sale Price on the Purchase Date for such Regular Purchase and (ii) the arithmetic average of the three (3) lowest Closing Sale Prices for the Ordinary Shares during the ten (10) consecutive Business Days ending on the Business Day immediately preceding such Purchase Date for such Regular Purchase (in each case, to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction that occurs on or after the date of this Agreement).

(kk)    "Registration Rights Agreement" means that certain Registration Rights Agreement, of even date herewith between the Company and the Investor.

(ll)    "Regular Purchase Date" means, with respect to a Regular Purchase made pursuant to Section 2(a) hereof, the Business Day for which the Investor receives, after 4:00 p.m., Eastern time on such Business Day, or thereafter as permitted by Section 2(a) hereof, a valid Purchase Notice for such Regular Purchase in accordance with this Agreement; provided that any Business Day that is twenty (20) days or less before the filing of any post-effective amendment to the Registration Statement or New Registration Statement, and until the effective date of any such post-effective amendment to the Registration Statement or New Registration Statement, shall not be a Regular Purchase Date.

(mm)    "Regular Purchase Notice" means, with respect to a Regular Purchase pursuant to Section 2(b) hereof, an irrevocable written notice from the Company to the Investor directing the Investor to buy a specified number of Purchase Shares (subject to the Purchase Share limitations contained in Section 2(b) hereof) at the applicable Purchase Price for such Regular Purchase in accordance with this Agreement.

(nn)    "Sale Price" means any sale price for the Ordinary Shares on the Principal Market as reported by the Principal Market.

(oo)    "SEC" means the U.S. Securities and Exchange Commission.

(pp)    "Securities" means, collectively, the Purchase Shares and the Commitment Shares.

6

Exhibit 20
Page 2817

(qq)    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(rr)    "Subsidiary" means any Person the Company wholly owns or controls, or in which the Company, directly or indirectly, owns a majority of the voting stock or similar voting interest, in each case that would be disclosable pursuant to Item 601(b)(21) of Regulation S-K promulgated under the Securities Act.

(ss)    "Transaction Documents" means, collectively, this Agreement and the schedules and exhibits hereto, the Registration Rights Agreement and the schedules and exhibits thereto and each of the other agreements, documents, certificates and instruments entered into or furnished by the parties hereto in connection with the transactions contemplated hereby and thereby.

(tt)    "Transfer Agent" means Computershare Trust Company, N.A., or such other Person who is then serving as the transfer agent for the Company in respect of the Ordinary Shares.

(uu)    "VWAP" means in respect of an applicable Accelerated Purchase Date, the volume weighted average price of the Ordinary Shares on the Principal Market, as reported on the Principal Market or by another reputable source such as Bloomberg, L.P.

## 2.    PURCHASE OF ORDINARY SHARES.

Subject to the terms and conditions set forth in this Agreement, the Company has the right, but not the obligation, to sell to the Investor, in the Company's sole and absolute discretion, and the Investor has the obligation to purchase from the Company, Purchase Shares as follows:

(a)    Commencement of Regular Purchases of Ordinary Shares. Upon the satisfaction of the conditions set forth in Sections 7 and 8 hereof (the "Commencement" and the date of satisfaction of such conditions the "Commencement Date") and thereafter, the Company shall have the right, but not the obligation, to direct the Investor, by its delivery to the Investor of a Purchase Notice from time to time on any Regular Purchase Date on which the Closing Sale Price is not below the Floor Price, to purchase up to One Hundred Sixty Thousand (160,000) Purchase Shares, subject to adjustment as set forth below in this Section 2(a) (such maximum number of Purchase Shares, as may be adjusted from time to time, the "Regular Purchase Share Limit"), at the Purchase Price on the Purchase Date (each such purchase a "Regular Purchase"); provided, however, that the Regular Purchase Share Limit shall be increased to: (i) One Hundred Seventy-Five Thousand (175,000) Purchase Shares, if the Closing Sale Price of the Ordinary Shares on the applicable Purchase Date is not below $8.50,(ii) Two Hundred Thousand (200,000) Purchase Shares, if the Closing Sale Price of the Ordinary Shares on the applicable Purchase Date is not below $10.00, and (iii) Two Hundred Fifty Thousand (250,000) Purchase Shares if the Closing Sale Price of the Ordinary Shares is not below $12.00 (all of which share and dollar amounts shall be appropriately proportionately adjusted for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction); provided that if, after giving effect to the full proportionate adjustment to the Regular Purchase Share Limit therefor, the Fully Adjusted Regular Purchase Share Limit then in effect would preclude the Company from delivering to the Investor a Regular Purchase Notice hereunder for a Purchase Amount (calculated by multiplying (X) the number of Purchase Shares equal to the Fully Adjusted Regular Purchase Share Limit, by (Y) the Purchase Price per Purchase Share covered by such Regular Purchase Notice on the applicable Purchase Date therefor) equal to or greater than the Alternate Adjusted Regular Purchase Share Limit, the Regular Purchase Share Limit for such Regular Purchase Notice shall not be

7

Exhibit 20
Page 2818

fully adjusted to equal the applicable Fully Adjusted Regular Purchase Share Limit, but rather the Regular Purchase Share Limit for such Regular Purchase Notice shall be adjusted to equal the applicable Alternate Adjusted Regular Purchase Share Limit as of the applicable Purchase Date for such Regular Purchase Notice; and provided, further, however, that the Investor's committed obligation under any single Regular Purchase, other than any Regular Purchase with respect to which an Alternate Adjusted Regular Purchase Share Limit shall apply, shall not exceed Three Million Five Hundred Thousand Dollars ($3,500,000). If the Company delivers any Regular Purchase Notice for a Purchase Amount in excess of the limitations contained in the immediately preceding sentence, such Regular Purchase Notice shall be void *ab initio* only with respect to the extent of the amount by which the number of Purchase Shares set forth in such Regular Purchase Notice exceeds the number of Purchase Shares which the Company is permitted to include in such Purchase Notice in accordance herewith, and the Investor shall have no obligation to purchase such excess Purchase Shares in respect of such Regular Purchase Notice; provided, however, that the Investor shall remain obligated to purchase the number of Purchase Shares which the Company is permitted to include in such Regular Purchase Notice. The Company may deliver a Regular Purchase Notice to the Investor as often as every Business Day, so long as the Company has not failed to deliver Purchase Shares for the most recent prior Regular Purchase. Notwithstanding the foregoing, the Company shall not deliver any Regular Purchase Notices during the PEA Period.

(b)    Accelerated Purchases. Subject to the terms and conditions of this Agreement, from and after one (1) Business Day following the Commencement Date, in addition to purchases of Purchase Shares as described in Section 2(a) above, the Company shall also have the right, but not the obligation, to direct the Investor, by its delivery to the Investor of an Accelerated Purchase Notice from time to time in accordance with this Agreement, to purchase the applicable Accelerated Purchase Share Amount at the Accelerated Purchase Price on the Accelerated Purchase Date therefor in accordance with this Agreement (each such purchase, an "Accelerated Purchase"); provided however, that the parties may mutually agree to increase the Accelerated Purchase Share Amount for any Accelerated Purchase up to One Million (1,000,000) Purchase Shares. The Company may deliver an Accelerated Purchase Notice to the Investor only on a Purchase Date on which the Company also properly submitted a Regular Purchase Notice providing for a Regular Purchase of a number of Purchase Shares not less than the Regular Purchase Share Limit then in effect on such Purchase Date in accordance with this Agreement (including, without limitation, giving effect to any automatic increase to the Regular Purchase Share Limit as a result of the Closing Sale Price of the Ordinary Shares exceeding certain thresholds set forth in Section 2(a) above on such Purchase Date and any other adjustments to the Regular Purchase Share Limit, in each case pursuant to Section 2(a) above). If the Company delivers any Accelerated Purchase Notice directing the Investor to purchase an amount of Purchase Shares that exceeds the Accelerated Purchase Share Amount that the Company is then permitted to include in such Accelerated Purchase Notice, such Accelerated Purchase Notice shall be void *ab initio* only with respect to the extent of the amount by which the number of Purchase Shares set forth in such Accelerated Purchase Notice exceeds the Accelerated Purchase Share Amount that the Company is then permitted to include in such Accelerated Purchase Notice (which shall be confirmed in an Accelerated Purchase Confirmation), and the Investor shall have no obligation to purchase such excess Purchase Shares in respect of such Accelerated Purchase Notice; provided, however, that the Investor shall remain obligated to purchase the Accelerated Purchase Share Amount which the Company is permitted to include in such Accelerated Purchase Notice. Within one (1) Business Day after completion of each Accelerated Purchase Date for an Accelerated Purchase, the Investor will provide to the Company a written confirmation of such Accelerated Purchase setting forth the applicable Accelerated Purchase Share Amount and Accelerated Purchase Price for such Accelerated Purchase (each, an "Accelerated Purchase

[5.5.2.3.2] [Rockley - Purchase Agreement (Executed) 4880-3819-1107 v.1.pdf] [Page 8 of 45]

Exhibit 20

Page 2819

Confirmation"). Notwithstanding the foregoing, the Company shall not deliver any Accelerated Purchase Notices during the PEA Period.

(c)     Additional Accelerated Purchases.  On any Accelerated Purchase Date, provided that the Company properly submitted a Purchase Notice for an Accelerated Purchase and subject to the terms and conditions of this Agreement, the Company shall also have the right, but not the obligation, to direct the Investor, by its delivery to the Investor of a Purchase Notice from time to time in accordance with this Agreement, to purchase the applicable Accelerated Purchase Share Amount (each such purchase, an "Additional Accelerated Purchase") at the Accelerated Purchase Price. The Company may deliver Purchase Notices to the Investor for multiple Additional Accelerated Purchases on an Accelerated Purchase Date subject to the second sentence of Section 2(g). Subject to the terms and conditions of this Agreement, from and after one Business Day following the Commencement Date, in addition to purchases of Purchase Shares as described in Section 2(a) and Section 2(b) above, the Company shall also have the right, but not the obligation, to direct the Investor, by its timely delivery to the Investor of an Additional Accelerated Purchase Notice on an Additional Accelerated Purchase Date in accordance with this Agreement, to purchase the applicable Additional Accelerated Purchase Share Amount at the applicable Additional Accelerated Purchase Price therefor in accordance with this Agreement (each such purchase, an "Additional Accelerated Purchase"); provided however, that the parties may mutually agree to increase the Additional Accelerated Purchase Share Amount for any Additional Accelerated Purchase. The Company may deliver multiple Additional Accelerated Purchase Notices to the Investor on an Additional Accelerated Purchase Date; provided, however, that the Company may deliver an Additional Accelerated Purchase Notice to the Investor only (i) on a Business Day that is also the Accelerated Purchase Date for an Accelerated Purchase with respect to which the Company properly submitted to the Investor an Accelerated Purchase Notice in accordance with this Agreement on the applicable Purchase Date for a Regular Purchase of a number of Purchase Shares not less than the Regular Purchase Share Limit then in effect in accordance with this Agreement (including, without limitation, giving effect to any automatic increase to the Regular Purchase Share Limit as a result of the Closing Sale Price of the Ordinary Shares exceeding certain thresholds set forth in Section 2(a) above on such Purchase Date and any other adjustments to the Regular Purchase Share Limit, in each case pursuant to Section 2(a) above), and (ii) if all Purchase Shares subject to all prior Regular Purchases, Accelerated Purchases and Additional Accelerated Purchases, including, without limitation, those that have been effected on the same Business Day as the applicable Additional Accelerated Purchase Date with respect to which the applicable Additional Accelerated Purchase relates, in each case have theretofore been received by the Investor as DWAC Shares in accordance with this Agreement. If the Company delivers any Additional Accelerated Purchase Notice directing the Investor to purchase an amount of Purchase Shares that exceeds the Additional Accelerated Purchase Share Amount that the Company is then permitted to include in such Additional Accelerated Purchase Notice, such Additional Accelerated Purchase Notice shall be void *ab initio* only with respect to the extent of the amount by which the number of Purchase Shares set forth in such Additional Accelerated Purchase Notice exceeds the Additional Accelerated Purchase Share Amount that the Company is then permitted to include in such Additional Accelerated Purchase Notice (which shall be confirmed in an Additional Accelerated Purchase Confirmation), and the Investor shall have no obligation to purchase such excess Purchase Shares in respect of such Additional Accelerated Purchase Notice; provided, however, that the Investor shall remain obligated to purchase the Additional Accelerated Purchase Share Amount which the Company is permitted to include in such Additional Accelerated Purchase Notice. Within one (1) Business Day after completion of each Additional Accelerated Purchase Date, the Investor will provide to the Company a written confirmation of each Additional Accelerated Purchase on such Additional Accelerated Purchase Date

9

Exhibit 20
Page 2820

setting forth the applicable Additional Accelerated Purchase Share Amount and Additional Accelerated Purchase Price for each such Additional Accelerated Purchase on such Additional Accelerated Purchase Date (each, an "Additional Accelerated Purchase Confirmation"). Notwithstanding the foregoing, the Company shall not deliver any Additional Accelerated Purchase Notices during the PEA Period.

(d)     Payment for Purchase Shares.    For each Regular Purchase, the Investor shall pay to the Company an amount equal to the Purchase Amount with respect to such Regular Purchase as full payment for such Purchase Shares via wire transfer of immediately available funds on the same Business Day that the Investor receives such Purchase Shares, if such Purchase Shares are received by the Investor before 1:00 p.m., Eastern time, or, if such Purchase Shares are received by the Investor after 1:00 p.m., Eastern time, the next Business Day. Within one (1) Business Day after completion of each Accelerated Purchase Date for an Accelerated Purchase or Additional Accelerated Purchase, respectively, the Investor will provide to the Company a written confirmation of such Accelerated Purchase setting forth the applicable Accelerated Purchase Share Amount and Accelerated Purchase Price for such purchase. For each Accelerated Purchase and each Additional Accelerated Purchase, the Investor shall pay to the Company an amount equal to the Purchase Amount with respect to such purchase as full payment for such Purchase Shares via wire transfer of immediately available funds no later than the second Business Day following the date that the Investor receives the Purchase Shares for such Purchase. If the Company or the Transfer Agent shall fail for any reason or for no reason to electronically transfer any Purchase Shares as DWAC Shares with respect to any Purchase within two (2) Business Days following the receipt by the Company of the Purchase Price or Accelerated Purchase Price, as applicable, for any Purchase therefor in compliance with this Section 2(d), and if on or after such Business Day the Investor purchases (in an open market transaction or otherwise) Ordinary Shares to deliver in satisfaction of a sale by the Investor of Purchase Shares in anticipation of receiving Purchase Shares from the Company with respect to such Purchase, then the Company shall, within two (2) Business Days after the Investor's request, either (i) pay cash to the Investor in an amount equal to the Investor's total purchase price (including customary brokerage commissions, if any) for the Ordinary Shares so purchased (the "Cover Price"), at which point the Company's obligation to deliver such Purchase Shares as DWAC Shares shall terminate, or (ii) promptly honor its obligation to deliver to the Investor such Purchase Shares as DWAC Shares and pay cash to the Investor in an amount equal to the excess (if any) of the Cover Price over the total Purchase Amount paid by the Investor pursuant to this Agreement for all of the Purchase Shares to be purchased by the Investor in connection with such purchases. All payments made under this Agreement shall be made in lawful money of the United States of America or wire transfer of immediately available funds to such account as the Company may from time to time designate by written notice in accordance with the provisions of this Agreement. Whenever any amount expressed to be due by the terms of this Agreement is due on any day that is not a Business Day, the same shall instead be due on the next succeeding day that is a Business Day.

(e)     Compliance with Rules of the Principal Market. Notwithstanding anything in this Agreement to the contrary, and in addition to the limitations set forth in Section 2(f), the Company shall not issue more than 25,320,862 (including the Commitment Shares) Ordinary Shares (the "Exchange Cap") under this Agreement, which equals 19.99% of the Company's outstanding Ordinary Shares as of the date hereof, unless shareholder approval is obtained to issue in excess of the Exchange Cap; provided, however, that the foregoing limitation shall not apply if at any time the Exchange Cap is reached and at all times thereafter the average price paid for all Ordinary Shares issued under this Agreement is equal to or greater than $6.38, which is a price equal to the lower of (i) the New York Stock Exchange Official Closing Price

[5.5.2.3.2] [Rockley - Purchase Agreement (Executed) 4880-3819-1107 v.1.pdf] [Page 10 of 45]

Exhibit 20
Page 2821

Case 1:23-cv-10095-MRA-MAA Filed 03/03/23 Entered 08/03/22 23:09:11 Page Exhibit 607
2021.11.15 - Rockley - Lincoln Park Purchase Agreement (Executed) (C    Pg 11 of 45

EXECUTION COPY

immediately preceding the execution of this Agreement or (ii) the arithmetic average of the New York Stock Exchange Official Closing Prices for the Ordinary Shares for the five (5) consecutive Business Days immediately preceding the execution of this Agreement, as calculated in accordance with the rules of the Principal Market (in such circumstance, for purposes of the Principal Market, the transaction contemplated hereby would not be "below market" and the Exchange Cap would not apply). Notwithstanding the foregoing, the Company shall not be required or permitted to issue, and the Investor shall not be required to purchase, any Ordinary Shares under this Agreement if such issuance would violate the rules or regulations of the Principal Market. The Company may, in its sole discretion, determine whether to obtain stockholder approval to issue more than 19.99% of its outstanding Ordinary Shares hereunder if such issuance would require stockholder approval under the rules or regulations of the Principal Market. The Exchange Cap shall be reduced, on a share-for-share basis, by the number of Ordinary Shares issued or issuable that may be aggregated with the transactions contemplated by this Agreement under applicable rules of the Principal Market.

(f)    Beneficial Ownership Limitation. Notwithstanding anything to the contrary contained in this Agreement, the Company shall not issue or sell, and the Investor shall not purchase or acquire, any Ordinary Shares under this Agreement which, when aggregated with all other Ordinary Shares then beneficially owned by the Investor and its affiliates (as calculated pursuant to Section 13(d) of the Exchange Act and Rule 13d-3 promulgated thereunder) would result in the beneficial ownership by the Investor and its affiliates of more than 4.99% of the then issued and outstanding Ordinary Shares (the "Beneficial Ownership Limitation"). Upon the written or oral request of the Investor, the Company shall promptly (but not later than twenty-four (24) hours) confirm orally or in writing to the Investor the amount of Ordinary Shares then outstanding.  Upon the oral or written request of the Company, the Investor shall promptly (but not later than twenty-four (24) hours) confirm orally or in writing to the Company whether the total number of shares beneficially held by it and its affiliates exceeds 4.0% of the total outstanding amount of Ordinary Shares then outstanding. The Investor and the Company shall each cooperate in good faith in the determinations required hereby and the application hereof. The Investor's written certification to the Company of the applicability of the Beneficial Ownership Limitation, and the resulting effect thereof hereunder at any time, shall be conclusive with respect to the applicability thereof and such result absent manifest error.

(g)    Excess Share Limitations. If the Company delivers any Purchase Notice for a Purchase Amount in excess of the limitations contained in this Section 2, such Purchase Notice shall be void *ab initio* to the extent of the amount by which the number of Purchase Shares set forth in such Purchase Notice exceeds the number of Purchase Shares which the Company is permitted to include in such Purchase Notice in accordance herewith, and the Investor shall have no obligation to purchase such excess Purchase Shares in respect of such Purchase Notice; provided, however, that the Investor shall remain obligated to purchase the number of Purchase Shares which the Company is permitted to include in such Purchase Notice. If the Company delivers a Purchase Notice, and all Purchase Shares subject to all prior Purchases have not theretofore been received by the Investor as DWAC Shares in accordance with this Agreement, such Purchase Notice shall not be deemed to have been delivered and the Investor shall not be required to purchase any Purchase Shares until all Purchase Shares for such prior Purchases have been received by the Investor as DWAC Shares. If any issuance of Purchase Shares would result in the issuance of a fraction of an Ordinary Share, the Company shall round down such fraction of an Ordinary Share to the nearest whole share and no fractional shares will be issued.

11

(h)    Adjustments for Shares and Prices. Except as specifically stated otherwise, all share-related and dollar-related limitations contained in this Section 2, shall be adjusted to take into account any reorganization, recapitalization, non-cash dividend, stock split, reverse stock, split or other similar transaction effected with respect to the Ordinary Shares.

## 3.    INVESTOR'S REPRESENTATIONS AND WARRANTIES.

The Investor represents and warrants to the Company that as of the date hereof and as of the Commencement Date:

(a)    Organization, Authority. The Investor is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with the requisite power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder.

(b)    Accredited Investor Status. The Investor is an "accredited investor" as that term is defined in Rule 501(a)(3) of Regulation D promulgated under the Securities Act.

(c)    Reliance on Exemptions. The Investor understands that the Securities may be offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and the Investor's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Investor set forth herein in order to determine the availability of such exemptions and the eligibility of the Investor to acquire the Securities.

(d)    Investment Purpose. The Investor is acquiring the Securities as principal for its own account for investment only and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other Persons to distribute or regarding the distribution of such Securities in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting the Investor's right to sell the Securities at any time pursuant to the Registration Statement described herein or otherwise in compliance with applicable federal and state securities laws). The Investor is acquiring the Securities hereunder in the ordinary course of its business.

(e)    Information. The Investor understands that its investment in the Securities involves a high degree of risk. The Investor (i) is able to bear the economic risk of an investment in the Securities including a total loss thereof, (ii) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the proposed investment in the Securities and (iii) has had an opportunity to ask questions of and receive answers from the officers of the Company concerning the financial condition and business of the Company and other matters related to an investment in the Securities. Neither such inquiries nor any other due diligence investigations conducted by the Investor or its representatives shall modify, amend or affect the Investor's right to rely on the Company's representations and warranties contained in Section 4 below. The Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of

12

Exhibit 20
Page 2823

Case 1:23-cv-10095-MRA-MAA Filed 03/03/23 Entered 03/03/22 17:09:10 Page Exhibit D-607
2021.11.15 - Rockley - Lincoln Park Purchase Agreement (Executed) (C    Pg 13 of 45

EXECUTION COPY

the Securities and is not relying on any accounting, legal, tax or other advice from the Company or its officers, employees, representatives or advisors.

(f)    No Governmental Review. The Investor understands that no U.S. federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of an investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(g)    Transfer or Sale. The Investor understands that (i) the Securities may not be offered for sale, sold, assigned or transferred unless (A) registered pursuant to the Securities Act or (B) an exemption exists permitting such Securities to be sold, assigned or transferred without such registration; (ii) any sale of the Securities made in reliance on Rule 144 promulgated under the Securities Act ("Rule 144") may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the Securities Act) may require compliance with some other exemption under the Securities Act or the rules and regulations of the SEC thereunder.

(h)    Validity; Enforcement. This Agreement and the other Transaction Documents have been duly and validly authorized, executed and delivered on behalf of the Investor and each is a valid and binding agreement of the Investor enforceable against the Investor in accordance with its terms, subject as to enforceability to general principles of equity and to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(i)    Residency. The Investor's principal place of business is in the State of Illinois.

(j)    No Short Selling. The Investor represents and warrants to the Company that at no time prior to the date of this Agreement has any of the Investor, its agents, representatives or affiliates engaged in or effected, in any manner whatsoever, directly or indirectly, any (i) "short sale" (as such term is defined in Rule 200 of Regulation SHO of the Exchange Act) of the Ordinary Shares or (ii) hedging transaction, which establishes a net short position with respect to the Ordinary Shares.

## 4.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Investor that as of the date hereof and as of the Commencement Date:

(a)    Organization and Qualification. The Company and each of its Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither the Company nor any of its Subsidiaries is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents, where such violation or default would not reasonably be expected to result in a Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, would not reasonably be expected to result in a Material Adverse Effect, and no proceeding has been instituted in any

13

Exhibit 20
Page 2824

such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification. The Company has no Subsidiaries except as set forth in the SEC Documents (as defined below).

(b) <u>Authorization; Enforcement; Validity</u>. The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement and each of the other Transaction Documents, and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby, including without limitation, the issuance of the Commitment Shares (as defined below in <u>Section 5(e)</u>) and the reservation for issuance and the issuance of the Purchase Shares issuable under this Agreement have been duly authorized by the Company's Board of Directors or a validly authorized committee thereof (collectively, the "<u>Board of Directors</u>"), and no further consent or authorization is required by the Company, its Board of Directors or any committee thereof, or its stockholders (save to the extent provided in this Agreement). This Agreement has been, and each other Transaction Document shall be on the Commencement Date, duly executed and delivered by the Company, and this Agreement constitutes, and each other Transaction Document upon its execution on behalf of the Company, shall constitute, the valid and binding obligations of the Company enforceable against the Company in accordance with their terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies. The Board of Directors of the Company has adopted all applicable resolutions (the "<u>Signing Resolutions</u>") to authorize this Agreement and the transactions contemplated hereby. The Signing Resolutions are valid, in full force and effect and have not been modified or supplemented in any respect. The Company has delivered to the Investor a true and correct copy of the Signing Resolutions adopted by the Board of Directors. Except as set forth in this Agreement, no other approvals or consents of the Company's Board of Directors and/or stockholders is necessary under applicable laws and the Company's Memorandum of Association in effect on the date hereof (the "<u>Memorandum of Association</u>") and/or the Company's Articles of Association in effect on the date hereof (the "Articles of Association") to authorize the execution and delivery of this Agreement or any of the transactions contemplated hereby, including, but not limited to, the issuance of the Commitment Shares and the issuance of the Purchase Shares.

(c) <u>Capitalization</u>. As of the date hereof, the authorized share capital of the Company is set forth in <u>Schedule 4(c)</u> hereof. Except as disclosed in the SEC Documents (as defined below) or <u>Schedule 4(c)</u>, (i) no shares of the Company's share capital are subject to preemptive rights or any other similar rights or any liens, encumbrances and defects ("<u>Liens</u>") suffered or permitted by the Company, (ii) there are no outstanding debt securities, (iii) except pursuant to stock option or stock purchase plans disclosed in the SEC Documents, there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of the Company or any of its Subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of the Company or any of its Subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of the Company or any of its Subsidiaries, (iv) except pursuant to employee stock purchase plans, stock option or stock purchase plans disclosed in the SEC Documents, there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the Securities Act (except the Registration Rights Agreement), (v) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of

14

Exhibit 20
Page 2825

its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries, (vi) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities as described in this Agreement and (vii) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. The Company has furnished to the Investor true and correct copies of the Memorandum of Association, and the Articles of Association, and summaries of the material terms of all securities convertible into or exercisable for Ordinary Shares, if any, which are not otherwise disclosed in the Registration Statement, any SEC Document or filed as an exhibit thereto.

(d)     Issuance of Securities. Upon issuance and payment therefor in accordance with the terms and conditions of this Agreement, the Securities shall be validly issued, fully paid and nonassessable and free from all taxes, Liens, charges, restrictions, rights of first refusal and preemptive rights with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Ordinary Shares. 7,785,560 Ordinary Shares (subject to adjustment for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction) have been duly authorized and have been or will be reserved for issuance upon purchase under this Agreement as Purchase Shares and Commitment Shares (as defined below in Section 5(e)) in accordance with this Agreement. The Commitment Shares shall be validly issued, fully paid and nonassessable and free from all taxes, Liens, charges, restrictions, rights of first refusal and preemptive rights with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Ordinary Shares.

(e)     No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the reservation for issuance and issuance of the Securities) will not (i) result in a violation of the Memorandum of Association, any Certificate of Designations, or the Articles of Association or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, or result in a violation of any applicable law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of the Principal Market applicable to the Company or any of its Subsidiaries) or by which any property or asset of the Company or any of its Subsidiaries is bound or affected, except in the case of conflicts, defaults, terminations, amendments, accelerations, cancellations and violations under clauses (i) or (ii), which would not reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary is in violation or default of or under (i) any provision of the Memorandum of Association or Articles of Association, any Subsidiary's respective certificate or articles of incorporation, any certificate of designation, preferences and rights of any outstanding series of preferred stock, organizational charter or bylaws, respectively, (ii) the terms of any indenture, material contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which it is a party or bound or to which its property is subject, or (iii) any judgment, order or decree of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its properties, which, in the case of clauses (ii) or (iii), could be reasonably expected to have a Material Adverse Effect. The business of the Company and each Subsidiary is not being conducted, and shall not be conducted, in violation of any applicable law, ordinance, regulation of any governmental entity, except for possible violations, the sanctions for which either individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect. Except as specifically contemplated by this Agreement and as required under the Securities Act or applicable state securities laws and the rules and regulations of the Principal Market, the Company is not required to obtain any consent,

15

Exhibit 20
Page 2826

Authorization or order of, or make any filing or registration with, any court or governmental agency or any regulatory or self-regulatory agency in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents in accordance with the terms hereof or thereof. Except as set forth elsewhere in this Agreement, all consents, Authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence shall be obtained or effected on or prior to the Commencement Date. Except as disclosed in the SEC Documents, since one year prior to the date hereof, the Company has not received nor delivered any notices or correspondence from or to the Principal Market, other than notices with respect to listing of additional Ordinary Shares and other routine correspondence. Except as disclosed in the SEC Documents, since one year prior to the date hereof, the Principal Market has not commenced any delisting proceedings against the Company.

(f)     SEC Documents; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company with the SEC under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the 24 months preceding the date hereof (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Documents") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Documents prior to the expiration of any such extension. As of their respective dates, the SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable. None of the SEC Documents, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Documents comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments. Except as set forth in the SEC Documents, the Company has received no notices or correspondence from the SEC for the one year preceding the date hereof. The SEC has not commenced any enforcement proceedings against the Company or any of its Subsidiaries.

(g)     Absence of Certain Changes. Except as disclosed in the SEC Documents and as a result of the effects of health epidemics, including the recent outbreak of the novel strain of coronavirus (COVID-19), since December 31, 2020, there has been no Material Adverse Effect on the business, properties, operations, financial condition or results of operations of the Company or its Subsidiaries. The Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to any Bankruptcy Law nor does the Company or any of its Subsidiaries have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy or insolvency proceedings. The Company is financially solvent and is generally able to pay its debts as they become due.

(h)     Absence of Litigation. Except as disclosed in the SEC Documents, there is no action, suit, proceeding, inquiry or investigation before or by any court, government agency, self- regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company, the Ordinary Shares or any of the Company's or its Subsidiaries' officers

16

Exhibit 20
Page 2827

or directors in their capacities as such, which could reasonably be expected to have a Material Adverse Effect.

(i)    Acknowledgment Regarding Investor's Status. The Company acknowledges and agrees that the Investor is acting solely in the capacity of arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby. The Company further acknowledges that the Investor is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby and any advice given by the Investor or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to the Investor's purchase of the Securities. The Company further represents to the Investor that the Company's decision to enter into the Transaction Documents has been based solely on the independent evaluation by the Company and its representatives and advisors.

(j)    No Integrated or Aggregated Offering. Neither the Company nor any of its affiliates has directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the transactions contemplated hereby to be integrated or aggregated with prior offerings by the Company in a manner that would require registration of the offer and sale of any of the Securities under the Securities Act, or stockholder approval of the issuance of the Securities pursuant to the rules of the Principal Market on which any of the securities of the Company are listed or designated.

(k)    Intellectual Property Rights. The Company and its Subsidiaries own or possess (or reasonably believe it can acquire on reasonable terms) adequate rights or licenses to use all material trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, Authorizations, trade secrets and rights necessary to conduct their respective businesses as now conducted, except as such failure to own, possess, or acquire such rights would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. None of the Company's material trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, Authorizations, trade secrets or other intellectual property rights have expired or terminated, or, by the terms and conditions thereof, could expire or terminate within two years from the date of this Agreement. The Company and its Subsidiaries do not have any knowledge of any infringement by the Company or its Subsidiaries of any material trademark, trade name rights, patents, patent rights, copyrights, inventions, licenses, service names, service marks, service mark registrations, trade secret or other similar rights of others, or of any such development of similar or identical trade secrets or technical information by others, and there is no claim, action or proceeding being made or brought against, or to the Company's knowledge, being threatened against, the Company or its Subsidiaries regarding trademark, trade name, patents, patent rights, invention, copyright, license, service names, service marks, service mark registrations, trade secret or other infringement, which could reasonably be expected to have a Material Adverse Effect.

(l)    Environmental Laws. Except as disclosed in the SEC Documents, the Company and its Subsidiaries (i) are in compliance with any and all applicable foreign, federal, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval, except where, in each of the three foregoing clauses, the failure to so comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

17

Exhibit 20
Page 2828

(m)    Title. The Company and its Subsidiaries own no real property. Except as disclosed in the SEC Documents, the Company and its Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them (other than intellectual property, which is covered in Section 4(k) above) that is material to the business of the Company and its Subsidiaries, in each case free and clear of all Liens and, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and its Subsidiaries, Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties, and Liens that would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. Any real property and facilities held under lease by the Company and its Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and its Subsidiaries are in compliance, except those that (i) are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its Subsidiaries or (ii) would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(n)    Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing or similar insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business.

(o)    Regulatory Permits. Except as disclosed in the SEC Documents, the Company and its Subsidiaries possess all material certificates, Authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses, and neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, Authorization or permit, except, in the case of each of the two foregoing clauses, as could not reasonably be expected to have a Material Adverse Effect.

(p)    Tax Status. Except as set forth in the SEC Documents, the Company and each of its Subsidiaries has made or filed all federal and state income and all other material tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply, and except as could not reasonably be expected to have a Material Adverse Effect. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(q)    Transactions With Affiliates. Except as set forth in the SEC Documents, none of the officers or directors of the Company and, to the knowledge of the Company, none of the Company's stockholders, the officers or directors of any stockholder of the Company, or any family member or affiliate of any of the foregoing, has either directly or indirectly any interest in, or is a party to, any transaction that is required to be disclosed as a related party transaction pursuant to Item 404 of Regulation S-K promulgated under the Securities Act.

18

Exhibit 20
Page 2829

(r)    Application of Takeover Protections. The Company and its Board of Directors have taken or will take prior to the Commencement Date all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Memorandum and Articles of Association or the laws of the country of its incorporation which is or could become applicable to the Investor as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and the Investor's ownership of the Securities.

(s)    Disclosure. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents that will be timely publicly disclosed by the Company, the Company confirms that neither it nor any other Person acting on its behalf has provided the Investor or its agents or counsel with any information that it believes constitutes material, non-public information which is not otherwise disclosed in the Registration Statement or the SEC Documents. The Company understands and confirms that the Investor will rely on the foregoing representation in effecting purchases and sales of securities of the Company. All of the disclosure furnished by or on behalf of the Company to the Investor regarding the Company, its business and the transactions contemplated hereby, including the disclosure schedules to this Agreement, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The Company acknowledges and agrees that the Investor neither makes nor has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 3 hereof.

(t)    Foreign Corrupt Practices. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any Subsidiary is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA"), including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; and the Company, each of its Subsidiaries and, to the knowledge of the Company, its affiliates have conducted their businesses in compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith. The operations of the Company and each of its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any applicable governmental agency, including, without limitation, Title 18 U.S. Code section 1956 and 1957, the Patriot Act, the Bank Secrecy Act, and international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur, all as amended, and any Executive order, directive or regulation pursuant to the authority of any of the foregoing, or any orders or licenses issued thereunder (collectively, the "Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the knowledge of the Company, threatened. Neither the Company nor any of its Subsidiaries, nor to the knowledge of the Company any of the directors, officers or employees, agents, affiliates or

19

Exhibit 20
Page 2830

representatives of the Company or each of its Subsidiaries, is an individual or entity that is, or is owned or controlled by an individual or entity that is: (i) the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor (ii) located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, the Balkans, Belarus, Burma/Myanmar, Cote D'Ivoire, Cuba, Democratic Republic of Congo, Iran, Iraq, Liberia, Libya, North Korea, Sudan, Syria, Venezuela and Zimbabwe). Neither the Company nor any of its Subsidiaries will, directly or indirectly, use the proceeds of the transactions contemplated hereby, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other individual or entity: (i) to fund or facilitate any activities or business of or with any individual or entity or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions or (ii) in any other manner that will result in a violation of Sanctions by any individual or entity (including any individual or entity participating in the transactions contemplated hereby, whether as underwriter, advisor, investor or otherwise). For the past five years, neither the Company nor any of its Subsidiaries has knowingly engaged in, and is not now knowingly engaged in, any dealings or transactions with any individual or entity, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

(u)    DTC Eligibility. The Company, through the Transfer Agent, currently participates in the DTC Fast Automated Securities Transfer (FAST) Program and the Ordinary Shares can be transferred electronically to third parties via the DTC Fast Automated Securities Transfer (FAST) Program.

(v)    Sarbanes-Oxley. The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Except as disclosed in the SEC Documents, the Company has concluded that its internal control over financial reporting is effective and the Company is not aware of any "significant deficiencies" or "material weaknesses" (each as defined by the rules adopted by the SEC) in its internal control over financial reporting, or any fraud, whether or not material, that involves management or other employees of the Company and its Subsidiaries who have a significant role in the Company's internal controls; and since the end of the latest audited fiscal year, there has been no change in the Company's internal control over financial reporting (whether or not remediated) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. The Board of Directors has, subject to the exceptions, cure periods and the phase in periods specified in the applicable stock exchange rules of the Principal Market ("Exchange Rules"), validly appointed an audit committee to oversee internal accounting controls whose composition satisfies the applicable independence and other requirements of the Exchange Rules and the rules under the Exchange Act, and the Board of Directors has adopted a charter for the audit committee that satisfies the requirements of the Exchange Rules and the rules under the Exchange Act. No relationship, direct or indirect, exists between or among the Company, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company, on the other hand, which is required to be described in the Registration Statement which is not so described. The Company has not, directly or indirectly, extended or maintained credit, or arranged for the extension of credit, or renewed an extension of credit, in the form of a personal loan to or for any of its directors or executive officers in violation of Applicable Laws, including Section 402 of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith.

Exhibit 20
Page 2831

(w)  Certain Fees. No brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents. The Investor shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section 4(w) that may be due in connection with the transactions contemplated by the Transaction Documents. The Company shall pay, and hold the Investor harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and reasonable documented out of pocket expenses) arising in connection with any such claim made by a third party for any such fees or commissions.

(x)  Investment Company. The Company is not, and immediately after giving effect to the sale of the Purchase Shares in accordance with this Agreement and the application of the proceeds as described in the Registration Statement under the caption "Use of Proceeds," will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(y)  Listing and Maintenance Requirements. The Ordinary Shares are registered pursuant to Section 12(b) of the Exchange Act, and the Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Ordinary Shares pursuant to the Exchange Act nor has the Company received any notification that the SEC is currently contemplating terminating such registration. Except as disclosed in the SEC Documents, the Company has not, in the twelve (12) months preceding the date hereof, received any notice from any Person to the effect that the Company is not in compliance with the listing or maintenance requirements of the Principal Market. Except as disclosed in the SEC Documents, the Company is in compliance with all such listing and maintenance requirements.

(z)  Accountants. The Company's accountants are set forth in the SEC Documents and, to the knowledge of the Company, such accountants are an independent registered public accounting firm as required by the Securities Act.

(aa)  No Market Manipulation. The Company has not, and to its knowledge no Person acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company.

(bb)  Shell Company Status. The Company was previously an issuer identified in Rule 144(i)(1) and has filed with the SEC current "Form 10 information" (as defined in Rule 144(i)(3)).

(cc)  Issuance of Commitment Shares. In consideration for the Investor's execution and delivery of this Agreement, the Company shall cause to be issued to the Investor 69,512 Ordinary Shares (the "Commitment Shares") and shall deliver to the Transfer Agent the Irrevocable Transfer Agent Instructions with respect to the issuance of such Commitment Shares. For the avoidance of doubt, all of the Commitment Shares shall be fully earned as of the date of this Agreement, whether or not the Commencement shall occur or any Purchase Shares are purchased by the Investor under this Agreement and irrespective of any subsequent termination of this Agreement.

21

Exhibit 20
Page 2832

(dd)    Benefit Plans; Labor Matters. Each benefit and compensation plan, agreement, policy and arrangement that is maintained, administered or contributed to by the Company for current or former employees or directors of, or independent contractors with respect to, the Company has been maintained in material compliance with its terms and the requirements of any applicable statutes, orders, rules and regulations, and the Company has complied in all material respects with all applicable statutes, orders, rules and regulations in regard to such plans, agreements, policies and arrangements. Each stock option granted under any equity incentive plan of the Company (each, a "Stock Plan") was granted with a per share exercise price no less than the market price per common share on the grant date of such option in accordance with the rules of the Principal Market, and no such grant involved any "back-dating," "forward-dating" or similar practice with respect to the effective date of such grant; each such option (i) was granted in compliance in all material respects with Applicable Laws and with the applicable Stock Plan(s), (ii) was duly approved by the Board of Directors or a duly authorized committee thereof, and (iii) has been properly accounted for in the Company's financial statements and disclosed, to the extent required, in the Company's filings or submissions with the SEC, and the Principal Market. No labor problem or dispute with the employees of the Company exists or is threatened or imminent, and the Company is not aware of any existing or imminent labor disturbance by the employees of any of its principal suppliers or contractors, that would have a Material Adverse Effect.

(ee)    Regulatory. During the 12-month period immediately preceding the date hereof, except as described in the SEC Documents, the Company and each of its Subsidiaries: (A) is and at all times has been in material compliance with all applicable U.S. and foreign statutes, rules, regulations, or guidance applicable to Company and its Subsidiaries ("Applicable Laws"), except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; (B) have not received any written notice of adverse finding, warning letter, untitled letter or other correspondence or notice from the U.S. Food and Drug Administration or any other federal, state, or foreign governmental authority having authority over the Company ("Governmental Authority") alleging or asserting material noncompliance with any Applicable Laws or any licenses, certificates, approvals, clearances, authorizations, permits and supplements or amendments thereto required by any such Applicable Laws ("Authorizations"); (C) possess all material Authorizations and such material Authorizations are valid and in full force and effect and, to

(ff)    the Company's knowledge, are not in violation of any term of any such material Authorizations; (D) have not received written notice of any claim, action, suit, proceeding, hearing, enforcement, investigation, arbitration or other action from any Governmental Authority or third party alleging that any product, operation or activity is in violation of any Applicable Laws or Authorizations and have no knowledge that any such Governmental Authority or third party is considering any such claim, litigation, arbitration, action, suit, investigation or proceeding; (E) have not received written notice that any Governmental Authority has taken, is taking or intends to take action to limit, suspend, modify or revoke any Authorizations and the Company has no knowledge that any such Governmental Authority is considering such action; and (F) have filed, obtained, maintained or submitted all material reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments as required by any Applicable Laws or material Authorizations and that all such reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments were complete and correct in all material respects on the date filed (or were corrected or supplemented by a subsequent submission). During the 12-month period immediately preceding the date hereof, to the Company's knowledge, the studies, tests and preclinical and clinical trials conducted by or on behalf of the Company were and, if still pending, are, in all material respects, being conducted in accordance with experimental protocols, procedures and controls pursuant to accepted professional scientific standards and all Applicable Laws. The Company has not received any written notices or correspondence from any Governmental

22

Exhibit 20
Page 2833

Authority requiring the termination, suspension or material modification of any studies, tests or preclinical or clinical trials conducted by or on behalf of the Company or its Subsidiaries. The Company has concluded that it uses commercially reasonable efforts to review, from time to time, the progress and results of the studies, tests and preclinical and clinical trials and, based upon (i) the information provided to the Company by the third parties conducting such studies, tests, preclinical studies and clinical trials that are described in the SEC Documents and the Company's review of such information, and (ii) the Company's actual knowledge, the Company reasonably believes that the descriptions of the results of such studies, tests, preclinical studies and clinical trials are accurate and complete in all material respects.

(gg)    Absence of Schedules. In the event that on the Commencement Date, the Company does not deliver any disclosure schedule contemplated by this Agreement, the Company hereby acknowledges and agrees that each such undelivered disclosure schedule shall be deemed to read as follows: "Nothing to Disclose".

(hh)    No Disqualification Events. None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering contemplated hereby, any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of sale (each, an "Issuer Covered Person") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event.

## 5.    COVENANTS.

(a)    Filing of Current Report and Registration Statement. The Company agrees that it shall, within the time required under the Exchange Act, file with the SEC a report on Form 8-K relating to the transactions contemplated by, and describing the material terms and conditions of, the Transaction Documents (the "Current Report"). The Company shall also use reasonable best efforts to file with the SEC, within twenty (20) Business Days from the date hereof, a new registration statement (the "Registration Statement") covering only the resale of the Purchase Shares and the Commitment Shares in accordance with the terms of the Registration Rights Agreement. The Company shall permit the Investor to review and comment upon the final pre-filing draft version of the Current Report at least two (2) Business Days prior to its filing with the SEC. The Investor shall use its reasonable best efforts to comment upon the final pre-filing draft version of the Current Report within one (1) Business Day from the date the Investor receives it from the Company.

(b)    Blue Sky. The Company shall take all such action, if any, as is reasonably necessary in order to obtain an exemption for or to register or qualify (i) the issuance of the Commitment Shares and the sale of the Purchase Shares to the Investor under this Agreement and (ii) any subsequent resale of all Securities by the Investor, in each case, under applicable securities or "Blue Sky" laws of the states of the United States in such states as is reasonably requested by the Investor from time to time, and shall provide evidence of any such action so taken to the Investor.

(c)    Listing/DTC. The Company shall promptly secure the listing of all of the Securities to be issued to the Investor hereunder on the Principal Market (subject to official notice of issuance) and upon each other national securities exchange or automated quotation system, if any, upon which the Ordinary

Exhibit 20
Page 2834

Shares are then listed, and shall use commercially reasonable efforts to maintain, so long as any Ordinary Shares shall be so listed, such listing of all such Securities from time to time issuable hereunder. The Company shall use commercially reasonable efforts to maintain the listing of the Ordinary Shares on the Principal Market and shall comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules and regulations of the Principal Market. Neither the Company nor any of its Subsidiaries shall take any action that would reasonably be expected to result in the delisting or suspension of the Ordinary Shares on the Principal Market. The Company shall promptly, and in no event later than the following Business Day, provide to the Investor copies of any notices it receives from the Principal Market regarding the continued eligibility of the Ordinary Shares for listing on the Principal Market; provided, however, that the Company shall not provide the Investor copies of any such notice that the Company reasonably believes constitutes material non-public information and that the Company would not be required to publicly disclose such notice in any report or statement filed with the SEC under the Exchange Act (including on Form 8-K) or the Securities Act. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 5(c). The Company shall take all action necessary to ensure that its Ordinary Shares can be transferred electronically as DWAC Shares.

(d)    Prohibition of Short Sales and Hedging Transactions. The Investor agrees that beginning on the date of this Agreement and ending on the date of termination of this Agreement as provided in Section 11, the Investor and its agents, representatives and affiliates shall not in any manner whatsoever enter into or effect, directly or indirectly, any (i) "short sale" (as such term is defined in Rule 200 of Regulation SHO of the Exchange Act) of the Ordinary Shares or (ii) hedging transaction, which establishes a net short position with respect to the Ordinary Shares.

(e)    Issuance of Commitment Shares. In consideration for the Investor's execution and delivery of this Agreement, the Company shall cause the Transfer Agent to issue 69,512 Commitment Shares directly to the Investor in accordance with Section 6 hereto and the Irrevocable Transfer Agent Instructions. For the avoidance of doubt, all of the Commitment Shares shall be fully earned as of the date of this Agreement, whether or not the Commencement shall occur or any Purchase Shares are purchased by the Investor under this Agreement and irrespective of any subsequent termination of this Agreement.

(f)    Due Diligence; Non-Public Information. During the term of this Agreement, the Investor shall have the right, as the Investor may reasonably deem appropriate, and upon reasonable advance notice to the Company, to perform reasonable due diligence on the Company during normal business hours and such diligence shall occur no more than once on a quarterly basis. The Company and its officers and employees shall provide information and reasonably cooperate with the Investor in connection with any reasonable request by the Investor related to the Investor's due diligence of the Company. Each party hereto agrees not to disclose any Confidential Information of the other party to any third party and shall not use the Confidential Information for any purpose other than in connection with, or in furtherance of, the transactions contemplated hereby in full compliance with applicable securities laws. Each party hereto acknowledges that the Confidential Information shall remain the property of the disclosing party and agrees that it shall take all reasonable measures to protect the secrecy of any Confidential Information disclosed by the other party. The receiving party may disclose Confidential Information to the extent such information is required to be disclosed by law, regulation or order of a court of competent jurisdiction or regulatory authority, provided that the receiving party shall promptly notify the disclosing party when such requirement to disclose arises, and shall cooperate with the disclosing party so as to enable the disclosing party to: (i) seek an appropriate protective order; and (ii) make any applicable claim of confidentiality in respect of such Confidential Information; and provided, further, that the receiving party shall disclose Confidential Information only to the extent required by the protective order or other similar order, if such

24

Exhibit 20
Page 2835

an order is obtained, and, if no such order is obtained, the receiving party shall disclose only the minimum amount of such Confidential Information required to be disclosed in order to comply with the applicable law, regulation or order. In addition, any such Confidential Information disclosed pursuant to this Section 5(f) shall continue to be deemed Confidential Information. Notwithstanding anything in this Agreement to the contrary, the Company and the Investor agree that neither the Company nor any other Person acting on its behalf shall provide the Investor or its agents or counsel with any information that constitutes material, non-public information, unless a simultaneous public announcement thereof is made by the Company in the manner contemplated by Regulation FD under the Exchange Act. In the event of a breach of the foregoing covenant by the Company or any Person acting on its behalf (as determined in the reasonable good faith judgment of the Investor), in addition to any other remedy provided herein or in the other Transaction Documents, if the Investor is holding any Securities at the time of the disclosure of such material non-public information, the Investor shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, non-public information without the prior approval by the Company; provided the Investor shall have first provided notice to the Company that it believes it has received information that constitutes material, non-public information, the Company shall have at least twenty-four (24) hours to either publicly disclose such material, non-public information or to demonstrate to the Investor that such information does not constitute material, non-public information prior to any such disclosure by the Investor, and the Company shall have failed to publicly disclose such material, non-public information or to demonstrate to the Investor that such information does not constitute material, non-public information within such time period. The Investor shall not have any liability to the Company, or any of its directors, officers, employees, stockholders or agents, for any such disclosure. The Company understands and confirms that the Investor shall be relying on the foregoing covenants in effecting transactions in securities of the Company.

(g)    Purchase Records. The Investor and the Company shall each maintain records showing the remaining Available Amount at any given time and the dates and Purchase Amounts for each Regular Purchase, Accelerated Purchase and Additional Accelerated Purchase or shall use such other method, reasonably satisfactory to the Investor and the Company.

(h)    Taxes. The Company shall pay any and all transfer, stamp or similar taxes that may be payable with respect to the issuance and delivery of any Ordinary Shares to the Investor made under this Agreement.

(i)    No Aggregation. From and after the date of this Agreement, neither the Company, nor any of its affiliates will, and the Company shall use its reasonable best efforts to ensure that no Person acting on their behalf will, directly or indirectly, make any offers or sales of any security or solicit any offers to buy any security, under circumstances that would cause this offering of the Securities by the Company to the Investor to be aggregated with other offerings by the Company in a manner that would require stockholder approval pursuant to the rules of the Principal Market on which any of the securities of the Company are listed or designated unless stockholder approval is obtained before the closing of such subsequent transaction in accordance with the rules of such Principal Market.

(j)    Use of Proceeds. The Company will use the net proceeds from the offering for any corporate purpose at the sole discretion of the Company.

(k)    Other Transactions. During the term of this Agreement, the Company shall not enter into, announce or recommend to its stockholders any agreement, plan, arrangement or transaction in or of which the terms thereof would restrict, materially delay, conflict with or impair the ability or right of the Company

25

Exhibit 20
Page 2836

to perform its obligations under the Transaction Documents, including, without limitation, the obligation of the Company to deliver the Securities to the Investor in accordance with the terms of the Transaction Documents.

(l)      No Integration. From and after the date of this Agreement, neither the Company, nor or any of its affiliates will, and the Company shall use its reasonable best efforts to ensure that no Person acting on their behalf will, directly or indirectly, make any offers or sales of any security or solicit any offers to buy any security, under circumstances that would require registration of the offer and sale of any of the Securities under the Securities Act.

(m)      Limitation on Variable Rate Transactions. From and after the date of this Agreement until termination of this Agreement, the Company shall be prohibited from effecting or entering into an agreement to effect any issuance by the Company or any of its Subsidiaries of Ordinary Shares involving a Variable Rate Transaction other than with the Investor. "Variable Rate Transaction" means an "equity line of credit" or substantially similar transaction whereby an investor is irrevocably bound to purchase securities over a period of time from the Company at a price based on the market price of the Company's Ordinary Shares at the time of each such purchase, provided, however, that this Section 5(m) shall not be deemed to prohibit the issuance and sale of Ordinary Shares pursuant to an "at-the-market offering" by the Company exclusively through a registered broker-dealer acting as agent of the Company pursuant to a written agreement between the Company and such registered broker-dealer.

(n)      Publicity. The Company shall afford the Investor and its counsel with the opportunity to review and comment upon, shall consult with the Investor and its counsel on the form and substance of, and shall give due consideration to all such comments from the Investor or its counsel on, disclosure that is part of any press release, SEC filing or any other public disclosure by or on behalf of the Company that identifies the Investor, describes its purchases hereunder or summarizes any aspect of the Transaction Documents or the transactions contemplated thereby, not less than twenty-four (24) hours prior to the issuance, filing or public disclosure thereof; provided that (i) the Company shall not be required to provide to the Investor any press release, SEC filing or any other public disclosure that solely discloses the number of shares sold to the Investor and the amounts paid by the Investor for such shares and (ii) the Company shall not be required to provide to the Investor any disclosures that are materially similar to those previously reviewed by the Investor. The Investor must be provided with a substantially final version of any such disclosure that relates to the Investor, at least twenty-four (24) hours prior to any release, filing or use by the Company thereof.

## 6.      TRANSFER AGENT INSTRUCTIONS.

(a)      Commitment Shares. On the date of this Agreement, the Company shall instruct the Transfer Agent to issue the Commitment Shares in accordance with the terms of this Agreement. All Commitment Shares to be issued to or for the benefit of the Investor pursuant to this Agreement shall be issued in book-entry form. The Company warrants to the Investor that, while the Agreement is effective, no instruction other than the Commencement Irrevocable Transfer Agent Instructions referred to in Section 6(b) will be given by the Company to the Transfer Agent with respect to the Commitment Shares.

Each book entry for the Commitment Shares shall contain a notation (a "Restrictive Legend") evidencing the Commitment Shares shall be stamped or otherwise imprinted with a legend, in substantially the following form:

26

Exhibit 20
Page 2837

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.    THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, UNLESS SOLD PURSUANT TO: (1) RULE 144 UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (2) AN OPINION OF HOLDER'S COUNSEL, IN A CUSTOMARY FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS.

(b)      Purchase Shares. On the date the Registration Statement is declared effective, the Company shall issue to the Transfer Agent, and any subsequent transfer agent, irrevocable instructions in the form agreed to prior to the date hereof (the "Commencement Irrevocable Transfer Agent Instructions") to (i) remove each Restrictive Legend on the Commitment Shares in accordance with the terms of the Registration Rights Agreement; and (ii) issue the Purchase Shares in accordance with the terms of this Agreement and the Registration Rights Agreement. The Purchase Shares to be issued from and after Commencement to or for the benefit of the Investor pursuant to this Agreement shall be issued only as DWAC Shares. The Company represents and warrants to the Investor that, while this Agreement is effective, no instruction other than as contemplated by the Commencement Irrevocable Transfer Agent Instructions and any Notice of Effectiveness of Registration Statement (as defined in the Registration Rights Agreement) will be given by the Company to the Transfer Agent with respect to the Purchase Shares from and after Commencement, and no instruction or other communication to the Transfer Agent with respect to the issuance of the Purchase Shares shall be made without the approval of the Investor. The Company shall provide confirmation of receipt by the Transfer Agent of all instructions pursuant to the Commencement Irrevocable Transfer Agent Instructions with respect to Purchase Shares within one Business Day of delivery of any Purchase Notice. The Purchase Shares covered by the Registration Statement shall otherwise be freely transferable on the books and records of the Company.

7.    **CONDITIONS TO THE COMPANY'S RIGHT TO COMMENCE SALES OF ORDINARY SHARES.**

The right of the Company hereunder to commence sales of the Purchase Shares on the Commencement Date is subject to the satisfaction or, where legally permissible, the waiver of each of the following conditions:

(a)      The Investor shall have executed each of the Transaction Documents and delivered the same to the Company;

(b)      The Registration Statement covering the resale of all of such Purchase Shares as required pursuant to the Registration Rights Agreement shall have been declared effective under the Securities Act by the SEC and no stop order with respect to the Registration Statement shall be pending or, to the Company's knowledge, threatened by the SEC;

27

Exhibit 20
Page 2838

(c)    The Ordinary Shares shall be listed on the Principal Market, and all Securities to be issued by the Company to the Investor under the Transaction Documents shall have been approved for listing on the Principal Market in accordance with the applicable rules and regulations of the Principal Market, subject only to official notice of issuance; and

(d)    The representations and warranties of the Investor shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 above, in which case, such representations and warranties shall be true and correct without further qualification) as of the date hereof and as of the Commencement Date as though made at that time.

8.    **CONDITIONS TO THE INVESTOR'S OBLIGATION TO PURCHASE ORDINARY SHARES.**

The obligation of the Investor to buy Purchase Shares (other than the Commitment Shares) under this Agreement is subject to the satisfaction or, where legally permissible, the waiver of each of the following conditions on or prior to the Commencement Date and, once such conditions have been initially satisfied, there shall not be any ongoing obligation to satisfy such conditions after the Commencement has occurred:

(a)    The Company shall have executed each of the Transaction Documents and delivered the same to the Investor;

(b)    The Company shall have issued or caused to be issued to the Investor (i) one or more certificates or book-entry statements representing the Commitment Shares free from all restrictive and other legends or (ii) a number of shares of Ordinary Shares equal to the number of Commitment Shares as DWAC Shares;

(c)    The Ordinary Shares shall be listed or quoted on the Principal Market, trading in the Ordinary Shares shall not have been within the last 365 days suspended by the SEC or the Principal Market for one Business Day or more, and all Securities to be issued by the Company to the Investor pursuant to this Agreement shall have been approved for listing or quotation on the Principal Market in accordance with the applicable rules and regulations of the Principal Market, subject only to official notice of issuance;

(d)    The Investor shall have received the opinion letter and the negative assurances letter of the Company's legal counsel dated as of the Commencement Date substantially in the form agreed to prior to the date of this Agreement by the Company's legal counsel and the Investor's legal counsel;

(e)    The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 4 above, in which case, such representations and warranties shall be true and correct in all material respects without further qualification) as of the date when made and as of the Commencement Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct in all material respects as of such date) and the Company shall have performed, satisfied and complied with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Commencement Date. The Investor shall have received a certificate, executed by the Chief

28

Exhibit 20
Page 2839

Executive Officer or the Chief Financial Officer of the Company, dated as of the Commencement Date, to the foregoing effect in the form attached hereto as **Exhibit A**;

(f)       The Board of Directors of the Company shall have adopted the Signing Resolutions, which shall be in full force and effect without any amendment or supplement thereto as of the Commencement Date;

(g)       As of the Commencement Date, the Company shall have reserved out of its authorized and unissued Ordinary Shares, solely for the purpose of effecting purchases of Purchase Shares hereunder, 7,716,048 Ordinary Shares (excluding the Commitment Shares);

(h)       The Commencement Irrevocable Transfer Agent Instructions and the Notice of Effectiveness of Registration Statement each shall have been delivered to and acknowledged in writing by the Company and the Company's Transfer Agent (or any successor transfer agent);

(i)       The Company shall have delivered to the Investor certificates evidencing the incorporation and good standing of the Company in the Cayman Islands issued by the Cayman Islands Government General Registry and a certificate or its equivalent evidencing the good standing of the Company as a foreign corporation in any other jurisdiction where the Company is duly qualified to conduct business, in each case, as of a date within ten (10) Business Days of the Commencement Date;

(j)       The Company shall have delivered to the Investor a certified copy of the Memorandum and Articles of Association as certified by the Registered Office Provider of the Company within ten (10) Business Days of the Commencement Date;

(k)       The Company shall have delivered to the Investor a director's certificate executed by a Director of the Company, dated as of the Commencement Date, in the form attached hereto as **Exhibit B**;

(l)       The Registration Statement covering the resale of the Securities in accordance with the Registration Rights Agreement shall have been declared effective under the Securities Act by the SEC and no stop order with respect to the Registration Statement shall be pending or, to the Company's knowledge, threatened by the SEC. The Company shall have prepared and filed with the SEC, not later than two (2) Business Days after the effective date of the Registration Statement, a final prospectus (the preliminary form of which shall be included in the Registration Statement) and shall have delivered to the Investor a true and complete copy thereof. When filed, such prospectus shall be current and available for the resale by the Investor of all of the Securities covered thereby. The Current Report shall have been filed with the SEC, as required pursuant to Section 5(a). All reports, schedules, registrations, forms, statements, information and other documents required to have been filed by the Company with the SEC at or prior to the Commencement Date pursuant to the reporting requirements of the Exchange Act shall have been filed with the SEC within the applicable time periods prescribed for such filings under the Exchange Act;

(m)      No Event of Default (as defined below) has occurred, and no event which, after notice and/or lapse of time, would reasonably be expected to become an Event of Default has occurred;

(n)       No statute, regulation, order, decree, writ, ruling or injunction shall have been enacted, entered, promulgated, threatened or endorsed by any federal, state, local or foreign court or governmental authority of competent jurisdiction which prohibits the consummation of or which would materially modify or delay any of the transactions contemplated by the Transaction Documents;

29

Exhibit 20
Page 2840

(o)    No action, suit or proceeding before any federal, state, local or foreign arbitrator or any court or governmental authority of competent jurisdiction shall have been commenced or threatened, and no inquiry or investigation by any federal, state, local or foreign governmental authority of competent jurisdiction shall have been commenced or threatened, against the Company, or any of the officers, directors or affiliates of the Company, seeking to restrain, prevent or change the transactions contemplated by the Transaction Documents, or seeking material damages in connection with such transactions; and

(p)    All federal, state and local governmental laws, rules and regulations applicable to the transactions contemplated by the Transaction Documents and necessary for the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby in accordance with the terms thereof shall have been complied with, and all consents, Authorizations and orders of, and all filings and registrations with, all federal, state and local courts or governmental agencies and all federal, state and local regulatory or self-regulatory agencies necessary for the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby in accordance with the terms thereof shall have been obtained or made, including, without limitation, in each case those required under the Securities Act, the Exchange Act, applicable state securities or "Blue Sky" laws or applicable rules and regulations of the Principal Market, or otherwise required by the SEC, the Principal Market or any state securities regulators.

## 9.    INDEMNIFICATION.

In consideration of the Investor's execution and delivery of the Transaction Documents and acquiring the Securities hereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless the Investor and all of its affiliates, shareholders, officers, directors, members, managers, employees and direct or indirect investors and any of the foregoing Person's agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of or relating to: (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (c) any cause of action, suit or claim brought or made against such Indemnitee and arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (d) any violation of the Securities Act, the Exchange Act, state securities or "Blue Sky" laws, or the rules and regulations of the Principal Market in connection with the transactions contemplated by the Transaction Documents by the Company or any of its Subsidiaries, affiliates, officers, directors or employees, (e) any untrue statement or alleged untrue statement of a material fact contained, or incorporated by reference, in the Registration Statement or any amendment thereto or any omission or alleged omission to state therein, or in any document incorporated by reference therein, a material fact required to be stated therein or necessary to make the statements therein not misleading, or (f) any untrue statement or alleged untrue statement of a material fact contained, or incorporated by reference, in the Registration Statement, or any omission or alleged omission to state therein, or in any document incorporated by reference therein, a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under

30

Exhibit 20
Page 2841

which they were made, not misleading; provided, however, that (I) the indemnity contained in clause (c) of this <u>Section 9</u> shall not apply to any Indemnified Liabilities which directly and primarily result from the fraud, gross negligence or willful misconduct of an Indemnitee, (II) the indemnity contained in clauses (d),

(e) and (f) of this <u>Section 9</u> shall not apply to any Indemnified Liabilities to the extent, but only to the extent, arising out of or based upon any untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Investor expressly for use in any Registration Statement, (III) the indemnity contained in clauses (d), (e) and (f) of this <u>Section 9</u> shall not inure to the benefit of the Investor to the extent such Indemnified Liabilities are based on a failure of the Investor to deliver or to cause to be delivered the final and complete prospectus made available by the Company, if such prospectus was timely made available by the Company pursuant to terms of the Transaction Documents, and if delivery of such prospectus would have cured the defect giving rise to such Indemnified Liabilities, and (IV) the indemnity in this <u>Section 9</u> shall not apply to amounts paid in settlement of any claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law, provided that no seller of Securities guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any seller of Securities who was not guilty of fraudulent misrepresentation. Payment under this indemnification shall be made within thirty (30) days from the date the Indemnitee makes written request for it. A certificate containing reasonable detail as to the amount of such indemnification submitted to the Company by the Indemnitee shall be conclusive evidence, absent manifest error, of the amount due from the Company to the Indemnitee; provided that the Indemnitee shall undertake to repay any amount paid to it hereunder if it is ultimately determined, by a final and non-appealable order of a court of competent jurisdiction, that the Indemnitee is not entitled to be indemnified against such Indemnified Liabilities by the Company pursuant to this Agreement. If any action shall be brought against any Indemnitee with respect to which indemnity may be sought pursuant to this Agreement, such Indemnitee shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Indemnitee. Any Indemnitee shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnitee, except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Indemnitee, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel.

## 10.    EVENTS OF DEFAULT.

In addition to any other rights and remedies under applicable law and this Agreement, so long as an "Event of Default" has occurred and is continuing, or if any event that, after notice and/or lapse of time, would reasonably be expected to become an Event of Default, has occurred and is continuing, the Company shall not deliver to the Investor any Purchase Notice, and the Investor shall not purchase any Ordinary Shares under this Agreement. An "Event of Default" shall be deemed to have occurred at any time as any of the following events occurs:

[5 5 2 3 2] [Rockley - Purchase Agreement (Executed) 4860-3819-1107 v 1 pdf] [Page 31 of 45]

Exhibit 20
Page 2842

(a)    the effectiveness of the Registration Statement registering the Securities lapses for any reason (including, without limitation, the issuance of a stop order or similar order), the Registration Statement or any prospectus thereunder is unavailable for the sale by the Company to the Investor (or the resale by the Investor) of any or all of the Securities to be issued to the Investor under the Transaction Documents, and any such lapse or unavailability continues for a period of ten (10) consecutive Business Days or for more than an aggregate of thirty (30) Business Days in any 365-day period, but excluding a lapse or unavailability where (i) the Company terminates the Registration Statement after the Investor has confirmed in writing that all of the Securities covered thereby have been resold or (ii) the Company supersedes the Registration Statement with a New Registration Statement, including (without limitation) when the Registration Statement is effectively replaced with a New Registration Statement covering Securities (provided in the case of this clause (ii) that all of the Securities covered by the superseded (or terminated) registration statement that have not theretofore been sold to the Investor are included in the superseding (or new) registration statement);

(b)    the suspension of the Ordinary Shares from trading on the Principal Market for a period of one (1) Business Day, provided that the Company may not direct the Investor to purchase any Ordinary Shares during any such suspension;

(c)    the delisting of the Ordinary Shares from The New York Stock Exchange; provided, however, that the Ordinary Shares are not immediately thereafter trading on New York Stock Exchange, The Nasdaq Global Select Market, the Nasdaq Capital Market, the NYSE Arca, the NYSE American, the OTC Bulletin Board, or the OTCQB or the OTCQX operated by the OTC Markets Group, Inc. (or any nationally recognized successor to any of the foregoing);

(d)    the failure for any reason by the Transfer Agent to issue Purchase Shares to the Investor by the second Business Day after the applicable Regular Purchase Date or Accelerated Purchase Date (as applicable) on which the Investor is entitled to receive such Purchase Shares;

(e)    the Company breaches any representation, warranty, covenant or other term or condition under any Transaction Document if such breach could have a Material Adverse Effect and except, in the case of a breach of a covenant which is reasonably curable, only if such breach continues for a period of at least five (5) Business Days;

(f)    if any Person commences a proceeding against the Company pursuant to or within the meaning of any Bankruptcy Law;

(g)    if the Company is at any time insolvent, or, pursuant to or within the meaning of any Bankruptcy Law, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "Custodian") of it or for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors or is generally unable to pay its debts as the same become due;

(h)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a Custodian of the Company or for all or substantially all of its property, or (iii) orders the liquidation of the Company;

Exhibit 20
Page 2843

(i)        if at any time the Company is not eligible to transfer its Ordinary Shares electronically as DWAC Shares; or

(j)        if at any time after the Commencement Date, the Exchange Cap is reached (to the extent the Exchange Cap is applicable pursuant to Section 2(e) hereof) and the Company's stockholders have not approved the transactions contemplated by this Agreement in accordance with the applicable rules and regulations of the Principal Market.

## 11.    TERMINATION

This Agreement may be terminated only as follows:

(a)        If pursuant to or within the meaning of any Bankruptcy Law, the Company commences a voluntary case or any Person commences a proceeding against the Company, a Custodian is appointed for the Company or for all or substantially all of its property, or the Company makes a general assignment for the benefit of its creditors (any of which would be an Event of Default as described in Sections 10(f), 10(g) and 10(h) hereof), this Agreement shall automatically terminate without any liability or payment to the Company (except as set forth below) without further action or notice by any Person.

(b)        In the event that the Commencement shall not have occurred on or before January 31, 2022, due to the failure to satisfy the conditions set forth in Sections 7 and 8 above with respect to the Commencement, either the Company or the Investor shall have the option to terminate this Agreement at the close of business on such date or thereafter without liability of any party to any other party (except as set forth below); provided, however, that the right to terminate this Agreement under this Section 11(b) shall not be available to any party if such party is then in breach of any covenant or agreement contained in this Agreement or any representation or warranty of such party contained in this Agreement fails to be true and correct such that the conditions set forth in Section 7(d) or Section 8(c), as applicable, could not then be satisfied.

(c)        At any time after the Commencement Date, the Company shall have the option to terminate this Agreement for any reason or for no reason by delivering notice (a "Company Termination Notice") to the Investor electing to terminate this Agreement without any liability whatsoever of any party to any other party under this Agreement (except as set forth below). The Company Termination Notice shall be effective one (1) Business Day after it has been received by the Investor.

(d)        This Agreement shall automatically terminate on the date that the Company sells and the Investor purchases the full Available Amount as provided herein, without any action or notice on the part of any party and without any liability whatsoever of any party to any other party under this Agreement (except as set forth below).

(e)        If, for any reason or for no reason, the full Available Amount has not been purchased in accordance with Section 2 of this Agreement by the Maturity Date, this Agreement shall automatically terminate on the Maturity Date, without any action or notice on the part of any party and without any liability whatsoever of any party to any other party under this Agreement (except as set forth below).

Except as set forth in Sections 11(a) (in respect of an Event of Default under Sections 10(f), 10(g) and 10(h), 11(d) and 11(e)), any termination of this Agreement pursuant to this Section 11 shall be effected by written notice from the Company to the Investor, or the Investor to the Company, as the case may be,

33

Exhibit 20
Page 2844

setting forth the basis for the termination hereof. The representations and warranties of the Company and the Investor contained in Sections 3 and 4 hereof, the indemnification provisions set forth in Section 9 hereof and the agreements and covenants set forth in Sections 5, 6, 10, 11 and 12 shall survive the Commencement and any termination of this Agreement. No termination of this Agreement shall (i) affect the Company's or the Investor's rights or obligations under (A) this Agreement with respect to any pending Regular Purchases, Accelerated Purchases, and Additional Accelerated Purchases and the Company and the Investor shall complete their respective obligations with respect to any pending Regular Purchases, Accelerated Purchases and Additional Accelerated Purchases under this Agreement and (B) the Registration Rights Agreement, which shall survive any such termination in accordance with its terms, or (ii) be deemed to release the Company or the Investor from any liability for intentional misrepresentation or willful breach of any of the Transaction Documents.

## 12.    MISCELLANEOUS.

(a)    Governing Law; Jurisdiction; Jury Trial. The corporate laws of the Cayman Islands shall govern all issues concerning the relative rights of the Company and its shareholders. All other questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of and venue in the United States District Court for the Southern District of New York or, if such court does not have subject matter jurisdiction, in any state court located in the County of New York with competent jurisdiction, for the adjudication of any dispute hereunder or under the other Transaction Documents or in connection herewith or therewith, or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY**.

(b)    Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature or signature delivered by e-mail in a ".pdf" format data file shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original signature.

(c)    Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

Exhibit 20
Page 2845

(d)     Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e)     Entire Agreement. The Transaction Documents supersede all other prior oral or written agreements between the Investor, the Company, their affiliates and Persons acting on their behalf with respect to the subject matter thereof, and this Agreement, the other Transaction Documents and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Investor makes any representation, warranty, covenant or undertaking with respect to such matters. The Company acknowledges and agrees that it has not relied on, in any manner whatsoever, any representations or statements, written or oral, other than as expressly set forth in the Transaction Documents. The Investor acknowledges and agrees that it has not relied on, in any manner whatsoever, any representations or statements, written or oral, other than as expressly set forth in the Transaction Documents. No provision of this Agreement may be amended other than by a written instrument signed by both parties hereto.

(f)     Notices. Any notices, consents, waivers, or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt when delivered personally; (ii) upon receipt when sent by facsimile or email (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses for such communications shall be:

If to the Company:

Rockley Photonics Holdings Limited
1 Ashley Road, 3rd Floor
Altrincham, Cheshire
United Kingdom, WA14 2DT
Phone: 44 (0) 1865292017
Telephone: 203.304.2499
E-mail: Tom.adams@rockleyphotonics.com
Attention: Tom Adams, General Counsel

With a copy to (which shall not constitute notice or service of process):

Pillsbury Winthrop Shaw Pittman LLP
2550 Hanover Street
Palo Alto, CA 94304-1115
Telephone: 650.233.4564
E-mail: dkaile@pillsburylaw.com
Attention: Davina K. Kaile

If to the Investor:

Exhibit 20
Page 2846

Lincoln Park Capital Fund, LLC
440 North Wells, Suite 410
Chicago, IL 60654
Telephone: 312.822.9300
Facsimile: 312.822.9301
E-mail: jscheinfeld@lpcfunds.com/jcope@lpcfunds.com
Attention: Josh Scheinfeld/Jonathan Cope

With a copy to (which shall not constitute notice or service of process):

K&L Gates, LLP
200 S. Biscayne Blvd., Ste. 3900
Miami, Florida 33131
Telephone: 305.539.3306
Facsimile: 305.358.7095
E-mail: clayton.parker@klgates.com
Attention: Clayton E. Parker, Esq.

If to the Transfer Agent:

Computershare Trust Company, N.A.
480 Washington Blvd. 26th Floor
Jersey City, NJ 07310
Phone: 201.222.4316
E-mail: donna.bent@computershare.com
Attention: Donna Bent

or at such other address, e-mail and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party three (3) Business Days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent or other communication, (B) mechanically or electronically generated by the sender's facsimile machine or e-mail account containing the time, date, and recipient facsimile number or e-mail address, as applicable, and an image of the first page of such transmission or (C) provided by a nationally recognized overnight delivery service, shall be rebuttable evidence of personal service, receipt by facsimile or email or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

(g)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Investor, including by merger or consolidation. The Investor may not assign its rights or obligations under this Agreement.

(h)     No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and, except as set forth in Section 9, is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

[5 5 2.3.2] [Rockley - Purchase Agreement (Executed) 4860-3819-1107 v 1 pdf] [Page 36 of 45]

Exhibit 20
Page 2847

(i)    Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to consummate and make effective, as soon as reasonably possible, the Commencement, and to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(j)    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(k)    Remedies, Other Obligations, Breaches and Injunctive Relief. The Investor's remedies provided in this Agreement, including, without limitation, the Investor's remedies provided in Section 9, shall be cumulative and in addition to all other remedies available to the Investor under this Agreement, at law or in equity (including a decree of specific performance and/or other injunctive relief), no remedy of the Investor contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit the Investor's right to pursue actual damages for any failure by the Company to comply with the terms of this Agreement. The parties acknowledge that a breach by any party of its obligations hereunder will cause irreparable harm to the non-breaching party and that the remedy at law for any such breach may be inadequate. The parties therefore agree that, in the event of any such breach or threatened breach, the non-breaching party shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(l)    Enforcement Costs. If: (i) this Agreement is placed by the Investor or the Company in the hands of an attorney for enforcement or is enforced by the Investor or the Company through any legal proceeding; (ii) an attorney is retained to represent the Investor in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Agreement; or (iii) an attorney is retained to represent the Investor or the Company in any other proceedings whatsoever in connection with this Agreement, then the party against which redress is sought under this Section 12(l) shall pay, all reasonable costs and expenses including attorneys' fees incurred in connection therewith to the party incurring such costs and expenses, as incurred, in addition to all other amounts due hereunder.

(m)    Amendment and Waiver; Failure or Indulgence Not Waiver. No provision of this Agreement may be amended other than by a written instrument signed by both parties hereto and no provision of this Agreement may be waived other than in a written instrument signed by the party against whom enforcement of such waiver is sought. No failure or delay in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

** *Signature Page Follows* **

37

Exhibit 20
Page 2848

**IN WITNESS WHEREOF,** the Investor and the Company have caused this Purchase Agreement to be duly executed as of the date first written above.

**THE COMPANY:**

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____
Name: Andrew Rickman
Title: Chief Executive Officer

**INVESTOR:**

**LINCOLN PARK CAPITAL FUND, LLC**
**BY: LINCOLN PARK CAPITAL, LLC**
**BY:**

By:_____
Name:
Title:

311168994.1

Exhibit 20
Page 2849

IN WITNESS WHEREOF, the Investor and the Company have caused this Purchase Agreement to be duly executed as of the date first written above.

THE COMPANY:

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By: _____
Name: Andrew Rickman
Title: Chief Executive Officer

**INVESTOR:**

**LINCOLN PARK CAPITAL FUND, LLC**
**BY: LINCOLN PARK CAPITAL, LLC**
BY: _____

By: _____
Name: Jonathan Cope
Title: President

311168994.1

Exhibit 20
Page 2850

## SCHEDULES

### Schedule 4(c) Capitalization

[5.5.2.3.2] [Rockley - Purchase Agreement (Executed) 4880-3819-1107 v.1.pdf] [Page 40 of 45]

Exhibit 20
Page 2851

## EXHIBITS

Exhibit A - Form of Officer's Certificate

Exhibit B - Form of Director's Certificate

[5.5.2.3.2] [Rockley - Purchase Agreement (Executed) 4880-3819-1107 v.1.pdf] [Page 41 of 45]

Exhibit 20
Page 2852

## DISCLOSURE SCHEDULES

### Schedule 4(c) – Capitalization

As of the date hereof, the Company's authorized share capital is $50,000 divided into 12,417,500,000 ordinary shares, nominal value $0.000004026575398 per share.

emilybryantalvarez@quinnemanuel.com

Rockley Data Room/21:02:2023 10:32

41

Exhibit 20
Page 2853

## EXHIBIT A

### FORM OF OFFICER'S CERTIFICATE

This Officer's Certificate ("Certificate") is being delivered pursuant to Section 8(e) of that certain Purchase Agreement dated as of [●], 2021, ("Purchase Agreement"), by and between **ROCKLEY PHOTONICS HOLDINGS LIMITED**, a Cayman Islands exempted company (the "Company"), and **LINCOLN PARK CAPITAL FUND, LLC**, an Illinois limited liability company (the "Investor"). Terms used herein and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement.

The undersigned, _____, _____ of the Company, hereby certifies, on behalf of the Company and not in [his/her] individual capacity, as follows:

1.      I am the _____ of the Company and make the statements contained in this Certificate;

2.      The representations and warranties of the Company are true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 4 of the Purchase Agreement, in which case, such representations and warranties are true and correct without further qualification) as of the date when made and as of the Commencement Date as though made at that time (except for representations and warranties that speak as of a specific date, in which case such representations and warranties are true and correct in all material respects as of such date);

3.      The Company has performed, satisfied and complied in all material respects with covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Commencement Date, to the extent not otherwise waived.

4.      The Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to any Bankruptcy Law nor does the Company or any of its Subsidiaries currently have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy or insolvency proceedings. The Company is currently financially solvent and is generally able to pay its debts as they become due.

IN WITNESS WHEREOF, I have hereunder signed my name on this ___ day of _____.

_____
Name:
Title:

The undersigned as Secretary of **ROCKLEY PHOTONICS HOLDINGS LIMITED**, a Cayman Islands exempted company, hereby certifies that _____ is the duly elected, appointed, qualified and acting _____ of _____ and that the signature appearing above is his genuine signature.

_____
Secretary

42

Exhibit 20
Page 2854

## EXHIBIT B

## FORM OF SECRETARY'S CERTIFICATE

This Secretary's Certificate (the "Certificate") is being delivered pursuant to Section 8(k) of that certain Purchase Agreement dated as of [●], 2021, ("Purchase Agreement"), by and between **ROCKLEY PHOTONICS HOLDINGS LIMITED**, a Cayman Islands exempted company (the "Company") and **LINCOLN PARK CAPITAL FUND, LLC**, an Illinois limited liability company (the "Investor"), pursuant to which the Company may sell to the Investor up to Fifty Million Dollars ($50,000,000) of the Company's Ordinary Shares, nominal value $0.000004026575398 per share (the "Ordinary Shares"). Terms used herein and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement.

The undersigned, _____, Secretary of the Company, hereby certifies, on behalf of the Company and not in [his/her] individual capacity, as follows:

1.      I am the Secretary of the Company and make the statements contained in this Secretary's Certificate.

2.      Attached hereto as Exhibit A and Exhibit B are true, correct and complete copies of the Company's Articles of Association ("Articles of Association") and Memorandum of Association ("Memorandum of Association"), in each case, as amended through the date hereof, and no action has been taken by the Company, its directors, officers or shareholders, in contemplation of the filing of any further amendment relating to or affecting the Articles of Association or Memorandum of Association.

3.      Attached hereto as Exhibit C are true, correct and complete copies of the resolutions duly adopted by the Board of Directors of the Company on _____, at which a quorum was present and acting throughout. Such resolutions have not been amended, modified or rescinded and remain in full force and effect and such resolutions are the only resolutions adopted by the Company's Board of Directors, or any committee thereof, or the stockholders of the Company relating to or affecting (i) the entering into and performance of the Purchase Agreement, or the issuance, offering and sale of the Securities and (ii) the performance of the Company of its obligation under the Transaction Documents as contemplated therein.

4.      As of the date hereof, the authorized, issued and reserved shares of the Company is as set forth on Exhibit D hereto.

**IN WITNESS WHEREOF**, I have hereunder signed my name on this ___ day of _____.

_____
Secretary

The undersigned, as _____ of **ROCKLEY PHOTONICS HOLDINGS LIMITED**, a Cayman Islands exempted company, hereby certifies that _____ is a duly elected, appointed, qualified and acting Secretary of **ROCKLEY PHOTONICS HOLDINGS LIMITED**, and that the signature appearing above is his genuine signature.

Exhibit 20
Page 2855



44



**Rockley Photonics Reports Third Quarter 2021 Financial Results**

*Revenue of $1.8 million and backlog[1] of $23.0 million*

*Broadened and accelerated commercial opportunities for VitalSpex™, Rockley's end-to-end non-invasive biomarker sensing platform, by signing multiple partnerships across key markets, including tier-1 consumer electronics manufacturers, global medtech companies, and leading healthcare research institutions*

**OXFORD, England and PASADENA, Calif.** – Nov. 15, 2021 – Rockley Photonics Holdings Limited (NYSE: RKLY) ("the Company" or "Rockley"), a global leader in photonics-based health monitoring and communications solutions, today announced its financial results for the third quarter ended September 30, 2021.

"I'm very excited about our progress in the third quarter as our product development and commercial activities exceeded internal expectations. Rockley's VitalSpex™ biomarker sensing platform has been well-received by our customers in both the consumer and medtech markets, we've signed new agreements with a wide range of partners, and we continue to make substantial progress with our ongoing human studies toward optimizing our biomarker algorithms," said Dr. Andrew Rickman, founder and chief executive officer of Rockley. "This progress reinforces my belief that our VitalSpex platform has the potential to improve individuals' health and well-being and help enable the transition from reactive to proactive healthcare."

Dr. Rickman continued, "Representing a significant step toward our goal of bringing real-time, non-invasive biomarker sensing to a wider and more diverse market, today we announced new partnership agreements with multiple additional consumer electronics companies, including some of the most prominent companies in the smartphone and wearables markets. In medtech, we announced partnerships with two of the world's largest medical device companies and expanded our development efforts to include wearables and full-stack data analytics solutions. And we continued to develop relationships with healthcare research institutions with the announcement of our partnership with Caltech. I believe that working with Caltech and other institutions will accelerate the development of future healthcare applications using our sensing platform. Each of these new partnerships provides further validation that our non-invasive biomarker sensing solutions are uniquely positioned to transform personal healthcare."

"We strengthened our balance sheet with the completion of our business combination and our financing arrangement with Lincoln Park Capital," said Mahesh Karanth, chief financial officer of Rockley. "We continue to make good progress on our commercialization efforts and are scaling our organization to address the large market opportunity ahead of us."

---

[1] Backlog is signed contract revenue that is currently in progress or the portion of contracts that have not been invoiced.

Exhibit 20
Page 2857

**Business Highlights:**

- Completed its business combination with SC Health on August 11, 2021, and commenced trading on the NYSE under the ticker "RKLY" on August 12, 2021

- Extended the Company's leadership in providing biosensing solutions for the consumer electronics market with the addition of five global consumer electronics companies, bringing its total to six of the top ten consumer wearables manufacturers, and reducing the Company's exposure to any single customer

- Expanded and accelerated its commercial strategy in medical devices and healthcare by signing multi-year partnerships with two of the world's top-ten medical equipment and device manufacturers, enabling Rockley to evaluate and incorporate the next generation of non-invasive biomarker sensing technology into a range of medical device applications

- Based on increased healthcare customer demand, began to scale up capacity for high-volume production of stand-alone wearable devices, including full-stack data analytics solutions, for widescale human studies, remote patient monitoring, and diagnostic and treatment support

- Entered into a research partnership with the California Institute of Technology (Caltech) to collaborate on the development of next-generation solutions that combine advanced sensors with AI to enhance insights into health and well-being

- Completed preliminary stages of multiple human studies using Rockley's wearable wristband, producing encouraging results across a range of biomarkers and refining the overall performance of the VitalSpex sensing platform

- Began the qualification process of a second source for its silicon photonics chip supply, putting it on track to qualify in the first quarter 2022

- Retired all convertible notes and expect to retire the remaining debt obligation of $28.6 million in 2022

- Signed financing agreement with Lincoln Park Capital, providing an equity line of credit of up to $50 million to strengthen the balance sheet and add flexibility in the commercialization of its non-invasive biomarker sensing solutions

**Third Quarter 2021 Financial Highlights:**

- Revenue of $1.8 million, compared to $2.2 million in the second quarter of 2021

- Gross profit of $(1.6) million, compared to $(2.4) million in the second quarter of 2021

- GAAP selling, general, and administrative expenses of $13.6 million, compared to $6.7 million in the second quarter of 2021. Non-GAAP selling, general, and administrative expenses of $9.4 million, compared to $5.8 million in the second quarter of 2021

- GAAP research and development expenses of $26.4 million, compared to $17.6 million in the second quarter of 2021. Non-GAAP research and development expenses of $24.3 million, compared to $15.7 million in the second quarter of 2021

- GAAP net loss of $58.0 million, or $0.54 net loss per share, compared to a net loss of $30.6 million, or $0.36 net loss per share, in the second quarter of 2021. Non-GAAP net loss of $51.4 million, or $0.48 net loss per share, compared to a non-GAAP net loss of $27.4 million or $0.33 net loss per share, in the second quarter of 2021

Exhibit 20
Page 2858

- Adjusted EBITDA totaled $(35.6) million, compared to $(23.4) million in the second quarter of 2021

- Cash, cash equivalents and investments of $125.0 million as of September 30, 2021

- Cash used in operations of $37.4 million, compared to $29.6 million in the second quarter of 2021

A reconciliation of GAAP financial measures to Adjusted EBITDA (Non-GAAP) financial measures is included in the financial statement tables included in this press release.

## Conference Call Information

Rockley will host a conference call and webcast to discuss its third quarter 2021 results at 5:00 p.m. Eastern Time today, November 15, 2021. The live audio webcast along with accompanying presentation materials will be accessible on the Company's Investor Relations website at investors.rockleyphotonics.com.

The U.S. dial-in for the call is 877-407-0784 or +1 201-689-8560 for international callers. Please reference access code 13724627. A replay of the conference call will be available until November 29, 2021, at 11:59 p.m. Eastern Time, while an archived version of the webcast will be available on Rockley's Investor Relations website for one year. The U.S. dial-in for the conference call replay is 844-512-2921 or +1 412-317-6671. The replay access code is 13724627.

## About Rockley

A global leader in photonics-based health monitoring and communications solutions, Rockley is developing a comprehensive range of photonic integrated circuits and associated modules, sensors, and full-stack solutions. From next-generation sensing platforms specifically designed for mobile health monitoring and machine vision to high-speed, high-volume solutions for data communications, Rockley is laying the foundation for a new generation of applications across multiple industries. Rockley believes that photonics will eventually become as pervasive as micro-electronics, and it has developed a platform with the power and flexibility needed to address both mass markets and a wide variety of vertical applications.

Formed in 2013, Rockley is uniquely positioned to support hyper-scale manufacturing and address a multitude of high-volume markets. Rockley has partnered with numerous Tier-1 customers across a diverse range of industries to deliver the complex optical systems required to bring transformational products to market.

To learn more about Rockley, visit rockleyphotonics.com.

## Cautionary Statement Regarding Forward-Looking Statements

Certain statements in this press release that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "anticipate," "believe," "continue," "could," "develop," "enable," "estimate," "eventual," "expect," "future," "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "will," "would" and other terms that predict or indicate future events, trends, or expectations, and similar

Exhibit 20
Page 2859

expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this press release include, but are not limited to, statements regarding the following: (a) the potential of the Company's solutions to improve individuals' health and well-being and enable the transition from reactive to proactive healthcare; (b) the anticipated retirement of the Company's remaining debt obligation and timing thereof; (c) the Company's financing agreement with Lincoln Park; (d) the status and timing of the Company's qualification of a second source for its silicon photonics chip supply; (e) backlog; (f) the anticipated and potential features, scope, goals, and benefits of the Company's platform, products, technology, and partnerships with third parties; (g) the Company's continued development of a range of photonic integrated circuits and associated modules, sensors, and full-stack solutions; (h) Rockley's belief that photonics will eventually become as pervasive as micro-electronics; and (i) Rockley's potential to support hyper-scale manufacturing, address a multitude of high-volume markets, and deliver the complex optical systems required to bring transformational products to market.

Forward-looking statements are subject to several risks and uncertainties (many of which are beyond the Company's control) or other assumptions that may cause actual results or performance to differ materially from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, the following: (i) the Company's ability to achieve commercial production of its products and technology, including in a timely and cost-effective manner; (ii) the Company's ability to achieve customer design wins, convert memoranda of understanding and development contracts into production contracts, and achieve customer acceptance of its products and technology; (iii) risks related to purchase orders, including the lack of long-term purchase commitments, the cancellation, reduction, delay, or other changes in customer purchase orders, and if and to the extent customers seek to enter into licensing arrangements in lieu of purchases; (iv) the Company's history of losses and need for additional capital and its ability to access additional financing to support its operations and execute on its business plan, as well as the risks associated with any future financings; (v) legal and regulatory risks, including those related to its products and technology and any threatened or actual litigation; (vi) risks associated with its fabless manufacturing model and dependency on third-party suppliers; (vii) the Company's reliance on a few significant customers for a majority of its revenue and its ability to expand and diversify its customer base; (viii) the Company's financial performance; (ix) the impacts of COVID-19 on the Company, its customers and suppliers, its target markets, and the economy; (x) the Company's ability to successfully manage growth and its operations as a public company; (xi) fluctuations in the Company's stock price and the Company's ability to maintain the listing of its ordinary shares on the NYSE; (xii) the Company's ability to anticipate and respond to industry trends and customer requirements; (xiii) changes in the Company's current and future target markets; (xiv) intellectual property risks; (xv) the Company's ability to compete successfully; (xvi) market opportunity and market demand for, and acceptance of, the Company's products and technology, as well as the customer products into which the Company's products and technology are incorporated; (xvii) risks related to international operations; (xviii) risks related to cybersecurity, privacy, and infrastructure; (xix) risks related to financial and accounting matters; (xx) general economic, financial, legal, political, and business conditions and changes in domestic and foreign markets; (xxi) the Company's ability to realize the anticipated benefits of the business combination; (xxii) changes adversely affecting the businesses or markets in which the Company is engaged; and (xxiii) risks related to the Company's backlog, including the risk that backlog may not translate into future revenue, as well as other factors described under the heading "Risk Factors" in the registration statement on Form S-1 filed by the Company on October 7, 2021, and declared effective on October 19, 2021, and in other documents the Company files with the

Exhibit 20
Page 2860

Securities and Exchange Commission in the future. The forward-looking statements contained in this press release are based on various assumptions, whether or not identified in this press release, and on the Company's current expectations, beliefs, and assumptions and are not predictions of actual performance. If any of these risks or uncertainties materialize, or should any of these assumptions prove incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting the Company will be those that have been anticipated. These forward-looking statements speak only as of the date hereof and the Company does not intend to update or revise any forward-looking statements, whether because of new information, future events, or otherwise, except as required by law.

###

**Contact Information**

**For Rockley**

*Media*
Karen Boud
Resonates
Telephone: +44 1635 898 698
Email: rockley@resonates.com

*Investors*
Gwyn Lauber
Rockley Photonics Holdings Limited
Telephone: +1 626-995-0001
Email: investors@rockleyphotonics.com

Exhibit 20
Page 2861

## Third Quarter 2021 Financial Results

### ROCKLEY PHOTONICS HOLDINGS LIMITED
#### Condensed Consolidated Statements of Operations and Comprehensive Loss
*(Unaudited and in thousands, except share and per share amounts)*

| | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Revenue | $ 1,839 | $ 2,195 | $ 4,517 | $ 5,805 | $ 19,061 |
| Cost of revenue | 3,459 | 4,549 | 5,015 | 11,742 | 18,100 |
| Gross profit | (1,620) | (2,354) | (498) | (5,937) | 961 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 13,568 | 6,715 | 5,354 | 27,588 | 12,603 |
| Research and development expenses | 26,418 | 17,551 | 10,790 | 59,949 | 27,007 |
| Total operating expenses | 39,986 | 24,266 | 16,144 | 87,537 | 39,610 |
| Loss from operations | (41,606) | (26,620) | (16,642) | (93,474) | (38,649) |
| Other income (expense): | | | | | |
| Forgiveness of PPP loan | — | 2,860 | — | 2,860 | — |
| Interest expense, net | (1,587) | (179) | 1 | (1,913) | (73) |
| Equity method investment loss | 40 | (597) | (689) | (720) | (941) |
| Change in fair value of debt instruments | (14,255) | (6,008) | (3,325) | (59,916) | (5,547) |
| Change in fair value of warrant liabilities | 515 | — | — | 515 | — |
| Gain (loss) on foreign currency | (481) | 97 | 285 | 150 | (1,369) |
| Total other income (expense) | (15,768) | (3,827) | (3,728) | (59,024) | (7,930) |
| Loss before income taxes | (57,374) | (30,447) | (20,370) | (152,498) | (46,579) |
| Provision for income tax | 598 | 110 | 154 | 808 | 374 |
| Net loss and comprehensive loss | $ (57,972) | $ (30,557) | $ (20,524) | $ (153,306) | $ (46,953) |
| | | | | | |
| Net loss per share: | | | | | |
| Basic and diluted | $ (0.54) | $ (0.36) | $ (0.25) | $ (1.67) | $ (0.56) |
| | | | | | |
| Weighted-average shares outstanding: | | | | | |
| Basic and diluted | 107,633,037 | 84,247,703 | 83,509,920 | 92,008,435 | 83,392,042 |

Exhibit 20
Page 2862

## ROCKLEY PHOTONICS HOLDINGS LIMITED
### Condensed Consolidated Balance Sheets
*(in thousands, except share amounts and par value)*

| | September 30, 2021 | December 31, 2020 |
|---|---|---|
| | *(Unaudited)* | |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 75,191 | $ 19,228 |
| Short-term investments, at fair value | 29,317 | — |
| Accounts receivable | 1,516 | 4,925 |
| Other receivables | 24,966 | 18,024 |
| Prepaid expenses | 9,815 | 1,605 |
| Other current assets | 4 | 609 |
| Total current assets | 140,809 | 44,391 |
| Long-term investments, at fair value | 20,485 | — |
| Property, equipment, and finance lease right-of-use assets, net | 9,358 | 6,182 |
| Equity method investment | 4,856 | 5,202 |
| Intangible assets, net | 3,048 | 3,048 |
| Other non-current assets | 3,069 | 1,607 |
| Total assets | $ 181,625 | $ 60,430 |
| | | |
| **Liabilities and Shareholders' Equity (Deficit)** | | |
| Current liabilities | | |
| Trade payables | $ 6,266 | $ 4,413 |
| Accrued expenses | 16,121 | 10,395 |
| Debt, current portion | 28,590 | — |
| Other current liabilities | 923 | 998 |
| Total current liabilities | 51,900 | 15,806 |
| Long-term debt, net of current portion | — | 74,804 |
| Warrant liabilities | 13,789 | — |
| Other long-term liabilities | 2,442 | 1,127 |
| Total liabilities | $ 68,131 | $ 91,737 |
| | | |
| Shareholders' equity (deficit) | | |
| Ordinary shares, $0.000004 par value; 12,417,500,000 and 139,033,366 authorized as of September 30, 2021, and December 31, 2020, respectively; 126,675,098 and 83,539,382 issued and outstanding as of September 30, 2021, and December 31, 2020, respectively | — | — |
| Additional paid-in-capital | 499,683 | 201,576 |
| Accumulated deficit | (386,189) | (232,883) |
| Total shareholders' equity (deficit) | 113,494 | (31,307) |
| Total liabilities and shareholders' equity (deficit) | $ 181,625 | $ 60,430 |

Exhibit 20
Page 2863

## ROCKLEY PHOTONICS HOLDINGS LIMITED
### Condensed Consolidated Statements of Cash Flows
#### (Unaudited and in thousands)

| | Three Months Ended | | | Nine Months Ended | |
|---|---|---|---|---|---|
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| **Cash flows from operating activities:** | | | | | |
| Net loss | $ (57,972) | $ (30,557) | $ (20,524) | $ (153,306) | $ (46,953) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | |
| Depreciation and amortization of property, equipment and finance lease right-of-use assets | 1,229 | 1,069 | 700 | 3,228 | 2,095 |
| Amortization of debt issuance costs | — | — | — | — | 26 |
| Gain on disposal of property and equipment | — | — | 26 | — | (98) |
| Bad debt expense | — | — | — | 377 | — |
| Accretion of marketable securities to redemption value | (32) | — | — | (32) | — |
| Stock-based compensation | 2,155 | 1,976 | 1,676 | 5,856 | 5,865 |
| Change in equity-method investment | (145) | 604 | 689 | 346 | 941 |
| Change in fair value of debt instrument | 14,255 | 6,008 | 3,325 | 59,916 | 5,547 |
| Change in fair value of warrant liabilities | (515) | — | — | (515) | — |
| Forgiveness of Paycheck Protection Program loan | — | (2,860) | — | (2,860) | — |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 895 | (106) | 271 | 3,032 | (1,111) |
| Other receivables | (1,929) | (2,644) | (4,566) | (6,942) | 4,036 |
| Prepaid expenses and other current assets | (2,090) | (63) | (385) | (7,859) | 878 |
| Other non-current assets | 403 | (236) | 128 | (1,330) | 485 |
| Trade payables | 1,277 | (2,102) | 432 | 1,147 | (3,915) |
| Accrued expenses | 5,398 | (441) | 2,598 | 5,800 | 4,306 |
| Other current and long-term liabilities | (374) | (206) | (2) | 1,240 | (840) |
| Net cash used in operating activities | (37,445) | (29,558) | (15,632) | (91,902) | (28,738) |
| **Cash flows from investing activities:** | | | | | |
| Purchase of property and equipment | (2,876) | (2,109) | (440) | (5,698) | (1,090) |
| Purchase of marketable securities | (54,800) | — | — | (54,800) | — |
| Proceeds from sale of marketable securities | 5,000 | — | — | 5,000 | — |
| Proceeds from maturity of marketable securities | 30 | — | — | 30 | — |
| Payment for asset acquisition | — | (500) | — | (500) | — |
| Investment in equity method investee | — | — | — | — | (2,500) |
| Net cash used in investing activities | (52,646) | (2,609) | (440) | (55,968) | (3,590) |
| **Cash flows from financing activities:** | | | | | |

Exhibit 20
Page 2864

| | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Proceeds from convertible loan notes | — | — | 16,464 | 76,723 | 28,714 |
| Principal payments on long-term debt | — | — | (27) | — | (1,979) |
| Proceeds from issuance of ordinary shares, net of issuance costs | 167,966 | — | — | 167,966 | 1,961 |
| Proceeds from Paycheck Protection Program loan | — | — | — | — | 2,860 |
| Proceeds from exercise of options | 86 | 146 | — | 369 | 20 |
| Proceeds from the exercise of warrants | 146 | 233 | — | 379 | 7 |
| Proceeds from issuance of warrants | — | — | — | 263 | — |
| Debt issuance costs incurred | 3,173 | (2,416) | — | (383) | — |
| Transaction costs | (41,484) | — | — | (41,484) | — |
| Principal payments on finance lease | — | — | — | — | (1,231) |
| Net cash provided by (used in) financing activities | 129,887 | (2,037) | 16,437 | 203,833 | 30,352 |
| Net increase (decrease) in cash and cash equivalents | 39,796 | (34,204) | 365 | 55,963 | (1,976) |
| Cash and cash equivalents: | | | | | |
| Beginning of period | 35,395 | 69,599 | 18,563 | 19,228 | 20,904 |
| End of period | $ 75,191 | $ 35,395 | $ 18,928 | $ 75,191 | $ 18,928 |

Exhibit 20
Page 2865

**Use of Non-GAAP Financial Measures**

This press release references certain financial measures that are not prepared in accordance with generally accepted accounting principles in the United States (GAAP), including Adjusted EBITDA, non-GAAP cost of revenue, non-GAAP selling, general, and administrative expense, non-GAAP research and development expense, non-GAAP net loss and non-GAAP net loss per share. The Company defines Adjusted EBITDA as earnings before interest expense, taxes, depreciation and amortization, stock-based compensation, and certain other items the Company believes are not indicative of its core operating performance. The Company defines non-GAAP cost of revenue as cost of revenue as cost of revenue other than stock-based compensation, non-GAAP selling, general, and administrative expenses as selling, general, and administrative expenses other than stock-based compensation, non-capitalized transaction costs and forgiveness of PPP loan, and non-GAAP research and development expenses as research and development expenses other than stock-based compensation. The Company defines non-GAAP net loss as net loss other than the non-GAAP cost of revenue adjustment, non-GAAP selling, general and administrative expenses adjustment, and non-GAAP research and development expenses adjustment (in each case as described above), and defines non-GAAP net loss per share as net loss other than the non-GAAP adjustments noted above divided by weighted shares outstanding.  None of these non-GAAP financial measures is a substitute for or superior to measures of financial performance prepared in accordance with GAAP and should not be considered as an alternative to any other performance measures derived in accordance with GAAP.

The Company believes that presenting these non-GAAP financial measures provides useful supplemental information to investors about the Company in understanding and evaluating its operating results, enhancing the overall understanding of its past performance and future prospects, and allowing for greater transparency with respect to key financial metrics used by its management in financial and operational-decision making. The Company uses these non-GAAP measures to help assess its operating performance and operating leverage in its business, analyze its financial results, establish operational goals, develop operating budgets, and make strategic decisions. The Company also believes that the presentation of these non-GAAP financial measures provides an additional tool for investors to use in comparing its core business and results of operations over multiple periods with other companies in its industry, many of which present similar non-GAAP financial measures to investors, and to help analyze the Company's cash performance.

Other companies may calculate non-GAAP measures differently, or may use other measures to calculate their financial performance, and therefore any non-GAAP measures the Company uses may not be directly comparable to similarly titled measures of other companies. Further, there are a number of limitations related to the use of non-GAAP measures and their nearest GAAP equivalents. Accordingly, these non-GAAP financial measures should be considered as supplemental in nature, should not be considered as the sole measure of the Company's performance, and are not intended to be construed, and should not be considered, in isolation from, or as a substitute for, the comparable or related financial information calculated in accordance with GAAP.

These limitations of the non-GAAP financial measures presented in this press release include the following:

- *Adjusted EBITDA*: (i) The exclusion of certain recurring, non-cash charges, such as depreciation of property and equipment and stock-based compensation expense. While these are non-cash charges, the Company may need to replace the assets being depreciated and amortized in the future and Adjusted EBITDA does not reflect cash requirements for these replacements or new capital expenditure

Exhibit 20
Page 2866

requirements; and ii the exclusion of stock-based compensation expense, which has been a significant recurring expense and the Company expects will continue to constitute a significant recurring expense for the foreseeable future, as equity awards are expected to continue to be an important component of the Company's compensation strategy.

- *Non-GAAP cost of revenue, non-GAAP selling, general, and administrative expenses, non-GAAP research and development expenses, non-GAAP net loss, and non-GAAP net loss per share*: The exclusion of stock-based compensation expense, which has been a significant recurring expense and the Company expects will continue to constitute a significant recurring expense for the foreseeable future, as equity awards are expected to continue to be an important component of the Company's compensation strategy.

In addition, non-GAAP selling, general, and administrative expenses exclude non-recurring expense related to non-capitalized transaction costs. While the Company expects this non-recurring expense to cease, the Company expects new non-recurring expense will be introduced following the Business Combination such as change in fair value of the Company's outstanding warrants which the Company expects will constitute to be a significant expense until all warrants are exercised and/or redeemed.

Because of these limitations, you should consider Adjusted EBITDA, non-GAAP cost of revenue, non-GAAP selling, general, and administrative expenses, non-GAAP research and development expenses, non-GAAP net loss, and non-GAAP net loss per share alongside other financial performance measures, including net loss and the Company's other GAAP results. The information in the tables below sets forth the non-GAAP financial measures along with the most directly comparable GAAP financial measures.

A reconciliation of Adjusted EBITDA to net loss for the three months ended September 30, 2021, June 30, 2021, and September 30, 2020 and nine months ended September 30, 2021 and 2020, respectively, are set forth below:

| (Unaudited and in thousands) | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Net Loss | $ (57,972) | $ (30,557) | $ (20,524) | $ (153,306) | $ (46,953) |
| Interest expense, net | 1,587 | 179 | (1) | 1,913 | 73 |
| Income tax expense | 598 | 110 | 154 | 808 | 374 |
| Depreciation and amortization | 1,229 | 1,069 | 700 | 3,228 | 2,095 |
| EBITDA | (54,558) | (29,199) | (19,671) | (147,357) | (44,411) |
| Non-capitalized transaction costs* | 3,214 | 79 | 1,511 | 4,254 | 1,541 |
| Stock-based compensation | 2,155 | 1,976 | 1,676 | 5,856 | 5,865 |
| Equity method investment loss | (145) | 604 | 689 | 346 | 941 |
| Change in fair value of debt instruments | 14,255 | 6,008 | 3,325 | 59,916 | 5,547 |
| Change in fair value of warrants | (515) | — | — | (515) | — |
| Forgiveness of PPP Loan | — | (2,860) | — | (2,860) | — |
| Adjusted EBITDA | $ (35,594) | $ (23,392) | $ (12,470) | $ (80,360) | $ (30,517) |

A reconciliation of non-GAAP net loss to net loss for the three months ended September 30, 2021, June 30, 2021, and September 30, 2020 and nine months ended September 30, 2021 and 2020, respectively, are set forth below:

Exhibit 20
Page 2867

| (Unaudited and in thousands) | Three Months Ended | | | Nine Months Ended | |
|---|---|---|---|---|---|
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| **Net Loss** | $ (57,972) | $ (30,557) | $ (20,524) | $ (153,306) | $ (46,953) |
| Non-GAAP cost of revenue adjustment | 347 | 363 | 467 | 977 | 1,808 |
| Non-GAAP selling, general and administrative expenses adjustment | 4,132 | 945 | 2,016 | 6,824 | 3,196 |
| Non-GAAP research and development expenses adjustment | 2,119 | 1,816 | 1,404 | 5,537 | 4,497 |
| **Non-GAAP Net loss** | $ (51,374) | $ (27,433) | $ (16,637) | $ (139,968) | $ (37,452) |
| | | | | | |
| **Non-GAAP Net loss per share:** | | | | | |
| Basic and diluted | $ (0.48) | $ (0.33) | $ (0.20) | $ (1.52) | $ (0.45) |
| | | | | | |
| **Weighted-average shares outstanding:** | | | | | |
| Basic and diluted | 107,633,037 | 84,247,703 | 83,509,920 | 92,008,435 | 83,392,042 |

A reconciliation of cost of revenue to non-GAAP cost of revenue for the three months ended September 30, 2021, June 30, 2021, and September 30, 2020 and nine months ended September 30, 2021 and 2020, respectively, are set forth below:

| (Unaudited and in thousands) | Three Months Ended | | | Nine Months Ended | |
|---|---|---|---|---|---|
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Cost of revenue | $ 3,459 | $ 4,549 | $ 5,015 | $ 11,742 | $ 18,100 |
| Stock-based compensation | 347 | 363 | 467 | 977 | 1,808 |
| Non-GAAP Cost of revenue | $ 3,112 | $ 4,186 | $ 4,548 | $ 10,765 | $ 16,292 |

A reconciliation of selling, general, and administrative expenses to non-GAAP selling, general, and administrative expenses for the three months ended September 30, 2021, June 30, 2021, and September 30, 2020 and nine months ended September 30, 2021 and 2020, respectively, are set forth below:

| (Unaudited and in thousands) | Three Months Ended | | | Nine Months Ended | |
|---|---|---|---|---|---|
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Selling, general, and administrative expenses | $ 13,568 | $ 6,715 | $ 5,354 | $ 27,588 | $ 12,603 |
| Depreciation and amortization | 449 | 424 | 186 | 1,250 | 569 |
| Stock-based compensation | 469 | 442 | 319 | 1,320 | 1,086 |
| Non-capitalized transaction costs* | 3,214 | 79 | 1,511 | 4,254 | 1,541 |
| Non-GAAP selling, general and administrative expenses | $ 9,436 | $ 5,770 | $ 3,338 | $ 20,764 | $ 9,407 |

Exhibit 20
Page 2868

A reconciliation of research and development expenses to non-GAAP research and development expenses for the three months ended September 30, 2021, June 30, 2021, and September 30, 2020 and nine months ended September 30, 2021 and 2020, respectively, are set forth below:

| *(Unaudited and in thousands)* | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2021 | June 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Research and development expenses | $ 26,418 | $ 17,551 | $ 10,790 | $ 59,949 | $ 27,007 |
| Depreciation and amortization | 780 | 645 | 514 | 1,978 | 1,526 |
| Stock-based compensation | 1,339 | 1,171 | 890 | 3,559 | 2,971 |
| Non-GAAP research and development expenses | $ 24,299 | $ 15,735 | $ 9,386 | $ 54,412 | $ 22,510 |

\*   Non-capitalized transaction costs include non-recurring expense related to the issuance of convertible loan notes and the Business Combination.

Exhibit 20
Page 2869

Case 1:23-cv-10081-lgb-95D-MRA-MA Filed 08/03/23 34 Entered 08/03/22 21:09:19 Page Exhibit F 607
Rockley UK-Noteholders Agreement (Exhibit 30.24 of 2022.10.25 Rockley    Pg 1 of 48

Exhibit 10.2

## NOTEHOLDER AGREEMENT

This Noteholder Agreement (this "Agreement") is dated as of _____, 2022, by and among Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands (the "Issuer"), the subsidiaries of the Issuer party hereto as Guarantors, each beneficial owner of the Notes issued under the Junior Indenture (as defined below) that is a signatory party hereto (each, a "Junior Holder" and collectively, the "Junior Holders") and each holder of the Notes issued under the Super Senior Indenture (as defined below) that is a signatory party hereto (each, a "Super Senior Holder" and collectively, the "Super Senior Holders" and together with the Junior Holders, the "Holders").

### RECITALS

WHEREAS, the Issuer, the other Note Parties, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (in such capacity, the "Junior Trustee"), have entered into an Indenture, dated as of May 27, 2022, as amended by that certain First Supplemental Indenture, dated as of August 4, 2022, between the Issuer and the Junior Trustee, as amended and restated by that certain Second Supplemental Indenture, dated as of September 30, 2022, between the Issuer, the other Note Parties and the Junior Trustee and as further amended and restated by that certain Fourth Supplemental Indenture, dated as of the date hereof, between the Issuer, the other Note Parties and the Junior Trustee, and as further amended, modified, restated, supplemented or otherwise modified from time to time (other than the Third Supplemental Indenture, dated as of September 30, 2022, by and among the Issuer, the other Note Parties and Wilmington Savings Fund Society, FSB, as trustee and collateral agent), the "Junior Indenture" and the notes issued thereunder, the "Junior Notes");

WHEREAS, the Issuer, the other Note Parties, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (in such capacity, the "Super Senior Trustee" and together with the Junior Trustee, the "Trustees"), have entered into an Indenture, dated as of the date hereof, as amended, modified, restated, supplemented or otherwise modified from time to time, the "Super Senior Indenture" and the notes issued thereunder, the "Super Senior Notes", and the Super Senior Indenture with the Junior Indenture, the "Indentures");

WHEREAS, the Issuer, the other Note Parties, the Junior Trustee, the Super Senior Trustee and Wilmington Savings Fund Society, FSB, as collateral agent (in such capacity, the "Collateral Agent"), have entered into a Collateral Agency and Intercreditor Agreement, dated as of the date hereof, as amended, modified, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement");

WHEREAS, the Junior Holders hereto entered into that certain Forbearance Agreement dated September 30, 2022 (the "Forbearance Agreement"), pursuant to which the Junior Trustee (as directed by the Holders) and Holders agreed to forbear from enforcing their rights against the Note Parties that arose because of certain specified events of default set forth in the Forbearance Agreement; and

WHEREAS, this Agreement, which supersedes the Forbearance Agreement, shall constitute a "Note Document" under both the Super Senior Indenture and Junior Indenture and these Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto hereby agree as follows:

Exhibit 20
Page 2870

1.    Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Intercreditor Agreement . The following capitalized terms shall have the meanings set forth below:

(a)    "Approved Forecast" means the initial or any subsequent amended Cash Flow Forecast approved in accordance with Section 5(a)(1).

(b)    "Cash Flow Forecast" shall have the meaning specified in Section 5(a)(1).

(c)    "Escrow End Date" shall mean the earlier of (x) the date upon which all the Senior Secured Obligations become due and payable whether on maturity, by acceleration or otherwise (other than in connection with an Insolvency or Liquidation Proceeding), (y) the commencement of an Insolvency or Liquidation Proceeding with respect to any Note Party and (z) the date upon which all Escrowed Funds (as defined in the Super Senior Indenture) have been distributed to the Issuer.

(d)    "Effective Date" has the meaning set forth in the first sentence of Section 4 of this Agreement.

(e)    "Note Parties" means the Issuer and each Guarantor.

(f)    "Noteholder Agreement Default" means (i) the failure of the Note Parties to comply with any term, condition or covenant set forth in this Agreement, including Section 5, (ii) any representation made by the Note Parties under or in connection with this Agreement shall prove to be false in any material respect as of the date when made or (iii) the commencement of any Insolvency or Liquidation Proceeding with respect to any Note Party.

(g)    "Strategic Milestones" has the meaning set forth in Section 5(f) of this Agreement.

(h)    "Variance Report" shall mean a weekly variance report, covering the Weekly Test Period, in each case, setting forth for the week ended on the immediately preceding Friday prior to the delivery thereof (1) the variance (as compared to the Approved Forecast for such Weekly Test Period) of the actual aggregate operating cash receipts of the Issuer in the aggregate for the Weekly Test Period, (2) the variance (as compared to the Approved Forecast for such Weekly Test Period) of the aggregate operating disbursements made by the Issuer in the aggregate for the applicable Weekly Test Period and (3) an explanation, in reasonable detail, for any aggregate negative variance in excess of $250,000.00, certified by an Officer of the Issuer.

(i)    "Weekly Test Period" means, at any time, each weekly period ended on a Friday; provided that the first Weekly Test Period after the Effective Date shall be the period from the Effective Date until the Friday of the first full week following the Effective Date.

2.    Representations and Warranties of the Note Parties. The Note Parties hereby represent and warrant as follows:

(a)    All representations and warranties of each of the Note Parties in the Secured Debt Documents to which it is a party are incorporated herein in full by this reference and are true and correct in all material respects as of the date hereof.

(b)    After giving effect to this Agreement, no Triggering Event has occurred and is continuing.

2

Exhibit 20
Page 2871

(c)    Each of the Note Parties has the power, and has been duly authorized by all requisite action, to execute and deliver this Agreement and the other documents and agreements executed and delivered in connection herewith to which it is a party. This Agreement has been duly executed by each of the Note Parties and the other documents and agreements executed and delivered in connection herewith to which any of the Note Parties is a party have been duly executed and delivered by each of them.

(d)    This Agreement is the legal, valid and binding obligation of each of the Note Parties and the other documents and agreements executed or delivered in connection herewith to which any of the Note Parties is a party are the legal, valid and binding obligations of the Note Parties, in each case enforceable against each of the Note Parties in accordance with their respective terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar law affecting creditors' rights generally.

(e)    The execution, delivery and performance of this Agreement and the other documents and agreements executed and delivered in connection therewith do not and will not (i) violate any law, rule, regulation or court order to which any of the Note Parties is subject; (ii) conflict with or result in a breach of the certificate of formation or incorporation, bylaws, limited liability company agreement or other organizational documents of any of the Note Parties or any other agreement or instrument to which it is party or by which the properties of any of the Note Parties is bound; or (iii) result in the creation or imposition of any Lien on any property of any of the Note Parties, whether now owned or hereafter acquired, other than Liens in favor of the Collateral Agent for the benefit of itself and the other Secured Parties.

(f)    No consent or authorization of, filing with or other act by or in respect of any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by each of the Note Parties, or the validity or enforceability, of this Agreement or the other documents or agreements executed or delivered in connection herewith to which any of the Note Parties is a party, or the consummation of the transactions contemplated hereby or thereby, or the continuing operations of any of the Note Parties following the consummation of such transactions.

(g)    There is no pending or, to the knowledge of any of the Note Parties after due inquiry, threatened litigation, proceeding, inquiry or other action (i) seeking an injunction or other restraining order, damages or other relief with respect to the transactions contemplated by this Agreement and the other documents and agreements executed or delivered in connection herewith or (ii) which affects or could affect the business, prospects, operations, assets, liabilities or condition (financial or otherwise) of any of the Note Parties, except, in the case of clause (ii), where such litigation, proceeding, inquiry or other action could not cause a Material Adverse Effect.

3.    Representations by the Holders; Holder Direction. Each of the Holders on its own behalf and as to itself, hereby represents to the Note Parties as of the date hereof as follows:

(a)    Execution and Delivery. This Agreement has been validly executed and delivered by such Holder separately and not jointly.

(b)    Ownership. Such Holder (i) is the beneficial owner of the aggregate principal amount of Notes under the Indentures set forth below its name on its signature hereto, and/or (ii) has, with respect to the beneficial owners of such Notes, (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such Notes, and (C) full power and authority to bind or act, on the behalf of, such beneficial owners.

3

Exhibit 20
Page 2872

(c) <u>Authorization; No Conflicts; No Consent</u>. Such Holder's execution, delivery and performance of this Agreement (i) has been duly authorized by all necessary action on the part of such Holder, (ii) does not (A) contravene, breach or conflict with such Holder's constituent or organizational documents or (B) violate any applicable requirement of law or any order, material contract concerning operations, or undertaking to which such Holder or any of its subsidiaries is a party or by which any of their properties is or may be bound, and (iii) does not and will not require either consent or approval of any regulatory authority or governmental authority or agency having jurisdiction over such Holder, or any other person or entity, which has not already been obtained.

(d) <u>Enforceability</u>. This Agreement is the legal, valid, and binding obligation of such Holder and is enforceable against such Holder in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

(e) <u>Collective Ownership</u>. Assuming the accuracy of each other Holder's representation in Section 3(b) hereof, such Holder and each other Holder collectively beneficially own 100% of the aggregate principal amount of the Notes issued under both the Junior Indenture and the Super Senior Indenture (other than the Notes issued under the Super Senior Indenture to Dr. Andrew Rickman).

4. <u>Conditions to Effectiveness</u>. This Agreement shall not be effective unless and until the date when each of the following conditions shall have been satisfied in the sole discretion of the Holders, as applicable (such date, the "<u>Effective Date</u>"):

(a) Each of the parties hereto shall have executed and exchanged counterparts of this Agreement.

(b) No event that would constitute a Triggering Event under the Secured Debt Documents shall have occurred and be continuing as of the Effective Date.

(c) The Issuer shall have engaged a Company Financial Advisor (as defined below) by way of written agreement on terms acceptable to the Required Super Senior Holders in compliance with the terms of Section 6(e)(i) below; it being understood and agreed that the engagement letter with Alvarez & Marsal Cayman Islands Limited ("<u>A&M</u>") is acceptable to the Required Super Senior Holders without modification (the "<u>A&M Engagement Letter</u>").

(d) The Issuer shall have engaged a Company Strategic Advisor (as defined below) by way of written agreement on terms acceptable to the Required Super Senior Holders in compliance with the terms of Section 6(e)(ii) below; it being understood and agreed that the engagement letter delivered to the Holders (or their counsel) with Jefferies LLC is acceptable to the Required Super Senior Holders without modification (the "<u>Jefferies Engagement Letter</u>").

5. <u>Additional Covenants of the Issuer</u>. In consideration of the Holders entering into this Agreement in accordance with the terms and conditions hereof, the Issuer hereby covenants and agrees that the Issuer shall at all times until the Secured Debt Termination Date comply with each of the following covenants:

(a) <u>Reporting</u>.

4

Exhibit 20
Page 2873

(1)     No later than 3:00 p.m. New York City time on the Friday each calendar week, commencing with the Friday of the first week following the week in which the Effective Date occurred the Issuer shall deliver to the Holder Representative and the Holders a rolling 13-week cash flow forecast (a "Cash Flow Forecast" and once approved as set forth below, an "Approved Forecast"), which shall reflect Issuer's good faith projection of all weekly cash receipts and disbursements in connection with the operation of its business. It is understood and agreed that the Cash Flow Forecast agreed to in connection with the Forbearance Agreement shall constitute the initial Approved Forecast hereunder.

(2)     The Required Super Senior Holders shall have three Business Days following the Business Day that the Cash Flow Forecast is delivered to Holder Representative and the Holders to review any Cash Flow Forecast before it becomes an Approved Cash Flow Forecast; provided, no such Cash Flow Forecast shall become an Approved Cash Flow Forecast if objected to in writing (which may include e-mail) during the review period by the Required Super Senior Holders (or Noteholder Representative if in effect). If the Required Super Senior Holders (or Noteholder Representative if in effect) object to any such Cash Flow Forecast, the parties agree to negotiate in good faith a revised Cash Flow Forecast. Unless a Consent regarding a Strategic Milestone has been sought, the previously delivered Approved Cash Flow Forecast shall remain in full force and effect until such time as a subsequently delivered Cash Flow Forecast becomes an Approved Cash Flow Forecast. If a Consent regarding a Strategic Milestone has been sought and the Required Super Senior Holders and Issuer are unable to agree on a Cash Flow Forecast for more than five (5) Business Days, a Noteholder Agreement Default shall be deemed to have occurred.

(3)     Issuer shall ensure that on a cumulative basis that no operational disbursements in the aggregate exceed 115% of forecasted aggregate total disbursements for such period as set forth in the Approved Cash Flow Forecast. Subject to such variance, the Issuer shall not be permitted to expend amounts in excess of the disbursements set forth in the Cash Flow Forecast or subsequent Approved Cash Flow Forecast. Any deviation from the Cash Flow Forecast or subsequent Approved Cash Flow Forecast beyond any applicable permitted disbursement variance shall constitute an immediate Noteholder Agreement Default unless waived in writing by the Required Super Senior Holders. Notwithstanding the foregoing, the Issuer shall be permitted to pay (x) fees and expenses of the Holders and Trustees as required pursuant to the provisions of the Secured Debt Documents and hereunder and (y) all reasonable and documented fees of Pillsbury Winthrop Shaw Pittman LLP and A&M, consistent with the terms of the A&M Engagement Letter, promptly upon invoicing for any work associated with the transaction and related work contemplated by this Agreement.

(4)     At any time, a Holder may decline to receive such Cash Flow Forecasts in their sole discretion by delivery of advance written notice to the Issuer and such election shall remain in effect until the Holder notifies the Issuer by delivery of advance written notice that it would like to receive subsequent Cash Flow Forecasts.

(b)     Variance Reporting.

(1)     Beginning with the delivery of the initial Variance Report and tested, as of the last day of each applicable Weekly Test Period, commencing with the last day of the first Weekly Test Period ending after the Effective Date, for such initial Weekly Test Period, and for each Weekly Test Period thereafter, (i) the variance (as compared to the Approved Forecast) of the actual operating cash of the Issuer; and (ii) the negative variance (as

5

Exhibit 20
Page 2874

compared to the Approved Forecast) of the aggregate operating disbursements made by the Issuer, shall not, on a cumulative basis, exceed 15%.

(2) No later than 2:00 p.m. New York City time on the Thursday of the first week after each Weekly Test Period (commencing with the Thursday of the first week after the first Weekly Test Period ending following the Effective Date), the Issuer shall deliver to the Holders (and, if one has been appointed, the Holder Representative), a Variance Report for the immediately preceding Weekly Test Period; provided that each Holder may decline to receive such Variance Reports in their sole discretion by delivery of advance written notice to the Issuer and such election shall remain in effect until the Holder notifies the Issuer by delivery of advance written notice that it would like to receive subsequent Variance Reports. Each such Variance Report shall be certified by an Officer of the Issuer as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

(c) Hold conference calls with the Issuer, the Company Financial Advisor, the Holders, and, if appointed, the Holder Representative (x) on a weekly basis on Fridays at 1:00 p.m. New York City time and (y) as requested upon reasonable prior notice by the Required Holders (or if a Holder Representative has been appointed, the Holder Representative), during normal business hours, to discuss the Issuer's current and projected operational performance, strategic process and any related financial matters; provided that each Holder may decline to participate in such calls in their sole discretion;

(d) Hold conference calls with the Issuer, the Company Strategic Advisor (as defined below), the Holders, and, if appointed, the Holder Representative (x) on a weekly basis on Fridays at 3:00 p.m. New York City time and (y) as requested upon reasonable prior notice by the Required Holders (or if a Holder Representative has been appointed, the Holder Representative), during normal business hours, to discuss the Issuer's strategic process; provided that each Holder may decline to participate in such calls in their sole discretion; and

(e) If requested by the Required Holders, provide the Holders (and any Holder Representative) (x) a reasonably detailed cost cutting business plan prepared by the Company Financial Advisor, and (y) such other analyses of the Issuer's business, prospects, or strategic plans as reasonably requested by the Required Holders, in each case in a form and substance reasonably satisfactory to the Required Holders; provided that each Holder may decline to receive such business plan in their sole discretion by delivery of advance written to the Issuer and such election shall remain in effect until the Holder notifies the Issuer by delivery of advance written notice that it would like to receive such business plan.

(f) Company Advisors.

(i) No later than the date hereof, the Note Parties shall have countersigned an engagement letter, in form and substance reasonably acceptable to the Required Super Senior Holders (or if a Holder Representative has been appointed, the Holder Representative), including as to scope and terms of engagement, providing for the retention of a financial advisor by the Note Parties (the "Company Financial Advisor"), and such financial advisor (or a prompt replacement satisfactory to the Required Super Senior Holders) shall be retained until the Secured Debt Termination Date (or until the Required Super Senior Holders otherwise agree) on substantially similar terms. Each of the Note Parties shall cooperate with the Company Financial Advisor and make management of the Issuer available thereto, and the Company Financial Advisor and the Issuer's other advisors shall be authorized and directed to deliver to the Holders (and if a Holder Representative has been appointed, the Holder Representative) all reports and analysis prepared by the Company Financial Advisor or such other advisors for the Note Parties and any other reports or

6

Exhibit 20
Page 2875

analysis which the Holders (and if a Holder Representative has been appointed, the Holder Representative) may reasonably request from the Company Financial Advisor or the Issuer's other advisors from time to time; provided that (x) the Issuer (with respect to the Company Financial Advisor) and Company Financial Advisor (with respect to the Holders) shall not be required to provide access to or disclose information that it determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Issuer or any of its Subsidiaries, or would be prohibited by applicable law, and (y) any visits, due diligence requests or inspections shall not unreasonably interfere with the business of the Issuer and its Subsidiaries; provided that each Holder may decline to receive such reports and analysis in their sole discretion by delivery of advance written to the Issuer and the Company Financial Advisor or the Issuer's other advisors and such election shall remain in effect until the Holder notifies the Issuer and the Company Financial Advisor or the Issuer's other advisors by delivery of advance written notice that it would like to receive subsequent reports and analysis. The engagement letter for Company Financial Advisor, other than the A&M Engagement Letter, shall specifically provide, among other things, that (1) the Holder Representative and the Holders shall be permitted to meet and speak directly with Company Financial Advisor from time to time without the Issuer present at such meetings or a party to any such calls and (2) Issuer shall be required to pay all fees and expenses of Company Financial Advisor promptly and in any event no later than three (3) business days after the receipt of summary invoices with respect thereto.

(ii) No later than the date hereof, the Note Parties shall have countersigned an engagement letter, in form and substance (including the parties thereto) acceptable to the Required Holders in their sole discretion (or if a Holder Representative is in place, Holder Representative subject to Section 7), including as to scope and terms of engagement, providing for the retention of an advisor to review Issuer's strategic alternatives (the "Company Strategic Advisor"), and such strategic advisor (or a prompt replacement satisfactory to the Required Holders in their sole discretion (or if a Holder Representative is in place, Holder Representative subject to Section 7)) shall be retained until the Secured Debt Termination Date (or until the Required Super Senior Holders otherwise agree) on substantially similar terms. Each of the Note Parties shall cooperate with the Company Strategic Advisor and make management of the Issuer available thereto, and the Company Strategic Advisor shall be authorized and directed to deliver to the Holders (and any Holder Representative) all reports and analysis prepared by the Company Strategic Advisor for the Note Parties and any other reports or analysis which the Holders (and any Holder Representative) may request from the Company Strategic Advisor and Issuer's other advisors from time to time including a written update on the strategic process immediately prior to the weekly meeting set forth in Section 6(d) above in form and substance acceptable to the Required Super Senior Holders in their sole discretion (or if a Holder Representative is in place, the Holder Representative subject to Section 7); provided that each Holder may decline to receive such updates, reports and analysis in their sole discretion by delivery of advance written notice to the Issuer and the Company Strategic Advisor and such election shall remain in effect until the Holder notifies the Issuer and the Company Strategic Advisor by delivery of advance written notice that it would like to receive subsequent updates, reports and analysis.

(g) Strategic Milestones. The Issuer, the Company Strategic Advisor, and the Holders have established and agreed to the milestones and time periods specified on Appendix A hereto (the "Strategic Milestones") for the strategic alternatives process set forth in Section 5(f)(ii) above. The Note Parties shall satisfy each of the Strategic Milestones on or before the dates set forth therein (or such longer period acceptable to the Required Super Senior Holders in their sole discretion (or if a Holder Representative is in place, the Holder Representative subject to Section 7)).

The Issuer further agrees and acknowledges that the failure to satisfy any of the covenants set forth above in this Section 5 shall constitute an immediate Noteholder Agreement Default; provided,

7

Exhibit 20
Page 2876

*however*, that with respect to any failure or breach with respect to the delivery of any Cash Flow Forecast or Variance Report, delivery of a cost cutting plan under Section 5(e) or the holding of meetings and conference calls pursuant to Sections 5(c) or (d), the Issuer shall have three (3) calendar days to cure any such failure or breach.

6. <u>Escrow Release</u>.

(a)    The Required Super Senior Holders may in their sole discretion, from time to time, direct the Super Senior Trustee to release Escrowed Funds, in whole or in part (each, an "<u>Escrow Release</u>"). Each Escrow Release shall be set forth in an instruction letter (each, an "<u>Escrow Release Letter</u>") from the Required Super Senior Holders (who may be directed pursuant to the Holder Representative in accordance with Section 7) to the Super Senior Trustee setting forth the amount Escrowed Funds to be released to the Issuer and the date upon which such funds shall be released.

(b)    If at any time the Issuer has been requested to convert all outstanding Super Senior Notes and any Escrowed Funds remain in the Escrow Account at such time, the Issuer may require such remaining Super Senior Holder(s) to authorize the Trustee to release all remaining Escrowed Funds on or prior to the requested conversion date.

(c)    If the Escrow End Date has occurred pursuant to clause (x) of the definition thereof, the Required Super Senior Holders shall, if permitted by applicable law, issue an Escrow Release Letter directing the Super Senior Trustee to apply the remaining Escrowed Funds in accordance with Section 6.05 of the Super Senior Indenture. Upon knowledge of an Insolvency or Liquidation Proceeding, the Issuer shall notify the Trustee of such Insolvency or Liquidation Proceeding under Section 4.36 of the Super Senior Indenture. If the Issuer has not provided such notice but an Insolvency or Liquidation Proceeding has commenced, the Required Super Senior Holders may provide notice to the Trustee of such Insolvency or Liquidation Proceeding under Section 4.36 of the Super Senior Indenture.

(d)    Each Junior Holder agrees it has no security interest in, Lien on or rights to the proceeds of the Super Senior Notes held in the Escrow Account. Each Junior Holder further agrees that it will not contest, protest or object to (x) any Escrow Release authorized by the Super Senior Holders or (y) any Escrow Release of the Escrow Funds to the Super Senior Holders or for application to the Collateral Agent Obligations in the event of an Insolvency or Liquidation Proceeding pursuant to the terms of the Super Senior Indenture and the Intercreditor Agreement.

7. <u>MNPI; Holder Representative</u>.

(a)    From time to time the Issuer and other Guarantors may request amendments, modifications, waivers, consents and/or other actions to be taken hereunder, under the Intercreditor Agreement and/or under the other Secured Debt Documents (each, a "<u>Consent</u>") which may require disclosing material non-public information of the Issuer ("<u>MNPI</u>"). For purposes of this Agreement, an "<u>Unrestricted Holder</u>" shall refer to any Holder that has not received and chooses not to receive any MNPI and a "<u>Restricted Holder</u>" shall refer to any Holder is not an Unrestricted Holder.

(b)    Each Holder agrees to represent itself with respect to any Consent (x) not requiring MNPI or (y) in the case of a Super Senior Holder, (1) approving or rejecting any Cash Flow Forecast that is not related to a corresponding Consent with respect to Strategic Milestones or (2) approving or withholding Escrow Release not related to a corresponding Consent with respect to Strategic Milestones (each, a "<u>Non-MNPI Consent</u>" and any other Consent, an "<u>MNPI Consent</u>" (including but not limited to (A) approving or rejecting the terms and scopes of the

8

Exhibit 20
Page 2877

engagements of any replacement Company Financial Advisor or replacement Company Strategic Advisor, (B) approving or rejecting extensions or modifications of any Strategic Milestone or (C) any other amendment, modification, waiver, consent and/or other action to be taken requiring MNPI). The Issuer shall notify all Holders of each Consent under this Agreement, the Intercreditor Agreement and their respective Secured Debt Documents but may only provide Restricted Holders MNPI unless any Unrestricted Holders request the MNPI and thereafter become Restricted Holders. For the avoidance of doubt, each Holder agrees to represent itself (x) with respect to any Non-MNPI Consent and (y) when it is an Unrestricted Holder.

(c)    With respect to each MNPI Consent:

(1)    each Holder agrees that it will represent whether it is an Unrestricted Holder or Restricted Holder with respect to such MNPI Consent to the Holder Representative, Requisite Holders Counsel (under and as defined in the Super Senior Indenture and the Junior Indenture) and the other Holders and the Holder Representative may rely on such representation without liability and shall be indemnified by the Holder making such representation;

(2)    each Unrestricted Holder (x) for purposes of any MNPI Consent under this Agreement (but not for the avoidance of doubt, with respect to any Consent which requires action under the Intercreditor Agreement or any other Secured Debt Documents), may choose to be disregarded for purposes of determining Required Super Senior Holders with prior written notice to the Issuer, Requisite Holders Counsel (under and as defined in the Super Senior Indenture and the Junior Indenture) and the other Super Senior Holders or (y) for any other MNPI Consent elect to be represented by the Noteholder Representative pursuant to the provisions below.

(d)    At any time, the Required Holders may appoint a holder representative (the "Holder Representative"), which shall have authority, as representative and agent of the Holders with respect to any MNPI Consent subject to the provisions below:

(1)    In determining whether to give or withhold Consent on behalf of any other Holder, the Holder Representative shall be absolutely protected in relying on information provided to it by the Issuer, its affiliates or its representatives without need of independent inquiry by the Holder Representative.

(2)    The Holders initially authorize and approve Wazee Street Capital Management LLC ("WSCM") as the Holder Representative to act as the Holders' representative and agent and to give MNPI Consents subject to the other provisions of this Section. If WSCM (or any successor Holder Representative) decides it is in its best interest to resign and no longer serve as the Holder Representative, the Holders may, (x) if another Holder agrees to serve as the Holder Representative, appoint such Holder as a the new Holder Representative or (y) at the expense of the Issuer, retain an independent financial advisor to serve as the Holder Representative (any such independent advisor, a "Holder Advisor"); provided, that in such circumstances where an independent financial advisor will serve as the Holder Representative, the individual or entity designated as the Holder Representative must be acceptable to all Holders. Any Person serving as the Holder Representative (including WSCM) may be removed at any time by the Required Super Senior Holders (where any Holder Representative that is also a Holder is disregarded in such vote). No such resignation or removal shall affect the validity of any Consent given by the Holder Representative prior to the resignation or removal of such Holder Representative.

9

Exhibit 20
Page 2878

(3)    Each Person serving as Holder Representative (including a Holder Advisor) shall be entitled to reimbursement of expenses and indemnification from the Issuer on the same terms as any agent or representative serving under the Secured Debt Documents. Each Holder Advisor shall also be entitled to compensation on terms reasonably agreed by the Issuer and Holders; provided that any such agreed compensation shall automatically be deemed part of the Approved Cash Flow Forecast for the following week.

(4)    The Holder Representative and all Restricted Holders at such time (if any) shall determine whether to approve or withhold any Consent and shall vote on a pro rata basis (with all Unrestricted Holders disregarded for such purpose); provided that, if all Holders (other than the Holder Representative) are Unrestricted Holders, the Holder Representative shall determine whether to approve or withhold any Consent in its sole discretion; provided further, and notwithstanding the forgoing, at any time, Holders representing the Required Holders may directly instruct the applicable Trustee or Collateral Agent with respect to any Consent.

(5)    The Holders agree (and any future Holder Representative shall agree at the time of appointment) that the Issuer shall be fully protected in relying upon Consent given or withheld pursuant to clause (4), and shall have no liability for entering into any transaction for which Consent has been received or for not entering into any transaction for which Consent has been withheld by the Holder Representative.

(6)    Each Restricted Holder agrees to execute any agreements or consent consistent with the Holder Representative's Consent given in accordance with clause (4) above in order to effectuate such Consent under this Agreement or the applicable Secured Debt Document.

8.    <u>Notices</u>. Any notice, consent or other communication to be provided under this Agreement shall be delivered by hand, e-mail, recorded delivery or courier using an internationally recognised courier company to the address specified in Schedule II; *provided, however*, that any party may update its contact information upon 5 business days' notice to the other parties hereto. A notice hereunder shall be deemed to have been received: (x) at the time recorded by the delivery company, in the case of recorded delivery; (y) at the time of delivery, if delivered by hand or courier; or (z) at the time of sending if sent by e-mail, provided that receipt shall not occur if the sender receives an automated message that the e-mail has not been delivered to the recipient.

9.    <u>Reaffirmation; No Novation</u>. The Indentures, the other Secured Debt Documents and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby ratified and confirmed. Each Note Party (i) agrees that, except as specifically provided herein, this Agreement and the transactions contemplated hereby shall not limit or diminish the obligations of the Note Parties arising under or pursuant to the Indentures or the other Secured Debt Documents to which it is a party, (ii) reaffirms its obligations under the Indentures, the Security Documents and each and every other Secured Debt Document to which it is a party and (iii) reaffirms all Liens on the Collateral which have been granted by it in favor of the Collateral Agent pursuant to any of the Security Documents, and all filings made with a governmental authority in connection therewith. This Agreement is not intended to and shall not constitute a novation of the Secured Debt Documents or the Secured Obligations created thereunder or any other obligations.

10.    <u>Miscellaneous</u>.

(a)    <u>Successors and Assigns</u>. This Agreement shall be binding on and shall inure to the benefit of the Note Parties, the Holders and their respective successors and assigns, transferees

10

Exhibit 20
Page 2879

and purchasers except as otherwise provided herein. No Note Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder without the prior express written consent of the Required Holders. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Note Parties and the Holders with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement. Each Holder agrees to provide notice to the other Holders of any successor, assignment, sale or transfer of the Notes referred to herein and to have any such successor, assignee, purchaser or transferee to become a party hereto.

(b)    Entire Agreement. This Agreement, including all schedules and other documents attached hereto or incorporated by reference herein or delivered in connection herewith, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all other understandings, oral or written, with respect to the subject matter hereof.

(c)    Fees and Expenses. The Issuer agrees to pay on demand all fees, costs, and expenses incurred by the Holders in connection with the preparation, execution, analysis, negotiation, delivery, and/or enforcement of this Agreement.

(d)    Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(e)    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)    Conflict of Terms. Except as otherwise provided in this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Note Documents, the provision contained in this Agreement shall govern and control.

(g)    Counterparts. This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement. Delivery of an executed signature page to this Agreement by telecopy shall be effective as delivery of a manually executed signature page to this Agreement.

(h)    Incorporation of Indenture. The provisions contained in Section 18.04 and Section 18.12 of the Super Senior Indenture are incorporated herein by reference to the same extent as if reproduced herein in their entirety, except with reference to this Agreement rather than the Super Senior Indenture.

(i)    Effectiveness in Insolvency or Liquidation Proceedings. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding. All references in this Agreement to any Grantor shall include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

*[signature page follows]*

11

Exhibit 20
Page 2880

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year first above written.

**ROCKLEY PHOTONICS HOLDINGS LIMITED**, as Issuer


By:_____
Name:
Title:

**ROCKLEY PHOTONICS LIMITED**, as a Guarantor


By:_____
Name:
Title:

**ROCKLEY PHOTONICS, INC.**, as a Guarantor


By:_____
Name:
Title:

**ROCKLEY PHOTONICS IRELAND LIMITED**, as a Guarantor


By:_____
Name:
Title:

**ROCKLEY PHOTONICS OY**, as a Guarantor


By:_____
Name:
Title:

*[Signature Page to Noteholder Agreement]*

Exhibit 20
Page 2881

**WHITEBOX MULTI-STRATEGY PARTNERS, LP**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I

By:_____
Name: Andrew Thau
Title: Senior Legal Analyst

**WHITEBOX RELATIVE VALUE PARTNERS, LP**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I

By:_____
Name: Andrew Thau
Title: Senior Legal Analyst

**WHITEBOX GT FUND, LP**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I
By:_____
Name: Andrew Thau
Title: Senior Legal Analyst

**PANDORA SELECT PARTNERS, LP**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I

By:_____
Name: Andrew Thau
Title: Senior Legal Analyst

13

Exhibit 20
Page 2882

**HIGHBRIDGE TACTICAL CREDIT MASTER FUND, L.P.**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I

By: Highbridge Capital Management, LLC, as Trading Manager and not in its individual capacity

By:_____
Name: Jonathan Segal
Title: Managing Director, Co-Chief Investment Officer

14

Exhibit 20
Page 2883

## ROC SPV XIX LLC

Beneficial owner of the Junior Notes in the principal amount reflected on <u>Schedule I</u>

By: ATW Partners Opportunities Management LLC, its manager

By:_____
Name: Antonio Ruiz- Gimenez
Title: Managing Member

By:_____
Name: Kerry Propper
Title: Managing Member


## ROC SPV XX LLC

Holder of the Super Senior Notes in the principal amount reflected on <u>Schedule I</u>
By: ATW Partners Opportunities Management LLC, its manager

By:_____
Name: Antonio Ruiz- Gimenez
Title: Managing Member

By:_____
Name: Kerry Propper
Title: Managing Member

15

Exhibit 20
Page 2884

16

Exhibit 20
Page 2885

**WAZEE STREET OPPORTUNITIES FUND V LP**
Beneficial owner of the Junior Notes and Holder of the Super Senior Notes in the principal amounts reflected on Schedule I

By: WSOF V GP LLC, its general partner

By: _____

Name: R. Michael Collins
Title: President

Exhibit 20
Page 2886

**MTVL, LLC**
Holder of the Super Senior Notes in the principal amount reflected on <u>Schedule I</u>

By:_____

Name:

Title: Authorized Signatories

Exhibit 20
Page 2887

## SCHEDULE I

| Beneficial Owner/Holder | Super Senior Notes | Junior Notes |
|---|---|---|
| Highbridge Tactical Credit Master Fund, L.P. | $9,919,083.83 | $3,568,606.40 |
| ROC SPV XIX LLC | $21,924,006.25 | $12,192,889.66 |
| ROC SPV XX LLC | $11,966,616.91 | - |
| Wazee Street Opportunities Fund V LP | $20,162,788.56 | $7,254,002.24 |
| Whitebox Multi-Strategy Partners, L.P. | $8,065,115.37 | $2,901,600.93 |
| Whitebox Relative Value Partners, LP | $5,544,766.84 | $1,994,850.62 |
| Whitebox GT Fund, LP | $1,008,139.45 | $362,700.10 |
| Pandora Select Partners, LP | $504,069.72 | $181,350.05 |
| Dr. Andrew Rickman | $1,054,720.83 | - |
| MTVL, LLC | $10,500,000.00 | - |
| Total | $90,649,307.77 | $28,456,000.00 |

19

Exhibit 20
Page 2888

**SCHEDULE II**

**Notice Addresses**

Whitebox GT Fund, LP
3033 Excelsior Blvd, Ste 500
Minneapolis, MN 55416
Email: AThau@whiteboxadvisors.com
aruth@whiteboxadvisors.com
WHB_LoanDocsHedgeFund_Dist@Whiteboxadvisors.com

Whitebox Relative Value Partners, LP
3033 Excelsior Blvd, Ste 500
Minneapolis, MN 55416
Email: AThau@whiteboxadvisors.com
aruth@whiteboxadvisors.com
WHB_LoanDocsHedgeFund_Dist@Whiteboxadvisors.com

Whitebox Multi-Strategy Partners, LP
3033 Excelsior Blvd, Ste 500
Minneapolis, MN 55416
Email: AThau@whiteboxadvisors.com
aruth@whiteboxadvisors.com
WHB_LoanDocsHedgeFund_Dist@Whiteboxadvisors.com

Pandora Select Partners, LP
3033 Excelsior Blvd, Ste 500
Minneapolis, MN 55416
Email: AThau@whiteboxadvisors.com
aruth@whiteboxadvisors.com
WHB_LoanDocsHedgeFund_Dist@Whiteboxadvisors.com

Wazee Street Opportunities Fund V LP
8101 E Prentice Ave Suite 610
Greenwood Village, CO 80111
Email: sam@wazeestreetcapital.com
michael@wazeestreetcapital.com
kayla@wazeestreetcapital.com

Highbridge Tactical Credit Master Fund, L.P.
c/o Maples & Calder
PO Box 309 GT, Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands, British West Indies
Email: hcmbankdebt@highbridge.com
HS_HighbridgeBankDebt@hedgeserv.com

MTVL, LLC
c/o Springfield Financial Advisory Ltd.
22nd Floor, Hang Lung Centre
2-20 Paterson Street

20

Exhibit 20
Page 2889

Causeway Bay
Hong Kong
Attn: Betty Cheng/Dale Wong
Email: bettycheng@springfld.com/ dalewong@springfld.com

with a copy to:
McCarthy Legal Services, LLC
1188 Centre Street
Newton Centre, MA 02459
Attn: Legal Department
Email: msawka@morningside.com

ROC SPV XX LLC
17 State Street, Suite 2100
New York, NY 10004
Email: kpropper@atwpartners.com / ibarber@atwpartners.com

ROC SPV XIX LLC
17 State Street, Suite 2100
New York, NY 10004
Email: kpropper@atwpartners.com / ibarber@atwpartners.com

21

Exhibit 20
Page 2890

## EXHIBIT A

### Strategic Milestones

| Strategic Milestone Date | Description of Strategic Milestone |
|---|---|
| October 26, 2022 | Strategic Advisor shall have (a) held preliminary conversations with relevant decisionmakers at each Tier 1 counterparty about an investment, commercial alliance and/or acquisition (as applicable to each such counterparty), and (b) provided Holders with a detailed summary of such conversations, each in scope and substance satisfactory to the Holders. |
| November 3, 2022 | Strategic Advisor shall have provided Holders with market feedback from each Tier 1 counterparty, including each counterparty's perspective on (a) the Company, (b) the prospects for a transaction, and (c) potential transaction structures, each in scope and substance satisfactory to the Holders. |
| November 15, 2022 | Tier 1 counterparties shall have submitted initial indications of interest for a transaction, including summary of terms (as appropriate for investment, commercial alliance and/or acquisition, as applicable), and the Holders shall continue to be satisfied, in their sole discretion, with the prospects for a successful transaction. |
| December 1, 2022 | Strategic Advisor shall provide Holders with an update and analysis of (a) the indications of interest received, (b) the prospects for a transaction, and (c) recommended potential transaction structures, and the Holders shall continue to be satisfied, in their sole discretion, with the prospects for a successful transaction. |
| December 7, 2022 | Tier 1 counterparties shall have submitted second indications of interest for a transaction, with draft transaction documents (or markups, as applicable), and the Holders shall continue to be satisfied, in their sole discretion, with the prospects for a successful transaction. |
| December 21, 2022 | Execution and public announcement of Transaction Agreement. |

22

Exhibit 20
Page 2891

Case 23-10081-lgb Doc 104-6 Filed 06/03/23 Entered 06/03/23 17:09:19 Exhibit 607
Rockley UK-Noteholders Agreement Exhibit 10.26 of 2022.10.25 Rockley    Pg 23 of 48

Exhibit 10.3

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is made and entered into as of _____, 2022, between Rockley Photonics Holdings Limited, an exempted company incorporated in the Cayman Islands with limited liability (the "Company"), and each of the several subscribers signatory hereto (each such subscriber, a "Subscriber" and, collectively, the "Subscribers").

This Agreement is made pursuant to the Repurchase and Subscription Agreement, dated as of October 24, 2022, among the Company and the Subscribers named therein (the "Subscription Agreement"), relating to the issuance by the Company of Convertible Notes and Warrants to the Subscribers and the repurchase by the Company of Bridge Notes (as defined in the Subscription Agreement) and certain of the May 2022 Convertible Notes (as defined in the Subscription Agreement) held by certain of the Subscribers.

The Company and each Subscriber hereby agrees as follows:

1.    Definitions.

**Capitalized terms used and not otherwise defined herein that are defined in the Subscription Agreement shall have the meanings given such terms in the Subscription Agreement.** As used in this Agreement, the following terms shall have the following meanings:

"Advice" shall have the meaning set forth in Section 6(c).

"Commission" means the United States Securities and Exchange Commission.

"Effectiveness Date" means, with respect to the Initial Registration Statement required to be filed hereunder, the tenth Trading Day following the filing date of the Initial Registration Statement (or (1) if later than such tenth Trading Day, the third Trading Day following the date of the letter from the Commission informing the Company that the Commission will not review the Registration Statement or (2) in the event of a review by the Commission, the 90th calendar day following the date hereof) and with respect to any additional Registration Statements that may be required pursuant to Section 2(c) or Section 3(c), the tenth Trading Day following the date on which an additional Registration Statement is required to be filed hereunder (or (1) if later than such tenth Trading Day, the third Trading Day following the date of the letter from the Commission informing the Company that the Commission will not review the Registration Statement or (2) in the event of a review by the Commission, the 90th calendar day following the date such additional Registration Statement is required to be filed hereunder); provided, however, that in the event the Company is notified by the Commission in writing that one or more of the above Registration Statements will not be reviewed or is no longer subject to further review and comments, the Effectiveness Date as to such Registration Statement shall be the tenth Trading Day following the date on which the Company is so notified if such date precedes the dates otherwise required above, provided, further, that if such Effectiveness Date falls on a day that is not a Trading Day, then the Effectiveness Date shall be the next succeeding Trading Day.

"Effectiveness Period" shall have the meaning set forth in Section 2(a).

Exhibit 20
Page 2892

"Event" shall have the meaning set forth in Section 2(d).

"Event Date" shall have the meaning set forth in Section 2(d).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Filing Date" means, with respect to the Initial Registration Statement required hereunder, the fifth Trading Day following the date hereof and, with respect to any additional Registration Statement that may be required pursuant to Section 2(c) or Section 3(c), the earliest practical date on which the Company is permitted by SEC Guidance to file such additional Registration Statement related to the Registrable Securities.

"Holder" or "Holders" means the registered holder or holders, as the case may be, from time to time of Registrable Securities.

"Indemnified Party" shall have the meaning set forth in Section 5(c).

"Indemnifying Party" shall have the meaning set forth in Section 5(c).

"Initial Registration Statement" means the initial Registration Statement filed pursuant to this Agreement.

"Losses" shall have the meaning set forth in Section 5(a).

"Plan of Distribution" shall have the meaning set forth in Section 2(a).

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated by the Commission pursuant to the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means, as of any date of determination, (a) all Ordinary Shares then issued or issuable upon conversion in full of the Convertible Notes (assuming on such date the Convertible Notes are converted in full without regard to any conversion limitations therein), (b) all Ordinary Shares issued or issuable as interest or principal on the Convertible Notes assuming all permissible interest and principal payments are made in Ordinary Shares and the Convertible Notes are held until maturity, (c) all Warrant Shares then issued or issuable upon exercise of the Warrants (assuming on such date the Warrants are exercised in full without regard to any exercise limitations therein), (d) any additional Ordinary Shares issued and issuable in connection with any anti-dilution provisions in the Convertible Notes or the Warrants (in each case, without giving effect to any limitations on conversion set forth in the Convertible Notes or limitations on exercise set forth in the Warrants); and (e) any securities then issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar

2

Exhibit 20
Page 2893

event with respect to the foregoing; provided, however, that any such Registrable Securities shall cease to be Registrable Securities (and the Company shall not be required to maintain the effectiveness of any, or file another, Registration Statement hereunder with respect thereto) if (a) a Registration Statement with respect to the resale of such Registrable Securities has been declared effective by the Commission under the Securities Act and such Registrable Securities have been disposed of by the Holder in accordance with such effective Registration Statement, (b) such Registrable Securities have been otherwise resold, or (c) such securities have become eligible for resale without volume or manner-of-sale restrictions pursuant to Rule 144 and without the requirement for the Company to be in compliance with the current public information requirement pursuant to Rule 144, as determined by the counsel to the Company and confirmed in a written opinion letter to such effect, addressed, delivered and acceptable to the Transfer Agent and the affected Holders, in each case as reasonably determined by the Company upon the advice of counsel to the Company.

"Registration Statement" means any registration statement required to be filed hereunder pursuant to Section 2(a) and any additional registration statements contemplated by Section 2(c) or Section 3(c), including (in each case) the Prospectus, amendments and supplements to any such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in any such registration statement.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"SEC Guidance" means (i) any publicly-available written or oral guidance of the Commission staff, or any comments, requirements or requests of the Commission staff made in writing to the Company and (ii) the Securities Act.

"Selling Shareholder Questionnaire" shall have the meaning set forth in Section 3(a).

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Ordinary Shares are listed or quoted for trading on the date in question:

3

Exhibit 20
Page 2894

the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, or the NYSE (or any successors to any of the foregoing).

"Transfer Agent" means Computershare Trust Company, N.A., the current transfer agent for the Ordinary Shares, and any successor transfer agent.

2.  Shelf Registration.

(a)    On or prior to each Filing Date, the Company shall prepare and file with the Commission a Registration Statement covering the resale of all of the Registrable Securities that are not then registered on an effective Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415. Each Registration Statement filed hereunder shall be on Form S-3 (except if the Company is not then eligible to register for resale the Registrable Securities on Form S-3, in which case such registration shall be on another appropriate form in accordance herewith, subject to the provisions of Section 2(e)) and shall contain (unless otherwise directed in writing by Holders representing at least 85% in interest of the Registrable Securities) substantially the "Plan of Distribution" attached hereto as Annex A and substantially the "Selling Shareholder" section attached hereto as Annex B; provided, however, that no Holder shall be required to be named as an "underwriter" without such Holder's express prior written consent. Subject to the terms of this Agreement, the Company shall use its commercially reasonable efforts to cause a Registration Statement filed under this Agreement (including, without limitation, under Section 3(c)) to be declared effective under the Securities Act as promptly as possible after the filing thereof, but in any event no later than the applicable Effectiveness Date, and shall use its commercially reasonable efforts to keep such Registration Statement continuously effective under the Securities Act until the date that all Registrable Securities covered by such Registration Statement (i) have been resold (whether pursuant to such Registration Statement or otherwise), or (ii) may be resold without volume or manner-of-sale restrictions pursuant to Rule 144 and without the requirement for the Company to be in compliance with the current public information requirement under Rule 144, as determined by the counsel to the Company and confirmed in a written opinion letter to such effect, addressed and acceptable to the Transfer Agent and the affected Holders (the "Effectiveness Period"). The Company shall promptly notify the Holders via e-mail of the effectiveness of a Registration Statement on the same Trading Day that the Company confirms effectiveness with the Commission, which shall be the date requested for effectiveness of such Registration Statement. The Company shall, no later than 5:00 p.m. (New York City time) on the Trading Day after the effective date of such Registration Statement, file a final Prospectus with the Commission as required by Rule 424. Failure to so notify the Holder within one (1) Trading Day of such notification of effectiveness or failure to file a final Prospectus as foresaid shall be deemed an Event under Section 2(d).

(b)    Notwithstanding the registration obligations set forth in Section 2(a), if the Commission informs the Company that all of the Registrable Securities cannot, as a result of the application of Rule 415, be registered for resale as a secondary offering on a single registration statement, the Company agrees to promptly inform each of the Holders thereof and use its commercially reasonable efforts to file such amendment(s) to the Initial Registration Statement as required by the Commission to cover the maximum number of Registrable Securities permitted to be registered by the Commission and subject to the provisions of

4

Exhibit 20
Page 2895

Section 2(d) with respect to the payment of liquidated damages; provided, however, that prior to filing such amendment, the Company shall be obligated to use its best efforts to advocate with the Commission for the registration of all of the Registrable Securities in accordance with the SEC Guidance, including without limitation, Compliance and Disclosure Interpretation 612.09.

(c) Notwithstanding any other provision of this Agreement and subject to the payment of liquidated damages pursuant to Section 2(d), if the Commission or any SEC Guidance sets forth a limitation on the number of Registrable Securities permitted to be registered on a particular Registration Statement as a secondary offering (and notwithstanding that the Company used its best efforts to advocate with the Commission for the registration of all or a greater portion of Registrable Securities), unless otherwise directed in writing by a Holder as to its Registrable Securities, the number of Registrable Securities to be registered on such Registration Statement will be reduced as follows:

a. First, the Company shall reduce or eliminate any securities to be included other than Registrable Securities;

b. Second, the Company shall reduce Registrable Securities represented by Warrant Shares (applied, in the case that some Warrant Shares may be registered, to the Holders on a pro rata basis based on the total number of unregistered Warrant Shares held by such Holders); and

c. Third, the Company shall reduce Registrable Securities represented by Underlying Shares issuable upon conversion of the Convertible Notes (applied, in the case that some of such Underlying Shares may be registered, to the Holders on a pro rata basis based on the total number of such unregistered Underlying Shares held by, or issuable to, such Holders).

In the event of a cutback hereunder, the Company shall give the Holder at least three (3) Trading Days prior written notice along with the calculations as to such Holder's allotment. In the event the Company amends the Initial Registration Statement in accordance with the foregoing, the Company will use its best efforts to file with the Commission, as promptly as allowed by Commission or SEC Guidance provided to the Company or to registrants of securities in general, one or more Registration Statements on Form S-3 or such other form available to register for resale those Registrable Securities that were not registered for resale on the Initial Registration Statement, as amended.

(d) If: (i) the Initial Registration Statement is not filed on or prior to its Filing Date, or (ii) the Company fails to file with the Commission a request for acceleration of a Registration Statement in accordance with Rule 461 promulgated by the Commission pursuant to the Securities Act, within five Trading Days of the date that the Company is notified (orally or in writing, whichever is earlier) by the Commission that such Registration Statement will not be "reviewed" or will not be subject to further review, or (iii) prior to the effective date of a Registration Statement, the Company fails to file a pre-effective amendment and otherwise respond in writing to comments made by the Commission in respect of such Registration Statement within ten (10) calendar days after the receipt of comments by or notice from the Commission that such amendment is required in order for such Registration Statement to be declared effective, or (iv) the Initial Registration Statement registering for resale all of the Registrable Securities is not

5

Exhibit 20
Page 2896

declared effective by the Commission by the Effectiveness Date of the Initial Registration Statement, or (v) after the effective date of a Registration Statement, such Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities included in such Registration Statement, or the Holders are otherwise not permitted to utilize the Prospectus therein to resell such Registrable Securities, for more than ten (10) consecutive calendar days (any such failure or breach being referred to as an "Event", and for purposes of clauses (i) and (iv), the date on which such Event occurs, and for purpose of clause (ii) the date on which such five (5) Trading Day period is exceeded, and for purpose of clause (iii) the date which such ten (10) calendar day period is exceeded, and for purpose of clause (v) the date on which such ten (10) calendar day period is exceeded being referred to as "Event Date"), then, in addition to any other rights the Holders may have hereunder or under applicable law, on each such Event Date and on each monthly anniversary of each such Event Date (if the applicable Event shall not have been cured by such date) until the applicable Event is cured, the Company shall pay to each Holder an amount in cash, as partial liquidated damages and not as a penalty, equal to the product of 2.0% multiplied by the aggregate Purchase Price paid by such Holder pursuant to the Subscription Agreement. If the Company fails to pay any partial liquidated damages pursuant to this Section in full within seven days after the date payable, the Company will pay interest thereon at a rate of 18% per annum (or such lesser maximum amount that is permitted to be paid by applicable law) to the Holder, accruing daily from the date such partial liquidated damages are due until such amounts, plus all such interest thereon, are paid in full. The partial liquidated damages pursuant to the terms hereof shall apply on a daily pro rata basis for any portion of a month prior to the cure of an Event.

(e)    If Form S-3 is not available for the registration of the resale of Registrable Securities hereunder, the Company shall (i) register the resale of the Registrable Securities on another appropriate form and (ii) undertake to register the Registrable Securities on Form S-3 as soon as practicable after the Company is eligible to use such form, provided, that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the Commission.

(f)    Notwithstanding anything to the contrary contained herein, in no event shall the Company be permitted to name any Holder or affiliate of a Holder as an "underwriter" without the prior written consent of such Holder.

3.    Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company shall:

(a)    Not less than two (2) Trading Days prior to the filing of each Registration Statement, the Company shall furnish to each Holder copies of all such documents proposed to be filed, which documents (other than those incorporated or deemed to be incorporated by reference) will be subject to the review of such Holders. The Company shall not file a Registration Statement, Prospectus or any amendments or supplements thereto to which the Holders of a majority of the Registrable Securities shall reasonably object in good faith, provided, that, the Company is notified of such objection in writing no later than one (1) Trading Day after the Holders have been so furnished copies of a

6

Exhibit 20
Page 2897

Registration Statement. Each Holder agrees to furnish to the Company a completed questionnaire in the form attached to this Agreement as Annex C a "Selling Shareholder Questionnaire") on a date that is not less than two (2) Trading Days prior to the Filing Date.

(b)　(i) Prepare and file with the Commission such amendments, including post-effective amendments, to a Registration Statement and the Prospectus used in connection therewith as may be necessary to keep a Registration Statement continuously effective as to the applicable Registrable Securities for the Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities, (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement (subject to the terms of this Agreement), and, as so supplemented or amended, to be filed pursuant to Rule 424, (iii) respond as promptly as reasonably practicable to any comments received from the Commission with respect to a Registration Statement or any amendment thereto and provide as promptly as reasonably practicable to the Holders true and complete copies of all correspondence from and to the Commission relating to a Registration Statement (provided that, the Company shall excise any information contained therein that would constitute material non-public information regarding the Company or any of its Subsidiaries), and (iv) comply in all material respects with the applicable provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by a Registration Statement during the applicable period in accordance (subject to the terms of this Agreement) with the intended methods of disposition by the Holders thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented.

(c)　If during the Effectiveness Period, the number of Registrable Securities at any time exceeds 100% of the number of Ordinary Shares then registered in a Registration Statement, then the Company shall file as soon as reasonably practicable, but in any case prior to the applicable Filing Date, an additional Registration Statement covering the resale by the Holders of not less than the number of such Registrable Securities. Notwithstanding the provisions of this Section 3(c), in relation to the Ordinary Shares issuable upon conversion of the Convertible Notes or upon exercise of the Warrants purchased in accordance with the provisions of Section 2(g) to the Subscription Agreement, the Issuer shall have no obligation to file more than one Registration Statement in any calendar quarter for such Ordinary Shares unless Convertible Notes in an aggregate original principal amount of at least $5.0 million are purchased in one or more transactions by one or more of the Purchasers during any such calendar quarter, in which case the Issuer shall file a Registration Statement relating to such underlying Ordinary Shares as soon as practicable in accordance with the provisions of this Section 3(c).

(d)　Notify the Holders of Registrable Securities to be sold (which notice shall, pursuant to clauses (iii) through (vi) hereof, be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made) as promptly as reasonably practicable and (if requested by any such Person) confirm such notice in writing no later than one (1) Trading Day following the day (i)(A) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement, and (B) with respect to a Registration Statement or any post-effective amendment, when the

7

Exhibit 20
Page 2898

same has become effective, (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information, (iii) of the issuance by the Commission or any other federal or state governmental authority of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose, (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in a Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to a Registration Statement, Prospectus or other documents so that, in the case of a Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and (vi) of the occurrence or existence of any pending corporate development with respect to the Company that the Company believes may be material and that, in the determination of the Company, makes it not in the best interest of the Company to allow continued availability of a Registration Statement or Prospectus; provided, however, that in no event shall any such notice contain any information which would constitute material, non-public information regarding the Company or any of its Subsidiaries, and the Company agrees that the Holders shall not have any duty of confidentiality to the Company or any of its Subsidiaries and shall not have any duty to the Company or any of its Subsidiaries not to trade on the basis of such information.

(e)    Use its commercially reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order stopping or suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(f)    If requested, furnish to each Holder, without charge, at least one conformed copy of each such Registration Statement and each amendment thereto, including financial statements and schedules, all documents incorporated or deemed to be incorporated therein by reference to the extent requested by such Person, and all exhibits to the extent requested by such Person (including those previously furnished or incorporated by reference) promptly after the filing of such documents with the Commission, provided that any such item which is available on the EDGAR system (or successor thereto) need not be furnished in physical form.

(g)    Subject to the terms of this Agreement, the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto, except after the giving of any suspension notice pursuant to Section 3(d).

8

Exhibit 20
Page 2899

(h)   Prior to any resale of Registrable Securities by a Holder, use its commercially reasonable efforts to register or qualify or cooperate with the selling Holders in connection with the registration or qualification (or exemption from the Registration or qualification) of such Registrable Securities for the resale by the Holder under the securities or Blue Sky laws of such jurisdictions within the United States as any Holder reasonably requests in writing, to keep each registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things reasonably necessary to enable the disposition in such jurisdictions of the Registrable Securities covered by each Registration Statement, provided that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified, subject the Company to any material tax in any such jurisdiction where it is not then so subject or file a general consent to service of process in any such jurisdiction.

(i)   [Reserved]

(j)   Upon the occurrence of any event contemplated by Section 3(d)(iii), 3(d)(iv) or 3(d)(v), as promptly as reasonably practicable under the circumstances taking into account the Company's good faith assessment of any adverse consequences to the Company and its shareholders of the premature disclosure of such event, prepare a supplement or amendment, including a post-effective amendment, to a Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither a Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. If the Company notifies the Holders in accordance with clauses (iii) through (vi) of Section 3(d) above to suspend the use of any Prospectus until the requisite changes to such Prospectus have been made, then the Holders shall suspend use of such Prospectus. The Company will use its best efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable. The Company shall be entitled to exercise its right under this Section 3(j) to suspend the availability of a Registration Statement and Prospectus, subject to the payment of partial liquidated damages otherwise required pursuant to Section 2(d), for a period not to exceed 60 calendar days (which need not be consecutive days) in any 12-month period.

(k)   Otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission under the Securities Act and the Exchange Act, including, without limitation, Rule 172 under the Securities Act, file any final Prospectus, including any supplement or amendment thereof, with the Commission pursuant to Rule 424 under the Securities Act, promptly inform the Holders in writing if, at any time during the Effectiveness Period, the Company does not satisfy the conditions specified in Rule 172 and, as a result thereof, the Holders are required to deliver a Prospectus in connection with any disposition of Registrable Securities and take such other actions as may be reasonably necessary to facilitate the registration of the Registrable Securities hereunder.

(l)   Upon the Company's initial eligibility for use of Form S-3 (or any successor form thereto) the Company shall use its best efforts to maintain

9

Exhibit 20
Page 2900

eligibility for use of Form S-3 (or any successor form thereto) for the registration of the resale of Registrable Securities.

(m)   The Company may require each selling Holder to furnish to the Company a certified statement as to the number of Ordinary Shares beneficially owned by such Holder and, if required by the Commission, the natural persons thereof that have voting and dispositive control over the shares. During any periods that the Company is unable to meet its obligations hereunder with respect to the registration of the Registrable Securities solely because any Holder fails to furnish such information within three Trading Days of the Company's request, any liquidated damages that are accruing at such time as to such Holder only shall be tolled and any Event that may otherwise occur solely because of such delay shall be suspended as to such Holder only, until such information is delivered to the Company.

4.    Registration Expenses. All fees and expenses incident to the performance of, or compliance with, this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses of the Company's counsel and independent registered public accountants) (A) with respect to filings made with the Commission, (B) with respect to filings required to be made with any Trading Market on which the Ordinary Shares then listed for trading, and (C) in compliance with applicable state securities or Blue Sky laws reasonably agreed to by the Company in writing (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities), (ii) printing expenses, (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company so desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder. In no event shall the Company be responsible for any broker or similar commissions of any Holder or, except to the extent provided for in the Transaction Documents, any legal fees or other costs of the Holders.

5.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, members, partners, agents, brokers (including brokers who offer and sell Registrable Securities as principal as a result of a pledge or any failure to perform under a margin call of Ordinary Shares), investment advisors and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each of them, and each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, members, stockholders, partners, agents and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title)

10

Exhibit 20
Page 2901

of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to (1) any untrue or alleged untrue statement of a material fact contained in a Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading or (2) any violation or alleged violation by the Company of the Securities Act, the Exchange Act or any state securities law, or any rule or regulation thereunder, in connection with the performance of its obligations under this Agreement, except to the extent, but only to the extent, that (i) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in a Registration Statement, such Prospectus or in any amendment or supplement thereto (it being understood that the Holder has approved Annex A hereto for this purpose) or (ii) in the case of an occurrence of an event of the type specified in Section 3(d)(iii)-(vi), the use by such Holder of an outdated, defective or otherwise unavailable Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Holder and prior to the receipt by such Holder of the Advice contemplated in Section 6(c). Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified person and shall survive the transfer of any Registrable Securities by any of the Holders in accordance with Section 6(f).

(b)    Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, to the extent arising out of or based solely upon: any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statement or omission is contained in any information so furnished in writing by such Holder to the Company expressly for inclusion in such Registration Statement or such Prospectus or (ii) to the extent, but only to the extent, that such information relates to such Holder's information provided in the Selling Shareholder Questionnaire or the proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in a Registration Statement (it being understood that the Holder has approved Annex A hereto for this purpose), such Prospectus or in any amendment or supplement thereto. In no event shall the liability of a selling Holder be greater in amount than the dollar amount of the proceeds (net of all expenses paid by such Holder in connection with any claim relating to this

11

Exhibit 20
Page 2902

Section 5 and the amount of any damages such Holder has otherwise been required to pay by reason of such untrue statement or omission) received by such Holder upon the sale of the Registrable Securities included in the Registration Statement giving rise to such indemnification obligation.

(c)     Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof, provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses, (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding, or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and counsel to the Indemnified Party shall reasonably believe that a material conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and the reasonable fees and expenses of no more than one separate counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld or delayed. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party, provided, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) not to be entitled to indemnification hereunder.

12

Exhibit 20
Page 2903

(d)    Contribution. If the indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in this Agreement, any reasonable attorneys' or other fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. In no event shall the contribution obligation of a Holder of Registrable Securities be greater in amount than the dollar amount of the proceeds (net of all expenses paid by such Holder in connection with any claim relating to this Section 5 and the amount of any damages such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission) received by it upon the sale of the Registrable Securities giving rise to such contribution obligation.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

6.    Miscellaneous.

(a)    Remedies. In the event of a breach by the Company or by a Holder of any of their respective obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. Each of the Company and each Holder agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall not assert or shall waive the defense that a remedy at law would be adequate.

(b)    No Piggyback on Registrations; Prohibition on Filing Other Registration Statements. Except as set forth on Schedule 6(b) attached hereto, neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in any Registration Statements other than the Registrable Securities. The Company shall not file any other registration statements until all Registrable Securities are registered pursuant to a Registration Statement that is

13

Exhibit 20
Page 2904

declared effective by the Commission, provided that this Section 6(b) shall not prohibit the Company from filing amendments to registration statements filed prior to the date of this Agreement so long as no new securities are registered on any such existing registration statements.

(c)    Discontinued Disposition. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(d)(iii) through (vi), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company will use its best efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable. The Company agrees and acknowledges that any periods during which the Holder is required to discontinue the disposition of the Registrable Securities hereunder shall be subject to the provisions of Section 2(d).

(d)    Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders of 50.1% or more of the then outstanding Registrable Securities (for purposes of clarification, this includes any Registrable Securities issuable upon exercise or conversion of any Security), provided that, if any amendment, modification or waiver disproportionately and adversely impacts a Holder (or group of Holders), the consent of such disproportionately impacted Holder (or group of Holders) shall be required. If a Registration Statement does not register all of the Registrable Securities pursuant to a waiver or amendment done in compliance with the previous sentence, then the number of Registrable Securities to be registered for each Holder shall be reduced pro rata among all Holders and each Holder shall have the right to designate which of its Registrable Securities shall be omitted from such Registration Statement. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of a Holder or some Holders and that does not directly or indirectly affect the rights of other Holders may be given only by such Holder or Holders of all of the Registrable Securities to which such waiver or consent relates; provided, however, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the first sentence of this Section 6(d). No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

(e)    Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the Subscription Agreement.

(f)    Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign (except by merger) its rights or obligations hereunder without the prior written consent of all of the Holders of the then outstanding Registrable Securities. Each Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under Section 9(e) of the Subscription Agreement.

(g)    No Inconsistent Agreements. Neither the Company nor any of its Subsidiaries has entered, as of the date hereof, nor shall the Company or any of its

14

Exhibit 20
Page 2905

Subsidiaries, on or after the date of this Agreement, enter into any agreement with respect to its securities, that would have the effect of impairing the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof. Except as set forth on Schedule 6(i), neither the Company nor any of its Subsidiaries has previously entered into any agreement granting any registration rights with respect to any of its securities to any Person that have not been satisfied in full.

(h)    Execution and Counterparts. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by e-mail delivery of a ".pdf" format data file or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com), such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such ".pdf" signature page were an original thereof.

(i)    Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with the provisions of the Subscription Agreement, as with respect to the Holder and the Company.

(j)    Cumulative Remedies. The remedies provided herein are cumulative and not exclusive of any other remedies provided by law.

(k)    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(l)    Headings. The headings in this Agreement are for convenience only, do not constitute a part of the Agreement and shall not be deemed to limit or affect any of the provisions hereof.

(m)    Independent Nature of Holders' Obligations and Rights. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder hereunder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder hereunder. Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of group or entity, or create a presumption that the Holders are in any way acting in concert or as a group or entity with respect to such obligations or the transactions contemplated by this Agreement or any other matters, and the Company acknowledges that the Holders are not acting in concert or as a group, and the Company shall not assert any such claim, with respect to such obligations or transactions. Each Holder shall be entitled to protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Holder to be joined as an additional party in any proceeding for such

15

Exhibit 20
Page 2906

purpose. The use of a single agreement with respect to the obligations of the Company contained was solely in the control of the Company, not the action or decision of any Holder, and was done solely for the convenience of the Company and not because it was required or requested to do so by any Holder. It is expressly understood and agreed that each provision contained in this Agreement is between the Company and a Holder, solely, and not between the Company and the Holders collectively and not between and among Holders.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Pages Follow)*

16

Exhibit 20
Page 2907

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**ROCKLEY PHOTONICS HOLDINGS LIMITED**

By:_____
   Name:
   Title:

[SIGNATURE PAGE OF HOLDERS FOLLOWS]

Exhibit 20
Page 2908

[SIGNATURE PAGE OF HOLDERS TO RKLY RRA]

Name of Holder: _____

*Signature of Authorized Signatory of Holder:* _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

[SIGNATURE PAGES CONTINUE]

18

Exhibit 20
Page 2909

**Annex A**

### Plan of Distribution

Each Selling Shareholder (the "Selling Shareholders") of the securities and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their securities covered hereby on the New York Stock Exchange or any other stock exchange, market or trading facility on which the securities are traded or in private transactions. These sales may be at fixed or negotiated prices. A Selling Shareholder may use any one or more of the following methods when selling securities:

  ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

  block trades in which the broker-dealer will attempt to sell the securities as agent but may position and resell a portion of the block as principal to facilitate the transaction;

  purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

  an exchange distribution in accordance with the rules of the applicable exchange;

  privately negotiated transactions;

  in transactions through broker-dealers that agree with the Selling Shareholders to sell a specified number of such securities at a stipulated price per security;

  through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

  a combination of any such methods of sale; or

  any other method permitted pursuant to applicable law.

The Selling Shareholders may also sell securities under Rule 144 or any other exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Shareholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Shareholders (or, if any broker-dealer acts as agent for the purchaser of securities, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2121; and in the case of a principal transaction a markup or markdown in compliance with FINRA Rule 2121.

In connection with the sale of the securities or interests therein, the Selling Shareholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the securities in the course of

19

Exhibit 20
Page 2910

hedging the positions they assume. The Selling Shareholders may also sell securities short and deliver these securities to close out their short positions, or loan or pledge the securities to broker-dealers that in turn may sell these securities. The Selling Shareholders may also enter into option or other transactions with broker-dealers or other financial institutions or create one or more derivative securities which require the delivery to such broker-dealer or other financial institution of securities offered by this prospectus, which securities such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Shareholders and any broker-dealers or agents that are involved in selling the securities may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the securities purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Each Selling Shareholder has informed the Company that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the securities.

The Company is required to pay certain fees and expenses incurred by the Company incident to the registration of the securities. The Company has agreed to indemnify the Selling Shareholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the securities may be resold by the Selling Shareholders without registration and without regard to any volume or manner-of-sale limitations by reason of Rule 144, without the requirement for the Company to be in compliance with the current public information under Rule 144 under the Securities Act or any other rule of similar effect or (ii) all of the securities have been sold pursuant to this prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale securities will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale securities covered hereby may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Exchange Act, any person engaged in the distribution of the securities may not simultaneously engage in market making activities with respect to the ordinary shares for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the Selling Shareholders will be subject to applicable provisions of the Exchange Act and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of the ordinary shares by the Selling Shareholders or any other person. We will make copies of this prospectus available to the Selling Shareholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act).

20

Exhibit 20
Page 2911

**Annex B**

## SELLING SHAREHOLDERS

The ordinary shares being offered by the selling shareholders are those previously issued to the selling shareholders, and those issuable to the selling shareholders, upon conversion of the convertible notes or exercise of the warrants. For additional information regarding the issuances of those Ordinary Shares and warrants, see "Private Placement of Convertible Notes and Warrants" above. We are registering the Ordinary Shares in order to permit the selling shareholders to offer the shares for resale from time to time. Except for the ownership of the Ordinary Shares, the convertible notes and the warrants, the selling shareholders have not had any material relationship with us within the past three years.

The table below lists the selling shareholders and other information regarding the beneficial ownership of the Ordinary Shares by each of the selling shareholders. The second column lists the number of Ordinary Shares beneficially owned by each selling shareholder, based on its ownership of the Ordinary Shares, convertible notes and warrants, as of _____, 2022, assuming conversion in full of the convertible notes and full exercise of the warrants held by the selling shareholders on that date, without regard to any limitations on such conversion or exercises.

The third column lists the Ordinary Shares being offered by this prospectus by the selling shareholders.

In accordance with the terms of a registration rights agreement with the selling shareholders, this prospectus generally covers the resale of the sum of (i) the number of Ordinary Shares issued to the selling shareholders in the "Private Placement of Convertible Notes and Warrants" described above and (ii) the maximum number of Ordinary Shares issuable upon (x) the conversion in full of the convertible notes and (y) exercise of the related warrants, determined, in each, as if the outstanding convertible notes and/or warrants were converted or exercised in full as of the trading day immediately preceding the date this registration statement was initially filed with the SEC, each as of the trading day immediately preceding the applicable date of determination and all subject to adjustment as provided in the registration right agreement, without regard to any limitations on the conversion of the convertible notes or exercise of the warrants. The fourth column assumes the sale of all of the shares offered by the selling shareholders pursuant to this prospectus.

Under the terms of the warrants, a selling shareholder may not exercise the warrants to the extent such exercise would cause such selling shareholder, together with its affiliates and attribution parties, to beneficially own a number of Ordinary Shares which would exceed 9.99% of our then outstanding Ordinary Shares following such exercise, excluding for purposes of such determination Ordinary Shares issuable upon exercise of such warrants which have not been exercised. The number of shares in the second and fourth columns do not reflect this limitation. The selling shareholders may sell all, some or none of their shares in this offering. See "Plan of Distribution."

21

Exhibit 20
Page 2912

| | Number of Ordinary Shares Owned Prior to Offering | Maximum Number of Ordinary Shares to be Sold Pursuant to this Prospectus | Number of Ordinary Shares Owned After Offering |
|---|---|---|---|
| **Name of Selling Shareholder** | | | |

22

Exhibit 20
Page 2913

**Annex C**

## ROCKLEY PHOTONICS HOLDINGS LIMITED

### Selling Shareholder Notice and Questionnaire

The undersigned beneficial owner of ordinary shares (the "Registrable Securities") of Rockley Photonics Holdings Limited., an exempted company incorporated under the laws of the Cayman Islands (the "Company"), understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "Commission") a registration statement (the "Registration Statement") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement (the "Registration Rights Agreement") to which this document is annexed. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Certain legal consequences arise from being named as a selling shareholder in the Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling shareholder in the Registration Statement and the related prospectus.

### NOTICE

The undersigned beneficial owner (the "Selling Shareholder") of Registrable Securities hereby elects to include the Registrable Securities owned by it in the Registration Statement.

23

Exhibit 20
Page 2914

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

**QUESTIONNAIRE**

1.  **Name.**

    (a)  Full Legal Name of Selling Shareholder

    _____

    (b)  Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities are held:

    _____

    (c)  Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by this Questionnaire):

    _____

2. **Address for Notices to Selling Shareholder:**

_____
_____
_____

Telephone:
E-Mail:
Contact Person:

3. **Broker-Dealer Status:**

    (a)  Are you a broker-dealer?

        Yes    No

    (b)  If "yes" to Section 3(a), did you receive your Registrable Securities as compensation for investment banking services to the Company?

        Yes    No

    Note:    If "no" to Section 3(b), the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement, and you hereby consent to being so identified.

24

Exhibit 20
Page 2915

(c) Are you an affiliate of a broker-dealer?

    Yes   No

(d) If you are an affiliate of a broker-dealer, do you certify that you purchased the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

    Yes   No

Note:    If "no" to Section 3(d), the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement, and you hereby consent to being so identified.

**4. Beneficial Ownership of Securities of the Company Owned by the Selling Shareholder.**

*Except as set forth below in this Item 4, the undersigned is not the beneficial or registered owner of any securities of the Company other than the securities issuable pursuant to the Subscription Agreement.*

(a) Type and Amount of other securities beneficially owned by the Selling Shareholder:

_____

_____

25

Exhibit 20
Page 2916

### 5. Relationships with the Company:

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:

_____

_____

The undersigned agrees to promptly notify the Company of any material inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Registration Statement remains effective; provided, that the undersigned shall not be required to notify the Company of any changes to the number of securities held or owned by the undersigned or its affiliates.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 5 and the inclusion of such information in the Registration Statement and the related prospectus and any amendments or supplements thereto. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus and any amendments or supplements thereto.

IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Date: __    Beneficial Owner: __

By:    __
Name:
Title:

**PLEASE EMAIL A .PDF COPY OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE TO:**

**[provide notice information]**

26

Exhibit 20
Page 2917

# EXHIBIT G
# (Filed Under Seal)

Exhibit 20
Page 2918

# EXHIBIT H
# (Filed Under Seal)

Exhibit 20
Page 2919

# EXHIBIT I
# (Filed Under Seal)

Exhibit 20
Page 2920

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(D)
### OF THE SECURITIES EXCHANGE ACT OF 1934
Date of Report (Date of earliest event reported): January 23, 2023

---

# Rockley Photonics Holdings Limited
(Exact name of registrant as specified in its charter)

| Cayman Islands | 001-40735 | 98-1644526 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |
| 3rd Floor 1 Ashley Road Altrincham, Cheshire United Kingdom (Address of principal executive offices) | | WA14 2DT (Zip Code) |

+44 (0) 1865 292017
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 20
Page 2921

## Item 1.03 Bankruptcy or Receivership.

*Voluntary Petition for Reorganization*

On January 23, 2023 (the "**Petition Date**"), Rockley Photonics Holdings Limited (the "**Company**" or "**Rockley**"), filed a voluntary petition for relief under chapter 11 of title 11 (the "**Chapter 11 Case**") of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The Company filed motions with the Bankruptcy Court to seek authorization to continue to operate its business as a "debtor in possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court. The Company has filed a series of first day motions with the Bankruptcy Court that seek authorization to ensure that it can continue to conduct its business without interruption. These motions are designed primarily to minimize the effect of bankruptcy on the Company's operations. None of Rockley's subsidiaries have filed voluntary petitions for relief under the Bankruptcy Code. The Company also filed the *Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* (as amended, supplemented, or modified from time to time, the "Plan") and related Disclosure Statement. The Company has sought expedited approval of the Plan as part of a comprehensive restructuring to de-lever the Company's consolidated balance sheet by eliminating existing debt and introducing a new capital structure which will provide approximately $35 million of cash for ongoing operations.

The Company cautions that trading in the Company's securities (including, without limitation, its common stock) during the pendency of the Chapter 11 Case is highly speculative and poses substantial risks. Trading prices for the Company's securities may bear little or no relationship to the actual recovery, if any, by holders of the Company's securities in the Chapter 11 Case.

Additional information about the Chapter 11 Case, court filings and other documents related to the Chapter 11 Case are available on a website administered by the Company's claims and noticing agent, Kroll Restructuring Administration LLC, at https://cases.ra.kroll.com/RockleyPhotonics. The information on this website is not incorporated by reference into, and does not constitute part of, this Form 8-K.

## Item 2.04.    Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.

The text set forth in Item 1.03 of this Current Report on Form 8-K regarding the bankruptcy filing is incorporated into this item by reference.

The filing of the Chapter 11 Case described above constituted an event of default or otherwise triggered or may trigger repayment obligations under a number of instruments and agreements relating to direct financial obligations of the Company and certain of its subsidiaries (the "**Debt Instruments**"). The Debt Instruments include (i) approximately $29.31 million in aggregate principal amount of outstanding convertible senior secured notes issued under that certain Indenture, dated as of May 27, 2022, by and among the Company, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "**May Notes**"), and (ii) approximately $90.6 million in aggregate principal amount of outstanding convertible senior secured notes issued under that certain Indenture, dated as of October 25, 2022, by and among the Company, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "**October Notes**").

The May Notes and the October Notes each provide that, as a result of the Chapter 11 Case, the principal, accrued and unpaid interest and certain other amounts due thereunder, including certain prepayment premiums payable, shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments as to the Company are automatically stayed as a result of the Chapter 11 Case, and the Company's creditors' rights of enforcement in respect of the Debt Instruments are subject to the applicable provisions of the Bankruptcy Code and any Bankruptcy Court orders impacting the stay.

Exhibit 20
Page 2922

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

As previously disclosed in the Company's 8-K filed December 15, 2023, on December 9, 2022, the Company received a letter from the New York Stock Exchange ("NYSE") notifying it that the Company is not in compliance with the continued listing requirement in Section 802.01B of the NYSE's Listed Company Manual because the Company's market capitalization fell below $50 million over a 30 trading day period and its stockholders' equity is less than $50 million. As a result of the Chapter 11 Cases in accordance with Section 802.01D of the NYSE Listed Company Manual, the Company expects that the Company's common stock will be the subject of delisting from the NYSE. Under NYSE delisting procedures, the Company has the right to appeal this determination, but the Company does not intend to appeal.

**Forward Looking Statements**

This Current Report on Form 8-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, Section 21E of the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995. Forward looking statements include, but are not limited to, statements regarding the Company's plans with respect to the Chapter 11 Case, the Company's plan to continue its operations while it works to complete its proposed reorganization, the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Case. Such statements are based on current assumptions that involve risks and uncertainties that could cause actual outcomes and results to differ materially, including: the ability of the Company to continue as a going concern and to continue to operate its business during the pendency of the Chapter 11 Case; the Company's ability to obtain approval by the Bankruptcy Court of the relief requested in the first day motions; the Company's ability to effectuate the restructuring plan and financing; the ability of the Company to develop and consummate a plan of reorganization with respect to the Chapter 11 Case; the Bankruptcy Court's rulings in the Chapter 11 Case and the outcome of the Chapter 11 Case in general; the length of time the Company will operate under the Chapter 11 Case; employee attrition and the Company's ability to retain senior management and other key personnel due to the distractions and uncertainties; the effectiveness of the overall restructuring activities pursuant to the Chapter 11 Case and any additional strategies the Company may employ to address its liquidity and capital resources; the actions and decisions of creditors and other third parties that have an interest in the Chapter 11 Case; increased legal and other professional costs necessary to execute the Company's restructuring; the Company's ability to maintain relationships with suppliers, customers, employees and other third parties as a result of the Chapter 11 Case; the trading price and volatility of the Company's common stock and the effects of the expected delisting from New York Stock Exchange; litigation and other risks inherent in a bankruptcy process; and other risks set forth in the Company's most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, as well as other documents that the Company files with the Securities and Exchange Commission. Investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Company disclaims any obligation to update these forward-looking statements because of new information, future events or circumstances or other factors.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Rockley Photonics Holdings Limited

Date:    January 23, 2023

By:        /s/ Richard A. Meier

Name:      Richard A. Meier

Title:     President and Chief Executive Officer

Exhibit 20
Page 2923

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3602**

WRITER'S EMAIL ADDRESS
**ericwinston@quinnemanuel.com**

February 6, 2023

**VIA ELECTRONIC MAIL**

John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131

> **Re:** *In re Rockley Photonics Holdings Limited*, Case No. 23-10081

Dear Counsel:

Our firm represents several longstanding investors (the "Investors"), led by Michael Tierney, in Rockley Photonics Holdings Limited ("Rockley"), holding in excess of 20 million shares of the publicly traded equity. Members of the Investors were significant participants in several Rockley private financing rounds prior to its reverse merger with SC Health Inc.

We write for two principal reasons. First, the Investors believe that Rockley's current path of a pre-packaged chapter 11 plan that hands equity ownership over to noteholders, all of whom invested tens of millions of dollars in 2022 when Rockley was projecting to have negative operating cash flow in 2022 and 2023, substantially undervalues the company as a going concern. As you may know, certain Investors signed non-disclosure agreements in December 2022, expecting to have a robust discussion and opportunity to further invest capital, and yet Rockley (or at least its investment banker) did not engage in a meaningful way but instead chose a prepackaged plan path. The Investors will be objecting to the proposed plan, taking targeted discovery, and will be opting out of third party releases (especially when they receive nothing under the proposed plan).

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY |
SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Exhibit 20
Page 2924

John A. Pintarelli, et al.
February 6, 2023

Second, with the hopes of avoiding litigation, the Investors are willing to immediately engage into two parallel processes demonstrating that Rockley's bankruptcy estate is seeking to maximize value, as is its fiduciary duties to do so.

One, the Investors are willing to proceed, subject to reasonable due diligence by the Investors and a fair auction process under 11 U.S.C. §§ 363(b) and (f), with a transaction to acquire Rockley's intellectual property (including its patent portfolio) (the "IP") and license the IP to Rockley on a non-exclusive basis with a negotiated royalty, for $15 million.  We note that according to the Disclosure Statement Rockley values the IP at $3 million, claiming that the IP is unique.  We believe that the IP is worth far more, and believe Rockley can and should auction the IP in a manner that will not disrupt the confirmation process, and should immediately negotiate with the Investors with respect to a transaction to sell the IP.

Two, the Investors are willing in principle to pursue an acquisition of all of the assets of Rockley, including potentially valuable tax attributes and claims against third parties, for an amount that exceeds Rockley's entire debt and would generate a return to existing equity holders.  To engage in this process, the Investors would need to undertake reasonable due diligence, including access to management, and would request a short delay in the confirmation process, not to exceed 60 days.

To allow for expedited due diligence, please provide to us on behalf of the Investor Group the following documents.  We expect the vast majority of this information has already been provided to note holders and the United States Trustee, or should have been provided to Investors who signed NDAs in December 2022, and thus it should not be difficult to provide to the Investors on an expedited basis. [1]

1.  The materials, including supporting financial analyses, provided to the "approximately 102 strategic and financial parties" by Rockley and its advisors commencing in October 2022, as well as the responses from those strategic and financial parties.

---

[1]    Certain Investors have already executed NDAs with Rockley.  To the extent necessary, we will undertake that any Investor who have not executed that NDA will do so prior to reviewing otherwise non-public documents provided by you to us.

2

Exhibit 20
Page 2925

John A. Pintarelli, et al.
February 6, 2023

2.  Financial analyses, projections, estimates and valuations relating to each of Agreed Equity Value,[2] Existing Subsidiaries, Existing Subsidiary Interests, Management Incentive Plan, Priority Tax Claims, Prepetition Noteholder Private Placement, Private Placement Documents, Professional Fee Escrow Amount, Reorganized Debtor, Reorganized Rockley Equity, Restructuring Expenses, Schedule of Retained Causes of Action, Secured Tax Claims, Taxes, and Unexpired Leases

3.  Analysis, valuations, estimates and other documents supporting the Liquidation Analyses and the Financial Projections, Exhibits B and C respectively to the Disclosure Statement.

4.  The Compensation and Benefits Program.

5.  D&O Liability Insurance Policies

6.  Any valuations performed by or for Rockley in 2021, 2022, and 2023 in connection with one or more of its patents, patent applications, copyrights, trademarks, or other intellectual property.

7.  Any license agreements entered into by Rockley relating to any IP, as well as attempts to license any IP.

8.  Agreements between Rockley and any of its customers, whether or not such agreements remain in force.

9.  Documents relating to tax credits, research grants, including applications therefor.

10. Submissions to the U.S. Food and Drug Administration, current clinical trials and studies involving Rockley products or technology.

Please respond by 5 p.m. EST this Thursday, February 9, 2023.

---

[2]  Unless otherwise indicated, capitalized terms have the meaning ascribed to them in the Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited.

3

Exhibit 20
Page 2926

John A. Pintarelli, et al.
February 6, 2023


For avoidance of doubt, nothing herein waives any claims, rights, or arguments of any Investor, and we reserve all rights to seek discovery for any documents, information, or testimony.


Sincerely yours,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


Eric Winston

Exhibit 20
Page 2927

**pillsbury**

Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor | San Francisco, CA 94111-5998 | tel 415.983.1000 | fax 415.983.1200

MAILING ADDRESS:  P.O. Box 2824, San Francisco, CA 94126-2824

Joshua D. Morse
tel: +1.415.983.1202
joshua.morse@pillsburylaw.com

February 10, 2023

Via Email
Eric Winston
Harry Olivar
Rachel Epstein
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

> Re:  ***In re Rockley Photonics Holdings Limited*** **(the "Debtor"), Case No. 23-10081 (LGB) (Bankr. S.D.N.Y.) (the "Bankruptcy Case")**

Dear Counsel:

As you know, we have engaged in numerous communications with you via email and Zoom this week in response to your letter dated February 6, 2023, to facilitate discussions regarding the possibility of your client's(s') funding of an alternative transaction in the Bankruptcy Case and to provide your client(s) with access to the information requested in your letter.  Specifically, we:

- Confirmed receipt of your letter on the morning of February 6, 2023, and requested the identity of all of the clients represented by your firm;

- Convened an initial call with you on the afternoon of February 7, 2023 (your earliest availability that day) to discuss various points raised in your letter and address how to provide your client(s) with access to the requested information;

- Followed up later that evening with an email outlining the Debtor's view on the terms under which access would be granted to a virtual data room containing the requested information (the "VDR");

- Promptly responded to emails from you on the morning of February 8, 2023, confirming your willingness to obtain access to the VDR by way of an NDA

www.pillsburylaw.com

Exhibit 20
Page 2928

February 10, 2023
Page 2

and provided you with a soft copy of the form of NDA your client Mr. Michael Tierney executed on December 21, 2022;[1]

- Finalized the proposed form of NDA you provided to us on the morning of February 9, 2023, within 71 minutes of receipt;

- Granted VDR access to you and Mr. Tierney on February 9, 2023, at approximately 11:48 AM (PT); and

- Convened a telephone conference on February 9, 2023, at 1:30 PM (PT) to provide an overview of the contents of the VDR and the process by which additional information would be added thereto in satisfaction of your request for information.

All told, within just over 73 hours of receiving your letter, the Debtor provided you with substantially all the information requested therein.[2]

Turning to the substance of your letter. It begins with an unsubstantiated claim that "Rockley's current path of a pre-packaged chapter 11 plan . . . substantially undervalues the company as a going concern." On the contrary, the *Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 2] (the "Plan"),[3] maximizes the value of the Debtor as the only viable option emerging from an extensive fundraising and marketing process conducted by the Debtor's investment bankers, including Jefferies LLP, pursuant to which more than 100 strategic and financial parties were contacted. Unfortunately, the response to such efforts was disappointing. Not a single indication of interest to acquire the Company was received. Not a single source of additional liquidity was located. Left with increasingly severe liquidity issues despite raising approximately $37.9 million of incremental funding from the Prepetition Noteholders, the Debtor's only path forward was through the Restructuring Transactions under the Plan that: (a) contemplates a value-maximizing balance sheet restructuring of the Debtor; (b) secures approximately $35 million of additional financial support from the Prepetition Noteholders to help fund ongoing operations; and (c) sets the Debtor up to secure necessary additional post-Effective Date funding. The Debtor believes that the Plan represents the best path forward and the only viable option (including, as set forth below, the proposals contained in your letter).

---

[1] The prior NDA executed by Mr. Tierney provided him with the opportunity to access the information contained in the VDR responsive to the first part of your Request No. 1 ("The materials, including supporting financial analyses, provided to the "approximately 102 strategic and financial parties" by Rockley and its advisors commencing in October 2022"). On multiple occasions, Mr. Tierney declined access to such information.

[2] *See* Annex A.

[3] Initially defined terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

www.pillsburylaw.com

Exhibit 20
Page 2929

February 10, 2023
Page 3

While it was reassuring to receive confirmation during our initial call on Tuesday that you would like to avoid litigation, the timing and tone of your letter is suspect given prior dealings with your only thus far identified client Mr. Michael Tierney. As you know, Mr. Tierney was presented with an opportunity in December 2022 to participate in developing an alternative financial solution to stave off the Debtor's bankruptcy filing. Mr. Tierney came to the process through SG Capital Management, LLC, in an effort "to figure out how to get out of this hole" the Company found itself in. Mr. Tierney executed an NDA on December 22, 2022 and participated in a virtual meeting with certain members of the Company's management and Jefferies. We understand Mr. Tierney was disappointed that Jefferies did not have an executable transaction proposal even though he indicated having the financial resources to provide additional capital to the Company that would have only afforded a few additional days of liquidity. Denying multiple opportunities to engage further and refusing additional information, including access to the VDR,[4] Mr. Tierney instead sent a letter to the Company's Board on January 6, 2023, leveling specious allegations and even going so far as to compare the Board's efforts to restructure the Company to "behavior which appears closely to conform to that of Theranos." Considering the foregoing, the Debtor is concerned that your letter is merely a continuation of Mr. Tierney's prior efforts to thwart the Debtor's restructuring to no constructive end instead of a serious effort to pursue an alternative transaction in the Bankruptcy Case.

Against this backdrop, I trust you understand why the Debtor is skeptical of your client's(s') true interest in "engag[ing] into two parallel [transaction] processes". While the Debtor is open to exploring both opportunities with your client(s), neither option, as presented in your letter, appears workable.

Your first proposal contemplates "a transaction to acquire [the Debtor's] intellectual property (including its patent portfolio) (the "IP") and license the IP to Rockley on a non-exclusive basis with a negotiated royalty for $15 million." That approach undervalues the IP and is impractical for several reasons.

*First*, the proposed transaction severely discounts the value of the IP as part of a going concern Reorganized Rockley. It does so by tethering the proposed purchase price to the notion that $15 million represents a windfall because "according to the Disclosure Statement, Rockley values the IP at $3 million." That stance is inaccurate and conveniently takes information included in the Disclosure Statement out of context. To be clear, the $3.0 million figure is a reference to information included in the Liquidation Analysis included as <u>Exhibit C</u> to the Disclosure Statement. Instead of representing the going concern value of the Debtor's IP, however, the Liquidation Analysis confirms that "intangible assets represent $3.0 million of book value." Disclosure Statement, Exhibit C at 6. It does not confirm the Debtor's view of the "value" of the IP. Instead, it represents the estimate of what could be obtained if the "[Bankruptcy Case] is

---

[4]   The record does not support your position that "Rockley (or at least its investment banker) did not engage in a meaningful way but instead chose a prepackaged plan path."

Exhibit 20
Page 2930

February 10, 2023
Page 4

unsuccessful and ultimately needs to be converted to a chapter 7 case, and [] the Debtor's subsidiaries are thereafter also entered into chapter 7 cases . . . and [] the Debtor and the non-debtor subsidiaries [are] liquidated on a jointly administered but nonconsolidated basis in a chapter 7 . . . ." *Id.* at 2.

*Second*, the proposed transaction fundamentally undermines the Debtor's going concern business plan, leaving the Debtor unlikely to be funded. Indeed, the Prepetition Noteholders informed the Debtor in a letter dated February 8, 2023, a copy of which is attached hereto as <u>Exhibit 1</u>, that they are "not interested in providing the funding contemplated by the current Plan to a company that does not own its intellectual property." Moving forward absent such funding impairs the Debtor's ability to proceed to confirmation of the Plan. And, even if the Debtor could somehow navigate around defaults under the Cash Collateral Order and Prepetition Notes Documents that the non-consensual sale of the IP would trigger, all sale proceeds would go to satisfying Administrative Claims and the Prepetition Noteholders, leaving no funds for Reorganized Rockley to operate post-Effective Date. Rather than meeting your purported goal of maximizing value, the proposed transaction is severely value destructive.

Your second proposal confirms an interest in pursuing the "acquisition of all of the assets of Rockley, including potentially valuable tax attributes and claims against third parties, for an amount that exceeds Rockley's entire debt and would generate a return to existing equity holders." While potentially interesting to the Debtor and the Prepetition Noteholders,[5] if real,[6] any such transaction cannot delay the confirmation hearing scheduled for March 3, 2023. The Debtor has insufficient liquidity to continue operating after that date without receiving the proceeds of the Prepetition Noteholder Private Placement and the Exit Facility. And, the Prepetition Noteholders have confirmed that they "are not willing to provide any additional financing to the Company to further explore the possibility of a sale or extend the timeline in the pending chapter 11 case."[7] Accordingly, your request for a "short delay in the confirmation process" to explore such transaction would only put the Debtor in a precarious liquidity position that threatens its ability to emerge from bankruptcy.

The foregoing leaves the Debtor cautious about the opportunities presented in your letter, however, rest assured that the commitment to maximizing the value of its estate

---

[5]  *See* Prepetition Noteholder Letter at 1-2 ("The Noteholders would be supportive of a sale of the assets of the Company that would provide value in excess of the Noteholders' claims, and encourage the Company to engage with the Investors and provide them information that would support their ability to make such a bid on a timeline consistent with the currently proposed prepackaged plan of reorganization[].)").

[6]  We are unable to ascertain from the information included in your letter whether your client(s) have(has) the financial bona fides to support such offer, which would require committed capital approaching $200 million. Based on our prior interaction with Mr. Tierney and similarly situated investors, those resources do not appear to exist.

[7]  *Id.* at 2.

www.pillsburylaw.com

Exhibit 20
Page 2931

February 10, 2023
Page 5

for the benefit of stakeholders is absolute.  At every turn in this process, the Debtor has operated in good faith and with transparency.  The Debtor is committed to providing your client(s) with an opportunity to participate in the Bankruptcy Case.[8]  That opportunity must not be illusory or a disguised attempt to leverage the Debtor's precarious financial position for an opportunistic return.  We look forward to continuing to work together to provide you with information to support the exploration of whether an alternative transaction is practicable under the circumstances.

All rights are hereby reserved.

Very truly yours,

*/s/ Joshua D. Morse*

Joshua D. Morse
Partner

cc:    James J. Masetti
       John A. Pintarelli
       Dania Slim

---

[8]    Given the Debtor's post-Effective Date capital needs, there should be ample opportunities for your client(s) to participate in future financing rounds.

www.pillsburylaw.com

Exhibit 20
Page 2932

## ANNEX A

| # | Request | Status/VDR Location |
|---|---------|---------------------|
| 1 | The materials, including supporting financial analyses, provided to the "approximately 102 strategic and financial parties" by Rockley and its advisors commencing in October 2022 | Folder 5 reflects all information provided to third-party investors during the pre-petition process |
| 1 | as well as the responses from those strategic and financial parties. | Folder 6.1.1 |
| 2 | Financial analyses, projections, estimates and valuations relating to each of Agreed Equity Value, Existing Subsidiaries, Existing Subsidiary Interests, Management Incentive Plan, Priority Tax Claims, Prepetition Noteholder Private Placement, Private Placement Documents, Professional Fee Escrow Amount, Reorganized Debtor, Reorganized Rockley Equity, Restructuring Expenses, Schedule of Retained Causes of Action, Secured Tax Claims, Taxes, and Unexpired Leases | Valuation to Be Filed ISO Confirmation Brief |
| 3 | Analysis, valuations, estimates and other documents supporting the Liquidation Analyses and the Financial Projections, Exhibits B and C respectively to the Disclosure Statement. | Folder 6.1.3 |
| 4 | The Compensation and Benefits Program. | Folder 6.1.4 |
| 5 | D&O Liability Insurance Policies | Folder 6.1.5 |
| 6 | Any valuations performed by or for Rockley in 2021, 2022, and 2023 in connection with one or more of its patents, patent applications, copyrights, trademarks, or other intellectual property. | N/A |
| 7 | Any license agreements entered into by Rockley relating to any IP, as well as attempts to license any IP. | Folder 5.5.5 |
| 8 | Agreements between Rockley and any of its customers, whether or not such agreements remain in force. | Folder 5.5.4.3 |
| 9 | Documents relating to tax credits, research grants, including applications therefor. | Folder 6.1.9.1 (2021) |
| 10 | Submissions to the U.S. Food and Drug Administration, current clinical trials and studies involving Rockley products or technology. | Pending clarification of information sought |

Exhibit 20
Page 2933

**EXHIBIT 1**

Exhibit 20
Page 2934



SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
+1 212 839 5300
+1 212 839 5599 FAX

AMERICA · ASIA PACIFIC · EUROPE

February 8, 2023

**By Email**

Joshua D. Morse
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
(415) 983-1202
Joshua.Morse@pillsburylaw.com

    Re:    Rockley Photonics

Dear Josh,

    We write on behalf of the Prepetition Noteholder Funds[1] (collectively, the "Noteholders") issued by Rockley Photonics Holdings Limited (together, with its subsidiaries, the "Company"). in response to the letter you forwarded from Quinn Emanuel, on behalf of a group of investors in the Company (the "Investors").

    We understand that the Investors have expressed interest in pursuing an acquisition of all of the assets of the Company for an amount that exceeds the Company's debt (including the Noteholders' claims, which are, as you know, in excess of $120 million plus interest, prepayment premiums and other fees, costs, and expenses[2]). The Noteholders would be supportive of a sale of the assets of the Company that would provide value in excess of the Noteholders' claims, and encourage the Company to engage with the Investors and provide them information that would

---

[1] As defined in the *Notice of Appearance*, Docket No. 16, in the Chapter 11 Case of Rockley Photonics Holdings Limited (the "Debtor") Case No. 23-10081.

[2] The Super Senior Notes Claims and Existing Notes Claims (each as defined in the Plan (as defined herein)) equal the outstanding aggregate principal amount of $90,649,307.77 and $29,309,680.00, respectively, plus accrued and unpaid interest with respect thereto (which in the case of the Super Senior Notes includes an additional 3% per annum interest at the default rate from and after January 15, 2023 due to a missed interest payment on such date), plus the prepayment premiums payable under the documents governing the Noteholders' claims and any additional fees, costs, expenses, and other obligations incurred in connection therewith (including any attorneys', financial advisors' and other professionals' fees and expenses that are chargeable under the documents governing the Noteholders' claims).

Sidley Austin (NY) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

Exhibit 20
Page 2935

# SIDLEY

Page 2

support their ability to make such a bid on a timeline consistent with the currently proposed prepackaged plan of reorganization (the "Plan").

However, the Noteholders are not willing to provide any additional financing to the Company to further explore the possibility of a sale or extend the timeline in the pending chapter 11 case. Prior to the commencement of the Debtor's chapter 11 case, the Company and its advisors ran a robust marketing process for the Company's assets which did not yield any actionable bids.

In addition, the Noteholders are not interested in providing the funding contemplated by the current Plan to a company that does not own its intellectual property. The Investors misrepresent the Debtor's valuation of the Company's intellectual property, citing to the *liquidation* value of the Company's intellectual property rather than its value to the Company as a going concern. A non-exclusive royalty arrangement as described by the Investors simply would be not workable or value-maximizing—rather, the Investor's lightly-sketched licensing proposal would degrade, rather than enhance, the value of the Company. To be clear, the Noteholders are not willing to provide any additional financing to pursue or implement such a transaction—and to pursue such a transaction the Company would need to secure replacement financing immediately, as such sale of the intellectual property would constitute a breach of the Debtor's cash collateral agreement and the Prepetition Note Documents (as defined in the Plan)—which would vitiate the investment thesis for the Noteholders upon which the Plan is based. The new money being invested by the Noteholders in the Exit Financing (as defined in the Plan) and Private Placement (as defined in the Plan) are premised on the Debtor and its non-Debtor subsidiaries being a going concern with substantially all of their assets remaining intact.

The Noteholders believe that, to the extent the Investors' interest is serious, it can be explored and pursued within the timeline allowed by the Company's proposed chapter 11 plan process—including, if necessary, through an amendment to the Company's proposed Plan to provide for a sale of the assets of the Company to the Investors and distribution of such sale proceeds to the Noteholders and other general unsecured creditors (satisfying such claims in full).

The Noteholders are concerned, however, that the Investors may be attempting to extract value that does not exist from the Company by threatening litigation and attempting to slow down the chapter 11 process without providing any financing to the Company to support the Company as a going concern through such a delay, and that the alternative proposal by the Investors will be distracting to management, use resources that the Company would not have but for the ongoing financial support of the Noteholders, and destroy any value left in the Company as a going concern. To that end, the Noteholders reiterate their belief that the Plan process being pursued by the Company is fair, reasonable, and in the best interest of all parties, including by providing the statutorily-permitted time to review and object to the Plan.

As always, we remain available to discuss. Please do not hesitate to reach out by phone or email at any time.

Exhibit 20
Page 2936



**SIDLEY**

Page 3

Sincerely,

*/s/ Leslie A. Plaskon*
Leslie A. Plaskon
Sidley Austin LLP

cc:    Anthony Grossi, Sidley Austin LLP
Genevieve Weiner, Sidley Austin LLP
Michele A. Nudelman, Sidley Austin LLP
Ameneh Bordi, Sidley Austin LLP
Jim Masetti, Pillsbury Winthrop Shaw Pittman LLP
Kenneth Suh, Pillsbury Winthrop Shaw Pittman LLP

Exhibit 20
Page 2937



Overview    News    Presentations    Stock    Financials    Forms & Filings    Governance    Sustainability

**NEWS DETAILS**

View all news

# Rockley Photonics Receives 2020 UK R&D Tax Credit and Files 2021 R&D Tax Credit Application

12/29/2022

OXFORD, England & PASADENA, Calif.–(BUSINESS WIRE)– Rockley Photonics Holdings Limited (NYSE: RKLY) ("Rockley"), a global medical technology company focused on delivering leading edge silicon photonics-based biosensing solutions by targeting a portfolio of biomarkers, today announced that it received 12.9 million pounds sterling ($15.5 million) for its fiscal 2020 R&D tax credit from HMRC, the tax agency of the UK government. The Company filed its fiscal 2021 R&D tax credit application and expects to file its fiscal 2022 R&D tax credit application in 2023.

**About Rockley Photonics**

Formed in 2013, Rockley is a global medical technology company focused on delivering leading edge silicon photonics-based biosensing solutions that target a portfolio of biomarkers. Rockley's ground-breaking end-to-end biosensing platform unlocks unique spectra-based biomarkers enabling insights into personal health and well-being. With next-generation biosensing platforms specifically designed for mobile health monitoring, Rockley is laying the foundation for a new generation of biomedical applications across multiple industries.

To learn more about Rockley, visit rockleyphotonics.com.

**Cautionary Note Regarding Forward-Looking Statements**

Statements in this press release that are not historical facts constitute "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements regarding Rockley's future expectations, beliefs, plans, objectives, and assumptions regarding future events or performance. The words "accelerate," "advance," "anticipate," "believe," "can," "capability," "continue," "could," "develop," "enable," "enhance", "estimate," "eventual," "expand," "expect," "focus," "forward," "future," "goal," "ground-breaking" "intend," "may," "might," "opportunity," "outlook," "plan," "possible," "position," "potential," "predict," "project," "revolutionize," "seem," "should," "trend," "vision," "will," "would" or other terms that predict or indicate future events, trends, or expectations, and similar expressions or the negative of such expressions may identify forward-looking statements, but the absence of these words or terms does not mean that a statement is not forward-looking. Forward-looking statements in this press release include, but are not limited to, statements regarding the following: (a) the timing of tax grant applications and expected receipt of future tax grants; and (b) our

Skip to main content

Exhibit 20
Page 2938



include, but are not limited to, the factors described under the heading "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021, and in other documents we file with the Securities and Exchange Commission. If any of these risks or uncertainties materialize, or should any of these assumptions prove incorrect, actual results may differ materially from those discussed in or implied by these forward-looking statements. There can be no assurance that future developments affecting Rockley will be those that have been anticipated. Given these risks and uncertainties, you should not place undue reliance on these forward-looking statements. These forward-looking statements speak only as of the date hereof and Rockley does not intend to update or revise any forward-looking statements, whether because of new information, future events, or otherwise, except as required by law.

**Contact Information**

Gwyn Lauber

Rockley Photonics

Telephone: +1 626-995-0001

Email: investors@rockleyphotonics.com

Source: Rockley Photonics Holdings Limited

**Multimedia Files:**



Download:

Download original 49 KB (500 x 500)

Download thumbnail 18 KB (200 x 200)

Download lowres 82 KB (480 x 480)

Download square 27 KB (250 x 250)

View all news

Skip to main content

Exhibit 20
Page 2939



Send Email

**Overview    News    Presentations**

## Quick Links

SEC Filings

Investor FAQs

Information Request Form

## Investor Email Alerts

Enter your Email Address

[SIGN UP]

News                          Events & Presentations

Quarterly Reports             Annual Reports

SEC Filings                   End of Day Stock Quote

UNSUBSCRIBE



With the flexibility and power of an innovative platform that drives multiple applications, Rockley is positioned to be the leading supplier of integrated optical components for dynamic, high-growth market sectors, including consumer sensors, healthcare, and data communications.

We have offices in California and the United Kingdom .

CONTACT US

Platform                          About Us

Applications                      Company Leadership

Publications                      Press Coverage

Videos                            Careers

Quality Policy

Skip to main content

Exhibit 20
Page 2940



Overview    News    Presentations





©2021. Rockley Photonics Ltd. All rights reserved.  |  **Privacy Policy**  |  **ISO 9001:2015**

Powered By Q4 Inc. 5.56.0.1

Exhibit 20
Page 2941

# EXHIBIT 21

Exhibit 21
Page 2942

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ROCKLEY PHOTONICS HOLDINGS LIMITED, | Case No. 23-10081 (LGB) |
| Debtor.[1] | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**(I) APPROVING THE ADEQUACY OF DEBTOR'S DISCLOSURE**
**STATEMENT, AND (II) CONFIRMING THE REVISED SECOND**
**AMENDED PREPACKAGED CHAPTER 11 PLAN OF**
**REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS LIMITED**

WHEREAS, Rockley Photonics Holdings Limited, as debtor and debtor-in-possession (the

"**Debtor**"), among other things:[2]

a. commenced, on January 20, 2023, a prepetition solicitation of votes on the Plan by distributing[3] to Holders of Super Senior Notes Claims in Class 3 and Holders of Existing Notes Claims in Class 4 (collectively, the "**Voting Classes**"), the following materials: (i) the *Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 2], (ii) the *Disclosure Statement for the Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 3] (the "**Disclosure Statement**"), and (iii) ballots to vote on the Plan, substantially in the forms attached as Exhibit 3 and Exhibits 4A and 4B to the Solicitation Procedures Order, which included an option to opt-out of the Third Party Releases in the Plan (the "**Ballots**," and collectively with the Plan and Disclosure Statement, the "**Solicitation Package**");

b. commenced, on January 23, 2023 (the "**Petition Date**"), the above-captioned case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (this "**Court**");

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom WA14 2DT D.

[2] Capitalized terms used but not defined in this order (the "**Confirmation Order**") are defined below or have the meanings ascribed to them in the *Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 133] (as amended and supplemented by the Plan Supplement and as may be further amended, modified, and supplemented from time to time, the "**Plan**"), attached as **Exhibit A**. The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

[3] *See Affidavit of Service of Craig E. Johnson Regarding Solicitation Materials* [Docket No. 15].

Exhibit 21
Page 2943

c. filed on the Petition Date: (i) the Plan, (ii) the Disclosure Statement, (iii) the *Declaration of Richard A. Meier, Chief Executive Officer of Rockley Photonics Holdings Limited, in Support of Chapter 11 Petition and First Day Motions* [Docket No. 4], (iv) *the Debtor's Motion For Entry Of An Order (I) Scheduling A Combined Disclosure Statement Approval And Plan Confirmation Hearing, (II) Establishing Plan And Disclosure Statement Objection And Reply Deadlines And Related Procedures, (III) Approving The Solicitation Procedures, (IV) Approving The Combined Hearing Notice, And (V) Granting Related Relief* [Docket No. 5] (the "**Solicitation Procedures Motion**"), and (v) the *Declaration Of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding The Solicitation Of Votes And Tabulation Of Ballots Cast On The Prepackaged Chapter 11 Plan Of Reorganization Of Rockley Photonics Holdings Limited* [Docket No. 14] (the "**Initial Voting Declaration**"), which details the prepetition solicitation and certifies that 100% in amount and number of Holders of Claims in the Voting Classes voted to accept the Plan;

d. caused to be served on January 26, 2023, the *Notice of Commencement of Prepackaged Chapter 11 Bankruptcy Case and Combined Hearing on Disclosure Statement and Confirmation of the Prepackaged Chapter 11 Plan*, attached as <u>Exhibit 1</u> to the Solicitation Procedures Order (the "**Combined Hearing Notice**"), which provided a summary of key terms of the Plan, on all Holders of Claims against and Interests in the Debtor, the United States Trustee for Region 2 (the "**U.S. Trustee**"), and certain other parties in interest, in compliance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and the Solicitation Procedures Order;

e. published on January 30, 2023, and February 1, 2023, the *Notice of Commencement of Prepackaged Chapter 11 Bankruptcy Case and Combined Hearing on Disclosure Statement and Confirmation of the Prepackaged Chapter 11 Plan*, attached as <u>Exhibit 2</u> to the Solicitation Procedures Order (the "**Publication Notice**"), in the *New York Times* and in the *Financial Times*, respectively;

f. filed on February 14, 2023, a *Certificate of Publication* [Docket No. 39] (the "**Publication Notice Affidavit**");

g. filed on February 17, 2023, an affidavit of service of the Combined Hearing Notice on all known creditors and interest holders of record as of January 11, 2023 [Docket No. 42] (the "**Confirmation Hearing Notice Affidavit**");

h. filed on February 17, 2023, the *Notice of Filing Plan Supplement to Prepackaged Chapter 11 Plan of Rockley Photonics Holdings Limited* [Docket No. 43] (the "**Initial Plan Supplement**"), which included the: (i) Assumed Executory Contract and Unexpired Lease List (as defined herein); (ii) Rejected Executory Contract and Unexpired Lease List (as defined herein); (iii) Exit Financing Documents; (iv) Private Placement Documents; (v) List of Members of the Reorganized

2

Exhibit 21
Page 2944

Debtor's New Board; (vi) New Governance Documents; (vii) Schedule of Retained Causes of Action; and (viii) Restructuring Steps Memorandum;

i. filed on February 24, 2023, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Distribution, Submission, and Tabulation of Opt-Out Forms Returned on the Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 63] (the "**Initial Opt-Out Declaration**") identifying by Class and in the aggregate, the number of Ballots and Opt-Out Forms (as defined in the Initial Opt-Out Declaration) issued or mailed, the number of Ballots and Opt-Out Forms received by the Voting Deadline and the Opt-Out Deadline (as such terms are defined in the Solicitation Procedures Order), the number of Ballots and Opt-Out Forms received but not counted, and the number of creditors that opted-out of the Third Party Releases pursuant to the Ballots and Opt-Out Forms;[4]

j. filed on February 27, 2023, the *Debtor's Memorandum of Law in Support of (I) Approval of Disclosure Statement, (II) Confirmation of the Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited, and (III) Omnibus Reply to Objections Thereto* [Docket No. 81] (the "**Confirmation Brief**"), together with a proposed confirmation order;

k. filed on February 27, 2023, the *Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 86];

l. filed on February 27 and 28, 2023, the (i) *Declaration of Richard A. Meier in Support of Debtor's Memorandum of Law in Support of (I) Approval of Disclosure Statement, (II) Confirmation of the Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited, and (III) Omnibus Reply to Objections Thereto* [Docket No. 90] (the "**Meier Declaration**"); (ii) *Declaration of Matthew Henry in Support of Debtor's Memorandum of Law in Support of (I) Approval of Disclosure Statement, (II) Confirmation of the Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited, and (III) Omnibus Reply to Objections Thereto* [Docket No. 88] (the "**Henry Declaration**"); and (iii) *Declaration of Jeremy Matican in Support of Debtor's Memorandum of Law in Support of (I) Approval of Disclosure Statement, (II) Confirmation of the Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited, and (III) Omnibus Reply to Objections Thereto* [Docket No. 85] (the "**Matican Declaration**");

m. filed on February 28, 2023, the *Notice of Adjournment of Combined Hearing on (I) Approval of Disclosure Statement and (II) Confirmation of the Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 91];

---

[4] As of the date hereof, the Debtor has received approximately 135 Opt-Out Forms.

3

Exhibit 21
Page 2945

n.      filed on March 5, 2023, the *Notice of Filing Amended Plan Supplement to the Prepackaged Chapter 11 Plan of Rockley Photonics Holdings Limited* [Docket No. 106] (the "**First Amended Plan Supplement**");

o.      filed on March 5, 2023, the *Supplemental Opt-Out Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Distribution, Submission, and Tabulation of Opt-Out Forms Returned on the Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* ("**Supplemental Opt-Out Declaration**," and together with the Initial Opt-Out Declaration and the Initial Voting Declaration, the "**Voting Declarations**");

p.      filed on March 7, 2023, the *Supplemental Declaration of Richard A. Meier in Support of (I) Approval of Debtor's Disclosure Statement, (II) Confirmation of the Amended Prepackaged Chapter 11 of Reorganization of Rockley Photonics Holdings Limited, (III) Omnibus Reply to Objections Thereto, and (IV) Reply to Investor Group's Confirmation Objection (Correcting Docket No. 113)* [Docket No. 128] ("**Supplemental Meier Declaration**," and, together with the Meier Declaration, the Henry Declaration, and the Matican Declaration, the "**Confirmation Declarations**");

q.      filed on March 7, 2023, the March 1 Valuation Analysis as <u>Exhibit D</u> to the *Declaration of Joshua D. Morse in Support of Debtors' Opposition to Objecting Shareholders' Motion in Limine to Exclude the Opinion and Testimony of Debtor's Valuation Expert* (the "**Morse Declaration**") [Docket No. 121];

r.      filed on March 7, 2023, the *Notice of Filing Second Plan Supplement to Prepackaged Chapter 11 Plan of Rockley Photonics Holdings Limited* ("**Second Amended Plan Supplement**" and together with the Initial Plan Supplement and the First Amended Plan Supplement, and any further amendments thereto, the "**Plan Supplement**");

s.      filed on March 7, 2023, the Plan;

t.      operated its business as debtor-in-possession during the Chapter 11 Case pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

AND WHEREAS, this Court has:

a.      reviewed the procedures regarding votes to accept or reject the Plan (the "**Solicitation Procedures**") set forth in the Solicitation Procedures Motion, which the Court approved on January 26, 2023, when it entered the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, and (V) Granting Related Relief* [Docket No. 25] (the "**Solicitation Procedures Order**");

4

Exhibit 21
Page 2946

b.  set February 23, 2023, at 5:00 p.m. (prevailing Eastern Time) as the deadline for filing objections to approval of the Disclosure Statement and confirmation of the Plan;

c.  set March 8, 9, and 10, 2022, at 10:00 a.m. (prevailing Eastern Time) as the dates and times for the combined hearing to consider approval of the Disclosure Statement and Confirmation of the Plan (the "**Combined Hearings**");

d.  reviewed the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Brief, the Voting Declarations, the Confirmation Declarations, and all pleadings, exhibits, statements, responses, and comments regarding approval of the Disclosure Statement and Confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Case;

e.  held the Combined Hearings pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128 and 1129 of the Bankruptcy Code;

f.  heard the statements, arguments, and objections made by counsel in respect of approval of the Disclosure Statement and confirmation of the Plan ("**Confirmation**");

g.  considered all testimony, documents, filings, and other evidence admitted at the Combined Hearings;

h.  taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and argument presented in this Chapter 11 Case; and

i.  overruled any and all objections to the approval of the Disclosure Statement and Confirmation and all statement and reservations of rights not consensually resolved or withdrawn, unless otherwise indicated herein.

NOW, THEREFORE, the Court having found that notice of the Combined Hearings and the opportunity for any party in interest to object to approval of the Disclosure Statement and Confirmation has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence proffered or adduced by counsel at the Combined Hearings establish just cause for the relief granted herein; and upon the record of the Combined Hearings and the representations made thereat; and after due deliberation thereon

5

Exhibit 21
Page 2947

and good cause appearing therefor, this Court hereby makes and issues the following findings of fact and conclusions of law, and orders:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.      Findings and Conclusions**

1.      The findings of fact and conclusions set forth herein and on the record of the Combined Hearings constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  If any of the following findings of fact constitute conclusions of law, they are adopted as such, and if any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.      Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a))**

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409, and this Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  Approval of the Disclosure Statement, including associated solicitation procedures approved in the Solicitation Procedures Order, and Confirmation are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(L), and the Court has jurisdiction to determine whether the Disclosure Statement contains adequate information for purposes of section 1125 of the Bankruptcy Code.  This Court has authority to enter a Final Order determining that the Disclosure Statement and Plan comply with the applicable provisions of the Bankruptcy Code and applicable law and should be approved and confirmed.

**C.      Eligibility for Relief**

3.      The Debtor is an entity eligible for relief under section 109 of the Bankruptcy Code.

Exhibit 21
Page 2948

**D.     Commencement of the Chapter 11 Case**

4.     On the Petition Date, the Debtor filed a voluntary case under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee, trustee or examiner has been appointed in the Chapter 11 Case.

**E.     Judicial Notice**

5.     To the extent necessary, this Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of this Chapter 11 Case maintained by the Clerk of the Court or its duly appointed agent, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of this Chapter 11 Case, including the Combined Hearings.  Any resolutions of any objections explained on the record at the Combined Hearings are incorporated by reference.

**F.     Notice of Transmittal of Solicitation Materials; Adequacy of Solicitation Notices**

6.     The transmittal and service of the Solicitation Package and the Notices of Non-Voting Status, including the Third Party Releases opt-out contained therein, the Combined Hearing Notice, and other materials distributed by the Debtor in connection with approval of the Disclosure Statement and Confirmation (collectively, the "**Confirmation Materials**") as described in the Voting Declarations were (i) appropriate and satisfactory based upon the circumstances of this Chapter 11 Case, (ii) conducted in good faith, and (iii) in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, any other applicable rules, laws, and regulations, and the Solicitation Procedures Order.  As evidenced by the Confirmation Hearing

Exhibit 21
Page 2949

Notice Affidavit, the Debtor provided notice of the Disclosure Statement, the Plan, the Plan Supplement, the release, exculpation, and injunction provisions contained in the Plan, the Combined Hearings, the Objection Deadline, and any other applicable bar dates described in the Solicitation Procedures Order to all parties in interest in the Chapter 11 Case.  Such notice was adequate, appropriate, sufficient, and satisfactory based upon the circumstances of this Chapter 11 Case and in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), the Local Rules, the Solicitation Procedures, and the Solicitation Procedures Order.  Additionally, as evidenced by the Publication Notice Affidavit and in accordance with the Solicitation Procedures Order, the Debtor timely published the Publication Notice in the national edition of the *New York Times* and the *Financial Times*.  Because such transmittal and service was timely, adequate and sufficient under the facts and circumstances of this Chapter 11 Case, no other or further notice is necessary or required.

**G.    Voting**

7.    On January 23, 2023, Craig E. Johnson of Kroll Restructuring Administration LLC (the "**Claims, Noticing, and Solicitation Agent**") filed the Initial Voting Declaration.  As evidenced thereby, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures.

**H.    Good-Faith Solicitation (11 U.S.C. § 1125(e))**

8.    Based on the record before the Court in this Chapter 11 Case, the Debtor and Prepetition Noteholders and each of their respective Related Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and therefore are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code because they have complied with

8

Exhibit 21
Page 2950

the applicable provisions of the Solicitation Procedures Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in connection with all of their respective activities arising out of or relating to (i) the offer, issuance, sale, solicitation, and purchase of the securities offered, issued, sold, solicited, and purchased under the Plan with respect to the Reorganized Rockley Equity and the Prepetition Noteholder Private Placement, (ii) the execution and implementation of Exit Financing under the Exit Financing Agreements (as further amended, modified or supplemented), (iii) their participation in this Chapter 11 Case, and (iv) the activities described in section 1125 of the Bankruptcy Code.

## I.      Approval of the Disclosure Statement

9.      The Disclosure Statement contains (i) sufficient information necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (ii) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtor, the Plan, and the transactions contemplated therein.

## J.      Voting Declarations

10.      Only the Voting Classes were eligible to vote on the Plan.  The Ballots used to solicit votes to accept or reject the Plan from Holders of Claims in the Voting Classes adequately addressed the particular needs of this Chapter 11 Case and were appropriate for Holders of Claims in the Voting Classes to vote to accept or reject the Plan.  Holders of Claims and Interests in Classes 1, 2, 5, 6, 7 and 8 were unimpaired or impaired under the Plan and were not entitled to vote to accept or reject the Plan (collectively, the "**Non-Voting Classes**").  Thus, Holders of Claims and Interests in the Non-Voting Classes were conclusively presumed to have accepted, or deemed to have rejected, the Plan, as applicable.  Based on the foregoing, and as evidenced by the

9

Exhibit 21
Page 2951

Initial Voting Declaration, the Voting Classes have voted to accept the Plan in accordance with the requirements of sections 1124, 11226 and 1129 of the Bankruptcy Code.

**K.      Solicitation**

11.      The solicitation of votes on the Plan, as described in the Voting Declarations, complied with the Solicitation Procedures approved in the Solicitation Procedures Order, was appropriate and satisfactory based upon the circumstances of this Chapter 11 Case, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations, including, to the extent applicable, any applicable requirements and exemptions from the registration requirements under the Securities Act.

12.      As set forth in the Initial Voting Declaration, the Solicitation Package was distributed to Holders of Claims in the Voting Classes as of January 11, 2023, which voting record date was approved by the Court in the Solicitation Procedures Order.

13.      Under sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtor was not required to solicit votes from Holders of Claims and Interests in the Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

**L.      Service of Opt-Out Form**

The Notice of Non-Voting Status included the Opt-Out Form and instructions for opting out of the Third-Party Release (as defined below) through the submission of the Opt-Out Form to the Claims, Noticing, and Solicitation Agent for recording by the Objection Deadline.  The process described in the Solicitation Procedures Order, the Solicitation Procedures, and the Confirmation Hearing Notice Affidavit that the Debtor and the Claims, Noticing, and Solicitation Agent followed to identify the relevant parties on which to serve the Notice of Non-Voting Status and to

10

Exhibit 21
Page 2952

distribute the Opt-Out Forms was reasonably calculated to ensure that each of the Holders of Claims and Interests was informed of its ability to opt of the Third-Party Release and the consequences for failing to timely do so. Transmission and service of the Opt-Out Forms was timely, adequate, and sufficient under the facts and circumstances of this Chapter 11 Case. No other or further notice is or shall be required.

**M.      Plan Supplement**

14.      The filing and notice of the Plan Supplement, and any modifications or supplements thereto, were proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order, and no other or further notice is or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into, the Plan. Subject to the terms of the Plan, the Debtor may alter, amend, update, or modify the Plan Supplement before the Effective Date with the Prepetition Noteholders' consent.

**N.      Modifications to the Plan**

15.      Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of solicitation, as described or set forth herein, or at the Combined Hearings, in the Plan Supplement, or in the Plan, as currently on-file with the Court, constitute technical changes or changes with respect to particular Claims made pursuant to the agreement of the Holders of such Claims and do not materially or adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims

11

Exhibit 21
Page 2953

in the Voting Classes be afforded an opportunity to change previously cast acceptances or rejections to the Plan.

16. This Confirmation Order contains or results in modifications to the Plan that were made to address objections and informal comments received from various parties in interest. The modifications to the Plan are consistent with the provisions of the Bankruptcy Code. The disclosure of any Plan modifications prior to or on the record at the Combined Hearings constitutes due and sufficient notice of any and all Plan modifications. The Plan as modified shall constitute the Plan submitted for Confirmation.

## O.  Objections

17. All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in objection to approval of the Disclosure Statement and Confirmation. To the extent that any objections (formal or informal), reservations of rights, statements, or joinders to Confirmation have not been resolved, withdrawn, waived, adjourned, or settled prior to entry of this Confirmation Order or otherwise resolved herein or as stated on the record of the Combined Hearings, they are hereby overruled on the merits based on the record before this Court.

## P.  Burden of Proof

18. As the proponent of the Plan, the Debtor has met its burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.

## Q.  Bankruptcy Rule 3016

19. The Plan is dated and identifies the Debtor as the proponent, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

Exhibit 21
Page 2954

**R.** **Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))**

20.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

a.      Proper Classification (11 U.S.C. § 1122). The Plan satisfies section 1122 of the Bankruptcy Code because it provides for the separate classification of Claims and Interests, each Claim and Interest in each Class is substantially similar to other Claims and Interests in such Class, valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and the classification complies with applicable provisions of the Bankruptcy Code.

b.      Designation, Specification and Treatment of Classes (11 U.S.C. §§ 1123(a)(1)-(3)). The Plan satisfies section 1123(a)(1)-(3) of the Bankruptcy Code because, in addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims which need not be classified, Article III of the Plan designates eight Classes of Claims and Interests, specifies the Classes of Claims and Interests that are unimpaired, and specifies the treatment of Claims and Interests that are impaired.

c.      No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan satisfies section 1123(a)(4) of the Bankruptcy Code because Article III of the Plan provides for equal treatment of all Claims and Interests within each Class, except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

d.      Implementation of the Plan (11 U.S.C. § 1123(a)(5)). The Plan satisfies section 1123(a)(5) of the Bankruptcy Code because the Plan, together with the Plan Documents (as defined herein), including the Plan Supplement, provide adequate and proper means for implementing the Plan, including: (i) issuance of Reorganized Rockley Equity under the Plan and the Prepetition Noteholder Private Placement (the "**Private Placement**"); (ii) entry into the Exit Financing; (iii) distributions to Holders of Allowed Claims; (iv) consummation of the Restructuring Transactions; (v) cancellation of certain existing agreements, obligations, instruments and Interests; (vi) adoption of a Management Incentive Plan; (vii) adoption of new organizational documents to govern the Reorganized Debtor and appointment of its initial board of directors; (viii) assumption of Compensation and Benefit Programs; (ix) the compromise or settlement of Claims, Interests, and Causes of Action; (x) preservation of Causes of Action by the Reorganized Debtor; (xi) concurrent proceedings in the Cayman Islands to oversee and implement the Restructuring Transactions contemplated under the Plan; (xii) assumption or rejection of Executory

13

Exhibit 21
Page 2955

Contracts and Unexpired Leases to which the Debtor is a party; and (xiii) various discharges, releases, injunctions and exculpations.

e.     Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). The Plan satisfies section 1123(a)(6) of the Bankruptcy Code because it prohibits the issuance of non-voting equity securities and provides that any New Governance Document (amended or amended and restated) must prohibit issuance of such equity securities in accordance with 1123(a)(6).

f.     Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)). The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code because the Plan Supplement discloses the individuals who will serve as the Reorganized Debtor's officers and directors and the Plan and New Governance Documents, as applicable, are consistent with the interests of all creditors and equity security holders and with public policy regarding the manner and selection of the Reorganized Debtor's officers and directors.

g.     Additional Plan Provisions (11 U.S.C. § 1123(b)). The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

h.     Impairment/Unimpairment of Claims or Interests (11 U.S.C. § 1123(b)(1)). As contemplated by section 1123(b)(1) of the Bankruptcy Code, pursuant to the Plan, Classes 1, 2, 5, and 6 are unimpaired, and Classes 3, 4, 7, and 8 are impaired.

i.     Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)). Articles IV.K and V.A of the Plan provide for the assumption of certain Executory Contracts and Unexpired Leases, to which the Debtor is a party, as set forth in the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List included in the Plan Supplement and pursuant to sections 365 and 1123 of the Bankruptcy Code.

j.     Compromise, Settlement & Retention of Claims (11 U.S.C. §§ 1123(b)(3)(A)-(B)). As contemplated by sections 1123(b)(3)(A)-(B) of the Bankruptcy Code, Article VIII.D of the Plan provides for the release of certain Claims and Causes of Action owned by the Debtor, and Article IV.O of the Plan preserves the Reorganized Debtor's rights to commence, pursue and settle any and all retained Causes of Action, whether arising before or after the Petition Date, including any actions enumerated in the Schedule of Retained Causes of Action in the Plan Supplement.

k.     Other Appropriate Provisions (11 U.S.C. § 1123(b)(5)-(6)). As permitted by section 1123(b)(5), the Plan modifies the rights of holders of claims or

14

Exhibit 21
Page 2956

interests in the Impaired Classes (Classes 3, 4, 7 and 8), and leaves unaffected the rights of holders of claims in the Unimpaired Classes (Classes 1, 2, 5 and 6). The Plan's provisions are appropriate and consistent with Sections 1123(b)(5) and (6) of the Bankruptcy Code, including provisions relating to: (i) distributions to Holder of Claims, (ii) resolution of Disputed Claims and Interests, (iii) allowance of certain Claims, (iv) releases by the Debtor of certain parties, (v) releases by certain third parties, (vi) exculpation of certain parties, (vii) the injunction of certain Claims and Causes of Action to implement the discharge, release and exculpation provisions, and (viii) retention of this Court's jurisdiction. The Plan therefore satisfies the requirements of sections 1123(b)(5) and (6) of the Bankruptcy Code.

l.     Cure of Defaults (11 U.S.C. § 1123(d)). Article V.D of the Plan provides for the satisfaction of Cure Claims under any Executory Contract and Unexpired Lease to be assumed under the Plan by payment in cash on the Effective Date, in the ordinary course of business, or as otherwise agreed by the parties to such contracts or leases.

**S.     The Debtor's Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))**

21.     The Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128, and Bankruptcy Rules 3017, 3018, and 3019, except as otherwise provided or permitted by orders of the Court, as required by section 1129(a)(2) of the Bankruptcy Code. Specifically:

a.     the Debtor is eligible to be a debtor under section 109 of the Bankruptcy Code and is a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;

b.     the Debtor has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

c.     the Debtor has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures Order in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

**T.     Good Faith Proposal of the Plan (11 U.S.C. § 1129(a)(3))**

22.     The Debtor has proposed the Plan (including the Plan Documents (as defined herein) and all other documents necessary or appropriate to effectuate the Plan) in good faith and

15

Exhibit 21
Page 2957

not by any means forbidden by law. In determining that the Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding this Chapter 11 Case and the formulation of the Plan. The good faith of the Debtor, the Prepetition Noteholders, the Prepetition Trustee, and the Exit Financing Parties is supported by the facts and record of this Chapter 11 Case, the Disclosure Statement, the Confirmation Declarations, and the record of the Combined Hearings. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtor's Estate and effectuating a successful restructuring of the Debtor's business. The Debtor, the Prepetition Noteholders, the Prepetition Trustee, and the Exit Financing Parties have negotiated and formulated the Plan (and the Plan Supplement) at arm's length and in good faith. The Plan itself (and the Plan Supplement), and the process leading to its formulation, (i) provide independent evidence of the good faith of the Debtor, the Prepetition Noteholders, the Prepetition Trustee, and the Exit Financing Parties that negotiated the Plan (and the Plan Supplement), (ii) serve the public interest, and (iii) assure fair treatment of Holders of Claims and Interests. Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1129 and 1142 of the Bankruptcy Code, and are each necessary for the Debtor to implement the Restructuring Transactions and consummate its value maximizing Plan. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

U.    **Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))**

23.    Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been or will be disclosed to the Court, and any such payment

16

Exhibit 21
Page 2958

made before Confirmation is reasonable or is subject to the Court's approval as reasonable if it is to be fixed after Confirmation, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

## V.  Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))

24.  In the Plan Supplement, the Debtor has disclosed the identity and affiliations of all persons proposed to serve on the New Board and the officers of the Reorganized Debtor as required by section 1123(a)(5)(i).  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer was also disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of the Reorganized Debtor.  The Plan also complies with section 1129(a)(5)(ii) of the Bankruptcy Code because the method of appointment of members of the New Board of the Reorganized Debtor was, is, and will be consistent with the interests of Holders of Claims and public policy.  The proposed officers and directors for the Reorganized Debtor are qualified, and their appointment to, or continuance in, such roles is consistent with the interests of Holders of Claims and with public policy.  Accordingly, the Debtor has satisfied section 1129(a)(5) of the Bankruptcy Code.

## W.  No Rate Changes

25.  Section 1129(a)(6) of the Bankruptcy Code is not applicable to this Chapter 11 Case.  The Plan proposes no rate change, subject to the jurisdiction of any governmental regulatory commission.

## X.  Best Interests of Holders Claims and Interests (11 U.S.C. § 1129(a)(7))

26.  Each Holder of an Impaired Claim or Interest has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of value, as of the Effective

Exhibit 21
Page 2959

Date, that is not less than the amount that such Holder would receive or retain if the Debtor were to liquidate under chapter 7 of the Bankruptcy Code on such date.

27.     The liquidation analysis attached as Exhibit B to the Disclosure Statement (the "**Liquidation Analysis**") and other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Combined Hearings, including in the Henry Declaration (i) are reasonable, persuasive, credible, and accurate as of the date(s) such analyses or evidence was prepared, presented, or proffered; (ii) used reasonable and appropriate methodologies and assumptions; (iii) have not been controverted by other evidence; and (iv) establish that Holders of Claims against and Interests in the Debtor will recover as much or more under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the Debtor were to liquidate under chapter 7 of the Bankruptcy Code.  Accordingly, the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

**Y.     Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))**

28.     Classes 1, 2, 5 and 6 are unimpaired by the Plan pursuant to section 1124 of the Bankruptcy Code.  Therefore, Holders of Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Voting Classes, Classes 3 and 4, are impaired and have voted to accept the Plan.  Classes 7 and 8 (together, the "**Rejecting Classes**") are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not receive or retain any property on account of their Claims or Interests and, accordingly, such Claims or Interests are impaired and such Holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Thus, section 1129(a)(8) of the Bankruptcy Code is not satisfied; however, as described

Exhibit 21
Page 2960

below, the Plan can nevertheless be confirmed over the deemed non-acceptance of the Rejecting

Classes pursuant to section 1129(b) of the Bankruptcy Code.

**Z.      Treatment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9))**

29.      The treatment of Administrative Claims, Professional Fee Claims, Priority Tax

Claims, and Other Priority Claims pursuant to Article II of the Plan satisfies the requirements of,

and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the

Debtor has satisfied the requirements of section 1129(a)(9) of the Bankruptcy Code.

**AA.      Acceptance By at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10))**

30.      Classes 3 and 4 are impaired Classes of Claims that voted to accept the Plan,

determined without including any acceptance of the Plan by any insider.  Accordingly, the Plan

satisfies section 1129(a)(10) of the Bankruptcy Code.

**BB.      Feasibility (11 U.S.C. § 1129(a)(11))**

31.      The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

The evidence supporting the feasibility of the Plan proffered or adduced at or prior to the

Combined Hearings, including the financial projections set forth in Exhibit C of the Disclosure

Statement and the Henry Declaration (i) are reasonable, persuasive, credible, and accurate as of

the date(s) such analyses or evidence was prepared, presented, or proffered; (ii) used reasonable

and appropriate methodologies and assumptions; (iii) have not been controverted by other

evidence; (iv) establishes that the Plan is feasible and Confirmation is not likely to be followed by

the liquidation, or the need for further financial reorganization, of the Debtor or the Reorganized

Debtor, and (v) establishes that the Debtor or the Reorganized Debtor, as applicable, will have

Exhibit 21
Page 2961

access to sufficient funds and financial resources to enable them to meet their obligations under the Plan.

**CC.  Payment of Statutory Fees (11 U.S.C. § 1129(a)(12))**

32.  The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930(a)(6), together with any interest thereon pursuant to 31 U.S.C. § 3717, shall be paid by the Reorganized Debtor, as applicable, for each quarter (including a fraction thereof) until this Chapter 11 Case is converted, dismissed, or closed, whichever is earlier.

**DD.  Retiree Benefits (11 U.S.C. § 1129(a)(13))**

33.  To the extent applicable, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code because claims for costs and expenses of administration of this case under section 1114(e)(2) of the Bankruptcy Code are included in the definition of Administrative Claims and will be paid in full under Article II.A of the Plan.

**EE.  Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(14)-(16))**

34.  Sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to this Chapter 11 Case because the Debtor does not owe domestic support obligations, is not an individual, and is a moneyed, business, or commercial corporation.

**FF.  Confirmation of Plan Over Non-Acceptance of Impaired Classes 11 U.S.C. § 1129(b)**

35.  The Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the requirements of section 1129(a)(8) have not been met because the Debtor has demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly" and is "fair and equitable" with respect to the Rejecting Classes.

20

Exhibit 21
Page 2962

36.    The Plan does not "discriminate unfairly" against Holders of Interests in the Debtor in Class 7 and Holders of Section 510(b) Claims in Class 8.  The treatment of such Holders is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment, and the Debtor has a valid rationale, as articulated in the Confirmation Brief, for the Plan's classification scheme and the disparate treatment, if any, provided for different Classes including based on (i) the Debtor's capital structure, prepetition debt documents and other definitive documents that control the rights of the Holders of Claims and Interests; and (ii) the Bankruptcy Code's priority scheme.

37.    The Plan is also "fair and equitable" as to each Rejecting Class because (i) no Interests or Claims junior to the Claims or Interests of the Rejecting Classes will receive or retain any property under the Plan based on such junior Interests or Claims and (ii) no holder of a Claim senior to the respective Rejecting Classes is receiving more than equal value on account of its Claim.

38.    Therefore, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed even if two impaired Classes are deemed to have rejected the Plan.

**GG.    Only One Plan 11 U.S.C. § 1129(c)**

39.    The Plan is the only plan confirmed and therefore satisfies section 1129(c) of the Bankruptcy Code.

**FF.    Principal Purpose of the Plan 11 U.S.C. § 1129(d)**

40.    The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, and there has been no filing by any governmental unit asserting any such attempted avoidance.  Therefore, the Plan satisfies section 1129(d) of the Bankruptcy Code.

21

Exhibit 21
Page 2963

**GG.    Not Small Business Case (11 U.S.C. § 1129(e))**

41.    This Chapter 11 Case is not a small business case, as that term is defined in the Bankruptcy Code.  Thus, section 1129(e) of the Bankruptcy Code does not apply.

**HH.    Satisfaction of Confirmation Requirements**

42.    Based on the foregoing and all other pleadings and evidence proffered or adduced at and prior to the Combined Hearings, the Plan and the Debtor, as applicable, satisfy all of the requirements for Confirmation set forth in section 1129 on the Bankruptcy Code.

**II.    Valuation**

43.    The valuation analysis attached as <u>Exhibit A</u> to the Matican Declaration and <u>Exhibit D</u> (under seal) to the Morse Declaration (the "**Valuation Analysis**") and the evidence adduced at the Combined Hearings and in the Valuation Analysis, including post-emergence enterprise value of the Reorganized Debtor, are reasonable and credible.  All parties in interest have been given the opportunity to challenge the Valuation Analysis.  The Valuation Analysis is reasonable, persuasive, and credible as of the date it was prepared, presented, or proffered, and uses reasonable and appropriate methodologies and assumptions.

**JJ.    Plan Documents**

44.    The terms of the Plan, and all exhibits and schedules thereto, and all documents filed in connection with the Plan (including the Plan Supplement) or executed or to be executed in connection with the transactions contemplated by the Plan, including the Restructuring Transactions, the New Governance Documents, the Exit Financing Documents, the Private Placement Documents, and all amendments and modifications to any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications (collectively,

22

Exhibit 21
Page 2964

the "**Plan Documents**") are incorporated by reference, are approved in all respects, and constitute an integral part of this Confirmation Order.

### KK.    Binding and Enforceable

45.    The Plan and the Plan Documents have been negotiated in good faith and at arm's length and, subject to the occurrence of the Effective Date, shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not the Claim or Interest is impaired under the Plan, whether or not such Holder has accepted the Plan, and whether or not such Holder is entitled to a distribution under the Plan.  The Plan and the Plan Documents constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms.  Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and the Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

### LL.    The New Governance Documents and Related Issuance of Reorganized Rockley Equity

46.    The New Governance Documents and the issuance of Reorganized Rockley Equity in connection therewith are an essential element of the Plan and are critical to the overall success and feasibility of the Plan.  The New Governance Documents are in the best interests of the Debtor, its Estate, and Holders of Claims and Interests.  The Debtor has exercised reasonable judgment in determining to enter into or file, as applicable, the New Governance Documents and has provided sufficient and adequate notice of the materials terms of the New Governance Documents, which were filed in the Plan Supplement.  The terms and conditions of the New Governance Documents are fair and reasonable, and the New Governance Documents were negotiated in good faith and at arm's length by the Debtor and the Prepetition Noteholders, and any fees, indemnities, expenses

Exhibit 21
Page 2965

and other amounts paid in connection with the New Governance Documents or the related issuance of Rockley Reorganized Equity are deemed to have been issued and made in good faith.

**MM.  The Private Placement Documents and Related Issuance of Reorganized Rockley Equity**

47.     The Private Placement Documents and the issuance of Reorganized Rockley Equity in connection therewith are an essential element of the Plan and are critical to the overall success and feasibility of the Plan.  The Private Placement Documents are in the best interests of the Debtor, its Estate, and Holders of Claims and Interests.  The Debtor has exercised reasonable judgment in determining to enter into or file, as applicable, the Private Placement Documents and has provided sufficient and adequate notice of the material terms of the Private Placement Documents, which were filed in the Plan Supplement.  The terms and conditions of the Private Placement Documents are fair and reasonable, and the Private Placement Documents were negotiated in good faith and at arm's length by the Debtor and the Prepetition Noteholders, and any fees, indemnities, expenses and other amounts paid in connection with the Private Placement Documents or the related issuance of Rockley Reorganized Equity are deemed to have been issued and made in good faith.

**NN.  Exit Financing**

48.     The Exit Financing is an essential element of the Plan and is critical to the overall success and feasibility of the Plan.  Entry into the Exit Financing Documents is in the best interests of the Debtor, its Estate, and Holders of Claims against and Interests in the Debtor and its Estate and is necessary for Confirmation and consummation of the Plan.  The Debtor has exercised reasonable judgment in determining to enter into or file, as applicable, the Exit Financing Documents and has provided sufficient and adequate notice of the material terms of the Exit Financing Documents, which were filed in the Plan Supplement.  The terms and conditions of the

Exhibit 21
Page 2966

Exit Financing Documents included in the Plan Supplement are fair and reasonable and were negotiated in good faith and at arm's length by the Debtor and the Prepetition Noteholders, and any fees, indemnities, expenses and other amounts paid in connection with the Exit Financing Documents are deemed to have been made in good faith. All other contracts, instruments, agreements, and documents to be executed in connection with the Exit Financing Documents, and any credit extended to the Reorganized Debtor pursuant to the Exit Financing Documents, is deemed to have been extended, issued, and made in good faith and for legitimate business purposes and is deemed not to constitute a fraudulent conveyance or fraudulent transfer (or a voidable transaction) under the Bankruptcy Code or any other applicable law. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Exit Financing Documents (i) shall be valid, binding, perfected, enforceable first priority Liens and security interests in the property subject to a security interest granted by the Reorganized Debtor pursuant to the Exit Financing Documents established in respect thereof under applicable nonbankruptcy law and any applicable intercreditor agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination. The obligations, guarantees, mortgages, pledges, Liens and other security interests granted pursuant to or in connection with the Exit Financing are granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or recharacterization.

## OO. Vesting of Assets

49. Except as otherwise provided in the Plan, the Plan Documents or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective

Exhibit 21
Page 2967

Date, all property in the Estate, all Retained Causes of Action, all Executory Contracts and Unexpired Leases assumed by the Debtor, and any property acquired by the Debtor under the Plan, including Interests held by the Debtor in non-Debtor affiliates, shall, pursuant to the Plan, vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Financing Documents, and Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, as applicable) unless expressly provided by the Plan or Confirmation Order. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by this Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**PP.** **Executory Contracts and Unexpired Leases**

50. The Debtor has exercised sound business judgment in determining whether to reject, assume, or assume and assign each of its Executory Contracts and Unexpired Leases pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set forth in the Plan Supplement. Except as set forth herein or in separate orders entered by the Court relating to assumption of Executory Contracts or Unexpired Leases, consistent with the Plan Supplement, the Debtor set Cure Amounts in the Plan Supplement and has cured or provided adequate assurance that the Debtor or the Reorganized Debtor will cure defaults, if any, under each Executory Contract or Unexpired Lease assumed under the Plan.

**QQ.** **Discharge, Compromise, Settlement, Release Exculpation and Injunction Provisions**

51. The Court has jurisdiction under 28 U.S.C. § 1334(a) and (b) to approve the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in

26

Exhibit 21
Page 2968

Article VIII of the Plan. Based on the record of this Chapter 11 Case and the evidence proffered or adduced at the Combined Hearings, the Court finds that the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article VIII of the Plan (as modified hereby) are consistent with sections 105(a) and 1123(b) of the Bankruptcy Code and applicable law. Further, the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article VIII of the Plan (as modified hereby) are integral components of the Plan. The discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article VIII of the Plan (as modified hereby) are hereby approved and authorized in their entirety.

**RR.    Debtor Release**

52.    The Debtor Release is reasonable and represents a valid exercise of the Debtor's business judgment under Bankruptcy Rule 9019. The Debtor's or Reorganized Debtor's pursuit of any such claims against the Debtor Released Parties is not in the best interest of the Estate's various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims. The Debtor Release is fair and equitable and complies with the absolute priority rule.

53.    The Debtor Release is also an integral part of the Plan and is in the best interests of the Debtor's Estate as a component of the comprehensive restructuring set forth in the Plan. The Plan, including the Debtor Release, was negotiated before and after the Petition Date by sophisticated parties represented by able counsel and financial advisors. The Debtor Release is therefore the result of an arm's length negotiation process and in the best interests of the Debtor's Estate.

27

Exhibit 21
Page 2969

54.    The Debtor Release appropriately offers protection to parties that participated in the Debtor's restructuring process.  Specifically, the Debtor Released Parties under the Plan made significant concessions and substantial contributions to this Chapter 11 Case, including, as applicable, providing postpetition financing under the Cash Collateral Orders, providing new financing under the Exit Financing Documents, providing new capital under the Private Placement Documents, actively supporting this Chapter 11 Case and the Plan (including the Prepetition Noteholders' agreement to exchange their prepetition secured debt for Reorganized Rockley Equity), and waiving substantial rights and Claims against the Debtor under the Plan (including the Prepetition Noteholders' deficiency claims).  The Debtor Release for the Debtor's directors and officers, as applicable, is also appropriate because the Debtor's directors and officers share an identity of interest with the Debtor, supported the Plan and this Chapter 11 Case, actively participated in meetings and negotiations during this Chapter 11 Case, and have provided other valuable consideration to the Debtor to facilitate the Debtor's reorganization.

55.    The scope of the Debtor Release is appropriately tailored to the facts and circumstances of this Chapter 11 Case.  Considering, among other things, the value provided by the Released Parties to the Debtor's Estate and the critical nature of the Debtor Release to the Plan, the Debtor Release is appropriate.

**SS.    Third-Party Release**

56.    Article VIII.E of the Plan contains third party releases granted by the Releasing Parties (the "**Third-Party Release**").  The Third-Party Release is necessary and integral to the Plan, and provides finality for the Debtor, the Reorganized Debtor, and the Released Parties with respect to the Plan and the Reorganized Debtor.  The Third-Party Release is consensual with respect to the Releasing Parties.  The Releasing Parties were provided proper and sufficient notice

28

Exhibit 21
Page 2970

of this Chapter 11 Case, the Plan, the Third-Party Release, and the Plan and Disclosure Statement

Objection Deadline through service of the Solicitation Materials and distribution of the Ballots.

No further notice is necessary.   The Plan provides appropriate and specific disclosure with respect

to the claims and the Causes of Action that are subject to the Third-Party Release, and no other

disclosure is necessary.  The Third-Party Release is specific in language, integral to the Plan, and

given for substantial consideration.

**TT.**    **Exculpation**

57.    The exculpation provision set forth in Article VIII.F of the Plan was proposed in

good faith and is essential to the Plan.  The record in this Chapter 11 Case fully supports the

exculpation provision, which is appropriately tailored to protect the Exculpated Parties from

inappropriate litigation and exclude actions determined by Final Order to have constituted actual

fraud, willful misconduct, gross negligence, or a violation of the New York Rules of Professional

Conduct.

**UU.**    **Injunction**

58.    The injunction provisions set forth herein and in Article VIII.G of the Plan are

appropriate to preserve and enforce the discharge and releases set forth in Articles VIII.B, VIII.C,

VIII.D and VIII.E of the Plan, the exculpation provisions in Article VIII.F of the Plan, and the

compromises and settlements implemented under the Plan, and issuance of the injunction is within

the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b) and 1334(d).

**VV.**    **Retention of Jurisdiction**

59.    Except as otherwise provided in any of the Plan Documents, the Court shall retain

jurisdiction over this Chapter 11 Case and all matters arising out of or related to this Chapter 11

Case and the Plan, including the matters set forth in Article XI of the Plan.

Exhibit 21
Page 2971

**WW.   Waiver of Stay**

60.     Under the circumstances, it is appropriate to waive the 14-day stay imposed by

Bankruptcy Rule 3020(e).

## ORDER

 BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

**A.       Findings of Fact and Conclusions of Law**

61.     The above-referenced findings of fact and conclusions of law are hereby

incorporated by reference as though fully set forth herein and constitute this Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by

Bankruptcy Rule 9014.

**B.       Eligibility for Relief**

62.     The Debtor was and is eligible for relief under section 109 of the Bankruptcy Code.

**C.       Combined Hearings on Approval of Disclosure Statement and Confirmation of Plan**

63.     It was appropriate to hold the Combined Hearings on the Debtor's request for

approval of the Disclosure Statement and Confirmation of the Plan under sections 105(d)(2)(B)(vi)

and 1125(g) of the Bankruptcy Code, and Bankruptcy Rule 3018(b).

**D.       Approval of the Disclosure Statement**

64.     The Disclosure Statement is approved in all respects as containing "adequate

information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in

section 1126(b)(2) of the Bankruptcy Code) in accordance with section 1125 of the Bankruptcy

Code.  Any and all objections and reservations of rights to the Disclosure Statement that have not

Exhibit 21
Page 2972

been withdrawn, waived, or resolved prior to the Combined Hearings are hereby overruled on the merits.

**E.    Confirmation**

65.    The Plan, together with the other Plan Documents, are hereby confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan Documents are incorporated by reference into, and are an integral part of, the Plan and this Confirmation Order, and are authorized and approved.  The Debtor is authorized to implement and consummate the Plan, including taking all actions necessary, advisable, or appropriate to finalize the Plan Documents and to effectuate the Plan and the Restructuring Transactions, without further authorization except as may be expressly required by the Plan or this Confirmation Order.

**F.    Objections**

66.    All objections, responses, reservations, statements, and comments to the Plan, other than those resolved, adjourned, or withdrawn with prejudice prior to, or on the record at, the Combined Hearings, are overruled on the merits in all respects.  All withdrawn objections, if any, are deemed withdrawn with prejudice.  All objections to Confirmation not filed and served prior to the deadline for filing objections to the Plan set forth in the Combined Hearing Notice, if any, are deemed waived and will not be considered by the Court.

**G.    Deemed Acceptance of the Plan as Modified**

67.    In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to accept the Plan as amended or modified.  No Holder of a Claim or Interest shall be permitted to change its vote as a consequence

31

Exhibit 21
Page 2973

of the Plan modifications. All modifications to the Plan are hereby approved pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**H.      Plan Implementation**

68.      <u>General Authorization</u>.   The transactions described in the Plan, the Plan Documents, and this Confirmation Order, including the Restructuring Transactions, are hereby approved.  Whether prior to, on or after the Effective Date, as applicable, and without any further order of the Court, other authority, or corporate action, the Debtor or the Reorganized Debtor, as applicable, and their respective directors, managers, officers, employees, members, agents, attorneys, financial advisors, and investment bankers, are authorized and empowered pursuant to section 1142(b) of the Bankruptcy Code and other applicable nonbankruptcy law to, and shall, (i) grant, issue, execute, deliver, file, or record any agreement, document, or security, and the documents contained in the Plan or the Plan Documents (as modified, amended, and supplemented pursuant to the provisions of the Plan governing such modifications, amendments, and supplements), or any other documents related thereto, and (ii) take any action necessary, advisable, or appropriate to implement, effectuate, and consummate the Plan, the Plan Documents, or this Confirmation Order, in accordance with their terms.

69.      All actions taken or to be taken shall be deemed to have been authorized and approved by this Court without further approval, act, or action under any applicable law, order, rule, or regulation, including, among other things, (a) all transfers of assets that are to occur pursuant to the Plan, the Plan Documents, or this Confirmation Order; (b) the incurrence of all obligations contemplated by the Plan, the Plan Documents, or this Confirmation Order and the making of all distributions under the Plan, the Plan Documents, or this Confirmation Order; (c) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the

Exhibit 21
Page 2974

Debtor or the Reorganized Debtor that is to occur pursuant to the Plan, the Plan Documents, or this Confirmation Order, including in connection with the Exit Financing and issuance of Reorganized Rockley Equity under the Plan and the Private Placement; and (d) entering into any and all transactions, contracts, leases, instruments, releases, and other documents and arrangements permitted by applicable law, order, rule, or regulation, including the New Governance Documents (including any subscription agreements) and the Exit Financing Documents. The approvals and authorizations in this Confirmation Order are non-exclusive and are not intended to limit the authority of the Debtor or Reorganized Debtor, as applicable, or any officer or director thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order pursuant to section 1142(b) of the Bankruptcy Code, whether before, on or after the Effective Date. Pursuant to section 1142 of the Bankruptcy Code, to the extent that, under applicable nonbankruptcy law, any of the foregoing actions would require approval of the equity holders or directors (or any equivalent body) of the Debtor or the Reorganized Debtor, such approval shall be deemed to have occurred and shall be in effect from and after the Effective Date without any further action by the equity holders or directors (or any equivalent body) of the Debtor or the Reorganized Debtor. On the Effective Date, or as soon thereafter as is practicable, the Debtor or the Reorganized Debtor, as applicable, shall file any documents required to be filed to effectuate the terms of the Plan. Any or all documents contemplated herein shall be accepted by each of the respective filing offices and recorded, if required, in accordance with applicable law. All counterparties to any documents described in this paragraph are hereby directed to execute such documents as may be required or provided by such documents, without any further order of this Court.

Exhibit 21
Page 2975

70. <u>No Action</u>. Pursuant to section 1142(b) of the Bankruptcy Code and other applicable law, this Confirmation Order shall constitute authorization for the Debtor or the Reorganized Debtor, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Plan Documents, this Confirmation Order, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, the Plan Documents, or this Confirmation Order, and the respective directors, managers, stockholders, or members of the Debtor or the Reorganized Debtor, as applicable, shall not be required to take any actions in connection with the implementation of the Plan, the Plan Documents, or this Confirmation Order.

71. <u>Management Incentive Plan</u>. Following the Effective Date and in accordance with the Private Placement Agreement, the Reorganized Debtor may reserve a certain percentage of Reorganized Rockley Equity as determined by the New Board, on a fully diluted, fully distributed basis, for grants made from time to time to certain employees of the Reorganized Debtor.

## I. **Binding Effect**

72. Effective as of entry of this Confirmation Order and subject to the occurrence of the Effective Date, the Plan, the Plan Documents, and this Confirmation Order shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not: (a) the Claim or Interest is impaired under the Plan; (b) such Holder has accepted the Plan; (c) such Holder has failed to vote to accept or reject the Plan or voted to reject the Plan; (d) such Holder is entitled to a distribution under the Plan; (e) such Holder will receive or retain any property or interests in property under the Plan; and (f) such Holder has filed a Proof of Claim in this Chapter 11 Case. The Plan, the Plan Documents, and this Confirmation Order constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable

34

Exhibit 21
Page 2976

in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Documents, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**J.     Plan Classification Controlling**

73.     The terms of the Plan shall govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for the purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtor except for voting purposes. Subject to the terms and conditions of the Plan, all rights of the Debtor or the Reorganized Debtor, as applicable, to challenge, object to, or seek to reclassify Claims and Interests (other than Allowed Super Senior Notes Claims and Allowed Existing Notes Claims) are expressly reserved.

**K.     Effective Date**

74.     Except as otherwise provided herein, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Documents, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims against or Interests in the Debtor (irrespective of whether their Claims or Interests are presumed to have accepted or deemed to have rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions

35

Exhibit 21
Page 2977

described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor or the Reorganized Debtor.

**L.      Restructuring Transactions**

75.      The Debtor or the Reorganized Debtor, as applicable, are authorized to implement and consummate the Restructuring Transactions (as may be modified, amended, and supplemented pursuant to the provisions of the Plan governing such modifications, amendments, and supplements) pursuant to the Plan, the Plan Documents, and this Confirmation Order, and are authorized to execute and deliver all necessary documents or agreements required to perform their obligations thereunder.   The Restructuring Transactions pursuant to the Plan and the Plan Documents are approved and authorized in all respects.  The Debtor or the Reorganized Debtor, as applicable, are authorized and directed, without the need for any future corporate action, to take all actions necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, agreements, or other documents created or executed in connection with the Plan, the Plan Documents, and the Restructuring Transactions.  In accordance with section 1142 of the Bankruptcy Code and applicable nonbankruptcy law, such actions may be taken without further action by stockholders, members, managers, directors, or partners.

**M.      Restructuring Steps**

76.      On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the transactions contemplated under the Restructuring Steps Memorandum set forth in the Plan Supplement and pursuant to and in accordance with any of the Plan Documents, the Plan and this Confirmation Order, and (b) execute and deliver, perform under, consummate, and implement

Exhibit 21
Page 2978

additional instruments and documents that may be reasonably necessary or desirable to consummate the Restructuring Steps.

77.     As of the Effective Date, and subject to the provisions of the Plan and this Confirmation Order, all persons and entities are hereby forever prohibited and permanently enjoined from taking any action that would adversely affect or interfere with the consummation of the Restructuring Transactions.  For the avoidance of doubt, nothing contained in this paragraph or in this Confirmation Order is intended to limit, alter, amend, or modify any of the rights and duties of the parties under any of the Plan Documents.

**N.     Distributions**

78.     All distributions pursuant to the Plan shall be made in accordance with Article VI of the Plan, and such methods of distribution are approved.  The Reorganized Debtor shall have no duty or obligation to make distributions to any Holder of an Allowed Claim unless and until such Holder executes and delivers, in a form acceptable to the Reorganized Debtor, any and all documents applicable to such distributions in accordance with Article VI of the Plan.

**O.     New Governance Documents and Issuance and Distribution of Reorganized Rockley Equity Under New Governance Documents**

79.     On the Effective Date, the Reorganized Debtor shall enter into the transaction documents and agreements contemplated by the New Governance Documents.  The Court hereby (i) approves the New Governance Documents (including the transactions and agreements contemplated thereby) and all actions to be taken, undertakings to be made, obligations to be incurred by the Debtor or the Reorganized Debtor, as applicable, pursuant to the New Governance Documents and (ii) authorizes the Debtor or the Reorganized Debtor, as applicable, to (A) execute and deliver those documents and agreements necessary and appropriate to enter into the New Governance Documents and issue the Reorganized Rockley Equity and incur and pay any fees,

37

Exhibit 21
Page 2979

indemnities, expenses and other payments provided for in the New Governance Documents; (B) enter into, perform under, and consummate the transactions contemplated by the New Governance Documents, including the issuance of Reorganized Rockley Equity; and (C) distribute and issue the Reorganized Rockley Equity in one or more issuances in accordance with the terms and conditions set forth in the Plan applicable to such distribution or issuance and the New Governance Documents, and any other documents, agreements or instruments evidencing or relating to such distribution or issuance, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Governance Documents). All of the shares or units of Reorganized Rockley Equity issued pursuant to the Plan and the New Governance Documents shall be duly authorized, validly issued, fully paid, and non-assessable.

80. Each distribution and issuance of the Reorganized Rockley Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New Governance Documents, and any other documents, agreements or instruments evidencing or relating to such distribution or issuance, which terms shall bind each Entity receiving Reorganized Rockley Equity under the Plan, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Governance Documents). For the avoidance of doubt, the acceptance of Reorganized Rockley Equity by any Holder of an Allowed Super Senior Notes Claim or an Allowed Existing Notes Claim shall constitute such Holder's agreement to be bound

Exhibit 21
Page 2980

by the New Governance Documents, as each may be amended or modified from time to time in accordance with its terms.

81. To the extent advisable or required under the Plan or applicable nonbankruptcy law, the Reorganized Debtor is authorized to file its New Governance Documents before, on or after the Effective Date with the applicable authorities in the state, province, or country of incorporation or formation in accordance with applicable corporate or formational laws of such state, province, or country of incorporation. After the Effective Date, the Reorganized Debtor may amend, amend and restate, supplement, or modify the New Governance Documents, and the Reorganized Debtor may file its certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the New Governance Documents and applicable law.

82. Notwithstanding anything to the contrary in the New Governance Documents, in accordance with section 1123(a)(6) of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, is prohibited from issuing any non-voting equity securities under the Plan; *provided*, that the foregoing restriction (i) shall have no force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code; (ii) shall only have such force and effect for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Debtor; and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

**P.**      **Private Placement Documents and Issuance and Distribution of Reorganized Rockley Equity Under Private Placement Documents**

83. The Reorganized Debtor and the Prepetition Noteholders that elect to participate in the Private Placement (each, a "**Private Placement Purchaser**") shall enter into the Private Placement Documents. The Court hereby (i) approves the Private Placement Documents, the issuance of Reorganized Rockley Equity, and all other actions to be taken, undertakings to be

39

Exhibit 21
Page 2981

made, obligations to be incurred, and fees and expenses to be paid by the Debtor or the Reorganized Debtor, as applicable, pursuant to the Private Placement Documents, including the payment or reimbursement of any fees, indemnities and expenses under or pursuant to any such documents and agreements in connection therewith; and (ii) authorizes the Debtor or the Reorganized Debtor, as applicable, to (A) execute and deliver the Private Placement Documents and any other documents, agreements or instruments evidencing or relating to the distribution or issuance of Reorganized Rockley Equity under the Private Placement Documents, and incur and pay any fees, indemnities, expenses and other payments provided for in the Private Placement Documents; (B) enter into, perform under, and consummate the transactions contemplated by the Private Placement Documents; and (C) issue the Reorganized Rockley Equity in accordance with the terms of the Private Placement Documents without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Private Placement Documents and the New Governance Documents). All of the shares or units of Reorganized Rockley Equity issued pursuant to the Plan and the Private Placement Documents shall be duly authorized, validly issued, fully paid, and non-assessable.

84. The issuance of Reorganized Rockley Equity in connection with the Private Placement Documents will be governed by the terms of the Plan, Private Placement Documents, and the New Governance Documents, which terms shall bind each Entity receiving Reorganized Rockley Equity. For the avoidance of doubt, the acceptance of Reorganized Rockley Equity by any Private Placement Purchaser shall constitute such Private Placement Purchaser's agreement to the Private Placement Documents and the New Governance Documents, in each case as may be amended or modified from time to time in accordance with its terms. Without limiting the

40

Exhibit 21
Page 2982

foregoing, this Confirmation Order and the Plan (including any Plan Documents) shall be deemed sufficient and adequate notice of such terms, provisions, restrictions, and conditions to all Holders of Reorganized Rockley Equity, such that all such Holders shall be deemed to have actual knowledge thereof and shall be deemed to have acquired (whether on the Effective Date or from time to time thereafter) such Reorganized Rockley Equity subject to all such terms, provisions, restrictions, and conditions.

**Q.** **Securities Registration Exemption**

85.     All shares or units of Reorganized Rockley Equity issued under the Plan, the New Governance Documents, and the Private Placement Documents, as well as the Exit Financing issued under the Exit Financing Documents shall be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, to the extent not available, on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (and in each case, on equivalent state law registration exemptions) and shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to or in connection with the offering, issuance, distribution, or sale of securities. The offering, issuance, and distribution of the Reorganized Rockley Equity under the Plan and the Private Placement Documents and the Exit Financing is authorized.

86.     Under section 1145 of the Bankruptcy Code, the Reorganized Rockley Equity shall be freely tradeable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with rules and regulations of the Securities and Exchange Commission (the "**Commission**"), if any, applicable at the time of any future transfer of such

Exhibit 21
Page 2983

securities or instruments; (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Governance Documents and the Plan, as applicable; and (d) applicable regulatory approval, if any. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

87.     Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the Depository Trust Company ("**DTC**")) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the initial sale and delivery by the issuer thereof to the Holder of an Allowed Super Senior Notes Claim or an Allowed Existing Notes Claim is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

88.     On the Effective Date, the Reorganized Rockley Equity shall not be listed for public trading on any securities exchange, the Reorganized Debtor will not be a reporting company under the Securities Exchange Act of 1934, and the Reorganized Debtor shall not be required to file reports with the Commission or any other governmental entity.

**R.    Retained Assets**

89.     To the extent that the retention by the Debtor or the Reorganized Debtor, as applicable, of assets held immediately prior to emergence in accordance with the Plan is deemed, in any instance, to constitute a "transfer" of property, such transfer of property to the Debtor, the or Reorganized Debtor, as applicable, (i) is or shall be a legal, valid, and effective transfer of property; (ii) vests or shall vest the Debtor or the Reorganized Debtor, as applicable, with good title to such property, free and clear of all Liens, charges, Claims, encumbrances, or interests, except as expressly provided in the Plan, the other Plan Documents or this Confirmation Order;

42

Exhibit 21
Page 2984

(iii) does not and shall not constitute an avoidable transfer under the Bankruptcy Code or under applicable nonbankruptcy law; and (iv) does not and shall not subject the Debtor or the Reorganized Debtor, as applicable, to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including by laws affecting successor or transferee liability.

### S.      Treatment of Executory Contracts and Unexpired Leases

90.      The assumption of the Executory Contracts and Unexpired Leases listed on Exhibit A of the Plan Supplement (the "**Assumed Executory Contract and Unexpired Lease List**") is hereby authorized.  The Reorganized Debtor is also authorized to assume, and shall be deemed to have assumed, all other Executory Contracts or Unexpired Leases _unless_ an Executory Contract or Unexpired Lease: (i) previously was assumed, assumed and assigned, or rejected by the Debtor; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, including this Order, shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of this Court authorizing and providing for its assumption under applicable federal Law.

91.      To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan

43

Exhibit 21
Page 2985

shall not entitle the non-Debtor party(ies) thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, no Restructuring Transaction shall be deemed to violate the terms of any Unexpired Lease or Executory Contract assumed in connection with the Plan.

92. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption, assumption and assignment, or cure amount related thereto (if any) will be deemed to have assented to such assumption, assumption and assignment, or cure amount.

93. Subject to the Debtor's cure obligations, if any, under section 365 of the Bankruptcy Code, the assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Subject to the Debtor's cure obligations, if any, under section 365 of the Bankruptcy Code, any Proofs of Claim filed with respect to an assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Court. Any disputed cure amount shall be determined in accordance with the procedures set forth in Articles V.C and V.D of the Plan, and applicable bankruptcy and nonbankruptcy law.

94. The rejection of the Executory Contracts and Unexpired Leases on <u>Exhibit B</u> of the Plan Supplement and pursuant to the Plan or otherwise (the "**Rejected Executory Contract and Unexpired Lease List**") is hereby authorized and shall not constitute a termination of preexisting

Exhibit 21
Page 2986

obligations owed to the Debtor or the Reorganized Debtor, as applicable, under such Executory Contract or Unexpired Lease. Proofs of Claim with respect to Claims against the Debtor arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtor, the Reorganized Debtor, the Estate, or their property, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, order, or approval of this Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.C.5 of the Plan.

95. On the Effective Date, this Order shall constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in this Confirmation Order or the Plan shall modify or amend any Executory Contract or Unexpired Lease, any amendment thereof or any guaranty thereof that is being assumed pursuant to the Plan and this Confirmation

Exhibit 21
Page 2987

Order that has been duly executed by the Debtor or a third party, as applicable, on or before the date of the entry of this Confirmation Order.

## T.    Exit Financing

96.    On the Effective Date, the Reorganized Debtor shall enter into the Exit Financing (the terms of which are set forth in the Exit Financing Documents).  The Court hereby (i) approves the Exit Financing (including the Reorganized Debtor's entry into the Exit Financing Documents and all other transactions and related agreements contemplated thereby) and all other actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid, including the payment or reimbursement of any fees, indemnities and expenses under or pursuant to any such documents and agreements in connection therewith, by the Debtor or the Reorganized Debtor, as applicable, pursuant to the Exit Financing Documents and (ii) authorizes the Debtor or the Reorganized Debtor, as applicable, to (A) execute and deliver those documents and agreements necessary and appropriate to implement the Exit Financing, including the Exit Financing Agreements and the other Exit Financing Document, and incur or pay any fees and expenses pursuant to the Exit Financing Documents; (B) enter into, perform under, and consummate the transactions contemplated by the Exit Financing Documents; and (C) distribute the proceeds of the Exit Financing in accordance with the terms and conditions of the Exit Financing Documents, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Financing Documents).  On and as of the Effective Date, the Exit Financing Documents (including the Exit Financing proceeds distributed thereunder) shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtor, enforceable against the Reorganized Debtor and the other parties thereto,

46

Exhibit 21
Page 2988

as applicable, in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance.

97.     On and as of the Effective Date, all Liens and security interests to be granted under the Exit Financing Documents shall (a) be deemed granted; (b) be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the terms of the Plan and the Exit Financing Documents; (c) not be subject to recharacterization, equitable subordination or avoidance for any purposes whatsoever and shall not constitute preferential transfers or fraudulent transfers (or voidable transactions) under the Bankruptcy Code or any other applicable law; and (d) be deemed automatically perfected on the Effective Date and senior in priority to all other Liens, subject only to such Liens and security interests as may be permitted to be senior under the Exit Financing Documents.  The Exit Financing Representative (or its designee) is authorized to file, with the appropriate authorities, financing statements, amendments thereto, or assignments thereof and other documents, including amendments or assignments thereof to evidence the Liens and security interests granted by the Exit Financing Documents.  The Reorganized Debtor and the Persons granting such Liens and security interests are authorized to make all filings and recordings, and to obtain any governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, foreign or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of this Confirmation Order, and any such filings, recordings, approvals and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice

Exhibit 21
Page 2989

of such Liens and security interests to third parties. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, this Court's retention of jurisdiction shall not govern the enforcement of the Exit Financing Documents, or any other documents executed in connection with the Exit Financing or any rights or remedies related thereto, such enforcement shall be dealt with in accordance with the provisions of the applicable Exit Financing Document.

## U.      **Exemption From Transfer Taxes**

98.      To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Entity) of property under the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor (including any Exit Financing, Private Placement or Reorganized Rockley Equity); (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; or (v) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other

48

Exhibit 21
Page 2990

documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## V. **Filing and Recording**

99.     This Confirmation Order is, and shall be, binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every foreign, federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions under the Plan.

## W. **Tax Withholding**

100.    In accordance with the provisions of the Plan and subject to Article VI.D.8 of the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions

Exhibit 21
Page 2991

necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Distribution Agent believes is reasonable and appropriate.

## X.  **Governmental Approvals Not Required**

101.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

## Y.  **Insurance Policies and Agreements**

102.    Insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements are considered to be Executory Contracts or Unexpired Leases, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of this Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto

Exhibit 21
Page 2992

prior to the Effective Date, no payments shall be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy.

**Z.      Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies**

103.      Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or this Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees or officers of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest voted to accept or reject the Plan.  This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions

51

Exhibit 21
Page 2993

taken to effectuate the Plan, including by any agent, shall be given the same effect as if such actions were performed under the applicable nonbankruptcy laws that govern the documents under which such agent was appointed.

104.    In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and without any further notice to or action, order, or approval of the Court, after the Effective Date the Reorganized Debtor may compromise and settle Claims against, and Interests in, the Debtor and its Estate and Causes of Action against other Entities.

**AA.    <u>Releases, Injunction, Exculpation and Related Provisions Under the Plan</u>**

105.    Except to the extent expressly modified by this Confirmation Order, the releases, injunctions, exculpations, and related provisions in Article VIII of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action of this Court or any other party.  Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the release, discharge and injunction provisions of this Confirmation Order and the Plan shall not waive, discharge, release, impair or otherwise affect any debts or other obligations of any non-Debtor affiliate of the Debtor or the Reorganized Debtor.

106.    Pursuant to Bankruptcy Rule 3020(c)(1), the following provision in Article VIII.G of the Plan will be immediately effective on the Effective Date:

> **EFFECTIVE AS OF THE EFFECTIVE DATE, PURSUANT TO SECTION 524(A) OF THE BANKRUPTCY CODE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE**

52

Exhibit 21
Page 2994

DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE REORGANIZED DEBTOR, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE EFFECTIVE DATE, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND THEIR RESPECTIVE RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN. EXCEPT AS OTHERWISE SET FORTH IN THE CONFIRMATION ORDER, EACH HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST, AS APPLICABLE, BY ACCEPTING, OR BEING ELIGIBLE TO ACCEPT, DISTRIBUTIONS UNDER OR REINSTATEMENT OF SUCH CLAIM OR INTEREST, AS APPLICABLE, PURSUANT TO THE PLAN, SHALL BE DEEMED TO HAVE CONSENTED TO THE INJUNCTION PROVISIONS SET FORTH IN THIS ARTICLE VIII.G.

Exhibit 21
Page 2995

107. Notwithstanding paragraph 106, nothing in the Plan shall be construed to release any non-Debtors from any Claims and Causes of Action held by Holders of Interests in the Debtor and Holders of General Unsecured Claims against the Debtor.

108. The injunction provisions in Article VIII.G of the Plan are (i) within the jurisdiction of this Court; (ii) necessary to preserve and enforce the releases in Articles VIII.C, VIII.D, and VIII.E of the Plan, the exculpation provisions in Article VIII.F of the Plan, and the compromises and settlements implemented under the Plan; and (iii) are narrowly tailored to achieve these purposes.

### BB. Post-Confirmation Notice

109. In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) days after the Effective Date, the Debtor shall cause a notice of Confirmation and occurrence of the Effective Date, substantially in the form attached as **Exhibit B** (the "**Notice of Confirmation and Effective Date**") to be served on all parties served with the Combined Hearing Notice by email or, to the extent the Claims, Noticing, and Solicitation Agent does not have a party's email address on file, by U.S. first-class mail, postage prepaid.

110. The Notice of Confirmation and Effective Date will have the effect of an order of the Court, will constitute sufficient notice of entry of this Confirmation Order and occurrence of the Effective Date to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

### CC. Cancelation of Liens; Surrender and Cancelation of Notes, Instruments, Certificates, and Other Documents Evidencing Claims

111. Except as otherwise provided in the Plan and Plan Documents (including without limitation the Exit Financing Documents), on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to the Plan, all mortgages, deeds of trust,

54

Exhibit 21
Page 2996

Liens, pledges, charges, encumbrances related to any Claim or Interest, or other security interests against any property of the Estate, other than any Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan, shall be fully released and discharged, subject to the consummation of the applicable distributions contemplated in the Plan. The Holders of such mortgages, deeds of trust, Liens, pledges, or Other Secured Claims (other than Other Secured Claims that are Reinstated pursuant to the Plan) shall be authorized and directed to release any collateral or other property of the Debtor (including any Cash collateral) held by such Holder and to take such actions as may be reasonably requested by the Debtor (or the Reorganized Debtor, as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtor (or the Reorganized Debtor, as the case may be). Except to the extent otherwise provided in the Plan and Plan Documents (including without limitation the Exit Financing Documents), on the Effective Date, all notes, instruments, certificates, indentures and other documents evidencing Claims, including the Prepetition Notes Claims, shall be cancelled, the Prepetition Trustee on account of the Prepetition Notes Claims shall be automatically relieved of any further obligations under the Prepetition Notes Documents, and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code; *provided, however*, that the Prepetition Notes Documents shall survive the Effective Date, shall not be subject to the releases set forth in Article VIII of the Plan, and shall continue in effect solely for the purposes of, with respect to the Prepetition Trustee, (i) allowing the Prepetition Trustee to receive distributions from the Debtor and to make further distributions to the applicable Holders of Claims (subject to any applicable charging liens), if applicable, and allowing such Holders to accept distributions on account of such Claims; (ii) maintaining, enforcing, and exercising any right or obligation to compensation

55

Exhibit 21
Page 2997

(including any fees and expenses), indemnification, exculpation, expense reimbursement, or contribution, or any other claim or entitlement that any Prepetition Trustee may have under the Prepetition Notes Documents or principle of law against any money or property distributed or allocable on account of such Claims and permitting any Prepetition Trustee to maintain, enforce and exercise its charging liens and priority of payment rights in connection with the foregoing; (iii) seeking compensation and reimbursement for any reasonable and documented fees and expenses incurred by or on behalf of the Prepetition Trustee in connection with the implementation of the Plan or this Confirmation Order; (iv) allowing the Prepetition Trustee to enforce its rights, claims, and interests against any Person or Entity that is not a Released Party; (v) preserving the right of the Prepetition Trustee to indemnification from the Debtor or any other Entity pursuant and subject to the terms of the applicable Prepetition Notes Documents, including for the purposes of and relating to any steps or actions taken by the Prepetition Trustee or documents, agreements, releases, or instruments entered into by the Prepetition Trustee in connection with the implementation of the Plan; (vi) permitting and directing the Prepetition Trustee to perform any functions that are necessary to effectuate any of the foregoing or any provisions of the Plan and this Confirmation Order; and (vii) preserving the Prepetition Trustee's right to appear and be heard in the Chapter 11 Case or in any other proceeding before or in the Bankruptcy Court, including to enforce any obligations owed to the Prepetition Trustee under the Plan or Confirmation Order or under the Prepetition Notes Documents; *provided*, *further*, that all provisions in the Prepetition Notes Documents which by their own terms survive the termination, discharge, expiration or maturity thereof, shall also survive and continue in full force and effect. Holders of or parties to such cancelled notes, securities, instruments, certificates, and other documents will have no rights arising from or relating to such notes, securities, instruments, certificates, and other documents, or

56

Exhibit 21
Page 2998

the cancellation thereof, except the rights provided for pursuant to this paragraph and the other provisions of the Plan.

**DD.** **U.S. Securities and Exchange Commission**

112. As to the Commission, notwithstanding any language to the contrary in the Plan or this Confirmation Order, no provision thereof or hereof shall: (i) preclude the Commission from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the Commission from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor person or non-Debtor entity in any forum.

**EE.** **Effect of Confirmation Order and Other Orders**

113. Unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in this Chapter 11 Case pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 9019.

**FF.** **Inconsistency**

114. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in this Confirmation Order). In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and this Confirmation Order on the other hand, this Confirmation Order shall control.

**GG.** **Injunctions and Automatic Stay**

115. Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code

Exhibit 21
Page 2999

or any order of the Court, and extant on this Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order), shall remain in full force and effect through and including the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

## HH.    Authorization to Consummate

116.    The Debtor is authorized to consummate the Plan and the Restructuring Transactions and finalize and implement the Plan Documents at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the Required Financing Parties under the Exit Financing Agreements) of the conditions precedent to consummation set forth in Article IX of the Plan.

## II.    Substantial Consummation

117.    On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

## JJ.    Severability

118.    Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, and the Definitive Documents, are mutually dependent and non-severable. This Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the Definitive Documents are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (iii) non-severable and mutually dependent.

Exhibit 21
Page 3000

**KK.    Effect of Non-Occurrence of Effective Date**

119.    If the Effective Date does not occur with respect to the Debtor, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or this Confirmation Order shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtor; (ii) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders, or any other Entity in any respect.

**LL.    Debtor's Actions Post-Confirmation Through the Effective Date**

120.    Until the Effective Date, the Debtor shall continue to operate its business as a debtor-in-possession, subject to the Court's oversight as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Court that is in full force and effect.

**MM.    Reports**

121.    After the Effective Date, the Debtor has no obligation to file with this Court or serve on any parties reports that the Debtor was obligated to file under the Bankruptcy Code or a prior order of the Court, including monthly operating reports (except for any periods for which a monthly operating report was not filed before the Confirmation Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided*, *however*, that the Debtor shall continue to comply with the U.S. Trustee's quarterly reporting requirements.

**NN.    Conditions to Effective Date**

122.    The Plan shall not become effective unless and until the conditions in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.

Exhibit 21
Page 3001

**OO.   Waiver of Stay**

123.   Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004(h)), this Confirmation Order is effective immediately and not subject to any stay, sufficient cause having been shown.

**PP.   Modification of Plan Supplement**

124.   Subject to the terms of the Plan and this Confirmation Order, the Debtor is authorized to modify and amend the Plan Supplement through and including the Effective Date, and to take all actions necessary and appropriate to effectuate the transactions contemplated therein.

**QQ.   Post-Confirmation Modification of the Plan**

125.   Subject to the terms of the Plan and this Confirmation Order, the Debtor is authorized to amend or modify the Plan (with the consent of the Required Financing Parties) at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Article X.A of the Plan, without further order of this Court.

**RR.   No Waiver/References to and Omissions of Plan Provisions**

126.   References to articles, sections, documents and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, document or provision nor constitute a waiver thereof, an such article, section, document or provision shall have the same validity, binding effect, and enforceability as every other article, section, document, or provision of the Plan, it being the intent of the Court that the

60

Exhibit 21
Page 3002

Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**SS.** **Reservation of Rights**

127. The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtor, the Prepetition Noteholders, or any other Person with respect to Claims against and Interests in the Debtor.

**TT.** **Final Order**

128. The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order. The period in which an appeal with respect to this Confirmation Order must be filed shall commence immediately upon the entry of this Confirmation Order.

**UU.** **Local Rules 3021-1 and 3022-1**

129. Pursuant to Local Rule 3021-1, the timetable for achieving substantial consummation of the Plan and entry of a final decree closing this Chapter 11 Case is as follows:

    a. Substantial Consummation of the Plan. The Debtor anticipates that the Effective Date and substantial consummation of the Plan will occur on March 10, 2023, or as soon as reasonably practicable thereafter.

    b. Distributions. Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim on the Effective Date, on the next occurring Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest) each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests (as applicable) in each applicable Class and in the manner provided in the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Interests, distributions on account of any such

61

Exhibit 21
Page 3003

Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

c.  Resolution of Claims. The Reorganized Debtor, with the consent of the Required Financing Parties under the Exit Financing Agreements shall resolve Disputed Claims against the Debtor's Estate consistent with the provisions of Article VII of the Plan.

d.  Post-Confirmation Status Reports. The Reorganized Debtor will file post-Confirmation disbursement and status reports every six (6) months until this Chapter 11 Case is closed by means of a final decree, converted to a case under chapter 7, or dismissed, whichever happens earlier.

e.  Motion for Final Decree. Consistent with Bankruptcy Rule 3022 and Local Rule 3022-1, within fourteen (14) days following the full administration of the Debtor's Estate, the Reorganized Debtor will file, on notice to the U.S. Trustee, an application and a proposed order for a final decree.

## VV.  **Retention of Jurisdiction**

130.  Notwithstanding the entry of this Confirmation Order, from and after the Effective Date, this Court shall, to the fullest extent legally permissible, retain exclusive jurisdiction over this Chapter 11 Case and all matters arising under, arising out of, or related to, this Chapter 11 Case, including all matters listed in Article XI of the Plan or addressed by this Confirmation Order, as well as for the purposes set forth in section 1142 of the Bankruptcy Code.

Dated: March 10, 2023
New York, New York

**/s/ Lisa G. Beckerman**
HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE

62

Exhibit 21
Page 3004

**Exhibit A**

Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization
of Rockley Photonics Holdings Limited

Exhibit 21
Page 3005

**Exhibit B**

Notice of Confirmation and Effective Date

Exhibit 21
Page 3006

**Exhibit A**

Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization
of Rockley Photonics Holdings Limited

Exhibit 21
Page 3007

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ROCKLEY PHOTONICS HOLDINGS LIMITED,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-10081 (LGB) |

---

### REVISED SECOND AMENDED PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS LIMITED

---

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
31 West 52nd Street
New York, NY 10019-6131
Phone: (212) 858-1000
Fax: (212) 858-1500
john.pintarelli@pillsburylaw.com
dania.slim@pillsburylaw.com
kwame.akuffo@pillsburylaw.com
alana.lyman@pillsburylaw.com

*Counsel for the Debtor*
*and Debtor-in-Possession*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Joshua D. Morse (admitted *pro hac vice*)
Jonathan Doolittle (admitted *pro hac vice*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
joshua.morse@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom WA14 2DT.

## **TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES .................................................. 2

    A.  Defined Terms ........................................................................................... 2

    B.  Rules of Interpretation .............................................................................. 14

    C.  Computation of Time ................................................................................ 15

    D.  Governing Law ......................................................................................... 15

    E.  Controlling Documents ............................................................................ 16

    F.  Deemed Acts ............................................................................................ 16

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ........................................ 16

    A.  Administrative Claims ............................................................................. 16

    B.  Professional Fee Claims ........................................................................... 17

        1.  Professional Fee Escrow Account ............................................... 17
        2.  Final Fee Applications and Payment of Professional Fee Claims ............... 17
        3.  Professional Fee Escrow Amount ............................................... 18
        4.  Post Confirmation Date Fees and Expenses ................................ 18

    C.  Priority Tax Claims .................................................................................. 18

    D.  Statutory Fees .......................................................................................... 19

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ................................................................................................... 19

    A.  Classification of Claims and Interests ..................................................... 19

    B.  Summary of Classification ....................................................................... 20

    C.  Treatment of Classes of Claims and Interests ......................................... 20

        1.  Class 1 — Other Secured Claims ............................................... 20
        2.  Class 2 — Other Priority Claims ............................................... 21
        3.  Class 3 — Super Senior Notes Claims ....................................... 22
        4.  Class 4 — Existing Notes Claims ............................................... 22
        5.  Class 5 — General Unsecured Claims ........................................ 23
        6.  Class 6 — Intercompany Claims ............................................... 24
        7.  Class 7 — Interests in the Debtor ............................................... 24
        8.  Class 8 — Section 510(b) Claims ............................................... 24

    D.  Special Provision Governing Unimpaired Claims .................................... 25

    E.  Elimination of Vacant Classes ................................................................ 25

    F.  Voting Classes; Deemed Acceptance by Non-Voting Classes ................. 25

    G.  Subordinated Claims ............................................................................... 25

    H.  Existing Subsidiary Interests ................................................................... 25

I. Controversy Governing Impairment ............................................................... 26

J. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 26

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 26

A. Restructuring Transactions ............................................................................. 26

B. Sources of Consideration for Plan Distributions .............................................. 27
   1. Reorganized Rockley Equity ......................................................... 27
   2. Exit Financing ............................................................................... 27
   3. Prepetition Noteholder Private Placement .................................... 28
   4. Cash on Hand ................................................................................ 29

C. Management Incentive Program ...................................................................... 29

D. Exemption from Registration Requirements .................................................... 29

E. Tax Returns .................................................................................................... 30

F. Corporate Existence ....................................................................................... 30

G. Corporate Action ............................................................................................ 30

H. Vesting of Assets in the Reorganized Debtor .................................................. 31

I. Cancellation of Notes, Instruments, Certificates, and Other Documents ......... 31

J. Section 1146(a) Exemption ............................................................................. 32

K. Compensation and Benefit Programs .............................................................. 32

L. Effectuating Documents and Further Transactions .......................................... 33

M. New Governance Documents .......................................................................... 33

N. Directors and Officers .................................................................................... 33

O. Preservation of Causes of Action .................................................................... 34

P. Payment of Certain Fees ................................................................................. 34

Q. Reporting Company Requirements .................................................................. 35

R. Concurrent Cayman Restructuring Process ..................................................... 35

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................................. 35

A. Assumption of Executory Contracts and Unexpired Leases ............................. 35

B. Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired
   Leases ............................................................................................................. 36

C. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 36

D. Cure of Defaults and Objections to Cure and Assumption ............................... 37

E. Insurance Policies ........................................................................................... 38

F. Indemnification Provisions ............................................................................. 39

ii

4884-8539-0165.v2
Exhibit 21
Page 3010

G. Modifications, Amendments, Supplements, Restatements, or Other Agreements .......... 39

H. Reservation of Rights .................................................................................................... 39

I. Nonoccurrence of Effective Date .................................................................................. 40

J. Contracts and Leases Entered Into After the Petition Date ........................................... 40

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 40

A. Distributions on Account of Claims or Interests Allowed as of the Effective Date ........ 40

B. Timing and Calculation of Amounts to Be Distributed .................................................. 41

C. Distribution Agent ......................................................................................................... 41

    1. Rights and Powers of Distribution Agent .................................................................. 41

D. Delivery of Distributions ............................................................................................... 41

    1. Delivery of Distributions in General .......................................................................... 41
    2. Record Date for Distributions .................................................................................... 42
    3. Special Rules for Distributions to Holders of Disputed Claims and Interests ............ 42
    4. No Fractional Distributions ........................................................................................ 42
    5. Minimal Distributions ................................................................................................ 42
    6. Unclaimed Distributions and Unclaimed Property ...................................................... 43
    7. Manner of Payment .................................................................................................... 43
    8. Compliance Matters ................................................................................................... 43
    9. No Postpetition or Default Interest on Claims ............................................................ 43
    10. Allocation Between Principal and Accrued Interest .................................................... 43
    11. Setoffs and Recoupment ............................................................................................ 44
    12. Foreign Currency Exchange ....................................................................................... 44
    13. Claims Paid or Payable by Third Parties .................................................................... 44

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................................................. 45

A. Disputed Claims Process ............................................................................................... 45

B. Allowance of Claims ...................................................................................................... 45

C. Claims Administration Responsibilities ......................................................................... 46

D. Adjustment to Claims or Interests Without Objection .................................................... 46

E. Reservation of Rights to Object to Claims ..................................................................... 46

F. Estimation of Claims ..................................................................................................... 46

G. Disputed and Contingent Claim Reserve ....................................................................... 47

H. Disallowance of Claims ................................................................................................. 47

I. Amendments to Proofs of Claim or Interests .................................................................. 48

J. No Distributions Pending Allowance ............................................................................. 48

K. Distributions After Allowance ....................................................................................... 48

iii

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................................................................................ 48

   A. Compromise and Settlement of Claims, Interests, and Controversies ............................ 48

   B. Discharge of Claims and Termination of Interests ............................................ 49

   C. Release of Liens ............................................................................ 49

   D. Debtor Release ............................................................................ 50

   E. Third-Party Release ........................................................................ 51

   F. Exculpation ................................................................................ 52

   G. Injunction .................................................................................. 53

   H. Protection Against Discriminatory Treatment ............................................... 54

   I. Reimbursement or Contribution ............................................................. 54

   J. Recoupment ................................................................................ 54

   K. Term of Injunctions or Stays ............................................................... 54

   L. Document Retention ........................................................................ 54

   M. U.S. Securities and Exchange Commission ................................................. 55

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................... 55

   A. Condition Precedent to Confirmation ...................................................... 55

   B. Conditions Precedent to the Effective Date ................................................. 55

   C. Waiver of Conditions to the Effective Date ................................................. 56

   D. Substantial Consummation ................................................................. 57

   E. Effect of Non-occurrence of Conditions to Consummation ................................. 57

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......... 57

   A. Modification of Plan ....................................................................... 57

   B. Effect of Confirmation on Modification .................................................... 57

   C. Revocation or Withdrawal of Plan ......................................................... 58

ARTICLE XI RETENTION OF JURISDICTION ............................................................ 58

ARTICLE XII MISCELLANEOUS PROVISIONS .......................................................... 60

   A. Binding Effect ............................................................................. 60

   B. Additional Documents ..................................................................... 61

   C. Statutory Fees ............................................................................. 61

   D. Notices .................................................................................... 61

   E. Reservation of Rights ...................................................................... 62

   F. Successors and Assigns .................................................................... 62

iv

G.  Entire Agreement ............................................................................................ 62

H.  Non-severability ............................................................................................. 62

I.   Plan Supplements and Exhibits ...................................................................... 62

J.   Good Faith Solicitation of Votes ................................................................... 63

K.  Waiver/Estoppel ............................................................................................. 63

v

## INTRODUCTION

Rockley Photonics Holdings Limited, as debtor and debtor-in-possession (the "**Debtor**"), proposes this prepackaged plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtor pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I of the Plan.

The Debtor seeks to consummate the Restructuring Transactions on the Effective Date of the Plan. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. This Plan is supported by the Prepetition Noteholders who collectively hold Super Senior Notes in aggregate principal amount of approximately $90.65 million and Existing Notes in aggregate principal amount of approximately $29.31 million.

Reference is made to the Disclosure Statement for a discussion of the Debtor's history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

Holders of Claims against and Interests in the Debtor should refer to the Disclosure Statement for a discussion of the Debtor's history, business, properties, operations, historical financial information, projections of future operations, and risk factors, as well as a summary and description of the Plan, the Restructuring Transactions that the Debtor seeks to consummate on the Effective Date of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I

4884-8539-0165.v2

Exhibit 21
Page 3014

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

### A.    *Defined Terms*

The following terms shall have the respective meanings specified below when used in capitalized form in the Plan.

**1.**    "*Administrative Claim*" means a Claim against the Debtor for the costs and expenses of administration of the Chapter 11 Case arising on or prior to the Effective Date pursuant to sections 328, 330, or 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate and operating the Debtor's business; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**2.**    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

**3.**    "*Agreed Equity Value*" means a total equity value of the Reorganized Debtor as of the Effective Date of $80 million.

**4.**    "*Allowed*" means, with respect to any Claim against or Interest in the Debtor, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest allowed pursuant to the Plan or a Final Order of the Bankruptcy Court (including the Cash Collateral Orders); *provided* that, with respect to a Claim described in clauses (a) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof is Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so Filed and the Claim has been allowed by a Final Order.   For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtor may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable Law.   Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtor or Reorganized Debtor, as applicable.   "*Allow*" and "*Allowing*" shall have correlative meanings.

**5.**    "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtor or the Reorganized Debtor, as applicable, of certain Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtor pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtor or Reorganized Debtor, as applicable, in accordance with the Plan, which list, if applicable, shall be included in

2

the Plan Supplement; *provided* that such list shall be in form and substance acceptable to the Prepetition Noteholders.

**6.** "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and similar applicable non-bankruptcy Law.

**7.** "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

**8.** "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having competent jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of the reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

**9.** "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

**10.** "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

**11.** "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable. All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

**12.** "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

**13.** "*Cash Collateral Order*s" means, collectively, the interim and final orders approving the Debtor's consensual use of Cash Collateral, in each case, as entered by the Bankruptcy Court in the Chapter 11 Case.

**14.** "*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, interest, guaranty, suit, obligation, liability, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, indemnity, guarantee, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, existing or hereinafter arising, fixed or contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in Law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, or pursuant to any other theory of Law or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtor, that the Debtor, its Estate, or the Reorganized Debtor would have been legally entitled to assert, in its own right (whether individually or collectively), or on behalf of the Holder

3

of any Claim against, or Interest in, the Debtor or other Entity, or that could have been asserted on behalf of the Debtor, its Estate, or the Reorganized Debtor. For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign Law, or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

15. "*Cayman Petition*" means the petition the Debtor will issue in the Grand Court of the Cayman Islands seeking the appointment of a restructuring officer to oversee / implement the Debtor's proposed restructuring pursuant to the Plan.

16. "*Cayman Proceeding*" means the restructuring proceedings commenced by filing the Cayman Petition on or immediately after the Petition Date.

17. "*Chapter 11 Case*" means (a) when used with reference to the Debtor, the case pending for the Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

18. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, whether or not assessed or Allowed.

19. "*Claims Objection Deadline*" means the deadline to object to Claims, which shall be the later of (a) sixty (60) days after the Effective Date and (b) sixty (60) days after the Filing of the applicable Proof of Claim, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.

20. "*Claims, Noticing, and Solicitation Agent*" means Kroll Restructuring Administration LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Case for the Debtor and any successors appointed by an order of the Bankruptcy Court.

21. "*Claims Register*" means the official register of Claims against the Debtor maintained by the Claims, Noticing, and Solicitation Agent.

22. "*Class*" means a class of Claims against, or Interests in the Debtor as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

23. "*Commission*" means the U.S. Securities and Exchange Commission.

24. "*Compensation and Benefits Programs*" means, if any, the Debtor's employee employment, wages, compensation, and benefits plans and policies, workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, policies, and guidelines, incentive and retention plans, life and accidental death and dismemberment insurance plans, and programs, including all retiree benefits as defined in section 1114 of the Bankruptcy Code, and all amendments and modifications thereto, applicable to any of the Debtor's employees, former employees, retirees, non-employee directors, and other individual service providers, in each

4884-8539-0165.v2

Exhibit 21
Page 3017

case existing with the Debtor immediately prior to the Effective Date; *provided* that any equity awards and associated equity award agreements held by any of the Debtor's employees, former employees, retirees, non-employee directors, and other individual service providers under any equity plans shall not constitute a Compensation and Benefits Program.

25.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

26.     "*Confirmation Date*" means the date on which Confirmation occurs.

27.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and *sections* 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

28.     "*Confirmation Objection Deadline*" means the deadline by which objections to confirmation of the Plan must be received by the Debtor and Filed on the Bankruptcy Court's docket.

29.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

30.     "*Consummation*" means the occurrence of the Effective Date.

31.     "*Cure Amounts*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in the Assumed Executory Contract and Unexpired Lease List) that is to be assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code; *provided* that if no Cure Amount is listed for any assumed Executory Contract or Unexpired Lease, the Cure Amount shall be $0.00.

32.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by the Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

33.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by the Debtor and/or its Affiliates as of the Petition Date for liabilities against the Debtor's current or former directors, managers, and officers, and all agreements, documents, or instruments relating thereto.

34.     "*Debtor*" means Rockley Photonics Holdings Limited as debtor and debtor-in-possession in the Chapter 11 Case.

35.     "*Debtor Release*" means the release granted by the Debtor and the Estate to the Released Parties as set forth in Article VIII.D of the Plan.

5

36. "*Debtor Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) each of the Prepetition Noteholders; (d) the Prepetition Trustee; (e) each of the Exit Financing Parties; (f) the Exit Financing Representative; and (g) each Related Party of each Entity set forth in clause (a) through this clause (g)

37. "*Definitive Documents*" means (a) the Plan and the Plan Supplement (and all exhibits, annexes, schedules, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the order approving the same and the Solicitation Materials; (d) the Cash Collateral Orders; (e) the first day motions and all orders sought pursuant thereto; (f) the Exit Financing Documents; (g) any and all documentation required to implement, incur, issue, and distribute the Reorganized Rockley Equity, or the Exit Financing, including any material disclosure documents related thereto; (h) the New Governance Documents; and (i) any and all other material documents, deeds, agreements, filings, notifications, letters or instruments necessary or required to consummate the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto), which shall, in each case, be consistent with this Plan; *provided* that such Definitive Documents shall be in form and substance acceptable to the Prepetition Noteholders.

38. "*Disclosure Statement*" means the disclosure statement for the Plan, as may be amended, supplemented or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable Law.

39. "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement (which order may be the Confirmation Order).

40. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; *provided*, *however*, that in no event shall a Claim that is deemed Allowed pursuant to this Plan be a Disputed Claim.

41. "*Distribution Agent*" means the Reorganized Debtor or any Entity the Reorganized Debtor selects to make or to facilitate distributions in accordance with the Plan.

42. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtor or the Reorganized Debtor, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Allowed Interests entitled to receive distributions under the Plan.

43. "*Distribution Record Date*" means, other than with respect to publicly-traded securities of the Debtor deposited with DTC, the record date for purposes of making distributions

6

under the Plan on account of Allowed Claims, which date shall be the Confirmation Date, or such other date as is announced by the Debtor or designated in a Final Order. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly-traded securities of the Debtor, the holders of which shall receive distributions in accordance with Article VI.D of the Plan and, as applicable, customary procedures of DTC.

44. "*DTC*" means The Depository Trust Company.

45. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

46. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

47. "*Estate*" means the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

48. "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., as now in effect or hereafter amended, and any rules and regulations promulgated thereunder.

49. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) each of the Prepetition Noteholders; (d) each of the Exit Financing Parties; (e) the Prepetition Trustee; (f) the Exit Financing Representative; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (h); and (h) each Related Party of each Entity in clause (a) through this clause (h).

50. "*Executory Contract*" means a contract or lease to which one or more of the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

51. "*Existing Notes*" means all Convertible Senior Secured Notes due 2026 issued under the Existing Notes Indenture.

52. "*Existing Notes Claims*" means any Claim arising under or related to the Existing Notes Indenture and the Existing Notes.

53. "*Existing Notes Indenture*" means that certain Indenture, dated as of May 27, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among the Debtor, the non-debtor guarantors party thereto comprising of all current and future direct and indirect subsidiaries of Debtor, other than immaterial subsidiaries; and the Existing Notes Trustee.

54. "*Existing Notes Trustee*" means Wilmington Savings Funds Society FSB, as trustee and collateral agent under the Existing Notes Indenture.

55. "*Existing Subsidiaries*" means the following direct and indirect wholly owned non-Debtor subsidiaries of the Debtor: (a) Rockley Photonics Limited; (b) Rockley Photonics Cayman

7

Limited; (c) Rockley Photonics, Inc.; (d) Rockley Photonics OY; (e) Rockley Photonics Ireland; and (f) Rockley Photonics Hong Kong.

56.    "*Existing Subsidiary Interests*" means the Debtor's direct or indirect interests in the Existing Subsidiaries.

57.    "*Exit Financing Parties*" means the financing parties providing the Exit Financing.

58.    "*Exit Financing*" means the new approximately $20.9 million principal amount of senior secured debt issued to the Prepetition Noteholders under the Exit Financing Agreements, which will be convertible or issued with warrants.

59.    "*Exit Financing Documents*" means, collectively, the Exit Financing Agreements, and any other related agreement, including any security agreement, guaranties, pledge or collateral agreement, note, deed of trust, mortgage, or other document (including UCC financing statements), instrument, contract, or agreement entered into or delivered with respect to, or in connection with, the Exit Financing, each of which shall be on terms and conditions acceptable to the Prepetition Noteholders.

60.    "*Exit Financing Agreements*" means (x) the principal agreement governing the Exit Financing, that certain governing document, dated as of the Effective Date, between the Reorganized Debtor, non-debtor guarantors comprising of all current and future direct and indirect subsidiaries of the Reorganized Debtor, other than immaterial subsidiaries; and the Exit Financing Representative and (y) any warrants issued by the Reorganized Debtor, if applicable.

61.    "*Exit Financing Representative*" means the trustee or administrative agent, as applicable, and collateral agent under the Exit Financing Agreement.

62.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Case with the *Bankruptcy* Court or, with respect to the filing of a Proof of Claim, the Claims, Noticing, and Solicitation Agent.

63.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

64.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, reconsideration, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, reconsideration, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, reconsideration, or rehearing shall have been denied, or resulted in no modification of such order, and such time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument, reconsideration, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any

8

analogous rule under the Bankruptcy Rules may be filed relating to such order, shall not cause an order not to be a Final Order.

65.      "*General Unsecured Claim*" means any Claim against the Debtor that is not Secured, and is not (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Secured Tax Claim; (d) an Other Secured Claim; (e) a Priority Tax Claim; (f) an Other Priority Claim; (g) a Super Senior Notes Claims; (h) an Existing Notes Claim; or (i) an Intercompany Claim; *provided* that General Unsecured Claims shall not include any Claim held by an Insider.

66.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

67.      "*Holder*" means an Entity holding a Claim against or an Interest in the Debtor.

68.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

69.      "*Indemnification Provisions*" means the provisions in place before or as of the Effective Date, whether in the Debtor's bylaws, certificates of incorporation, limited liability company agreement, partnership agreement, management agreement, other formation or organizational document, board resolution, indemnification agreement, contract, or otherwise providing the basis for any obligation of the Debtor as of the Effective Date to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, the Debtor's' current directors, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals.

70.      "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

71.      "*Intercompany Claim*" means any Claim against the Debtor that is held by the Existing Subsidiaries.

72.      "*Interest*" means any common stock, ordinary share, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

73.      "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

74.      "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

75.      "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

4884-8539-0165.v2

Exhibit 21
Page 3022

**76.** "*Management Incentive Plan*" has the meaning set forth in Article IV.C of the Plan.

**77.** "*New Board*" means the board of directors of the Reorganized Debtor selected by the Prepetition Noteholders in accordance with the New Governance Documents. The identity of each member of the New Board shall be set forth in the Plan Supplement.

**78.** "*New Governance Documents*" means any document that may be included with the Plan Supplement with respect to the governance of the Reorganized Debtor following the consummation of the Restructuring Transactions, which may be in the form of a term sheet, and any certificates of formation, charters, certificates or articles of incorporation, bylaws, operating agreements, shareholders' agreements, limited liability company agreements or other applicable organizational documents or charter documents and other shareholder documents, each of which shall be on terms and conditions acceptable to the Prepetition Noteholders.

**79.** "*Other Priority Claim*" means any Claim against the Debtor, other than (a) an Administrative Claim, (b) a Professional Fee Claim, or (c) a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**80.** "*Other Secured Claim*" means any Secured Claim against the Debtor, other than: (a) a Secured Tax Claim, (b) the Super Senior Notes Claims, or (c) the Existing Notes Claims.

**81.** "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

**82.** "*Petition Date*" means January 23, 2023.

**83.** "*Plan*" means this *Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited*, pursuant to chapter 11 of the Bankruptcy Code and all exhibits, supplements, appendices, and schedules, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

**84.** "*Plan Supplement*" means the compilation of documents and forms and/or term sheets of documents, agreements, schedules, and exhibits to the Plan that will be Filed by the Debtor with the Bankruptcy Court prior to the Confirmation Hearing, and any amendments to the Plan Supplement Filed prior to the Effective Date, which may include the following, as applicable: (a) the New Governance Documents; (b) the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Lease List, if any; (d) the Rejected Executory Contract and Unexpired Lease List, if any; (e) the Schedule of Retained Causes of Action; (f) the Private Placement Documents; (g) the Exit Financing Documents; and (h) the Restructuring Steps Memorandum, if any. The Debtor shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date as set forth in this Plan, in each case with the prior written consent of the Prepetition Noteholders.

**85.** "*Prepetition Noteholders*" means each of the current Holders of the Prepetition Notes.

86. "*Prepetition Notes*" means, collectively, the Super Senior Notes and the Existing Notes.

87. "*Prepetition Notes Claims*" means collectively, the Super Senior Notes Claims and the Existing Notes Claims.

88. "*Prepetition Notes Documents*" means the documents governing the Prepetition Notes.

89. "*Prepetition Trustee*" means the Super Senior Notes Trustee and the Existing Notes Trustee.

90. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91. "*Prepetition Noteholder Private Placement*" means the private placement of $20 million of Reorganized Rockley Equity at a 20% discount to Agreed Equity Value that will be conducted pursuant to the Private Placement Documents.

92. "*Private Placement Documents*" means the documents governing the Prepetition Noteholder Private Placement, which shall be included in the Plan Supplement; *provided* that such documents shall be in form and substance acceptable to the Prepetition Noteholders.

93. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

94. "*Professional*" means an Entity employed in the Chapter 11 Case pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

95. "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional from the Petition Date through and including the Effective Date to the extent such fees and expenses have not been paid or denied pursuant to an order of the Bankruptcy Court or higher court of competent jurisdiction. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

96. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtor with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

97. "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services in connection with the Chapter 11 Case prior to and as of the

Confirmation Date, which estimates Professionals shall deliver to the Debtor as set forth in Article II.B.3 of the Plan.

98.　"*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

99.　"*Proof of Interest*" means a proof of Interest filed in the Chapter 11 Case.

100.　"*Reinstate,*" "*Reinstated,*" or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

101.　"*Rejected Executory Contract and Unexpired Lease List*" means, if applicable, the list as determined by the Debtor or the Reorganized Debtor, as applicable, of certain Executory Contracts and Unexpired Leases to be rejected by the Reorganized Debtor pursuant to the Plan, which list, as may be amended from time to time, shall be included in the Plan Supplement; *provided* that such list shall be in form and substance acceptable to the Prepetition Noteholders.

102.　"*Related Party*" means, with respect to any Entity, and in each case solely in its capacity as such with respect to the Entity to which it is related, each of such Entity's current and former, direct or indirect, directors, members, managers, officers, control persons, equity holders, partners, participants, managed accounts or funds, fund advisors or managers, investment managers, management companies, affiliates, predecessors, successors, assigns, subsidiaries, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; provided that with respect to the Debtor, its current and former equity holders shall not be included as Related Parties of the Debtor as used herein.

103.　"*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) each of the Prepetition Noteholders; (d) the Prepetition Trustee; (e) each of the Exit Financing Parties; (f) the Exit Financing Representative; and (g) each Related Party of each Entity in clause (c) through this clause (g);

104.　"*Releasing Parties*" means, collectively, and in each case in its capacity as such, each of the Released Parties.

105.　"*Reorganized Debtor*" means the Debtor, or any successor or assign thereto, as reorganized on the Effective Date in accordance with this Plan, whether by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, reorganization, or otherwise.

106.　"*Reorganized Rockley Equity*" means the common stock of Reorganized Debtor to be issued on the Effective Date pursuant to the Plan.

107.　"*Restructuring Expenses*" means the reasonable and documented fees and expenses of the Prepetition Noteholders, Prepetition Trustee, and Exit Financing Representative, including the reasonable and documented fees and expenses of (a) Sidley Austin LLP, as counsel to the Prepetition Noteholders and the Exit Financing Parties; (b) Maples Group, as counsel to the

Prepetition Noteholders; and (c) Chapman and Cutler LLP, as counsel to the Prepetition Trustee, and Exit Financing Representative.

108.  "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the Restructuring Transactions contemplated by the Plan, which shall be included in the Plan Supplement.

109.  "*Restructuring Transactions*" means the transactions described in Article IV.A of the Plan.

110.  "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtor that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, to be included in the Plan Supplement; *provided* that such list shall be in form and substance acceptable to the Prepetition Noteholders.

111.  "*Secured Claim*" means a Claim that is secured by a valid, perfected, and enforceable Lien on property in which any of the Debtor has an interest or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtor' interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

112.  "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

113.  "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

114.  "*Solicitation Materials*" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related ballots.

115.  "*Section 510(b) Claim*" means a Claim that is subordinated, or subject to subordination, pursuant to section 510(b) of the Bankruptcy Code, including, without limitation, a Claim arising from the rescission or purchase of a sale or security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such security or for reimbursement or contribution on account of such Claim pursuant to section 502 of the Bankruptcy Code.

116.  "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

117.  "*Super Senior Notes*" means all Convertible Senior Secured Notes due 2026 issued under the Super Senior Notes Indenture.

118.  "*Super Senior Notes Claims*" means any Claim arising under or related to the Super Senior Notes Indenture and the Super Senior Notes.

119.  "*Super Senior Notes Indenture*" means that certain Indenture, dated as of October 25, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among the Debtor, the non-debtor guarantors party thereto

13

4884-8539-0165.v2

Exhibit 21
Page 3026

comprising of all current and future direct and indirect subsidiaries of Debtor, other than immaterial subsidiaries; and the Super Senior Notes Trustee.

120. "*Super Senior Notes Trustee*" means Wilmington Savings Funds Society FSB, as trustee and collateral agent under the Super Senior Notes Indenture.

121. "*Taxes*" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not, imposed on the Debtor or Reorganized Debtor, as applicable, resulting from the Restructuring Transactions.

122. "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.E of the Plan.

123. "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

124. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or an *Allowed* Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the  Debtor' or the Reorganized Debtor' requests for information necessary to facilitate a particular distribution; or (d) timely taken any other action necessary to facilitate such distribution.

125. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

126. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

### B. *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions, provided, if applicable, that such contract, lease, instrument, release, indenture, or other agreement or document is in form and substance acceptable to the Prepetition Noteholders; (3) unless otherwise specified in the Plan, any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have

14

been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified, provided, if applicable, such document, schedule or exhibit is in form and substance acceptable to the Prepetition Noteholders; (4) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (5) all references herein to "Articles" are references to Articles hereof or hereto; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (9) any capitalized term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (10) references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, to the extent applicable to the Chapter 11 Case; (12) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (13) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (14) references to "corporate action", "corporate structure" and other references to "corporate", and "corporation" will, except as the context may otherwise require, be deemed to include other forms of entities as well; (15) any effectuating provisions may be interpreted by the Debtor, or after the Effective Date, the Reorganized Debtor, in its sole discretion in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity and subject, in all cases, to the approval and consent rights of the Prepetition Noteholders set forth herein; (16) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (17) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

### C.    *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

### D.    *Governing Law*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of Laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing Law of such

15

agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtor or the Reorganized Debtor, as applicable, shall be governed by the Laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

### E. Controlling Documents

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control. In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

### F. Deemed Acts

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

## ARTICLE II

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

### A. Administrative Claims

Except as otherwise specifically provided in the Plan, and except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment with respect to such Holder, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on or as soon as is reasonably practicable after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim which shall constitute reinstatement of such Allowed Administrative Clam pursuant to Section 1124 of the Code; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; (5) if such Allowed Administrative Claim is an

16

Intercompany Claim but only to the extent that the Reorganized Debtor Reinstates any such Intercompany Claims under the terms of the Plan, in the ordinary course of its business after the Effective Date; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**B.     *Professional Fee Claims***

### 1.     Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.   The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.   No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.   Such funds shall not be considered property of the Estate, the Debtor, or the Reorganized Debtor.

The Professional Fee Claims shall be paid in full in Cash from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.   When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 2.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed on or prior to the first Business Day that is forty-five (45) days after the Effective Date.   The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.   The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtor's and the Reorganized Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

The funding of the Professional Fee Escrow Account in the Professional Fee Escrow Amount for Allowed Professional Fee Claims shall be funded from Cash on hand prior to the Effective Date.

17

### 3. Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good faith estimate of their fees and expenses incurred in rendering services to the Debtor before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date and shall deliver such estimate to the Debtor and the Prepetition Noteholders not later than three (3) Business Days prior to the anticipated Effective Date.   For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.   If a Professional does not provide an estimate, the Debtor shall estimate (in consultation with the Prepetition Noteholders) a reasonable amount of unbilled fees and expenses of such Professional, considering any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.   The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtor shall increase the amount of funds held in the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

### 4. Post Confirmation Date Fees and Expenses

From and after the Confirmation Date, the Debtor, or the Reorganized Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses (including Restructuring Expenses) related to implementation of the Plan and Consummation incurred by the Debtor or the Reorganized Debtor, as applicable.   After the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtor or the Reorganized Debtor, as applicable, shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtor or Reorganized Debtor, as applicable, and the Prepetition Noteholders such reasonable claims for compensation or reimbursement of expenses incurred by the retained professionals of the Debtor or the Reorganized Debtor, as applicable.   If the Debtor, the Reorganized Debtor or Prepetition Noteholders, as applicable, dispute the reasonableness of any such invoice, the Debtor, Reorganized Debtor, or the Prepetition Noteholders, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### C. *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, each Holder of

18

an Allowed Priority Tax Claim will, at the option of the Debtor or Reorganized Debtor (with the consent of the Prepetition Noteholders), in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) receive Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### D.      *Statutory Fees*

The Debtor or the Reorganized Debtor, as applicable, shall pay all U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtor's or Reorganized Debtor's business (or such amount agreed to with the U.S. Trustee or ordered by the Bankruptcy Court), for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.   On and after the Effective Date, the Reorganized Debtor shall pay all such fees when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### A.      *Classification of Claims and Interests*

Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.   A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

19

### B. Summary of Classification

A summary of the classification of Claims against and Interests in the Debtor pursuant to the Plan is summarized in the following chart. All potential Classes with respect to the Debtor are set forth herein.

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Super Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | Existing Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept/Reject) |
| 7 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### C. Treatment of Classes of Claims and Interests

1. **Class 1 — Other Secured Claims**

   (a) *Classification*: Class 1 consists of any Other Secured Claims.

   (b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the election of the Debtor (with the consent of the Prepetition Noteholders), either:

   (i) payment in full in Cash;

   (ii) delivery of the collateral securing such Allowed Other Secured Claim;

   (iii) Reinstatement of such Allowed Other Secured Claim; or

20

(iv)     such other treatment (as acceptable to the Prepetition Noteholders) rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code,

in each case subject to all defenses or disputes the Debtor and the Reorganized Debtor may have with respect to such Claim; *provided* that, notwithstanding the foregoing, the Allowed amount of such Other Secured Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

(c)     *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

## 2.     Class 2 — Other Priority Claims

(a)     *Classification*:  Class 2 consists of any Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the election of the Debtor (with the consent of the Prepetition Noteholders), either:

(i)     payment in full in Cash on the later of (A) the Effective Date and (B) the date such Allowed Other Priority Claim becomes payable in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim; or

(ii)     such other treatment (as acceptable to the Prepetition Noteholders) rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code,

in each case subject to all defenses or disputes the Debtor and the Reorganized Debtor may have with respect to such Claim; *provided* that, notwithstanding the foregoing, the Allowed amount of such Other Priority Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

(c)     *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

21

3.   **Class 3 — Super Senior Notes Claims**

    (a)   *Classification*:  Class 3 consists of all Super Senior Notes Claims.

    (b)   *Allowance*:  On the Effective Date, the Super Senior Notes Claims shall be Allowed, without avoidance, offset, reduction, subordination, recoupment, or deduction of any kind, in the aggregate principal amount of not less than $90.65 million plus accrued and unpaid interest, fees, costs, expenses, and other obligations, including reasonable and documented attorney's fees, agent's fees, and other obligations arising under or in connection with the Super Senior Notes Indenture and the Super Senior Notes.

    (c)   *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Super Senior Notes Claim, each Holder of an Allowed Super Senior Notes Claim shall receive, on the Effective Date:

        (i)   its Pro Rata share and interest in a distribution of Reorganized Rockley Equity (subject to dilution by the Management Incentive Plan and the Prepetition Noteholder Private Placement) which will constitute 75.82 % of Reorganized Rockley Equity;

        (ii)   the right to purchase its Pro Rata share of $15.87 million of the Exit Financing;

        (iii)   its Pro Rata share of $5.08 million of the Exit Financing; and

        (iv)   the right to participate in the Prepetition Noteholder Private Placement to acquire its Pro Rata share of up to 75.82% of $20 million of Reorganized Rockley Equity at a 20% discount to Agreed Equity Value.

    (d)   *Voting*:  Class 3 is Impaired under the Plan.  Therefore, Holders of Allowed Super Senior Notes Claims are entitled to vote to accept or reject the Plan.

4.   **Class 4 — Existing Notes Claims**

    (a)   *Classification*:  Class 4 consists of all Existing Notes Claims.

    (b)   *Allowance*:  On the Effective Date, the Existing Notes Claims shall be Allowed, without avoidance, offset, reduction, subordination, recoupment, or deduction of any kind, in the aggregate principal amount of not less than $29.31 million, plus accrued and unpaid interest, fees, costs, expenses, and other obligations, including reasonable and documented attorney's fees, agent's fees, and other obligations arising under or in connection with the Existing Notes Indenture and the Existing Notes.

22

(c) *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Existing Notes Claim, each Holder of an Allowed Existing Notes Claim shall receive, on the Effective Date:

(i) its Pro Rata share and interest in a distribution of Reorganized Rockley Equity (subject to dilution by the Management Incentive Plan and the Prepetition Noteholder Private Placement) which will constitute 24.18% of Reorganized Rockley Equity; and

(ii) the right to participate in the Prepetition Noteholder Private Placement to acquire its Pro Rata share of up to 24.18% of $20 million of Reorganized Rockley Equity at a 20% discount to Agreed Equity Value.

(d) *Voting*:  Class 4 is Impaired under the Plan.  Therefore, Holders of Allowed Existing Notes Claims are entitled to vote to accept or reject the Plan.

5.    **Class 5 — General Unsecured Claims**

(a) *Classification*:  Class 5 consists of all General Unsecured Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim or has been paid before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each General Unsecured Claim, each such Holder shall receive, at the election of the Debtor (with the consent of the Prepetition Noteholders):

(i) payment in full in Cash of the amount of its Allowed General Unsecured Claim plus postpetition interest to the extent necessary under applicable law to render such Unsecured Claim Unimpaired on the later of (A) the Effective Date and (B) the date such Allowed General Unsecured Claim becomes payable in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim;

(ii) Reinstatement of such Allowed General Unsecured Claim; or

(iii) such other treatment rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code,

in each case subject to all defenses or disputes the Debtor and the Reorganized Debtor may have with respect to such Claim; *provided* that, notwithstanding the foregoing, the Allowed amount of such General Unsecured Claim shall be subject to and shall not exceed the limitations or

23

maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

(c)     *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.     **Class 6 — Intercompany Claims**

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  As may be provided in the Restructuring Steps Memorandum, each Intercompany Claim shall, at the election of the Debtor (with the consent of the Prepetition Noteholders), either on or after the Effective Date, be:

   (i)     Reinstated;

   (ii)     converted to equity; or

   (iii)     extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims

(c)     *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     **Class 7 — Interests in the Debtor**

(a)     *Classification*:  Class 7 consists of all Interests in the Debtor.

(b)     *Treatment*:  On the Effective Date, all Allowed Interests in the Debtor shall be cancelled, extinguished, and released, as of the Effective Date.

(c)     *Voting*:  Class 7 is Impaired, and Holders of Interests in the Debtor are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Interests in the Debtor are not entitled to vote to accept or reject the Plan.

8.     **Class 8 — Section 510(b) Claims**

(a)     *Classification*:  Class 8 consists of all Section 510(b) Claims.

(b)     *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be discharged and extinguished and the Holders thereof shall not receive or

24

retain any property under this Plan on account of such Section 510(b) Claims.

(c)    *Voting*:  Class 8 is Impaired, and Holders of Section 510(b) Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Interests in the Debtor are not entitled to vote to accept or reject the Plan.

## D.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## F.    *Voting Classes; Deemed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

## G.    *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.   Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## H.    *Existing Subsidiary Interests*

Except as may be set forth in the Restructuring Steps Memorandum, on the Effective Date, the Existing Subsidiary Interests shall remain effective and outstanding and shall be owned by the Reorganized Debtor, and each Existing Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date.  The Debtor's non-Debtor Affiliates are receiving distribution on account of their

25

Existing Subsidiary Interests for the purposes of administrative convenience and in exchange for the Debtor's and Reorganized Debtor's agreement under the Plan to provide management services to certain other non-Debtor Affiliates. For the avoidance of doubt, any Existing Subsidiary Interest in non-Debtor subsidiaries owned by the Debtor shall continue to be owned by the Reorganized Debtor.

## I.        *Controversy Governing Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, resolve such controversy on or before the Confirmation Date.

## J.        *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one or more of the Classes of Claims or Interests entitled to vote pursuant to Article III.C of the Plan. The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor reserves the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.        *Restructuring Transactions*

On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall enter into any transaction and take all actions as may be necessary or appropriate to effectuate the Plan and any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan. These transactions may include, as applicable, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, (collectively, the "Restructuring Transactions"). The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of the Exit Financing Documents, and any filing related thereto; (2) the issuance of the Reorganized Rockley Equity; (3) execution of the Private Placement Documents and implementation of the Prepetition Noteholder Private Placement; (4) the execution and delivery of the New Governance Documents, and (5) all other actions that the Debtor determines to be necessary or advisable, including making filings or recordings that may be required by applicable Law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtor determine are necessary or advisable to effectuate the provisions and intent of the Plan.

26

The Debtor and the Prepetition Noteholders shall cooperate in good faith to structure the Restructuring Transactions in a tax efficient manner.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy Law.

## B.   *Sources of Consideration for Plan Distributions*

The Debtor shall fund distributions under the Plan, as applicable, with (1) the issuance of the Reorganized Rockley Equity; (2) proceeds from issuance of the Exit Financing; (3) proceeds from issuance of the Reorganized Rockley Equity pursuant to the Prepetition Noteholder Private Placement; and (4) Cash on hand.   Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 1.   Reorganized Rockley Equity

On the Effective Date, the Reorganized Rockley Equity shall be issued and distributed to the Entities entitled to receive the Reorganized Rockley Equity pursuant to, and in accordance with, the Plan.  On the Effective Date, the issuance of the Reorganized Rockley Equity shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest, and the Debtor or Reorganized Debtor, as applicable, is authorized to take any action necessary or appropriate in furtherance thereof.   All of the shares of Reorganized Rockley Equity distributed and issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.   Each distribution and issuance of the Reorganized Rockley Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.   For the avoidance of doubt, the receipt, via distribution or issuance, of Reorganized Rockley Equity by a Holder of a Super Senior Notes Claim, or a Holder of an Existing Notes Claim, shall be deemed as such Holder's agreement to be bound by the New Governance Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms. The Reorganized Rockley Equity will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of DTC.

### 2.   Exit Financing

Prior to the Effective Date, the Debtor shall document and implement the Exit Financing on terms and conditions consistent with the Plan.  On the Effective Date, the Reorganized Debtor and the Prepetition Noteholders shall execute and deliver the Exit Financing Documents. Confirmation of the Plan shall be deemed approval of (a) the Exit Financing Documents and (b) all

27

transactions contemplated thereby and all actions to be taken and undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to enter into and execute the Exit Financing Documents, and such other documents as may be required to effectuate the treatment afforded by the Exit Financing without further notice to or order of the Bankruptcy Court, subject to the consent of the Prepetition Noteholders. For clarity and avoidance of doubt, the Holders of Allowed Super Senior Notes Claims will purchase (Pro Rata based on their respective ownership interest in the Allowed Super Senior Notes or as otherwise mutually agreed among such Holders) Exit Financing in an aggregate amount of approximately $20.9 million; *provided*, *however*, that the approximately $20.9 million purchase obligation shall be reduced dollar for dollar by $5.08 million of Allowed Super Senior Notes Claims that will convert into Exit Financing on the Effective Date.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents, as applicable, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents and (c) shall be deemed automatically perfected on the Effective Date and senior in priority to all other Liens, subject only to such Liens and security interests as may be permitted to be senior under the Exit Financing Documents, as applicable. The Exit Financing and all the Liens and security interests to be granted in accordance with the Exit Financing Documents shall not be subject to avoidance, recharacterization, equitable subordination or any other challenge for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers or voidable transactions (or similar concepts) under the Bankruptcy Code or any applicable non-bankruptcy Law.

The Reorganized Debtor and the persons and entities granting such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

3.      **Prepetition Noteholder Private Placement**

Prior to the Effective Date, Holders of Allowed Super Senior Notes Claims and Allowed Existing Notes Claims will have the option to participate in the Prepetition Noteholder Private Placement for the purchase of Reorganized Rockley Equity on terms and conditions consistent with the Private Placement Documents; *provided* that Holders of Allowed Super Senior Notes Claims and Allowed Existing Notes Claims shall have the joint and several obligation to ensure that the Prepetition Noteholder Private Placement is fully subscribed as of the Effective Date (for the avoidance of doubt, such joint and several obligation shall exclude the Prepetition Trustee). On the Effective Date, the Reorganized Debtor and Holders of Allowed Super Senior Notes Claims and Allowed Existing Notes Claims that elect to participate will enter into the Private Placement Documents. Confirmation of the Plan shall be deemed (a) approval of the Prepetition Noteholder

28

Private Placement and the Private Placement Documents; (b) approval of all transactions contemplated thereby and all actions to be taken and undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and (c) authorization of the Reorganized Debtor to enter into and execute the Private Placement Documents and such other documents as may be required for the Prepetition Noteholder Private Placement.

All the shares of Reorganized Rockley Equity issued pursuant to the Private Placement Documents shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of Reorganized Rockley Equity pursuant to the Prepetition Noteholder Private Placement shall be governed by the terms and conditions set forth in the Private Placement Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of Reorganized Rockley Equity by any participant in the Prepetition Noteholder Private Placement shall be deemed as such participant's agreement to the Private Placement Documents and the New Governance Documents, in each case as may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 4. Cash on Hand

The Debtor or Reorganized Debtor, as applicable, shall use Cash on hand to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan and subject to the consent of the Prepetition Noteholders.

### C. *Management Incentive Program*

On or after the Effective Date, the New Board shall be authorized to adopt a management incentive plan (the "**Management Incentive Plan**"). All grants under the Management Incentive Plan shall ratably dilute all Rockley Reorganized Equity issued pursuant to the Plan.

The Management Incentive Plan will reserve exclusively for participants in the Management Incentive Plan a pool of up to 10% of Reorganized Rockley Equity, on a fully diluted basis, which may take the form of equity or equity-based awards, including options, restricted stock units, or other equity instruments, determined on a fully diluted and fully distributed basis. The terms of the Management Incentive Plan (including the participants, forms of awards, amount of allocations and the timing of the grant of the options and other equity-based compensation), and the terms and conditions of such options and other equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined at the sole discretion of the New Board.

### D. *Exemption from Registration Requirements*

The offering, issuance, and distribution of the Reorganized Rockley Equity under the Plan and the Private Placement Documents and the Exit Financing shall be exempt from registration under the Securities Act and any other applicable securities Laws pursuant to section 1145 of the Bankruptcy Code. To the extent issued pursuant to section 1145 of the Bankruptcy Code, these Securities may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the

29

Bankruptcy Code, in which case, such securities, and any securities not otherwise eligible for issuance under Section 1145 of the Bankruptcy Code, may only be sold pursuant to an effective registration statement under the Securities Act or an applicable exemption from such registration requirements. In addition, the Reorganized Rockley Equity generally may be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states. Recipients of the Reorganized Rockley Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities Laws.

## E.    Tax Returns

After the Effective Date, the Reorganized Debtor shall complete and file all final or otherwise required foreign, federal, state, and local tax returns for the Debtor and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of Debtor's Chapter 11 Case, as determined under applicable tax Laws.

## F.    Corporate Existence

Except as otherwise provided in the Plan or the Plan Supplement, the Debtor shall continue to exist after the Effective Date pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated. For the avoidance of doubt, after the cancellation of the Interests in the Debtor described in this Plan, the former equityholders of the Debtor shall not be deemed to own any interest, directly or indirectly, in the Debtor, its subsidiaries or any asset thereof.

## G.    Corporate Action

Subject to the terms and conditions contained herein, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including the (1) selection of the managers, officers and members of the New Board; (2) approval, adoption, and filing of the New Governance Documents; (3) issuance and distribution of the Reorganized Rockley Equity; (4) implementation of any Restructuring Transactions, and performance of all actions and transactions contemplated in connection therewith; (5) entry into, delivery, and performance under the Exit Financing Documents; (5) rejection, assumption, assumption and assignment, as applicable of Executory Contracts and Unexpired Leases; and (6) all other actions reasonably necessary or appropriate to promptly consummate any Restructuring Transactions (whether to occur before, on, or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtor or the Reorganized Debtor, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor, including the Reorganized Rockley Equity,

30

the New Governance Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy Law.

### H.      Vesting of Assets in the Reorganized Debtor

On the Effective Date, except as otherwise provided in the Plan, all property of Debtor's Estate, all retained Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Financing Documents, and Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, as applicable).  On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### I.      Cancellation of Notes, Instruments, Certificates, and Other Documents

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of the Debtor giving rise to any rights or obligations relating to Claims against or Interests in the Debtor (except with respect to any Claim or Interest that is Reinstated pursuant to the Plan) shall be contributed and set off, and upon such contribution and set-off, shall be deemed cancelled and surrendered, and the obligations of the Debtor or the Reorganized Debtor, as applicable, and any non-Debtor direct or indirect subsidiaries thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; *provided*, *however*, that all Liens and security interests granted by the Debtor to the Prepetition Noteholders in respect to Prepetition Notes Claims shall remain in effect to the same extent, in the same manner and on the same terms and priorities as they were prior to the Effective Date and secure the obligations of the Reorganized Debtor under the Exit Financing Agreements without the need to file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect the security interests granted by the Exit Financing Agreements; *provided, further,* that notwithstanding such cancellation, satisfaction, release, and discharge or anything to the contrary contained in the Plan or Confirmation Order, any such document or instrument that governs the rights, claims, interest, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions as specified under the Plan; (2) allowing and preserving the rights of the Prepetition Trustee to make distributions as specified under the Plan, as applicable, including allowing the Prepetition Trustee to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable governing documents, or other order of the Bankruptcy Court; (3) preserving the Prepetition Trustee's right to compensation and indemnification as against any money or property distributed or to be distributed to Holders of Prepetition Notes Claims; (4) preserving all rights, including rights of enforcement, of the Prepetition Trustee against any Person or Entity other than

31

a Released Party, including with respect to contractual indemnification or contribution claims; (5) permitting the Prepetition Trustee to enforce any obligation (if any) owed to the Prepetition Trustee under this Plan; and (6) permitting the Prepetition Trustee to appear in the Chapter 11 Case or in any proceeding in the Bankruptcy Court or any other court. Notwithstanding anything to the contrary herein, each applicable Agent is authorized and directed to, at the sole cost and expense of the Reorganized Debtor, execute (and take any reasonable additional steps at the sole cost and expense of the Reorganized Debtor necessary to give effect to) any applicable documents required to effectuate the contribution and set-off pursuant to the Plan.

Except for the foregoing, subsequent to the performance by the Prepetition Trustee of its obligations pursuant to the Plan, the Prepetition Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Notes Documents. Nothing in this Article IV.I shall in any way affect or diminish the rights of the Prepetition Trustee to exercise any charging lien against distributions to Holders of Prepetition Notes Claims with respect to any unpaid fees.

## J. Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from Debtor to Reorganized Debtor or to any other Entity) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor (including any Reorganized Rockley Equity); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## K. Compensation and Benefit Programs

On and after the Effective Date, except as otherwise provided in the Plan or any Final Order, without limiting any authority provided to the New Board under the Debtor's and Reorganized Debtor's respective formation and constituent documents, the Reorganized Debtor

32

4884-8539-0165.v2

Exhibit 21
Page 3045

shall: (1) amend, adopt, assume, and honor in the ordinary course of business the Compensation and Benefit Programs; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Except as otherwise provided by the Plan or any Final Order, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

**L.      *Effectuating Documents and Further Transactions***

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the boards of directors and managers thereof (including the New Board), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Exit Financing Documents, the New Governance Documents, and the Reorganized Rockley Equity, or consents except for those expressly required under the Plan.

**M.      *New Governance Documents***

To the extent advisable or required under the Plan or applicable non-bankruptcy Law, on the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor will file the New Governance Documents, which shall be included in the Plan Supplement, with the applicable authorities in the state, province, or country of incorporation or formation in accordance with the applicable corporate or formational Laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend, amend and restate, supplement, or modify the New Governance Documents, and the Reorganized Debtor may file certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation or formation and the New Governance Documents.

**N.      *Directors and Officers***

On the Effective Date, the terms of the current members of the Debtor's board of directors shall expire and new directors of the Reorganized Debtor shall be appointed. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose at or prior to the Confirmation Hearing the identity and affiliations of the directors and officers of the Reorganized Debtor. The New Board shall be selected by the Prepetition Noteholders on the terms set forth in the New Governance Documents.

From and following the Effective Date, each director, officer, or manager of the Reorganized Debtor shall be appointed and serve pursuant to the terms of the charter and bylaws or other formation and constituent documents and the New Governance Documents, and applicable Laws of the Reorganized Debtor's jurisdiction of formation. To the extent that any such director

or officer of the Reorganized Debtor is an Insider, the Debtor will disclose the nature of any compensation to be paid to such director or officer.

### O. Preservation of Causes of Action

Following the Effective Date, in accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in Article VIII of the Plan, which shall be deemed released and waived by the Debtor and Reorganized Debtor as of the Effective Date.

The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. Other than the Released Parties and Exculpated Parties with respect to the releases and exculpations contained in Article VIII of the Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in Article VIII of the Plan.

### P. Payment of Certain Fees

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtor or the Reorganized Debtor, as applicable, shall pay the Restructuring Expenses on the Effective Date, subject to the conditions set forth in this Article IV.P. The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Case) without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtor at least three (3) Business Days before the anticipated Effective Date or such later date as permitted by the Debtor; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtor. In addition, the Debtor or the Reorganized Debtor, as applicable, shall continue to pay pre- and post- Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

*Q.*     *Reporting Company Requirements*

On the Effective Date, the Reorganized Debtor will not be a reporting company under the Exchange Act and shall not be required to file reports with the Commission or any other governmental entity.

**R.**     *Concurrent Cayman Restructuring Process*

On or immediately following the Petition Date, the Debtor will issue the Cayman Petition in the Grand Court of the Cayman Islands seeking the appointment of a Restructuring Officer to oversee and implement the Restructuring Transactions from a Cayman Law perspective. The Cayman Petition will provide details of the Plan and Restructuring Transactions, noting that further transactional steps are yet to take place. A moratorium will apply automatically upon the issuance of the Cayman Petition, then the substantive hearing of the Cayman Petition will take place within approximately twenty-one (21) days of its filing. At the hearing to consider the Cayman Petition, the Restructuring Officer will provide a further update on the progress of the Restructuring and will request that a further hearing be listed for the Cayman Court to consider and approve the Plan and Restructuring Transactions. The intention is that such hearing will take place on or before the contemplated Confirmation Hearing.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases of the Debtor shall be deemed assumed by the Reorganized Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) previously was assumed, assumed and assigned, or rejected by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List. On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is identified on the Rejected Executory Contract and Unexpired Lease List shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired

4884-8539-0165.v2

Exhibit 21
Page 3048

Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

To the maximum extent permitted by Law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.      *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases***

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or the Reorganized Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy Law to the contrary, the Debtor and Reorganized Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases***

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Claims, Noticing, and Solicitation Agent and served on the Reorganized Debtor no later than thirty days after the Effective Date.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Claims, Noticing, and Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Reorganized Debtor, the Estate, or their property, without the need for any objection by the Debtor or Reorganized Debtor, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

4884-8539-0165.v2

Exhibit 21
Page 3049

Except as otherwise provided in the Plan or an order of the Bankruptcy Court, all Claims arising from the rejection by the Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim against the Debtor pursuant to Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtor, or the Reorganized Debtor, as applicable, (with the consent of the Prepetition Noteholders) reserves the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

### D.     *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash on the Effective Date, in the ordinary course of business, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor of the Cure Amount; *provided*, that nothing herein shall prevent the Debtor or Reorganized Debtor (with the consent of the Prepetition Noteholders) from paying any Cure Amount despite the failure of the relevant counterparty to File such request for payment of such Cure Claim.  The Debtor or Reorganized Debtor (with the consent of the Prepetition Noteholders) also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise agreed upon in writing by the Debtor or Reorganized Debtor (with the consent of the Prepetition Noteholders), as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or Cure Amount including pursuant to the Plan must be filed, served, and actually received by the counsel to the Debtor and the U.S. Trustee on or before the Confirmation Objection Deadline or such other deadline that may be set by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Amount will be deemed to have assented to such assumption or Cure Amount.

**For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease is proposed to be assumed in the Plan and is not listed as having a related Cure Amount (or lists such Cure Amount as $0) on the Assumed Executory Contract and Unexpired Lease List, any counterparty to such Executory Contract or Unexpired Lease that fails to object to the proposed assumption by the Confirmation Objection Deadline will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.**  Any such Claim or Cause of Action that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

4884-8539-0165.v2

Exhibit 21
Page 3050

The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtor to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption.

The Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure Amount, such Cure Amount shall be considered to be zero.**

### E.    *Insurance Policies*

Except as set forth herein, the Debtor's insurance policies, including the D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtor shall be deemed to have assumed all insurance policies and all agreements, documents, and instruments relating thereto, and such insurance policies and such agreements, documents, or instruments relating thereto shall re-vest in the Reorganized Debtor, including the D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the insurance policies (including, any "tail policy"), and any agreements, documents, or instruments relating thereto. In addition, on and after the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce, limit, or restrict the coverage under the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtor who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policies for the full term of such policy regardless of whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in Article VIII, all of the Debtor's current and former directors',

38

managers', officers', members', and trustees' rights as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein.

## F.     *Indemnification Provisions*

On and as of the Effective Date, the Indemnification Provisions will be assumed by the Debtor, and shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date, and the Reorganized Debtor's governance documents shall provide for indemnification, defense, reimbursement, and limitation of liability of, and advancement of fees and expenses to, the Debtor's and the Reorganized Debtor's current directors, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals serving in such capacity as of the Effective Date to the fullest extent permitted by Law and at least to the same extent as provided under the Indemnification Provisions against any Cause of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted; *provided* that the Reorganized Debtor shall not indemnify (1) any Person for any Cause of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence, bad faith, or willful misconduct. Except as otherwise provided herein, the Reorganized Debtor will not amend or restate its governance documents before, on, or after the Effective Date to terminate or materially adversely affect the Reorganized Debtor's obligations to provide such rights to indemnification, defense, reimbursement, limitation of liability, or advancement of fees and expenses. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the Indemnification Provisions.

On and as of the Effective Date, any of the Debtor's indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtor or Reorganized Debtor, as applicable, shall be assumed by the Reorganized Debtor and otherwise remain unaffected by the Chapter 11 Case.

## G.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

## H.     *Reservation of Rights*

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor, as applicable, has any liability thereunder.

4884-8539-0165.v2
Exhibit 21
Page 3052

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or the Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

### I. *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

### J. *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtor and any Executory Contracts and Unexpired Leases assumed by the Debtor may be performed by the Reorganized Debtor in the ordinary course of business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

### A. *Distributions on Account of Claims or Interests Allowed as of the Effective Date*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor, as the case may be, and the Holder of the applicable Claim or Interest, the Distribution Agent shall make distributions under the Plan on account of Claims or Interests Allowed on the Effective Date or as soon as reasonably practical thereafter; *provided*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

## B.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the next occurring Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest) each Holder of an Allowed Claim and Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtor shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

## C.    Distribution Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date or as soon as reasonably practicable thereafter.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 1.    Rights and Powers of Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

## D.    Delivery of Distributions

### 1.    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent, as appropriate (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtor has not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Case on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so

41

that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtor, the Reorganized Debtor, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

## 2. Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded Security is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

## 3. Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtor, on the one hand, and the Holder of a Disputed Claim or Disputed Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all of the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest, as applicable, or has otherwise been resolved by settlement or Final Order. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Allowed Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Disputed Interest, as applicable, in such Class that becomes an Allowed Claim or Allowed Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Allowed Interests in such Class.

## 4. No Fractional Distributions

No fractional notes or shares, as applicable, of any Security shall be distributed pursuant to the Plan, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest would otherwise result in the issuance of a number of units or amounts of Securities that is not a whole number, the actual distribution of units or amounts of Securities shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one- half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized units or amounts of Securities issued pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

## 5. Minimal Distributions

Holders of Allowed Claims or Allowed Interests entitled to distributions of $100 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of this Plan and its Holder shall be forever barred from asserting that Claim against the Reorganized Debtor or its property.

4884-8539-0165.v2

Exhibit 21
Page 3055

6. **Unclaimed Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the attempted distribution. After such date, all unclaimed property or interests in property shall be deemed Unclaimed Distributions and shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

7. **Manner of Payment**

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

8. **Compliance Matters**

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

9. **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan, or the Confirmation Order, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

10. **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

43

### 11. Setoffs and Recoupment

Unless otherwise provided in the Plan or the Confirmation Order, the Debtor and the Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy Law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor,(as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

### 12. Foreign Currency Exchange

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### 13. Claims Paid or Payable by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Reorganized Debtor.  To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtor or Reorganized Debtor, as applicable.  To the extent that one or more of the Debtor's insurers agrees to satisfy a Claim in full (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims, Noticing, and Solicitation Agent

44

without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A. *Disputed Claims Process*

Holders of Claims and Interests need not file a Proof of Claim or Proof of Interest, as applicable, with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan or any applicable order establishing bar dates for Filing a Proof of Claim, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article V.C of the Plan. On and after the Effective Date, Allowed Claims and Interests shall be treated as set forth in Article III of the Plan. Notwithstanding the foregoing, Entities must file cure objections as set forth in Article V.D of the Plan to the extent such Entity disputes the amount of the cure set forth in the Assumed Executory Contract and Unexpired Lease List.

**Except as otherwise provided herein, all Proofs of Claim and Proofs of Interest required to be filed pursuant to the Plan or an order entered by the Bankruptcy Court, as applicable, that are filed after the date that they are required to be filed pursuant to the Plan or an order entered by the Bankruptcy Court, as applicable, shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtor, or Reorganized Debtor without the need for any objection by the Debtor or Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court, unless leave to file a late Proof of Claim or Proof of Interest is obtained.**

In addition, following the Effective Date, the Reorganized Debtor, with the consent of the "Required Financing Parties" (or similar term) under the Exit Financing Agreements, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.

### B. *Allowance of Claims*

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date. Except as specifically provided in the Plan or in any order

45

entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

## C. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtor, with the consent of the "Required Financing Parties" (or similar term) under the Exit Financing Agreements, shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Reorganized Debtor, shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article IV.O of the Plan.

## D. Adjustment to Claims or Interests Without Objection

Following the Effective Date, any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtor without the Reorganized Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, following the Effective Date, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtor without the Reorganized Debtor having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

## E. Reservation of Rights to Object to Claims

Following the Effective Date, any objections to Disputed Claims shall be Filed on or before the later of (1) the Claims Objection Deadline and (2) such later date as may be specifically fixed by the Bankruptcy Court. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

## F. Estimation of Claims

The Debtor (with respect to the period prior to the Effective Date) or the Reorganized Debtor (with respect to the Period after the Effective Date), as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any

46

objection to any Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor or the Reorganized Debtor as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## G.      *Disputed and Contingent Claim Reserve*

On or after the Effective Date, with the prior written consent of the Prepetition Noteholders, the Reorganized Debtor may establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Reorganized Debtor, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.

## H.      *Disallowance of Claims*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and the full amount of such obligation to the Debtor has been paid or turned over in full.

All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and Disallowed as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Reorganized Debtor elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

47

## I. Amendments to Proofs of Claim or Interests

On or after the Effective Date, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; *provided* that the foregoing shall not apply to Administrative Claims other than 503(b)(9) Claims.

## J. No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## K. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

For the avoidance of doubt, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

## A. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described herein in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtor or Reorganized Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims,

Interests, Causes of Action, and controversies under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable. All distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) are intended to be and shall be final. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against, and Interests in, the Debtor and the Debtor's Estate and Causes of Action against other Entities.

**B.      Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions taken to effectuate the Plan, including by the Prepetition Trustee, shall be given the same effect as if such actions were performed under the applicable non-bankruptcy Laws that govern the documents under which the Prepetition Trustee was appointed.

**C.      Release of Liens**

**Except with respect to the Liens securing the obligations under the Exit Financing Agreements, or the Other Secured Claims that are Reinstated pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtor, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Reorganized Debtor to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

49

### D.    Debtor Release

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the service of the Debtor Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable Law, as such Law may be extended or integrated after the Effective Date, on and after the Effective Date, each and all of the Debtor, its Estate, and the Reorganized Debtor, in each case on behalf of itself any and all other Entities who may assert, or purport to assert any claim or Cause of Action, directly or derivatively, by, through or for the Debtor, its Estate, and the Reorganized Debtor, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Debtor Released Parties from any and all Claims, Interests, or Causes of Action whatsoever, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Debtor Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Super Senior Notes, the Existing Notes, and any administrative, enforcement, or remedial action taken in connection therewith, the Chapter 11 Case, any Avoidance Action, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Exit Financing, the Exit Financing Documents, the Reorganized Rockley Equity, the New Governance Documents, or any other Restructuring Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Debtor Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any Claims or Causes of Action for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction, (2) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Exit Financing Documents, the New Governance Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan, or (3) any retained Causes of Action listed on the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) essential to Confirmation of the Plan; (b) given in exchange for the good and valuable consideration provided by the Debtor Released Parties, including, without limitation, the Debtor Released Parties' contributions to facilitating the Restructuring Transactions, and implementing the Plan; (c) a good faith settlement and compromise of the Claims released by the Debtor Release; (d) in the best interests of the Debtor and its Estate; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Debtor, the Reorganized Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### E.      *Third-Party Release*

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the substantial contributions of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable Law, as such Law may be extended or integrated after the Effective Date, on and after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all Claims, Interests, or Causes of Action, whatsoever, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Super Senior Notes, the Existing Notes and any administrative, enforcement, or remedial action taken in connection therewith, the Chapter 11 Case, any Avoidance Action, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Exit Financing, the Exit Financing Documents, the Reorganized Rockley Equity, the New Governance Documents, or any other Restructuring Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any Claims or Causes of Action

51

for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction, (2) any obligations arising after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Exit Financing Documents, the Prepetition Noteholder Private Placement, the New Governance Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan, or (3) any retained Causes of Action listed on the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions, and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

## F.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from any Cause of Action based on or relating to, or in any manner arising from, in whole or in part, any act or omission based on the negotiation, formulation, preparation, dissemination, entry into, execution, filing, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Case, including the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Confirmation Order or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, and the implementation of the Restructuring Transactions contemplated by the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, gross negligence, or a violation of the New York Rules of Professional Conduct. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the

4884-8539-0165.v2

Exhibit 21
Page 3065

solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any obligations arising after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Exit Financing Documents, the New Governance Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## G. *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable Law, and except as otherwise expressly provided in the Plan or the Confirmation Order, for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective Related Parties shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.G.

### H.    *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against the Reorganized Debtor, or any Entity with which the Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because the Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

### I.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### J.    *Recoupment*

In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### K.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### L.    *Document Retention*

Unless otherwise provided in the Confirmation Order, on and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

*M.*     *U.S. Securities and Exchange Commission*

Notwithstanding any language to the contrary contained in the Disclosure Statement, the Plan, or the Confirmation Order, no provision in the Disclosure Statement, the Plan, or the Confirmation Order shall (i) preclude the Commission from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the Commission from commencing or continuing any claims, cause of action, proceeding or investigations against any non-Debtor person or non-Debtor entity in any forum.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

*A.*     *Condition Precedent to Confirmation*

It shall be a condition to the Confirmation that the following conditions shall have been satisfied or waived pursuant to Article IX.C:

**1.**     the Bankruptcy Court shall have entered the Cash Collateral Order in form and substance acceptable to the Prepetition Noteholders, which Cash Collateral Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay;

**2.**     all conditions and milestones in the Cash Collateral Order shall have been satisfied or waived in accordance with their terms and no Termination Event shall have occurred and be continuing thereunder; and

**3.**     the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed, and shall be in form and substance acceptable to the Prepetition Noteholders.

*B.*     *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.C:

**1.**     the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order, which Confirmation Order shall (a) authorize the Debtor to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan, (b) authorize the Debtor to: (i) implement the Restructuring Transactions, including the Exit Financing; (ii) make all distributions and issuances as required under the Plan; and (iii) enter into any agreements, transactions, and sales of property, (c) authorize the implementation of the Plan in accordance with its terms, (d) decree that the provisions of the Confirmation Order and the Plan are non-severable and mutually dependent, (e) contain the release, injunction, and exculpation provisions contained in Article VIII, and (f) shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay;

**2.** the Bankruptcy Court shall have entered the Cash Collateral Orders, which Cash Collateral Orders shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay;

**3.** the Debtor shall have obtained any and all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions, including the Plan;

**4.** the documentation related to the Exit Financing shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Financing shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Financing Agreements;

**5.** the New Governance Documents shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

**6.** the court overseeing the Cayman Proceeding shall have issued orders satisfactory to the Debtor and the Prepetition Noteholders approving the Restructuring Transactions;

**7.** all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable Laws;

**8.** all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such Professional Fee Claims;

**9.** the Debtor and Reorganized Debtor, as applicable, shall have implemented the Restructuring Transactions, including, but not limited to the consummation and closing of the Prepetition Noteholder Private Placement and the Exit Financing, in a manner consistent with the Plan;

**10.** all Restructuring Expenses (including all reasonable and documented fees and expenses incurred by counsel to the Prepetition Noteholders, and the Prepetition Trustee and Exit Financing Representative) invoiced or estimated in accordance with Article IV.P shall have been paid in full; and

**11.** the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Article X.A of the Plan.

## C. *Waiver of Conditions to the Effective Date*

Each condition precedent to Confirmation or the Effective Date set forth in Article IX.A or IX.B (except for the condition that the Confirmation Order shall have been entered) may be

waived in whole or in part at any time by the Debtor, with the prior written consent of the Prepetition Noteholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

**D.** *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

**E.** *Effect of Non-occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to the Debtor, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtor; (2) prejudice in any manner the rights of such Debtor, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtor, any Holders, or any other Entity in any respect.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.** *Modification of Plan*

Subject to the last sentence of this paragraph, with the prior written consent of the Prepetition Noteholders, the Debtor reserves the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and the terms set forth herein and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, and also subject to the last sentence of this paragraph, the Debtor expressly reserves its rights (with the written consent of the Prepetition Noteholders) to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. In addition to the consent of the Prepetition Noteholders, any alteration, amendment, or modification of the Plan which materially and adversely affects the rights or interests of the Prepetition Trustee shall also require the consent of the Prepetition Trustee.

**B.** *Effect of Confirmation on Modification*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

57

### C. *Revocation or Withdrawal of Plan*

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4. ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and

58

other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, and the Restructuring Transactions;

11.     hear, determine, adjudicate, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

12.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.     consider any modifications to the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile or clarify any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

14.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

4884-8539-0165.v2
Exhibit 21
Page 3072

15. hear and determine matters related to any requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

16. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

17. enforce all orders previously entered by the Bankruptcy Court;

18. enter an order or Final Decree concluding or closing the Chapter 11 Case; and

19. hear any other matter not inconsistent with the Bankruptcy Code

*provided, however*, that the Bankruptcy Court shall not retain jurisdiction after the Effective Date over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, including, for the avoidance of doubt, any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter. To the extent that it is legally impermissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court will have non-exclusive jurisdiction over such matters to the extent legally permissible.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtor that arose prior to the Effective Date.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### A. *Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor. All Claims against and Interests in the Debtor shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

60

**B.** *Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Reorganized Debtor and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.** *Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Reorganized for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of the Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

**D.** *Notices*

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| **Debtor** | **Counsel to Debtor** |
|---|---|
| Richard A. (Randy) Meier<br>**Rockley Photonics Holdings Limited**<br>3rd Floor 1 Ashley Road<br>Altrincham, Cheshire<br>United Kingdom WA14 2DT | Joshua D. Morse<br>Jonathan Doolittle<br>**Pillsbury Winthrop Shaw Pittman LLP**<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998<br><br>John A. Pintarelli<br>Dania Slim<br>Kwame O. Akuffo<br>Alana A. Lyman<br>**Pillsbury Winthrop Shaw Pittman LLP**<br>31 West 52nd Street<br>New York, NY 10019-6131 |
| **U.S. Trustee** | **Counsel to the Prepetition Noteholders** |
| Andrea B. Schwartz<br>Brian Masumoto<br>United States Department of Justice<br>Office of the United States Trustee<br>Southern District of New York | Anthony Grossi<br>Ameneh Bordi<br>Leslie Plaskon<br>Michele Nudelman<br>**Sidley Austin LLP** |

4884-8539-0165.v2

Exhibit 21
Page 3074

| 201 Varick Street, Rm. 1006<br>New York, New York 10014 | 787 Seventh Avenue<br>New York, NY 10019 |
|---|---|
| **Counsel to the Prepetition Trustee** | **Counsel to the Exit Financing Representative** |
| Bart Pisella<br>Joon P. Hong<br>**Chapman and Cutler LLP**<br>1270 Avenue of the Americas<br>New York, NY 10020 | Bart Pisella<br>Joon P. Hong<br>**Chapman and Cutler LLP**<br>1270 Avenue of the Americas<br>New York, NY 10020 |

### E.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.   None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, beneficiary, guardian or other successor or assign, and the officer, director, agent, representative, or attorney therefor.

### G.      *Entire Agreement*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which  have  become merged and integrated into the Plan.

### H.      *Non-severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, and the Definitive Documents, are mutually dependent and non-severable.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the Definitive Documents are: (1) valid and enforceable pursuant to their terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor; and (3) non-severable and mutually dependent.

### I.      *Plan Supplements and Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed,

4884-8539-0165.v2

Exhibit 21
Page 3075

copies of such exhibits and documents shall be made available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from https://cases.ra.kroll.com/RockleyPhotonics. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

## J.      *Good Faith Solicitation of Votes*

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and each of its agents, representatives, members, principals, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtor will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

## K.      *Waiver/Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

63

Dated:  March 10, 2023          **ROCKLEY PHOTONICS HOLDINGS
                                  LIMITED**


                                 */s/ Richard A. Meier*
                                 Richard A. Meier
                                 President and Chief Executive Officer

64

**Exhibit B**

Notice of Confirmation and Effective Date

Exhibit 21
Page 3078

PILLSBURY WINTHROP
SHAW PITTMAN LLP
John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
31 West 52nd Street
New York, NY 10019-6131
Phone: (212) 858-1000
Fax: (212) 858-1500
john.pintarelli@pillsburylaw.com
dania.slim@pillsburylaw.com
kwame.akuffo@pillsburylaw.com
alana.lyman@pillsburylaw.com

*Counsel for the Debtor*

PILLSBURY WINTHROP
SHAW PITTMAN LLP
Joshua D. Morse (admitted *pro hac vice*)
Jonathan Doolittle (admitted *pro hac vice*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
joshua.morse@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ROCKLEY PHOTONICS HOLDINGS LIMITED,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-10081 (LGB) |

**NOTICE OF (A) ENTRY OF ORDER (I) APPROVING THE
ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT AND
(II) CONFIRMING THE AMENDED PREPACKAGED CHAPTER 11
PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS
LIMITED AND (B) OCCURRENCE OF PLAN EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that on March 10, 2023, the United States Bankruptcy Court

for the Southern District of New York (the "**Bankruptcy Court**") entered an order [Docket

No. __] (the "**Confirmation Order**") approving the *Disclosure Statement for the Prepackaged*

*Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 3] and

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom WA14 2DT.

Exhibit 21
Page 3079

confirming the *Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 133] (as modified, amended, and including all supplements and exhibits thereto, the "**Plan**") (attached as **Exhibit A** to the Confirmation Order).[2]

PLEASE TAKE FURTHER NOTICE that the Plan was substantially consummated, and the Effective Date of the Plan occurred on March __, 2023.

PLEASE TAKE FURTHER NOTICE that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed on or prior to April __, 2023, which is the first Business Day that is forty-five days after the Effective Date.

PLEASE TAKE FURTHER NOTICE that the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor and the Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Holders are deemed to have accepted or rejected the Plan and regardless of whether such Holders are impaired under the Plan) and such Holders' respective predecessors, successors, and assigns, all entities that are parties to or are subject to the settlements, compromises, releases (including the Debtor Release, Third-Party Release, and Exculpation), and injunctions described in the Plan, each entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in **Article VIII** of the Plan.

---

[2]   Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan and the Confirmation Order, as applicable.

Exhibit 21
Page 3080

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, the Confirmation Order and copies of all documents filed in this chapter 11 case are available free of charge by visiting the website of Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/rockley or by calling Kroll Restructuring Administration LLC at 833-232-4652 (toll free) or +1 (646) 440-4743 (international). You may also obtain copies of any pleadings filed with the Bankruptcy Court by visiting the Bankruptcy Court's website at https://www.nysb.uscourts.gov and following the procedures and paying any fees set forth therein.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE PLEASE CONTACT KROLL RESTRUCTURING ADMINISTRATION LLC BY CALLING 833-232-4652 (TOLL FREE) OR +1 (646) 440-4743 (INTERNATIONAL).**

---

Exhibit 21
Page 3081

DATED: March __, 2023
New York, New York

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

_____

John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
31 West 52nd Street
New York, NY 10019-6131
Phone: (212) 858-1000
Fax: (212) 858-1500
john.pintarelli@pillsburylaw.com
dania.slim@pillsburylaw.com
kwame.akuffo@pillsburylaw.com
alana.lyman@pillsburylaw.com

Joshua D. Morse (admitted _pro hac vice_)
Jonathan Doolittle (admitted _pro hac vice_)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
joshua.morse@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com

_Counsel for the Debtor_

4

Exhibit 21
Page 3082

# EXHIBIT 22

Exhibit 22
Page 3083

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): March 10, 2023**

---

# Rockley Photonics Holdings Limited
**(Exact name of registrant as specified in its charter)**

---

| Cayman Islands | 001-40735 | 98-1644526 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3rd Floor 1 Ashley Road**
**Altrincham, Cheshire**
**United Kingdom**   **WA14 2DT**
(Address of principal executive offices)   (Zip Code)

**+44 (0) 1865 292017**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.000004026575398 par value per share | RKLY | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one ordinary share at an exercise price of $11.50 per share | RKLY.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

Exhibit 22
Page 3084

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 22
Page 3085

**Item 1.03.        Bankruptcy or Receivership.**

As previously disclosed, on January 23, 2023, Rockley Photonics Holdings Limited (the "**Company**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") to implement a "pre-packaged" plan of reorganization (the "**Plan**") in order to facilitate the restructuring of the Company.

*Confirmation of Plan of Reorganization*

On March 10, 2023, the Bankruptcy Court entered its Order (i) approving the adequacy of the Company's disclosure statement; and (ii) confirming the Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization of the Company (the "**Confirmation Order**"), attached hereto as Exhibit 2.1, by which it confirmed the Plan of Reorganization. The Plan became effective on March 14, 2023 (the "**Effective Date**").

**Item 3.03.        Material Modification to Rights of Security Holders.**

Pursuant to the Plan, after the Effective Date, the Company will liquidate pursuant to Cayman Islands law. Holders of existing equity interests in the Company will receive or retain any distribution or property on account of such equity interests. In connection with the liquidation, the Company expects to file a Form 15 with the Securities and Exchange Commission to terminate the registration of its ordinary shares. Thereafter, the Company's reporting obligations under the Securities Exchange Act of 1934, as amended shall be terminated.

**Item 5.02.        Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangement of Certain Officers.**

Effective March 17, 2023, Chad Becker resigned as Chief Financial Officer of the Company. Mr. Becker's resignation was not in connection with any known disagreement with the Company on any matter. Richard Meier, our Chief Executive Officer, assumed the duties of the Company's principal accounting officer and principal financial officer upon the effectiveness of Mr. Becker's resignation.

**Item 9.01.        Financial Statements and Exhibits.**

*(d) Exhibits*

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Confirmation Order, dated March 10, 2023. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL). |

Exhibit 22
Page 3086

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

April 7, 2023

ROCKLEY PHOTONICS HOLDINGS
LIMITED

By:  /s/ Richard A. Meier
Name: Richard A. Meier
Title:   President and Chief Executive Officer

Exhibit 22
Page 3087

# EXHIBIT 23

Exhibit 23
Page 3088

**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
31 West 52nd Street
New York, NY 10019-6131
Phone: (212) 858-1000
Fax: (212) 858-1500
john.pintarelli@pillsburylaw.com
dania.slim@pillsburylaw.com
kwame.akuffo@pillsburylaw.com
alana.lyman@pillsburylaw.com

*Counsel for the Debtor*

**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
Joshua D. Morse (admitted *pro hac vice*)
Jonathan Doolittle (admitted *pro hac vice*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
joshua.morse@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

In re:

ROCKLEY PHOTONICS HOLDINGS
LIMITED,

Debtor.[1]

Chapter 11

Case No. 23-10081 (LGB)

---

**NOTICE OF (A) ENTRY OF ORDER (I) APPROVING THE ADEQUACY
OF DEBTOR'S DISCLOSURE STATEMENT AND (II) CONFIRMING
THE REVISED SECOND AMENDED PREPACKAGED CHAPTER 11
PLAN OF REORGANIZATION OF ROCKLEY PHOTONICS HOLDINGS
<u>LIMITED AND (B) OCCURRENCE OF PLAN EFFECTIVE DATE</u>**

**PLEASE TAKE NOTICE** that, on March 10, 2023, the United States Bankruptcy Court

for the Southern District of New York (the "**Bankruptcy Court**") entered an order [Docket

No. 137] (the "**Confirmation Order**") approving the *Disclosure Statement for the Prepackaged*

*Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 3] and

---

[1] The last four digits of the Debtor's federal identification number are 4526. The Debtor's mailing address is 3rd Floor 1 Ashley Road, Altrincham, Cheshire, United Kingdom WA14 2DT.

Exhibit 23
Page 3089

confirming the *Revised Second Amended Prepackaged Chapter 11 Plan of Reorganization of Rockley Photonics Holdings Limited* [Docket No. 133] (as modified, amended, and including all supplements and exhibits thereto, the "**Plan**") (attached as **Exhibit A** to the Confirmation Order).[2]

PLEASE TAKE FURTHER NOTICE that the Plan was substantially consummated, and the Effective Date of the Plan occurred, on March 14, 2023.

PLEASE TAKE FURTHER NOTICE that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed on or prior to April 28, 2023, which is the first Business Day that is forty-five days after the Effective Date.

PLEASE TAKE FURTHER NOTICE that the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor and the Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Holders are deemed to have accepted or rejected the Plan and regardless of whether such Holders are impaired under the Plan) and such Holders' respective predecessors, successors, and assigns, all entities that are parties to or are subject to the settlements, compromises, releases (including the Debtor Release, Third-Party Release, and Exculpation), and injunctions described in the Plan, each entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in **Article VIII** of the Plan.

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan and the Confirmation Order, as applicable.

Exhibit 23
Page 3090

PLEASE TAKE FURTHER NOTICE that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

PLEASE TAKE FURTHER NOTICE that the Plan, the Plan Supplement, the Confirmation Order and copies of all documents filed in this chapter 11 case are available free of charge by visiting the website of Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/rockley or by calling Kroll Restructuring Administration LLC at 833-232-4652 (toll free) or +1 (646) 440-4743 (international). You may also obtain copies of any pleadings filed with the Bankruptcy Court by visiting the Bankruptcy Court's website at https://www.nysb.uscourts.gov and following the procedures and paying any fees set forth therein.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE PLEASE CONTACT KROLL RESTRUCTURING ADMINISTRATION LLC BY CALLING 833-232-4652 (TOLL FREE) OR +1 (646) 440-4743 (INTERNATIONAL).**

---

Exhibit 23
Page 3091

DATED: March 14, 2023
New York, New York

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Dania Slim*
John A. Pintarelli
Dania Slim
Kwame O. Akuffo
Alana A. Lyman
31 West 52nd Street
New York, NY 10019-6131
Phone: (212) 858-1000
Fax: (212) 858-1500
john.pintarelli@pillsburylaw.com
dania.slim@pillsburylaw.com
kwame.akuffo@pillsburylaw.com
alana.lyman@pillsburylaw.com

Joshua D. Morse (admitted *pro hac vice*)
Jonathan Doolittle (admitted *pro hac vice*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
joshua.morse@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com

*Counsel for the Debtor*

4

Exhibit 23
Page 3092