ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL (248668)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KENNETH S. GROSSMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DAVID SIN, et al., <br><br> Defendants. | Case No. 2:23-cv-09501-MRA-MAA <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS <br><br> DATE:     May 30, 2024 <br> TIME:      1:30 p.m. <br> CTRM:    10B <br> JUDGE:    Hon. Mónica Ramírez Almadani |

4896-0177-1958.v1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................... 1

II. FACTUAL BACKGROUND .................................................... 2

III. ARGUMENT ....................................................................... 6

    A. Reliability of Confidential Witnesses ................................... 6

    B. The Complaint Alleges Actionable Misrepresentations ..................... 8

        1. Defendants Misrepresented Rockley's Product Development and Commercialization Prospects ........................ 8

            a. Defendants' Misrepresentations Are Not Protected by the Safe Harbor ........................... 10

            b. Defendants' Misrepresentations Were Not Puffery ....... 12

            c. Defendants' Opinion Statements Were Materially Misleading ................................................... 13

        2. Defendants Concealed Material Adverse Facts Regarding HRT and Apple ................................... 13

    C. The Complaint Alleges a Strong Inference of Scienter ..................... 15

    D. The Complaint Alleges Claims Under Section 20(a) ........................ 22

IV. CONCLUSION .................................................................... 23

4896-0177-1958.v1

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................................... 8, 9, 22

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .............................................................................. 23

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .............................................................................. 16

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ................................................................................ 20

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ............................................................... 8, 12, 13, 14

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................... 11

*In re China Med. Sec. Litig.*,
2012 WL 5713399 (C.D. Cal. May 10, 2012) ...................................................... 20

*In re CV Therapeutics, Inc.*,
2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ....................................................... 10

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................ 6

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .............................................................. 11, 12

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................................ 13

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ....................................................... 20

4896-0177-1958.v1

**Page**

*In re Quality Sys., Inc. Sec. Litig.*,
　865 F.3d 1130 (9th Cir. 2017)..................................................................10, 11, 12

*In re QuantumScape Sec. Class Action Litig.*,
　580 F. Supp. 3d 714 (N.D. Cal. 2022) .............................................11, 16, 17, 18

*In re Snap Inc. Sec. Litig.*,
　2018 WL 2972528 (C.D. Cal. June 7, 2018)...........................................6, 14, 19

*In re Terayon Commc'ns Sys., Inc.*,
　2002 WL 989480 (N.D. Cal. Mar. 29, 2002)......................................................21

*In re UTStarcom, Inc. Sec. Litig.*,
　617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................20

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018).......................................................................2, 14

*Mulligan v. Impax Labs., Inc.*,
　36 F. Supp. 3d 942 (N.D. Cal. 2014).................................................................12

*Nguyen v. Radient Pharms. Corp.*,
　2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ....................................................15

*Plumbers Union Loc. No. 12 Pension Fund*
　*v. Ambassador's Grp.*,
　717 F. Supp. 2d 1170 (E.D. Wash. 2010) ..........................................................22

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
　2020 WL 2559939 (N.D. Cal. May 20, 2020) ......................................................7

*Reese v. Malone*,
　747 F.3d 557 (9th Cir. 2014),
　*overruled on other grounds by*
　*City of Dearborn Heights Act 345 Police*
　*& Fire Ret. Sys. v. Align Tech., Inc.*,
　856 F.3d 605 (9th Cir. 2017)..................................................................*passim*

*Roberti v. OSI Sys., Inc.*,
　2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).......................................12, 16, 19

- iii -

4896-0177-1958.v1

**Page**

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ....................................................... 7

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................... 18, 20

*Sydanmaa v. L.A. Police Dep't*,
   2021 WL 1593249 (C.D. Cal. Mar. 16, 2021) ............................................. 9, 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..........................................................................16, 18, 21

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)........................................................ 13

**Rules, Statutes, and Regulations**

15 U.S.C.
   §78j(b) ................................................................................................ 1, 22
   §78t(a)..........................................................................................................22

4896-0177-1958.v1

Lead Plaintiffs ("Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss filed by defendants Rickman, Karanth, and Meier (collectively, "Defendants") ("Motion" or "Mot.") (ECF 64).[1]

## I.    INTRODUCTION

Defendants' Motion concedes that Plaintiffs have adequately alleged four of the six elements required to plead a claim under §10(b), challenging only the elements of falsity and scienter.  But Defendants' arguments regarding these elements each fail, as they misstate or ignore Plaintiffs' allegations and relevant authorities, and rest upon unfounded factual assertions that cannot be resolved in Defendants' favor on a motion to dismiss.

Tellingly, Defendants' Motion does not contest the falsity of several key misrepresentations alleged in the Complaint.  *See* §III.A.1, *infra*.  By itself, this failure is sufficient to establish that Plaintiffs have adequately alleged falsity.  Moreover, the falsity arguments Defendants do advance are each unavailing.  First, Defendants' misrepresentations are not protected by the "safe harbor" established by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), because each misstatement was either: (i) not forward-looking; or (ii) made with actual knowledge of its false or misleading nature, and not accompanied by adequate cautionary language.  §III.A.1.a, *infra*.  Second, Defendants' arguments that their misrepresentations constitute nonactionable "puffery" or opinion statements – which apply to only a handful of the many alleged misrepresentations – fail when such misstatements are viewed in context and considered in light of Plaintiffs' detailed allegations regarding the information Defendants possessed.  §III.A.1.b-c, *infra*. Finally, Defendants' argument that they were not obligated to disclose material

---

[1] Defendants Sin, Coloma, and SINCap have yet to be served in this action and are not at issue in the Motion.  Unless otherwise noted herein: all capitalized terms have the same meanings as defined in the Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 56); all "¶_" or "¶¶_" references are to the Complaint; all emphasis is added; and citations and footnotes are omitted.

- 1 -

adverse information concerning their financial prospects ignores that "once defendants [chose] to tout positive information to the market, they [were] bound to do so in a manner that wouldn't mislead investors." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018); §III.B.2, *infra*.

Regarding scienter, Defendants' arguments improperly seek to address and discredit the numerous allegations supporting Defendants' fraudulent intent in isolation. But when these allegations are "taken collectively" and "viewed holistically," as required by Supreme Court and Ninth Circuit authority, they unquestionably raise a strong inference of scienter that is "'at least as compelling as any opposing inference of nonfraudulent intent.'" *Reese v. Malone*, 747 F.3d 557, 568-69 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); §III.C, *infra*.

When the Complaint's detailed factual allegations are accepted as true and viewed in the light most favorable to Plaintiffs – as they must be on a motion to dismiss – it is clear they adequately state claims for securities fraud. Thus, Plaintiffs respectfully request that the Motion be denied in its entirety.

## II.   FACTUAL BACKGROUND

Rockley is a company specializing in the development of photonics chipsets. ¶¶59-61. Leading up to and during the Class Period, Rockley claimed to have developed technology that enabled continuous non-invasive monitoring of multiple biomarkers, such as blood pressure and glucose. *Id.* At the start of the Class Period, Rockley's stated plan was to target the consumer health and wellness markets by selling its chipset modules to original equipment manufacturers ("OEMs") of consumer wearable devices, such as Apple, for incorporation into those customers' product offerings, such as smartwatches. ¶¶62-63.

In early-2021, Rockley was identified by SC Health, a blank check company or SPAC, as a target for a Merger that would infuse Rockley with over $150 million

- 2 -

of desperately needed funding and result in Rockley becoming a publicly traded company. ¶¶41-50. Rickman and Karanth were highly motivated to complete the Merger, as doing so would result in a *$775,000 cash bonus* for Karanth and an award "with an aggregate value of *$4.5 million*," including *$1.5 million in cash*, for Rickman – in addition to substantial salary increases for both. ¶¶51-52. Thus, to ensure the Merger would be approved, Defendants overstated the development status and commercial prospects of Rockley's consumer wearable products, while also concealing known material risks regarding the only two revenue streams the Company had at the time. ¶¶5-10, 66-103, 122-131.

Specifically, Defendants told investors at the time that "this is *not a future story – this is happening now*, and we have *strong visibility on our numbers* in close partnership with our customers." ¶¶5, 130. Those "numbers" conveyed that Defendants expected to commercialize Rockley's consumer wearable products by 2022 and experience sky-rocketing revenue increases thereafter, with Rickman specifically telling investors that Rockley "*very conservatively*" expected to generate revenues of *$426 million* in 2023 and *more than $1.1 billion* in 2024. ¶¶5, 92, 124-125.

In the meantime, Defendants claimed that the resources needed to fund Rockley's product development would primarily come from the Company's receipt of NRE revenues from two customers: Apple, who had supposedly "committed" to provide more than $70 million in NRE revenue to Rockley; and HRT, a joint venture Rockley had formed with a Chinese company, Hengtong. ¶¶6, 66-70, 83, 127-128, 136.

To justify Rockley's revenue projections, Defendants claimed that Rockley's consumer wearable products were "*validated by leading blue-chip customers*." ¶¶5, 127-128. In truth, however, there was no product for Rockley's customers to "validate," because Rockley's consumer wearable products were nowhere near

- 3 -

4896-0177-1958.v1

ready for commercialization at the start of the Class Period – or at any point during it.

Indeed, by the start of the Class Period, Rockley had yet to even **begin** its efforts to develop a critical new ASIC chipset for its consumer wearables module. ¶¶93-102. This new chipset was essential to Rockley's efforts to create a commercially viable product that could fit inside existing devices from consumer wearable OEMs, and it required **at least 15-24 months** to develop, after which the completed product would need to be subjected to multiple rounds of human studies, qualified by consumer wearable OEMs, and then incorporated into such customers' own product designs, before being included in any such customers' product launches. *Id.* Yet, Rockley did not even **hire** the person responsible for architecting this critical component until December 2021 – more than eight months after Rickman told investors "this is not a future story – **this is happening now**." *Id.*

Nonetheless, throughout the Class Period, Defendants told investors that their development plans remained "on track," that there were **no "meaningful hurdles"** to commercial adoption of Rockley's consumer wearables products in 2023, and that Rockley had secured "**deep design wins and commitments**" from its consumer wearable customers, with whom Rockley was supposedly negotiating "**volume [purchase orders]**." ¶¶9, 96, 153-154, 162. But these statements, and the revenue projections they supposedly supported, were materially false and misleading, because Rockley never had a commercially viable consumer wearables product at any point during the Class Period – or any hope of developing one by the start of 2023. ¶¶131, 157, 164.

In addition, Defendants concealed from investors known material risks regarding Rockley's critical revenue streams from HRT and Apple. ¶¶10, 71-80, 84-91. Specifically, Defendants concealed that Rockley's HRT revenues were at imminent risk of going away, due to the likelihood that U.S. regulators would soon preclude Hengtong from doing business with U.S. companies, as a result of

- 4 -

Hengtong's 2020 acquisition of a company that had previously been placed on the U.S. government's banned "Entity List."   ¶¶71-80.   Additionally, Defendants concealed that Rockley's relationship with Apple had become strained during 2021 due to Rockley's public disclosure of the notoriously secretive Apple as its largest customer, and Apple's dissatisfaction with Rockley's chip yield rates.  ¶¶84-91.

The truth regarding Defendants' misrepresentations was revealed through a series of partial corrective disclosures.  ¶¶231-244.  First, on December 21, 2021, the concealed risks regarding HRT were revealed when Hengtong was, in fact, prohibited from doing business with U.S. companies, thereby eliminating a vital source of revenue for the Company.  ¶¶81-82.  Then, on May 12, 2022, Rockley lowered its 2023 revenue projections from its previous estimate of $426 million to a range of $300 million to $320 million.  ¶¶105-106.

One month later, Karanth unexpectedly resigned from his position as CFO. ¶107.  And less than two months after that, on August 11, 2022, Defendants revealed that Rockley was ***withdrawing its 2023 revenue guidance entirely*** and shifting its focus away from the consumer wearable products that had previously provided the sole basis for the Company's 2023 revenue projections – and which Defendants had described as "on track" for "production" as recently as three months prior.  *Id.* During an earnings call that same day, a befuddled analyst attempted to reconcile these developments with Defendants' previous representations regarding the lack of any "***meaningful hurdles***" in the way of Rockley's supposedly imminent commercialization of its consumer wearable products, by asking Rickman what had changed.  ¶¶107, 186-187.  In response, Rickman confirmed that Defendants' glowing reports over the past year had been baseless all along, specifically stating: "***I don't think anything has changed***."  *Id.*

Despite this shocking admission, however, Rickman continued to conceal the truth regarding Rockley's dire state of affairs.  In fact, during the same call, Rickman told investors that Rockley's "***overall business prospects***" were "***actually stronger***

- 5 -

*than they have been*." ¶¶108, 184-185. But these representations were also false and misleading. Within months, Rickman (temporarily) resigned from his role as CEO, and by January 23, 2023, Rockley had declared bankruptcy, wiping out all existing investors and causing significant losses to Plaintiffs and members of the Class. ¶¶114-117. Rickman, however, did not fare as poorly. In fact, he was rewarded with a reappointment to CEO and a lucrative new equity incentive plan following the Company's successful reorganization. ¶¶120-121.

## III.   ARGUMENT

To defeat the Motion, the Complaint "'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *3 (C.D. Cal. June 7, 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In deciding a 12(b)(6) motion, the Court must accept all allegations of material fact stated in the complaint as true . . . [and] draw all reasonable inferences in favor of the nonmoving party." *Id.* at *4.

"To state a securities fraud claim, plaintiff must plead: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Reese*, 747 F.3d at 567. Defendants challenge only the first two of these elements, falsity and scienter. Mot. at 6.

### A.   Reliability of Confidential Witnesses

As an initial matter, Plaintiffs address Defendants' erroneous contention that allegations sourced from two former Rockley employees are not reliable. Mot. at 17-18. In the Ninth Circuit, "[n]aming sources is unnecessary so long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'" *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Plaintiffs' allegations easily satisfy these standards.

- 6 -

4896-0177-1958.v1

First, the Complaint "provide[s] each witness's job title, description, and responsibilities," which courts have found sufficient to "me[e]t the PSLRA's requirements for confidential witnesses." *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *4 (N.D. Cal. May 20, 2020); *see also* ¶¶86, 88, 98. In addition, Plaintiffs detail how the witnesses' "personal knowledge . . . comes as a direct result of their positions." *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020). For example, because the Former Process Engineer specialized in silicon bonding of photonics chips made for Apple, it makes sense that he would need to be aware of Apple's expected product development timelines and yield requirements. ¶¶86-89. Similarly, the Former Chip Designer is alleged to have been hired "for the purpose of architecting an ASIC chipset, without which Rockley could not offer a commercially viable product for incorporation into existing product offerings from consumer wearable OEMs." ¶98. Contrary to Defendants' assertions (Mot. at 17), it makes sense that the Former Chip Designer would have personal knowledge regarding the intended end-use and expected development timeline for the chipset he was specifically hired to architect. Additionally, the basis for the Former Chip Designer's knowledge regarding these topics is bolstered by Plaintiffs' detailed allegations regarding the specific reasons why the ASIC chipset was essential to Rockley's development of a commercially viable consumer wearables product, and the expected timeline provided to him during the hiring process. ¶¶98-101.

Moreover, the allegations sourced to both witnesses are corroborated by other facts, including: (i) public reports in April 2022 that Apple "was still several years away" from incorporating non-invasive glucose monitoring into its wearable devices (¶87); (ii) the fact that Rockley's Apple revenues never came close to materializing to their reportedly expected amounts (¶¶85, 91, 193); (iii) Rickman's admission, following Rockley's complete withdrawal of its 2023 revenue guidance and sudden pivot away from the consumer wearables market, that he "***d[id]n't think anything***

- 7 -

*ha[d] changed*" (¶107); and (iv) Rockley's failure, to this day, to commercialize any consumer wearable products (¶120).

### B.    The Complaint Alleges Actionable Misrepresentations

To plead falsity, Plaintiffs must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'"  *Reese*, 747 F.3d at 568 (alteration original).  Such allegations, however, need only satisfy "the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*."  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (emphasis original).  Thus, falsity is adequately pled where Plaintiffs allege "sufficient factual matter, accepted as true . . . [to] allow[] the court to draw the reasonable inference that the defendant [made a misleading statement]."  *Ashcroft*, 556 U.S. at 678.  In the Ninth Circuit, "[a] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Here, the Complaint alleges multiple such statements by Defendants.

### 1.    Defendants Misrepresented Rockley's Product Development and Commercialization Prospects

Throughout the Class Period, Defendants made numerous concrete statements regarding the purported current status of Rockley's development and commercialization of its consumer wearable products.  Among other things, Defendants told investors that: (i) the commercialization of Rockley's consumer wearable products was "*not a future story*," but was in fact "*happening now*" (¶130); (ii) Rockley's products were "*validated by leading blue-chip customers*" (¶¶127-128, 162); (iii) there were *no "meaningful hurdles remain[ing] from a technology standpoint*" (¶¶153-154, 170); and (iv) Rockley had secured "*deep design wins and commitments*" and was "*negotiating, volume [purchase orders]*" from its consumer wearable customers (¶162).

- 8 -

These statements were materially false and misleading because they gave investors "the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"  *Berson*, 527 F.3d at 985.  Indeed, contrary to Defendants' representations, Rockley was never close to completing its development of a commercially viable consumer wearables product at any point during the Class Period.  ¶¶7-9, 94-102.  As such, it was ***impossible*** for Rockley's customers to have "validated" such products; Rockley was ***not*** in a position to secure "deep design wins and commitments" or negotiate "volume [purchase orders]"; meaningful technology hurdles ***did*** remain; and the commercialization of Rockley's consumer wearables products was absolutely ***not*** "happening now."  ¶¶131, 157, 164, 171.

Defendants' Motion does not address ***any*** of the above misrepresentations.  *See* Mot. at 9-14.  As such, Defendants have waived any ability to challenge the falsity of such statements in connection with the Motion.  *See Sydanmaa v. L.A. Police Dep't*, 2021 WL 1593249, at *1 (C.D. Cal. Mar. 16, 2021) ("it is improper to raise new arguments on reply").

Defendants do, however, generally challenge the basis for Plaintiffs' allegation that Rockley was never close to completing its development of a commercially viable consumer wearables product during the Class Period.  Mot. at 5, 14, 17.  Specifically, Defendants curiously assert that Plaintiffs' allegations are somehow contradicted by Rockley's disclosures that "its plan was to sell its silicon photonic chips to technology companies that would incorporate the chips into their own consumer wearables products."  *Id.* at 14.  But Plaintiffs' allegations are ***premised*** upon these disclosures, not contradicted by them.  Indeed, the entire basis for Plaintiffs' claim that Rockley was unable to develop a commercially viable consumer wearables product during the Class Period rests upon the allegation that the new ASIC chipset "was essential to Rockley's efforts to create a commercially viable consumer wearables product ***that could fit inside existing devices from consumer wearable OEMs***."  ¶8; *see also* ¶¶63, 93-94, 98.  As such, Defendants'

- 9 -

perplexing assertion is directly contradicted by Plaintiffs' allegations and, at best, raises a factual dispute that cannot be resolved as a matter of law.

### a. Defendants' Misrepresentations Are Not Protected by the Safe Harbor

Defendants' argument that certain alleged misrepresentations are protected from liability by the PSLRA safe harbor fails for two reasons. Mot. at 9-11.

First, several of the supposedly "forward-looking statements" Defendants point to are "'mixed statements,' containing non-forward-looking statements as well as forward-looking statements." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). For example, when Defendants provided revenue projections, they told investors that the "basis of [Rockley's] financial projections," came from the fact that Rockley was "currently engaged or contracted with" "leading blue-chip customers" who had supposedly "validated" Rockley's products. ¶128. Plaintiffs allege that these statements regarding current and historical facts were materially false and misleading when made. ¶131(c)-(d). Thus, Defendants cannot avoid liability for such statements simply by combining them with revenue projections. *Quality Sys.*, 865 F.3d at 1141-42 ("the safe harbor is not designed to protect companies and their officials . . . when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement"); *see also In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) (defendants' use of "inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements").[2]

Moreover, the forward-looking portions of such statements are also not protected under the safe harbor, because "[f]or cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA,

---

[2] This same reasoning similarly applies to other alleged misrepresentations containing "mixed statements." *See, e.g.*, ¶¶140, 167, 173.

- 10 -

4896-0177-1958.v1

that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148. As such, "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate," and Defendants provided no such language here. *Id.*

Second, even those alleged misstatements that were purely forward-looking are not protected by the safe harbor, because such statements "were materially false or misleading, were not accompanied by appropriate cautionary statements, and were made with actual knowledge of their false or misleading nature." *Id.* at 1141. "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil' . . . [and] it must 'precise[ly]' and 'directly address' the alleged misrepresentations." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (some alterations original).

Here, the purported cautionary language Defendants rely upon consists of insufficient "'vague or blanket (boilerplate) disclaimers . . . that the investment has risks.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1035 (S.D. Cal. 2005). For the most part, these purported warnings merely cautioned investors that the future is unknowable ("'assumptions and estimates . . . may not prove to be accurate'") or that success is uncertain ("'there can be no guarantee . . . that [Rockley's] products will be commercially successful'"). Mot. at 10-11. And they clearly never warned investors of the undisclosed problems related to Rockley's prolonged timeline to develop the essential component of a new ASIC chipset. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead

- 11 -

reasonable investors." (alterations original)); *see also Glazer*, 63 F.4th at 780-81; *Immune Response*, 375 F. Supp. 2d at 1034-35.

Moreover, for several of the supposedly forward-looking misstatements, Defendants cite **no cautionary language at all**. Specifically, the only cautionary language Defendants cite comes from SEC filings dated April 2, 2021 through November 15, 2021. Mot. at 10-11. Accordingly, Defendants cite no cautionary language accompanying the supposedly forward-looking statements made on March 19, 2021 (¶¶122-131) or any such statements made after November 15, 2021 (¶¶159-189). Nor do Defendants cite any cautionary language accompanying the numerous misrepresentations Defendants made during investor calls and presentations. *See* ¶¶128-130, 140-143, 148-156, 162-163, 169-170, 174, 179-188, 191-197.

### b. Defendants' Misrepresentations Were Not Puffery

Defendants' argument that certain alleged misrepresentations constitute nonactionable puffery fails. Mot. 11-12. The Ninth Circuit has held that "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. Here, Defendants' statements conveyed a concrete state of affairs that materially differed from the one that actually existed, *i.e.*, that it was impossible for Rockley to commercialize its consumer wearable products by 2023. *See Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015) (holding that certain statements "about the status of specific products" were not puffery).

Moreover, "determining whether a given statement is material [*i.e.*, not puffery] 'entail[s] fact-intensive assessments that are more properly left to the jury.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (some alterations original). Thus, a statement can only be characterized as puffery if it is "'so "exaggerated" or "vague" that no reasonable investor would rely on it when

- 12 -

4896-0177-1958.v1

considering the total mix of available information.'"  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  Here, that is not the case.

### c.    Defendants' Opinion Statements Were Materially Misleading

Defendants' argument regarding their purported "statements of opinion" also fails. Mot. at 12.  First, several of the misrepresentations Defendants point to contain statements of fact that are alleged to be false and misleading.  *See* ¶¶136, 142, 173, 192.  "Simply inserting the word 'believe' in front of a statement of fact does not . . . immunize Defendants from liability" for such statements.  *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *9 (C.D. Cal. Apr. 12, 2016).  Moreover, Defendants ignore that opinion statements are actionable when the opinion does "not 'fairly align[] with the information in [defendants'] possession at the time.'"  *Glazer*, 63 F.4th at 771, 779 (some alterations original).  Here, Plaintiffs allege that Defendants were in possession of undisclosed material information that was entirely incompatible with their professed opinions.  *See* ¶¶138(e), 144(a), 175(a), 198(b).  Thus, those statements are actionable.

### 2.    Defendants Concealed Material Adverse Facts Regarding HRT and Apple

The Complaint also alleges that Defendants misled investors by touting the significance of Rockley's revenue streams from HRT and Apple, while simultaneously concealing known material risks that substantially imperiled the viability of those revenues.  ¶¶125, 128, 136.  Specifically, Defendants highlighted the amount of revenue Rockley had historically generated from these two critical customers and – with regard to Apple, specifically – touted that Rockley had "received [$70] million of NRE commitment to date by one of the largest technology companies in the world."  *Id.*  These representations were particularly material to investors, given Rockley's representations that it was dependent upon such revenues to "develop and commercialize Rockley's technology and modules."  ¶¶6, 66-67,

- 13 -

83-84, 125. Defendants, however, concealed from investors material risks that were known to Defendants and substantially impacted the viability of these critical revenue streams. ¶¶10, 71-80, 83-91.

As the Ninth Circuit has held, "'once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Khoja*, 899 F.3d at 1009 (alterations original). By choosing to highlight to investors the importance of the HRT and Apple revenue streams, Defendants were duty-bound to do so in a manner that did not mislead investors, including by disclosing known material adverse information affecting the viability of those revenues.

Regarding HRT, Defendants argue that they did not know "in advance that Hengtong would be added to the 'Entity List,'" and that they were not obligated to "speculate about possible governmental action before it occurred." Mot. at 7-8. But Defendants' lack of certainty regarding the ultimate fate of HRT does not absolve them of their duty to provide fulsome disclosure of known material facts concerning the positive information they chose to tout. *See Glazer*, 63 F.4th at 781 (finding disclosure misleading where the omitted "risk . . . had not yet become an absolute certainty," but defendant "was aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development").

Defendants' argument that they had no obligation to disclose the omitted facts regarding the risks to HRT because such information was supposedly "publicly disclosed and widely publicized" (Mot. at 7-8) is nothing more than a veiled "truth-on-the-market" defense. *Snap*, 2018 WL 2972528, at *7. To succeed on this defense, Defendants must "'show that the information was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created' by the alleged false or misleading statements." *Id.* Because this requires an "intensely fact-specific" showing, "courts rarely dismiss a

- 14 -

4896-0177-1958.v1

complaint on this basis." *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011).  Moreover, Defendants cannot make such a showing here, because **none** of the public information they cite to provided any information regarding **Rockley's** connection to the national security scrutiny placed on Hengtong – or even mentioned Rockley at all.  As such, these reports failed to apprise investors of the risks to **Rockley's** revenues and, at best, raise factual inquires that cannot be resolved as a matter of law.

Regarding Apple, Defendants' argument regarding Rockley's disclosure that the term "commitment" paradoxically meant "no commitment" (Mot. at 14-15) fails because the purported disclosures Defendants rely upon were not made until weeks **after** Defendants' alleged misrepresentation.  ¶128.  Moreover, Defendants' argument that Plaintiffs fail to allege "that Apple's actual NRE payments to Rockley fell materially short of the projected $70 million" (Mot. at 15) is flatly contradicted by Plaintiffs' allegations.  ¶¶85, 91, 193.

### C.    The Complaint Alleges a Strong Inference of Scienter

"To adequately plead scienter, the complaint must 'state with particularity facts giving rise to **a strong inference** that the defendant acted with the required state of mind.'"  *Reese*, 747 F.3d at 568 (emphasis original).  In the Ninth Circuit, "[t]he inference must be that 'the defendant[] made false or misleading statements either **intentionally** or with **deliberate recklessness**.'"  *Id.* at 569 (emphasis and some alterations original).  "'[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'"  *Id.* (alterations original).

When assessing the element of scienter, "a court must first accept all factual allegations in the complaint as true" and "'review all the allegations holistically.'"  *Id.* at 568-69.  The "relevant inquiry" is then "'whether **all** of the facts alleged, **taken collectively**, give rise to a strong inference of scienter, **not** whether any individual

- 15 -

allegation, scrutinized in isolation, meets that standard.'" *Id.* at 569 (some emphasis original).  A strong inference of scienter is one that is "'cogent and at least **as compelling** as any opposing inference of nonfraudulent intent.'"  *Id.*  "[I]f two possible inferences – one fraudulent and the other nonfraudulent – are **equally compelling**, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

Here, Plaintiffs allege numerous facts that – taken collectively – clearly give rise to a strong inference of scienter.

***First***, strong evidence of scienter comes from the fact that Defendants made numerous detailed factual statements regarding the precise matters that were misrepresented and omitted.  *See, e.g.*, ¶¶128, 140-143, 148-156, 162-163, 169-170, 173-174, 179, 192, 207-208.  "As the Ninth Circuit has previously explained, an assertion that defendants were unaware of the alleged issues can be 'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'" *Roberti*, 2015 WL 1985562, at *12 (alterations original) (citing *Reese*, 747 F.3d at 571); *see also QuantumScape*, 580 F. Supp. 3d at 741 (finding scienter adequately alleged where "the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality").

For example, in March 2021, Rickman provided investors with a detailed description of Rockley's consumer wearables technology, specifically stating, *inter alia*, "[w]e're also designing the electronics and ASIC controller on the back of our module." ¶207.  In August 2021, Rickman told investors that the "pre-alpha devices from a physical hardware perspective will be the devices to go-to-market for our customers," further noting that the devices "will go into our customers['] wearables," before going "through another set of human trials." ¶141.  In November 2021, Rickman represented that there were no "meaningful hurdles remain[ing] from a technology standpoint," specifically stating that "what's been critical here is the

- 16 -

delivery of that benchtop performance in the miniaturized spectrophotometer chip format." ¶153.  In January 2022, Rickman stated that Rockley had secured "deep design wins and commitments" from its consumer wearables customers and was "negotiating, volume [purchase orders]" with such customers, who had supposedly "validated" "[e]verything." ¶162.

The above statements convey an in-depth understanding of, and involvement with, the development and commercialization processes for Rockley's consumer wearable products.  Given Plaintiffs' allegations that the truth regarding such processes was "completely at odds with" Defendants' statements, Defendants "must have known they were not reporting the truth – there is no middle ground between the two positions." *QuantumScape*, 580 F. Supp. 3d at 741; *see also Reese*, 747 F.3d at 572 ("the inference that [Defendants] did not have access to the [misrepresented] data is directly contradicted by the fact that [they] specifically addressed it in [their] statement").[3]

***Second***, Plaintiffs allege specific facts confirming that Defendants had access to, and direct knowledge of, the allegedly misrepresented and omitted facts.  ¶¶202-216.  These facts include allegations that: (i) "Rockley's Vice President of Integrated Circuit Design provided regular progress reports regarding the development of the new ASIC chipset ***directly to Rickman***" (¶211); (ii) "the Former Chip Designer ***personally gave a presentation to Rickman*** regarding the reasons why successful completion of the new ASIC chipset was necessary in order to make Rockley's consumer wearables technology commercially viable" (*id.*); (iii) Rickman attended a meeting that included a presentation "emphasizing the fact that Rockley's consumer wearable OEM customers required smaller, cheaper products, which required successful implementation of the new ASIC chipset" (*id.*); and (iv)

---

[3]  Defendants also made detailed factual statements regarding Rockley's relationships with HRT and Apple, which Plaintiffs similarly allege to be materially false and misleading.  *See, e.g.*, ¶¶128, 136-137, 143, 145.

- 17 -

Rickman signed the JV Agreement, which established a substantial Rockley presence within HRT's management team, and required HRT to "actively monitor" compliance with export control laws and hire a "qualified compliance officer" to actively manage ongoing export control compliance (¶¶202-203). *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information").

*Third*, Rickman and Karanth were both heavily incentivized to materially misrepresent Rockley's prospects in order to complete the Merger, as doing so would result in a *$775,000 cash bonus* for Karanth and an award "with an aggregate value of *$4.5 million*," including *$1.5 million in cash*, for Rickman – in addition to substantial salary increases for both. ¶¶51-52, 228; *see Tellabs*, 551 U.S. at 32 ("personal financial gain may weigh heavily in favor of a scienter inference"); *see also QuantumScape*, 580 F. Supp. 3d at 741-42 (finding, in a SPAC case, that scienter was supported by defendant's motive to "raise[] hundreds of millions of dollars," which created a "financial incentive to represent that its [products] were farther along and less risky than they actually were").

*Fourth*, the temporal proximity between Defendants' material misrepresentations and the disclosure of information undermining them further supports a strong inference of scienter. For example, just *one month* after Defendants made detailed factual representations regarding HRT, *without* disclosing known material risks concerning HRT's future viability, Rockley disclosed that it would no longer proceed with sales to HRT, lowering its revenue guidance for 2021 and 2022 as a result. ¶¶71-82, 145, 221. Similarly, *less than three months* after Rickman made detailed representations regarding the current status of Rockley's consumer wearables product development, Defendants stunningly announced that Rockley was withdrawing all 2023 revenue guidance based on such products and shifting its focus away from the consumer wearables market Defendants had

- 18 -

4896-0177-1958.v1

previously touted. ¶¶173, 177-187, 221. And just *four months* after Rickman represented that Rockley's "overall business prospects" were "stronger than they have been," and just *one month* after Meier represented that Rockley's "cash flow and . . . balance sheet" put the Company "in a position to move forward in an aggressive fashion," Rockley began the process of negotiating a pre-packaged plan of reorganization, which culminated in Rockley filing for bankruptcy in January 2023, less than 18 months after closing the Merger. ¶¶116-117, 185, 192, 221.

As the Ninth Circuit has held, "[t]emporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese*, 747 F.3d at 574-75 (finding inference of scienter "bolster[ed]" where "the statements and the contradictory disclosures are separated by three to six months"); *see also*, *e.g.*, *Snap*, 2018 WL 2972528, at *5 (finding inference of scienter based on "fact that [the defendant] allegedly changed its position three months after [the alleged misrepresentation]"); *Roberti*, 2015 WL 1985562, at *11 (finding temporal proximity of "less than six months" to be supportive of scienter).

*Fifth*, contrary to Defendants' assertions, the resignations of Rickman and Karanth were both "'accompanied by suspicious circumstances'" (*see* Mot. at 20), thus further bolstering the strong inference of their scienter. ¶¶223-225. Specifically, Karanth resigned less than two months before Rockley stunned investors by completely withdrawing its revenue guidance for 2023. ¶¶107, 223. As CFO, Karanth was responsible for Rockley's revenue guidance, and thus his resignation immediately prior to the Company's complete retraction of that guidance provides strong circumstantial evidence of his scienter. Indeed, one analyst expressly noted the suspicious timing of his departure by stating that Karanth's departure "does not help as to the optics of this shift in focus and revocation of guidance." ¶¶109, 223.

- 19 -

The resignation of Rickman, Rockley's founder and longtime leader, contemporaneously with the commencement of the Company's negotiations regarding its reorganization plan – and approximately one month before the Company ultimately filed for bankruptcy – is similarly suspicious. ¶¶28, 114-117, 224. The suspicious nature of Rickman's resignation is further bolstered by his reappointment to the position of CEO following Rockley's emergence from bankruptcy proceedings, along with a new lucrative equity incentive plan, which allowed Rickman to minimize the amount of scrutiny he faced in connection with the bankruptcy without suffering the significant financial consequences that befell Rockley's investors. ¶¶28, 121, 224-225.

Numerous courts have found that suspiciously timed corporate resignations, like those of Rickman and Karanth, add to the inference of scienter. *See, e.g.*, *Frank v. Dana Corp.*, 646 F.3d 954, 960 (6th Cir. 2011); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *7 (C.D. Cal. Jan. 26, 2021); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009); *In re China Med. Sec. Litig.*, 2012 WL 5713399, at *4 (C.D. Cal. May 10, 2012).

***Sixth***, Rickman's scienter is bolstered by his blatantly evasive responses to multiple pointed analyst questions concerning the allegedly misrepresented and omitted facts. *See, e.g.*, ¶¶181-187, 193-196. Specifically, instead of responding in any meaningful way to direct questions regarding Rockley's complete withdrawal of its 2023 revenue guidance, the apparently sudden evaporation of Rockley's consumer wearables market, and the disappearance of purportedly "committed" NRE revenue Defendants had previously touted, Rickman provided opaque responses clearly intended to obfuscate the issues and avoid directly revealing the falsity of Defendants' misrepresentations. *Id.* As such, Rickman's self-serving responses and lack of transparency provide further indicia of his deceptive intent. *See S. Ferry*, 542 F.3d at 784 ("courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-

- 20 -

4896-0177-1958.v1

sense perspective"); *In re Terayon Commc'ns Sys., Inc.*, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002) (holding that "defendants' evasive responses further support a strong inference of scienter").

***Finally***, the strong inference of scienter is further supported by the fact that the alleged misrepresentations concerned the most critical aspects of Rockley's business, operations, and general wellbeing: the viability of its only two actual revenues streams; the development and commercialization of its core product, which provided the sole basis for its future revenue projections; and the ability of the Company to stave off bankruptcy. ¶¶217-220. The Ninth Circuit has recognized that it is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies." *Reese*, 747 F.3d at 569. As such, the Ninth Circuit has held that "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances": (1) "the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the *Tellabs* standard"; (2) "the allegations 'may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information'"; and (3) "such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 575-76.

Here, all three of the above circumstances apply. First, as detailed above, the Complaint alleges numerous other facts that raise a strong inference of scienter when viewed holistically with the alleged facts regarding Defendants' roles within the Company. Second, as the Ninth Circuit has held, "'actual access to the disputed information'" can be found where Defendants' "statements are specific and reflect . . . access to the disputed information." *Id.* at 576-77. As detailed above, Defendants made several such statements here, and Plaintiffs also allege specific

- 21 -

4896-0177-1958.v1

facts confirming that Defendants had access to the allegedly misrepresented facts. ¶¶128, 140-143, 148-156, 162-163, 169-170, 173-174, 179, 192, 202-216.  Third, the nature of the misrepresented information – which directly pertained to the most fundamental and existential concerns facing Rockley, and was the focus of nearly all of Defendants' public comments during the Class Period – was clearly so "fundamental to operations of [Rockley's] business," that it "would be 'absurd' to suggest that management was without knowledge of the matter[s]." *Reese*, 747 F.3d at 576; *see also Berson*, 527 F.3d at 987, 989 (finding scienter adequately alleged, despite the fact that "plaintiffs allege[d] no particular facts indicating that [defendants] actually knew about the [misrepresented information]," because the "facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them"); *Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1178 (E.D. Wash. 2010) ("[S]ome events are so integral to the operations of a company that knowledge thereof cannot be denied by senior executives.").

Defendants' attempts to debunk the above allegations in isolation are both ineffective and improper.  Mot. at 17-20.  When "'taken collectively'" and "viewed holistically," as required by Supreme Court and Ninth Circuit authority, such allegations easily raise an inference of scienter that is "'cogent and ***at least as compelling*** as any opposing inference of nonfraudulent intent.'" *Reese*, 747 F.3d at 568-69, 575.

### D.   The Complaint Alleges Claims Under Section 20(a)

Defendants do not challenge the adequacy of Plaintiffs' control person allegations under §20(a), and have thus waived any ability to raise such arguments in connection with the Motion.  Mot. at 20; *Sydanmaa*, 2021 WL 1593249, at *1. Instead, Defendants argue only that such claims should be dismissed because Plaintiffs fail to allege a primary violation under §10(b).  Mot. at 20.  As set forth above, this argument fails. Thus, all Defendants are liable under §20(a).

- 22 -

## IV.  CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Motion be denied.  In the event the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend the Complaint in order to cure any deficiencies identified by the Court, given that this is the first adjudication of any complaint in this action. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

DATED:  April 10, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
NATHAN R. LINDELL
KEVIN S. SCIARANI

s/ Nathan R. Lindell
NATHAN R. LINDELL

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiffs Jonathan Lottner and Federico Huergo, certifies that this brief contains 6,914 words, which complies with the word limit of L.R. 11-6.1.

DATED:  April 10, 2024

s/ Nathan R. Lindell
NATHAN R. LINDELL

- 23 -

4896-0177-1958.v1