ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL (248668)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KENNETH S. GROSSMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DAVID SIN, et al., <br><br> Defendants. | Case No. 2:23-cv-09501-MRA-MAA <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT COLOMA'S MOTION TO DISMISS <br><br> Date:        November 21, 2024 <br> Time:        1:30 p.m. <br> Courtroom:  10B |

4885-4113-3043.v1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................... 1

II. RELEVANT FACTUAL BACKGROUND ..................................................... 2

    A.  SC Health ........................................................................................... 2

    B.  The Merger Announcement ................................................................. 4

    C.  The Proxy ........................................................................................... 8

    D.  Coloma's Professed Due Diligence ...................................................... 9

III. ARGUMENT ............................................................................................... 10

    A.  The Complaint Alleges Actionable Misrepresentations Made by Coloma .............................................................................................. 10

        1.  Coloma's Attempts to Avoid Liability Are Meritless .............. 13

            a.  Coloma's Statement that Rockley Was "Poised for Substantial and Imminent Commercial Growth" Was Not Puffery ................................................................. 13

            b.  Coloma's Purported "Opinion" that Rockley Was "Poised for Substantial and Imminent Commercial Growth" Was Materially False and Misleading ............. 15

            c.  Coloma's Statements Regarding Rockley's Revenue Projections and Product Development Timelines Are Not Protected by the PSLRA Safe Harbor ................................................................................ 16

    B.  The Complaint Alleges a Strong Inference of Scienter as to Coloma .............................................................................................. 18

    C.  Coloma is Liable Under Section 20(a) ............................................... 22

IV. CONCLUSION ............................................................................................ 22

4885-4113-3043.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................. 10

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ................................................................................ 22

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ................................................................................ 19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ............................................................................. *passim*

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ...................................................... 11

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .................................................................... 17

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................ 13, 15

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...................................................................... 14, 16, 18

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ............................................................ 16, 17, 21

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) .......................................................... 10

*In Re Stable Rd. Acquisition Corp.*,
2022 WL 2762213 (C.D. Cal. July 13, 2022) ........................................................ 17

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................... 13

- ii -

**Page**

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ................................................................... 10, 18, 19

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ......................................................................... 19, 21

*SEC v. DeFrancesco*,
683 F. Supp. 3d 367 (S.D.N.Y. 2023) ................................................................. 18

*Sydanmaa v. L.A. Police Dep't*,
2021 WL 1593249 (C.D. Cal. Mar. 16, 2021) .................................................... 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ..................................................................................... 19, 21

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)..................................................... 15

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ................................................................................. 14

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b) ................................................................................................................ 22
§78t(a)................................................................................................................. 22

4885-4113-3043.v1

Lead Plaintiffs ("Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss filed by defendant Coloma ("Motion" or "Mot.") (ECF 84).[1]

## I.    INTRODUCTION

The claims against Coloma are based upon material misrepresentations he made to investors in order to ensure that a de-SPAC acquisition organized by the company for which he served as CEO would receive shareholder approval, resulting in more than $67 million worth of financial benefits for Coloma and his associates. The time period to complete the transaction was about to expire, which would have resulted in Coloma's financial incentives expiring worthless.  As such, he was highly incentivized to say and do whatever he could to ensure that the deal was approved, which led Coloma to tell investors that the acquisition target – a private company that he had been entrusted to thoroughly investigate – was "poised for ***substantial and imminent*** commercial growth" and would see its revenues explode from $79 million in 2022 to $426 million in 2023 and $1.125 billion in 2024, despite Coloma's awareness of information directly contradicting such claims.

Coloma's Motion contends that he should not be held liable for his material misrepresentations because they were: (1) mere corporate puffery; (2) statements of opinion that are not alleged to be false; and/or (3) forward-looking statements protected by the PSLRA's safe harbor.  In addition, Coloma argues that the Complaint fails to allege a strong inference that he was at least deliberately reckless when making the alleged misrepresentations.  As further detailed herein, none of these arguments support dismissal of the claims against Coloma.

---

[1]    Unless otherwise noted: all capitalized terms have the same meanings as defined in the Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 56); all "¶_" or "¶¶_" references are to the Complaint; all emphasis is added; and citations and footnotes are omitted.

- 1 -

First, the specific words Coloma chose to use, as well as the context in which his statement was made, prevent any finding that his statement about Rockley's "substantial and imminent commercial growth" was mere puffery.  Second, even if that statement is treated as a pure statement of opinion – which it was not, given that it conveyed concrete facts regarding the present state of affairs at Rockley – it is nonetheless actionable because the Complaint alleges it "did not 'fairly align[] with the information in [Coloma's] possession at the time.'"  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 779 (9th Cir. 2023).  Third, his forward-looking statements are not protected by the safe harbor because they were false and misleading, unaccompanied by meaningful cautionary language, and made with actual knowledge of their false and misleading nature.  Finally, Coloma had actual access to the misrepresented and omitted facts, which – combined with his incentive to mislead investors – gives rise to a strong inference that he acted with at least deliberate recklessness.  As such, the Motion should be denied in its entirety.

## II.      RELEVANT FACTUAL BACKGROUND

### A.      SC Health

SC Health was a special purpose acquisition company, or a "SPAC," otherwise known as a "blank check" company.  ¶¶1, 41.  Like most SPACs, SC Health was formed for a singular purpose: to raise money from investors through an IPO and then use those funds to acquire a private business that it could take public through a business combination known as a de-SPAC transaction.  *Id.*  At all relevant times, Coloma served as CEO and a director of SC Health, in addition to serving as Managing Director-Investments for defendant SINCap and a Director of SC Health Group Limited.  ¶27.

SINCap is a Pan-Asia multi-asset professional investment firm based in Singapore.  ¶34.  At all relevant times, SINCap was controlled by defendants Coloma and Sin, who in turn controlled three entities that played critical roles in the Merger:

- 2 -

4885-4113-3043.v1

SC Health; SC Health Holdings Limited, which served as SC Health's "Sponsor"; and SC Health Group Limited, which wholly owned the Sponsor.  ¶¶34, 36-38.

In July 2019, the Sponsor Defendants took SC Health public via an IPO.  ¶42. As is typically the case with SPACs, SC Health's investors relied heavily upon the skill, transparency, and diligence of Coloma and the other Sponsor Defendants when deciding to invest in SC Health.  ¶¶41-42.  Among other things, the offering documents represented that Coloma would "maintain . . . a hands-on approach to all aspects of strategy and operation," "capitalize on . . . [his] experience and networks," and "conduct a thorough due diligence" that would include, among other things, "meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial, operational, legal and other information."  ¶42.

The IPO materials also set forth specific "Business Combination Criteria" for SC Health's eventual target company, which included "a history of free cash flow generation and profitability."  ¶43.  In addition, the offering documents required that the business combination be approved by a vote of SC Health's shareholders within 18 months of the IPO.  ¶44.  SC Health's investors were also afforded the right to redeem their shares – for an amount equal to the full cost of their investment – at any time prior to the successful completion of the acquisition.  *Id.*  Any such redemptions would have the effect of both shrinking the investment pool to be received by the target company and decreasing the chances that the acquisition would be approved.  *Id.*

If Coloma and the Sponsor Defendants succeeded in getting investor approval for an acquisition within the allotted time frame, they stood to be richly rewarded. ¶45.  Specifically, for an aggregate purchase price of $25,000, SC Health had issued "founder shares" and private placement warrants to the Sponsor and its insiders, which were valued, as of July 20, 2021, at ***$55.4 million*** and ***$12.1 million***, respectively.  *Id.*  Importantly, however, if an acquisition was not completed within

- 3 -

the allotted time frame, SC Health was required to return *all* of the investor capital it had raised through the IPO (plus interest) and the Sponsor Defendants' lucrative financial incentives would *expire worthless*.  ¶¶44-45.  As a result, Coloma was highly incentivized to convince shareholders to approve an acquisition within the allotted time frame.

As of December 22, 2020, less than one month before the January 16, 2021 deadline to complete an acquisition, the Sponsor Defendants had yet to publicly identify an acquisition target.  ¶46.  Thus, they scheduled a January 12, 2021 proxy vote requesting shareholder approval for a three-month extension of the acquisition deadline.  On January 5, 2021, SC Health announced it had signed a "'non-binding letter of intent'" with an unnamed "'Target'" company.  SC Health's shareholders subsequently approved the request to extend the acquisition deadline to April 16, 2021, thereby preserving Coloma and the Sponsor Defendants' ability to collect their valuable founder incentives through a potential merger.  ¶¶46-48.

### B.     The Merger Announcement

The unnamed "'Target'" would later be identified as Rockley, a company with a history of recurring losses and significant accumulated debt, which claimed to have developed a photonic chipset module capable of continuously and non-invasively monitoring multiple biomarkers, such as blood pressure and glucose.  ¶¶47, 59-61. Rockley's initial plan was to target the consumer markets by selling its chipset module to original equipment manufacturers ("OEMs") of consumer wearable devices, such as Apple, for incorporation into those customers' product offerings, such as smartwatches.  ¶¶62-63.  Although Rockley did not meet SC Health's stated criteria of having a "history of free cash flow generation and profitability," Coloma and the Sponsor Defendants were highly incentivized to complete a business combination and running out of time to do so.  ¶43.

On March 19, 2021, less than one month before the extension was set to expire, the Sponsor Defendants and Rockley issued a joint press release and held a

- 4 -

joint investor call (the "Merger Announcement Call") promoting the proposed Merger.  ¶¶49, 122-131.  That same day, SC Health filed with the SEC a Form 8-K signed by Coloma, which attached the press release, a transcript of the Merger Announcement Call, and a copy of the slide presentation (the "Merger Announcement Presentation") used during the call.  ¶¶122-123.

Given the limited time remaining to complete the Merger, it was critical for Coloma and the other Defendants to use the events of March 19, 2021 to curry favor with investors, as failing to gain investor approval for the proposed Merger would all but ensure that Defendants' massive financial incentives would expire worthless. ¶226.  Among other things, the press release included quoted remarks from Coloma, which emphasized his knowledge of Rockley's technology and commercial prospects as a basis for SC Health's support for the Merger, stating in pertinent part:

> "We are healthcare investors, and we ***very quickly understood the transformational nature of Rockley's technology*** and the way it will revolutionize consumers' ability to track, monitor and better understand their day-to-day health and wellness.  Based on Rockley's large addressable market, world-class team, and the myriad applications that their silicon photonics platform enables, we view Rockley as one of the most compelling opportunities in the entire healthcare space."

ECF 85-1 at 7.

Coloma then opened the Merger Announcement Call by expanding on his understanding of Rockley's technology and business prospects, stating in pertinent part:

> Rockley has developed a photonic sensing platform that we believe is transformational versus existing technology in terms of its range, accuracy, and efficiency, among other things, but its applications in health and wellness is what excites us as healthcare investors, in the

- 5 -

near term, as a key component in consumer wearable devices such as smartwatches, fitness bands, and mobile devices . . . .

ECF 65-3 at 78.[2]  In addition, Coloma touted the fact that Rockley's "strategic partnerships" included "one of the largest technology companies in the world, that [has] stated that it views health and wellness as critical to their product offerings." ECF 65-3 at 78.  Based on these comments, Coloma then told investors: "We believe the company is poised for ***substantial and imminent commercial growth***, which is why we are happy to bring Rockley to the listed markets now rather than later." ¶129.

The Merger Announcement Presentation shared during the call bore the logos of both SC Health and Rockley and identified Coloma as one of four presenters. ECF 85-2 at 12, 15.  Among other things, the presentation represented that the "commercial launch" of Rockley's consumer wearable chipset module (the "Chipset Module") was expected in 2022 and would be followed by "[s]ignificant revenue increases from 2023 onwards, on the back of commercial adoption by consumer technology manufacturers."  *Id.* at 36, 46; *see also* ¶125.  Specifically, the presentation projected Rockley's revenues to increase from $79 million in 2022 to $426 million in 2023 and $1.125 billion in 2024. ¶124.[3]  The Merger Announcement Presentation also shared an illustration of the Chipset Module's components, which purportedly included an "ASIC Controller."  ECF 85-2 at 20.  Additionally, the presentation represented that Rockley's technology had been "***[v]alidated*** by [l]eading [b]lue-[c]hip [c]ustomers" and highlighted a purported "$70M+ NRE

---

[2]  Coloma submitted the March 19, 2021 press release and Merger Announcement Presentation with his request for judicial notice, but his submission curiously omitted the Merger Announcement Call transcript that accompanied those materials as an attachment to the March 19, 2021 Form 8-K signed by Coloma.  *See* ECF 85.

[3]  The Merger Announcement Presentation further broke down Rockley's expected revenues for 2023 and 2024 by customer, attributing ***nearly 30%*** of the expected revenues for those years to revenue from Apple.  ¶125.

- 6 -

4885-4113-3043.v1

committ[ment] by a leading developer of smartphones, smart watches, and consumer electronics" (Apple). *Id.* at 26; ¶127.

Coloma's March 19, 2021 representations convincingly painted Rockley as a company poised for "*imminent*" commercialization and explosive revenue growth on the back of Rockley's "leading blue-chip customers[']" commercial adoption of the Company's supposedly "*[v]alidated*" technology. ¶¶124-129. Unfortunately for investors, however, that picture was painted on a canvas of lies, as the undisclosed truth was that Rockley: had yet to create an actual Chipset Module capable of being "[v]alidated" by its customers; was nowhere close to experiencing "substantial and imminent commercial growth"; and had no hope of realizing "[s]ignificant revenue increases" by 2023. *See* ¶131.

Indeed, at the time of the Merger announcement, Rockley had yet to even **begin** its efforts to develop a critical component for its Chipset Module: a new ASIC chipset that was essential to Rockley's efforts to create a commercially viable module that could fit inside existing devices from consumer wearable OEMs. ¶¶93-102. This new chipset required **at least 15-24 months** to develop, **after which** the completed product would need to be subjected to multiple rounds of human studies, qualified by consumer wearable OEMs, and then incorporated into such customers' own product designs, **before** being included in any such customers' product offerings, which precluded any possibility that Rockley's Chipset Module would be incorporated into OEM customers' 2023 product launches. *Id.* Indeed, by March 19, 2021, Rockley had yet to even **hire** the person responsible for architecting this critical component – and, in fact, would not do so until December 2021, more than eight months after Coloma told investors Rockley was poised for "**imminent commercial growth**." *Id.*

The Merger Announcement Presentation's revenue projections for 2023 and 2024 were also false and misleading for the additional reason that they relied on significant revenue contributions (nearly 30% of Rockley's total expected revenue

- 7 -

4885-4113-3043.v1

for each year) from Apple, which had informed Rockley that its potential product incorporating Rockley's technology was not expected to hit the market until 2026. ¶84. In addition, Coloma and the other Defendants failed to disclose that significant portions of Rockley's projected revenues for 2021 and 2022 – specifically, those revenues attributable to HRT, a joint venture Rockley had formed with a Chinese company, Hengtong – were at substantial risk of going away, due to the likelihood that U.S. regulators would soon preclude Hengtong from doing business with U.S. companies, as a result of Hengtong's 2020 acquisition of a company that had previously been placed on the U.S. government's banned "Entity List." ¶¶71-80.

## C. The Proxy

On July 22, 2021, SC Health filed with the SEC a Form 424B3 joint prospectus and proxy statement regarding the Merger (the "Proxy"), which was signed by defendant Coloma. ¶¶45, 132. The primary purpose of the Proxy was to solicit SC Health investors' approval for the Merger based on the recommendation from Coloma and the other Sponsor Defendants that they do so. ¶132. The Proxy supported this recommendation by, among other things: (i) reiterating the 2022-2024 revenue projections from the Merger Announcement Presentation; and (ii) telling investors that Rockley planned to "start ***delivering final samples*** [of its Chipset Module] to customers in the ***first half of 2022*** with production ramp of these products commencing in the ***second half of 2022***." ¶¶133, 135. These representations continued to be false for the same reasons as detailed above – namely, because Rockley had yet to even commence the process of developing the essential ASIC chipset, which meant there was no possibility that Rockley could deliver final samples of a commercially viable Chipset Module to OEM customers in 2022 or have the Chipset Module incorporated into such customers' 2023 product offerings. ¶138.

- 8 -

4885-4113-3043.v1

In addition, the Proxy specifically touted the significance of Rockley's projected revenues from HRT, while continuing to conceal the known material risks that substantially imperiled the viability of those revenues.  ¶¶136, 138.

### D.   Coloma's Professed Due Diligence

Based on Coloma's affirmative assurances that he had thoroughly investigated Rockley's operations, financial prospects, and customer relationships, there is no doubt that he was aware of the undisclosed facts regarding the actual development timeline for Rockley's Chipset Module and the nature of Rockley's relationships with Apple and HRT.  ¶230.  This is particularly true given the critical significance of the Chipset Module and the Apple/HRT revenues to Rockley's financial prospects.  Indeed, at the time of Coloma's due diligence, Apple and HRT were the *only two* actual revenue streams Rockley had, and the development of the Chipset Module provided the *sole basis* for Rockley's revenue projections for 2023 and beyond.  ¶¶217-219.  As such, even a cursory investigation of Rockley's operations, financial prospects, and customer relationships would have undoubtedly focused on the topics of the alleged misrepresentations detailed above.

But Coloma's professed due diligence was far from cursory.  Among other things, Coloma represented that his due diligence of Rockley would include "meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial, operational, legal and other information."  ¶42.  As detailed in SEC filings, these efforts specifically included "*a three-hour virtual lab tour and product demonstrations which included Q&A on the technology*," as well as "several third-party *interviews of Rockley's customers*, suppliers, and existing investors, and non-affiliated silicon photonics industry experts" and "in depth *technical diligence* of Rockley's . . . *in-house engineering capabilities*."  ECF 85-4 at 216.  In addition, Coloma specifically spoke about Rockley's technology, commercial prospects, and

- 9 -

4885-4113-3043.v1

relationship with Apple in his March 19, 2021 representations to investors, further confirming his awareness of the facts underlying those specific topics.

## III.    ARGUMENT

To defeat the Motion, the Complaint "'must contain sufficient factual matter, *accepted as true*, to "state a claim to relief that is plausible on its face."'" *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *3 (C.D. Cal. June 7, 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In deciding a 12(b)(6) motion, the Court must accept all allegations of material fact stated in the complaint as true . . . [and] *draw all reasonable inferences in favor of the nonmoving party*." *Id.* at *4.

"To state a securities fraud claim, plaintiff must plead: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014). Coloma challenges only the first two of these elements: falsity and scienter. Mot. at 11-29.

### A.    The Complaint Alleges Actionable Misrepresentations Made by Coloma

To plead falsity, Plaintiffs must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *Reese*, 747 F.3d at 568 (alteration original). Such allegations, however, need only satisfy "the *reasonable inference* standard of plausibility." *Glazer*, 63 F.4th at 766 (emphasis original). Thus, falsity is adequately pled where Plaintiffs allege "sufficient factual matter, accepted as true . . . [to] allow[] the court to draw the reasonable inference that the defendant [made a misleading statement]." *Ashcroft*, 556 U.S. at 678. In the Ninth Circuit, "a statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Here, the Complaint easily satisfies these requirements by

- 10 -

4885-4113-3043.v1

identifying multiple misstatements made by Coloma and detailing the specific reasons why such statements were false or misleading at the time they were made. *See* ¶¶122-125, 127, 129, 131-138.

While Coloma acknowledges that the Complaint identifies his affirmative statement that Rockley was "'poised for substantial and imminent commercial growth'" as an alleged misstatement, he curiously contends that he "can only theorize about additional allegations against him." Mot. at 12, 15; *see also* ¶¶129, 131. But the Complaint requires no such speculation on Coloma's part. In addition to the affirmative misstatement made by Coloma during the Merger Announcement Call, the Complaint clearly identifies several misrepresentations made in documents that were filed with the SEC and signed by Coloma. *See* ¶¶122-125, 127, 132-137.

Specifically, these alleged misrepresentations include: (i) statements made in the Merger Announcement Presentation, which bore SC Health's logo, identified Coloma as one of the presenters, and was attached to a Form 8-K signed by Coloma; and (ii) statements made in the Proxy, which was similarly signed by Coloma. *Id.* As the signer of such documents, Coloma is liable for the alleged misrepresentations contained therein, and the Complaint leaves no doubt as to which specific statements within such documents are alleged to be false and misleading. *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *16 (C.D. Cal. Aug. 8, 2013) ("[A]n individual defendant's signature on a document containing actionable misrepresentations is a sufficient basis upon which to hold that defendant liable.") (collecting cases).[4]

The Complaint further details the specific reasons why each statement attributed to Coloma was materially false or misleading at the time it was made.

---

[4] Moreover, the basis for Plaintiffs' claims against Coloma concerning such alleged misrepresentations was explained to Coloma's counsel during the parties' pre-motion conference pursuant to Local Rule 7-3, further removing any purported confusion on Coloma's part as to the claims asserted against him.

- 11 -

¶¶131, 138. With regard to Coloma's statement that Rockley was "poised for **substantial and imminent commercial growth**," the Complaint alleges this statement was false and misleading because Rockley was nowhere close to commercializing its Chipset Module at the time, given that it had yet to even begin the 15-24 month process of developing the critical ASIC chipset required to fit the module inside OEM customers' wearable devices, after which time the Chipset Module would need to be subjected to multiple rounds of human studies, qualified by Rockley's customers, and then incorporated into such customers' own product designs, **before** being included in any customers' product launches. ¶¶93-95, 97, 131(a).

These same facts are similarly alleged to have rendered false and misleading: (i) the Merger Announcement Presentation's representation that the "commercial launch" of Rockley's Chipset Module was expected in 2022 (¶131(a)); (ii) the Proxy's representation that Rockley planned to "start delivering final samples [of its Chipset Module] to customers in the first half of 2022 with production ramp of these products commencing in the second half of 2022" (¶138(a)); and (iii) the revenue projections included in both the Merger Announcement Presentation and the Proxy (¶¶131(b), 138(b)).[5]

The revenue projections set forth in the Merger Announcement Presentation and the Proxy are also alleged to be materially false and misleading for the additional

---

[5] Coloma's contention that, because it was plausible for Rockley to develop the ASIC chipset by "late 2022 or early 2023," it was similarly plausible that Rockley "could generate significant consumer wearable sales in 2023" ignores the allegations of the Complaint. *See* Mot. at 27-28. As detailed above, the Complaint alleges that development of the ASIC chipset was just the first of many hurdles Rockley needed to clear before the Chipset Module could be incorporated into customers' product offerings, and that the time needed to complete **all** of those activities precluded any possibility of the Chipset Module being incorporated into customers' 2023 product launches, which occurred at the start of the year. *See* ¶¶93-95. These allegations are corroborated by Defendants' statements confirming the need to complete these activities, and the time required to do so, which Coloma was undoubtedly aware of based on his discussions with Rockley's management and customers. ¶¶135, 140-141, 148-150, 163, 165, 183, 230.

- 12 -

4885-4113-3043.v1

reasons that they: (i) assumed significant revenue from Apple in 2023 and 2024, despite the fact that the product Rockley was working to develop for Apple was not expected to hit the market until 2026 (¶¶84, 92-95, 97, 131(f)); and (ii) failed to disclose that Rockley's HRT revenues were facing a substantial risk of going away due to the likelihood that U.S. regulators would soon preclude Hengtong from doing business with U.S. companies (¶¶71-80, 131(g)).

The Complaint further alleges that the Merger Announcement Presentation's statement that Rockley's Chipset Module had been "***[v]alidated***" by Rockley's customers was false and misleading because the actual Chipset Module such customers would ultimately be purchasing from Rockley had yet to be created. ¶130(c).

Lastly, the Complaint alleges that the Proxy's representations touting the significance of Rockley's projected revenues from HRT were false and misleading because they concealed known material risks that substantially imperiled the viability of such revenues.  ¶138(e).

### 1.    Coloma's Attempts to Avoid Liability Are Meritless

#### a.    Coloma's Statement that Rockley Was "Poised for Substantial and Imminent Commercial Growth" Was Not Puffery

Coloma's argument that his statement that Rockley was "'***poised for substantial and imminent commercial growth***'" was mere puffery is unavailing. *See* Mot. at 12-13.  "[D]etermining whether a given statement is material [*i.e.*, not puffery] 'entail[s] fact-intensive assessments that are more properly left to the jury.'" *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (some alterations original).  Thus, a statement can only be characterized as puffery if it is "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  Here, that is clearly not the case.

- 13 -

4885-4113-3043.v1

Coloma attempts to frame his statement as a "tepid statement of general optimism about Rockley's future growth" by recasting it as merely contending that Rockley was "poised to grow" or "positioned to grow in the future." Mot. at 13. But that is *not* what Coloma said. Instead, he said that Rockley was "poised for *substantial and imminent* commercial growth." ¶129. The inclusion of the words "substantial and imminent" cannot be ignored, as they conveyed a high level of certainty about the present state of affairs at Rockley. Indeed, *Meriam-Webster* defines the word "imminent" to mean "*ready to take place*" or "*happening soon*." *Imminent*, Meriam-Webster (https://www.merriam-webster.com/dictionary/imminent). As such, contrary to Coloma's claims, his statement conveyed a "concrete description" of the present state of affairs at Rockley – namely, that Rockley was ready *at that time* to experience "substantial" commercial growth – which "'differ[ed] in a material way from the one that actually exist[ed],'" for the reasons detailed above. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (emphasis original); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 958 (9th Cir. 1996) (finding statement that "FDA approval of the [company's] drug was 'imminent'" properly alleged to be false and misleading when "there was no chance for timely FDA approval").

Moreover, as the Ninth Circuit has held, even "'general statements of optimism, *when taken in context*, may form a basis for a securities fraud claim.'" *Glazer*, 63 F.4th at 770. Here, the context of Coloma's misstatement further enforces the concrete nature of the message it conveyed to investors. As detailed above, the statement was made about a private company that Coloma had been entrusted by SC Health investors to thoroughly investigate. ¶¶41-42. In addition, it was preceded by other statements from Coloma, which provided the purported basis for his belief that Rockley was "poised for substantial and imminent commercial growth" – namely, the specific capabilities of the technology Rockley had "developed" and the "strategic partnerships" Rockley had in place at the time. ECF

- 14 -

4885-4113-3043.v1

65-3 at 78.  And contrary to Coloma's assertion that the statement "did not promise anything concrete in terms of Rockley's growth/revenue metrics or timeline" (Mot. at 13), it was provided at the outset of an investor call that included a presentation containing detailed financial projections and product development timelines.  ¶¶123-125.

Based on the context of Coloma's misstatement and the specific words used, it cannot be said that his statement was "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'"  *Impac*, 554 F. Supp. 2d at 1096.  As such, Coloma's puffery argument fails.[6]

> **b.      Coloma's Purported "Opinion" that Rockley Was "Poised for Substantial and Imminent Commercial Growth" Was Materially False and Misleading**

Coloma also argues that his statement that Rockley was "'poised for substantial and imminent commercial growth'" is inactionable because it was prefaced with the words "'[w]e believe.'"  Mot. at 12, 14.  This argument fails for multiple reasons.

First, as explained above, Coloma's statement conveyed concrete facts regarding the present state of affairs at Rockley, which are alleged to be false and misleading.  ¶131(a).  "Simply inserting the word 'believe' in front of a statement of fact does not . . . immunize Defendants from liability" for such statements.  *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *9 (C.D. Cal. Apr. 12, 2016).

---

[6]   Coloma relatedly relies on two inapposite, pre-PSLRA opinions to contend that "'general statements of optimism do not imply a misleading projection of future results.'"  Mot. at 13-14.  This argument is misplaced, however, given the Ninth Circuit's more recent holdings that: "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim'" when they "'contravene[] the unflattering facts in [defendant's] possession'"; and opinion statements are actionable when they do "not 'fairly align[] with the information in [defendant's] possession at the time.'"  *Glazer*, 63 F.4th at 770-71.

- 15 -

4885-4113-3043.v1

Second, Coloma's argument ignores that an opinion statement is actionable when the professed opinion does "not 'fairly align[] with the information in [defendant's] possession at the time.'" *Glazer*, 63 F.4th at 771, 779 (some alterations original). As detailed above, Plaintiffs allege that Coloma's due diligence of Rockley – which included, among other things, "a three-hour ***virtual lab tour and product demonstrations*** which included ***Q&A on the technology***," as well as "several third-party ***interviews of Rockley's customers***, suppliers, and existing investors" and "in depth technical diligence of Rockley's . . . ***in-house engineering capabilities***" – provided Coloma with information regarding Rockley's product development timeline and commercial prospects that was completely at odds with his purported belief that Rockley was "poised for substantial and imminent commercial growth." *See* §II.D., *supra*; *see also* ¶¶131(a), 230. As such, even if treated as a pure statement of opinion, Coloma's alleged misstatement is actionable.

### c. Coloma's Statements Regarding Rockley's Revenue Projections and Product Development Timelines Are Not Protected by the PSLRA Safe Harbor

Coloma's argument that his statements regarding Rockley's projected revenues and the development timeline for Rockley's Chipset Module are protected by the PSLRA safe harbor also fails. Mot. at 18-25. Contrary to Coloma's assertions, these statements are not protected by the safe harbor because the Complaint alleges that they "were materially false or misleading, were not accompanied by appropriate cautionary statements, and were made with actual knowledge of their false or misleading nature." *Quality Sys.*, 865 F.3d at 1141.

"To be 'meaningful,' the cautionary language must 'identify[] important factors that could cause actual results to differ.'" *Glazer*, 63 F.4th at 780. More specifically, the "caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil' . . . [and] it must 'precise[ly]' and 'directly address' the alleged misrepresentations." *In re QuantumScape Sec.*

- 16 -

*Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (some alterations original).  Here, the purported cautionary language Coloma relies upon consists of insufficient "'vague or blanket (boilerplate) disclaimers . . . that the investment has risks.'"  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1035 (S.D. Cal. 2005).  For the most part, these purported warnings merely cautioned investors that the future is unknowable ("'assumptions and estimates . . . may not prove to be accurate'") or that success is uncertain ("'there can be no guarantee . . . that [Rockley's] products will be commercially successful'").  *See* Mot. at 18-25.

The purported warnings plainly failed to warn investors of the specific undisclosed facts that Plaintiffs allege to have rendered Coloma's statements materially false and misleading – namely, that: (i) Rockley had yet to commence development of its essential ASIC chipset, which precluded any possibility that Rockley's Chipset Module would be commercially launched in 2022 and provide a significant revenue ramp in 2023; (ii) the product Rockley was working to develop for Apple was not expected to hit the market until 2026; and (iii) Rockley's HRT revenues were facing a substantial risk of going away due to the likelihood that U.S. regulators would soon preclude Hengtong from doing business with U.S. companies.  Thus, they are insufficient to shield Coloma from liability pursuant to the PSLRA safe harbor.  *See, e.g.*, *Glazer*, 63 F.4th at 780-81 (finding cautionary language insufficient where defendant "was aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development"); *QuantumScape*, 580 F. Supp. 3d at 738 (finding cautionary language that spoke "at a high level of generality about unspecified 'delays'" to be insufficient because it failed to "adequately warn investors that [defendant] in fact did not (allegedly) have a [product] that would function as promised"); *In Re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *9 (C.D. Cal. July 13, 2022) (finding "warnings of risks that might occur" to be misleading where defendants "knew that many of those risks had already materialized or ***very likely would materialize***"); *see*

- 17 -

*also SEC v. DeFrancesco*, 683 F. Supp. 3d 367, 374 (S.D.N.Y. 2023) ("'A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'").

In addition, the Complaint clearly alleges that Coloma knew, based upon information provided to him in connection with his thorough due diligence of Rockley, that his statements regarding Rockley's projected revenues and the development timeline for Rockley's Chipset Module were materially false and misleading at the time he made them.  ¶230.[7]

### B.    The Complaint Alleges a Strong Inference of Scienter as to Coloma

"To adequately plead scienter, the complaint must 'state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind.'"  *Reese*, 747 F.3d at 568 (emphasis original).  In the Ninth Circuit, "[t]he inference must be that 'the defendant[] made false or misleading statements either *intentionally* or with *deliberate recklessness*.'"  *Id.* at 569 (emphasis and some alterations original).  "'[A]n actor is [deliberately] reckless if he had *reasonable grounds to believe material facts existed that were misstated or omitted*, but nonetheless *failed to obtain and disclose such facts* although he could have done so without extraordinary effort.'"  *Id.* (alterations original).

When assessing the element of scienter, "a court must first accept all factual allegations in the complaint as true" and "'review all the allegations holistically.'"  *Id.* at 568-69.  The "relevant inquiry" is then "'whether *all* of the facts alleged, *taken*

---

[7]    Coloma curiously contends that his "statements of present fact" also "qualif[y] for the PSLRA's safe harbor," but the safe harbor is limited to forward-looking statements, and none of the cases he cites hold otherwise – or even mention the safe harbor at all.  *See* Mot. at 25; *see also Quality Sys.*, 865 F.3d at 1141-42 ("the safe harbor is not designed to protect companies and their officials when they . . . make a materially false or misleading statement about current or past facts").  Moreover, as detailed in §III.A, *supra*, the Complaint alleges that Coloma's representations were false and misleading at the time he made them, and allegations of deliberate recklessness are sufficient to allege scienter for non-forward-looking statements, as detailed in §III.B, *infra*.

4885-4113-3043.v1

*collectively*, give rise to a strong inference of scienter, ***not*** whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 569 (some emphasis original). A strong inference of scienter is one that is "'cogent and at least ***as compelling*** as any opposing inference of nonfraudulent intent.'" *Id.* "[I]f two possible inferences – one fraudulent and the other nonfraudulent – are ***equally compelling***, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

Here, the Complaint alleges a multitude of facts that – when accepted as true and taken collectively – give rise to a strong inference that Coloma was at least deliberately reckless when making the above misrepresentations.

First, the Complaint alleges that Coloma had access to, and direct knowledge of, the allegedly misrepresented and omitted facts through his professed due diligence of Rockley. ¶230. As detailed above, Coloma's investigation included, among other things, interviews with Rockley's management and inspections of Rockley's facilities – including "a three-hour virtual lab tour and product demonstrations which included Q&A on the technology" – as well as "interviews of Rockley's customers" and "in depth technical diligence of Rockley's . . . in-house engineering capabilities." ECF 85-4 at 216; ¶230. Given the in-depth nature of Coloma's investigation, it is implausible that he was unaware of the allegedly misrepresented and omitted facts regarding the Chipset Module's development timeline and the revenue streams from Apple and HRT. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information").

This is particularly true given the critical importance of the allegedly misrepresented information to Rockley's financial prospects – the very topic SC Health investors entrusted Coloma to investigate. ¶¶41-42, 230.

- 19 -

4885-4113-3043.v1

Specifically, at the time of Coloma's due diligence, the Chipset Module was Rockley's core product and the ***sole basis*** for Rockley's revenue projections for 2023 and beyond, making it undoubtedly a focus of Coloma's investigation.  ¶¶125, 218, 230.  Moreover, the ASIC chipset component for that module was specifically referenced in the Merger Announcement Presentation and discussed by Rickman during the Merger Announcement Call, who stated at the time: "We're also designing the electronics and ASIC controller on the back of our module."  ¶207; ECF 85-2 at 20.  As such, Coloma was undoubtedly aware of Rockley's need to develop a new ASIC chipset for its Chipset Module.  Thus, it is implausible that Coloma's interviews with Rockley's management, "Q&A on [Rockley's] technology," and "in depth technical diligence of Rockley's . . . in-house engineering capabilities" would not have informed him that Rockley had yet to commence the 15-24 month process of developing this critical component for its core product.  ECF 85-4 at 216; ¶230.  Moreover, Coloma's "interviews of [Rockley's] customers" undoubtedly would have informed him that Rockley's Chipset Module would not fit into such customers' consumer wearable products without the new ASIC chipset, and that such customers would not be able to include the Chipset Module in their own product offerings until after the Chipset Module had not only been fully developed by Rockley but also subjected to multiple rounds of human studies, qualified by such customers, and incorporated into such customers' own product designs.  ¶¶94-95, 98, 230.  Moreover, because HRT and Apple were the only two actual revenue streams Rockley had at the time of Coloma's due diligence, it is similarly implausible that Coloma's interviews with Rockley's management and customers would not have revealed the allegedly misrepresented and omitted facts regarding those two customers.  ¶¶217, 219, 230.[8]

---

[8]  Coloma appears to contend that he should not be liable for knowingly misrepresenting material information regarding Rockley because he relied on Rockley for such information and "there is no allegation that Coloma (or SCH) had any better access to Rockley's internal information than did the other professionals

4885-4113-3043.v1

Coloma's scienter is further bolstered by the Complaint's allegations concerning the perverse incentive structure of the de-SPAC transaction, which created an all-or-nothing proposition that highly incentivized Coloma to do whatever it took to ensure that shareholders approved the Merger. ¶¶226-227. The Supreme Court has recognized that "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Here, Coloma and the Sponsor Defendants stood to gain ***more than $67 million*** worth of founder shares and warrants if the Merger was approved – and ***nothing*** if it was not. Moreover, by the time of Coloma's misrepresentations, the window to complete an acquisition had nearly expired, making it clear he would not receive a second chance to make a run at another acquisition target if the Merger failed. ¶226. In addition, by April 15, 2021, SC Health shareholders had redeemed 46.23% of the initially outstanding shares, putting the Merger in serious jeopardy and adding significant pressure on Coloma to justify the deal. ¶¶54, 227. As a result, Coloma had two choices: overstate Rockley's prospects to ensure that he and his associates received tens of millions of dollars' worth of rewards; or risk seeing his time and efforts founding SC Health amount to nothing. ¶¶226-227. When considered in connection with the allegations regarding Coloma's actual access to information through his thorough due diligence of Rockley, his financial incentive to misrepresent Rockley's prospects further adds to the strong inference that he was at least deliberately reckless when making the alleged misrepresentations. *See QuantumScape*, 580 F. Supp. 3d at 741-42 (finding, in a SPAC case, that scienter was supported by

working on the de-SPAC transaction." Mot. at 16. But Coloma's relative access to information compared to other individuals is irrelevant. The Complaint alleges – and the extraneous material he cites in fact confirm – that his personal involvement in due diligence provided him with "actual access to the disputed information," irrespective of what other individuals did or did not know, which is sufficient to establish his scienter. *Killinger*, 542 F.3d at 786.

4885-4113-3043.v1

defendant's "financial incentive to represent that its [products] were farther along and less risky than they actually were").

### C. Coloma is Liable Under Section 20(a)

Coloma does not challenge the adequacy of Plaintiffs' control person allegations under §20(a), and has thus waived any ability to raise such arguments in connection with the Motion. Mot. at 30; *Sydanmaa v. L.A. Police Dep't*, 2021 WL 1593249, at *1 (C.D. Cal. Mar. 16, 2021). Instead, Coloma argues only that such claims should be dismissed because Plaintiffs fail to allege a primary violation under §10(b). Mot. at 30. As set forth above and in Plaintiffs' opposition to the Rockley Defendants' motions to dismiss (ECF 67), this argument fails. Thus, Coloma is liable under §20(a).

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Motion be denied. In the event the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend the Complaint in order to cure any deficiencies identified by the Court, given that this is the first adjudication of Plaintiffs' claims against Coloma. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

DATED: October 28, 2024          Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
NATHAN R. LINDELL
KEVIN S. SCIARANI


          s/ Nathan R. Lindell
     NATHAN R. LINDELL

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ksciarani@rgrdlaw.com

- 22 -

4885-4113-3043.v1

Lead Counsel for Lead Plaintiffs

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Lead Plaintiff Jonathan Lottner and Federico Huergo, certifies that this brief contains 6,977 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 28, 2024

s/ Nathan R. Lindell
NATHAN R. LINDELL

- 23 -

4885-4113-3043.v1